No. 25-1575

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

The Sustainability Institute, *et al.*,

*Plaintiffs-Appellees,*

v.

Donald J. Trump, *et al.*,

*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the District of South Carolina

————————————

**EMERGENCY MOTION FOR STAY PENDING APPEAL AND
IMMEDIATE ADMINISTRATIVE STAY**

————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*

BRYAN P. STIRLING
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
  *Attorneys, Appellate Staff
  Civil Division, Room 7260
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, D.C. 20530
  (202) 514-3388
  sean.r.janda@usdoj.gov*

# INTRODUCTION

The government respectfully requests a stay pending appeal, and an immediate administrative stay, of a set of district-court orders that assert authority to oversee the government's determinations about when to terminate grants across a variety of statutory programs. In so doing, the district court overrode the President's Executive Orders directing his subordinates to ensure that, where legally permissible, federal funds are not being used to support activities that are inconsistent with the President's policy priorities. The district court has now entered three overlapping injunctions—an order that was entered without considering the merits, a permanent injunction that was entered on some claims, and a preliminary injunction that was entered on other claims—which require the government to restore plaintiffs' access to grant funds and which forbid the government from pausing or terminating any of thirty-two grants without first seeking authorization from the court.

Those injunctions are erroneous on all levels. Most glaringly, as the Supreme Court has recently held in a similar posture, essentially contractual claims like plaintiffs' must be brought in the Court of Federal Claims, not in district court. In nevertheless asserting jurisdiction over plaintiffs' claims,

the district court improperly disregarded that recent and instructive precedent and bafflingly recast plaintiffs' claims seeking access to grant funds as claims not founded on those grants. The district court compounded its error by failing to recognize that the agencies' decisions to enter into, pause, and terminate the grants at issue in this case are committed to agency discretion by law, as plaintiffs have failed to identify any statutory constraints on the agencies' broad discretion to allocate grant funding as they determine best to advance the purposes of the relevant federal programs.

In addition to being wrong on the merits, the district court's injunction inflicts substantial and irreparable harm on the government. It requires the government to make millions of dollars in grant funding immediately available to plaintiffs, with no assurance that the government may recover those funds if it ultimately prevails. And the injunction improperly inserts the district court between the President and his subordinates, requiring the agencies to seek preclearance from the district court before pausing or terminating grant funding.

This Court and the Supreme Court have repeatedly and recently stayed pending appeal district court orders that preclude federal agencies

from carrying out the President's directives to stop funding, where legally

permissible, programs that do not comport with the President's priorities.

*See, e.g.*, *Department of Educ. v. California*, 145 S. Ct. 966 (2025); Order,

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189

(4th Cir. Mar. 14, 2025); Order, *American Ass'n of Colls. for Teacher Educ. v.

McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025). The interference with the

President's priorities is no more warranted in this case than in those. We

request a stay pending appeal and an immediate administrative stay.

## STATEMENT

1. In the days after his inauguration, the President issued several

Executive Orders setting forth his Administration's priorities and instructing

agencies to pause funding to the extent permitted by law to allow time to

review whether the funding aligns with those priorities. For example,

Executive Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025), titled

*Unleashing American Energy*, declares the policy of the United States to

encourage certain "energy exploration and production," guarantee the

accessibility of "an abundant supply of reliable energy," and ensure no

federal funding is "employed in a manner contrary to the principles outlined

in this section, unless required by law," *id.* § 2(a), (c), (g). The Executive

Order further instructs agencies to "immediately pause the disbursement of funds" under two statutes—the Inflation Reduction Act (IRA) and the Infrastructure Investment and Jobs Act (IIJA)—to assess "consistency with the law and the policy outlined in" the Executive Order, *id.* § 7(a).

As relevant to this stay motion, this case involves thirty-two grants across approximately twenty funding programs that generally encompass environmental or agricultural projects and that are administered by the Environmental Protection Agency, the Department of Agriculture, the Department of Transportation, or the Department of Energy. *See* App. 26-30.[1] In almost all cases, funds for those grant programs were appropriated by the IRA, Pub. L. No. 117-169, 136 Stat. 1818 (2022); the IIJA, Pub. L. No. 117-58, 135 Stat. 429 (2021); or the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4. *See* App. 49-63 (cataloguing relevant statutory provisions for each grant at issue).

Shortly after the President's Executive Orders, the obligation and disbursement of funds under each grant were temporarily paused pending a

---

[1] In their complaint, plaintiffs also challenged the government's actions with respect to six additional grants—referred to as grants 27-32, *see* App. 29—but the district court denied plaintiffs preliminary relief as to those grants. This stay motion thus does not address those grants.

review of the funding for consistency with the Administration's policy

priorities. Over the ensuing months, however, the agencies began to make

decisions regarding whether to terminate specific grants. By April 22, the

agencies had closed or terminated, or were in the process of terminating,

twelve grants; they had unfrozen or were in the process of unfreezing

fourteen grants, including some grants where funding was being restored

pursuant to an injunction in a different case; and they continued to freeze

obligations and disbursements on three grants. *See* App. 26-30; *see also* Dkt.

No. 147-4, at 2 (clarifying that grant 8, which was originally listed as closed,

was in the process of being terminated). Finally, the awarding of three of the

grants had not been finalized before that process was paused; those awards

remained pending as of April 22. *See* App. 26-30.

2. Plaintiffs are thirteen community groups and six cities who allege

that they were awarded, or are subrecipients on, those thirty-two grants. *See*

App. 69. They allege that the freezing and termination of their grants

contravene the relevant statutes, violate the "separation of powers" and

"Presentment Clauses" by contravening the relevant statutes, violate the

requirements of the Administrative Procedure Act, and violate the First

Amendment. *See* App. 140-51. Among other relief, plaintiffs sought an

injunction prohibiting the continued freezing or the termination of grants and prohibiting the agency defendants from "impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds." App. 152-55.

Plaintiffs filed a motion for a preliminary injunction, in which they sought "injunctive relief to restore the federal grants awarded to Plaintiffs." Dkt. No. 24-1, at 1. On April 9, the government responded to that motion, explaining both that the district court lacked jurisdiction over plaintiffs' claims, *see* Dkt. No. 56, at 9-16, and that the agencies' actions comported with the relevant law, *see id.* at 19-31.

On April 29, the district court entered an order in which the court rejected the government's jurisdictional arguments and ordered additional discovery before resolution of the preliminary injunction motion. First, the district court rejected the government's argument that plaintiffs' claims properly belonged in the Court of Federal Claims under the Tucker Act, not in district court under the APA. In so concluding, the court stated that plaintiffs' claims "are not based on contract, but instead are rooted in the Constitution and the grant programs' respective authorizing statutes," and that plaintiffs "seek equitable, not monetary, relief." App. 34-39. And the court rejected the government's reliance on the Supreme Court's recent stay

decision in *Department of Education v. California*, 145 S. Ct. 966 (2025), in which the Court held that similar claims seeking to restore access to grant funds likely had to be brought in the Court of Federal Claims. App. 39-42.

Second, the district court rejected the argument that the agencies' decisions to freeze or terminate the grants in question are committed to agency discretion by law and thus unreviewable under the APA. In rejecting that argument, the court stated—without citing any statutory language—that "there is no indication that Congress intended to commit funding under the IRA and IIJA to the agencies' discretion." App. 42-44.

Then, rather than proceeding to resolve plaintiffs' pending preliminary-injunction motion, the district court ordered the government to provide documents related to the freezing or termination of many of the grants and related generally to the freezing of grants under the IRA and IIJA—discovery that was in addition to the "thousands of documents" that the government had produced in response to an earlier order of the district court. App. 45-46. Moreover, although the court had not evaluated the merits of plaintiffs' claims, it further ordered the government not to "freeze or terminate" any of the grants that the government had identified as unfrozen "without notice to the Court and authorization from the Court." App. 47.

Over the following two weeks, the government provided additional discovery on an expedited basis, even as plaintiffs' preliminary-injunction motion remained pending. On May 16, in advance of another hearing on that motion, the government agreed not to "contest judgment on the merits of Plaintiffs' APA claims" as applied to the thirty-two grants now at issue in order to "find common ground and move quickly towards final judgment." Dkt. No. 153, at 1. The government explained that it maintained, and was willing to stand on, the jurisdictional objections discussed in the previous order. *Id.*

3. On May 20, the district court entered both a permanent and preliminary injunction on plaintiffs' claims challenging the freezing or termination of the thirty-two grants. First, as to plaintiffs' APA claims, the district court accepted the government's consent to the entry of judgment. As relief, the court declared "that the freeze and/or termination" of the thirty-two grants were "ultra vires" and "in violation of the United States Constitution"; set aside "the freeze and/or termination" of the grants and "direct[ed] the Enjoined Agencies to restore Plaintiffs['] access to grant funds immediately"; and enjoined the agencies "from freezing, terminating,

or otherwise interfering with the funding of" the grants "without written authorization from this Court." App. 8.

Second, the district court addressed plaintiffs' "nonstatutory review" claims, which were predicated on the assertion that the defendants "exceeded the scope of their authority and/or acted unconstitutionally by failing to faithfully execute the law of the United States." App. 10 (alteration and quotation omitted). The court stated—without substantial elaboration—that plaintiffs were likely to succeed on the merits and that the nonstatutory review claims "are, for all practical purposes, mirror images" of the APA claims "which Defendants have elected not to contest." App. 14. And on the equities, the court concluded that plaintiffs had demonstrated irreparable harm from the inability to access grant funds and that those harms outweighed any countervailing interests, primarily because the government and public do not have an interest in the "perpetuation of unlawful agency action." App. 15-19.

Based on those conclusions, the district court entered a preliminary injunction on plaintiffs' nonstatutory review claims. That preliminary injunction prohibits the heads of the relevant agencies "from freezing and/or terminating" the grants at issue; "directs that Plaintiffs['] access to funding

9

for these grants be immediately restored"; and prohibits the agency heads from "freezing, terminating, or otherwise interfering with the funding" of the grants "without written authorization from the Court." App. 20. In addition, the court "impose[d] a nominal bond of zero dollars." App. 22; *cf.* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). Finally, the district court rejected the government's request for a stay pending appeal. App. 8-9.

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A.     The District Court Lacked Jurisdiction over Plaintiffs' Claims

The district court's conclusion that it could exercise jurisdiction over plaintiffs' claims has no sound legal footing. At their core, plaintiffs' claims seek access to grant funds, and those claims must be brought in the Court of Federal Claims rather than in district court. And regardless, the agencies'

decisions regarding whether to enter into, freeze, or terminate the grants at issue in this case are committed to agency discretion by law.

1. The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks to access funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the

11

bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients," *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for asserted violations of those grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach." *Id.*

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also United States v. J&E Salvage Co.*, 55 F.3d 985, 987-88 (4th Cir. 1995) (applying *Megapulse*).

The Supreme Court recently stayed another district court order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act grants the

Court of Federal Claims jurisdiction over suits "to order the payment of money." *California*, 145 S. Ct. at 968. There, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

That reasoning applies with full force here. As in *California*, plaintiffs in this case alleged a violation of "a contractual obligation to pay money." 145 S. Ct. at 968 (quotation omitted). The source of plaintiffs' purported rights to payment from the agencies are the grant agreements, which bear the hallmarks of a contract. Plaintiffs sought, and the district court issued, an order compelling the continued payment of funds under those particular grants. *See* App. 8, 20 (ordering the agencies to "restore Plaintiffs['] access to grant funds").

In nonetheless concluding that plaintiffs' claims could proceed in district court, the court fundamentally misunderstood the Supreme Court's *California* decision. As an initial matter, the district court suggested that it need not follow the Supreme Court's holding on the Tucker Act question, both because the *California* decision "was made in the context of an emergency application for a stay pending appeal" with "limited briefing" and because the *California* Court considered additional factors in granting a stay "which are not relevant or present here," such as the "potential harm to the parties and public interest." App. 41-42.

The court was wrong on both counts. The *California* Court made clear its conclusion that the district court in that case likely "lacked jurisdiction to order the payment of money under the APA," in a context where the government bore the burden of demonstrating likelihood of success on the merits. 145 S. Ct. at 968. That reasoning applies *a fortiori* here, where it was plaintiffs who bore the burden of establishing jurisdiction—and in any event, this Court now sits in an identical procedural posture to the *California* Court. *Cf.* Order, *American Ass'n of Colls. for Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (relying on the *California* decision in granting a motion for a stay pending appeal). And although the *California*

14

Court also concluded that the government was likely to demonstrate the equitable factors necessary to support a stay pending appeal, *see* 145 S. Ct. at 968-69, its conclusion on those factors does not diminish the force of its independent conclusion that the government was likely to succeed on the merits of the jurisdictional question.

In addition, the district court distinguished *California* on the grounds that, in that case, the terms of the individual grants were at issue whereas "this case deals with" the "implementation of a broad, categorical freeze on obligated funds" rather than the terms of specific grants. App. 41. But that is incorrect. Plaintiffs in this case have not identified any statutory right to the continued funding of their specific grants. Instead, any right to access grant funds—and any obligation to continue making those funds available— necessarily stems from the grant agreements. Indeed, plaintiffs themselves described their requested injunction as "simply requir[ing] the government to honor commitments it has already made to Plaintiffs in binding grant agreements." Dkt. No. 24-1, at 35; *see also* App. 117-20 (plaintiffs' allegations that their grants are "legally binding agreements" and that "regulations incorporated in" those agreements constrain the agencies' ability to suspend or terminate their awards). And regardless, the district court's relief—which

15

forbids terminating any covered grant even on an individualized basis without first seeking authorization from the court—goes well beyond providing relief against an asserted "categorical freeze." Thus, like in *California*, this dispute sounds in contract.

Finally, the district court erred in relying on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which did not involve contracts with the government at all. *See* App. 37. Unlike a challenge that might lead to monetary payments as "a mere by-product," *Bowen*, 487 U.S. at 910, obtaining specific monetary payments from the agencies was the entire aim of plaintiffs' endeavor here. The Supreme Court distinguished *Bowen* on this precise basis in *California*. *See* 145 S. Ct. at 968 (contrasting *Bowen* as addressing situations where "setting aside an agency's action may result in the disbursement of funds").

2. The district court magnified its error by subjecting the agencies' decisions regarding whether to enter into, pause, or terminate grants to review under the APA's reasoned decisionmaking requirements. The agencies' determinations in that regard are committed to agency discretion by law.

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had

16

previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by

putting restrictions in the operative statutes." 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), courts may not "intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018).

Plaintiffs have failed to demonstrate that any of the programs at issue here are not such programs. For example, ten of the grants at issue here are Environmental and Climate Justice grants. *See* App. 49-51. The statute governing such grants appropriates $2.8 billion and provides that the EPA Administrator "shall use" the funds to provide grants "to carry out" specified

activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)-(b). Permitted activities include, for example, "community-led air and other pollution monitoring, prevention, and remediation"; "mitigating clime and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events"; "reducing indoor toxics and indoor air pollution"; and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2).

Plaintiffs have contended that the statute's use of "shall" requires the Administrator to expend the full measure of appropriated funds on the specified programs. *See, e.g.*, Dkt. No. 24-1, at 15, 26. But plaintiffs do not even purport to identify anything in the statute that constrains the Administrator's discretion to determine how best to allocate the billions of dollars appropriated among many different potential grant recipients or activities. To the contrary, the statute makes clear that the Administrator may determine which activities "benefit disadvantaged communities" and may exercise his discretion to allocate funds among many possible activities to best achieve that goal as he understands it. And nothing in the statute prohibits the Administrator from terminating or pausing plaintiffs' grants

19

under that provision if he determines that plaintiffs' projects do not comport with Administration priorities, or provides any justiciable standard for evaluating such decisions.

The district court reached a contrary conclusion by inverting the analysis. According to the district court, defendants had "not pointed to any evidence showing that" Congress intended to commit funding decisions to agency discretion. App. 44. But that is exactly backwards. *Lincoln* establishes the general rule that complicated agency funding determinations are committed to agency discretion, subject to displacement only by specific statutory restrictions. *See* 508 U.S. at 193. The district court did not cite any provision of the relevant statutes that supposedly restricts the agencies' discretion—and, as explained above, these statutes in fact give the agencies substantial discretion regarding how to allocate funds. Accordingly, the district court erred in subjecting the relevant funding decisions to APA review.

3. Finally, the district court seemed to suggest that even if it lacked jurisdiction over plaintiffs' APA claims, it could properly exercise jurisdiction over plaintiffs' nonstatutory review claims because "such claims are plainly beyond the jurisdiction of the Court of Claims." App. 9. But plaintiffs'

20

nonstatutory claims—which are, as the district court put it, "mirror images" of their APA claims, App. 14—do not provide an avenue for circumventing the limitations that Congress has placed on district court jurisdiction.

As an initial matter, nonstatutory review is available—if at all—only where there is no other "meaningful and adequate means of vindicating" a plaintiff's rights and where Congress has not "clearly and directly" precluded review. *Board of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991). But here, plaintiffs do have an adequate means of vindicating their asserted right to access grant funds: they may bring a contract action in the Court of Federal Claims. And through the Tucker Act, Congress has made clear that it intends for that court—and not district courts—to exercise jurisdiction over such claims. And if the district court were correct that plaintiffs had viable APA claims, those claims would preclude nonstatutory review.

Moreover, nonstatutory review allows a plaintiff to obtain (at most) "equitable relief," *Strickland v. United States*, 32 F.4th 311, 366 (4th Cir. 2022)—and only in cases where an agency has "plainly act[ed] in excess of its delegated powers," a standard that captures "only extreme agency error, not

merely garden-variety errors of law or fact." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (alterations and quotations omitted).

But here, as explained, plaintiffs essentially seek monetary, not equitable, relief: they want access to their grant funds. *Cf. Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999) (holding that a remedy, even if styled as an equitable one, that seeks to "attach money in the hands of the Government" is "money damages"). And regardless, as explained, the relevant statutes provide broad, unreviewable discretion to the agencies to determine whether to enter into, pause, or terminate grants. Plaintiffs thus cannot plausibly demonstrate that the agencies' decisions to pause or terminate their grants were plainly in excess of the agencies' authority.

## B.     The Equitable Factors Favor a Stay Pending Appeal

The balance of harms and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435 (noting that these factors merge in cases involving the government).

First, the district court's preliminary injunction risks irreparable harm to the government and to the public interest by requiring the payment of money that the government may never recover. As in *Department of Education v. California*, the government "is unlikely to recover the grant

22

funds once they are disbursed." 145 S. Ct. at 969. Plaintiffs have not

"promised to return withdrawn funds should [their] grant termination[s] be

reinstated," *see id.*, nor did the district court impose a bond when it entered

its injunction, App. 20-22. If the injunction is stayed, the agencies will retain

the grant money at issue and plaintiffs may obtain appropriate money

damages if they are ultimately successful on their claims in the appropriate

forum. But the opposite is not necessarily true. If plaintiffs receive funds

while the injunction is in place, the agencies may well be left with no

meaningful recourse to reclaim the funds even if they prevail. *See California*,

145 S. Ct. at 968-69 (noting, in granting a stay, that "respondents have not

refuted the Government's representation that it is unlikely to recover the

grant funds once they are disbursed").

Second, that harm is compounded by the injunctions' interference with

the President's ability to execute core Executive Branch policies. As

explained, the grants at issue here were paused or terminated based on the

potential that the grants might conflict with the Administration's policy

priorities. Interfering with the President's ability to control his subordinates

by directing them to ensure that funding is consistent with his priorities—

and thus requiring the government to expend money in support of causes

that may be inconsistent with the Administration's policy objects—inflicts a severe separation-of-powers harm on the Executive Branch. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (Roberts, C.J., in chambers).

Those harms are substantially magnified by the district court's extreme intrusions into the workings of the Executive Branch, on multiple fronts. For one, the court has now explicitly established a preclearance regime, which prohibits the agencies from pausing or terminating any of the covered grants for any reason—no matter how lawful—without first obtaining approval from the district court. The Constitution vests the "entire" executive power in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). But the district court has in effect seized a portion of that power for itself. And compounding the problem, the court has ordered extensive discovery into the government's decisions regarding grant funding, with the government now having produced many thousands of documents in a case where the court lacks jurisdiction altogether. App. 45-46. Beyond that overreach, the court also extended the injunctions' scope to encompass three grants (numbered 1, 37, and 38) for which the government has not even negotiated final grant agreements and for which no funds are yet obligated. *See* App. 8, 26, 30. The court has thus improperly put itself in the position of

24

"supervising" the agencies "to work out compliance" with the relevant statutes. *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004).

Conversely, plaintiffs have not established that they would suffer any substantial irreparable harm if the injunctions were stayed. Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled. And regardless, the gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (it is "well settled that economic loss does not, in and of itself, constitute irreparable harm"). If plaintiffs prevail in the appropriate forum, they will receive funds to the extent required by law. That fact fatally undermines plaintiffs' assertions of irreparable harm.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal and an immediate administrative stay.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

BRYAN P. STIRLING
   *United States Attorney*

DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, D.C. 20530*
   *(202) 514-3388*
   *sean.r.janda@usdoj.gov*

MAY 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5093 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point CenturyExpd BT typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Sean R. Janda*
SEAN R. JANDA

# APPENDIX

# TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order (Dkt. No. 157) ...................................... App. 1

Memorandum Opinion and Order (Dkt. No. 146) .................................... App. 31

List of Plaintiffs' Grants and Statutory Authorities (Dkt. No. 24-22)... App. 48

Amended Complaint (Dkt. No. 23) ............................................................. App. 64

District Court Docket................................................................................ App. 205

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute *et al.*, | Case No. 2:25-cv-2152-RMG |
| Plaintiffs, | |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States; Kevin Hassett, in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council; United States Office of Management and Budget; Russell Vought, in his official capacity as Director of the United States Office of Management and Budget; United States Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency; United States Department of Agriculture; Brook Rollins, in her official capacity as Secretary of Agriculture; United States Department of Transportation; Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation; United States Department of Energy; Chris Wright, in his official capacity as the Secretary of the United States Department of Energy; United States Department of Government Efficiency Service, Amy Gleason, in her official capacity as Acting Administrator of the United States DOGE Service; Elon Musk, in his official capacity as Senior Advisor of the United States DOGE Service, | **ORDER** |
| Defendants. | |

**App. 1**

Plaintiffs, recipients of 38 federal grants, brought this action against various federal agencies and governmental officials in their official capacities alleging that the freezing and/or terminating of their grants violated their rights under the United States Constitution and the Administrative Procedures Act ("APA"). (Dkt. No. 23). Plaintiffs allege that their grants were frozen and/or terminated because they were funded by appropriations under the Inflation Reduction Act ("IRA"), the Inflation Investment and Jobs Act ("IIJA"), or other mandatory legislation which Defendants oppose. Plaintiffs filed a motion for preliminary injunctive relief on March 26, 2025, which the parties have fully briefed. (Dkt. No. 24, 56, 64).

Defendants advised the Court in a submission of May 16, 2025 that they "do not contest judgment on the merits of [Plaintiffs'] APA claims" for 32 of the 38 grants at issue in this litigation. (Dkt. No. 153 at 1).[1] The 32 grants in which Defendants no longer oppose relief under the APA were funded by the IRA, the IIJA or other mandatory congressional legislation. While Defendants do not contest the entry of judgment for the Plaintiffs in 32 of the 38 claims, they oppose injunctive relief for Plaintiffs while Defendants contest on appeal the Court's jurisdiction under the APA. (Dkt. No. 153 at 1, n. 1). As discussed below, the Court enters judgment under the APA for Plaintiffs on the 32 grants no longer contested by Defendants and then addresses Plaintiffs' prayer for equitable relief on these APA claims.[2]

---

[1] Dkt. No. 136-1 (attached as Exhibit A), which was prepared by Defendants, lists the 38 grants under challenge in this litigation. Defendants have advised the Court that they do not contest the entry of judgment regarding Grants 1-26 and 33-38.

[2] Defendants earlier advised the Court that they had restored grant funding for Grants 8, 13, 14, 15, 17, 18, 20, 21, 24, 25, 26, 34, 35, 36. (Dkt. No. 136-1; 147-4, ¶ 10). The Court thereafter entered an order directing Defendants "not to subsequently freeze or terminate these grants without notice to the Court and authorization from the Court that the freezing and/or termination may proceed." (Dkt. No. 146 at 17). This Order remains in effect until modified or rescinded by this Court or an appellate court.

2

The Court further addresses below Plaintiffs' assertion of nonstatutory review jurisdiction for the alleged ultra vires acts of Defendants, acting in their official capacities, in freezing and/or terminating their grants in violation of the United States Constitution. Plaintiffs assert that Defendants actions in targeting grants based on their opposition to previously adopted acts of Congress constitute a failure to "faithfully execute[]" the laws of the United States, as mandated by Article II, Section 3 of the United States Constitution. Plaintiffs point to a long line of United States Supreme Court decisions and the Fourth Circuit's recent decision in *Strickland v. United States*, 32 F.4th 311, 363-366 (2022), upholding nonstatutory review jurisdiction of the federal courts to provide parties equitable relief in actions against federal officials in their official capacities for actions taken outside their legal authority and/or in violation of the United States Constitution.

Finally, the Court addresses Plaintiffs' request for preliminary injunctive relief regarding six grants that were funded by general appropriations to the United States Department of Agriculture ("USDA"). Defendants continue to contest their liability under the APA regarding those six claims.[3]

## I.    Factual Background

On January 20, 2025, President Donald Trump issued an executive order which directed all agencies to "immediately pause the disbursements of funds appropriated through the Inflation Reduction Act of 2022 . . . or the Infrastructure Investment and Jobs Act . . . ." Executive Order 14154, 2025 WL 315844 (January 20, 2025). That directive was under a section titled "Terminating the Green New Deal." *Id.* There was initially some uncertainty within the federal

---

[3] These six claims still contested by Defendants under the APA are Grants 27-32. (Dkt. No. 136-1) (Exhibit A).

**App. 3**

agencies whether the directive applied only to matters related to the Green New Deal or to all appropriations arising under the IRA and IIJA. Two Office of Management and Budget (OMB) memoranda were issued shortly after the executive order that appeared to direct all agencies of the federal government to temporarily pause all spending on IRA and IIJA appropriated projects. (Dkt. No. 1-1, 1-2). Within days, various federal agencies, including the Environmental Protection Agency (EPA) and the USDA, issued directives that that all spending of funds related to the IRA and IIJA be immediately paused. (Dkt. No. 21-2, 21-3, 21-4, 21-8). Hundreds of previously awarded and active federal grants to non-profit organizations and local governments were summarily frozen with no notice or process. Numerous lawsuits similar to this action soon followed.

The 32 grants funded by mandatory legislation were primarily funded by IRA or the IIJA. For example, many of the EPA grants at issue in this litigation were funded under the Environmental and Climate Justice Block Grants program, a $2.8 billion dollar appropriation that provided that the Administrator "shall . . . award grants for periods of up to 3 years . . . that benefit disadvantaged communities . . . ." 42 U.S.C. § 7438(a)(1), (b)(1).[4] In implementing the Administrator's instruction to eliminate all grants funded by the IRA and the IIJA, internal EPA records document that Environmental and Climate Justice Block Grants were specifically targeted for freezing and/or termination. (Dkt. Nos. 1-4, 149-3, 149-4).

The Government Defendants in this and other similar suits initially denied that the freezing of the grants was on the basis that they were funded by the IRA and IIJA. Instead, Defendants

---

[4] The Administrator was authorized to award grants under the Act for such purposes as "community-led air and other pollution monitoring," "mitigating climate and health risks," "climate resiliency," and "reducing indoor toxins and indoor air pollution." §7438(b)(2)(A).

App. 4

claimed with little explanation that the mass freezing of federal grants was due to a change in agency priorities or policies. In a parallel action in Rhode Island, involving many of the same Government Defendants, defendants contended that there was "no singular freeze" but "thousands of individual decisions made by agencies about whether particular grants or other funding should be paused." *Woonasquatucket River Watershed Council v. United States Department of Agriculture*, C.A. No. 1:25-cv-97, Dkt. No. 31 at 31 (D.R.I. March 27, 2025). The Rhode Island Court and another district court confronted with this defense in a recent grant funding case found it "unfathomable" and "truly doubtful" that "agencies suddenly began exercising their own discretion to suspend funding across the board at the same time." *Woonsaquatucket River Watershed Council v. United States Department of Agriculture*, 2025 WL 1116157 at *11 (D.R.I. April 15, 2025); *National Council of Nonprofits v. Office of Management and Budge*t, 2025 WL 597959 at *7 (D.D.C. February 25, 2025).

After similar arguments were made in this case, the Court ordered Defendants to produce all documents related to "freezing, pausing, and/or terminating of grant funds to the grant recipients who are parties to this litigation." (Dkt. No. 45 at 5-7). Defendants produced thousands of documents, not one showing any individualized review of decisions to freeze or terminate grants of the Plaintiffs in this action. (Dkt. Nos. 79-91, 95-103, 106-132).

The Defendants thereafter advised the Court that they had resumed the funding for 14 of the 38 grants at issue in this litigation, terminated four grants, and were processing the termination of six other grants. (Dkt. No. 136-1). The Court noted that these actions appeared to be a pivot by the Defendants away from freezing grants and reflected a move by Defendants toward terminating a smaller group of grants. Defendants claimed at a recent hearing that the grants were being terminated only after an individualized review of each grant. (Dkt. No. 142 at 35). To determine

5

**App. 5**

the veracity of this representation, the Court ordered Defendants to produce all documents related to the termination or the proposed termination of grants at issue in this action to determine whether any such individualized review had actually been conducted. (Dkt. No. 146 at 15).

Defendants produced over 500 additional pages of documents in response to the Court's discovery order. (Dkt. No. 147-1 to 147-10). Not one document showed any individualized review of the grant of any Plaintiff in this action before the grant was terminated or designated for termination. Defendants' response included a declaration from senior EPA official Travis Voyles, claiming that on February 25, 2025 he had made an "individualized review" of an unidentified number of EPA grants, including many involved in this litigation, and determined that they were "terminated for policy reasons." (Dkt. No. 147-4). Mr. Voyles further stated that he orally communicated his termination decisions to another EPA official who then began the termination process. (*Id*. at 2-3). Not a single document was produced which evidenced any review by the EPA. The Court finds it hard to believe that numerous active federal grants, some totaling millions of dollars, were summarily terminated by a high-ranking government official without the production of a single document to detail the review and decision making process.

On May 16, 2025, the last business day before the Court's oral argument on Plaintiffs' motion for preliminary injunction, Defendants informed the Court that they "do not contest judgment on the merits of Plaintiffs' APA claims" and recognized that a judgment would "require Defendants to fund or negotiate grant agreements for 32 of 38 awards . . . ." (Dkt. No. 153 at 1). Defendants excluded from this concession six grants which were reportedly funded by general appropriations to the USDA. (*Id*.). Defendants further advised the Court that in the event that the Court provided injunctive relief to the Plaintiffs on their APA claims, they intended to seek to stay

**App. 6**

of any such relief while they continued to pursue a challenge to the Court's jurisdiction under the APA. (*Id.* at n.1).

## II.    The Uncontested APA Claims

The 32 APA claims in which Defendants no longer contest were part of the widespread agency action freezing or terminating grants that were funded by mandatory congressional legislation, primarily the IRA and IIJA. These grants were funded by legislation that mandated that the funds be expended for a specific purpose and left no discretion to agency heads to disregard the legislative mandates because current officials did not approve of the purposes of the previously appropriated programs. Plaintiffs have produced substantial, highly persuasive evidence to support their claims that their grant funds were frozen and/or terminated because Defendants disfavored previously authorized congressional appropriations and that such actions were outside of the legal authority of the agency Defendants and in violation of the Constitution's separation of powers. Plaintiffs focus their APA claims primarily on statutory provisions which prohibit agency actions which are "not in accordance with law" or which are "contrary to" any constitutional right or power. 5 U.S.C. § 706(2)(A), (B). Based on the full record and the concession of the Defendants on May 16, 2025 (Dkt. No. 153), the Court hereby enters judgment for Plaintiffs on the 32 grants no longer contested.[5]

The Court now turns to the issue of remedy. The APA provides district courts authority to "hold unlawful and to set aside agency action" found "not to be in accordance with law." 5 U.S.C.

---

[5] Judgment is rendered regarding Grants 1-26 and 33-38, (Dkt. No. 136-1) (Exhibit A). These grants involved the following agencies: EPA (Grants 2-15), USDA (Grants 16-26), United States Department of Energy ("DOE") (Grant 1), and the United States Department of Transportation ("DOT") (Grants 37-38).

§ 706(2)(A). To that end, the Court grants Plaintiffs that are recipients of Grants 1-26 and 33-38 the following relief:

    A. A declaration that the freeze and/ or termination of Grants 1-26 and 33-38 were ultra vires acts outside the legal authority of the EPA, USDA, DOE, and DOT (hereafter the "Enjoined Agencies") and in violation of the United States Constitution, constituting unlawful agency action under 5 U.S.C. § 706(2)(A) and (B);

    B. Sets aside the freeze and/or termination of Grants 1-26 and 33-38 and directs the Enjoined Agencies to restore Plaintiffs access to grant funds immediately;

    C. Enjoins the Enjoined Agencies from freezing, terminating or otherwise interfering with the funding of Grants 1-26 and 33-38 without written authorization from this Court[6]; and

    D. Directs the Enjoined Agencies to submit a certification to this Court within seven days of this Order confirming compliance with this Order.

Defendants seek a stay of this Court's injunctive relief pending appeal. A stay of relief to the losing party after judgment is certainly "not a matter of right" and involves the exercise of judicial discretion "dependent upon the circumstances of a particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citing *Virginia R. Co. v. United States*, 272 U.S. 658, 672-3 (1926)). The party requesting the stay bears the burden of persuasion. The Supreme Court in *Nken* laid out four factors to consider in addressing a motion for a stay after judgment: (1) whether the stay applicant

---

[6] The Court finds it necessary to maintain supervision over the continued functioning of the unlawfully frozen or terminated grants because Defendants in this and parallel litigation have provided shifting post hoc justifications for their actions, at times appearing to be as a means to evade court orders. To the extent Defendants have legitimate and lawful reasons to terminate or freeze grant funding, the Court will promptly give consideration to any such submission by Defendants.

8

has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the granting of the stay will substantially injure the prevailing party; and (4) where the public interest lies. 556 U.S. at 433. The first two factors from *Nken* are the most critical. *Id.*

  After carefully considering the Defendants motion to stay, the Court finds that a stay of the Court's injunctive relief is not appropriate under these circumstances. First, the Court finds that Defendants are not likely to succeed on the merits. The Court addressed in detail, in its April 29, 2025 Order, the Court's jurisdiction in this case, finding that Supreme Court precedent supports Plaintiffs' argument that their claims for declaratory and injunctive relief can properly be heard by an Article III court under the APA. (Dkt. No. 146 at 1-12). Plaintiffs' already strong jurisdictional arguments have been further strengthened by the Court's additional finding below of nonstatutory jurisdiction related to Defendants' alleged ultra vires and unconstitutional acts, since such claims are plainly beyond the jurisdiction of the Court of Claims. The only forum in which Plaintiffs may adjudicate all of their pending claims is in an Article III court.

  Second, Defendants cannot sustain their burden of demonstrating that they would suffer irreparable injury from the granting of injunctive relief to Plaintiffs. Indeed, Defendants have not offered any evidence to support such a claim. Third, Plaintiffs, which include many nonprofits heavily dependent on the challenged grants to sustain their mission, administrative functions, and staffing, have confronted significant challenges to their ongoing operations and experienced staff layoffs due to the abrupt freezing of grant funds. Plaintiffs have further experienced significant challenges to their good will and reputations by withdrawing services to community groups and individuals who were relying upon Plaintiffs' services and assistance. (See Dkt. No. 64-2 at 2-5). Fourth, the public interest lies in upholding the rule of law and providing an effective remedy for

9

**App. 9**

those injured by the unlawful actions of government officials. For these reasons, Defendants' motion to stay is denied.[7]

### III. Plaintiffs' Claims for Relief under the Court's Nonstatutory Review Jurisdiction

Plaintiffs additionally assert claims under the Court's nonstatutory review jurisdiction for equitable relief against federal officials in their official capacities on the basis that those federal officials exceeded the scope of their authority and/or acted unconstitutionally by failing to "faithfully execute[]" the laws of the United States. U.S. Const. Article II, Section 3. (Dkt. No. 23, ¶¶ 285-307). Plaintiffs expressly reference in their complaint the Fourth Circuit's recent decision in *Strickland v. United States* in support of their claim for nonstatutory review. Plaintiffs assert these claims as a second and independent basis for federal jurisdiction and seek preliminary injunctive relief on these claims. (Dkt. No. 24-1 at 16-20).

Defendants have to date focused their opposition to Plaintiffs' federal jurisdiction almost entirely on whether this Court has jurisdiction under the APA. By earlier order, the Court found that Plaintiffs have jurisdiction with this Court under the APA and that their claims were exclusively for equitable and declaratory relief. (Dkt. No. 146). The Court now turns its attention to Plaintiffs' claims referred to by *Strickland* as "nonstatutory review claims" or as "the *Larson-Dugan* exception to sovereign immunity." *Strickland* 32 F.4th at 363.

#### A. Jurisdiction:

The United States Supreme Court has long recognized nonstatutory federal jurisdiction over claims which involve (1) an action against a federal official; (2) asserted in his official capacity; (3) based on allegations that the federal official has acted beyond his statutory or

---

[7] Defendants have repeatedly argued that Plaintiffs' claims are for money damage, not equitable relief. Plaintiffs' Amended Complaint requests only equitable remedies, and the Court's remedy set forth above exclusively provides equitable relief.

10

constitutional authority; and (4) a request for equitable relief. *See*, *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958); *Larson v. Domestic and Foreign Commerce Corporation*, 337 U.S. 682, 689 (1949). The *Strickland* court reversed a district court decision which "mistakenly overlooked the long-established line of precedent establishing that parties can seek to enjoin federal officials in their official capacities from exceeding the scope of their authority or acting unconstitutionally." 32 F.4th at 365. *Strickland* quoted approvingly from an amicus brief submitted in that action by Professors Erwin Chemerinsky and Aziz Huq which traced the history of nonstatutory review claims back to *Marbury v. Madison*, 5 U.S. 137, 166 (1803).[8] *Strickland*, 32 F.4th at 365; *see also*, *International Refugee Assistance Project v. Trump*, 883 F.3d 233, 287-88 (4th Cir. 2018) (en banc) (J. Gregory, concurring).

Plaintiffs' Separation of Powers and ultra vires claims (Counts I and II) plainly state a claim for nonstatutory review. (Dkt. No. 23, ¶¶ 285-307). Plaintiffs have sued federal officials in their official capacities and have alleged that their actions freezing and/or terminating their grants because they were funded by now disfavored federal laws were in violation of their duty Article II, Section 2 of the United States Constitution to "faithfully execute[]" the laws of the United States. Plaintiffs seek exclusively equitable remedies, declaratory and preliminary and permanent injunctive relief. (*Id.*, ¶¶ 89-91). The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims.

---

[8] The Court has filed the Chemerinsky and Huq amicus brief cited in the *Strickland* decision onto the docket in this case because its details the strong line of precedents supporting nonstatutory review jurisdiction. (Dkt. No. 156).

**App. 11**

## B. Standing

Defendants have challenged Plaintiffs' standing. (Dkt. No. 56 at 17-18). After a careful review of the record and the arguments of the parties, the Court finds that Plaintiffs have standing to assert their claims.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 339. Because Plaintiffs here seek declaratory and injunctive relief, they must establish an ongoing or future injury in fact. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

In a case involving multiple plaintiffs, "[a]t least one plaintiff must demonstrate standing for each claim and form of requested relief" for that claim to proceed. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018); *see also Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (internal quotation marks omitted). Consequently, once it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009) (declining to analyze whether additional plaintiffs had standing when one plaintiff did);

12

**App. 12**

*Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

Plaintiffs have offered detailed statements of organizational and reputational harm arising from the abrupt freezing and/or terminating of their grants without notice. (Dkt. Nos. 24-2, 24-3, 24-4, 24-6, 24-9, 24-10). Plaintiff Sustainability Institute stated that the funding freeze had caused "disruptions in . . . day to day operations, causing a slowdown and budgetary challenges." (Dkt. No. 24-2, ¶ 37). Plaintiff Agrarian Trust detailed "extreme distress to . . . staff members, farmers, and community partners" from the grant freeze. (Dkt. No. 24-3, ¶ 15). Other Plaintiffs have offered similar unchallenged statements or organizational injury and reputational damage from Defendants' action under challenge in this litigation. The record fully supports findings that numerous Plaintiffs have suffered injury in fact, that the injuries are fairly traceable to Defendants' challenged conduct, and that it is likely that these injuries are redressable by a favorable judicial decision. Finding that Plaintiffs have standing, the Court proceeds to consider the merits of the motion.

### C. Plaintiffs' Motion for a Preliminary Injunction:

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction, a party must make a "clear showing" that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). Plaintiff bears the burden of showing that each factor supports his request for preliminary injunction. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991).

**App. 13**

The Court addresses the four *Winter* factors in turn below.

### 1. Likelihood of Success on the Merits:

The record before the Court contains ample evidence that the 32 grants Defendants no longer challenge under the APA were frozen and/or terminated because they were funded by mandatory congressional legislation that the Agency Official Defendants do not favor. While Defendants have contended that the grants were individually reviewed and frozen or terminated for undefined "policy reasons," the Court-ordered discovery in this case failed to produce a single document showing any individualized review of the Plaintiffs' grants or discussion of any basis for freezing or terminating the grants other than disapproval of the purposes of the funding. (*See* Dkt. Nos. 1-1, 1-2, 21-2, 21-3, 21-4, 21-8, 149-3, 149-4). These documents provide strong support for Plaintiffs' claim that the freezing and/or termination of the 32 grants constituted a violation of the Agency Official Defendants duty to "faithfully execute[]" the laws of the United States.

It is worthwhile to note that Plaintiffs' nonstatutory review claims and Plaintiffs' APA claims which Defendants have elected not to contest are, for all practical purposes, mirror images of each other. The 32 grants no longer under challenge under the APA all were frozen and/or terminated because they were funded by now disfavored legislation. The APA claims challenged agency actions that were "not in accordance with law" and "contrary to constitutional right" based on the official actions of Defendants acting outside their authority and in violation of the Separation of Powers. 5 U.S.C. § 706(2)(A) and (B). Plaintiffs' nonstatutory review claims are based on the argument that Defendants, have failed to "faithfully execute[]" the laws and rely on the identical facts and conduct that constitute the now uncontested APA claims.

14

**App. 14**

In sum, the Court finds that Plaintiffs have shown a likelihood of success on the merits on their nonstatutory review claims concerning the 32 grants Defendants no longer contest regarding APA liability.

### 2. Irreparable Injury

A plaintiff seeking injunctive relief must demonstrate the presence of irreparable injury. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (citing *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." The second prong of the *Winter* test requires the plaintiff to make a "clear showing" that they are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 21. Irreparable injury must be both imminent and likely; speculation about potential future injuries is insufficient. *Winter*, 555 U.S. at 22.

First, the Nonprofit Plaintiffs offer several forms of harm they face, including disruptions in their day-to-day operations, financial strain, personnel actions including dismissal and furloughs, operations being curtailed or ended, and damage to their credibility and reputation. (Dkt. No. 24-1 at 29-34).

The Government responds that: (1) Plaintiffs allegations are speculative and not sufficiently likely to occur under the *Winter* standard; and (2) Plaintiffs have failed to establish the harm they face is irreparable and could not be cured by a monetary award after judgment. (Dkt No. 56 at 31-4).

Plaintiffs have adequately demonstrated both the likelihood of their injury as well as its irreparability. In their Complaint, their preliminary injunction motions, and the twenty declarations

**App. 15**

filed in support, the Plaintiffs have laid out dozens of examples of obligated funding and the harms

that the withholding thereof has caused. (Dkt. Nos. 1, 23, 24, 44). The court's analysis in *New York*

*v. Trump* is relevant:

> It is so obvious that it almost need not be stated that when money is
> obligated and therefore expected (particularly money that has been
> spent and reimbursement is sought) and is not paid as promised,
> harm follows—debt is incurred, debt is unpaid . . . services stop, and
> budgets are upended. And when there is no end in sight to the
> Defendants' funding freeze, that harm is amplified because those
> served by the expected but frozen funds have no idea when the
> promised monies will flow again.

*New York*, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025). Indefinitely pausing funding

"unquestionably make it more difficult" for the Plaintiffs to "accomplish their primary [mission]"

and is a form of irreparable harm. *Woonasquatucket River Watershed Council*, 2025 WL 1116157,

at *22 (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)).

Second, the City Plaintiffs submit that the pause in funding presents harms such as negative

impacts on their budget due to reliance on federal funding, an inability to honor agreements with

third parties, and delays or cancelations to projects. (Dkt. No. 64 at 18). The Government responds

that the Municipalities are sufficiently well-resourced whose projects are not "the type of activities

that establish irreparable harm to justify extraordinary relief." (Dkt No. 56 at 34-5). The

government's argument is insufficient. A few examples show the variety of irreparable harms.

Plaintiff City of San Diego has hired four employees using their USDA funding, those positions

are now at risk. (Dkt. No. 24-20, ¶ 8). Plaintiff City of Columbus would be forced to draw down

funds from other projects and divert money from other budgetary requirements, causing a ripple

effect of budgetary issues. (Dkt. No. 24-16, ¶ 19). Plaintiff City of Madison has contractual

agreements made with sub-grantees in reliance on the EPA funding and are unable to honor those

agreements. (Dkt. No. 24-17, ¶ 24).

16

**App. 16**

Congress enacted these laws and appropriated funding to these agencies, the funding freeze unconnected to legal authorization causes significant and irreparable harms to Plaintiffs. In their Complaint and subsequent filings, Plaintiffs have demonstrated dozens of examples of obligated funding and the harms they face when those funds are withheld.

Plaintiffs have adequately demonstrated irreparable harm arising from Defendants' actions.

### 3.  Balance of Equities and Public Interest

The balance of the equities and public interest weigh in favor of granting Plaintiffs' request for preliminary injunctive relief. "The[] final two factors—balance of the equities and weighing the public interest—'merge when the Government is the opposing party.'" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *63 (4th Cir. Apr. 30, 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 329 n.10 (1982) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609–610 (1952) (concurring opinion)).

Here, Plaintiffs assert an interest in "[e]nsuring [that] Congressional and local priorities are achieved," "having governmental agencies abide by federal laws that govern their existence and operations" and "protecting constitutional rights," (Dkt. No. 24-1 at 36), while the Government emphasizes the potential that it will be unable to recover "millions of taxpayer dollars" disbursed pursuant to a preliminary injunction if a court later determines that the Government's decision to freeze or terminate the grants was lawful. (Dkt. No. 56 at 35). The Government also argues that "[r]equiring the Executive to financially support specific projects that may be within the statutory

17

parameters of a program but nevertheless at odds with the Executive's priorities negatively impacts the public interest." (*Id.*).

The Court finds that the balance of the equities tips strongly in favor of Plaintiffs. The Government "is in no way harmed by [the] issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional" and "if anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). The Court has determined that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their ultra vires claims challenging Grants 1-26 and 33-38—in other words, a substantial likelihood that Agency Official Defendants have acted unconstitutionally by encroaching upon the domain of the Legislature. And if the Court's constitutional concerns alone were not enough to tip the scales in Plaintiff's favor, the Court considers sufficient the threat to Plaintiffs' survival in the face of suddenly and inexplicably paused and/or terminated funding, culminating in their need to furlough staff and pause services to the communities whom they operate to serve. (Dkt. No. 24-1 at 2; *see generally* Dkt. No. 23). Given that the Government no longer even challenges Plaintiffs' APA claims (excluding those asserted against the Secretary of Agriculture regarding grants under the Partnership for Climate-Smart Commodities ("PCSC")), the Court finds that it would be confounding indeed to credit the Government's assertion of its interests in retaining taxpayer funds over that of Plaintiffs in receiving these congressionally-allocated funds where the Government no longer even maintains that it followed lawful procedures in freezing and terminating those funds. (Dkt. No. 153).

"The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded, . . . . [a]nd an agency is not harmed by an order prohibiting it from violating the law." *Woonasquatucket River Watershed*

18

**App. 18**

*Council*, 2025 WL 1116157, at *23. "On the other hand, without injunctive relief to pause the categorical freeze of IIJA and IRA funds, the funding that the Nonprofits are owed (based on the Agencies' own past commitments) creates an indefinite limbo." *Id.* "Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated," the Court finds that the balance of equities tips indisputably in Plaintiffs' favor on their ultra vires claims. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025)

The public interest also favors a preliminary injunction. The perpetuation of unlawful agency action is contrary to the public interest, and there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations. *See League of Women Voters of United States*, 838 F.3d at 12. "Government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020). Given the Court's finding that Plaintiffs are likely to succeed on the merits of their constitutional claims, a preliminary injunction here ensures that the agencies do not act in excess of their authority or in violation of the Constitution. Preserving fairness, accountability, and balance of power in governance serves the public interest and granting Plaintiffs preliminary injunctive relief does just that.

Defendants argue that they are serving the public interest by protecting and seeking to recover "millions of taxpayer dollars." But the relief Plaintiffs seek only allows them to access funds that have been appropriated by Congress; obligated prior to this suit; can only be used for specific, approved purposes; and will only be released as the Plaintiffs implement their grant program plans. Sufficient procedures have already taken place or are already in place to protect taxpayer dollars.

**App. 19**

Because Plaintiffs have made clear showing under the four *Winters* factors, the Court grants Plaintiffs motion for preliminary injunction on Claims I and II as to Grants 1-26 and 33-38. The Court orders the following relief:

A. Enjoins Lee Zeldin, in his official capacity as Administrator of the EPA, Brook Rollins, in his official capacity as Secretary of USDA, Sean Duffy, in his official capacity as Secretary of the Secretary of DOT, and Chris White, in his official capacity as Secretary of DOE (hereafter "Enjoined Individual Defendants") from freezing and/or terminating Grants 1-26 and 33-38 and directs that Plaintiffs access to funding for these grants be immediately restored;

B. Enjoins the Enjoined Individual Defendants from freezing, terminating or otherwise interfering with the funding of Grants 1-26 and 33-38 without written authorization from the Court[9];

C. Directs the Enjoined Individual Defendants to submit a certification to this Court within seven days of this Order confirming compliance with this Order.

## D. Bond

Plaintiffs urge this Court to set a nominal bond of zero dollars in this case. (Dkt. No. 24 at 3). Plaintiffs cite recent decisions by other district courts that have considered the issue with respect to nonprofits contesting the freezing of grant funds. *See, e.g.*, *Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764, at *29

---

[9] See Footnote 6 for further explanation regarding this condition of the preliminary injunction.

**App. 20**

(D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because requested bond "would essentially forestall [the] [p]laintiffs' access to judicial review").

Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331-332 (4th Cir. 2013) (*abrogated on other grounds as recognized by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022)). "In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.1974)). District courts often waive the bond requirement in public interest cases, recognizing that the failure to do so could prevent certain plaintiffs from obtaining meaningful judicial review. *See Defenders of Wildlife v. U.S. Fish and Wildlife Service*, 530 F. Supp. 3d 543, 560 (D.S.C. 2021) (collecting cases).

The Government contests Plaintiffs' request for the imposition of nominal bond and "request[s] that the Court require Plaintiffs to post security . . . for any taxpayer funds distributed during the pendency of the Court's Order," citing a presidential memorandum opposing the waiver of injunction bonds. White House memorandum states that "it is the policy of the United States to demand that parties seeking injunctions against the [government] must cover the costs and damages incurred if the [g]overnment is ultimately found to have been wrongfully enjoined or restrained." (Dkt. No. 56 at 36) (citing Presidential Memorandum, Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c), available at https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/   (Mar. 11,

21

**App. 21**

2025)). This Court is not bound by the memorandum and declines to adopt any policy that would have the effect of blocking opponents of the government from the courts. *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"). This Court agrees with the District of Rhode Island that, "[i]n a case where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic— and contravene the very basis of this opinion—to hold the Nonprofits hostage for the resulting harm." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *24. The Court thus imposes a nominal bond of zero dollars.

## IV. Plaintiffs' Claims for Relief Regarding Grants Funded by General Appropriations of the USDA

The six grants which Defendants continue to contest arise were administered by the USDA and were funded under the Commodity Credit Corporation, an entity under the control of the USDA. The grants were awarded under a program titled Partnerships for Climate Smart Commodities. ("PCSC"). Defendants have represented to the Court PCSC funding derived exclusively from the general appropriations of the USDA. Defendants assert that the USDA Secretary has broad discretion in the use of these funds, which differs from appropriations under the IRA, IIJA, or other mandatory congressional legislation. (Dkt. No. 142 at 42-43).

Defendants have informed the Court that that "PCSC has been converted into the Advancing Markets for Producers" to "reprioritize efforts so that more money goes directly to farmers." (Dkt. No. 153 at 2). As part of this new program, USDA has imposed a requirement that 65% of the federal funds must go to the producers. (*Id.* at 2-3). Six grants of Plaintiffs (Exhibit A, Grants 27-32) have been terminated because they allegedly do not meet the newly imposed 65%

22

**App. 22**

requirement. (*Id*. at 3). The termination notices invite Plaintiffs to submit new proposals under the redesigned program by June 20, 2025. (*Id*.). Plaintiffs challenge the termination of the six USDA grants on the basis that the newly adopted program with the 65% requirement "emerged out of nowhere" and USDA provided "no explanation how its new 65% threshold was derived." (Dkt No. 149 at 14-15).

There is a very limited record before the Court on the termination of Grants 27-32. Plaintiffs assert that these six grants were summarily terminated at or about the time of the other 32 grants with no notice or reasoned explanation. According to Defendants, the funding of these grants was exclusively from generally appropriations and were not part of any mandatory legislation.[10] Thus, the challenges to the termination of these grants are based on an alleged failure to follow proper APA procedures, rather than a violation of USDA's duty to "faithfully execute[]" the laws. Further, the explanation provided by USDA officials for the termination of the six grants was not based on an undifferentiated attack on the purposes set forth in congressional legislation but on an effort to reduce administrative costs so that producers receive a greater share of the benefits of the federal funds. Moreover, affected Plaintiffs are invited to submit applications under the revised grant program.

Under the *Winter* factors, a threshold, critical issue is whether Plaintiffs can carry the burden of showing a likelihood of success on the merits to entitle them to the "extraordinary remedy" of preliminary injunctive relief. *Winter*, 555 U.S. at 20. On this record, the Court finds that Plaintiff cannot meet this standard. It may be with a fuller record and with further

---

[10] The Plaintiffs stated in the Amended Complaint that "upon information and belief," a portion of the PCSC grants was funded by the IRA. (Dkt. No. 23). Based on the present information before the Court, this appears not to be correct.

23

developments Plaintiffs establish a basis for an APA claim but at this time preliminary injunctive relief is not appropriate.

## V.    Conclusion

Based on the foregoing, the Court has ruled as follows:

A.  Under Section II, the Court enters judgment for Plaintiffs regarding the uncontested APA claims (Exhibit A, Grants 1-26, 33-38). Plaintiffs are provided declaratory and permanent injunctive relief. Defendants' motion to stay is denied.

B.  Under Section III, The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims and that Plaintiffs' have standing to assert those claims. The Court further grants Plaintiffs preliminary injunction for Grants 1-26 and 33-38 regarding the nonstatutory review claims.

C.  Under Section IV, the Court denies Plaintiffs preliminary injunctive relief regarding Grants 27-32.

 s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

May 20, 2025
Charleston, South Carolina

24

**App. 24**

# EXHIBIT A

USCA4 Appeal: 25-1575    Doc: 6    Filed: 05/22/2025    Pg: 57 of 268

| Granting Agency | Grant Number | Project Name / Notes | Grant Program | Grant Recipient | Decl. Cite | Grant agreement under review; Presently Paused; Accessible to Grantees; Terminated (As of 4/22/2025) |
|---|---|---|---|---|---|---|
| DOE | DE-SE0001546 | Assistance for Latest and Zero Building Energy Code Adoption | Assistance for Adoption of the Latest and Zero Building Energy Codes | City of Baltimore | Baltimore Decl., Ex. 14-C | Award No. DE-SE0001546 is a conditional award. Therefore, the grant funds have never been - and are not presently - accessible to the grantee. Per the terms of the award, "the availability of funds to the Recipient for payment of costs incurred by the Recipient is conditioned upon the Grants Officer's review and approval of the Recipient's application and the completion of negotiations." |
| EPA | 5F-03D33625-0 | Youth Empowerment Strategies 4 Environmental Justice | Environmental and Climate Justice Block Grant – Community Change Grant | Earth Island Institute | Earth Island Decl., Ex. 8- D | Termination in Progress* |
| EPA | 3D30824 | Community Change Grant | Environmental and Climate Justice Block Grant - Community Change Grant | Sustainability Institute | Sustainability Institute Decl., Ex. 1- B | Termination in Progress* |
| EPA | 97T28301 | Inflation Reduction Act - Environmental and Climate Justice | Environmental and Climate Justice Block Grant - Community Change Grant | Leadership Counsel for Justice and Accountability | Leadership Counsel Decl., Ex. 9- A | Termination in Progress* |
| EPA | 96272300 | Uplifting Bronx Voices for Climate Change Resilience | Environmental and Climate Justice Block Grant - Community Change Grant | Bronx River Alliance | Bronx River Decl., Ex. 5- B | Termination in Progress* |
| EPA | 97T28901 | Huliau o Wai'anae: Turning Points for a Sustainable Future. | Environmental and Climate Justice Block Grant - Community Change Grant | Earth Island Institute | Earth Island Decl., Ex. 8- B | Termination in Progress* |
| EPA | 00A01479 | Elm City Climate Collaborative | Environmental and Climate Justice Block Grant - Community Change Grant | City of New Haven | New Haven Decl., Ex. 18-C | Termination in Progress* |

**App. 26**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | EPA | 0E+00000 | Climate Resilience Starts at Home: Growing Energy Efficiency, Indoor Air Quality, and Green Jobs in Madison and Fitchburg, Wisconsin | Environmental and Climate Justice Block Grant - Community Change Grant | City of Madison | Madison Decl., Ex. 16-A | Closed |
| 9 | EPA | 00A01441 | Electrify New Haven | Environmental and Climate Justice Block Grant - Government to Government Grant | City of New Haven | New Haven Decl., Ex. 18-A | Terminated |
| 10 | EPA | 95336801 | DPW YH20+ Expansion II | Environmental and Climate Justice Block Grant - Government to Government Grant | City of Baltimore | Baltimore Decl., Exs. 14-C, 14-D | Terminated |
| 11 | EPA | 03D03424 | North Mecklenburg Air Monitoring Network | Environmental Justice Collaborative Problem-Solving | CleanAIRE NC | CleanAIRE NC Decl., Ex. 6-B | Terminated |
| 12 | EPA | 96229424 | Partnership for Urban Waterways in Bronx and Lower Westchester Counties, New York | Environmental Justice Collaborative Problem-Solving | Bronx River Alliance | Bronx River Decl., Ex. 5- D | Terminated |
| 13 | EPA | 00A01475 | Union Station Area Thermal Energy Network | Climate Pollution Reduction Grant Program | City of New Haven | New Haven Decl., Ex. 18-B | Accessible to grantees |
| 14 | EPA | 95335901 | Bowley's Lane Composing Facility | Solid Waste Infrastructure for Recycling Grant Program | City of Baltimore | Baltimore Decl., Ex. 14-A | Accessible to grantees |
| 15 | EPA / NFWF | 0602.24.082555 | Accelerating Clean Water and Conservation Outcomes in Shenandoah Valley (VA) | Innovative Nutrient and Sediment Reduction Grants Program | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Ex. 4- E | Accessible to grantees |
| 16 | USDA | AM22FFWPA0013 | Collaborative Farm Worker and Meatpacking Worker 14-State COVID Relief Fund Project | Agricultural Marketing Service Farm and Food Worker Relief | Pasa | Pasa Decl., Ex. 12-B | Presently paused because previously identified on DEIA list. Payments made through Jan. 19, 2025. |
| 17 | USDA | 2022-70416-37195 | Subaward with National Young Farmers Coalition | American Rescue Plan Technical Assistance Investment Program | RAFI-USA | RAFI-USA Decl., Ex. 13-H | Accessible to Grantees |

App. 27

USCA4 Appeal: 25-1575     Doc: 6     Filed: 05/22/2025     Pg: 59 of 268

| # | | | | | | | |
|---|---|---|---|---|---|---|---|
| 18 | USDA | NR225F48XXXXC002 | Organic Technical Staffing Assistance | Conservation Stewardship Program: Organic Technical Assistance Grant | Marbleseed | Marbleseed Decl., Ex. 10-C | Accessible to Grantees. Most recent payment completed on 4/11/25. |
| 19 | USDA | NR223A750003C062 | Subaward with RAFI-USA | Conservation Technical Assistance Cooperative Agreement | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3- D | Agreement closeout completed. Award no longer active as of 11/14/24. |
| 20 | USDA | FSA24CPT0014403 | Distressed Borrower Technical Assistance | Distressed Borrower Assistance Network Program | RAFI-USA | RAFI-USA, Decl. Ex. 13- D | Payment was paused due to IRA funding, but was released on Friday pursuant to *Woonasquatucket* injunction and the payments are in process. There are corrections that are pending on the payment requests. |
| 21 | USDA | NR242D37XXXXG002 | In Pennsylvania to help improve grazing success and associated economic, environmental, and social co-benefits, including animal health, soil health, carbon sequestration, cost savings, water quality | Environmental Quality Incentives Program – Conservation Innovation Grants | Pasa | Pasa Decl., Ex. 12-D | Accessible to Grantees. Payment completed 4/14 |
| 22 | USDA | NR243A750003C062 | Expanding RAFI-USA's Conservation Resources for Resilient Farms Project | Equity in Conservation Outreach Cooperative Agreement | RAFI-USA | RAFI-USA Decl. Ex. 13- B | Presently paused because previously identified on DEIA list. Payments made through Jan. 19, 2025. |
| 23 | USDA | NR243A750003C045 | Deliver outreach and education programming to increase awareness of and participation in NRCS programs, services and leadership opportunities in agriculture and natural resource conservation in Kentucky. | Equity in Conservation Outreach Cooperative Agreement | Organic Association of Kentucky (OAK) | OAK Decl., Ex. 11-B | Presently paused because previously identified on DEIA list. Payments made through Jan. 19, 2025. |
| 24 | USDA | FSA24GRA0011586 | Increase Land, Capital, and Market Access for Underserved Farmers on a Mid-size National Landscape using New Model, Agrarian Commons | Increasing Land, Capital, and Market Access Program | Agrarian Trust | Agrarian Trust Decl., Ex. 2-A | Payment was paused due to IRA funding, but was released on Friday pursuant to Woonasquatucket injunction and the payments are in process. There are corrections that are pending on the payment requests. |

**App. 28**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 25 | USDA | FSA24CPT0013706 | Gaining New Ground | Increasing Land, Capital, and Market Access Program | RAFI-USA | RAFI-USA Decl., Ex. 13- F | Payment was paused due to IRA funding, but was released on Friday pursuant to Woonasquatucket injunction and the payments are in process. There are corrections that are pending on the payment requests. |
| 26 | USDA | FSA23CPT0013706 | Gaining New Ground - Subaward with RAFI-USA | Increasing Land, Capital, and Market Access Program | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3- B. | Payment was paused due to IRA funding, but was released on Friday pursuant to Woonasquatucket injunction and the payments are in process. There are corrections that are pending on the payment requests. |
| 27 | USDA | NR233A750004G045 | Expands markets for climate-smart dairy, beef and poultry industry in DE, NC, NJ, NY, MD, OH, PA, SC, TN, VA and WV and supports the implementation and monitoring of climate-smart practices. | Partnerships for Climate-Smart Commodities Program | Conservation Innovation Fund | Cons. Innovation Fund Decl., Ex. 7-A | Recipient notified award will be terminated. Payment will be processed for expenses through the date of notice. |
| 28 | USDA | NR233A750004G045 | Subaward with Conservation Innovation Fund | Partnerships for Climate-Smart Commodities Program | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Exs. 4-A, 4-B | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 29 | USDA | NR243A750004G010 | Expands climate-smart wheat, grain, specialty and organic crop markets in IA, IL, IN, KS, KY, MI, MN, MO, ND, NE, OH, SD, TN, WI and supports farmer CS practice implementation and monitoring. | Partnerships for Climate-Smart Commodities Program | Marbleseed | Marbleseed Decl., Ex. 10-B | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 30 | USDA | NR233A750004G025 | Expands markets in the Eastern US for climate-smart dairy, grain, livestock, organic and specialty crops; supports farmer and rancher climate-smart practice implementation and monitoring | Partnerships for Climate-Smart Commodities Program | Pasa | Pasa Decl., Ex. 12-A | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 31 | USDA | NR233A750004G092 | Expand markets for climate-Smart grass-fed lamb, grass fed beef, corn, soybeans, small grains, produce, dairy, agroforestry and hemp in Kentucky; supports socially disadvantaged farmers | Partnerships for Climate-Smart Commodities Program | Organic Association of Kentucky (OAK) | OAK Decl., Ex.11-D | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 32 | USDA | NR233A750004G080 | Subaward with A Greener World (AGW) | Partnerships for Climate-Smart Commodities Program | RAFI-USA | RAFI Decl., Ex. 13-J | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |

| | | | | | | |
|---|---|---|---|---|---|---|
| 33 | USDA | FSA23CPT0013667 | Resources for Resilient Farms | Rural Development Policy Cooperative Agreement | RAFI-USA | RAFI-USA Decl, Ex. | Grant manager working with program manager on process for unfreezing the award. |
| 34 | USDA | FSA23CPT0012856 | Collaborative Approaches for Impact for Philadelphia Urban and Innovative Agriculture | Urban Agriculture and Innovative Production Grant | Pasa | Pasa Decl., Ex. 12-C | Accessible to Grantees. Payment submitted on 4/7/25 and staff are reviewing/processing. |
| 35 | USDA | 24-DG-11052021-228 | Ready, Set, Grow San Diego | Urban and Community Forestry Grant | City of San Diego | San Diego Decl., Ex. 20-A | Accessible to Grantees. |
| 36 | USDA | 23-DG-11094200-363 | Subaward of Ohio Department of Natural Resources | Urban and Community Forestry Grant | City of Columbus | Columbus Decl., Ex. 15-A | Accessible to Grantees. |
| 37 | USDOT | N/A | East Nashville Spokes | Active Transportation Infrastructure Investment Program | City of Nashville | Nashville Decl., Ex. 17 | No grant agreement completed. Grant agreement under review. |
| 38 | USDOT | N/A | Electrify Music City | Charging and Fueling Infrastructure Grant Program | City of Nashville | Nashville Decl., Ex. 17 | No grant agreement completed. Grant agreement under review. |

\* EPA reports that payment for expenses properly incurred during the pendency of termination will be available as part of the termination closeout process pursuant to the terms of the grant agreements.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| The Sustainability Institute *et al.*, | Case No. 2:25-cv-2152-RMG |
| Plaintiffs, | |
| v. | |
| | **ORDER** |
| Donald J. Trump, in his official capacity as President of the United States, *et al.* | |
| Defendants. | |

The Court conducted a hearing on April 23, 2025 to address the issue of jurisdiction and review recent developments regarding the grants at issue in this case. The Court memorializes and supplements its rulings from the bench at the April 23 hearing in two sections below. First, the Court addresses the issue of jurisdiction. Second, the Court addresses supplementing the record.

## I.    Jurisdiction

Plaintiffs bring this case under the United States Constitution and the APA, 5 U.S.C. §§ 702, 704, alleging that Defendants improperly froze Plaintiffs' grant funds appropriated by Congress under the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA"). Defendants argue that this court lacks subject matter jurisdiction to hear Plaintiffs claims because (A) the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over Plaintiffs' claims and (B) Plaintiffs are challenging funding decisions committed to agency discretion by law which are not subject to Administrative Procedure Act ("APA") review.

### A.  Tucker Act

"Absent a wavier, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *see United States v. Mitchell*, 463 U.S.

1

**App. 31**

206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

The Tucker Act confers jurisdiction upon the Court of Federal Claims over specific categories of actions brought against the United States and waives the Government's sovereign immunity for those actions. 28 U.S.C.A. § 1491, *see Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Specifically, "[t]he Tucker act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 330, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert denied*, 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

The APA also offers a waiver of sovereign immunity and entitles "a person suffering legal wrong because of any agency action" to seek "judicial review thereof." 5 U.S.C. § 702. Section 702 of the APA specifies that sovereign immunity is not available as a defense when the party seeks "relief other than money damages" against the United States or its agencies. 5 U.S.C. § 702; *Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988) (stating that Congress amended § 702 in 1976 to "broaden the avenues for judicial review of agency action be eliminating the defense of sovereign immunity" in suits "seeking relief other than money damages."). Section 704 of the APA specifies that judicial review of agency action may be had when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Therefore, courts interpreting sections 702 and 704, have held that for the APA's waiver of sovereign immunity to apply, a claim must (1) request "relief other than

2

**App. 32**

money damages" and (2) show no "adequate remedy" is available elsewhere, such as in the Court of Federal Claims under the Tucker Act. *See Doe v. United States*, 372 F.3d 1308, 1312 (Fed. Cir. 2004).

"The interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346. As discussed, "[t]he APA allows private parties to sue the federal government in district court over final agency actions, so long as they seek relief other than monetary damages 'for which there is no other adequate remedy in a court.'" *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346). And "[c]laims for money, by contrast, proceed under the Tucker Act and in the Court of Federal Claims." *Williams v. Roth*, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing 28 U.S.C. §§ 1346(a)(2), 1491). To that end, "where 'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (noting the flip side of the same coin: "[t]he Tucker Act yields when the . . . Administrative Procedure Act. . . provides an avenue for relief").

There is a "distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation— and an equitable action for specific relief . . . ." *Bowen*, 487 U.S. at 893. A claim for specific relief through declaratory judgment or injunction that requires the federal government to pay money to plaintiffs does not automatically transform the action into one for money damages. *Id.* ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *Harrison v. Kendall*, 670 F.Supp.3d 280, 297 (E.D. Va. 2023) ("[a] suit which does not seek monetary damages does not arise under the Tucker Act

**App. 33**

simply because the plaintiff's success will result in eventual monetary gain from the government."). Instead, "[t]o determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F.4th at 615-16 (quoting *Randall*, 95 F.3d at 346).

"The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The Court discusses the elements of the *Megapulse* framework in turn below.

### 1. Source of Rights

Defendants argue that Plaintiffs' source of rights stem from their grant agreements with the government. (Dkt. No. 56 at 10-11). Defendants point to language in Plaintiffs' motion for preliminary injunction and their amended complaint where Plaintiffs assert that they have entered into binding agreements with the government; that the government has provided funding up to a specified dollar amount, over a specified time period, for specified work; and that the government has not abided by the grant agreements and regulations. (*Id.*) Defendants further argue that Plaintiffs characterized the remedy they are seeking as simply requiring the government to honor commitments it has already made to Plaintiffs in binding grant agreements. (*Id.* at 11).

Plaintiffs argue that their claims are not based on contract, but instead are rooted in the Constitution and the grant programs' respective authorizing statutes. (Dkt. No. 64 at 5). In their amended complaint, Plaintiffs explicitly ask the Court to interpret and enforce federal law, not the individual grants. (Dkt. No. 23 at 77-88). In counts I and II of the amended complaint, Plaintiffs

4

**App. 34**

contend that Defendants freezing actions violate separation of powers and were done *ultra vires*. (*Id.* at 77-81). Specifically, Plaintiffs allege that Defendants did not have any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds and that the Defendants' actions usurped Congress' constitutionally authorized spending and legislative powers. (*Id.*) In count III, Plaintiffs allege that Defendants actions were arbitrary and capricious and violate the APA because Defendants froze all IRA and IIJA funding relying on factors which Congress did not intend them to consider. (*Id.* at 81-83). In count IV, Plaintiffs allege that Defendants violated the APA because Defendants actions are contrary to the IRA and IIJA and are not in accordance with the statutory requirements to create, fund, and carry out the grant programs. (*Id.* at 83-85). In count V, Plaintiffs allege that Defendants freezing actions violate the First Amendment of the Constitution because Defendants targeted federal funding recipients based on their viewpoint. (*Id.* at 85-87). And in count VI, Plaintiffs allege that Defendants actions violate the IRA and IIJA because Defendants are statutorily required to carry out the congressionally mandated to obligate and distribute the funds that Congress appropriated for the grant programs.

Additionally, Plaintiffs prayer for relief requests, among other things, declaratory judgments that Defendants actions violated the Constitution, statutory provisions enacting and appropriating funds to Plaintiffs grant programs, and the APA; an injunction prohibiting Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their grant funds; and an order setting aside Defendants actions to freeze or terminate the grants. (*Id.* at 89-91).

Based on the Court's review of the Complaint, the Court finds that Plaintiffs' claims do not turn on the terms of a contract between the parties. None of Plaintiffs' claims are based on Defendants failure to perform obligations in the grant awards. Plaintiffs are not seeking judicial

review of the grant agreements between the parties. Instead, they have asked the Court to review and interpret federal laws. That Plaintiffs' action implicates agreements for federal funds does not transform the action into one for money damages. The source of the rights alleged in this action is federal law—namely the IRA, IIJA, and the Constitution—not any obligations outlined in the grant awards.

### 2.  Type of Relief Sought

Defendants argue that Plaintiffs seek monetary relief because their claims are tied to Plaintiffs accessing federal funds. (Dkt. No. 56 at 11). Defendants further argue that the Court of Federal Claims could provide the Plaintiffs complete relief because Plaintiffs are requesting the monetary amounts awarded by the grants, which, in Defendants' view, are specific sums already calculated and past due.

It is now axiomatic that there is a "distinction between an action at law for damages," which provides monetary compensation, and "an equitable action for specific relief," which might nonetheless require monetary relief. *Bowen*, 487 U.S. at 893; *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) ("[W]hether [restitution] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.))). Simply because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships. *Compare Bowen*, 487 U.S. at 905 (holding the district court had jurisdiction because declaratory or injunctive relief was appropriate to clarify petitioner state's ongoing obligations under the Medicaid plan), *with Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020) (holding that petitioners properly

6

**App. 36**

2:25-cv-02152-RMG    Filed: 05/22/2025    Pg: 68 of 268

relied on the Tucker Act to sue for damages in the Court of Federal Claims because plaintiffs were strictly concerned with "specific sums already calculated, past due, and designed to compensate for completed labors").

The Court finds *Bowen* especially instructive here. "The principal question presented [in *Bowen*] is whether a federal district court has jurisdiction to review a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program." *Bowen*, 487 U.S. at 882. The Supreme Court held the district court had subject matter jurisdiction over the suit. *Id.* at 912. The plaintiff, Massachusetts, sought prospective relief which was "important to the Commonwealth both because the . . . program [at issue was] still active and because the legal issues involved [had] ramifications that affect[ed] other aspects of the Medicaid program. What [was] at stake . . . [was] the scope of the Medicaid program, not just how many dollars Massachusetts should have received in any particular year." *Id.* at 889–90. Thus, the Supreme Court held the Court of Federal Claims was unable to provide an adequate remedy. *Id.* at 904.

Plaintiffs primary purpose in brining their claims is to seek equitable, not monetary, relief. They do not bring claims for past pecuniary harms. Rather, like the plaintiffs in *Bowen*, Plaintiffs claims are to preserve their ongoing and prospective agreements with the Government. Plaintiffs have an ongoing relationship with the government and seek declaratory and injunctive relief to confirm the Government's future obligations towards Plaintiffs under the IRA and IIJA. Plaintiffs' claims are about the process in which their grants were frozen, not the monetary awards in the grants themselves.

Additionally, the harms that Plaintiffs allege can only be remedied by specific, not monetary, relief. Plaintiffs state that the blanket IIJA and IRA funding freezes will result in lost

7

**App. 37**

jobs, suspension of research and community initiatives, loss of goodwill, and harm to the Plaintiffs' reputation. Money damages will not resolve those alleged harms.

Specifically, loss of goodwill and harm to Plaintiffs' reputation cannot be remedied by monetary damages. Some of the Plaintiffs here have devoted resources to build trust and relationships in the communities in which they serve, and those Plaintiffs now fear that the trust and relationships they built may be broken. For example, Plaintiff Pennsylvania Association for Sustainable Agriculture ("Pasa") is a non-profit organization that supports farmers' goals of creating economically viable, environmental sound, and community-focused farms and food systems.  Pasa is largely funded by federal grants. It's largest grant award, $50 million from the Untied States Department of Agriculture Natural Resources and Conservation Service Partnership for Climate-Smart Commodities program, was frozen and is subject in this lawsuit. When applying for that award, Pasa built trust and relationships with farmers in their communities, the people Pasa endeavored to serve with the grant funds. Pasa now fears that the continued freezing of funds may force them to abandon the very farmers who entrusted them with their time and their land. Those relationships are also tested by the uncertainty surrounding federal funds caused by the funding freeze. Pasa states that, if the trust between Pasa and the farming community is broken, it is impossible to estimate how long it may take to repair those relationships. (Dkt. No. 24-13).

Even if the total grant funds could be restored by a damages award in the Court of Federal Claims, such a damage award would not alleviate the reputational harms Plaintiffs would likely suffer. The farmers, for example, may be hesitant to work with Pasa in the future in fear that an agency's funding decision may change overnight and disrupt critical operations, such as seasonal planting and harvesting.  Under these circumstances, declaratory relief establishing that blanket freezes of grants done without individualized process and without legal authority are improper is

8

**App. 38**

critical to provide to provide Plaintiffs effective relief.  Such relief, if granted, would provide Pasa's clients with the assurance that any federal funds that they plan to rely on will only be frozen or cancelled through actual authority provided by federal laws and after the funding agency follows the lawful process. This example emphasizes that Plaintiffs' claims are about process, not damages, and are available only through the equitable powers of the district court under the APA.

Since the Court finds that the proper source of Plaintiffs' rights is federal law and because the relief sought is declaratory and injunctive in nature, the Court finds that the "essence" of the Plaintiffs' claims is not contractual in nature. Plaintiffs' claims cannot properly be brought under the Tucker Act in the Court of Federal Claims and fall plainly within the jurisdiction of this Court under the APA.

### 3. *Department of Education v. California*

Defendants contend that the Supreme Court's recent issuance of an emergency stay order in a three-page decision, issued without benefit of a record or oral argument, definitively disposes of all jurisdictional issues in this case. The Court finds Defendants' argument unpersuasive.

In *Department of Education v. California*, the Supreme Court stayed a district court's temporary restraining order pending the resolution of the appeal in the underlying case. *California*, 2025 WL 1008354, at \*2. At the district court, plaintiffs sought preliminary relief enjoining the Government from terminating grant awards under programs administered by the United States Department of Education. *California v. U.S. Department of Education*, No. 25-105488-MJJ, 2025 WL 760825, at \*1 (D. Mass. Mar. 10, 2025). The District Court for the District of Massachusetts granted injunctive relief against the government. *Id.* at \*5. The Government appealed the district court's order and requested a stay pending the appeal. *California v. U.S. Department of Education*, No. 25-1244, 2025 WL 878431, at \*1 (1st Cir. Mar. 21, 2025). The First Circuit Court of Appeals

9

**App. 39**

denied the Government's request to stay the district court's order pending appeal. *Id.* at *1. The Government then filed an emergency application to the Supreme Court requesting the Court vacate the district court's temporary restraining order and immediately stay the case pending the disposition of the Government's appeal. *California*, 2025 WL 1008354, at *1. The Supreme Court granted the application and stayed the district court's order. The Court reasoned that a stay is appropriate because (1) "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," (2) the Government is likely to suffer irreparable harm, and (3) "respondents would not suffer irreparable harm while the TRO is stayed." *Id.*

In finding that the Government is likely to succeeded in showing the District Court lacked jurisdiction to order payment of money under the APA, the Supreme Court very briefly discussed the jurisdictional line between the APA and Tucker Act. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages, but also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). The Supreme Court further noted that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the [district court in *California*] ordered . . . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, the Supreme Court stated that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The *California* ruling is not dispositive of the jurisdictional questions in this case for three reasons.

**App. 40**

First, the *California* ruling was made in the context of an emergency application for a stay pending appeal. In that procedural posture, the Supreme Court relied on limited briefing and did not have the benefit of oral argument or a factual record. Additionally, the Supreme Court applied a likelihood of success standard to the Government's application for a stay, stopping well short of addressing the complex jurisdictional issues on the merits. Without a factual record, meaningfully addressing the jurisdictional issues under *Bowen* would not have been possible. Under these circumstances, the Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to definitively address the jurisdictional issues in this case. The Court therefore finds that, *Bowen*, not the emergency stay order in *California*, is the guiding compass in deciding whether the Court has jurisdiction under the APA or the Court of Claims has jurisdiction under the Tucker Act.

Second, the terms and conditions of the individual grants are not at issue here. In *California*, the First Circuit Court of Appeals determined that "the terms and conditions of each individual grant award" were "at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the Supreme Court then granted the Department's application for a stay because it concluded that the district court issued an order "to enforce a contractual obligation to pay money" and "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1. In this case, the terms and conditions of each individual grant are not at issue. Rather, this case deals with Defendants' implementation of a broad, categorical freeze on obligated funds pending determinations on whether it is lawful to summarily freeze or terminate disbursements of such funds. Plaintiffs here allege that the categorical funding freeze was not based on individualized

11

**App. 41**

assessment of any particular grant terms and conditions or agreements between the Parties but, instead, was based on the grants being funded by the IRA and IIJA.

Third, there are still other factors the Supreme Court considered in ruling in *California* which are not relevant or present here. The issuance of a stay is dependent upon the circumstances of the particular case, and the Supreme Court's finding that the District Court likely lacks jurisdiction is just one of the factors it considered. The Supreme Court also considered potential harm to the parties and public interest when issuing the stay. The combination of those factors guided the Supreme Court in making its judgment. Those factors are not relevant to the Court's determination here. And even if they were relevant, they are not present in this case. For example, unlike in *California* there is no indication in this case that the Plaintiffs could not or would not pay the money back if so ordered. Additionally, Plaintiffs have provided considerable evidence of irreparable harm should they not regain access to their grant funding. This is different from *California* where the Supreme Court specifically found that the State government could fund the affected programs during the pendency of the litigation, effectively eliminating a major portion of the California plaintiffs' irreparable harm claim. *California*, 2025 WL 1008354, at *1.

In sum, considering the full record before the Court, the clear statutory authority for APA jurisdiction where a party is seeking relief from agency action other than money damages, and the well-established standards set forth in *Bowen*, the Court finds that it has jurisdiction over this matter under the APA.

### B. Agency Discretion

Defendants argue that their actions to freeze the grant funds were committed to agency discretion by law and fall outside the scope of permissible judicial review under the APA. (Dkt. No. 56 at 14-16).

**App. 42**

As discussed above, APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "That language sets up a 'basic presumption of judicial review' of agency action." *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). The text carves out two exceptions to that "basic principle." *Id.* First, where "statutes preclude judicial review" per § 701(a)(1); and second, where "agency action is committed to agency discretion by law" per § 701(a)(2). *Holbrook,* 48 F.4th at 287. With regard to the second, "[a]gency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)). Of import here, the APA's prohibition of judicial review of actions committed to agency discretion by law, and a defect related thereto, "goes to subject matter jurisdiction." *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–506 (4th Cir. 2013)).

Defendants primarily rely on the Supreme Court's opinion in *Lincoln v. Vigil* to support its argument on agency discretion. 508 U.S. 182 (1992). In *Lincoln*, the Court found an agency's particular use of funds from a "lump sum" grant was committed to its discretion because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. That is, "a lump-sum appropriation reflects a congressional recognition that an agency must be allowed flexibility to shift funds within a

13

**App. 43**

particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 193 (internal citation omitted).

Here, there is no indication that Congress intended to commit funding under the IRA and IIJA to the agencies' discretion. Defendants have not pointed to any evidence showing that this was Congress' intention. And this case does not involve an agency's allocation of funds under a lump-sum grant by Congress (which by its nature implies delegation of wide discretion to the agency). Because Defendants have not shown that the funds at issue here were committed to agency discretion, the Court declines to apply the 5 U.S.C. § 701(a)(2) exception to the APA's waiver of sovereign immunity here.

## II.    Supplementation of the Record and the Process Going Forward

When this case was initially filed on March 19, 2025, Plaintiffs alleged that their grants, totaling 38, had been frozen[1] because the funds for those grants had been appropriated under two Acts of Congress now disfavored by the present Administration: the Inflation Reduction Act (IRA) and the Infrastructure Investment and Jobs Act. (IIJA). (Dkt. No. 1 at 2). At oral argument before the Court on April 23, 2025, Defendants' counsel was unable to provide the Court any estimate of the number of grants which had been summarily frozen since January 20, 2025, but he acknowledged that grants had been frozen on a mass, not individualized, basis.[2]

In response to a recent Order directing Defendants to provide a status report on the 38 grants at issue in this litigation, Defendants submitted a chart which indicated that the funding of 13 grants had been restored, four of the grants had been terminated, and 12 of the grants had

---

[1] As used in this Order, the terms "frozen" or "freeze" have the same meaning as a "pause" in funding or any other action that disrupted the normal flow of grant funds to the grantees.

[2] This was corroborated by the fact that in the thousands of pages of records produced by Defendants relating to the freezing of grants at issue in this litigation, the Court could not locate a single document (other than four termination letters) which referenced any individual grantee.

14

**App. 44**

terminations being processed. (Exhibit A). It appears to the Court that the Defendants' chart reflects a pivot away from the summary freezing of grants in mass. Defendants appear now to be turning their focus to a narrower set of grants allegedly sought to be terminated because they are allegedly not consistent with "agency policy." At the hearing of April 23, 2025, Defendants' counsel could not provide the Court any additional justification for the termination or proposed termination of any of the grants in this litigation. Questions also arose at the recent hearing regarding the status of certain grants.

In an effort to obtain greater specification of the reasons for the proposed termination of certain grants and a better understanding of the present status of several other grants, the Court orders Defendants to provide the following within seven days of this Order:

1. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the termination of the grants set forth in Exhibit A at Nos. 9, 10, 11, and 12 and the proposed termination of grants set forth at Nos. 2, 3, 4, 5, 6, 7, 27, 28, 29, 30, 31, and 32.

2. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the freezing of funds set forth in Exhibit A at Nos. 16, 22, and 23.

3. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the decision to finalize or not to finalize the grant awards set forth in Exhibit A at Nos. 37 and 38.

4. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the status of the grant set forth at Exhibit A at No. 15. Exhibit A lists No. 15 as "accessible to grantee" but Plaintiffs indicate this grantee has been

15

**App. 45**

unable to access the funds. To the extent the grant remains frozen or slated for possible termination, produce all relevant documents.

5. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the status of the grant set forth at Exhibit A at No. 8. Exhibit A lists this grant as "closed," and Plaintiffs assert that to their knowledge the grant is frozen. To the extent the grant remains frozen or is slated for possible termination, produce all relevant documents.

6. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present in which Defendants were instructed and/or advised that all grants authorized by the IRA or the IIJA were to be frozen.

7. The Court previously gave Defendants until April 21, 2025 to supplement their privilege logs regarding the deliberative process privilege. (Dkt. No. 77). Per Defendants' request, the Court extends the time to supplement the privilege logs until 7 days following the issuance of this order and only the privilege logs of Defendants EPA and USDA need to be addressed.

In the event that any Defendant asserts any privilege in regard to any of the documents required to be produced in Paragraphs 1-7 above, such documents must be identified in an appropriately documented privilege log and must be submitted to the Court under seal and *ex parte* for *in camera* review within seven days of this Order.

Additionally, to avoid the confusion created by Defendants producing thousands of documents in response to this Court's earlier order without identifying which particular discovery request Defendants were responding to, the Court orders and directs that Defendants respond to each discovery request above separately and clearly identify which documents are responsive to

**App. 46**

each discovery request. This directive applies both to responses to discovery requests in which no privilege is asserted as well as all documents produced *ex parte* and *in camera* based on an assertion of privilege.

Once Defendants comply with their discovery obligations to the Court above, Plaintiffs may file a response to the submitted documents and address any other issues related to the production of documents and/or their pending motion for a preliminary injunction with seven days after receipt of the Plaintiffs' responses required in Paragraphs 1-7 above.

Finally, in regard to the grants which Defendants have identified as now unfrozen in Exhibit A at Nos. 13, 14, 15, 16, 17, 18, 20, 21, 24, 25, 26, 34, 35 and 36, Defendants are ordered and directed not to subsequently freeze or terminate these grants without notice to the Court and authorization from the Court that the freezing and/or terminating of the grants may proceed.


              _s/ Richard Mark Gergel_____
              Richard Mark Gergel
              United States District Judge

April 29, 2025
Charleston, South Carolina

**App. 47**

# LIST OF PLAINTIFFS' GRANTS AND STATUTORY AUTHORITIES

# EXHIBIT 21

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| Granting Agency | Grant Number | Project Name/Notes | Grant Program | Grant Recipient | Relevant Cites | Statutory Authority and Funding Source(s) for Grant Program |
|---|---|---|---|---|---|---|
| DOE | DE-SE0001546 | Assistance for Latest and Zero Building Energy Code Adoption | Assistance for Adoption of the Latest and Zero Building Energy Codes | City of Baltimore | Baltimore Decl., Ex. 14-C [1]<br><br>Amended Compl. ¶¶ 55–61, 150–52 | "Assistance for Latest and Zero Building Energy Code Adoption." DOE "shall use" appropriated funds for this program for "grants to assist" State and local governments to "adopt . . . building energy code[s]" for residential and commercial buildings that meet certain "energy savings" standards. Inflation Reduction Act ("IRA"), Pub. L. No. 117–169 § 50131, 136 Stat. 1818, 2041–42 (Aug. 16, 2022).<br><br>"Energy Policy and Conservation Act." Granting DOE certain authority "to promote the conservation of energy and reduce the rate of growth of energy demand," including through "the development and implementation of specific State energy conservation programs" and "Federal financial and technical assistance to States in support of such programs." 42 U.S.C. § 6321(b). |
| EPA | 5F-03D33625-0 | Youth Empowerment Strategies 4 Environmental Justice | Environmental and Climate Justice Block Grant – | Earth Island Institute | Earth Island Decl., Ex. 8-D<br><br>Amended Compl. ¶¶ 37–38, 114–122 | "Environmental and Climate Justice Block Grants." EPA "shall" use IRA funds appropriated for this program to award grants for certain environmental projects "that benefit disadvantaged |

---

[1] Exhibit cites in this column reference exhibits to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction.

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Community Change Grant | | | communities." IRA § 60201, 136 Stat. at 2078–79 (codified at 42 U.S.C. § 7438). |
| EPA | 3D30824 | Community Change Grant | Environmental and Climate Justice Block Grant - Community Change Grant | Sustainability Institute | Sustainability Inst. Decl., Ex. 1-B  Amended Compl. ¶¶ 18–21, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 97T28301 | Inflation Reduction Act – Environmental and Climate Justice | Environmental and Climate Justice Block Grant - Community Change Grant | Leadership Counsel for Justice and Accountability | Leadership Counsel Decl., Ex. 9-A  Amended Compl. ¶¶ 39–40, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 96272300 | Uplifting Bronx Voices for Climate Change Resilience | Environmental and Climate Justice Block Grant – Community Change Grant | Bronx River Alliance | Bronx River Decl., Ex. 5-B  Amended Compl. ¶¶ 30–31, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 97T28901 | Huliau o Wai'anae: Turning Points for a Sustainable Future. | Environmental and Climate Justice Block Grant – Community Change Grant | Earth Island Institute | Earth Island Decl., Ex. 8-B  Amended Compl. ¶¶ 37–38, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 00A01479 | Elm City Climate Collaborative | Environmental and Climate Justice Block Grant – Community Change Grant | City of New Haven | New Haven Decl., Ex. 18-C  Amended Compl. ¶¶ 70–73, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| EPA | 00E05005 | Climate Resilience Starts at Home: Growing Energy Efficiency, Indoor Air Quality, and Green Jobs in Madison and Fitchburg, Wisconsin | Environmental and Climate Justice Block Grant - Community Change Grant | City of Madison | Madison Decl., Ex. 16-A<br><br>Amended Compl. ¶¶ 64–65, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 00A01441 | Electrify New Haven | Environmental and Climate Justice Block Grant – Government to Government Grant | City of New Haven | New Haven Decl., Ex. 18-A<br><br>Amended Compl. ¶¶ 70–73, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 95336801 | DPW YH20+ Expansion II | Environmental and Climate Justice Block Grant - Government to Government Grant | City of Baltimore | Baltimore Decl., Exs. 14-C, 14-D<br><br>Amended Compl. ¶¶ 55–61, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 03D03424 | North Mecklenburg Air Monitoring Network | Environmental Justice Collaborative Problem-Solving | CleanAIRE NC | CleanAIRE NC Decl., Ex. 6-B<br><br>Amended Compl. ¶¶ 32–33, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 96229424 | Partnership for Urban Waterways in Bronx and Lower Westchester Counties, New York | Environmental Justice Collaborative | Bronx River Alliance | Bronx River Decl., Ex. 5-D<br>Amended Compl. ¶¶ 30–31, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |

**App. 51**

EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities

| | | | Problem-Solving | | | |
|---|---|---|---|---|---|---|
| EPA | 00A01475 | Union Station Area Thermal Energy Network | Climate Pollution Reduction Grant Program | City of New Haven | New Haven Decl., Ex. 18-B<br><br>Amended Compl. ¶¶ 70–73, 138–141 | "Greenhouse Gas Air Pollution Plans and Implementation Grants." EPA "shall" use IRA funds appropriated to this program to award grants for plans and projects "for the reduction of greenhouse gas air pollution." IRA § 60114, 136 Stat. at 2076–77 (codified at 42 U.S.C. § 7437). |
| EPA | 95335901 | Bowley's Lane Composing Facility | Solid Waste Infrastructure for Recycling Grant Program | City of Baltimore | Baltimore Decl., Ex. 14-A<br><br>Amended Compl. ¶¶ 55–61, 155–58 | "State and Tribal Assistance Grants." Under this program, the Infrastructure Investment and Jobs Act ("IIJA") appropriated funds to EPA which "shall be made available" until 2026 for grants under Section 302(a) of the Save Our Seas 2.0 Act. IIJA, Pub. L. No. 117–58 § 601, 135 Stat. 429, 1404 (Nov. 15, 2021).<br><br>"Post-Consumer Materials Infrastructure Grant Program." Section 302(a) of the Save Our Seas 2.0 Act creates a grant program to "support . . . municipal recycling programs" and "improvements to local waste management systems," among other purposes. Pub. L. 116-224 § 302(a), 134 Stat. 1072, 1092 (2020). |
| EPA / NFWF | 0602.24.082555 | Accelerating Clean Water and Conservation Outcomes in | Innovative Nutrient and Sediment Reduction | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Ex. 4-E | "Environmental Programs and Management." The IIJA appropriated funds which "shall be for" EPA's Chesapeake Bay Program, IIJA § 601, |

EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities

| | | | | | |
|---|---|---|---|---|---|
| | | Shenandoah Valley (VA) | Grants Program | | Amended Compl. ¶¶ 27–29, 159–62 | 135 Stat. at 1396, the "goal" of which is "restoring and protecting the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem," including through "assistance grants [] to nonprofit organizations." 33 U.S.C. § 1267(a)(2), (a)(4), (d)(2) |
| USDA | AM22FFWPA0 013 | Collaborative Farm Worker and Meatpacking Worker 14-State COVID Relief Fund Project | Agricultural Marketing Service Farm and Food Worker Relief | Pasa | Pasa Decl., Ex. 12-B

Amended Compl. ¶¶ 47–50, 171–72 | "Agricultural Programs." The Consolidated Appropriations Act of 2021 appropriated funds that USDA "shall use" for "grants and loans" to farmers and other food workers on the frontlines of the COVID-19 pandemic. Pub. L. 116-260 § 751, 134 Stat. 1182, 2107.

"Specialty Crop Block Grants." The Consolidated Appropriations Act of 2021 appropriated funds to USDA for "Specialty Crop Block Grants" "to remain available until expended." Pub. L. 116-260 § 752, 134 Stat. 1182, 2108.

Under the Specialty Crops Competitiveness Act of 2004, Specialty Crop Block Grants are made by USDA "to enhance the competitiveness of specialty crops," Pub. L. 108-465 § 101, 118 Stat. 3882, 3882, and include "multistate programs." Agriculture Improvement Act of 2018, Pub. L. 115-334 § 10107, 132 Stat. 4490, 4905–06 |

**App. 53**

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| USDA | 2022-70416-37195 | Subaward with National Young Farmers Coalition | American Rescue Plan Technical Assistance Investment Program | RAFI-USA | Amended Compl. ¶¶ 51–54, 132–37 | "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups." The American Rescue Plan Act of 2021 appropriated funds to this program that USDA "shall" use to provide "technical assistance" and other support to "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2 § 1006, 135 Stat. 4, 13 (Mar. 11, 2021).<br><br>"USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters." The IRA amended Section 1006 of the American Rescue Plan Act and appropriated funds to, among other things, "provide . . . technical assistance" on agriculture issues "to underserved farmers, ranchers, or forest landowners." IRA § 22007(a), 136 Stat. at 2022–23. |
|---|---|---|---|---|---|---|
| USDA | NR225F48XXXXC002 | Organic Technical Staffing Assistance | Conservation Stewardship Program: Organic Technical Assistance Grant | Marbleseed | Marbleseed Decl., Ex. 10-C<br><br>Amended Compl. ¶¶ 41–43, 123–131 | "Additional Agricultural Conservation Investments." The IRA appropriated funds to USDA's "conservation stewardship program" and other programs—funds that "shall" be available for agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–2016.<br><br>"Conservation Stewardship Program." USDA "shall carry out [the] conservation stewardship program to encourage producers to address priority resource concerns and improve and conserve the quality and condition of natural resources in a comprehensive manner." 16 U.S.C. § 3839aa-22. |
| USDA | NR223A75000 3C062 | Subaward with RAFI-USA | Conservation Technical Assistance Cooperative Agreement | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3-D<br><br>Amended Compl. ¶¶ 24–26, 123–131 | "Conservation Technical Assistance." IRA appropriates funds to USDA "to provide conservation technical assistance through the Natural Resources Conservation Service." IRA § 21002(a), 136 Stat. at 2018.<br><br>"Conservation Technical Assistance Fund." The Soil Conservation and Domestic Allotment Act of 1935 appropriates funds to USDA "to provide permanently for the control and prevention of soil erosion to preserve soil, water, and related resources, promote soil and water quality, control floods, [and] . . . protect public health, public lands and relieve unemployment," among other purposes. 16 U.S.C.A. §§ 590a, 590f(b). |

EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities

| USDA | FSA24CPT0014403 | Distressed Borrower Technical Assistance | Distressed Borrower Assistance Network Program | RAFI-USA | RAFI Decl., Ex. 13-D<br><br>Amended Compl. ¶¶ 51–54, 146–49 | "Farm Loan Immediate Relief for Borrowers with at-Risk Agricultural Operations." USDA "shall" use IRA funds for this program to "provide relief" to "distressed borrowers . . . whose agricultural operations are at financial risk as expeditiously as possible." IRA § 22006, 136 Stat. at 2021.<br><br>The Consolidated Farm and Rural Development Act further empowers USDA to "compromise, adjust, reduce, or charge-off debts or claims," among other authorities. 7 U.S.C. 1981(b)(4). |
| USDA | NR242D37XXXXG002 | In Pennsylvania to help improve grazing success and associated economic, environmental, and social co-benefits, including animal health, soil health, carbon sequestration, cost savings, water quality | Environmental Quality Incentives Program – Conservation Innovation Grants | Pasa | Pasa Decl., Ex. 12-D<br><br>Amended Compl. ¶¶ 47–50, 123–131 | "Additional Agricultural Conservation Investments." The IRA appropriates funds to USDA's "environmental quality incentives program,"—funds that "shall" be available for agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–2016.<br><br>Under the "Environmental Quality Incentives Program," USDA "shall provide payments to [certain] producers," 16 U.S.C. § 3839aa-2(a), to "promote agricultural production, |

**App. 56**

EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities

| | | | | | |
|---|---|---|---|---|---|
| | | | | | forest management, and environmental quality as compatible goals, and to optimize environmental benefits." *Id.* § 3839aa. |
| USDA | NR243A750003C062 | Expanding RAFI-USA's Conservation Resources for Resilient Farms Project | Equity in Conservation Outreach Cooperative Agreement | RAFI-USA | RAFI Decl., Ex. 13-B<br><br>Amended Compl. ¶¶ 51–54, 123–131 | *See* "Additional Agricultural Conservation Investments" program, "Environmental Quality Incentives Program," the "Conservation Stewardship Program," and the "Conservation Technical Assistance Fund," *supra.*<br><br>*See also* "Agricultural Conservation Easement Program," which USDA "shall establish for the conservation of eligible land and natural resources through easements or other interests in land." 16 U.S.C.A. § 3865(a). |
| USDA | NR243A750003C045 | Deliver outreach and education programming to increase awareness of and participation in NRCS programs, services and leadership opportunities in agriculture and natural resource conservation in Kentucky. | Equity in Conservation Outreach Cooperative Agreement | Organic Association of Kentucky (OAK) | OAK Decl., Ex. 11-B<br><br>Amended Compl. ¶¶ 44–46, 123–131 | *See* "Additional Agricultural Conservation Investments" program "Environmental Quality Incentives Program," the "Conservation Stewardship Program," the "Conservation Technical Assistance Fund," and the "Agricultural Conservation Easement Program," *supra.* |
| USDA | FSA24GRA0011586 | Increase Land, Capital, and Market Access for Underserved Farmers on a Mid-size National Landscape using New | Increasing Land, Capital, and Market Access Program | Agrarian Trust | Agrarian Trust Decl., Ex. 2-A | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups." The American Rescue Plan Act of 2021 appropriated |

**App. 57**

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  | Model, Agrarian Commons |  |  | Amended Compl. ¶¶ 22–23, 132–37 | funds that USDA "shall" use to provide "technical assistance," "grants and loans" to "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2 § 1006, 135 Stat. 4, 13 (Mar. 11, 2021). "USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters." The IRA amended Section 1006 of the American Rescue Plan Act and appropriated additional funds to benefit "underserved farmers, ranchers, or forest landowners" and those who "experienced discrimination . . . in Department of Agriculture farm lending programs," and to "address racial equity issues" within USDA. IRA § 22007, 136 Stat. at 2022–23. |
| USDA | FSA24CPT0013706 | Gaining New Ground | Increasing Land, Capital, and Market Access Program | RAFI-USA | RAFI Decl., Ex. 13-F Amended Compl. ¶¶ 51–54, 123–131 | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups" program, and "USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters" program, *supra*. |
| USDA | FSA23CPT0013706 | Gaining New Ground - Subaward with RAFI-USA | Increasing Land, Capital, and Market Access Program | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3-B. | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups" program, and "USDA Assistance and Support for |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | Amended Compl. ¶¶ 24–26, 123–131 | Underserved Farmers, Ranchers, Foresters" program, *supra*. |
|---|---|---|---|---|---|---|
| USDA | NR233A75000 4G045 | Expands markets for climate-smart dairy, beef and poultry industry in DE, NC, NJ, NY, MD, OH, PA, SC, TN, VA and WV and supports the implementation and monitoring of climate-smart practices. | Partnerships for Climate-Smart Commodities Program | Conservation Innovation Fund | Cons. Innovation Fund Decl., Ex. 7-A<br><br>Amended Compl. ¶¶ 34–36, 169–170 | The "Commodity Credit Corporation Charter Act" created the Commodity Credit Corporation as an arm of USDA for the purpose of "stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds, and fibers . . . and of facilitating the orderly distribution of agricultural commodities." 15 U.S.C. § 714.<br><br>"Additional Agricultural Conservation Investments." The IRA appropriated funds to USDA's Commodity Credit Corporation that "shall" be available for agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–2016. |
| USDA | NR233A75000 4G045 | Subaward with Conservation Innovation Fund | Partnerships for Climate-Smart Commodities Program | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Exs. 4-A, 4-B<br><br>Amended Compl. ¶¶ 27–29, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra*. |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | |
|---|---|---|---|---|---|
| USDA | NR243A75000 4G010 | Expands climate-smart wheat, grain, specialty and organic crop markets in IA, IL, IN, KS, KY, MI, MN, MO, ND, NE, OH, SD, TN, WI and supports farmer CS practice implementation and monitoring. | Partnerships for Climate-Smart Commodities Program | Marbleseed | Marbleseed Decl., Ex. 10-B<br><br>Amended Compl. ¶¶ 41–43, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra.* |
| USDA | NR233A75000 4G025 | Expands markets in the Eastern US for climate-smart dairy, grain, livestock, organic and specialty crops; supports farmer and rancher climate-smart practice implementation and monitoring | Partnerships for Climate-Smart Commodities Program | Pasa | Pasa Decl., Ex. 12-A<br><br>Amended Compl. ¶¶ 47–50, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra.* |
| USDA | NR233A75000 4G092 | Expand markets for climate-Smart grass-fed lamb, grass fed beef, corn, soybeans, small grains, produce, dairy, agroforestry and hemp in Kentucky; supports socially disadvantaged farmers | Partnerships for Climate-Smart Commodities Program | Organic Association of Kentucky (OAK) | OAK Decl., Ex.11-D<br><br>Amended Compl. ¶¶ 44–46, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra.* |
| USDA | NR233A75000 4G080 | Subaward with A Greener World (AGW) | Partnerships for Climate-Smart | RAFI-USA | RAFI Decl., Ex. 13-J | *See* "Commodity Credit Corporation Charter Act" and "Additional |

**App. 60**

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Commodities Program | | Amended Compl. ¶¶ 51–54, 169–170 | Agricultural Conservation Investments," *supra*. |
| USDA | FSA23CPT0013667 | Resources for Resilient Farms | Rural Development Policy Cooperative Agreement | RAFI-USA | RAFI Decl., Ex. 13-L<br><br>Amended Compl. ¶¶ 41–43, 132–137 | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups" program, and "USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters" program, *supra*.<br><br>*See also* "Rural development policy cooperative agreements." The Rural Development Act of 1972 authorizes USDA to enter into cooperative agreements "to improve the coordination and effectiveness of Federal programs, services, and actions affecting rural areas," and that "serve the mutual interest of the parties in rural development activities." 7 U.S.C. § 2204b(b)(4)(A). |
| USDA | FSA23CPT0012856 | Collaborative Approaches for Impact for Philadelphia Urban and Innovative Agriculture | Urban Agriculture and Innovative Production Grant | Pasa | Pasa Decl., Ex. 12-C<br><br>Amended Compl. ¶¶ 47–50, 173 | "Food Supply Chain and Agriculture Pandemic Response." The American Rescue Plan Act of 2021 appropriated funds that USDA "shall use" to "make loans and grants" to "maintain and improve food and agricultural supply chain resiliency," among other things. American Rescue Plan Act § 1001, 135 Stat. at 11. |
| USDA | 24-DG-11052021-228 | Ready, Set, Grow San Diego | | City of San Diego | San Diego Decl., Ex. 20-A | "State and Private Forestry Conservation Programs." The IRA appropriated funds to USDA "to |

**App. 61**

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Urban and Community Forestry Grant | | Amended Compl. ¶¶ 74–75, 142–145 | provide multiyear, programmatic, competitive grants" to states and local governments through the Urban and Community Forestry Assistance Program. IRA § 23003(a)(2), 136 Stat. at 2026.<br><br>"Urban and Community Forestry Assistance Program." This program is intended to "implement a tree planting program to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits." 16 U.S.C. § 2105(b)(5). |
| USDA | 23-DG-11094200-363 | Subaward of Ohio Department of Natural Resources | Urban and Community Forestry Grant | City of Columbus | Columbus Decl., Ex. 15-A<br><br>Amended Compl. ¶¶ 62–63, 142–45 | " *See* "State and Private Forestry Conservation Programs" and the "Urban and Community Forestry Assistance Program," *supra*. |
| USDOT | N/A | East Nashville Spokes | Active Transportation Infrastructure Investment Program | City of Nashville | Nashville Decl., Ex. 17<br><br>Amended Compl. ¶¶ 66–69, 166–168 | "Active Transportation Infrastructure Investment Program." The IIJA appropriated funds through 2026 that USDOT "shall" use to "carry out an active transportation infrastructure investment program to make grants, on a competitive basis, to eligible organizations to construct eligible projects to provide safe and connected active transportation facilities in an active transportation network or active |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | transportation spine." IIJA § 11529(a), (j), 135 Stat. at 612, 615. |
| USDOT | N/A | Electrify Music City | Charging and Fueling Infrastructure Grant Program | City of Nashville | Nashville Decl., Ex. 17<br><br>Amended Compl. ¶¶ 66–69, 163–165 | "Grants for Charging and Fueling Infrastructure." The IIJA appropriated funds to USDA "to establish a grant program to strategically deploy publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure along designated alternative fuel corridors or in certain other locations that will be accessible to all drivers of electric vehicles, hydrogen vehicles, propane vehicles, and natural gas vehicles." IIJA § 11401(a), 135 Stat. at 546; *id.* § 11101(b)(1)(C)(i)–(v), 135 Stat. at 445 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE,
AGRARIAN TRUST, ALLIANCE FOR
AGRICULTURE, ALLIANCE FOR THE
SHENANDOAH VALLEY, BRONX RIVER
ALLIANCE, CLEANAIRE NC, CONSERVATION
INNOVATION FUND, EARTH ISLAND
INSTITUTE, LEADERSHIP COUNSEL FOR
JUSTICE AND ACCOUNTABILITY,
MARBLESEED, ORGANIC ASSOCIATION OF
KENTUCKY, PENNSYLVANIA ASSOCIATION
FOR SUSTAINABLE AGRICULTURE AND
RURAL ADVANCEMENT FOUNDATION
INTERNATIONAL-USA,
and

MAYOR AND CITY COUNCIL OF BALTIMORE,
CITY OF COLUMBUS, CITY OF MADISON,
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,          Case No. 2:25-cv-02152-RMG
CITY OF NEW HAVEN, CITY OF SAN DIEGO

                Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States;               **FIRST AMENDED COMPLAINT**
KEVIN HASSETT, in his official capacity as       **FOR DECLARATORY**
Assistant to the President for Economic Policy   **AND INJUNCTIVE RELIEF**
and Director of the National Economic Council;
UNITED STATES OFFICE OF MANAGEMENT
AND BUDGET; RUSSELL VOUGHT, in his
official capacity as Director of the United States
Office of Management and Budget; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official capacity
as Administrator of the United States Environmental
Protection Agency; UNITED STATES DEPARTMENT
OF AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as the Secretary
of the United States Department of Transportation;
UNITED STATES DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official capacity as the

**App. 64**

Secretary of the United States Department of Energy;
UNITED STATES DEPARTMENT OF
GOVERNMENTAL EFFICIENCY SERVICE;
AMY GLEASON, in her official capacity as
Acting Administrator of the United States DOGE
Service; ELON MUSK, in his official capacity as
Senior Advisor of the United States DOGE Service.

Defendants.

## **INTRODUCTION**

1. This action seeks to ensure that programs and funding that Congress has lawfully enacted to improve lives, strengthen communities, and protect the environment throughout the nation reach their intended recipients and fulfill their intended purposes without unlawful interference by the executive branch of the federal government. Plaintiffs are nonprofit organizations and municipalities that have been awarded federal grant funds, either as direct recipients or as sub-grantees, to carry out specific programs enacted by Congress under the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA), and other federal statutes.

2. Beginning the day he took office, the President issued multiple executive orders carrying out his intention to unlawfully defy Congressional mandates by freezing, disrupting, and terminating funds that Congress had directed and appropriated to specific grant programs to benefit the environment and support communities.

3. One order, *Unleashing American Energy*, directed federal agencies to "*Terminat[e]*," by which the President meant to "immediately" stop, the disbursement of all funds—totaling over $1 trillion—appropriated by Congress under the IRA and IIJA. Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025) ("Energy EO") (emphasis added). The Energy EO prohibits agencies from disbursing *any* funds under the two statutes that are not "consistent" with a list of Presidential "polic[ies]," as determined by the President's political appointees. Energy EO §§ 2, 7.

**App. 65**

4. Another, titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, mandates the termination of all 'equity-related' grants or contracts within 60 days. Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) ("Equity EO") (emphasis added).

5. A third, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, orders agencies to "terminate or modify" contracts and grants to "advance the policies of [the Trump] Administration."  Exec. Order 14222, 90 Fed. Reg. 11095, 11096 (Feb. 26, 2025) ("DOGE EO") (together with the Energy EO and the Equity EO, the "Executive Orders").

6. These Executive Orders cite no legal authority for the President or his agencies to unilaterally freeze, let alone terminate, congressionally appropriated funds. Nor do the Orders cite authority which would allow the executive branch to condition the spending of congressionally appropriated funds on compliance with the President's policies and preferences—as distinct from Congress's. Because there is none. Defendants' freezes are not only wholly unsupported by law, but in fact directly contradict duly enacted statutes.

7. In the weeks since the Executive Orders, senior officials from federal agencies including the Office of Management and Budget ("OMB"), Environmental Protection Agency ("EPA"), Department of Agriculture ("USDA"), the Department of Transportation ("DOT"), the Department of Energy ("DOE") and Department of Government Efficiency ("DOGE"), have enforced these unconstitutional Executive Orders and taken other actions to interfere with the disbursement of congressionally mandated and awarded federal grants.

8. The officials have directed agency staff to freeze IRA and IIJA funding, Ex. A ("First OMB Memo"), Ex. B ("Second OMB Memo"), Ex. C ("USDA Directive"), including funds "obligat[ed]" to specific recipients, and Ex. D ("EPA Memo"). They have required agency staff

**App. 66**

to certify that funding disbursements comply with the Executive Orders prior to releasing funds
to recipients, Ex. E ("EPA Executive Order Compliance Review Requirement"). They have
directed staff to identify projects for potential removal, Ex. F ("DOT Memo"), and they have
prohibited disbursements of funds over $50,000 without new approvals from DOGE. Ex. G
("EPA Notice of DOGE Approval Requirement").

9. EPA, USDA, DOT and DOE staff have taken various actions that prevent Plaintiffs from
accessing grant funds to proceed with the congressionally mandated programs entrusted to them.
For example, EPA, USDA, DOT and DOE have blocked Plaintiffs' access to the websites and
portals needed to access funds, frozen or labeled as "suspended" the accounts containing the
grant funds preventing Plaintiffs from drawing down funds, informed Plaintiffs orally that funds
are frozen and cannot be drawn down, communicated through state agencies that expenditures
may not be reimbursed, and otherwise prevented Plaintiffs from accessing grant funds, usually
with no explanation or justification. These actions by EPA, USDA, DOT and DOE together with
those described in Paragraph 8 above, are collectively referred to in this complaint as the
"Program Freezing Actions."

10. In addition, EPA, USDA, DOT and DOE grant officers have become unavailable, and in
many cases have failed to provide grantees with clear answers about the status of their grants or
any explanation as to why they have been frozen.

11. Two federal courts have already issued temporary restraining orders and preliminary
injunctions against aspects of the Administration's funding freezes, finding that they lack
constitutional, statutory, and/or regulatory authority.

12. Despite these judicial orders, grants continue to be repeatedly frozen, unfrozen, and then
frozen again with no notice or justification. This inflicts significant harm on Plaintiffs,

4

**App. 67**

preventing them from executing critical projects, carrying out their missions, planning for the future, paying their employees, contractors, or sub-awardees, and serving the communities where they are implementing these congressional priorities.

13. The Administration's unlawful and arbitrary freeze of congressionally mandated programs and funding appropriated and awarded to carry out those programs violates multiple statutory provisions, as well as fundamental constitutional and administrative safeguards. In this nation, Congress enacts laws, and the Executive Branch, whoever may be occupying it at any given time, must faithfully execute those laws. The Administration has simply refused to do so with respect to the programs at issue in this case and instead has seized control of federal spending to further its own aims, in the process undoing the spending decisions made by Congress.

14. For the reasons set forth herein, Plaintiffs respectfully request that the Court grant appropriate relief to remedy Plaintiffs' injuries and to enforce the Constitution and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, as well as vacatur under 5 U.S.C. § 706.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]" of the United States, and because Plaintiff The Sustainability Institute is headquartered in North Charleston and resides in South Carolina. Venue is proper in the Charleston Division because "a substantial part of the events or

**App. 68**

omissions giving rise to the claim occurred" in this Division, Local Civ. Rule 3.01(A)(1)—for example, The Sustainability Institute's project to build and weatherize affordable homes in North Charleston is funded by a congressionally authorized Community Change Grant, which is subject to the funding freeze challenged in this case.

**PARTIES**

**I.    Plaintiffs**

17.  Plaintiffs are thirteen Community Groups: the Sustainability Institute; Agrarian Trust; Alliance for Agriculture; Alliance for the Shenandoah Valley; Bronx River Alliance; CleanAIRE NC; Conservation Innovation Fund; Earth Island Institute; Marbleseed; Organic Association of Kentucky; Leadership Counsel for Justice and Accountability; Pennsylvania Association for Sustainable Agriculture; and Rural Advancement Foundation International-USA; and six cities: Baltimore, Maryland; Columbus, Ohio; Madison, Wisconsin; Nashville, Tennessee; New Haven, Connecticut; and San Diego, California.

*Community Groups*

18.  Plaintiff the Sustainability Institute is a 501(c)(3) nonprofit organization headquartered in North Charleston, South Carolina. Established in 1999, the Sustainability Institute's mission is to advance sustainable and resilient communities while building the next generation of conservation leaders. The Sustainability Institute applied for and was awarded a 3-year, $11.3 million "Community Change Grant" from EPA in 2024. This grant was authorized by Congress as part of the IRA.

19.  The Sustainability Institute intends to use this grant to carry out specific projects approved by EPA to advance Congress's objectives for the grant program. Under terms of the grant, the Sustainability Institute will work with the City of North Charleston to develop energy-

6

**App. 69**

efficient affordable homes for disadvantaged people in the Union Heights neighborhood; reduce greenhouse gas emissions by weatherizing and retrofitting homes; and restore a historically black community fragmented by the construction of Highway 26, among other projects.

20. On January 29, 2025, the Sustainability Institute's Community Change Grant was first suspended. Later, on February 7, the organization was able to make a successful draw down of funds using the online portal grantees use to access funds. On February 10, the funds were frozen again. On February 19, funds were unfrozen again, only to be frozen again on March 9. Grant funds have remained frozen since March 9. Multiple inquiries by Sustainability Institute to its EPA grant officer have gone unanswered, and Sustainability Institute was notified by its former grant officer that she received a directive not to communicate with grantees.

21. The funding pause is causing widespread disruption to the Sustainability Institute's internal operations and its ability to implement programs that align with its mission. Most pressing, the freeze in funding is preventing the Sustainability Institute from working on the Union Heights redevelopment project because it requires significant investments in new equipment and hiring contractors. Without certainty that federal funding will be available to reimburse these major expenditures, the Sustainability Institute is unable to advance the project. The Sustainability Institute has also had to shift significant resources towards managing how to address the loss of funding and spend time and resources discussing how to manage projects in absence of support from the federal government. The Sustainability Institute is also concerned about harm to the reputation it has built up after almost two decades working in the Charleston community if it fails to deliver on this committed project.

22. Plaintiff Agrarian Trust is a 501(c)(3) nonprofit organization incorporated in California and based in Oregon which focuses on securing land for sustainable farming and fostering a

**App. 70**

more just and equitable food system. The organization works to protect farmland from development and ensure that it remains accessible to farmers, particularly those from marginalized communities. Agrarian Trust promotes land access and stewardship through community-driven solutions, offering tools and resources to help transition agricultural land into the hands of farmers committed to sustainable and equitable practices in 15 states. In 2024, Agrarian Trust was awarded a five-year, IRA-funded Increasing Land, Capital and Market Access grant ("Increasing Land Access Grant") by USDA totaling $12,966,593.00 to fund farmland acquisitions in Nebraska, Texas, and New York, as well as farmer-led initiatives and partnerships with community-based organizations in West Virginia, Virginia, Washington, Maine, and Montana.

23. Agrarian Trust has not been reimbursed for its work since the funding freeze began in January 2025. As a result, the organization has not been able to proceed with its land acquisition work for four farms and has been forced to start depleting its savings to sustain operations and programs. Agrarian Trust has been forced to put contracts on hold, alter workplans and consider reducing hours, furloughs, or staff layoffs, including for four staff hired as part of this grant. The funding freeze has caused distress to the organization's staff, as well as farmers and community partners across 15 states.

24. Plaintiff Alliance for Agriculture is a 501(c)(3) nonprofit organization based in Orocovis, Puerto Rico. Alliance for Agriculture's mission is to transform the way agriculture is done in Puerto Rico. The organization achieves this mission by amplifying the local agricultural sector and supporting small farmers and processors, farmers markets and community organizations, working with distribution channels to bring organic products to a wider market, and raising awareness about local food consumption.

8

**App. 71**

25. Alliance for Agriculture is the subawardee under a cooperative agreement between
Plaintiff Rural Advancement Foundation International-USA ("RAFI-USA") and USDA Natural
Resources Conservation Service Outreach and Advocacy Division through the Increasing Land
Access Grant program. This subaward agreement obligated $1,538,200 to Alliance for
Agriculture. The purpose of this project is for Alliance for Agriculture to work with RAFI-USA
to achieve the goal of improving farmland access and security by addressing core barriers to
attaining land while also working to retain farmland by mitigating and preventing land
loss. Alliance for Agriculture is also the subawardee under a separate Conservation Technical
Assistance cooperative agreement between RAFI-USA and USDA Natural Resources
Conservation Service Outreach and Advocacy Division that obligated $129,316 to Alliance for
Agriculture. The purpose of this project is for the Alliance for Agriculture to provide localized
outreach, education, and hands-on technical assistance regarding Natural Resources
Conservation Service programs. The primary focus is on assisting small-scale, farmers that are
Black, Indigenous, or People of Color through the Natural Resources Conservation Service
application process and conservation action plan preparation.

26. Alliance for Agriculture has not been able to access its federal grant funds since January
28, 2025. The funding freeze has had a severe impact on the Alliance as well as farmers and
agricultural communities in Puerto Rico. Farmers expect to be able to receive this crucial
support, including technical assistance, land access guidance, and financial resources, but are
now left in limbo. Training programs, infrastructure investments, and local food system funding
has been stalled. The interruption to funding from these awards and uncertainty about when
funding will resume has negatively impacted the Alliance's ability to operate. Rather than
focusing on its core mission of supporting farmworkers and agricultural communities in Puerto

9

**App. 72**

Rico, the Alliance has been forced to divert attention to navigating the federal funding freeze. If the federal funding freeze continues, the organization will have to lay personnel off. A continued freeze will also undoubtedly damage Alliance for Agriculture's reputation. Farmers and partners trust the Alliance to deliver on promises, and stalled commitments risk eroding that trust.

27. Plaintiff Alliance for the Shenandoah Valley is a 501(c)(3) nonprofit organization that is headquartered in New Market, Virginia. Alliance for the Shenandoah Valley works to ensure the Valley's rural character, scenic beauty, clean water and vibrant communities are protected by providing accurate and timely information to community members and decision makers. It achieves this, in part, by informing and engaging people to protect the natural resources, cultural heritages, and rural character of its region. Alliance for the Shenandoah Valley is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

28. Alliance for the Shenandoah Valley was awarded a subgrant from the National Fish and Wildlife Foundation for $1,531,595.72 on January 14, 2025 under the Innovative Nutrient and Sediment Reduction Grants Program. The Innovative Nutrient and Sediment Reduction Grants Program is a partnership between the National Fish and Wildlife Foundation, the Environmental Protection Agency, and the federal-state Chesapeake Bay Program partnership. The purpose of this subaward is to accelerate the rate of implementation and increase the effectiveness of water quality best management practices in a high priority agricultural region of the Chesapeake Bay watershed. Alliance for the Shenandoah Valley was also awarded a subgrant from the Conservation Innovation Fund for $400,000 in October 2023, under the Partnerships for Climate-Smart Commodities Program. Under the subaward, the Alliance engages farmers in implementing climate-smart agriculture and forestry practices.

**App. 73**

29. Alliance for the Shenandoah Valley has not been able to access federal funds for either federal grant since February 12, 2025. This pause has harmed the Alliance for the Shenandoah Valley's programs and the organization itself. The organization's relationship with farmers and landowners, which took years to build, are eroded by this disruption to Alliance's ability to provide support and assistance. In reliance on the availability of the Partnerships program, farmers that the organization works with to join the partnership program have made investments to adopt sustainable practices expecting to be reimbursed, but now that funding is unavailable to them.

30. Plaintiff Bronx River Alliance is a 501(c)(3) nonprofit organization based in New York City which serves as a coordinated voice for the Bronx River and works with over 100 partners including the New York City Department of Parks and Recreation to protect and restore the Bronx River corridor and greenway so that it can be a healthy ecological, recreational, educational and economic resource for the communities through which the river flows. Bronx River Alliance was awarded a nearly $1 million EPA Community Change grant to enable communities in the Bronx to have a voice in decisions related to coastal adaptation, habitat restoration and infrastructure projects. The organization was also awarded a $500,000 Environmental Justice Collaborative Problem Solving Program grant ("Environmental Justice Problem Solving Grant") to improve water quality in four Bronx and Westchester County waterways by partnering with local communities to collect and use water quality data in advocating for policy and infrastructure improvements that address longstanding sources of water pollution.

31. Bronx River Alliance has not been able to reliably access funds under both EPA grants since around January 29, 2025. The grants were accessible for a few days in early February but

**App. 74**

were both suspended again on February 12. The grants were last suspended on March 10. This disruption in funding has forced the organization to cover costs for water quality monitoring supplies, equipment and partner and subaward obligations. The funding freeze has also made it difficult to pay staff to coordinate volunteers for water sample collection, resulting in reduced data collection. The reduction in data will impede municipalities, advocates, and elected officials from securing funding to upgrade aging sewage infrastructure, which directly harms public health and water quality. This will also result in increased health risks from recreational water activities, including paddling, fishing, and swimming in the river. The organization has not been able to proceed with hiring projected staff, causing existing staff members to continue working without pay. The freeze is affecting the organization's ability to cover at least three staff positions. The organization's Community Change subawards are directly tied to community engagement, with each partner committed to engaging 100 community members—work that has also been stalled. The nonprofit's inability to access the grant funds means that community members are prevented from having a voice in infrastructure and development projects to address flooding and heat impacts on vulnerable populations, including children, the elderly, and individuals with chronic illnesses. The inability to follow through on multi-year organizational commitments is also jeopardizing relationships years in the making with community partners, government agencies, and elected officials.

32. Plaintiff CleanAIRE NC is a 501(c)(3) nonprofit organization headquartered in Charlotte, North Carolina. CleanAIRE NC works to protect the health of all North Carolinians by pursuing equitable and collaborative strategies to address air pollution and fight climate change. CleanAIRE was awarded a $500,000 Environmental Justice Problem Solving Grant on June 2, 2024. With this grant, CleanAIRE NC will engage in air monitoring in four impacted

**App. 75**

communities across north Mecklenburg County to address health impacts associated with air pollution. CleanAIRE NC will also work with partners to train Community Health Workers as lead AirKeepers and conduct a Health Impact Assessment with Lake Norman Community Health Clinic, Mecklenburg County Health Department, Atrium Health, and North Carolina State University.

33. However, as of January 29, 2025, CleanAIRE NC has been unable to make drawdown requests for funding under its Environmental Justice Problem Solving Grant. If funds remain frozen, CleanAIRE NC may be forced to let go of key staff and stop important community air monitoring programs. Currently staff are being forced to shift away from programmatic priorities to manage the fallout from the funding freeze.

34. Plaintiff Conservation Innovation Fund is a 501(c)(3) nonprofit organization incorporated in Wyoming and headquartered in Washington, D.C. Across the country, Conservation Innovation Fund creates water, carbon, and biodiversity "environmental assets" to address the regulatory and voluntary needs of its municipal and corporate partners while supporting the sale of sustainably produced commodities. Conservation Innovation Fund is the recipient of a USDA Partnerships for Climate-Smart Commodities grant and award of $24,999,954 over five years. Conservation Innovation Fund was awarded this grant on June 8, 2023.

35. The purposes of this grant are to develop a private-sector mechanism within the U.S. economy for commodities such as milk, beef, and grain that are cultivated with sustainable practices; to create incremental markets for environmental assets tied to sustainable practices; and to invest in America's rural and agricultural communities. Conservation Innovation Fund works with farms to integrate agricultural best management practices such as cover crops, zero tillage production, nutrient management and manure management into dairy, beef and grain

13

**App. 76**

supply chains, with greenhouse gas reductions and water quality benefits that can be purchased by supply chain partners and other stakeholders. Farmers in Virginia, Maryland, Pennsylvania, Delaware, and West Virginia, as well as Maryland & Virginia Milk Producers Cooperative Association members in Ohio, North Carolina, South Carolina, Tennessee, New Jersey and New York, are eligible for assistance through the grant. The grant agreement and award are the culmination of over 10 years of planning and preparation and coordination with USDA.

36. The reimbursement requests that Conservation Innovation Fund has submitted since January 20, 2025 have not been paid out. The disruption in funding has significantly delayed program implementation. Conservation Innovation Fund provides funding directly to farmers for implementation of best management practices. 29 farms await payment of $1,937,735.50, related to implementation of best management practices, which must be implemented in the springtime for the best outcomes. Farms have been forced to delay necessary purchases for equipment, seed and services related to the implementation of best management practices. Conservation Innovation Fund has been forced to reduce staff, shutter business development opportunities, and seek alternative funding sources. The pause also harms Conservation Innovation Fund's reputation with farmers, customers and funders. Farmers had begun to reach out directly to Conservation Innovation Fund and its partners, and to build momentum among their rural communities behind the economic opportunity presented by the program, which targets hundreds of small farmers. Now all inbound calls have stopped. The pause in USDA funding also has caused efforts to expand capital for market-based conservation programs to come to a standstill, creating uncertainty and chaos for an entire emerging sector of the agricultural economy.

37. Plaintiff Earth Island Institute is a 501(c)(3) nonprofit environmental corporation founded in 1982 and headquartered in Berkeley, California. It serves as an incubator for grassroots

**App. 77**

environmental projects, offering fiscal sponsorship and support to over 75 initiatives worldwide

focused on conservation, climate action, wildlife protection, sustainable food systems,

Indigenous rights, and environmental justice. The organization also engages in legal advocacy

through Earth Island Advocates, fosters youth leadership through the Brower Youth Awards, and

publishes the award-winning *Earth Island Journal*. Through these efforts, Earth Island Institute

empowers communities to develop and implement innovative solutions to pressing

environmental challenges.

38. In December 2024, EPA Region 9 awarded the nonprofit a Community Change Grant

totaling $3,073,914 million for a project integrating traditional knowledge with modern

technology to promote intergenerational learning and collaborative problem-solving within the

Wai'anae community in Hawaii. Key components include establishing an environmental advisory

team, engaging community members in environmental and health data collection, developing an

intergenerational learning fellowship to share traditional knowledge and skills, and conducting a

community health assessment to understand the impacts of water and air contaminants on

residents. Earth Island spent 110 hours of staff time to develop this Community Change Grant

project. Earth Island also serves as a statutory partner to the West Anniston Foundation, which on

August 2024 was awarded a $2,596,592 Environmental and Climate Justice Block grant by EPA

Region 4 for their project to empower young adults in West Anniston by providing training

programs that enhance community engagement with governmental processes and address local

health and environmental issues in this predominantly Black, low-income community in

Anniston, Alabama. Earth Island put about 380 hours of staff time to develop this winning

project, which was expected to start on March 1, 2025. Earth Island has received no notification

or justification from EPA that its funding was suspended. Earth Island has also been unable to

obtain any clarity around the status of its two grant funds. The funding freeze has caused the
organization to spend many hours tracking the status of the grants and divert staff from their
other work responsibilities. The funding freeze also harms the nonprofit's reputation as it has to
freeze and perhaps end funding to its partners in Hawaii and Alabama.

39. Plaintiff Leadership Counsel for Justice and Accountability is a 501(c)(3) nonprofit
organization based in Fresno, California. Leadership Counsel's mission is to work alongside the
most impacted California communities to advocate for sound policy and eradicate injustice to
secure equal access to opportunity regardless of wealth, race, income, and place. Leadership
Counsel was awarded a Community Change Grant of over $3 million from EPA in 2024. With
this funding, Leadership Counsel is carrying out an EPA-approved project to connect
disadvantaged communities in California's San Joaquin Valley to public decision-making venues
and better equip these communities to advocate for their interests on climate change issues.

40. Since early February, Leadership Counsel has not been able to reliably request
reimbursements through the federal government's online portal for withdrawing grant funds
called Automated Standard Application for Payments ("ASAP"). Leadership Counsel's inability
to access funds, and the uncertainty about when these funds will become reliably available, has
forced the organization to adjust its workplans and engagements with community members.
Leadership Counsel and one subawardee have been forced to pay for staff time and other
expenses for work done on this program themselves while this funding has been paused.

41. Plaintiff Marbleseed is a 501(c)(3) nonprofit organization headquartered in Spring Valley,
Wisconsin. Established in 1995, Marbleseed is committed to supporting farmers in their
transition toward sustainable, organic farming systems that are ecologically sound, economically
viable, and socially just. Marbleseed works with small farms to support peer-to-peer learning

16

**App. 79**

with free and farmer-led programs, print and digital resources, and in-person events that support thriving regenerative and organic farms and food systems.

42. Marbleseed received a $4,517,254.65 award under USDA's Partnerships for Climate-Smart Commodities. Under this program, Marbleseed will provide rural and agricultural communities with the tools needed to build operational and environmental resiliency by implementing climate-smart production practices that reduce greenhouse gas emissions and sequester carbon. Marbleseed was also awarded a $300,000 Organic Technical Staffing Assistance grant under USDA's Conservation Stewardship Program to improve conservation performance by installing and adopting additional activities and improving, maintaining, and managing existing activities on agricultural land and nonindustrial private forest land. Marbleseed's work will expand conservation planning assistance to organic agricultural producers and accelerate conservation practice implementation for farmers in their network. This grant has been frozen since January 31, 2025, and Marbleseed has not received reimbursement for its work.

43. Marbleseed's Climate-Smart grant has been frozen since March 7, 2025, causing significant harm to the farmers Marbleseed supports. The funding uncertainty has disrupted the trusting, supportive network Marbleseed has worked to build. Marbleseed is hesitant to take next steps in agreements with partners because the organization does not want to make promises they cannot deliver on. Marbleseed's programmatic work has slowed. The organization has imposed a hiring freeze, closed an open full-time staff position, reduced employee working hours as an alternative to layoffs, and redirected staff time to other program areas. During this time of the year, the Marbleseed team typically plans field days comprised of on-the-farm trainings and

**App. 80**

education events but has been unable to provide this opportunity to partners and communities due to the freeze. All of this has taken a significant toll on employees.

44. Plaintiff Organic Association of Kentucky, ("OAK"), is a 501(c)(3) nonprofit organization based in Lexington, Kentucky. Incorporated since 2015, OAK serves to improve the health of the environment and communities by advancing organic regenerative agriculture to grow ecological resilience, economic viability, and socially just futures for Kentucky farmers through educational, technical, and market resources. On September 18, 2023, OAK was awarded $4,407,706.00 as part of the Climate-Smart Commodities Grant ("Climate-Smart") under the USDA's Natural Resources Conservation Service ("NRCS") to expand markets for climate-smart grass-fed lamb, grass-fed beef, corn, soybeans, small grains, produce, dairy, agroforestry and hemp in Kentucky. In 2025, USDA increased the award amount to $4,739,827.15. Using incentives and technical assistance, the five-year project helps up to 110 farmers per year adopt cover crops, reduce tillage, diversify crop rotations, reduce nitrogen inputs, implement holistic grazing, agroforestry and other conservation practices to improve soil health and water quality, reduce greenhouse gas emissions and promote wildlife habitat, connecting climate-smart commodity production with climate adaptation and greenhouse gas benefits. OAK has been unable to access its funding under this grant since January 20, 2025. On February 1, 2024, OAK was awarded $261,296 as part of the Equity in Conservation Outreach Cooperative Agreement ("Equity in Conservation") under NRCS to deliver outreach and education programming to increase awareness of and participation in NRCS programs, services, and leadership opportunities in agriculture and natural resource conservation in Kentucky, with a focus on reaching underserved farmers, ranchers or landowners. This grant is also currently

frozen. OAK has not received information from USDA confirming details about the status of these frozen grants.

45. The funding freeze has disrupted OAK's ability to operate its critical programs and has caused the nonprofit to plan layoffs, dip into its limited emergency reserves and reduce its services to farmers, who can no longer access the expertise, resources, and assistance they have come to rely on. OAK's inability to honor financial commitments to farmers erodes OAK's credibility built over years of service. As a small nonprofit, OAK relies on a small team of highly skilled staff who have cultivated deep relationships with farmers and partners. Without access to federal funding, these positions are at risk of being eliminated, resulting in the loss of vital expertise that has been built over years of effort including hiring, training, one-on-one relationships with farmers and deep knowledge of their farming operations. This loss of human capital would be expensive and difficult to replace and would severely impact the organization's capacity to continue operating effectively in the future.

46. In addition to the operational impacts, OAK's staff has spent an increasing amount of time navigating the uncertainty caused by the funding freeze and stewarding the development of alternate scenarios. This has diverted valuable time and resources away from their core responsibilities of supporting farmers and advancing conservation programs, further exacerbating the organization's strain and delaying future fundraising activities.

47. Plaintiff the Pennsylvania Association for Sustainable Agriculture, d/b/a Pasa Sustainable Agriculture ("Pasa"), is a 501(c)(3) nonprofit organization based in Harrisburg, Pennsylvania. Pasa's mission is to support farmers in creating economically viable, environmentally sound, and community-focused farms and food systems. In 2023, Pasa applied for and was awarded a five-year USDA grant of over $55 million through the IRA-funded Partnerships for Climate-Smart

19

**App. 82**

Commodities program. In 2024, USDA increased the award amount to just over $59.5 million. With this funding, Pasa plans to implement a USDA-approved project to support over 2,000 small to mid-scale underserved farmers from Maine to South Carolina to implement scientifically validated conservation practices that increase efficiency and productivity and reduce and sequester greenhouse gasses. Funding under that grant is currently paused.

48. Pasa also has a USDA Environmental Quality Incentives Program $74,993 grant, which provides technical and financial assistance to agriculture producers to address numerous natural resource concerns. Pasa is evaluating, refining and demonstrating that the practice of silvopasture — an agroforestry practice that integrates trees and grazing livestock operations on the same land — helps to improve grazing success and has associated economic, environmental a, and social co-benefits in Pennsylvania,

49. Pasa has a $32,380,331.30 USDA Agricultural Marketing Service Farm and Food Worker Relief grant to provide financial relief to frontline farmworkers and meatpacking workers with expenses related to the COVID-19 pandemic. Pasa was advised it could only submit expenses incurred before January 20, 2025, with no guidance from USDA about subsequent expenses covering payments for farmers and food workers. Pasa also has a $1,496,963 award from USDA's Farm Service Agency for an Urban Agriculture and Innovative Production grant to support urban agriculture efforts in Philadelphia. After submitting an invoice on March 7, 2025, Pasa was instructed to revise its January invoice to only include expenses before January 19, 2025, and has received no guidance for expenses incurred after January 20, 2025.

50. Pasa faces several financial challenges as a result of the funding pause. First, Pasa will potentially have to pay a large sum of unemployment claims for potentially 60 employees. Second, Pasa has been forced to use rainy day funds to reimburse farmers and contractors for

**App. 83**

2:25-cv-02152-RMG    Entry Number 23

completed work, as well as cover employee payroll for the month of March. Finally, Pasa has been unable to secure alternative funding because banks are hesitant to loan money to non-profits when there are no assurances that government contracts will be honored. The disruptions to Pasa's operations frustrate the organization's mission and its ability to serve frontline farmworkers.

51. RAFI-USA is a nonprofit organization dedicated to supporting family farmers, rural communities, and food systems across the country. Based in North Carolina, RAFI-USA works to advance sustainable agriculture and economic justice to promote equity and resilience in rural areas. RAFI-USA provides direct support to underserved farmers, particularly those who are Black, Indigenous, and People of Color, small-scale, or facing systemic barriers, through grant programs, technical assistance, and advocacy efforts. RAFI-USA is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

52. RAFI-USA was awarded a cooperative agreement with USDA through the Increasing Land Access Program for $8,499,695 in May 2024. This grant funds the Gaining New Ground project, which improves land access and land security for underserved farmers of color in North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico. RAFI-USA was also awarded a cooperative agreement with the USDA Farm Service Agency through the Distressed Borrower Assistance Network Program for $2,389,182.72 in August 2024 to address the critical need for farm advocates and technical assistance providers by developing training and peer support resources and establishing a Distressed Borrower Assistance Network. RAFI-USA also has an American Rescue Plan Technical Assistance Investment Program grant from the USDA National Institute of Food and Agriculture for $425,000. Under the grant, RAFI-USA will work to

**App. 84**

increase familiarity with, and access to, USDA Farm Service Agency loan programs among farmers who are young and Black, Indigenous, and People of Color.

53. RAFI-USA was awarded a cooperative agreement with the USDA Natural Resources Conservation Service through the Partnerships for Climate-Smart Commodities Program for $2,073,301 in September 2023. The purpose of this project is to reduce barriers for small and underserved farmers to implement climate-smart agriculture and forestry practices. RAFI-USA was also awarded a Rural Development Policy Cooperative Agreement with the USDA Farm Service Agency Outreach Office for $1,548,896.68 in September 2023 to help ensure that all farmers have equitable access to services. This cooperative agreement was updated in June 2024 to increase the award amount to $1,707,039.82. Another cooperative agreement through the Equity in Conservation Outreach Cooperative Agreement program for $696,664 is intended to help expand delivery of conservation services to historically underserved producers.

54. RAFI-USA has not received reimbursement of federal funds for requests submitted since January 20, 2025 aside from a reimbursement through its Equity in Conservation Outreach Cooperative Agreement. RAFI-USA received a reimbursement for the Equity in Conservation Outreach Cooperative Agreement program on March 17, 2025 after waiting on reimbursement requests to be paid out since January. RAFI-USA's mission is being undercut because farmers and rural communities are being directly harmed due to their inability to access promised funds and RAFI-USA has been prevented from continuing to provide critical support and assistance to these communities. The pause has also harmed RAFI-USA financially. The organization has been forced to pause hiring for two positions and has taken out a line of credit to cover costs in the absence of federal reimbursements.

**App. 85**

*Cities*

55. Plaintiff the Mayor and City Council of Baltimore ("Baltimore")[1] is a municipal

corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted

with all the powers of local self-government and home rule afforded by those articles. Baltimore

is the largest city in Maryland and the 30th largest city in the United States. Over the past few

years, Baltimore has been awarded more than 20 federal grants through grant programs funded

by the IRA and IIJA. These grants include a $4 million grant under the EPA's Solid Waste

Infrastructure for Recycling ("SWIFR") grant program to help develop a solar-powered

composting facility; two EPA Environmental Justice Government-to-Government ("EJG2G")

awards, totaling over $500,000, for its YH2O+ Career Training Program ("YH2O+"), which

prepares young adults for jobs in the water and solid waste industries; and a $10 million award

through the IRA's Assistance for the Adoption of the Latest and Zero Building Energy Codes

grant program (the "Energy Codes grant").

56. The SWIFR Grant-funded composting facility is expected to benefit Baltimore in several

ways. It will have the capacity to compost approximately 12,000 tons of organic materials per

year, diverting those materials from landfills and incinerators and reducing greenhouse gas

emissions by 6,000 tons. It will also encourage renewable energy and reduce long-term energy

costs, reduce the city's dependence on waste incineration, create four or five permanent full-time

green energy jobs for local residents, provide Baltimore residents access to organics recycling,

---

[1] Because Baltimore is a party to ongoing litigation relating to the Equity EO, Baltimore joins the claims asserted in this complaint only as to the Energy EO, Cost Efficiency EO, and agency actions to implement the Energy EO and Cost Efficiency EO. Baltimore does not join the asserted claims as to the Equity EO and agency actions to implement the Equity EO.

**App. 86**

benefit local food production, and further Baltimore's goal to prioritize composting as part of its solid waste management plan.

57. On January 31, 2025, Baltimore received an email from an EPA official stating that "Funding has been paused for grants under the Infrastructure Investment and Jobs Act at this time," including "all funding on existing grants for the Solid Waste Infrastructure for Recycling (SWIFR) grant program." The funding pause applied to the City's $4 million SWIFR grant. Two weeks later, on February 12, 2025, Baltimore received word from the EPA that it could resume work on the grant. Although the grant is unfrozen as of the date of filing, such volatility in funding availability disrupts this project. The SWIFR grant is reimbursement-based, so Baltimore must front any money for the compositing facility and then seek reimbursement from EPA. Thus, Baltimore is faced with the catch-22 of deciding whether to expend resources on the project, given the risk that the funding will be suspended and expenses will not be reimbursed, or to halt work on this important project.

58. The YH2O+ program prepares young adults for full-time jobs in the water and solid waste industries. Roughly 200 young men and women have successfully completed the program since its inception in 2015. The YH2O+ program benefits Baltimore by providing a better-trained workforce for to join City departments and staff its facilities. Baltimore relies on this program as a pipeline for new workers. The EPA awarded Baltimore $524,000 through the Environmental Justice Government-to-Government Program (previously known as the State Environmental Justice Cooperative Agreement Program) for fiscal years 2021 through 2025, including a $324,000 award for fiscal year 2025. Baltimore relies on the funding to operate its program.

59. The YH2O+ awards were suspended following the President's issuance of the Energy EO. The funds had been present in Baltimore's payment portal consistently prior to January 23,

2025, but Baltimore was unable to draw down the funds on at least three dates in February 2025. The awards reappeared in the portal on March 5, 2025, and Baltimore was able to draw down the $200,000 award and close it out on March 6, 2025. However, as of March 11, 2025, the $324,000 award for fiscal year 2025 was missing again in Baltimore's funding portal, and none of it has been drawn down. Without these funds the YH2O+ program was put on hold in January. Baltimore is very unlikely to run the program without the EPA funding, so it will lose the opportunity to train future employees for city jobs.

60. The $10 million Energy Codes grant will allow Baltimore to provide workforce training related to building inspections; fund evaluation of energy code compliance and enforcement in new and existing buildings; and develop and adopt new Building Performance Standards consistent with the International Code Council ("ICC") and International Energy Conservation Code ("IECC") construction standards, as is now required by the State of Maryland. The initiative is also intended to contribute to the Baltimore's greenhouse gas emissions reduction goals and, because the City owns many buildings in Baltimore, would help Baltimore to ensure compliance with Maryland's strict new rules and avoid fines from the State.

61. Baltimore received an Assistance Agreement for $10 million from the DOE in December 2024. It was signed on December 18, 2024, with a performance period to begin on January 1, 2025. Although Baltimore has the signed grant agreement, the City is awaiting DOE's review and approval of the Statement of Project Objectives ("SOPO") for the City's project. The SOPO will specify what the $10 million in funding can be spent on. Once the SOPO is approved, Baltimore will be able to begin drawing down funds. The City asked DOE on March 13, 2025 for a call to discuss the SOPO, seeking to finalize it, but the DOE gave a non-committal response on March 14, 2025 and has not responded further. It appears that the $10 million in funding is on

**App. 88**

hold. For 2025, Baltimore planned to use the federal funding to hire new staff—including educators, project managers, and consultants—and to audit buildings' compliance with ICC and IECC standards. Without the funds, the City is unable to begin the hiring and auditing process. Pausing the Building Codes grant funding also negatively affects Baltimore's own real estate in the city.

62. Plaintiff the City of Columbus ("Columbus") is a municipal corporation organized under Ohio law. *See* Ohio Constitution, Art. XVIII. Columbus prioritizes planting trees to enhance residents' health and quality of life, increase property values, and improve the environment. Trees are particularly important in Columbus because they help to mitigate the city's severe urban heat island effect. As a part of its plan to improve the City's tree canopy, Columbus, through its Recreation and Parks Department, successfully applied for a $500,000 Urban and Community Forestry Grant as a subgrantee of the Ohio Department of Natural Resources ("ODNR"). The grant is designed for Columbus to purchase and plant approximately 1,250 diverse trees in disadvantaged areas in need of increased tree cover.

63. During the 2024 planting season, Columbus expended $393,930 of the awarded $500,000. On February 18, 2025, the ODNR sent a letter to the Columbus Recreation and Parks Department explaining that the State's reimbursement requests were not being processed by the U.S. Forestry Service and suggesting that Columbus temporarily suspend expenses against their grant, given the risk that expenses would not be reimbursed. ODNR also indicated that Columbus should submit outstanding reimbursements. On February 27, 2025, Columbus submitted a "Sub Awardee Request for Reimbursement(s)" to the ODNR requesting reimbursement in the amount of $393,930. On March 13, 2025, ODNR sent an email reversing course, stating that the grant was "approved for implementation." However, Columbus has not

**App. 89**

yet been reimbursed for the $393,930 it has already spent and is concerned that the federal government will continue to turn this grant on and off and may well not ultimately reimburse the city for the full amount of eligible expenses. If Columbus does not receive the reimbursement it is owed under this grant, it will be forced to cover this expense through money from its capital budget.

64. Plaintiff the City of Madison ("Madison") is a municipal corporation organized and existing under the laws of the State of Wisconsin. Madison has been awarded a $20 million grant through EPA's Community Change Grants Program to lead a collaborative project to improve housing affordability through whole home energy upgrades, thereby saving residents money on energy bills, improving indoor air quality, and cutting climate pollution. The project—a partnership with four community organizations—aims to upgrade 825 units of housing in low-income census tracts. These homes tend to be least energy efficient, and the residents are forced to spend a disproportionate share of their income on home energy bills. Madison's project also aims to provide an additional 1,050 households with technology to reduce energy use by items plugged into outlets in the home and 60 early career workers with workforce training.

65.  On or around January 31, 2025, Madison's grant disappeared from the ASAP transaction page, making it impossible to draw down funds. The grant was then labeled as "Suspended" until around February 19, 2025, when that status changed to "Open." On or around March 10, 2025, the status changed back to "Suspended," and Madison remains unable to draw down funds. Two of Madison's partner organizations—Sustain Dane and Project Home—have already begun work to deliver their whole home upgrade programs, but they will not be able to continue if funding is not unfrozen. The other two organizations have not been able to begin work on the project, which means two key elements of the project, community outreach and workforce training, have

27

**App. 90**

not been implemented. Freezing this grant also creates several contractual problems for Madison: Madison cannot continue to honor its subrecipient agreements with Sustain Dane and Project Home, and it cannot execute expected agreements with the remaining two local partners identified in the grant. Additionally, the EPA required Madison to identify a "statutory partner" in the grant application. Madison indicated in the grant application that it would award $1,163,842 to its statutory partner, Urban Triage. Madison will not be able to honor its "Statutory Partnership Agreement" with Urban Triage if the grant remains frozen. Finally, the grant program and the text of the IRA require that the project be completed within three (3) years and do not allow extensions, so even a temporary delay may impede Madison's ability to achieve the project's goals. And a permanent freeze of this funding would deprive thousands of Madison's most vulnerable residents of the opportunity to significantly reduce their monthly energy bills, improve their indoor air quality, and access job opportunities.

66. Plaintiff the Metropolitan Government of Nashville & Davidson County ("Nashville") is a combined municipal corporation and county government organized and existing under the laws of the State of Tennessee. In August of 2024, Nashville was awarded $4.7 million for its "Electrify Music City" project, which would upgrade, improve and expand its public electric vehicle charging infrastructure under the Charging and Fueling Infrastructure Grant program. A few months later in January 2025, Nashville also won a highly competitive $9.3 million grant for its "East Nashville Spokes" project under the Active Transportation Infrastructure Investment Program to help fund a multi-modal, safe transit connection project that includes protected bike lanes as well as Americans with Disabilities Act and pedestrian improvements. This project would connect neighborhoods in the city so residents can have safer, better transit access to their

28

**App. 91**

jobs, including connecting a Metropolitan Development and Housing Agency ("MDHA")
redevelopment district with the downtown area.

67. Upon receiving notice of the Charging and Fueling Infrastructure award, Nashville
immediately began the process to complete a grant agreement with the Federal Highway
Administration ("FHWA") so that it could get started on the work for the EV charging stations.
Over the next several weeks, Nashville and FHWA had a final grant agreement draft approved by
the local FHWA office, which was sent to FHWA headquarters for final draft approval in
December of 2024. Nashville has not heard anything from its partners at FHWA regarding the
grant agreement since this last communication other than to inform them that there is a new point
of contact.

68. Defendant DOT's failure and refusal to complete the grant agreement and make the
promised funds available has thrown planning and implementation of the Electrify Music City
project into disarray and uncertainty. Nashville started its procurement process for a vendor to
install, repair and improve its electric vehicle charging stations. Nashville selected a vendor and
entered into a contract with this vendor. Nashville now cannot guarantee that it has the federal
funds to complete certain projects with this vendor. Further, Nashville incorporated the awarded
funds in its Transportation Improvement Program budget for this fiscal year. With the funds
frozen, Nashville cannot properly plan or fully implement its project plans. Nashville has
operated free or affordable electric vehicle charging stations since 2017, and without fully
implementing this program, residents will not have access to the new amenities or the benefits
the project proposed. The accessibility of electric vehicle charging infrastructure not only
improves the quality of life for residents who use electric vehicles, but also reduces pollution in
the city that can cause medical issues for residents.

**App. 92**

69. Similarly, after both a public press release and written notification by Defendant DOT that Nashville won its award of $9.4 million, FHWA reached out to introduce their point of contact and execute the grant agreement process on January 15, 2025. This was the last communication that Nashville received from Defendants. Nashville residents expect and are excited about the East Nashville Spokes project. It is a multi-year project that could transform Nashville into a more walkable, bikeable city, and work on this project had already started when the city applied. For the past several years, Nashville has been conducting community engagement, planning, and designing to create a project plan for connecting several neighborhoods in the city. To help it fund the next several phases of the project, Nashville incorporated this project into a city-wide Transit Referendum that anticipates leveraging federal funds to bring the project to completion. The Transit Referendum passed overwhelmingly in November 2024. However, with the funds frozen, this project has languished in uncertainty. The federal government freezing its award means that better connections across the city and safer streets, including for connections between downtown and quickly developing areas in Nashville, are not fully funded.

70. Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized and existing under the laws of the State of Connecticut. New Haven has received at least three EPA grants funded by the IRA. In July 2024, New Haven received a $1 million Environmental Justice Government-to-Government award to help city residents transition from burning heating oil to efficient heat pumps for home heating and from gas stoves to induction stoves in order to reduce heating costs and air pollution. The same month, New Haven was awarded a $9.5 million grant under the EPA's Climate Pollution Reduction Grant program to help fund an advanced geothermal heat pump system that will heat and cool the city's main train station, Union Train

**App. 93**

Station, and a planned 1000-unit New Haven Housing Authority housing development. In January 2025, New Haven was awarded a $20 million Community Change Grant to improve climate resiliency and quality of life for residents of 14 disadvantaged neighborhoods. New Haven plans to use this funding to lead a coalition of 20 partner organizations to improve the energy efficiency of affordable housing development, upgrade the energy efficiency of existing homes, improve bike infrastructure and green spaces, and improve food rescue (matching unused food from food businesses with people who need it), among other project components.

71. On or before Monday, February 3, 2025, New Haven's Government-to-Government funding became unavailable. Over the next several weeks, the funding's status in ASAP was change to "Suspended," then to "Open," then back to "Suspended." When the status is labeled as "Suspended" it is not possible to draw down funds. The project has already begun in partnership with several partner organizations, including the Community Action Agency of New Haven (CAANH), which has already hired one full-time staff person who will likely need to be laid off if the grant remains suspended. Other partner organizations have invoiced the City for staff time spent working on the project, but the City is unable to obtain reimbursement and cannot afford to continue to pay partner organizations' invoices for work on this project unless the funding is unfrozen.

72. New Haven's $9.5 million grant under the EPA's Climate Pollution Reduction Program is intended to provide approximately 60% of the funding required for its advanced geothermal heat pump project. In recent weeks, the project's status in ASAP has also toggled back and forth between "Suspended" and "Open." It is currently labeled as "Open." This week, New Haven plans to release a Request for Proposals to design the new geothermal heating and cooling system. After 30 days, New Haven plans to select a firm to design the system, but without greater

**App. 94**

certainty about the availability of the grant funding the City will be unable to enter into a contract to design the complex system. The funding uncertainty may also chill qualified bidders for the project. An extended delay will likely prevent the project from ever getting started, depriving New Haven of an innovative geothermal system that would both reduce the train station's energy expenses and help the City to achieve its goal of completely electrifying City operated buildings by 2030.

73. On February 3, 2025, New Haven received formal notice of its $20 million Community Change award. Since the grant appeared in ASAP, it has also toggled back and forth between "Suspended" and "Open." Its current status is "Suspended." The period of performance for the award begins on April 1, 2025, and New Haven is currently finalizing job descriptions for new hires to launch and manage the project, but the City will be unable move forward so long as the grant is frozen or at risk of being frozen. Without the grant, New Haven and its residents will be deprived of improved infrastructure and housing, and more residents will likely go hungry unless the City diverts funding from other priorities.

74. Plaintiff City of San Diego ("San Diego") is a municipal corporation and California charter city, duly organized and existing by virtue of the laws of the State of California. San Diego is the second largest city in California and the eighth largest city in the United States. In 2024, San Diego was awarded an approximately $10 million grant under the USDA's Urban and Community Forestry grant program for a project entitled "Ready, Set, Grow San Diego." The grant funds a five-year program to plant and maintain trees in local communities as part of an ongoing effort to grow and improve San Diego's urban forest. This grant is intended to increase equitable access to trees and nature, aid in combating extreme heat and climate change, and provide much-needed shade to San Diego residents. Trees also help to reduce air pollution levels,

**App. 95**

protect vulnerable residents, and increase stormwater absorption, leading to less runoff and decreased flood risk.

75.  In February 2025, a program manager from USDA verbally notified a City Forester by phone that USDA's Budget and Finance Incident Finance Branch, Albuquerque Service Center (ASC) had paused payments for grant reimbursement requests, but recommended to continue submitting reimbursement requests. USDA declined to provide written confirmation of the pause. On March 20, USDA indicated that payments were being processed and that the next invoice "should" be paid within approximately one week. The City has thus far expended approximately $66,000, approximately $5,000 of which was reimbursed in December 2024, and the total remaining value of the awarded grant is $9,994,781.69. Without this grant, San Diego would be forced to modify or cancel its Ready, Set, Grow San Diego program because the City's General Fund cannot absorb the costs. In turn, the City would lose the many benefits associated with greater tree cover and would struggle to meet its climate action goals as outlined in its Climate Action Plan, aiming to enhance green spaces that contribute to a healthier and more livable city.

## II.    <u>Defendants</u>

76. Defendant Donald J. Trump is the President of the United States. He signed the Energy EO, Equity EO, and Cost Efficiency EO. Defendant Trump is sued in his official capacity as President of the United States.

77. Defendant Kevin Hassett is the Assistant to the President for Economic Policy and Director of the National Economic Council. In these roles, Defendant Hassett advises President Trump on various economic matters. *See* Exec. Order 12835, *Establishment of the National Economic Council*, 58 Fed. Reg. 6189 (Jan. 27, 1993).

33

**App. 96**

78. Defendant Hassett is also responsible for determining whether IRA and IIJA funds are consistent with President Trump's policies and should be disbursed. Energy EO § 7. Defendant Hassett is sued in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council.

79. Defendant Office of Management and Budget is a cabinet agency in the Executive branch that oversees the federal budget. *See* 31 U.S.C. §§ 501–07.

80. The Office of Management and Budget has issued multiple memoranda that have directed the freeze of federal grant funds.

81. Defendant Russell Vought is the Director and highest-ranking official of the Office of Management and Budget, *see id.* § 502, which is a cabinet agency in the Executive branch that oversees the federal budget. *See id.* §§ 501–07. Defendant Vought is sued in his official capacity as OMB Director.

82. Defendant Vought's predecessor, then-acting OMB Director Matthew J. Vaeth, authored the First OMB Memo challenged in this case freezing IRA and IIJA funds.

83. As current OMB Director, Defendant Vought is responsible for that Memo and ensuring its directives are implemented by agencies that administer the IRA and IIJA. *See id.* § 503(a) (granting Director authority to direct and approve "governmentwide financial management policies for executive agencies").

84. Under Section 7 of the Energy EO, Defendant Vought and the OMB are responsible for determining whether IRA and IIJA funds are consistent with President Trump's policies and should be disbursed.

85. Under Section 2(b) of the Equity EO, Vought is also responsible for consulting with federal agencies to "terminate . . . 'equity-related' grants or contracts."

34

**App. 97**

86. Defendant EPA is an independent agency in the Executive branch responsible for enforcing the Nation's environmental laws, for overseeing congressionally mandated grants and programs related to environmental protection, and for distributing funds Congress specifically appropriated to those grants and programs.

87. Defendant Lee Zeldin is the Administrator of the U.S. Environmental Protection Agency. *See* Reorganization Plan No. 3 of 1970, 42 U.S.C. § 4321 note. Defendant Zeldin is sued in his official capacity as EPA Administrator.

88. Defendants Zeldin and the EPA are tasked with the implementation of the Energy EO and with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

89. Defendant Zeldin is ultimately responsible for the EPA Memo challenged in this case freezing IRA and IIJA funds and ensuring that EPA staff implement its directives.

90. Defendant USDA is an executive branch agency responsible for providing leadership on food, agriculture, natural resources, rural development, nutrition, and related issues based on public policy, the best available science, and effective management.

91. Defendant USDA is tasked with administering various grant programs funded by Congress in the IRA and IIJA, including the Partnerships for Climate-Smart Commodities program.

92. Defendant Brooke Rollins is the Secretary of Agriculture. Defendant Rollins serves as the head and highest-ranking official of the USDA. *See* 7 U.S.C. § 2202. Defendant Rollins is sued in her official capacity.

**App. 98**

93. Defendant Rollins is ultimately responsible for USDA's ongoing freeze of IRA funds challenged in this case. USDA is also tasked with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

94. Defendant U.S. Department of Transportation is an executive branch agency responsible for ensuring a safe, efficient, and modern transportation system that serves the American people and economy, promoting the safe, efficient, sustainable, and equitable movement of people and goods.

95. Defendant DOT is tasked with administering various grant programs funded by Congress in the IRA and IIJA.

96. Defendant Sean Duffy is the Secretary of the Department of Transportation. Defendant Duffy serves as the head and highest-ranking official of DOT. Defendant Duffy is sued in his official capacity.

97. Secretary Duffy was responsible for the March 12, 2025, directive to interfere with federal grants administered by the Department of Transportation.

98. Defendant Duffy is ultimately responsible for DOT's ongoing freeze of funds challenged in this case. DOT is also tasked with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

99. Defendant U.S. Department of Energy ("DOE") is an executive branch agency responsible for advancing the national, economic, and energy security of the United States and ensuring a safe, clean, efficient, energy system that serves the American people and economy.

100. Defendant DOE is tasked with administering various grant programs funded by Congress in the IRA and IIJA,

**App. 99**

101. Defendant Chris Wright is the Secretary of the Department of Energy. Defendant Wright serves as the head and highest-ranking official of DOE. Defendant Wright is sued in his official capacity.

102. Defendant Wright is ultimately responsible for DOE's ongoing freeze of funds challenged in this case.

103. Defendant DOGE coordinates teams across multiple agencies with the goal of reconfiguring agency data, technology, and spending. Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025); Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). In performing this role, DOGE acts as an agency—and not merely an advisor to the President.

104. Defendant DOGE or United States DOGE Service is an entity established by President Trump within the Executive Office of the President "to implement the President's DOGE Agenda." Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). Executive Order 14158 also established a temporary organization known as the U.S. DOGE Service Temporary Organization within DOGE "dedicated to advancing the President's 18-month DOGE agenda." *Id.*

105. Defendant DOGE is integral to the implementation of the funding freeze. The DOGE EO instructs agencies to review existing grants "in consultation with the agency's DOGE Team Lead" and "terminate or modify" those grants to "advance the policies of [the Trump] Administration." Exec. Order 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). Further, on March 3, 2025, EPA announced a new policy that any assistance agreement or contract "$50,000 or greater must receive approval from an EPA DOGE Team member." Ex. G.

106. Defendant Amy Gleason is the acting administrator of DOGE and is sued in her official capacity.

37

**App. 100**

107. Defendant Elon Musk is a federal officer, Senior Advisor to the President, and special government employee within the Executive Office of the President. Mr. Musk is also the de facto head of DOGE, sued here in his official capacity. While the Director of the Office of Administration recently stated that Mr. Musk is "not an employee of the U.S. DOGE Service or U.S. DOGE Temporary Organization,"[2] Mr. Musk is the de facto head of DOGE. As President Trump made clear in his March 4, 2025, speech to Congress, DOGE is "headed by Elon Musk, who is in the gallery tonight." *See Full Transcript of President Trump's Speech to Congress*, N.Y. Times (Mar. 4, 2025), https://www.nytimes.com/2025/03/04/us/politics/transcript-trump-speech-congress. html.

## BACKGROUND

108. In each of the applicable statutes governing the unstable or frozen funds, Congress has spoken clearly and unmistakably as to its mandates and intent. The Defendants have violated these mandates at each and every turn.

## I.     Federal Funding Obligations and Relevant Statutory Grant Programs

### a.  *Federal Funding Obligations*

109. After Congress passes a bill appropriating funding and the President signs it into law, OMB apportions the funds to the appropriate agencies, which must "obligate" and pay the funds in accordance with Congress's directives. *See* U.S. Gov't Accountability Office, Office of the General Counsel, *Principles of Federal Appropriations Law* at 2-3–2-4, GAO-16-464SP (4th ed. 2016), https://perma. cc/EBK3-7A5L (the "Red Book").

---

[2] Decl. of Joshua Fisher, *New Mexico v. Elon Musk*, No. 1:25-cv-429 (D.D.C. Feb. 17, 2025), ECF No. 24-1.

**App. 101**

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 23    Pg. 133 of 268

110. "Obligating" funds is a budgeting term of art: funds are "obligated" by the agency when there is "some action that creates a legal liability or definite commitment on the part of the government, or creates a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government." Red Book at 7-3–7-4, GAO-06-382SP (3d ed. 2006), https://perma. cc/W2LU-P49R.

111.  "[T]he 'obligational event' for a grant generally occurs at the time of grant award." Red Book at 10-107, GAO-06-382SP (3d ed. 2006).

**b.** *The Inflation Reduction Act*

112. In 2022, Congress passed and the President signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA").

113. The IRA created numerous new statutory programs and appropriated $433 billion for investments over ten years to support those programs, including $369 billion for climate change and energy programs.

*Environmental and Climate Justice Block Grants*

114. Among other programs, the IRA amended the Clean Air Act to create a new program for "Environmental and Climate Justice Block Grants." *Id.* § 60201, 136 Stat. at 2078 (codified at 42 U.S.C. § 7438).

115. Congress appropriated $2.8 billion to EPA to award grants under the program, and another $200 million to EPA to provide technical assistance to eligible entities related to the grants.

116. Congress instructed that the EPA Administrator "***shall***" use these funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified] activities . . . that benefit disadvantaged communities," 42 U.S.C. § 7438(b)(1) (emphasis added), such as

**App. 102**

"community-led air and other pollution monitoring, prevention, and remediation," "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events," "climate resiliency and adaptation," "reducing indoor toxics and indoor air pollution," and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2).

117. Congress defined "eligible entity" as "a community-based nonprofit organization," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3).

118. EPA has awarded Environmental and Climate Justice Block Grants through several sub-programs, including the Environmental and Climate Justice Community Change Grants Program ("Community Change Grants"), the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program,[3] and Environmental Justice Government-to-Government Grants.

119. By December 2024, EPA had selected 105 recipients of Community Change Grants and awarded them nearly $1.6 billion in a highly competitive process with approximately 2,700 applicants. Plaintiffs The Sustainability Institute, Bronx River Alliance, Earth Island, Leadership Counsel for Justice and Accountability, New Haven and Madison are among the recipients of Community Change Grants.

120. EPA has selected 98 recipients of Environmental Justice Collaborative Problem-Solving Cooperative Agreements and awarded a total of $43.8 million in IRA funding through this

---

[3] EPA, *Biden-Harris Administration Announces Nearly $1.6 Billion in Environmental and Climate Justice Community Change Grants* (Dec. 12, 2024), https://perma.cc/2ETK-BDDM.

**App. 103**

program. Plaintiffs Bronx River Alliance and CleanAIRE NC are among the recipients of awards
under this program.

121. For Fiscal Year 2023, EPA used IRA and annual appropriations to fund awards to
governmental entities partnering with community-based organizations. In particular, EPA
awarded $20 million from annual appropriations to states partnering with community-based
organizations, and $10 million to "U.S. territories, freely associated states, Puerto Rico, and
tribes in remote areas."[4] EPA awarded $20 million from IRA appropriations to local governments
partnering with community-based organizations and $20 million to tribal governments partnering
with community-based organizations.[5]

122. For Fiscal Year 2024, EPA awarded about $81.5 million in Environmental Justice
Government-to-Government Grants. Of this, about $52.5 million came from the IRA
appropriations, while about $29 million came from annual appropriations.[6] Plaintiffs Baltimore
and New Haven are recipients of Government-to-Government Environmental Justice Grants.

*Equity in Conservation Outreach Cooperative Agreements,*
*Environmental Quality Incentives Program - Conservation Innovation Grants;*
*The Conservation Stewardship Program, and*
*Conservation Technical Assistance Cooperative Agreements*

123. In Section 21001 of the IRA, Congress made a significant investment in specific
programs to be facilitated by the Commodity Credit Corporation, appropriating over $18 billion

---

[4] EPA, *Environmental Justice Government-to-Government Program* (Jan. 7, 2025),
https://perma.cc/EV5P-N253.

[5] *Id.*

[6] System for Award Management (SAM.gov), *Environmental Justice Government-to-Government (EJG2G) Program*, https://perma.cc/FZ73-E47J (last visited Mar. 16, 2025).

**App. 104**

to the Secretary of Agriculture to remain available until September 30, 2031. IRA, § 21001, 136 Stat. at 2015–16.

124. Congress directed that that this funding "*shall*" be available to support certain agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." *Id.* (emphasis added). Carbon dioxide, methane, and nitrous oxide are common greenhouse gases that contribute to climate change.[7]

125. The Environmental Quality Incentives Program was established "to promote agricultural production, forest management, and environmental quality as compatible goals." 110 Stat. 997; *codified at* 16 U.S.C. § 3839aa. As part of this program, the Natural Resources Conservation Service offers Conservation Innovation Grants – a competitive grant program designed to stimulate the development and adoption of innovative conservation approaches and technologies. 7 C.F.R. § 1466.31 *et. seq.* Plaintiff Pasa is a recipient of a Conservation Innovation Grant.

126. The Equity in Conservation Outreach Cooperative Agreements are authorized in part by various provisions of the Farm Security Act, including the Environmental Quality Incentives Program (16 U.S.C. §§ 3839aa to 3839aa-8), the Conservation Stewardship Program (16 U.S.C. §§ 3839aa-21 to 3839aa-25), and the Agricultural Conservation Easement Program (16 U.S.C. §§ 3865 to 3865d).

127. Each of these programs is facilitated by the Commodity Credit Corporation. In addition, Equity in Conservation Outreach Cooperative Agreements are authorized by the Conservation Technical Assistance Program created by the Soil Conservation and Domestic Allotment Act of

---

[7] EPA, *Overview of Greenhouse Gases*, https://perma.cc/TG2E-UT5X (last updated Jan. 16, 2025).

42

**App. 105**

1935. 16 U.S.C. §§ 590a to 590q-3. The Conservation Technical Assistance Program is operated

through the Natural Resources Conservation Service and funded through appropriations.

128. As discussed above, in Section 21001 of the IRA, Congress made a significant

investment and appropriated over $18 billion to the Secretary of Agriculture to remain available

until September 30, 2031, to fund specific programs including the Environmental Quality

Incentives program, the Conservation Stewardship Program, and the Agricultural Conservation

Easement Program to be facilitated by the Commodity Credit Corporation. 136 Stat. at 2015–17.

Congress specified that the funds facilitated by the Commodity Credit Corporation "shall" be

available for "agricultural conservation practices." *Id.* at 2016. In addition, in Section 21002 of

the IRA, Congress appropriated $1 billion to the Natural Resources Conservation Service to

provide conservation technical assistance. *Id.* at 2018

129. Plaintiffs OAK and RAFI-USA are recipients of the Equity in Conservation Outreach

Cooperative Agreements.

130. Plaintiff Marbleseed is a recipient of a Natural Resources Conservation Service, Organic

Technical Staffing Assistance grant.

131. Plaintiff Alliance for Agriculture is a sub-awardee on a grant awarded to Plaintiff RAFI-

USA through the Conservation Technical Assistance Program.

*Increasing Land Access Grants,*
*Rural Development Policy Cooperative Agreements, and*
*American Rescue Plan Technical Assistance Investment Program Grants*

132. Section 1006 of the American Rescue Plan Act of 2021 appropriated over $1 billion to

the Secretary of Agriculture for fiscal year 2021 and directed that the Secretary "shall" use those

funds on various agricultural programs that benefit "socially disadvantaged farmers, ranchers, or

43

**App. 106**

forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2, 135 Stat. 4, 13–14.

133. In Section 22007 of the IRA, Congress amended Section 1006 of the American Rescue Plan Act and appropriated an additional $2.9 billion to the Secretary of Agriculture to fund various agricultural programs to benefit "underserved farmers, ranchers, or forest landowners," certain educational institutions that serve underserved communities, and "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs . . . ." IRA, § 22007, 136 Stat. at 2022–23.

134. Section 22007 of the IRA directs the Secretary to use these funds, among other purposes, "to provide outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition;" "to provide grants and loans to . . . improve land access (including heirs' property and fractionated land issues);" to "address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture;" "to support and supplement agricultural research, education, and extension, as well as scholarships and programs that provide internships and pathways to agricultural sector or Federal employment;" and "to provide financial assistance, including the cost of any financial assistance." *Id.*

135. USDA invested several hundred million dollars of these IRA funds to create the "Increasing Land, Capital and Market Access Program" ("Increasing Land Access Grants"). [8]

---

[8] USDA, *USDA Announces Up to $550 Million in American Rescue Plan Funding for Projects Benefiting Underserved Producers and Minority Serving Institutions that Create Career Development Opportunities for Next Generation Leaders* (Aug. 24, 2022), https://perma.cc/AC6N-Y4PC.

**App. 107**

Fifty recipients have been awarded approximately $300 million. Plaintiffs Agrarian Trust and RAFI-USA are Increasing Land Access Grants recipients. [9] Plaintiff Alliance for Agriculture is a subaward recipient of RAFI-USA's Increasing Land Access Grant.

136. USDA also invested funds appropriated under Section 22007 of the IRA into American Rescue Plan Technical Assistance Investment Program grants, a program originally authorized under Section 1006 of the American Rescue Plan Act of 2021. Plaintiff RAFI-USA is among the recipients of American Rescue Plan Technical Assistance Investment Program grants.

137. Upon information and belief, USDA also invested funding appropriated under Section 22007 of the IRA into the Rural Development Policy Cooperative Agreement program. Established by the Rural Development Act of 1972, the Rural Development Policy Cooperative Agreement program authorizes USDA to enter into cooperative agreements "to improve the coordination and effectiveness of Federal programs, services, and actions affecting rural areas, including the establishment and financing of interagency groups, if the Secretary determines that the objectives of the agreement will serve the mutual interest of the parties in rural development activities." 7 U.S.C. § 2204b(b)(4)(A). Plaintiff RAFI-USA is among the recipients of Rural Development Policy Cooperative Agreement.

*Climate Pollution Reduction Grants*

138. In Section 60114 of the IRA, Congress amended the Clean Air Act to create a program for Climate Pollution Reduction Grants. Congress appropriated $250 million, to remain available until September 30, 2031, for greenhouse gas air pollution planning grants. IRA § 60114, 136

---

[9] USDA, *Increasing Land, Capital, and Market Access Program*, https://perma.cc/8YBV-U6QC (last accessed Mar. 11, 2025).

45

**App. 108**

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 23

Stat. at 2076. Congress appropriated $4.75 billion, to remain available until September 30, 2026, for greenhouse gas air pollution implementation grants. *Id.*

139. Section 60114(b) provides that the EPA Administrator "*shall* make a grant to at least one eligible entity in each State for the costs of developing a plan for the reduction of greenhouse gas air pollution." *Id.* (emphasis added). "Each such plan *shall* include programs, policies, measures, and projects that will achieve or facilitate the reduction of greenhouse gas air pollution." *Id.* (emphasis added). The Administrator "*shall* publish a funding opportunity announcement for" these grants no later than 270 days after the statute's enactment. *Id.* (emphasis added).

140. Section 60114(c) provides that the EPA Administrator "*shall* competitively award grants to eligible entities to implement plans developed under subsection (b)." *Id.* (emphasis added). Applications for these grants "*shall* include information regarding the degree to which greenhouse gas air pollution is projected to be reduced in total and with respect to low-income and disadvantaged communities," and the Administrator "*shall* make funds available to" grantees "based on [their] performance in implementing [their] plan[s] submitted under this section and in achieving projected greenhouse gas air pollution reduction." IRA § 60114, 136 Stat. at 2077 (emphasis added).

141. In 2024, 211 states, municipalities, tribes, and territories submitted their Priority Climate Action Plans to EPA. [10] EPA then awarded over $4.3 billion to 25 state, local, and tribal recipients under the Climate Pollution Reduction Grants Implementation Grants General Competition. These "grants will implement community-driven solutions to tackle the climate

---

[10] EPA, *Climate Pollution Reduction Grants*, https://perma.cc/TFS4-V24L (last accessed Mar. 13, 2025).

**App. 109**

crisis, reduce air pollution, and accelerate the clean energy transition."[11] Plaintiff New Haven is a

Climate Pollution Reduction Grants Implementation Grant recipient.

*Urban and Community Forestry Grants*

142. In Section 23003(a)(2) of the IRA, Congress appropriated $1.5 billion to USDA, to

remain available until September 30, 2031, for multiyear, programmatic, competitive grants to

local governments and other entities through the Urban and Community Forestry Assistance

program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978, 16

U.S.C. § 2105(c), for tree planting and related activities. These funds are administered through

the U.S. Forest Service, an agency within USDA.

143. The purposes of the Urban and Community Forestry Assistance program, as laid out in

16 U.S.C. § 2105(b), include "implement[ing] tree planting program[s] to complement urban and

community tree maintenance and open space programs and to reduce carbon dioxide emissions,

conserve energy, and improve air quality in addition to providing other environmental benefits."

144. Following a competitive application process, the Forest Service announced more than

$1 billion in grants to 385 community-based organizations, local and state governments, and

other entities in all 50 states. The agency also allocated $250 million in funding directly to state

and territory forestry agencies to administer grants. [12]

145. The awarded projects are dedicated to "tree planting and maintenance, workforce

development, wood utilization, extreme heat mitigation, restoration and resilience strategies, and

---

[11] *Id.*

[12] USDA, *Urban and Community Forestry Factsheet* (2023), https://perma.cc/2VG4-QBUL; USDA, *Urban Forests*, https://www.fs.usda.gov/managing-land/urban-forests (last visited Mar. 13, 2025).

**App. 110**

community planning. Most projects include multiple themes."[13] Plaintiffs Columbus and San Diego are Urban and Community Forestry Grant recipients.

*Distressed Borrower Assistance Network Cooperative Agreements*

146. In Section 22006 of the IRA, Congress appropriated $3.1 billion to USDA, to remain available until September 30, 2031, "to provide payments to, for the cost of loans or loan modifications for, or to carry out section 331(b)(4) of the Consolidated Farm and Rural Development Act," 7 U.S.C. § 1981(b)(4), "with respect to distressed borrowers of direct or guaranteed loans administered by the Farm Service Agency under subtitle A, B, or C of that Act," 7 U.S.C. §§ 1922–1970. IRA, 136 Stat. at 2021.

147. Congress intended this funding to "provide relief to those borrowers whose agricultural operations are at financial risk as expeditiously as possible." IRA, § 22006, 136 Stat. at 2021.

148. The USDA launched the Distressed Borrowers Assistance Network in September 2024[14] to provide relief to distressed direct and guaranteed farm loans and implement Section 22206 of the IRA.[15] This network was formed through "a series of Cooperative Agreements" with network partners including RAFI-USA. [16]

149. Plaintiff RAFI-USA is thus a recipient of a Distressed Borrower Assistance Network Cooperative Agreement.

---

[13] USDA, *Urban and Community Forestry Factsheet* (2023), https://perma.cc/2VG4-QBUL.

[14] USDA, *USDA Launches Assistance Network to Support Financially Distressed Farmers and Ranchers* (Sept. 21, 2024) https://perma.cc/5NKR-QN35.

[15] USDA, *USDA Announces Additional $250 Million in Financial Assistance for Distressed Farm Loan Borrowers* (Oct. 7, 2024) https://perma.cc/78X4-JYNV.

[16] USDA, *USDA Launches Assistance Network to Support Financially Distressed Farmers and Ranchers* (Sept. 21, 2024) https://perma.cc/5NKR-QN35.

**App. 111**

*Assistance for Latest and Zero Building Energy Code Adoption*

150. In section 50131 of the IRA, Congress allocated $1 billion to help state and local governments update their building energy codes. Congress provided that Secretary of Energy "shall use" $330 million of these funds for grants to assist in the adoption of energy codes that meet or exceed the 2021 International Energy Conservation Code for residential building or the ANSI/ASHRAE/IES Standard 90.1-2019 for commercial buildings and in achieving compliance with such a plan. The Secretary "shall use" the remaining $670 million for grants to assist in the adoption of building energy codes that meet or exceed the zero energy provisions in the 2021 International Energy Conservation Code or an equivalent stretch code and in achieving compliance with such a code.

151. Section 50131(a) provides that this funding is appropriated "to carry out activities under part D of title III of the Energy Policy and Conservation Act," a law with the express purpose of "promot[ing] the conservation of energy and reduc[ing] the rate of growth of energy demand." 42 U.S.C. § 6321(b).

152. DOE allocated $400 million to a formula grant program for states, and $530 million to a competitive grant program for states and localities.[17] The competitive grant program was divided into three rounds of funding, with two having already been awarded. Plaintiff Baltimore is a recipient of a grant under this program.

**c.** *The Infrastructure Investment and Jobs Act*

153. In 2021, Congress passed and the President signed into law the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ("IIJA").

---

[17] DOE, *Clean Energy Infrastructure Funding Opportunity Exchange,* https://perma.cc/NZ9E-RPZF.

**App. 112**

154. The IIJA appropriated approximately $660 billion to fund a wide variety of programs to create jobs, lower energy costs, improve infrastructure, and help communities burdened by pollution.

*Solid Waste Infrastructure for Recycling Grants*

155. In section 601 of the IIJA, Congress appropriated $275 million for grants under section 302(a) of the Save Our Seas 2.0 Act of 2020. IIJA, § 601, 135 Stat. at 1404. It provided that $55,000,000, to remain available until expended, "shall be made available" for fiscal year 2022, and the same for each subsequent fiscal year through 2026. *Id.*

156. Section 302(a) of the Save Our Seas 2.0 Act created a recycle-ing grant program to "support improvements to local post-consumer materials management, including municipal recycling programs" and "to assist local waste management authorities in making improvements to local waste management systems." Pub. L. 116-224 § 302(a), 134 Stat. 1072, 1092 (2020). Congress directed that in developing application requirements, the EPA Administrator "shall consider" requesting "a description of how the funds will support disadvantaged communities." *Id.* at 1091.

157. Section 302(a) of the Save Our Seas 2.0 Act authorized the Solid Waste Infrastructure for Recycling Grants program while the IIJA appropriated significant funding for the program. [18]

158. In 2023, EPA selected 25 local governments to receive the first round of Solid Waste Infrastructure for Recycling Grants out of 311 total applications. Plaintiff Baltimore is a recipient of a Solid Waste Infrastructure for Recycling Grant.

---

[18] EPA, *Solid Waste Infrastructure for Recycling Grant Program*, https://perma.cc/TA34-V755 (last accessed Mar. 13, 2025).

**App. 113**

*Innovative Nutrient and Sediment Reduction Grant Program*

159. In Section 601 of the IIJA, Congress appropriated $1.959 billion for Environmental and Program Management at EPA. 135 Stat. at 1396. Of these funds, Congress directed that $238 million "shall be for" EPA's Chesapeake Bay Program. *Id.* The Chesapeake Bay Program was established by Section 117 of the Clean Water Act. 33 U.S.C. § 1267.

160. Of these IIJA funds directed to the Chesapeake Bay Program, EPA allocated $83 million to the National Fish and Wildlife Foundation to administer both Small Watershed Grants and the Innovative Nutrient and Sediment Reduction programs. [19] Innovative Nutrient and Sediment Reduction grants are awarded to support innovative, sustainable, and cost-effective approaches that reduce nutrient and sediment pollution to the Chesapeake Bay and its local waterways.

161. In fiscal year 2024, the National Fish and Wildlife Foundation awarded $22.4 million to 13 new or continuing Innovative Nutrient and Sediment Reduction Grant projects. Those 13 awards leveraged $35.3 million in matching funds, providing a total conservation impact of $57.7 million.

162. Plaintiff Alliance for the Shenandoah Valley is a recipient of an Innovative Nutrient and Sediment Reduction grant.

*Charging and Fueling Infrastructure Program Grant*

163. In Section 11401 of the IIJA, Congress established "a grant program to strategically deploy publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure along designated alternative fuel corridors or in certain other locations that will be accessible to all

---

[19] Biden-Harris Administration announces $206 million to selectees to protect and restore Chesapeake Bay through community partnerships, https://perma.cc/R46D-UEB4.

**App. 114**

drivers of electric vehicles, hydrogen vehicles, propane vehicles, and natural gas vehicles."

Eligible entities include "units of municipal government." Pub. L. 117-58 § 11401(a), 135 Stat.

546, 547 (2021).

164. Congress appropriated $2.5 billion for the Charging and Fueling Infrastructure Grant

Program. *Id.* §§ 11101(a)(5)(b)(C)(i) –(v), 135 Stat. 445. Specifically, Congress appropriated

$300,000,000 for fiscal year 2022, $400,000,000 for fiscal year 2023, $500,000,000 for fiscal

year 2024, $600,000,000 for fiscal year 2025, and $700,000,000 for fiscal year 2026. *Id.*

165. Plaintiff Nashville has been awarded a Charging and Fueling Infrastructure Grant.

*Active Transportation Infrastructure Investment Grant Program.*

166. In Section 11529 of the IIJA, Congress directed the Secretary of Transportation to

"carry out an active transportation infrastructure investment program to make grants, on a

competitive basis, to eligible organizations to construct eligible projects to provide safe and

connected active transportation facilities in an active transportation network or active

transportation spine." 135 Stat. 612.

167. Congress appropriated $200,000,000 for each of fiscal years 2022 through 2026 for the

Active Transportation Infrastructure Investment Grant Program. 135 Stat. 615.

168. Plaintiff Nashville has been awarded an Active Transportation Infrastructure Investment

Grant.

d. *Other Grants*

*Partnerships for Climate-Smart Commodities Grants*

169. The Partnerships for Climate-Smart Commodities Grant program was established under

the Commodity Credit Corporation Charter Act, an arm of the USDA created to support farming.

*See* 15 U.S.C. § 714. The Commodity Credit Corporation was created for the purposed of

**App. 115**

"stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance

of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds,

and fibers . . . and of facilitating the orderly distribution of agricultural commodities." The

Climate-Smart Commodities program is intended to achieve this purpose by supporting climate-

smart farmers, ranchers, and forest owners to strengthen and stabilize U.S. rural agricultural

communities.

170. USDA invested over $3.1 billion of Commodity Credit Corporation funding in the

"Partnerships for Climate-Smart Commodities" program and has already approved 141 projects

for awards.[21] Upon information and belief, appropriations from Section 21001 of the IRA, 136

Stat. at 2015–2016, were also used to fund the Partnerships for Climate-Smart Commodities

Program.[20] Plaintiffs Alliance for the Shenandoah Valley, Conservation Innovation Fund,

Marbleseed, OAK, Pasa, and RAFI - USA are recipients of the Partnerships for Climate-Smart

Commodities grants.

*Farm and Food Workers Grant Relief Program*

171. In Section 101 of the Specialty Crops Competitiveness Act of 2004, Congress

established a Specialty Crop Block Grants program and appropriated $44.5 million for each

fiscal year from 2005 to 2009 for that purpose. 118 Stat. 3883. This program was later amended

by the Agricultural Improvement Act of 2018, which extended the program through 2023 and

authorized USDA to directly administer multistate programs. 132 Stat. 4905-06. The

Consolidated Appropriations Act of 2021 appropriated an additional $100 million to this program

---

[20] *See* USDA, *Biden-Harris Administration Announces New Investments to Improve
Measurement, Monitoring, Reporting and Verification of Greenhouse Gas Emissions through
President Biden's Investing in America Agenda* (July 12, 2023), https://perma.cc/MF4G-GYC3
(referring to the Partnerships program as an "Inflation Reduction Act investment").

**App. 116**

"to remain available until expended." 134 Stat. 2108. In addition, the Consolidated

Appropriations Act of 2021, provided $1.5 billion "for grants and loans" for measures to protect

food producers, among others, against COVID-19. 134 Stat. 2107.

172. In September 2021, USDA announced the creation of the Farm and Food Workers

Relief grant program using funds from the Consolidated Appropriations Act of 2021.[21] The

program was designed to provide relief to farmworkers, meatpacking workers, and front-line

grocery workers for expenses incurred due to the COVID-19 pandemic. *Id.* Plaintiff Pasa is a

recipient of a Farm and Food Workers grant.

*Office of Urban Agriculture and Innovative Production Grants*

173. Section 1001 of the American Rescue Plan Act of 2001 appropriated $4 billion to

USDA, directing that USDA "shall use" these funds to, among other things, "make loans and

grants" to "maintain and improve food and agricultural supply chain resiliency." 135 Stat. 11.

USDA used some of these funds for Urban Agriculture and Innovative Production Grants, a

competitive grant program designed to initiate or expand efforts of urban and suburban farmers

to give consumers more options to buy locally produced products and reduce the climate impact

of the food supply chain.[22] Plaintiff Pasa is a recipient of an Urban Agriculture and Innovative

Production Grant.

## II.    Plaintiffs' Grant Agreements

174. Each of Plaintiffs' grants is a legally binding agreement with the government.

---

[21] USDA, *USDA Invests $700 million in Grants to Provide Relief to Farm and Food Workers Impacted by COVID-19* (Sept. 7, 2021), https://perma.cc/4USW-PEL8.

[22] USDA, *USDA Invests $14.2 Million in 52 Urban Agriculture and Innovative Production Efforts* (Oct. 26, 2022), https://perma.cc/XZ3N-GKJS.

**App. 117**

175. Before awarding a grant under the programs enumerated above, EPA, USDA and DOT give public notice of the funding opportunity, solicit applications, 2 C. F. R. § 200.204, conduct a "merit review process," and only select grant "recipients most likely to be successful in delivering results based on the program objectives," *id.* § 200.205.[23]

176. To ensure that taxpayer money is well spent, federal grants involve lengthy and complex application procedures and reporting and auditing requirements. *See, e.g.,* 2 C. F. R. §§ 200.500–200.521 (financial auditing requirements for federal award recipients), 200.328–200.330 (performance, financial monitoring, and reporting requirements for federal award recipients).[24]

177. Recipients of EPA, USDA, DOT and DOE grants, like Plaintiffs, are selected by the grantor agency in this competitive process and enter into legally binding "Grant Agreements" with the agency.

178. In Plaintiffs' Grant Agreements, EPA, USDA, DOT and DOE agreed to provide funding up to a specified dollar amount, over a specified time period, for specified work advancing Congress's objectives for the grant program. In exchange, grantees have agreed to use grant

---

[23] 2 C.F.R. Part 200 contains the OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, which have been adopted in relevant part by EPA, *see* 2 C.F.R. § 1500.2, and USDA, *see* 2 C.F.R. § 400.1, for grants and awards administered by those agencies.

[24] *See also* EPA, *Grantee Forms*, https://perma.cc/CHE7-HZGS (last updated Oct. 4, 2024) (listing dozens of forms, questionnaires, and certifications for EPA grant applicants and recipients); EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://perma.cc/3WG4-2ZLE (46-page general conditions governing EPA grant awards, including 15-pages of post-award financial reporting and auditing requirements); EPA, *Community Change Grants Terms and Conditions*, https://perma.cc/5A65-4NEX (last updated Dec. 5, 2024) (21-page conditions governing Community Change Grants, in addition to EPA's General Terms and Conditions); USDA, *General Terms and Conditions for Grants and Cooperative Agreements* (effective Oct. 2024), https://perma.cc/V2AT-CV5G (31-page general conditions governing USDA grant awards, including multiple pages of post-award financial reporting and auditing requirements).

**App. 118**

funds to complete their agency-approved project on an agency-approved timeline. Grantees have also agreed to comply with lengthy terms and conditions of their award agreements, including statutory and regulatory requirements and reporting, recordkeeping, and auditing conditions.

179. The Grant Agreements, however, are not contracts in the sense that the Federal Government does not receive consideration in the form of direct, tangible benefits from the grantees' performance. The grant funds are provided to carry out U.S. policy interests as determined by Congress, not to provide direct, tangible benefits to the Federal Government such as financial benefits. As the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dept. of Educ.*, 470 U.S. 656, 669 (1985).

180. The regulations incorporated in Plaintiffs' Grant Agreements provide that, after awarding a grant, agencies may only "[t]emporarily withhold payments" or "[s]uspend or terminate the Federal award in part or in its entirety" if: (*i*) "the recipient . . . fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the federal award," and (*ii*) "the Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions." 2 C. F. R. § 200.339.

181. "Specific conditions" are less drastic remedies for non-compliance that must be exhausted before a federal agency may suspend or terminate grant funds, such as "[r]equiring additional project monitoring" or "more detailed financial reports." *Id.* § 200.208(c).

182. When specific conditions fail to remedy non-compliance, "[u]pon initiating" a more severe remedy such as suspension or termination of funding, "the Federal agency must provide

**App. 119**

the recipient with an opportunity to object and provide information challenging the action." *Id.* § 200.342.

183. To date, no Plaintiffs have received notice that their grants are out of compliance.

184. After grants are awarded, Plaintiffs do not hold the funding in their own bank accounts. Rather, they are allowed to withdraw money only incrementally—on an as-needed basis—from Government-controlled accounts. Recipients generally "must be paid in advance" for their expenditures made in furtherance of their grant activities. 2 C. F. R. § 200.305(b)(1). Many Plaintiffs also incur expenses required by their grants and withdraw reimbursements from their Government-controlled accounts shortly after. Federal agencies generally must provide reimbursement payments "within 30 calendar days after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper." *Id.* § 200.305(b)(3).

185. Given this incremental process for accessing funds, even short delays in payment can cause great harm.

## III.    The Trump Administration's Actions to Freeze and "Terminat[e]" Grants

### a.  *The Executive Orders*

186. On January 20, 2025, President Trump issued an Executive Order titled "Unleashing American Energy." 90 Fed. Reg. at 8353.

187. Section 2 of the Energy EO declared several purported "polic[ies] of the United States," including "to ensure that ***no Federal funding be employed in a manner contrary to the principles outlined in this section***, unless required by law." *Id.* § 2 (emphasis added).

188. Section 7 of the Energy EO, titled "Terminating the Green New Deal," further provided that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated
> through the Inflation Reduction Act of 2022 (Public Law 117-169) or the

**App. 120**

Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order*.

Energy EO § 7 (emphases added). The Energy EO provides no end date for this indefinite funding freeze.

189. Section 7 further provides that within 90 days (*i. e.*, before April 20, 2025), all agency heads must submit a report detailing their review and recommendations to "enhance their alignment with the policy set forth in section 2." Critically, the Energy EO directs that "[n]o funds" blocked under the Order "shall be disbursed" unless the Director of OMB and Assistant to the President for Economic Policy determine that such payments "are consistent with any review recommendations they have chosen to adopt." *Id.*

190. President Trump thus directed that over $1 trillion in funding appropriated by Congress for specific purposes under the IRA and IIJA, including billions of dollars in project awards that had already been obligated to specific recipients by executive agencies, should be immediately frozen. The Energy EO forbids the disbursement of any funds that the Executive branch deems "[in]consistent[t] with . . . the policy outlined in section 2" of the Order. *Id.* § 7.

191. The Energy EO cited no legal authority for its across-the-board freeze of congressionally appropriated funds.

192. The Energy EO did not distinguish between obligated and non-obligated funds appropriated under the IRA or IIJA, simply blocking all "disbursements" across the board. *Id*

193. Also on January 20, 2025, President Trump issued an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." Exec. Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025),

58

**App. 121**

194. The Equity EO directed agencies to "*terminate* . . . all . . . 'equity-related' grants or contracts" within sixty days, i.e., by March 21, 2025, among other directives. *Id.* § 2(b) (emphasis added). The Equity EO also purported to eliminate prior directives requiring agencies to consider equity in their federal funding decisions.

195. The Equity EO did not define "equity-related" grants or environmental justice.

196. The Equity EO cited no legal authority to categorically terminate all "equity-related" grants and contracts.

197. The Equity EO did not follow the procedures required by EPA's grant agreements and regulations prior to suspending or terminating funding.

198. The DOGE EO, issued on February 26, 2025, instructed agencies, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants" and to "terminate or modify" those contracts and grants to "advance the policies of [the Trump] Administration." 90 Fed. Reg. 11095 § 3(b).

199. On March 3, 2025, EPA sent an email instructing all agency directors that "any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member." Ex. G.

200. The DOGE EO and EPA Notice of DOGE Approval Requirement did not identify or consider how much funding would be frozen, terminated, or subject to this approval requirement nor which programs or recipients would be affected.

201. The DOGE EO and EPA Notice of DOGE Approval Requirement did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies or pending DOGE review.

**b.  *The Program Freezing Directives***

202. Since January 20, 2025, executive branch agencies have taken multiple unlawful actions to effectuate the Executive Orders.

*i.  The First OMB Memo*

203. On January 21, 2025, the Acting Director of the OMB issued a memorandum to agency and department heads numbered M-25-11 and titled "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*." Ex. A.

204. The First OMB Memo notifies agency and department heads of the "directive in Section 7 of the [Energy EO]," which "requires agencies to immediately pause disbursements of funds appropriated under the [IRA and IIJA]." *Id.*

205. The Memo interprets the IRA and IIJA funding freeze in Section 7 of the Energy EO to apply "only . . . to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order," which "is consistent with Section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and policy outlined in section 2 of the order. '" *Id.*

206. The Memo states that the funds to be blocked are "*any appropriations for objectives that contravene the policies established in section 2." Id.* (emphasis added). "Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.*

207. The First OMB Memo thus directs agencies to freeze all IRA and IIJA funds that they deem to contravene President Trump's policies.

208. The Memo does not identify or consider how much funding would be frozen or which programs or recipients would be affected.

**App. 123**

209. The Memo does not identify any legal authority in any federal law, grant award, or the Constitution to block funds on this basis.

*ii.   The Second OMB Memo*

210. On January 27, the Acting Director of the OMB issued a second memorandum to agency and department heads numbered M-25-13 and titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Program." Ex. B.

211. The Second OMB Memo asserted that President Trump's election "gave him a mandate" to "align Federal spending and action with the will of the American people *as expressed through Presidential priorities*." *Id.* at 1 (emphasis added).

212. The Memo stated that "[f]inancial assistance should be dedicated to advancing Administration priorities," including "unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government," and halting "[t]he use of Federal resources to advance Marxist equity, transgenderism, and new green deal social engineering policies." *Id.*

213.  To that end, the Second OMB Memo directed federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders," citing seven such orders[25] issued by the Trump Administration, including the Energy EO and Equity EO. *Id.* at 1–2.

---

[25] Specifically, the Second OMB Memo cites: *Protecting the American People Against Invasion* (Jan. 20, 2025); *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025); *Putting America First in International Environmental Agreements* (Jan. 20, 2025); *Unleashing American Energy* (Jan. 20, 2025); *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025).

**App. 124**

214. The Memo stated that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* at 2 (emphasis in original).

215. After a federal district court issued an administrative stay of the Second OMB Memo, OMB retracted the Memo "in name only" to "evade[e] judicial review" while continuing to implement the underlying funding federal funding freeze. *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *7 (D. D. C. Feb. 3, 2025).

*iii.  The EPA Memo*

216. Also on January 27, EPA's Acting Chief Financial Officer issued a memorandum to staff titled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause." Ex. B.

217. The EPA Memo was "provided based on instructions from OMB" and "[i]n accordance with the Executive Order *Unleashing American Energy*." *Id.*

218. The EPA Memo ordered an indefinite freeze of: (*i*) "unobligated funds appropriated by the [IRA and IIJA]," and (*ii*) "disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the [IRA and IIJA]." *Id.* The freeze of IRA and IIJA funds would "allow for the review of processes, policies and programs as required by Section 7 of the [Energy EO]." *Id.*

**App. 125**

219. The EPA Memo, unlike the First OMB Memo, extended the funding freeze to all IRA and IIJA funds, not only those deemed contrary to the policies set out in Section 2 of the Energy EO.

220. The EPA memo further specified that the freeze applied even to "obligat[ed]" funds not yet paid out to recipients.

221. Like the preceding memos and Executive Orders, the EPA Memo did not clarify which programs or recipients would be affected and cited no legal authority for the freeze.

   *iv.  The USDA Directive*

222. On January 22, 2025, USDA advised grantees that "[a]s of late yesterday, January 21, 2025, the administration placed a temporary suspension on all actions related to grants, including Partnerships for Climate-Smart Commodities grants." Ex. C at 2.

223. Later that same day, USDA notified grantees of "additional guidance from the USDA Office of the Chief Financial Officer's office on the temporary suspension of all USDA actions related to grants, including Partnerships for Climate-Smart Commodities grants." Ex. C at 4. USDA stated that "payments or claims may continue to be processed under existing awards, *provided that they are not funded using IRA and IIJA funding sources*. Additional guidance related to IIJA and IRA funds will be provided by [USDA officials] when available." *Id.* at 4 (emphasis added).

224. In a February 20, 2025 press release, USDA referred to a funding "pause[] due to the review of funding in the Inflation Reduction Act (IRA)." The press release stated that $20 million—out of the billions of dollars in IRA funding administered by USDA—would be unfrozen "as USDA continues to review IRA funding" for consistency with the priorities of the Administration. Ex. C at 6–7.

**App. 126**

*v. The DOT Directives*

225. On January 29, 2025, Secretary of Transportation Sean Duffy issued a memorandum to DOT staff stating that, pursuant to the Executive Orders, the agency must "identify and eliminate all . . . funding agreements . . . or portions thereof, which were authorized, adopted, or approved [during the Biden Administration] and which reference or relate in any way to climate change, 'greenhouse gas' emissions, racial equity, gender identity, 'diversity, equity, and inclusion' goals, environmental justice, or the Justice 40 Initiative." Ex. H at 2 ("DOT Secretary's Directive").

226. The DOT Secretary's Directive gave staff 20 days (i.e., until February 18) to "initiate all lawful actions necessary to rescind, cancel, revoke, and terminate all DOT . . . funding agreements, programs, . . . or portions thereof, which are subject to the relevant executive orders and which are not required by clear and express statutory language." *Id.*

227. On March 12, 2025, the United States Department of Transportation Secretary, Sean Duffy, ordered a "review" of "projects announced from FY 2022 through FY 2025" to "identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." Ex. F at 1.

228. Specifically, the DOT Memo directed the agency to identify award selections that include any of the following elements: "equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure." *Id.*

229. Further, the DOT Memo directed "project-by-project" review to identify "for potential removal" any Programs that have "[s]tatutory language" that includes equity requirements,

climate considerations, or bicycle infrastructure or "mandatory evaluation criteria" that includes "equity and/or climate requirements." *Id.*

230. Upon review, the memo instructs that DOT would identify which project selections should either continue, be revised with a reduced or modified scope, or be cancelled entirely. The DOT Memo contemplates that project sponsors may propose alternative elements as substitutes, as long as hose elements "align with current Administration EOs." *Id.*

231. The DOT Memo did not identify or consider how much funding would be frozen, terminated, or subject to this approval requirement nor which programs or recipients would be affected.

232. The DOT Memo did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies.

   *vi.  The DOE Memo*

233. On January 20, 2025, Acting Secretary of Energy, Ingrid Kolb ordered a broad review of DOE actions, including "Funding Actions." The memo directed that "[a]ll funding and financial assistance activities including . . . grants . . . shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional Authorization and Administration policy." Ex. I at 2.

234. The memo further directed that such "[s]uch approvals will be made in writing by the Secretary (acting) or the program head with the prior approval of the Secretary (acting)."

235. The DOE Memo did not identify or consider how much funding would be affected by this approval requirement nor which programs or recipients would be affected.

236. The DOE Memo did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies.

**App. 128**

*vii.  Further Agency Actions to Freeze Program Funding*

237.  EPA, USDA, DOT and DOE have undertaken various actions consistent with the Executive Orders, the First OMB Memo, the EPA Memo, and the USDA Directive to freeze the funding programs at issue in this case and prevent Plaintiffs from carrying out their grants and accessing their grant funds.

238. For example, EPA, USDA, DOT and DOE have blocked Plaintiffs' access to the websites and portals needed to access funds, frozen or labeled as "suspended" the accounts containing the grant funds to prevent Plaintiffs from drawing down funds, informed Plaintiffs orally that funds are frozen and cannot be drawn down, and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification.

## IV.  <u>Court Orders Against the Funding Freeze and Subsequent Agency Actions</u>

239. Despite clear court orders to stop action, Defendants have defied the rule of law and continued to freeze funding.

240. Two federal courts have issued temporary restraining orders and preliminary injunctions against the across-the-board funding freeze effectuated by the now-rescinded Second OMB Memo, finding that plaintiffs have shown a likelihood of success on their separation-of-powers and APA claims, and a likelihood of irreparable harm in the absence of preliminary relief. *See New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *5 (D. R. I. Jan. 31, 2025) (temporary restraining order), *appeal filed*, No. 25-1138 (1st Cir. Feb. 10, 2025); *Nat'l Council of Nonprofits*, No. 25-cv-239, 2025 WL 368852, at *14 (D. D. C. Feb. 3, 2025) (temporary restraining order); *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19–20 (D. D. C. Feb. 25, 2025) (preliminary injunction); *New York v. Trump*,

66

**App. 129**

No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *1 (D. R. I. Mar. 6. 2025) (preliminary injunction), *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

241. Despite these orders, Defendants continue to engage in the freezing actions discussed above in paragraph 9.

242. In court and within agencies, the Administration has relied on an ever-shifting set of funding freeze directives and communications to evade complying with court orders. The Government has also taken the position that injunctions are limited to named defendants and the grants held by named plaintiffs, leaving large swaths of the unlawful freeze in place and grantees unprotected.

243. For example, *PoliticoPro* reported on the Administration's position that a "spending pause" announced by EPA on February 7 that "applied to more than two dozen EPA climate and infrastructure programs" is a "new" freeze and "*separate* from President Donald Trump's broader spending freeze that has been blocked by the courts."[26]

244. On February 19, the *New York Times* reported that USDA budget officers received an email with a "halt spending flowchart" which "flatly declared that certain spending Congress had approved, including through the Biden-era Inflation Reduction Act and the bipartisan Infrastructure Investment and Jobs Act, should be frozen . . . . '***Do not obligate or outlay***,' the flowchart said, citing no specific legal authorities."[27]

---

[26] Alex Guillén, *EPA says spending halt for climate, infrastructure law programs is different from Trump freeze*, *PoliticoPro* (Feb. 11, 2025) (emphasis added), https://perma.cc/G5MJ-5QD8.

[27] Charlie Savage, *Trump Team Finds Loophole to Defy Spirit of Court Orders Blocking Spending Freezes*, *New York Times* (Feb. 19, 2025) (emphasis added), https://perma.cc/7GRD-PSY7.

**App. 130**

245. Upon information and belief, EPA may also be using a flowchart (reproduced below) to freeze or cancel "equity-related" grants based on the presence of certain arbitrary keywords in grant documents, such as "advocate," "diverse community," "equality," "equity," "inequality," "racism," or "socioeconomic," among others. Ex. J ("EPA Flowchart for 'Equity-Related' Grants").



246. On March 3, EPA sent an email instructing staff that they "must complete and sign the attached [Executive Order] Compliance Review form for ***all funding actions***." Ex. E (emphasis added). This form requires relevant EPA staff, before funding may be disbursed, to "demonstrate[] the signer understands and confirms the action and associated workplan or

68

**App. 131**

performance work statement **complies with [Executive Order requirements]** at the time of signature." Ex. E (emphasis added).

247. Upon information and belief OMB, EPA, USDA, DOT, DOGE, and other agencies are continuing to freeze IRA, IIJA, and "equity-related" funding despite these court orders.

## LEGAL FRAMEWORK

### I. Congress's Legislative Authority, Including the Power of the Purse, and the Separation of Powers

248. The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." Art. I, § 1.

249. Congress's lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.,* 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("[N]o area seems more clearly the province of Congress than the power of the purse.").

250. In our system of governance, this power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185 (D. C. Cir. 1992) (internal citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

251. Congress's power over the purse is rooted in two constitutional provisions. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in

**App. 132**

2:25-cv-02152-RMG    Date Filed 03/26/25    Pg. 164 of 268

Consequence of Appropriations made by Law." Art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

252. The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." Art. I, § 8, cl. 1.

253. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

254. When Congress passes a law appropriating money for a particular purpose, it is the President's job to spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

255. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.,* 725 F. 3d 255, 261 n. 1 (D.C. Cir. 2013) (Kavanaugh, J.).

256. Nor does the President "have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F. 3d 272, 283 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018). Where the Executive withholds funding "to effectuate its own policy goals"

**App. 133**

without authorization from Congress, it violates the Constitution. *City & Cnty. of S. F. v. Trump*, 897 F. 3d 1225, 1235 (9th Cir. 2018).

257. If a President disagrees with Congress's spending decision, he can veto the legislation; but once a spending law has passed, the President has a simple duty to spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

258. The President has no constitutional power to amend or repeal statutes, *Clinton v. City of N. Y.,* 524 U.S. 417, 438 (1998) and doubly lacks the power to supplant Congress's spending directives with his own.

259. When a President intrudes on Congress's power over the purse, he violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Reps. v. Burwell*, 130 F. Supp. 3d 53, 76 (D. D. C. 2015), and acts as a "bulwark of the Constitution's separation of powers." *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.,* 665 F. 3d 1339, 1347 (D. C. Cir. 2012). Allowing the President to usurp this power "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

260. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when a President attempts to unilaterally seize the Nation's purse strings to serve his policy goals.

## II.  **The Presentment Clauses**

261. The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

**App. 134**

262. These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2–3.

263. The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–40 (quoting *Chadha*, 462 U.S. at 951).

264. The Constitution's careful limitations on the President's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

### III. <u>The First Amendment</u>

265. The First Amendment provides that the Government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This protection extends to both individual and organizational expression, and the government may not restrict speech based on its content or viewpoint. Laws or policies that target speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).

**App. 135**

266. Government actions that limit speech must be the least restrictive means of achieving a compelling state interest. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

267. Furthermore, the government cannot condition benefits or financial assistance on the suppression of constitutionally protected speech, especially when such a denial of support is based on the viewpoint or content of the expression. *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

## IV. **The Impoundment Control Act**

268. The Impoundment Control Act of 1974 ("ICA") sets forth very limited circumstances in which the President or an agency may "defer" or "rescind" congressionally appropriated funds.

269. Under the ICA, a "deferral" encompasses any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). A deferral thus includes both delays in obligating funds and delays in disbursing funds that are already obligated.

270. When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and must set forth one of only three permissible grounds for the deferral. The three permissible grounds for deferrals are: (1) "to provide for contingencies" (which generally means keeping a small cushion in case obligations end up costing more than anticipated); (2) "to achieve savings made possible by or through changes in requirements or greater efficiency of operations;" or (3) "as specifically provided by law." 2 U.S.C. § 684(b).

271. The Government Accountability Office ("GAO) has held that "policy reasons," including efforts to ensure funds are spent consistent with the President's policy preferences, are

**App. 136**

not a proper basis for deferrals. GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance,* B-331564, at 6 (Jan. 16, 2020).

272. Where the president seeks to have appropriated funds "rescinded," the ICA requires that the President send a special message to Congress specifying the funds he seeks to have *Congress* rescind and the reasons for his proposal. 2 U.S.C. § 683(a). The Administration can withhold obligating the relevant funds for 45 session days after the President transmits his message, but if Congress does not rescind the funds in that time, the Administration must make the funds available for obligation.

273. There is an exception to the ICA for so-called "programmatic delays," which are not prohibited by the Act. GAO has explained that "programmatic delays occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated." B-331564, at 7. Programmatic delays are meant "to advance congressional budgetary policies by ensuring that congressional programs are administered efficiently." *City of New Haven v. United States*, 809 F. 2d 900, 901 (D.C. Cir. 1987). Permissible programmatic delays do not include when the Executive Branch withholds money "on its own volition . . . to ensure compliance with presidential policy prerogatives." B-331564, at 7.

274. Thus, in addition to requiring an agency to spend appropriated money before it expires, the ICA also prohibits delays in spending funds based on policy objections.

**V. The Administrative Procedure Act**

275. Congress enacted the APA to ensure stability in agency action by mandating reasoned decisionmaking, and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See N. C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F. 3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting the APA prohibits policy change based on

74

**App. 137**

"political winds and currents" without adherence to "law and legal process"); *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices").

276. To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Telephone Coop., Inc. v. Fed. Comms. Comm'n*, 402 F. 3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (C).

277. The APA tasks courts—not the Executive—with "deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), reflecting the duty of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

278. As to process, "[t]he [APA] requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process. Otherwise, government becomes a matter of the whim and caprice of the bureaucracy . . . ." *N. C. Growers' Ass'n*, 702 F. 3d at 772 (Wilkinson, J., concurring); *accord S. C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 967 (D. S. C. 2018) (same) (quoting *id.)*.

279. To enforce these principles, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious," an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

**App. 138**

280. An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action," *Def's of Wildlife v. U.S. Dep't of Interior*, 931 F. 3d 339, 345 (4th Cir. 2019) (internal quotation omitted), "including a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43).

281. When an agency is not writing on a "blank slate" but is "changing [its] position," the agency must "provide a more detailed justification than what would suffice for a new policy" if, "for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *F. C. C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

282. When changing policy, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy interests." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33(2020). "[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy." *Id.* at 30 (citation and quotations omitted). At bottom, an agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516.

**App. 139**

283. Judicial review under the APA is limited to agency actions made reviewable by statute and "final agency action." 5 U.S.C. § 704. Agency action, including agency memoranda, are "final agency action" when they "'mark[]' the 'consummation' of the agency's decisionmaking process' and result[] in 'rights and obligations being determined. '" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)).

284. In sum, "[t]he role of the reviewing court under the APA is . . . . fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright Enters.*, 603 U.S. at 395 (citation and quotations omitted).

## VI. Nonstatutory Review Claims and *Ultra Vires* Actions

285. Separate from the APA, "a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority."' *Strickland v. United States*, 32 F. 4th 311, 363 (4th Cir. 2022).

286. Such "nonstatutory review" or "*ultra vires*" claims arise when federal officials have acted "beyond the scope of their powers and/or in an unconstitutional manner." *Id.* at 366.

287. Sovereign immunity does not shield federal officials from such claims because actions beyond statutory or constitutional authority "are considered individual and not sovereign actions." *Id.* (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)).

## CLAIMS FOR RELIEF

### —COUNT I—
### THE ENERGY EO, EQUITY EO, DOGE EO,
### AND PROGRAM FREEZING ACTIONS
### VIOLATE THE SEPARATION OF POWERS
### NONSTATUTORY REVIEW AND ULTRA VIRES ACTION

**(All Plaintiffs[28])**

288. The allegations in the preceding paragraphs are incorporated herein by reference.

289. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

290. The U.S. Constitution grants Congress, not the President, exclusive power over the nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

291. When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause).

292. The President has no constitutional power to freeze funds appropriated by Congress, particularly when the freeze is based on Presidential policies rather than Congress's spending directives. *E.g.*, *City & Cnty. of S. F.*, 897 F. 3d at 1231–35.

293. Congress has enacted the federal grant programs at issue in this case under the IRA and the IIJA and has appropriated over $1 trillion in funding for those programs to serve enumerated purposes specified in these statutory programs.

294. Consistent with their constitutional and statutory duties, federal agencies obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

295. Defendants are constitutionally required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

296. But in the Energy EO, Equity EO, and DOGE EO President Trump directed that federal funding be paused or terminated if it was inconsistent with his own policies.

---

[28] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**App. 141**

297. The President's Executive Orders, and the Program Freezing Actions implementing those Orders, directly contravene Congress's directives in the IRA, IIJA, and other statutes to carry out and fund the statutory programs at issue in this case. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (IRA "Environmental and Climate Justice Block Grants" program, directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities"); IRA, § 22007, 136 Stat. at 2022 (directing that USDA "shall" award grants for "USDA Assistance and Support for Underserved Farmers, Ranchers [and] Foresters" and those "determined to have experienced discrimination . . . in Department of Agriculture farm lending programs"); *see also* 33 U.S.C. § 1302f(c)(4)(A)(ii) (IIJA, requiring that EPA "shall" give priority to grant applications submitted on behalf of "a small, rural, or disadvantaged community").

298. None of the Executive Orders nor the Program Freezing Actions point to any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds based on the President's policy preferences.

299. All the relevant constitutional powers here—the power to appropriate, spend, and legislate—belong solely to Congress. The President has no constitutional power to indefinitely freeze funds appropriated by Congress, much less based on policies that conflict with what Congress specified.

300. The Energy EO, Equity EO, DOGE EO, and Program Freezing Actions—including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, DOT memo, DOE Memo, EPA Notice of DOGE Approval Requirement, EPA Executive Order Compliance Review Requirement, and any other agency action to freeze or block IRA, IIJA, or "equity-related" funding based on President Trump's priorities—usurp Congress's spending power, *see* U.S. Const. art. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and

**App. 142**

Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violate the separation of powers.

## —COUNT II—
### THE ENERGY EO, EQUITY EO, DOGE EO,
### AND PROGRAM FREEZING ACTIONS
### VIOLATE THE PRESENTMENT CLAUSES
### NONSTATUTORY REVIEW AND ULTRA VIRES ACTION
### (All Plaintiffs[29])

301. The allegations in the preceding paragraphs are incorporated herein by reference.

302. The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill . . . *before* the bill becomes law." *Clinton*, 524 U.S. at 439. "Presidential action that either repeals or amends *parts* of *duly enacted statutes*" violates the Presentment Clauses. *See id.* (emphasis added).

303. The Energy EO, Equity EO, and DOGE EO violate the Presentment Clauses to the extent they seek to "terminat[e]" or "modify" parts of the IRA or IIJA and other relevant statutes after they were passed by Congress and signed by the President. *See* Energy EO § 7; Equity EO § 2(b); DOGE EO § 3(b).

304. In purpose and in effect, the Energy EO, Equity EO, and DOGE EO amend the spending provisions of the IRA and the IIJA and other statutes, indefinitely suspending funding appropriated under these statutes, and unlawfully terminating the programs mandated by Congress, that the Executive Branch deems incompatible with *presidential* policies wholly different than *Congress's* directives for the funds and programs. *See supra* ¶¶ 186–247.

---

[29] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**App. 143**

305. Like the "line item veto" in *Clinton*, the Energy EO, Equity EO, and DOGE EO "cancel" Congress's spending priorities expressed in duly enacted statutes and replace them with those of the President. 524 U.S. at 436. The President lacks power to amend enacted law, as do his agencies.

306. By cancelling Congress's spending directives and replacing them with the President's policy preference to withhold appropriated funds, the Energy EO, Equity EO, and DOGE EO seek to repeal and amend the IRA and the IIJA in violation of the Presentment Clauses. *See* U.S. Const. Art. I, § 7, cl. 2–3.

307. For these same reasons, the Program Freezing Actions—including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, DOT Memo, DOE Memo, EPA Notice of DOGE Approval Requirement, EPA Executive Order Compliance Review Requirement, and any other agency action implementing the Executive Orders to freeze or block IRA and the IIJA or "equity-related" funding based on President Trump's priorities—also violate the Presentment Clauses.

### —COUNT III—
### THE PROGRAM FREEZING ACTIONS ARE
### ARBITRARY AND CAPRICIOUS
### IN VIOLATION OF THE APA
### (All Plaintiffs[30])

308. The allegations of the preceding paragraphs are incorporated herein by reference.

---

[30] Baltimore joins this claim only as to agency actions implementing the Energy EO and Cost Efficiency EO, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**App. 144**

309. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

310. The Program Freezing Actions, including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, DOT Memo, DOE Memo, EPA Notice of DOGE Approval Requirement, the EPA Executive Order Compliance Review Requirement, agency actions to block or prevent Plaintiffs from accessing the online portals needed to withdraw their grant funds, and other agency actions that prevent Plaintiffs from accessing their awarded grant funds, are arbitrary and capricious for multiple reasons.

311. First, these agency actions indefinitely froze over $1 trillion appropriated under the IRA and the IIJA without consideration of the "serious reliance interests" of recipients, including Plaintiffs, on those funds. *Fox Television Stations*, 556 U.S. at 515. "Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision. To say that OMB 'failed to consider an important aspect of the problem' would be putting it mildly." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11.

312. Second, these agency actions rely "on factors which Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43. Specifically, these actions indefinitely freeze funds based on the *President's* policies, contrary to Congress's specific directives and purposes for appropriating funds in the IRA and the IIJA and other federal statutes.

313. Third, these agency actions indefinitely froze *all* IRA and IIJA funding, as well as funding under other federal statutes without a consideration of alternative options. *See Regents of Univ. of Cal.*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy.").

**App. 145**

2.25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 23    Page 83 of 94

314.   For example, Defendants could have engaged in a review of grant funding and how it relates to President Trump's priorities *without* freezing the funds.

315. The unexplained freeze of all IRA and IIJA funds and freezing of funds under various other federal statutes epitomizes agency action by "whim and caprice of the bureaucracy," *N. C. Growers' Ass'n*, 702 F. 3d at 772 (Wilkinson, J., concurring).

316. The Program Freezing Actions must be vacated as arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

**—COUNT IV—**
**THE PROGRAM FREEZING ACTIONS**
**ARE NOT IN ACCORDANCE WITH LAW,**
**IN EXCESS OF STATUTORY AUTHORITY, AND**
**WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**
**IN VIOLATION OF THE APA**
**(All Plaintiffs[31])**

317. The allegations of the preceding paragraphs are incorporated herein by reference.

318. The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

319. "Courts"—not the Executive— "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters.*, 603 U.S. at 412. The APA reflects the judiciary's constitutional duty "to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

---

[31] Baltimore joins this claim only as to agency actions implementing the Energy EO and Cost Efficiency EO, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**App. 146**

320. For five reasons, the Program Freezing Actions are outside of the agencies' statutory authority, contrary to law, and without observance of procedure required by law.

321. First, no federal law or regulation gives the President, OMB, EPA, USDA, DOT, DOE or DOGE the power to freeze funding appropriated by Congress and obligated by executive agencies. The Executive Branch has blocked these funds based on President Trump's policies, as articulated in the Energy EO, Equity EO, and DOGE EO—policies that are entirely different than, and in many cases directly conflict with, the directives and purposes specified by Congress for expending the funds.

322. By freezing funding based on the *President's* priorities rather than "stated statutory factors," the "Executive has acted contrary to law and in violation of the APA." *New York*, 2025 WL 357368, at *2.

323. Second, these agency actions are unconstitutional on the grounds set forth in Counts I–II and V, *see supra* ¶¶ 288–307, *infra*, ¶¶ 329–339, and are thus "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C. § 706(2)(A), (B).

324. Third, these agency actions are contrary to the IRA, the IIJA and other statutes creating and appropriated money to the programs for which Plaintiffs receive grants. Defendants' actions are not in accordance with the statutory requirements to create, fund, and carry out these programs.

325. Fourth, these agency actions are contrary to the Impoundment Control Act of 1974. Defendants have unlawfully delayed the expenditure of funds, resulting in deferrals that are for impermissible policy reasons and that did not follow the ICA's requirements for notifying

Congress of deferrals. The agency actions also represent unlawful rescissions of the funds in violation of the ICA.

326. Fifth, these agency actions, which remain in effect, direct a freeze of IRA, IIJA, and "equity-related" funding that violates agency regulations and the grant agreements that incorporate these regulations. *See, e.g.*, *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018) ("[W]here an agency's decision does not comport with governing . . . regulations, that decision is 'not in accordance with law' and must be set aside."). To the extent subsequent agency actions have unilaterally frozen specific funding or programs, those freezes are unlawful for the same reasons.

327. These agency actions indefinitely freeze IRA, IIJA, and "equity-related" funding without identifying any permissible grounds for freezing funds, exhausting less drastic remedies, 2 C. F. R. §§ 200.339, 200.208(c), or affording any recipient notice and an opportunity to object. *Id.* § 200.342. Both binding regulations and grant agreements require these award-specific findings and procedures before funding may be suspended.

328. The Program Freezing Actions, and any other agency action to freeze or block IRA, IIJA, or "equity-related" funding based on President Trump's priorities rather than Congress's are in excess of the agencies' statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

## — COUNT V —
### THE PROGRAM FREEZING ACTIONS VIOLATE THE FIRST AMENDMENT AND ARE NOT IN ACCORDANCE WITH LAW
#### (Community Group Plaintiffs)

**App. 148**

329. The allegations of the preceding paragraphs are incorporated herein by reference as to the non-city plaintiffs.

330. Under the First Amendment, actions by the government targeting speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger*, 515 U.S. at 828–29. In particular, the government cannot condition benefits or financial assistance on the suppression of constitutionally protected speech, especially when such a denial of support is based on the viewpoint or content of the expression. *Speiser*, 357 U.S. at 518.

331. In addition, under the APA, courts must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

332. The Second OMB Memo purported to block all disbursements of federal financial assistance pending a "review" to determine whether they are "consistent with the President's Policies," including those outlined in the Equity EO, which mandates the termination of all "equity-related grants."

333. The Equity EO directs government officials to eliminate "environmental justice" from government initiatives. Equity EO § 2(b)(i). It further instructs agencies to terminate all grants or contracts deemed "equity related" within 60 days. *Id.*

334. The Second OMB Memo further directs agencies to identify federal funding recipients that supposedly "advance Marxist equity, transgenderism, and green new deal social engineering policies."

335. While none of these terms are defined, the pejorative descriptions and context make clear that they are highly disfavored by the Administration.

336. The Second OMB Memo targets federal funding recipients who express or advocate for viewpoints or content disfavored by the Administration, discriminating against these entities for continued federal funding based on their viewpoint.

337. Upon information and belief, the Program Freezing Actions identify organizations based on their viewpoints for purposes of blocking, freezing, or cancelling grant funding.

338. For example, EPA is using a flowchart to identify which grants to freeze or cancel based on the presence of certain arbitrary keywords representing viewpoints disfavored by the Administration in grant applications or other grant materials. This is unconstitutional viewpoint-based discrimination because it targets grantees like the nonprofit Community Group Plaintiffs and penalizes them based on their presence of certain words, concepts, and viewpoints in grant application or other grant materials—even though the words, concepts, and viewpoints were prioritized by Congress for federal funding, and the grantees were awarded funding on the basis of their grant materials, expressly to advance these policies that are central to their missions.

339. The Program Freezing Actions violate the First Amendment by restricting Plaintiffs' constitutionally protected speech based on its content.

—COUNT VI—
THE ENERGY EO, EQUITY EO, DOGE EO,
AND PROGRAM FREEZING ACTIONS
VIOLATE THE IRA AND THE IIJA AND OTHER RELEVANT STATUTES
NONSTATUTORY REVIEW AND ULTRA VIRES ACTION
(All Plaintiffs[32])

340. The allegations of the preceding paragraphs are incorporated herein by reference.

---

[32] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**App. 150**

341. Congress has enacted the federal grant programs at issue in this case under the IRA, IIJA, and other relevant statutes and has appropriated over $1 trillion in funding for those programs to serve enumerated purposes specified in these statutory programs.

342. Defendants are statutorily required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

343. Consistent with their statutory duties, federal agencies obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

344. But in the Energy EO, Equity EO, and DOGE EO President Trump directed that federal funding be paused or terminated if it was inconsistent with his own policies.

345. The President's Executive Orders and the Program Freezing Actions directly contravene the statutory requirements to carry out and fund the statutory programs under the IRA, IIJA, and other statutes under which Plaintiffs received grants. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (IRA "Environmental and Climate Justice Block Grants" program, directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities"); IRA, § 22007, 136 Stat. at 2022 (directing that USDA "shall" award grants for "USDA Assistance and Support for Underserved Farmers, Ranchers [and] Foresters" and those "determined to have experienced discrimination . . . in Department of Agriculture farm lending programs"); *see also* 33 U.S.C. § 1302f(c)(4)(A)(2) (IIJA, requiring that EPA "shall" give priority to grant applications submitted on behalf of "a small, rural, or disadvantaged community"); Section 1001 of the American Rescue Plan Act of 2001, Technical Assistance Investment Program to support farmworkers, and Urban Agriculture and Innovative Production Grant to support urban agriculture efforts in underserved communities.

88

**App. 151**

**PRAYER FOR RELIEF**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the

following relief:

A.  Issue a declaratory judgment that Sections 2 and 7 of the Unleashing Energy EO that

direct the freezing or termination of federal grants violate the United States Constitution

and are therefore void;

B.  Issue a declaratory judgment that Section 2(b) of the Equity EO that directs the

termination of "equity-related" grants or contracts violates the United States Constitution;

C.  Issue a declaratory judgment that Section 3(b) of the DOGE EO that directs the

termination or modification of grants to advance the policies of the Trump Administration

violates the United States Constitution;

D.  Issue a declaratory judgment that executive actions taken to freeze or terminate awarded

federal grants under the Community Change Grants program; the Environmental Justice

Collaborative Problem Solving Program; the Environmental Justice Government-to-

Government Program; the Partnerships for Climate-Smart Commodities program; the

Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative

Agreements program; the Conservation Technical Assistance Program; the Increasing

Land, Capital and Market Access Program; the Rural Development Policy Cooperative

Agreement program; the American Rescue Plan Technical Assistance Investment

Program; the Climate Pollution Reduction Grants program; the Urban and Community

Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative

Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the

Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling

Infrastructure Program Grants; the Active Transportation Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief Program; Assistance for Latest and Zero Building Energy Code Adoption; and the Office of Urban Agriculture and Innovative Production Grants program, violate the United States Constitution, the statutory provisions enacting and appropriating funds to these programs, and the APA;

E.  Pursuant to 5 U.S.C. § 706, hold unlawful and set aside any actions taken by OMB, EPA, USDA, DOT, or DOGE to freeze or terminate federal grants under the Community Change Grants program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative Agreement program; the American Rescue Plan Technical Assistance Investment Program; the Climate Pollution Reduction Grants program; the Urban and Community Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling Infrastructure Program Grants; Assistance for Latest and Zero Building Energy Code Adoption; Active Transportation Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief Program; and the Office of Urban Agriculture and Innovative Production Grants program;

F.  Preliminarily and permanently enjoin Defendants from continuing to freeze or terminating grants or effectuating any termination under the Community Change Grants

90

**App. 153**

program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative Agreement program; the American Rescue Plan Technical Assistance Investment Program; the Climate Pollution Reduction Grants program; the Urban and Community Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling Infrastructure Program Grants; the Active Transportation Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief Program; Assistance for Latest and Zero Building Energy Code Adoption; and the Office of Urban Agriculture and Innovative Production Grants program;

G.  Prohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds awarded under such program(s);

H.  Require Defendants to make grant program managers available to Plaintiffs to assist with the administration of grant funds, and require that grant program managers respond to questions from grantees in a timely manner;

I.  Provide Plaintiffs and the Court with weekly status updates regarding grant disbursements and grant program administration;

J.  Retain jurisdiction over this matter to ensure compliance with the above relief;

**App. 154**

K.  Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees,

pursuant to 28 U.S.C. § 2412; and

L.  Grant such other relief as this Court deems just and proper.

Respectfully submitted this 26th day of March 2025.

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N. C. Bar No. 41333)
(*Pro Hac Vice* pending)
Irena Como (N. C. Bar No. 51812)
(*Pro Hac Vice* pending)
Nicholas S. Torrey (N. C. Bar No. 43382)
(*Pro Hac Vice* pending)
SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org

*Counsel for Plaintiffs The Sustainability Institute,
Agrarian Trust, Alliance for Agriculture, Alliance
for the Shenandoah Valley, Bronx River Alliance,
CleanAIRE NC, Conservation Innovation Fund,
Earth Island Institute, Leadership Counsel for
Justice and Accountability, Marbleseed, Organic
Association of Kentucky, Pennsylvania Association
of Sustainable Agriculture, and Rural Advancement
Foundation International – USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
(*Pro Hac Vice* pending)

**App. 155**

Elaine Poon (VA Bar No. 91963)
(*Pro Hac Vice* pending)
Jon Miller (MA Bar No. 663012)
(*Pro Hac Vice* pending)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org

*Counsel for Plaintiffs Mayor and City Council of Baltimore, City of Columbus, City of Madison, Metropolitan Government of Nashville and Davidson County, City of New Haven, City of San Diego*

<u>/s/</u> Mark Ankcorn
Mark Ankcorn, Senior Chief Deputy City Attorney
(CA Bar No. 166871)
(*Pro Hac Vice* pending)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Plaintiff City of San Diego*

**App. 156**

**CERTIFICATE OF SERVICE**

I certify that on March 26, 2025, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system:

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

**App. 157**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | |
|---|---|
| The Sustainability Institute, et al., <br><br><br> _____ <br> *Plaintiff(s)* <br> v. <br> Donald J. Trump, in his official capacity as President <br> of the United States, et al. <br><br> _____ <br> *Defendant(s)* | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No.  2:25-cv-02152-RMG <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  United States Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Carl Brzorad
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                          *Signature of Clerk or Deputy Clerk*

**App. 158**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:25-cv-02152-RMG

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                         *Server's signature*

                                               _____
                                                         *Printed name and title*

                                               _____
                                                         *Server's address*

Additional information regarding attempted service, etc:

**App. 159**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | |
|---|---|
| The Sustainability Institute, et al., | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | )    Civil Action No.   2:25-cv-02152-RMG |
| Donald J. Trump, in his official capacity as President of the United States, et al. | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Chris Wright, in his official capacity as the Secretary of Energy
United States Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Carl Brzorad
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
                                                                                  *Signature of Clerk or Deputy Clerk*

**App. 160**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:25-cv-02152-RMG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**App. 161**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE,
AGRARIAN TRUST, ALLIANCE FOR
AGRICULTURE, ALLIANCE FOR THE
SHENANDOAH VALLEY, BRONX RIVER
ALLIANCE, CLEANAIRE NC, CONSERVATION
INNOVATION FUND, EARTH ISLAND
INSTITUTE, LEADERSHIP COUNSEL FOR
JUSTICE AND ACCOUNTABILITY,
MARBLESEED, ORGANIC ASSOCIATION OF
KENTUCKY, PENNSYLVANIA ASSOCIATION
FOR SUSTAINABLE AGRICULTURE AND
RURAL ADVANCEMENT FOUNDATION
INTERNATIONAL-USA,

and

MAYOR AND CITY COUNCIL OF BALTIMORE,
CITY OF COLUMBUS, CITY OF MADISON,
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,                    Case No. 2:25-cv-02152-RMG
CITY OF NEW HAVEN, CITY OF SAN DIEGO

                       Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; KEVIN HASSETT,
in his official capacity as Assistant to the President for
Economic Policy and Director of the National Economic
Council; UNITED STATES OFFICE OF MANAGEMENT
AND BUDGET; RUSSELL VOUGHT, in his
official capacity as Director of the United States
Office of Management and Budget; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official capacity
as Administrator of the United States Environmental
Protection Agency; UNITED STATES DEPARTMENT
OF AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as the Secretary
of the United States Department of Transportation;
UNITED STATES DEPARTMENT OF ENERGY;

**App. 162**

CHRIS WRIGHT, in his official capacity as the
Secretary of the United States Department of Energy;
UNITED STATES DEPARTMENT OF
GOVERNMENTAL EFFICIENCY SERVICE;
AMY GLEASON, in her official capacity as
Acting Administrator of the United States DOGE
Service; ELON MUSK, in his official capacity as
Senior Advisor of the United States DOGE Service.

Defendants.

NOW COMES Plaintiff, Organic Association of Kentucky, by and through its undersigned

counsel, to make the following answers to the Rule 26.01 Interrogatories:

(A)    State the full name, address, and telephone number of all persons or legal entities who
       may have a subrogation interest in each claim and state the basis and extent of the
       interest.

       **ANSWER:** None.

(B)    As to each claim, state whether it should be tried jury or non-jury and why.

       **ANSWER:**   All claims should be tried non-jury because Plaintiffs do not seek
                     damages.

(C)    State whether the party submitting these responses is a publicly-owned company and
       separately identify (1) any parent corporation and any publicly-held corporation
       owning ten percent (10%) or more of the party's stock; (2) each publicly-owned
       company of which it is a parent; and (3) each publicly-owned company in which the
       party owns ten percent (10%) or more of the outstanding shares.

       **ANSWER:**

               (1) No parent corporation, nor any publicly-held corporation, owns ten percent or
                   more of Organic Association of Kentucky.

               (2) Organic Association of Kentucky is not a parent of any publicly-owned
                   corporation.

               (3) Organic Association of Kentucky does not own ten percent or more of the
                   outstanding shares of any publicly-owned corporation.

(D)    State the basis for asserting the claim in the division in which it was filed (or the basis
       of any challenge to the appropriate of the division).  See Local Civ. Rule 3.01 (D.S.C).

**App. 163**

**ANSWER:**

Venue is proper in the Charleston Division under Local Civ. Rule 3.01(A)(1) because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division.

(E)    Is this action related in whole or in party to any other matter filed in this district, whether civil or criminal? If so, provide (1) a short caption and the full case number of the related action, (2) an explanation of how the matters are related; and (3) statement of the status of the related action. Counsel should disclose any cases that *may* be related regardless of whether they are still pending. Whether cases *are* related such that they should be assigned to a single judge will be determined by the clerk of court based on a determination of whether the cases arise from the same or identical transactions, happenings, or events; involve the identical parties or property; or for any other reason would entail substantial duplication of labor if heard by different judges.

**ANSWER:**  No.

(F)    [*Defendants only.*] If the defendant is improperly identified, give the proper identification and state whether counsel will accept service of an amended summons and Pleading reflecting the correct identification.

**ANSWER:**   N/A

(G)  [*Defendants only*] If you contend that some other person or legal entity is, in whole or in Part, liable to you or the party asserting a claim against you in this matter, identify such Person or entity and describe the basis of their liability.

**ANSWER:**  N/A

This the 26th day of March 2025.

*/s/* Carl T. Brzorad
Carl T. Brzorad
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cbrzorad@selc.org

*/s/* Kimberley Hunter
Kimberley Hunter (N.C. Bar No. 41333)
(*Pro Hac Vice* pending)
Irena Como (N.C. Bar No. 51812)
(*Pro Hac Vice* pending)

Nicholas S. Torrey (N.C. Bar No. 43382)
(*Pro Hac Vice* pending)
SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE,
AGRARIAN TRUST, ALLIANCE FOR
AGRICULTURE, ALLIANCE FOR THE
SHENANDOAH VALLEY, BRONX RIVER
ALLIANCE, CLEANAIRE NC, CONSERVATION
INNOVATION FUND, EARTH ISLAND
INSTITUTE, LEADERSHIP COUNSEL FOR
JUSTICE AND ACCOUNTABILITY,
MARBLESEED, ORGANIC ASSOCIATION OF
KENTUCKY, PENNSYLVANIA ASSOCIATION
FOR SUSTAINABLE AGRICULTURE AND
RURAL ADVANCEMENT FOUNDATION
INTERNATIONAL-USA,

and

MAYOR AND CITY COUNCIL OF BALTIMORE,
CITY OF COLUMBUS, CITY OF MADISON,
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,                    Case No. 2:25-cv-02152-RMG
CITY OF NEW HAVEN, CITY OF SAN DIEGO

                     Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; KEVIN HASSETT,
in his official capacity as Assistant to the President for
Economic Policy and Director of the National Economic
Council; UNITED STATES OFFICE OF MANAGEMENT
AND BUDGET; RUSSELL VOUGHT, in his
official capacity as Director of the United States
Office of Management and Budget; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official capacity
as Administrator of the United States Environmental
Protection Agency; UNITED STATES DEPARTMENT
OF AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as the Secretary
of the United States Department of Transportation;
UNITED STATES DEPARTMENT OF ENERGY;

**App. 166**

CHRIS WRIGHT, in his official capacity as the
Secretary of the United States Department of Energy;
UNITED STATES DEPARTMENT OF
GOVERNMENTAL EFFICIENCY SERVICE;
AMY GLEASON, in her official capacity as
Acting Administrator of the United States DOGE
Service; ELON MUSK, in his official capacity as
Senior Advisor of the United States DOGE Service.

Defendants.

NOW COMES Plaintiff, Earth Island Institute, by and through its undersigned counsel, to

make the following answers to the Rule 26.01 Interrogatories:

(A)    State the full name, address, and telephone number of all persons or legal entities who
       may have a subrogation interest in each claim and state the basis and extent of the
       interest.

       **ANSWER:** None.

(B)    As to each claim, state whether it should be tried jury or non-jury and why.

       **ANSWER:**    All claims should be tried non-jury because Plaintiffs do not seek
                      damages.

(C)    State whether the party submitting these responses is a publicly-owned company and
       separately identify (1) any parent corporation and any publicly-held corporation
       owning ten percent (10%) or more of the party's stock; (2) each publicly-owned
       company of which it is a parent; and (3) each publicly-owned company in which the
       party owns ten percent (10%) or more of the outstanding shares.

       **ANSWER:**

              (1) No parent corporation, nor any publicly-held corporation, owns ten percent or
                  more of Earth Island Institute.

              (2) Earth Island Institute is not a parent of any publicly-owned corporation.

              (3) Earth Island Institute does not own ten percent or more of the outstanding shares
                  of any publicly-owned corporation.

(D)    State the basis for asserting the claim in the division in which it was filed (or the basis
       of any challenge to the appropriate of the division).  See Local Civ. Rule 3.01 (D.S.C).

       **ANSWER:**

Venue is proper in the Charleston Division under Local Civ. Rule 3.01(A)(1) because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division.

(E)     Is this action related in whole or in party to any other matter filed in this district, whether civil or criminal? If so, provide (1) a short caption and the full case number of the related action, (2) an explanation of how the matters are related; and (3) statement of the status of the related action. Counsel should disclose any cases that *may* be related regardless of whether they are still pending. Whether cases *are* related such that they should be assigned to a single judge will be determined by the clerk of court based on a determination of whether the cases arise from the same or identical transactions, happenings, or events; involve the identical parties or property; or for any other reason would entail substantial duplication of labor if heard by different judges.

**ANSWER:**  No.

(F) [*Defendants only.*] If the defendant is improperly identified, give the proper identification and state whether counsel will accept service of an amended summons and Pleading reflecting the correct identification.

**ANSWER:**   N/A

(G) [*Defendants only*] If you contend that some other person or legal entity is, in whole or in Part, liable to you or the party asserting a claim against you in this matter, identify such Person or entity and describe the basis of their liability.

**ANSWER:**  N/A

This the 26th day of March 2025.

/s/ Carl T. Brzorad
Carl T. Brzorad
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N.C. Bar No. 41333)
(*Pro Hac Vice* pending)
Irena Como (N.C. Bar No. 51812)
(*Pro Hac Vice* pending)
Nicholas S. Torrey (N.C. Bar No. 43382)
(*Pro Hac Vice* pending)

**App. 168**

SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org

# EXHIBIT A
# "First OMB Memo"



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 21, 2025

M-25-11

MEMORANDUM TO THE HEADS OF DEPARTMENTS AND AGENCIES

FROM:     Matthew J. Vaeth, Acting Director, Office of Management and Budget

Kevin Hassett, Assistant to the President for Economic Policy and Director of the National Economic Council

SUBJECT:   Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*

The directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58). This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order. This interpretation is consistent with section 7's heading ("Terminating the Green New Deal") and its reference to the "law and the policy outlined in section 2 of th[e] order."

For the purposes of implementing section 7 of the Order, funds supporting the "Green New Deal" refer to any appropriations for objectives that contravene the policies established in section 2. Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget.

**App. 171**

# EXHIBIT B

# "Second OMB Memo"



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 27, 2025

M-25-13

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:          Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT:     Temporary Pause of Agency Grant, Loan, and Other Financial Assistance
                      Programs

     The American people elected Donald J. Trump to be President of the United States and gave him a mandate to increase the impact of every federal taxpayer dollar. In Fiscal Year 2024, of the nearly $10 trillion that the Federal Government spent, more than $3 trillion was Federal financial assistance, such as grants and loans. Career and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities. Financial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending "wokeness" and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve.

     This memorandum requires Federal agencies to identify and review all Federal financial assistance[1] programs and supporting activities consistent with the President's policies and requirements.[2]  For example, during the initial days of his Administration, President Donald J. Trump issued a series of executive orders to protect the American people and safeguard valuable taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20,

---

[1] 2 CFR 200.1 defines Federal financial assistance to mean "[a]ssistance that recipients or subrecipients receive or administer" in various forms, but this term does not include assistance provided directly to individuals. For the purposes of this memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals.
[2] Nothing in this memo should be construed to impact Medicare or Social Security benefits.

**App. 173**

2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025). These executive orders ensure that Federal funds are used to support hardworking American families.

To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders. In the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities. The temporary pause will become effective on January 28, 2025, at 5:00 PM. Even before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect. Federal agencies must report this information to OMB along with an analysis of the requirement. OMB also directs Federal agencies to pause all activities associated with open NOFOs, such as conducting merit review panels.

No later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause. Each agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis. To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards (2 CFR 200.344), or recording obligations expressly required by law.

Additionally, agencies must, for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published, and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards.

**App. 174**

# EXHIBIT C

# "USDA Directive"



Andrew Currie <andrew@pasafarming.org>

---

## FW: FOR DISTRIBUTION TO GRANT RECIPIENTS: Partnerships for Climate-Smart Commodities Grant Update

---

**Culbert, Tanya - FPAC-NRCS, MS** <tanya.culbert@usda.gov>                    Wed, Jan 22, 2025 at 1:14 PM
To: "Culbert, Tanya - FPAC-NRCS, MS" <tanya.culbert@usda.gov>
Cc: "Anderson, John - FPAC-FSA, SD" <john.a.anderson@usda.gov>, "Abouali, Mustapha - FPAC-NRCS, NV"
<mustapha.abouali@usda.gov>, "Hansen, Eric - FPAC-NRCS, DC" <Eric.Hansen@usda.gov>

Hello Grantees,

Please see message below for your awareness.

Let me know if you have questions and I will work to get you answers.

Thank you,

Tanya Culbert

National Program Officer

Office of the Associate Chief l Center for Sustainable Commodity Markets

 Natural Resources Conservation Service
U.S. DEPARTMENT OF AGRICULTURE

l c: (601) 748-9177 lRemote duty station

e: tanya.culbert@usda.gov l https://www.nrcs.usda.gov/

Stay Connected with USDA:

     

Helping People Help the Land

*USDA is an equal opportunity provider, employer, and lender.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**App. 176**

USCA4 Appeal: 25-1575   Doc: 6   Date Filed: 05/22/2025   Pg: 208 of 268   Page 3 of 8

2/11/25, 7:54 AM    Fwd: Sustainable Agriculture Mail - FW: USDA NRCS | O GRANTS: Partnerships for Climate-Smart Commodities Grant …

Dear Grant Recipients,

As of late yesterday, January 21, 2025, the administration placed a temporary suspension on all actions related to grants, including Partnerships for Climate-Smart Commodities grants. This is a fluid situation, and we ask for your patience as we work to gain additional clarification for you in the coming days.

Please contact your National Program Officer if you have additional questions. We will continue to provide periodic updates via email as more information becomes available.

Sincerely,

Katina

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Katina D. Hanson

*Director*

Office of the Associate Chief | Center for Sustainable Commodity Markets



USDA
**Natural Resources Conservation Service**
U.S. DEPARTMENT OF AGRICULTURE

*USDA is an equal opportunity provider, employer, and lender.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**App. 177**



Andrew Currie <andrew@pasafarming.org>

---

## FW: FOR DISTRIBUTION TO GRANT RECIPIENTS: Partnerships for Climate-Smart Commodities Grant Update FAQs

---

**Culbert, Tanya - FPAC-NRCS, MS** <tanya.culbert@usda.gov>          Wed, Jan 22, 2025 at 3:53 PM
To: "Culbert, Tanya - FPAC-NRCS, MS" <tanya.culbert@usda.gov>

Hello Grantees,

Please see additional guidance below.

Thank you,

Tanya Culbert

National Program Officer

Office of the Associate Chief I Center for Sustainable Commodity Markets

**USDA** Natural Resources Conservation Service
U.S. DEPARTMENT OF AGRICULTURE

l c: (601) 748-9177 IRemote duty station

e: tanya.culbert@usda.gov I https://www.nrcs.usda.gov/

Stay Connected with USDA:

    

Helping People Help the Land

*USDA is an equal opportunity provider, employer, and lender.*

****************************************************************************

Dear Grant Recipients,

USCA4 Appeal: 25-1575   Doc: 6        Filed: 05/22/2025    Pg: 210 of 268

2/11/25, 7:53 AM                Fwd: Sustainable Agriculture Mailbox (FOR IMMEDIATE DISTRIBUTION) - RE: Partnerships for Climate Smart Commodities Grant ...

We have received additional guidance from the USDA Office of the Chief Financial Officer's office on the temporary suspension of all USDA actions related to grants, including Partnerships for Climate-Smart Commodities grants. Please see Frequently Asked Questions (FAQs) below:

1. **Does the moratorium include no-cost extensions or no-cost modifications on existing awards?**

   a. <u>Answer:</u> No, it does not apply to no-cost extensions or no-cost modifications. This may include budget revisions that do not obligate additional funds, no-cost extensions of time, changes in key staff, and other changes that do not result in any additional expenditure of funds (regardless of their source).

2. **Can existing work continue under active awards?**

   a. <u>Answer:</u> Yes, until such time that you receive guidance in the future that specific transactions must be modified or terminated.

3. **Can payments or claims be processed under existing awards?**

   a. <u>Answer:</u> At this time, yes, payments or claims may continue to be processed under existing awards, provided that they are not funded using IRA and IIJA funding sources. Additional guidance related to IIJA and IRA funds will be provided by OCFO and/or OBPA, when available.

The above direction is subject to change pending updates from the current administration. Any updates will be communicated in writing when available.

Again, this is a fluid situation, and we ask for your patience as we work to gain additional clarification for you in the coming days.  Please contact your National Program Officer if you have additional questions. We will continue to provide periodic updates via email as more information becomes available.

Sincerely,

Katina

*************************************************************************

Katina D. Hanson

*Director*

Office of the Associate Chief I Center for Sustainable Commodity Markets



Natural Resources Conservation Service
U.S. DEPARTMENT OF AGRICULTURE

*USDA is an equal opportunity provider, employer, and lender.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the

violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**App. 180**

 **U.S. Department of Agriculture**

**PRESS RELEASE**

# Secretary Rollins Releases the First Tranche of Funding Under Review

PUBLISHED:    February 20, 2025

SHARE:      

Today, U.S. Secretary of Agriculture Brooke Rollins announced that USDA will release the first tranche of funding that was paused due to the review of funding in the Inflation Reduction Act (IRA).

**Washington, D.C., Feb. 20, 2025**—Today, U.S. Secretary of Agriculture Brooke Rollins announced that USDA will release the first tranche of funding that was paused due to the review of funding in the Inflation Reduction Act (IRA).

In alignment with White House directives, Secretary Rollins will honor contracts that were already made directly to farmers. Specifically, USDA is releasing approximately $20 million in contracts for the Environmental Quality Incentive Program, the Conservation Stewardship Program, and the Agricultural Conservation Easement Program.

"American farmers and ranchers are the backbone of our nation," **said Secretary Rollins**. "They feed, fuel, and clothe our nation—and millions of people around the world. The past four years have been among the most difficult for American Agriculture, due in no small measure to Biden's disastrous policies of over-regulation, extreme environmental programs, and crippling inflation. Unfortunately, the Biden administration rushed out hundreds of millions of dollars of IRA funding that was supposed to be distributed over eight years. After careful review, it is clear that some of this funding went to programs that had nothing to do with agriculture—that is why we are still reviewing—whereas other funding was directed to farmers and ranchers who have since made investments in these programs.

**App. 181**

We will honor our commitments to American farmers and ranchers, and we will ensure they have the support they need to be the most competitive in the world."

This is the first tranche of released funding, and additional announcements are forthcoming as USDA continues to review IRA funding to ensure that we honor our sacred obligation to American taxpayers—and to ensure that programs are focused on supporting farmers and ranchers, not DEIA programs or far-left climate programs.

# # #

USDA is an equal opportunity provider, employer, and lender.

PRESS RELEASE

Release No.:
0030.25



U.S. Department of Agriculture

# EXHIBIT D
# "EPA Memo"

**THE CHIEF FINANCIAL OFFICER**

WASHINGTON, D.C. 20460

January 27, 2025

## CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**   Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action
Pause

**FROM:**      Gregg Treml, Chief Financial Officer (Acting)     GREGG      Digitally signed by
                                                                 TREML      GREGG TREML
                                                                            Date: 2025.01.27
                                                                            16:59:02 -05'00'

**TO:**        Deputy Assistant Administrators
               Deputy Associate Administrators
               Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including
unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the
Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass
financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in
discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including
funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure
Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements
will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the
Order.

All related actions, including new contract, grant, rebate and interagency actions, to include
drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any
actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this
time and all upcoming travel funded from either should be cancelled.

**App. 184**

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    Senior Resource Officials
    Senior Budget Officers
    Regional Comptrollers
    Funds Control Officers

Controlled by U.S. Environmental Protection Agency

2

**App. 185**

# EXHIBIT E

# "EPA Executive Order Compliance Review Requirement"



**Executive Order Compliance Review**
The following review verification document must be included with any assistance agreement, contract or interagency (IA) funding action or amendment to a workplan or statement of work. The document demonstrates that the signatory understands that the action and associated workplan or performance work statement complies with Executive Order requirements (detailed here: Presidential Actions – The White House) at the time of signature.

For actions requiring this document, signature must be by the Office Director (OD) in Headquarters or the Division Director (DD) in the regions. An OD/DD may assign a designee. Contracting Officers/ Specialists, IA Specialists, and Grants Specialists must retain the signed document in the contract, IA or grant file.

Funding actions for $50,000 and above, review and signature by a DOGE team member is required.

**Funding Action Review Confirmation**
This confirms that the workplan, budget or performance work statement does not conflict with the Executive Orders and aligns with the Administrator's "Powering the Great American Comeback" initiative. Funding organizations may batch actions and attach a list of covered actions, which must include the following details, at a minimum.

Contract/ Grant/ IA #:

Recipient/ Vendor name:

Funding amount $:

Description of Work (one sentence and only for $50,000 and above actions):

_____
Program Office Director (or designee)/ Regional Division Director (or designee)

_____
DOGE Team (if required)

**App. 188**

# EXHIBIT F
# "DOT Memo"

**Attention: Heads of Secretarial Offices and Operating Administrations (OA)**

**Overview:**  The Office of the Assistant Secretary for Transportation Policy (OST-P) is providing guidance on competitive award selections made after January 20, 2021, that do NOT have fully obligated grant agreements or cooperative agreements in place.

Projects with executed grant agreements in place that are fully obligated are not subject to the guidance below. For selections with partially obligated grant agreements, the same review should take place before awarding subsequent phases or adding additional funds to an existing grant agreement. Additional guidance will be provided regarding revisions to standard terms and conditions appearing in draft grant agreements or templates.

**Summary:**  All competitive grant and cooperative agreement award selections must comply with current Administration priorities and Executive Orders (EO) that address energy, climate change, diversity and gender, and economic analysis, and other priorities.  Applicable Executive Orders and Memoranda include:

- Executive Order 14148, Initial Rescissions of Harmful Executive Orders and Actions;

- Executive Order 14154, Unleashing American Energy

- Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing

- Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

- Secretarial Order 2100.7, Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities

- Secretarial Memorandum on Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender

This guidance provides direction for identifying award selections without fully obligated grant agreements that do not comply with these priorities.

**ACTION**: For projects announced from FY 2022 through FY 2025, review all underlined award selections without grant agreements and partially obligated grant agreements. The focus of this review is to identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders.

**Step 1: Program Identification.** Identify Programs for which award selections may have included any of the following elements: equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-

specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure. Additionally, project-by-project review of selections to identify any project scope elements for potential removal are required for any Programs that meet the criteria below:

- Statutory language includes equity requirements, climate considerations, or bicycle infrastructure.
- NOFO mandatory evaluation criteria includes equity and/or climate requirements.
- Eligible activities included bicycle infrastructure, EV and/or EV charging infrastructure.

Programs that do not meet the criteria above should be shared with the OA Administrator or equivalent OST leadership for concurrence/confirmation. Following OA Administrator or equivalent OST leadership concurrence, the OST Office of Policy (OST-P) and Office of the General Counsel (OGC) will provide final confirmation on whether a program is required to conduct a project-by-project review. If OST-P and OGC confirm that a project-by-project review is not required, offices may proceed with negotiating and finalizing grant agreements. If OST-P and OGC confirm that project-by-project review is required, offices should proceed to Step 2. Please submit review requests to the OST Policy Board at OSTPolicyBoard@dot.gov.

**Step 2: Project-by Project Review.** Programs that require further review shall have Program Teams examine each individual project to identify those award selections that have project scopes that include any of the project elements listed in Step 1 (i.e. equity activities, DEI activities climate change activities, etc.). Those Teams should document their project-by-project examination and flag any project scope elements or activities for potential removal, including:

- Project activities such as equity analysis, green infrastructure, bicycle infrastructure, EV and/or EV charging infrastructure.
- Project purpose or primary project benefits include equity and/or climate such as-projects that purposefully improve the condition for EJ communities or actively reduce GHG emissions.

*Note: If project scope elements are based in statute, program offices should consult with applicable legal counsel, and following legal concurrence, raise any proposed scope changes to OA leadership.*

OA leadership shall review the findings from the Team review, and recommend to OST-P and OGC which project selections should:

**App. 191**

a. Continue in their current form with no change;

b. Be revised with a reduced or modified scope; or

c. Be canceled entirely.

**Step 3: Project Scope Revision.** Award selections identified in Step 2.b must update project scopes to eliminate flagged activities, and where possible replace identified elements with relevant elements that align with program statute, the scope of the application submission, and current Administration EOs.

Where the scope of the project includes elements noted above, Teams should negotiate with project sponsors to update project scopes to eliminate and, where possible, replace those identified elements with relevant elements that align with the program statute, the original scope of the application submission, and current Administration EOs.

a. If the project sponsor agrees to proceed with scope changes, proceed to grant agreement formulation and execution. The project sponsor may propose alternative project elements to substitute for the redline elements that should be removed as long as they 1) align with the program statute, 2) are consistent with the purposes of the original scope of the application submission, and 3) align with current Administration EOs.

b. If the project sponsor does not agree to remove project elements noted in Step 2 and replace with acceptable alternative scope, then the Team should proceed with a reduced award that removes the flagged scope and activities.

# EXHIBIT G

# "EPA Notice of DOGE Approval Requirement"

**Subject:** FW: Updated EO Compliance Review

Project Officers and Contract Officer Representatives:

Good morning. Please see the updated EO compliance review document (attached) and the instructions below.

Funding organizations will need to provide the amended EO compliance review document to award officials to signal alignment on Administration priorities as detailed through Executive Orders (Presidential Actions – The White House) and the Administrator's "Powering the Great American Comeback" Initiative (EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative | US EPA). For transactions below $50,000, the compliance document is largely the same, except it requests the dollar amount.

There is a new requirement for transactions greater than $50,000. **Effective today, any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member.** To facilitate the DOGE Team review, please include a brief (1-sentence) explanation of the funding action (all other fields must be completed as well). Programs and regions should aim to submit a single tranche of actions for DOGE review each day between 3pm – 6pm EST. While emergency/ special actions are understandable, please work to batch your funding actions as best as possible.

For compliance reviews requiring DOGE sign-off, please email your request by **2 p.m.** to ██████████████ at ████████████@epa.gov **and** ████████████ at ████████████@epa.gov.

Thank you for your time, and feel free to contact me with any questions.

Have a great day,

# EXHIBIT H
# "DOT Secretary's Directive"



**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

## MEMORANDUM FOR SECRETATRIAL OFFICERS AND HEADS OF OPERATING ADMINISTRATIONS

**From:**     The Secretary

**Subject:**     Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender

**DATE:**     January 29, 2025

---

1. This Memorandum sets forth the initial steps to be taken by the U.S. Department of Transportation (Department or DOT) to implement the provisions of several executive orders including those titled as follows: several executive orders and memoranda issued by the President on January 20, 2025, including: Executive Order 14148, *Initial Rescissions of Harmful Executive Orders and Actions*; Executive Order 14151, *Ending Radical And Wasteful Government DEI Programs And Preferencing;* Executive Order 14154, *Unleashing American Energy;* and an Executive Order of January 20, 2025 titled *"Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government* (collectively referred to herein as "relevant executive orders"), which direct Federal agencies, where and as consistent with law, to identify and eliminate all orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, and policy statements, or portions thereof, which were authorized, adopted, or approved between noon on January 20, 2021 and noon on January 20, 2025, and which reference or relate in any way to climate change, "greenhouse gas" emissions, racial equity, gender identity, "diversity, equity, and inclusion" goals, environmental justice, or the Justice 40 Initiative.

2. All DOT Operating Administrations (OAs) and all components of the Office of the Secretary (OST) shall, within 10 days of the date of this Memorandum, identify and list in a written report to the Office of the General Counsel and the Office of the Under Secretary for Policy all DOT orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, and policy statements, or portions thereof, which are subject to the relevant executive orders.

3. Within 10 days after submission of the report, all OAs and OST components shall, in coordination and consultation with the Office of the General Counsel and the Office of the Under Secretary for Policy, initiate all lawful actions necessary to rescind, cancel, revoke, and terminate all DOT orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, policy statements, or portions thereof, which are subject to the relevant executive orders and which are not required by clear and express statutory language.

4. The Office of the General Counsel and the Office of the Under Secretary for Policy shall be responsible for overseeing compliance with this Memorandum and within 30 days of the date hereof shall

Pg: 227 of 268     Filed: 05/22/2025     Doc: 6     USCA4 Appeal: 25-1575

submit a written report to the Secretary regarding the status of compliance by each OA and OST component.

5. Pursuant to the relevant executive orders, the following Departmental Orders are hereby canceled:

| DOT 1000.17 | Department of Transportation Equity Council | Dec. 19, 2022 |
| DOT 4360 | Climate Change Adaptation and Resilience Policy for DOT Operational Assets | Sept. 18, 2023 |
| DOT 5610.2C | U.S. Department of Transportation Actions to Address Environmental Justice in Minority Populations and Low-income Populations | May 16, 2021 |

Secretary of Transportation

Pg: 228 of 268

Filed: 05/22/2025     Doc: 6     USCA4 Appeal: 25-1575

**App. 197**

# EXHIBIT F
# "DOE Memo"



**The Secretary of Energy**
Washington, DC 20585

January 20, 2025

MEMORANDUM FOR HEADS OF DEPARTMENTAL ELEMENTS

FROM:                 INGRID C. KOLB
                      ACTING SECRETARY

SUBJECT:              Agency-wide Review of Program and Administrative Activities

As we navigate through this transition period for a new Administration within the Department of Energy (DOE), it is imperative to ensure a deliberate approach to the Administration's programmatic and administrative policies and priorities. To that end, effective immediately and until further notice, prior to any actions or decisions on all herein described activities, a review under varying criteria will be undertaken to ensure all such actions are consistent with current Administration policies and priorities, including budgetary priorities.[1] The broad spectrum of actions include but are not limited to: personnel actions; awarding of grants, loans, funding opportunities, and cost sharing agreements; contracting, procurement announcements, and actions; rulings, decisions or other actions on any applications, enforcement action, or settlements of any contested matter; submissions to the Federal Register for publication; and the publication or announcement of reports, studies, congressional correspondence, and public statements. This includes all studies or reports that are either ongoing, set to be released, are already under review, or have not yet begun.

The reviews are necessary to facilitate a comprehensive review of the Department's ongoing activities and to align these efforts with Congressional authorizations and the Administration's priorities, to ensure that resources are allocated efficiently, and that the Department's initiatives are in line with the statutory mission of DOE and the priorities of the Administration.

As discussed below, a process will be in place for the submission of requests for action by the Secretary (acting) to ensure the important work of the Department continues to serve the American people.

Scope of Actions:

1. **Personnel Actions:** All personnel actions, including appointments, promotions, and transfers, are to be halted. This includes both internal staff movements and external hiring processes, unless expressly and unambiguously authorized with the prior approval of the acting Secretary, after the date of issuance of this order.

---

[1] With respect to NNSA, nothing herein is intended to contradict 50 USC Ch. 41 but to be construed broadly consistent with the Secretary's authority thereunder, include §2402(d).

**App. 199**

Pg: 230 of 268      Filed: 05/22/2025      Doc: 6      USCA4 Appeal: 25-1575

USCA4 Appeal: 25-1575     Doc: 6     Filed: 05/22/2025     Pg: 231 of 268

2. **Procurement Announcements and Actions:** Any announcements or awards regarding procurement opportunities and contracts are to be put on hold, other than for routine building operations and supplies for contracts with a value of less than $100,000. This includes, but is not limited to, requests for proposals (RFPs), requests for quotations (RFQs), and contract negotiations. Such approvals will be made in writing by the Secretary (acting) or the Head of Departmental Element with the prior approval of the Secretary (acting).

3. **Funding Actions:** All funding and financial assistance activities including loans, loan guarantees, grants, cost sharing agreements, funding opportunity announcements, and contracts shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional authorization and Administration policy. Such approvals will be made in writing by the Secretary (acting) or the program head with the prior approval of the Secretary (acting).

4. **Release of Reports, Studies, Congressional Correspondence, and Public Announcements:** Submission of actions to the Secretary (acting) for approval shall be completed through relevant program heads prior to continuation of development and dissemination of any reports, studies, requests for information (RFIs) or congressional correspondence, including both finalized documents and those in draft form; conducting and scheduling public meetings related to any studies or reports. Relative to studies and reports being conducted by the National Laboratories, approvals must be obtained by the Head of Departmental Element with concurrence by the Administration designee within the Departmental Element. If reports or studies are subject to statutory or other requirements, a request for waiver from the reviews may be made to the Secretary (acting), who may grant the waiver. Submission of actions to the Secretary (acting) for approval shall be completed before publishing any Department social media posts, press releases, or other public announcements including website changes, even if previously scheduled and approved.

5. **Federal Register Notices:** Nothing should be sent to the Federal Register (FR) for publication without written approval of the Secretary (acting) or designee. The Office of the General Counsel is directed to: (i) immediately withdraw all items that have been submitted to the FR but have not yet been published, and (ii) provide the Secretary (acting) by noon on January 23 a list of all items that have been published but have not yet reached the date by which any such item is considered final (including the date such item becomes final).

6. **Actions under the National Environmental Policy Act (NEPA):** NEPA work may continue. However, the Secretary (acting) shall be informed of all NEPA work by January 24, 2025; or if new action is taken, at least 10 days before initiated. The scope of the NEPA reviews shall be reviewed by the Principal Deputy General Counsel or other person as designated by the Secretary (acting). Final Environmental Assessments and Environmental Impact Statements shall be

reviewed and approved by the Principal Deputy General Counsel or other person as designated by the Secretary (acting).

The reviews shall be conducted by all DOE offices, field offices, National Laboratories, and NNSA. There are no exemptions other than for routine building operations and supplies for contracts with a value of less than $100,000 without prior approval by the Secretary (acting).

**Rescinding of Signature Authority.**

To ensure compliance with this Directive, all signature authority for any of the actions provided herein are rescinded. Any actions requiring signature authority should not proceed until explicit authorization is provided in writing by the Secretary (acting) or designee.

The heads or administrators of each of the program, administrative, and support offices, National Laboratory Directors, field offices, and NNSA shall immediately disseminate this memorandum within their respective organizations and ensure full compliance with the directives as applicable.

Further guidance regarding the full resumption of activities, results of the review process, additional changes in DOE priorities, interagency collaboration, and legal compliance guidance will be forthcoming. Your cooperation and understanding are greatly appreciated as we work to enhance the effectiveness and efficiency of the Department.

# EXHIBIT J

# "EPA Flowchart for 'Equity-Related' Grants"

## Decision Tree



**Keywords**

activism
activists
advocacy
advocate
advocates
barrier
barriers
biased
biased toward
biases
biases towards
bipoc
black and latinx
community diversity
community equity
cultural differences
cultural heritage
culturally responsive
disabilities
disability
discriminated
discrimination
discriminatory
diverse backgrounds
diverse communities
diverse community
diverse group
diverse groups
diversified
diversify
diversifying
diversity and inclusion
diversity equity
enhance the diversity
enhancing diversity
equal opportunity
equality
equitable
equity
ethnicity
excluded
female
females
fostering inclusivity
gender
gender diversity

genders
hate speech
excluded
female
females
fostering inclusivity
gender
gender diversity
genders
hate speech
hispanic minority
historically

implicit bias
implicit biases
inclusion inclusive
inclusiveness inclusivity
increase diversity
increase the diversity
indigenous community
inequalities
inequality
inequitable
inequities
institutional
lgbt
marginalize
marginalized
minorities
minority
multicultural
polarization
political
prejudice
privileges
promoting diversity
race and ethnicity
racial
racial diversity
racial inequality
racial justice
racially
racism
sense of belonging
sexual preferences

social justice
sociocultural
socioeconomic
status
stereotypes
systemic
trauma
under appreciated
under represented
under served
underrepresentation
underrepresented
underserved
undervalued
victim
women
women and
underrepresented

**App. 204**

APPEAL

## U.S. District Court
### District of South Carolina (Charleston)
### CIVIL DOCKET FOR CASE #: 2:25−cv−02152−RMG

The Sustainability Institute et al v. Trump et al
Assigned to: Honorable Richard M Gergel
Cause: 05:702 Administrative Procedure Act

Date Filed: 03/19/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**The Sustainability Institute**          represented by     **Benjamin James Grillot**
Southern Environmental Law Center (DC)
122 C Street NW
Suite 325
Washington, DC 20001
202−828−8382
Email: bgrillot@selc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
Southern Environmental Law Center (Cha)
525 East Bay Street
Suite 200
Charleston, SC 29403
843−720−5270
Email: cbrzorad@selcsc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
Southern Environmental Law Center (NC)
136 East Rosemary Street
Suite 500
Chapel Hill, NC 27514
919−967−1450
Fax: 919−929−9421
Email: icomo@selc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
Southern Environmental Law Center (NC)
136 East Rosemary Street
Suite 500
Chapel Hill, NC 27514
919−967−1450
Email: kmeyer@selc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
Southern Environmental Law Center
(CHNC)
601 W Rosemary Street
Suite 220
Chapel Hill, NC 27516

**App. 205**

919–967–1450
Email: ntorrey@selcnc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Agrarian Trust**                    represented by    **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alliance for Agriculture**          represented by    **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**App. 206**

*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Alliance for the Shenandoah Valley** | represented by | **Benjamin James Grillot** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Bronx River Alliance** | represented by | **Benjamin James Grillot** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**App. 207**

**CleanAIRE NC**                                    represented by    **Benjamin James Grillot**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Carl T Brzorad**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Irena Como**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kimberley Claire Hunter**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Nicholas Steele Torrey**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Conservation Innovation Fund**                    represented by    **Benjamin James Grillot**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Carl T Brzorad**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Irena Como**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kimberley Claire Hunter**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Nicholas Steele Torrey**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leadership Counsel for Justice and**              represented by    **Benjamin James Grillot**
**Accountability**                                  (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*

**App. 208**

*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marbleseed**      represented by     **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pennsylvania Association for Sustainable Agriculture**      represented by     **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)

**App. 209**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Rural Advancement Foundation International–USA**     represented by     **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Baltimore, Maryland**     represented by     **Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elaine Poon**
Public Rights Project
490 43rd Street
Unit 115
Oakland, CA 94609
510–738–6788
Email: elaine@publicrightsproject.org

**App. 210**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Graham Provost**
Public Rights Project
490 43rd Street
Unit 115
Oakland, CA 94609
510–738–6788
Email: graham@publicrightsproject.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Benjamin Miller**
Public Rights Project
490 43rd Street
Unit 115
Oakland, CA 94609
510–738–6788
Email: jon@publicrightsproject.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Columbus, Ohio**                        represented by  **Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elaine Poon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Graham Provost**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Benjamin Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Madison, Wisconsin**                        represented by  **Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elaine Poon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Graham Provost**
(See above for address)

**App. 211**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Benjamin Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nashville, Tennessee**                    represented by  **Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elaine Poon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Graham Provost**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Benjamin Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**New Haven, Connecticut**                  represented by  **Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elaine Poon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Graham Provost**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Benjamin Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**San Diego, California**                   represented by  **Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**App. 212**

**Plaintiff**

**Organic Association of Kentucky**          represented by  **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Earth Island Institute**          represented by  **Benjamin James Grillot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl T Brzorad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Irena Como**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberley Claire Hunter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Steele Torrey**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**App. 213**

**Defendant**

**Donald J Trump**                       represented by   **Lee Ellis Berlinsky**
*in his official capacity as President of the*            US Attorneys Office
*United States*                                          PO Box 978
                                                         Charleston, SC 29402
                                                         843–727–4381
                                                         Fax: 843–727–4443
                                                         Email: lee.berlinsky@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         US Attorneys Office (Cola)
                                                         1441 Main Street
                                                         Suite 500
                                                         Columbia, SC 29201
                                                         803–929–3068
                                                         Email: todd.timmons@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin Hassett**                        represented by   **Lee Ellis Berlinsky**
*in his official capacity as Assistant to the*           (See above for address)
*President for Economic Policy and*                      *LEAD ATTORNEY*
*Director of the National Economic*                      *ATTORNEY TO BE NOTICED*
*Council*
                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**United States Office of Management**   represented by   **Lee Ellis Berlinsky**
**and Budget**                                           (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Russell Vought**                       represented by   **Lee Ellis Berlinsky**
*in his official capacity as Director of the*            (See above for address)
*United States Office of Management and*                 *LEAD ATTORNEY*
*Budget*                                                 *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**United States Environmental**          represented by   **Lee Ellis Berlinsky**
**Protection Agency**                                    (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)

**App. 214**

                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Lee Zeldin**                          represented by   **Lee Ellis Berlinsky**
*in his official capacity as Administrator*              (See above for address)
*of the United States Environmental*                     *LEAD ATTORNEY*
*Protection Agency*                                      *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of**         represented by   **Lee Ellis Berlinsky**
**Agriculture**                                          (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Brooke Rollins**                      represented by   **Lee Ellis Berlinsky**
*in her official capacity as Secretary of*               (See above for address)
*Agriculture*                                            *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of**         represented by   **Lee Ellis Berlinsky**
**Transportation**                                       (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Sean Duffy**                          represented by   **Lee Ellis Berlinsky**
*in his official capacity as the Secretary of*           (See above for address)
*the United States Department of*                        *LEAD ATTORNEY*
*Transportation*                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Stuart Timmons**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of**         represented by   **Lee Ellis Berlinsky**
**Governmental Efficiency Service**                      (See above for address)

**App. 215**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Stuart Timmons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Amy Gleason**
*in her official capacity as Acting Administrator of the United States DOGE Service*

represented by **Lee Ellis Berlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Stuart Timmons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Elon Musk**
*in his official capacity as Senior Advisor of the United States DOGE Service*

represented by **Lee Ellis Berlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Stuart Timmons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Energy**

represented by **Lee Ellis Berlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Stuart Timmons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chris Wright**
*in his official capacity as the Secretary of the United States Department of Energy*

represented by **Lee Ellis Berlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Stuart Timmons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ActiveSGV**

represented by **Jillian Beth Blanchard**
Lawyers for Good Government
6218 Georgia Avenue NW
Unit 5001
Washington, DC 20011
617–997–3394
Email: Jillian@lawyersforgoodgovernment.org
*LEAD ATTORNEY*
*PRO HAC VICE*

**App. 216**

*ATTORNEY TO BE NOTICED*

**Kathleen McColl McDaniel**
Burnette Shutt and McDaniel PA
PO Box 1929
Columbia, SC 29202
803–850–0912
Fax: 803–904–7910
Email: kmcdaniel@burnetteshutt.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Khadijah Silver**
Lawyers for Good Government
6218 Georgia Avenue NW
Unit 5001
Washington, DC 20011
617–997–3394
Email: khadijah@lawyersforgoodgovernment.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larissa Mika Koehler**
Lawyers for Good Government
6218 Georgia Avenue NW
Unit 5001
Washington, DC 20011
617–997–3394
Email: Larissa@lawyersforgoodgovernment.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Environmental Protection Network**     represented by  **Jillian Beth Blanchard**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen McColl McDaniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Khadijah Silver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larissa Mika Koehler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Heru Urban Farming and Garden**     represented by  **Jillian Beth Blanchard**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**App. 217**

**Kathleen McColl McDaniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Khadijah Silver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larissa Mika Koehler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Kalamazoo Climate Crisis Coalition**          represented by  **Jillian Beth Blanchard**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen McColl McDaniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Khadijah Silver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larissa Mika Koehler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Landforce**          represented by  **Jillian Beth Blanchard**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen McColl McDaniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Khadijah Silver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larissa Mika Koehler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**App. 218**

*ATTORNEY TO BE NOTICED*

**Amicus**

**MetroHealth System**               represented by   **Jillian Beth Blanchard**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen McColl McDaniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Khadijah Silver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larissa Mika Koehler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/19/2025 | 1 | COMPLAINT against Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Lee Zeldin ( Filing fee $ 405 receipt number ASCDC–12337427.), filed by CleanAIRE NC, Rural Advancement Foundation International–USA, Alliance for the Shenandoah Valley, Nashville, Tennessee, Marbleseed, The Sustainability Institute, Baltimore, Maryland, Conservation Innovation Fund, Madison, Wisconsin, New Haven, Connecticut, San Diego, California, Agrarian Trust, Bronx River Alliance, Leadership Counsel for Justice and Accountability, Columbus, Ohio, Pennsylvania Association for Sustainable Agriculture, Alliance for Agriculture. Service due by 6/17/2025 (Attachments: # 1 Exhibit A– First OMB Memo, # 2 Exhibit B– Second OMB Memo, # 3 Exhibit C– USDA Directive, # 4 Exhibit D– EPA Memo, # 5 Exhibit E– EPA Executive Order Compliance Review Requirement, # 6 Exhibit F– DOT Memo, # 7 Exhibit G– EPA Notice of DOGE Approval Requirement, # 8 Exhibit H– EPA Flowchart for Equity–Related Grants, # 9 Exhibit I– EPA Compliance Form)(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 3 | Local Rule 26.01 Answers to Interrogatories by The Sustainability Institute.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 4 | Local Rule 26.01 Answers to Interrogatories by Agrarian Trust.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 5 | Local Rule 26.01 Answers to Interrogatories by Alliance for Agriculture.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 6 | Local Rule 26.01 Answers to Interrogatories by Alliance for the Shenandoah Valley.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 7 | Local Rule 26.01 Answers to Interrogatories by Bronx River Alliance.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 8 | Local Rule 26.01 Answers to Interrogatories by CleanAIRE NC.(rhei, ) (Entered: 03/20/2025) |

**App. 219**

| 03/19/2025 | 9 | Local Rule 26.01 Answers to Interrogatories by Conservation Innovation Fund.(rhei, ) (Entered: 03/20/2025) |
|---|---|---|
| 03/19/2025 | 10 | Local Rule 26.01 Answers to Interrogatories by Leadership Counsel for Justice and Accountability.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 11 | Local Rule 26.01 Answers to Interrogatories by Marbleseed.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 12 | Local Rule 26.01 Answers to Interrogatories by Pennsylvania Association for Sustainable Agriculture.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 13 | Local Rule 26.01 Answers to Interrogatories by Rural Advancement Foundation International–USA.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 14 | Local Rule 26.01 Answers to Interrogatories by Baltimore, Maryland.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 15 | Local Rule 26.01 Answers to Interrogatories by Columbus, Ohio.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 16 | Local Rule 26.01 Answers to Interrogatories by Madison, Wisconsin.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 17 | Local Rule 26.01 Answers to Interrogatories by Nashville, Tennessee.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 18 | Local Rule 26.01 Answers to Interrogatories by New Haven, Connecticut.(rhei, ) (Entered: 03/20/2025) |
| 03/19/2025 | 19 | Local Rule 26.01 Answers to Interrogatories by San Diego, California.(rhei, ) (Entered: 03/20/2025) |
| 03/20/2025 | 20 | Summons Issued as to Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Lee Zeldin. U.S. Attorney and U.S. Attorney General. (rhei, ) (Entered: 03/20/2025) |
| 03/26/2025 | 21 | NOTICE of Appearance by Lee Ellis Berlinsky on behalf of Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Lee Zeldin (Berlinsky, Lee) (Entered: 03/26/2025) |
| 03/26/2025 | 22 | NOTICE of Appearance by Todd Stuart Timmons on behalf of Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Lee Zeldin (Timmons, Todd) (Entered: 03/26/2025) |
| 03/26/2025 | 23 | AMENDED COMPLAINT against All Defendants, filed by CleanAIRE NC, Rural Advancement Foundation International–USA, Alliance for the Shenandoah Valley, Nashville, Tennessee, Marbleseed, The Sustainability Institute, Baltimore, Maryland, Conservation Innovation Fund, Madison, Wisconsin, New Haven, Connecticut, San Diego, California, Agrarian Trust, Bronx River Alliance, Leadership Counsel for Justice and Accountability, Columbus, Ohio, Pennsylvania Association for Sustainable Agriculture, Alliance for Agriculture, Earth Island Institute, Organic Association of Kentucky. Service due by 6/24/2025 (Attachments: # 1 Summons – U.S. Department of Energy, # 2 Summons – Chris Wright, U.S. Dept. of Energy, # 3 LR 26.01 Answers – Organic Association of Kentucky, # 4 LR 26.01 Answers – Earth Island Institute, # 5 Exhibit A – First OMB Memo, # 6 Exhibit B – Second OMB Memo, # 7 Exhibit C – USDA Directive, # 8 Exhibit D – EPA Memo, # 9 Exhibit E – EPA Executive Order Compliance Review Requirement, # 10 Exhibit F – DOT Memo, # 11 Exhibit G – EPA Notice of DOGE Approval Requirement, # 12 Exhibit H – DOT Secretary's Directive, # 13 Exhibit I – DOE Memo, # 14 Exhibit J – EPA Flowchart for |

**App. 220**

| | | |
|---|---|---|
| | | Equity–Related Grants) (Brzorad, Carl) Modified to add new plaintiff parties as filers, as listed on document, per attorney filing user on 3/27/2025 (sshe, ). (Entered: 03/26/2025) |
| 03/26/2025 | 24 | MOTION for Preliminary Injunction by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 4/9/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit 1 – Sustainability Institute Declaration, # 3 Exhibit 2 – Agrarian Trust Declaration, # 4 Exhibit 3 – Alliance for Agriculture Declaration, # 5 Exhibit 4 – Alliance for the Shenandoah Valley Declaration, # 6 Exhibit 5 – Bronx River Alliance Declaration, # 7 Exhibit 6 – CleanAIRE NC Declaration, # 8 Exhibit 7 – Conservation Innovation Fund Declaration, # 9 Exhibit 8 – Earth Island Institute Declaration, # 10 Exhibit 9 – Leadership Counsel for Justice and Accountability Declaration, # 11 Exhibit 10 – Marbleseed Declaration, # 12 Exhibit 11 – Organic Association of Kentucky Declaration, # 13 Exhibit 12 – Pasa Declaration, # 14 Exhibit 13 – RAFI–USA Declaration, # 15 Exhibit 14 – City of Baltimore Declaration, # 16 Exhibit 15 – City of Columbus Declaration, # 17 Exhibit 16 – City of Madison Declaration, # 18 Exhibit 17 – City of Nashville Declaration, # 19 Exhibit 18 – City of New Haven Declaration, # 20 Exhibit 19 – City of San Diego (Charvel) Declaration, # 21 Exhibit 20 – City of San Diego (Widener) Declaration, # 22 Exhibit 21 – List of Plaintiffs' Grants and Statutory Authorities)No proposed order.(Brzorad, Carl) (Attachment 1 replaced on 3/27/2025) (sshe, ). Modified on 3/27/2025 to replace with corrected document as requested and provided by filing user(sshe, ). (Entered: 03/26/2025) |
| 03/26/2025 | 25 | MOTION to Expedite *Discovery and Memorandum in Support* by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 4/9/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A – Plaintiffs' First Set of Written Discovery Requests)No proposed order.(Brzorad, Carl) (Entered: 03/26/2025) |
| 03/27/2025 | 26 | MOTION to Appear Pro Hac Vice by Irena Como ( Filing fee $ 350 receipt number ASCDC–12354497) by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Leadership Counsel for Justice and Accountability, Marbleseed, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, The Sustainability Institute, Earth Island Institute, Organic Association of Kentucky. Response to Motion due by 4/10/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certficiate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) Modified on 3/28/2025 to add new plaintiff parties as filers(sshe, ). (Entered: 03/27/2025) |
| 03/27/2025 | 28 | MOTION to Appear Pro Hac Vice by Kimberley Hunter ( Filing fee $ 350 receipt number ASCDC–12354912) by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, The Sustainability Institute. Response to Motion due by 4/10/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – |

**App. 221**

| | | |
|---|---|---|
| | | Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 03/27/2025) |
| 03/27/2025 | 29 | MOTION to Appear Pro Hac Vice by Nicholas Torrey ( Filing fee $ 350 receipt number ASCDC–12354932) by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, The Sustainability Institute. Response to Motion due by 4/10/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 03/27/2025) |
| 03/27/2025 | 30 | Summons Issued as to United States Department of Energy, Chris Wright. U.S. Attorney and U.S. Attorney General. (sshe, ) (Entered: 03/27/2025) |
| 03/28/2025 | 31 | **TEXT ORDER: Plaintiffs have moved to expedite a limited amount of discovery related to their motion for preliminary injunction. (Dkt. No. 25). The Court has shortened the time for the Defendants to respond to this motion to 4/2/25. AND IT IS SO ORDERED. Entered at the direction of Honorable Richard M Gergel on 3/28/25. (cper, ) (Entered: 03/28/2025)** |
| 03/31/2025 | 32 | **ORDER: To allow this Court to fully and properly review the actions under challenge in this litigation, Defendants are directed to address, in their response to Plaintiffs' motion for a preliminary injunction, all legal and factual bases upon which the Defendants relied upon, could have relied upon, or might in the future might rely upon to freeze the grant funds at issue in this litigation. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 3/31/2025. (ltap, )** (Entered: 03/31/2025) |
| 03/31/2025 | 33 | NOTICE of Hearing on 24 MOTION for Preliminary Injunction : Motion Hearing set for 4/23/2025 at 10:00 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Richard M Gergel. (ltap, ) (Entered: 03/31/2025) |
| 03/31/2025 | 34 | **TEXT ORDER granting 26 Motion of Irena Como; 28 Motion of Kimberley Hunter; 29 Motion of Nicholas Torrey, to Appear Pro Hac Vice for Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, The Sustainability Institute. AND IT IS SO ORDERED. Entered at the Direction of Honorable Richard M Gergel on 3/31/2025.(sshe, )** (Entered: 03/31/2025) |
| 03/31/2025 | 35 | SUPPLEMENT *NOTICE OF RECENT DEVELOPMENTS* re 24 MOTION for Preliminary Injunction *Notice of Recent Developments* by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. (Attachments: # 1 Exhibit A Agreement 5B–03D03424–0, ECF No. 24–7 at 35, # 2 Exhibit B Agreement 5B–03D03424–0, ECF No. 24–7 at 35, # 3 Exhibit C Agreement 5B–03D03424–0, ECF No. 24–7 at 35, # 4 Exhibit D Agreement 5B–03D03424–0, ECF No. 24–7 at 35, # 5 Exhibit E at 4–21 (EPA–proposed deletions highlighted))No proposed order.(Brzorad, Carl) Modified on 4/1/2025 to edit docket text for event type description, not a motion, motion terminated, No response due, as requested and provided by filing user; to add descriptions (not entered at the time of filing) to exhibits per ECF Standard Preferences(sshe, ). (Entered: 03/31/2025) |

**App. 222**

| | | |
|---|---|---|
| 04/01/2025 | 37 | RESPONSE in Opposition re 35 MOTION for Hearing re 24 MOTION for Preliminary Injunction *Notice of Recent Developments* Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin.Reply to Response to Motion due by 4/8/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Timmons, Todd) (Entered: 04/01/2025) |
| 04/01/2025 | 38 | **TEXT ORDER: Plaintiffs have moved to expedite the hearing on the motion for preliminary injunction, which is presently scheduled for 4/23/25. (Dkt. No. 35). Defendants oppose the motion. (Dkt. No. 37). The Court denies the motion to expedite the hearing. The Court will benefit from the full briefing of these matters by the parties before conducting oral argument. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 4/1/2025. (ltap, )** (Entered: 04/01/2025) |
| 04/02/2025 | 39 | RESPONSE in Opposition re 25 MOTION to Expedite *Discovery and Memorandum in Support* Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin.Reply to Response to Motion due by 4/9/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Timmons, Todd) (Entered: 04/02/2025) |
| 04/03/2025 | 40 | MOTION for Leave to File *Brief of Amici Curiae* by ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System. Response to Motion due by 4/17/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit 1–A Declaration of Michelle Roos, # 3 Exhibit 1–B Declaration of Ashwini Sehgal, # 4 Exhibit 1–C Declaration of Jenny Doezema, # 5 Exhibit 1–D Declaration of Ilyssa Manspeizer, # 6 Exhibit 1–E Declaration of Wesley Reutimann, # 7 Exhibit 1–F Declaration of Tyrean Lewis)No proposed order.(McDaniel, Kathleen) (Entered: 04/03/2025) |
| 04/03/2025 | 41 | MOTION to Appear Pro Hac Vice by Jillian Blanchard ( Filing fee $ 350 receipt number ASCDC–12368279) by ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System. Response to Motion due by 4/17/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Application of Jillian Blanchard for PHV Admission, # 2 Exhibit Certificate of Good Standing (Pending), # 3 Exhibit Address/Email Form)No proposed order.(McDaniel, Kathleen) Modified on 4/9/2025 to reference 53 Additional attachment, certificate of good standing, filed 4/9/2025(sshe, ). (Attachment 1 replaced on 4/18/2025) (sshe, ). Modified to replace with corrected application document provided by filing user on 4/18/2025 (sshe, ). (Entered: 04/03/2025) |
| 04/03/2025 | 42 | MOTION to Appear Pro Hac Vice by Khadijah Silver ( Filing fee $ 350 receipt number ASCDC–12368309) by ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System. Response to Motion due by 4/17/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Application for PHV Admission, # 2 Exhibit Certificate of Good Standing, # 3 Exhibit Address/Email Form)No proposed order.(McDaniel, Kathleen) (Entered: 04/03/2025) |
| 04/03/2025 | 43 | MOTION to Appear Pro Hac Vice by Larissa Koehler ( Filing fee $ 350 receipt number ASCDC–12368324) by ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System. Response to Motion due by 4/17/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Application for PHV Admission, # 2 Exhibit Certificate |

**App. 223**

| | | |
|---|---|---|
| | | of Good Standing (Pending), # 3 Exhibit Address/Email Form)No proposed order.(McDaniel, Kathleen) Modified on 4/9/2025 to reference 54 Additional Attachment, certificate of good standing, filed 4/9/2025 (sshe, ). (Entered: 04/03/2025) |
| 04/03/2025 | 44 | REPLY to Response to Motion re 25 MOTION to Expedite *Discovery and Memorandum in Support* Response filed by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. (Attachments: # 1 Exhibit EPA Email, # 2 Exhibit Unpublished Opinion)(Brzorad, Carl) (Entered: 04/03/2025) |
| 04/07/2025 | 45 | **ORDER granting in part and denying in part 25 Motion to Expedite. The Court hereby narrows the discovery requests of Plaintiffs to one Request to Produce for the following five Defendants: United States Department of Governmental Efficiency Service ("DOGE"), United States Environmental Protection Agency, United States Department of Agriculture, United States Department of Transportation, and United States Department of Energy. The responses to the following narrowed Requests to Produce are due on or before April 17, 2025 at 5:00 p.m. and shall be filed on the ECF. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/7/2025.(ltap, )** (Entered: 04/07/2025) |
| 04/07/2025 | 46 | MOTION for Reconsideration re 45 Order on Motion to Expedite,, by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. Response to Motion due by 4/21/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A: Supreme Court decision in Department of Education v. California, No. 24A910 (Apr. 4, 2025))No proposed order.(Berlinsky, Lee) (Entered: 04/07/2025) |
| 04/08/2025 | 47 | RESPONSE in Opposition re 46 MOTION for Reconsideration re 45 Order on Motion to Expedite,, Response filed by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute.Reply to Response to Motion due by 4/15/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Brzorad, Carl) (Entered: 04/08/2025) |
| 04/08/2025 | 48 | Emergency MOTION to Stay re 45 Order on Motion to Expedite,, by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. Response to Motion due by 4/22/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Timmons, Todd) (Entered: 04/08/2025) |
| 04/08/2025 | 49 | MOTION to Appear Pro Hac Vice by Jonathan B. Miller ( Filing fee $ 350 receipt number ASCDC–12376950) by Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut. Response to Motion due by 4/22/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 04/08/2025) |

**App. 224**

| | | |
|---|---|---|
| 04/08/2025 | 50 | MOTION to Appear Pro Hac Vice by Graham Provost ( Filing fee $ 350 receipt number ASCDC–12376966) by Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut. Response to Motion due by 4/22/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 04/08/2025) |
| 04/09/2025 | 51 | REPLY to Response to Motion re 46 MOTION for Reconsideration re 45 Order on Motion to Expedite,, Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. (Timmons, Todd) (Entered: 04/09/2025) |
| 04/09/2025 | 52 | **ORDER: The Court GRANTS–IN–PART AND DENIES–IN–PART Defendants motion to reconsider (Dkt. No. 46) and DENIES Defendants motion to stay (Dkt. No. 48). AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/9/2025.(ltap, )** (Entered: 04/09/2025) |
| 04/09/2025 | 53 | Additional Attachments to Main Document 41 MOTION to Appear Pro Hac Vice by Jillian Blanchard ( Filing fee $ 350 receipt number ASCDC–12368279). First attachment description: Certificate of Good Standing for Jillian Blanchard . (McDaniel, Kathleen) (Entered: 04/09/2025) |
| 04/09/2025 | 54 | Additional Attachments to Main Document 43 MOTION to Appear Pro Hac Vice by Larissa Koehler ( Filing fee $ 350 receipt number ASCDC–12368324). First attachment description: Certificate of Good Standing for Larissa Koehler . (McDaniel, Kathleen) (Entered: 04/09/2025) |
| 04/09/2025 | 55 | MOTION for Leave to File Excess Pages *to Respond to the Motion for Preliminary Injunction* by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. Response to Motion due by 4/23/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Timmons, Todd) (Entered: 04/09/2025) |
| 04/09/2025 | 56 | RESPONSE in Opposition re 24 MOTION for Preliminary Injunction Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin.Reply to Response to Motion due by 4/16/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Timmons, Todd) (Main Document 56 replaced with corrected signature on 4/11/2025) (hcor, ). (Entered: 04/09/2025) |
| 04/10/2025 | 57 | **TEXT ORDER granting 55 Motion for Leave to File Excess Pages. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 4/10/25.(ltap, )** (Entered: 04/10/2025) |
| 04/10/2025 | 58 | MOTION to Appear Pro Hac Vice by Benjamin Grillot ( Filing fee $ 350 receipt number ASCDC–12381467) by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, The Sustainability Institute. Response to Motion due by 4/24/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – |

**App. 225**

| | | Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 04/10/2025) |
|---|---|---|
| 04/10/2025 | 59 | MOTION Clarification of March 31, 2025 Order re 32 Order,, by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 4/24/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Brzorad, Carl) (Entered: 04/10/2025) |
| 04/11/2025 | 60 | RESPONSE in Opposition re 59 MOTION Clarification of March 31, 2025 Order re 32 Order,, Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin.Reply to Response to Motion due by 4/18/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Timmons, Todd) (Entered: 04/11/2025) |
| 04/11/2025 | 61 | MOTION to Appear Pro Hac Vice by Elaine Poon ( Filing fee $ 350 receipt number ASCDC–12385202) by Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut. Response to Motion due by 4/25/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 – Application/Affidavit for Pro Hac Vice Admission, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 04/11/2025) |
| 04/14/2025 | 62 | Consent MOTION for Leave to File Excess Pages *in Reply in Support of Motion for Preliminary Injunction* by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 4/28/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Brzorad, Carl) (Entered: 04/14/2025) |
| 04/14/2025 | 63 | **TEXT ORDER granting 62 Motion for Leave to File Excess Pages for reply in support of their motion for preliminary injunction. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 4/14/2025.(ltap, )** (Entered: 04/14/2025) |
| 04/16/2025 | 64 | REPLY to Response to Motion re 24 MOTION for Preliminary Injunction Response filed by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. (Attachments: # 1 Exhibit 1 – U.S. Brief in Federal Circuit, # 2 Exhibit 2 – Chart Summarizing Pltfs Injuries, # 3 Exhibit 3 – Pasa Supplemental Declaration)(Brzorad, Carl) (Entered: 04/16/2025) |
| 04/17/2025 | 65 | REPLY by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, |

| | | |
|---|---|---|
| | | United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 45 Order on Motion to Expedite,, . (Attachments: # 1 Certification, # 2 DOE_000001 – DOE_000095)(Berlinsky, Lee) (Entered: 04/17/2025) |
| 04/17/2025 | 66 | REPLY by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 45 Order on Motion to Expedite,, . (Attachments: # 1 Certification, # 2 DOT–000001 – DOT–000104)(Berlinsky, Lee) (Entered: 04/17/2025) |
| 04/17/2025 | 67 | REPLY by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 45 Order on Motion to Expedite,, . (Attachments: # 1 Cetification, # 2 USDA000102 – USDA000324)(Berlinsky, Lee) (Entered: 04/17/2025) |
| 04/17/2025 | 68 | MOTION for Protective Order by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. Response to Motion due by 5/1/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A, DOT Privilege Log, # 2 Exhibit B, USDA Privilege Log, # 3 Exhibit C, EPA Privilege Log)No proposed order.(Berlinsky, Lee) Modified on 4/18/2025 to reference 70 Additional Attachment, Affidavit of Records (EPA); 76 Additional Attachment, DOT Supplemental Privilege Log, filed 4/18/2025 (sshe, ).(sshe, ). Modified on 4/22/2025 to reference 106 Supplement filed 4/21/25 (sshe, ). (Entered: 04/17/2025) |
| 04/17/2025 | 69 | MOTION for Extension of Time of *Deadline in the Court's Order [ECF 45]* by United States Environmental Protection Agency. Response to Motion due by 5/1/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Berlinsky, Lee) (Entered: 04/17/2025) |
| 04/17/2025 | 70 | Additional Attachments to Main Document 68 MOTION for Protective Order . First attachment description: Affidavit of Records (EPA) . (Berlinsky, Lee) Modified on 4/22/2025 to reference 105 Supplement filed 4/21/25 (sshe, ). (Entered: 04/17/2025) |
| 04/17/2025 | 71 | RESPONSE in Opposition re 68 MOTION for Protective Order Response filed by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute.Reply to Response to Motion due by 4/24/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Brzorad, Carl) (Entered: 04/17/2025) |
| 04/18/2025 | 72 | NON–STANDARD ITEM RECEIVED: flash drive from Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin re: 68 MOTION for Protective Order . Received 4/17/2025 PM; hand delivered to chambers 4/18/2025 AM. (sshe, ) (Entered: 04/18/2025) |
| 04/18/2025 | 73 | **TEXT ORDER: For good cause shown, Defendant Environmental Protection Agency's motion for a 24–hour extension to comply with the Court's order of April 7, 2025 (Dkt. No. 69) is granted. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 4/18/2025.(ltap, ) (Entered:** |

| | | 04/18/2025) |
|---|---|---|
| 04/18/2025 | 74 | **TEXT ORDER GRANTING** <br> **42 Motion for Khadijah Silver to Appear Pro Hac Vice for ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System;** <br> **43 Motion for Larissa Koehler to Appear Pro Hac Vice for ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System;** <br> **49 Motion for Jonathan B. Miller to Appear Pro Hac Vice for Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut;** <br> **50 Motion for Graham Provost to Appear Pro Hac Vice for Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut;** <br> **58 Motion for Benjamin Grillot to Appear Pro Hac Vice for Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, The Sustainability Institute;** <br> **61 Motion for Elaine Poon to Appear Pro Hac Vice for Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut.** <br> **AND IT IS SO ORDERED. Entered at the Direction of Honorable Richard M Gergel on 4/18/2025.(sshe, )** (Entered: 04/18/2025) |
| 04/18/2025 | 75 | REPLY by United States Department of Transportation to 45 Order on Motion to Expedite,, *(Supplemental documents)*. (Attachments: # 1 1, Certification, # 2 2, DOT–000965–DOT–001253)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 76 | Additional Attachments to Main Document 68 MOTION for Protective Order . First attachment description: DOT Supplemental Privilege Log . (Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 77 | **ORDER: Defendants' motion for a 30–day extension to provide further support for privileges and protections asserted in the privilege logs is denied. Such a delay would potentially disrupt the Court's timely consideration of jurisdictional issues and the pending motion for a preliminary injunction. (Dkt. No. 24). The Court does find merit in Plaintiffs' offered compromise to allow Defendants to supplement their privilege logs through April 21, 2025 at 5:00 p.m., and extends the time to supplement the privilege logs through that date and time. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/18/2025.(ltap, )** (Entered: 04/18/2025) |
| 04/18/2025 | 78 | NON–STANDARD ITEM RECEIVED: flash drive from United States Department of Transportation re: 45 Order on Motion to Expedite. Hand delivered and Received by chambers 4/18/2025. (sshe, ) (Entered: 04/18/2025) |
| 04/18/2025 | 79 | REPLY by United States Environmental Protection Agency to 45 Order on Motion to Expedite,, . (Attachments: # 1 Certification, # 2 EPA_00000735–EPA_00057420_Part1, # 3 EPA_00000735–EPA_00057420_Part2, # 4 EPA_00000735–EPA_00057420_Part3, # 5 EPA_00000735–EPA_00057420_Part4, # 6 EPA_00000735–EPA_00057420_Part5, # 7 EPA_00000735–EPA_00057420_Part6, # 8 EPA_00000735–EPA_00057420_Part7)(Berlinsky, Lee) Modified on 4/21/2025 to reference Additional Attachments 80 , 81 , 82 , 83 , 84 , 85 , 86 , 87 , 88 , 89 , 90 , 91 filed 4/18/2025 (sshe, ). Modified on 4/22/2025 to reference 95 – 103 , 106 – 110 , 111 ref 97, 112 – 132 (sshe, ). (Entered: 04/18/2025) |
| 04/18/2025 | 80 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00000735–EPA_00057420_Part8 . (Attachments: # 1 EPA_00000735–EPA_00057420_Part9, # 2 EPA_00000735–EPA_00057420_Part10, # 3 EPA_00000735–EPA_00057420_Part11, # 4 EPA_00000735–EPA_00057420_Part12, # 5 EPA_00000735–EPA_00057420_Part13, # 6 |

| | | |
|---|---|---|
| | | EPA_00000735–EPA_00057420_Part14)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 81 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00000735–EPA_00057420_Part15 . (Attachments: # 1 EPA_00000735–EPA_00057420_Part16, # 2 EPA_00000735–EPA_00057420_Part17, # 3 EPA_00000735–EPA_00057420_Part18, # 4 EPA_00000735–EPA_00057420_Part19, # 5 EPA_00000735–EPA_00057420_Part20, # 6 EPA_00000735–EPA_00057420_Part21, # 7 EPA_00000735–EPA_00057420_Part22, # 8 EPA_00000735–EPA_00057420_Part23)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 82 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00000735–EPA_00057420_Part24 . (Attachments: # 1 EPA_00000735–EPA_00057420_Part25, # 2 EPA_00000735–EPA_00057420_Part26, # 3 EPA_00000735–EPA_00057420_Part27, # 4 EPA_00000735–EPA_00057420_Part28, # 5 EPA_00000735–EPA_00057420_Part29, # 6 EPA_00000735–EPA_00057420_Part30, # 7 EPA_00000735–EPA_00057420_Part31, # 8 EPA_00000735–EPA_00057420_Part32, # 9 EPA_00000735–EPA_00057420_Part33)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 83 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00000735–EPA_00057420_Part34 . (Attachments: # 1 EPA_00000735–EPA_00057420_Part35, # 2 EPA_00000735–EPA_00057420_Part36, # 3 EPA_00000735–EPA_00057420_Part37, # 4 EPA_00000735–EPA_00057420_Part38, # 5 EPA_00000735–EPA_00057420_Part39, # 6 EPA_00000735–EPA_00057420_Part40, # 7 EPA_00000735–EPA_00057420_Part41)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 84 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00000735–EPA_00057420_Part42 . (Attachments: # 1 EPA_00000735–EPA_00057420_Part43, # 2 EPA_00000735–EPA_00057420_Part44, # 3 EPA_00000735–EPA_00057420_Part45, # 4 EPA_00000735–EPA_00057420_Part46, # 5 EPA_00000735–EPA_00057420_Part47)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 85 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00057421 . (Attachments: # 1 EPA_00057466, # 2 EPA_00057561, # 3 EPA_00070430_Part1, # 4 EPA_00070430_Part2, # 5 EPA_00070430_Part3, # 6 EPA_00070430_Part4, # 7 EPA_00070430_Part5)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 86 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00070430_Part6 . (Attachments: # 1 EPA_00070430_Part7, # 2 EPA_00070430_Part8, # 3 EPA_00070430_Part9, # 4 EPA_00070430_Part10, # 5 EPA_00070430_Part11, # 6 EPA_00070430_Part12, # 7 EPA_00070430_Part13, # 8 EPA_00070430_Part14)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 87 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00070430_Part15 . (Attachments: # 1 EPA_00070430_Part16, # 2 EPA_00070430_Part17, # 3 EPA_00070430_Part18, # 4 EPA_00070430_Part19, # 5 EPA_00070430_Part20)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 88 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00071140 . (Attachments: # 1 EPA_00071909_Part1, # 2 EPA_00071909_Part2, # 3 EPA_00071909_Part3, # 4 EPA_00071909_Part4, # 5 EPA_00071909_Part5, # 6 EPA_00071909_Part6, # 7 EPA_00071909_Part7)(Berlinsky, Lee) (Entered: 04/18/2025) |

**App. 229**

| 04/18/2025 | 89 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00073595_ . (Attachments: # 1 EPA_00073635_Part1, # 2 EPA_00073635_Part2, # 3 EPA_00073635_Part3, # 4 EPA_00073635_Part4, # 5 EPA_00073635_Part5, # 6 EPA_00073635_Part6, # 7 EPA_00075040_)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 90 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00075137_Part1 . (Attachments: # 1 EPA_00075137_Part2, # 2 EPA_00075137_Part3, # 3 EPA_00075137_Part4, # 4 EPA_00075290_)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 91 | Additional Attachments to Main Document 79 Reply,. First attachment description: EPA_00075291_Part1 . (Attachments: # 1 EPA_00075291_Part2, # 2 EPA_00075291_Part3, # 3 EPA_00075291_Part4, # 4 EPA_00075291_Part5, # 5 EPA_00075291_Part6, # 6 EPA_00075291_Part7, # 7 EPA_00075291_Part8)(Berlinsky, Lee) (Entered: 04/18/2025) |
| 04/20/2025 | 92 | Letter from U.S. Attorney's Office–District of South Carolina. (Berlinsky, Lee) (Entered: 04/20/2025) |
| 04/21/2025 | 93 | **ORDER: Defendants are directed to provide the Court a status report on or before April 22, 2025 at 5:00 p.m. which addresses the following: 1.The status of Defendants' efforts to resume "processing, disbursement, and payment" of grants subject to the Woonasquatucket River Watershed Council injunction; and 2.The specific status of the grants set forth at Dkt. No. 25–1 at 14–20, indicating whether the grant funds for each grant are presently paused, accessible to grantees, or terminated. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/21/2025. (ltap, )** (Entered: 04/21/2025) |
| 04/21/2025 | 95 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00000735–EPA_00006744 . (Attachments: # 1 EPA_00036078–EPA–00041425_Part1, # 2 EPA_00036078–EPA–00041425_Part2, # 3 EPA_00036078–EPA–00041425_Part3, # 4 EPA_00042133–EPA_00045081, # 5 EPA_00045082)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 96 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00045102–EPA_00049226 . (Attachments: # 1 EPA_00049228_Part1, # 2 EPA_00049228_Part2, # 3 EPA_00049228_Part3, # 4 EPA_00049330, # 5 EPA_00049361–EPA_00050946)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 97 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00050947_Part1 . (Attachments: # 1 EPA_00050947_Part2, # 2 EPA_00050947_Part3, # 3 EPA_00051267–EPA_00052837, # 4 EPA_00052941)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 98 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00052972–EPA_00053864 . (Attachments: # 1 EPA_00053901–EPA_00070430)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 99 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00071140 – EPA_00110483 . (Attachments: # 1 EPA_00110492–EPA_00132226, # 2 EPA_00132232–EPA_00142403, # 3 EPA_00142746–EPA_00146138, # 4 EPA_00146143–EPA_00180340, # 5 EPA_00180342–EPA_00208170)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 100 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00208179–EPA_00223138 . (Attachments: # 1 EPA_00223140–EPA_00226116, # 2 EPA_00226118–EPA_00226172, # 3 EPA_00226196–EPA_00230068, # 4 EPA_00230107–EPA_00238946, # 5 EPA_00239342–EPA_00239400)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 101 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00239410–EPA_00239465 . (Attachments: # 1 EPA_00239479–EPA_00239535, # 2 EPA_00239545–EPA_00291039, # 3 EPA_00291040–EPA_00292158, # 4 EPA_00296792–EPA_00297915)(Berlinsky, Lee) (Entered: 04/21/2025) |

**App. 230**

| 04/21/2025 | 102 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00297922_Part1 . (Attachments: # 1 EPA_00297922_Part2, # 2 EPA_00297972–EPA_00299162, # 3 EPA_00299172–EPA_00299869, # 4 EPA_00299999–EPA_00315792, # 5 EPA_00316059–EPA_00317963, # 6 EPA_00317972–EPA_00318037)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 103 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00318047–EPA_00318103 . (Attachments: # 1 EPA_00318113–EPA_00318180)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 104 | REPLY to Response to Motion re 68 MOTION for Protective Order Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. (Timmons, Todd) (Entered: 04/21/2025) |
| 04/21/2025 | 105 | SUPPLEMENT by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 70 Additional Attachments to Main Document *Supplemental Privilege Log*. (Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 106 | Additional Attachments to Main Document 79 Reply,,. First attachment description: Affidavit of Records_4–21–2025_packard . (Attachments: # 1 EPA_00000005–EPA_00000132, # 2 EPA_00000137–EPA_00000244, # 3 EPA_00000258–EPA_00000353, # 4 EPA_00000356–EPA_00000580, # 5 EPA_00000582–EPA_00000707, # 6 EPA_00000709–EPA_00000970)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 107 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00000995–EPA_00006144 . (Attachments: # 1 EPA_000006167–EPA_00006201, # 2 EPA_00006211–EPA_00006240, # 3 EPA_00006337–EPA_00006732, # 4 EPA_00006739–EPA_00011121, # 5 EPA_000022543–EPA_00035603, # 6 EPA_00035606–EPA_00035795)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 108 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00035808–EPA_00035812 . (Attachments: # 1 EPA_00035838, # 2 EPA_00035886–EPA_00036003, # 3 EPA_00036016–EPA_00036793, # 4 EPA_00036795)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 109 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00036935–EPA_00037546 . (Attachments: # 1 EPA_00037612–EPA_00038577, # 2 EPA_00038649–EPA_00041718, # 3 EPA_00041784–EPA_0042003, # 4 EPA_00042005–EPA_0042053, # 5 EPA_00042057–EPA_00044606, # 6 EPA_00044608–EPA_00045122)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 110 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00045124–EPA_00045173 . (Attachments: # 1 EPA_00045174–EPA_00045357, # 2 EPA_00045380–EPA_00046262, # 3 EPA_00046267–00046297, # 4 EPA_00046332–EPA_00047894, # 5 EPA_00047912–EPA_00048001, # 6 EPA_00048009)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 111 | Additional Attachments to Main Document 97 Additional Attachments to Main Document. First attachment description: EPA_00048075–EPA_00048321 . (Attachments: # 1 EPA_00048328–EPA_00048398, # 2 EPA_00048399, # 3 EPA_0048514–EPA_00049198, # 4 EPA_00049204–EPA_00049586, # 5 EPA_00049618–EPA_00049752, # 6 EPA_00049755_Part1)(Berlinsky, Lee) (Entered: 04/21/2025) |

**App. 231**

| 04/21/2025 | <u>112</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00049755_Part2 . (Attachments: # <u>1</u> EPA_00049755_Part3, # <u>2</u> EPA_00049755_Part4, # <u>3</u> EPA_00049755_Part5, # <u>4</u> EPA_00049755_Part6, # <u>5</u> EPA_00050020, # <u>6</u> EPA_00050074)(Berlinsky, Lee) (Entered: 04/21/2025) |
|---|---|---|
| 04/21/2025 | <u>113</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00050161–EPA–00050342 . (Attachments: # <u>1</u> EPA_00050396–EPA_00050435, # <u>2</u> EPA_00050438_Part1, # <u>3</u> EPA_00050438_Part2, # <u>4</u> EPA_00050501–EPA_00050559, # <u>5</u> EPA_00050566–EPA_00050639, # <u>6</u> EPA_00050643–EPA_00050734)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>114</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00050738–EPA_00050855 . (Attachments: # <u>1</u> EPA_00050872_Part1, # <u>2</u> EPA_00050872_Part2, # <u>3</u> EPA_00051075–EPA_00051168, # <u>4</u> EPA_00051170–EPA_00051335, # <u>5</u> EPA_00051383–EPA_00051516, # <u>6</u> EPA_00051524–EPA_00051609, # <u>7</u> EPA_00051631–EPA_00051676)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>115</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00051707–EPA_00015758_Part1 . (Attachments: # <u>1</u> EPA_00051707–EPA_00015758_Part2, # <u>2</u> EPA_00051781–EPA_00051895, # <u>3</u> EPA_00051904–EPA_00052074, # <u>4</u> EPA_00052078–EPA_00052155, # <u>5</u> EPA_00052156–EPA_00052245, # <u>6</u> EPA_00052258–EPA_00052335)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>116</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00052394_Part1 . (Attachments: # <u>1</u> EPA_00052394_Part2, # <u>2</u> EPA_00052394_Part3, # <u>3</u> EPA_00052498_Part1, # <u>4</u> EPA_00052498_Part2, # <u>5</u> EPA_00052498_Part3, # <u>6</u> EPA_00052608–EPA_00053020, # <u>7</u> EPA_00053023–EPA–00053323)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>117</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00053386–EPA_00053457 . (Attachments: # <u>1</u> EPA_00053617–EPA_00053732, # <u>2</u> EPA_00053734–EPA–00053781, # <u>3</u> EPA_00057183–00071901, # <u>4</u> EPA_000071903–EPA_00089145, # <u>5</u> EPA_00101995–EPA_00106637, # <u>6</u> EPA_00106667–EPA_00107015, # <u>7</u> EPA_00107083–EPA_00110451)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>118</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00120621–EPA_00140859 . (Attachments: # <u>1</u> EPA_00140861–EPA_00143007, # <u>2</u> EPA_00143008–EPA_00143060.pdf, # <u>3</u> EPA_00143069–EPA_00160749, # <u>4</u> EPA_00160752–EPA_00161548, # <u>5</u> EPA_00161558–EPA_00161863, # <u>6</u> EPA_00161864–EPA_00163484, # <u>7</u> EPA_00163488–00179612, # <u>8</u> EPA_00179613)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>119</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00206984–EPA_00222254 . (Attachments: # <u>1</u> EPA_00206984–EPA_00222254, # <u>2</u> EPA_00222257–EPA_00222340, # <u>3</u> EPA_00222341–EPA_00222389, # <u>4</u> EPA_00222403_Part1, # <u>5</u> EPA_00222403_Part2, # <u>6</u> EPA_00222491–EPA_00222530, # <u>7</u> EPA_00222531_Part1, # <u>8</u> EPA_00222531_Part2, # <u>9</u> EPA_00222618–EPA_00222708.)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>120</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00222723_Part1 . (Attachments: # <u>1</u> EPA_00222723_Part2, # <u>2</u> EPA_00222790–EPA_00222870, # <u>3</u> EPA_00222987–EPA_00223310, # <u>4</u> EPA_00223316–EPA_00223358, # <u>5</u> EPA_00223392–EPA_00223478, # <u>6</u> EPA_00223497_Part1, # <u>7</u> EPA_00223497_Part2, # <u>8</u> EPA_00223497_Part3)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | <u>121</u> | Additional Attachments to Main Document <u>79</u> Reply,,. First attachment description: EPA_00223593_Part1 . (Attachments: # <u>1</u> EPA_00223593_Part2, # <u>2</u> EPA_00223593_Part3, # <u>3</u> EPA_00223688–EPA_00223981, # <u>4</u> EPA_00223989–EPA_00224042, # <u>5</u> EPA_00224050–EPA_00224224, # <u>6</u> EPA_00224264–EPA_00224430, # <u>7</u> EPA_00224433–EPA_00224535, # <u>8</u> |

**App. 232**

| | | |
|---|---|---|
| | | EPA_00224538, # 9 EPA_00224587–EPA_00224700)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 122 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00224703 . (Attachments: # 1 EPA_00224752–EPA_00224839, # 2 EPA_00224857_Part1, # 3 EPA_00224857_Part2, # 4 EPA_00224951–EPA_00225165, # 5 EPA_00225168_Part1, # 6 EPA_00225168_Part2, # 7 EPA_00225168_Part3, # 8 EPA_00225168_Part4)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 123 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00225354 . (Attachments: # 1 EPA_00225358_Part1, # 2 EPA_00225358_Part2, # 3 EPA_00225358_Part3, # 4 EPA_00225358_Part4, # 5 EPA_00225549–EPA_00225556, # 6 EPA_00225580_Part1, # 7 EPA_00225580_Part2, # 8 EPA_00225580_Part3)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 124 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00225790–EPA_00226024 . (Attachments: # 1 EPA_00226041–EPA_00226110, # 2 EPA_00226223–EPA_00226300, # 3 EPA_00226301–EPA_00226601, # 4 EPA_00226604–EPA_00226688, # 5 EPA_00226931–EPA_00227142, # 6 EPA_00227144–EPA_00230088, # 7 EPA_00230759–EPA_00230835, # 8 EPA_00230836, # 9 EPA_00230892–EPA_00230952)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 125 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00230957–EPA_00231038 . (Attachments: # 1 EPA_231045–EPA_00231093, # 2 EPA_00231100–EPA_00231116, # 3 EPA_00231120, # 4 EPA_00231168–EPA_00231321, # 5 EPA_00231326–EPA_00231346, # 6 EPA_00231393–EPA_00231668, # 7 EPA_00297792–EPA_00298465, # 8 EPA_00298488–EPA_00298518, # 9 EPA_00298565–EPA_00298661, # 10 EPA_00298700–EPA_00298975)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 126 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00231671–EPA_00231688 . (Attachments: # 1 EPA_00231703–EPA_00231759, # 2 EPA_00231763–EPA_00231822, # 3 EPA_00231824, # 4 EPA_00231869–EPA_00232051, # 5 EPA_00232147–EPA_002323085, # 6 EPA_00232387–EPA_00232433, # 7 EPA_00232451–EPA_00232596, # 8 EPA_00232601–EPA_00237701, # 9 EPA_00237703–EPA_00237777.pdf)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 127 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00237805–EPA_00237938 . (Attachments: # 1 EPA_00237939–EPA_00238024.pdf, # 2 EPA_00238027–EPA_00238105, # 3 EPA_00238107–EPA_00238177, # 4 EPA_00238179–EPA_00238258, # 5 EPA_00238264–EPA_00238379, # 6 EPA_00238388–EPA_00239332, # 7 EPA_00239564–EPA_00290739, # 8 EPA_00290474–EPA_00291327, # 9 EPA_00291329–EPA_00291580, # 10 EPA_00291583–EPA_00291992)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 128 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00292008 . (Attachments: # 1 EPA_00292079–EPA_00293061, # 2 EPA_00293062–EPA_00293122, # 3 EPA_00293192–293381, # 4 EPA_00293500–EPA_00293910, # 5 EPA_00293923–EPA_00294119, # 6 EPA_00294020–EPA_00294286, # 7 EPA_00294288–EPA_00294494, # 8 EPA_00294499–EPA_00294679, # 9 EPA_00294684–EPA_00294729, # 10 EPA_00294733–EPA_00294805)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 129 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00294806–EPA_00294851 . (Attachments: # 1 EPA_00295337–EPA_00295975.pdf, # 2 EPA_00295988–EPA_00296950, # 3 EPA_00296959, # 4 EPA_00297004–EPA_00297205, # 5 EPA_00297206_Part1, # 6 EPA_00297206_Part2, # 7 EPA_00297206_Part3, # 8 EPA_00297413_Part1, # 9 EPA_00297413_Part2, # 10 EPA_00297413_Part3, # 11 EPA_00297413_Part4)(Berlinsky, Lee) (Entered: 04/21/2025) |

**App. 233**

| 04/21/2025 | 130 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00297609_Part1 . (Attachments: # 1 EPA_00297609_Part2, # 2 EPA_00297609_Part3, # 3 EPA_00297745–EPA_00297776, # 4 EPA_00297785–EPA_00298442)(Berlinsky, Lee) (Entered: 04/21/2025) |
|---|---|---|
| 04/21/2025 | 131 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00298977–EPA_00299248 . (Attachments: # 1 EPA_00299374–EPA_00299528, # 2 EPA_00299532–EPA_00299704, # 3 EPA_00299721–EPA_00299908, # 4 EPA_00299914–EPA_00299991, # 5 EPA_00299996–EPA_00314861, # 6 EPA_00314863–EPA_00315486, # 7 EPA_00315490–EPA_00315606, # 8 EPA_00315624–EPA_00315805, # 9 EPA_00315811–EPA_00316315, # 10 EPA_00316319–EPA_00316568)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/21/2025 | 132 | Additional Attachments to Main Document 79 Reply,,. First attachment description: EPA_00316570–EPA_00316673 . (Attachments: # 1 EPA_00316679–EPA_00316798, # 2 EPA_00316800–EPA_00316915, # 3 EPA_00316919–EPA_00316975, # 4 EPA_00316979–EPA_00317040, # 5 EPA_00317045–EPA_00317107, # 6 EPA_00317110–EPA_00317534, # 7 EPA_00317552–EPA_00317606, # 8 EPA_00317657–EPA_00318187, # 9 EPA_00318189–EPA_00318269)(Berlinsky, Lee) (Entered: 04/21/2025) |
| 04/22/2025 | 133 | NON–STANDARD ITEM RECEIVED: flash drive from United States Environmental Protection Agency re: 45 Order on Motion to Expedite, on 4/21/25 before 5:00 PM; hand delivered to chambers 4/22/25 9:00 AM. (sshe, ) (Entered: 04/22/2025) |
| 04/22/2025 | 134 | MOTION to Unseal Document by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 5/6/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Brzorad, Carl) (Entered: 04/22/2025) |
| 04/22/2025 | 135 | **TEXT ORDER: Plaintiffs have moved to unseal all documents on Defendants' privilege logs based upon the deliberative process privilege because the justifications provided are inadequate. (Dkt. No. 134). The time for Defendants to respond to this motion is shortened to 5:00 p.m. on 4/25/25. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 4/22/2025. (ltap, )** (Entered: 04/22/2025) |
| 04/22/2025 | 136 | REPLY by Sean Duffy, Amy Gleason, Kevin Hassett, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 93 Order,, . (Attachments: # 1 Exhibit A: Chart of Grant Status)(Berlinsky, Lee) (Entered: 04/22/2025) |
| 04/23/2025 | 137 | **TEXT ORDER: Before the Court is a Motion for Leave to File Brief of Amici Curiae Nonprofit Recipients of Federal Funding in Support of Plaintiffs' Motion for a Preliminary Injunction. (Dkt. No. 40). No party has opposed the motion. The Court grants the motion for leave (Dkt. No. 40) and authorizes the Nonprofit Recipients to file their amicus brief on the Court's docket. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 4/23/2025.(ltap, )** (Entered: 04/23/2025) |
| 04/23/2025 | 138 | **Minute Entry. Proceedings held before Honorable Richard M Gergel: Motion Hearing held on 4/23/2025 re 24 MOTION for Preliminary Injunction filed by Baltimore, Maryland, Pennsylvania Association for Sustainable Agriculture, Leadership Counsel for Justice and Accountability, San Diego, California, Madison, Wisconsin, Rural Advancement Foundation International–USA, Conservation Innovation Fund, The Sustainability Institute, Alliance for Agriculture, Nashville, Tennessee, Alliance for the Shenandoah Valley, Bronx** |

| | | |
|---|---|---|
| | | **River Alliance, New Haven, Connecticut, Marbleseed, CleanAIRE NC, Agrarian Trust, Columbus, Ohio. Court to issue order. Court Reporter Karen Martin. (cper, )** (Entered: 04/23/2025) |
| 04/23/2025 | 139 | **TEXT ORDER granting 41 Motion of Jillian Blanchard to Appear Pro Hac Vice for ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System. AND IT IS SO ORDERED. Entered at the Direction of Honorable Richard M Gergel on 4/23/2025.(sshe, )** (Entered: 04/23/2025) |
| 04/23/2025 | 140 | Amicus Curiae APPEARANCE *Brief of Amici Curiae Nonprofit Recipients of Federal Funding in Support of Plaintiffs' Motion for Preliminary Injunction* entered by Kathleen McColl McDaniel on behalf of ActiveSGV, Environmental Protection Network, Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, MetroHealth System. (McDaniel, Kathleen) Modified to add descriptive docket text on 4/23/2025 (sshe, ). (Entered: 04/23/2025) |
| 04/24/2025 | 142 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Motion Hearing held on 4/23/2025, before Judge Richard M. Gergel. Court Reporter/Transcriber Karen E. Martin, Telephone number/E–mail Karen_E_Martin@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 5/15/2025. Redacted Transcript Deadline set for 5/27/2025. Release of Transcript Restriction set for 7/23/2025. (kmartin, ) (Entered: 04/24/2025) |
| 04/24/2025 | 143 | MOTION for interim relief by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 5/8/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel.(Brzorad, Carl) (Entered: 04/24/2025) |
| 04/25/2025 | 144 | **TEXT ORDER: Plaintiffs have moved to unseal all documents on Defendants' privilege logs based upon the deliberative process privilege because the justifications provided are inadequate. (Dkt. No. 134). The Court raised this issue with Defendants at its April 23 hearing and indicated that it will allow Defendants to further supplement their privilege logs. The Court will provide Defendants with an opportunity to supplement their privilege logs in a forthcoming order memorializing and supplementing the rulings the Court made at the April 23 hearing. Because Defendants will be afforded an opportunity to supplement their privilege logs, the Court denies as moot and without prejudice Plaintiffs' motion (Dkt. No. 134). AND IT IS SO ORDERED. Entered at the direction of Honorable Richard M Gergel on 4/25/25.(cper, )** (Entered: 04/25/2025) |
| 04/25/2025 | 145 | MOTION to Compel *Production of Native Files* by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute. Response to Motion due by 5/12/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit E–discovery Motion, # 2 Exhibit Logikcull Production Requirements)No proposed order.(Brzorad, Carl) (Entered: 04/25/2025) |
| 04/29/2025 | 146 | **ORDER regarding jurisdiction and supplementing the record. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/29/2025. (ltap, )** (Entered: 04/29/2025) |

**App. 235**

| | | |
|---|---|---|
| 05/06/2025 | 147 | REPLY by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 146 Order . (Attachments: # 1 Exhibit 1, Declaration of Karen Woodrich, # 2 Exhibit 2, Declaration of Patricia Kovacs, # 3 Exhibit 3, Declaration of Arlan Finfrock, # 4 Exhibit 4, Declaration of Travis Voyles, # 5 Exhibit 5, Packard Supplemental Search Decl. – Part 1 of 4, # 6 Exhibit 5, Packard Supplemental Search Decl. – Part 2 of 4, # 7 Exhibit 5, Packard Supplemental Search Decl. – Part 3 of 4, # 8 Exhibit 5, Packard Supplemental Search Decl. – Part 4 of 4, # 9 Exhibit 6, Packard Deliberative Process Decl., # 10 Exhibit 7, Declaration of Kailee Buller)(Timmons, Todd) (Entered: 05/06/2025) |
| 05/07/2025 | 148 | RESPONSE in Opposition re 143 MOTION for interim relief Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin.Reply to Response to Motion due by 5/14/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Timmons, Todd) (Entered: 05/07/2025) |
| 05/12/2025 | 149 | REPLY by Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Baltimore, Maryland, Bronx River Alliance, CleanAIRE NC, Columbus, Ohio, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Madison, Wisconsin, Marbleseed, Nashville, Tennessee, New Haven, Connecticut, Organic Association of Kentucky, Pennsylvania Association for Sustainable Agriculture, Rural Advancement Foundation International–USA, San Diego, California, The Sustainability Institute to 146 Order . (Attachments: # 1 Exhibit 1–Table of Grants and Relief Requested, # 2 Exhibit 2–Transcript of Preliminary Injunction Hearing, # 3 Exhibit 3– EPA Jan. 21 Email, # 4 Exhibit 4– EPA Mar. 7 Emails, # 5 Exhibit 5– EPA Feb. 22–24 Emails, # 6 Exhibit 6– EPA Feb. 21–24 Emails, # 7 Exhibit 7– Supplemental Declaration of the Sustainability Institute, # 8 Exhibit 8– Inside EPA Article, # 9 Exhibit 9– EPA Reduction in Force Memo, # 10 Exhibit 10– Supplemental Declaration of CleanAIRE NC)(Brzorad, Carl) Modified to add exhibit descriptions provided by filing user on 5/13/2025 (rhei, ). (Entered: 05/12/2025) |
| 05/12/2025 | 150 | RESPONSE to Motion re 145 MOTION to Compel *Production of Native Files* Response filed by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin.Reply to Response to Motion due by 5/19/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Berlinsky, Lee) (Entered: 05/12/2025) |
| 05/13/2025 | 151 | NOTICE of Hearing on 24 MOTION for Preliminary Injunction : Motion Hearing set for 5/19/2025 at 10:00 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Richard M Gergel. (ltap, ) (Entered: 05/13/2025) |
| 05/13/2025 | 152 | **TEXT ORDER: Defendants may file a reply to Plaintiffs response at Dkt. No. 149 by 12:00 PM Friday, May 16th. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 5/13/2025. (ltap, )** (Entered: 05/13/2025) |
| 05/16/2025 | 153 | REPLY by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin to 152 Order . (Timmons, Todd) (Entered: 05/16/2025) |

**App. 236**

| 05/16/2025 | 154 | **Minute Entry. Proceedings held before Honorable Richard M Gergel: Telephone Conference held on 5/16/2025 re: Docket No. 149 and 153. All parties are represented on the call. Court Reporter Lisa Smith. (cper, ) (Entered: 05/16/2025)** |
|---|---|---|
| 05/19/2025 | 155 | **Minute Entry. Proceedings held before Honorable Richard M Gergel: Motion Hearing held on 5/19/2025 re 24 MOTION for Preliminary Injunction filed by Baltimore, Maryland, Pennsylvania Association for Sustainable Agriculture, Leadership Counsel for Justice and Accountability, San Diego, California, Madison, Wisconsin, Rural Advancement Foundation International–USA, Conservation Innovation Fund, The Sustainability Institute, Alliance for Agriculture, Nashville, Tennessee, Alliance for the Shenandoah Valley, Bronx River Alliance, New Haven, Connecticut, Marbleseed, CleanAIRE NC, Agrarian Trust, Columbus, Ohio. The Court to issue an Order. Court Reporter Lisa Smith. (hcor, ) (Entered: 05/19/2025)** |
| 05/20/2025 | 156 | Brief of Amici Curiae. USCA4 Appeal: 21–1346 (ltap, ) Modified on 5/21/2025 docketed for reference per 157 Order, per chambers(sshe, ). (Entered: 05/20/2025) |
| 05/20/2025 | 157 | **ORDER Re: 24 Motion for Preliminary Injunction. A. Under Section II, the Court enters judgment for Plaintiffs regarding the uncontested APA claims (Exhibit A, Grants 1–26, 33–38). Plaintiffs are provided declaratory and permanent injunctive relief. Defendants' motion to stay is denied.B. Under Section III, The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims and that Plaintiffs' have standing to assert those claims. The Court further grants Plaintiffs preliminary injunction for Grants 1–26 and 33–38 regarding the nonstatutory review claims.C. Under Section IV, the Court denies Plaintiffs preliminary injunctive relief regarding Grants 27–32. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 5/20/2025. (Attachments: # 1 Exhibit)(ltap, ) (Entered: 05/20/2025)** |
| 05/21/2025 | 159 | NOTICE OF APPEAL as to 146 Order, 157 Order on Motion for Preliminary Injunction,,, by Sean Duffy, Amy Gleason, Kevin Hassett, Elon Musk, Brooke Rollins, Donald J Trump, United States Department of Agriculture, United States Department of Energy, United States Department of Governmental Efficiency Service, United States Department of Transportation, United States Environmental Protection Agency, United States Office of Management and Budget, Russell Vought, Chris Wright, Lee Zeldin. – The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Berlinsky, Lee) (Entered: 05/21/2025) |
| 05/22/2025 | 160 | DELETION OF DOCKET ENTRY NUMBER 158 Reason: Attorney filer filed amended Notice of Appeal document to include reference link to two USDC Orders, not only one Order Corrected Filing Document Number 159 Filing date is that of original filing: 5/21/2025 (sshe, ) (Entered: 05/22/2025) |
| 05/22/2025 | 161 | Transmittal Sheet for Notice of Appeal to USCA re 159 Notice of Appeal,, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (sshe, ) (Entered: 05/22/2025) |

**App. 237**