No. 25-1575

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

THE SUSTAINABILITY INSTITUTE, *et al.*,
*Plaintiff-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
*et al.*,
*Defendant-Appellants*.

_____

**APPELLEES' RESPONSE IN OPPOSITION
TO APPELLANTS' MOTION TO STAY PENDING APPEAL**

_____

Kimberley Hunter
Irena Como
Nicholas S. Torrey
Carl T. Brzorad
Spencer Gall
SOUTHERN ENVIRONMENTAL LAW
CENTER
*136 East Rosemary Street, Suite 500*
*Chapel Hill, NC 27514*
(919) 967-1450
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
cbrzorad@selc.org
sgall@selc.org

Graham Provost
Elaine Poon
Jon Miller
PUBLIC RIGHTS PROJECT
*490 43rd Street, Unit #115*
*Oakland, CA 94609*
(510) 738-6788
graham@publicrightsproject.org
elaine@publicrightsproject.org
jon@publicrightsproject.org

Mark Ankcorn, Senior Chief Deputy
City Attorney
*1200 Third Avenue, Suite 1100*
*San Diego, California 92101-4100*
(619) 533-5800
mankcorn@sandiego.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

   I.   Appellees' Congressionally Appropriated Grant Funding ............................3

   II.  Appellants Freeze and Terminate Congressional Grant Programs ...............4

   III. Appellees Challenge the Program Freezing and Termination Actions ..........6

ARGUMENT ................................................................................9

   I.   Appellants Cannot Make a Strong Showing They Will Succeed
      on the Merits ...................................................................9

      A.  Appellants consented to judgment on the merits of the APA claims and
          their jurisdictional objections are wrong......................................10

      B.  Appellants will not succeed on the merits of the non-statutory review
          claims ...................................................................14

   II.  Appellants Will Not Suffer Irreparable Harm ...............................18

   III. Appellees Will Suffer Irreparable Harm .....................................20

   IV. A Stay Would Harm the Public Interest .....................................22

CONCLUSION ................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Association of Colleges for Teacher Education v. McMahon*,
No. 25-1281 (4th Cir.) ...........................................................................13

*Board of Governors of Federal Reserve System v. MCorp Financial,
Incorporated*, 502 U.S. 32 (1991) ................................................. 16, 17

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)........................................... 7, 12, 13

*California v. Department of Education*, 145 S. Ct. 966 (2025)...................... passim

*California v. Department of Education*, 2025 WL 760825
(D. Mass. Mar. 10, 2025).......................................................................13

*Chamber of Commerce of United States v. Reich*, 74 F.3d 1322
(D.C. Cir. 1996) ……............................................................................ 15

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).............11

*Collins v. Yellen*, 594 U.S. 220 (2021)................................................... 15

*Community Legal Services in East Palo Alto v. U.S. Department of Health and
Human Services*, 2025 WL 1393876 (9th Cir. May 14, 2025)...........................14

*DCH Regional Medical Center v. Azar,* 925 F.3d 503 (D.C. Cir. 2019).................17

*Department of the Army v. Blue Fox, Incorporated*, 525 U.S. 255 (1999).............18

*FCC v. Fox Television Stations, Incorporated*, 556 U.S. 502 (2009).....................12

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) .............................................................................15

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021)……........................................... 21

*Leaders of a Beautiful Struggle v. Baltimore Police Department*,
2 F.4th 330 (4th Cir. 2021) ............................................................ 19, 22

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995)................................. 16, 17

*Lincoln v. Vigil*, 508 U.S. 182 (1992)........................................................ 7, 13, 14

*Motor Vehicle Manufacturers Association of United States, Incorporated v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983)...................12

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................... 9, 18, 20, 22

*Strickland v. United States,* 32 F.4th 311 (4th Cir. 2022) .......................................15

*Webster v. Doe*, 486 U.S. 592 (1988) ......................................................... 16

*Woonasquatucket River Watershed Council v. United States Department of Agriculture*, 2025 WL 1116157 (D.R.I. April 15, 2025) .......................................7

**Statutes**

42 U.S.C. § 7437 ...............................................................................................3

42 U.S.C. § 7438...........................................................................................10, 11

5 U.S.C. § 706...................................................................................................10

**Other Authorities**

90 Fed. Reg. 8353 (Jan. 29, 2025) .............................................................5

90 Fed. Reg. 8339 (Jan. 29, 2025). ..........................................................5

# INTRODUCTION

After declining to contest the merits of many Appellees' claims, Appellants now seek to escape thoughtfully crafted district court orders that prevent their continued illegal interference with congressionally mandated grant programs.[1]

Throughout this litigation, Appellants have failed to seriously dispute their violations of both the Constitution and the Administrative Procedure Act. And when the district court ordered Appellants to produce evidence to substantiate their assertions, the truth of their illegal behavior was brought into sharp focus. At that point, Appellants simply conceded the claims against them.

Now, rather than defend their actions on the merits, Appellants craft byzantine theories of jurisdiction that, if taken seriously, would leave Appellees without any avenue to challenge Appellants' unconstitutional actions. In other words, having been caught red-handed in their defiance of Congress, Appellants now seek to evade accountability from the judiciary.

But established jurisprudence confirms federal district courts have equitable jurisdiction over challenges to the unconstitutional acts of federal officials, which are not shielded by sovereign immunity. Appellees' substantive and procedural APA

---

[1] The district court looked in detail at each of the relevant grant programs and subsequently declared unlawful and enjoined Appellants' actions as to all Appellees' grants except those under the Partnerships for Climate-Smart Commodities program, which Appellants did not concede, and which are still at issue below. Those grants are not part of this appeal.

claims for equitable relief, which Appellants have conceded on the merits, are also properly heard in federal district court. Appellants' attempt to overread the Supreme Court's recent emergency ruling in *California v. Department of Education*, 145 S. Ct. 966 (2025), should be seen for what it is—a misleading attempt to evade review. Appellees' claims enforce Congress's laws and the Constitution and seek forward-looking equitable and declaratory relief, not money damages; they belong in federal district court, not the Court of Federal Claims.

Appellants' persistent attempts to mischaracterize the relief Appellees seek means they also overlook the harm Appellees will suffer if a stay is issued. Appellees—nonprofit groups and cities— worked tirelessly to craft and implement the work plans blocked by Appellants' actions. Appellees do not seek "damages"; they want to get back to work helping their communities with everything from affordable housing to sustainable agriculture. Since January 20, Appellees have been plunged into chaos, unable to fulfill their grant obligations, employ staff, and uphold their reputations in the communities that rely on them. With the district court's order, Appellees finally got relief. A stay would pull the rug out from underneath them, again. Meanwhile, Appellants offer *no evidence* a stay is needed to prevent irreparable harm to them.

All this, coupled with the clear public interest in maintaining constitutional order and ensuring the money appropriated by Congress can reach the communities it was intended to serve, means Appellants' motion should be denied.

## BACKGROUND

### I.    Appellees' Congressionally Appropriated Grant Funding

The United States has a long, successful history of congressionally mandated grant programs that work in partnership with nonprofit and government entities on the ground. These efficient programs ensure congressional spending can get where it is most needed without expanding federal infrastructure. For example, in 2021, Congress directed investment in transportation, broadband, and energy infrastructure via federal grant programs for nonprofits and cities under the bipartisan Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021) ("IIJA"), and in 2022, Congress enacted the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA"), which likewise accomplishes a significant portion of its objectives via delegated grant programs. Congress legislated in detail how these programs should be administered, and appropriated funding with specificity, not as lump sum payments. *See, e.g.*, 42 U.S.C. § 7437(a)–(d) ("Greenhouse gas air pollution plans and implementation grants" program, appropriating funds EPA "shall" use to "award grants" to local governments to implement plans "for the reduction of greenhouse gas air pollution").

3

Across the United States, nonprofit organizations and municipalities answered these calls by engaging with their communities to craft grant proposals as part of rigorous application processes, and, ultimately, began implementing work plans to advance Congress's goals. As they pursue this important work on the ground, grant recipients are allowed to withdraw money only incrementally, generally to recompense past expenditures, from Government-controlled accounts. *See, e.g.*, D.Ct. Dkt. 157 at 19.

## II.    Appellants Freeze and Terminate Congressional Grant Programs

This community-centered work ground to a halt when Appellants abruptly froze and later terminated entire grant programs as contrary to the President's policies. In the ensuing chaos, grants have been turned on and off, and Appellees have been forced to abandon community assistance essential to their missions and even lay off staff. *See* D.Ct. Dkt. 24-1 at 29–30. Many Appellees worry they will be unable to accomplish goals set out in their three-year work plans. *See, e.g.*, D.Ct. Dkt. Nos. 24-2 at 4–5 ¶ 8, 24-6 at 5 ¶ 9.

President Trump issued Executive Orders that directed this interference with congressional grant programs. Executive Order 14154, "Unleashing American Energy," ("Energy EO"), directs federal agencies to "Terminat[e] the Green New Deal"—meaning to stop the disbursement of all funds appropriated under the IRA and IIJA—and forbids the disbursement of any funds the Executive branch deems

"contrary" to the President's policies. 90 Fed. Reg. 8353, §§ 2(i), 7 (Jan. 29, 2025). And Executive Order 14151, "Ending Radical and Wasteful Government DEI [Diversity, Equity, and Inclusion] Programs and Preferencing," ("Equity EO"), directs agencies to "terminate . . . all . . . 'equity-related' grants or contracts" within sixty days. 90 Fed. Reg. 8339, § 2(b) (Jan. 29, 2025).

Appellants implemented these orders, first freezing and then terminating entire grant programs for pure policy reasons—as they conceded below: "The pauses and terminations here are not based on grantee compliance; they are based on the agency's review of whether federal funds are being spent in a manner that best promotes the Executive's agenda." D.Ct. Dkt. 56 at 21. They did so by broadly identifying statutory programs they deemed to advance policies disfavored by the President, including targeting programs created under the IRA and IIJA, D.Ct. Dkt. 23-8 at 2, and by using arbitrary keyword searches such as "greenhouse gas," "climate change," and "equality." *E.g.*, D.Ct. Dkt. 23-10 at 2; 23-12 at 1; 23-14 at 2–3; 147-1 at ¶¶ 17–18.

In so doing, the Executive terminated the very priorities Congress funded. *Compare, e.g.*, 42 U.S.C. § 7438 ("Environmental and climate justice block grants" program, which EPA "shall" use to "award grants" for specified environmental projects to "benefit disadvantaged communities"), *with* D.Ct. Dkt. 147-4 at 2 ¶ 3, 110 ¶ 6 (terminating Environmental and Climate Justice Block grant "program[]"

for "policy reasons"); D.Ct. Dkt. 95-1 at 99 through 95-2 at 7 (identifying "Environmental justice" as rationale for termination).

## III.    Appellees Challenge the Program Freezing and Termination Actions

Appellees filed this action after Appellants' actions upended their ability to continue the work they had promised their communities. On March 26, 2025, Appellees amended their complaint, D.Ct. Dkt. 23, and moved for a preliminary injunction. D.Ct. Dkt. 24. Because Appellants had engaged in shifting narratives and justifications for their actions, Appellees also moved for expedited discovery to fully understand what actions led to the freezing and termination of their grants. D.Ct. Dkt. 25.

On April 9, 2025, the district court narrowed Appellees' discovery requests and granted expedited discovery. D.Ct. Dkt. 45. Appellants moved for reconsideration and a stay, arguing the court lacked jurisdiction. D.Ct. Dkt. 46, 48. In response, the court explained that limited discovery would assist in determining its jurisdiction. D.Ct. Dkt. 52. Appellants did not appeal and ultimately produced what the court described as a "document dump," Suppl. App. 52, with none of over 9,000 documents containing any individualized evaluation of Appellees' grants or the review the APA requires, Suppl. App. 71.

At a hearing on April 23, 2025, Appellants' counsel conceded for the first time the grant freezes occurred *en masse*, but stated, "I do think the terminations were

6

done based on a review of the grants." Suppl. App. 35. The court invited Appellants to produce any additional documents to support this contention of a reasoned and individualized grant termination process. Suppl. App. 71–72; *see also* D.Ct. Dkt. 146 at 14–17.

The court then issued an order determining it had jurisdiction, including over Appellees' APA claims. D.Ct. Dkt. 146. Applying *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the court explained that Appellees sought to continue the work in their communities via forward-looking equitable and declaratory relief against agency actions, not backward-looking money damages pursuant to a contract dispute. *Id.* at 4–9. As such, the court concluded this case is significantly different from *California*, *id.* at 9–12, and that the highly specific grant programs created by Congress were not committed to agency discretion under *Lincoln v. Vigil*, 508 U.S. 182 (1992). *Id.* at 9–14. The court also ruled that grants that had already been unfrozen, many following a preliminary injunction in *Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*, 2025 WL 1116157 (D.R.I. April 15, 2025), should remain so.

Ultimately, Appellants did not produce any evidence to support their claims of a reasoned individualized grant review process. Instead, they filed declarations admitting they cancelled grants in bulk without reviewing individual grants, assessing the impact of the terminations, or engaging in any other reasoned process.

EPA Assistant Deputy Administrator Voyles explained on February 25, 2025, he unilaterally and in one day determined several grant *programs* should be terminated "for policy reasons." D.Ct. Dkt. 147-4 at 2 ¶ 3. These included all grants in the Environmental Justice Collaborative Problem Solving Agreement Program, Community Change Grants, and the Environmental Justice Government-to-Government Program at issue in this case.[2] USDA made similar broad, program-wide terminations, including freezing some grant programs because they contain unspecified "DEIA"[3] terms disfavored by the Administration, D.Ct. Dkt. No. 147-1 at ¶¶ 17–24, or merely because grants used "IRA funding." D.Ct. Dkt. 136-1 at 3–4. Appellees' Department of Transportation grants were put on hold indefinitely to determine whether whole grant "programs" align with administration priorities. Dkt. No. 147-3 at ¶¶ 4–5. And a Department of Energy grant was frozen without explanation despite Congress's mandate that IRA funding for this program be used for energy efficiency projects just like the grantee's. D.Ct. Dkt. 149 at 20–21.

---

[2] Attachments to Mr. Voyles's declaration refer to his decision to terminate the "Environmental Justice Block Grant Program," *id.* at 110 ¶ 6, which includes Community Change Grants, Environmental Justice Collaborative Problem Solving grants, and Environmental Justice Government-to-Government Grants. *Inflation Reduction Act Environmental and Climate Justice Program*, EPA, https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-environmental-and-climate-justice-program (last updated Mar. 27, 2025).

[3] "Diversity, equity, inclusion, and accessibility."

Appellees explained in detail how these policy-based decisions violated both the APA and the Constitution. D.Ct. Dkt. 149. The district court gave Appellants yet another chance to explain how these actions were lawful. Rather than muster any explanation, on May 16, 2025, Appellants stated they would no longer "contest judgment on the merits of Appellees' APA claims," other than for six specific grants not part of this appeal. D.Ct. Dkt. 153 at 1.

On May 19, 2025, at a second hearing, the court announced it would enter judgment and a permanent injunction on the APA claims Appellants no longer contest, and would issue a preliminary injunction on Appellees' nonstatutory review claims for *ultra vires* actions. Suppl. App. 126–27. The court issued a written order on May 20, 2025. D.Ct. Dkt. 157.

## ARGUMENT

Appellants cannot satisfy the four-factor test governing their request for a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). They will not succeed on the merits. They have produced no evidence they will be irreparably injured absent a stay. By contrast, a stay will substantially injure Appellees and the communities they serve and is not in the public interest.

### I.    Appellants Cannot Make a Strong Showing They Will Succeed on the Merits.

Appellants make no effort to defend the lawfulness of their conduct. Subject to unavailing jurisdictional objections, they consented below to judgment on the

9

merits of Appellees' APA claims, including claims that their actions violated the constitutional principle of separation of powers. And in this Court, they mount no substantive defense to the charge that their actions are unconstitutional and *ultra vires* for purposes of Appellees' nonstatutory review claims. Instead, their position is that the district court had no jurisdiction to review or restrain their actions, lawful or not. It is striking for Appellants to effectively concede the government is acting unconstitutionally. It is even more striking for Appellants to seek equitable relief from this Court so their lawless conduct may continue. But at bottom, Appellants' jurisdictional arguments are simply wrong. They cannot show likelihood of success.

A.     **Appellants consented to judgment on the merits of the APA claims and their jurisdictional objections are wrong.**

Much here is undisputed. Appellants do not contest Appellees' claims that their actions were "contrary to constitutional right, power, privilege, or immunity," made "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," and "arbitrary [and] capricious" under the APA. 5 U.S.C. § 706(2)(A)–(D); *see also* D.Ct. Dkt. 153 at 1. Their concession includes that they acted contrary to their constitutional authority when they disregarded congressional spending decisions and the executive branch's responsibility to faithfully execute the law. *See* D.Ct. Dkt. 23 ¶¶ 318, 323–24. Statutory provisions in the federal grant programs mandate that funding be spent in specific ways. For example, the EPA Administrator "shall" use the Environmental and Climate Justice Block Grant

10

Program funds to award grants for specified activities. 42 U.S.C. § 7438(b). Appellees explained how their grants all align precisely with these statutory criteria. *E.g.*, D.Ct. Dkt. Nos. 24-02 at ¶¶ 2, 8; 24-06 at ¶¶ 2, 4-5, 9-10. Other statutory grants contain similarly exacting provisions. *See* D.Ct. Dkt. 24 at 26–27.

Appellants admit their actions represent an effort to flout the will of Congress because the President does not like congressional policies. They could not credibly claim otherwise. For example, Section 7 of the Energy EO directs the executive branch to "terminat[e]" the IRA and IIJA. And the Equity EO directs agencies to "terminat[e] . . . all . . . 'equity-related' grants or contracts" and scrutinize "'environmental justice' programs and policies," Equity EO § 2, despite the fact that Congress expressly funded such grants. *E.g.*, 42 U.S.C. § 7438; IRA § 22007, 136 Stat. at 2022–23 (directing funding to many equity-related programs, including "Environmental and climate justice block grants," and to "address racial equity issues"). "Because the Executive Order[s] direct Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with [the President's policies], there is no reasonable argument that the President has not . . . . violate[d] the constitutional principle of the Separation of Powers." *City & Cty of San Francisco v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018). Indeed, Appellees have stated quite clearly that they do not intend to ever spend the money Congress appropriated for these programs. *See, e.g.,* D.Ct. Dkt. 64 at 8.

Appellants also do not dispute their procedural violations of the APA. Among other things, they concede that they acted without considering Appellees' "serious reliance interests," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and that they relied "on factors which Congress has not intended [them] to consider," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), by terminating and freezing grant programs based on Presidential policies that are contrary to Congress's specific directives.

Appellants say none of this lawlessness matters because the district court lacked jurisdiction to stop them. In their telling, the Tucker Act bars Appellees from seeking anything but contract damages via the Court of Federal Claims because the Tucker Act impliedly displaces the APA's waiver of sovereign immunity. Dkt. 6 at 11.

Not so. Following the Supreme Court's guidance in *Bowen*, the district court correctly determined it had jurisdiction over Appellees' APA claims. D.Ct. Dkt. 146 at 12. After a careful review of the pleadings and discovery, the district court concluded Appellees' "claims do not turn on the terms of a contract between the parties" and that "the source of the rights alleged in this action is federal law—namely the IRA, IIJA, and the Constitution—not any obligations outlined in the grant awards." D.Ct. Dkt. 146 at 5–6. Indeed, the evidence showed Appellants did not even consider individual grant agreements before freezing them. *See, e.g.*, D.Ct.

Dkt. 147-4 at ¶ 3. As the district court found, Appellees here, like in *Bowen*, seek to "preserve their ongoing and prospective agreements with the Government" via declaratory and injunctive relief. D.Ct. Dkt. 146 at 7; *see also Bowen*, 487 U.S. at 905. The fact that a judicial remedy "may require one party to pay money to another" does not "characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

Appellants overread the Supreme Court's recent emergency order in *California* and the concise order applying it in *American Association of College for Teacher Education v. McMahon*, No. 25-1281 (4th Cir.). In *California*, the district court found procedural irregularities in the termination letters for specific grants, concluding they failed to adequately explain the reasoning behind the terminations, without reaching the substantive APA claims. *Cal. v. Dep't of Educ.*, 2025 WL 760825, at *2–3 & n.3 (D. Mass. Mar. 10, 2025). In contrast, the pleadings and evidence below show that "the terms and conditions of the individual grants are not at issue," as the district court correctly concluded. D.Ct. Dkt. 146 at 11. Appellants violated substantive statutory and constitutional provisions, which have nothing to do with the terms and conditions of any specific agreement or the content of any letter.

Appellants also try to cloak their conduct in unreviewable discretion. The district court correctly rejected that argument too. Appellants rely entirely on *Lincoln*, but that case involved a "lump sum" appropriation lacking any "statutor[y]

13

restrict[ions] [on] what can be done with those funds," *Lincoln*, 508 U.S. at 192 (citation and quotations omitted). By contrast, Congress legislated with great detail about how the grant funding at issue here must be spent, commanding that Appellants "shall" use funding for particular specified purposes, subject to specific restrictions. D.Ct. Dkt. 157 at 7, 17. As the Ninth Circuit recently explained while rejecting an identical argument from the government, "[t]he rule announced in *Lincoln* has no application where, as here, the agency fails to carry out a program that is *required* by statute" through the use of language like "'shall' [that] plainly imposes a mandatory duty." *Community Legal Services in East Palo Alto v. U.S. Dep't of Health and Human Servs.*, 2025 WL 1393876, at *4–5 (9th Cir. May 14, 2025).

## B. Appellants will not succeed on the merits of the non-statutory review claims.

Appellants have no likelihood of success on Appellee's claims for nonstatutory review of unconstitutional action. These claims center on the fact federal officials named in this action acted outside of their constitutional and statutory authority when they froze and terminated federal grant programs.

Here too, Appellants mount no substantive defense of their conduct and go all in on jurisdiction. But here too, they are wrong. Wholly apart from the APA, federal district courts have jurisdiction over nonstatutory review claims to enjoin government officials from violating the Constitution. *See, e.g.*, *Free Enter. Fund v.*

14

*Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases). This jurisdiction to enjoin constitutional violations specifically extends to "separation-of-powers claim[s]." *Id*."[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

Appellants failed to contest this independent jurisdictional basis through several rounds of briefing below and offered only abstract objections at argument. *See* Suppl. App. 103–09. Their efforts in this Court fare no better. The government's principal theory, here and in other cases like *California*, has been that the Tucker Act "impliedly forbids" APA claims in grant cases. But even if that theory were correct as to the APA (it is not), the theory simply does not apply to Appellees' nonstatutory constitutional claims for at least two reasons.

***First***, Appellants' argument is based on sovereign immunity and the interplay between the APA and the Tucker Act. But sovereign immunity "does not apply when a plaintiff files suit seeking equitable relief against federal officials . . . alleging that those officials . . . acted unconstitutionally." *Strickland v. United States,* 32 F.4th 311, 363 (4th Cir. 2022). For such claims, the officials' actions "are considered individual and not sovereign actions." *Id.* (citation omitted). "So, there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

15

*Second*, the text of the Tucker Act cannot do the heavy lifting that Appellants need to evade Appellees' nonstatutory constitutional claims. When the government contends that a statute strips district courts of jurisdiction to hear constitutional claims, and the result would be that a party has no forum in which to assert its constitutional claims, the Supreme Court imposes a strict clear statement rule to avoid the "serious constitutional issues" that would arise if no such forum existed. *Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."). Appellants' theories would leave no forum for Appellees to bring their separation-of-powers claims because the Federal Circuit, which oversees the Court of Federal Claims, has held that the court cannot hear such claims since the relevant constitutional provisions are not "money-mandating." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). With this context, *Webster* forecloses Appellants' reliance on the Tucker Act. That statute contains no "clear" statement that Congress intended to extinguish constitutional claims relating to grants, *Webster*, 486 U.S. at 603, and Appellants do not contend otherwise. The most they offer is an "impli[cation]" that the Tucker Act precludes jurisdiction. Dkt. 6 at 11.

Faced with all this precedent, Appellants retreat to *Board of Governors of Fed. Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 43-44 (1991) to suggest nonstatutory review is unavailable. But *MCorp* has no application here for several

16

reasons. First, *MCorp* involved alleged statutory violations, not constitutional ones. Appellants peddle a quotation about "vindicating" rights but elide that it was about vindicating "*statutory* rights." *Compare* Dkt. 6 at 21, *with MCorp*, 502 U.S. at 43 (emphasis added). Second, the alternative forum in *MCorp* (the Foreign Intelligence Surveillance Court) provided for judicial review of the same statutory claim that the plaintiff sought to bring in district court, which, as discussed above, is not possible here. *See MCorp*, 502 U.S. at 43; *see also LeBlanc*, 50 F.3d 1028 (separation-of-powers claims cannot be heard in the Court of Federal Claims). Third, *MCorp* emphasized that the relevant statute "clearly and directly" stripped district courts of jurisdiction to hear claims. *Id.* at 44. The Tucker Act contains no such clear jurisdiction-stripping language.

Appellants also contend that nonstatutory review is available only to challenge "extreme agency error, not merely garden-variety errors of law or fact." Dkt. 6 at 22–23 (quoting *DCH Reg'l Med. Ctr. v. Azar,* 925 F.3d 503, 509 (D.C. Cir. 2019)). They are wrong again. The standard they cite is from a line of cases that applies only to alleged *statutory* violations. District courts have jurisdiction to enjoin any *constitutional* violation. *Free Enter. Fund*, 561 U.S. at 491 n.2. In any event, this situation *is* extreme; the district court was "frankly, embarrassed for the government to read Mr. Voyles' affidavit" describing the flouting of congressionally mandated grant programs. Suppl. App 116.

Finally, Appellants contend Appellees seek monetary damages and not equitable relief. *See* Dkt. 6 at 23. But the only case they cite in support of this contention concerns the APA's waiver of sovereign immunity, not a nonstatutory constitutional claim, and was a request for past due monetary damages to compensate for loss, rather than the prospective relief sought here. *Id.* (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999)).

Beyond these failed jurisdictional arguments, Appellants have barely contested the merits of Appellees' nonstatutory review claims. As the district court noted, the analysis for these claims is almost identical to Appellees' substantive APA claims challenging unconstitutional action and contravention of statutory authority, which Appellants have not contested. *See* D.Ct. Dkt. Nos. 157 at 14, 153 at 1, 9. The record below established that Appellants refused to implement specific grant programs Congress directed because the President opposed the policies Congress enacted and directed actions to undermine them. D.Ct. Dkt. 157 at 14. This is a straightforward failure to faithfully execute the laws which Defendants have failed to rebut either below or in this court.

## II. Appellants Will Not Suffer Irreparable Harm.

Appellants will not be harmed at all, much less "irreparably injured," pending appeal. *Nken*, 556 U.S. at 434. Their argument that they may have to "make millions of dollars in grant funding immediately available" absent a stay is misleading and

unsupported by evidence. Dkt. 6 at 3. Grantees may only withdraw funds for

"specific, approved purposes," incrementally "as the Plaintiffs implement their grant

program plans," which have already been approved by Appellants. D.Ct. Dkt. 157 at

19. As the district court concluded, "[s]ufficient procedures have already taken place

or are already in place to protect taxpayer dollars." *Id*. Appellants have provided no

evidence to the contrary in sworn affidavits or otherwise. *See* Fed. R. App. Pro. 8

(a)(2)(B). The Ninth Circuit recently faulted the government for its similar failure to

provide any evidence of harm and distinguished the case from *California* on that

basis. *Community Legal Services in East Palo Alto.*, 2025 WL 1393876, at *4–5.

Moreover, Appellants are "in no way harmed by issuance of a preliminary

injunction which prevents [it] from enforcing restrictions likely to be found

unconstitutional." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330,

346 (4th Cir. 2021) (citation and quotations omitted). Congress appropriated this

grant funding to be spent for specific purposes. Appellants' real complaint is that

they will be forced to stop illegally obstructing Congress's funding directives. But

as discussed above, Appellants do not control the Nation's purse strings; Congress

does. *Supra* at 10–12. Indeed, while Appellants claim the district court's injunction

imposes "a severe separation-of-powers harm on the Executive Branch," Dkt. 6 at

24–25, the sole effect of the injunction is to prevent the Executive from terminating

Congress's spending programs and replacing them with the President's contrary policies.

Appellants' other arguments also fail. Appellants complain about a supposed "preclearance regime," Dkt. 6 at 25, ignoring the district court's well-supported finding that Appellants' "shifting post hoc justifications" to "evade court orders" in other cases necessitated ongoing oversight. D.Ct. Dkt. 157 at 8 n.6. They likewise ignore the court's statement that it will "promptly" allow "legitimate and lawful" terminations, *id.*—which to date Appellants have not proposed. Appellants also fault the district court for extending the injunction to awarded grants that lack "final grant agreements," Dkt. 6 at 25, despite their own concession to judgment "that would require Defendants to . . . negotiate" those agreements. D.Ct. Dkt. 153 at 1.

## III. Appellees Will Suffer Irreparable Harm

Appellees will be "substantially injure[d]" by a stay. *Nken*, 556 U.S. at 434. A stay would plunge the Appellees, their employees, and the communities they serve back into chaos and uncertainty. The district court correctly found that Appellees made a "clear showing" of irreparable harm, D.Ct. Dkt. 157 at 15–17, which will return if the court's injunction is stayed pending appeal, allowing Appellants to illegally freeze and terminate Appellees' grants again.

Appellants are wrong when they claim the resulting harm to Appellees is purely "monetary." *Id.* at 26. They ignore the "dozens of examples" of irreparable

harm that flow from lost grant funding, which the district court found, D.Ct. Dkt. 157 at 16, based on a robust factual record. *See* D.Ct. Dkt. 64-2 (summarizing evidence and irreparable injuries).

**First,** projects central to Appellees' missions will stall or simply disappear, such as the Sustainability Institute's project to weatherize and upgrade low-income homes in Charleston, D.Ct. Dkt. 24-2 at ¶¶ 20, 39–41, and Agrarian Trust's multi-state project to help underserved farmers secure land and farm sustainably, D.Ct. Dkt. 24-3 at ¶¶ 7–16. Further delays caused by the re-freezing of grants will frustrate Appellees' ability to accomplish their multi-year workplans, *e.g.*, D.Ct. Dkt. 24-2 at ¶¶ 41–43, and likely force Appellees to lay off staff. *E.g.*, D.Ct. Dkt. 24-14 at ¶ 15; 24-3 at ¶¶ 17–18; 24-7 at ¶ 12. Unlike *California*, Appellees here do not "have the financial wherewithal to keep their programs running" absent grant funding. 145 S.Ct. at 969. *See, e.g.*, D.Ct. Dkt. 24-14 at ¶ 15; 24-3 at ¶¶ 17–18; 24-7 at ¶ 12.

**Second**, a stay will harm Appellees' reputations, goodwill, and "community connections," which are "significant and irreparable injuries." *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021). Appellees have earned the trust of their communities as reliable partners and advocates. Appellees promised to complete critical projects on defined timelines. A stay would further erode their hard-earned trust and reputations in the community. D.Ct. Dkt. 64-2; D.Ct. Dkt. 24-1 at 33–34.

***Third,*** a stay would irreparably harm City Appellees by hampering local job and business growth, undermining democratic referenda, jeopardizing their ability to plan for the future, diverting funds away from essential services for residents, and depriving their residents of access to important public programs. *See* D.Ct. Dkt. 64 at 18. These harms cannot be reduced to money damages and are thus irreparable.

## IV.    A Stay Would Harm the Public Interest

The public interest strongly disfavors allowing Appellants to resume their lawless conduct, particularly as they no longer defend the legality of their actions. *Nken*, 556 U.S. at 434. As this Court has observed, "the system is improved by an injunction" which "prevents the state from enforcing [policies] likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F. 4th at 346 (citation and quotations omitted).

Moreover, the public interest strongly favors the faithful execution of grant programs Congress created to help communities across the country address pressing issues ranging from climate change to environmental justice. Appellants have been quite clear they simply refuse to spend appropriated funds on these congressional priorities. *E.g.*, D.Ct. Dkt. 147-4 at ¶ 3, p. 110 ¶ 6. A stay would allow Appellants to continue harming the communities Congress sought to benefit.

## CONCLUSION

For the foregoing reasons, the Court should deny Appellants' motion for stay.

Respectfully submitted,


Kimberley Hunter
Irena Como
Nicholas S. Torrey
Carl T. Brzorad
Spencer Gall
SOUTHERN ENVIRONMENTAL LAW
CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
cbrzorad@selc.org
sgall@selc.org

*Counsel for Appellees The Sustainability Institute,
Agrarian Trust, Alliance for Agriculture, Alliance
for the Shenandoah Valley, Bronx River Alliance,
CleanAIRE NC, Earth Island Institute, Leadership
Counsel for Justice and Accountability,
Marbleseed, Organic Association of Kentucky,
Pennsylvania Association of Sustainable
Agriculture, and Rural Advancement Foundation
International - USA*

Graham Provost
Elaine Poon
Jon Miller
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org
elaine@publicrightsproject.org
jon@publicrightsproject.org

*Counsel for Appellees Baltimore, Maryland,
Columbus, Ohio, Madison, Wisconsin, Nashville,
Tennessee, and New Haven, Connecticut*

Mark Ankcorn, Senior Chief Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Appellees City of San Diego*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,145 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word for Microsoft 365 in proportionally spaced 14-pt Times New Roman typeface.

*/s/ Kimberley Hunter*
Kimberley Hunter

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Kimberley Hunter*
Kimberley Hunter

# SUPPLEMENTAL APPENDIX

TABLE OF CONTENTS

<u>Page</u>

Transcript of Motions Hearing Before the Honorable Richard M. Gergel, United States District Court for the District of South Carolina, on April 23, 2025 (Dkt. No. 142) .........................................................................Suppl. App. 1

Transcript of Motions Hearing Before the Honorable Richard M. Gergel, United States District Court for the District of South Carolina, on May 19, 2025 (Dkt. No. 163) .......................................................................Suppl. App. 74

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
                      CHARLESTON DIVISION


THE SUSTAINABILITY INSTITUTE, )
et al,                        )
              Plaintiffs,     )      April 23, 2025
                              )
         -versus-             )      2:25-2152
                              )
                              )      Charleston, SC
DONALD J. TRUMP,              )
et al,                        )
              Defendants.     )


                 TRANSCRIPT OF MOTION HEARING

           BEFORE THE HONORABLE RICHARD M. GERGEL
           UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Plaintiffs:   KIMBERLY C. HUNTER, ESQ.
                      Southern Environmental Law Center
                      136 East Rosemary Street, Suite 500
                      Chapel Hill, NC 27514

                      JONATHAN B. MILLER, ESQ.
                      Public Rights Project
                      490 43rd Street, Unit 115
                      Oakland, CA 94609

For the Defendants:   TODD S. TIMMONS, AUSA
                      LEE E. BERLINSKY, AUSA
                      US Attorney's Office
                      PO Box 978
                      Charleston, SC 29402

Court Reporter:       KAREN E. MARTIN, RMR, CRR
                      PO Box 835
                      Charleston, SC 29402


     Proceedings reported by stenographic court reporter.
     Transcript produced with computer-aided transcription
                          software.
```

```
1                    Wednesday, April 23, 2025
2          (WHEREUPON, court was called to order at 10:01 AM)
3               THE COURT:  Good morning.  Please be seated.
4               Okay.  We're in the matter of The Sustainability
5    Institute and others vs. Donald Trump and others,
6    2:25-2152.
7               Could counsel for the plaintiff who will be
8    speaking today identify for the record please?
9               MS. HUNTER:  Kimberly Hunter will be speaking
10   for the plaintiff non-profit organizations and be taking
11   the balance of the argument, Your Honor.
12              THE COURT:  Very good.
13              MR. MILLER:  Good morning, Your Honor.  Jonathan
14   Miller on behalf of the plaintiff cities for any questions
15   Your Honor may have about them.
16              THE COURT:  Very good.  Thank you.
17              And for the defendants?
18              MR. TIMMONS:  Yes, Todd Timmons for the US
19   Attorney's Office.
20              THE COURT:  Okay.  Very good.
21              MR. BERLINSKY:  Your Honor, Lee Berlinsky for
22   the US Attorney's Office.
23              THE COURT:  Mr. Berlinsky, I didn't think they
24   would keep you quiet.  Good to see you here.
25              MR. BERLINSKY:  Thank you.
```

1      **THE COURT:**  Folks, now, let me just, first of

2  all, say that when I schedule oral argument, I don't do it

3  simply to provide counsel an opportunity to repeat to me

4  what they've already put in their briefs.  I've had a

5  chance to read the briefs and the underlying authorities.

6  And I have a number of specific questions I want to

7  address and I'll have you address.  So rather than -- so

8  don't be expect to be able to sit up here and allocute.

9  If you have laid out oral argument, just throw it aside.

10  It's not going to happen.

11      And I thought the best order of this is to first

12  address the issue of jurisdiction.  And then to the extent

13  we proceed from there, we will then address the other

14  issues.

15      So let me -- the Government has asserted that

16  this Court lacks jurisdiction.  Who will argue that point?

17      **MR. TIMMONS:**  I will, Your Honor.

18      **THE COURT:**  Okay.  Very good.  Mr. Timmons, let

19  me just ask you a beginning question here.  Has Bowen been

20  overturned?

21      **MR. TIMMONS:**  Good morning, Your Honor.  I

22  haven't had the privilege of being in your courtroom

23  before, but it is a pleasure to be here on behalf of the

24  USA.

25      **THE COURT:**  Glad to have you here.

4

1          MR. TIMMONS:  No, Your Honor, it has not been

2    overturned.

3          THE COURT:  So tell me why I don't have

4    jurisdiction.

5          MR. TIMMONS:  You don't have jurisdiction, Your

6    Honor, because cases about grant funding are cases about

7    money.  That's what the Supreme Court has said.

8          THE COURT:  Maybe I'm wrong, I thought Bowen was

9    a grant case.

10         MR. TIMMONS:  I can't remember if it was a

11   grant.

12         THE COURT:  It's a money case, a grant to the --

13   under the medicaid program to states.

14         MR. TIMMONS:  Right.

15         THE COURT:  Authorized by an act of Congress.

16         MR. TIMMONS:  Right.  I can't remember what the

17   term is, if it would be a grant or if that's a statutory

18   entitlement.  But your point is well taken.

19         THE COURT:  And it required -- going forward it

20   required the payment of money by the United States to the

21   State of Massachusetts, correct?

22         MR. TIMMONS:  Correct.

23         THE COURT:  Okay.  So tell me why these -- so

24   you're not arguing that every grant must be -- every

25   dispute over a grant must be in the Court of Claims, are

5

1    you?

2             MR. TIMMONS:  Unless -- it would unless it has

3    the characteristics that were found in Bowen.  That case

4    was more about defining the relationship between the state

5    and the federal government for --

6             THE COURT:  Case law doesn't follow that.

7    That's not that narrow.  So let's just get to it.  The

8    plaintiff -- I read the complaint.  And I know under Bowen

9    we're supposed to search.  We don't have to take the

10   complaint at its face value, correct?

11            MR. TIMMONS:  Correct, Your Honor.

12            THE COURT:  So I need to look at what remedy the

13   plaintiffs seek in this case, the non-profits and the

14   cities.  And at least on the face of the complaint, they

15   seek equitable relief, do they not?

16            MR. TIMMONS:  On the face of the complaint, yes.

17            THE COURT:  And they -- and they're looking for

18   relief going forward, are they not?

19            MR. TIMMONS:  I would say they're looking for

20   the value of their grant award.

21            THE COURT:  That's a play on words.  Are they --

22   answer my question.  Are they seeking relief going

23   forward?

24            MR. TIMMONS:  They're seeking relief the Court

25   of Federal Claims could provide them.  That is different

6

1    --

2            **THE COURT:**  You didn't answer my question.  I

3    want you to answer my question then you can make your

4    argument.  My question is simple.  Are they seeking relief

5    going forward?

6            **MR. TIMMONS:**  Yes, Your Honor.

7            **THE COURT:**  And they're seeking as they describe

8    equitable relief, declaratory and injunctive relief, are

9    they not?

10           **MR. TIMMONS:**  I think they're describing that.

11   I think that's in substance -- we've got to look at the

12   substance over the form.  But, yes, they are asking for a

13   declaratory injunction just like the California plaintiffs

14   were.

15           **THE COURT:**  Right.  And by the way, do you think

16   California overruled Bowen?

17           **MR. TIMMONS:**  I don't.

18           **THE COURT:**  Okay.  And what weight should I

19   give -- first of all, what was the record the Supreme

20   Court had when they issued the stay in California?

21           **MR. TIMMONS:**  They had the application for stay

22   that the United States filed.  They had the response to

23   the application the plaintiffs filed, which is much the

24   same that district courts have ruled on preliminary

25   injunction cases as well.

7

1          THE COURT:  Is there a record?  My question was

2     there an appendix or any kind of record?

3          MR. TIMMONS:  No.

4          THE COURT:  And as I understand, my

5     responsibility under Bowen is to make a searching

6     examination of the claim and the nature of the claim, to

7     look beyond the complaint itself to see what is the

8     essence of the claim and what relief -- and what relief

9     would be sufficient for the plaintiff should they have a

10    claim.  Isn't that what I'm supposed to be doing?

11         MR. TIMMONS:  Yes, Your Honor.  I would phrase

12    it as what is their entitlement to recovery and what is

13    the source of relief they are seeking?

14         THE COURT:  Right.  And let me ask you this.  If

15    I concluded that the only sufficient relief was injunctive

16    and declaratory, would the Court of Claims have

17    jurisdiction?

18         MR. TIMMONS:  If the injunction is going to say

19    to pay money to the plaintiffs, then the Court of Federal

20    Claims would have jurisdiction over that.

21         THE COURT:  Okay.  If I ordered -- well, I

22    thought -- I might have misread Bowen.  But I believe it

23    says that just because the payment of money is involved

24    doesn't make it a Tucker Act claim.  Isn't that right?

25    Did I miss something there?

8

 1          MR. TIMMONS:  I think you have to look at --
 2   that's a fair reading of Bowen.
 3          THE COURT:  Thank you.
 4          MR. TIMMONS:  You ignore -- you would ignore the
 5   other characteristics of Bowen, which is the ongoing
 6   relationship between the parties that the Court of Federal
 7   Claims can't reach; that is, how is medicaid between the
 8   federal and state government --
 9          THE COURT:  Let me say this.  If you're arguing
10   that Bowen is limited to its facts and no further, you
11   ignore 50 years of jurisprudence which I don't elect to
12   do.  Okay?  So you're not going to persuade me that the
13   facts of Bowen are as far as Bowen goes.  That is not the
14   way I read Bowen.  And that's not the way dozens of my
15   colleagues around the country have read it over 50 years.
16   So let's just dispense with that argument.
17          I just don't know what to make of the cursory
18   order in the denial or the grant of the motion to stay.
19   I've always been taught that that doesn't generally
20   overturn existing Supreme Court authority.  Is that fair?
21          MR. TIMMONS:  Yes, Your Honor.  And I think
22   that -- I read the Supreme Court order as distinguishing
23   Bowen on the facts, not overturning it.
24          THE COURT:  Okay.  Have any other courts
25   addressed this issue you're aware of?  What does the

1    California court mean?  What does the California decision

2    mean?  Any other courts addressed this issue?

3              **MR. TIMMONS:**  Yes, Your Honor.

4              **THE COURT:**  What have they said?

5              **MR. TIMMONS:**  So we've got the Catholic Bishops

6    case, and that court had the same logic as the Supreme

7    Court and said that this is a Tucker Act case.  The

8    plaintiffs have cited some other district courts that have

9    since --

10             **THE COURT:**  What are those?  What are those?

11             **MR. TIMMONS:**  The Rhode Island case.

12             **THE COURT:**  Yeah, Rhode Island, I've read that

13   one.  What else?

14             **MR. TIMMONS:**  New York v. Trump.

15             **THE COURT:**  I've read that one.  What else?

16             **MR. TIMMONS:**  Then you have the Fourth Circuit

17   has looked at it and found that --

18             **THE COURT:**  My circuit has looked at it?

19             **MR. TIMMONS:**  Yes, Your Honor.

20             **THE COURT:**  Okay.  What case was that?

21             **MR. TIMMONS:**  It was Association of Colleges for

22   Teacher Education.  And in that case they applied

23   California and stayed injunctive relief granted by the

24   District Court in Maryland.

25             **THE COURT:**  Okay.  Did you happen in your work

1  overlook -- happen to come across Judge Wilkinson's recent

2  order?

3          MR. TIMMONS:  I do not have that one, Your

4  Honor, no, I don't.

5          THE COURT:  You're not familiar with Judge

6  Wilkinson's recent order indicating the need for the

7  Government to turn square corners?  You know anything

8  about that case?  You know anything about that decision?

9          MR. TIMMONS:  I have heard that phrase used,

10  yes.

11          THE COURT:  Justice Roberts, Chief Justice

12  Roberts also used it, didn't he?  Actually it's Justice

13  Holmes' case.

14          MR. TIMMONS:  Where he says that men must turned

15  square corners when dealing with the Government.  And they

16  flipped it and said the Government must do the same.

17          THE COURT:  Isn't that an interesting idea.  So

18  tell me what other arguments you have other than that

19  Bowen should be limited to its absolute facts?  Any other

20  arguments you've got?

21          MR. TIMMONS:  And I don't say that Bowen should

22  be limited to the facts.

23          THE COURT:  You'd be ignoring a lot of case law

24  if you did.

25          MR. TIMMONS:  No, I don't.  I do think that we

1   should follow this, California's logic though.  I mean, I

2   think the plaintiffs --

3           THE COURT:  I don't know what the California

4   logic is.  They don't have a record.  I'm supposed to --

5   I've been trying to dig into this thing.  I don't see much

6   of an analysis at all.  And it seems to be contrary to

7   what I'm supposed to do, to make a searching analysis,

8   which I don't think the court would say that it did.  But

9   a number of courts have looked at this and have

10  generally -- you know I've issued an order that I said I

11  thought the Government was overreading the California

12  case.  One day we'll find out am I right or wrong about

13  that, correct?  But it looked like to me it was

14  overreading the decision.  And it has extrapolated from a

15  cursory three or four-page order on a grant of a motion to

16  stay basically in overturning a body of 50 years of case

17  law.  And I just don't -- I don't personally read it that

18  way.  And I think that if that's the Government's view, we

19  kind of part ways.

20          MR. TIMMONS:  Well, Your Honor, we can set

21  California aside and we can talk about the body of case

22  law that interpreted Bowen.  I think that might be a more

23  --

24          THE COURT:  I'll be glad to hear from you on

25  that.

1      MR. TIMMONS:  So, one case, one recent case is

2   South Carolina v. United States where the court applied

3   Bowen, talked extensively about the Tucker Act, about the

4   Bowen line of cases.  And that's where the principle is

5   that substance prevails over form.

6      THE COURT:  Listen, that's been from the

7   beginning.  But my question is simply this.  If I

8   determine that the plaintiffs cannot get relief other than

9   by injunctive -- prospective injunctive relief,

10  declaratory and injunctive relief, then that case should

11  be in my court, should it not?

12     MR. TIMMONS:  If you determine that, yes.  But I

13  think to determine that would be error.

14     THE COURT:  Well, you know, I used to --

15  Mr. Timmons, I used to practice in front of Judge

16  Hemphill.  He's before your time.  He was a district judge

17  up in the upper part of the state.  And if you went to his

18  courtroom, he oddly had a roadmap on the wall of his

19  courtroom of the eastern United States.  And when a

20  lawyer, particularly one from the Government, told him

21  they were going to appeal him, he would point to the map

22  and he'd say that's the road to Richmond.  So I say to

23  you, there's a road to Richmond for you.

24     MR. TIMMONS:  Understand.  I mean, I think

25  another thing we should look at is the Maine Community

13

1    Health Options case.  And in that case, we're talking

2    about losses suffered by a health plan.  And those -- I

3    think if that case could be heard in the Court of Federal

4    Claims, certainly a case over whether grant funding has

5    been allocated properly could be heard in the Court of

6    Federal Claims.

7              THE COURT:  Well, you know, all they're trying

8    to do here -- you know, they brought this suit.  They're

9    not -- anything about back is purely incidental.  They're

10   worried about going forward.  I read these declarations.

11   These not-for-profits have certain missions, do they not?

12             MR. TIMMONS:  Yes, Your Honor.

13             THE COURT:  For the public good generally?  Do

14   you agree?

15             MR. TIMMONS:  I agree, yeah.  Sure.  I would

16   hope so.

17             THE COURT:  And Congress appropriated acts under

18   the IRA and IIJA to fulfill certain public goods, correct?

19             MR. TIMMONS:  Correct.

20             THE COURT:  And these plaintiffs assert their

21   rights under those acts, do they not?

22             MR. TIMMONS:  No, Your Honor.

23             THE COURT:  Well, I disagree with you.  They say

24   they got these grants under their act -- under those acts.

25   You don't think they got -- I mean, I'm confused.  I

1    thought the OMB instruction and the EO and all that

2    related to not funding grants that were appropriated by

3    the -- that were authorized by the IRA and IIJA.  Am I

4    wrong about that?

5            MR. TIMMONS:  Their entitlement of funding came

6    from the executive's decision to award them a grant award.

7            THE COURT:  Well, how about what did Congress

8    do?  Did Congress have a role in this or does Congress not

9    exist anymore?

10            MR. TIMMONS:  Congress authorized the lump sum

11    appropriations to agencies.

12            THE COURT:  Does that matter?  I think doesn't

13    Congress have the authority to appropriate?  Doesn't it?

14            MR. TIMMONS:  It mattered to the court in

15    Lincoln v. Vigil.

16            THE COURT:  Does Congress have control of the

17    purse under the Constitution of the United States?

18            MR. TIMMONS:  Yes.

19            THE COURT:  And does the Executive Branch have

20    the duty to faithfully execute the laws of the Congress?

21            MR. TIMMONS:  Yes, or to carry out the

22    discretion afforded to them by the Congress.

23            THE COURT:  Right, if there's discretion.  And

24    if there's not discretion, to faithfully execute the laws.

25    Am I right?

1          MR. TIMMONS:  Yes, sir.

2          THE COURT:  Okay.  Anything further on the

3    Court's jurisdiction?

4          MR. TIMMONS:  Yes, Your Honor.  I mean, I think

5    we do need to look at the issue of agency discretion.

6    Because in Lincoln v. Vigil, and the Fourth Circuit said

7    in Holbrook that to find a statute is not discretionary,

8    you have to carefully examine the language.  And here, if

9    we look at the language, it's not clear what takes away

10   the discretion of these agencies to act.

11         THE COURT:  How about if I determine that -- how

12   many -- first of all, how many grants were frozen?

13         MR. TIMMONS:  There's 38 grant awards in this

14   case.

15         THE COURT:  Not in my case.  Generally.  How

16   many grants were frozen?

17         MR. TIMMONS:  I can't answer that, Your Honor.

18         THE COURT:  Come on, you know that.

19         MR. TIMMONS:  I don't.

20         THE COURT:  A thousand?

21         MR. TIMMONS:  Your Honor, I honestly don't have

22   that information.

23         THE COURT:  Do you have any estimate?  Give me a

24   range.  More than a thousand?

25         MR. TIMMONS:  I honestly do not know.

         **THE COURT:**  You don't know how many this
Executive Branch unilaterally froze with no notice?  You
don't know that?

         **MR. TIMMONS:**  I don't.

         **THE COURT:**  That kind of goes to an issue about
whether it's arbitrary, capacious, if we get to that,
correct?

         **MR. TIMMONS:**  We don't think so, Your Honor.

         **THE COURT:**  I know you don't think so.  But it
does raise -- you can't even tell me how many -- how about
just one agency, give me the EPA.  How many did EPA
cancel?

         **MR. TIMMONS:**  Your Honor, I'm not general
counsel for the EPA.  I can't speak --

         **THE COURT:**  You're here on behalf of them.  You
indicated you represented them.  I've had this with the
Department of Justice before, by the way, where they claim
-- they switch back and forth when you ask them a
question.  So my thing is your answer is you have no idea,
no idea how many grants were frozen?

         **MR. TIMMONS:**  That is my answer, Your Honor.

         **THE COURT:**  Okay.  And indications in the record
that it was because the agencies did not approve of the
IRA and IIJA.  Isn't there evidence in the record that was
why it was not approved?  That's at least what the Rhode

1    Island court found, did it not?

2         MR. TIMMONS:  I think the fair characterization

3    of the order is they did not approve of how President

4    Biden's administration allocated funds under those two

5    laws.

6         THE COURT:  That's how you interpret the Rhode

7    Island decision?

8         MR. TIMMONS:  Well, I don't know why we would

9    defer to the Rhode Island decision if we're not deferring

10   to the Supreme Court.

11        THE COURT:  I'm just asking.  It's another

12   district court.  I read the order.  Have you read the

13   order?

14        MR. TIMMONS:  I have.

15        THE COURT:  I take it you don't agree with it?

16        MR. TIMMONS:  Well, I just think, Your Honor, if

17   we're not going to give California credence, then we

18   shouldn't be giving district court decisions credence.

19        THE COURT:  Well, at least, you know, I thought

20   Judge McElroy made a searching analysis of the issue of

21   jurisdiction, and whether the Tucker Act applied or

22   whether the APA applied.  She did exactly what Bowen told

23   her to do.  And I'm just sort of wondering -- and plainly,

24   the Supreme Court, in this very truncated order, which I

25   don't think they intended to be the final word on all

1    this, they always say that, that their shadow docket cases

2    are just temporary matters. So, you know, I've already

3    issue an order and said I thought you guys are overreading

4    that case. And we'll find out if I'm right or wrong. It

5    won't be the first time I'm wrong. Might not be the first

6    time you're wrong.

7           **MR. TIMMONS:** It would not be the first time I'm

8    wrong.

9           **THE COURT:** We all know that. And in these

10   times, you never know what was true yesterday is true

11   today. But my -- have you got anything else you want to

12   share with me about my jurisdiction?

13          **MR. TIMMONS:** I mean, Your Honor, I would just

14   share language from Great Wolf Life, which was quoted by

15   the Supreme Court, that says Bowen has no bearing on the

16   unavailability of an injunction to enforce a contractual

17   obligation to pay money past due. And I know Your Honor

18   said that --

19          **THE COURT:** You think this is a past due case, I

20   don't see this as a past due case. This is a going

21   forward case. These are not-for-profits. They're not

22   looking for a money damage. They're looking for to serve

23   the public to fulfill their mission going forward. To

24   characterize this as a pursuit for money damages has to

25   be, you know, it's complete -- in my view, and all due

respect to you, sir, it's completely unreasonable.  It is

a complete mischaracterization of their claim.

And, you know, you want me to put -- you're

trying to put a size 10 foot in a size 4 shoe.  It doesn't

fit.  This is not a Tucker Act case.  And maybe one day

somebody will tell me I'm wrong.  But, you know, I've been

applying this case law for quite a while.  And I -- you

know, I -- my understanding of this, I've studied this

complaint and the case law very carefully.  This is a

claim going forward.  I'll let the plaintiffs correct me

if this is a money damage claim for past amounts due.

We're only talking about a matter of maybe six or eight

weeks of monies haven't been paid.  I don't think that's

the driving -- I don't think all these lawyers sitting

here would be here for six weeks of missed grants, do you?

**MR. TIMMONS:**  Your Honor, I think, first of all,

I'd say it's not as if they've waived entitlement to past

due sums as a part of the relief they're seeking.

**THE COURT:**  Well, you want them to do that?

Would it change the analysis if it's an incidental part of

the order?  Bowen says that doesn't change the analysis.

But if you want them to, I bet you they would say, okay,

I'll give up the last six weeks of grants for the next

three or five years.  Do you really think it turns on

that?  I don't think it turns on that.

1          MR. TIMMONS:  Well, I can address the going

2    forward relief as I see it.  I mean, I think the reason

3    that that is a big part of the Bowen decision is because

4    it was going to be -- the law was going to be interpreted

5    in perpetuity.

6          I think here that if the Court of Federal Claims

7    issues a judgment that says you cannot pause a grant, you

8    cannot terminate a grant, then they're entitled to the

9    full value of that grant.  There is no further statutory

10   interpretation that needs to be done.  So the relief --

11   even if it is going forward relief, it can be awarded by

12   the Court of Federal Claims.

13         THE COURT:  You think this is a money damage

14   case.  And all due respect, sir, I think that's nonsense.

15         MR. TIMMONS:  Well, I will take that as directly

16   as you put it and we'll move on to agency discretion.  Is

17   that okay, Your Honor?

18         THE COURT:  First of all, I have to determine if

19   I have jurisdiction before we do anything else.

20         MR. TIMMONS:  Well, that's a jurisdictional

21   argument.

22         THE COURT:  Tell me your jurisdictional argument

23   about agency discretion.

24         MR. TIMMONS:  I would quote Lincoln v. Vigil,

25   which says, the allocation of funds from a lump sum

1    appropriation is another administrative decision

2    traditionally regarded as committed to agency discretion.

3    That principle was used in General Land --

4              THE COURT:  I may have misread the statutes

5    here.  And there are a number of them, I'll give it that.

6    But they generally say that they shall expend these funds.

7    And the EO and OMB documents say they shall not.  And I

8    think there's a conflict there.  And I don't think they

9    had the discretion to do what they did.  And a number of

10   courts around the country have so found that.  And, you

11   know, one day we're going to find out what the answer is.

12   But at this point, I'm going to stay with the precedence

13   of many years of case law.

14             So anything else you've got, I don't think it's

15   committed to agency discretion to violate an act of

16   Congress.  I don't think -- an executive department has

17   lots of discretion.  I am with you on that.  I've upheld

18   agency discretion many times.  I've got them in my MDL.

19   Believe me, I just ruled extensively on a case that

20   involves billions of dollars of potential exposure to the

21   United States and I said they didn't have it.  I'm very

22   familiar with the idea of agency discretion.  Let me say

23   this, this is not agency discretion.

24             MR. TIMMONS:  And Your Honor, I would -- and

25   just one closing on that point, I would like to discuss

1    the General Land Office v. Biden case.

2            THE COURT:  Okay.  Go right ahead.

3            MR. TIMMONS:  That case involved border wall

4    funding.  The State of Texas said that the President could

5    not pause funding and redirect it for other purposes.  And

6    the court said that is a discretionary decision.  And that

7    was decided just last year.  And so I think -- I mean, I

8    understand that there's an idea that the actions here

9    don't seem to be discretionary --

10           THE COURT:  Have they reappropriated the money

11   they froze?  I didn't know they had done that.

12           MR. TIMMONS:  In the border wall case?

13           THE COURT:  No.  In these cases, have they

14   reappropriated the money?

15           MR. TIMMONS:  In some cases, yes.  In some

16   cases, no.

17           THE COURT:  How about in the 19 here?  Only four

18   have been terminated.  I can't imagine they've

19   reappropriated the money.

20           MR. TIMMONS:  I mean, I think we can't -- you

21   know, I can't say when that would happen.  But it's

22   certainly --

23           THE COURT:  It might happen, right?

24           MR. TIMMONS:  Certainly.  And it may --

25           THE COURT:  It might not happen, right?

1    **MR. TIMMONS:** Correct. I mean, I just don't

2   think we can say in the courtroom today what may happen in

3   the future in any of these 21 programs.

4           **THE COURT:** All I can say is I have official

5   documents which state and which guided these agencies that

6   appears to me which said cancel everything funded by these

7   two congressional acts. And if that is really what

8   happened, and that's another issue, I mean, did it happen?

9   That's not jurisdiction, that's merits of the case, that's

10   a problem for the Government. If it didn't happen, you

11   might well have some good defenses.

12           **MR. TIMMONS:** Right. And I think I do want to

13   point out that that is not what the order said. The order

14   said to pause funding and determine if it's consistent

15   with the President's policy on energy, diversity, those

16   things. It did not say to cancel -- stop all funding in

17   these programs.

18           **THE COURT:** Let me ask you this. Did either --

19   well, let me -- we know what the executive order says.

20           **MR. TIMMONS:** Yes.

21           **THE COURT:** Has the OMB instructed agencies,

22   notwithstanding the EO, to pause all funding under the IRA

23   and the IIJA?

24           **MR. TIMMONS:** I don't have that information in

25   front of me. I don't know that. I don't know the answer

24

1    to that.

2            THE COURT:  Well, that's a pretty important

3    point.

4            MR. TIMMONS:  I don't think the record shows

5    that all funding has been paused.

6            THE COURT:  My question is different.  Has the

7    OMB instructed agencies regardless what the EO says about

8    limiting to the Green New Deal, that it should pause all

9    IRA and IIJA grants?

10           MR. TIMMONS:  I do not know the answer to that

11   question.

12           THE COURT:  I want you in three days answer that

13   question for me.

14           MR. TIMMONS:  Yes, sir.

15           THE COURT:  You might want to -- before you

16   represent that to me, you might want to look at some of

17   those documents you have under seal.  You hear me?

18           MR. TIMMONS:  Yes, Your Honor.

19           THE COURT:  Okay.  Anything further?

20           MR. TIMMONS:  No, Your Honor.

21           MS. HUNTER:  Your Honor, can I make a few points

22   on jurisdiction?

23           THE COURT:  Absolutely.  Let me make sure that

24   Mr. Timmons is finished first.

25           MR. TIMMONS:  I think I'm finished, Your Honor.

```
 1          THE COURT:  Good.  You can go back to the office
 2   and complain about me.
 3          Yes, ma'am?
 4          MS. HUNTER:  Thank you, Your Honor.  We concur
 5   with your general analysis of the Tucker Act as to our APA
 6   claims.
 7          THE COURT:  Are y'all just looking for money
 8   damages?
 9          MS. HUNTER:  We are not.  As I think you
10   correctly stated, these are very hardworking, non-profit
11   organizations.  A lot of them are here in the courtroom.
12   Some have come a long way to be here.  They spend their
13   lives working to improve the public -- the public good and
14   all they want to do is get back to work.  That's what --
15          THE COURT:  So would they be happy if you just
16   paid them the six weeks back pay, back grant?  Is that
17   going to make them happy.
18          MS. HUNTER:  That wouldn't effectuate either
19   their aims or Congress' aims.
20          THE COURT:  Do you read Bowen as saying if
21   there's some incidental payment of money as a result of an
22   order that that makes it a Tucker Act case?
23          MS. HUNTER:  No, quite the opposite.  I think it
24   expressly says the opposite.  I don't think we need to
25   belabor those points unless you want to, Your Honor.  But
```

1    I did want to point out one other key piece here.  I think

2    in your conversation you've alluded to very serious

3    separation of powers concerns here.  And in our case,

4    which is different than in California, different than

5    Rhode Island, we also have these ultra vires

6    constitutional claims, separation of powers claims, First

7    Amendment claims.  And the entire reasoning behind the

8    California decision was based on the APA sovereign

9    immunity waiver and whether there was jurisdiction because

10   of that sovereign immunity waiver.  And that just doesn't

11   apply to the plaintiffs ultra vires claims.

12          THE COURT:  But the Rhode Island case found that

13   the agency acted ultra vires outside of its authority by

14   canceling grants because of the source of funding by

15   Congress.

16          MS. HUNTER:  Absolutely, Your Honor.  I just

17   wanted to be quite clear that in addition to all the

18   arguments that you've discussed today, there's also this

19   entire separate bucket that has nothing to the APA.  So

20   regardless of kind of what develops with APA claims and

21   the Tucker Act, there has been no court that has said

22   ultra vires constitutional claims separate from the APA

23   would belong in the Court of Federal Claims because that's

24   just not the type of claim that Court of Federal Claims --

25          THE COURT:  The constitutional claim that the --

1    the violation of the separation of powers.

2         MS. HUNTER:  Exactly.  And that jurisdiction is

3    squarely within this Court.  And I think every day we see

4    more and more about how this case is fundamentally about

5    separation of powers.  To build on the questions you were

6    just asking, I mean, my read of the executive orders is

7    pretty express that the President wants the IRA and the

8    IIJA terminated.  He's said so again in a joint address to

9    Congress.  And the White House said the same thing in

10   their Earth Day messaging yesterday.  So --

11        THE COURT:  Well, the OMB issued a memorandum to

12   all the departments heads, all the departments of the

13   Government, not just the EPA or anybody with the Green New

14   Deal, right?

15        MS. HUNTER:  Correct, Your Honor.

16        THE COURT:  I take that as not being an

17   accident, right?

18        MS. HUNTER:  Right.

19        THE COURT:  Why would he send it to every

20   agency?  And, you know, it appears to me that there was an

21   intent to do exactly what you say, which is to -- that the

22   present administration does not approve of a prior act of

23   Congress.  And, you know, there will be an administration

24   after this.  And that administration might not like

25   something this administration did that Congress

 1    authorized.  Tough.  They don't have a right to overrule

 2    it.

 3          We don't have -- you know, we don't have a king

 4    in the United States.  We have separation of powers.  And

 5    the power is diffuse.  And some people would criticize the

 6    American form of government as being inefficient because

 7    it disburses power among threes branches of government.

 8    But that's our system of government.

 9          And, you know, one thing I think people have got

10    to be careful of is if you undermine the rule of law, it

11    will come back and bite you later when you are on the

12    other end of this.  And the responsibility of the Court is

13    to preserve the system.  We don't take sides.  Whoever

14    wins or loses these fights is of no consequence to us.

15          MS. HUNTER:  Exactly, Your Honor.  And I think

16    we see this in the type of language that has been used in

17    the executive orders and memos is directly at odds with

18    language Congress used.  So Congress enacted these

19    programs for the benefit of mitigating against climate

20    change, for combating environmental injustice.  And what

21    these executive orders and subsequent directives, and

22    you've seen this in the documents we've gotten from

23    defendants, show is there is specific targeting on those

24    concepts.  So this isn't just a case of like, well, are we

25    going to reallocate the funding in a slightly different

1   way.  This is we don't want to implement these

2   congressionally mandated programs.

3         THE COURT:  And let me say this.  I understand

4   it.  I understand that the present administration doesn't

5   agree with all this.  And they ought to go to Congress and

6   change the law.

7         MS. HUNTER:  Right.

8         THE COURT:  You know, that's their -- they don't

9   get to go unilaterally change an act of Congress.  They

10  have -- the duty of the executive is to faithfully execute

11  the laws.  And, you know, what we're talking about here is

12  who actually implemented these freezes?  It was the

13  agency.  OMB plainly does not have the authority to freeze

14  a grant.  That is not OMB's -- whatever OMB told them,

15  they didn't have any authority to tell them.  If they told

16  them, ignore the law, tough.  The agencies don't have any

17  authority to follow an unauthorized act, right?

18        MS. HUNTER:  That's correct, Your Honor.  And

19  the last point I'll make on this, just to respond to, you

20  know, changing the law, this was money that was

21  specifically appropriated by Congress.  So even if there's

22  a subsequent change in the law, the money that has been

23  specifically appropriated for specific purposes needs to

24  be distributed in compliance with that congressional

25  mandate.

1          THE COURT:  But congress can amend its laws.

2    Congress could come back and amend its laws.  There's a

3    process, if under the -- if a prior Congress adopted

4    something that the present Congress doesn't agree, it can

5    amend the law.  That's the way the system works.  And

6    perhaps some of your clients might be unhappy if they did

7    that.  But they haven't done it, have they?

8          MS. HUNTER:  They have not, Your Honor.

9          THE COURT:  Yeah.  Okay.  Anything further

10   Ms. Hunter?

11         MS. HUNTER:  Not on jurisdiction, Your Honor.

12         THE COURT:  I do find, I guess there's no

13   mystery that I do find the Court has jurisdiction over

14   this matter.  I think these claims are not contractual.

15   One is not in essence a contract.  But even more

16   compelling, the remedy here would be completely inadequate

17   under the -- in the Court of Claims.  This is a matter

18   properly before this Court.  And the Court has

19   jurisdiction over these claims.

20         Now, let me turn if I might now to -- and we'll

21   issue an order in due course on the issue of jurisdiction.

22   I received yesterday a chart.  Who is going to be

23   addressing the chart from the Government?

24         MR. TIMMONS:  I will, Your Honor.

25         THE COURT:  First of all, I commend you for this

1    work.  It's very helpful actually.  And it brought to me a

2    lot of clarification about what's going on here.

3            Before we go there, let me ask you.  Does the

4    Government dispute -- I mean, do the plaintiffs dispute

5    any aspect of this chart?

6            **MS. HUNTER:**  There is one error in this chart

7    that we've been able to determine, Your Honor.  That is

8    the Alliance for Shenandoah is listed as having a grant

9    that is accessible to grantees.  And that has not been the

10   experience of the Alliance for Shenandoah.  They do not

11   have access to that grant.

12           **THE COURT:**  So let me find that one.  What page

13   is it on?  Can you help me on that?

14           **MS. HUNTER:**  It's on Page 2.  It's third from

15   the bottom.

16           **THE COURT:**  Okay.  By the way, I am going to

17   have my law clerk hand out a chart which actually has a

18   remarkably complex designation 1 through 38 so we can

19   actually refer to these a little more easily.

20           So what number, Ms. Hunter, would this be?  Is

21   it Number 15?

22           **MS. HUNTER:**  Let me just take a look, I don't

23   know.  Yes.  It's 15.  And just to be clear, not only have

24   they not been able to access it them themselves, they've

25   been told by the agency that they don't have access to

```
1   that grant.
2           THE COURT:  Mr. Timmons, where did the
3   information come from that it was accessible?
4           MR. TIMMONS:  It came from the agency.
5           THE COURT:  Okay.
6           MS. HUNTER:  The only other note I would make on
7   Grants 2 through 7 --
8           THE COURT:  The terminations?
9           MS. HUNTER:  Termination in progress, the
10  plaintiffs have not received any notification --
11          THE COURT:  I think they're saying termination
12  in progress so they wouldn't have gotten that.
13          MR. MILLER:  And, Your Honor, similarly on
14  No. 8, I think we actually don't understand the closed
15  designation.  We understood those funds to be frozen
16  previously for the City of Madison, now says closed.  I
17  don't know if that means terminated as well or in the
18  process of termination.
19          THE COURT:  Mr. Timmons, do you have any idea
20  what that means?  That was only used in that one grant.
21          MR. TIMMONS:  I'll have to check on that and get
22  back to Your Honor.
23          THE COURT:  Good.  We'll do the same for the
24  No. 15 as well.
25          MR. TIMMONS:  Yes, Your Honor.
```

1          THE COURT:  Okay.  So other than that,

2    Ms. Hunter, it appears that there are a number of your

3    clients who have had their grants restored; is that

4    correct?

5          MS. HUNTER:  Well, these clients have had their

6    grants turned on, turned off, turned on, turned off.

7          THE COURT:  I'm going to enter an order, by the

8    way, that orders none of those be frozen again or

9    terminated without further order of this Court.  So we're

10   going to stop this yo-yo situation.

11         MS. HUNTER:  Thank you, Your Honor.  So yes, as

12   the current status as far as I can tell as of 9 a.m. this

13   morning, otherwise I think this is accurate.

14         THE COURT:  Moving target here.

15         Okay.  Mr. Timmons, let me ask you first about

16   these terminated cases, Number 9 through 12.  Let me ask

17   you about those, first.  And we'll start with the City of

18   New Haven.  Why is that -- why is that -- why was that

19   grant terminated?

20         MR. TIMMONS:  It's not consistent with agency

21   priorities.

22         THE COURT:  Was it originally frozen like the

23   others?

24         MR. TIMMONS:  I don't have that information in

25   front of me.

1           THE COURT:  What's the agency priority we're
2     talking about?
3           MR. TIMMONS:  It's consistency with the
4     priorities of the administration as expressed in the
5     executive orders.
6           THE COURT:  But we've had this problem that the
7     agency priority might be they don't agree with a prior act
8     of Congress.
9           MR. TIMMONS:  I would disagree with that.  I do
10    think that the executive orders state the administration's
11    priorities in funding.  I would disagree --
12          THE COURT:  Let me ask you this, if the priority
13    of the administration would violate an act of Congress,
14    does the Executive Branch have the discretion to violate
15    an act of Congress?
16          MR. TIMMONS:  No.  And I believe these executive
17    orders are consistent with the congressional acts.
18          THE COURT:  Okay.  But if I concluded they
19    weren't, you would agree with me that would be ultra
20    vires?
21          MR. TIMMONS:  Yes, Your Honor.
22          THE COURT:  So you don't -- give me more detail
23    on the Electrify New Haven grant, City of New Haven,
24    Number 9.  Other than what priority are we talking about?
25    What specifically in this grant makes it not an -- not a

1    priority of this administration?

2         MR. TIMMONS:  I don't have that information in

3    front of me.  So I would have to rest on the decisions

4    that the agency determined.

5         THE COURT:  No, I'm not going to do that.  I

6    asked -- you know, I asked for all documents relating to

7    freezing.

8         MR. TIMMONS:  Right.

9         THE COURT:  And I got an ocean of documents.

10   Thousands.  And I can't say I have personally examined

11   every one of them.  Have you examined every one of them?

12        MR. TIMMONS:  No, Your Honor.

13        THE COURT:  I don't know of anyone who could.

14   But my clerks have been very diligent.  They spent a lot

15   of time this week looking at them.  We couldn't find one

16   referring to any individual grantee.  Did I miss

17   something?

18        MR. TIMMONS:  I'm sure you didn't, Your Honor.

19        THE COURT:  So that tends to suggest this was an

20   en masse freeze without individual consideration of the

21   grants.  Does that seem like a fair reason?

22        MR. TIMMONS:  I would say that at the pause was,

23   as you said, it was a broad pause base on funding.  I do

24   think the terminations were done based on a review of the

25   grants.

1          THE COURT:  And I think that's -- I think that's

2     fine.  But you haven't given me any documents to show me

3     that, have you?

4          MR. TIMMONS:  I don't have all the documents

5     that we would intend to present in this case.

6          THE COURT:  I'm going to give you a chance to

7     present them because I'm going to have you present them in

8     the next week to me on every one of these grants which

9     have been terminated and which have been -- are

10    terminations in progress.  I want to see the underlying

11    reasoning.  You understand there's a problem if the action

12    is based on post hac reasoning.  Do you understand that?

13         MR. TIMMONS:  I do.

14         THE COURT:  So I want to see what was the

15    reasoning behind it.  What was the -- what was the stated

16    purpose.  And you're telling me they made an individual

17    determination of why that grant should be terminated?

18    They've made an individualized determination, are you

19    telling me that?

20         MR. TIMMONS:  I think the decision making in

21    this case is always going to be it's inconsistent with

22    priorities, and that it -- it's going to be -- it's going

23    to be the same reason for all of them, yes, Your Honor.  I

24    mean, it's not going to be --

25         THE COURT:  But that's not -- and what reason is

1   that?  I mean, agency -- but if you just say it's

2   inconsistent with our priorities, if our priorities are

3   inconsistent with a statute, that's a problem, isn't it?

4           MR. TIMMONS:  I think if the plaintiffs have

5   demonstrated that those priorities are inconsistent with

6   the statute, which is what I don't think they've done,

7   which is why I don't think they're entitled to an

8   injunction.

9           THE COURT:  I hear what you're saying.  But you

10  agree with me, if they were to prove that, they would have

11  a good point, would they not?

12          MR. TIMMONS:  It depends on how many they prove

13  it for.  Is it for all of these programs?  Some of these

14  --

15          THE COURT:  I'm just saying for any one they

16  approve, it was inconsistent.  They would have a valid

17  point, would they not?

18          MR. TIMMONS:  Yes, Your Honor.

19          THE COURT:  Okay.  And I could go through them

20  all.  City of Baltimore, do you have any idea why they

21  terminated?

22          MR. TIMMONS:  You're going to get the same

23  answer, Your Honor, for all of them as you suspect.

24          THE COURT:  You don't know, do you?

25          MR. TIMMONS:  I don't know, no.

1      THE COURT:  CleanAIRE, you don't know, do you?

2   You don't know why they terminated it?

3      MR. TIMMONS:  I know that they were all

4   terminated -- any terminations are going to be because

5   they're inconsistent with the policy.

6      THE COURT:  Who told you that?

7      MR. TIMMONS:  That's -- I'm fairly confident

8   saying that, Your Honor.

9      THE COURT:  But tell me what gives you that

10  confidence.  I don't have that confidence.  So I want to

11  know, give me some confidence.

12     MR. TIMMONS:  The letters that the EPA sent to

13  the plaintiffs, the ones that I've reviewed in the

14  terminations.

15     THE COURT:  I've reviewed those letters.  They

16  don't give a reason.  I've got copies of them.  It was

17  provided by the plaintiffs.  It doesn't state a reason.

18  It lists possible reasons.  Merit, fairness, excellence in

19  performing their duties.  Do you have any evidence they

20  weren't performing their duties under the grant?  I

21  haven't seen any evidence of that.  I mean, maybe there

22  is.  I mean, let me say this.  If someone is not following

23  their grant properly or is committing waste, fraud, that's

24  another thing y'all listed, they should be terminated.

25  Don't you agree?

1          MR. TIMMONS:  Yes, Your Honor.

2          THE COURT:  I don't think plaintiffs would

3   disagree with that.  That would be completely within the

4   discretion.  But your letter -- and did I miss something?

5   I think they are a form letter, aren't they?  I mean, all

6   of the four got exactly the same letter, did they not?

7          MR. TIMMONS:  Like I said, Your Honor, the

8   termination reasons are going to be similar for all of

9   these cases.

10          THE COURT:  Well, but I don't understand the

11   reason.  To say it's a different priority does not answer

12   the question.

13          MR. TIMMONS:  That is the explanation that the

14   agency gave.  I can't offer you a different --

15          THE COURT:  I'm going to give you another chance

16   to go back and get specific documents to show what that

17   means because that's not good enough.  That is not good

18   enough.  And I know they put you, Mr. Timmons, in a

19   difficult situation.  They haven't given you that

20   information.  And I don't want to give you a hard time

21   because you only got what you got, right?

22          THE CLERK:  You're fine, Your Honor.  I'm doing

23   just fine.

24          THE COURT:  Good.  Mr. Berlinsky is my friend

25   here.  I don't want to pick on him too much either.  But,

1  you know, I just -- the Government's going to have to do

2  better than say I trust an unnamed person who told me that

3  it was agency priority when that doesn't tell me anything

4  and there's a plausible read of that meaning from these

5  other documents that it was based on the IRA and IIJA.

6       So if there's another reason, you know, I want

7  to hear from them because the Government -- there are

8  reasons that grants could be terminated legitimately.  But

9  you've got to -- you can't just -- you're not going to

10 have this Court on a boilerplate just accept some form

11 termination notice with no reason.

12      **MR. TIMMONS:**  Understood.

13      **THE COURT:**  Particularly when it appears to me

14 that the plaintiffs have made a very strong showing that

15 the freezes were unlawful.  And it appears from this chart

16 that the Government has pivoted away from that.  They're

17 flowing some.  The only ones that aren't, we've got a

18 couple of DEI ones we'll talk about in a minute.  But

19 other than that, y'all are either letting the money flow

20 or terminating them.  Isn't that fair?

21      **MR. TIMMONS:**  I think the idea with the pause

22 was to make decisions of whether to proceed with some and

23 terminate others.

24      **THE COURT:**  Okay.  Well, there have been a

25 number of courts that have found the pause itself

1   unlawful, correct?

2        MR. TIMMONS:  There have been.

3        THE COURT:  Yeah.  Okay.  You don't agree with

4   them and I respect that.  You might not agree with that I

5   do.

6        Okay.  So for all of these, the ones that have

7   been terminated, you have no idea why they're terminated,

8   correct?

9        MR. TIMMONS:  I have no idea beyond what the

10  agencies have offered in the termination letters, no, Your

11  Honor.

12       THE COURT:  Okay.  And if I were to rely -- i

13  will tell you right now, you need to tell your clients

14  that isn't good enough.  Okay?  But we're going to give

15  them a chance to come forward with their specific

16  documents.

17       Is the same true for the six grants listed on --

18  at Numbers 2 through 7, the termination's in progress, you

19  don't really know why they're being terminated?

20       MR. TIMMONS:  I don't know why they're being

21  terminated, especially the ones in progress.  If they

22  haven't issued termination letters, I couldn't speculate

23  on the rationale.  I think that would also -- you know,

24  we're not going to have a final agency action on that, I

25  mean, until we see what the decision the --

1          THE COURT:  If it's derivative of an unlawful

2     freeze, you might already have an answer that might be

3     final.  So the question is, I understand this, are the

4     grants frozen for these people?

5          MR. TIMMONS:  I think they would be frozen, yes,

6     Your Honor.

7          THE COURT:  Okay.  Well, that's -- I think we --

8     there are plenty of authority out there that that's --

9          MR. TIMMONS:  I understand that.  I just, for

10    the Court, I just want to say, I can't -- I wouldn't feel

11    comfortable getting out in front of the agency and saying

12    what their reason is if they haven't issued their decision

13    on it yet.

14          THE COURT:  I've got a hunch they might not

15    know.  And how about towards the end here, Numbers 27

16    through 32, do you have any idea about those, why they are

17    being terminated?

18          MR. TIMMONS:  Yes, Your Honor.  Those are

19    Partnership for Climate-Smart Commodities Program.  Those

20    are not funded through any of the sources that we've been

21    talking about today.  That was a discretionary program

22    created by the Biden Administration funded separately.

23          THE COURT:  Tell me about that.  I don't know

24    about that.  So give me a little more detail on that.

25          MR. TIMMONS:  Yes, Your Honor.  Give me one

1    second and let me pull that up.  This was addressed in our

2    brief where we mentioned that -- we cited the report that

3    said that this program has considerable authority.  And

4    it's not reliant on IRA funding, IIJA funding, or APA

5    funding.  It was a fully discretionary program created by

6    the Secretary of Agriculture under the Biden

7    Administration.  It's not funded by any of these sources

8    we're talking about today.

9              THE COURT:  Okay.  That's a good point.  I'm

10   going to ask plaintiffs about that.  That's a fair point.

11   That's a new -- I didn't pick that up before, so thank you

12   for that.

13             MR. TIMMONS:  Yes.  Your Honor, I guess the

14   clarification on that is the IRA appropriated funds for

15   the climate-related soil programs, but these grants are

16   under the partnerships for Climate-Smart Commodities

17   Program.  That's not a program --

18             THE COURT:  That's just not a part of the IRA or

19   the IIJA; is that correct?

20             MR. TIMMONS:  No, Your Honor.  It's not created

21   by Congress, that program.

22             THE COURT:  Okay.  Well, then that's an

23   interesting distinction.  Thank you for that.

24             Talk to me about the DEI reference.  Were

25   these -- there are three of them.  Let's see if we can

1    find them here.  I think they are -- I think 16, 22, and

2    23.  What's the problem with the so-called DEI reference?

3            MR. TIMMONS:  Yes, Your Honor.  And I have to

4    caveat it with, you know, I have not investigated this

5    completely.  But here's what I think is that the Rhode

6    Island case did not involve the DEI executive order and

7    that this grant also implicates that in addition to --

8            THE COURT:  But what's the problem?  I mean, I

9    understand -- I mean, was this frozen because of DEI?  Or

10   was it also an IRA or IIJA appropriation that now people

11   are looking for another reason to freeze it?  Which one is

12   it?

13           MR. TIMMONS:  The way I interpret it is that it

14   is not compliant with the executive order on DEI issues

15   and that that is why.

16           THE COURT:  But what was the original reason it

17   was frozen?

18           MR. TIMMONS:  I would have to -- I don't have

19   that information right here.  I'd have to look back and

20   see if I can find that.

21           THE COURT:  You understand the problem with post

22   hoc justifications?

23           MR. TIMMONS:  Yes, Your Honor.  I mean, I would

24   look at the information that was provided, you know, at

25   the time.  I just don't --

45

1    THE COURT:  Yeah, I mean, I think we're going --

2    I'm going to ask for the documents and let's look at it.

3    But what is it about DEI, what is it specifically about

4    DEI that would make it appropriate to cancel these grants?

5    I'm just trying to understand.  If they're funded by the

6    IIJA or the IRA, what is it -- what's the problem with the

7    grant?

8    MR. TIMMONS:  So as the President explained in

9    the executive order, his concern is that the prior

10    administration funded hurtful practices under the name of

11    DEI.

12    THE COURT:  But what are these hurtful

13    practices?

14    MR. TIMMONS:  He feels that DEI programs that

15    favor parties over others are not fair.  I mean, that's --

16    THE COURT:  But is that part of these grants?

17    What are these grants doing that violates that principle?

18    I'm just trying to get to the bottom -- you know, there's

19    a lot of -- people go in and they throw a term around and

20    they think it's a loaded term and it means a lot.  It

21    doesn't mean much to me.  What did these grantees actually

22    do that violate that executive order?

23    MR. TIMMONS:  And again, I don't think it's

24    anything the grantees did.  I think it's the funding

25    priorities of President Biden's Administration are

1  different than the funding priorities of President

2  Trump's.

3          THE COURT:  But there are definitely some parts

4  of the appropriations of Congress that relate to DEI

5  funding.  I know the present administration doesn't agree

6  with that.  I respect that.  My question is do they have

7  the authority to unilaterally violate an act of Congress?

8  I've got to start with the thing of what's the problem?

9  Because it may well be it's completely unprotected

10 conduct.

11          MR. TIMMONS:  Your Honor, I think we are not

12 arguing that any of these grants violated federal law,

13 violated the funding statutes.  But we are saying that

14 President Trump would like to allocate these funds to

15 serve different purposes.

16          THE COURT:  Well, he isn't allocating them so

17 right now we're just canceling them.  And the indications

18 are they are just canceling or freezing.  So I'm just

19 trying to get to the -- you're speculating that he might

20 want to allocate them.

21          MR. TIMMONS:  Well, Your Honor --

22          THE COURT:  What we need, Mr. Timmons, is a

23 little specification.  We just need specification.  And

24 then that will help me figure out what's this all about?

25 Speaking in code words, like priority, DEI, doesn't tell

1    us anything.  And it may be that the administration's

2    actions are perfectly legitimate, authorized, within its

3    power.  But you've got to give me something to show me

4    that.

5              MR. TIMMONS:  Understood.

6              THE COURT:  You hear what I'm saying?  I'm not

7    going to respond to anybody's buzzwords, plaintiff or

8    defense.

9              MR. TIMMONS:  And I don't mean to assert

10   buzzwords.

11             THE COURT:  Well, it sounds that way because I

12   know you're being given marching orders.  You're here.

13   You're not the Attorney General of the United States.

14   You're sent here to represent your client.  I understand

15   that.  And I don't want to give you too hard a time

16   because of that.  But it's just not good enough to just

17   throw a word out and tell me, well, that ends the

18   discussion.  It begins the discussion.  And it may be that

19   the Government's view is perfectly legitimate.  But you've

20   got to get there.  And I'm not going to accept a buzzword

21   as the answer from either party.

22             MR. TIMMONS:  Understood.  Your Honor, if I may,

23   there's a couple points I would like to address?  I do

24   think, you know, if we're going to talk about whether the

25   grants will be funded, whether they'll be terminated, I

48

1    think we need to just be fair to the public record and

2    what people have said on this.  The EPA has a press

3    release.  It was issue on April 10th.  It says that

4    Administrator Zeldin is re-prioritizing EPA's commitment

5    to protecting human health and the environment.  The Biden

6    Administration doled out billions of taxpayer dollars and

7    we're putting them --

8              THE COURT:  You can give me -- I don't want to

9    hear politician's press releases.  Really, I mean --

10             MR. TIMMONS:  And I agree with that, Your Honor.

11   But we've repeatedly cited things that the President has

12   said, things that these agencies have said.

13             THE COURT:  I haven't -- only thing I've cited

14   are orders.  And I have avoided taking quotes from the New

15   York Times or some source.

16             MR. TIMMONS:  I was about to quote the New York

17   Post so, I'll just not do that.

18             THE COURT:  That's not, to me, a source, a legal

19   source of authority.

20             MR. TIMMONS:  And I a hundred percent agree.  I

21   just don't want the record to reflect that the

22   administration has not made comments about re-prioritizing

23   funding.

24             THE COURT:  Listen, they've got it in these

25   termination letters, for instance.  But they've got to do

1    more than that to tell me what that means.  Because there

2    are ways that that can be applied to violate the law.  And

3    there are ways it could be interpreted to be proper.  And

4    that's what we've got to get to is to the bottom line of

5    all this.  Do you hear what I'm saying?

6              **MR. TIMMONS:**  Yes, Your Honor.

7              **THE COURT:**  I'm not trying to make a final

8    decision.

9              Okay.  Ms. Hunter, let me hear from you about

10   these various -- how do you view this chart, first of all?

11   Do you see some progress here?

12             **MS. HUNTER:**  There's a little more clarity

13   perhaps, Your Honor.  Certainly appreciate the defendants

14   putting it together.  I think this is kind of what we had

15   been looking for from the outset was a little clarity of

16   the status.

17             **THE COURT:**  But you've got to give them credit

18   that they have restored some of the funds, thirteen of the

19   38.  Correct?

20             **MS. HUNTER:**  So long as those remain accessible.

21             **THE COURT:**  I'm going to handle that one.  Okay?

22   We're not going to be in a yo-yo situation.

23             **MS. HUNTER:**  Yes.  Yes.  We appreciate that.  I

24   think what is striking to me, and I don't want to

25   speculate, Your Honor, but I think we want to distinguish

1    between individualized determinations, i.e., looking at a

2    particular program by a particular party and maybe they

3    are being wasteful or maybe they're not fulfilling the

4    terms.  That's one type of individualized determination.

5    What I see here is, to the extent it's individualized,

6    it's at the grant program level.  So, you know, when we

7    see the list of terminated grants --

8            THE COURT:  Let me stop you here.  If there is

9    money that Congress has appropriated, shall fund, and

10   they've taken that bucket and terminated it because they

11   don't agree with it, that's a problem.

12           MS. HUNTER:  That's exactly what I was saying to

13   Your Honor.

14           THE COURT:  I get that.  And, you know, we've

15   been trying to sort through some of these documents,

16   trying to figure out a process.  And, frankly, it's pretty

17   hard.  Okay?  It looks pretty chaotic to me.  And -- but

18   we're now -- I mean, I view, at least in these 38 cases,

19   that's all, 38 grants, that the Government has pivoted

20   from blanket en masse freezes, unfreezing some and others

21   moving to termination.  And for those, we need an

22   explanation.  Because just calling something a termination

23   rather than a freeze does not make it legal.

24           MS. HUNTER:  That's right, Your Honor.  And I

25   think what is consuming --

1      THE COURT:  Or does it make it illegal?  We've

2   got to drill down here on what the facts are.  And words

3   like change in -- words like change in priority and DEI

4   tell me nothing.

5      MS. HUNTER:  Correct, Your Honor.  I think, you

6   know, when we look at -- to answer the question you posed

7   to opposing counsel here, when you look at the terminated

8   grants, they are all environmental justice problem-solving

9   grants --

10     THE COURT:  They are, all six of them are

11   environmental justice grants.

12     MS. HUNTER:  And we also know that one of the,

13   quote, priorities listed in the executive order was to

14   eliminate mention of environmental justice.  The problem

15   is is the statutory language expressly talks about

16   environmental justice.

17     THE COURT:  You need to help me with that of

18   kind of connecting the dots.  We've tried to get into

19   the -- I mean, these statutes are enormously complicated.

20   I'm sure you and your staff have really spent a lot of

21   time trying to put the jigsaw puzzle together.

22     But we're getting a little more specific here,

23   so I need some help understanding.  If they're taking a

24   bucket called environmental justice, is that like

25   something specifically in the -- a statute directing it

1    shall be funded?  Or is it -- Mr. Timmons said there were

2    certain grants that came from funds outside of that,

3    created -- that's, to me, a very different thing.  And I

4    think if a new Secretary of Agriculture comes in and says

5    this is discretionary money and I want to spend it on

6    Project B instead of Project A, he probably has the

7    authority to do that.  Because he's not violating an act

8    of Congress that we can tell.

9            Now, you may have other arguments about

10   constitutional and First Amendment or something.  I'll be

11   honest with you, I don't find your First Amendment

12   argument very persuasive.  The separation of powers is a

13   little bit stronger argument.  But this is why we're --

14   what we've lacked here is a lack of specificity, right?

15   That's been one of the problems.  And we're going to get

16   specific.  I'm going to require that on these terminations

17   and proposed terminations, they're going to give me every

18   document related to these particular grantees.

19           And, Mr. Timmons, let me mention this.  I have a

20   sense some of these agencies have tried to do a document

21   dump on me to wear us out on things completely irrelevant

22   to my request previously.  And that's what happened here.

23   I got not one document -- I said give me everything about

24   these grantees, and I didn't get one document on the

25   grantees.  I might have missed something out of the 9,000

1    y'all have produced, but I don't think so.

2         This time we're going to get very specific.  I

3    only want them about these grantees.  We're now down to a

4    limited number of terminations and proposed terminations.

5    And I want those documents.  I don't want all this process

6    stuff.  I don't want it.  It's got to relate to these

7    grantees.  What's the reason for the termination of these

8    grants or proposed terminations?  I want to see it.

9         **MS. HUNTER:**  Your Honor, if I may?  And I can

10   get into answering sort of the distinguishing factors

11   between these different grant programs.  But I don't want

12   us to lose sight of the APA claims, which are separate to

13   anything related to the statutory language.  It is correct

14   in certain circumstances that a new administration can

15   come in, change priorities, and shift course.

16        **THE COURT:**  Right.  There's a regulation on

17   that.

18        **MS. HUNTER:**  Right.  And this is where we get

19   into Justice Roberts turning square corners.  You have to

20   do so pursuant to certain procedures, which means you've

21   got to look at the reliance and trust of everybody who has

22   been depending on these grant programs.  You have to have

23   a reasoned explanation.  You have to have, you know, a

24   rational basis for making the change.  And so I just think

25   it's really important that, yes, the statutory language is

1    relevant for the separation of powers issues.  But you've

2    also got this whole other orderly process that usually

3    happens when there's a change in administration.

4           **THE COURT:**  And, you know, if you unilaterally

5    freeze them, that might not do it.  If you terminate and

6    give notice and an opportunity to be heard, that's sort of

7    squaring the corners.

8           **MS. HUNTER:**  Well, if that termination decision

9    is based on a reasoned explanation, and you've considered

10   reliance and trust, which in all the documents I've

11   reviewed and even the rhetoric I see in the defendant's

12   briefs and elsewhere, there is no understanding of the way

13   that these plaintiffs and the public have relied on these

14   grant programs.

15         **THE COURT:**  Have you found any document that

16   considered even who these grantees were?

17         **MS. HUNTER:**  Not in any detail, no, Your Honor.

18         **THE COURT:**  I think other than a termination

19   letter, I haven't seen the name of any grantee in it.  And

20   they are obviously form letters.

21         **MS. HUNTER:**  Correct, Your Honor.  And in fact,

22   if the Court's asking for supplemental briefing, we can

23   certainly identify some documents we found in the record

24   that show the contrary.  But also, many of our plaintiffs

25   have actual letters from their own grant supervisors

1   saying you're doing a great job, you're doing everything

2   we've asked for, you're in compliance, there's no problem

3   here.  And so I think the record is very contrary to the

4   idea that there's, you know, specific, individualized

5   determinations that these grantees are not following --

6            THE COURT:  That's why I said it appears that

7   the plaintiff's original claim here, which was there was

8   no individualized consideration, it was just mass -- en

9   masse termination, freezing of grants has merit.  Maybe

10  the best evidence of it is is the response on the chart.

11  They are not doing that anymore.  So they're moving on,

12  now trying to go to terminations on some of them.  And

13  we've got to look at that process.

14           MS. HUNTER:  Right.  And I think what we're

15  seeing is rather than going grant by grant, they're going

16  grant program by grant program.

17           THE COURT:  I think that's a good point.  That's

18  why I'm going to ask for the underlying documents specific

19  to this.  And then you're going to have a chance to tell

20  me why that -- if it is, then why there may be problems

21  with that, under the APA, under separation of powers, or

22  whatever there might be.

23           MS. HUNTER:  Yes.  Thank you, Your Honor.  I can

24  touch briefly on the Climate-Smart Commodities.

25           THE COURT:  Yeah, talk to me about that because

1    that one hit me cold.

2         MS. HUNTER:  Yes.  And it's been a little bit

3    confusing to us, Your Honor.  It seems to have gotten

4    wrapped up in the generalized freeze, perhaps because

5    climate was included in the title.  And so it's a little

6    opaque.  And we would love more information from

7    defendants on this, how exactly the money flows into that

8    program.  But certainly, it does seem this sort of larger

9    Green New Deal freeze is what precipitated the freeze of

10   those grants, and then, ultimately now, the termination of

11   those grants.

12        And again, I would just refer to the APA, that

13   that's not how this sort of mass freeze -- these are large

14   grants.  These are grants that people have spent literally

15   a year putting together, a lot of work to organize

16   partners together, to work with different farmers.  And so

17   to abruptly terminate or put kind of new conditions on

18   this grant at the very least requires the agency to go

19   through a process.

20        THE COURT:  Have you seen any communication of

21   why these freezes have occurred, these ones they are

22   talking about that weren't under the IRA or the IIJA?

23        MS. HUNTER:  These recipients recently received

24   a letter saying our new priority is to give a higher

25   percentage of this money directly to farmers.  You can

1   come back and reorganize your grant.  And that, you know,

2   that may be a legitimate practice going forward.

3        But again, for that to be APA compliant, there

4   needs to be, you know, is that even a possible thing to

5   do?  How is that going to impact the farming community?

6   How is it going to impact everyone who's relied on these

7   grants for years?

8        And if you look at the statutory language, and

9   we can provide this to you, at a very basic level, this

10  money is about helping farmers all over the United States.

11  And what this change, abrupt change has done after, you

12  know, farmers have been relying on this funding and are

13  ready to go and have put all this ground work in is just

14  disruptive to farmers all across the country.  So it's a

15  little different than the sort of exact opposite language

16  that's used in other sections related to the IRA.  And

17  we'd be happy to provide more argumentation on that in

18  briefing.

19        **THE COURT:**  Yeah.  I think what we need to do is

20  have another round of document production, very specific.

21  And give y'all a chance to respond to that.  And I think

22  we need to get back together again to talk about this with

23  a fuller record.

24        It just occurred to me as I'm -- you know,

25  5 o'clock, right before 5 the thing drops.  And it just

1    occurred to me that the case was shifting, it was

2    changing.  And part of it is I think you folks have had

3    some success.  Okay?  And not complete success, but

4    partial success.  And it's become more manageable.  And

5    it's going to become more manageable for the Government.

6    Folks like Mr. Timmons, who are just overwhelmed I'm sure

7    with all this, of trying to drill down on specific

8    explanations.  There may be good ones.  There may be good

9    explanations.

10          I mean, I'm curious about this whole -- I mean,

11   it does seem to me these ones in a discretionary account

12   of the Secretary of Agriculture seem to be different in

13   this case than the rest of them, you know.  Doesn't mean

14   they did it right, but I'm just saying it's pretty

15   different.  Okay?  And the fact they may have gotten

16   thrown into the pot inadvertently because they weren't

17   funny folk, so be it, I mean.  But --

18          **MS. HUNTER:**  We would appreciate that

19   opportunity, Your Honor.  I will just start, sympathy for

20   all of the attorneys in this case.  But really the people

21   suffering here are the plaintiffs, who don't know from

22   day-to-day --

23          **THE COURT:**  How about their clients?  How about

24   their constituents?

25          **MS. HUNTER:**  Right.  Exactly.  The communities

1    that they serve.  And a lot of them already had to

2    furlough staff, or may be on the brink of having to lay

3    staff off, you know, aren't delivering these services to

4    their communities that they've promised.  So the faster we

5    can get resolution and clarity for them --

6              THE COURT:  Well, let me tell you something.  I

7    am going to give them seven days to produce this new

8    information.  And I want to give you a chance to respond

9    to it.

10              I've got to address this motion -- this motion

11   of the plaintiffs about the inadequacy of the privilege

12   log.  And let me just say, let's make the Government jobs

13   easier.  I'm only concerned about the ones where we're

14   having disputes.  So it's only the USDA and EPA.  Okay?

15   So you don't need to worry about supplementing the long on

16   the other agencies.  That will narrow your burden a little

17   bit.

18              But this deliberation privilege, process

19   privilege is just not adequately described.  I can't

20   figure it out.  I mean, I've been looking at some of these

21   and trying to figure out what is it about -- is there

22   deliberation in there?  I'm having trouble figuring that

23   out.  So I think a little explanation, you may just say,

24   oh, I get it now.

25              And I've sampled them, Mr. Timmons.  I have not

1   gone in and methodically looked at them all.  But I don't

2   understand it.  And plainly, the plaintiffs don't

3   understand it.  And I've actually got the documents and I

4   can't understand it.

5          We will have the same situation where if any

6   document is asserted to be privileged, the privilege log

7   needs -- an adequate privilege log needs to be prepared

8   and documents need to be presented to me in camera so I

9   can review them to see if the privileges asserted have

10   legal validity.

11          And let me tell you sort of my long-term thought

12   here is, this is -- to the extent there's an APA issue

13   here, and there appears to be, we're going to need to sort

14   of follow the APA process.  We're going to have to create

15   an administrative record, which we're I think a long way

16   towards doing already in this case.

17          And I want to kind of move on and get this thing

18   to the end.  It's not -- it's getting a lot less

19   complicated.  And so in fairly quick order, let's get to

20   the end of this.  We're not talking about just preliminary

21   injunctions.  We're talking about a judgment at the end,

22   which would be a final judgment of this Court.  And then

23   everybody who -- anybody who is unhappy can appeal.  How

24   about that?  Does that make sense?

25          **MS. HUNTER:**  Yes, Your Honor.  The one thing I

1    would mention -- well, a couple of things.  Several of the

2    plaintiffs are in sort of limbo situations where they're

3    not sure if they should be responding to an attempt to,

4    like, rewrite their grants, or change their grants.  And

5    there may be certain deadlines running there.  So if

6    there's a way -- and we can provide more information about

7    that.  But holding some of those timelines in abeyance

8    could perhaps be helpful.

9            THE COURT:  Yeah.  I'm glad to consider it.

10   Make it in the form of a motion.  Run it by the other

11   side, they might agree to it.

12           You know, I'm not planning to be the grants

13   officer for the United States.  Okay?  I'm not doing that.

14   I'm not going to get down to that level.

15           But, you know, we need not to sink the ship

16   before we're ready to sail.  Right?  We've got to make --

17   we've got to keep them in place.  So I've tried to move

18   quickly on this.

19           And believe me, I have a lot of other things

20   going on on my docket.  But I've tried to give priority.

21   And we're going to get you back here very soon.  But I

22   want to give the chance for the Government to supplement.

23   And then I want to give you folks a very brief chance to

24   respond to it and give me additional information.  Because

25   y'all have insights, just like Mr. Timmons shared with me

1    some insights.

2           And Mr. Timmons, let me say this.  I do want,

3    like on this agriculture program, I want a little more

4    explanation on that if you could for me.  These are the

5    programs where you're telling me it's not from the IRA or

6    the IIJA.  I just need a little more understanding of

7    that, a little more background so I can understand the

8    nature of that funding, and maybe some explanation of how

9    it got caught up in all of this.  And there may be a

10   perfectly logical reason for that.

11          **MR. TIMMONS:**  Yes, Your Honor.

12          **THE COURT:**  May be independent.  It may just be

13   coincidental; that is, I do see a material difference

14   between doing something that is -- in which an agency does

15   not have discretion to one in which the agency does have

16   discretion.  I mean, that's very different.  And I hear

17   the plaintiff about APA protocols and cutting -- and

18   turning square corners.  But they do seem in a sort of

19   fundamental way different to me.

20          Okay.  Now --

21          **MS. HUNTER:**  Your Honor, can I ask for one

22   further point of clarification?

23          **THE COURT:**  You can make two if you'd like.

24          **MS. HUNTER:**  Grants 37 and 38 --

25          **THE COURT:**  Yeah, I was wondering about those.

1   **MS. HUNTER:** These are grants that were awarded

2 but, you know, the paperwork wasn't yet finalized. We

3 think our claims are broadly applicable to those grants,

4 too. But I just wanted to -- as we move forward, I just

5 wanted to check that they were in the area where

6 defendants would be providing additional information.

7   **THE COURT:** Okay. I'll add that. I had not.

8 Thank you for pointing that out.

9   **MR. MILLER:** Your Honor, that would also apply,

10 I believe, to Grant No. 1 as well.

11   **THE COURT:** I had that in a pack, the three of

12 them together. I think that's a good point. I had not

13 thought about it that way, but I do believe we need more

14 information on that.

15   **MR. TIMMONS:** So, Your Honor, I just want to

16 clarify. I mean, you'd initially said it was only

17 pertaining to two defendants. It's now back to all four

18 defendants that you want more information on?

19   **THE COURT:** No, no. Here's -- let me see if I

20 can -- make sure I got it right. First of all, I had not

21 thought about the DOT. I'll say that. So I am going to

22 ask you about the DOT for those, what's going on with

23 those grants. I need a little explanation why they're not

24 being -- they're grant under review. Have they made a

25 decision yet whether they're going to proceed or not?

1        MR. TIMMONS:  No, Your Honor.

2        THE COURT:  How do I deal with that?  I mean,

3   it's in the process.

4        MR. TIMMONS:  I mean, Your Honor, I would also

5   point out that for two of these programs, the Active

6   Transportation Infrastructure Investment Program and for

7   the Charging and Fueling Infrastructure Grant Program, we

8   don't have a plaintiff that has a grant agreement in

9   either one of those programs.  And yet we're going to --

10  we're considering issues --

11       THE COURT:  Hold on just a minute.  How are they

12  listed?  Why are they here if there's not a plaintiff?

13       MR. TIMMONS:  There's a plaintiff that has a

14  notice of the funding award.  But they have not negotiated

15  the terms with the Government to determine the grant

16  award.

17       THE COURT:  So where are they?  Explain to me

18  because I'm not very familiar with this grant process,

19  Mr. Timmons.  Explain to me the stages and where these

20  particular plaintiffs are at.

21       MR. TIMMONS:  They were awarded funding and then

22  they have not finalized the grant agreement.  And the

23  agency has not, you know, established the terms and

24  conditions that's going to govern the grant.

25       THE COURT:  But they've been granted the --

1    they've been awarded the grant?

2         MR. TIMMONS:  Yeah, awarded the grant.  But they

3    have not entered into a binding grant agreement or

4    finalized grant agreement.  I'm not sure what the right

5    phrase is.  I don't want to get --

6         THE COURT:  Is that normally -- is there a

7    standard grant agreement?

8         MR. TIMMONS:  No.

9         THE COURT:  They vary?

10        MR. TIMMONS:  I mean, yeah, they have to

11   negotiate things like payment terms, timing.  Usually, the

12   grant agreements are going to have standard terms and

13   conditions you might expect in a government contract.

14        THE COURT:  Yes, that's what I thought.

15        MR. TIMMONS:  But in terms of negotiating the

16   details, that has not been done.

17        THE COURT:  And do we know the reason it hasn't

18   been done, since it sounds like to me mostly ministerial?

19        MR. TIMMONS:  Well, I mean, I guess I would say

20   it was awarded under the prior administration.  The prior

21   administration did not negotiate the grant award with the

22   client either.  So I guess the question would be for both

23   administrations why they didn't finalize that before now.

24        THE COURT:  I'm involving an agency.  These

25   administration things are not --

1          **MR. TIMMONS:**  That's a fair point, Your Honor.

2     But I think the short answer is they just -- you know,

3     there's no legal obligation to access the funds now

4     pursuant to an injunction.

5          **THE COURT:**  I agree with that.  But if -- let me

6     ask you this.  If the reason they haven't performed these

7     ministerial acts is because they don't agree with the

8     appropriations of Congress, would that be something I

9     should consider?

10          **MR. TIMMONS:**  I guess I would disagree that

11     negotiating a contract is a ministerial act.  I guess I

12     would put it that way.

13          **THE COURT:**  But you told me it's already been

14     awarded, so let's get past that.  If they decided not to

15     perform to finalize the contract because they disagree

16     with the funding of Congress, is that something I should

17     be concerned about?

18          **MR. TIMMONS:**  Like, that situation, yes.  But

19     because they don't finalize the funding because it's not

20     consistent with their priorities, that's a situation I

21     think --

22          **THE COURT:**  Here we go back to that priority

23     thing.  What does that mean?  If the priority is I don't

24     like the act of Congress, that's a problem.  If it's I

25     have the discretion and I have the right to make those

1    calls, I think you've got a point.  So it's just a loaded

2    term.  It doesn't mean anything to me.  You've got to get

3    more specific to me.

4          MR. TIMMONS:  I just think -- I just don't think

5    we can say that -- the record isn't there that they don't

6    like the act of Congress.

7          THE COURT:  Oh, I disagree.  There's a lot of

8    evidence of that.  I think there's a lot of evidence.

9          MR. TIMMONS:  Well, Your Honor, in two programs

10    we only have active grants.  In the Urban and Community

11    Forestry Grant Program and the Climate Pollution Reduction

12    Grant, we only had active grants.  So I just think the

13    idea that in all of these programs the administration is

14    hostile and will never fund grants in any of them --

15          THE COURT:  Well, let me ask you this.  Let's

16    say the IRA has 50 buckets of funds, different buckets.

17    And the new secretary of one of these agencies goes

18    through and says I like this bucket, but not this bucket.

19    I like this part of the law, but not this part of the law.

20    That's still violating the law for the bucket you don't

21    pick because you don't like the law.  I mean, I tell

22    defendant -- criminal defendants all the time, you've got

23    to obey the law, right?  All of it, not just part of it.

24    You've got to obey every part of it, right?  It's pretty

25    good advice I give them, isn't it?

1           **MR. TIMMONS:**  Yes, Your Honor.

2           **THE COURT:**  Okay.  I mean, that's what we're

3   doing here is you've got to obey.  So it's no answer they

4   don't -- they're not hostile to every bucket.  The

5   plaintiff says to me it's certain buckets they're focusing

6   on.  Fine.  Let's look at what the legal authority for

7   that is.  And if it's something that's not left to the

8   discretion of the agency because Congress has mandated it,

9   that's one point.  If it's discretionary, that's something

10  else.

11          You know, I'm just trying to be a neutral in

12  this, trying to uphold basic legal principles.  But the

13  Government needs to do more.  And, you know, I'm trying to

14  give you some tools to let you go back to your clients and

15  tell them what you need because they may have good answers

16  to these questions.  No answers don't work.

17          **MR. TIMMONS:**  Understood.

18          **THE COURT:**  Okay.  Ms. Hunter, anything further

19  from the plaintiff?

20          **MS. HUNTER:**  The only thing I would say, you

21  indicated you weren't fully convinced by our First

22  Amendment concerns.  I'd be happy talk about that more now

23  or at a later hearing.

24          **THE COURT:**  Later.  I've read them.  Believe me,

25  I've been through this.  I looked at it.  I just don't

1    find it as persuasive as some of these other issues.

2            MS. HUNTER:  I will just --

3            THE COURT:  You don't have to bat a thousand to

4    win the batting championship.

5            MS. HUNTER:  No, but I will just note that, you

6    know, Plaintiff Sustainability Institute, who is right

7    here in Charleston, and we sort of talked about in our

8    brief where they were asked to scrub their language and

9    talk about their work in a very different way that really

10   would be, you know, an affront to the community that they

11   serve, they are on the list that we got last night of

12   termination in progress.

13           THE COURT:  Well, we're going to look at that

14   one.  I kind of caught that one.  I also found the list of

15   words you can't use anymore.  It's a little bit of Alice

16   in Wonderland.  Where did that document come from?

17           MS. HUNTER:  That's an EPA document, Your Honor.

18           THE COURT:  You know one of the words was women?

19           MS. HUNTER:  I am very personally aware of that,

20   Your Honor.

21           THE COURT:  You can't use the word women

22   anymore.  Or equity.  Can't use equity anymore.

23           MS. HUNTER:  And so I note this because they

24   have been asked to provide this sanitized work plan.  They

25   so far have refused to do so.  Now, their grant is on a

1   list.  And so as we're in this interim period, I just --

2   and we can, again, provide a suggestion for Your Honor.

3   But I don't --

4           THE COURT:  But I want all those -- I'm

5   expecting on those communications you're talking about, I

6   expect to get them.  If you may persuade me if that's the

7   problem there might be a First Amendment problem in that.

8           MS. HUNTER:  Thank you, Your Honor.

9           THE COURT:  I just haven't seen that kind of

10  evidence.

11          MS. HUNTER:  That's all we're asking for, Your

12  Honor, is the ability to review the evidence and to

13  present our own evidence on that point.

14          THE COURT:  And, you know, I just say to

15  everybody, let's, you know -- we've already found common

16  ground in about a third of these, you know.  And perhaps

17  if everybody drills down, we can find more common ground

18  where we don't have to fight about everything.  I always

19  say to the parties, keep talking to each other.  You know,

20  we're all officers of the court.  Right?

21          MR. TIMMONS:  Yes, Your Honor.

22          MS. HUNTER:  That's right, Your Honor.  Thank

23  you.

24          THE COURT:  Anything further?

25          MR. TIMMONS:  Yes, Your Honor.  I wanted to

1   clarify.  I think we have -- you know, we have the

2   deadline accelerated to Friday.  I was wondering if we

3   could make both of our assignments due --

4           THE COURT:  Yeah, actually I had overlooked

5   telling you that I was going to extend everything out

6   seven days to give you more time on the privilege logs.

7           MR. TIMMONS:  Thank you, Your Honor.

8           What's that?  Well, then you ask him, Lee.

9           THE COURT:  You're Gergel's buddy.  You say it.

10          MR. BERLINSKY:  I don't want to stand up just

11  for this one small detail, Your Honor.  But we would

12  certainly ask for ten days rather than seven if we could

13  get it.  You know, the daunting task that we had to

14  produce this many documents in --

15          THE COURT:  I wouldn't think there are many

16  documents on these limited number of -- you know, I think

17  y'all overread my request.  I asked you on specific

18  grants, tell me the grantees, you know, and tell me why

19  you froze them.  And I can get a document.  I got zero.

20  Nobody gave me -- the only documents I have seen with a

21  grantee's name is a termination letter the plaintiffs gave

22  me.  Y'all have produced to me 9,000 documents without

23  mentioning one grantee.  That's odd.  Okay?  So now, it

24  kind of proves the point the plaintiffs made about mass

25  freezes, which frankly, Mr. Timmons candidly acknowledged

1    that.  So we're beyond that.  We're now moved to other

2    things.

3          But you're asking me -- all I'm asking you to do

4    is go to these, what we now have is, what, 12 terminations

5    and a few DEI, and now these two DOT things, where we're

6    trying to figure out what's going on with that.  And I

7    just want the ones about why these grants are being

8    terminated.  I don't think that's such a great burden.

9          And I appreciate the burden y'all are under.  I

10   really do.  I've been there before.  I get it.  But we've

11   got a bunch of not for profits who are having to lay off

12   people, people going without pay, they're being burdened.

13   So seven days is fine.

14         **MR. BERLINSKY:**  Thank you.

15         **THE COURT:**  Anything further?

16         **MS. HUNTER:**  If I could just clarify, Your

17   Honor?  We're -- you're going to issue a written order on

18   jurisdiction?

19         **THE COURT:**  I am.

20         **MS. HUNTER:**  And the plaintiffs have the

21   opportunity to file a motion for some minimal interim

22   relief regarding deadlines?

23         **THE COURT:**  You do.  And I'm also going to order

24   the defendants on anyone who has been unfrozen, that they

25   cannot refreeze without further order of this Court.

73

1          **MS. HUNTER:**  Thank you, Your Honor.  That's all.

2          **THE COURT:**  Very good.

3          This hearing is adjourned.

4       (WHEREUPON, court was adjourned at 11:28 AM)

5                          * * *

6    I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8       s/Karen E. Martin                4/23/2025

    _____        _____
9    Karen E. Martin, RMR, CRR            Date.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF SOUTH CAROLINA
                          CHARLESTON DIVISION

                                - - -

THE SUSTAINABILITY INSTITUTE, : 2:  25-cv-02152
*et al.*                       :
                               : May 19, 2025
                  Plaintiffs,  :
        versus                 : (Pages 1 - 54)
                               :
                               :
DONALD J. TRUMP, *in his*      :
*official capacity as President*:
*of the United States, et al.* :

                  Defendants.

                                - - -
                 TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE RICHARD M. GERGEL
              UNITED STATES DISTRICT COURT JUDGE
                                - - -

**A P P E A R A N C E S:**

For the Plaintiffs:        KIMBERLEY CLAIRE HUNTER
                           Southern Environmental Law Center
                           136 East Rosemary St., Suite 500
                           Chapel Hill, NC 27514

                           ELAINE POON
                           Public Rights Project
                           490 43rd Street, Unit 115
                           Oakland, CA 94609

For the Defendant:         TODD STUART TIMMONS
                           U.S. Attorneys Office (Cola)
                           1441 Main Street, Suite 500
                           Columbia, SC 29201

                           LEE ELLIS BERLINSKY
                           US Attorneys Office
                           PO Box 978
                           Charleston, SC 29402

```
Court Reporter:              LISA D. SMITH, RPR, CRR
                            Official Court Reporter
                            P.O. Box 835
                            Charleston, SC 29401



     Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

3

1          *(The following proceedings commenced at 10:00 a.m.)*

2          THE COURT:  Good morning.  Please be seated.

3          Good morning, everyone.  This is matter of The

4   Sustainability Institute and others vs. Donald J. Trump and

5   others, 2:  25-2152.

6          Could counsel for the plaintiffs who will be speaking

7   identify for the record, please?

8          MS. HUNTER:  Kimberley Hunter, for the plaintiffs,

9   your Honor.

10          THE COURT:  Thank you.

11          And for the defense?

12          MR. TIMMONS:  Yes, your Honor.  Todd Timmons, on

13   behalf of the Department of Justice.

14          THE COURT:  Very good.

15          MR. BERLINSKY:  And Lee Berlinsky, on behalf of the

16   defendant.  Thank you.

17          THE COURT:  Okay.  Let's talk a little bit about the

18   order of things today, as we will discuss.  I first want to

19   discuss the issue of the defendants' response at Docket 153

20   that was filed on Friday, indicating that defendants no longer

21   contest the judgment on the merits of the APA claims.  Those

22   are Dockets what -- Grants 1 through 26 and 33 through 38.

23   Those are 32 of the 38 grants the defendants say they no

24   longer contest.

25          We had a telephone conference on Friday, in which Mr.

4

1    Timmons confirmed my understanding from the filing, that

2    although the government defendants don't contest their

3    liability, they would seek a stay should the Court enter

4    relief in the form of injunctive relief.

5         Mr. Timmons, is that correct?  Is that a correct

6    statement of the government's position?

7         MR. TIMMONS:  Yes, your Honor.

8         THE COURT:  Very good.  Okay.  And after we deal with

9    that claim, I then want to address the plaintiffs' claim for

10   nonstatutory review jurisdiction, and then the implications of

11   that, if there is jurisdiction.

12        And finally, I want to address, after that, the

13   plaintiffs' claims which are still contested by the

14   government.  Those are Grants 27 to 32.  So, we'll do it in

15   that order so we can keep some rational line drawing here on

16   the issues.

17        So, let me say that I am prepared -- based on the

18   government's position expressed in Docket 153, I'm going to

19   enter judgment for the plaintiffs on Grants 1 through 26 and

20   33 through 38.  And then the issue of remedy arises.  And I'll

21   be glad to hear from plaintiffs regarding remedy.

22        MS. HUNTER:  Thank you, your Honor.  And if I could

23   first just ask for a point of clarification.  Will you be --

24        THE COURT:  You can ask for two points of

25   clarification.

5

1          MS. HUNTER:  Thank you.  Do you intend to enter

2     judgment -- final judgment, or is this just judgment as to the

3     preliminary injunction?

4          THE COURT:  No, no.  I'm going to enter final

5     judgment.

6          MS. HUNTER:  Thank you, your Honor.

7          THE COURT:  It would go up on appeal as a final

8     judgment.  So, the question is:  What remedies -- and

9     specifically, you know, as I understand the government's

10     position, they don't object to a declaratory relief, they just

11     don't want injunctive relief.  And so, the question is -- I

12     want to address the appropriateness of any injunctive relief,

13     what relief you seek, and then I guess you ought to take up

14     the issue of whether or not a stay should be issued.

15          MS. HUNTER:  Yes.  Thank you, your Honor.  Well, I

16     think we would request the relief that is outlined in our

17     prayer for relief in our complaint -- and that starts on page

18     89 of our complaint -- and starts with a series of declaratory

19     judgments.  The first three declaratory judgments relate to

20     the executive orders, the unleashing Energy Executive Order,

21     the Equity Executive Order, and the DOGE Executive Order.

22     Those are the constitutional questions, and so, those may be

23     more appropriate in the second part of the process --

24          THE COURT:  Well, the APA covers unlawful,

25     unconstitutional acts.  So, it's appropriate with either or

6

1    both.  And let me ask you this:  You have an executive order

2    that I think on the unleashing the energy could be read

3    potentially to be limited to the New Green Deal, okay.

4            MS. HUNTER:  (Affirmative nod).

5            THE COURT:  And then their OMB memoranda that are

6    sent to every agency, not just to those in which the New Green

7    Deal might be -- so-called New Green Deal might be applicable.

8    And then from there flows agency memoranda, which say

9    everything to do with the IRA or the IIJA stop, right?

10            MS. HUNTER:  That's right, your Honor.

11            THE COURT:  And for the APA, its agency action that

12   may be unconstitutional -- though I'm not sure what the

13   President's intent was -- the actual implementation is broader

14   than the executive order.  There could even be an argument --

15   I think one judge referenced that it might have been ultra

16   vires even from the President's instructions.  But whether it

17   is or not is somewhat academic, that is:  What is the

18   authority to violate statutes of the United States?  I mean,

19   there can't be -- you know, there was an argument about, well,

20   it was an exercise of discretion.  There's no discretion to

21   violate the law.  That's not one of the options for executive

22   officers.  They have to a duty to faithfully execute the laws,

23   right?

24            MS. HUNTER:  Yes, your Honor.

25            THE COURT:  And so, I'm just sort of wondering who do

7

1    you target here, because actual -- your clients' injuries flow

2    directly from agency action.  And, of course, we're now

3    talking about the APA.

4              MS. HUNTER:  Yep.

5              THE COURT:  You know what I'm saying?

6              MS. HUNTER:  Yes.

7              THE COURT:  So --

8              MS. HUNTER:  Well, I think defendants have maybe made

9    that a little bit easy for us with their filing -- not the

10   most recent filing, the filing prior to that -- in which they

11   outlined in declaration testimony exactly how these freezes

12   and terminations took place.  And so, for the EPA grants,

13   there's a declaration from Mr. Travis Voyles, which outlines

14   that on February 25th, he made the decision as an executive

15   officer to terminate a set of grant programs.

16             THE COURT:  How many did he terminate?

17             MS. HUNTER:  It's the set of grant programs, so I

18   don't know how many individual grants.  But there were --

19             THE COURT:  But he says he did individual grant

20   reviews.  How many individual grant reviews did this man do?

21   He didn't leave a paper trail, for one.  We know there are a

22   number of them of our plaintiffs, but those weren't the only

23   ones he reviewed.  This lawsuit had not even been filed yet.

24             MS. HUNTER:  That's right, your Honor.  But there's

25   no evidence in the record that he did do any individualized

8

1    grant reviews.

2    THE COURT:  But he said he did.

3    MS. HUNTER:  He said he did.  And I know your Honor

4    has asked for those documents.  And we have asked for those

5    documents and we haven't received anything to suggest that at

6    any point, he --

7    THE COURT:  Well, in other cases -- y'all have gotten

8    a little ahead of the game here.  In other cases, they just

9    come in and argue and there's no record, so you have to sort

10   of take them for what say.  You know, I'm used to looking for

11   evidence, you know.  So, when they told me initially that this

12   was the exercise of government and all that, I said, well,

13   show me the documents.  They sent me a truckload full of

14   documents, ultimately thousands.  Not one of them showed any

15   individualized concession review of consideration or anything

16   regarding these grants.

17   And then they told me, Well, you know, we're now sort

18   of pivoting over to terminations.  I said, Well, show me the

19   evidence of individualized -- I said it was represented to me

20   that they were individualized terminations.  So, I said, give

21   me those.  And I got 500 documents.  Still no evidence of any

22   individualized --

23   MS. HUNTER:  And I think part of the problem here

24   might be that we're using "individualized" in different ways.

25   THE COURT:  No.  I think it's very understandable

9

what it means.  Others may have interpreted it to change the

meaning of words.  There's a lot of funniness about words

these days.  But, you know, everybody understands what we're

talking about, and that is an individual grant recipient had

his or her -- or its grants reviewed, and there is just no

record evidence of it.

So, it goes back, Ms. Hunter, from the beginning

here, my point is, the APA challenges agency action.  And I

kind of, like -- you know, you may want me to strike some

executive order or some OMB memo that's probably ultra vires

and all that.  But I don't need to reach things I don't need

to reach.  You've got, as you allege, unlawful agency action.

The defendant no longer contests them.  So, the question is:

In light of that -- you know, generally, I try to not do more

than I have to, right?

MS. HUNTER:  (Affirmative nod.)

THE COURT:  And so, it seems to me that we have a

number of agency actions here which are not contested.  So,

here's my real question -- not so much what exactly is

declaratory.  I can figure that out about declaratory relief.

What injunctive relief do you seek?  Because this is

apparently what the defendants object to.

MS. HUNTER:  Yes, your Honor.

And I think if we look at that declaration of Mr.

Voyles, just focusing on EPA for the time being, he says:  On

1   February 25th, I conducted an individualized review of EPA

2   grant programs -- that's his use of the word "individualized"

3   -- for consistencies with agency policy priorities.  That day

4   I decided that certain grant programs should be terminated for

5   policy reasons.

6           And so, I think that and the actions that flow from

7   that decision is an executive action where you can issue both

8   a declaratory judgment that that action was arbitrary and

9   capricious, and also hold unlawful and set aside that action

10  and the actions that stem from it, pursuant to 5 U.S.C. 706.

11          THE COURT:  So, I enjoin it.  And then what happens?

12          MS. HUNTER:  If you enjoin that action, then

13  everything which stems from that, which is the subsequent

14  termination of grants within those grant programs, would be

15  unlawful, and those grant programs would need to be

16  reinstated.

17          THE COURT:  And we have some which are just paused

18  right now, and some are frozen.  You want me to direct that

19  those grant funds be -- that the grant be reinstated,

20  basically?

21          MS. HUNTER:  Yes, your Honor.

22          THE COURT:  And as a consequence, the funds would

23  flow from there?

24          MS. HUNTER:  That's exactly right, your Honor.

25          THE COURT:  Okay.  Whether it's called "termination"

1    or "freeze" or "pause" or whatever, it doesn't really matter,

2    you want the grants to function again.

3                MS. HUNTER:  (Affirmative nod.)

4                THE COURT:  What are the arguments that I should stay

5    this?

6                MS. HUNTER:  Well, defendants haven't made any

7    argument for --

8                THE COURT:  Well, I'm looking for -- maybe we ought

9    to wait and let them argue.  You know, it's a different

10   standard when a plaintiff argues for preliminary injunction,

11   such as I presume you will for the nonstatutory review --

12   that's the *Winter* standard, right, the *Winter* standard -- for

13   once you have a judgment, which you will have, it's the *Nken*

14   standard, which is almost the opposite, right?  The burden is

15   not on the plaintiff anymore, it's on the government.

16               MS. HUNTER:  Correct, your Honor.

17               THE COURT:  And the government has to say -- among

18   other things, has to have a finding that is likely to be

19   successful on review, right?

20               MS. HUNTER:  That's right, your Honor, which would

21   seem sort of impossible here, given that they are conceding to

22   the merits --

23               THE COURT:  Well, they argue that this Court doesn't

24   have jurisdiction.  I've addressed that issue.  But if I had a

25   view that the defendants were likely to be successful, I would

1   not have issued the order, right?

2        MS. HUNTER:  That's right, your Honor.

3        THE COURT:  It's a little bit -- you know, I think

4   that review anticipates, like, a jury verdict that the Judge

5   has doubts about, something like that.

6        MS. HUNTER:  (Affirmative nod.)

7        THE COURT:  I believe the Court's judgment regarding

8   jurisdiction was correct, so they won't meet that standard.

9        How about their irreparable injury?  They have to

10  show that the non-prevailing party is irreparably injured.

11  What's the evidence of irreparable injury of the government if

12  the grants previously rewarded were reinstated?

13       MS. HUNTER:  I can't see any irreparable injury

14  there, your Honor.  Congress has appropriated this money for a

15  particular purpose.  And so, all that the agencies need to do

16  is faithfully execute the law that Congress has passed.  So,

17  there's no injury to the defendants.  There's certainly

18  significant injury to the --

19       THE COURT:  Well, that's another *Nken* factor, isn't

20  it?  And that's the issue of whether there is any substantial

21  injury of the plaintiffs.  Those 32 grant recipients in which

22  the grants are no longer contested, tell me about their injury

23  that they would suffer if I were to delay relief while

24  appellate review occurred.

25       MS. HUNTER:  Yes.  Thank you, your Honor.

13

1    Well, you know, we filed this motion for preliminary

2    injunction almost two months ago, and at that point, set out

3    in declaration testimony all the irreparable harm that our

4    plaintiffs --

5    THE COURT:  I'll bet it hasn't gotten better.

6    MS. HUNTER:  It has not gotten better.  You know, for

7    some, it has gotten better.  As we know, some of the grants

8    have been reinstated.  And so, for those, it has gotten

9    better.  Although, I would note that even those plaintiffs who

10   have had grants temporarily reinstated are still suffering a

11   lot of harm because they're not able to make those long-term

12   decisions they would want to make.

13       I think another really important point to note here

14   is that a lot of these grant programs have a three-year term

15   that is statutory and cannot be extended.  And so, any delay

16   is really crunching the time that they are able to get this

17   work done and to align with the grant agreements which they

18   have agreed to.  And so, every single day --

19   THE COURT:  Now, I agree with you, it's been two

20   months since you filed the suit.  But getting from filing to

21   judgment in two months is pretty good work.

22   MS. HUNTER:  Yes, your Honor.  And we really

23   appreciate the time and attention that you have taken to move

24   us along in this case.  That being said, it's still every

25   single day we are getting calls from our plaintiffs and from

1    the communities that they serve --

2            THE COURT:  Are staff furloughs occurring?

3            MS. HUNTER:  Yes, staff furloughs are occurring.  In

4    fact, even some staff have had to be laid off.  Other groups

5    have had to hold off on staffs that they really need to hire

6    in order to accomplish the grant programs.

7            THE COURT:  Time is not their friend.

8            MS. HUNTER:  That's correct, your Honor.

9            THE COURT:  Okay.  How about the public interest?

10           MS. HUNTER:  The public interest here seems very

11   clear.  Two main points:  One, this is what Congress intended.

12   Congress presented these grant programs to be in the broad

13   public interest and set in place a process for distributing

14   these funds, which the prior Administration then pursued.  It

15   was a complicated process where they really made sure that

16   everyone went through an application process, and we put the

17   absolute best grant programs in place.  So, that whole process

18   of government has been abandoned.  But then probably more

19   importantly, these are all programs that are serving

20   communities on the ground with very substantial needs,

21   including right here in North Charleston.

22           THE COURT:  Talk to me about The Sustainability

23   Institute.  I don't know much about them.  Tell me about them.

24           MS. HUNTER:  Well, this is a group that's been

25   focused on affordable housing and community cohesion and also

1    climate resilience in the Charleston area for over a decade

2    and applied for this grant in particular to focus on a

3    neighborhood that had been previously impacted by a highway

4    exit.  And so, it's a really wonderful grant program that

5    combines both environmental justice, which I guess we are no

6    longer allowed to say anymore, but --

7              THE COURT:  You can say it in my Court.

8              MS. HUNTER:  -- you know, benefit to a community

9    that's really suffered long-standing harm because of previous

10   government actions and historic systemic racism.  But it's

11   also focused on the future and climate resilience and putting

12   in place weatherization for houses, so that that community can

13   become more cohesive and more resilient over time.

14             THE COURT:  And also, I think for energy efficiency.

15             MS. HUNTER:  Exactly.

16             THE COURT:  And consequences of lack of efficiency.

17             MS. HUNTER:  That's exactly right, your Honor.

18             THE COURT:  Well, why can't the Administration -- new

19   Administration -- elections have consequences -- just come in

20   and say, Well, we don't really like these acts and we've just

21   decided we're not going to spend the money, we think it's in

22   the public's interest?  Why can't they do that?

23             MS. HUNTER:  Well, they certainly can't come in and

24   say we're not going to spend the money.  That would be the

25   very definition of a violation of separation of powers.  You

1    know, Congress has the power of the purse, not the Executive.

2    But even to the extent they wanted to spend the money

3    differently, they can't --

4             THE COURT:  There's no evidence of that.

5             MS. HUNTER:  There's absolutely no evidence of that.

6    That's right.

7             THE COURT:  They've just cancelled the grants.

8             MS. HUNTER:  They've just cancelled the grants.  And

9    there's no evidence that we have seen, or that the defendants

10   have presented, that there is any process in place to

11   reallocate that funding.

12            THE COURT:  Is there any public interest in upholding

13   our form of government of separation of powers that the

14   Executive faithfully execute the laws of Congress?

15            MS. HUNTER:  Absolutely, your Honor.  There is a

16   reason that we have these laws in place, both the APA and

17   these constitutional safeguards, and that is exactly so that

18   every four years we don't have kind of a whiplash of change

19   and complete disregard from both the prior Administration and

20   Congress.  We have limited powers for the Executive, extensive

21   powers but limited powers.  And that has been, you know, our

22   system of government for over a century.

23            THE COURT:  Should a new Administration come in after

24   this one, of a different party or a different approach, they

25   may be similarly disadvantaged by having to implement

1  congressional acts they may not agree with until Congress has

2  the wisdom to change it, correct?

3          MS. HUNTER:  Yes.  And this is a normal thing that

4  happens in government.  And, you know, courts -- to the extent

5  any administration has tried this type of thing before, courts

6  have been very clear that it's improper.

7          THE COURT:  Let me hear from Mr. Timmons on the issue

8  of the request for a stay.  Glad to hear from you on that.

9          MR. TIMMONS:  Yes, sir, your Honor.  Happy to be

10  here.  The government's position is that the likelihood of

11  success factor weighs heavily in a stay.  We understand

12  your Honor disagrees with our position on jurisdiction.

13          THE COURT:  You're not going to persuade me on that

14  because I've reached --

15          MR. TIMMONS:  No, I'm not.

16          THE COURT:  So, tell me what other reason.  You've

17  conceded liability on the APA.  What other basis would there

18  be to say that there's not likelihood of success?

19          MR. TIMMONS:  Well, we look at how the Fourth Circuit

20  has handled stay requests that have come up to them.  And in

21  both cases that I'm aware, in grant funding cases, the Fourth

22  Circuit has said that the relief should be stayed pending --

23          THE COURT:  But those are preliminary injunctions,

24  aren't they?

25          MR. TIMMONS:  Yes, your Honor.

1          THE COURT:  This is a judgment.  You know, this is --

2    the government defendants will be found liable.  They have

3    violated the rights of the plaintiffs.

4          MR. TIMMONS:  But the issue is --

5          THE COURT:  And there's nothing more basic, that

6    every plaintiff suffering injury has a right to relief,

7    correct?

8          MR. TIMMONS:  If the Court has jurisdiction to order

9    it.

10          THE COURT:  Of course.  I have to have jurisdiction.

11    And you get to argue that.  But the question is -- you are

12    familiar with the *Nken* standards, correct?

13          MR. TIMMONS:  Yes, your Honor.

14          THE COURT:  Okay.  So, if you can't persuade me -- is

15    there any other reason the plaintiffs aren't likely to have

16    success other than your argument about jurisdiction, which I

17    have already rejected?  Any other reason?

18          MR. TIMMONS:  Your Honor, I just got to wrestle with

19    the fact that Fourth Circuit has looked at it twice and in

20    both cases has stayed the relief that your Honor is

21    considering granting.

22          THE COURT:  They have not considered it because they

23    haven't had a judgment yet, have they?

24          MR. TIMMONS:  Well, the issue is whether the relief

25    should be stayed pending appeal, which would be exactly the

19

1    same issue.

2        THE COURT:  And you're going to have every chance to

3    argue that.  You know, you're not the first lawyer to tell me

4    that they're going to race to the Fourth Circuit.  And I just

5    say:  Have at it.  You know, that doesn't have the slightest

6    impact on me.  I believe that the Fourth Circuit has

7    consistently upheld the concept that injured parties should

8    have remedies.  And that's all they're asking for here.  We're

9    not at a preliminary injunction stage.  We are at the end of

10   the case, right?

11       MR. TIMMONS:  Right.

12       THE COURT:  End of the case.  And you readily concede

13   that you don't contest the liability under the APA, you simply

14   argue that the APA is not enforceable in my court.  Is that

15   correct?

16       MR. TIMMONS:  Yes, your Honor.

17       THE COURT:  And you think they ought to go to the

18   Court of Claims, correct?

19       MR. TIMMONS:  As to those 32, yes, your Honor.

20       THE COURT:  I respectfully disagree with you.  I've

21   laid out a lengthy order why I say that.  Are there any other

22   reasons other than you think the Fourth Circuit will agree

23   with you?  Any other reason?

24       MR. TIMMONS:  Your Honor, I hope I didn't suggest

25   that I was, like, threatening to take you to the Fourth

1    Circuit.  I just -- you have to understand --

2            THE COURT:  You can't threaten me in a way that would

3    matter anyway, so don't worry.

4            MR. TIMMONS:  Okay.  I mean, I just wanted -- the

5    government -- they're going to push the jurisdictional

6    argument, we're going to push it until it's resolved.

7            THE COURT:  It's okay.

8            MR. TIMMONS:  Okay.  I just didn't want you to think

9    I was, you know --

10           THE COURT:  You're ok.  I don't know if I told you

11   this story -- I think I did, so I'll probably sound like an

12   old man repeating himself.  But I used to practice in front of

13   Judge Hemphill up in Rock Hill.  And he was a former

14   congressman; very irascible guy, served during the New Deal.

15   And he had a roadmap up on his wall in his courtroom, which

16   seemed a very odd place to put a highway map.  And one day

17   somebody did exactly what you did to me:  I'm going to take it

18   to the Fourth Circuit.  And Judge Hemphill pointed over to the

19   map and he said:  That's the road to Richmond.  So, I guess he

20   had had it himself.  I always thought that was a pretty cool

21   response.  So, I think you'll probably fly to Richmond --

22   won't take the road anymore.  But, have at it.  And, you know,

23   if the Fourth Circuit doesn't agree with me, they have a --

24   they know how to reverse me.

25           MR. TIMMONS:  Well, your Honor, we do think that

21

1    there is irreparable harm to the government.

2            THE COURT:  Tell me about irreparable harm.

3            MR. TIMMONS:  Well, if the money -- you know, if the

4    Fourth Circuit or the Supreme Court ultimately decides that

5    this Court did not have jurisdiction over the case and there's

6    been an order to expend funds on projects, then the money has

7    been spent, it cannot be appropriated for any other purpose.

8    The government has --

9            THE COURT:  Why can't you -- can you seek to have it

10   returned?

11           MR. TIMMONS:  Well, I'm not sure.  I'd have to look

12   at the procedures for that.  But I don't think -- I think the

13   plaintiffs would say:  We had a court order saying we could

14   spend it, so we're not going to return the money.

15           THE COURT:  And you have courts -- the point is, you

16   don't have anything in the record that they aren't capable of

17   paying it back, do you?

18           MR. TIMMONS:  In the record, no, your Honor.

19           THE COURT:  I don't have any other way to do things

20   other than what's in the record.

21           MR. TIMMONS:  Uh-huh.

22           THE COURT:  What else?  Any other arguments why I

23   should not provide the parties relief at the time I issue

24   judgment?

25           MR. TIMMONS:  I think the public interest in the -- I

22

1    mean, the elected representatives of the people being able to

2    carry out their policy priorities is a public interest.

3              THE COURT:  You mean Congress?

4              MR. TIMMONS:  Well, and the President, who has

5    discretion to --

6              THE COURT:  Well, I know.  But the President doesn't

7    have the discretion to break the law, does he?

8              MR. TIMMONS:  Of course not, your Honor.

9              THE COURT:  He has the duty to faithfully execute the

10   laws, correct?

11             MR. TIMMONS:  Right.  But I think there is a public

12   interest in having the proper balance between the Executive

13   and Congress laid out.

14             THE COURT:  And where does that balance lie?  That is

15   the issue and why we're in the third branch talking about the

16   prerogatives of the first and second branch, right?

17             MR. TIMMONS:  Yes.

18             THE COURT:  Sounds like *Marbury v. Madison* to me.  I

19   mean, you know, it's why we're here.  And it's the

20   Constitution we're having to address.  And it just seems to me

21   that the public interest lies most directly in upholding our

22   form of government.  It seems simply that.  And you do not

23   contest that, if the APA applies, that the plaintiffs are

24   entitled to relief.  What that means is their claim is based

25   on the fact that the Executive acted in excess of authority,

1    that these agency heads acted in excess of their authority,

2    without authority, ultra vires, and in violation of the

3    constitution.  I mean, that's the basis of their claim.

4         So, I will enter judgment today.  And I will enter

5    judgment with injunctive relief.

6         So, let's move on to the issue of the --

7         MS. HUNTER:  Your Honor, can I make one minor point?

8         THE COURT:  You don't want to buy it back, Ms.

9    Hunter.

10        MS. HUNTER:  I think this leads into what you're

11   saying.  But, you know, the defendants here are saying, well,

12   the Fourth Circuit or the Supreme Court may tell us we need to

13   go to the Court of Federal Claims.  But even if that were the

14   case, which it is not, your Honor, presumably, the Court of

15   Federal Claims under that argument would have jurisdiction to

16   hear our APA claims, and then they would enter judgment.  So,

17   there's no future here where the government needs to get its

18   money back.  So, I think that eliminates any irreparable harm

19   for the government here, your Honor.

20        THE COURT:  You mean having not contested it here, it

21   would be harder to go somewhere else and contest the very same

22   claim?

23        MS. HUNTER:  Yes, your Honor.

24        MR. TIMMONS:  And, your Honor, of course, I would

25   just say that is not what the government -- that's not the

24

1    position we would take in the Court of Federal Claims.  That

2    we concede -- our not disputing an APA claim in district court

3    is very much different than not disputing a contract claim in

4    the Court of Federal Claims.

5            THE COURT:  I don't think you're going to have an

6    opportunity to argue that, so I'm not going to get into it

7    with you.  I think it would be a very difficult position to

8    take.  But that doesn't -- I don't think you're going to get

9    there because I think we have jurisdiction right where we are.

10           Let's move on to the issue of the nonstatutory

11   review.  You know, the issue of jurisdiction of this Court

12   over unconstitutional conduct of the Executive branch is not

13   an issue we address every day.  In fact, it's not an issue

14   that -- it has only come to me in a damages claim, like

15   *Bivens*.  This is not a *Bivens* claim.  This is an effort for

16   equitable relief.

17           And Ms. Hunter urged me on our telephone conference

18   on Friday to take a look at *Strickland* and these other cases,

19   which, frankly, I haven't paid a lot of -- I've been focused

20   -- we've all focused our attention on the APA jurisdictional

21   issues.  Appropriately so, the government had its arguments,

22   and the plaintiffs had theirs.  But I now turn my attention to

23   that issue.

24           And, you know, what I've come to realize in reading

25   *Strickland*, which I read at the time it came out, but it

1    didn't seem the importance to it, to me, that it is now.  It

2    plainly holds that a district court has authority under

3    several different theories, just inherent authority.  There

4    are certain cases that are considered exceptions to sovereign

5    immunity.  There are several different theories, all which are

6    laid out in *Strickland*.

7         And the Fourth Circuit mentioned an amicus brief by

8    Professor Chemerinsky, favorably quoting it in the order.  So,

9    of course, I went and read it.  I know Professor Chemerinsky

10   -- now Dean Chemerinsky -- very well.  He speaks to the Fourth

11   Circuit and the district judges frequently.  We know him well.

12   And he makes a quite persuasive argument of the history of

13   this theory, dating back -- here we go again, *Marbury v.*

14   *Madison*, and quotes *Youngstown Steel*, a number of the *INS*

15   cases, cases involving -- some of the terrorist cases in the

16   Bush Administration.  He cites a number of cases.  But the

17   clearest expression of it is in *Strickland*.  And in Judge

18   Gregory's concurring opinion in an immigration case -- I think

19   it was a religious-ban case -- he also sets forth -- he was

20   then, I think, chief judge -- this whole theory.

21        So, let's lay it out, first, Ms. Hunter.  And then I

22   want to hear from the government about jurisdiction for

23   nonstatutory review.

24        MS. HUNTER:  Yes, your Honor.  So, essentially, you

25   know, this is different than a *Bivens* action, because this

26

1    type of jurisdiction is focused only on declaratory or

2    injunctive relief.  And it's focused on --

3            THE COURT:  By the way, that's the only thing I'm

4    giving you --

5            MS. HUNTER:  Yes.

6            THE COURT:  -- in the first judgment.  You're not

7    getting damages.

8            MS. HUNTER:  And we're not asking for damages.

9            THE COURT:  You're not asking and you're not getting.

10            MS. HUNTER:  So, just clarifying how this is a little

11    bit different than *Bivens*.  But it's similar in that it

12    relates to the acts of federal officials and essentially says

13    that when federal officials are acting in excess of their

14    constitutional or statutory authority, the Court has

15    jurisdiction to hear claims from plaintiffs withstanding in

16    jurisdiction to issue declaratory relief.

17            If I could step back a little bit and talk about why

18    we believe it's really important that you do rule on these

19    particular claims, which are Counts 1 and 2 in our

20    complaint --

21            THE COURT:  But your APA count is actually Count 3.

22            MS. HUNTER:  That's correct, your Honor.  These first

23    two are -- they're sometimes call ultra vires claims,

24    sometimes called nonstatutory review claims.  And the reason

25    that these claims are important is exactly this jurisdictional

27

1    argument that the defendants are seeking to make.

2            First, let's be quite clear, we believe this Court

3    has jurisdiction to hear our APA claims.  We believe

4    your Honor set that out very nicely in your most recent order.

5    *Boeing* continues to be good lore.  So, that should all be

6    fine.  And we believe we'll prevail.

7            THE COURT:  This is generally why we don't have to

8    discuss these other issues.  But the defendants now argue

9    *Boeing* is meaningless.  So --

10           MS. HUNTER:  That's correct, your Honor.

11           THE COURT:  So, what are they?  So, this theory --

12           MS. HUNTER:  The defendants' argument about *Boeing*,

13   your Honor, is based on the APA waiver of sovereign immunity.

14   And they are saying that because there is an adequate remedy

15   in the Court of Federal Claims under the Tucker Act, that that

16   waiver of sovereign immunity no longer applies, and so that

17   would divest this Court of jurisdiction over APA claims.

18           Again, we don't believe that that is a good theory or

19   a good argument.  Nonetheless, it is the one the defendants

20   have made, has been making all over the country, and have

21   announced their intent to take it to the Fourth Circuit and

22   the Supreme Court.  This separate jurisdiction, this ultra

23   vires nonstatutory jurisdiction, has no bearing on that

24   argument.  It doesn't involve the APA waiver of sovereign

25   immunity as a separate reason that this Court has

28

1    jurisdiction.  And so, while ordinarily a court may avoid some

2    constitutional questions, here, where the Court is answering

3    those constitutional questions in the context of the APA, we

4    believe it's really important that the Court also addresses

5    those questions in the ultra vires nonstatutory jurisdiction

6    --

7         THE COURT:  How is it even different from the APA

8    claim, since, as I understand -- I know y'all make some

9    certain procedural arguments as well, which don't really seem

10   particularly relevant to the grants in which they are no

11   longer contesting.  But there are statutory authorizations

12   directing the expenditure of these funds that they no longer

13   contest.  That was the basis, as I understood it, of your APA

14   claim, correct?

15        MS. HUNTER:  That is a strong basis.  There are other

16   things --

17        THE COURT:  Other procedural bases.

18        MS. HUNTER:  -- that are particularly important for

19   the grants that we're going to discuss in part three.  But,

20   yes, you're correct, your Honor.  Ruling substantively, ruling

21   on this ultra vires nonstatutory review jurisdiction would be

22   the same argument.  It wouldn't be additional work for the

23   Court than ruling under the APA jurisdiction.  But I do

24   believe that ruling on Counts 1 and 2 in addition to our other

25   counts would ensure durability of this Court's order.  We

29

1    believe it should be durable regardless.  But it would give

2    the plaintiffs a basis for jurisdiction that even the

3    defendants haven't, you know, considered a challenge to what

4    that might look like.

5         THE COURT:  Well, is there any different standard

6    between striking agency action or government action --

7    government official action in excess of its authority under

8    the APA and under nonstatutory review?

9         MS. HUNTER:  The remedy is slightly different,

10   your Honor, because it would not include the set-aside remedy

11   under the APA.  But in terms of the declaratory judgment, I

12   believe it would be the same.

13        THE COURT:  How about injunctive relief?

14        MS. HUNTER:  Injunctive relief could be issued under

15   both.

16        THE COURT:  Yes.  When you say "sustainability," what

17   do you mean by that?  Are you saying that -- the difference,

18   what was that?  I didn't quite understand what you were

19   saying.

20        MS. HUNTER:  Oh, sorry.  Under the APA, one of the

21   remedies is that you can set aside the agency action under

22   706.  That's limited to the APA.  So, under the nonstatutory

23   review jurisdiction, it would be more like a simple

24   declaratory judgment with associated injunctive relief.

25        THE COURT:  Substantively the same.

30

1          MS. HUNTER:  Yes, your Honor.

2          THE COURT:  Let me hear from Mr. Timmons on the issue

3     of nonstatutory review.

4          MR. TIMMONS:  Yes, your Honor.  So, the first thing

5     I'd like to say is, you know, when you raised the issue on

6     Friday, it was not an issue that I had, frankly, thought about

7     until your Honor brought it to my attention.  But it does make

8     sense that if we've resolved the agency action question under

9     the APA, what is the Article III case and controversy left?

10    Is it just to advise on whether or not the executive order

11    exceeded some constitutional principle?  And so, I do think

12    that that's an important question to look at.

13          I will be honest with you, over the weekend, I

14    haven't -- you know, I don't know that I've come down to a

15    firm position on it.

16          THE COURT:  Well, I have.

17          MR. TIMMONS:  Yeah.  Yeah.

18          THE COURT:  I mean, you know, I expressed on Friday,

19    I said:  I'm going to take a hard look at this issue.  And

20    unlike you, I did spend the weekend reading.  And I read every

21    case I could in the federal judiciary in which this issue has

22    been addressed.  I didn't see any response from the government

23    on this claim of jurisdiction in your brief.

24          MR. TIMMONS:  Well, your Honor, I would say that our

25    argument has always been the Court does not have jurisdiction

1    over any claim in this case.  You cannot repackage a contract

2    claim as a constitutional violation to get jurisdiction in

3    this Court.  We have set --

4              THE COURT:  I understand that general concept.  I

5    looked at your brief.  I didn't see anything addressing

6    statutory review theory, *Strickland*.

7              MR. TIMMONS:  No, sir, not that theory.  But the idea

8    that this Court does not have jurisdiction to decide the

9    constitutional claim, we definitely assert that, your Honor.

10             THE COURT:  Well, in the abstract under the APA,

11   you've said it.  But if you argue the Court doesn't have

12   jurisdiction under APA, why would the Court not have

13   jurisdiction under nonstatutory review, if that's a recognized

14   legal basis for federal jurisdiction?

15             MR. TIMMONS:  On the jurisdictional question?

16             THE COURT:  Yeah.

17             MR. TIMMONS:  So, as your Honor mentioned, if you're

18   going to sue for constitutional violation for money damages --

19             THE COURT:  But that's -- they're not suing --

20             MR. TIMMONS:  But that's -- that's -- then we get

21   back to the jurisdictional argument.

22             THE COURT:  Well, you say that.  I'm not awarding.

23   If I gave them relief here, I wouldn't give them money

24   damages.

25             MR. TIMMONS:  But that is the jurisdictional argument

32

1    we are making.

2             THE COURT:  I understand that.

3             MR. TIMMONS:  So, that's why we said we've challenged

4    jurisdiction on the constitutional claim.

5             THE COURT:  I mean, we're talking in circles here.

6    Their only request, they would only receive injunctive and

7    declaratory relief, nothing more.  They have not requested and

8    they will not be awarded, under any theory, damages.  I think

9    that is a makeshift argument by the government that has no

10   merit.  But you'll get a chance to argue that in another

11   court.  And perhaps you'll persuade someone else, unlike you

12   haven't persuaded me.  But that's okay.

13            But I'm just trying to address an alternative theory.

14   And I was noting, as I just said to Ms. Hunter, that it was

15   Count 1 and Count 2 of their complaint.  It was a bigger deal.

16   You, not inappropriately, focused on the APA issue.  I

17   understand that.  That's been a hot issue out there.  And you

18   focused on it.  But, you know, there's another independent

19   basis for court jurisdiction that is as old as the Judiciary.

20   I went back and read *Marbury*.  I did.  And Chief Justice

21   Marshall definitely -- I mean, they don't have any statute

22   authorizing that review of the executive action.  *Youngstown*

23   *Steel*, President Truman seizing control of the steel industry,

24   there's no statute authorizing that.

25            And have you read Professor Chemerinsky's amicus

**Suppl. App. 105**

1    brief?

2    MR. TIMMONS:  I have not read his amicus brief.  But

3    he was the author of the textbook in my common law class.

4    THE COURT:  Well, I'm not surprised.  He's probably

5    one of the great scholars of American constitutional law.  But

6    I'm going to add his amicus brief to this docket.  I think

7    it's a really worthwhile discussion of the legal theory here.

8    You know, it's not something that courts deal with every day.

9    But if the Court has jurisdiction under this statute to

10   address unconstitutional ultra vires action by government

11   officials in their suit -- in their official capacity, let's

12   look at what this is.  This is a claim against government

13   officials in their official capacities for action in excess of

14   their legal authority, in which the plaintiff seeks equitable

15   relief only, correct?  That's the parameters of this

16   jurisdiction, correct?

17   MR. TIMMONS:  No, your Honor.

18   THE COURT:  Huh?

19   MR. TIMMONS:  No.

20   THE COURT:  You're saying no?

21   MR. TIMMONS:  It's your -- your Honor, that's your

22   opinion on how the jurisdictional and the relief plays out.

23   THE COURT:  No.  I'm quoting from *Strickland*.  You

24   don't agree with *Strickland*?

25   MR. TIMMONS:  I don't agree that the way you phrased

34

1    the case is how the request for relief is presented, no, I

2    don't.

3              THE COURT:  I'm asking -- I was just describing the

4    *Strickland* cause of action as described by the Fourth Circuit.

5              MR. TIMMONS:  Yeah.  Oh, I'm sorry, your Honor.  I'm

6    sorry, your Honor.

7              THE COURT:  The Fourth Circuit, I know you told me

8    you want to run there.  You might want to read this case

9    before you get there.  Have you read *Strickland*?

10             MR. TIMMONS:  No, your Honor.

11             THE COURT:  Okay.  Well, that puts you at something

12   of a disadvantage.  It's cited, by the way, in the plaintiffs'

13   complaint.  And, you know, it lays out the elements of what

14   this jurisdiction is.  And let me repeat it again, because I'm

15   not making this up.  This is not my theory.  This is the

16   Fourth Circuit's opinion.  This is the basis of numerous U.S.

17   Supreme Court decisions of what this jurisdiction means.  It

18   is limited to actions against government officials in their

19   official capacity for constituting actions in excess of their

20   legal authority, or otherwise unconstitutional, in which the

21   plaintiff seeks equitable relief.  That's it.  That's what

22   *Strickland* stands for.

23             MR. TIMMONS:  And, your Honor, I want to be clear.  I

24   have not asserted that -- you know, I did not assert in our

25   brief that the Court lacks jurisdiction over those claims.  To

35

1    be completely frank with your Honor, I have not reached the

2    solid conclusion that your Honor has.  So, you're a little

3    ahead of me.  I just want to be honest about that.

4                THE COURT:  You'll maybe catch up by the Fourth

5    Circuit.

6                MR. TIMMONS:  But I would say I guess our position on

7    that would be, we have not answered the complaint yet.

8    Jurisdiction has been decided, so it's not like -- you know,

9    it's not like going the additional step and reaching a merits

10   argument somehow --

11               THE COURT:  I have a motion for preliminary

12   injunction from you.  I wouldn't enter judgment on this

13   theory.

14               MR. TIMMONS:  Right.

15               THE COURT:  But I have a motion for a preliminary

16   injunction.  And a preliminary injunction, one of the bases --

17   one of the remaining bases, 32 of the 38 grants, are disposed

18   of.  Under the judgment, you've asserted there's no

19   jurisdiction.  The plaintiffs reasonably assert an alternative

20   basis for the Court's jurisdiction and request for relief.

21   And that is nonstatutory review.  And I have a pending motion

22   for preliminary injunction, which I have an obligation to

23   address.  So, I'm now -- you can answer and object and do

24   whatever you want, the plaintiffs filed a motion for

25   preliminary injunction that included this theory, and I have

36

1    to address it.

2            But you are correct, I would never enter a final

3    judgment on something you haven't conceded.  Though, I must

4    say having not contested under the APA, you might think it

5    won't matter before the Court of Claims.  It matters in front

6    of me, if you had exactly the same set of facts.  I mean, my

7    point was:  The facts are identical, the legal standard is

8    substantially the same, the remedy sought is substantially the

9    same.  So, I think in some ways your decision not to contest

10   under the APA, you know, creates a strong basis for the

11   plaintiffs to argue a likelihood of success on the merits for

12   their preliminary injunction.  You understand what I'm saying?

13           MR. TIMMONS:  Yes, your Honor.  And, I mean, I'm not

14   suggesting to your Honor you can't decide arguments that are

15   presented to you.  I'm just suggesting one approach would be

16   that we can resolve the issue of preliminary relief on the APA

17   so there is not a need to go the extra step and address

18   constitutional --

19           THE COURT:  I'll do the extra step.  Don't worry.

20   I'm ready to do it.  I've done the work.  Unlike you, Mr.

21   Timmons, I actually read all this.  And I think there's a

22   solid basis to address preliminary injunction.  So, when you

23   go over to the Fourth Circuit, you're going to face both

24   jurisdictional issues and you'll have to confront both of

25   them.  And, you know, you'll have to persuade the Fourth

37

1    Circuit that the decision in *Strickland* is wrongly decided.

2    That's your prerogative.  You have to give them notice you're

3    going to argue against a precedent.  But I think the

4    plaintiffs have an incredible basis.  I want to hear from

5    them, and then I want to hear from you on the *Winter* standard.

6        So, why don't we let me go back to Ms. Hunter and

7    then I'll come back to you on this issue.

8        Ms. Hunter, assuming I find jurisdiction, which I do

9    on the nonstatutory review, I now move to your motion for a

10   preliminary injunction.  And tell me under the *Winter*

11   standards why I should grant you preliminary injunctive

12   relief.

13       MS. HUNTER:  Thank you, your Honor.  Well, we are

14   likely to succeed on the merits, both on terms of our

15   nonstatutory review claims and on our APA claims.  The

16   defendants have conceded as to 32 of those APA claims.  I

17   believe you wanted to address the other six later.

18       THE COURT:  And by the way, as to the issue of

19   preliminary injunction right now, I'm only addressing the 32

20   which have already been uncontested.  We'll move in a minute

21   to the other six.

22       MS. HUNTER:  So, likelihood of success seems fairly

23   straightforward at this juncture, your Honor.  We've discussed

24   irreparable harm already this morning.  We've presented

25   substantial irreparable harm in declaration testimony which

38

1    we've continued to update over time, as that harm has become

2    more and more acute.  In this case, the balancing of the

3    equities and the public interest merge because the government

4    is a party.  And we have made strong showing that it would be

5    in the public interest both for the people and the public on

6    the ground, but also for the normal orderly rule of law for

7    these grant programs that were passed by the thoughtful

8    process of Congress and then the thoughtful Administration of

9    the prior executive to continue.  And so, we would ask that

10   you preserve the status quo and issue a preliminary injunction

11   in the plaintiffs' favor.

12        THE COURT:  Well, let me ask you this.  Of these 32

13   grants, I have tried to trace them a bit to statutes.  And I

14   think I've largely done that.

15        MS. HUNTER:  Yes.

16        THE COURT:  It is the plaintiffs' assertion that

17   these grants are based upon mandatory appropriations of

18   Congress, correct?

19        MS. HUNTER:  That's right, your Honor.

20        THE COURT:  Their common language is they shall be

21   expended for this purpose, correct?

22        MS. HUNTER:  That's correct, your Honor.

23        THE COURT:  And it's the plaintiffs' theory that to

24   cancel the grants because the present holders of office

25   disagree with that mandate is ultra vires.

39

1          MS. HUNTER:  That's correct.  And in our most recent

2     brief we put a little more meat on the bones with regard to

3     each grant program and connected the statutory language to the

4     language of the executive orders.  And I think what we see in

5     many cases is that this statutory language is actually

6     diametrically opposed to the stated policies of the executive

7     branch.

8          THE COURT:  Well, that's why when, you know, Mr.

9     Timmons was saying, well, there was a change in policy, I

10    said:  What's the policy?  Because if the policy is not to

11    follow the law, that's not -- that's a discretion one cannot

12    exercise, correct?

13         MS. HUNTER:  That's correct.  And as far as we can

14    tell, the policy, as these executive orders, once again, seems

15    to essentially be saying is:  Don't follow the law,

16    particularly with these IRA and IIJA grants.

17         THE COURT:  Well, I mean, I don't have any doubt that

18    the present agency officials don't agree with those laws,

19    correct?

20         MS. HUNTER:  Correct.

21         THE COURT:  And as American citizens, they can speak

22    out against them, correct?

23         MS. HUNTER:  That's right.

24         THE COURT:  But they don't have the authority to

25    violate an act of Congress.

1          MS. HUNTER:  No.  And I think that unleashing

2    executive order, if you boil it down, it essentially says:  We

3    will eliminate these two congressionally mandated programs,

4    the IRA and IIJA.

5          THE COURT:  Well, you keep wanting me to go to the

6    top.  And my tendency is to go to the people who actually

7    committed the acts.  Because I think there's, frankly, a

8    little ambiguity, probably intentional, in those executive

9    orders.  But there's no ambiguity at the agency level.

10          MS. HUNTER:  That's correct, your Honor.  But I would

11    note that one thing that the nonstatutory review of

12    jurisdiction gets you is that ability to go to the top.  The

13    President is --

14          THE COURT:  There's no question.  I mean, *Marbury v.*

15    *Madison, Youngstown Steel*, obviously, I get.  The question is:

16    What do I need to do?  Because I'm trying to find a way, if I

17    find a wrong, to find a remedy.  And the question is:  What do

18    I need to do to establish it?

19          I, frankly, think if you compare those agency memos

20    about cancel everything, or find me every word with "economic

21    justice" in it and cancel it, is broader than those executive

22    orders.  They don't exactly say that.  In fact, their

23    questions in some of these documents I've been sent in which

24    they say what does this mean, they're asking the OMB what does

25    this mean, because the agencies are a little confused:  Are we

1    only talking about the New Green Deal or are we talking about

2    everything?  And OMB makes it very clear:  We're talking about

3    everything, right?  So, you know, the question is:  Where do

4    you -- who actually freezes or terminates these grants?

5            MS. HUNTER:  Yes.  And as we discussed already,

6    your Honor, I think the defendants were very helpful in

7    elucidating that in these declarations, which did explain

8    that, you know, for EPA, they were terminated by this

9    particular person and likewise for USDA.

10           THE COURT:  Yeah.  Okay.  Let me hear from Mr.

11   Timmons on the issue of whether preliminary injunctive relief

12   under the nonstatutory review -- first of all, why are the

13   plaintiffs not likely to have a success on the merits for the

14   same reason they're having success regarding the 32 grants

15   under the APA?

16           MR. TIMMONS:  Again, your Honor, it's a

17   jurisdictional argument there.

18           THE COURT:  What's the jurisdictional argument?

19           MR. TIMMONS:  That you cannot repackage a

20   constitutional claim as a -- you cannot repackage a claim for

21   money damages as a constitutional claim.  And, your Honor, I

22   don't want to frustrate the Court.  So, if the Court has

23   already rejected our analysis of the equities here and the

24   likelihood of success, we can stand on our brief and the

25   arguments we've made.

42

1      THE COURT:  Well, your brief doesn't address it, so
2    that's why I'm asking you.
3      MR. TIMMONS:  It does, your Honor.  We -- we do have
4    -- I mean -- I just -- I know you do not agree with the way
5    that we've balanced the equities or the way we've calculated
6    the harm.  And so, I'm happy to advance that argument, but I
7    think you're going to tell me that you don't agree with me.
8      THE COURT:  Well, it's not a question of whether I
9    agree with you.  I asked you, Mr. Timmons, initially, I said I
10   was told there was individualized review before these grants
11   were frozen.  And I asked for documents to show me that.  I've
12   been through the documents.  They don't show that.  So, then
13   you told me that you were confident they had made
14   individualized reviews before they terminated.
15     MR. TIMMONS:  No.  I don't believe I said that,
16   your Honor.
17     THE COURT:  You don't think you said that?
18     MR. TIMMONS:  I could be wrong, but --
19     THE COURT:  You're wrong.  Let me read you from your
20   transcript.  Docket 142, page 35:
21     "MR. TIMMONS:  I would say that if the pause was as
22   you said, it was a broad pause based on funding" -- which was,
23   by the way, a new concession on your part.
24     Then you said:  "I do think the terminations were
25   done based on a review of the grants."

43

1        MR. TIMMONS:  Yes, your Honor.

2        THE COURT:  That's why I asked for the grant reviews.

3   And they don't show individual review.  Mr. Voyles claims he

4   has individual reviews for some unknown number of grants he

5   cancelled in one day without a single piece of paper, which he

6   claims he orally -- orally -- related to some other official.

7   I've been involved with government for a lot of years.  I've

8   never seen a decision of any substance without a paper trail,

9   without a set of documents, reasoning, explaining, documenting

10  the review, the explanation for it.

11       I was, frankly, embarrassed for the government to

12  read Mr. Voyles' affidavit.  I've just never seen anything

13  submitted to me like that.  It was, frankly, sort of an insult

14  to the Court.  You know, y'all can do what you wish.  I'm used

15  to the government speaking to me straight, to answer my

16  questions honestly.  Fifteen years on the bench, I've never

17  had an experience where I thought the government did not do

18  that.

19       MR. TIMMONS:  Well, your Honor, I'm sorry that I've,

20  you know, kind of hurt your faith in our office.  I'm trying

21  my best to answer the questions based on the information I

22  have.  We're talking about -- we're talking about one grant

23  program out of 21.  And so, you know --

24       THE COURT:  I'm sorry?

25       MR. TIMMONS:  There's 21 grant programs at issue in

44

1    this case.  And we're talking about one of those 21 grant

2    programs and how that was decided.

3            THE COURT:  Yeah.  But I -- I --

4            MR. TIMMONS:  And I think I was fair in saying that

5    -- oh, go ahead.  I'm sorry.

6            THE COURT:  But I asked you for all the information

7    on all the grant terminations and I got no -- to avoid this

8    very issue, Oh, there are more, I gave you every chance.  I

9    have received, I think, 9,500 pieces of paper.  Nothing shows

10   any individual review.

11           And my colleagues, other district courts around the

12   country, at the preliminary injunction stage, have relied on

13   the word of the government.  I just said, like Kansas:  Show

14   me.  Show it to me.  And what I find is nothing.  There's

15   nothing.  What the plaintiffs allege happened.  The new

16   Administration didn't like the former actions of Congress

17   acting ultra vires, and cancelled grants that were mandated,

18   and now wants to argue that I don't have the jurisdiction to

19   hear it.  I do have jurisdiction.  I have it on two

20   independent grounds.  I'm going to enter judgment today.  I'm

21   going to grant a preliminary injunction under the nonstatutory

22   review.

23           Now, let's turn to the six grants contested.

24           Ms. Hunter, let me make sure I sort of understand

25   what these grants are all about.  Mr. Timmons shared with me

45

1    -- and I didn't know this -- at our last hearing that these

2    Commodity Credit Corporation grants, these six grants -- this

3    is 27 through 32 grants -- that these were appropriated funds,

4    generally appropriated funds, to the Department of Agriculture

5    in which the former Administration had elected to create

6    something called the Partnership for Climate-Smart Commodities

7    and then awarded grants.  Do I have that part right?

8         MS. HUNTER:  Yes, your Honor.  Essentially, it's

9    through the Community Credit Corporation.

10        THE COURT:  Yeah.  And so, I raised then, I said,

11   well, that looks a little different to me, when Mr. Timmons

12   shared it with me.  So, I was very interested in whether that

13   appears to be correct.  I noticed in your complaint -- and you

14   said it upon information and belief, so I think you didn't

15   really know that it might have had some IRA money.  But I

16   don't see any evidence of IRA money for these particular

17   grants.  Do you have anything to the contrary?

18        MS. HUNTER:  No, your Honor.  I mean, there was a

19   press release -- and apparently we're using press releases

20   now.  That's what the defendants have offered for these

21   claims.  We were trying to get to the bottom of these grants,

22   because, as your Honor noted, they were cancelled at the same

23   time as all of the other IRA grants.  So, we were trying to

24   better understand that.  And we did find a press release at

25   the time from the Biden Administration which suggested that

46

1    IRA money had been used to supplement this pot of grant

2    funding.

3           And in the press release that the defendants cite in

4    their most recent brief -- which they didn't attach, so I'm

5    not sure if we have the right one, but we think we have the

6    right one -- the quote from the secretary is:  "The

7    Partnership For Climate-Smart Commodities initiative was

8    largely built to advance the Green New Scam, which seems

9    similar to the language being used about the Green New Deal in

10   the executive order.

11          THE COURT:  But it didn't tell us the source of the

12   funding.

13          MS. HUNTER:  It didn't.  And I don't actually think

14   it's relevant where the funding came from, your Honor.

15          THE COURT:  Well, let me say this.  There's sort of

16   several different theories of liability under the APA.  One of

17   them is that these officials acted contrary to appropriations

18   of Congress that were specifically mandated.  Those are grants

19   1 through 26 and 33 through 38.  Okay.  And I've already told

20   you my thoughts about that.  When we get to the ones that are

21   terminated -- I think they're now terminated, those six

22   grants.  Because the Administration seeks to -- the secretary

23   seeks to repurpose the moneys, which I think we agree there

24   can be lawful changes in policy, right -- we know that,

25   there's a statute that says that -- as long as they have the

1    discretion to do it.  And if there's general appropriated

2    funds, general agencies have discretion.  And as I understand

3    the representation of the government -- and if it's not

4    correct, I want you to straighten me out on this -- is that

5    they have decided to repurpose the money and they call it a

6    different program.  I can't remember the name of it right now.

7    But it appears to have a similar mission.  But they're

8    insisting on 65 percent of the money to go directly to

9    producers, not to overhead.  Not an unsympathetic view, you

10   know, just extracting without knowing details.  And the

11   plaintiffs have been invited -- these six grant recipients

12   have been invited to apply for the new grant and will have the

13   opportunity to demonstrate that they can meet the

14   requirements.

15            Any part of that seem to be wrong?

16            MS. HUNTER:  No, your Honor.  Except, I would say

17   that this isn't just a sort of general appropriation.  It is

18   within this Community Credit Corporation set of funds, which

19   is there to stabilize and advance the interests of farmers,

20   which this abrupt change without notice or any review does not

21   --

22            THE COURT:  It's probably not -- maybe, you know, in

23   government, class might not be the model way to change policy.

24   I see that.  But I'm at a point of having to look at

25   preliminary injunctive relief.  And let me just be honest with

1   you, the facts are kind of a muddle to me right now, unlike

2   your evidence about, you know, we can trace an executive order

3   to an OMB, to an agency memo, to -- to internal memos to say

4   get all these grants, and, boom, they're gone.  That's really

5   strong -- it's not even circumstantial, it's direct evidence.

6   I don't have that here.  You know, I don't have it here.  And

7   it's more of a procedural argument, you know:  Did they

8   consider reliance?  Did they file a fair process?  Contrary to

9   the other ones, which there's no evidence they're planning to

10  spend the money on anything.  They're here, announcing a

11  program.  This is different.

12          And, you know, preliminary injunctive relief is

13  extraordinary relief, right?  *Winter* says it's not entitled in

14  every case by any means.  It's not routinely granted in any

15  essence.  And I'm just having trouble getting through the

16  first step of this, of showing a likelihood of success.  I'm

17  not saying that once we get into the -- we build a fuller

18  record, not relying on press releases, that we actually -- you

19  might persuade me that this was unlawful.  But I'm struggling

20  right now to meet the -- you know, I take these standards very

21  seriously.  And I'm just -- I'm just -- I'm having trouble

22  getting where I can say that there is a likelihood of success

23  on the merits.  The answer is kind of what Mr. Timmons said

24  about his knowledge of *Strickland*:  I don't know.  I mean, I

25  don't know on this.  And I think it would be irresponsible for

49

me to issue an injunction on something I don't really fully
understand.

Now, what you can do is go build a record on this.
And I'm open to considering.  When I say "I don't know," I
don't have an opinion one way or the other.  I just can't --
you just can't -- in my view, you can't meet your burden to
show a likelihood of success because the record before us is
so limited.  Frankly, I'm sure you aren't too thrilled to be
relying on a press release as the basis of your evidence, but
you'll have your chance to take depositions and to further
develop the record.  And it may be that, on the merits, you
know, we'll have -- I will be able to make a definitive
determination one way or the other.  I'm just not comfortable
at this point with this paucity of a record to make a finding
for preliminary injunctive relief.

But I invite further review to talk with the
government to try to get more evidence and to get more
discovery done to see whether there might be a basis under
either the APA or some other grants.  You know, it doesn't
seem that there's a violation of the constitutional provision.
There is not a specific statute that we're violating here.
So, we're really an APA claim.  And I think we just need more
evidence.

You know, there are two parts of the APA:  There is
sort of the procedural, and there's the substantive.  And the

1    32 grants are sort of prevailing on the substantive part, not

2    the procedural.  And you're asking me basically on a

3    procedural grant.  And the evidence, in my view, just isn't

4    there at this point to meet the plaintiffs' burden.

5            MS. HUNTER:  Thank you, your Honor.  And I agree with

6    that general assessment.  I will say that the Court has been,

7    I think, extraordinarily generous with the defendants in

8    allowing them to offer up what is the record to support their

9    termination of these grants.  And in many ways, I think it's

10   no different than the other grants, where there is no paper

11   trail.  And the fact that what they did present -- the only

12   thing they presented in their most recent briefing was this

13   press release, which was intended to demonstrate a reasoned

14   process and a consideration of --

15           THE COURT:  Well, it might not be true.  It might not

16   be true.  And you can come back and show me that, okay?

17           MS. HUNTER:  Right.

18           THE COURT:  But, if it is true -- it is reasoned, if

19   it's, in fact, true.  And I presume your clients are going to

20   apply for these grants?

21           MS. HUNTER:  I believe many of them might,

22   your Honor, yes.

23           THE COURT:  Yeah.  I think they should if they really

24   want to participate.  And then if they think this was a

25   charade or untrue or whatever, then you'll actually -- and

51

1    you'll have some chance to take some depositions and gather

2    more documents.  But at this early stage, I think we're

3    struggling to figure out -- this just seems to be another

4    kettle of fish to me.  This is just a different theory.

5              And I can understand in the beginning it all happens

6    at the same time.  You're assuming there's one kettle of fish,

7    you know.  And I think your complaint shows that you're

8    thinking maybe there's IRA money in all this.  You're not the

9    first plaintiff to file a lawsuit and find out facts might be

10   somewhat different.  I will say, mostly your facts are proven

11   to be true.  You went and got the documents.  So, I'm not in a

12   position to issue a preliminary injunction on the six.

13             Mr. Timmons, you want to buy it back, or are you

14   happy to stand on what you've said already?

15             MR. TIMMONS:  I think I'm good, your Honor.  Thank

16   you for the opportunity, though.

17             THE COURT:  You're going to let Mr. Berlinsky argue

18   that part?

19             MR. TIMMONS:  Yeah.  He wants to take this one.  He's

20   confident.  I didn't see him hop up before.

21             THE COURT:  No, I didn't either.

22             Yes, Ms. Hunter.

23             MS. HUNTER:  The only thing that I would ask is that,

24   as these plaintiffs -- you know, a lot of these plaintiffs are

25   the ones having to furlough staff and are certainly suffering

1    significant harm on a daily basis that, you know, the sooner

2    we can move that process along and move discovery along, that

3    would be appreciated, your Honor.

4         THE COURT:  Well, you know, I will take it that the

5    32 are going to go up on appeal, and the six will be here.

6    And we'll issue a scheduling order, and you can start taking

7    depositions.

8         MS. HUNTER:  Thank you, your Honor.

9         THE COURT:  You've got an answer due, I think, today;

10   is that right?  I think today we have an answer due.

11        MR. TIMMONS:  The answer is due a week from tomorrow.

12        THE COURT:  Oh, I missed it by a week.  Okay.  And

13   then we'll issue a scheduling order.  And I don't know of any

14   reason, if the other ones go up on appeal, why I would need to

15   hold these in abeyance, since they're not really covered by my

16   order.

17        Any disagreement with that from anybody?  Can we go

18   ahead and address the six to which I'm not granting relief?

19        MR. TIMMONS:  Your Honor, we're going to file a

20   motion to dismiss based on 12(b)6 for failure to exhaust on

21   that.  So, after that issue is resolved, we --

22        THE COURT:  Well, you'll file a 12(b)6.  We'll

23   address it.

24        MS. HUNTER:  Your Honor, can I clarify?  Should we

25   also be swiftly moving for summary judgment on the ultra vires

53

1    nonstatutory basis?

2          THE COURT:  Well, I think the defendant has a right

3    to answer.  The only reason we're getting to judgment is

4    because they are not contesting.  Okay.  It's uncontested

5    claims.  There's no reason.  But I think they have a right to

6    file and address those issues.  And in the interim, you'll

7    have preliminary injunctive relief on that theory.  But I

8    think you would be premature to file for summary judgment

9    before they answer.  And you may want to create or may not

10   want to create more of a record.  If you feel like your record

11   is adequate after -- I presume they're going to make a motion

12   to dismiss.  I'll address that issue.  I've substantially

13   addressed that issue already here.  And then you do as you

14   wish.  I don't tell plaintiffs or defendants how to try their

15   cases.

16         MS. HUNTER:  Okay.  Thank you, your Honor.  So, just

17   a final point of clarification:  Your Honor plans to issue a

18   preliminary injunction on both jurisdictional theories but

19   also judgment on the APA?

20         THE COURT:  No.  I'm entering -- on the APA claims,

21   I'm entering judgment and granting permanent declaratory and

22   permanent injunctive relief.  Those are over.  The defendants

23   are not contesting under the APA.  That's over.  They can take

24   that up on appeal.  They've got a final judgment.

25         On the nonstatutory review, I'm going to grant

54

1    preliminary injunctive relief, not permanent.  And then I'm

2    going to deny the motion for preliminary injunction as to the

3    six contested.  My goal is to get that out today, but it may

4    be tomorrow before that happens.

5            MS. HUNTER:  Thank you, your Honor.

6            THE COURT:  Mr. Timmons, anything further from the

7    government?

8            MR. TIMMONS:  No, your Honor.

9            THE COURT:  Thank you.  This hearing's adjourned.

10                   * * * * * *