No. 25-1575

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

The Sustainability Institute, *et al.*,

*Plaintiffs-Appellees*

v.

Donald J. Trump, *et al.*,

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the District of South Carolina

---

## BRIEF OF AMICUS CURIAE
## U.S. SENATOR SHELDON WHITEHOUSE
## IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Gerson Smoger
SMOGER & ASSOCIATES, P.C.
4228 Hallmark
Dallas, TX 75229
Tel. (510) 531-4529

Robert S. Peck
*Counsel of Record*
CENTER FOR CONSTITUTIONAL
  LITIGATION, P.C.
1901 Connecticut Avenue, N.W.
Suite 1101
Washington, DC 20009
Tel. (202) 944-2874
robert.peck@cclfirm.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................1

INTRODUCTION ................................................................1

BACKGROUND ...................................................................4

ARGUMENT .....................................................................8

   I.   The President Must "Faithfully Execute[]" Laws Passed by Congress ..8

   II.  Congress Created a Path for the President to Prompt Reconsideration of Spending Policy Without Violating the Constitution .......................11

   III. Separation of Powers Issues Are Properly Brought by Affected Individuals to the Courts .................................................13

CONCLUSION ..................................................................14

CERTIFICATE OF SERVICE ..............................................15

CERTIFICATE OF COMPLIANCE ......................................15

ii

# TABLE OF AUTHORITIES

**Cases**

*Bond v. United States*, 564 U.S. 211 (2011) ......................................................4, 13

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ..... 11

*Clinton v. City of New York*, 524 U.S. 417 (1998) ....................................9, 11

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ......................................................... 7, 9

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013)................................10, 12

*Kendall v. U.S.*, 37 U.S. 524 (1838) ............................................................. 10

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .......................................................... 11

*Myers v. United States*, 272 U.S. 52 (1926) ................................................. 8

*Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074 (10th Cir. 2006)..... 13

*Train v. City of New York*, 420 U.S. 35 (1975) ............................................ 11

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
     833 F. Supp. 2d 524 (E.D.N.C. 2011)............................................... 13

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) (Marshall, C.J.)............. 3

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) .........3, 10

**Statutes**

2 U.S.C. §§ 683-84 ...................................................................................... 11

42 U.S.C. § 18795 ........................................................................................ 5

42 U.S.C. § 7437 .......................................................................................... 5

42 U.S.C. § 7438 .......................................................................................... 5

Pub. L. No. 117-169 § 60106, 136 Stat. 1818, 2069 (2022) ........................... 5

Pub. L. No. 117-58 § 11115, 135 Stat. 480 (2021) ........................................ 6

Pub. L. No. 117-58 § 11406, 135 Stat. 576 (2021) ........................................ 6

Pub. L. No. 117-58, div. J, title VIII, 135 Stat. 429, 1421 (2021) .................. 6

**Other Authorities**

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025) ........................... 2

H.R. Rep. 117-130 (2021) ............................................................................ 7

H.R. Rep. 117-70 (2021) .............................................................................. 7

H.R. Rep. 94–1656 (1976) ........................................................................... 13

Jonathan L. Ramseur, Cong. Rsch. Serv., R47262, Inflation Reduction Act of
     2022 (IRA): Provisions Related to Climate Change (2023)......................... 6

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ............ 2

**Constitutional Provisions**

U.S. Const. art. II, § 3 ............................................................. 3, 9

## INTEREST OF AMICUS CURIAE

As a member of the legislative branch, Senator Whitehouse has an acute interest in safeguarding Congress's exclusive legislative authority. Senator Whitehouse is the ranking member of the Senate Environment and Public Works ("EPW") Committee, which has jurisdiction over significant portions of the funding at issue in this case. During debate and passage of the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA"), he was a senior member of the Budget and EPW Committees and authored several provisions of each statute. He therefore has an interest in seeing these funds distributed in accordance with legislative mandates.[1]

## INTRODUCTION

Upon taking office, President Trump issued a rash of executive orders circumventing the legislative process. These included the "Unleashing American Energy" order, which commanded agencies to

---

[1] Senator Whitehouse is filing this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2). No party or counsel for any party authored this brief in whole or in part, no party or party's counsel contributed any money intended to fund the preparation or submission of this brief, and no person other than Senator Whitehouse or his counsel contributed money intended to fund this brief. *See* Fed. R. App. P. 29(a)(4)(E).

"immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]." Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025). The order's clear intent was to eliminate funding streams for climate change and environmental justice. The Office of Management and Budget ("OMB") made this goal explicit, ordering agencies to withhold funding that the Administration saw as "advanc[ing] Marxist equity . . . and green new deal social engineering policies." D. Ct. Dkt 23-6. Although OMB withdrew that memo when it quickly led to adverse judicial rulings, the process it set in motion, and the harm it caused, continue. Agencies froze all IRA and IIJA funding with no consideration for statutory requirements, funding obligations, or impoundment and rescission procedures. Congressional direction cannot be so easily swept aside.

The founders divided power between the three branches to prevent "accumulation of all powers, legislative, executive, and judiciary, in the same hands," because such accumulation "may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). Under that system, "the legislature makes, the executive executes, and the judiciary construes the

law." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825) (Marshall, C.J.). When Congress passes legislation, it is the President's duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

President Trump seeks to upset this constitutional balance, aggrandizing executive power at the expense of the legislative branch. When, as here, Congress has exercised its power of the purse and issued spending directives that are abundantly clear, the executive who takes issue with them is not without power. Congress has delineated a process under the Impoundment Control Act for the President to prompt Congressional reconsideration of spending decisions without violating the separation of powers. President Trump did not avail himself of this tool, instead unilaterally grabbing the power to decide Congressional spending prerogatives. Rather than execute the law, he engaged in a legislative act.

Despite this, the motions panel erroneously dismissed major constitutional claims in a single sentence. Defendants would have the

Court believe that the controversy here implicates discrete contractual disputes and should be relegated to the Court of Federal Claims.  In fact, the dispute here is a constitutional one, testing whether President Trump can disregard clear legislative mandates.  Separation of powers is no mere formality.  It does more than "protect each branch of government from incursion by the others"; the "structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011).

## BACKGROUND

In passing the IRA and IIJA, Congress sought to spur clean energy development, mitigate climate change, and address environmental injustices.  The plain text of the statutes makes this clear.  Each statute appropriates billions of dollars in grant funding to accomplish those goals, with precise instructions for how agencies must award funding.  They do not leave room for agencies to withhold money based on policy preferences outside the specific statutory criteria of each provision crafted to address climate change and promote environmental justice.

For instance, the IRA contains $3 billion in funding and technical assistance for "environment and climate justice block grants."  42 U.S.C.

§ 7438(a).  Eleven grants in this case are funded by this program.  D. Ct. Dkt. 24-22 at 2-5.  EPA must distribute these grants to projects that, for instance, "help reduce greenhouse gas emissions and other air pollutants," "mitigate climate and health risks" from extreme heat, and promote "climate resiliency and adaptation."  42 U.S.C. § 7438(b).  The Administrator is instructed to use these funds to "benefit disadvantaged communities."

The IRA repeatedly directs funding to climate change and environmental justice projects.  *See, e.g.*, 42 U.S.C. § 7437 (grants "for the reduction of greenhouse gas air pollution"); 42 U.S.C. § 18795 (grants for home energy efficiency programs, with special provisions for work performed in disadvantaged communities); Pub. L. No. 117-169 § 60106, 136 Stat. 1818, 2069 (2022) (funding to "reduce greenhouse gas emissions and other air pollutants at schools in low-income and disadvantages communities").  All told, eighty-nine provisions in the IRA address climate change, with seven of those specifically directed to environmental and climate justice.[2]  *See* Jonathan L. Ramseur, Cong. Rsch. Serv.,

---

[2] This focus reflects an increasing awareness that climate change poses existential threats and must be addressed.  Senator Whitehouse, *Time to Wake Up 271: Recent Reports* (Sept. 15, 2020),

R47262, Inflation Reduction Act of 2022 (IRA): Provisions Related to Climate Change (2023).

The IIJA similarly directs funds to climate change and environmental justice projects. Some of these funds must be distributed based on enumerated statutory formulas. *See, e.g.*, National Electric Vehicle Infrastructure Formula Program, Pub. L. No. 117-58, div. J, title VIII, 135 Stat. 429, 1421 (2021) ("formula" grants for electric vehicle charging infrastructure). These provisions leave the agencies *zero* discretion to impose unauthorized policy preferences on funding distribution, much less policy preferences that are facially inconsistent with the statutory text. Like the IRA, the IIJA directs funding to promote environmental justice. *See, e.g.*, Pub. L. No. 117-58 § 11406, 135 Stat. 576 (2021) (grants to mitigate urban heat islands, expand tree cover, and improve air quality in low-income communities); Pub. L. No. 117-58 § 11115, 135 Stat. 480 (2021) (funding to reduce mobile source air emissions, prioritizing benefits to disadvantaged communities). When agencies block entire provisions of the IRA and IIJA by freezing and

---

https://www.youtube.com/watch?v=LSZ3xOFpG84&list=PLhyg5hj7I21j r7tP--id5EmMTmpTbdlw1&index=33.

terminating hundreds of grants, including those at issue here, they are not initiating discrete contract disputes. They are seeking to legislate, by erasing policies reflected in Congressional spending directives.

Congress's intent to promote environmental justice and address climate change is also unmistakable from the legislative history. Members worked to craft bills that would "tackle the climate crisis" by "driv[ing] economic opportunities, environmental conservation, and climate resilience—especially in underserved and disadvantaged communities." H.R. Rep. 117-130, at 5 (2021); *see also* H.R. Rep. 117-70, at 392 (2021) (IIJA intended to "reduce carbon pollution . . . and build a more just and equitable future through investment in businesses owned by socially and economically disadvantaged individuals"). The IRA and IIJA epitomize the "step-by-step, deliberate and deliberative process" of legislation committed to Congress by the Constitution. *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983). According to the Congressional Research Service, Congress held 23 committee hearings to shape the IRA, 16 of those by the 117th Congress which ultimately passed it. Congress held 99 committee hearings on topics that shaped the IIJA, 19 of those in the 117th Congress. The legislative history reinforces the clear statutory

7

text and leaves no room for the executive to withhold funding based on policy preferences inconsistent with these statutory goals.

## ARGUMENT

### I.    The President Must "Faithfully Execute[]" Laws Passed by Congress.

The panel erred when it found that Plaintiffs' claims are likely subject to the Tucker Act.  This case is not about agencies' failures to honor specific grant agreements: it is about President Trump's wholesale disregard for Congress's legislative role and the Constitutional separation of powers.  When a wrecking ball has destroyed the entire building, parties should not be forced to litigate over each broken brick.

The balance of powers is fundamental to the nation's constitutional system.  In the words of Justice Brandeis: "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power.  The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

8

The Constitution places the power to make law and the power of
the purse in the hands of Congress. Congress is the people's branch,
consisting of members from each State who must work together to pass
laws. This need for collective action among members representing
diverse interests may mean that progress is slow and reflects
compromises. But that is exactly the point: historical records and judicial
precedent "provide abundant support for the conclusion that the power
to enact statutes may only 'be exercised in accord with a single, finely
wrought and exhaustively considered, procedure.'" *Clinton v. City of New
York*, 524 U.S. 417, 439-40 (1998) (quoting *Chadha*, 462 U.S. at 951).
This takes time and compromise, and reflects Congress's role as the most
democratic of the branches.

Once Congress passes legislation, and the President signs it, the
President's duty is to "take Care that the Laws be faithfully executed."
U.S. Const. art. II, § 3. The President cannot unilaterally refuse to
comply with the laws that Congress has passed. "When the President
takes measures incompatible with the expressed or implied will of
Congress, his power is at its lowest ebb," and such measures must be
carefully scrutinized, "for what is at stake is the equilibrium established

by our constitutional system." *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring). Here, President Trump instructed agencies to withhold funding in contravention of explicit statutory requirements. He lacks both constitutional and statutory authority to do so. Simply put, presidential policy preferences cannot be allowed to supersede legislative mandates.[3]

To be sure, the President has authority to control and supervise agencies and agency spending, but only within the bounds of the statutes that Congress has passed. There is no constitutional authority to pursue policies that conflict with statutory text. Courts have repeatedly, emphatically concluded that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Kendall v. U.S.*, 37 U.S. 524 (1838) (rejecting the argument that the President's power to execute laws allows him to refuse to spend funds as

---

[3] This is a constitutional principle Senators from both sides of the aisle agree on. *See* Brief of Amici Curiae U.S. Senators Kevin Cramer, Shelley Moore Capito, and others, *Kentucky, et al. v. Fed. Highway Admin., et al.*, No. 24-5532, ECF 45 at 3-4 (6th Cir. Oct. 7, 2024) (emphasizing importance of separation of powers to avoid "concentrated power" in the executive branch (quoting *Youngstown*, 343 U.S. at 593–94)).

directed by Congress); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); *Train v. City of New York*, 420 U.S. 35, 42-47 (1975). Allowing him to do so would be tantamount to allowing a post-signature veto. *Cf. Clinton*, 524 U.S. at 439 (finding line-item veto unconstitutional). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018).

## II. Congress Created a Path for the President to Prompt Reconsideration of Spending Policy Without Violating the Constitution.

The executive is not without constitutional options for adopting new policy postures. Where Congress has accorded discretion in a statute, the President may act within the bounds of that authorized discretion. When executed timely, the President has veto power. Each year, the President submits a budget proposal to Congress to express his preferred spending priorities. But for already appropriated funds, the President must avail himself of the Impoundment Control Act, 2 U.S.C. §§ 683-84.

The Impoundment Control Act is an articulation by Congress of the separation of powers between Congress's funding decisions and the

11

"faithful execution" of those funding decisions by the executive. The law sets forth a process by which a President can ask Congress to reconsider previously enacted appropriations. The process allows the President to pause unobligated expenditures for 45 days, while Congress undergoes an expedited reconsideration. The legislation allows "faithful execution" of Congressional will as expressed through its spending decisions, while providing a method for the executive to prompt a new look by Congress at the policy choices it has made.

Under the Impoundment Control Act, if he wishes to delay or avoid spending appropriated funds, the President must transmit such a request to Congress and explain the reasons for the proposed deferral. *Id.* He may withhold unobligated funds permanently only if Congress subsequently passes a rescission bill. *Id.*; *see also Aiken County*, 725 F.3d at 261 n.1 (while "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress," he "does not have unilateral authority to refuse to spend the funds" except in compliance with the Impoundment Control Act). But the President never sent a special message to Congress. Instead, he simply ordered EPA and other agencies to freeze legislatively required federal

funding, ignoring the Impoundment Control Act and exceeding his constitutional powers.

## III. Separation of Powers Issues Are Properly Brought by Affected Individuals to the Courts.

As the Supreme Court has observed, the "claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond*, 564 U.S. at 222. Nothing renders them "disabled from relying on those principles in otherwise justiciable cases and controversies." *Id*.

The Tucker Act does not afford the relief sought by the Plaintiff in this case. The Act creates a "damage remedy for contract claims," "foreclose[s] specific performance of government contracts," and affords no other remedies. H.R. Rep. No. 94–1656, at 12–13 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6133. Every circuit to examine it has concluded that it "'impliedly forbid[s]' federal courts from ordering declaratory or injunctive relief." *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006); *see also Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 833 F. Supp. 2d 524, 534 (E.D.N.C. 2011), *aff'd,* 714 F.3d 186 (4th Cir. 2013). A trip to the Court of Federal Claims

13

would be a fruitless detour.  Jurisdiction properly lies within the court below.

### CONCLUSION

President Trump may wish he had the power to accomplish his policy goals instantaneously with a stroke of the pen.  But our constitutional system does not allow it.  I respectfully urge this Court to grant Plaintiffs' petition for rehearing en banc.

DATE: June 17, 2025

Respectfully submitted,

/s/ *Robert S. Peck*
Robert S. Peck
Counsel of Record
CENTER FOR
  CONSTITUTIONAL
  LITIGATION, P.C.
1901 Connecticut Avenue, NW
Suite 1101
Washington, DC 20009
(202) 944-2874
robert.peck@cclfirm.com

Gerson Smoger
SMOGER & ASSOCIATES, P.C.
4228 Hallmark
Dallas, TX 75229
(510) 531-4529

*Counsel for Amicus Curiae*

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of June, 2025, the foregoing amicus brief was electronically filed with the Clerk of Court using the CM/ECF system, which will cause a copy of this motion to be served upon all attorneys of record in this matter.

*/s/ Robert S. Peck*
Robert S. Peck

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify pursuant to Fed. R. App. P. 29(b)(4) that this brief contains 2,583 words, excluding exempted portions, according to the count of Microsoft Word.

*/s/ Robert S. Peck*
Robert S. Peck