No. 25-1575

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

The Sustainability Institute, *et al.*,

Plaintiffs-Appellees,

v.

Donald J. Trump, *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of South Carolina

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

BRYAN P. STIRLING
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 2

STATEMENT OF THE ISSUE .............................................................. 3

STATEMENT OF THE CASE ............................................................... 3

    A.    Legal and Factual Background ............................................ 3

    B.    Procedural Background ........................................................ 7

SUMMARY OF ARGUMENT ............................................................... 15

STANDARD OF REVIEW ..................................................................... 18

ARGUMENT ............................................................................................ 19

I.    The District Court Lacked Jurisdiction over Plaintiffs' Claims ............ 19

    A.    Plaintiffs' Claims Must Be Brought in the Court of Federal Claims ............................................................. 19

    B.    The Challenged Actions Are Committed to Agency Discretion by Law ............................................................. 27

    C.    Plaintiffs Cannot Circumvent These Limitations on Review by Labeling Their Claims as "Constitutional" or "Nonstatutory Review" Claims ................................... 32

II.    Plaintiffs Have Failed to Demonstrate That the Relevant Equitable Considerations Support Injunctive Relief ............................. 38

CONCLUSION ........................................................................................ 42

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve*
  *Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ................................................................ 20

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................ 14-15, 35, 36

*Board of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ................................................................ 34

*Boaz Hous. Auth. v. United States*,
  994 F.3d 1359 (Fed. Cir. 2021) ........................................ 20, 21

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) .......................................................... 23, 26

*California v. U.S. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025) .............................................. 21

*Crowley Gov't Servs., Inc. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022) ........................................ 19, 23

*Dalton v. Specter*,
  511 U.S. 462 (1994) .......................................................... 37, 38

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) .......................................... 34, 36

*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012) ............................................ 41

*Department of Educ. v. California*,
  145 S. Ct. 966 (2025) .................................... 9, 16, 21, 22, 24, 26, 39

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) .......................................................... 23

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................17, 28

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ......................................... 17, 27, 28, 31

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ............................................................ 23

*Maryland v. King*,
  567 U.S. 1301 (2012) .......................................................... 40

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ............................................................ 20

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ........................................... 21

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ..................................... 28, 29

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................ 38

*Norton v. Southern Utah Wilderness All.*,
  542 U.S. 55 (2004) .............................................................. 41

*Nuclear Regulatory Comm'n v. Texas*,
  No. 23-1300, slip op. (U.S. June 18, 2025) ...................33, 34

*Puerto Rico v. United States*,
  490 F.3d 50 (1st Cir. 2007) ............................................... 35

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ............................................................40

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ...................................... 25, 26

*Strickland v. United States*,
  32 F.4th 311 (4th Cir. 2022) ............................................. 34

*United States v. J & E Salvage Co.*,
  55 F.3d 985 (4th Cir. 1995) ......................................... 21, 23

iii

*United States v. M/V Sanctuary*,
   540 F.3d 295 (4th Cir. 2008) .................................................... 18, 19

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................ 19

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .................................................... 41

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...................................................................... 38

**Statutes:**

American Rescue Plan Act of 2021,
   Pub. L. No. 117-2, 135 Stat. 4 ......................................................4

Inflation Reduction Act,
   Pub. L. No. 117-169, 136 Stat. 1818 (2022) ...................................3
      § 21001(a)(1), 136 Stat. at 2015-2016 ......................................6, 30

Infrastructure Investment and Jobs Act,
   Pub. L. No. 117-58, 135 Stat. 429 (2021) ....................................3-4

16 U.S.C. § 3839aa .......................................................................... 5

28 U.S.C. § 1292(a)(1) ...................................................................... 3

28 U.S.C. § 1331 ............................................................................. 2

28 U.S.C. § 1491(a)(1) ................................................................... 20

42 U.S.C. § 7438(a)-(b) ............................................................. 4, 29

42 U.S.C. § 7438(b)(2) ..................................................................... 5

**Regulatory Material:**

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025) .............................. 6

iv

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................ 3

Fed. R. Civ. P. 65(c) ...................................................................... 12

# INTRODUCTION

This case arises out of agencies' decisions to pause or terminate funding of certain grants in accordance with Executive Orders issued by the President directing subordinate officials to ensure that, where legally permissible, federal funds are not being used to support activities that are inconsistent with the President's policy priorities. Plaintiffs, who received funds under affected grants, challenged the government's funding decisions in district court. The court has now entered three overlapping injunctions that require the government to restore plaintiffs' access to grant funds and that forbid the government from pausing or terminating any of 32 grants without first seeking authorization from the court.

As a panel of this Court has already recognized in granting a stay of the district court's injunctions pending appeal, those injunctions are erroneous. Most glaringly, as the Supreme Court recently held in a similar posture, essentially contractual claims like plaintiffs' must be brought in the Court of Federal Claims, not in district court. In nevertheless asserting jurisdiction over plaintiffs' claims, the district court improperly disregarded that recent and instructive precedent and recast plaintiffs' claims seeking access to grant funds as claims not founded on those grants. The district

court compounded its error by failing to recognize that the agencies'
decisions to enter into, pause, and terminate the grants at issue in this case
are committed to agency discretion by law. Plaintiffs have failed to identify
any statutory constraints on the agencies' broad discretion to allocate grant
funding as they determine best to advance the purposes of the relevant
federal programs.

In addition to being wrong on the merits, the district court's
injunctions are unsupported by the equities. They require the government to
make millions of dollars in grant funding available to plaintiffs, with no
assurance that the government may recover those funds if it ultimately
prevails. And they improperly insert the district court between the President
and his subordinates, requiring the agencies to seek preclearance from the
district court before pausing or terminating grant funding. This Court should
reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C.
§ 1331. J.A. 65. As explained below, the district court lacked jurisdiction over
plaintiffs' claims. *See infra* pp. 19-38. The district court entered injunctive
relief on April 29, 2025, and on May 20, 2025. *See* J.A. 47; J.A. 24. The

government filed a timely notice of appeal on May 21, 2025. J.A. 2936; *see also* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court properly exercised jurisdiction to require the Executive Branch to continue making grant funds available to plaintiffs.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

1. As relevant to this appeal, this case involves 32 grants across approximately 20 funding programs that generally encompass environmental or agricultural projects and that are administered by the Environmental Protection Agency, the Department of Agriculture, the Department of Transportation, or the Department of Energy. *See* J.A. 26-30.[1] In almost all cases, funds for those grant programs were appropriated by the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) (IRA); the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429

---

[1] In their complaint, plaintiffs also challenged the government's actions with respect to six additional grants—referred to as grants 27-32, *see* J.A. 29—but the district court denied plaintiffs preliminary relief as to those grants. This appeal thus does not concern those grants.

3

(2021) (IIJA); or the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4. *See* J.A. 2125-2139 (cataloguing relevant statutory provisions for each grant at issue).

Although the specific statutory framework governing each program varies, each relevant statute generally outlines high-level goals that the program is designed to accomplish and appropriates funds to the agency for the program. The agency is then generally responsible for determining how to allocate the appropriated funds among potential grant recipients to best carry out the goals of the program.

For example, many of the grants at issue here are Environmental and Climate Justice block grants. *See* J.A. 2125-2127. The statute governing such grants appropriates $2.8 billion and provides that the EPA Administrator "shall use" the funds to provide grants to eligible entities "to carry out" specified activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)-(b). Allowable activities include, for example, "community-led air and other pollution monitoring, prevention, and remediation"; "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events"; "reducing indoor toxics and indoor air pollution"; and "facilitating engagement of

4

disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2).

As another example, one of the grants at issue here was awarded as part of the Department of Agriculture's Environmental Quality Incentives Program. *See* J.A. 2132. The "purposes" of that program are "to promote agricultural production, forest management, and environmental quality as compatible goals, and to optimize environmental benefits" by providing grants that "assis[t] producers" with various activities, including "complying with local, State, and national regulatory requirements"; "protecting soil, water, air, and related natural resources"; "install[ing] and maintain[ing] conservation practices that sustain food and fiber production while" also "enhancing soil, water, and related natural resources"; and "mak[ing] beneficial, cost-effective changes to production systems." 16 U.S.C. § 3839aa. The IRA appropriates more than $8 billion across four fiscal years "to carry out" the "environmental quality incentives program," with the stipulation that "the funds shall be available for 1 or more agricultural conservation practices or enhancements that the Secretary determines directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester

5

carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001(a)(1), 136 Stat. at 2015-2016.

2. In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities and instructing agencies to pause funding to the extent permitted by law to allow time to review whether the funding aligns with those priorities. For example, Executive Order 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025), titled *Unleashing American Energy*, declares the policy of the United States to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure that no federal funding is "employed in a manner contrary to the principles outlined in this section, unless required by law," *id.* § 2(a), (c), (i). The Executive Order further instructs agencies to "immediately pause the disbursement of funds" under the IRA and IIJA to assess "consistency with the law and the policy outlined in" the Executive Order. *Id.* § 7(a).

Shortly after the President's Executive Orders, the obligation and disbursement of funds under each grant at issue here were temporarily paused pending a review of the funding for consistency with the Administration's policy priorities. Over the ensuing months, however, the

6

agencies began to make decisions regarding whether or not to terminate grants. By April 22, the agencies had closed or terminated, or were in the process of terminating, 12 grants; they had unfrozen or were in the process of unfreezing 14 grants, including some grants where funding was being restored pursuant to an injunction in a different case; and they continued to freeze obligations and disbursements on three grants. *See* J.A. 26-30; *see also* J.A. 2370 (clarifying that grant 8, which was originally listed as closed, was in the process of being terminated). Finally, the awarding of three of the grants had not been finalized before that process was paused; those awards remained pending as of April 22. *See* J.A. 26-30.

### B.    Procedural Background

1. Plaintiffs are 13 community groups and six cities who allege that they were awarded, or are subrecipients of, the grants at issue in this case. *See* J.A. 66. They claim that the freezing and termination of their grants were unlawful in a variety of ways.

In particular, and as relevant here, plaintiffs bring claims under the Administrative Procedure Act challenging the agencies' funding decisions as arbitrary and capricious, contrary to the relevant statutes and grant agreements, and in violation of the Constitution. *See* J.A. 141-144. In

7

addition, plaintiffs bring what they characterize as "nonstatutory review" or "ultra vires" claims. In those claims, plaintiffs contend that the funding decisions "contravene the statutory requirements to carry out and fund the statutory programs under the IRA, IIJA, and other statutes under which Plaintiffs received grants." J.A. 148. And plaintiffs contend that the decisions violate the constitutional "separation of powers" by "contraven[ing] Congress's directives in the IRA, IIJA, and other statutes to carry out and fund the statutory programs" and violate the "Presentment Clauses" by effectively "amend[ing] the spending provisions of the IRA and the IIJA and other statutes." J.A. 138-141. Among other relief, plaintiffs sought an injunction prohibiting the continued freezing or the termination of grants and prohibiting the agency defendants from "impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds." J.A. 149-152.

2. Plaintiffs filed a motion for a preliminary injunction, in which they sought "injunctive relief to restore the federal grants awarded to Plaintiffs." Dkt. No. 24-1, at 1. On April 9, the government responded to that motion, explaining both that the district court lacked jurisdiction over plaintiffs' claims, *see* Dkt. No. 56, at 9-16, and that the agencies' actions comported with the relevant law, *see id.* at 19-31.

8

On April 29, the district court entered an order rejecting the government's jurisdictional arguments and ordering additional discovery before resolution of the preliminary injunction motion. First, the district court rejected the government's argument that plaintiffs' claims properly belonged in the Court of Federal Claims under the Tucker Act, not in district court under the APA. In so concluding, the court stated that plaintiffs' claims "are not based on contract, but instead are rooted in the Constitution and the grant programs' respective authorizing statutes," and that plaintiffs "seek equitable, not monetary, relief." J.A. 34-39. And the court rejected the government's reliance on the Supreme Court's recent stay decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), in which the Court held that similar claims seeking to restore access to grant funds likely had to be brought in the Court of Federal Claims. J.A. 39-42.

Second, the district court rejected the government's argument that the agencies' decisions to freeze or terminate the grants in question are committed to agency discretion by law and thus unreviewable under the APA. In rejecting that argument, the court stated—without citing any statutory language—that "there is no indication that Congress intended to

9

commit funding under the IRA and IIJA to the agencies' discretion." J.A. 42-44.

Then, rather than proceeding to resolve plaintiffs' pending preliminary-injunction motion, the district court ordered the government to provide documents related to the freezing or termination of many of the grants and related generally to the freezing of grants funded by the IRA and IIJA—discovery that was in addition to the "thousands of documents" that the government had produced in response to an earlier order of the district court. J.A. 45-46. Moreover, although the court had not evaluated the merits of plaintiffs' claims, it further ordered the government not to "freeze or terminate" any of the grants that the government had identified as unfrozen "without notice to the Court and authorization from the Court." J.A. 47.

Over the following two weeks, the government provided additional discovery on an expedited basis, even as plaintiffs' preliminary-injunction motion remained pending. On May 16, in advance of another hearing on that motion, the government agreed not to "contest judgment on the merits of Plaintiffs' APA claims" as applied to the 32 grants now at issue in order to "find common ground and move quickly towards final judgment." Dkt. No.

10

153, at 1. The government explained that it maintained, and was willing to stand on, the jurisdictional objections discussed in the previous order. *Id.*

3. On May 20, the district court entered both a permanent and preliminary injunction on plaintiffs' claims challenging the freezing or termination of the 32 grants. First, as to plaintiffs' APA claims, the district court accepted the government's consent to the entry of judgment. As relief, the court declared "that the freeze and/ or termination" of the 32 grants was "ultra vires" and "in violation of the United States Constitution"; set aside "the freeze and/or termination" of the grants and "direct[ed] the Enjoined Agencies to restore Plaintiffs['] access to grant funds immediately"; and enjoined the agencies "from freezing, terminating or otherwise interfering with the funding of" the grants "without written authorization from this Court." J.A. 8.

Second, the district court addressed plaintiffs' "nonstatutory review" claims, which were predicated on the assertion that the defendants "exceeded the scope of their authority and/or acted unconstitutionally by failing to faithfully execute the laws of the United States." J.A. 10 (alteration and quotation omitted). The court stated—without substantial elaboration—that plaintiffs were likely to succeed on the merits and that the nonstatutory

11

review claims "are, for all practical purposes, mirror images" of the APA claims "which Defendants have elected not to contest." J.A. 14. And on the equities, the court concluded that plaintiffs had demonstrated irreparable harm from the inability to access grant funds and that those harms outweighed any countervailing interests, primarily because the government and public do not have an interest in the "perpetuation of unlawful agency action." J.A. 15-19.

Based on those conclusions, the district court entered a preliminary injunction on plaintiffs' nonstatutory review claims. That preliminary injunction prohibits the heads of the relevant agencies "from freezing and/or terminating" the grants at issue; "directs that Plaintiffs['] access to funding for these grants be immediately restored"; and prohibits the agency heads from "freezing, terminating or otherwise interfering with the funding" of the grants "without written authorization from the Court." J.A. 20. In addition, the court "impose[d] a nominal bond of zero dollars." J.A. 22; *cf.* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined

12

or restrained."). Finally, the district court rejected the government's request for a stay pending appeal. J.A. 8-9.

4. The government appealed and moved for a stay of the district court's injunctions pending appeal. This Court granted that motion. The stay panel concluded that the government "is likely to succeed in showing that the district court lacked subject matter jurisdiction over Plaintiffs' claims." Order 3, June 5, 2025 (Stay Op.) (quotation omitted).

The stay panel explained that "[t]his case is much like *Department of Education v. California.*" Stay Op. 3. In that case, the plaintiffs challenged "the cancellation of grants that were funded generally by an authorizing statute but awarded specifically to each grantee by an operative grant agreement," and the district court entered "an injunction which set aside the grant cancellations and prohibited the Government from" suspending or withholding "funds approved and obligated for the grants." *Id.* (quotation omitted). The Supreme Court stayed that injunction, concluding that "the Government was likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* (quotation omitted). As the stay panel explained, the Supreme Court's conclusion was based on the principle that the "APA's limited waiver of immunity does not

13

extend to orders to enforce a contractual obligation to pay money"; instead, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States." Stay Op. 3-4 (quotation omitted).

The stay panel concluded that the district court likely lacked jurisdiction over plaintiffs' claims for the same reason. As the panel explained, plaintiffs "assert similar claims" to the plaintiffs in *California*: they "allege the Government violated the APA by suspending and canceling certain grants" and, "like the grants in *California*, the grants here were awarded by federal executive agencies to specific grantees from a generalized fund." Stay Op. 4. Thus, the panel explained, "it is the operative grant agreements"—not the underlying statutes—that "entitle any particular Plaintiff to receive federal funds." *Id.*

Moreover, the panel concluded it was unlikely that plaintiffs could use their ultra vires claims as "a detour around the Tucker Act." Stay Op. 4-5. The panel explained that courts' power "to enjoin unlawful executive action" is constrained by "implied statutory limitations" and that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Stay Op. 5 (quoting *Armstrong v.*

14

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015)). Finally, the panel

concluded that the government had demonstrated the requisite irreparable

harm to support a stay pending appeal "because it is being forced to disburse

funds from a finite appropriation" under the injunctions and may not "recoup

those funds once expended." *Id.*

Judge Heytens dissented. In his view, the jurisdictional questions

presented by the case "are novel and difficult" and "could end up being

resolved in favor of either party after full briefing and argument." Stay Op. 6

(Heytens, J., dissenting). But "[a]t this point," he did not "believe the

defendants have made a sufficiently strong showing that they are likely to

succeed on the merits to warrant the extraordinary equitable relief of a stay

pending appeal." *Id.* (quotation omitted).

## SUMMARY OF ARGUMENT

**I.A.** The district court lacked jurisdiction over plaintiffs' claims, which

are contract claims that must be brought in the Court of Federal Claims. The

APA provides a limited waiver of sovereign immunity for claims against the

United States seeking relief other than money damages provided that

another statute does not impliedly preclude review. Where a party seeks

15

funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is suit under the Tucker Act, not the APA.

The Supreme Court has recently stayed a different district court's order to make grant payments in an analogous context, concluding that the government was likely to succeed in demonstrating that the district court lacked jurisdiction over claims seeking such relief. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). As a panel of this Court concluded in staying the district court's injunctions pending appeal, the Supreme Court's reasoning applies with full force in this case. Here, as in *California*, plaintiffs have brought claims to enforce a contractual obligation to make funds available and the only source of plaintiffs' asserted rights to the funds are the grant agreements in question. Thus, their claims are essentially contractual and belong in the Court of Federal Claims.

**B.** The district court also lacked jurisdiction over plaintiffs' claims because the agencies' decisions to pause or terminate grant funding in this context are committed to agency discretion by law. In deciding how to allocate resources, an agency must engage in "a complicated balancing of a number of factors" that are uniquely within the agency's "expertise," including "whether its 'resources are best spent' on one program or another;

16

whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

Plaintiffs have failed to demonstrate that any grant program at issue in this case meaningfully constrains the relevant agency's discretion regarding how to allocate appropriated funds among potential grant recipients. To the contrary, the relevant statutes generally provide undifferentiated sums, which the agencies must determine how best to allocate among many different statutory goals and potential recipients.

**C.** Nor can plaintiffs circumvent these limits on the district court's jurisdiction by labeling their claims as "nonstatutory review" claims. Nonstatutory review is only available to correct extreme agency errors where the plaintiff has no other available avenue to vindicate its rights and Congress has not precluded review. Plaintiffs' claims fail at each hurdle: the Tucker Act provides them an avenue to vindicate their rights; Congress has implicitly precluded review outside that scheme; and the agency defendants

17

plainly have statutory authority to freeze or terminate grant funding, belying any claim that they acted in the absence of any colorable authority.

**II.** The district court's entry of injunctive relief is also not supported by relevant equitable considerations. The district court's injunctions inflict severe harm on the government and the public by requiring the payment of funds that the government may never recover to projects that may not be aligned with the President's policy priorities. Moreover, the injunctions reflect an extreme intrusion into the Executive Branch, establishing a regime whereby agency officials must preclear grant decisions with the district court and interfering with the President's constitutional prerogative to direct subordinate officials. By contrast, plaintiffs have not established that the injunctions are necessary to avert irreparable harm, because plaintiffs' asserted harms are monetary and plaintiffs can receive any funds to which they are entitled through suit in an appropriate forum.

## STANDARD OF REVIEW

The question whether the district court properly exercised jurisdiction over plaintiffs' claims is a legal question that this Court reviews de novo. *See United States v. M/V Sanctuary*, 540 F.3d 295, 299 (4th Cir. 2008) (legal

18

questions are reviewed de novo). In addition, a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. This Court reviews the district court's "decision to grant a preliminary injunction for abuse of discretion, with factual determinations considered for clear error and legal conclusions considered de novo." *M/V Sanctuary*, 540 F.3d at 302.

## ARGUMENT

### I.    The District Court Lacked Jurisdiction over Plaintiffs' Claims

#### A.    Plaintiffs' Claims Must Be Brought in the Court of Federal Claims

1. The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking relief other than money damages, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or

19

impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks to access funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for asserted violations of

those grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach." *Id.*

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also United States v. J & E Salvage Co.*, 55 F.3d 985, 987-88 (4th Cir. 1995) (applying *Megapulse*).

The Supreme Court recently stayed another district court order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act provides the Court of Federal Claims jurisdiction over suits "to order the payment of money." *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). There, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's

21

request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

The district court lacked jurisdiction over plaintiffs' claims here for the same reasons, as the stay panel properly concluded. *See* Stay Op. 4. As in *California*, plaintiffs in this case allege that the government has violated "a contractual obligation to pay money" assertedly embodied in plaintiffs' grant agreements. 145 S. Ct. at 968 (quotation omitted). And as in *California*, "the grants here were awarded by federal executive agencies to specific grantees" like plaintiffs "from a generalized fund." Stay Op. 4. As a result—and again like in California—the source of plaintiffs' purported rights to payment from the agencies are not the underlying statutes but rather are "the operative grant agreements," which bear the hallmarks of a contract. *Id.*

The harm that plaintiffs alleged and the relief they sought (and received) from the district court underscores that this dispute is, at base, contractual. Plaintiffs' concern is the loss of federal funds. *See, e.g.*, Stay Opp'n 20-21 (explaining that plaintiffs' harms are those that "flow from lost grant funding"). To remedy that asserted harm, plaintiffs sought, and the

22

district court issued, an order compelling the continued payment of funds under those particular grants—an order that plaintiffs themselves described as "simply requir[ing] the government to honor commitments it has already made to Plaintiffs in binding grant agreements." Dkt. No. 24-1, at 35; *see also* J.A. 8, J.A. 20 (ordering the agencies to "restore Plaintiffs['] access to grant funds").

The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of their suit. *Crowley*, 38 F.4th at 1112 (quotation omitted). This suit is thus not a challenge to some regulatory action with monetary implications, but rather a suit for money due from the government. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002); *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 26-327 (2020); *cf. Bowen v. Massachusetts*, 487 U.S. 879 (1988). Because "the alpha and omega of this dispute" is a contract claim for moneys allegedly owed, the district court lacks jurisdiction under the APA. *J & E Salvage Co.*, 55 F.3d at 989.

2. In nonetheless concluding that plaintiffs' claims could proceed in district court, that court fundamentally misunderstood the Supreme Court's *California* decision. As an initial matter, the district court suggested that it

23

need not follow the Supreme Court's holding on the Tucker Act question, both because the *California* decision "was made in the context of an emergency application for a stay pending appeal" with "limited briefing" and because the *California* Court considered additional factors in granting a stay "which are not relevant or present here," such as the "potential harm to the parties and public interest." J.A. 41-42.

On the first point, the *California* Court made clear its conclusion that the district court in that case likely "lacked jurisdiction to order the payment of money under the APA," in a context where the government bore the burden of demonstrating likelihood of success on the merits. 145 S. Ct. at 968. That reasoning applies *a fortiori* here, where it was plaintiffs who bore the burden of establishing jurisdiction. And on the second point, although the *California* Court also concluded that the government was likely to demonstrate the equitable factors necessary to support a stay pending appeal, *see id.* at 968-69, its conclusion on those factors does not diminish the force of its independent conclusion that the government was likely to succeed on the merits of the jurisdictional question.

In addition, the district court distinguished *California* on the grounds that, in that case, the terms of the individual grants were at issue whereas

24

"this case deals with" the "implementation of a broad, categorical freeze on obligated funds" rather than the terms of specific grants. J.A. 41. But as the stay panel properly recognized, *see* Stay Op. 4, that is incorrect. As explained, plaintiffs in this case have not identified any statutory right to the continued funding of their specific grants. Instead, any right to access grant funds—and any obligation to continue making those funds available— necessarily stems from the grant agreements. *See* Dkt. No. 24-1, at 35 (plaintiffs describing the injunction they sought as requiring "the government to honor commitments" made in the "grant agreements"); *see also* J.A. 114-117 (plaintiffs' allegations that their grants are "legally binding agreement[s]" and that "regulations incorporated in" those agreements constrain the agencies' ability to suspend or terminate their awards).

This case is thus much like *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985). There, a government contractor encountered difficulties performing the contract; the government invoked a liquidated damages provision and, as a result, withheld payments under the contract. *Id.* at 892. The contractor sued, claiming that the government had violated statutory procedures in withholding the payments. *Id.* The D.C. Circuit held that the suit had to go to the Court of Federal Claims. The court explained

25

that the plaintiff sought "an injunction requiring the government to pay monies owed" and that the "right to these payments is created in the first instance by the contract, not by the" relevant statute. *Id.* at 894. In other words, the statute "confers no such right in the absence of the contract itself." *Id.* The requested remedy was thus "the classic contractual remedy of specific performance." *Id.* So too here.

Finally, the district court erred in relying on *Bowen*, 487 U.S. 879, which did not involve contracts with the government at all. *See* J.A. 37. *Bowen* stands for the proposition that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds"; nevertheless, as the Supreme Court explained in *California*, "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910) (quotation omitted). That distinction drawn by the Supreme Court extends equally to this case. Unlike a challenge that might lead to monetary payments as "a mere by-product," *Bowen*, 487 U.S. at 910, obtaining specific monetary payments from the agencies was the entire aim of plaintiffs' endeavor here.

**B.     The Challenged Actions Are Committed to Agency Discretion by Law**

The district court magnified its error by subjecting the agencies' decisions regarding whether to enter into, pause, or terminate grants to review under the APA's reasoned decisionmaking requirements. The agencies' determinations in that regard are committed to agency discretion by law.

1. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly

27

within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln*, 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), courts may not "intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly requir[e]

28

a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

Against that backdrop, plaintiffs have failed to identify any statutory constraints that would permit review of the agencies' decisions to pause or terminate plaintiffs' specific grants. To the contrary, the programs at issue here are precisely the sorts of programs that confer discretion on the agencies regarding how best to distribute funds to various potential grantees.

For example, as explained, *see supra* pp. 4-5, many of the grants at issue here are Environmental and Climate Justice block grants. Those grants are governed by a statute that appropriates billions of dollars and provides that the EPA Administrator "shall use" the funds to "carry out" any of a large number of permissible activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)-(b).

Nothing in that statute constrains the Administrator's discretion to determine how best to allocate the billions of dollars appropriated among many different potential grant recipients or activities. To the contrary, the statute makes clear that the Administrator may determine which activities "benefit disadvantaged communities" and may exercise his discretion to

29

allocate funds among many possible activities to best achieve that goal as he understands it. And nothing in the statute prohibits the Administrator from terminating or pausing plaintiffs' grants under that provision if he determines that plaintiffs' projects do not comport with Administration priorities, or provides any justiciable standard for evaluating such decisions.

As another example, another program at issue here is the Department of Agriculture's Environmental Quality Incentives Program. Here again, Congress has established a program that contains a number of related purposes and goals and has appropriated billions of dollars for the agency to use to carry out those goals. *See supra* pp. 5-6. This time, the program is generally related to promoting environmentally beneficial practices among agricultural producers, and Congress has provided that the funds "shall be available" for "conservation practices or enhancements that the Secretary determines" achieve various ends. IRA § 21001(a)(1), 136 Stat. at 2015-2016. As with the Environmental and Climate Justice block grants, however, nothing in the relevant statutory scheme meaningfully constrains the agency's discretion to determine how best to allocate the funds among the many potential statutory goals or among the many potential grant recipients that propose projects to carry out each goal. And again, nothing in the

30

statute constrains the Secretary from pausing or terminating plaintiffs'
specific grants if he determines that their projects do not comport with
Administration priorities.

2. The district court reached a contrary conclusion only by inverting
the analysis. According to the district court, defendants had "not pointed to
any evidence showing that" Congress intended to commit funding decisions
to agency discretion. J.A. 44. But that is exactly backwards. *Lincoln*
establishes the general rule that complicated agency funding determinations
are committed to agency discretion, subject to displacement only by specific
statutory restrictions. *See* 508 U.S. at 193. The district court did not cite any
provision of the relevant statutes that supposedly restricts the agencies'
discretion—and, as explained above, these statutes in fact give the agencies
substantial discretion regarding how to allocate funds. Accordingly, the
district court erred in subjecting the relevant funding decisions to judicial
review.

For their part, plaintiffs have attempted to identify some statutory
language that they believe constrains the agency's discretion, at least in the
case of the Environmental and Climate Justice block grant program. There,
plaintiffs have contended that the statute's use of "shall" requires the

Administrator to expend the full measure of appropriated funds on the

specified programs. *See, e.g.*, Dkt. No. 24-1, at 15, 26. But even under

plaintiffs' own reading of that language (and, presumably, of similar

statutory language in other relevant programs), nothing in the statute

requires that the Administrator continue to fund plaintiffs' grants specifically

or provides any meaningful standard by which to judge the Administrator's

determination to curtail funding to projects that do not, in the

Administrator's view, properly advance the Administration's priorities. That

language thus does not constrain the Administrator's discretion in the

relevant sense or support the district court's decision to exercise jurisdiction

over plaintiffs' claims seeking judicial review of the Administrator's specific

decisions related to plaintiffs' specific grants.

> ### C. Plaintiffs Cannot Circumvent These Limitations on Review by Labeling Their Claims as "Constitutional" or "Nonstatutory Review" Claims

The district court additionally entered a preliminary injunction on

plaintiffs' nonstatutory review claims. As explained, those claims assert that

the agencies' decisions to terminate or freeze plaintiffs' grants "contravene

the statutory requirements to carry out and fund" the programs, J.A. 148,

and violate the constitutional "separation of powers" and the "Presentment

Clauses," J.A. 138-141. *See supra* pp. 8, 11-12. The district court concluded that it could properly exercise jurisdiction over those claims—even if plaintiffs' APA claims were not within the court's jurisdiction—because "such claims are plainly beyond the jurisdiction of the Court of Claims." J.A. 9. And on the merits, the court concluded that plaintiffs were likely to succeed on their claims because the discovery that the court had ordered did not show "any individualized review of the Plaintiffs' grants or discussion of any basis for freezing or terminating the grants other than disapproval of the purposes of the funding." J.A. 14. The district court's conclusions were erroneous on all fronts.

1. As the Supreme Court recently explained, because nonstatutory review "could become an easy end-run around the limitations" of "judicial-review statutes," the Court's "cases have strictly limited" that review. *Nuclear Regulatory Comm'n v. Texas*, No. 23-1300, slip op. at 14 (U.S. June 18, 2025). For that reason, a nonstatutory review claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* (quotation omitted).

As an initial matter, nonstatutory review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a

meaningful and adequate opportunity for judicial review,' or if a statutory

review scheme forecloses all other forms of judicial review." *Nuclear*

*Regulatory Comm'n*, slip op. at 15 (quoting *Board of Governors of Fed.*

*Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). In circumstances

where such review is available, it allows a plaintiff to obtain (at most)

"equitable relief," *Strickland v. United States*, 32 F.4th 311, 366 (4th Cir.

2022), in cases where an agency has "plainly act[ed] in excess of its delegated

powers"—a standard that captures "only extreme agency error, not merely

garden-variety errors of law or fact," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d

503, 509 (D.C. Cir. 2019) (alterations and quotations omitted). To meet that

demanding test, a plaintiff may not simply "dress up a typical statutory-

authority argument as" a nonstatutory review claim; instead, a plaintiff must

demonstrate that an agency has acted "contrary to a specific prohibition in a

statute." *Nuclear Regulatory Comm'n*, slip op. at 15 (quotation omitted).

Here, plaintiffs' attempt to assert nonstatutory review claims fails at each

level.

First, plaintiffs have an adequate means of vindicating their asserted

right to grant funds, because they may bring contract actions in the Court of

Federal Claims. Such actions would allow them to recover as damages any

34

grant funds to which they are lawfully entitled. And while plaintiffs would prefer to bring a district-court suit seeking an injunction requiring restoration of their grants rather than a case seeking damages for any lost funds, they have made no showing that the congressionally provided mechanism for review is "somehow constitutionally insufficient and hence [they] must have a nonstatutory cause of action to vindicate" their rights. *Puerto Rico v. United States*, 490 F.3d 50, 60 (1st Cir. 2007).

Second, and similarly, the Tucker Act implicitly precludes plaintiffs' nonstatutory review claims, just as it does plaintiffs' APA claims, *see supra* pp. 19-26. As the stay panel properly recognized, federal courts' equitable authority "to enjoin unlawful executive action is subject to . . . implied statutory limitations." Stay Op. 5 (alteration in original) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). And "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Armstrong*, 575 U.S. at 328 (quotation omitted). Thus, for example, in *Armstrong*, the Supreme Court held that Congress had implicitly precluded private enforcement of a particular Medicaid statutory requirement, in part because "the sole remedy Congress provided for a State's failure to comply with Medicaid's

35

requirements" is "the withholding of Medicaid funds by the Secretary." *Id.*
And private parties cannot "circumvent Congress's exclusion of private
enforcement" by "invoking [courts'] equitable powers." *Id.* So too here.
Congress has provided that the sole remedy for plaintiffs' asserted right to
funds under their grants is a suit in the Court of Federal Claims under the
Tucker Act. Therefore, plaintiffs may not "detour around the Tucker Act" by
asserting their nonstatutory review claims in district court. Stay Op. 5.

Finally, in any event, plaintiffs' nonstatutory review claims would fail
on the merits. As explained, nonstatutory review is available only where an
agency has acted without any colorable statutory authority. *See DCH Reg'l
Med. Ctr.*, 925 F.3d at 509. But here, plaintiffs have not contested that the
relevant agencies in fact have statutory authority to pause or terminate
grant funding in certain circumstances. Indeed, plaintiffs have not—as
explained, *see supra* pp. 29-32—identified any statutory requirement that
expressly precludes the agencies from pausing or terminating plaintiffs'
grants specifically. To the contrary, the relevant statutes provide broad,
unreviewable discretion to the agencies to determine whether to enter into,
pause, or terminate grants. Instead of identifying any such clear statutory
limitation that the agencies transgressed, plaintiffs' primary theory, accepted

by the district court, is that the agencies did not exercise their statutory authority for the right reasons—not that they had no statutory authority at all. *Cf.* J.A. 14 (concluding that the agencies acted improperly because their decisions were based on their "disapproval of the purposes of the funding"). And that theory cannot meet the high bar required to succeed on a nonstatutory review claim.

2. In response to these arguments, plaintiffs have previously contended that at least some of their nonstatutory review claims are "constitutional" claims that are not, in plaintiffs' view, subject to the high bar that nonstatutory review claims must ordinarily clear. *See* Stay Opp'n 16-18. Plaintiffs are incorrect, because plaintiffs advance no bona fide, freestanding constitutional claims.

As the Supreme Court explained in *Dalton v. Specter*, 511 U.S. 462 (1994), not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, the Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority

to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, plaintiffs' asserted constitutional claims are really "statutory one[s]," *Dalton*, 511 U.S. at 474, as they assert that the agencies have exceeded their statutory authority. Any statutory claim could be recharacterized as a violation of the constitutional "separation of powers," J.A. 138-139, or as "amend[ing]" the relevant statutes in violation of the Presentment Clause, J.A. 140-141, but that is precisely the sleight of hand rejected in *Dalton*.

## II.    Plaintiffs Have Failed to Demonstrate That the Relevant Equitable Considerations Support Injunctive Relief

1. The balance of equities and the public interest preclude the district court's relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government).

First, the district court's preliminary injunction risks irreparable harm to the government and to the public interest by requiring the payment of money that the government may never recover. As in *California*, the

38

government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. Plaintiffs have not "promised to return withdrawn funds should [their] grant termination[s] be reinstated" in the future, *see id.* (quotation omitted), nor did the district court impose a bond when it entered its injunction, J.A. 20-22.

Without the injunctive relief entered by the district court, the agencies would retain the grant money at issue and plaintiffs could obtain any appropriate money damages if they are ultimately successful on their claims in the appropriate forum. But the opposite is not necessarily true. If plaintiffs receive funds under the district court's injunction, the agencies may well be left with no meaningful recourse to reclaim the funds, even if they ultimately are able to terminate the grants.

Second, that harm is compounded by the injunctions' interference with the President's ability to execute core Executive Branch policies. As explained, the grants at issue here were paused or terminated based on the potential that the grants might conflict with the Administration's policy priorities. Interfering with the President's ability to control subordinate officials by directing them to ensure that funding is consistent with his priorities—and thus requiring the government to expend money in support

39

of causes that may be inconsistent with the Administration's policy objects—inflicts a severe separation-of-powers harm on the Executive Branch. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Those harms are substantially magnified by the district court's extreme intrusions into the workings of the Executive Branch, on multiple fronts. For one, the court has now explicitly established a preclearance regime, which prohibits the agencies from pausing or terminating any of the covered grants for any reason—no matter how lawful—without first obtaining approval from the district court. The Constitution vests the "entire" executive power in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). But the district court has in effect seized a portion of that power for itself. And compounding the problem, the court has ordered extensive discovery into the government's decisions regarding grant funding, with the government now having produced many thousands of documents in a case where the court lacks jurisdiction altogether. J.A. 45-46. Beyond that overreach, the court also extended the injunctions' scope to encompass three grants (numbered 1, 37, and 38) for which the government has not even negotiated final grant agreements and for which no funds are yet obligated. *See* J.A. 8, J.A. 26, J.A. 30. The court has thus improperly put itself in the

40

position of "supervising" the agencies "to work out compliance" with the relevant statutes. *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004).

2. Conversely, plaintiffs have not established that they would suffer any substantial irreparable harm in the absence of injunctive relief. Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled. And regardless, the gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (It is "well settled that economic loss does not, in and of itself, constitute irreparable harm."); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." (alteration in original) (quotation omitted)). If plaintiffs prevail in the appropriate forum, they will receive funds to the extent required by law. That fact fatally undermines plaintiffs' assertions of irreparable harm.

41

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated, and the case should be remanded with instructions to dismiss for lack of jurisdiction.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

BRYAN P. STIRLING
*United States Attorney*

DANIEL TENNY

*s/ Sean R. Janda*

SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

June 2025

42

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8348 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

_s/ Sean R. Janda_
Sean R. Janda