## No. 25-1575

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

The Sustainability Institute, *et al.*,

Plaintiffs-Appellees,

v.

Donald J. Trump, *et al.*,

Defendants-Appellants.

---

On Appeal from the United States District Court for the District of South Carolina

---

## JOINT APPENDIX: VOLUME 1

---

KIMBERLEY HUNTER
IRENA COMO
NICHOLAS S. TORREY
CARL T. BRZORAD
SPENCER GALL
*Southern Environ-*
*mental Law Center*
*136 East Rosemary*
*Street, Suite 500*
*Chapel Hill, NC 27514*
*(919) 967-1450*
*kmeyer@selc.org*
*icomo@selc.org*
*ntorrey@selc.org*
*cbrzorad@selc.org*
*sgall@selc.org*

GRAHAM PROVOST
ELAINE POON
JONATHAN MILLER
*Public Rights Project*
*490 43rd Street, Unit #115*
*Oakland, CA 94609*
*(510) 738-6788*
*graham@publicrightsproject.org*
*elaine@publicrightsproject.org*
*jon@publicrightsproject.org*

MARK ANKCORN
*Senior Chief Deputy City*
*Attorney*
*1200 Third Avenue, Suite 1100*
*San Diego, CA 92101-4100*
*(619) 533-5800*
*mankcorn@sandiego.gov*

BRETT A. SHUMATE
*Assistant Attorney*
*General*

BRYAN P. STIRLING
*United States Attorney*

DANIEL TENNY
SEAN R. JANDA
*Attorneys, Appellate*
*Staff*
*Civil Division, Room*
*7260*
*U.S. Department of*
*Justice*
*950 Pennsylvania*
*Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

# TABLE OF CONTENTS

**Page**

## Volume 1

District Court Order with Grant Chart Exhibit (May 20, 2025),
Order, Dkt. No. 157 ........................................................J.A. 1
Grant Chart Exhibit, Dkt. No. 157-1...............................J.A. 25

District Court Order (April 29, 2025), Dkt. No. 146 ...................J.A. 31

District Court Order (April 9, 2025), Dkt. No. 52 .......................J.A. 48

District Court Order (March 31, 2025), Dkt. No. 32.....................J.A. 59

Amended Complaint with Exhibits (March 26, 2025),
Amended Complaint, Dkt. No. 23.......................................J.A. 61
Exhibit A: First OMB Memo, Dkt. No. 23-5.................J.A. 155
Exhibit B: Second OMB Memo, Dkt. No. 23-6 ............J.A. 157
Exhibit C: USDA Directive, Dkt. No. 23-7 .................J.A. 160
Exhibit D: EPA Memo, Dkt. No. 23-8 ..........................J.A. 168
Exhibit E: EPA Executive Order Compliance Review
Requirement, Dkt. No. 23-9 ............................................J.A. 171
Exhibit F: DOT Memo, Dkt. No. 23-10..........................J.A. 174
Exhibit G: EPA Notice of DOGE Approval
Requirement, Dkt. No. 23-11 ..........................................J.A. 178
Exhibit H: DOT Secretary's Directive, Dkt. No. 23-12 ...............J.A. 180
Exhibit I: DOE Memo, Dkt. No. 23-13 .........................J.A. 183
Exhibit J: EPA Flowchart for Equity-Related
Grants, Dkt. No. 23-14 ....................................................J.A. 187

Exhibits to Plaintiffs' Preliminary Injunction Motion (March 26, 2025),
Exhibit 1: Sustainability Institute Declaration, Dkt. No. 24-2 ....J.A. 190
Exhibit 2: Agrarian Trust Declaration, Dkt. No. 24-3 .................J.A. 234
Exhibit 3: Alliance for Agriculture Declaration, Dkt. No. 24-4 ...J.A. 324

## Volume 2

Exhibits to Plaintiffs' Preliminary Injunction Motion (cont.)
    Exhibit 4: Alliance for the Shenandoah Valley
    Declaration, Dkt. No. 24-5................................................................J.A. 463
    Exhibit 5: Bronx River Alliance Declaration, Dkt. No. 24-6........J.A. 667
    Exhibit 6: CleanAIRE NC Declaration, Dkt. No. 24-7................J.A. 735
    Exhibit 7: Conservation Innovation Fund
    Declaration, Dkt. No. 24-8................................................................J.A. 780
    Exhibit 8: Earth Island Institute
    Declaration, Dkt. No. 24-9................................................................J.A. 852
    Exhibit 9: Leadership Counsel for Justice and Accounability
    Declaration, Dkt. No. 24-10..............................................................J.A. 920

## Volume 3

Exhibits to Plaintiffs' Preliminary Injunction Motion (cont.)
    Exhibit 10: Marbleseed Declaration, Dkt. No. 24-11 ....................J.A. 942
    Exhibit 11: Organic Association of Kentucky
    Declaration, Dkt. No. 24-12..............................................................J.A. 1148
    Exhibit 12: Pasa Declaration, Dkt. No. 24-13 ..............................J.A. 1368

## Volume 4

Exhibits to Plaintiffs' Preliminary Injunction Motion (cont.)
    Exhibit 13: RAFI-USA Declaration, Dkt. No. 24-14 ..................J.A. 1539
    Exhibit 14: City of Baltimore Declaration, Dkt. No. 24-15 ........J.A. 1917
    Exhibit 15: City of Columbus Declaration, Dkt. No. 24-16 ........J.A. 1988
    Exhibit 16: City of Madison Declaration, Dkt. No. 24-17..........J.A. 2006
    Exhibit 17: City of Nashville Declaration, Dkt. No. 24-18 .........J.A. 2024
    Exhibit 18: City of New Haven Declaration, Dkt. No. 24-19 .....J.A. 2039
    Exhibit 19: City of San Diego (Charvel)
    Declaration, Dkt. No. 24-20..............................................................J.A. 2091
    Exhibit 20: City of San Diego (Widener)
    Declaration, Dkt. No. 24-21..............................................................J.A. 2095

Exhibit 21: List of Plaintiffs' Grants and Statutory
Authorities, Dkt. No. 24-22 ........................................................J.A. 2124

## Volume 5

Exhibits to Plaintiffs' Reply in Support of Preliminary Injunction
Motion (April 16, 2025),
Exhibit 1: U.S. Brief in Federal Circuit, Dkt. No. 64-1 .............J.A. 2140
Exhibit 2: Chart Summarizing Plaintiffs'
Injuries, Dkt. No. 64-2 ....................................................J.A. 2242
Exhibit 3: Pasa Supplemental Declaration, Dkt. No. 64-3 .........J.A. 2247


Transcript of April 23 Hearing, Dkt. No. 142 ......................................J.A. 2252

Exhibits to Government's Response to Court Order (May 6, 2025),
Exhibit 1: Declaration of Karen Woodrich, Dkt. No. 147-1........J.A. 2325
Exhibit 2: Declaration of Patricia Kovacs, Dkt. No. 147-2 .........J.A. 2347
Exhibit 3: Declaration of Arlan Finfrock, Dkt. No. 147-3 ..........J.A. 2351
Exhibit 4: Declaration of Travis Voyles, Dkt. No. 147-4.............J.A. 2369
Exhibit 5: Packard Supplemental Search
Declaration, Dkt. Nos. 147-5 through 147-8................................J.A. 2480

## Volume 6

Exhibits to Government's Response to Court Order (cont.)
Exhibit 6: Packard Deliberative Process
Declaration, Dkt. No. 147-9..............................................J.A. 2759
Exhibit 7: Declaration of Kailee Buller, Dkt. No. 147-10 ..........J.A. 2812


Exhibits to Plaintiffs' Response to Court Order (May 12, 2025),
Exhibit 1: Table of Grants and Relief
Requested, Dkt. No. 149-1................................................J.A. 2826
Exhibit 2: Excerpt of Transcript of Preliminary Injunction
Hearing, Dkt. No. 149-2....................................................J.A. 2832
Exhibit 3: EPA January 21 Email, Dkt. No. 149-3......................J.A. 2838
Exhibit 4: EPA March 7 Emails, Dkt. No. 149-4.........................J.A. 2839

Exhibit 5: EPA February 22-24 Emails, Dkt. No. 149-5 ............J.A. 2841

Exhibit 6: EPA February 21-24 Emails, Dkt. No. 149-6 ............J.A. 2843

Exhibit 7: Supplemental Declaration of the Sustainability
Institute, Dkt. No. 149-7 .................................................................J.A. 2844

Exhibit 8: Inside EPA Article, Dkt. No. 149-8.............................J.A. 2853

Exhibit 9: EPA Reduction in Force Memo, Dkt. No. 149-9 .......J.A. 2855

Exhibit 10: Supplemental Declaration of
CleanAIRE NC, Dkt. No. 149-10 ..................................................J.A. 2857

Transcript of May 19 Hearing, Dkt. No. 163 .........................J.A. 2881

Notice of Appeal (May 21, 2025), Dkt. No. 159 .....................J.A. 2936

Docket Sheet ....................................................................................J.A. 2937

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| The Sustainability Institute *et al.*, | Case No. 2:25-cv-2152-RMG |
| Plaintiffs, | |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States; Kevin Hassett, in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council; United States Office of Management and Budget; Russell Vought, in his official capacity as Director of the United States Office of Management and Budget; United States Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency; United States Department of Agriculture; Brook Rollins, in her official capacity as Secretary of Agriculture; United States Department of Transportation; Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation; United States Department of Energy; Chris Wright, in his official capacity as the Secretary of the United States Department of Energy; United States Department of Government Efficiency Service, Amy Gleason, in her official capacity as Acting Administrator of the United States DOGE Service; Elon Musk, in his official capacity as Senior Advisor of the United States DOGE Service, | **ORDER** |
| Defendants. | |

1

**J.A. 0001**

Plaintiffs, recipients of 38 federal grants, brought this action against various federal agencies and governmental officials in their official capacities alleging that the freezing and/or terminating of their grants violated their rights under the United States Constitution and the Administrative Procedures Act ("APA"). (Dkt. No. 23). Plaintiffs allege that their grants were frozen and/or terminated because they were funded by appropriations under the Inflation Reduction Act ("IRA"), the Inflation Investment and Jobs Act ("IIJA"), or other mandatory legislation which Defendants oppose. Plaintiffs filed a motion for preliminary injunctive relief on March 26, 2025, which the parties have fully briefed. (Dkt. No. 24, 56, 64).

Defendants advised the Court in a submission of May 16, 2025 that they "do not contest judgment on the merits of [Plaintiffs'] APA claims" for 32 of the 38 grants at issue in this litigation. (Dkt. No. 153 at 1).[1] The 32 grants in which Defendants no longer oppose relief under the APA were funded by the IRA, the IIJA or other mandatory congressional legislation. While Defendants do not contest the entry of judgment for the Plaintiffs in 32 of the 38 claims, they oppose injunctive relief for Plaintiffs while Defendants contest on appeal the Court's jurisdiction under the APA. (Dkt. No. 153 at 1, n. 1). As discussed below, the Court enters judgment under the APA for Plaintiffs on the 32 grants no longer contested by Defendants and then addresses Plaintiffs' prayer for equitable relief on these APA claims.[2]

---

[1] Dkt. No. 136-1 (attached as Exhibit A), which was prepared by Defendants, lists the 38 grants under challenge in this litigation. Defendants have advised the Court that they do not contest the entry of judgment regarding Grants 1-26 and 33-38.

[2] Defendants earlier advised the Court that they had restored grant funding for Grants 8, 13, 14, 15, 17, 18, 20, 21, 24, 25, 26, 34, 35, 36. (Dkt. No. 136-1; 147-4, ¶ 10). The Court thereafter entered an order directing Defendants "not to subsequently freeze or terminate these grants without notice to the Court and authorization from the Court that the freezing and/or termination may proceed." (Dkt. No. 146 at 17). This Order remains in effect until modified or rescinded by this Court or an appellate court.

2

**J.A. 0002**

The Court further addresses below Plaintiffs' assertion of nonstatutory review jurisdiction for the alleged ultra vires acts of Defendants, acting in their official capacities, in freezing and/or terminating their grants in violation of the United States Constitution. Plaintiffs assert that Defendants actions in targeting grants based on their opposition to previously adopted acts of Congress constitute a failure to "faithfully execute[]" the laws of the United States, as mandated by Article II, Section 3 of the United States Constitution. Plaintiffs point to a long line of United States Supreme Court decisions and the Fourth Circuit's recent decision in *Strickland v. United States*, 32 F.4th 311, 363-366 (2022), upholding nonstatutory review jurisdiction of the federal courts to provide parties equitable relief in actions against federal officials in their official capacities for actions taken outside their legal authority and/or in violation of the United States Constitution.

Finally, the Court addresses Plaintiffs' request for preliminary injunctive relief regarding six grants that were funded by general appropriations to the United States Department of Agriculture ("USDA"). Defendants continue to contest their liability under the APA regarding those six claims.[3]

## I.    Factual Background

On January 20, 2025, President Donald Trump issued an executive order which directed all agencies to "immediately pause the disbursements of funds appropriated through the Inflation Reduction Act of 2022 . . . or the Infrastructure Investment and Jobs Act . . . ." Executive Order 14154, 2025 WL 315844 (January 20, 2025). That directive was under a section titled "Terminating the Green New Deal." *Id.* There was initially some uncertainty within the federal

---

[3] These six claims still contested by Defendants under the APA are Grants 27-32. (Dkt. No. 136-1) (Exhibit A).

**J.A. 0003**

agencies whether the directive applied only to matters related to the Green New Deal or to all appropriations arising under the IRA and IIJA. Two Office of Management and Budget (OMB) memoranda were issued shortly after the executive order that appeared to direct all agencies of the federal government to temporarily pause all spending on IRA and IIJA appropriated projects. (Dkt. No. 1-1, 1-2). Within days, various federal agencies, including the Environmental Protection Agency (EPA) and the USDA, issued directives that that all spending of funds related to the IRA and IIJA be immediately paused. (Dkt. No. 21-2, 21-3, 21-4, 21-8). Hundreds of previously awarded and active federal grants to non-profit organizations and local governments were summarily frozen with no notice or process. Numerous lawsuits similar to this action soon followed.

The 32 grants funded by mandatory legislation were primarily funded by IRA or the IIJA. For example, many of the EPA grants at issue in this litigation were funded under the Environmental and Climate Justice Block Grants program, a $2.8 billion dollar appropriation that provided that the Administrator "shall . . . award grants for periods of up to 3 years . . . that benefit disadvantaged communities . . . ." 42 U.S.C. § 7438(a)(1), (b)(1).[4] In implementing the Administrator's instruction to eliminate all grants funded by the IRA and the IIJA, internal EPA records document that Environmental and Climate Justice Block Grants were specifically targeted for freezing and/or termination. (Dkt. Nos. 1-4, 149-3, 149-4).

The Government Defendants in this and other similar suits initially denied that the freezing of the grants was on the basis that they were funded by the IRA and IIJA. Instead, Defendants

---

[4] The Administrator was authorized to award grants under the Act for such purposes as "community-led air and other pollution monitoring," "mitigating climate and health risks," "climate resiliency," and "reducing indoor toxins and indoor air pollution." §7438(b)(2)(A).

4

**J.A. 0004**

claimed with little explanation that the mass freezing of federal grants was due to a change in agency priorities or policies. In a parallel action in Rhode Island, involving many of the same Government Defendants, defendants contended that there was "no singular freeze" but "thousands of individual decisions made by agencies about whether particular grants or other funding should be paused." *Woonasquatucket River Watershed Council v. United States Department of Agriculture*, C.A. No. 1:25-cv-97, Dkt. No. 31 at 31 (D.R.I. March 27, 2025). The Rhode Island Court and another district court confronted with this defense in a recent grant funding case found it "unfathomable" and "truly doubtful" that "agencies suddenly began exercising their own discretion to suspend funding across the board at the same time." *Woonsaquatucket River Watershed Council v. United States Department of Agriculture*, 2025 WL 1116157 at *11 (D.R.I. April 15, 2025); *National Council of Nonprofits v. Office of Management and Budge*t, 2025 WL 597959 at *7 (D.D.C. February 25, 2025).

After similar arguments were made in this case, the Court ordered Defendants to produce all documents related to "freezing, pausing, and/or terminating of grant funds to the grant recipients who are parties to this litigation." (Dkt. No. 45 at 5-7). Defendants produced thousands of documents, not one showing any individualized review of decisions to freeze or terminate grants of the Plaintiffs in this action. (Dkt. Nos. 79-91, 95-103, 106-132).

The Defendants thereafter advised the Court that they had resumed the funding for 14 of the 38 grants at issue in this litigation, terminated four grants, and were processing the termination of six other grants. (Dkt. No. 136-1). The Court noted that these actions appeared to be a pivot by the Defendants away from freezing grants and reflected a move by Defendants toward terminating a smaller group of grants. Defendants claimed at a recent hearing that the grants were being terminated only after an individualized review of each grant. (Dkt. No. 142 at 35). To determine

5

**J.A. 0005**

the veracity of this representation, the Court ordered Defendants to produce all documents related to the termination or the proposed termination of grants at issue in this action to determine whether any such individualized review had actually been conducted. (Dkt. No. 146 at 15).

Defendants produced over 500 additional pages of documents in response to the Court's discovery order. (Dkt. No. 147-1 to 147-10). Not one document showed any individualized review of the grant of any Plaintiff in this action before the grant was terminated or designated for termination. Defendants' response included a declaration from senior EPA official Travis Voyles, claiming that on February 25, 2025 he had made an "individualized review" of an unidentified number of EPA grants, including many involved in this litigation, and determined that they were "terminated for policy reasons." (Dkt. No. 147-4). Mr. Voyles further stated that he orally communicated his termination decisions to another EPA official who then began the termination process. (*Id*. at 2-3). Not a single document was produced which evidenced any review by the EPA. The Court finds it hard to believe that numerous active federal grants, some totaling millions of dollars, were summarily terminated by a high-ranking government official without the production of a single document to detail the review and decision making process.

On May 16, 2025, the last business day before the Court's oral argument on Plaintiffs' motion for preliminary injunction, Defendants informed the Court that they "do not contest judgment on the merits of Plaintiffs' APA claims" and recognized that a judgment would "require Defendants to fund or negotiate grant agreements for 32 of 38 awards . . . ." (Dkt. No. 153 at 1). Defendants excluded from this concession six grants which were reportedly funded by general appropriations to the USDA. (*Id*.). Defendants further advised the Court that in the event that the Court provided injunctive relief to the Plaintiffs on their APA claims, they intended to seek to stay

**J.A. 0006**

of any such relief while they continued to pursue a challenge to the Court's jurisdiction under the APA. (*Id.* at n.1).

## II.    The Uncontested APA Claims

The 32 APA claims in which Defendants no longer contest were part of the widespread agency action freezing or terminating grants that were funded by mandatory congressional legislation, primarily the IRA and IIJA. These grants were funded by legislation that mandated that the funds be expended for a specific purpose and left no discretion to agency heads to disregard the legislative mandates because current officials did not approve of the purposes of the previously appropriated programs. Plaintiffs have produced substantial, highly persuasive evidence to support their claims that their grant funds were frozen and/or terminated because Defendants disfavored previously authorized congressional appropriations and that such actions were outside of the legal authority of the agency Defendants and in violation of the Constitution's separation of powers. Plaintiffs focus their APA claims primarily on statutory provisions which prohibit agency actions which are "not in accordance with law" or which are "contrary to" any constitutional right or power. 5 U.S.C. § 706(2)(A), (B). Based on the full record and the concession of the Defendants on May 16, 2025 (Dkt. No. 153), the Court hereby enters judgment for Plaintiffs on the 32 grants no longer contested.[5]

The Court now turns to the issue of remedy. The APA provides district courts authority to "hold unlawful and to set aside agency action" found "not to be in accordance with law." 5 U.S.C.

---

[5] Judgment is rendered regarding Grants 1-26 and 33-38, (Dkt. No. 136-1) (Exhibit A). These grants involved the following agencies: EPA (Grants 2-15), USDA (Grants 16-26), United States Department of Energy ("DOE") (Grant 1), and the United States Department of Transportation ("DOT") (Grants 37-38).

§ 706(2)(A). To that end, the Court grants Plaintiffs that are recipients of Grants 1-26 and 33-38 the following relief:

A. A declaration that the freeze and/ or termination of Grants 1-26 and 33-38 were ultra vires acts outside the legal authority of the EPA, USDA, DOE, and DOT (hereafter the "Enjoined Agencies") and in violation of the United States Constitution, constituting unlawful agency action under 5 U.S.C. § 706(2)(A) and (B);

B. Sets aside the freeze and/or termination of Grants 1-26 and 33-38 and directs the Enjoined Agencies to restore Plaintiffs access to grant funds immediately;

C. Enjoins the Enjoined Agencies from freezing, terminating or otherwise interfering with the funding of Grants 1-26 and 33-38 without written authorization from this Court[6]; and

D. Directs the Enjoined Agencies to submit a certification to this Court within seven days of this Order confirming compliance with this Order.

Defendants seek a stay of this Court's injunctive relief pending appeal. A stay of relief to the losing party after judgment is certainly "not a matter of right" and involves the exercise of judicial discretion "dependent upon the circumstances of a particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citing *Virginia R. Co. v. United States*, 272 U.S. 658, 672-3 (1926)). The party requesting the stay bears the burden of persuasion. The Supreme Court in *Nken* laid out four factors to consider in addressing a motion for a stay after judgment: (1) whether the stay applicant

---

[6] The Court finds it necessary to maintain supervision over the continued functioning of the unlawfully frozen or terminated grants because Defendants in this and parallel litigation have provided shifting post hoc justifications for their actions, at times appearing to be as a means to evade court orders. To the extent Defendants have legitimate and lawful reasons to terminate or freeze grant funding, the Court will promptly give consideration to any such submission by Defendants.

8

**J.A. 0008**

has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the granting of the stay will substantially injure the prevailing party; and (4) where the public interest lies. 556 U.S. at 433. The first two factors from *Nken* are the most critical. *Id.*

After carefully considering the Defendants motion to stay, the Court finds that a stay of the Court's injunctive relief is not appropriate under these circumstances. First, the Court finds that Defendants are not likely to succeed on the merits. The Court addressed in detail, in its April 29, 2025 Order, the Court's jurisdiction in this case, finding that Supreme Court precedent supports Plaintiffs' argument that their claims for declaratory and injunctive relief can properly be heard by an Article III court under the APA. (Dkt. No. 146 at 1-12). Plaintiffs' already strong jurisdictional arguments have been further strengthened by the Court's additional finding below of nonstatutory jurisdiction related to Defendants' alleged ultra vires and unconstitutional acts, since such claims are plainly beyond the jurisdiction of the Court of Claims. The only forum in which Plaintiffs may adjudicate all of their pending claims is in an Article III court.

Second, Defendants cannot sustain their burden of demonstrating that they would suffer irreparable injury from the granting of injunctive relief to Plaintiffs. Indeed, Defendants have not offered any evidence to support such a claim. Third, Plaintiffs, which include many nonprofits heavily dependent on the challenged grants to sustain their mission, administrative functions, and staffing, have confronted significant challenges to their ongoing operations and experienced staff layoffs due to the abrupt freezing of grant funds. Plaintiffs have further experienced significant challenges to their good will and reputations by withdrawing services to community groups and individuals who were relying upon Plaintiffs' services and assistance. (See Dkt. No. 64-2 at 2-5). Fourth, the public interest lies in upholding the rule of law and providing an effective remedy for

9

**J.A. 0009**

those injured by the unlawful actions of government officials. For these reasons, Defendants'
motion to stay is denied.[7]

### III.    Plaintiffs' Claims for Relief under the Court's Nonstatutory Review Jurisdiction

Plaintiffs additionally assert claims under the Court's nonstatutory review jurisdiction for
equitable relief against federal officials in their official capacities on the basis that those federal
officials exceeded the scope of their authority and/or acted unconstitutionally by failing to
"faithfully execute[]" the laws of the United States. U.S. Const. Article II, Section 3. (Dkt. No. 23,
¶¶ 285-307). Plaintiffs expressly reference in their complaint the Fourth Circuit's recent decision
in *Strickland v. United States* in support of their claim for nonstatutory review. Plaintiffs assert
these claims as a second and independent basis for federal jurisdiction and seek preliminary
injunctive relief on these claims. (Dkt. No. 24-1 at 16-20).

Defendants have to date focused their opposition to Plaintiffs' federal jurisdiction almost
entirely on whether this Court has jurisdiction under the APA. By earlier order, the Court found
that Plaintiffs have jurisdiction with this Court under the APA and that their claims were
exclusively for equitable and declaratory relief. (Dkt. No. 146). The Court now turns its attention
to Plaintiffs' claims referred to by *Strickland* as "nonstatutory review claims" or as "the *Larson-
Dugan* exception to sovereign immunity." *Strickland* 32 F.4th at 363.

#### A. Jurisdiction:

The United States Supreme Court has long recognized nonstatutory federal jurisdiction
over claims which involve (1) an action against a federal official; (2) asserted in his official
capacity; (3) based on allegations that the federal official has acted beyond his statutory or

---

[7] Defendants have repeatedly argued that Plaintiffs' claims are for money damage, not equitable
relief. Plaintiffs' Amended Complaint requests only equitable remedies, and the Court's remedy
set forth above exclusively provides equitable relief.

10

**J.A. 0010**

constitutional authority; and (4) a request for equitable relief. *See*, *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958); *Larson v. Domestic and Foreign Commerce Corporation*, 337 U.S. 682, 689 (1949). The *Strickland* court reversed a district court decision which "mistakenly overlooked the long-established line of precedent establishing that parties can seek to enjoin federal officials in their official capacities from exceeding the scope of their authority or acting unconstitutionally." 32 F.4th at 365. *Strickland* quoted approvingly from an amicus brief submitted in that action by Professors Erwin Chemerinsky and Aziz Huq which traced the history of nonstatutory review claims back to *Marbury v. Madison*, 5 U.S. 137, 166 (1803).[8] *Strickland*, 32 F.4th at 365; *see also*, *International Refugee Assistance Project v. Trump*, 883 F.3d 233, 287-88 (4th Cir. 2018) (en banc) (J. Gregory, concurring).

Plaintiffs' Separation of Powers and ultra vires claims (Counts I and II) plainly state a claim for nonstatutory review. (Dkt. No. 23, ¶¶ 285-307). Plaintiffs have sued federal officials in their official capacities and have alleged that their actions freezing and/or terminating their grants because they were funded by now disfavored federal laws were in violation of their duty Article II, Section 2 of the United States Constitution to "faithfully execute[]" the laws of the United States. Plaintiffs seek exclusively equitable remedies, declaratory and preliminary and permanent injunctive relief. (*Id.*, ¶¶ 89-91). The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims.

---

[8] The Court has filed the Chemerinsky and Huq amicus brief cited in the *Strickland* decision onto the docket in this case because its details the strong line of precedents supporting nonstatutory review jurisdiction. (Dkt. No. 156).

**J.A. 0011**

## B. Standing

Defendants have challenged Plaintiffs' standing. (Dkt. No. 56 at 17-18). After a careful review of the record and the arguments of the parties, the Court finds that Plaintiffs have standing to assert their claims.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 339. Because Plaintiffs here seek declaratory and injunctive relief, they must establish an ongoing or future injury in fact. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

In a case involving multiple plaintiffs, "[a]t least one plaintiff must demonstrate standing for each claim and form of requested relief" for that claim to proceed. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018); *see also Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (internal quotation marks omitted). Consequently, once it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009) (declining to analyze whether additional plaintiffs had standing when one plaintiff did);

12

**J.A. 0012**

*Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

Plaintiffs have offered detailed statements of organizational and reputational harm arising from the abrupt freezing and/or terminating of their grants without notice. (Dkt. Nos. 24-2, 24-3, 24-4, 24-6, 24-9, 24-10). Plaintiff Sustainability Institute stated that the funding freeze had caused "disruptions in . . . day to day operations, causing a slowdown and budgetary challenges." (Dkt. No. 24-2, ¶ 37). Plaintiff Agrarian Trust detailed "extreme distress to . . . staff members, farmers, and community partners" from the grant freeze. (Dkt. No. 24-3, ¶ 15). Other Plaintiffs have offered similar unchallenged statements or organizational injury and reputational damage from Defendants' action under challenge in this litigation. The record fully supports findings that numerous Plaintiffs have suffered injury in fact, that the injuries are fairly traceable to Defendants' challenged conduct, and that it is likely that these injuries are redressable by a favorable judicial decision. Finding that Plaintiffs have standing, the Court proceeds to consider the merits of the motion.

**C. Plaintiffs' Motion for a Preliminary Injunction:**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction, a party must make a "clear showing" that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). Plaintiff bears the burden of showing that each factor supports his request for preliminary injunction. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991).

13

**J.A. 0013**

The Court addresses the four *Winter* factors in turn below.

**1.  Likelihood of Success on the Merits:**

The record before the Court contains ample evidence that the 32 grants Defendants no longer challenge under the APA were frozen and/or terminated because they were funded by mandatory congressional legislation that the Agency Official Defendants do not favor. While Defendants have contended that the grants were individually reviewed and frozen or terminated for undefined "policy reasons," the Court-ordered discovery in this case failed to produce a single document showing any individualized review of the Plaintiffs' grants or discussion of any basis for freezing or terminating the grants other than disapproval of the purposes of the funding. (*See* Dkt. Nos. 1-1, 1-2, 21-2, 21-3, 21-4, 21-8, 149-3, 149-4). These documents provide strong support for Plaintiffs' claim that the freezing and/or termination of the 32 grants constituted a violation of the Agency Official Defendants duty to "faithfully execute[]" the laws of the United States.

It is worthwhile to note that Plaintiffs' nonstatutory review claims and Plaintiffs' APA claims which Defendants have elected not to contest are, for all practical purposes, mirror images of each other. The 32 grants no longer under challenge under the APA all were frozen and/or terminated because they were funded by now disfavored legislation. The APA claims challenged agency actions that were "not in accordance with law" and "contrary to constitutional right" based on the official actions of Defendants acting outside their authority and in violation of the Separation of Powers. 5 U.S.C. § 706(2)(A) and (B). Plaintiffs' nonstatutory review claims are based on the argument that Defendants, have failed to "faithfully execute[]" the laws and rely on the identical facts and conduct that constitute the now uncontested APA claims.

14

**J.A. 0014**

In sum, the Court finds that Plaintiffs have shown a likelihood of success on the merits on their nonstatutory review claims concerning the 32 grants Defendants no longer contest regarding APA liability.

### 2. Irreparable Injury

A plaintiff seeking injunctive relief must demonstrate the presence of irreparable injury. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (citing *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." The second prong of the *Winter* test requires the plaintiff to make a "clear showing" that they are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 21. Irreparable injury must be both imminent and likely; speculation about potential future injuries is insufficient. *Winter*, 555 U.S. at 22.

First, the Nonprofit Plaintiffs offer several forms of harm they face, including disruptions in their day-to-day operations, financial strain, personnel actions including dismissal and furloughs, operations being curtailed or ended, and damage to their credibility and reputation. (Dkt. No. 24-1 at 29-34).

The Government responds that: (1) Plaintiffs allegations are speculative and not sufficiently likely to occur under the *Winter* standard; and (2) Plaintiffs have failed to establish the harm they face is irreparable and could not be cured by a monetary award after judgment. (Dkt No. 56 at 31-4).

Plaintiffs have adequately demonstrated both the likelihood of their injury as well as its irreparability. In their Complaint, their preliminary injunction motions, and the twenty declarations

filed in support, the Plaintiffs have laid out dozens of examples of obligated funding and the harms that the withholding thereof has caused. (Dkt. Nos. 1, 23, 24, 44). The court's analysis in *New York v. Trump* is relevant:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid . . . services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*New York*, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025). Indefinitely pausing funding "unquestionably make it more difficult" for the Plaintiffs to "accomplish their primary [mission]" and is a form of irreparable harm. *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *22 (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)).

Second, the City Plaintiffs submit that the pause in funding presents harms such as negative impacts on their budget due to reliance on federal funding, an inability to honor agreements with third parties, and delays or cancelations to projects. (Dkt. No. 64 at 18). The Government responds that the Municipalities are sufficiently well-resourced whose projects are not "the type of activities that establish irreparable harm to justify extraordinary relief." (Dkt No. 56 at 34-5). The government's argument is insufficient. A few examples show the variety of irreparable harms. Plaintiff City of San Diego has hired four employees using their USDA funding, those positions are now at risk. (Dkt. No. 24-20, ¶ 8). Plaintiff City of Columbus would be forced to draw down funds from other projects and divert money from other budgetary requirements, causing a ripple effect of budgetary issues. (Dkt. No. 24-16, ¶ 19). Plaintiff City of Madison has contractual agreements made with sub-grantees in reliance on the EPA funding and are unable to honor those agreements. (Dkt. No. 24-17, ¶ 24).

16

**J.A. 0016**

Congress enacted these laws and appropriated funding to these agencies, the funding freeze unconnected to legal authorization causes significant and irreparable harms to Plaintiffs. In their Complaint and subsequent filings, Plaintiffs have demonstrated dozens of examples of obligated funding and the harms they face when those funds are withheld.

Plaintiffs have adequately demonstrated irreparable harm arising from Defendants' actions.

### 3. Balance of Equities and Public Interest

The balance of the equities and public interest weigh in favor of granting Plaintiffs' request for preliminary injunctive relief. "The[] final two factors—balance of the equities and weighing the public interest—'merge when the Government is the opposing party.'" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *63 (4th Cir. Apr. 30, 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 329 n.10 (1982) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609–610 (1952) (concurring opinion)).

Here, Plaintiffs assert an interest in "[e]nsuring [that] Congressional and local priorities are achieved," "having governmental agencies abide by federal laws that govern their existence and operations" and "protecting constitutional rights," (Dkt. No. 24-1 at 36), while the Government emphasizes the potential that it will be unable to recover "millions of taxpayer dollars" disbursed pursuant to a preliminary injunction if a court later determines that the Government's decision to freeze or terminate the grants was lawful. (Dkt. No. 56 at 35). The Government also argues that "[r]equiring the Executive to financially support specific projects that may be within the statutory

17

**J.A. 0017**

parameters of a program but nevertheless at odds with the Executive's priorities negatively impacts the public interest." (*Id.*).

The Court finds that the balance of the equities tips strongly in favor of Plaintiffs. The Government "is in no way harmed by [the] issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional" and "if anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). The Court has determined that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their ultra vires claims challenging Grants 1-26 and 33-38—in other words, a substantial likelihood that Agency Official Defendants have acted unconstitutionally by encroaching upon the domain of the Legislature. And if the Court's constitutional concerns alone were not enough to tip the scales in Plaintiff's favor, the Court considers sufficient the threat to Plaintiffs' survival in the face of suddenly and inexplicably paused and/or terminated funding, culminating in their need to furlough staff and pause services to the communities whom they operate to serve. (Dkt. No. 24-1 at 2; *see generally* Dkt. No. 23). Given that the Government no longer even challenges Plaintiffs' APA claims (excluding those asserted against the Secretary of Agriculture regarding grants under the Partnership for Climate-Smart Commodities ("PCSC")), the Court finds that it would be confounding indeed to credit the Government's assertion of its interests in retaining taxpayer funds over that of Plaintiffs in receiving these congressionally-allocated funds where the Government no longer even maintains that it followed lawful procedures in freezing and terminating those funds. (Dkt. No. 153).

"The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded, . . . . [a]nd an agency is not harmed by an order prohibiting it from violating the law." *Woonasquatucket River Watershed*

18

**J.A. 0018**

*Council*, 2025 WL 1116157, at *23. "On the other hand, without injunctive relief to pause the categorical freeze of IIJA and IRA funds, the funding that the Nonprofits are owed (based on the Agencies' own past commitments) creates an indefinite limbo." *Id.* "Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated," the Court finds that the balance of equities tips indisputably in Plaintiffs' favor on their ultra vires claims. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025)

The public interest also favors a preliminary injunction. The perpetuation of unlawful agency action is contrary to the public interest, and there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations. *See League of Women Voters of United States*, 838 F.3d at 12. "Government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020). Given the Court's finding that Plaintiffs are likely to succeed on the merits of their constitutional claims, a preliminary injunction here ensures that the agencies do not act in excess of their authority or in violation of the Constitution. Preserving fairness, accountability, and balance of power in governance serves the public interest and granting Plaintiffs preliminary injunctive relief does just that.

Defendants argue that they are serving the public interest by protecting and seeking to recover "millions of taxpayer dollars." But the relief Plaintiffs seek only allows them to access funds that have been appropriated by Congress; obligated prior to this suit; can only be used for specific, approved purposes; and will only be released as the Plaintiffs implement their grant program plans. Sufficient procedures have already taken place or are already in place to protect taxpayer dollars.

**J.A. 0019**

Because Plaintiffs have made clear showing under the four *Winters* factors, the Court grants Plaintiffs motion for preliminary injunction on Claims I and II as to Grants 1-26 and 33-38. The Court orders the following relief:

    A. Enjoins Lee Zeldin, in his official capacity as Administrator of the EPA, Brook Rollins, in his official capacity as Secretary of USDA, Sean Duffy, in his official capacity as Secretary of the Secretary of DOT, and Chris White, in his official capacity as Secretary of DOE (hereafter "Enjoined Individual Defendants") from freezing and/or terminating Grants 1-26 and 33-38 and directs that Plaintiffs access to funding for these grants be immediately restored;

    B. Enjoins the Enjoined Individual Defendants from freezing, terminating or otherwise interfering with the funding of Grants 1-26 and 33-38 without written authorization from the Court[9];

    C. Directs the Enjoined Individual Defendants to submit a certification to this Court within seven days of this Order confirming compliance with this Order.

**D. Bond**

Plaintiffs urge this Court to set a nominal bond of zero dollars in this case. (Dkt. No. 24 at 3). Plaintiffs cite recent decisions by other district courts that have considered the issue with respect to nonprofits contesting the freezing of grant funds. *See, e.g.*, *Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764, at *29

---

[9] See Footnote 6 for further explanation regarding this condition of the preliminary injunction.

(D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because requested bond "would essentially forestall [the] [p]laintiffs' access to judicial review").

Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331-332 (4th Cir. 2013) (*abrogated on other grounds as recognized by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022)). "In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.1974)). District courts often waive the bond requirement in public interest cases, recognizing that the failure to do so could prevent certain plaintiffs from obtaining meaningful judicial review. *See Defenders of Wildlife v. U.S. Fish and Wildlife Service*, 530 F. Supp. 3d 543, 560 (D.S.C. 2021) (collecting cases).

The Government contests Plaintiffs' request for the imposition of nominal bond and "request[s] that the Court require Plaintiffs to post security . . . for any taxpayer funds distributed during the pendency of the Court's Order," citing a presidential memorandum opposing the waiver of injunction bonds. White House memorandum states that "it is the policy of the United States to demand that parties seeking injunctions against the [government] must cover the costs and damages incurred if the [g]overnment is ultimately found to have been wrongfully enjoined or restrained." (Dkt. No. 56 at 36) (citing Presidential Memorandum, Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c), available at https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/    (Mar.    11,

21

2025)). This Court is not bound by the memorandum and declines to adopt any policy that would have the effect of blocking opponents of the government from the courts. *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"). This Court agrees with the District of Rhode Island that, "[i]n a case where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic— and contravene the very basis of this opinion—to hold the Nonprofits hostage for the resulting harm." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *24. The Court thus imposes a nominal bond of zero dollars.

## IV.    Plaintiffs' Claims for Relief Regarding Grants Funded by General Appropriations of the USDA

The six grants which Defendants continue to contest arise were administered by the USDA and were funded under the Commodity Credit Corporation, an entity under the control of the USDA. The grants were awarded under a program titled Partnerships for Climate Smart Commodities. ("PCSC"). Defendants have represented to the Court PCSC funding derived exclusively from the general appropriations of the USDA. Defendants assert that the USDA Secretary has broad discretion in the use of these funds, which differs from appropriations under the IRA, IIJA, or other mandatory congressional legislation. (Dkt. No. 142 at 42-43).

Defendants have informed the Court that that "PCSC has been converted into the Advancing Markets for Producers" to "reprioritize efforts so that more money goes directly to farmers." (Dkt. No. 153 at 2). As part of this new program, USDA has imposed a requirement that 65% of the federal funds must go to the producers. (*Id.* at 2-3). Six grants of Plaintiffs (Exhibit A, Grants 27-32) have been terminated because they allegedly do not meet the newly imposed 65%

22

requirement. (*Id.* at 3). The termination notices invite Plaintiffs to submit new proposals under the redesigned program by June 20, 2025. (*Id.*). Plaintiffs challenge the termination of the six USDA grants on the basis that the newly adopted program with the 65% requirement "emerged out of nowhere" and USDA provided "no explanation how its new 65% threshold was derived." (Dkt No. 149 at 14-15).

There is a very limited record before the Court on the termination of Grants 27-32. Plaintiffs assert that these six grants were summarily terminated at or about the time of the other 32 grants with no notice or reasoned explanation. According to Defendants, the funding of these grants was exclusively from generally appropriations and were not part of any mandatory legislation.[10] Thus, the challenges to the termination of these grants are based on an alleged failure to follow proper APA procedures, rather than a violation of USDA's duty to "faithfully execute[]" the laws. Further, the explanation provided by USDA officials for the termination of the six grants was not based on an undifferentiated attack on the purposes set forth in congressional legislation but on an effort to reduce administrative costs so that producers receive a greater share of the benefits of the federal funds. Moreover, affected Plaintiffs are invited to submit applications under the revised grant program.

Under the *Winter* factors, a threshold, critical issue is whether Plaintiffs can carry the burden of showing a likelihood of success on the merits to entitle them to the "extraordinary remedy" of preliminary injunctive relief. *Winter*, 555 U.S. at 20. On this record, the Court finds that Plaintiff cannot meet this standard. It may be with a fuller record and with further

---

[10] The Plaintiffs stated in the Amended Complaint that "upon information and belief," a portion of the PCSC grants was funded by the IRA. (Dkt. No. 23). Based on the present information before the Court, this appears not to be correct.

**J.A. 0023**

developments Plaintiffs establish a basis for an APA claim but at this time preliminary injunctive relief is not appropriate.

**V.    Conclusion**

    Based on the foregoing, the Court has ruled as follows:

A.    Under Section II, the Court enters judgment for Plaintiffs regarding the uncontested APA claims (Exhibit A, Grants 1-26, 33-38). Plaintiffs are provided declaratory and permanent injunctive relief. Defendants' motion to stay is denied.

B.    Under Section III, The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims and that Plaintiffs' have standing to assert those claims. The Court further grants Plaintiffs preliminary injunction for Grants 1-26 and 33-38 regarding the nonstatutory review claims.

C.    Under Section IV, the Court denies Plaintiffs preliminary injunctive relief regarding Grants 27-32.

                        _s/ Richard Mark Gergel_
                        Richard Mark Gergel
                        United States District Judge

May 20, 2025
Charleston, South Carolina

**J.A. 0024**

# EXHIBIT A

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 31 of 467    Total Pages:(31 of 467)

| Granting Agency | Grant Number | Project Name / Notes | Grant Program | Grant Recipient | Decl. Cite | Grant agreement under review; Presently Paused; Accessible to Grantees; Terminated (As of 4/22/2025) |
|---|---|---|---|---|---|---|
| DOE | DE-SE0001546 | Assistance for Latest and Zero Building Energy Code Adoption | Assistance for Adoption of the Latest and Zero Building Energy Codes | City of Baltimore | Baltimore Decl., Ex. 14-C | Award No. DE-SE0001546 is a conditional award. Therefore, the grant funds have never been - and are not presently - accessible to the grantee. Per the terms of the award, "the availability of funds to the Recipient for payment of costs incurred by the Recipient is conditioned upon the Grants Officer's review and approval of the Recipient's application and the completion of negotiations." |
| EPA | 5F-03D33625-0 | Youth Empowerment Strategies 4 Environmental Justice | Environmental and Climate Justice Block Grant – Community Change Grant | Earth Island Institute | Earth Island Decl., Ex. 8- D | Termination in Progress* |
| EPA | 3D30824 | Community Change Grant | Environmental and Climate Justice Block Grant - Community Change Grant | Sustainability Institute | Sustainability Institute Decl., Ex. 1- B | Termination in Progress* |
| EPA | 97T28301 | Inflation Reduction Act - Environmental and Climate Justice | Environmental and Climate Justice Block Grant - Community Change Grant | Leadership Counsel for Justice and Accountability | Leadership Counsel Decl., Ex. 9- A | Termination in Progress* |
| EPA | 96272300 | Uplifting Bronx Voices for Climate Change Resilience | Environmental and Climate Justice Block Grant - Community Change Grant | Bronx River Alliance | Bronx River Decl., Ex. 5- B | Termination in Progress* |
| EPA | 97T28901 | Huliau o Wai'anae: Turning Points for a Sustainable Future. | Environmental and Climate Justice Block Grant - Community Change Grant | Earth Island Institute | Earth Island Decl., Ex. 8- B | Termination in Progress* |
| EPA | 00A01479 | Elm City Climate Collaborative | Environmental and Climate Justice Block Grant - Community Change Grant | City of New Haven | New Haven Decl., Ex. 18-C | Termination in Progress* |

| | Agency | Number | Project | Program | Grantee | Declaration | Status |
|---|---|---|---|---|---|---|---|
| 8 | EPA | 0E+00000 | Climate Resilience Starts at Home: Growing Energy Efficiency, Indoor Air Quality, and Green Jobs in Madison and Fitchburg, Wisconsin | Environmental and Climate Justice Block Grant - Community Change Grant | City of Madison | Madison Decl., Ex. 16-A | Closed |
| 9 | EPA | 00A01441 | Electrify New Haven | Environmental and Climate Justice Block Grant - Government to Government Grant | City of New Haven | New Haven Decl., Ex. 18-A | Terminated |
| 10 | EPA | 95336801 | DPW YH20+ Expansion II | Environmental and Climate Justice Block Grant - Government to Government Grant | City of Baltimore | Baltimore Decl., Exs. 14-C, 14-D | Terminated |
| 11 | EPA | 03D03424 | North Mecklenburg Air Monitoring Network | Environmental Justice Collaborative Problem-Solving | CleanAIRE NC | CleanAIRE NC Decl., Ex. 6-B | Terminated |
| 12 | EPA | 96229424 | Partnership for Urban Waterways in Bronx and Lower Westchester Counties, New York | Environmental Justice Collaborative Problem-Solving | Bronx River Alliance | Bronx River Decl., Ex. 5- D | Terminated |
| 13 | EPA | 00A01475 | Union Station Area Thermal Energy Network | Climate Pollution Reduction Grant Program | City of New Haven | New Haven Decl., Ex. 18-B | Accessible to grantees |
| 14 | EPA | 95335901 | Bowley's Lane Composing Facility | Solid Waste Infrastructure for Recycling Grant Program | City of Baltimore | Baltimore Decl., Ex. 14-A | Accessible to grantees |
| 15 | EPA / NFWF | 0602.24.082555 | Accelerating Clean Water and Conservation Outcomes in Shenandoah Valley (VA) | Innovative Nutrient and Sediment Reduction Grants Program | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Ex. 4- E | Accessible to grantees |
| 16 | USDA | AM22FFWPA0013 | Collaborative Farm Worker and Meatpacking Worker 14-State COVID Relief Fund Project | Agricultural Marketing Service Farm and Food Worker Relief | Pasa | Pasa Decl., Ex. 12-B | Presently paused because previously identified on DEIA list. Payments made through Jan. 19, 2025. |
| 17 | USDA | 2022-70416-37195 | Subaward with National Young Farmers Coalition | American Rescue Plan Technical Assistance Investment Program | RAFI-USA | RAFI-USA Decl., Ex. 13-H | Accessible to Grantees |

USCA4 Appeal: 25-1575     Doc: 55-1     Filed: 06/23/2025     Pg: 33 of 467     Total Pages:(33 of 467)

| | USDA | NR225F48XXXXC002 | Organic Technical Staffing Assistance | Conservation Stewardship Program: Organic Technical Assistance Grant | Marbleseed | Marbleseed Decl., Ex. 10-C | Accessible to Grantees. Most recent payment completed on 4/11/25. |
|---|---|---|---|---|---|---|---|
| 18 | | | | | | | |
| 19 | USDA | NR223A750003C062 | Subaward with RAFI-USA | Conservation Technical Assistance Cooperative Agreement | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3- D | Agreement closeout completed. Award no longer active as of 11/14/24. |
| 20 | USDA | FSA24CPT0014403 | Distressed Borrower Technical Assistance | Distressed Borrower Assistance Network Program | RAFI-USA | RAFI-USA, Decl. Ex. 13- D | Payment was paused due to IRA funding, but was released on Friday pursuant to *Woonasquatucket* injunction and the payments are in process. There are corrections that are pending on the payment requests. |
| 21 | USDA | NR242D37XXXXG002 | In Pennsylvania to help improve grazing success and associated economic, environmental, and social co-benefits, including animal health, soil health, carbon sequestration, cost savings, water quality | Environmental Quality Incentives Program – Conservation Innovation Grants | Pasa | Pasa Decl., Ex. 12-D | Accessible to Grantees. Payment completed 4/14 |
| 22 | USDA | NR243A750003C062 | Expanding RAFI-USA's Conservation Resources for Resilient Farms Project | Equity in Conservation Outreach Cooperative Agreement | RAFI-USA | RAFI-USA Decl. Ex. 13- B | Presently paused because previously identified on DEIA list. Payments made through Jan. 19, 2025. |
| 23 | USDA | NR243A750003C045 | Deliver outreach and education programming to increase awareness of and participation in NRCS programs, services and leadership opportunities in agriculture and natural resource conservation in Kentucky. | Equity in Conservation Outreach Cooperative Agreement | Organic Association of Kentucky (OAK) | OAK Decl., Ex. 11-B | Presently paused because previously identified on DEIA list. Payments made through Jan. 19, 2025. |
| 24 | USDA | FSA24GRA0011586 | Increase Land, Capital, and Market Access for Underserved Farmers on a Mid-size National Landscape using New Model, Agrarian Commons | Increasing Land, Capital, and Market Access Program | Agrarian Trust | Agrarian Trust Decl., Ex. 2-A | Payment was paused due to IRA funding, but was released on Friday pursuant to Woonasquatucket injunction and the payments are in process. There are corrections that are pending on the payment requests. |

USCA4 Appeal: 25-1575     Doc: 55-1     Filed: 06/23/2025     Pg: 34 of 467     Total Pages:(34 of 467)

| | | | | | | |
|---|---|---|---|---|---|---|
| 25 | USDA | FSA24CPT0013706 | Gaining New Ground | Increasing Land, Capital, and Market Access Program | RAFI-USA | RAFI-USA Decl., Ex. 13- F | Payment was paused due to IRA funding, but was released on Friday pursuant to Woonasquatucket injunction and the payments are in process. There are corrections that are pending on the payment requests. |
| 26 | USDA | FSA23CPT0013706 | Gaining New Ground - Subaward with RAFI-USA | Increasing Land, Capital, and Market Access Program | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3- B. | Payment was paused due to IRA funding, but was released on Friday pursuant to Woonasquatucket injunction and the payments are in process. There are corrections that are pending on the payment requests. |
| 27 | USDA | NR233A750004G045 | Expands markets for climate-smart dairy, beef and poultry industry in DE, NC, NJ, NY, MD, OH, PA, SC, TN, VA and WV and supports the implementation and monitoring of climate-smart practices. | Partnerships for Climate-Smart Commodities Program | Conservation Innovation Fund | Cons. Innovation Fund Decl., Ex. 7-A | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 28 | USDA | NR233A750004G045 | Subaward with Conservation Innovation Fund | Partnerships for Climate-Smart Commodities Program | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Exs. 4-A, 4-B | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 29 | USDA | NR243A750004G010 | Expands climate-smart wheat, grain, specialty and organic crop markets in IA, IL, IN, KS, KY, MI, MN, MO, ND, NE, OH, SD, TN, WI and supports farmer CS practice implementation and monitoring. | Partnerships for Climate-Smart Commodities Program | Marbleseed | Marbleseed Decl., Ex. 10-B | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 30 | USDA | NR233A750004G025 | Expands markets in the Eastern US for climate-smart dairy, grain, livestock, organic and specialty crops; supports farmer and rancher climate-smart practice implementation and monitoring | Partnerships for Climate-Smart Commodities Program | Pasa | Pasa Decl., Ex. 12-A | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 31 | USDA | NR233A750004G092 | Expand markets for climate-Smart grass-fed lamb, grass fed beef, corn, soybeans, small grains, produce, dairy, agroforestry and hemp in Kentucky; supports socially disadvantaged farmers | Partnerships for Climate-Smart Commodities Program | Organic Association of Kentucky (OAK) | OAK Decl., Ex.11-D | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |
| 32 | USDA | NR233A750004G080 | Subaward with A Greener World (AGW) | Partnerships for Climate-Smart Commodities Program | RAFI-USA | RAFI Decl., Ex. 13-J | Recipient notified award will be terminated. Payment will be processed for expenses up through the date of notice. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 33 | USDA | FSA23CPT0013667 | Resources for Resilient Farms | Rural Development Policy Cooperative Agreement | RAFI-USA | RAFI-USA Decl, Ex. | Grant manager working with program manager on process for unfreezing the award. |
| 34 | USDA | FSA23CPT0012856 | Collaborative Approaches for Impact for Philadelphia Urban and Innovative Agriculture | Urban Agriculture and Innovative Production Grant | Pasa | Pasa Decl., Ex. 12-C | Accessible to Grantees. Payment submitted on 4/7/25 and staff are reviewing/processing. |
| 35 | USDA | 24-DG-11052021-228 | Ready, Set, Grow San Diego | Urban and Community Forestry Grant | City of San Diego | San Diego Decl., Ex. 20-A | Accessible to Grantees. |
| 36 | USDA | 23-DG-11094200-363 | Subaward of Ohio Department of Natural Resources | Urban and Community Forestry Grant | City of Columbus | Columbus Decl., Ex. 15-A | Accessible to Grantees. |
| 37 | USDOT | N/A | East Nashville Spokes | Active Transportation Infrastructure Investment Program | City of Nashville | Nashville Decl., Ex. 17 | No grant agreement completed. Grant agreement under review. |
| 38 | USDOT | N/A | Electrify Music City | Charging and Fueling Infrastructure Grant Program | City of Nashville | Nashville Decl., Ex. 17 | No grant agreement completed. Grant agreement under review. |

* EPA reports that payment for expenses properly incurred during the pendency of termination will be available as part of the termination closeout process pursuant to the terms of the grant agreements.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| The Sustainability Institute *et al.*, | Case No. 2:25-cv-2152-RMG |
| Plaintiffs, | |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States, *et al.* | **ORDER** |
| Defendants. | |

The Court conducted a hearing on April 23, 2025 to address the issue of jurisdiction and review recent developments regarding the grants at issue in this case. The Court memorializes and supplements its rulings from the bench at the April 23 hearing in two sections below. First, the Court addresses the issue of jurisdiction. Second, the Court addresses supplementing the record.

## I.    Jurisdiction

Plaintiffs bring this case under the United States Constitution and the APA, 5 U.S.C. §§ 702, 704, alleging that Defendants improperly froze Plaintiffs' grant funds appropriated by Congress under the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA"). Defendants argue that this court lacks subject matter jurisdiction to hear Plaintiffs claims because (A) the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over Plaintiffs' claims and (B) Plaintiffs are challenging funding decisions committed to agency discretion by law which are not subject to Administrative Procedure Act ("APA") review.

### A.  Tucker Act

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *see United States v. Mitchell*, 463 U.S.

1

**J.A. 0031**

206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

The Tucker Act confers jurisdiction upon the Court of Federal Claims over specific categories of actions brought against the United States and waives the Government's sovereign immunity for those actions. 28 U.S.C.A. § 1491, *see Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Specifically, "[t]he Tucker act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 330, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert denied*, 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

The APA also offers a waiver of sovereign immunity and entitles "a person suffering legal wrong because of any agency action" to seek "judicial review thereof." 5 U.S.C. § 702. Section 702 of the APA specifies that sovereign immunity is not available as a defense when the party seeks "relief other than money damages" against the United States or its agencies. 5 U.S.C. § 702; *Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988) (stating that Congress amended § 702 in 1976 to "broaden the avenues for judicial review of agency action be eliminating the defense of sovereign immunity" in suits "seeking relief other than money damages."). Section 704 of the APA specifies that judicial review of agency action may be had when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Therefore, courts interpreting sections 702 and 704, have held that for the APA's waiver of sovereign immunity to apply, a claim must (1) request "relief other than

2

**J.A. 0032**

money damages" and (2) show no "adequate remedy" is available elsewhere, such as in the Court of Federal Claims under the Tucker Act. *See Doe v. United States*, 372 F.3d 1308, 1312 (Fed. Cir. 2004).

"The interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346. As discussed, "[t]he APA allows private parties to sue the federal government in district court over final agency actions, so long as they seek relief other than monetary damages 'for which there is no other adequate remedy in a court.'" *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346). And "[c]laims for money, by contrast, proceed under the Tucker Act and in the Court of Federal Claims." *Williams v. Roth*, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing 28 U.S.C. §§ 1346(a)(2), 1491). To that end, "where 'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (noting the flip side of the same coin: "[t]he Tucker Act yields when the . . . Administrative Procedure Act. . . provides an avenue for relief").

There is a "distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief . . . ." *Bowen*, 487 U.S. at 893. A claim for specific relief through declaratory judgment or injunction that requires the federal government to pay money to plaintiffs does not automatically transform the action into one for money damages. *Id.* ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *Harrison v. Kendall*, 670 F.Supp.3d 280, 297 (E.D. Va. 2023) ("[a] suit which does not seek monetary damages does not arise under the Tucker Act

3

simply because the plaintiff's success will result in eventual monetary gain from the government."). Instead, "[t]o determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F.4th at 615-16 (quoting *Randall*, 95 F.3d at 346).

"The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The Court discusses the elements of the *Megapulse* framework in turn below.

### 1. Source of Rights

Defendants argue that Plaintiffs' source of rights stem from their grant agreements with the government. (Dkt. No. 56 at 10-11). Defendants point to language in Plaintiffs' motion for preliminary injunction and their amended complaint where Plaintiffs assert that they have entered into binding agreements with the government; that the government has provided funding up to a specified dollar amount, over a specified time period, for specified work; and that the government has not abided by the grant agreements and regulations. (*Id.*) Defendants further argue that Plaintiffs characterized the remedy they are seeking as simply requiring the government to honor commitments it has already made to Plaintiffs in binding grant agreements. (*Id.* at 11).

Plaintiffs argue that their claims are not based on contract, but instead are rooted in the Constitution and the grant programs' respective authorizing statutes. (Dkt. No. 64 at 5). In their amended complaint, Plaintiffs explicitly ask the Court to interpret and enforce federal law, not the individual grants. (Dkt. No. 23 at 77-88). In counts I and II of the amended complaint, Plaintiffs

4

**J.A. 0034**

contend that Defendants freezing actions violate separation of powers and were done *ultra vires*. (*Id.* at 77-81). Specifically, Plaintiffs allege that Defendants did not have any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds and that the Defendants' actions usurped Congress' constitutionally authorized spending and legislative powers. (*Id.*) In count III, Plaintiffs allege that Defendants actions were arbitrary and capricious and violate the APA because Defendants froze all IRA and IIJA funding relying on factors which Congress did not intend them to consider. (*Id.* at 81-83). In count IV, Plaintiffs allege that Defendants violated the APA because Defendants actions are contrary to the IRA and IIJA and are not in accordance with the statutory requirements to create, fund, and carry out the grant programs. (*Id.* at 83-85). In count V, Plaintiffs allege that Defendants freezing actions violate the First Amendment of the Constitution because Defendants targeted federal funding recipients based on their viewpoint. (*Id.* at 85-87). And in count VI, Plaintiffs allege that Defendants actions violate the IRA and IIJA because Defendants are statutorily required to carry out the congressionally mandated to obligate and distribute the funds that Congress appropriated for the grant programs.

Additionally, Plaintiffs prayer for relief requests, among other things, declaratory judgments that Defendants actions violated the Constitution, statutory provisions enacting and appropriating funds to Plaintiffs grant programs, and the APA; an injunction prohibiting Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their grant funds; and an order setting aside Defendants actions to freeze or terminate the grants. (*Id.* at 89-91).

Based on the Court's review of the Complaint, the Court finds that Plaintiffs' claims do not turn on the terms of a contract between the parties. None of Plaintiffs' claims are based on Defendants failure to perform obligations in the grant awards. Plaintiffs are not seeking judicial

**J.A. 0035**

review of the grant agreements between the parties. Instead, they have asked the Court to review and interpret federal laws. That Plaintiffs' action implicates agreements for federal funds does not transform the action into one for money damages. The source of the rights alleged in this action is federal law—namely the IRA, IIJA, and the Constitution—not any obligations outlined in the grant awards.

### 2. Type of Relief Sought

Defendants argue that Plaintiffs seek monetary relief because their claims are tied to Plaintiffs accessing federal funds. (Dkt. No. 56 at 11). Defendants further argue that the Court of Federal Claims could provide the Plaintiffs complete relief because Plaintiffs are requesting the monetary amounts awarded by the grants, which, in Defendants' view, are specific sums already calculated and past due.

It is now axiomatic that there is a "distinction between an action at law for damages," which provides monetary compensation, and "an equitable action for specific relief," which might nonetheless require monetary relief. *Bowen*, 487 U.S. at 893; *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) ("[W]hether [restitution] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.))). Simply because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships. *Compare Bowen*, 487 U.S. at 905 (holding the district court had jurisdiction because declaratory or injunctive relief was appropriate to clarify petitioner state's ongoing obligations under the Medicaid plan), *with Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020) (holding that petitioners properly

6

**J.A. 0036**

relied on the Tucker Act to sue for damages in the Court of Federal Claims because plaintiffs were strictly concerned with "specific sums already calculated, past due, and designed to compensate for completed labors").

The Court finds *Bowen* especially instructive here. "The principal question presented [in *Bowen*] is whether a federal district court has jurisdiction to review a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program." *Bowen*, 487 U.S. at 882. The Supreme Court held the district court had subject matter jurisdiction over the suit. *Id.* at 912. The plaintiff, Massachusetts, sought prospective relief which was "important to the Commonwealth both because the . . . program [at issue was] still active and because the legal issues involved [had] ramifications that affect[ed] other aspects of the Medicaid program. What [was] at stake . . . [was] the scope of the Medicaid program, not just how many dollars Massachusetts should have received in any particular year." *Id.* at 889–90. Thus, the Supreme Court held the Court of Federal Claims was unable to provide an adequate remedy. *Id.* at 904.

Plaintiffs primary purpose in brining their claims is to seek equitable, not monetary, relief. They do not bring claims for past pecuniary harms. Rather, like the plaintiffs in *Bowen*, Plaintiffs claims are to preserve their ongoing and prospective agreements with the Government. Plaintiffs have an ongoing relationship with the government and seek declaratory and injunctive relief to confirm the Government's future obligations towards Plaintiffs under the IRA and IIJA. Plaintiffs' claims are about the process in which their grants were frozen, not the monetary awards in the grants themselves.

Additionally, the harms that Plaintiffs allege can only be remedied by specific, not monetary, relief. Plaintiffs state that the blanket IIJA and IRA funding freezes will result in lost

**J.A. 0037**

jobs, suspension of research and community initiatives, loss of goodwill, and harm to the Plaintiffs' reputation. Money damages will not resolve those alleged harms.

Specifically, loss of goodwill and harm to Plaintiffs' reputation cannot be remedied by monetary damages. Some of the Plaintiffs here have devoted resources to build trust and relationships in the communities in which they serve, and those Plaintiffs now fear that the trust and relationships they built may be broken. For example, Plaintiff Pennsylvania Association for Sustainable Agriculture ("Pasa") is a non-profit organization that supports farmers' goals of creating economically viable, environmental sound, and community-focused farms and food systems. Pasa is largely funded by federal grants. It's largest grant award, $50 million from the Untied States Department of Agriculture Natural Resources and Conservation Service Partnership for Climate-Smart Commodities program, was frozen and is subject in this lawsuit. When applying for that award, Pasa built trust and relationships with farmers in their communities, the people Pasa endeavored to serve with the grant funds. Pasa now fears that the continued freezing of funds may force them to abandon the very farmers who entrusted them with their time and their land. Those relationships are also tested by the uncertainty surrounding federal funds caused by the funding freeze. Pasa states that, if the trust between Pasa and the farming community is broken, it is impossible to estimate how long it may take to repair those relationships. (Dkt. No. 24-13).

Even if the total grant funds could be restored by a damages award in the Court of Federal Claims, such a damage award would not alleviate the reputational harms Plaintiffs would likely suffer. The farmers, for example, may be hesitant to work with Pasa in the future in fear that an agency's funding decision may change overnight and disrupt critical operations, such as seasonal planting and harvesting. Under these circumstances, declaratory relief establishing that blanket freezes of grants done without individualized process and without legal authority are improper is

8

**J.A. 0038**

critical to provide to provide Plaintiffs effective relief.  Such relief, if granted, would provide Pasa's clients with the assurance that any federal funds that they plan to rely on will only be frozen or cancelled through actual authority provided by federal laws and after the funding agency follows the lawful process. This example emphasizes that Plaintiffs' claims are about process, not damages, and are available only through the equitable powers of the district court under the APA.

Since the Court finds that the proper source of Plaintiffs' rights is federal law and because the relief sought is declaratory and injunctive in nature, the Court finds that the "essence" of the Plaintiffs' claims is not contractual in nature. Plaintiffs' claims cannot properly be brought under the Tucker Act in the Court of Federal Claims and fall plainly within the jurisdiction of this Court under the APA.

### 3.  *Department of Education v. California*

Defendants contend that the Supreme Court's recent issuance of an emergency stay order in a three-page decision, issued without benefit of a record or oral argument, definitively disposes of all jurisdictional issues in this case. The Court finds Defendants' argument unpersuasive.

In *Department of Education v. California*, the Supreme Court stayed a district court's temporary restraining order pending the resolution of the appeal in the underlying case. *California*, 2025 WL 1008354, at *2. At the district court, plaintiffs sought preliminary relief enjoining the Government from terminating grant awards under programs administered by the United States Department of Education. *California v. U.S. Department of Education*, No. 25-105488-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). The District Court for the District of Massachusetts granted injunctive relief against the government. *Id.* at *5. The Government appealed the district court's order and requested a stay pending the appeal. *California v. U.S. Department of Education*, No. 25-1244, 2025 WL 878431, at *1 (1st Cir. Mar. 21, 2025). The First Circuit Court of Appeals

denied the Government's request to stay the district court's order pending appeal. *Id.* at *1. The Government then filed an emergency application to the Supreme Court requesting the Court vacate the district court's temporary restraining order and immediately stay the case pending the disposition of the Government's appeal. *California*, 2025 WL 1008354, at *1. The Supreme Court granted the application and stayed the district court's order. The Court reasoned that a stay is appropriate because (1) "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," (2) the Government is likely to suffer irreparable harm, and (3) "respondents would not suffer irreparable harm while the TRO is stayed." *Id.*

In finding that the Government is likely to succeeded in showing the District Court lacked jurisdiction to order payment of money under the APA, the Supreme Court very briefly discussed the jurisdictional line between the APA and Tucker Act. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages, but also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). The Supreme Court further noted that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the [district court in *California*] ordered . . . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, the Supreme Court stated that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The *California* ruling is not dispositive of the jurisdictional questions in this case for three reasons.

10

**J.A. 0040**

First, the *California* ruling was made in the context of an emergency application for a stay pending appeal. In that procedural posture, the Supreme Court relied on limited briefing and did not have the benefit of oral argument or a factual record. Additionally, the Supreme Court applied a likelihood of success standard to the Government's application for a stay, stopping well short of addressing the complex jurisdictional issues on the merits. Without a factual record, meaningfully addressing the jurisdictional issues under *Bowen* would not have been possible. Under these circumstances, the Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to definitively address the jurisdictional issues in this case. The Court therefore finds that, *Bowen*, not the emergency stay order in *California*, is the guiding compass in deciding whether the Court has jurisdiction under the APA or the Court of Claims has jurisdiction under the Tucker Act.

Second, the terms and conditions of the individual grants are not at issue here. In *California*, the First Circuit Court of Appeals determined that "the terms and conditions of each individual grant award" were "at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the Supreme Court then granted the Department's application for a stay because it concluded that the district court issued an order "to enforce a contractual obligation to pay money" and "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1. In this case, the terms and conditions of each individual grant are not at issue. Rather, this case deals with Defendants' implementation of a broad, categorical freeze on obligated funds pending determinations on whether it is lawful to summarily freeze or terminate disbursements of such funds. Plaintiffs here allege that the categorical funding freeze was not based on individualized

11

**J.A. 0041**

assessment of any particular grant terms and conditions or agreements between the Parties but, instead, was based on the grants being funded by the IRA and IIJA.

Third, there are still other factors the Supreme Court considered in ruling in *California* which are not relevant or present here. The issuance of a stay is dependent upon the circumstances of the particular case, and the Supreme Court's finding that the District Court likely lacks jurisdiction is just one of the factors it considered. The Supreme Court also considered potential harm to the parties and public interest when issuing the stay. The combination of those factors guided the Supreme Court in making its judgment. Those factors are not relevant to the Court's determination here. And even if they were relevant, they are not present in this case. For example, unlike in *California* there is no indication in this case that the Plaintiffs could not or would not pay the money back if so ordered. Additionally, Plaintiffs have provided considerable evidence of irreparable harm should they not regain access to their grant funding. This is different from *California* where the Supreme Court specifically found that the State government could fund the affected programs during the pendency of the litigation, effectively eliminating a major portion of the California plaintiffs' irreparable harm claim. *California*, 2025 WL 1008354, at *1.

In sum, considering the full record before the Court, the clear statutory authority for APA jurisdiction where a party is seeking relief from agency action other than money damages, and the well-established standards set forth in *Bowen*, the Court finds that it has jurisdiction over this matter under the APA.

**B. Agency Discretion**

Defendants argue that their actions to freeze the grant funds were committed to agency discretion by law and fall outside the scope of permissible judicial review under the APA. (Dkt. No. 56 at 14-16).

12

**J.A. 0042**

As discussed above, APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "That language sets up a 'basic presumption of judicial review' of agency action." *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). The text carves out two exceptions to that "basic principle." *Id.* First, where "statutes preclude judicial review" per § 701(a)(1); and second, where "agency action is committed to agency discretion by law" per § 701(a)(2). *Holbrook,* 48 F.4th at 287. With regard to the second, "[a]gency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)). Of import here, the APA's prohibition of judicial review of actions committed to agency discretion by law, and a defect related thereto, "goes to subject matter jurisdiction." *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–506 (4th Cir. 2013)).

Defendants primarily rely on the Supreme Court's opinion in *Lincoln v. Vigil* to support its argument on agency discretion. 508 U.S. 182 (1992). In *Lincoln*, the Court found an agency's particular use of funds from a "lump sum" grant was committed to its discretion because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. That is, "a lump-sum appropriation reflects a congressional recognition that an agency must be allowed flexibility to shift funds within a

13

**J.A. 0043**

particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 193 (internal citation omitted).

Here, there is no indication that Congress intended to commit funding under the IRA and IIJA to the agencies' discretion. Defendants have not pointed to any evidence showing that this was Congress' intention. And this case does not involve an agency's allocation of funds under a lump-sum grant by Congress (which by its nature implies delegation of wide discretion to the agency). Because Defendants have not shown that the funds at issue here were committed to agency discretion, the Court declines to apply the 5 U.S.C. § 701(a)(2) exception to the APA's waiver of sovereign immunity here.

## II. Supplementation of the Record and the Process Going Forward

When this case was initially filed on March 19, 2025, Plaintiffs alleged that their grants, totaling 38, had been frozen[1] because the funds for those grants had been appropriated under two Acts of Congress now disfavored by the present Administration: the Inflation Reduction Act (IRA) and the Infrastructure Investment and Jobs Act. (IIJA). (Dkt. No. 1 at 2). At oral argument before the Court on April 23, 2025, Defendants' counsel was unable to provide the Court any estimate of the number of grants which had been summarily frozen since January 20, 2025, but he acknowledged that grants had been frozen on a mass, not individualized, basis.[2]

In response to a recent Order directing Defendants to provide a status report on the 38 grants at issue in this litigation, Defendants submitted a chart which indicated that the funding of 13 grants had been restored, four of the grants had been terminated, and 12 of the grants had

---

[1] As used in this Order, the terms "frozen" or "freeze" have the same meaning as a "pause" in funding or any other action that disrupted the normal flow of grant funds to the grantees.
[2] This was corroborated by the fact that in the thousands of pages of records produced by Defendants relating to the freezing of grants at issue in this litigation, the Court could not locate a single document (other than four termination letters) which referenced any individual grantee.

14

**J.A. 0044**

terminations being processed. (Exhibit A). It appears to the Court that the Defendants' chart reflects a pivot away from the summary freezing of grants in mass. Defendants appear now to be turning their focus to a narrower set of grants allegedly sought to be terminated because they are allegedly not consistent with "agency policy." At the hearing of April 23, 2025, Defendants' counsel could not provide the Court any additional justification for the termination or proposed termination of any of the grants in this litigation. Questions also arose at the recent hearing regarding the status of certain grants.

In an effort to obtain greater specification of the reasons for the proposed termination of certain grants and a better understanding of the present status of several other grants, the Court orders Defendants to provide the following within seven days of this Order:

1. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the termination of the grants set forth in Exhibit A at Nos. 9, 10, 11, and 12 and the proposed termination of grants set forth at Nos. 2, 3, 4, 5, 6, 7, 27, 28, 29, 30, 31, and 32.

2. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the freezing of funds set forth in Exhibit A at Nos. 16, 22, and 23.

3. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the decision to finalize or not to finalize the grant awards set forth in Exhibit A at Nos. 37 and 38.

4. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the status of the grant set forth at Exhibit A at No. 15. Exhibit A lists No. 15 as "accessible to grantee" but Plaintiffs indicate this grantee has been

unable to access the funds.  To the extent the grant remains frozen or slated for possible termination, produce all relevant documents.

5.  All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the status of the grant set forth at Exhibit A at No. 8. Exhibit A lists this grant as "closed," and Plaintiffs assert that to their knowledge the grant is frozen. To the extent the grant remains frozen or is slated for possible termination, produce all relevant documents.

6.  All documents prepared, received, possessed or transmitted from January 20, 2025 to the present in which Defendants were instructed and/or advised that all grants authorized by the IRA or the IIJA were to be frozen.

7.  The Court previously gave Defendants until April 21, 2025 to supplement their privilege logs regarding the deliberative process privilege. (Dkt. No. 77). Per Defendants' request, the Court extends the time to supplement the privilege logs until 7 days following the issuance of this order and only the privilege logs of Defendants EPA and USDA need to be addressed.

In the event that any Defendant asserts any privilege in regard to any of the documents required to be produced in Paragraphs 1-7 above, such documents must be identified in an appropriately documented privilege log and must be submitted to the Court under seal and *ex parte* for *in camera* review within seven days of this Order.

Additionally, to avoid the confusion created by Defendants producing thousands of documents in response to this Court's earlier order without identifying which particular discovery request Defendants were responding to, the Court orders and directs that Defendants respond to each discovery request above separately and clearly identify which documents are responsive to

16

**J.A. 0046**

each discovery request. This directive applies both to responses to discovery requests in which no privilege is asserted as well as all documents produced *ex parte* and *in camera* based on an assertion of privilege.

Once Defendants comply with their discovery obligations to the Court above, Plaintiffs may file a response to the submitted documents and address any other issues related to the production of documents and/or their pending motion for a preliminary injunction with seven days after receipt of the Plaintiffs' responses required in Paragraphs 1-7 above.

Finally, in regard to the grants which Defendants have identified as now unfrozen in Exhibit A at Nos. 13, 14, 15, 16, 17, 18, 20, 21, 24, 25, 26, 34, 35 and 36, Defendants are ordered and directed not to subsequently freeze or terminate these grants without notice to the Court and authorization from the Court that the freezing and/or terminating of the grants may proceed.


  s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge


April 29, 2025
Charleston, South Carolina

**J.A. 0047**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| The Sustainability Institute, et al., | Case No. 2:25-02152-RMG |
| Plaintiffs, | |
| v. | |
| Donald Trump, in his official capacity as President of the United States, et al., | **ORDER** |
| Defendants. | |

This matter is before the Court on Defendants' Motion for Reconsideration of the Court's Order for Expedited Discovery (Dkt. No. 46) and Defendants' Emergency Motion to Stay the Court's Order for Expedited Discovery (Dkt. No. 48). The Court entered an Expedited Discovery Order requiring five Defendants to produce a limited number of documents related to the grants at issue in this case. (Dkt. No. 45). The limited discovery authorized by the Expedited Discovery Order would allow the Court to better understand the nature of Plaintiffs' claims and, if meritorious, the appropriate remedies, issues central both to whether the Court has jurisdiction over this matter and Plaintiffs' entitlement to preliminary injunctive relief.

Defendants now move for reconsideration of the Court's Expedited Discovery Order under Fed. R. Civ. P. 54(b) and stay of the Court's Expedited Discovery Order under Fed. R. Civ. P. 26(c). Defendants argue that the Supreme Court's decision in *Department of Education v. California*, No. 24A910, 2025 WL 1008354 (Apr. 4, 2025) suggests that this Court does not have subject matter jurisdiction over Plaintiffs' claims; and therefore, the Court should reconsider or stay its Expedited Discovery Order and not subject Defendants to discovery at this early stage. For the reasons set forth below, the Court grants-in-part Defendants' motion to reconsider and denies Defendants' motion to stay.

1

**J.A. 0048**

## I. Standard

### A. Motion For Reconsideration

Rule 54(b) governs the Court's reconsideration of interlocutory orders. Fed. R. Civ. P. 54(b). Where a district court issues an interlocutory order such as one for partial summary judgment "that adjudicates fewer than all of the claims," the court retains discretion to revise such an order "at any time before the entry of a judgment adjudicating all the claims." *Id.*

Compared to motions to reconsider final judgments pursuant to Rule 59(e), Rule 54(b)'s approach involves broader flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light. *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 326 (4th Cir. 2017).

The discretion Rule 54(b) provides is not limitless. Courts have cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case. *Id.* at 325 (citing *Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515-16 (4th Cir. 2003)) (internal citations omitted). "The law-of-the case doctrine provides that in the interest of finality, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Carlson*, 856 F.3d at 325 (citing *TWFS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009)) (internal citations omitted). Thus, a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) "a subsequent trial produc[ing] substantially different evidence;" (2) a change in applicable law; or (3) clear error causing "manifest injustice." *Id.* This standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e), but it departs from such standard by accounting for potentially different evidence discovered during litigation as opposed to the discovery of "new

**J.A. 0049**

evidence not available at trial." *Id.* (citing *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)).

### B. Motion to Stay Discovery

District courts have "broad discretion" and "wide latitude" in controlling discovery. *Mey v. Phillips*, 71 F.4th 203, 217 (4th Cir. 2023); *see also Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993) (stating that district courts have broad discretion in their resolution of discovery problems that arise in cases pending before them).

Under Fed. R. Civ. P. 26(c), a court may stay discovery during the pendency of a dispositive motion for "good cause" shown. *Hollins v. U.S. Tennis Ass'n,* 469 F. Supp. 2d 67, 78 (E.D.N.Y. 2006); *see also Tilley v. United States,* 270 F. Supp. 2d 731, 734 (M.D.N.C. 2003) (staying discovery during pendency of a motion for summary judgment). However, the mere filing of a dispositive motion does constitute "good cause" and does not alone warrant the issuance of a stay. *Hollins,* 469 F.Supp.2d at 78. Stay of discovery pending the outcome of a dispositive motion requires a case-by-case analysis. *E.g., Skellerup Ind. Ltd. v. City of Los Angeles,* 163 F.R.D. 598, 601 (C.D. Cal. 1995). In determining whether a stay of discovery is appropriate, courts have considered a number of factors including the breadth of discovery and burden of responding to it, the risk of unfair prejudice to a party opposing the stay, the nature and complexity of the action, the posture or stage of the litigation, and any other relevant circumstances. *See Hollins,* 469 F.Supp.2d at 78; *Skellerup,* 162 F.R.D. at 601.

## II.    Discussion

In both motions, Defendants argue that the Supreme Court's recent per curiam decision in *Department of Education v. California* staying a district court's temporary restraining order settles once and for all the jurisdictional questions in this case. In light of the seminal Supreme Court

**J.A. 0050**

decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988) and its progeny, which require a careful analysis of the nature of the specific claims asserted and the remedies necessary to provide a prevailing plaintiff relief, the Court declines to adopt Defendants' view at this stage, especially without the benefit of the parties' briefing and argument on the issues.

In *Department of Education v. California*, the Supreme Court stayed a district court's temporary restraining order, which it construed as an appealable preliminary injunction, pending the resolution of the appeal in the underlying case. *California*, 2025 WL 1008354, at *2. At the district court, plaintiffs sought preliminary relief enjoining the Government from terminating grant awards under programs administered by the United States Department of Education. *California v. U.S. Department of Education*, No. 25-105488-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). The District Court for the District of Massachusetts entered injunctive relief against the government. *Id.* at *5. The Government appealed the district court's order and requested a stay pending the appeal. *California v. U.S. Department of Education*, No. 25-1244, 2025 WL 878431, at *1 (1st Cir. Mar. 21, 2025). The First Circuit Court of Appeals denied the Government's request to stay the district court's order pending appeal. *Id.* at *1. The Government then filed an emergency application to the Supreme Court requesting the Court vacate the district court's temporary restraining order and immediately stay the case pending the disposition of the Government's appeal. *California*, 2025 WL 1008354, at *1. The Supreme Court granted the application and stayed the district court's order. The Court reasoned that a stay is appropriate because (1) "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" and (2) the Government is likely to suffer irreparable harm. *Id.*

4

**J.A. 0051**

The Supreme Court's discussion on jurisdiction is relevant here. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages, but also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). The Supreme Court further noted that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the [district court in *California*] ordered . . . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, the Supreme Court stated, that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The Court, when addressing both of Defendants motions in turn below, finds that the Supreme Court's decision in *California* should not prevent the discovery ordered in this case.

## A. Motion for Reconsideration

Defendants contend that the Supreme Court's opinion in *California* indicates "that the Tucker Act applies to actions challenging federal grant terminations and, as a result, jurisdiction over those actions lies solely in the Court of Federal Claims." (Dkt. No. 46 at 3). Based on that premise, Defendants argue requiring them to participate in discovery is manifestly unjust and contrary to controlling law such that the Court should reconsider its Expedited Discovery Order. The Court rejects Defendants argument for three reasons.

First, it appears to the Court that Defendants overread the Supreme Court's decision in *California*. The Supreme Court's order is on the Government's application to vacate the district court's temporary restraining order and request for an immediate administrative stay. That procedural posture led the Supreme Court to apply a likelihood of success standard to the

5

J.A. 0052

Government's application, stopping well short of addressing the complex jurisdictional issues on the merits. *California*, 2025 WL 1008354 at *2 ("[T]he Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."). Based on the standard the Supreme Court applied, it is not clear that this Court lacks jurisdiction over this case at this time. It is certainly not so clear that requiring five Defendants to respond to one discovery request each would be manifestly unjust or contrary to controlling law. In addition to ignoring the standard of review, the Defendants discount a long line of cases, starting with *Bowen*, that have addressed whether a case falls under the APA or Tucker Act. *See, e.g.*, *Bowen*, 487 U.S. at 882-887; *Great-West Life*, 534 U.S. at 212; *Maine Community Health Options v. United States*, 590 U.S. 296, 327 (2020). The Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional questions in this case. A careful examination of Plaintiffs' claims and the relief sought, mandated by *Bowen*, are necessary to resolve the question of whether Plaintiffs have jurisdiction with this Court under the APA or must pursue their claims under the Tucker Act before the Court of Federal Claims.

Second, the discovery ordered in the Expedited Discovery Order would help the Court fully and properly analyze subject matter jurisdiction. To determine whether the Court has jurisdiction, the Court must decide whether Plaintiffs' claims constitute a request for legal relief of money damages thus falling outside of Congress's waiver of sovereign immunity in the APA. *See Bowen*, 487 U.S. at 891-901. Whether a plaintiff is seeking legal or equitable relief depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought. *See Great-West Life*, 534 U.S. at 213; *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) ("The classification of a particular action as one which is not or is not 'at its essence' a contract action

6

**J.A. 0053**

depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).”). Documents related to the freezing, pausing, and terminating of the grant funds at issue here will help the Court understand the nature of Plaintffs' claims and whether money damages alone would provide Plaintiffs and adequate remedy should they prevail on the merits. Based on this limited discovery, the Court may find that a declaration clarifying the extent of the Defendants' obligations under the various statutes at issue here and/or prospective injunctive relief are necessary to afford the Plaintiffs adequate relief in the event their complaint has merit. In that instance, the case would fall under the APA and the Court would have jurisdiction. Alternatively, the Court may find that in order to grant relief to a meritorious complaint the Court would have to enforce a contractual obligation to pay money damages and order Defendants to make payments to Plaintiffs. In that instance, the case would fall under the Tucker Act and the Court would not have jurisdiction. Expedited discovery would assist the Court in sorting out these issues.

Third, Defendants will not be irreparably harmed by participating in expedited discovery. Defendants argue that the Court should reconsider its Expedited Discovery Order because other district courts have changed course in light of the Supreme Court's decision in *California*. (Dkt. No. 46 at 4). Defendants cite *New York v. Trump*, No. 25-cv-39, where the District of Rhode Island granted an emergency motion to stay an order enforcing a preliminary injunction after the Supreme Court issued its decision in *California*. The Court's Expedited Discovery Order is not an order granting or enforcing a preliminary injunction but simply an order facilitating limited expedited discovery to assist the Court to address jurisdictional issues and the potential merit (or lack thereof) regarding Plaintiffs' motion for preliminary injunction. Defendants here are not in danger of suffering irreparable harm like the Defendants in *California* and *New York* were.

7

**J.A. 0054**

The Court does, however, grant-in-part Defendants' motion to reconsider regarding the production requirement directed at DOGE. Defendants assert that DOGE is part of the Executive Office of the President. (Dkt. No. 48 at 5). The actual legal status of DOGE has been something of an enigma, and the clarification by Defendants that it is part of the President's Office seems reasonable. Consequently, the Court grants Defendants' motion to reconsider regarding the production requirements of DOGE and strikes DOGE's discovery obligations.

Accordingly, except for the modification of the Expedited Discovery Order regarding DOGE, Defendants have failed to show that there was a change in applicable law or clear error causing manifest injustice that requires the Court to reconsider its Expedited Discover Order.

### B. Motion to Stay Discovery

Defendants also seek a stay of the Court's Expedited Discovery Order similarly arguing that the Supreme Court's decision in *California* indicates that this Court lacks jurisdiction over this case and that the Court should address jurisdictional arguments before permitting parties to engage in discovery. As indicated above, the Expedited Discovery Order relates directly to addressing jurisdictional issues mandated by *Bowen*.

In determining whether a stay of discovery is appropriate, courts have considered a number of factors including the breadth of discovery and burden of responding to it, the risk of unfair prejudice to a party opposing the stay, the nature and complexity of the action, the posture or stage of the litigation, and any other relevant circumstances. *See Hollins,* 469 F.Supp.2d at 78; *Skellerup,* 162 F.R.D. at 601. All relevant factors here disfavor a stay.

The breadth of discovery ordered here is narrow in time and scope. The requests for production of documents are tied directly to the grants at issue here and only concern documents

8

**J.A. 0055**

from January 20, 2025 to the present. The Defendants' burden to respond to that discovery is similarly low.

There is a great risk of unfair prejudice to Plaintiffs if the Court stays the Expedited Discovery Order. The Court ordered limited expedited discovery on Plaintiff's motion for a preliminary injunction to allow the Court to better understand the nature of the claims being asserted by Plaintiffs and, if their claims had merit, the type of relief that might be effective and proper. This limited discovery is highly relevant to the issue of jurisdiction, specifically whether Plaintiffs' claims should be considered under the Tucker Act by the United States Court of Claims or by this Court under the APA.

In *Bowen*, the district court was directed to carefully examine the nature of the claim and the remedy sought. If the plaintiff's claim is essentially a contract claim seeking money damages, jurisdiction lies with the Court of Claims. *Id.* at 893. On the other hand, if the plaintiff seeks equitable relief, such as declaratory and injunctive relief, the case falls under the APA because for all practical purposes the Tucker Act does not provide for equitable relief. *Id.* Further, as the Supreme Court explained, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize relief as 'money damages.'" *Id.* The determination of whether the claim "at its essence" is a contract claim "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968. The district court's inquiry into the nature of the claim must go beyond the allegations in the complaint and look beneath the surface to examine the true nature of the claim and the relief sought. *Suburban Mortgage Associates, Inc. v. U.S. Department of Housing and Urban Development*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *cf. Kerns v. U.S.*, 585 F.3d 187, 192 (4th Cir. 2009) (stating in the Federal Tort Claims Act immunity context that a trial

9

**J.A. 0056**

court may go beyond the allegations of the complaint and consider evidence when deciding the Government's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)).

Despite the fact intensive inquiry required by this issue, Defendants urge this Court to address jurisdiction before allowing any discovery. This argument ignores the common practice of district courts conducting limited jurisdictional discovery to determine whether the court has jurisdiction over the matter before the court. The expedited discovery would allow the Court to fully and properly address the issue of jurisdiction as a threshold question in considering Plaintiffs' motion for a preliminary injunction. If the Court determines that the Court lacks jurisdiction over this case because the claims are essentially contractual in nature and money damages can provide complete relief, the process will stop then and there, and the case will be dismissed. However, if the Court determines that under § 702 and §704 of the APA that plaintiffs seek "relief other than money damages" and there "is no other adequate remedy" available, then Plaintiffs have a right to pursue their claims in the United States District Court under the APA.

Because the limited discovery ordered by the Court is appropriate to assist in addressing issues relevant to jurisdiction and the merits of the Plaintiffs' motion for preliminary injunction (should the Court have jurisdiction), the Court finds that a stay of the Expedited Discovery Order is not in the interest of justice or the fair deliberation of the issues before the Court. Consequently, Defendants' motion to stay is denied.

**III.    Conclusion**

For the reasons set forth above, the Court **GRANTS-IN-PART AND DENIES-IN-PART** Defendants' motion to reconsider (Dkt. No. 46) and **DENIES** Defendants' motion to stay (Dkt. No. 48).

**J.A. 0057**

_s/ Richard Mark Gergel_____
Richard Mark Gergel
United States District Judge

April 9, 2025
Charleston, South Carolina

11

**J.A. 0058**

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| The Sustainability Institute *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2:25-2152-RMG |
| | ) | |
| Donald J. Trump, in his official capacity as President of the United States, *et al.* | ) | |
| | ) | |
| Defendants. | ) | **ORDER** |
| | ) | |
| | ) | |

Plaintiffs have moved for a preliminary injunction in this action, and Defendants have a response due on or before April 9, 2025. (Dkt. No. 24). Plaintiffs assert in their Amended Complaint that despite judicial orders directing the unfreezing of funds related to certain "paused" or suspended grants, "grants continue to be repeatedly frozen, unfrozen, and then frozen again with no notice or justification." (Dkt. No. 23 at ¶ 12). Plaintiffs further assert in their memorandum in support of their motion for preliminary injunction, that despite judicial orders directing that grant funds be unfrozen, "many of the grants remain frozen" and "it remains unclear which of an ongoing series of agency actions are responsible for the freeze at any given time. And agencies appear to be engaging in new actions either in an attempt to evade court orders or in an effort to create more impediments to the disbursement of funding or both." (Dkt. No. 24-1 at 13).

Recent concerns along these same lines were addressed by the United States District Court for the District of Rhode Island in two decisions issued in *New York v. Trump*. In that case, the defendants argued that the lawsuit was moot because a memorandum directing the freezing of certain funds issued by the Office of Management and Budget ("OMB") had been rescinded. The

**J.A. 0059**

court, in granting the Plaintiffs' motion for a temporary restraining order, rejected the defendants' argument because the evidence showed the "substantive effect of the directive carries on." *New York v. Trump*, C.A. No. 25-cv-39-JJM-PAS, 2025 WL 357368 at *4 (D.R.I. January 31, 2025). The court observed that the reported recission of the OMB Directive "was in name-only and may have been issued simply to defeat the jurisdiction of the courts." *Id*. The Rhode Island District Court addressed the defendants' mootness argument again when addressing the Plaintiff's motion for preliminary injunction. The Court, in granting the Plaintiffs' motion for preliminary injunction, again found that the evidence suggested the OMB directive's recission was "in name only" and "may have been issued simply to defeat the jurisdiction of the courts." *New York v. Trump*, C.A. No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *5, 16 (D.R.I. March 6, 2025). The Rhode Island District Court's order granting preliminary injunction enjoined the defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds" at issue in the litigation. *Id.* at *16.

To allow this Court to fully and properly review the actions under challenge in this litigation, Defendants are directed to address, in their response to Plaintiffs' motion for a preliminary injunction, all legal and factual bases upon which the Defendants relied upon, could have relied upon, or might in the future might rely upon to freeze the grant funds at issue in this litigation.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

March 31, 2024
Charleston, South Carolina

2

**J.A. 0060**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

THE SUSTAINABILITY INSTITUTE,
AGRARIAN TRUST, ALLIANCE FOR
AGRICULTURE, ALLIANCE FOR THE
SHENANDOAH VALLEY, BRONX RIVER
ALLIANCE, CLEANAIRE NC, CONSERVATION
INNOVATION FUND, EARTH ISLAND
INSTITUTE, LEADERSHIP COUNSEL FOR
JUSTICE AND ACCOUNTABILITY,
MARBLESEED, ORGANIC ASSOCIATION OF
KENTUCKY, PENNSYLVANIA ASSOCIATION
FOR SUSTAINABLE AGRICULTURE AND
RURAL ADVANCEMENT FOUNDATION
INTERNATIONAL-USA,
and

MAYOR AND CITY COUNCIL OF BALTIMORE,
CITY OF COLUMBUS, CITY OF MADISON,
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,          Case No. 2:25-cv-02152-RMG
CITY OF NEW HAVEN, CITY OF SAN DIEGO

               Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States;
KEVIN HASSETT, in his official capacity as          **FIRST AMENDED COMPLAINT**
Assistant to the President for Economic Policy       **FOR DECLARATORY**
and Director of the National Economic Council;        **AND INJUNCTIVE RELIEF**
UNITED STATES OFFICE OF MANAGEMENT
AND BUDGET; RUSSELL VOUGHT, in his
official capacity as Director of the United States
Office of Management and Budget; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official capacity
as Administrator of the United States Environmental
Protection Agency; UNITED STATES DEPARTMENT
OF AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as the Secretary
of the United States Department of Transportation;
UNITED STATES DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official capacity as the

Secretary of the United States Department of Energy;
UNITED STATES DEPARTMENT OF
GOVERNMENTAL EFFICIENCY SERVICE;
AMY GLEASON, in her official capacity as
Acting Administrator of the United States DOGE
Service; ELON MUSK, in his official capacity as
Senior Advisor of the United States DOGE Service.

Defendants.

## INTRODUCTION

1. This action seeks to ensure that programs and funding that Congress has lawfully enacted to improve lives, strengthen communities, and protect the environment throughout the nation reach their intended recipients and fulfill their intended purposes without unlawful interference by the executive branch of the federal government. Plaintiffs are nonprofit organizations and municipalities that have been awarded federal grant funds, either as direct recipients or as sub-grantees, to carry out specific programs enacted by Congress under the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA), and other federal statutes.

2. Beginning the day he took office, the President issued multiple executive orders carrying out his intention to unlawfully defy Congressional mandates by freezing, disrupting, and terminating funds that Congress had directed and appropriated to specific grant programs to benefit the environment and support communities.

3. One order, *Unleashing American Energy*, directed federal agencies to "*Terminat[e]*," by which the President meant to "immediately" stop, the disbursement of all funds—totaling over $1 trillion—appropriated by Congress under the IRA and IIJA. Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025) ("Energy EO") (emphasis added). The Energy EO prohibits agencies from disbursing *any* funds under the two statutes that are not "consistent" with a list of Presidential "polic[ies]," as determined by the President's political appointees. Energy EO §§ 2, 7.

2

**J.A. 0062**

4. Another, titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, mandates the termination of all 'equity-related' grants or contracts within 60 days. Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) ("Equity EO") (emphasis added).

5. A third, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, orders agencies to "terminate or modify" contracts and grants to "advance the policies of [the Trump] Administration." Exec. Order 14222, 90 Fed. Reg. 11095, 11096 (Feb. 26, 2025) ("DOGE EO") (together with the Energy EO and the Equity EO, the "Executive Orders").

6. These Executive Orders cite no legal authority for the President or his agencies to unilaterally freeze, let alone terminate, congressionally appropriated funds. Nor do the Orders cite authority which would allow the executive branch to condition the spending of congressionally appropriated funds on compliance with the President's policies and preferences—as distinct from Congress's. Because there is none. Defendants' freezes are not only wholly unsupported by law, but in fact directly contradict duly enacted statutes.

7. In the weeks since the Executive Orders, senior officials from federal agencies including the Office of Management and Budget ("OMB"), Environmental Protection Agency ("EPA"), Department of Agriculture ("USDA"), the Department of Transportation ("DOT"), the Department of Energy ("DOE") and Department of Government Efficiency ("DOGE"), have enforced these unconstitutional Executive Orders and taken other actions to interfere with the disbursement of congressionally mandated and awarded federal grants.

8. The officials have directed agency staff to freeze IRA and IIJA funding, Ex. A ("First OMB Memo"), Ex. B ("Second OMB Memo"), Ex. C ("USDA Directive"), including funds "obligat[ed]" to specific recipients, and Ex. D ("EPA Memo"). They have required agency staff

3

**J.A. 0063**

to certify that funding disbursements comply with the Executive Orders prior to releasing funds to recipients, Ex. E ("EPA Executive Order Compliance Review Requirement"). They have directed staff to identify projects for potential removal, Ex. F ("DOT Memo"), and they have prohibited disbursements of funds over $50,000 without new approvals from DOGE. Ex. G ("EPA Notice of DOGE Approval Requirement").

9. EPA, USDA, DOT and DOE staff have taken various actions that prevent Plaintiffs from accessing grant funds to proceed with the congressionally mandated programs entrusted to them. For example, EPA, USDA, DOT and DOE have blocked Plaintiffs' access to the websites and portals needed to access funds, frozen or labeled as "suspended" the accounts containing the grant funds preventing Plaintiffs from drawing down funds, informed Plaintiffs orally that funds are frozen and cannot be drawn down, communicated through state agencies that expenditures may not be reimbursed, and otherwise prevented Plaintiffs from accessing grant funds, usually with no explanation or justification. These actions by EPA, USDA, DOT and DOE together with those described in Paragraph 8 above, are collectively referred to in this complaint as the "Program Freezing Actions."

10. In addition, EPA, USDA, DOT and DOE grant officers have become unavailable, and in many cases have failed to provide grantees with clear answers about the status of their grants or any explanation as to why they have been frozen.

11. Two federal courts have already issued temporary restraining orders and preliminary injunctions against aspects of the Administration's funding freezes, finding that they lack constitutional, statutory, and/or regulatory authority.

12. Despite these judicial orders, grants continue to be repeatedly frozen, unfrozen, and then frozen again with no notice or justification. This inflicts significant harm on Plaintiffs,

**J.A. 0064**

preventing them from executing critical projects, carrying out their missions, planning for the future, paying their employees, contractors, or sub-awardees, and serving the communities where they are implementing these congressional priorities.

13. The Administration's unlawful and arbitrary freeze of congressionally mandated programs and funding appropriated and awarded to carry out those programs violates multiple statutory provisions, as well as fundamental constitutional and administrative safeguards. In this nation, Congress enacts laws, and the Executive Branch, whoever may be occupying it at any given time, must faithfully execute those laws. The Administration has simply refused to do so with respect to the programs at issue in this case and instead has seized control of federal spending to further its own aims, in the process undoing the spending decisions made by Congress.

14. For the reasons set forth herein, Plaintiffs respectfully request that the Court grant appropriate relief to remedy Plaintiffs' injuries and to enforce the Constitution and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, as well as vacatur under 5 U.S.C. § 706.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]" of the United States, and because Plaintiff The Sustainability Institute is headquartered in North Charleston and resides in South Carolina. Venue is proper in the Charleston Division because "a substantial part of the events or

**J.A. 0065**

omissions giving rise to the claim occurred" in this Division, Local Civ. Rule 3.01(A)(1)—for example, The Sustainability Institute's project to build and weatherize affordable homes in North Charleston is funded by a congressionally authorized Community Change Grant, which is subject to the funding freeze challenged in this case.

## **PARTIES**

### I.  **Plaintiffs**

17. Plaintiffs are thirteen Community Groups: the Sustainability Institute; Agrarian Trust; Alliance for Agriculture; Alliance for the Shenandoah Valley; Bronx River Alliance; CleanAIRE NC; Conservation Innovation Fund; Earth Island Institute; Marbleseed; Organic Association of Kentucky; Leadership Counsel for Justice and Accountability; Pennsylvania Association for Sustainable Agriculture; and Rural Advancement Foundation International-USA; and six cities: Baltimore, Maryland; Columbus, Ohio; Madison, Wisconsin; Nashville, Tennessee; New Haven, Connecticut; and San Diego, California.

*Community Groups*

18. Plaintiff the Sustainability Institute is a 501(c)(3) nonprofit organization headquartered in North Charleston, South Carolina. Established in 1999, the Sustainability Institute's mission is to advance sustainable and resilient communities while building the next generation of conservation leaders. The Sustainability Institute applied for and was awarded a 3-year, $11.3 million "Community Change Grant" from EPA in 2024. This grant was authorized by Congress as part of the IRA.

19. The Sustainability Institute intends to use this grant to carry out specific projects approved by EPA to advance Congress's objectives for the grant program. Under terms of the grant, the Sustainability Institute will work with the City of North Charleston to develop energy-

**J.A. 0066**

efficient affordable homes for disadvantaged people in the Union Heights neighborhood; reduce greenhouse gas emissions by weatherizing and retrofitting homes; and restore a historically black community fragmented by the construction of Highway 26, among other projects.

20. On January 29, 2025, the Sustainability Institute's Community Change Grant was first suspended. Later, on February 7, the organization was able to make a successful draw down of funds using the online portal grantees use to access funds. On February 10, the funds were frozen again. On February 19, funds were unfrozen again, only to be frozen again on March 9. Grant funds have remained frozen since March 9. Multiple inquiries by Sustainability Institute to its EPA grant officer have gone unanswered, and Sustainability Institute was notified by its former grant officer that she received a directive not to communicate with grantees.

21. The funding pause is causing widespread disruption to the Sustainability Institute's internal operations and its ability to implement programs that align with its mission. Most pressing, the freeze in funding is preventing the Sustainability Institute from working on the Union Heights redevelopment project because it requires significant investments in new equipment and hiring contractors. Without certainty that federal funding will be available to reimburse these major expenditures, the Sustainability Institute is unable to advance the project. The Sustainability Institute has also had to shift significant resources towards managing how to address the loss of funding and spend time and resources discussing how to manage projects in absence of support from the federal government. The Sustainability Institute is also concerned about harm to the reputation it has built up after almost two decades working in the Charleston community if it fails to deliver on this committed project.

22. Plaintiff Agrarian Trust is a 501(c)(3) nonprofit organization incorporated in California and based in Oregon which focuses on securing land for sustainable farming and fostering a

7

**J.A. 0067**

more just and equitable food system. The organization works to protect farmland from development and ensure that it remains accessible to farmers, particularly those from marginalized communities. Agrarian Trust promotes land access and stewardship through community-driven solutions, offering tools and resources to help transition agricultural land into the hands of farmers committed to sustainable and equitable practices in 15 states. In 2024, Agrarian Trust was awarded a five-year, IRA-funded Increasing Land, Capital and Market Access grant ("Increasing Land Access Grant") by USDA totaling $12,966,593.00 to fund farmland acquisitions in Nebraska, Texas, and New York, as well as farmer-led initiatives and partnerships with community-based organizations in West Virginia, Virginia, Washington, Maine, and Montana.

23. Agrarian Trust has not been reimbursed for its work since the funding freeze began in January 2025. As a result, the organization has not been able to proceed with its land acquisition work for four farms and has been forced to start depleting its savings to sustain operations and programs. Agrarian Trust has been forced to put contracts on hold, alter workplans and consider reducing hours, furloughs, or staff layoffs, including for four staff hired as part of this grant. The funding freeze has caused distress to the organization's staff, as well as farmers and community partners across 15 states.

24. Plaintiff Alliance for Agriculture is a 501(c)(3) nonprofit organization based in Orocovis, Puerto Rico. Alliance for Agriculture's mission is to transform the way agriculture is done in Puerto Rico. The organization achieves this mission by amplifying the local agricultural sector and supporting small farmers and processors, farmers markets and community organizations, working with distribution channels to bring organic products to a wider market, and raising awareness about local food consumption.

8

J.A. 0068

25. Alliance for Agriculture is the subawardee under a cooperative agreement between Plaintiff Rural Advancement Foundation International-USA ("RAFI-USA") and USDA Natural Resources Conservation Service Outreach and Advocacy Division through the Increasing Land Access Grant program. This subaward agreement obligated $1,538,200 to Alliance for Agriculture. The purpose of this project is for Alliance for Agriculture to work with RAFI-USA to achieve the goal of improving farmland access and security by addressing core barriers to attaining land while also working to retain farmland by mitigating and preventing land loss. Alliance for Agriculture is also the subawardee under a separate Conservation Technical Assistance cooperative agreement between RAFI-USA and USDA Natural Resources Conservation Service Outreach and Advocacy Division that obligated $129,316 to Alliance for Agriculture. The purpose of this project is for the Alliance for Agriculture to provide localized outreach, education, and hands-on technical assistance regarding Natural Resources Conservation Service programs. The primary focus is on assisting small-scale, farmers that are Black, Indigenous, or People of Color through the Natural Resources Conservation Service application process and conservation action plan preparation.

26. Alliance for Agriculture has not been able to access its federal grant funds since January 28, 2025. The funding freeze has had a severe impact on the Alliance as well as farmers and agricultural communities in Puerto Rico. Farmers expect to be able to receive this crucial support, including technical assistance, land access guidance, and financial resources, but are now left in limbo. Training programs, infrastructure investments, and local food system funding has been stalled. The interruption to funding from these awards and uncertainty about when funding will resume has negatively impacted the Alliance's ability to operate. Rather than focusing on its core mission of supporting farmworkers and agricultural communities in Puerto

9

**J.A. 0069**

Rico, the Alliance has been forced to divert attention to navigating the federal funding freeze. If the federal funding freeze continues, the organization will have to lay personnel off. A continued freeze will also undoubtedly damage Alliance for Agriculture's reputation. Farmers and partners trust the Alliance to deliver on promises, and stalled commitments risk eroding that trust.

27. Plaintiff Alliance for the Shenandoah Valley is a 501(c)(3) nonprofit organization that is headquartered in New Market, Virginia. Alliance for the Shenandoah Valley works to ensure the Valley's rural character, scenic beauty, clean water and vibrant communities are protected by providing accurate and timely information to community members and decision makers. It achieves this, in part, by informing and engaging people to protect the natural resources, cultural heritages, and rural character of its region. Alliance for the Shenandoah Valley is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

28. Alliance for the Shenandoah Valley was awarded a subgrant from the National Fish and Wildlife Foundation for $1,531,595.72 on January 14, 2025 under the Innovative Nutrient and Sediment Reduction Grants Program. The Innovative Nutrient and Sediment Reduction Grants Program is a partnership between the National Fish and Wildlife Foundation, the Environmental Protection Agency, and the federal-state Chesapeake Bay Program partnership. The purpose of this subaward is to accelerate the rate of implementation and increase the effectiveness of water quality best management practices in a high priority agricultural region of the Chesapeake Bay watershed. Alliance for the Shenandoah Valley was also awarded a subgrant from the Conservation Innovation Fund for $400,000 in October 2023, under the Partnerships for Climate-Smart Commodities Program. Under the subaward, the Alliance engages farmers in implementing climate-smart agriculture and forestry practices.

10

**J.A. 0070**

29. Alliance for the Shenandoah Valley has not been able to access federal funds for either federal grant since February 12, 2025. This pause has harmed the Alliance for the Shenandoah Valley's programs and the organization itself. The organization's relationship with farmers and landowners, which took years to build, are eroded by this disruption to Alliance's ability to provide support and assistance. In reliance on the availability of the Partnerships program, farmers that the organization works with to join the partnership program have made investments to adopt sustainable practices expecting to be reimbursed, but now that funding is unavailable to them.

30. Plaintiff Bronx River Alliance is a 501(c)(3) nonprofit organization based in New York City which serves as a coordinated voice for the Bronx River and works with over 100 partners including the New York City Department of Parks and Recreation to protect and restore the Bronx River corridor and greenway so that it can be a healthy ecological, recreational, educational and economic resource for the communities through which the river flows. Bronx River Alliance was awarded a nearly $1 million EPA Community Change grant to enable communities in the Bronx to have a voice in decisions related to coastal adaptation, habitat restoration and infrastructure projects. The organization was also awarded a $500,000 Environmental Justice Collaborative Problem Solving Program grant ("Environmental Justice Problem Solving Grant") to improve water quality in four Bronx and Westchester County waterways by partnering with local communities to collect and use water quality data in advocating for policy and infrastructure improvements that address longstanding sources of water pollution.

31. Bronx River Alliance has not been able to reliably access funds under both EPA grants since around January 29, 2025. The grants were accessible for a few days in early February but

11

**J.A. 0071**

were both suspended again on February 12. The grants were last suspended on March 10. This disruption in funding has forced the organization to cover costs for water quality monitoring supplies, equipment and partner and subaward obligations. The funding freeze has also made it difficult to pay staff to coordinate volunteers for water sample collection, resulting in reduced data collection. The reduction in data will impede municipalities, advocates, and elected officials from securing funding to upgrade aging sewage infrastructure, which directly harms public health and water quality. This will also result in increased health risks from recreational water activities, including paddling, fishing, and swimming in the river. The organization has not been able to proceed with hiring projected staff, causing existing staff members to continue working without pay. The freeze is affecting the organization's ability to cover at least three staff positions. The organization's Community Change subawards are directly tied to community engagement, with each partner committed to engaging 100 community members—work that has also been stalled. The nonprofit's inability to access the grant funds means that community members are prevented from having a voice in infrastructure and development projects to address flooding and heat impacts on vulnerable populations, including children, the elderly, and individuals with chronic illnesses. The inability to follow through on multi-year organizational commitments is also jeopardizing relationships years in the making with community partners, government agencies, and elected officials.

32. Plaintiff CleanAIRE NC is a 501(c)(3) nonprofit organization headquartered in Charlotte, North Carolina. CleanAIRE NC works to protect the health of all North Carolinians by pursuing equitable and collaborative strategies to address air pollution and fight climate change. CleanAIRE was awarded a $500,000 Environmental Justice Problem Solving Grant on June 2, 2024. With this grant, CleanAIRE NC will engage in air monitoring in four impacted

12

**J.A. 0072**

communities across north Mecklenburg County to address health impacts associated with air pollution. CleanAIRE NC will also work with partners to train Community Health Workers as lead AirKeepers and conduct a Health Impact Assessment with Lake Norman Community Health Clinic, Mecklenburg County Health Department, Atrium Health, and North Carolina State University.

33. However, as of January 29, 2025, CleanAIRE NC has been unable to make drawdown requests for funding under its Environmental Justice Problem Solving Grant. If funds remain frozen, CleanAIRE NC may be forced to let go of key staff and stop important community air monitoring programs. Currently staff are being forced to shift away from programmatic priorities to manage the fallout from the funding freeze.

34. Plaintiff Conservation Innovation Fund is a 501(c)(3) nonprofit organization incorporated in Wyoming and headquartered in Washington, D.C. Across the country, Conservation Innovation Fund creates water, carbon, and biodiversity "environmental assets" to address the regulatory and voluntary needs of its municipal and corporate partners while supporting the sale of sustainably produced commodities. Conservation Innovation Fund is the recipient of a USDA Partnerships for Climate-Smart Commodities grant and award of $24,999,954 over five years. Conservation Innovation Fund was awarded this grant on June 8, 2023.

35. The purposes of this grant are to develop a private-sector mechanism within the U.S. economy for commodities such as milk, beef, and grain that are cultivated with sustainable practices; to create incremental markets for environmental assets tied to sustainable practices; and to invest in America's rural and agricultural communities. Conservation Innovation Fund works with farms to integrate agricultural best management practices such as cover crops, zero tillage production, nutrient management and manure management into dairy, beef and grain

13

**J.A. 0073**

supply chains, with greenhouse gas reductions and water quality benefits that can be purchased by supply chain partners and other stakeholders. Farmers in Virginia, Maryland, Pennsylvania, Delaware, and West Virginia, as well as Maryland & Virginia Milk Producers Cooperative Association members in Ohio, North Carolina, South Carolina, Tennessee, New Jersey and New York, are eligible for assistance through the grant. The grant agreement and award are the culmination of over 10 years of planning and preparation and coordination with USDA.

36. The reimbursement requests that Conservation Innovation Fund has submitted since January 20, 2025 have not been paid out. The disruption in funding has significantly delayed program implementation. Conservation Innovation Fund provides funding directly to farmers for implementation of best management practices. 29 farms await payment of $1,937,735.50, related to implementation of best management practices, which must be implemented in the springtime for the best outcomes. Farms have been forced to delay necessary purchases for equipment, seed and services related to the implementation of best management practices. Conservation Innovation Fund has been forced to reduce staff, shutter business development opportunities, and seek alternative funding sources. The pause also harms Conservation Innovation Fund's reputation with farmers, customers and funders. Farmers had begun to reach out directly to Conservation Innovation Fund and its partners, and to build momentum among their rural communities behind the economic opportunity presented by the program, which targets hundreds of small farmers. Now all inbound calls have stopped. The pause in USDA funding also has caused efforts to expand capital for market-based conservation programs to come to a standstill, creating uncertainty and chaos for an entire emerging sector of the agricultural economy.

37. Plaintiff Earth Island Institute is a 501(c)(3) nonprofit environmental corporation founded in 1982 and headquartered in Berkeley, California. It serves as an incubator for grassroots

environmental projects, offering fiscal sponsorship and support to over 75 initiatives worldwide focused on conservation, climate action, wildlife protection, sustainable food systems, Indigenous rights, and environmental justice. The organization also engages in legal advocacy through Earth Island Advocates, fosters youth leadership through the Brower Youth Awards, and publishes the award-winning *Earth Island Journal*. Through these efforts, Earth Island Institute empowers communities to develop and implement innovative solutions to pressing environmental challenges.

38. In December 2024, EPA Region 9 awarded the nonprofit a Community Change Grant totaling $3,073,914 million for a project integrating traditional knowledge with modern technology to promote intergenerational learning and collaborative problem-solving within the Wai'anae community in Hawaii. Key components include establishing an environmental advisory team, engaging community members in environmental and health data collection, developing an intergenerational learning fellowship to share traditional knowledge and skills, and conducting a community health assessment to understand the impacts of water and air contaminants on residents. Earth Island spent 110 hours of staff time to develop this Community Change Grant project. Earth Island also serves as a statutory partner to the West Anniston Foundation, which on August 2024 was awarded a $2,596,592 Environmental and Climate Justice Block grant by EPA Region 4 for their project to empower young adults in West Anniston by providing training programs that enhance community engagement with governmental processes and address local health and environmental issues in this predominantly Black, low-income community in Anniston, Alabama. Earth Island put about 380 hours of staff time to develop this winning project, which was expected to start on March 1, 2025. Earth Island has received no notification or justification from EPA that its funding was suspended. Earth Island has also been unable to

**J.A. 0075**

obtain any clarity around the status of its two grant funds. The funding freeze has caused the organization to spend many hours tracking the status of the grants and divert staff from their other work responsibilities. The funding freeze also harms the nonprofit's reputation as it has to freeze and perhaps end funding to its partners in Hawaii and Alabama.

39. Plaintiff Leadership Counsel for Justice and Accountability is a 501(c)(3) nonprofit organization based in Fresno, California. Leadership Counsel's mission is to work alongside the most impacted California communities to advocate for sound policy and eradicate injustice to secure equal access to opportunity regardless of wealth, race, income, and place. Leadership Counsel was awarded a Community Change Grant of over $3 million from EPA in 2024. With this funding, Leadership Counsel is carrying out an EPA-approved project to connect disadvantaged communities in California's San Joaquin Valley to public decision-making venues and better equip these communities to advocate for their interests on climate change issues.

40. Since early February, Leadership Counsel has not been able to reliably request reimbursements through the federal government's online portal for withdrawing grant funds called Automated Standard Application for Payments ("ASAP"). Leadership Counsel's inability to access funds, and the uncertainty about when these funds will become reliably available, has forced the organization to adjust its workplans and engagements with community members. Leadership Counsel and one subawardee have been forced to pay for staff time and other expenses for work done on this program themselves while this funding has been paused.

41. Plaintiff Marbleseed is a 501(c)(3) nonprofit organization headquartered in Spring Valley, Wisconsin. Established in 1995, Marbleseed is committed to supporting farmers in their transition toward sustainable, organic farming systems that are ecologically sound, economically viable, and socially just. Marbleseed works with small farms to support peer-to-peer learning

with free and farmer-led programs, print and digital resources, and in-person events that support thriving regenerative and organic farms and food systems.

42. Marbleseed received a $4,517,254.65 award under USDA's Partnerships for Climate-Smart Commodities. Under this program, Marbleseed will provide rural and agricultural communities with the tools needed to build operational and environmental resiliency by implementing climate-smart production practices that reduce greenhouse gas emissions and sequester carbon. Marbleseed was also awarded a $300,000 Organic Technical Staffing Assistance grant under USDA's Conservation Stewardship Program to improve conservation performance by installing and adopting additional activities and improving, maintaining, and managing existing activities on agricultural land and nonindustrial private forest land. Marbleseed's work will expand conservation planning assistance to organic agricultural producers and accelerate conservation practice implementation for farmers in their network. This grant has been frozen since January 31, 2025, and Marbleseed has not received reimbursement for its work.

43. Marbleseed's Climate-Smart grant has been frozen since March 7, 2025, causing significant harm to the farmers Marbleseed supports. The funding uncertainty has disrupted the trusting, supportive network Marbleseed has worked to build. Marbleseed is hesitant to take next steps in agreements with partners because the organization does not want to make promises they cannot deliver on. Marbleseed's programmatic work has slowed. The organization has imposed a hiring freeze, closed an open full-time staff position, reduced employee working hours as an alternative to layoffs, and redirected staff time to other program areas. During this time of the year, the Marbleseed team typically plans field days comprised of on-the-farm trainings and

17

**J.A. 0077**

education events but has been unable to provide this opportunity to partners and communities due to the freeze. All of this has taken a significant toll on employees.

44. Plaintiff Organic Association of Kentucky, ("OAK"), is a 501(c)(3) nonprofit organization based in Lexington, Kentucky. Incorporated since 2015, OAK serves to improve the health of the environment and communities by advancing organic regenerative agriculture to grow ecological resilience, economic viability, and socially just futures for Kentucky farmers through educational, technical, and market resources. On September 18, 2023, OAK was awarded $4,407,706.00 as part of the Climate-Smart Commodities Grant ("Climate-Smart") under the USDA's Natural Resources Conservation Service ("NRCS") to expand markets for climate-smart grass-fed lamb, grass-fed beef, corn, soybeans, small grains, produce, dairy, agroforestry and hemp in Kentucky. In 2025, USDA increased the award amount to $4,739,827.15. Using incentives and technical assistance, the five-year project helps up to 110 farmers per year adopt cover crops, reduce tillage, diversify crop rotations, reduce nitrogen inputs, implement holistic grazing, agroforestry and other conservation practices to improve soil health and water quality, reduce greenhouse gas emissions and promote wildlife habitat, connecting climate-smart commodity production with climate adaptation and greenhouse gas benefits. OAK has been unable to access its funding under this grant since January 20, 2025. On February 1, 2024, OAK was awarded $261,296 as part of the Equity in Conservation Outreach Cooperative Agreement ("Equity in Conservation") under NRCS to deliver outreach and education programming to increase awareness of and participation in NRCS programs, services, and leadership opportunities in agriculture and natural resource conservation in Kentucky, with a focus on reaching underserved farmers, ranchers or landowners. This grant is also currently

**J.A. 0078**

frozen. OAK has not received information from USDA confirming details about the status of these frozen grants.

45. The funding freeze has disrupted OAK's ability to operate its critical programs and has caused the nonprofit to plan layoffs, dip into its limited emergency reserves and reduce its services to farmers, who can no longer access the expertise, resources, and assistance they have come to rely on. OAK's inability to honor financial commitments to farmers erodes OAK's credibility built over years of service. As a small nonprofit, OAK relies on a small team of highly skilled staff who have cultivated deep relationships with farmers and partners. Without access to federal funding, these positions are at risk of being eliminated, resulting in the loss of vital expertise that has been built over years of effort including hiring, training, one-on-one relationships with farmers and deep knowledge of their farming operations. This loss of human capital would be expensive and difficult to replace and would severely impact the organization's capacity to continue operating effectively in the future.

46. In addition to the operational impacts, OAK's staff has spent an increasing amount of time navigating the uncertainty caused by the funding freeze and stewarding the development of alternate scenarios. This has diverted valuable time and resources away from their core responsibilities of supporting farmers and advancing conservation programs, further exacerbating the organization's strain and delaying future fundraising activities.

47. Plaintiff the Pennsylvania Association for Sustainable Agriculture, d/b/a Pasa Sustainable Agriculture ("Pasa"), is a 501(c)(3) nonprofit organization based in Harrisburg, Pennsylvania. Pasa's mission is to support farmers in creating economically viable, environmentally sound, and community-focused farms and food systems. In 2023, Pasa applied for and was awarded a five-year USDA grant of over $55 million through the IRA-funded Partnerships for Climate-Smart

19

**J.A. 0079**

Commodities program. In 2024, USDA increased the award amount to just over $59.5 million. With this funding, Pasa plans to implement a USDA-approved project to support over 2,000 small to mid-scale underserved farmers from Maine to South Carolina to implement scientifically validated conservation practices that increase efficiency and productivity and reduce and sequester greenhouse gasses. Funding under that grant is currently paused.

48. Pasa also has a USDA Environmental Quality Incentives Program $74,993 grant, which provides technical and financial assistance to agriculture producers to address numerous natural resource concerns. Pasa is evaluating, refining and demonstrating that the practice of silvopasture — an agroforestry practice that integrates trees and grazing livestock operations on the same land — helps to improve grazing success and has associated economic, environmental a, and social co-benefits in Pennsylvania,

49. Pasa has a $32,380,331.30 USDA Agricultural Marketing Service Farm and Food Worker Relief grant to provide financial relief to frontline farmworkers and meatpacking workers with expenses related to the COVID-19 pandemic. Pasa was advised it could only submit expenses incurred before January 20, 2025, with no guidance from USDA about subsequent expenses covering payments for farmers and food workers. Pasa also has a $1,496,963 award from USDA's Farm Service Agency for an Urban Agriculture and Innovative Production grant to support urban agriculture efforts in Philadelphia. After submitting an invoice on March 7, 2025, Pasa was instructed to revise its January invoice to only include expenses before January 19, 2025, and has received no guidance for expenses incurred after January 20, 2025.

50. Pasa faces several financial challenges as a result of the funding pause. First, Pasa will potentially have to pay a large sum of unemployment claims for potentially 60 employees. Second, Pasa has been forced to use rainy day funds to reimburse farmers and contractors for

**J.A. 0080**

completed work, as well as cover employee payroll for the month of March. Finally, Pasa has been unable to secure alternative funding because banks are hesitant to loan money to non-profits when there are no assurances that government contracts will be honored. The disruptions to Pasa's operations frustrate the organization's mission and its ability to serve frontline farmworkers.

51. RAFI-USA is a nonprofit organization dedicated to supporting family farmers, rural communities, and food systems across the country. Based in North Carolina, RAFI-USA works to advance sustainable agriculture and economic justice to promote equity and resilience in rural areas. RAFI-USA provides direct support to underserved farmers, particularly those who are Black, Indigenous, and People of Color, small-scale, or facing systemic barriers, through grant programs, technical assistance, and advocacy efforts. RAFI-USA is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

52. RAFI-USA was awarded a cooperative agreement with USDA through the Increasing Land Access Program for $8,499,695 in May 2024. This grant funds the Gaining New Ground project, which improves land access and land security for underserved farmers of color in North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico. RAFI-USA was also awarded a cooperative agreement with the USDA Farm Service Agency through the Distressed Borrower Assistance Network Program for $2,389,182.72 in August 2024 to address the critical need for farm advocates and technical assistance providers by developing training and peer support resources and establishing a Distressed Borrower Assistance Network. RAFI-USA also has an American Rescue Plan Technical Assistance Investment Program grant from the USDA National Institute of Food and Agriculture for $425,000. Under the grant, RAFI-USA will work to

increase familiarity with, and access to, USDA Farm Service Agency loan programs among farmers who are young and Black, Indigenous, and People of Color.

53. RAFI-USA was awarded a cooperative agreement with the USDA Natural Resources Conservation Service through the Partnerships for Climate-Smart Commodities Program for $2,073,301 in September 2023. The purpose of this project is to reduce barriers for small and underserved farmers to implement climate-smart agriculture and forestry practices. RAFI-USA was also awarded a Rural Development Policy Cooperative Agreement with the USDA Farm Service Agency Outreach Office for $1,548,896.68 in September 2023 to help ensure that all farmers have equitable access to services. This cooperative agreement was updated in June 2024 to increase the award amount to $1,707,039.82. Another cooperative agreement through the Equity in Conservation Outreach Cooperative Agreement program for $696,664 is intended to help expand delivery of conservation services to historically underserved producers.

54. RAFI-USA has not received reimbursement of federal funds for requests submitted since January 20, 2025 aside from a reimbursement through its Equity in Conservation Outreach Cooperative Agreement. RAFI-USA received a reimbursement for the Equity in Conservation Outreach Cooperative Agreement program on March 17, 2025 after waiting on reimbursement requests to be paid out since January. RAFI-USA's mission is being undercut because farmers and rural communities are being directly harmed due to their inability to access promised funds and RAFI-USA has been prevented from continuing to provide critical support and assistance to these communities. The pause has also harmed RAFI-USA financially. The organization has been forced to pause hiring for two positions and has taken out a line of credit to cover costs in the absence of federal reimbursements.

**J.A. 0082**

*Cities*

55. Plaintiff the Mayor and City Council of Baltimore ("Baltimore")[1] is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in Maryland and the 30th largest city in the United States. Over the past few years, Baltimore has been awarded more than 20 federal grants through grant programs funded by the IRA and IIJA. These grants include a $4 million grant under the EPA's Solid Waste Infrastructure for Recycling ("SWIFR") grant program to help develop a solar-powered composting facility; two EPA Environmental Justice Government-to-Government ("EJG2G") awards, totaling over $500,000, for its YH2O+ Career Training Program ("YH2O+"), which prepares young adults for jobs in the water and solid waste industries; and a $10 million award through the IRA's Assistance for the Adoption of the Latest and Zero Building Energy Codes grant program (the "Energy Codes grant").

56. The SWIFR Grant-funded composting facility is expected to benefit Baltimore in several ways. It will have the capacity to compost approximately 12,000 tons of organic materials per year, diverting those materials from landfills and incinerators and reducing greenhouse gas emissions by 6,000 tons. It will also encourage renewable energy and reduce long-term energy costs, reduce the city's dependence on waste incineration, create four or five permanent full-time green energy jobs for local residents, provide Baltimore residents access to organics recycling,

---

[1] Because Baltimore is a party to ongoing litigation relating to the Equity EO, Baltimore joins the claims asserted in this complaint only as to the Energy EO, Cost Efficiency EO, and agency actions to implement the Energy EO and Cost Efficiency EO. Baltimore does not join the asserted claims as to the Equity EO and agency actions to implement the Equity EO.

**J.A. 0083**

benefit local food production, and further Baltimore's goal to prioritize composting as part of its solid waste management plan.

57. On January 31, 2025, Baltimore received an email from an EPA official stating that "Funding has been paused for grants under the Infrastructure Investment and Jobs Act at this time," including "all funding on existing grants for the Solid Waste Infrastructure for Recycling (SWIFR) grant program." The funding pause applied to the City's $4 million SWIFR grant. Two weeks later, on February 12, 2025, Baltimore received word from the EPA that it could resume work on the grant. Although the grant is unfrozen as of the date of filing, such volatility in funding availability disrupts this project. The SWIFR grant is reimbursement-based, so Baltimore must front any money for the compositing facility and then seek reimbursement from EPA. Thus, Baltimore is faced with the catch-22 of deciding whether to expend resources on the project, given the risk that the funding will be suspended and expenses will not be reimbursed, or to halt work on this important project.

58. The YH2O+ program prepares young adults for full-time jobs in the water and solid waste industries. Roughly 200 young men and women have successfully completed the program since its inception in 2015. The YH2O+ program benefits Baltimore by providing a better-trained workforce for to join City departments and staff its facilities. Baltimore relies on this program as a pipeline for new workers. The EPA awarded Baltimore $524,000 through the Environmental Justice Government-to-Government Program (previously known as the State Environmental Justice Cooperative Agreement Program) for fiscal years 2021 through 2025, including a $324,000 award for fiscal year 2025. Baltimore relies on the funding to operate its program.

59. The YH2O+ awards were suspended following the President's issuance of the Energy EO. The funds had been present in Baltimore's payment portal consistently prior to January 23,

**J.A. 0084**

2025, but Baltimore was unable to draw down the funds on at least three dates in February 2025. The awards reappeared in the portal on March 5, 2025, and Baltimore was able to draw down the $200,000 award and close it out on March 6, 2025. However, as of March 11, 2025, the $324,000 award for fiscal year 2025 was missing again in Baltimore's funding portal, and none of it has been drawn down. Without these funds the YH2O+ program was put on hold in January. Baltimore is very unlikely to run the program without the EPA funding, so it will lose the opportunity to train future employees for city jobs.

60. The $10 million Energy Codes grant will allow Baltimore to provide workforce training related to building inspections; fund evaluation of energy code compliance and enforcement in new and existing buildings; and develop and adopt new Building Performance Standards consistent with the International Code Council ("ICC") and International Energy Conservation Code ("IECC") construction standards, as is now required by the State of Maryland. The initiative is also intended to contribute to the Baltimore's greenhouse gas emissions reduction goals and, because the City owns many buildings in Baltimore, would help Baltimore to ensure compliance with Maryland's strict new rules and avoid fines from the State.

61. Baltimore received an Assistance Agreement for $10 million from the DOE in December 2024. It was signed on December 18, 2024, with a performance period to begin on January 1, 2025. Although Baltimore has the signed grant agreement, the City is awaiting DOE's review and approval of the Statement of Project Objectives ("SOPO") for the City's project. The SOPO will specify what the $10 million in funding can be spent on. Once the SOPO is approved, Baltimore will be able to begin drawing down funds. The City asked DOE on March 13, 2025 for a call to discuss the SOPO, seeking to finalize it, but the DOE gave a non-committal response on March 14, 2025 and has not responded further. It appears that the $10 million in funding is on

**J.A. 0085**

hold. For 2025, Baltimore planned to use the federal funding to hire new staff—including educators, project managers, and consultants—and to audit buildings' compliance with ICC and IECC standards. Without the funds, the City is unable to begin the hiring and auditing process. Pausing the Building Codes grant funding also negatively affects Baltimore's own real estate in the city.

62. Plaintiff the City of Columbus ("Columbus") is a municipal corporation organized under Ohio law. *See* Ohio Constitution, Art. XVIII. Columbus prioritizes planting trees to enhance residents' health and quality of life, increase property values, and improve the environment. Trees are particularly important in Columbus because they help to mitigate the city's severe urban heat island effect. As a part of its plan to improve the City's tree canopy, Columbus, through its Recreation and Parks Department, successfully applied for a $500,000 Urban and Community Forestry Grant as a subgrantee of the Ohio Department of Natural Resources ("ODNR"). The grant is designed for Columbus to purchase and plant approximately 1,250 diverse trees in disadvantaged areas in need of increased tree cover.

63. During the 2024 planting season, Columbus expended $393,930 of the awarded $500,000. On February 18, 2025, the ODNR sent a letter to the Columbus Recreation and Parks Department explaining that the State's reimbursement requests were not being processed by the U.S. Forestry Service and suggesting that Columbus temporarily suspend expenses against their grant, given the risk that expenses would not be reimbursed. ODNR also indicated that Columbus should submit outstanding reimbursements. On February 27, 2025, Columbus submitted a "Sub Awardee Request for Reimbursement(s)" to the ODNR requesting reimbursement in the amount of $393,930. On March 13, 2025, ODNR sent an email reversing course, stating that the grant was "approved for implementation." However, Columbus has not

**J.A. 0086**

yet been reimbursed for the $393,930 it has already spent and is concerned that the federal
government will continue to turn this grant on and off and may well not ultimately reimburse the
city for the full amount of eligible expenses. If Columbus does not receive the reimbursement it
is owed under this grant, it will be forced to cover this expense through money from its capital
budget.

64. Plaintiff the City of Madison ("Madison") is a municipal corporation organized and
existing under the laws of the State of Wisconsin. Madison has been awarded a $20 million grant
through EPA's Community Change Grants Program to lead a collaborative project to improve
housing affordability through whole home energy upgrades, thereby saving residents money on
energy bills, improving indoor air quality, and cutting climate pollution. The project—a
partnership with four community organizations—aims to upgrade 825 units of housing in low-
income census tracts. These homes tend to be least energy efficient, and the residents are forced
to spend a disproportionate share of their income on home energy bills. Madison's project also
aims to provide an additional 1,050 households with technology to reduce energy use by items
plugged into outlets in the home and 60 early career workers with workforce training.

65. On or around January 31, 2025, Madison's grant disappeared from the ASAP transaction
page, making it impossible to draw down funds. The grant was then labeled as "Suspended" until
around February 19, 2025, when that status changed to "Open." On or around March 10, 2025,
the status changed back to "Suspended," and Madison remains unable to draw down funds. Two
of Madison's partner organizations—Sustain Dane and Project Home—have already begun work
to deliver their whole home upgrade programs, but they will not be able to continue if funding is
not unfrozen. The other two organizations have not been able to begin work on the project,
which means two key elements of the project, community outreach and workforce training, have

27

**J.A. 0087**

not been implemented. Freezing this grant also creates several contractual problems for Madison: Madison cannot continue to honor its subrecipient agreements with Sustain Dane and Project Home, and it cannot execute expected agreements with the remaining two local partners identified in the grant. Additionally, the EPA required Madison to identify a "statutory partner" in the grant application. Madison indicated in the grant application that it would award $1,163,842 to its statutory partner, Urban Triage. Madison will not be able to honor its "Statutory Partnership Agreement" with Urban Triage if the grant remains frozen. Finally, the grant program and the text of the IRA require that the project be completed within three (3) years and do not allow extensions, so even a temporary delay may impede Madison's ability to achieve the project's goals. And a permanent freeze of this funding would deprive thousands of Madison's most vulnerable residents of the opportunity to significantly reduce their monthly energy bills, improve their indoor air quality, and access job opportunities.

66. Plaintiff the Metropolitan Government of Nashville & Davidson County ("Nashville") is a combined municipal corporation and county government organized and existing under the laws of the State of Tennessee. In August of 2024, Nashville was awarded $4.7 million for its "Electrify Music City" project, which would upgrade, improve and expand its public electric vehicle charging infrastructure under the Charging and Fueling Infrastructure Grant program. A few months later in January 2025, Nashville also won a highly competitive $9.3 million grant for its "East Nashville Spokes" project under the Active Transportation Infrastructure Investment Program to help fund a multi-modal, safe transit connection project that includes protected bike lanes as well as Americans with Disabilities Act and pedestrian improvements. This project would connect neighborhoods in the city so residents can have safer, better transit access to their

J.A. 0088

jobs, including connecting a Metropolitan Development and Housing Agency ("MDHA") redevelopment district with the downtown area.

67. Upon receiving notice of the Charging and Fueling Infrastructure award, Nashville immediately began the process to complete a grant agreement with the Federal Highway Administration ("FHWA") so that it could get started on the work for the EV charging stations. Over the next several weeks, Nashville and FHWA had a final grant agreement draft approved by the local FHWA office, which was sent to FHWA headquarters for final draft approval in December of 2024. Nashville has not heard anything from its partners at FHWA regarding the grant agreement since this last communication other than to inform them that there is a new point of contact.

68. Defendant DOT's failure and refusal to complete the grant agreement and make the promised funds available has thrown planning and implementation of the Electrify Music City project into disarray and uncertainty. Nashville started its procurement process for a vendor to install, repair and improve its electric vehicle charging stations. Nashville selected a vendor and entered into a contract with this vendor. Nashville now cannot guarantee that it has the federal funds to complete certain projects with this vendor. Further, Nashville incorporated the awarded funds in its Transportation Improvement Program budget for this fiscal year. With the funds frozen, Nashville cannot properly plan or fully implement its project plans. Nashville has operated free or affordable electric vehicle charging stations since 2017, and without fully implementing this program, residents will not have access to the new amenities or the benefits the project proposed. The accessibility of electric vehicle charging infrastructure not only improves the quality of life for residents who use electric vehicles, but also reduces pollution in the city that can cause medical issues for residents.

29

**J.A. 0089**

69. Similarly, after both a public press release and written notification by Defendant DOT that Nashville won its award of $9.4 million, FHWA reached out to introduce their point of contact and execute the grant agreement process on January 15, 2025. This was the last communication that Nashville received from Defendants. Nashville residents expect and are excited about the East Nashville Spokes project. It is a multi-year project that could transform Nashville into a more walkable, bikeable city, and work on this project had already started when the city applied. For the past several years, Nashville has been conducting community engagement, planning, and designing to create a project plan for connecting several neighborhoods in the city. To help it fund the next several phases of the project, Nashville incorporated this project into a city-wide Transit Referendum that anticipates leveraging federal funds to bring the project to completion. The Transit Referendum passed overwhelmingly in November 2024. However, with the funds frozen, this project has languished in uncertainty. The federal government freezing its award means that better connections across the city and safer streets, including for connections between downtown and quickly developing areas in Nashville, are not fully funded.

70. Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized and existing under the laws of the State of Connecticut. New Haven has received at least three EPA grants funded by the IRA. In July 2024, New Haven received a $1 million Environmental Justice Government-to-Government award to help city residents transition from burning heating oil to efficient heat pumps for home heating and from gas stoves to induction stoves in order to reduce heating costs and air pollution. The same month, New Haven was awarded a $9.5 million grant under the EPA's Climate Pollution Reduction Grant program to help fund an advanced geothermal heat pump system that will heat and cool the city's main train station, Union Train

30

**J.A. 0090**

Station, and a planned 1000-unit New Haven Housing Authority housing development. In January 2025, New Haven was awarded a $20 million Community Change Grant to improve climate resiliency and quality of life for residents of 14 disadvantaged neighborhoods. New Haven plans to use this funding to lead a coalition of 20 partner organizations to improve the energy efficiency of affordable housing development, upgrade the energy efficiency of existing homes, improve bike infrastructure and green spaces, and improve food rescue (matching unused food from food businesses with people who need it), among other project components.

71. On or before Monday, February 3, 2025, New Haven's Government-to-Government funding became unavailable. Over the next several weeks, the funding's status in ASAP was change to "Suspended," then to "Open," then back to "Suspended." When the status is labeled as "Suspended" it is not possible to draw down funds. The project has already begun in partnership with several partner organizations, including the Community Action Agency of New Haven (CAANH), which has already hired one full-time staff person who will likely need to be laid off if the grant remains suspended. Other partner organizations have invoiced the City for staff time spent working on the project, but the City is unable to obtain reimbursement and cannot afford to continue to pay partner organizations' invoices for work on this project unless the funding is unfrozen.

72. New Haven's $9.5 million grant under the EPA's Climate Pollution Reduction Program is intended to provide approximately 60% of the funding required for its advanced geothermal heat pump project. In recent weeks, the project's status in ASAP has also toggled back and forth between "Suspended" and "Open." It is currently labeled as "Open." This week, New Haven plans to release a Request for Proposals to design the new geothermal heating and cooling system. After 30 days, New Haven plans to select a firm to design the system, but without greater

31

**J.A. 0091**

certainty about the availability of the grant funding the City will be unable to enter into a contract to design the complex system. The funding uncertainty may also chill qualified bidders for the project. An extended delay will likely prevent the project from ever getting started, depriving New Haven of an innovative geothermal system that would both reduce the train station's energy expenses and help the City to achieve its goal of completely electrifying City operated buildings by 2030.

73. On February 3, 2025, New Haven received formal notice of its $20 million Community Change award. Since the grant appeared in ASAP, it has also toggled back and forth between "Suspended" and "Open." Its current status is "Suspended." The period of performance for the award begins on April 1, 2025, and New Haven is currently finalizing job descriptions for new hires to launch and manage the project, but the City will be unable move forward so long as the grant is frozen or at risk of being frozen. Without the grant, New Haven and its residents will be deprived of improved infrastructure and housing, and more residents will likely go hungry unless the City diverts funding from other priorities.

74. Plaintiff City of San Diego ("San Diego") is a municipal corporation and California charter city, duly organized and existing by virtue of the laws of the State of California. San Diego is the second largest city in California and the eighth largest city in the United States. In 2024, San Diego was awarded an approximately $10 million grant under the USDA's Urban and Community Forestry grant program for a project entitled "Ready, Set, Grow San Diego." The grant funds a five-year program to plant and maintain trees in local communities as part of an ongoing effort to grow and improve San Diego's urban forest. This grant is intended to increase equitable access to trees and nature, aid in combating extreme heat and climate change, and provide much-needed shade to San Diego residents. Trees also help to reduce air pollution levels,

J.A. 0092

protect vulnerable residents, and increase stormwater absorption, leading to less runoff and decreased flood risk.

75.  In February 2025, a program manager from USDA verbally notified a City Forester by phone that USDA's Budget and Finance Incident Finance Branch, Albuquerque Service Center (ASC) had paused payments for grant reimbursement requests, but recommended to continue submitting reimbursement requests. USDA declined to provide written confirmation of the pause. On March 20, USDA indicated that payments were being processed and that the next invoice "should" be paid within approximately one week. The City has thus far expended approximately $66,000, approximately $5,000 of which was reimbursed in December 2024, and the total remaining value of the awarded grant is $9,994,781.69. Without this grant, San Diego would be forced to modify or cancel its Ready, Set, Grow San Diego program because the City's General Fund cannot absorb the costs. In turn, the City would lose the many benefits associated with greater tree cover and would struggle to meet its climate action goals as outlined in its Climate Action Plan, aiming to enhance green spaces that contribute to a healthier and more livable city.

## II.  **Defendants**

76. Defendant Donald J. Trump is the President of the United States. He signed the Energy EO, Equity EO, and Cost Efficiency EO. Defendant Trump is sued in his official capacity as President of the United States.

77. Defendant Kevin Hassett is the Assistant to the President for Economic Policy and Director of the National Economic Council. In these roles, Defendant Hassett advises President Trump on various economic matters. *See* Exec. Order 12835, *Establishment of the National Economic Council*, 58 Fed. Reg. 6189 (Jan. 27, 1993).

**J.A. 0093**

78. Defendant Hassett is also responsible for determining whether IRA and IIJA funds are consistent with President Trump's policies and should be disbursed. Energy EO § 7. Defendant Hassett is sued in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council.

79. Defendant Office of Management and Budget is a cabinet agency in the Executive branch that oversees the federal budget. *See* 31 U.S.C. §§ 501–07.

80. The Office of Management and Budget has issued multiple memoranda that have directed the freeze of federal grant funds.

81. Defendant Russell Vought is the Director and highest-ranking official of the Office of Management and Budget, *see id.* § 502, which is a cabinet agency in the Executive branch that oversees the federal budget. *See id.* §§ 501–07. Defendant Vought is sued in his official capacity as OMB Director.

82. Defendant Vought's predecessor, then-acting OMB Director Matthew J. Vaeth, authored the First OMB Memo challenged in this case freezing IRA and IIJA funds.

83. As current OMB Director, Defendant Vought is responsible for that Memo and ensuring its directives are implemented by agencies that administer the IRA and IIJA. *See id.* § 503(a) (granting Director authority to direct and approve "governmentwide financial management policies for executive agencies").

84.  Under Section 7 of the Energy EO, Defendant Vought and the OMB are responsible for determining whether IRA and IIJA funds are consistent with President Trump's policies and should be disbursed.

85. Under Section 2(b) of the Equity EO, Vought is also responsible for consulting with federal agencies to "terminate . . . 'equity-related' grants or contracts."

34

**J.A. 0094**

86. Defendant EPA is an independent agency in the Executive branch responsible for enforcing the Nation's environmental laws, for overseeing congressionally mandated grants and programs related to environmental protection, and for distributing funds Congress specifically appropriated to those grants and programs.

87. Defendant Lee Zeldin is the Administrator of the U.S. Environmental Protection Agency. *See* Reorganization Plan No. 3 of 1970, 42 U.S.C. § 4321 note. Defendant Zeldin is sued in his official capacity as EPA Administrator.

88. Defendants Zeldin and the EPA are tasked with the implementation of the Energy EO and with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

89. Defendant Zeldin is ultimately responsible for the EPA Memo challenged in this case freezing IRA and IIJA funds and ensuring that EPA staff implement its directives.

90. Defendant USDA is an executive branch agency responsible for providing leadership on food, agriculture, natural resources, rural development, nutrition, and related issues based on public policy, the best available science, and effective management.

91. Defendant USDA is tasked with administering various grant programs funded by Congress in the IRA and IIJA, including the Partnerships for Climate-Smart Commodities program.

92. Defendant Brooke Rollins is the Secretary of Agriculture. Defendant Rollins serves as the head and highest-ranking official of the USDA. *See* 7 U.S.C. § 2202. Defendant Rollins is sued in her official capacity.

J.A. 0095

93. Defendant Rollins is ultimately responsible for USDA's ongoing freeze of IRA funds challenged in this case. USDA is also tasked with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

94. Defendant U.S. Department of Transportation is an executive branch agency responsible for ensuring a safe, efficient, and modern transportation system that serves the American people and economy, promoting the safe, efficient, sustainable, and equitable movement of people and goods.

95. Defendant DOT is tasked with administering various grant programs funded by Congress in the IRA and IIJA.

96. Defendant Sean Duffy is the Secretary of the Department of Transportation. Defendant Duffy serves as the head and highest-ranking official of DOT. Defendant Duffy is sued in his official capacity.

97. Secretary Duffy was responsible for the March 12, 2025, directive to interfere with federal grants administered by the Department of Transportation.

98. Defendant Duffy is ultimately responsible for DOT's ongoing freeze of funds challenged in this case. DOT is also tasked with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

99. Defendant U.S. Department of Energy ("DOE") is an executive branch agency responsible for advancing the national, economic, and energy security of the United States and ensuring a safe, clean, efficient, energy system that serves the American people and economy.

100. Defendant DOE is tasked with administering various grant programs funded by Congress in the IRA and IIJA,

36

**J.A. 0096**

101. Defendant Chris Wright is the Secretary of the Department of Energy. Defendant Wright serves as the head and highest-ranking official of DOE. Defendant Wright is sued in his official capacity.

102. Defendant Wright is ultimately responsible for DOE's ongoing freeze of funds challenged in this case.

103. Defendant DOGE coordinates teams across multiple agencies with the goal of reconfiguring agency data, technology, and spending. Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025); Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). In performing this role, DOGE acts as an agency—and not merely an advisor to the President.

104. Defendant DOGE or United States DOGE Service is an entity established by President Trump within the Executive Office of the President "to implement the President's DOGE Agenda." Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). Executive Order 14158 also established a temporary organization known as the U.S. DOGE Service Temporary Organization within DOGE "dedicated to advancing the President's 18-month DOGE agenda." *Id.*

105. Defendant DOGE is integral to the implementation of the funding freeze. The DOGE EO instructs agencies to review existing grants "in consultation with the agency's DOGE Team Lead" and "terminate or modify" those grants to "advance the policies of [the Trump] Administration." Exec. Order 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). Further, on March 3, 2025, EPA announced a new policy that any assistance agreement or contract "$50,000 or greater must receive approval from an EPA DOGE Team member." Ex. G.

106. Defendant Amy Gleason is the acting administrator of DOGE and is sued in her official capacity.

**J.A. 0097**

107. Defendant Elon Musk is a federal officer, Senior Advisor to the President, and special government employee within the Executive Office of the President. Mr. Musk is also the de facto head of DOGE, sued here in his official capacity. While the Director of the Office of Administration recently stated that Mr. Musk is "not an employee of the U.S. DOGE Service or U.S. DOGE Temporary Organization,"[2] Mr. Musk is the de facto head of DOGE. As President Trump made clear in his March 4, 2025, speech to Congress, DOGE is "headed by Elon Musk, who is in the gallery tonight." *See Full Transcript of President Trump's Speech to Congress*, N.Y. Times (Mar. 4, 2025), https://www.nytimes.com/2025/03/04/us/politics/transcript-trump-speech-congress. html.

## **BACKGROUND**

108. In each of the applicable statutes governing the unstable or frozen funds, Congress has spoken clearly and unmistakably as to its mandates and intent. The Defendants have violated these mandates at each and every turn.

## I.    **Federal Funding Obligations and Relevant Statutory Grant Programs**

### a.  *Federal Funding Obligations*

109. After Congress passes a bill appropriating funding and the President signs it into law, OMB apportions the funds to the appropriate agencies, which must "obligate" and pay the funds in accordance with Congress's directives. *See* U.S. Gov't Accountability Office, Office of the General Counsel, *Principles of Federal Appropriations Law* at 2-3–2-4, GAO-16-464SP (4th ed. 2016), https://perma. cc/EBK3-7A5L (the "Red Book").

---

[2] Decl. of Joshua Fisher, *New Mexico v. Elon Musk*, No. 1:25-cv-429 (D.D.C. Feb. 17, 2025), ECF No. 24-1.

**J.A. 0098**

110. "Obligating" funds is a budgeting term of art: funds are "obligated" by the agency when there is "some action that creates a legal liability or definite commitment on the part of the government, or creates a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government." Red Book at 7-3–7-4, GAO-06-382SP (3d ed. 2006), https://perma. cc/W2LU-P49R.

111. "[T]he 'obligational event' for a grant generally occurs at the time of grant award." Red Book at 10-107, GAO-06-382SP (3d ed. 2006).

**b. *The Inflation Reduction Act***

112. In 2022, Congress passed and the President signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA").

113. The IRA created numerous new statutory programs and appropriated $433 billion for investments over ten years to support those programs, including $369 billion for climate change and energy programs.

*Environmental and Climate Justice Block Grants*

114. Among other programs, the IRA amended the Clean Air Act to create a new program for "Environmental and Climate Justice Block Grants." *Id.* § 60201, 136 Stat. at 2078 (codified at 42 U.S.C. § 7438).

115. Congress appropriated $2.8 billion to EPA to award grants under the program, and another $200 million to EPA to provide technical assistance to eligible entities related to the grants.

116. Congress instructed that the EPA Administrator "***shall***" use these funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified] activities . . . that benefit disadvantaged communities," 42 U.S.C. § 7438(b)(1) (emphasis added), such as

**J.A. 0099**

"community-led air and other pollution monitoring, prevention, and remediation," "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events," "climate resiliency and adaptation," "reducing indoor toxics and indoor air pollution," and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2).

117. Congress defined "eligible entity" as "a community-based nonprofit organization," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3).

118. EPA has awarded Environmental and Climate Justice Block Grants through several sub-programs, including the Environmental and Climate Justice Community Change Grants Program ("Community Change Grants"), the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program,[3] and Environmental Justice Government-to-Government Grants.

119. By December 2024, EPA had selected 105 recipients of Community Change Grants and awarded them nearly $1.6 billion in a highly competitive process with approximately 2,700 applicants. Plaintiffs The Sustainability Institute, Bronx River Alliance, Earth Island, Leadership Counsel for Justice and Accountability, New Haven and Madison are among the recipients of Community Change Grants.

120. EPA has selected 98 recipients of Environmental Justice Collaborative Problem-Solving Cooperative Agreements and awarded a total of $43.8 million in IRA funding through this

---

[3] EPA, *Biden-Harris Administration Announces Nearly $1.6 Billion in Environmental and Climate Justice Community Change Grants* (Dec. 12, 2024), https://perma.cc/2ETK-BDDM.

40

**J.A. 0100**

program. Plaintiffs Bronx River Alliance and CleanAIRE NC are among the recipients of awards under this program.

121. For Fiscal Year 2023, EPA used IRA and annual appropriations to fund awards to governmental entities partnering with community-based organizations. In particular, EPA awarded $20 million from annual appropriations to states partnering with community-based organizations, and $10 million to "U.S. territories, freely associated states, Puerto Rico, and tribes in remote areas."[4] EPA awarded $20 million from IRA appropriations to local governments partnering with community-based organizations and $20 million to tribal governments partnering with community-based organizations.[5]

122. For Fiscal Year 2024, EPA awarded about $81.5 million in Environmental Justice Government-to-Government Grants. Of this, about $52.5 million came from the IRA appropriations, while about $29 million came from annual appropriations.[6] Plaintiffs Baltimore and New Haven are recipients of Government-to-Government Environmental Justice Grants.

*Equity in Conservation Outreach Cooperative Agreements,*
*Environmental Quality Incentives Program - Conservation Innovation Grants;*
*The Conservation Stewardship Program, and*
*Conservation Technical Assistance Cooperative Agreements*

123. In Section 21001 of the IRA, Congress made a significant investment in specific programs to be facilitated by the Commodity Credit Corporation, appropriating over $18 billion

---

[4] EPA, *Environmental Justice Government-to-Government Program* (Jan. 7, 2025), https://perma.cc/EV5P-N253.

[5] *Id.*

[6] System for Award Management (SAM.gov), *Environmental Justice Government-to-Government (EJG2G) Program*, https://perma.cc/FZ73-E47J (last visited Mar. 16, 2025).

41

**J.A. 0101**

to the Secretary of Agriculture to remain available until September 30, 2031. IRA, § 21001, 136 Stat. at 2015–16.

124. Congress directed that that this funding "***shall***" be available to support certain agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." *Id.* (emphasis added). Carbon dioxide, methane, and nitrous oxide are common greenhouse gases that contribute to climate change.[7]

125. The Environmental Quality Incentives Program was established "to promote agricultural production, forest management, and environmental quality as compatible goals." 110 Stat. 997; *codified at* 16 U.S.C. § 3839aa. As part of this program, the Natural Resources Conservation Service offers Conservation Innovation Grants – a competitive grant program designed to stimulate the development and adoption of innovative conservation approaches and technologies. 7 C.F.R. § 1466.31 *et. seq.* Plaintiff Pasa is a recipient of a Conservation Innovation Grant.

126. The Equity in Conservation Outreach Cooperative Agreements are authorized in part by various provisions of the Farm Security Act, including the Environmental Quality Incentives Program (16 U.S.C. §§ 3839aa to 3839aa-8), the Conservation Stewardship Program (16 U.S.C. §§ 3839aa-21 to 3839aa-25), and the Agricultural Conservation Easement Program (16 U.S.C. §§ 3865 to 3865d).

127. Each of these programs is facilitated by the Commodity Credit Corporation. In addition, Equity in Conservation Outreach Cooperative Agreements are authorized by the Conservation Technical Assistance Program created by the Soil Conservation and Domestic Allotment Act of

---

[7] EPA, *Overview of Greenhouse Gases*, https://perma.cc/TG2E-UT5X (last updated Jan. 16, 2025).

42

**J.A. 0102**

1935. 16 U.S.C. §§ 590a to 590q-3. The Conservation Technical Assistance Program is operated through the Natural Resources Conservation Service and funded through appropriations.

128. As discussed above, in Section 21001 of the IRA, Congress made a significant investment and appropriated over $18 billion to the Secretary of Agriculture to remain available until September 30, 2031, to fund specific programs including the Environmental Quality Incentives program, the Conservation Stewardship Program, and the Agricultural Conservation Easement Program to be facilitated by the Commodity Credit Corporation. 136 Stat. at 2015–17. Congress specified that the funds facilitated by the Commodity Credit Corporation "shall" be available for "agricultural conservation practices." *Id.* at 2016. In addition, in Section 21002 of the IRA, Congress appropriated $1 billion to the Natural Resources Conservation Service to provide conservation technical assistance. *Id.* at 2018

129. Plaintiffs OAK and RAFI-USA are recipients of the Equity in Conservation Outreach Cooperative Agreements.

130. Plaintiff Marbleseed is a recipient of a Natural Resources Conservation Service, Organic Technical Staffing Assistance grant.

131. Plaintiff Alliance for Agriculture is a sub-awardee on a grant awarded to Plaintiff RAFI-USA through the Conservation Technical Assistance Program.

*Increasing Land Access Grants,*
*Rural Development Policy Cooperative Agreements, and*
*American Rescue Plan Technical Assistance Investment Program Grants*

132. Section 1006 of the American Rescue Plan Act of 2021 appropriated over $1 billion to the Secretary of Agriculture for fiscal year 2021 and directed that the Secretary "shall" use those funds on various agricultural programs that benefit "socially disadvantaged farmers, ranchers, or

43

**J.A. 0103**

forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2, 135 Stat. 4, 13–14.

133. In Section 22007 of the IRA, Congress amended Section 1006 of the American Rescue Plan Act and appropriated an additional $2.9 billion to the Secretary of Agriculture to fund various agricultural programs to benefit "underserved farmers, ranchers, or forest landowners," certain educational institutions that serve underserved communities, and "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs . . . ." IRA, § 22007, 136 Stat. at 2022–23.

134. Section 22007 of the IRA directs the Secretary to use these funds, among other purposes, "to provide outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition;" "to provide grants and loans to . . . improve land access (including heirs' property and fractionated land issues);" to "address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture;" "to support and supplement agricultural research, education, and extension, as well as scholarships and programs that provide internships and pathways to agricultural sector or Federal employment;" and "to provide financial assistance, including the cost of any financial assistance." *Id.*

135. USDA invested several hundred million dollars of these IRA funds to create the "Increasing Land, Capital and Market Access Program" ("Increasing Land Access Grants"). [8]

---

[8] USDA, *USDA Announces Up to $550 Million in American Rescue Plan Funding for Projects Benefiting Underserved Producers and Minority Serving Institutions that Create Career Development Opportunities for Next Generation Leaders* (Aug. 24, 2022), https://perma.cc/AC6N-Y4PC.

**J.A. 0104**

Fifty recipients have been awarded approximately $300 million. Plaintiffs Agrarian Trust and RAFI-USA are Increasing Land Access Grants recipients. [9] Plaintiff Alliance for Agriculture is a subaward recipient of RAFI-USA's Increasing Land Access Grant.

136. USDA also invested funds appropriated under Section 22007 of the IRA into American Rescue Plan Technical Assistance Investment Program grants, a program originally authorized under Section 1006 of the American Rescue Plan Act of 2021. Plaintiff RAFI-USA is among the recipients of American Rescue Plan Technical Assistance Investment Program grants.

137. Upon information and belief, USDA also invested funding appropriated under Section 22007 of the IRA into the Rural Development Policy Cooperative Agreement program. Established by the Rural Development Act of 1972, the Rural Development Policy Cooperative Agreement program authorizes USDA to enter into cooperative agreements "to improve the coordination and effectiveness of Federal programs, services, and actions affecting rural areas, including the establishment and financing of interagency groups, if the Secretary determines that the objectives of the agreement will serve the mutual interest of the parties in rural development activities." 7 U.S.C. § 2204b(b)(4)(A). Plaintiff RAFI-USA is among the recipients of Rural Development Policy Cooperative Agreement.

*Climate Pollution Reduction Grants*

138. In Section 60114 of the IRA, Congress amended the Clean Air Act to create a program for Climate Pollution Reduction Grants. Congress appropriated $250 million, to remain available until September 30, 2031, for greenhouse gas air pollution planning grants. IRA § 60114, 136

---

[9] USDA, *Increasing Land, Capital, and Market Access Program*, https://perma.cc/8YBV-U6QC (last accessed Mar. 11, 2025).

**J.A. 0105**

Stat. at 2076. Congress appropriated $4.75 billion, to remain available until September 30, 2026, for greenhouse gas air pollution implementation grants. *Id.*

139. Section 60114(b) provides that the EPA Administrator "*shall* make a grant to at least one eligible entity in each State for the costs of developing a plan for the reduction of greenhouse gas air pollution." *Id.* (emphasis added). "Each such plan *shall* include programs, policies, measures, and projects that will achieve or facilitate the reduction of greenhouse gas air pollution." *Id.* (emphasis added). The Administrator "*shall* publish a funding opportunity announcement for" these grants no later than 270 days after the statute's enactment. *Id.* (emphasis added).

140. Section 60114(c) provides that the EPA Administrator "*shall* competitively award grants to eligible entities to implement plans developed under subsection (b)." *Id.* (emphasis added). Applications for these grants "*shall* include information regarding the degree to which greenhouse gas air pollution is projected to be reduced in total and with respect to low-income and disadvantaged communities," and the Administrator "*shall* make funds available to" grantees "based on [their] performance in implementing [their] plan[s] submitted under this section and in achieving projected greenhouse gas air pollution reduction." IRA § 60114, 136 Stat. at 2077 (emphasis added).

141. In 2024, 211 states, municipalities, tribes, and territories submitted their Priority Climate Action Plans to EPA. [10] EPA then awarded over $4.3 billion to 25 state, local, and tribal recipients under the Climate Pollution Reduction Grants Implementation Grants General Competition. These "grants will implement community-driven solutions to tackle the climate

---

[10] EPA, *Climate Pollution Reduction Grants*, https://perma.cc/TFS4-V24L (last accessed Mar. 13, 2025).

**J.A. 0106**

crisis, reduce air pollution, and accelerate the clean energy transition."[11] Plaintiff New Haven is a Climate Pollution Reduction Grants Implementation Grant recipient.

*Urban and Community Forestry Grants*

142. In Section 23003(a)(2) of the IRA, Congress appropriated $1.5 billion to USDA, to remain available until September 30, 2031, for multiyear, programmatic, competitive grants to local governments and other entities through the Urban and Community Forestry Assistance program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978, 16 U.S.C. § 2105(c), for tree planting and related activities. These funds are administered through the U.S. Forest Service, an agency within USDA.

143. The purposes of the Urban and Community Forestry Assistance program, as laid out in 16 U.S.C. § 2105(b), include "implement[ing] tree planting program[s] to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits."

144. Following a competitive application process, the Forest Service announced more than $1 billion in grants to 385 community-based organizations, local and state governments, and other entities in all 50 states. The agency also allocated $250 million in funding directly to state and territory forestry agencies to administer grants. [12]

145. The awarded projects are dedicated to "tree planting and maintenance, workforce development, wood utilization, extreme heat mitigation, restoration and resilience strategies, and

---

[11] *Id.*

[12] USDA, *Urban and Community Forestry Factsheet* (2023), https://perma.cc/2VG4-QBUL; USDA, *Urban Forests*, https://www.fs.usda.gov/managing-land/urban-forests (last visited Mar. 13, 2025).

**J.A. 0107**

community planning. Most projects include multiple themes."[13] Plaintiffs Columbus and San Diego are Urban and Community Forestry Grant recipients.

*Distressed Borrower Assistance Network Cooperative Agreements*

146. In Section 22006 of the IRA, Congress appropriated $3.1 billion to USDA, to remain available until September 30, 2031, "to provide payments to, for the cost of loans or loan modifications for, or to carry out section 331(b)(4) of the Consolidated Farm and Rural Development Act," 7 U.S.C. § 1981(b)(4), "with respect to distressed borrowers of direct or guaranteed loans administered by the Farm Service Agency under subtitle A, B, or C of that Act," 7 U.S.C. §§ 1922–1970. IRA, 136 Stat. at 2021.

147. Congress intended this funding to "provide relief to those borrowers whose agricultural operations are at financial risk as expeditiously as possible." IRA, § 22006, 136 Stat. at 2021.

148. The USDA launched the Distressed Borrowers Assistance Network in September 2024[14] to provide relief to distressed direct and guaranteed farm loans and implement Section 22206 of the IRA.[15] This network was formed through "a series of Cooperative Agreements" with network partners including RAFI-USA.[16]

149. Plaintiff RAFI-USA is thus a recipient of a Distressed Borrower Assistance Network Cooperative Agreement.

---

[13] USDA, *Urban and Community Forestry Factsheet* (2023), https://perma.cc/2VG4-QBUL.

[14] USDA, *USDA Launches Assistance Network to Support Financially Distressed Farmers and Ranchers* (Sept. 21, 2024) https://perma.cc/5NKR-QN35.

[15] USDA, *USDA Announces Additional $250 Million in Financial Assistance for Distressed Farm Loan Borrowers* (Oct. 7, 2024) https://perma.cc/78X4-JYNV.

[16] USDA, *USDA Launches Assistance Network to Support Financially Distressed Farmers and Ranchers* (Sept. 21, 2024) https://perma.cc/5NKR-QN35.

**J.A. 0108**

*Assistance for Latest and Zero Building Energy Code Adoption*

150. In section 50131 of the IRA, Congress allocated $1 billion to help state and local governments update their building energy codes. Congress provided that Secretary of Energy "shall use" $330 million of these funds for grants to assist in the adoption of energy codes that meet or exceed the 2021 International Energy Conservation Code for residential building or the ANSI/ASHRAE/IES Standard 90.1-2019 for commercial buildings and in achieving compliance with such a plan. The Secretary "shall use" the remaining $670 million for grants to assist in the adoption of building energy codes that meet or exceed the zero energy provisions in the 2021 International Energy Conservation Code or an equivalent stretch code and in achieving compliance with such a code.

151. Section 50131(a) provides that this funding is appropriated "to carry out activities under part D of title III of the Energy Policy and Conservation Act," a law with the express purpose of "promot[ing] the conservation of energy and reduc[ing] the rate of growth of energy demand." 42 U.S.C. § 6321(b).

152.  DOE allocated $400 million to a formula grant program for states, and $530 million to a competitive grant program for states and localities.[17] The competitive grant program was divided into three rounds of funding, with two having already been awarded. Plaintiff Baltimore is a recipient of a grant under this program.

   **c.  *The Infrastructure Investment and Jobs Act***

153. In 2021, Congress passed and the President signed into law the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ("IIJA").

---

[17] DOE, *Clean Energy Infrastructure Funding Opportunity Exchange,* https://perma.cc/NZ9E-RPZF.

**J.A. 0109**

154. The IIJA appropriated approximately $660 billion to fund a wide variety of programs to create jobs, lower energy costs, improve infrastructure, and help communities burdened by pollution.

*Solid Waste Infrastructure for Recycling Grants*

155. In section 601 of the IIJA, Congress appropriated $275 million for grants under section 302(a) of the Save Our Seas 2.0 Act of 2020. IIJA, § 601, 135 Stat. at 1404. It provided that $55,000,000, to remain available until expended, "shall be made available" for fiscal year 2022, and the same for each subsequent fiscal year through 2026. *Id.*

156. Section 302(a) of the Save Our Seas 2.0 Act created a recycle-ing grant program to "support improvements to local post-consumer materials management, including municipal recycling programs" and "to assist local waste management authorities in making improvements to local waste management systems." Pub. L. 116-224 § 302(a), 134 Stat. 1072, 1092 (2020). Congress directed that in developing application requirements, the EPA Administrator "shall consider" requesting "a description of how the funds will support disadvantaged communities." *Id.* at 1091.

157. Section 302(a) of the Save Our Seas 2.0 Act authorized the Solid Waste Infrastructure for Recycling Grants program while the IIJA appropriated significant funding for the program. [18]

158. In 2023, EPA selected 25 local governments to receive the first round of Solid Waste Infrastructure for Recycling Grants out of 311 total applications. Plaintiff Baltimore is a recipient of a Solid Waste Infrastructure for Recycling Grant.

---

[18] EPA, *Solid Waste Infrastructure for Recycling Grant Program*, https://perma.cc/TA34-V755 (last accessed Mar. 13, 2025).

**J.A. 0110**

*Innovative Nutrient and Sediment Reduction Grant Program*

159. In Section 601 of the IIJA, Congress appropriated $1.959 billion for Environmental and Program Management at EPA. 135 Stat. at 1396. Of these funds, Congress directed that $238 million "shall be for" EPA's Chesapeake Bay Program. *Id.* The Chesapeake Bay Program was established by Section 117 of the Clean Water Act. 33 U.S.C. § 1267.

160. Of these IIJA funds directed to the Chesapeake Bay Program, EPA allocated $83 million to the National Fish and Wildlife Foundation to administer both Small Watershed Grants and the Innovative Nutrient and Sediment Reduction programs. [19] Innovative Nutrient and Sediment Reduction grants are awarded to support innovative, sustainable, and cost-effective approaches that reduce nutrient and sediment pollution to the Chesapeake Bay and its local waterways.

161. In fiscal year 2024, the National Fish and Wildlife Foundation awarded $22.4 million to 13 new or continuing Innovative Nutrient and Sediment Reduction Grant projects. Those 13 awards leveraged $35.3 million in matching funds, providing a total conservation impact of $57.7 million.

162. Plaintiff Alliance for the Shenandoah Valley is a recipient of an Innovative Nutrient and Sediment Reduction grant.

*Charging and Fueling Infrastructure Program Grant*

163. In Section 11401 of the IIJA, Congress established "a grant program to strategically deploy publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure along designated alternative fuel corridors or in certain other locations that will be accessible to all

---

[19] Biden-Harris Administration announces $206 million to selectees to protect and restore Chesapeake Bay through community partnerships, https://perma.cc/R46D-UEB4.

**J.A. 0111**

drivers of electric vehicles, hydrogen vehicles, propane vehicles, and natural gas vehicles." Eligible entities include "units of municipal government." Pub. L. 117-58 § 11401(a), 135 Stat. 546, 547 (2021).

164. Congress appropriated $2.5 billion for the Charging and Fueling Infrastructure Grant Program. *Id.* §§ 11101(a)(5)(b)(C)(i) –(v), 135 Stat. 445. Specifically, Congress appropriated $300,000,000 for fiscal year 2022, $400,000,000 for fiscal year 2023, $500,000,000 for fiscal year 2024, $600,000,000 for fiscal year 2025, and $700,000,000 for fiscal year 2026. *Id.*

165. Plaintiff Nashville has been awarded a Charging and Fueling Infrastructure Grant.

*Active Transportation Infrastructure Investment Grant Program.*

166. In Section 11529 of the IIJA, Congress directed the Secretary of Transportation to "carry out an active transportation infrastructure investment program to make grants, on a competitive basis, to eligible organizations to construct eligible projects to provide safe and connected active transportation facilities in an active transportation network or active transportation spine." 135 Stat. 612.

167. Congress appropriated $200,000,000 for each of fiscal years 2022 through 2026 for the Active Transportation Infrastructure Investment Grant Program. 135 Stat. 615.

168. Plaintiff Nashville has been awarded an Active Transportation Infrastructure Investment Grant.

**d.  *Other Grants***

*Partnerships for Climate-Smart Commodities Grants*

169. The Partnerships for Climate-Smart Commodities Grant program was established under the Commodity Credit Corporation Charter Act, an arm of the USDA created to support farming. *See* 15 U.S.C. § 714. The Commodity Credit Corporation was created for the purposed of

**J.A. 0112**

"stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds, and fibers . . . and of facilitating the orderly distribution of agricultural commodities." The Climate-Smart Commodities program is intended to achieve this purpose by supporting climate-smart farmers, ranchers, and forest owners to strengthen and stabilize U.S. rural agricultural communities.

170. USDA invested over $3.1 billion of Commodity Credit Corporation funding in the "Partnerships for Climate-Smart Commodities" program and has already approved 141 projects for awards.[21] Upon information and belief, appropriations from Section 21001 of the IRA, 136 Stat. at 2015–2016, were also used to fund the Partnerships for Climate-Smart Commodities Program.[20] Plaintiffs Alliance for the Shenandoah Valley, Conservation Innovation Fund, Marbleseed, OAK, Pasa, and RAFI - USA are recipients of the Partnerships for Climate-Smart Commodities grants.

*Farm and Food Workers Grant Relief Program*

171. In Section 101 of the Specialty Crops Competitiveness Act of 2004, Congress established a Specialty Crop Block Grants program and appropriated $44.5 million for each fiscal year from 2005 to 2009 for that purpose. 118 Stat. 3883. This program was later amended by the Agricultural Improvement Act of 2018, which extended the program through 2023 and authorized USDA to directly administer multistate programs. 132 Stat. 4905-06. The Consolidated Appropriations Act of 2021 appropriated an additional $100 million to this program

---

[20] *See* USDA, *Biden-Harris Administration Announces New Investments to Improve Measurement, Monitoring, Reporting and Verification of Greenhouse Gas Emissions through President Biden's Investing in America Agenda* (July 12, 2023), https://perma.cc/MF4G-GYC3 (referring to the Partnerships program as an "Inflation Reduction Act investment").

**J.A. 0113**

"to remain available until expended." 134 Stat. 2108. In addition, the Consolidated Appropriations Act of 2021, provided $1.5 billion "for grants and loans" for measures to protect food producers, among others, against COVID-19. 134 Stat. 2107.

172. In September 2021, USDA announced the creation of the Farm and Food Workers Relief grant program using funds from the Consolidated Appropriations Act of 2021.[21] The program was designed to provide relief to farmworkers, meatpacking workers, and front-line grocery workers for expenses incurred due to the COVID-19 pandemic. *Id.* Plaintiff Pasa is a recipient of a Farm and Food Workers grant.

*Office of Urban Agriculture and Innovative Production Grants*

173. Section 1001 of the American Rescue Plan Act of 2001 appropriated $4 billion to USDA, directing that USDA "shall use" these funds to, among other things, "make loans and grants" to "maintain and improve food and agricultural supply chain resiliency." 135 Stat. 11. USDA used some of these funds for Urban Agriculture and Innovative Production Grants, a competitive grant program designed to initiate or expand efforts of urban and suburban farmers to give consumers more options to buy locally produced products and reduce the climate impact of the food supply chain. [22] Plaintiff Pasa is a recipient of an Urban Agriculture and Innovative Production Grant.

**II.    Plaintiffs' Grant Agreements**

174. Each of Plaintiffs' grants is a legally binding agreement with the government.

---

[21] USDA, *USDA Invests $700 million in Grants to Provide Relief to Farm and Food Workers Impacted by COVID-19* (Sept. 7, 2021), https://perma.cc/4USW-PEL8.

[22] USDA, *USDA Invests $14.2 Million in 52 Urban Agriculture and Innovative Production Efforts* (Oct. 26, 2022), https://perma.cc/XZ3N-GKJS.

**J.A. 0114**

175. Before awarding a grant under the programs enumerated above, EPA, USDA and DOT give public notice of the funding opportunity, solicit applications, 2 C. F. R. § 200.204, conduct a "merit review process," and only select grant "recipients most likely to be successful in delivering results based on the program objectives," *id.* § 200.205.[23]

176. To ensure that taxpayer money is well spent, federal grants involve lengthy and complex application procedures and reporting and auditing requirements. *See, e.g.,* 2 C. F. R. §§ 200.500–200.521 (financial auditing requirements for federal award recipients), 200.328–200.330 (performance, financial monitoring, and reporting requirements for federal award recipients).[24]

177. Recipients of EPA, USDA, DOT and DOE grants, like Plaintiffs, are selected by the grantor agency in this competitive process and enter into legally binding "Grant Agreements" with the agency.

178. In Plaintiffs' Grant Agreements, EPA, USDA, DOT and DOE agreed to provide funding up to a specified dollar amount, over a specified time period, for specified work advancing Congress's objectives for the grant program. In exchange, grantees have agreed to use grant

---

[23] 2 C.F.R. Part 200 contains the OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, which have been adopted in relevant part by EPA, *see* 2 C.F.R. § 1500.2, and USDA, *see* 2 C.F.R. § 400.1, for grants and awards administered by those agencies.

[24] *See also* EPA, *Grantee Forms*, https://perma.cc/CHE7-HZGS (last updated Oct. 4, 2024) (listing dozens of forms, questionnaires, and certifications for EPA grant applicants and recipients); EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://perma.cc/3WG4-2ZLE (46-page general conditions governing EPA grant awards, including 15-pages of post-award financial reporting and auditing requirements); EPA, *Community Change Grants Terms and Conditions*, https://perma.cc/5A65-4NEX (last updated Dec. 5, 2024) (21-page conditions governing Community Change Grants, in addition to EPA's General Terms and Conditions); USDA, *General Terms and Conditions for Grants and Cooperative Agreements* (effective Oct. 2024), https://perma.cc/V2AT-CV5G (31-page general conditions governing USDA grant awards, including multiple pages of post-award financial reporting and auditing requirements).

J.A. 0115

funds to complete their agency-approved project on an agency-approved timeline. Grantees have also agreed to comply with lengthy terms and conditions of their award agreements, including statutory and regulatory requirements and reporting, recordkeeping, and auditing conditions.

179. The Grant Agreements, however, are not contracts in the sense that the Federal Government does not receive consideration in the form of direct, tangible benefits from the grantees' performance. The grant funds are provided to carry out U.S. policy interests as determined by Congress, not to provide direct, tangible benefits to the Federal Government such as financial benefits. As the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dept. of Educ.*, 470 U.S. 656, 669 (1985).

180. The regulations incorporated in Plaintiffs' Grant Agreements provide that, after awarding a grant, agencies may only "[t]emporarily withhold payments" or "[s]uspend or terminate the Federal award in part or in its entirety" if: (*i*) "the recipient . . . fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the federal award," and (*ii*) "the Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions." 2 C. F. R. § 200.339.

181. "Specific conditions" are less drastic remedies for non-compliance that must be exhausted before a federal agency may suspend or terminate grant funds, such as "[r]equiring additional project monitoring" or "more detailed financial reports." *Id.* § 200.208(c).

182. When specific conditions fail to remedy non-compliance, "[u]pon initiating" a more severe remedy such as suspension or termination of funding, "the Federal agency must provide

**J.A. 0116**

the recipient with an opportunity to object and provide information challenging the action." *Id.*
§ 200.342.

183. To date, no Plaintiffs have received notice that their grants are out of compliance.

184. After grants are awarded, Plaintiffs do not hold the funding in their own bank accounts. Rather, they are allowed to withdraw money only incrementally—on an as-needed basis—from Government-controlled accounts. Recipients generally "must be paid in advance" for their expenditures made in furtherance of their grant activities. 2 C. F. R. § 200.305(b)(1). Many Plaintiffs also incur expenses required by their grants and withdraw reimbursements from their Government-controlled accounts shortly after. Federal agencies generally must provide reimbursement payments "within 30 calendar days after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper." *Id.* § 200.305(b)(3).

185. Given this incremental process for accessing funds, even short delays in payment can cause great harm.

### III.    The Trump Administration's Actions to Freeze and "Terminat[e]" Grants

#### a.  *The Executive Orders*

186. On January 20, 2025, President Trump issued an Executive Order titled "Unleashing American Energy." 90 Fed. Reg. at 8353.

187. Section 2 of the Energy EO declared several purported "polic[ies] of the United States," including "to ensure that *no Federal funding be employed in a manner contrary to the principles outlined in this section*, unless required by law." *Id.* § 2 (emphasis added).

188. Section 7 of the Energy EO, titled "Terminating the Green New Deal," further provided that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated
> through the Inflation Reduction Act of 2022 (Public Law 117-169) or the

57

**J.A. 0117**

> Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order*.

Energy EO § 7 (emphases added). The Energy EO provides no end date for this indefinite funding freeze.

189. Section 7 further provides that within 90 days (*i. e.* , before April 20, 2025), all agency heads must submit a report detailing their review and recommendations to "enhance their alignment with the policy set forth in section 2." Critically, the Energy EO directs that "[n]o funds" blocked under the Order "shall be disbursed" unless the Director of OMB and Assistant to the President for Economic Policy determine that such payments "are consistent with any review recommendations they have chosen to adopt." *Id.*

190. President Trump thus directed that over $1 trillion in funding appropriated by Congress for specific purposes under the IRA and IIJA, including billions of dollars in project awards that had already been obligated to specific recipients by executive agencies, should be immediately frozen. The Energy EO forbids the disbursement of any funds that the Executive branch deems "[in]consistent[t] with . . . the policy outlined in section 2" of the Order. *Id.* § 7.

191. The Energy EO cited no legal authority for its across-the-board freeze of congressionally appropriated funds.

192. The Energy EO did not distinguish between obligated and non-obligated funds appropriated under the IRA or IIJA, simply blocking all "disbursements" across the board. *Id*

193. Also on January 20, 2025, President Trump issued an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." Exec. Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025),

**J.A. 0118**

194. The Equity EO directed agencies to "*terminate* . . . all . . . 'equity-related' grants or contracts" within sixty days, i.e., by March 21, 2025, among other directives. *Id*. § 2(b) (emphasis added). The Equity EO also purported to eliminate prior directives requiring agencies to consider equity in their federal funding decisions.

195. The Equity EO did not define "equity-related" grants or environmental justice.

196. The Equity EO cited no legal authority to categorically terminate all "equity-related" grants and contracts.

197. The Equity EO did not follow the procedures required by EPA's grant agreements and regulations prior to suspending or terminating funding.

198. The DOGE EO, issued on February 26, 2025, instructed agencies, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants" and to "terminate or modify" those contracts and grants to "advance the policies of [the Trump] Administration." 90 Fed. Reg. 11095 § 3(b).

199. On March 3, 2025, EPA sent an email instructing all agency directors that "any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member." Ex. G.

200. The DOGE EO and EPA Notice of DOGE Approval Requirement did not identify or consider how much funding would be frozen, terminated, or subject to this approval requirement nor which programs or recipients would be affected.

201. The DOGE EO and EPA Notice of DOGE Approval Requirement did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies or pending DOGE review.

**J.A. 0119**

**b.** ***The Program Freezing Directives***

202. Since January 20, 2025, executive branch agencies have taken multiple unlawful actions to effectuate the Executive Orders.

   *i.  The First OMB Memo*

203. On January 21, 2025, the Acting Director of the OMB issued a memorandum to agency and department heads numbered M-25-11 and titled "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*." Ex. A.

204. The First OMB Memo notifies agency and department heads of the "directive in Section 7 of the [Energy EO]," which "requires agencies to immediately pause disbursements of funds appropriated under the [IRA and IIJA]." *Id.*

205. The Memo interprets the IRA and IIJA funding freeze in Section 7 of the Energy EO to apply "only . . . to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order," which "is consistent with Section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and policy outlined in section 2 of the order.'" *Id.*

206. The Memo states that the funds to be blocked are "*any appropriations for objectives that contravene the policies established in section 2." Id.* (emphasis added). "Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.*

207. The First OMB Memo thus directs agencies to freeze all IRA and IIJA funds that they deem to contravene President Trump's policies.

208. The Memo does not identify or consider how much funding would be frozen or which programs or recipients would be affected.

**J.A. 0120**

209. The Memo does not identify any legal authority in any federal law, grant award, or the Constitution to block funds on this basis.

*ii. The Second OMB Memo*

210. On January 27, the Acting Director of the OMB issued a second memorandum to agency and department heads numbered M-25-13 and titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Program." Ex. B.

211. The Second OMB Memo asserted that President Trump's election "gave him a mandate" to "align Federal spending and action with the will of the American people *as expressed through Presidential priorities*." *Id.* at 1 (emphasis added).

212. The Memo stated that "[f]inancial assistance should be dedicated to advancing Administration priorities," including "unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government," and halting "[t]he use of Federal resources to advance Marxist equity, transgenderism, and new green deal social engineering policies." *Id.*

213. To that end, the Second OMB Memo directed federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders," citing seven such orders[25] issued by the Trump Administration, including the Energy EO and Equity EO. *Id.* at 1–2.

---

[25] Specifically, the Second OMB Memo cites: *Protecting the American People Against Invasion* (Jan. 20, 2025); *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025); *Putting America First in International Environmental Agreements* (Jan. 20, 2025); *Unleashing American Energy* (Jan. 20, 2025); *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025).

**J.A. 0121**

214. The Memo stated that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* at 2 (emphasis in original).

215. After a federal district court issued an administrative stay of the Second OMB Memo, OMB retracted the Memo "in name only" to "evade[e] judicial review" while continuing to implement the underlying funding federal funding freeze. *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *7 (D. D. C. Feb. 3, 2025).

### iii. The EPA Memo

216. Also on January 27, EPA's Acting Chief Financial Officer issued a memorandum to staff titled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause." Ex. B.

217. The EPA Memo was "provided based on instructions from OMB" and "[i]n accordance with the Executive Order *Unleashing American Energy*." *Id.*

218. The EPA Memo ordered an indefinite freeze of: (*i*) "unobligated funds appropriated by the [IRA and IIJA]," and (*ii*) "disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the [IRA and IIJA]." *Id.* The freeze of IRA and IIJA funds would "allow for the review of processes, policies and programs as required by Section 7 of the [Energy EO]." *Id.*

**J.A. 0122**

219. The EPA Memo, unlike the First OMB Memo, extended the funding freeze to all IRA and IIJA funds, not only those deemed contrary to the policies set out in Section 2 of the Energy EO.

220. The EPA memo further specified that the freeze applied even to "obligat[ed]" funds not yet paid out to recipients.

221. Like the preceding memos and Executive Orders, the EPA Memo did not clarify which programs or recipients would be affected and cited no legal authority for the freeze.

   *iv.*  *The USDA Directive*

222. On January 22, 2025, USDA advised grantees that "[a]s of late yesterday, January 21, 2025, the administration placed a temporary suspension on all actions related to grants, including Partnerships for Climate-Smart Commodities grants." Ex. C at 2.

223. Later that same day, USDA notified grantees of "additional guidance from the USDA Office of the Chief Financial Officer's office on the temporary suspension of all USDA actions related to grants, including Partnerships for Climate-Smart Commodities grants." Ex. C at 4. USDA stated that "payments or claims may continue to be processed under existing awards, *provided that they are not funded using IRA and IIJA funding sources*. Additional guidance related to IIJA and IRA funds will be provided by [USDA officials] when available." *Id.* at 4 (emphasis added).

224. In a February 20, 2025 press release, USDA referred to a funding "pause[]" due to the review of funding in the Inflation Reduction Act (IRA)." The press release stated that $20 million—out of the billions of dollars in IRA funding administered by USDA—would be unfrozen "as USDA continues to review IRA funding" for consistency with the priorities of the Administration. Ex. C at 6–7.

**J.A. 0123**

*v.  The DOT Directives*

225. On January 29, 2025, Secretary of Transportation Sean Duffy issued a memorandum to DOT staff stating that, pursuant to the Executive Orders, the agency must "identify and eliminate all . . . funding agreements . . . or portions thereof, which were authorized, adopted, or approved [during the Biden Administration] and which reference or relate in any way to climate change, 'greenhouse gas' emissions, racial equity, gender identity, 'diversity, equity, and inclusion' goals, environmental justice, or the Justice 40 Initiative." Ex. H at 2 ("DOT Secretary's Directive").

226. The DOT Secretary's Directive gave staff 20 days (i.e., until February 18) to "initiate all lawful actions necessary to rescind, cancel, revoke, and terminate all DOT . . . funding agreements, programs, . . . or portions thereof, which are subject to the relevant executive orders and which are not required by clear and express statutory language." *Id.*

227. On March 12, 2025, the United States Department of Transportation Secretary, Sean Duffy, ordered a "review" of "projects announced from FY 2022 through FY 2025" to "identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." Ex. F at 1.

228. Specifically, the DOT Memo directed the agency to identify award selections that include any of the following elements: "equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure." *Id.*

229. Further, the DOT Memo directed "project-by-project" review to identify "for potential removal" any Programs that have "[s]tatutory language" that includes equity requirements,

**J.A. 0124**

climate considerations, or bicycle infrastructure or "mandatory evaluation criteria" that includes "equity and/or climate requirements." *Id.*

230. Upon review, the memo instructs that DOT would identify which project selections should either continue, be revised with a reduced or modified scope, or be cancelled entirely. The DOT Memo contemplates that project sponsors may propose alternative elements as substitutes, as long as hose elements "align with current Administration EOs." *Id.*

231. The DOT Memo did not identify or consider how much funding would be frozen, terminated, or subject to this approval requirement nor which programs or recipients would be affected.

232. The DOT Memo did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies.

    *vi.  The DOE Memo*

233. On January 20, 2025, Acting Secretary of Energy, Ingrid Kolb ordered a broad review of DOE actions, including "Funding Actions." The memo directed that "[a]ll funding and financial assistance activities including . . . grants . . . shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional Authorization and Administration policy." Ex. I at 2.

234. The memo further directed that such "[s]uch approvals will be made in writing by the Secretary (acting) or the program head with the prior approval of the Secretary (acting)."

235. The DOE Memo did not identify or consider how much funding would be affected by this approval requirement nor which programs or recipients would be affected.

236. The DOE Memo did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies.

**J.A. 0125**

*vii.  Further Agency Actions to Freeze Program Funding*

237.  EPA, USDA, DOT and DOE have undertaken various actions consistent with the Executive Orders, the First OMB Memo, the EPA Memo, and the USDA Directive to freeze the funding programs at issue in this case and prevent Plaintiffs from carrying out their grants and accessing their grant funds.

238. For example, EPA, USDA, DOT and DOE have blocked Plaintiffs' access to the websites and portals needed to access funds, frozen or labeled as "suspended" the accounts containing the grant funds to prevent Plaintiffs from drawing down funds, informed Plaintiffs orally that funds are frozen and cannot be drawn down, and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification.

**IV.    Court Orders Against the Funding Freeze and Subsequent Agency Actions**

239. Despite clear court orders to stop action, Defendants have defied the rule of law and continued to freeze funding.

240. Two federal courts have issued temporary restraining orders and preliminary injunctions against the across-the-board funding freeze effectuated by the now-rescinded Second OMB Memo, finding that plaintiffs have shown a likelihood of success on their separation-of-powers and APA claims, and a likelihood of irreparable harm in the absence of preliminary relief. *See New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *5 (D. R. I. Jan. 31, 2025) (temporary restraining order), *appeal filed*, No. 25-1138 (1st Cir. Feb. 10, 2025); *Nat'l Council of Nonprofits*, No. 25-cv-239, 2025 WL 368852, at *14 (D. D. C. Feb. 3, 2025) (temporary restraining order); *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19–20 (D. D. C. Feb. 25, 2025) (preliminary injunction); *New York v. Trump*,

66

**J.A. 0126**

No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *1 (D. R. I. Mar. 6. 2025) (preliminary injunction), *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

241. Despite these orders, Defendants continue to engage in the freezing actions discussed above in paragraph 9.

242. In court and within agencies, the Administration has relied on an ever-shifting set of funding freeze directives and communications to evade complying with court orders. The Government has also taken the position that injunctions are limited to named defendants and the grants held by named plaintiffs, leaving large swaths of the unlawful freeze in place and grantees unprotected.

243. For example, *PoliticoPro* reported on the Administration's position that a "spending pause" announced by EPA on February 7 that "applied to more than two dozen EPA climate and infrastructure programs" is a "new" freeze and "*separate* from President Donald Trump's broader spending freeze that has been blocked by the courts."[26]

244. On February 19, the *New York Times* reported that USDA budget officers received an email with a "halt spending flowchart" which "flatly declared that certain spending Congress had approved, including through the Biden-era Inflation Reduction Act and the bipartisan Infrastructure Investment and Jobs Act, should be frozen . . . . '***Do not obligate or outlay***,' the flowchart said, citing no specific legal authorities."[27]

---

[26] Alex Guillén, *EPA says spending halt for climate, infrastructure law programs is different from Trump freeze*, *PoliticoPro* (Feb. 11, 2025) (emphasis added), https://perma.cc/G5MJ-5QD8.

[27] Charlie Savage, *Trump Team Finds Loophole to Defy Spirit of Court Orders Blocking Spending Freezes*, *New York Times* (Feb. 19, 2025) (emphasis added), https://perma.cc/7GRD-PSY7.

**J.A. 0127**

245. Upon information and belief, EPA may also be using a flowchart (reproduced below) to freeze or cancel "equity-related" grants based on the presence of certain arbitrary keywords in grant documents, such as "advocate," "diverse community," "equality," "equity," "inequality," "racism," or "socioeconomic," among others. Ex. J ("EPA Flowchart for 'Equity-Related' Grants").



246. On March 3, EPA sent an email instructing staff that they "must complete and sign the attached [Executive Order] Compliance Review form for *all funding actions*." Ex. E (emphasis added). This form requires relevant EPA staff, before funding may be disbursed, to "demonstrate[] the signer understands and confirms the action and associated workplan or

**J.A. 0128**

performance work statement **complies with [Executive Order requirements]** at the time of signature." Ex. E (emphasis added).

247. Upon information and belief OMB, EPA, USDA, DOT, DOGE, and other agencies are continuing to freeze IRA, IIJA, and "equity-related" funding despite these court orders.

## LEGAL FRAMEWORK

### I. Congress's Legislative Authority, Including the Power of the Purse, and the Separation of Powers

248. The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." Art. I, § 1.

249. Congress's lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.,* 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("[N]o area seems more clearly the province of Congress than the power of the purse.").

250. In our system of governance, this power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185 (D. C. Cir. 1992) (internal citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

251. Congress's power over the purse is rooted in two constitutional provisions. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in

**J.A. 0129**

Consequence of Appropriations made by Law." Art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

252. The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." Art. I, § 8, cl. 1.

253. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

254. When Congress passes a law appropriating money for a particular purpose, it is the President's job to spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

255. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.,* 725 F. 3d 255, 261 n. 1 (D.C. Cir. 2013) (Kavanaugh, J.).

256. Nor does the President "have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F. 3d 272, 283 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018). Where the Executive withholds funding "to effectuate its own policy goals"

J.A. 0130

without authorization from Congress, it violates the Constitution. *City & Cnty. of S. F. v. Trump*, 897 F. 3d 1225, 1235 (9th Cir. 2018).

257. If a President disagrees with Congress's spending decision, he can veto the legislation; but once a spending law has passed, the President has a simple duty to spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

258. The President has no constitutional power to amend or repeal statutes, *Clinton v. City of N. Y.,* 524 U.S. 417, 438 (1998) and doubly lacks the power to supplant Congress's spending directives with his own.

259. When a President intrudes on Congress's power over the purse, he violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Reps. v. Burwell*, 130 F. Supp. 3d 53, 76 (D. D. C. 2015), and acts as a "bulwark of the Constitution's separation of powers." *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.,* 665 F. 3d 1339, 1347 (D. C. Cir. 2012). Allowing the President to usurp this power "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

260. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when a President attempts to unilaterally seize the Nation's purse strings to serve his policy goals.

## II.  The Presentment Clauses

261. The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

**J.A. 0131**

262. These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2–3.

263. The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–40 (quoting *Chadha*, 462 U.S. at 951).

264. The Constitution's careful limitations on the President's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

### III. <u>The First Amendment</u>

265. The First Amendment provides that the Government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This protection extends to both individual and organizational expression, and the government may not restrict speech based on its content or viewpoint. Laws or policies that target speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).

**J.A. 0132**

266. Government actions that limit speech must be the least restrictive means of achieving a compelling state interest. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

267. Furthermore, the government cannot condition benefits or financial assistance on the suppression of constitutionally protected speech, especially when such a denial of support is based on the viewpoint or content of the expression. *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

## IV. The Impoundment Control Act

268. The Impoundment Control Act of 1974 ("ICA") sets forth very limited circumstances in which the President or an agency may "defer" or "rescind" congressionally appropriated funds.

269. Under the ICA, a "deferral" encompasses any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). A deferral thus includes both delays in obligating funds and delays in disbursing funds that are already obligated.

270. When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and must set forth one of only three permissible grounds for the deferral. The three permissible grounds for deferrals are: (1) "to provide for contingencies" (which generally means keeping a small cushion in case obligations end up costing more than anticipated); (2) "to achieve savings made possible by or through changes in requirements or greater efficiency of operations;" or (3) "as specifically provided by law." 2 U.S.C. § 684(b).

271. The Government Accountability Office ("GAO) has held that "policy reasons," including efforts to ensure funds are spent consistent with the President's policy preferences, are

73

**J.A. 0133**

not a proper basis for deferrals. GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance,* B-331564, at 6 (Jan. 16, 2020).

272. Where the president seeks to have appropriated funds "rescinded," the ICA requires that the President send a special message to Congress specifying the funds he seeks to have *Congress* rescind and the reasons for his proposal. 2 U.S.C. § 683(a). The Administration can withhold obligating the relevant funds for 45 session days after the President transmits his message, but if Congress does not rescind the funds in that time, the Administration must make the funds available for obligation.

273. There is an exception to the ICA for so-called "programmatic delays," which are not prohibited by the Act. GAO has explained that "programmatic delays occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated." B-331564, at 7. Programmatic delays are meant "to advance congressional budgetary policies by ensuring that congressional programs are administered efficiently." *City of New Haven v. United States*, 809 F. 2d 900, 901 (D.C. Cir. 1987). Permissible programmatic delays do not include when the Executive Branch withholds money "on its own volition . . . to ensure compliance with presidential policy prerogatives." B-331564, at 7.

274. Thus, in addition to requiring an agency to spend appropriated money before it expires, the ICA also prohibits delays in spending funds based on policy objections.

**V.  The Administrative Procedure Act**

275. Congress enacted the APA to ensure stability in agency action by mandating reasoned decisionmaking, and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See N. C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F. 3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting the APA prohibits policy change based on

**J.A. 0134**

"political winds and currents" without adherence to "law and legal process"); *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices").

276. To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Telephone Coop., Inc. v. Fed. Comms. Comm'n*, 402 F. 3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (C).

277. The APA tasks courts—not the Executive—with "deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), reflecting the duty of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

278. As to process, "[t]he [APA] requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process. Otherwise, government becomes a matter of the whim and caprice of the bureaucracy . . . ." *N. C. Growers' Ass'n*, 702 F. 3d at 772 (Wilkinson, J., concurring); *accord S. C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 967 (D. S. C. 2018) (same) (quoting *id.*).

279. To enforce these principles, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious," an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

75

**J.A. 0135**

280. An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action," *Def's of Wildlife v. U.S. Dep't of Interior*, 931 F. 3d 339, 345 (4th Cir. 2019) (internal quotation omitted), "including a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43).

281. When an agency is not writing on a "blank slate" but is "changing [its] position," the agency must "provide a more detailed justification than what would suffice for a new policy" if, "for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *F. C. C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

282. When changing policy, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy interests." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33(2020). "[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy." *Id.* at 30 (citation and quotations omitted). At bottom, an agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516.

**J.A. 0136**

283. Judicial review under the APA is limited to agency actions made reviewable by statute and "final agency action." 5 U.S.C. § 704. Agency action, including agency memoranda, are "final agency action" when they "'mark[]' the 'consummation' of the agency's decisionmaking process' and result[] in 'rights and obligations being determined. '" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)).

284. In sum, "[t]he role of the reviewing court under the APA is . . . . fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright Enters.*, 603 U.S. at 395 (citation and quotations omitted).

## VI. Nonstatutory Review Claims and *Ultra Vires* Actions

285. Separate from the APA, "a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority.'" *Strickland v. United States*, 32 F. 4th 311, 363 (4th Cir. 2022).

286. Such "nonstatutory review" or "*ultra vires*" claims arise when federal officials have acted "beyond the scope of their powers and/or in an unconstitutional manner." *Id.* at 366.

287. Sovereign immunity does not shield federal officials from such claims because actions beyond statutory or constitutional authority "are considered individual and not sovereign actions." *Id.* (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)).

## CLAIMS FOR RELIEF

### —COUNT I—
### THE ENERGY EO, EQUITY EO, DOGE EO,
### AND PROGRAM FREEZING ACTIONS
### VIOLATE THE SEPARATION OF POWERS
### NONSTATUTORY REVIEW AND ULTRA VIRES ACTION

77

**J.A. 0137**

**(All Plaintiffs[28])**

288. The allegations in the preceding paragraphs are incorporated herein by reference.

289. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

290. The U.S. Constitution grants Congress, not the President, exclusive power over the nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

291. When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause).

292. The President has no constitutional power to freeze funds appropriated by Congress, particularly when the freeze is based on Presidential policies rather than Congress's spending directives. *E.g.*, *City & Cnty. of S. F.*, 897 F. 3d at 1231–35.

293. Congress has enacted the federal grant programs at issue in this case under the IRA and the IIJA and has appropriated over $1 trillion in funding for those programs to serve enumerated purposes specified in these statutory programs.

294. Consistent with their constitutional and statutory duties, federal agencies obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

295. Defendants are constitutionally required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

296. But in the Energy EO, Equity EO, and DOGE EO President Trump directed that federal funding be paused or terminated if it was inconsistent with his own policies.

---

[28] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**J.A. 0138**

297. The President's Executive Orders, and the Program Freezing Actions implementing those Orders, directly contravene Congress's directives in the IRA, IIJA, and other statutes to carry out and fund the statutory programs at issue in this case. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (IRA "Environmental and Climate Justice Block Grants" program, directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities"); IRA, § 22007, 136 Stat. at 2022 (directing that USDA "shall" award grants  for "USDA Assistance and Support for Underserved Farmers, Ranchers [and] Foresters" and those "determined to have experienced discrimination . . . in Department of Agriculture farm lending programs"); *see also* 33 U.S.C. § 1302f(c)(4)(A)(ii) (IIJA, requiring that EPA "shall" give priority to grant applications submitted on behalf of "a small, rural, or disadvantaged community").

298. None of the Executive Orders nor the Program Freezing Actions point to any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds based on the President's policy preferences.

299. All the relevant constitutional powers here—the power to appropriate, spend, and legislate—belong solely to Congress. The President has no constitutional power to indefinitely freeze funds appropriated by Congress, much less based on policies that conflict with what Congress specified.

300. The Energy EO, Equity EO, DOGE EO, and Program Freezing Actions—including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, DOT memo, DOE Memo, EPA Notice of DOGE Approval Requirement, EPA Executive Order Compliance Review Requirement, and any other agency action to freeze or block IRA, IIJA, or "equity-related" funding based on President Trump's priorities—usurp Congress's spending power, *see* U.S. Const. art. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and

Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violate the separation of powers.

**—COUNT II—**
**THE ENERGY EO, EQUITY EO, DOGE EO,**
**AND PROGRAM FREEZING ACTIONS**
**VIOLATE THE PRESENTMENT CLAUSES**
**NONSTATUTORY REVIEW AND ULTRA VIRES ACTION**
**(All Plaintiffs[29])**

301. The allegations in the preceding paragraphs are incorporated herein by reference.

302. The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill . . . *before* the bill becomes law." *Clinton*, 524 U.S. at 439. "Presidential action that either repeals or amends *parts* of *duly enacted statutes*" violates the Presentment Clauses. *See id.* (emphasis added).

303. The Energy EO, Equity EO, and DOGE EO violate the Presentment Clauses to the extent they seek to "terminat[e]" or "modify" parts of the IRA or IIJA and other relevant statutes after they were passed by Congress and signed by the President. *See* Energy EO § 7; Equity EO § 2(b); DOGE EO § 3(b).

304. In purpose and in effect, the Energy EO, Equity EO, and DOGE EO amend the spending provisions of the IRA and the IIJA and other statutes, indefinitely suspending funding appropriated under these statutes, and unlawfully terminating the programs mandated by Congress, that the Executive Branch deems incompatible with *presidential* policies wholly different than *Congress's* directives for the funds and programs. *See supra* ¶¶ 186–247.

---

[29] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**J.A. 0140**

305. Like the "line item veto" in *Clinton*, the Energy EO, Equity EO, and DOGE EO "cancel" Congress's spending priorities expressed in duly enacted statutes and replace them with those of the President. 524 U.S. at 436. The President lacks power to amend enacted law, as do his agencies.

306. By cancelling Congress's spending directives and replacing them with the President's policy preference to withhold appropriated funds, the Energy EO, Equity EO, and DOGE EO seek to repeal and amend the IRA and the IIJA in violation of the Presentment Clauses. *See* U.S. Const. Art. I, § 7, cl. 2–3.

307. For these same reasons, the Program Freezing Actions—including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, DOT Memo, DOE Memo, EPA Notice of DOGE Approval Requirement, EPA Executive Order Compliance Review Requirement, and any other agency action implementing the Executive Orders to freeze or block IRA and the IIJA or "equity-related" funding based on President Trump's priorities—also violate the Presentment Clauses.

—COUNT III—
**THE PROGRAM FREEZING ACTIONS ARE
ARBITRARY AND CAPRICIOUS
IN VIOLATION OF THE APA
(All Plaintiffs[30])**

308. The allegations of the preceding paragraphs are incorporated herein by reference.

---

[30] Baltimore joins this claim only as to agency actions implementing the Energy EO and Cost Efficiency EO, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

81

**J.A. 0141**

309. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

310. The Program Freezing Actions, including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, DOT Memo, DOE Memo, EPA Notice of DOGE Approval Requirement, the EPA Executive Order Compliance Review Requirement, agency actions to block or prevent Plaintiffs from accessing the online portals needed to withdraw their grant funds, and other agency actions that prevent Plaintiffs from accessing their awarded grant funds, are arbitrary and capricious for multiple reasons.

311. First, these agency actions indefinitely froze over $1 trillion appropriated under the IRA and the IIJA without consideration of the "serious reliance interests" of recipients, including Plaintiffs, on those funds. *Fox Television Stations*, 556 U.S. at 515. "Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision. To say that OMB 'failed to consider an important aspect of the problem' would be putting it mildly." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11.

312. Second, these agency actions rely "on factors which Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43. Specifically, these actions indefinitely freeze funds based on the *President's* policies, contrary to Congress's specific directives and purposes for appropriating funds in the IRA and the IIJA and other federal statutes.

313. Third, these agency actions indefinitely froze *all* IRA and IIJA funding, as well as funding under other federal statutes without a consideration of alternative options. *See Regents of Univ. of Cal.*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy.").

82

**J.A. 0142**

314.   For example, Defendants could have engaged in a review of grant funding and how it relates to President Trump's priorities *without* freezing the funds.

315.   The unexplained freeze of all IRA and IIJA funds and freezing of funds under various other federal statutes epitomizes agency action by "whim and caprice of the bureaucracy," *N. C. Growers' Ass'n*, 702 F. 3d at 772 (Wilkinson, J., concurring).

316.   The Program Freezing Actions must be vacated as arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

**—COUNT IV—**
**THE PROGRAM FREEZING ACTIONS**
**ARE NOT IN ACCORDANCE WITH LAW,**
**IN EXCESS OF STATUTORY AUTHORITY, AND**
**WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**
**IN VIOLATION OF THE APA**
**(All Plaintiffs[31])**

317.   The allegations of the preceding paragraphs are incorporated herein by reference.

318.   The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

319.   "Courts"—not the Executive— "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters.*, 603 U.S. at 412. The APA reflects the judiciary's constitutional duty "to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

---

[31] Baltimore joins this claim only as to agency actions implementing the Energy EO and Cost Efficiency EO, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**J.A. 0143**

320. For five reasons, the Program Freezing Actions are outside of the agencies' statutory authority, contrary to law, and without observance of procedure required by law.

321. First, no federal law or regulation gives the President, OMB, EPA, USDA, DOT, DOE or DOGE the power to freeze funding appropriated by Congress and obligated by executive agencies. The Executive Branch has blocked these funds based on President Trump's policies, as articulated in the Energy EO, Equity EO, and DOGE EO—policies that are entirely different than, and in many cases directly conflict with, the directives and purposes specified by Congress for expending the funds.

322. By freezing funding based on the *President's* priorities rather than "stated statutory factors," the "Executive has acted contrary to law and in violation of the APA." *New York*, 2025 WL 357368, at *2.

323. Second, these agency actions are unconstitutional on the grounds set forth in Counts I–II and V, *see supra* ¶¶ 288–307, *infra*, ¶¶ 329–339, and are thus "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C. § 706(2)(A), (B).

324. Third, these agency actions are contrary to the IRA, the IIJA and other statutes creating and appropriated money to the programs for which Plaintiffs receive grants. Defendants' actions are not in accordance with the statutory requirements to create, fund, and carry out these programs.

325. Fourth, these agency actions are contrary to the Impoundment Control Act of 1974. Defendants have unlawfully delayed the expenditure of funds, resulting in deferrals that are for impermissible policy reasons and that did not follow the ICA's requirements for notifying

**J.A. 0144**

Congress of deferrals. The agency actions also represent unlawful rescissions of the funds in violation of the ICA.

326. Fifth, these agency actions, which remain in effect, direct a freeze of IRA, IIJA, and "equity-related" funding that violates agency regulations and the grant agreements that incorporate these regulations. *See, e.g.*, *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018) ("[W]here an agency's decision does not comport with governing . . . regulations, that decision is 'not in accordance with law' and must be set aside."). To the extent subsequent agency actions have unilaterally frozen specific funding or programs, those freezes are unlawful for the same reasons.

327. These agency actions indefinitely freeze IRA, IIJA, and "equity-related" funding without identifying any permissible grounds for freezing funds, exhausting less drastic remedies, 2 C. F. R. §§ 200.339, 200.208(c), or affording any recipient notice and an opportunity to object. *Id.* § 200.342. Both binding regulations and grant agreements require these award-specific findings and procedures before funding may be suspended.

328. The Program Freezing Actions, and any other agency action to freeze or block IRA, IIJA, or "equity-related" funding based on President Trump's priorities rather than Congress's are in excess of the agencies' statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

**—COUNT V —**
**THE PROGRAM FREEZING ACTIONS**
**VIOLATE THE FIRST AMENDMENT AND**
**ARE NOT IN ACCORDANCE WITH LAW**
**(Community Group Plaintiffs)**

85

J.A. 0145

329. The allegations of the preceding paragraphs are incorporated herein by reference as to the non-city plaintiffs.

330. Under the First Amendment, actions by the government targeting speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger*, 515 U.S. at 828–29. In particular, the government cannot condition benefits or financial assistance on the suppression of constitutionally protected speech, especially when such a denial of support is based on the viewpoint or content of the expression. *Speiser*, 357 U.S. at 518.

331. In addition, under the APA, courts must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

332. The Second OMB Memo purported to block all disbursements of federal financial assistance pending a "review" to determine whether they are "consistent with the President's Policies," including those outlined in the Equity EO, which mandates the termination of all "equity-related grants."

333. The Equity EO directs government officials to eliminate "environmental justice" from government initiatives. Equity EO § 2(b)(i). It further instructs agencies to terminate all grants or contracts deemed "equity related" within 60 days. *Id.*

334. The Second OMB Memo further directs agencies to identify federal funding recipients that supposedly "advance Marxist equity, transgenderism, and green new deal social engineering policies."

335. While none of these terms are defined, the pejorative descriptions and context make clear that they are highly disfavored by the Administration.

**J.A. 0146**

336. The Second OMB Memo targets federal funding recipients who express or advocate for viewpoints or content disfavored by the Administration, discriminating against these entities for continued federal funding based on their viewpoint.

337. Upon information and belief, the Program Freezing Actions identify organizations based on their viewpoints for purposes of blocking, freezing, or cancelling grant funding.

338. For example, EPA is using a flowchart to identify which grants to freeze or cancel based on the presence of certain arbitrary keywords representing viewpoints disfavored by the Administration in grant applications or other grant materials. This is unconstitutional viewpoint-based discrimination because it targets grantees like the nonprofit Community Group Plaintiffs and penalizes them based on their presence of certain words, concepts, and viewpoints in grant application or other grant materials—even though the words, concepts, and viewpoints were prioritized by Congress for federal funding, and the grantees were awarded funding on the basis of their grant materials, expressly to advance these policies that are central to their missions.

339. The Program Freezing Actions violate the First Amendment by restricting Plaintiffs' constitutionally protected speech based on its content.

### —COUNT VI—
### THE ENERGY EO, EQUITY EO, DOGE EO,
### AND PROGRAM FREEZING ACTIONS
### VIOLATE THE IRA AND THE IIJA AND OTHER RELEVANT STATUTES
### NONSTATUTORY REVIEW AND ULTRA VIRES ACTION
### (All Plaintiffs[32])

340. The allegations of the preceding paragraphs are incorporated herein by reference.

---

[32] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

**J.A. 0147**

341. Congress has enacted the federal grant programs at issue in this case under the IRA, IIJA, and other relevant statutes and has appropriated over $1 trillion in funding for those programs to serve enumerated purposes specified in these statutory programs.

342. Defendants are statutorily required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

343. Consistent with their statutory duties, federal agencies obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

344. But in the Energy EO, Equity EO, and DOGE EO President Trump directed that federal funding be paused or terminated if it was inconsistent with his own policies.

345. The President's Executive Orders and the Program Freezing Actions directly contravene the statutory requirements to carry out and fund the statutory programs under the IRA, IIJA, and other statutes under which Plaintiffs received grants. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (IRA "Environmental and Climate Justice Block Grants" program, directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities"); IRA, § 22007, 136 Stat. at 2022 (directing that USDA "shall" award grants for "USDA Assistance and Support for Underserved Farmers, Ranchers [and] Foresters" and those "determined to have experienced discrimination . . . in Department of Agriculture farm lending programs"); *see also* 33 U.S.C. § 1302f(c)(4)(A)(2) (IIJA, requiring that EPA "shall" give priority to grant applications submitted on behalf of "a small, rural, or disadvantaged community"); Section 1001 of the American Rescue Plan Act of 2001, Technical Assistance Investment Program to support farmworkers, and Urban Agriculture and Innovative Production Grant to support urban agriculture efforts in underserved communities.

**J.A. 0148**

## **PRAYER FOR RELIEF**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the following relief:

A.  Issue a declaratory judgment that Sections 2 and 7 of the Unleashing Energy EO that direct the freezing or termination of federal grants violate the United States Constitution and are therefore void;

B.  Issue a declaratory judgment that Section 2(b) of the Equity EO that directs the termination of "equity-related" grants or contracts violates the United States Constitution;

C.  Issue a declaratory judgment that Section 3(b) of the DOGE EO that directs the termination or modification of grants to advance the policies of the Trump Administration violates the United States Constitution;

D.  Issue a declaratory judgment that executive actions taken to freeze or terminate awarded federal grants under the Community Change Grants program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative Agreement program; the American Rescue Plan Technical Assistance Investment Program; the Climate Pollution Reduction Grants program; the Urban and Community Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling

**J.A. 0149**

Infrastructure Program Grants; the Active Transportation Infrastructure Investment Grant
Program; the Farm and Food Workers Grant Relief Program; Assistance for Latest and
Zero Building Energy Code Adoption; and the Office of Urban Agriculture and
Innovative Production Grants program, violate the United States Constitution, the
statutory provisions enacting and appropriating funds to these programs, and the APA;

E.  Pursuant to 5 U.S.C. § 706, hold unlawful and set aside any actions taken by OMB, EPA,
USDA, DOT, or DOGE to freeze or terminate federal grants under the Community
Change Grants program; the Environmental Justice Collaborative Problem Solving
Program; the Environmental Justice Government-to-Government Program; the
Partnerships for Climate-Smart Commodities program; the Conservation Stewardship
Program; the Equity in Conservation Outreach Cooperative Agreements program; the
Conservation Technical Assistance Program; the Increasing Land, Capital and Market
Access Program; the Rural Development Policy Cooperative Agreement program; the
American Rescue Plan Technical Assistance Investment Program; the Climate Pollution
Reduction Grants program; the Urban and Community Forestry Grant Program; the
Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid
Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment
Reduction Grant Program; the Charging and Fueling Infrastructure Program Grants;
Assistance for Latest and Zero Building Energy Code Adoption; Active Transportation
Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief
Program; and the Office of Urban Agriculture and Innovative Production Grants program;

F.  Preliminarily and permanently enjoin Defendants from continuing to freeze or
terminating grants or effectuating any termination under the Community Change Grants

**J.A. 0150**

program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative Agreement program; the American Rescue Plan Technical Assistance Investment Program; the Climate Pollution Reduction Grants program; the Urban and Community Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling Infrastructure Program Grants; the Active Transportation Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief Program; Assistance for Latest and Zero Building Energy Code Adoption; and the Office of Urban Agriculture and Innovative Production Grants program;

G. Prohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds awarded under such program(s);

H. Require Defendants to make grant program managers available to Plaintiffs to assist with the administration of grant funds, and require that grant program managers respond to questions from grantees in a timely manner;

I. Provide Plaintiffs and the Court with weekly status updates regarding grant disbursements and grant program administration;

J. Retain jurisdiction over this matter to ensure compliance with the above relief;

91

**J.A. 0151**

K. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

L. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 26th day of March 2025.

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N. C. Bar No. 41333)
(*Pro Hac Vice* pending)
Irena Como (N. C. Bar No. 51812)
(*Pro Hac Vice* pending)
Nicholas S. Torrey (N. C. Bar No. 43382)
(*Pro Hac Vice* pending)
SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org

*Counsel for Plaintiffs The Sustainability Institute, Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association of Sustainable Agriculture, and Rural Advancement Foundation International – USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
(*Pro Hac Vice* pending)

92

**J.A. 0152**

Elaine Poon (VA Bar No. 91963)
(*Pro Hac Vice* pending)
Jon Miller (MA Bar No. 663012)
(*Pro Hac Vice* pending)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org

*Counsel for Plaintiffs Mayor and City Council of Baltimore, City of Columbus, City of Madison, Metropolitan Government of Nashville and Davidson County, City of New Haven, City of San Diego*

<u>/s/ Mark Ankcorn</u>
Mark Ankcorn, Senior Chief Deputy City Attorney
(CA Bar No. 166871)
(*Pro Hac Vice* pending)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Plaintiff City of San Diego*

**J.A. 0153**

**CERTIFICATE OF SERVICE**

I certify that on March 26, 2025, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system:

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

**J.A. 0154**

# EXHIBIT A
# "First OMB Memo"



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 21, 2025

M-25-11

MEMORANDUM TO THE HEADS OF DEPARTMENTS AND AGENCIES

FROM:       Matthew J. Vaeth, Acting Director, Office of Management and Budget

                Kevin Hassett, Assistant to the President for Economic Policy and Director of the National Economic Council

SUBJECT:   Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*

The directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58).  This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order. This interpretation is consistent with section 7's heading ("Terminating the Green New Deal") and its reference to the "law and the policy outlined in section 2 of th[e] order."

For the purposes of implementing section 7 of the Order, funds supporting the "Green New Deal" refer to any appropriations for objectives that contravene the policies established in section 2.  Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget.

**J.A. 0156**

# EXHIBIT B
# "Second OMB Memo"



### EXECUTIVE OFFICE OF THE PRESIDENT
#### OFFICE OF MANAGEMENT AND BUDGET
##### WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 27, 2025

M-25-13

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:        Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT:     Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs

The American people elected Donald J. Trump to be President of the United States and gave him a mandate to increase the impact of every federal taxpayer dollar. In Fiscal Year 2024, of the nearly $10 trillion that the Federal Government spent, more than $3 trillion was Federal financial assistance, such as grants and loans. Career and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities. Financial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending "wokeness" and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve.

This memorandum requires Federal agencies to identify and review all Federal financial assistance[1] programs and supporting activities consistent with the President's policies and requirements.[2]  For example, during the initial days of his Administration, President Donald J. Trump issued a series of executive orders to protect the American people and safeguard valuable taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20,

---

[1] 2 CFR 200.1 defines Federal financial assistance to mean "[a]ssistance that recipients or subrecipients receive or administer" in various forms, but this term does not include assistance provided directly to individuals. For the purposes of this memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals.
[2] Nothing in this memo should be construed to impact Medicare or Social Security benefits.

**J.A. 0158**

2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025). These executive orders ensure that Federal funds are used to support hardworking American families.

To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders.  In the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities.  The temporary pause will become effective on January 28, 2025, at 5:00 PM. Even before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect. Federal agencies must report this information to OMB along with an analysis of the requirement. OMB also directs Federal agencies to pause all activities associated with open NOFOs, such as conducting merit review panels.

No later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause. Each agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis.  To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards (2 CFR 200.344), or recording obligations expressly required by law.

Additionally, agencies must, for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published, and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards.

**J.A. 0159**

# EXHIBIT C
# "USDA Directive"

2/11/25, 7:54 AM    Pasa Sustainable Agriculture Mail - FW: FOR DISTRIBUTION TO GRANT RECIPIENTS: Partnerships for Climate-Smart Commodities Grant ...

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 23-7    Page 2 of 8



**Andrew Currie <andrew@pasafarming.org>**

## FW: FOR DISTRIBUTION TO GRANT RECIPIENTS: Partnerships for Climate-Smart Commodities Grant Update

**Culbert, Tanya - FPAC-NRCS, MS** <tanya.culbert@usda.gov>                    Wed, Jan 22, 2025 at 1:14 PM
To: "Culbert, Tanya - FPAC-NRCS, MS" <tanya.culbert@usda.gov>
Cc: "Anderson, John - FPAC-FSA, SD" <john.a.anderson@usda.gov>, "Abouali, Mustapha - FPAC-NRCS, NV"
<mustapha.abouali@usda.gov>, "Hansen, Eric - FPAC-NRCS, DC" <Eric.Hansen@usda.gov>

Hello Grantees,

Please see message below for your awareness.

Let me know if you have questions and I will work to get you answers.

Thank you,

Tanya Culbert

National Program Officer

Office of the Associate Chief | Center for Sustainable Commodity Markets



Natural Resources Conservation Service
U.S. DEPARTMENT OF AGRICULTURE

| c: (601) 748-9177 |Remote duty station

e: tanya.culbert@usda.gov | https://www.nrcs.usda.gov/

Stay Connected with USDA:



Helping People Help the Land

*USDA is an equal opportunity provider, employer, and lender.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Dear Grant Recipients,

As of late yesterday, January 21, 2025, the administration placed a temporary suspension on all actions related to grants, including Partnerships for Climate-Smart Commodities grants. This is a fluid situation, and we ask for your patience as we work to gain additional clarification for you in the coming days.

Please contact your National Program Officer if you have additional questions. We will continue to provide periodic updates via email as more information becomes available.

Sincerely,

Katina

******************************************************************************

Katina D. Hanson

*Director*

Office of the Associate Chief | Center for Sustainable Commodity Markets



**Natural Resources Conservation Service**
U.S. DEPARTMENT OF AGRICULTURE

*USDA is an equal opportunity provider, employer, and lender.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

2/11/25, 7:53 AM    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 23-7    Page 4 of 8

Center for Sustainable Agriculture Mail - FW: FOR DISTRIBUTION TO GRANT RECIPIENTS: Partnerships for Climate-Smart Commodities Grant …



**Andrew Currie <andrew@pasafarming.org>**

---

### FW: FOR DISTRIBUTION TO GRANT RECIPIENTS: Partnerships for Climate-Smart Commodities Grant Update FAQs

---

**Culbert, Tanya - FPAC-NRCS, MS** <tanya.culbert@usda.gov>                Wed, Jan 22, 2025 at 3:53 PM
To: "Culbert, Tanya - FPAC-NRCS, MS" <tanya.culbert@usda.gov>

Hello Grantees,

Please see additional guidance below.

Thank you,

Tanya Culbert

National Program Officer

Office of the Associate Chief l Center for Sustainable Commodity Markets

 Natural Resources Conservation Service
U.S. DEPARTMENT OF AGRICULTURE

l c: (601) 748-9177 lRemote duty station

e: tanya.culbert@usda.gov l https://www.nrcs.usda.gov/

Stay Connected with USDA:



Helping People Help the Land

*USDA is an equal opportunity provider, employer, and lender.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Dear Grant Recipients,

We have received additional guidance from the USDA Office of the Chief Financial Officer's office on the temporary suspension of all USDA actions related to grants, including Partnerships for Climate-Smart Commodities grants. Please see Frequently Asked Questions (FAQs) below:

1. **Does the moratorium include no-cost extensions or no-cost modifications on existing awards?**

   a. <u>Answer:</u> No, it does not apply to no-cost extensions or no-cost modifications. This may include budget revisions that do not obligate additional funds, no-cost extensions of time, changes in key staff, and other changes that do not result in any additional expenditure of funds (regardless of their source).

2. **Can existing work continue under active awards?**

   a. <u>Answer:</u> Yes, until such time that you receive guidance in the future that specific transactions must be modified or terminated.

3. **Can payments or claims be processed under existing awards?**

   a. <u>Answer:</u> At this time, yes, payments or claims may continue to be processed under existing awards, provided that they are not funded using IRA and IIJA funding sources. Additional guidance related to IIJA and IRA funds will be provided by OCFO and/or OBPA, when available.

The above direction is subject to change pending updates from the current administration. Any updates will be communicated in writing when available.

Again, this is a fluid situation, and we ask for your patience as we work to gain additional clarification for you in the coming days.  Please contact your National Program Officer if you have additional questions. We will continue to provide periodic updates via email as more information becomes available.

Sincerely,

Katina

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Katina D. Hanson

*Director*

Office of the Associate Chief | Center for Sustainable Commodity Markets



**Natural Resources Conservation Service**
U.S. DEPARTMENT OF AGRICULTURE

*USDA is an equal opportunity provider, employer, and lender.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the

violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

J.A. 0165

 U.S. Department of Agriculture

**PRESS RELEASE**

## Secretary Rollins Releases the First Tranche of Funding Under Review

PUBLISHED: February 20, 2025

SHARE:   

Today, U.S. Secretary of Agriculture Brooke Rollins announced that USDA will release the first tranche of funding that was paused due to the review of funding in the Inflation Reduction Act (IRA).

**Washington, D.C., Feb. 20, 2025**—Today, U.S. Secretary of Agriculture Brooke Rollins announced that USDA will release the first tranche of funding that was paused due to the review of funding in the Inflation Reduction Act (IRA).

In alignment with White House directives, Secretary Rollins will honor contracts that were already made directly to farmers. Specifically, USDA is releasing approximately $20 million in contracts for the Environmental Quality Incentive Program, the Conservation Stewardship Program, and the Agricultural Conservation Easement Program.

"American farmers and ranchers are the backbone of our nation," **said Secretary Rollins**. "They feed, fuel, and clothe our nation—and millions of people around the world. The past four years have been among the most difficult for American Agriculture, due in no small measure to Biden's disastrous policies of over-regulation, extreme environmental programs, and crippling inflation. Unfortunately, the Biden administration rushed out hundreds of millions of dollars of IRA funding that was supposed to be distributed over eight years. After careful review, it is clear that some of this funding went to programs that had nothing to do with agriculture—that is why we are still reviewing—whereas other funding was directed to farmers and ranchers who have since made investments in these programs.

**J.A. 0166**

We will honor our commitments to American farmers and ranchers, and we will ensure they have the support they need to be the most competitive in the world."

This is the first tranche of released funding, and additional announcements are forthcoming as USDA continues to review IRA funding to ensure that we honor our sacred obligation to American taxpayers—and to ensure that programs are focused on supporting farmers and ranchers, not DEIA programs or far-left climate programs.

# # #

USDA is an equal opportunity provider, employer, and lender.

PRESS RELEASE

**Release No.:**
**0030.25**



U.S. Department of Agriculture

**J.A. 0167**

# EXHIBIT D
# "EPA Memo"



## THE CHIEF FINANCIAL OFFICER

WASHINGTON, D.C. 20460

January 27, 2025

## CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**    Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action
Pause

**FROM:**    Gregg Treml, Chief Financial Officer (Acting)    GREGG    Digitally signed by
                                                            TREML    GREGG TREML
                                                                     Date: 2025.01.27
                                                                     16:59:02 -05'00'

**TO:**    Deputy Assistant Administrators
           Deputy Associate Administrators
           Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including
unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the
Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass
financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in
discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including
funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure
Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements
will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the
Order.

All related actions, including new contract, grant, rebate and interagency actions, to include
drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any
actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this
time and all upcoming travel funded from either should be cancelled.

**J.A. 0169**

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    Senior Resource Officials
    Senior Budget Officers
    Regional Comptrollers
    Funds Control Officers

## Controlled by U.S. Environmental Protection Agency

# EXHIBIT E

# "EPA Executive Order Compliance Review Requirement"

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 23-9    Page 2 of 3



**Executive Order Compliance Review**
The following review verification document must be included with any assistance agreement, contract or interagency (IA) funding action or amendment to a workplan or statement of work. The document demonstrates that the signatory understands that the action and associated workplan or performance work statement complies with Executive Order requirements (detailed here: Presidential Actions – The White House) at the time of signature.

For actions requiring this document, signature must be by the Office Director (OD) in Headquarters or the Division Director (DD) in the regions. An OD/DD may assign a designee. Contracting Officers/ Specialists, IA Specialists, and Grants Specialists must retain the signed document in the contract, IA or grant file.

Funding actions for $50,000 and above, review and signature by a DOGE team member is required.

**Funding Action Review Confirmation**
This confirms that the workplan, budget or performance work statement does not conflict with the Executive Orders and aligns with the Administrator's "Powering the Great American Comeback" initiative. Funding organizations may batch actions and attach a list of covered actions, which must include the following details, at a minimum.

Contract/ Grant/ IA #:

Recipient/ Vendor name:

Funding amount $:

Description of Work (one sentence and only for $50,000 and above actions):

_____
Program Office Director (or designee)/ Regional Division Director (or designee)

_____
DOGE Team (if required)

**J.A. 0173**

# EXHIBIT F
# "DOT Memo"

**Attention: Heads of Secretarial Offices and Operating Administrations (OA)**

**Overview:**  The Office of the Assistant Secretary for Transportation Policy (OST-P) is providing guidance on competitive award selections made after January 20, 2021, that do NOT have fully obligated grant agreements or cooperative agreements in place.

Projects with executed grant agreements in place that are fully obligated are not subject to the guidance below. For selections with partially obligated grant agreements, the same review should take place before awarding subsequent phases or adding additional funds to an existing grant agreement. Additional guidance will be provided regarding revisions to standard terms and conditions appearing in draft grant agreements or templates.

**Summary:**  All competitive grant and cooperative agreement award selections must comply with current Administration priorities and Executive Orders (EO) that address energy, climate change, diversity and gender, and economic analysis, and other priorities.  Applicable Executive Orders and Memoranda include:

- Executive Order 14148, Initial Rescissions of Harmful Executive Orders and Actions;

- Executive Order 14154, Unleashing American Energy;

- Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing

- Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

- Secretarial Order 2100.7, Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities

- Secretarial Memorandum on Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender

This guidance provides direction for identifying award selections without fully obligated grant agreements that do not comply with these priorities.

**ACTION**: For projects announced from FY 2022 through FY 2025, review all award selections without grant agreements and partially obligated grant agreements. The focus of this review is to identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders.

**Step 1: Program Identification.** Identify Programs for which award selections may have included any of the following elements: equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-

**J.A. 0175**

specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure. Additionally, project-by-project review of selections to identify any project scope elements for potential removal are required for any Programs that meet the criteria below:

- Statutory language includes equity requirements, climate considerations, or bicycle infrastructure.
- NOFO mandatory evaluation criteria includes equity and/or climate requirements.
- Eligible activities included bicycle infrastructure, EV and/or EV charging infrastructure.

Programs that do not meet the criteria above should be shared with the OA Administrator or equivalent OST leadership for concurrence/confirmation. Following OA Administrator or equivalent OST leadership concurrence, the OST Office of Policy (OST-P) and Office of the General Counsel (OGC) will provide final confirmation on whether a program is required to conduct a project-by-project review. If OST-P and OGC confirm that a project-by-project review is not required, offices may proceed with negotiating and finalizing grant agreements. If OST-P and OGC confirm that project-by-project review is required, offices should proceed to Step 2. Please submit review requests to the OST Policy Board at OSTPolicyBoard@dot.gov.

**Step 2: Project-by Project Review.** Programs that require further review shall have Program Teams examine each individual project to identify those award selections that have project scopes that include any of the project elements listed in Step 1 (i.e. equity activities, DEI activities climate change activities, etc.). Those Teams should document their project-by-project examination and flag any project scope elements or activities for potential removal, including:

- Project activities such as equity analysis, green infrastructure, bicycle infrastructure, EV and/or EV charging infrastructure.
- Project purpose or primary project benefits include equity and/or climate such as- projects that purposefully improve the condition for EJ communities or actively reduce GHG emissions.

*Note: If project scope elements are based in statute, program offices should consult with applicable legal counsel, and following legal concurrence, raise any proposed scope changes to OA leadership.*

OA leadership shall review the findings from the Team review, and recommend to OST-P and OGC which project selections should:

**J.A. 0176**

    a. Continue in their current form with no change;
    b. Be revised with a reduced or modified scope; or
    c. Be canceled entirely.

**Step 3: Project Scope Revision.** Award selections identified in Step 2.b must update project scopes to eliminate flagged activities, and where possible replace identified elements with relevant elements that align with program statute, the scope of the application submission, and current Administration EOs.

Where the scope of the project includes elements noted above, Teams should negotiate with project sponsors to update project scopes to eliminate and, where possible, replace those identified elements with relevant elements that align with the program statute, the original scope of the application submission, and current Administration EOs.

    a. If the project sponsor agrees to proceed with scope changes, proceed to grant agreement formulation and execution. The project sponsor may propose alternative project elements to substitute for the redline elements that should be removed as long as they 1) align with the program statute, 2) are consistent with the purposes of the original scope of the application submission, and 3) align with current Administration EOs.

    b. If the project sponsor does not agree to remove project elements noted in Step 2 and replace with acceptable alternative scope, then the Team should proceed with a reduced award that removes the flagged scope and activities.

# EXHIBIT G
# "EPA Notice of DOGE Approval Requirement"

**Subject:** FW: Updated EO Compliance Review

Project Officers and Contract Officer Representatives:

Good morning. Please see the updated EO compliance review document (attached) and the instructions below.

Funding organizations will need to provide the amended EO compliance review document to award officials to signal alignment on Administration priorities as detailed through Executive Orders (Presidential Actions – The White House) and the Administrator's "Powering the Great American Comeback" Initiative (EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative | US EPA). For transactions below $50,000, the compliance document is largely the same, except it requests the dollar amount.

There is a new requirement for transactions greater than $50,000. **Effective today, any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member**. To facilitate the DOGE Team review, please include a brief (1-sentence) explanation of the funding action (all other fields must be completed as well). Programs and regions should aim to submit a single tranche of actions for DOGE review each day between 3pm – 6pm EST. While emergency/ special actions are understandable, please work to batch your funding actions as best as possible.

For compliance reviews requiring DOGE sign-off, please email your request by **2 p.m.** to ██████████ at ██████████ @epa.gov **and** ██████████ at ██████████ @epa.gov.

Thank you for your time, and feel free to contact me with any questions.

Have a great day,

# EXHIBIT H

# "DOT Secretary's Directive"



**U.S. Department of Transportation**

Office of the Secretary
of Transportation

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

## MEMORANDUM FOR SECRETATRIAL OFFICERS AND HEADS OF OPERATING ADMINISTRATIONS

**From:**      The Secretary

**Subject:**   Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender

**DATE:**      January 29, 2025

1. This Memorandum sets forth the initial steps to be taken by the U.S. Department of Transportation (Department or DOT) to implement the provisions of several executive orders including those titled as follows: several executive orders and memoranda issued by the President on January 20, 2025, including: Executive Order 14148, *Initial Rescissions of Harmful Executive Orders and Actions*; Executive Order 14151, *Ending Radical And Wasteful Government DEI Programs And Preferencing;* Executive Order 14154, *Unleashing American Energy;* and an Executive Order of January 20, 2025 titled *"Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government* (collectively referred to herein as "relevant executive orders"), which direct Federal agencies, where and as consistent with law, to identify and eliminate all orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, and policy statements, or portions thereof, which were authorized, adopted, or approved between noon on January 20, 2021 and noon on January 20, 2025, and which reference or relate in any way to climate change, "greenhouse gas" emissions, racial equity, gender identity, "diversity, equity, and inclusion" goals, environmental justice, or the Justice 40 Initiative.

2. All DOT Operating Administrations (OAs) and all components of the Office of the Secretary (OST) shall, within 10 days of the date of this Memorandum, identify and list in a written report to the Office of the General Counsel and the Office of the Under Secretary for Policy all DOT orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, and policy statements, or portions thereof, which are subject to the relevant executive orders.

3. Within 10 days after submission of the report, all OAs and OST components shall, in coordination and consultation with the Office of the General Counsel and the Office of the Under Secretary for Policy, initiate all lawful actions necessary to rescind, cancel, revoke, and terminate all DOT orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, policy statements, or portions thereof, which are subject to the relevant executive orders and which are not required by clear and express statutory language.

4. The Office of the General Counsel and the Office of the Under Secretary for Policy shall be responsible for overseeing compliance with this Memorandum and within 30 days of the date hereof shall

Total Pages:(186 of 467)     Pg: 186 of 467     Filed: 06/23/2025     Doc: 55-1     USCA4 Appeal: 25-1575

2

submit a written report to the Secretary regarding the status of compliance by each OA and OST component.

5. Pursuant to the relevant executive orders, the following Departmental Orders are hereby canceled:

| | | |
|---|---|---|
| DOT 1000.17 | Department of Transportation Equity Council | Dec. 19, 2022 |
| DOT 4360 | Climate Change Adaptation and Resilience Policy for DOT Operational Assets | Sept. 18, 2023 |
| DOT 5610.2C | U.S. Department of Transportation Actions to Address Environmental Justice in Minority Populations and Low-income Populations | May 16, 2021 |

Secretary of Transportation

# EXHIBIT F
# "DOE Memo"

Total Pages:(189 of 467)    Pg: 189 of 467    Filed: 06/23/2025    Doc: 55-1    USCA4 Appeal: 25-1575



**The Secretary of Energy**
Washington, DC 20585

January 20, 2025

MEMORANDUM FOR HEADS OF DEPARTMENTAL ELEMENTS

FROM:          INGRID C. KOLB
               ACTING SECRETARY

SUBJECT:       Agency-wide Review of Program and Administrative Activities

As we navigate through this transition period for a new Administration within the Department of Energy (DOE), it is imperative to ensure a deliberate approach to the Administration's programmatic and administrative policies and priorities. To that end, effective immediately and until further notice, prior to any actions or decisions on all herein described activities, a review under varying criteria will be undertaken to ensure all such actions are consistent with current Administration policies and priorities, including budgetary priorities.[1]  The broad spectrum of actions include but are not limited to: personnel actions; awarding of grants, loans, funding opportunities, and cost sharing agreements; contracting, procurement announcements, and actions; rulings, decisions or other actions on any applications, enforcement action, or settlements of any contested matter; submissions to the Federal Register for publication; and the publication or announcement of reports, studies, congressional correspondence, and public statements. This includes all studies or reports that are either ongoing, set to be released, are already under review, or have not yet begun.

The reviews are necessary to facilitate a comprehensive review of the Department's ongoing activities and to align these efforts with Congressional authorizations and the Administration's priorities, to ensure that resources are allocated efficiently, and that the Department's initiatives are in line with the statutory mission of DOE and the priorities of the Administration.

As discussed below, a process will be in place for the submission of requests for action by the Secretary (acting) to ensure the important work of the Department continues to serve the American people.

Scope of Actions:

1. **Personnel Actions:**  All personnel actions, including appointments, promotions, and transfers, are to be halted. This includes both internal staff movements and external hiring processes, unless expressly and unambiguously authorized with the prior approval of the acting Secretary, after the date of issuance of this order.

---

[1] With respect to NNSA, nothing herein is intended to contradict 50 USC Ch. 41but to be construed broadly consistent with the Secretary's authority thereunder, include §2402(d).

**J.A. 0184**

2. **Procurement Announcements and Actions:** Any announcements or awards regarding procurement opportunities and contracts are to be put on hold, other than for routine building operations and supplies for contracts with a value of less than $100,000. This includes, but is not limited to, requests for proposals (RFPs), requests for quotations (RFQs), and contract negotiations. Such approvals will be made in writing by the Secretary (acting) or the Head of Departmental Element with the prior approval of the Secretary (acting).

3. **Funding Actions:** All funding and financial assistance activities including loans, loan guarantees, grants, cost sharing agreements, funding opportunity announcements, and contracts shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional authorization and Administration policy. Such approvals will be made in writing by the Secretary (acting) or the program head with the prior approval of the Secretary (acting).

4. **Release of Reports, Studies, Congressional Correspondence, and Public Announcements:** Submission of actions to the Secretary (acting) for approval shall be completed through relevant program heads prior to continuation of development and dissemination of any reports, studies, requests for information (RFIs) or congressional correspondence, including both finalized documents and those in draft form; conducting and scheduling public meetings related to any studies or reports. Relative to studies and reports being conducted by the National Laboratories, approvals must be obtained by the Head of Departmental Element with concurrence by the Administration designee within the Departmental Element. If reports or studies are subject to statutory or other requirements, a request for waiver from the reviews may be made to the Secretary (acting), who may grant the waiver. Submission of actions to the Secretary (acting) for approval shall be completed before publishing any Department social media posts, press releases, or other public announcements including website changes, even if previously scheduled and approved.

5. **Federal Register Notices:** Nothing should be sent to the Federal Register (FR) for publication without written approval of the Secretary (acting) or designee. The Office of the General Counsel is directed to: (i) immediately withdraw all items that have been submitted to the FR but have not yet been published, and (ii) provide the Secretary (acting) by noon on January 23 a list of all items that have been published but have not yet reached the date by which any such item is considered final (including the date such item becomes final).

6. **Actions under the National Environmental Policy Act (NEPA):** NEPA work may continue. However, the Secretary (acting) shall be informed of all NEPA work by January 24, 2025; or if new action is taken, at least 10 days before initiated. The scope of the NEPA reviews shall be reviewed by the Principal Deputy General Counsel or other person as designated by the Secretary (acting). Final Environmental Assessments and Environmental Impact Statements shall be

3

reviewed and approved by the Principal Deputy General Counsel or other person as designated by the Secretary (acting).

The reviews shall be conducted by all DOE offices, field offices, National Laboratories, and NNSA. There are no exemptions other than for routine building operations and supplies for contracts with a value of less than $100,000 without prior approval by the Secretary (acting).

**Rescinding of Signature Authority.**

To ensure compliance with this Directive, all signature authority for any of the actions provided herein are rescinded. Any actions requiring signature authority should not proceed until explicit authorization is provided in writing by the Secretary (acting) or designee.

The heads or administrators of each of the program, administrative, and support offices, National Laboratory Directors, field offices, and NNSA shall immediately disseminate this memorandum within their respective organizations and ensure full compliance with the directives as applicable.

Further guidance regarding the full resumption of activities, results of the review process, additional changes in DOE priorities, interagency collaboration, and legal compliance guidance will be forthcoming. Your cooperation and understanding are greatly appreciated as we work to enhance the effectiveness and efficiency of the Department.

Total Pages:(191 of 467)    Pg: 191 of 467    Filed: 06/23/2025    Doc: 55-1    USCA4 Appeal: 25-1575

# EXHIBIT J

# "EPA Flowchart for 'Equity-Related' Grants"

**Decision Tree**



**Keywords**

activism
activists
advocacy
advocate
advocates
barrier
barriers
biased
biased toward
biases
biases towards
bipoc
black and latinx
community diversity
community equity
cultural differences
cultural heritage
culturally responsive
disabilities
disability
discriminated
discrimination
discriminatory
diverse backgrounds
diverse communities
diverse community
diverse group
diverse groups
diversified
diversify
diversifying
diversity and inclusion
diversity equity
enhance the diversity
enhancing diversity
equal opportunity
equality
equitable
equity
ethnicity
excluded
female
females
fostering inclusivity
gender
gender diversity

genders
hate speech
excluded
female
females
fostering inclusivity
gender
gender diversity
genders
hate speech
hispanic minority
historically

implicit bias
implicit biases
inclusion inclusive
inclusiveness inclusivity
increase diversity
increase the diversity
indigenous community
inequalities
inequality
inequitable
inequities
institutional
lgbt
marginalize
marginalized
minorities
minority
multicultural
polarization
political
prejudice
privileges
promoting diversity
race and ethnicity
racial
racial diversity
racial inequality
racial justice
racially
racism
sense of belonging
sexual preferences

social justice
sociocultural
socioeconomic
status
stereotypes
systemic
trauma
under appreciated
under represented
under served
underrepresentation
underrepresented
underserved
undervalued
victim
women
women and
underrepresented

**J.A. 0189**

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# SUSTAINABILITY INSTITUTE DECLARATION
# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute, et al., | Civ. No. 2:25-cv-02152-RMG |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DECLARATION OF BRYAN CORDELL, THE SUSTAINABILITY INSTITUTE**

I, Bryan Cordell, declare as follows:

1.     My name is Bryan Cordell, and I live in Charleston, South Carolina. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Sustainability Institute, which is one of several grant recipients affected by the freeze in federal grant funding.

2.     The Sustainability Institute is a 501(c)(3) nonprofit organization that is headquartered at 3973 Rivers Avenue, Suite 101, North Charleston, SC 29405. Established in 1999, the Sustainability Institute's mission is to advance sustainable and resilient communities while building the next generation of conservation leaders.

3.     I am the Executive Director for the Sustainability Institute. I have worked at the Sustainability Institute for over 20 years. I earned my Bachelor of Arts from the College of Charleston in Charleston, South Carolina. As Executive Director, I oversee all organizational operations and planning, managing workstreams across several program areas.

4.     The Sustainability Institute has a diverse portfolio of work that includes a weatherization and critical home repair program serving four counties of South Carolina, a regional program that advises and certifies high-performance commercial and multifamily buildings, and a nationally accredited AmeriCorps service-learning and workforce training program that performs habitat restoration work across the entire coast of South Carolina. The Sustainability Institute operates through several programs funded by governmental and non-governmental sources.

5.     For example, we are currently contracted through Charleston County government to provide weatherization and critical home repairs to households throughout Charleston County,

**J.A. 0192**

and we are also contracted with Santee Cooper to provide similar services to ratepayers in Horry, Georgetown and Berkeley Counties. We receive funding from the National Oceanic and Atmospheric Administration to perform habitat restoration work in underserved coastal communities of South Carolina. We also receive funding from the Corps Network and the South Carolina Commission of AmeriCorps to support our accredited AmeriCorps service-learning program.

6.      In the past, the Sustainability Institute was a subrecipient of a U.S. Department of Energy Better Buildings Neighborhood Program grant, which allowed us to develop a citywide energy efficiency program that provided residents of the City of Charleston with access to energy audits, contracting services, utility rebates and other financial incentives. We were also a subrecipient of a U.S. Department of Labor Pathways Out of Poverty Training grant, which supported a program to help disadvantaged populations find ways out of poverty and into economic self-sufficiency through employment in energy efficiency industries.

7.      The Sustainability Institute has a demonstrated record of developing and implementing successful programs in partnership with federal agencies. Our programs have provided over 10,000 homeowners in the greater Charleston area with new skills and robust education to help them reduce their home energy bills through simple home repairs and behavioral modifications. Additionally, we have fully weatherized, repaired and upgraded more than 600 low-income homes with energy efficient repairs and improvements, saving many South Carolinian families 20% or more on electricity costs.

8.      On December 20, 2024, the Sustainability Institute was awarded an $11,396,020 Community Change Grant under the Inflation Reduction Act (IRA) for Advancing Environmental and Climate Justice in Union Heights, a Historic Black Settlement Community in

North Charleston, South Carolina. The project, implemented in partnership with the City of North Charleston, aims to restore and revitalize Union Heights, a historically Black community disrupted by the construction of Highway 26, by building energy efficient affordable homes as well repairing, weatherizing and upgrading existing homes in the North Charleston community. The grant has a project period of January 1, 2025 to December 31, 2027.

9.      This grant was the culmination of many hours of work and years of relationship building with the community and the City of North Charleston.

10.     For example, building a successful federal grant application demanded significant staff resources. Together, our Executive Director and Director of Finance dedicated hundreds of hours towards writing our grant application. We were supported by two additional full-time staff members who worked on project planning and development, as well as the final grant review process.

11.     Moreover, the Sustainability Institute has been performing weatherization and critical home repair work in the Union Heights for over a decade. Union Heights residents envisioned this work and participated in the planning for more than 5 years. For the past two years, we have worked with project partners on our grant application to identify weatherization and critical home repair needs within the community. All in all, the critical development of this program was done in partnership between Union Heights, the City of North Charleston, the Coastal Community Foundation of South Carolina, and a set of community-based partners and stakeholders.

12.     The project includes several key components: Project 218, home weatherization, critical home repairs, and energy efficiency upgrades for 50 homes, green infrastructure and nature-based solutions, and workforce development.

**J.A. 0194**

13.    Project 218 will involve the redevelopment of vacant land into 10 affordable housing units and green space for the Union Heights community. During the 1960s, Exit 218 cut the lower half of Union Heights off from the rest of the neighborhood leading to long-term development and social challenges for its residents.

14.    Later, during construction of the Leatherman Port Terminal, which opened in 2021, Exit 218 off Interstate 26 was removed, leaving 2.77 acres of vacant land and held by the South Carolina Department of Transportation (DOT). However, because the DOT no longer needed the vacant land, it was transferred to the City of North Charleston as part of a community mitigation plan.

15.    Project 218 will reconnect this historic neighborhood which has been carved in two since the 1960s and address the community's severe shortage of affordable housing. Our work will not only develop 10 single-family "green" homes but will also transfer the land to a community-based land trust to ensure long-term affordability.

16.    Under the land trust model, 10 Union Heights residents will own their homes, while Community First Land Trust will retain ownership of the land in perpetuity. A revolving loan fund or similar mechanism held by the Coastal Community Foundation of South Carolina will reinvest profits from home sales back into the land trust, enabling the creation of more affordable housing in the community. The community change grant will fund the construction of the first 10 homes, and once sold, will generate resources to build as many as 20 additional housing units for this community.

17.    This multi-year project will create jobs in the community by hiring 12 AmeriCorps Conservation Corps members from Union Heights and surrounding low-income

neighborhoods. These community members will support weatherization projects and community capacity-building activities, providing valuable workforce training and economic opportunities.

18.     Through our nationally recognized and award-winning Environmental Conservation Corps Program, over 195 AmeriCorps members have contributed over 163,000 hours of conservation service in our region. Many of our service members are at-risk and/or disadvantaged youth and veterans who have benefited from our workforce training programs.

19.     The AmeriCorps program will provide an opportunity for North Charleston community residents to gain climate-related workforce training, as well as play a critical role in shaping their community's future.

20.     Finally, the Sustainability Institute will repair, weatherize, and enhance the energy efficiency and resilience of 50 existing homes in Union Heights, reducing greenhouse gas emissions and improving residents' health. With only 93 owner-occupied single-family homes in the community, this initiative will provide critical energy upgrades to more than half of the owner-occupied homes in Union Heights, significantly improving the community.

21.     We were unable to access our ASAP.gov account from January 10, 2025, to January 22, 2025, due to lack of communication from the EPA and a typo on their part during the creation of our account. ASAP.gov is an electronic system used by federal agencies to transfer funds to recipient organizations.

22.     Once we were granted access on January 22, 2025, we immediately added our bank account to the system, but had to wait until January 31, 2025, for the bank account to be verified and ready to use.

23.     Our community change grant was first suspended on January 29, 2025, before we had even had the chance to access our funds.

24.     Our team checks the status of our federal grant every day, several times a day. On February 7, 2025, the Sustainability Institute was able to access our grant funds for 3 days. That same day, we made a successful drawdown of funds of $200,000.00 and developed an internal spending plan in anticipation of the drawdown being accepted. We received the grant funds on February 7, 2025. Unfortunately, on February 10, 2025, our funds were frozen again.

25.     The successful drawdown was used to cover various payroll and operational expenses. Ultimately, Sustainability Institute leadership made the decision to not complete the spending plan because some of the funds were intended for our subrecipients, however, they were unable to provide sufficient documentation for a drawdown within a 5-day period. We returned $111,062.40 of funds on February 14, 2025.

26.     The erratic and unpredictable nature of the pause has created widespread uncertainty within our organization. In response, our staff working on compliance have dedicated nearly all their time since January 29, 2025, to assessing risks and strategizing how to operate our projects during this unprecedented disruption.

27.     We currently have two full-time employees who have compliance-specific responsibilities within the EJCPS program. Their work includes attending meetings, participating in briefings and calls, conducting planning activities, and consulting external advisors/ consultants. However, we are also in the process of hiring a part-time Grants Manager to manage pre- and post-award compliance.

28.     Under normal circumstances, the Sustainability Institute would rely on our grant project officer for regular updates and to ask questions related to the project. In past awards, we communicated with our project officers several times a week about our projects. However, staffing changes and firings within the EPA – especially the dismantling of the Office of

Environmental Justice and External Civil Rights which administers the Community Change

Grant Program – have led to widespread confusion, making it difficult to get guidance and

information about our grant.

29.     During the last week of January, we were informed by our EPA project officer that

she received a directive to pause communication with grant awardees for at least 30 days. Our

EPA project officer advised us to continue with our grant activities to the extent possible. Our

EPA project office was a member of the Office of Environmental Justice and External Civil

Rights.  It is our understanding that many employees in this Department have been terminated.

30.     On February 6, 2025, our first project officer informed us that we would be

assigned a new project officer shortly. Once we received our new project officer's EPA email, we

made multiple unsuccessful attempts to contact them: twice on February 11, 2025, once on

February 12, 2025; and once more on March 11, 2025. As of March 19, we have not received

any response from our second EPA project officer.

31.     On February 20, 2025, our first project officer alerted us that ASAP.gov funds

were unsuspended as of February 19th.

32.     On February 20, 2025, we made our second draw down of funds for a total of

$56,017.25. We used these funds to reimburse several expenses, including payroll and

operational expenses, as well as payment to one of our subrecipients for $42,079.05.

33.     On March 6, 2025, we received an email stating that all awardees were receiving

new project officers due to widespread EPA staffing reductions.

34.     On March 9, 2025, ASAP.gov reflected that our funds were frozen again. As of

March 19, 2025, we still do not have access to our EPA funds.

35.    On March 11, 2025, we sent an email to our third EPA project officer. As of March 14, 2025, we have not received a response.

36.    After losing critical program support from the EPA, we have decided to hire a consultant with the goal of better understanding the compliance risks associated with the pause. The cost of a consultant is not covered by our federal grants, so we have to divert money from other program areas to cover associated cost, instead of using that money for activities central to our mission. From our experience, consultants are not as valuable as EPA's grant officers, nor are they as responsive to questions about our grant obligations.

37.    The funding freeze has led to massive disruptions in our organizations' day-to-day operations, causing slowdowns and budgetary challenges. As a result, we have had to divert staff and other resources towards responding to manage the fallout. For example, since the first pause, our Director of Finance has spent approximately 80% of their time addressing these financial consequences—both internally and with our subrecipients. Our Director of Finance has sought guidance from external sources, but this cannot replace the critical oversight and support that a federal project officer would provide.

38.    Federal grant management is a complex process, and without adequate advice and support, we face ongoing uncertainty and risk. Most of our leadership is working almost exclusively on responding to shifting guidance, and at times, nonexistent guidance, from the government and the EPA. These disruptions to our work capacity will inevitably flow into other active programs unrelated to the Union Heights program, further straining our resources and programmatic priorities.

39.    Without federal funding, we are unable to begin programmatic work for the Union Heights revitalization. Phase 1 of the Advancing Environmental and Climate Justice in Union

**J.A. 0199**

Heights project involves designing, planning, and defining the program. However, we are hesitant to enter into contracts without assurances that the money will be reimbursed. Not only that, but we cannot cover the costs out of pocket, so we have been forced to significantly decrease activities under our impacted programs.

40.     Moreover, we are unable to pay our subgrantees most of which are small community-based organizations in South Carolina. Our subgrantees face an added disadvantage under the funding pause because they cannot survive long-term hiring pauses. As a result, the South Carolina community shoulders a significant burden, with the impacts continuing to filter through to our local partners, further straining their resources and ability to serve the community.

41.     Essentially, the Union Heights project demands investments in contracts, equipment, and community members. We do not have the resources to cover these operational expenses and will not ask our subgrantees to work without pay.  Consequently, we are over 45-days behind on the initial program plan.

42.     Because we are working under a very tight timeline, we are concerned that if we do not meet our grant deliverables, it will cause irreparable harm to the life of the project. For example, because of the funding freeze we cannot engage in work with the civil engineers who will conduct the construction site layout for Union Heights. We were able to begin work with a contractor on the architectural designs for Project 218, however, both the site layout and the conceptual designs are critical steps prior to beginning any construction project. We need access to funding to proceed with every aspect of the project.

43.      The funding freeze chaos is forcing our organization to make decisions on how to remain complaint with federal grant requirements with limited financial resources and no knowledge of the future. It is an impossible situation to be in.

**J.A. 0200**

44.    We have reached out to private philanthropy to assist with this difficult predicament, but our award from EPA is substantial and cannot be replaced with private funding.

45.    We are also worried that the pause will undermine the long-standing trust between the Sustainability Institute and the North Charleston community, which has been built over years of dedicated work and relationship-building. This trust is critical to the success of our programs, and any disruption due to the funding freeze erodes this trust and could have lasting consequences for our partnership with the community.

46.    Moreover, if we must redirect resources and staff towards litigation to fight the funding freeze, we have less time to dedicate to the critical activities that serve our community across all our program areas.

47.    In all, the emotional toll of the funding freeze has been substantial. Many of our staff are forced to resolve funding problems daily, as opposed to spending our limited resources bringing solutions to our communities. Not only that, but we have worked with federal agencies for years and we are also disheartened by the disruption to our relationships with vital EPA staff.

48.    The injury to Sustainability Institute and its interests would be redressed by an order from this Court to preliminarily and permanently enjoin the Defendants from implementing, applying, or enforcing any freeze or recission of funding to our Community Change Grant. Without such an order, we will continue to be unable to reliably access our awarded EPA grant funds and to be harmed.

49.    An order from the Court requiring Defendants to not unlawfully interfere with our binding grant agreement will redress Sustainability Institute's concerns and injuries.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

**J.A. 0201**

Executed this 24th day of March 2025.

Bryan Cordell

# SUSTAINABILITY INSTITUTE DECLARATION

# EXHIBIT 1-A

**Community Change Grants Track 1 - Project Narrative**

**Section A. Executive Summary**
- **Application Title:** Advancing Environmental and Climate Justice in Union Heights, a Historic Black Settlement Community in North Charleston, SC.
- **Lead Applicant:** Sustainability Institute
- **Statutory Partner to the Lead Applicant**: City of North Charleston
- **Contact Information:**

| Lead Applicant<br>Bryan Cordell, Executive Director<br>director@sustainabilityinstitutesc.org<br>(843)529-3421 | Statutory Partner<br>Adam MacConnell, City of North Charleston<br>amacconnell@northcharleston.org<br>(843)740.5821 |
|---|---|

- **Eligibility:** The Sustainability Institute is a tax-exempt 501(c)(3) organization.
- **Climate Action Strategy:** Energy-Efficient, Healthy, and Resilient Housing and Buildings; Workforce Development Programs for Occupations that Reduce Greenhouse Gas Emissions and Air Pollutants; Green Infrastructure and Nature-Based Solutions.
- **Pollution Reduction Strategy:** Indoor Air Quality and Community Health Improvements.
- **Grant Award Period and Completion:** Estimated beginning date: 01/01/2025. Estimated ending date: 12/31/2027.
- **Amount of EPA Funding Requested:** $11,396,020.00
- **Target Investment Area:** N/A.
- **Disadvantaged Community to benefit from the projects:** Union Heights is a geographically-defined community identified as disadvantaged on the EPA IRA Disadvantaged Communities Map.
- **Other Sources of Funding:** The mix of activities detailed in this application are designed to catalyze EPA's investment of funds available under this unique NOFO to complement community demonstration, engagement, and education activities to advance awareness, uptake, and impact of available federal, state, local, and utility rebates; loans; and grants to reduce energy poverty, showcase low-carbon building technologies, and support economic opportunity and community power-building, while reducing greenhouse gas emissions and improving health outcomes for families. Enactment of the IIJA and IRA resulted in a transformational infusion of funds for existing programs, e.g., the Weatherization Assistance Program (WAP), the Energy Efficiency and Conservation Block Grant (EECBG) Program, and the Low-Income Home Energy Assistance Program (LIHEAP). The IIJA and IRA also extend, increase, and modify existing rebate programs, and establish new rebates for low-income households in disadvantaged communities like Union Heights. South Carolina expects to administer $137 million committed by the IRA for consumer home energy rebate programs; however, the State continues to develop its programs prior to applying and rebates are not expected to be available in SC before 2025. By selecting this project, EPA would fund intensive activities tailored for exponential impact by maximizing consumer awareness of available and anticipated resources.
- **Resubmission Status:** This is the first submission of this request.

1
**J.A. 0204**

**Section B. Project Workplan**

**Part 1. Community-Driven Investments for Change**

**1.1  Community Vision Description**

**Community Description:** Union Heights is a "settlement community" founded by freed slaves who settled on an abandoned plantation after the Civil War. An EPA IRA Disadvantaged Community, Union Heights is located in the "Charleston Neck," local vernacular for a narrow area of once-undesirable, swampy land on a peninsula between the urban centers of Charleston and modern-day North Charleston, South Carolina, and bordered to the east and west by the tidal Cooper and Ashley Rivers, respectively.

To the east of Union Heights, along the Cooper River, is the South Carolina Port Authority's Leatherman Terminal, which serves container ships and will soon have capacity for 2.4 million cargo containers. Also, to the east is the Charleston Navy Yard, a former Naval Base deactivated in 1995 and currently undergoing redevelopment. Both sites are serviced by CSX and Norfolk Southern on major rail lines with tracks that run parallel to the Union Heights community.

To the west of Union Heights are a series of two US highways and Interstate 26, as well as a 198-acre tract of land in early stages of redevelopment called the "Magnolia Project," located in what was once a heavy-industrial zone that housed fertilizer factories, a lumber-treatment plant, and other businesses that left a legacy of contamination resulting in designation as a "Superfund" site[1]. These industrial sites along with Union Heights and other adjoining residential communities comprise an area known as the "Charleston Neck."

Located south of Union Heights is South Carolina's most populous city, Charleston, whose historic downtown is a major center for tourism. To the north is the Park Circle area of North Charleston, a bustling district that has undergone a renaissance, attracting local businesses and restaurants to the area.

The Charleston Naval Base opened in 1901, shortly before the official establishment of Union Heights in 1910. Spanning 1,575 acres, the Naval Base grew to become a significant military and economic hub, providing defense for the United States during World War I and World War II and employment for nearly 26,000 people. Union Heights developed alongside the growth of the Naval Base, nearby mills, and plants, with most lots purchased in the 1930s to early 1960s. During this time, Union Heights was a thriving and self-sufficient working-class neighborhood, belying the deep physical and economic harm to the community as a result of government-sponsored "urban renewal" projects of the 1960s. Later, Interstate 26 would slash through the area, removing two streets and many businesses through eminent domain. This was followed by construction of Exit 218 off Interstate 26, further bifurcating the Union Heights community, which was, at the time, a predominantly Black neighborhood that was about 70% owner-occupied.

Population decreased in the neighborhood by 48.2% between 1980 and 1990. Then, in 1996 the Naval Base shut down, eliminating 15,000 jobs and leaving behind an aging population and little

---

[1] EPA ID: SCD980310239, Koppers Co., Inc. (Charleston Plant)

economic activity. Today, fewer than half of people living in Union Heights own their homes. Rapid population and gentrification are displacing long-term residents and diluting the community's historic identity. Most existing homes are 60 to100 years old and in various stages of disrepair.

Union Heights has many notable community and cultural assets, including nearby schools; a community center that serves as a hub for recreation, afterschool programs, and civic engagement; many houses of worship; neighborhood-based businesses; Community-Based Organizations; and an engaged neighborhood association. Generations of residents and families who have lived in Union Heights are committed to its success and preservation.

During construction of the Leatherman Port Terminal which opened in 2021, Exit 218 off Interstate 26 was removed, leaving 2.77 acres of vacant land and homes to be transferred from the South Carolina Department of Transportation to the City of North Charleston as part of a community mitigation plan. Redevelopment of this land into affordable housing and green space – referred to in this application as "Project 218" - is viewed by residents as an opportunity to reknit and heal the community, address intertwined challenges including housing shortage and affordability, and present a path forward for future neighborhood resilience.

This application seeks to address and tie together a number of critical projects and activities in Union Heights, each of which have been prioritized by community residents and championed by community stakeholders, including:

1. Repairing, weatherizing, fortifying and upgrading the energy efficiency and resilience of fifty (50) existing homes to reduce greenhouse gas emissions that will result in improved health outcomes for families;
2. Project 218 – developing 2.77 acres of land formerly occupied by Exit 218 to pilot a new paradigm for energy efficient/zero-energy housing construction and affordable, resilient development by constructing 10 single-family "green" homes, with land to be transferred to and operated by a community-based land trust;
3. Constructing one "showcase" home that will be used for purposes of community demonstration, outreach, and education, and will showcase zero-energy, healthy, resilient and low-carbon technologies;
4. Expanding economic opportunity – particularly for the next generation of climate workers and leaders – by harnessing a long-standing and accredited AmeriCorps workforce training and service-learning program focused on climate-related jobs; and
5. Providing opportunities for community residents to become skillfully engaged and drive the shaping of the community's future through investments in leadership development and training.

Benefits provided by the grant will include, but not be limited to:

- increased energy efficiency in existing homes that will lead to reduced energy insecurity, financial burden, and greenhouse gas (GHG) emissions;
- reductions in health exposure to indoor air pollution and toxins in existing homes that will contribute to safer and healthier living environments;

- new homes constructed to zero-energy, healthy, and low-carbon standards that provide community members with access to affordable, sustainable and resilient housing;
- community reductions to climate risks;
- increased resilience from deployment of green infrastructure and nature-based solutions; and
- access to conservation jobs that reduce GHG emissions and other air pollutants.

**Community Challenges:**

Union Heights residents and businesses experience a number of climate-change and pollution-related challenges that cause significant impacts on people living in the community, particularly seniors and children who present acute vulnerabilities and susceptibilities.

### A.    Extreme Heat:

Climate vulnerabilities include exposure to extreme heat, flooding risks, and storm events. North Charleston is located in a hot, humid climate where outdoor temperatures in summer season are oppressive, averaging 91.3 degrees in July based on NOAA data for years 1991 through 2020. In addition, the number of extreme heat days is rapidly increasing. Currently, South Carolina averages 25 dangerous heat days per year; by 2050, the Palmetto State is projected to experience nearly 64 such days annually[2]. Extreme heat is of particular concern for residents with insufficient or no access to cooling and many homes in Union Heights do not have proper cooling. Some have no air conditioning; many others have no central HVAC and require the use of window units and/or room fans; and others have aging HVAC systems that have often exceeded life expectancy, are inefficient, and are in disrepair. Seniors facing inadequate cooling are especially vulnerable to heat.

For many households in the Project Area, the cost to heat and cool the home is one of their largest expenses, with some spending upwards of $300 to $500 per month on electricity and gas, resulting in a disproportionate prevalence of household energy insecurity. Many homes have little to no insulation and the vast majority suffer from significant building envelope leakage. Energy use intensity is high, and many families regularly face difficulty paying their utility bills, while others experience recurring power disconnections. Households with children and people living with health vulnerabilities such as disabilities and chronic medical conditions are most at-risk.

### B.    Indoor Air Quality Pollution:

Because the majority of homes in Union Heights were constructed decades before the start of building codes, exposure to indoor air pollution and toxins in homes is also a concern. Home repair agencies operating in the community cite "significant numbers" of homes where carbon monoxide leaks, lead-based paint, and mold issues have been detected. Lead-based paint exposure is of concern to families because even low levels of lead in children can lead to lower IQ, slowed or stunted growth, and hearing problems.

### C.    Flooding:

---

[2] Killer Heat in the United States, Climate Choices and the Future of Dangerously Hot Days (2019). In UCSUSA.org. Retrieved June 30, 2024, from https://www.ucsusa.org/sites/default/files/attach/2019/07/killer-heat-analysis-full-report.pdf

**J.A. 0207**

Because Union Heights is located in a coastal zone on low-lying wetlands sandwiched between two rivers, tidal flooding and storm event flooding is a severe vulnerability. In 2025, Charleston is expected to reach an inflection point and see 36 more days of significant tidal flooding in a year on average than the previous decade, nearly a threefold increase. Sea level rise increases vulnerability over time as it is now rising by about 1 inch every 2 years. Wetlands, which historically would have played an important function in absorbing flood waters in this area, have been mostly filled in over time. Many existing homes in the community are built on-grade and have little protection from rising waters. Flooding frequently causes local roads, including those around the neighborhood's assets, to become impassable. Finally, flooding causes pollutants from nearby industry to be carried across the community, increasing risks of exposure that impact community health.

**D.    Outdoor Air Pollution:**
With the heavy industrial heritage of the surrounding area, exposure to outdoor pollution is a legacy issue and present-day challenge. Nearby brownfields are linked to the industrial mining that took place along the Ashley River and nearby fertilizer and chemical plants. Rail cars carrying coal still pass alongside the community on a daily basis. The community is also exposed to emissions from automobile traffic on the adjacent Interstate and hundreds of heavy-duty trucks that pass back and forth daily to access the Leatherman Terminal.

**Community Vision:**
The community's vision is for this grant to jump-start a series of interconnected projects and activities that, taken together, will repair and heal the fabric of the community while providing resources to residents and Community-Based Organizations to create the lasting change and power-sharing that will support the community's objectives to become more resilient, healthy, equitable, and sustainable for generations to come. Feedback from significant community engagement conducted over more than five (5) years has informed strategy development, aided in gap identification, and punctuated data that has been collected through decades of combined programs and services performed by grant partners in the area. From its earliest roots, Union Heights has been a place that prides itself on its self-sufficiency, even in the face of an onslaught of challenges and barriers – many of them rooted in systemic racism. The goal of this application and its proposed activities is to build on the community's foundation of lived experiences with systemic marginalization to develop and determine a new story all on its own: that of a historic community that overcame the worst of what man or nature could throw at it, proudly standing the test of time by transforming itself into a replicable model of resilience and sustainability through community-based, community-driven solutions and power-building. This transformation, which began generations ago, begins anew with the projects outlined as follows.

**1.2    Selected Strategies Climate Action Strategies –**

Strategy 3: <u>Energy-Efficient, Healthy and Resilient Housing and Buildings</u>:

<u>Project #1: Fixing, weatherizing, upgrading and fortifying existing homes to increase energy efficiency, reduce greenhouse gas emissions, and produce better health outcomes for all residents</u>.

Overall, this project is designed to tackle energy insecurity in the community by immediately

5

**J.A. 0208**

reducing energy and water costs for 50 households by 30% or more, work that also reduces GHG emissions and decarbonizes the community, reduces the urban heat island effect, improves health and safety by reducing exposures to indoor air pollutants and toxins, and makes homes more resilient to climate risks. Activities touching up to 50 homes will include:

- Up to fifty (50) homes will receive deep and comprehensive weatherization retrofits
- Up to forty (40) homes will receive "pre-weatherization" repairs
- Up to forty (40) homes will receive HVAC and/or other upgrades which include repairing or replacing leaking HVAC ductwork, replacing hot water heaters, or replacing appliances
- Up to thirteen (13) homes will receive "fortification" upgrades
- Up to thirteen (13) homes will receive a solar PV system.

Weatherizing, repairing, and upgrading existing homes in the Union Heights community ranks as the top priority for community residents based on formal and anecdotal feedback and is widely viewed by residents and stakeholders alike as the community's most significant challenge.

Homes will be selected for repairs, retrofits, and upgrades based on data collected from the following sources:

(a) a professional survey designed by the Joseph P. Riley, Jr. Center for Livable Communities (Riley Center) at the College of Charleston and currently being administered in the community, by community members and AmeriCorps volunteers, that seeks to identify home repair and weatherization needs;

(b) community engagement workshops on "Energy Conservation + Healthy Homes" currently being performed in the community by CBO Collaborating Entities; and

(c) referrals from nonprofit home repair agencies operating in Union Heights.

A data analysis performed by the Riley Center utilized county tax records to determine there are approximately 308 owner-occupied, single-family homes in the Union Heights community. Planning Department staff at the City of North Charleston similarly performed an analysis using ACS 2020 Housing data that showed 308 total housing units, which included 93 owner-occupied, 117 rental-occupied, and 98 vacant housing units. We know that some unknown number of these 93 total owner-occupied homes need substantial repair that will likely exceed 80% of the value of the home. In discussions with partner CBOs and the community, we decided that 50 of the 98 owner-occupied homes would be a fair target number of homes that would likely qualify and be good candidates for energy efficiency upgrades and repairs. Based on our community outreach plans, processes for qualifying homes and households, and estimated construction timelines, our Project Team determined that it is possible to complete up to 50 construction projects on existing homes during the 3-year grant period.

Through our proposed program, building performance experts from The Sustainability Institute, the Lead Applicant and a North Charleston-based CBO, will conduct energy audits, in accordance with national industry protocols, and inspections of each home to determine repair, weatherization and energy-efficiency upgrade needs and potential. Thirty (30) energy audits/ inspections will occur in Year 1 of this grant and 20 in Year 2. Utilizing its years of experience

6

**J.A. 0209**

working in the community and well-established best practices, The Sustainability Institute will coordinate and manage repairs and upgrades and implement a robust process for quality assurance to ensure energy efficiency and health targets are achieved.

Energy audits will follow protocols set forth by Building Performance Institute (BPI) and will include pre- and post- performance testing including blower-door, duct blaster, infrared camera, and combustion appliance zone (CAZ) testing. All testing results and findings of the pre-existing homes, including photographic evidence, will be documented prior to work being completed in a comprehensive energy audit report using AriesPro cloud-based, energy auditing software platform. Energy consumption will be tracked in AriesPro with real-time utility data tracking, reporting, and analysis for a period of 3 years to identify energy consumption reductions, utility bill cost savings, and carbon footprint/ emission reductions.

Repairs will focus on critical health and safety repairs, called "pre-weatherization repairs," that pose immediate safety risks to the home occupants and/or that are obstructing weatherization activity from taking place (typically structural, plumbing, mechanical and/or electrical repairs). For example, a roof that is leaking water and causing mold/moisture damage to an attic, which not only poses long-term health risks to occupants, but also "blocks" energy efficiency investments in the attic such as insulation upgrades. Based on our history of working on homes in Union Heights, we expect 80% of homes touched will need these repairs.

All homes will receive weatherization improvements, which include air sealing building envelopes, insulating attics and crawlspaces, and installing programmable "smart" thermostats, LED lighting, attic tents, and water-saving devices. Work will be performed following Building Performance Institute standards and improvement measures will target high savings-to-cost ratios.

Eighty percent (80%) of homes will receive additional energy efficiency upgrades which may include repairing or replacing HVAC units, repairing or replacing ductwork, replacing hot water heaters, and/or replacing appliances. Upgrades will be deployed as part of a process to replace old, inefficient heating and cooling equipment and/or to electrify a home. Fixing and replacing aging HVAC units and HVAC ductwork will equip households to stay cool during dangerous heat waves with more efficient and less costly systems to operate.

Homeowners will be responsible for all maintenance and replacement of weatherization and energy efficiency installments. However, most installments will include a warranty and will have an average life expectancy of at least ten years. Homeowners will be educated on proper maintenance and care of installments.

Twenty-five percent (25%) of homes will receive solar PV systems to offset energy use. Systems installed will be up to 5kW, sufficient to meet the power requirements of a small household. A typical 5kW solar system can produce 25kW a day and up to 700kW a month, which is 65-75% of the monthly power consumption of a typical home (920kW). Installation of solar PV will produce further energy savings for households through a clean energy source.

Twenty-five percent (25%) of homes will receive upgrades classified as "fortifications" which could include high-performance windows, new "cool" roofs, sealed crawlspaces and other measures that provide superior energy efficiency gains but can also provide durability and

7

**J.A. 0210**

climate resilience to combat multiple hazards. Many of these products would have special ratings specific to our climate zone.

Homeowners receiving weatherization and repair services will attend "Energy Conservation + Healthy Homes workshops" where homeowners learn conservation techniques that can reduce energy and water consumption and receive hands-on instruction in using common conservation products. Workshops will be held in the evenings at the Gethsemani Community Center in the neighborhood. A number of strategies will be deployed to remove barriers to participation, including providing meals for participants and child care for those who need it.

The Sustainability Institute will partner with the Union Heights Community Association and other partner CBO's to advertise and recruit participation from the community in workshops. The schedule and flyers for workshops will be provided at community association meetings. Flyers will also be disseminated at the Gethsemani Community Center in the neighborhood, as well as through neighborhood churches. The logos of the Lead Applicant, Sustainability Institute, as well as the logo of the Statutory Partner, City of North Charleston, will appear on all meeting agendas and materials. The logos for the respective leaders of each workshop/meeting will also be on the agenda and materials. Distribution of the persons attending is estimated at: 85% public participants (local representatives including community members and representatives of the partner nonprofits and CBOs) and 15% state and local governments. We do not anticipate any program income being generated.

As part of the audit/inspection process, homes will be assessed for indoor air pollution and indoor toxins. Combustion appliance zone testing (CAZ) will be performed on every home to test for carbon monoxide leaks or high levels. Exhaust ventilation will be inspected and tested in kitchens and bathrooms to ensure proper techniques are in place for venting moist air and pollutants. Mold tests will be performed when mold is detected to inform remediation plans. And, homes will be tested for lead-based paint when certain risk factors are present. When needed, smoke and CO detectors will also be installed.

One existing home will also receive a "comprehensive home energy makeover" with leveraged funding support committed by the Wells Fargo Foundation. The goal of this aligned project is to demonstrate how energy-saving, cost-effective home improvements can reduce energy costs and enhance the value of a home. The home upgrades will promote the benefits of home energy efficiency through the eyes of a real, local family, as well as make a compelling case to home visitors and the media for the non-energy benefits that the improvements achieve in comfort, health, safety and more.

The total budget allocated to this strategy is $2,805,195, or roughly 25 percent of the total federal funding request. Decisions about the amount of this allocation compared to other projects were made collaboratively by CBO partners and community members and were based on an evaluation of community need and prioritization.

Project #2: "Project 218" - Piloting a new paradigm for energy efficient/zero-energy housing construction and affordable, resilient development.

This project will include completing pre-development infrastructure on 2.77 acres of land and constructing 10 new single-family housing units. Overall, this strategy is designed to provide the

8

**J.A. 0211**

community with access to much-needed affordable housing – particularly for seniors –and also to produce quality constructed homes that are low-carbon, energy-efficient/ Zero-Energy Ready, healthy, durable and climate resilient. In siting this project on the Exit 218 land that was used to divide and displace the community, the project will serve to reconnect the community and heal old wounds, enhance the historic fabric of the community, and provide a path forward for future preservation and sustainability of the neighborhood.

The City of North Charleston is in the process of transferring ownership of all 2.77 acres of land to the Community First Land Trust (CFLT). CFLT's mission is to develop and steward affordable housing solutions within environmental justice mitigation communities in North Charleston to prevent gentrification and promote community sustainability. CFLT uses a model of shared equity ownership to make homes more affordable to low-income buyers. Once the 10 homes are built, CFLT will sell each home to a low-income buyer while maintaining ownership of the land.

Currently, no pre-development infrastructure has been completed on the land and therefore must be completed as a critical first step in developing the lots. Pre-development infrastructure will include roads, water and sewer, as well as innovative green infrastructure projects. The implementation of green infrastructure will help to mitigate flooding concerns and create passive cooling strategies, concerns reported by the community as extreme. The various infrastructure components were assessed to evaluate the estimated length of time needed for permitting and construction and it was determined that is it feasible to perform the entire infrastructure scope of work within the grant's 3-year period. Further, we split the infrastructure work into two phases to complete the infrastructure needed for pre-development of 10 homesites during year one of the award so that home construction can start in year two of the grant award alongside the remaining infrastructure being installed that same year. The City of North Charleston's Public Works Department will oversee and manage the implementation of all public infrastructure.

Ten (10) new single-family homes will be constructed on the Exit 218 parcel. Homes will be ENERGY STAR, Indoor airPLUS and DOE Zero-Energy Ready certified and will use innovative, low-carbon and healthy building materials in construction. ENERGY STAR homes are at least 10% more energy efficient than homes built to minimum code standards resulting in lower utility bills and reduced energy consumption. A Zero-Energy Ready home is designed to be so energy efficient that a renewable energy system could offset most or all of the home's energy use. Hempcrete, a natural biocomposite material, will be used to construct non-weight bearing insulating infill walls. It has a high vapor permeability that allows for better control of temperature in indoor environments and is considered a carbon-storing material. All homes will have solar PV installed with battery backup, providing a source of clean energy and offsetting nearly 100% of energy consumption. Homes will be designed by Root Down Building Collective (RDBC), a nonprofit, collaborating entity that specializes in architectural design, engineering and workforce training to advance bio-regional, regenerative, carbon-negative, and healthy building systems. RDBC has already produced conceptual designs and floorplans for these homes that have been reviewed by the community. RDBC is also well-versed in designing and utilizing the proposed construction methods.

Funded through this grant, the first 10 homes will be constructed in years 2 and 3 of the grant and will be ready to be occupied by the end of the grant period. Homes will be sold by CFLT as

affordable housing at 80 – 100% AMI. Sales prices will be subsidized and based upon a number of factors including AMI category, household size, current interest rates and the actual development cost per unit. CFLT will retain ownership of the land. The homeowner will be required to sign a restricted deed upon purchase/closing that ensures that the property remains affordable. The land trust may also have the first right of denial to buy the property back. In the deed, upon resell, the next buyer MUST also qualify under the same HUD affordable housing model that was utilized in the first purchase of the home. CFLT will use the proceeds from the sales to help fund construction of the remaining 20 homesites, keeping the same "green" performance and certification requirements. Construction of the first 10 homes will result in a scalable model for construction delivery, paving the way for construction of the subsequent 20 homes of Project 218 to be completed post- grant. CFLT will advise and manage the affordability criteria and process for ensuring affordability during initial sale and all subsequent sales throughout the life of the project. CFLT will also solicit prospective buyers in a way that ensures that the purchasing process is open to all that qualify and that homes are not sold to a specific cluster of the community, including soliciting buyers through community engagement sessions hosted in different areas of the community.

A Revolving Fund for Affordable Housing will be established as the mechanism through which the proceeds from the sale of homes will be held as restricted and reinvested back into construction of future housing on the Project 218 property. The Coastal Community Foundation of South Carolina has committed to establish, manage and advise the Revolving Fund. The Coastal Community Foundation of SC works to create communities rich in equity, opportunity, and well-being by uniting people and investing resources so that all community members have a pathway to achieve their goals. They have been a partner to the Union Heights community and leading voice in the preliminary planning of Project 218 up to this point, and regularly establish and manage funds on behalf of their donors and partners. The Revolving Fund will present an opportunity for the Coastal Community Foundation to maintain a strong role in the Project and help see the Project through from completion of the first 10 homes to the full buildout of the Project 218 property. The Revolving Fund will also be a mechanism through which other donors can invest and restrict their contributions to support the project in the post-grant period.

Long-term cost savings for future homeowners will be realized through the focus on high-performing, energy efficient homes. Constructing new homes to be energy efficient, Zero-Energy Ready, and low-carbon will reduce energy burden for families, increase energy security and resilience, produce GHG reductions, and help decarbonize the community. Zero-Energy Ready certification will enable homes to mostly or fully offset energy costs. Using healthy building materials in the construction such as no-VOC paints and finishes and hempcrete, keeping homes all-electric, and using proper techniques for moisture control and ventilation will ensure that newly constructed homes are healthy and safe, low-carbon, and will also contribute to positive health outcomes for the community. By implementing climate-smart, higher-performing and healthy building materials, our affordable housing projects will showcase a shift to promoting both environmental and human health in a community that has been subjected to environmental injustices and sick housing for far too long.

The total budget being allocated to this strategy is $6,771,170, which is roughly 59 percent of the total budget. This includes the cost for infrastructure of $2,246,300, which was evaluated and estimated by F.A. Johnson Development Group in consultation with engineering companies for

**J.A. 0213**

their Report, and then re-reviewed by independent engineering experts for this grant. The hard costs for construction of the 10 homes total $3,244,500, which includes a 5% contingency. Five of those will be 1,150 square feet single family housing units with 3 bedrooms and 2 bathrooms. The total cost for each of the single-family units will be $386,500, of which $10,000 will cover site preparation, landscaping, and parking and $20,000 will cover solar PV systems up to 5kW. The other five homes will be 650 square feet senior housing units with 1 bedroom and 1 bathroom, constructed in compliance with the Americans with Disabilities Act (ADA). The total cost for each of the senior housing units will be $231,500, of which $10,000 will cover site preparation, landscaping, and parking and $20,000 will cover solar PV systems up to 5kW. The developer costs for all homes have been budgeted at $310 per square foot.

Decisions about the amount of this allocation compared to other projects were made by CBO partners in consultation with community members. Additionally, our Project Team determined that it is critically important to the future viability of the site that all pre-development infrastructure be installed as part of this grant, as partners recognize that the completion of the infrastructure will make future completion of homesites infinitely easier to fund, and will ultimately result in affordable housing by offsetting the cost of the site development expenses.

Project #3: Construction of a "showcase home" for outreach, demonstration and programming.

One additional home will be constructed on one nearby vacant lot in the community that is currently owned by CFLT and ready for home construction. This will enable the project to produce a demonstration pilot home in Year 1 of the grant that will showcase the building methods and technologies that will be used in future construction. This "showcase home" will be 1,250 square feet and will be open for outreach, demonstration and programming for all 3 years of the grant period and will then be sold by CFLT as affordable housing to support future construction in the community. It will also be utilized as headquarters and office space for 3 CFLT staff members as well as SI AmeriCorps members to carry out project activities during the grant period. The interior and exterior of the home will feature active demonstrations of the materials and technologies being promoted. Building performance metrics will be assessed and tracked through the 3-year span.

The cost of designing, constructing and maintaining the showcase house is $637,311, which is roughly 5.6 percent of the total budget. The hard costs for construction of the showcase home total $487,725, which includes $310 per square foot for developer costs, $15,000 for site preparation, landscaping, and parking; $7,000 for water and sewer tap fees; $20,000 for solar panels, and $35,000 for Ereasy Hempspray installation. It also includes a 5% construction contingency. Decisions about the amount of this allocation compared to other projects were made by CBO partners in consultation with community members.

The total cost Strategy 3: Energy-Efficient, Healthy and Resilient Housing and Buildings is $10,213,676, which is roughly 89.6 percent of the total budget.

Strategy 1: Green Infrastructure and Nature-Based Solutions:

Union Heights and the Project 218 site face a number of complex climate challenges and risks including extreme heat, urban heat island effects, and flooding. Providing nature-based solutions as a part of the landscape plan for Project 218 as opposed to traditional infrastructure will help to

11

**J.A. 0214**

restore natural systems, capture and reduce stormwater runoff and associated pollution, improve water quality, provide shade, and produce co-benefits including reducing GHG emissions. Green infrastructure and NBS that will be deployed as part of this project will include, but not be limited to, installing pervious paving; planting native plants; planting shade trees; installing rain collection devices; and constructing rain gardens. These strategies, taken together, will reduce climate risks and improve overall resilience of the Project 218 site and community.

There are a number of environmental outputs and outcomes that will be tracked and measured as a part of this strategy which are referenced in the Performance Measurement Plan. Outputs include: # of sf of new rain gardens; # of sf of new shade canopy; # of native plants installed; # of sf of new sidewalks installed with permeable paving; # sf of impervious pavement reduced; and # rain barrels installed for residential rainwater collection. Outcomes include: increased green space as measured by sf of added greenspace and increased resilience to extreme weather and climate conditions as measured by reductions in tidal flooding and flash flooding events, improved groundwater recharge, and cooler ambient temperatures during heat waves.

The total cost Strategy 1: Green Infrastructure and Nature-Based Solutions is $300,331, which is roughly 2.6 percent of the total budget.

Strategy 8: <u>Workforce Development Programs for Occupations that Reduce Greenhouse Gas Emissions and Air Pollutants</u>:

<u>Project #4: Expanding economic opportunity through an accredited workforce training and service-learning program focused on climate related jobs.</u>

The Sustainability Institute (SI) operates an AmeriCorps Conservation Corps program called the Environmental Conservation Corps that is an implementation partner of the American Climate Corps. The program has been operational for 15 years and is nationally-recognized and awarded.

The workforce training and service-learning program provides individuals with pathways to well-paying careers in conservation (including environmental justice) through a well-tested, high-quality and fully-accredited program that performs evidence-based conservation projects and activities. The goal of SI's program is to "create the next generation of conservation leaders while performing critically needed conservation work that promotes coastal resilience and protects the places most vulnerable to a rapidly changing climate."

Corps members serve 3, 6, 9 and 12-month terms, receive specialized training and certifications in conservation skills, are paid a living stipend, and receive a Segal education award upon graduating.

Twelve (12) Corps members serving 9-month terms in years 2 and 3 of the grant will be recruited directly from Union Heights and surrounding communities to perform conservation projects in Union Heights that focus on reducing greenhouse gas emissions and other pollutants, implementing green infrastructure, and supporting community capacity-building activities. They will be joining as part of the new American Climate Corps. At least 80% of those recruited will be joining as part of our program's long-standing "Opportunity Youth Service Initiative," which is designed to provide conservation service experience to young people aged 18-24 experiencing

12

**J.A. 0215**

barriers (e.g. poverty, unemployment, past court involvement, physical or learning disability). Non-US citizens are not allowed to participate in our program and do not receive stipends under our program. US citizenship is checked and verified as part of our participant eligibility certification process.

Conservation activities will include, but not be limited to: Organizing outreach activities; administering surveys to households that will collect data on home repair and weatherization needs as well as energy burden (through a partnership with the Riley Center); participating in energy audits and installation of energy-saving technologies in existing homes; coordinating and teaching Energy Conservation + Healthy Homes workshops in the community; tracking energy savings in homes post weatherization activities as well as other environmental outcomes; conducting tours and presentations of the "showcase home;" participating in the installation of hempcrete, solar and other sustainable materials as part of the new home construction projects; and designing and building rain gardens that will be integrated into the landscape plan for the Exit 218 project. Eighty percent (80%) of their service term, or 960 hours, will be spent engaging in these direct service opportunities. These activities will be supported and supplemented as needed by additional Corps members that are serving in SI's Environmental Conservation Corps program.

Corps members will receive industry-recognized training, certificates and certifications in three areas: weatherization, healthy materials, and green infrastructure-nature-based solutions. These will include, but not be limited to:

- Weatherization training: Building Performance Institute (BPI) – Building Science Principles certificate and Healthy Housing Principles certificate.

- Healthy Materials training: EPA Lead Renovator: Renovations, Repairs or Painting (RRP) certification.

- Green Infrastructure – Nature-based Solutions training: Clemson University Cooperative Extension Master Rain Gardener certification and Adopt-A-Stream certified volunteer training.

The other 20% of Corps members' service terms, or 240 hours, will be devoted to indirect service activities such as durable skills training, that includes training in financial literacy, resume writing, interviewing, engaging with mentors and in other professional development activities that will equip them to thrive in their professional careers.

We will track all workforce data. We currently track and report the number of hours of that AmeriCorps members engage in "direct service" and "indirect service" activities, the number and type of trainings, certificates and certifications participated in and earned by AmeriCorps members, and whether or not trainees were placed in and retained (and for how long) in jobs following their graduation from the program and end of term of service. These metrics are tracked through eGrants, an online system used by national AmeriCorps designed to automate the grants, project management, and reporting process for AmeriCorps programs.

Members will be paid a living stipend of $14,400 ($12/hour) for Crew Members or $16,200

**J.A. 0216**

($13.50/hour) for Crew Leaders during their 9- month term of service and will receive a Segal Education Award upon graduating that totals $5,176.50, which can be used to pay educational expenses at institutions of higher education and training programs, or to repay qualified student loans.

Member activities will be coordinated, supervised and managed by a full-time Project Coordinator, who will be employed by The Sustainability Institute, recruited directly from the community, and will work out of the showcase home located in the community for the 3-year grant period. The showcase house will also serve as the headquarters and office for the Corps members.

The total budget being allocated to this project is $590,108, which is roughly 5.2 percent of the total budget. Decisions about the amount of this allocation compared to other projects were made by CBO partners in consultation with community members.

Other Project Activities: <u>Providing opportunities and resources for residents to become skillfully engaged and drive the shaping of the community's future through power-building investments in leadership development and training.</u>

The Union Heights community has identified a pressing need for training community leaders, and believes that specialized training in board development, leadership, environmental justice and advocacy will result in community leaders being better organized, positioned and having more skills to effectively participate in project activities and future resilience planning. The Riley Center will work with the community groups to design, coordinate and deliver these trainings in years 1 and 2 of the grant.

The project will also supply these communities with intensive technical support services intended to support meaningful community engagement, coalition- and capacity-building activities such as organizational development and strategic planning, grants strategy, and other technical services relating to the pursuit of federal, state, and philanthropic funding opportunities and leveraging private investment, where applicable, in support of community objectives. This will occur in years 2 and 3 of the grant.

Additionally, three individuals from the local community will be trained at the subcontractor level in hempcrete installation and finishing in Year 1 of the grant. These workers will provide the hempcrete install and the wall finishing for the 10 homes of Project 218 and will be prepared to perform the hempcrete work on the Project's next 20 homes. This is a high-demand skill as hempcrete installation is a specialized field and local contractors are currently recruiting subs from other states to perform this work. Training will be provided by Root Down Building Collective and Americhanvre Learning, a leading training provider for hempcrete cast systems.

The total budget being allocated to this project is $291,905, which is roughly 2.6 percent of the total budget. Decisions about the amount of this allocation compared to other projects were made by CBO partners in consultation with community members.

The total cost Strategy 8: Workforce Development Programs for Occupations that Reduce Greenhouse Gas Emissions and Air Pollutants is $882,013, which is roughly 7.7 percent of the

**J.A. 0217**

total budget.

**Pollution Reduction Strategies:**

Strategy 1: <u>Indoor Air Quality and Community Health Improvements</u>:

Households in the Union Heights community face high levels of indoor air pollution due to the age, condition, and leakiness of homes. Many homes were constructed prior to current codes and lack proper ventilation. Pre-weatherization repairs and weatherization of single-family homes will include activities designed to reduce sources and levels of indoor air pollution and improve community health outcomes. As part of the audit/inspection process, combustion appliance zone (CAZ) testing will be completed, homes will be inspected for proper ventilation, and when applicable, homes will be tested for mold and lead-based paint. A number of improvement strategies will be deployed as part of the retrofit process, including: fixing or removing leaky combustion equipment; improving ventilation (such as ducting kitchen and bath fans to the outside); remediating mold and lead-based paint; and installing smoke and carbon monoxide detectors. The improvements will be tracked and quantified. Reductions in CO levels will be measured and recorded.

As part of the Energy Conservation + Healthy Homes workshops, households will receive public education and resources on indoor air toxins/ toxins that can be detrimental to human health. Specifically, households will learn about mold, lead paint, radon, asbestos, fossil fuel combustion, and pollution from outdoors that infiltrates inside homes. This education will equip households to recognize, understand and monitor potential sources of indoor pollution that can be harmful to health.

Our new construction projects will prioritize healthy building materials and finishes that are "red list free," meaning they do not contain carcinogens or any harmful VOCs known to cause adverse health effects. Red list chemicals are commonly found in cheap building materials often specified for low-income projects, such as vinyl and PVC-based interior finishes, and are high carbon emitters, sources of environmental pollution, and lead to poor indoor air quality in homes. The affordable housing units proposed under this grant will be "red list free" and will therefore enhance positive indoor air quality for the Union Heights community.

**Part 2. Program Management, Capability and Capacity**

**2.1  Performance Management Plan, Outputs / Outcomes:**

| PROJECT/ ACTIVITY | OUTPUTS | OUTCOMES | PERFORMANCE TRACKING |
|---|---|---|---|
| Strategy/ Goal: Green Infrastructure and Nature-based Solutions | | | |

15

**J.A. 0218**

| | | | |
|---|---|---|---|
| *"Project 218": Piloting a new paradigm for energy efficient housing construction and affordable, resilient development.*<br><br>Installation of pre-development infrastructure including green infrastructure and nature-based solutions | # Acres of predevelopment infrastructure installed<br><br># sf and acres of New community green space<br><br># sf of New rain gardens<br><br># sf of New shade tree canopy<br><br># Native plants installed<br><br># sf of New sidewalks installed with permeable paving<br># impervious pavement reduced<br><br># Rain barrels installed for residential rainwater collection | Increased green space as measured by square footage of added greenspace<br><br>Increased resilience to extreme weather and climate conditions as measured by reductions in tidal flooding and flash flooding events, improved groundwater recharge, and cooler ambient temperatures during heat waves | Outputs related to sf or # of green infrastructure installed will be tracked and measured during installation<br><br>Improved groundwater recharge and reductions in flooding and stormwater runoff will be measured through a stormwater analysis pre- and post-installation of infrastructure<br><br>Cooler ambient temperatures will be measured through temperature tests/ sensors |
| **Strategy/ Goal: Energy-efficient, Healthy, Resilient Housing and Buildings** | | | |
| *Fixing, weatherizing, upgrading and fortifying existing homes to increase energy efficiency and produce better health outcomes for families.*<br><br>Energy audits/ inspections<br><br>"Pre-weatherization" repairs<br><br>Weatherization activities<br><br>Energy efficiency upgrades<br><br>Renewable energy installation<br><br>Fortification upgrade.<br><br>Energy Conservation + Healthy Home workshops for households | # Community survey of households<br><br># Home energy audits performed<br><br># Air sealings completed<br><br># Homes insulated<br><br># Programmable, smart thermostats installed<br><br># HVAC upgrades/ replacements<br><br># Electrification/ replacements of natural gas appliances<br><br># Installations of PV solar systems totaling 65kW renewable generation capacity installed<br><br># Fortification upgrades<br><br># workshops on Energy Conservation + Healthy Home and # participants | Lowered electricity consumption<br><br>Lowered consumption of home heating fuels and reductions in associated climate pollutants<br><br>Lowered indoor emissions of Hazardous Air Pollutants<br><br>Increased number of homes connected to PV solar<br><br>Increased community awareness of energy conservation<br><br>Increased community awareness of indoor air quality pollutants and sources<br><br>Increased access to energy sources with low air pollution and carbon emissions | Household surveys and analyzed with survey assessment report<br><br>Audit reports with air sealing, insulation and other EE and health improvements quantified<br><br>Reductions in energy consumption measured and tracked for 3 years<br><br>Reduction in carbon emissions measured and tracked for 3 years<br><br>Surveys of all workshop participants to measure increases in awareness/ knowledge<br><br>Surveys of households receiving services to assess improvements in health and safety |
| *"Project 218": Piloting a new paradigm for energy efficient housing construction and affordable, resilient development.*<br><br>Construction of new energy efficient, ENERGY STAR and DOE Zero-energy Ready homes<br><br>Construction of a "showcase" house<br><br>Installation of renewable energy systems | # design charrettes held<br><br># Project Advisory Council meetings held<br><br># neighborhood association meetings attended<br><br># new DOE Zero-energy ready & EnergyStar certified homes constructed<br><br># showcase house for outreach, education and workforce development purposes constructed<br><br># renewable generation capacity installed | Increased involvement of individuals and more community input from disadvantaged communities in planning and decision-making processes<br><br>Increased access to affordable, energy-efficient homes<br><br>Increased # of homes connected to a resilient power source<br><br>Increased access to clean energy sources with low air pollution and carbon emissions | Tracking of # individuals attending charrettes and meetings<br><br>Tracking of # households occupying new homes & # homes connected to resilient power source<br><br>Surveys of households occupying new homes to collect data on & measure reductions in energy burden |

16

**J.A. 0219**

| Strategy/ Goal: Workforce Development Program for Occupations that Reduce Greenhouse Gas Emission and Air Pollution | | | |
|---|---|---|---|
| *Expanding economic opportunity through an accredited workforce training and service-learning program focused on reducing GHG emissions and air pollution.*<br><br>Recruitment, training and job placement of AmeriCorps service members | # Individuals who receive wages/ stipends and supportive services delivered to enable community members' participation in workforce training programs<br><br># Trainings provided<br><br># Certifications and certificates earned<br><br># Member service hours completed (both direct and indirect)<br><br># Graduating from training program<br><br># Individuals hired and retained into high-quality jobs to reduce air pollution and GHG emissions | Increased wages, benefits, job quality, and job security for participants in workforce training program<br><br>Increased literacy among participants about environmental sectors and skills required to pursue these jobs<br><br>Increased knowledge and skills on weatherization, home repair, energy efficiency and home health and safety practices, techniques, risks, and opportunities | Documentation of service hours completed, trainings participated in, certifications and certificates earned, and status of graduation occurs through an eGrants platform provided through AmeriCorps, and is all data reported to AmeriCorps on midterm and final reports<br><br>Documentation of individuals hired and retained into jobs gets tracked through member check-in process that occurs at 1, 3 , 6 and 12 - month intervals and is reported through a Corps Member Database |

## 2.2   Project Linkages to the EPA Strategic Plan:

Our project activities support and advance EPA Strategic Plan Goal 2 (Take Decisive Action to Advance Environmental Justice and Civil Rights) and EPA Objective 2.1, (Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels) in the following ways:

- Reducing high energy burden of low-income and Black households through weatherization, home repair and upgrade work. These activities are designed to lower the costs for these households to heat, cool and operate their homes, as well as produce health benefits. Low-income households devote up to three times as much income to energy costs as do other, higher-income households. The median energy burden of Black households is 43% higher than that of white (non- Hispanic) households. High energy burdens are also correlated with greater risk for respiratory diseases, increased stress and economic hardship, and difficulty in moving out of poverty.

- Tackling and solving indoor air pollution in residential homes, a long-standing public health problem in the Union Heights community. Activities will identify and solve sources of indoor air quality pollution and reduce exposure for households, as well as increase public awareness and increase environmental health literacy.

- Providing a way to reknit and heal a community that was previously fragmented and separated through racist transportation policies, by reconnecting land and using it to develop affordable housing.

- Providing workforce development for occupations that reduce greenhouse gas emissions

17

**J.A. 0220**

- and air pollutants for individuals that are economically disadvantaged, resulting in increased skills, wages, benefits, job quality and job security.

- Providing green infrastructure and nature-based solutions that reduce climate risks. Low-income households and BIPOC communities are disparately affected by the impacts of climate change.

Our project supports and advances the following EPA Strategic Plan Goals:

Goal 1 - Tackle the Climate Crisis: by reducing emissions from energy use in homes that cause climate change through weatherization and energy efficiency upgrades; by accelerating resilience and adaptation to climate change impacts through upgrades to existing homes, new construction of zero-energy ready homes, and through green infrastructure and nature-based solutions that will be deployed as part of the infrastructure investments for Project 218.

Goal 4 - Ensure Clean and Healthy Air for All Communities: by reducing exposures to indoor air quality pollutants in existing homes and by ensuring newly constructed homes are "red list free" and meet stringent goals and requirements for healthy indoor air.

Goal 6 - Safeguard and Revitalize Communities: by restoring the Project 218 land for productive uses and healthy communities.

Goal 7 - Ensure Safety of Chemicals for People and the Environment: by requiring that newly constructed homes do not use red list chemicals in materials and construction.

## 2.3   CBO Experience and Commitment:

The Sustainability Institute ("SI") is a 501(c)(3) organization based in North Charleston, South Carolina with a mission of advancing resilient, sustainable and equitable communities while building the next generation of conservation leaders. Our diverse portfolio of work spanning more than two decades has included climate action planning for government agencies, a broad range of job/workforce training programs, a city-wide energy efficiency program, a home weatherization and repair program, a commercial green building certification program, and an AmeriCorps service-learning program focusing on environmental conservation.

We have an intense focus on conducting community outreach and empowering vulnerable and marginalized families and communities. This work has developed our reputation as the go-to resource in our region for expertise on sustainability and technical training in conservation, a trusted partner to neighborhoods undergoing change, and a place where at-risk and disadvantaged people find a voice and opportunity through service-learning and a supportive environment.

We have operated our AmeriCorps program for 13 years in affiliation with the national Corps Network and provided service-learning for more than 200 AmeriCorps members. We are a fully Accredited Corps, having achieved accreditation in 2022 from the Corps Center of Excellence. We have operated our weatherization program for more than 13 years, performing retrofits on more than 500 homes for low-income families in our community and operating weatherization

18

**J.A. 0221**

pilot programs for the Department of Energy's Better Buildings Neighborhood Program (through the Southeast Energy Efficiency Alliance), for utilities such as South Carolina Electric & Gas, for local governments such as Charleston County, and for philanthropic foundations such as the Home Depot Foundation.

Our organization has had deep engagement with the Union Heights community and surrounding communities for more than 18 years and maintains a trusted partnership with the Community Council, community leaders, and residents. Over the years we have performed intensive community outreach, completed 11 comprehensive weatherization/home repair projects in the neighborhood, installed green infrastructure projects, and provided hundreds of community members with educational workshops routinely through the Gethsemani Community Center and neighborhood churches.

### 2.4  Programmatic and Managerial Capability and Resources:

The Sustainability Institute is well-positioned to successfully carry out the project and complete, oversee and manage the award. SI is a nonprofit 501(c)(3) organization as defined by 2 CFR 200.1 and is eligible to serve as the Lead Applicant and enter into a Statutory Partnership with the City of North Charleston, a local government as described in NOFO Section III.A. The roles and responsibilities of the organization outlined in the application have been successfully carried out by the organization in other federal awards or grant-funded projects. SI has partnered with all of the collaborating CBOs and entities of this project before, has a long history of working in underserved communities in the region including in Union Heights, and has a reputation for being well-trusted in the communities served. It also has deep experience serving in the role as a backbone organization and organizing cross-sector groups of partners for collective impact initiatives around energy efficiency and workforce development. In this role, SI often works to guide vision and strategy; support aligned activities; establish shared measurement practices; build public interest and will; and mobilize funding.

The City of North Charleston was incorporated June 12, 1972; is a unit of government within the State of South Carolina as defined by 2 CFR 200.1; and is eligible to enter into a Statutory Partnership with a CBO as described in NOFO Section III.A. North Charleston has a long history of supporting community sustainability and revitalization efforts. The City's achievements have been recognized through the National League of Cities Award for Municipal Excellence for Sustainable Revitalization and the Home Depot Foundation's Award of Excellence for Sustainable Community Development.

SI has specific organizational experience and capacity related to performing the proposed projects in this grant. SI has more than 13 years of experience performing weatherization and energy efficiency upgrade work and has weatherized more than 500 low-income housing units through various programs it has managed as part of the Department of Energy's Better Building Program, utilities, county government and foundations. SI is the only nonprofit operating outside of the state-funded community action agencies in South Carolina performing volume weatherization work, and outpaces most of those regional agencies in annual quotas. SI will weatherize and repair approximately 75 – 100 homes in the 2024 year across 4 counties of the state. All work, quality control, and training are performed to Building Performance Institute (BPI) standard work specifications. SI also advises both the South Carolina Energy Office and

South Carolina Office of Resilience on weatherization and building performance as a technical consultant.

Many of the activities that will be performed by SI for this grant will be performed as a part of its AmeriCorps program, which is a Federally funded and accredited conservation Corps program that the organization has successfully managed for 13 years. Over that period, more than 200 AmeriCorps members have served in the program and the program has produced two national AmeriCorps Member of the Year awardees (out of more than 30,000 members serving nationally), and one State Commission Member of the Year.

As the Lead Applicant, The Sustainability Institute has a long history of successfully managing Federal awards and is experienced in adhering to compliance with applicable reporting requirements. SI's Executive Director has managed more than $10 million in grant programs, including more than $5 million in Federal awards, has been employed with the organization for 18 years, and is well-versed in program and financial compliance. SI's Director of Finance is a certified public accountant and has more than 13 years of experience in managing nonprofit finances and overseeing financial compliance and reporting. SI's Director of Conservation, who will oversee AmeriCorps program activities, has worked for the organization for more than 2 years and serves as the Program Director for the organization's Federally funded AmeriCorps program. SI's AmeriCorps program is one of a select group of Corps programs operating nationally that is a part of the Corps Network's Corps Center of Excellence Accreditation program. Accredited Corps undergo a rigorous in-depth review of general operations, youth programming operations, governance standards, financial management practices, and risk management guidelines. SI's Program Director for Weatherization and Construction, who will oversee home weatherization and repair activities in existing homes, has more than 6 years of experience in the industry, is a certified Home Energy Rater and Building Performance Institute Building Analyst, and has overseen more than 75 weatherization and home repair projects for SI in the past 12 months.

A projected milestone schedule for the proposed projects (up to three years) has been included in ATTACHMENT G- READINESS APPROACH. Included is a breakout of the project activities into phases with associated tasks and timeframes for completion of tasks, procedures, and controls for ensuring that the award funds will be expended in a timely and efficient manner while ensuring that costs are eligible, reasonable, and allowable.

The Sustainability Institute is financially stable and has a history of managing finances well. In 2023, SI had $710,941 in net operating income and ended the year with $938,922 in net assets. SI is in the process of completing an independent audit of the 2023 year, but the last external financial review performed in 2022 produced no material modifications. The organization has strong governance practice, policies and procedures in place, which are reviewed and updated annually. Additionally, the organization has been fully accredited by the Corps Network, which requires an in-depth review of its general operations, youth programming operations, governance standards, financial management practices, and risk management guidelines. Its AmeriCorps program utilizes a robust Operations Manual and Member Handbook which are reviewed by AmeriCorps and provide policies and procedures for program management, oversight, and risk reduction. SI regularly performs formal reporting on program outcomes and program and organizational finances to funders, including federal, state and local governments as well as

foundation funders.

Staff is required to receive certificate training in performing National Service Criminal History Checks, Key Concepts of Financial Grants Management, and Fraud Awareness. SI has formal controls and governance policies in place including, but not limited to, Code of Ethics; Whistleblower Protection; Conflict of Interest; Fraternization; Prohibited Activities; Financial Controls; Capitalization; Gift Acceptance; Records Retention and Document Destruction; Cybersecurity; and more.

**2.5 Past Performance**:

1. Corps Network, PY 2022-2023. Project Period October 1, 2022 - September 30, 2023. Source of funds: Federal through AmeriCorps. Award Amount: $111,137.

The Sustainability Institute was able to successfully complete and manage the agreement. The grant required the submission of a mid-term and final report which documented progress towards achieving expected results, including progress meeting certain required program performance measures. SI met its obligations under this grant and both reports were submitted on-time with no post-submittal modifications required. This grant award also required a 20% match which SI successfully provided. Successful operation of this program and management of this grant was a factor in being awarded a new grant for an increased amount for PY 2023-2024.

2. Charleston County Community Services, 2022 Treasury Department American Rescue Plan Act. Project Period July 1, 2022 – December 31, 2023. Source of funds: Federal through the U.S. Treasury Department. Award Amount: $250,000.

The Sustainability Institute was able to successfully complete and manage the grant agreement. The grant award supported weatherization and home repair activities, including 40 energy audits and 20 weatherization and repair projects. The grant required reporting through a monthly reporting and cost reimbursement submission. All reports and cost reimbursement requests were submitted on time and were granted. All funds were fully spent and all work was completed successfully and on time. Successful operation of this program and management of this grant was a factor in being awarded a new grant in an increased amount for the 2024 year.

3. Sol Systems/ Google, "Closing the Pre-Weatherization Gap Initiative." Project period January 12, 2023 – December 31, 2023. Source of Funds: Corporate/ philanthropic. Award Amount: $200,000.

The Sustainability Institute was able to successfully complete and manage the grant agreement. The grant award supported "pre-weatherization" home repair activities, including executing 30 "pre-weatherization" repair projects. The grant required reporting through a quarterly reporting submission process that included SI providing an overview of the supported measures, project results, and learning outcomes. SI was also required to participate in monthly check-in calls, as well as in an in-person site visit. All reports were submitted on time, all funds were fully spent and all work was completed successfully and on time. Successful operation of this program and management of this grant was a factor in being awarded a new grant in the same amount for the 2024 year.

21

**J.A. 0224**

### 3.2 Feasibility:

All projects in this application – individually and collectively –can successfully and effectively be performed within the 3-year grant period of performance as demonstrated in the Readiness Approach. A preliminary project feasibility study has been completed and pre-planning activities are already in progress. The weatherization, repair and energy efficiency projects are very similar in scope to services historically and currently performed by The Sustainability Institute. The feasibility of the infrastructure and housing construction projects have been well-studied, site control is already in place by a Statutory Partner (City of North Charleston), and the City of North Charleston is prepared to execute permitting and project activities as specified. Preliminary design work for both the site and the homes has already begun. The workforce training activities are an extension of a program already in place. The community leadership development activities are very similar in scope to services historically and currently being provided by the Riley Center in other underserved communities.

### 3.3 Sustainability:

After the 3-year project execution period, we can assure that the projects contained in this application can be sustained. The only activities of this grant that will require future operation and maintenance activities beyond the grant term are contained within Project 218 and include the maintenance of the public infrastructure (streets and sidewalks), which is a responsibility and obligation of the City of North Charleston, maintenance of the private infrastructure (common areas to be maintained and operated by Community First Land Trust), and the temporary maintenance and operation of the 10 homesites by Community First Land Trust (before sale to private buyers). Community First Land Trust is both committed to these responsibilities and has the necessary resources. Additionally, proceeds from the sale of the 10 homes in Phase 1 will help fund ongoing operation and maintenance costs for the site.

### 3.4 Program Budget Description:

For a detailed breakdown of the budget in template form, subawards and scheduled activities to complete projects, see ATTACHMENT A – BUDGET and ATTACHMENT G – READINESS APPROACH. For a detailed description of the methodology for reaching disadvantaged populations in the community, see ATTACHMENT E–COMMUNITY ENGAGEMENT PLAN.

Project Component Budget
1.  Project #1: Home Energy Retrofits -- $2,805,195
2.  Project #2: "Project 218" -- $6,771,170
3.  Project #3: Showcase House -- $637,311
4.  Project #4: Workforce Training -- $590,108
5.  Project #5: Community Engagement and Leadership Training -- $300,331
6.  Project #6: Green Infrastructure and Nature-Based Solutions -- $291,905

**J.A. 0225**

# SUSTAINABILITY INSTITUTE DECLARATION

# EXHIBIT 1-B

5F - 03D30824 - 0    Page 1

## U.S. ENVIRONMENTAL PROTECTION AGENCY

### Grant Agreement

| | |
|---|---|
| GRANT NUMBER (FAIN): 03D30824 | |
| MODIFICATION NUMBER: 0 | DATE OF AWARD |
| PROGRAM CODE: 5F | 12/20/2024 |
| TYPE OF ACTION | MAILING DATE |
| New | 12/26/2024 |
| PAYMENT METHOD: ASAP | ACH# |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| Not for Profit | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| Sustainability Institute<br>3973 RIVERS AVE, STE 101<br>NORTH CHARLESTON, SC 29405-7058<br>EIN: 58-2474104 | Sustainability Institute<br>3973 RIVERS AVE, STE 101<br>NORTH CHARLESTON, SC 29405-7058 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Bryan Cordell<br>3973 Rivers Avenue, Suite 101<br>North Charleston, SC 29405<br>**Email:** director@sustainabilityinstitutesc.org<br>**Phone:** 843-327-3573 | Lestina Dongo<br>61 Forsyth Street SW<br>Atlanta, GA 30303<br>**Email:** Dongo.Lestina@epa.gov<br>**Phone:** 404-562-9054 | Jimmy Robinson<br>Grants Management Section<br>61 Forsyth Street SW<br>Atlanta, GA 30303<br>**Email:** Robinson.Jimmy@epa.gov<br>**Phone:** 404-562-9694 |

**PROJECT TITLE AND DESCRIPTION**

Environmental and Climate Justice Block Grant Program

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 01/01/2025 - 12/31/2027 | 01/01/2025 - 12/31/2027 | $ 11,441,520.00 | $ 11,441,520.00 |

### NOTICE OF AWARD

Based on your Application dated 08/01/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 11,396,020.00. EPA agrees to cost-share 99.60% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 11,396,020.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 4<br>61 Forsyth Street<br>Atlanta, GA 30303-8960 | U.S. EPA, Region 4, Environmental Justice, Community Health, and Environmental Review Division<br>R4 - Region 4<br>61 Forsyth Street SW<br>Atlanta, GA 30303 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Shantel Shelmon - Grants Management Officer | DATE<br>12/20/2024 |

5F - 03D30824 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 11,396,020 | $ 11,396,020 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 45,500 | $ 45,500 |
| Allowable Project Cost | $ 0 | $ 11,441,520 | $ 11,441,520 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.616 - Environmental and Climate Justice Block Grant Program | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 25125WB043 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 11,396,020 |
| | | | | | | | | | $ 11,396,020 |

**J.A. 0228**

5F - 03D30824 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,053,773 |
| 2. Fringe Benefits | $ 263,443 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 87,670 |
| 6. Contractual | $ 230,000 |
| 7. Construction | $ 5,688,475 |
| 8. Other | $ 3,808,719 |
| 9. Total Direct Charges | $ 11,132,080 |
| 10. Indirect Costs: 15.00 % Base MTDC | $ 309,440 |
| 11. Total (Share: Recipient ___0.40 % Federal ___99.60 %) | $ 11,441,520 |
| 12. Total Approved Assistance Amount | $ 11,396,020 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 11,396,020 |
| 15. Total EPA Amount Awarded To Date | $ 11,396,020 |

J.A. 0229

5F - 03D30824 - 0    Page 4

## Attachment 1 - Project Description

This action approves funding in the amount of $11,396,020 under the Inflation Reduction Act (IRA) to the Sustainability Institute of South Carolina. Specifically, the project will: provide funding to the Sustainability Institute of South Carolina along with its statutory partner, the City of North Charleston to reduce greenhouse gas emissions by weatherizing and retrofitting existing homes; restore a historically black community previously disintegrated by the construction of Highway 218, and develop newly constructed energy efficient affordable homes to benefit disadvantaged persons in the Union Heights community in North Charleston; and create training and workforce programs to train community members in environmental justice and preparation for environmental justice jobs.

The activities to be preformed include: repairing, weatherizing, fortifying and upgrading the energy efficiency and resilience of fifty (50) existing homes to reduce greenhouse gas emissions that will result in improved health outcomes by families; project 218 – developing 2.77 acres of land formerly occupied by Exit 218 to pilot a new paradigm for energy efficient/zero-energy housing construction and affordable, resilient development by constructing 10 single-family "green" homes, with land to be transferred to and operated by a community-based land trust; constructing one "showcase" home that will be used for purposes of community demonstration, outreach, and education, and will showcase zero-energy, healthy, resilient and low-carbon technologies; expanding economic opportunity – particularly for the next generation of climate workers and leaders – by harnessing a long-standing and accredited AmeriCorps workforce training and service-learning program focused on climate-related jobs; and providing opportunities for community residents to become skillfully engaged and drive the shaping of the community's future through investments in leadership development and training.

The anticipated deliverables include 50 weatherized, energy efficient existing homes and constructing a total of 30 newly constructed energy efficient homes; hosting trainings and workshops in environmental justice to educate community members and prepare them for the environmental justice workforce: installed pervious paving, planted native plants, trees, installed rain collection devices, and constructed rain gardens. The expected outcomes include less outdoor and indoor pollution in the Union Heights community, improved health outcomes of the community, and lower energy burdens as a result of this project. The intended beneficiaries are disadvantaged communities.

Activities to be implemented through subawards include but are not limited to the following: home energy retrofits, show case housing, workforce training, community engagement and leadership training, green Infrastructure and nature-based solutions.

**J.A. 0230**

5F - 03D30824 - 0    Page 5

## Administrative Conditions

### **National Administrative Terms and Conditions**

### **General Terms and Conditions**

The General Terms and Conditions of this agreement are updated in accordance with the link below. However, these updated conditions apply solely to the funds added with this amendment and any previously awarded funds not yet disbursed by the recipient as of the award date of this amendment. The General Terms and Conditions cited in the original award or prior funded amendments remain in effect for funds disbursed by the recipient prior to the award date of this amendment.

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

These terms and conditions are binding for disbursements and are in addition to or modify the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### **A. Correspondence Condition**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

•Federal Financial Reports (SF-425):  rtpfc-grants@epa.gov and *Lestina Dongo Dongo.Lestina@epa.gov*


•MBE/WBE reports (EPA Form 5700-52A): Jimmy Robinson, Robinson.jimmy@epa.gov or Lestina Dongo Dongo.Lestina@epa.gov

•All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications:  ***Project Officer***  Lestina Dongo Dongo.Lestina@epa.gov

•Payment requests (if applicable):  Lestina Dongo Dongo.Lestina@epa.gov

•Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Lestina Dongo. Dongo.Lestina@epa.gov

**J.A. 0231**

5F - 03D30824 - 0    Page 6

**B. Pre-Award Administrative Capability**

***Sustainability Institute*** pre-award certification review was initiated, but is not completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review,  is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at ***Sustainability Institute***  own risk. If  fails to respond or is unable to satisfactorily address all identified deficiencies within 90 days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

**C. New Recipient Training Requirement**

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

5F - 03D30824 - 0    Page 7

## Programmatic Conditions

The recipient agrees to comply with the current EPA Community Change Grants Programmatic Terms and Conditions, available at: https://www.epa.gov/inflation-reduction-act/epa-community-change-grants-program-terms-and-conditions.

These terms and conditions are in addition to the General Terms and Conditions, additional programmatic terms and conditions, and the administrative terms and conditions included in the EPA award document.

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# AGRARIAN TRUST DECLARATION – EXHIBIT 2

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-3    Page 2 of 90

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, et al.,<br><br>                Defendants. | Civ. No. 2:25-cv-02152-RMG |

**DECLARATION OF JEAN THERON WILLOUGHBY, AGRARIAN TRUST**

I, Jean Theron Willoughby, declare as follows:

1.     My name is Jean Theron Willoughby. This declaration is based on my personal knowledge, professional education and experience, and personal belief. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration on behalf of Agrarian Land Trust, ("Agrarian Trust"), a nonprofit organization affected by the federal funding pause.

2.     Agrarian Trust is a 501(c)(3) nonprofit established in 2014 and incorporated in California in 2016, with a physical address of 4 Leighton Point Road, Pembroke, Maine 04666. Our mailing address is PO Box 86362, Portland, Oregon 97286. Agrarian Trust is dedicated to farmland conservation and secure land tenure for next-generation farmers. Agrarian Trust accomplishes this through its Agrarian Commons initiative, a unique community-led approach to land ownership and stewardship that aims to ensure farmland remains available for regenerative agriculture, thriving farm businesses, and food security by fundraising to purchase farms, holding land, and offering affordable, long-term leases to new farmers (typically for 99 years or as long as state law allows). Agrarian Trust is active in 15 states and has also received donations of farms from retiring farmers and landowners. Agrarian Trust holds title to farm properties in multiple states, with four land acquisitions planned in 2025. This approach makes farmland more affordable for new farmers and ensures that retiring farmers' land and legacy is passed on to a new generation, solving one of the biggest bottlenecks in farms transitioning to new generations due to the skyrocketing cost of land, development pressure, lack of access to capital, and significant socioeconomic barriers.

3.     Agrarian Trust has seven full-time employees with experience in farming and roots in agricultural communities across the United States. Its employees provide access to specialized legal services related to land trusts, farmland conservation planning, fundraising and grant writing, administrative support, educational resources for landowners and farmers, and real estate expertise.

**J.A. 0236**

4.      I serve as Agrarian Trust's Executive Director. I have worked with Agrarian Trust since 2014 to support organizational development and strategic initiatives. I was among its first-hired employees and later worked as a management consultant for Agrarian Trust before joining the staff in my current role as Executive Director in November 2024. I have extensive federal grant management experience and have served as Project Director for several previous federal grants.

5.      Agrarian Trust hired four employees to assist with projects that are dependent on federal grant funding. The team brings over 70 years of combined experience to Agrarian Trust's farm real estate transactions, technical assistance to farmers, and farmland conservation projects.

6.      Agrarian Trust also has experience managing federal and private grants, including as the primary awardee of grants from the Sustainable Agriculture Research and Education program for both the North Central and Northeast regions.

7.      Agrarian Trust is a recipient of the Increasing Land, Capital, and Market Access Program ("ILA Program") through the U.S. Department of Agriculture's Farm Service Agency ("USDA"). The ILA Program funds 50 projects that improve access to land, capital, and markets for underserved farmers, ranchers, and forest landowners by increasing access to farm ownership, supporting farmland succession, conserving farmland, and assisting with farm business planning.

8.      On June 24, 2024, Agrarian Trust received an executed award agreement for $12,966,593.00 through the ILA Program. The contract term is November 18, 2023, through November 30, 2028.

9.      Under the ILA Program, Agrarian Trust has 18 partners across the United States, which includes farmer-led groups and educational partners. Agrarian Trust is the primary awardee responsible for the grant project, but the majority of the award supports farmers and community-based nonprofit organizations. Nebraska, Texas, and New York are the three states where farmland acquisitions are to take place in collaboration with four subaward partners. Agrarian Trust also has

critical work related to this project in West Virginia, Virginia, Washington, Maine, Vermont, New Hampshire, California, New Mexico, and Montana. Our national technical assistance partner is based in Massachusetts, with the grant supporting six employees there, including two full-time employees hired to work on this federally-funded grant project.

10.     Our projects take place across the U.S. and have far-reaching socioeconomic and environmental impacts. Because of their large scale, these projects represent major economic development opportunities and positive impacts for area residents in terms of increased food security, improved air and water quality, and expanded job opportunities. Regenerative agricultural practices are integrated into all of our work. We develop land stewardship agreements for every farm in collaboration with farmers and our partners.

11.     We have not received reimbursement for project expenses from USDA since the processing of an overdue request from October 2024, which means that the reimbursement and advance requests we have submitted (and that were logged by USDA staff) in November and December 2024, and January and February 2025 have not yet been paid.

12.     Per the terms of our grant agreement, Agrarian Trust can proceed with its land acquisition work by submitting all required documentation and requests for advances from USDA. Agrarian Trust is unable to honor its commitment of acquiring farmland without prior approval from USDA. The only information we have received from USDA regarding the status of our project was an email on March 12, 2025, informing us of a change in our USDA program contact. Beyond this, we have not received any updates from USDA regarding the status of funding since the funding was frozen in January 2025.

13.     Lack of communication from USDA and lack of reimbursement for costs incurred during the months of November and December 2024 and lack of USDA processing for advances for the months of January and February 2025 has undermined our ability to carry out our work.

14.     The funding freeze has also affected our operations. While approximately 85% of the ILA grant benefits farmers, about 15% covers Agrarian Trust's operating costs and accounts for a majority of our funding. Without access to these federal funds since January 2025, we have been forced to start depleting Agrarian Trust's savings to sustain operations and programs.

15.     The ongoing delays and uncertainty are causing extreme distress to Agrarian Trust staff members, farmers, and community partners. Agrarian Trust is in the middle of four farm purchases to support farm transition to the next generation of farmers and create hubs for rural community development. After years of hard work to identify these farm properties and develop relationships with their owners and retiring farmers, Agrarian Trust finds itself unable to follow through on these and future transactions due to the funding freeze. These four farm purchases are currently in limbo. Delays risk the future not only of these projects, but the farmers' livelihoods and Agrarian Trust's ability to function.

16.     Agrarian Trust's inability to acquire this land due to the funding freeze also puts the surrounding communities at risk. Two farms are located near Buffalo, New York, the third is near Omaha, Nebraska, and a fourth will be in Houston, Texas. These farms are largely in low-income communities, with most suffering from population loss, declining tax bases, and food insecurity. The success of these projects provides much-needed economic development, access to fresh food, and an increase in economic opportunities for hundreds of farmers and their families as the farms will be held in perpetuity for agriculture.

17.     Agrarian Trust's inability to access funds and the uncertainty about when these funds will become available and reliably accessed again has caused the organization to have to adjust its engagements with partners and those who rely on the agreement. Agrarian Trust has been forced to put contracts on hold, alter workplans, and consider reducing hours, furloughing, or laying off staff if this uncertainty continues. Agrarian Trust continues to remain in compliance and do everything

possible to move its projects forward, but the planned farm acquisitions are virtually stalled as we await access to the funding needed to pay for real estate due diligence procedures (including title searches and surveys) and earnest money deposits as required by purchase and sales agreements. Additionally, training and technical assistance for farmers has been stymied as Agrarian Trust and our educational partners are unable to plan for meetings, workshops, webinars, conferences, and other educational events while our funding is in limbo.

18.     Agrarian Trust is at risk of losing at least four employees hired to work on the ILA Program grant whose salaries are supported by federal funding, reduced hours for the remainder of employees, and potentially the shuttering of Agrarian Trust due to lack of funding. This is all not to forget the huge loss for the farming communities and partners relying on Agrarian Trust for the properties that will have to be transferred if the Agrarian Commons initiative does not continue.

19.     As of March 14, 2025, Agrarian Trust is owed $567,968.00 in federal funds, a significant sum for a small, hardworking organization. This amount includes two reimbursement requests, two advance requests, and a subaward invoice.

20.     Agrarian Trust has subaward agreements with partner organizations and contractual obligations it can no longer honor or renew unless funding resumes, including agreements with farm service providers, educational partners, as well experts and attorneys providing local counsel to farmers and community partners engaged in farm acquisitions and starting new businesses.

21.     Due to the funding freeze, Agrarian Trust is losing trust with farmers and subaward partners that have taken years of dedicated effort to establish through outreach, collaboration, and consistent support. The disruption has not only jeopardized ongoing projects but weakened trust in Agrarian Trust's ability to fulfil its commitments, eroding the foundation of trust we have so carefully built over the years.

22.     All of this uncertainty and a lack of reliable access to awarded funds has negatively impacted farming communities across the United States, including in the 15 states where Agrarian Trust and its farming partners have embarked on projects supported by federal funding. Farmers, their families, and communities will be further imperiled if this funding continues to be withheld.

23.     Overall, Agrarian Trust stands to lose more than $12,000,000.00 in awarded funds. This amount does not reflect the extensive hours that employees, farmers, partners, and community members have dedicated to developing the opportunities this funding would have supported, nor the numerous economic prospects, and advancement in their farming careers and businesses.

24.     The injury to Agrarian Trust and its interests would be redressed by an order from the Court granting Plaintiffs the relief they have requested.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

_____
Jean Theron Willougby

Executed this 17th day of March 2025

# AGRARIAN TRUST DECLARATION – EXHIBIT 2-A

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number<br>FSA24GRA0011586 | 2. Amendment No.<br>01 | 3. Award/Project Period<br>11/18/2023 - 11/30/2028 | 4. Type of Award Instrument<br>Grant |
|---|---|---|---|

| 5. Agency:<br>  (Name and Address)<br><br>USDA, FSA Outreach Office<br>1400 Independence Ave SW<br>Stop 0513 Rm 4079-S<br>Washington DC 20250-0513 | 6. Recipient Organization: (Name and Address)<br>Agrarian Land Trust<br>P.O. Box 86362<br>Portland, Oregon 97286 |
|---|---|

| | DUNS:<br>XP1HKMEX2WE6 | EIN: |
|---|---|---|

| 7. Agency Program Contact:<br>Sonja Baisden Shell<br>sonja.baisdenshell@usda.gov<br>(202) 690-5280 | 8. Agency Administrative Contact:<br>Lamont Nowlin<br>Lamont.Nowlin@usda.gov<br>(202) 720-2086 | 9. Recipient Program Contact:<br>Sarah Holdeman<br>sarah@agrariantrust.org<br>(940) 231-3841 | 10. Recipient Administrative Contact:<br>Jean Willoughby<br>jean@agrariantrust.org<br>(984) 227-0437 |
|---|---|---|---|

| 11. CFDA Number<br>10.968 | 12. Authority<br>Section 1006 of the American Rescue Plan Act of 2021 (Pub. L 117-2), as amended | 13. Type of Action<br>ii. Amendment/Revision | 14. Project Director<br>Jean Willoughby<br>jean@agrariantrust.org<br>(984) 227-0437 |
|---|---|---|---|

**15. Project Title/Description:**
Increase Land, Capital, and Market Access for Underserved Farmers on a Mid-size Nat'l Landscape using New Model, Agrarian Commons Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16. Entity Type:** \_\_\_\_Profit   _X_ Nonprofit   \_\_\_\_Higher Education   \_\_\_\_Federal   \_\_\_\_State/Local   \_\_\_\_Indian/Native American

   \_\_\_\_Other

| 17. Select Funding Type: | ☑ Federal | ☐ Non-Federal | 18. Accounting and Appropriation Data | | | |
|---|---|---|---|---|---|---|
| | | | Financial Code | Amount | Fiscal Year | Treasury Symbol |
| Original Funds Total: | $ 12,966,593.00 | | Fund Center: FA10402000<br>Fund: AGSEN0115D | $ 12,966,593.00 | | 12-0115 2022/2031 |
| Additional Funds Total: | | | Functional Area:<br>FA6121RATEC | | | BOC: 2559 |
| Grand Total: | $ 12,966,593.00 | $ 0.00 | | | | Funded program: FA.AD.ORCH.CA |

**19. APPROVED BUDGET**

| Personnel | $ | 1,379,598.46 | Fringe Benefits | $ | 400,083.55 |
|---|---|---|---|---|---|
| Travel | $ | 93,255.00 | Equipment | $ | |
| Supplies | $ | 14,313.00 | Contractual | $ | 14,000.00 |
| Construction | $ | | Other | $ | 10,854,314.99 |
| Total Direct Cost\ | $ | 12,755,565.00 | Total Indirect Cost | $ | 211,028.00 |
| | | | Total Non-Federal Funds | $ | 0.00 |
| | | | Total Federal Funds Awarded | $ | 12,966,593.00 |
| | | | Total Approved Budget | $ | 12,966,593.00 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

**J.A. 0243**

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

| NOTICE OF GRANT AND AGREEMENT AWARD | | | |
|---|---|---|---|
| **Award Identifying Number** | **Amendment No.** | **Award/Project Period** | **Type of Award Instrument** |
| FSA24GRA0011586 | 01 | 11/18/2023 - 11/30/2028 | Grant |

List of Attachments:

| Amendment Narrative; Attachment 1A - Statement of Work; Attachment 2A - Project Narrative; Attachment 3A - Revised Budget Narrative; Attachment 4A - General Terms and Conditions (March 2024) |
|---|

| **Name and Title of Authorized Government Representative** | **Signature** | | **Date** |
|---|---|---|---|
| Steven Peterson<br>Associate Administrator | STEVEN PETERSON | Digitally signed by STEVEN PETERSON<br>Date: 2024.06.24 07:37:04 -04'00' | 06/24/2024 |
| **Name and Title of Authorized Recipient Representative** | **Signature** | | **Date** |
| Jean Theron Willoughby, Interim Co-Director | JEAN THERON WILLOUGHBY | Digitally signed by JEAN THERON WILLOUGHBY<br>Date: 2024.06.21 14:14:25 -04'00' | |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD).  USDA is an equal opportunity provider, employer, and lender.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Page 2

**J.A. 0244**

Amendment Narrative

## AMENDMENT NO. 1
## TO AGREEMENT NUMBER FSA24GRA0011586

**PURPOSE**

The purpose of this amendment is to update the Notice of Award, Statement of Work (Attachment 1A), Project Narrative (Attachment 2A), Budget Narrative (Attachment 3A), and General Terms and Conditions (Attachment 4A).

**In the case of any conflict between language in this amendment and the award General Terms and Conditions, the provisions of this amendment will control.**

**REVISIONS TO THE NOTICE OF AWARD (FORM ADS-093):**

1. The Approved Budget for the agreement is revised as shown in Block 19.
2. The list of Attachments on page 2 of the NOA has been revised to include this amendment narrative and the revised attachments.

**REVISIONS TO AGREEMENT ATTACHMENTS**

1. The Agreement Statement of Work has been updated with Attachment 1A to this amendment.

2. The Agreement Project Narrative has been updated with Attachment 2A to this amendment.

3. The Agreement Subaward Budget Narrative and overall budget cost categories have been updated with Attachment 3A to this amendment.

4. The General Terms and Conditions have been updated with Attachment 4A to this amendment.

**J.A. 0245**

Attachment 1A

**Agreement Number: FSA24GRA0011586**

**Statement of Work**

1.  **PURPOSE AND OBJECTIVES**

The authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169). Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access. Section 1006 also provides resources for grants to improve land access, including providing resources related to heirs' property and other land access issues that affect access to USDA programs.

2.  **SPECIAL CONDITIONS IN EFFECT**

This is formal correspondence notifying you that all special conditions included in the original agreement statement of work are rescinded except those included in section 7, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS and those listed below. Other project activities may commence unless they are associated with NEPA or those outlined below.

**LAND ACQUISITION** – Any actions related to real property as defined in 2 CFR Part 200.1, such as land purchases, are not authorized, pending agency policy approval.  This includes staff time researching costs, working on purchase offers, and all other actions associated with the acquisition of real property.  Any work in these areas would be considered voluntary, and the Federal Government would not be able to reimburse for this work.

More specifically, until further guidance is provided, recipient organization is prohibited from incurring costs for:

*   personnel for any activities directly and/or indirectly related to land acquisition,
*   fringe benefits for any activities directly and/or indirectly related to land acquisition,
*   contractual agreements for any activities directly and/or indirectly related to land acquisition, and specifically:
    *   Comunidad Maya Pixan Ixim (CMPI)
    *   Alianza Agricola
    *   Somali Bantu Community Organization (SBCO)
    *   The Nashville Food Project Market Garden Program, Growing Together
    *   Plant It Forward (PIF)
*   any other activities directly and/or indirectly related to land acquisition.
*   Recipient organization may not incur indirect costs directly and/or indirectly related to land acquisition.

**J.A. 0246**

**3. PROJECT NARRATIVE**

The recipient will carry out the project described in the Project Proposal; the referenced Project Proposal is incorporated as Attachment 2A. The project narrative may be a topic during the project orientation meeting and, as a result, may be subject to modification.

**4. BUDGET NARRATIVE**

The official budget as noted in the award and described in the attached Budget Narrative (Attachment 3A) will be considered the total budget. Amounts included in this budget narrative are estimates. The budget narrative will be a topic during the project orientation meeting, and as a result, may be subject to modification. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

**5. REPORTING REQUIREMENTS**

a. The recipient must submit performance progress reports to the Results Verification System (RVS), according to the following schedule. The first performance progress report is due by March 31, 2024, and quarterly thereafter. Thus, for year 1 of the 2 agreement, the progress report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email. Further details on reporting to RVS will be provided during negotiation with the awarding agency.

Progress Report #1: March 31, 2024
Progress Report #2: June 30, 2024
Progress Report #3: September 30, 2024
Progress Report #4: December 31, 2024

b. The recipient must submit financial report (SF-425) to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov. If the recipient requests reimbursement payments only, the first financial report is due June 30, 2024, and bi-annually thereafter. Thus, for year 1 of the agreement, the financial report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email. Financial Report #1: June 30, 2024 Financial Report #2: December 31, 2024 If the recipient requests advance payments, financial reports are due at the same time as performance progress reports, which are as follows:

Financial Report #1: March 31, 2024
Financial Report #2: June 30, 2024
Financial Report #3: September 30, 2024
Financial Report #4: December 31, 2024

**6. PAYMENT INFORMATION**

Attachment 1A

Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) (see Attachment 4A). Also see https://www.fpacbc.usda.gov/about/grants-and-agreements/awardpayments/index.html for preparation and submission guidance.

## 7.  NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS

The National Environmental Policy Act (NEPA) environmental review process must be completed for activities under this agreement with potential impacts to the human environment prior to the recipient drawing down funds or incurring expenses under this Grant Agreement. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 C.F.R. § 1506.1. USDA Farm Service Agency reserves the right to de-obligate funds obligated under this Grant Agreement (or to require the return of such funds) in the event a Recipient breaches or otherwise fails to perform under any of the Grant requirements. FSA must approve the project plan before the land access and/or land improvement portion of the project is implemented (refer to the Programmatic Environmental Assessment for the Increasing Land, Capital, and Market Access Program). Prior to project plan approval, USDA Farm Service Agency will complete the NEPA process and provide a determination of whether further review, documentation, and/or mitigation measures are required. The Recipient must satisfy any requirements contained in USDA Farm Service Agency's determination prior to drawing down funds, or incurring expenses related to the land access and/or land improvement activities. Once these conditions have been successfully completed, USDA Farm Service Agency will then notify the Recipient that the review is complete. At that time, the distribution and expenditure of funds associated with land access and/or land improvement activities will be authorized. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 C.F.R. § 1506.1.

## 8.  GENERAL TERMS AND CONDITIONS

The General Terms and Conditions applicable to this award (General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) are attached and incorporated as Attachment 4A. They are also available online at the following link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-terms-and-conditions/index.html

J.A. 0248

**Agrarian Land Trust – Project Narrative Addendum**

**Increasing Land, Capital, and Market Access Through the Agrarian Commons**

**Introduction and Justification:**

Agricultural land is in a crisis, and underserved producers are in dire need of targeted and locally-driven technical assistance to gain land access. As farms across the United States are struggling to stay afloat under the pressure of development, speculation, and consolidation, some farmers have received more USDA support than others. While securing land tenure is a challenge facing all farmers in this country, Agrarian Trust knows that farmers of color in particular are inadequately supported in accessing land, and is centering the work of making affordable land security available to Black, Indigenous, People of Color (BIPOC) farmers. More than 98% of farmland in the U.S. is owned by white people while more than 70% of the farmworkers who seed, cultivate, weed, and harvest the crops that feed us are people of color. This gross injustice needs to change. As the farmer population in the US ages, more than 400 million acres of farmland are expected to change hands during this decade and the next, an opportunity to address this injustice becomes available with every farm ownership transfer. The Agrarian Commons is a new and innovative model and tool that can be used at the local level to engage in the farm ownership transfer process, bringing ownership into a community land trust focused on and limited in scope to land stewardship and conveying secure and affordable land tenure through 99-year leases (or as long as state law allows). Applicant Agrarian Trust, in collaboration with a vast network of community stakeholders, farmers, educators, attorneys, and nonprofits, is working in communities across the country to bring about the Agrarian Commons model.

The goal of this project is to create and strengthen land access with additional opportunities to focus on capital access and market access for use in agriculture on a mid-size national landscape using the innovative design of the Agrarian Commons, a new model which has proven to be successful in securing long-term land access and tenure and mitigating land loss. The target audience is Black, Indigenous, and People of Color (BIPOC) underserved farmers, most of whom also identify as new and beginning lower-revenue new and beginning specialty crop growers and livestock farmers, who need land access and security and knowledge of and access to federal agricultural programs. There are programmatic gaps in existing programs that this project will also address, which includes land, capital, and market access focused on BIPOC farmers.

The known agricultural census area for our target audience of Black, Indigenous, and People of Color (BIPOC) farmers indicates that BIPOC farmers are currently less likely than white farmers to own land and access USDA programs and loans, and that farmland in the United States is concentrated in white ownership. While white farmers own 500,708,900 acres of farmland, American Indian farmers own only 50,723,444 acres and Black farmers own just 2,887,102 acres (2017 Ag Census, Table 61). Primary producers in the United States are disproportionately white, with 95.4% of farms listing only white primary producers, while nationally only 61.6% of U.S. citizens are white. In contrast, only 1.6% of primary producers are American Indian or Alaska Native, only

1.4% are Black, and just 3.29% are Hispanic (2017 Ag Census, Table 52). BIPOC farmers also experience greater barriers to accessing USDA programs and loans than their white counterparts. While white farmers received $11.3 billion in Community Credit Corporation, conservation related, and other federal farm payments in 2017, Black farmers secured only $57.2 million, American Indian farmers received $68.6 million (2017 Ag Census, Table 61). BIPOC farmers are also more likely to operate at a small-scale and to manage livestock; small-scale ranches receive inadequate programmatic support from the USDA. All of the farmer organizations in this grant include and represent BIPOC farmers and the majority of them have incorporated sustainable livestock into their specialty crop farms.

The project objectives of acquiring and accessing land with and for multiple BIPOC farmer collectives and organizations directly responds to inequities in land ownership by securing approximately 500 +/- acres of farmland. These collectives and organizations will collaborate with technical assistance providers to empower members to launch, grow, and build business resilience on additional farmland. The objectives of providing technical assistance for USDA programs in partnership with Tufts University, Cornell Cooperative Extension of Eerie County (CCE Eerie), the Nature Conservancy, American Farmland Trust, and other local technical assistance providers addresses inequities in USDA program and loan access, while the objective of partnering with Farm Commons and other local technical assistance providers addresses inequities in access to legal services and business development beyond what the USDA currently provides.

The underserved farmers who are the beneficiaries and stakeholders of this project lack familiarity with their regions' businesses, regulations, and market sectors, and the institutions that provide technical and financial assistance. Language, literacy, and cultural factors make it difficult to initiate an independent farm operation. Coordination of outreach and development of a well-trained network of culturally competent service providers who can deliver specialized consultation and capacity building, innovative training, technical assistance, and follow-up support services is needed to help these underserved producers navigate resources available through USDA, state Departments of Agriculture, and other community-based organizations.

The BIPOC farmers who are the beneficiaries and stakeholders of this project have been involved in the conceptualizing of this project and technical assistance activities, and will be involved in guiding this project over the course of the next five years. The target audience and beneficiaries and stakeholders are partners in this project, and they have helped to create, conceptualize, and design the activities and objectives of this grant application. The push for this application submission to acquire land for community stewardship and to empower next generation farmers came directly from self-organized groups across the country who asked Agrarian Trust to collaborate to create Agrarian Commons to support access, tenure, and equity to land and capital, infrastructure, markets access and service assistance. The target audience and beneficiaries will guide this project over the next five years by helping to create the structure of their local Agrarian Commons, holding seats on the local Agrarian Commons boards, collaborating on farm acquisitions, stewardship, and lease

2

**J.A. 0250**

agreements, informing the forms of technical assistance that will be made available to them, and leading peer-to-peer learning and training. The partners, beneficiaries, and stakeholder communities include:

- **Maya Economic Development Corporation (MEDC)**: A non-profit 501(c)(3) organization which works to improve the health and well-being of Mayan people through community development strategies in Omaha, Nebraska (NE). MEDC seeks to restore Indigenous traditional ecological knowledge and advance science-informed regenerative agriculture using agroforestry and integrated livestock practices to mitigate climate change and improve soil, water, and human health while establishing a reliable long-term land-based spiritual and economic foundation for the Maya community in NE.

- **Alianza Agrícola**: A group led by and comprised of immigrant farmworkers in Western and Central New York. Alianza Agrícola is New York State's only worker-founded, worker-led organized group of immigrant dairy farmworkers. This group is mostly from Mexico, and live and work in isolation and poverty on dairy farms in 5 Western New York counties.

- **Somali Bantu Community Organization (SBCO):** A non-profit 501(c)(3) organization with a mission to educate and empower refugees and immigrants in Buffalo and Erie Counties while preserving their traditions, languages and cultures to foster a dynamic community across Western New York. The organization provides social and educational support services to the Somali Bantu refugee and immigrant community of Buffalo's West Side, with programs that include citizenship support, translation, interpretation, advocacy, an after school program, and the Somali Bantu Community Farming program.

- **Plant It Forward (PIF):** A non-profit 501(c)3 empowers refugees to develop sustainable urban farming businesses that produce fresh, healthy food for our community. The organization works on unsecured land to train and mentor farmers, and facilitate sales to local markets. Located throughout Houston,Texas the PIF farms are cultivated with sustainable practices that enrich the land and support the surrounding community.

- **West Virginia University Center for Resilient Communities:** Agrarian Trust's partner New Roots Community Farm will work with WVU Center for Resilient Communities to work with Susanna Wheeler (Director, New Roots Community Farm) to engage in a statewide mapping of conserved and eased properties. They will also conduct interviews and gather data to compile a report on the state of farmland protection and preservation in West Virginia. NRCF will then work with the CRC to develop a road map for land access initiatives based on their mapping and evaluation of current programs.

- **Garden Variety Harvests:** A community-based farm operated by Cameron Terry, a Black farmer who has been growing food and providing educational

3

opportunities for the Roanoke, VA community on borrowed and leased urban yards since 2017 and more recently collaborating with Agrarian Trust to grow his farm through our Agrarian Commons initiative. We will collaborate to expand the Southwest Virginia Agrarian Commons and secure land access and capital access for underserved farmers within Virginia who are connected to the initiative through training, technical assistance, and farm activities.

This project will meet the needs of historically underserved producers and operators by providing them with long-term, secure land access addressing this fundamental need. This project will increase their access to markets and capital, which will help to take producers who are on the edge of viability from surviving to thriving. This will be done through the specialized project design of the Agrarian Commons, an innovative way to connect available land to underserved producers who have challenges in accessing land, and restoring land into the hands of those who have been underserved. This project will also meet the needs of underserved producers and operators by providing them with wrap-around technical assistance and support services that include business development, tax training and legal services, which are essential to effectively provide meaningful and sustained access to land, capital, and markets.

Applicant Agrarian Trust has specialized expertise and a proven track record in effectively working with underserved producers in providing land access and capital access, and of working and coordinating with technical assistance providers to provide market access training and education. This project will expand the new and innovative existing model of the Agrarian Commons which addresses the major barrier to producer success: land access. Over the past three years, the first three years of the existence of the Agrarian Commons model, 8 farms totaling over 400 acres of farmland across the nation have been secured for historically underserved producers, mainly Black, Indigenous, people of color farmers and women farmers. 83% of Agrarian Commons decision-making board members are Black, Indigenous, people of color, and women.

<u>Overview of the Agrarian Commons</u>
Agrarian Commons is a transformative land-holding model which can be used to cultivate just, resilient, and healthy food systems and economies. Agrarian Commons hold land in community-centered entities that are partners and/or nonprofit subsidiaries of the national 501(c)(3) Agrarian Trust and often other nonprofits. Decision-making within an Agrarian Commons takes place in the local governance structures such as local boards, which include beneficiary farmers in their decision-making.

Agrarian Commons hold land to convey affordable and equitable leases for 99 years (or as long as state law allows), which can be passed down to heirs or transferred to future farmers, for the purposes of regenerative farming, food security, ecological stewardship, and community benefit. Each Agrarian Commons is supported by the national 501(c)(3) Agrarian Trust in various ways including but not limited to organizational and leadership development, administrative and financial management, agricultural and legal technical assistance, communications, access to philanthropic support, grant writing, and access to other resources and assistance.

4

**Objectives and Outcomes:**

Objective 1: Partner with Tufts University which will (1) serve as the National Network Level Technical Assistance (TA) Provider, collaborating with program staff and partners operating incubator programs to customize progressive TA, including but not limited to: info sharing to over 40,000 people and replication of innovative models to connect underserved producers to innovative models around land, capital, markets, and USDA programs, and (2) provide TA directly to the 150 underserved BIPOC farmers who are the beneficiaries of this project in coordination and collaboration with existing partner networks and local farmers in the proposed Agrarian Commons regions. TA will focus on access to USDA programs and resources and increasing capacity to access land, capital, and markets.

- Goals
  - Provide customized training and technical assistance to BIPOC farmers participating in the proposed Agrarian Commons' projects and connect participating underserved producers to USDA programs and resources that are of value to them.
  - Coordinate technical assistance and training with local/regional partners engaged in Agrarian Commons to better connect BIPOC producers with USDA programs and resources and other support services in the Agrarian Commons' regions.
  - Promote documented trainings and new resources developed for broader national audiences.
  - Provide the outreach, training and technical assistance component of the project by connecting incubator farms to the FIELD Network and Agrarian Trust's programs in order to share information and develop resources for staff to build their farms capacity to access land, capital, and markets.
  - Coordinate quarterly virtual networking events and four annual FIELD Schools/conference meetings to provide technical assistance, information sharing, and support programs in the development of land connections for graduates of the program.
  - Document, develop and disseminate resources (fact sheets, toolkits, resource guides, website resource library) for programs to model and share with other new land-based farmer training programs on farmland access, Agrarian Commons model, and partnership building in regional communities.
  - Evaluate TA program delivery and track/evaluation outcomes and metrics associated with producer access to USDA programs
- Expected Outcomes
  - Stakeholders and project beneficiaries will be meaningfully involved in determining technical assistance program benefits
  - Stakeholders and project beneficiaries will have increased understanding of ability to access and utilize USDA and FSA programs
  - An increased number of BIPOC farmers will utilize USDA programs and services
- Metrics that will be gathered and reported
  - Number of farmers who apply for and participate in a USDA program

5

**J.A. 0253**

- Number of farmers who receive loans or cost-share program agreements to advance their business goals
- Number of farmers who access farmland via new lease agreements or farmland purchases
- Number of farmers who access new markets and increase annual revenues
- Number of farmers who secure crop insurance and have greater level of risk protection
- Number of farmers attending training and number of hours of TA provided
- Number of BIPOC farmers accessing other USDA & FSA resources

Objective 2: Partner with Cornell Cooperative Extension of Eerie County to provide the BIPOC producers who are the beneficiaries of this project with a workshop series that will help them prepare to apply for financing from the Farm Service Agency (FSA), and to provide additional technical assistance nationally for USDA and FSA programs that the BIPOC producers ask for during the Needs Assessment conducted by Tufts University.
- Expected Outcomes
  - The BIPOC underserved producers will learn about FSA loan programs and the factors that lenders consider when evaluating loan applications.
  - The BIPOC underserved producers will receive practical guidance on meeting with an FSA loan officer.
  - Beneficiaries of this project will receive targeted services and support collectively designed to improve understanding of and equitable participation in USDA programs and services.
- Metrics that will be gathered and reported
  - Number of farmers who participate in a USDA and FSA program
  - Number of farmers who receive loans or cost-share program agreements to advance their business goals
  - Number of farmers who access farmland via new lease agreements or farmland purchases
  - Number of farmers attending training and number of hours of TA provided
  - Number of BIPOC farmers accessing other USDA & FSA resources

Objective 3: Partner with Farm Commons to provide technical assistance (T/A) education and support to the 150 underserved BIPOC farmers who are the beneficiaries of this project to fill the gaps in USDA and FSA programs and opportunities using and empowering local knowledge and innovation.
- Expected Outcomes
  - The beneficiaries of this project will learn to reduce liability exposure and personal asset loss through LLCs/corporations, planning for succession.
  - The beneficiaries of this project will receive technical support in setting up a business structure and drafting governance documents.
  - The beneficiaries of this project will learn to reduce exposure to lawsuits for food safety, slip/fall and worker injuries.

6

**J.A. 0254**

- The beneficiaries of this project will receive technical support in deciding which insurance is important to the farm and how much.
- The beneficiaries of this project will learn to reduce risk of enforcement action regarding wage/hour issues, family/volunteer labor, interns/apprentices, Payroll and tax compliance.
- The beneficiaries of this project will receive technical support in understanding state specific laws/regulations.
- The beneficiaries of this project will learn to build resilience around leasing, land contracts, and performing due diligence on prospective land for agricultural production and diversification activities.
- The beneficiaries of this project will receive technical support in writing leases and land contracts, performing due diligence on prior/current land uses.
- The beneficiaries of this project will receive technical support in managing shifting legal obligations when diversifying into food service, value-added production, agritourism and other "non-agricultural" activities.
- Metrics that will be gathered and reported
  - Number of farmers who participate in the training program
  - Number of farmers who access farmland via new lease agreements or farmland purchases
  - Number of hours of TA provided
  - Number of BIPOC farmers who secure insurance for their business
  - Number of BIPOC farmers who create business structure and governance documents for their businesses

Objective 4: Partner with American Farmland Trust to provide Agricultural Land Stewardship education and support to the 150 underserved BIPOC farmers who are the beneficiaries of this project.
- Expected Outcomes:
  - Beneficiaries will be trained in the fundamentals of soil health over the five year project. Training topics will include:
    - Basics of Soil Health and Soil Health Assessment
    - Cropping Systems and Cover Crops
    - Eliminating, reducing and modifying tillage for soil health
    - Adaptive Nutrient Management for Soil Health
    - Economics of Soil Health and USDA-NRCS programs
- Metrics that will be gathered and reported:
  - Number of farmers who participate in the training program
  - Number of Ag Service Providers that participate in the training program
  - A baseline and final survey of farmer participants to understand gaps in knowledge of soil conservation practices and to track learning progress by end of the project
  - Number of hours of training provided

Objective 5: Partner with The Nature Conservancy to provide technical assistance and advisement on soil health and testing, conservation practices, potential funding sources

7

**J.A. 0255**

and relevant contacts, data collection and analysis, on-farm technology, and support from agronomists as needed to the stakeholders and beneficiaries of this project.

- Expected Outcomes:
  - Maya Economic Development Corporation (MEDC) develops a solid local and regional network that supports its endeavor during and after the 5-year project.
  - MEDC develops a successful environmental and economic model that could be replicated by other BIPOC organizations.
  - MEDC farmers will receive support through training in the fundamentals of soil health over the 5-year project. Topics may include:
    - Basics of soil health and soil health management
    - Cover cropping systems
    - Agroforestry
    - Nutrient management for soil health and water quality
    - Economics of Soil Health and USDA-NRCS programs
    - Other MEDC's topics of interest

Metrics:
- Number of training events.
- Number of applications to local grants or funding opportunities.
- Number of meetings with local experts and potential donors.
- Number of reports shared to MEDC with information about regenerative practices.
- Number of local farmers that learn from MEDC's initiative.

Objective 6: Partner with Maya Economic Development Corporation in NE and Plant It Forward in TX to create two new Agrarian Commons and secure land access and capital access for collectives of underserved BIPOC producers.
- Expected Outcomes
  - BIPOC underserved producers will have secure, long-term land access, capital access, and market access
  - BIPOC communities will have increased access to fresh, healthy, and culturally appropriate foods
- Metrics that will be gathered and reported
  - Number of acres secured for BIPOC underserved producers
  - Number of BIPOC farmers benefiting from the secure land access
  - Number of community members benefitting from the secure land access the BIPOC farmers will now have

Objective 7: Partner with the Somali Bantu Community Organization of Western New York, Alianza Agricola, and Cornell Cooperative Extension of Eerie County to create a Buffalo Agrarian Commons and secure land access and capital access for underserved Somali Bantu farmers and Mexican farmers in New York
- Expected Outcomes
  - BIPOC underserved producers will have secure, long-term land access, capital access, and market access

8

**J.A. 0256**

- ○ BIPOC communities will have increased access to fresh, healthy, and culturally appropriate foods
- Metrics that will be gathered and reported
  - ○ Number of acres secured for BIPOC underserved producers
  - ○ Number of BIPOC farmers benefiting from the secure land access
  - ○ Number of community members benefitting from the secure land access the BIPOC farmers will now have

Objective 8: Partner with the Garden Variety Harvests to expand the Southwest Virginia Agrarian Commons and secure land access and capital access for underserved farmers in Virginia
- Expected Outcomes
  - ○ BIPOC underserved producers will have secure, long-term land access, capital access, and market access
  - ○ BIPOC communities will have increased access to fresh, healthy, and culturally appropriate foods
- Metrics that will be gathered and reported
  - ○ Number of acres secured for BIPOC underserved producers
  - ○ Number of BIPOC farmers benefiting from the secure land access
  - ○ Number of community members benefitting from the secure land access the BIPOC farmers will now have

**Approach:**
Objective 1: Partner with Tufts University which will (1) serve as the National Network Level Technical Assistance (TA) Provider, coordinating and providing TA to program staff and partners operating incubator/apprenticeship programs, including but not limited to: info sharing, and replication of innovative models to connect underserved producers to innovative models around land, capital, markets, and USDA programs, and (2) provide TA directly to the 150 underserved BIPOC farmers who are the beneficiaries of this project in coordination with existing partner networks in the proposed Agrarian Commons' regions. TA will focus on access to USDA programs and resources and increasing capacity to access land, capital, and markets.
Activities to be conducted during the full 5 years of the grant include:
- Conduct a Needs Assessment on training approaches for BIPOC farmers to connect to USDA programs and services and identify gaps in services.
  - ○ Identify the partners and collaborators developing the Agrarian Commons' projects and associated technical assistance providers and partners and conduct an analysis of existing trainings and a needs assessment on the barriers to producer's accessing USDA programs and services.
  - ○ Identify gaps in training, technical assistance, and access or eligibility to USDA programs and services among targeted audiences.
  - ○ Coordinate training needs and identify priority programs to target outreach and educational activities.
  - ○ Host regular meetings with training and technical assistance partners to coordinate future training programs and services for producers in all regions.

9

**J.A. 0257**

- Develop training and technical assistance resources to connect producers to USDA programs and services
  - Based on Needs Assessment (above), develop a series of virtual trainings on targeted USDA programs and services for BIPOC farmers, including:
    - USDA Farm Service Agency Programs: obtaining a Farm Tract Number; FSA Microloans; FSA Farm/Home Loans; FSA Operating Loans; Emergency Loans; FSA Youth Loans; down payment and guaranteed loan programs; Organic Cost-Share Program; filing acreage reports and other programs covered in their Guide to FSA Farm Loans;
    - USDA Natural Resources Conservation Service Programs: Environmental Quality Incentives Program (EQIP), Conservation Stewardship Program (CSP); Agricultural Management Assistance Program (AMA); Conservation Innovation Grants (CIG); Conservation Reserve Program (CFP); Grazing Lands Conservation Initiative (GLCI); Regional Conservation Partnership Program (RCPP)
    - USDA Rural Development Programs: Rural Cooperative Development Grant Programs; Rural Energy For America Programs (REEP); Business and Industry Loan Guarantees; Community Facilities Direct Loan and Grant Programs; Housing and Labor Housing Programs; Water and Waste Disposal Loan and Grant Programs; and others as identified above.
    - USDA Risk Management Agency: crop insurance 101; Non-Insured Disaster Assistance Program (NAP); Micro-Whole Farm Revenue Protection Program (mWFRP); other Commodity Insurance Coverage Programs as identified during needs assessment.
    - USDA Food and Nutrition Service Programs: Accepting WIC, SNAP, and EBT transactions and any applicable local double voucher/nutrition incentive programs; Information about related possible local Produce Prescription Rx Programs
    - USDA Agricultural Marketing Programs: Local Food Promotion Program (LFPP); Farmers Market Promotion Programs (FMPP); Microgrants for food security programs; SpecialtyCrop Block Grants (SCBGP)
    - USDA Sustainable Agriculture Research and Education Programs: Farmer Research Grants and Partnership Grants
  - Prepare content, training materials, schedule webinars/web-based online meetings, coordinate simultaneous translation providers, coordinate agency representatives and guest speakers, and work with local programs to outreach and schedule programming. Track attendance and evaluate workshop content and delivery (see Evaluation scope below).
- Develop Plain Language Guides on USDA Programs and Services
  - Develop up to five Plain Language Guides (one per year) on most applicable USDA Programs for underserved farmers. Secure agency review and include updated content resulting from changes in the 2023

**J.A. 0258**

Farm Bill Programs. Priority guides will be based on input from Commons' communities and will likely cover the most popular programs: EQIP and NRCS conservation programs, FSA Loans, Food Safety/FSMA, Crop Insurance programs, and Rural Development energy and facilities programs.
  ○ Guides will be formatted, published and broadly disseminated to national networks for use in local and regional farmer training programs.
- Track, Evaluate, and Report Technical Assistance Outcomes and Metrics
  ○ Develop goals, metrics, and evaluation measures with collaborating partners to set target numbers of farmers to track and measure progress toward individual and program-level goals.
  ○ Develop evaluation surveys, participatory and culturally responsive evaluation strategies and work with collaborating partners to assess project outputs and project outcomes.
- Provide incubator/apprenticeship program staff with training and technical assistance and online resource library on launching and establishing Incubator Farm Programs as a pathway toward land access for new farmers
  ○ Outreach to support new, potential incubator farm programs with technical assistance, model development, connections to resources, and support as they build programs and develop protocols and programming.
  ○ Conduct a bi-annual inventory of incubator and apprenticeship training programs, and keep the national map of projects current and updated.
  ○ Outreach to engage historically underserved communities with opportunities to engage in the FIELD Network by providing conference presentations, sharing information at regional food/agriculture events, and other venues.
  ○ Update existing incubator and apprenticeship training resources, curricula, and toolkits in online resource/web library with updated case studies, program examples, new program agreements and models.
  ○ Promote new and updated resources nationally among beginning farmer training programs.
- Expand and build connections between national FIELD Network partners + Agrarian Trust and Agrarian Commons model
  ○ Outreach to engage FIELD Network members in raising awareness of the AT project, inventory key challenges and opportunities in land access among programs in their regions; who are key players, who do they partner with for land access, how do they support graduates to find/access land.
  ○ Identify training and technical assistance needs of incubator staff and partners to connect farmers to land
  ○ Develop key training programming (webinars, regional meetups, networking sessions, case studies) to meet needs.
  ○ Share examples of AC programs, and interest in exploring relationships necessary to forming a local/regional commons.

11

**J.A. 0259**

- ○ Host national networking sessions / information sharing on farmland access/connection challenges with FIELD network participants; highlight successful models of land matching and connections for SD farmers.
- Highlight successful models of Incubator Programs who facilitate pathways to independent farm ownership
    - ○ Identify and interview incubator/apprenticeship training programs which effectively facilitate farmland connections for new farmers leaving incubator/apprenticeship programs
    - ○ Develop case studies featuring strategies, models, partnerships, and resources needed to facilitate effective referrals and land match
    - ○ Identify long-term technical assistance and support strategies provided and document
    - ○ Share case studies broadly via resource website and feature programs in webinars and networking sessions
- Host annual FIELD Schools each year to build the capacity of incubator/apprenticeship programs to support SD producers with access to land, capital, and markets
    - ○ Host four FIELD School in different Agrarian Commons project locations each year (TX, NE, NY) to feature regional field trips to proposed new Commons and prominent incubator and apprenticeship training programs in those regions
    - ○ Facilitate professional development workshop tracks on Incubator Farm and Apprenticeship Program Management
    - ○ Facilitate professional development workshops on best practices in land access/models, access to capital/financing, and market development for new, beginning, and graduating farmers
    - ○ Engage speakers/presenters on plenary issues relevant to long-term farmer success and access to USDA programs and services

Objective 2: Partner with Cornell Cooperative Extension of Eerie County to provide the BIPOC producers who are the beneficiaries of this project with a workshop series that will help them prepare to apply for financing from the Farm Service Agency (FSA), and to provide additional technical assistance nationally for USDA and FSA programs that the BIPOC producers ask for during the Needs Assessment conducted by Tufts University. Activities to be conducted during the full 5 years of the grant include:

- Planning: Create an agenda for each workshop, select a date and time, secure speakers and panelists, reserve a venue, hire a caterer if needed, set-up a registration site
- Development: create content and resource material for each workshop, and create a virtual evaluation survey for each workshop
- Publicity: Create a flier or postcard for each workshop, write a media release and send it to those on CCE Erie's media list, promote the series and each workshop on social media, create web page content for the series, send personal emails to contacts at organizations which serve farmers and community gardeners

12

**J.A. 0260**

- Delivery: register participants, coordinate refreshments, room set-up and audio-visual arrangements with caterer and venue staff and conduct each workshop and conduct workshop evaluation
- Follow-up: send follow-up email to registrants offering tailored, one-on-one assistance, send thank you notes to speakers, panelists, caterer, venue staff
- Gather metrics listed above for sharing and reporting

Objective 3: Partner with Farm Commons to provide technical assistance (TA) education and support to the 150 underserved BIPOC farmers who are the beneficiaries of this project to fill the gaps in USDA and FSA programs and opportunities. Activities to be conducted during the full 5 years of the grant include:

- Coordinate with underserved BIPOC producers in each of the five project areas (NE, TX, and the two projects in NY) to coordinate with farmers on workshop needs, desires, timeline, agendas, and participation
- Work with translators to create educational videos utilizing the material Farm Commons has already created. Native speakers with familiarity with agricultural and legal concepts and good screen presence would be chosen to record the educational videos.
- Give each non-English speaking underserved BIPOC producer access to the video workshops in their own languages on the web platform. The content will be customized by a local partner to reflect their cultural understandings around things like the role of the law in society, the expectation of legal enforcement, the nature of risk as business concepts, familiarity with insurance products and more.
- Share print material, a workbook, and assessments in each underserved BIPOC producer's native language.
- Facilitate peer-to-peer learning and Q&A times with translators
- Gather metrics listed above for reporting and sharing

Objective 4: Partner with American Farmland Trust to provide Agricultural Land Stewardship education and conservation technical assistance support to the 150 underserved BIPOC farmers who are the beneficiaries of this project. Activities to be conducted during the full 5 years of the grant include:

- Basics of Soil Health and Soil Health Assessment- This workshop will include an introduction to soil health principles and functions. AFT and partners will provide a basic background on soil biology and ecology, soil health indicators, assessment techniques and soil health management planning. There will be an on-farm component to the training with a regional soil health successful farmer.
- Cropping Systems and Cover Crops- This workshop will focus on adapting cover crop management to different soil types and farm operations and highlight the potential of selected cover crop species or mixtures to address specific soil health constraints. Cover cropping effect on Nitrogen management will also be discussed. The classroom experience will include a panel of farmers who have been implementing cover crops long-term. The on-farm component will be with a regional farmer who has a history of cover crop management.
- Eliminating, reducing and modifying tillage for soil health- This workshop will discuss the benefits of reduced tillage, no-till systems and planting green.

13

Presenters and farmer panels will cover a wide range of topics including nutrient management and pests and disease control in no-till systems. There will be an on-farm component with a regional farmer using reduced tillage management.

- Adaptive Nutrient Management for Soil Health- This workshop will discuss how soil biology impacts nutrient management and what tools are available for adapting to variable nitrogen needs. Topics will include biochar, nutrient management in pasture systems, management effects on nutrient loss to waterways and the atmosphere and a farmer panel discussion. There will be an on-farm component with a regional farmer.
- Economics of Soil Health and USDA-NRCS programs- This workshop will discuss the economic costs and benefits of soil health practice adoption. We will have experts share their knowledge on partial budgeting, quantifying management changes and highlight decision-making tools available to use to conduct an on-farm economic analysis.  We will also bring in our partners from the USDA-NRCS and Soil and Water Conservation Districts to share what conservation programs they have to offer and information on how to participate in those programs.

Objective 5: Partner with The Nature Conservancy to provide technical assistance and advisement on soil health and testing, conservation practices, potential funding sources and relevant contacts, data collection and analysis, on-farm technology, and support from agronomists as needed to the stakeholders and beneficiaries of this project. Activities to be conducted during the full 5 years of the grant include:
- Provide training and technical assistance to Maya Economic Development Corporation (MEDC) and connect the participating underserved producers to local USDA programs and other valuable resources.
- Coordinate technical assistance and training with local/regional experts in regenerative practices to be implemented in the acquired land.
- Advise on data collection and analysis strategies to track progress.
- Coordinate networking opportunities for MEDC to expand their access to local resources (i.e., knowledge and funding).
- Keep MEDC updated on new practices or technologies aligned with MEDC's goals that could potentially improve its overall performance.
- Support their outreach activities. This may include:
  - develop communications about their activities,
  - recruiting volunteers when required, and
  - organizing field days open to the community.

Objective 6: Partner with Maya Economic Development Corporation in NE and Plant It Forward in TX to create two new Agrarian Commons and secure land access and capital access for collectives of underserved BIPOC producers. Activities to be conducted during the full 5 years of the grant  include:
- Create bylaws, articles of incorporation, and founding documents of the Agrarian Commons, working with attorney and community partners to be specific to the BIPOC underserved producers needs - years 1 & 2 of funding

14

**J.A. 0262**

- Found the Agrarian Commons board, bringing together land and farmers, and ensuring review and input is happening from farmers and board members - years 1 & 2 of funding
- Create land management framework, including farm operations, lease, and management agreements - years 1 & 2 of funding
- File and incorporate the Agrarian Commons, filing with the state and IRS - years 1 & 2 of funding
- Create webpages and collateral content used for outreach and engagement, education, and to use for leveraging other funding such as philanthropic donations to complete additional project costs. - year 3
- Appraisal - Year 3
- Environmental assessment - ensure there is no concern of contamination or other issue - year 3
- Title search - year 3
- Engage lawyer for lease negotiation - year 3
- Involve all partner agreements - year 3
- Raise additional fund through story telling and fundraiser from donors and align press to raise additional money needed - year 3
- Closing and recording - year 4

Objective 7: Partner with the Somali Bantu Community Organization of Western New York, Alianza Agricola, and Cornell Cooperative Extension of Eerie County to create a Buffalo Agrarian Commons and secure land access and capital access for underserved Somali Bantu and Mexican farmers in New York. Activities include:
Activities to be conducted during the first three years of the grant by Cornell Cooperative Extension of Eerie County:
- Needs Assessment - year 1
  - Meet with both farmer collectives to discuss their land needs
  - Develop a form with a list of criteria and desirable features that can be used to screen potential properties
- Property Search - year 2
  - Regularly review property listings on the New York Farmland Finder and realty websites that specialize in working lands
  - Share listings with farmers to determine interest in potential properties
- Desktop Property Assessment - year 2 or sooner
  - For properties of interest, perform a preliminary property assessment based on publicly available data (e.g., natural resources, topography, zoning, human-made features, environmental hazards)
  - Meet with stakeholders to discuss findings and determine interest in a site visit
- Site Visit - year 2 or sooner
  - Coordinate site visits to properties of interest with stakeholders and landowner
  - Summarize findings from each site visit
- Property Selection - year 2 or sooner

15

**J.A. 0263**

      ○  Meet with stakeholders after each site visit to discuss interest level and determine next steps

Activities to be conducted during the full 5 years of the grant by Agrarian Trust:

- Create bylaws, articles of incorporation, and founding documents of the Agrarian Commons, working with attorney and community partners to be specific to the BIPOC underserved producers needs - years 1 & 2 of funding
- Found the Agrarian Commons board, bringing together land and farmers, and ensuring review and input is happening from farmers and board members - years 1 & 2 of funding
- Create land management framework, including farm operations, lease, and management agreements - years 1 & 2 of funding
- File and incorporate the Agrarian Commons, filing with the state and IRS - years 1 & 2 of funding
- Create webpages and collateral content used for outreach and engagement, education, and to use for leveraging other funding such as philanthropic donations to complete additional project costs. - year 3
- Appraisal - year 3
- Environmental assessment - ensure there is no concern of contamination or other issue - year 3
- Title search - year 3
- Engage lawyer for lease negotiation - year 3
- Involve all partner agreements - year 3
- Raise additional fund through story telling and fundraiser from donors and align press to raise additional money needed - year 3
- Closing and recording - year 4

Objective 8: Partner with Garden Variety Harvests to expand the Southwest Virginia Agrarian Commons and secure land access and capital access for underserved farmers in Virginia.

Activities to be conducted during the full 5 years of the grant include:

- Create webpages and collateral content used for outreach and engagement, education, and to use for leveraging other funding such as philanthropic donations to complete additional project costs. - years 1 & 2 of funding
- Engage lawyer for lease negotiation and advising - years 1 & 2 of funding
- Involve all partner agreements - years 1 - 5 of funding
- Raise additional fund through story telling and fundraiser from donors and align press to raise additional money needed - years 1 & 2 of funding
- Closing and recording - year 1 or sooner

**Personnel and Resources:**

**Jean Willoughby -** Executive Director of Agrarian Trust and experienced federal grant manager, Jean has worked in farming and in agricultural nonprofits supporting small, mid-scale, and family farmers for more than a decade. With demonstrated experience in economic development and equity-building initiatives, Jean's work focuses on building partnerships and organizational development. Jean has worked with 100+ nonprofit,

16

**J.A. 0264**

corporate, community, municipal, and federal institutions including the NIH, CDC, and others. She has provided consulting services and conducted feasibility studies for organizations across the country including the Triangle Land Conservancy and the Massachusetts Food System Collaborative. Jean is the founder of Health Equity Resources and Education LLC and a trainer with the Racial Equity Institute. Previously, she served on Agrarian Trust's Board of Directors until 2018 and was Organizational Development Director from 2018 to 2020.

**Nathan Galaviz -** Commons Manager, Agrarian Trust. Nathan is responsible for assisting project partners and beneficiaries with land access planning. Working in collaboration with Agrarian Commons Coordinators, Nathan is responsible for ensuring ownership structure and stewardship agreements are set in place and carried out accordingly. His background spans facilitating transitions of farms, collaborating with diverse stakeholders, and showcasing an understanding of innovative land ownership models. Nathan's Agrarian Commons board duties involve recordkeeping, compliance, and effective liaison work, highlighting his commitment to supporting local community interests. Nathan's proactive approach, coupled with technical expertise in various aspects of land projects, underscores his dedication to fostering sustainable and equitable land practices and ensuring the success of Agrarian Commons initiatives.

**Sarah Holdeman -** Operations Manager, Agrarian Trust. Sarah is responsible for managing Operations at Agrarian Trust, including but not limited to onboarding and integrating staff members into processes and systems, organizing and reporting information for grants, supporting grant budget management, and managing our CRM donor database. Sarah has a background working with Agrarian Commons farmers and philanthropic partners to support shared goals as well as to facilitate place-based and community-led initiatives. Outside of Agrarian Trust, Sarah has worked in a number of food systems roles including as farm crew, in food pantry operations, and as a farmer's market coordinator.

**Susanna Wheeler -** Director, New Roots Community Farm. Susanna supervises all farmer support programs, providing direct mentorship and technical assistance for landowners and land seekers in the Southwest West Virginia region. She leads the design and coordination of annual land access workshops in the region and attends county and statewide farmland protection board meetings and conferences. New Roots Community Farm is located on 82 acres and is a nonprofit organization operating a year-round, 6-acre, diversified vegetable production farm that demonstrates intensive regenerative growing techniques and tools suited to Central Appalachian farm enterprises. Operation of this demonstration farm anchors New Roots as a key support for seasoned farmers as well as the beginning, young, and BIPOC producers.

**Rachel Armstrong -** Farm Commons Technical Assistance Provider. Rachel is the founder and executive director of Farm Commons where she is reforming legal services in a way that respects the client as a primary source of knowledge, inspiration, and solutions and that helps farmers build legal capacity and resilience through innovative

**J.A. 0265**

models. In 2018 Rachel was named an Ashoka Fellow in recognition of her creativity in imagining a more empowered legal system.

**Jennifer Hashley -** Tufts University National Technical Assistance Provider and Coordinator. PD/PI and New Entry Director, she led the organization for 21 years and has served as PI on hundreds of federal awards. Jennifer has led the national FIELD Network, which engages over 6,000 producers (76% of whom are underserved) for the past 10 years and will coordinate core partners, provide project management, organize annual FIELD schools, and conduct program evaluation and outcomes reporting.

**Luis Marcos -** Agrarian Commons Community Coordinator for NE. Luis is President and CEO of the Maya Economic Development Corporation. Through his work with the Omaha Nation and Indigenous nations across borders, he has been named as Ambassador of the Q'anjob'al, Akateko, Chuj, and Popti Nations with the Omaha Tribe.

**Rachel Lockhart -** Agrarian Commons Community Coordinator for Houston, TX. Rachel Lockhart spent two years serving as a Sustainable Agriculture Extension Agent with the US Peace Corps in Senegal, West Africa, and manages the Farmer Education and Farm Services program for refugee and new American farmers in Houston, TX for Plant It Forward.

**Kathleen McCormick -** Cornell Cooperative Extension of Eerie County Technical Assistance Provider. Kathleen is experienced in connecting farmers with USDA programs and resources, as agricultural educator for Cornell Cooperative Extension. As Regional Navigator with Farmland for a New Generation New York Kathleen has a proven track record helping new farmers secure land access in Erie County.

**Aaron Ristow -** American Farmland Trust Technical Assistance Provider. Aaron directs AFT's Genesee River Demonstration Farm Network and Rented Lands Conservation Incentives Program as well as other AFT initiatives in New York state. He has 17 years of experience coordinating and administering agricultural extension and research activities, most recently focusing on multi-partner projects related to soil health measurement, implementation, and adaptive nutrient management.

**Ignacio Villa -** Agrarian Commons Community Coordinator for Buffalo, NY. Ignacio has over 20 years of experience working on small farms helping farmers to develop successful businesses and grow food sustainably, including work with dairies and intensive grazing. He is a member of Erie County's Cornell Cooperative Extension of Eerie County Ag Program Committee, Erie County's Community Climate Action Task Force, and was recently recognized for his innovative vision in a report by the Western New York Regional Food System Initiative.

**Jill Wells -** The Nature Conservancy Technical Assistance Provider. Jill gained experience with community outreach, education, and event planning as Director of Education at the Nebraska AIDS Project. Jill has worked with the Nature Conservancy for nearly 20 years where she is a writer and core collaborator with community partners.

18

**J.A. 0266**

**Jacob Fritton -** Coordinated agriculture projects for the Nature Conservancy for the past eight years, including on two projects with over 60 producers to reduce water use by using technology to guide irrigation decisions, and two projects that assist over 30 farmers as they newly adopt cover crops. Jacob provides technical assistance to farmers through work plan development, technical assistance on Farm Bill funding, and implementation of practices.

## Outcome Evaluation Plan and Reporting

The outcomes and impacts of this project will be documented and evaluated and disseminated by the academics, scholars, research and communication professionals involved in the activities of this proposal. Project performance measures and metrics (also referred to as indicators of success) are: the number of number of acres secured for BIPOC underserved producers, the number of BIPOC farmers benefiting from the secure land access, the number of farmers who apply for and participate in a USDA programs, the number of farmers who receive loans or cost-share program agreements to advance their business goals, the number of farmers who access farmland via new lease agreements or farmland purchases, the number of farmers who access new markets and increase annual revenues. Jennifer Hashley of Tufts University will be responsible for overseeing and measuring performance measures and metrics for the technical assistance component of this project, and the grant manager hired by Agrarian Trust will be responsible for overseeing and measuring performance for the land access component of this project. The grant manager will work with the collaborators and partners of this project to compile all metrics and report out and engage with the USDA and other stakeholders. A minimum of $450,000 of the funding is set aside for monitoring and performance measurement. Two expected outcomes that will be completed within the project and the plan to document and share these outcomes are:

- Training and Educational Materials and Resources will be produced and shared and disseminated via Tuft University's New Entry online resource library and listservs and through Agrarian Trust's online resource library and listservs, benefiting the underserved BIPOC producers of the project, and also additional underserved producers and technical assistance providers who are not already directly filling a role of this project.
    - Work with collaborating partners to track outputs and to interview farmers on assessing project outcomes.
    - Share project outputs and outcomes with Agrarian Commons partners for quarterly TA reporting and assessment of the project toward meeting its shared goals.
    - Share all training materials developed (webinars, Plain Language Guides, educational resources or fact sheets) broadly with local, regional and national audiences via posting on national and regional listservs, social media, newsletters, such as the National Incubator Farm Training Initiative (NIFTI) listserv, the National Ag Apprenticeship Listserve (AgALN), the BFRDP Funded Partners listserv offered by NIFA; via the Northeast

19

**J.A. 0267**

Sustainable Agriculture Working Group, COMFOOD listserv, Northeast Organic Farming Association Listservs, and other local/regional or national lists identified by collaborating partners.

- Post resources to New Entry's national Farmer Resource Libraries on https://nesfp.nutrition.tufts.edu/resources and Agrarian Trust website
- Distribute information about resources in New Entry's e-newsletter (circulation 15,000 subscribers) and social media and those of partner organizations to highlight resource spotlights and to share training strategies with other farmer training programs.
- Distribute information about resources in Agrarian Trust's e-newsletter (circulation 25,000 subscribers) and social media and those of partner organizations to highlight resource spotlights and to share training strategies with other farmer training programs.

● The stories, models, methods and legal documents used for providing structure to the Agrarian Commons created and expanded through this project, giving BIPOC underserved producers access to land, capital and markets will be compiled and shared broadly, being adapted into podcasts, news articles, toolkits, blog posts, and curated for social sharing, similarly to the recent articles and press done by The Guardian, Yes! Magazine, Higher Ground Productions, Reuters, and others about the work of Agrarian Trust. This will bring benefit to the project beneficiaries by helping to increase the audience and donor base of their existing non-profits, and will benefit other BIPOC farmers and collectives that will learn from and adapt project methods and outcomes to fit their own needs, helping them to secure and access land, markets, and capital.
- This information, and these methods, resources, and outcomes will be shared broadly with local, regional and national non-profit and media audiences that Agrarian Trust has access to through virtual and in-person conferences, national partner organizations who regularly share Agrarian Trust's work through their websites, newsletters, and social media, news organizations that regularly publicize the work of Agrarian Trust, and by continuing to do presentations that are hosted and presented by the USDA and SARE education projects.
- This information, and these methods, resources, and outcomes will be distributed also in Agrarian Trust's e-newsletter (circulation 25,000 subscribers), website, and social media, and through the Agrarian Commons network that, with this project, will be in over 15 states.

**Local Farm Stewardship Boards and Partners**

20

This will include development of agreements for farmland ownership structures, including conservation agreements, and technical assistance for transitioning land ownership for farmer beneficiaries in multiple states, including but not limited to Virginia, West Virginia, Maine, Montana, Washington. Includes support for Agrarian Commons board trainings, workshops, and facilitation. Support for partner workshops, online and in-person events, and gatherings throughout each year of the project for beneficiaries. Includes funds for event planning, honoraria, website support, publications, printing, materials and supplies.

Agrarian Trust partners with several organizations focused on rebuilding local food economies, including the U.S. Food Sovereignty Alliance, and will provide access to education and support to the farmers who are the beneficiaries of this project through these partnerships. Farmers will be engaged through multiple avenues, including ongoing events, publications, and online resources. Agrarian Trust will serve as a partner coordinating and facilitating events to engage farmers in learning opportunities, new partnerships, and membership opportunities with our partners. Agrarian Trust will organize workshops, online and in-person events, and gatherings throughout each year of the project. Support for workshops, online and in-person events, and gatherings throughout each year of the project for beneficiaries includes funds for event planning, honoraria, website support, publications, printing, materials and supplies.

### Agrarian Commons Land and Market Access

Agrarian Trust will work to advance expanded land access and market access for underrepresented farm communities in the existing Agrarian Commons network in states including but not limited to Virginia, Washington, and Maine. This will allow us to serve an additional 265 farmers who are part of the Agrarian Commons network.

### Management and Partnership Plan

Tufts University will serve as the national technical assistance coordinator, working with The Nature Conservancy, American Farmland Trust, Farm Commons, Cornell Cooperative Extension of Eerie County, Agrarian Trust and all Agrarian Commons Community and Relationship Coordinators to ensure all Technical Assistance needs of the BIPOC underserved producers who are the beneficiaries of this project are met, and that targeted services and support is provided to improve the understanding of and equitable participation in the full range of USDA programs and services and also the understanding and equitable participation in business and legal frameworks that help to create strong, profitable, and sustainable farm businesses. All technical assistance providers will have shared leadership in guiding the programs and education offered.

Agrarian Trust will serve as the national coordinator for the five land acquisition and access components of the project, working with existing partnerships of The Nature Conservancy and Cornell Cooperative Extension of Eerie County to create the community-holding structures and governance of land, using existing staff to do outreach, engagement, and communication to leverage additional project funding to

**J.A. 0269**

cover renewable energy, soil and ecosystem improvements, infrastructure improvements, and additional costs associated with securing land access for BIPOC and underserved farmers, and working with existing real estate attorney relationships to develop the legal framework and action steps needed.

Each Agrarian Commons Community Coordinator (in TX, NE, and NY) will work with Agrarian Trust and underserved BIPOC producers to ensure that their goals, needs, and desires guide the project and the project direct benefits them and their communities. Each Agrarian Commons Community Coordinator will help build shared leadership among all stakeholders and beneficiaries at the local land level and in the national scope of Agrarian Trust's work. All components of this project will take place over the full five years of this grant project, with reporting and sharing among partners and collaborators happening at least every ninety days.

Agrarian Trust's team will serve in the administrative role on the project, overseeing coordination, communication, data-sharing, and reporting among members of the project team and stakeholder groups on a weekly basis both in-person and electronically via email, Zoom, Google Meet, and shared Google Drive folders and documents, which can then be used by each organization on their websites, in their newsletters, and through cross-sector collaborations. All partners and collaborators involved in this application will ensure public access to all data and information associated with this project.

This project will be sustained beyond the life of the award by building upon the strong foundational structure of land access and technical assistance education this project will provide, which will give all stakeholders and beneficiaries the resources they need to create and carry forward profitable and sustainable farming businesses, collectives, and cooperatives.

Attachment 3A

**Agrarian Land Trust – Budget Narrative Addendum**

**Project: Increasing Land, Capital, and Market Access for BIPOC Farmers Through the Agrarian Commons**

**KEY PERSONNEL**

**Nathan Galaviz, Agrarian Commons Manager.** Responsible for assisting project partners and beneficiaries with commons organizational development as well as land access planning. Working in collaboration with Agrarian Commons Community Coordinators, Nathan is responsible for ensuring governance structure and stewardship agreements are set in place and carried out accordingly. Assist with maintaining effective working relationships among participants including farmer-beneficiaries, partners, and technical service providers by convening meetings and assisting with conducting workshops. Responsible for coordinating and assisting with monthly meetings, workshops, and yearly site visits. Assist with monitoring project land stewardship agreements and participating in stewardship board training, events, and meetings throughout the 5-year grant period.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $75,000 | Yr 1-2: 50% FTE; Yr 3-5: 35% | 5 years | $162,202.32 |

**Sarah Holdeman, Operations Manager.** Assist the project's Grant Manager and Finance & Development Manager with project data collection and reporting requirements. Responsible for collecting, reviewing, and submitting content of performance reporting for the project. Assist with project budget management. Ensure state compliance and insurance coverage in states where new Agrarian Commons are formed through this project. Responsible for onboarding new project staff members and participants including partners and beneficiaries, integrating project team members into processes and systems, and collecting, recording, storing, and reporting information for the project. (Project funds will only be used to support onboarding and assisting personnel specifically for this project.) Assist with operations and HR functions associated solely with the project. This role also provides day-to-day oversight of the project and will receive auto generated emails from the grants management system regarding actionable items.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $75,000 | Yr 1-2: 75% FTE; Yr 3-5: 50% | 5 years | $237,155.09 |

**Jean Willoughby, Grant Manager & Co-Director.** Serve as the program director with overall responsibility for the project, including all functions related to managing the agreement; primary contact for the agreement and grants management system regarding actionable items. Conduct project planning, budgeting, and management. Responsible for hiring, training, and evaluating project personnel and daily supervision of project team. Lead engagement and coordination of project team and participants with partners and technical assistance providers. Build cross-organizational partnerships to support participants and stewardship boards in achieving project goals. Coordinate developing and implementing the new Agrarian Commons land-holding legal entities formed by this project. This role also serves as the project administrative contact, responsible for the content of financial reporting for the project in collaboration with the Finance & Development Manager, and as the signatory official with legal authority to commit the organization to financial and other responsibilities.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $85,000 | Yr 1-2: 75% FTE; Yr 3-5: 50% | 5 years | $268,775.77 |

**J.A. 0271**

Attachment 3A

**TBH, Finance & Development Manager.** A new staff member will be hired to serve as Finance & Development Manager and will report directly to the Grant Manager (who will temporarily fulfill this role's responsibilities until the new hire is made) and assist with supervising project financial functions. Responsible for ensuring that project financial reporting is carried out in a timely, accurate, and transparent manner. Accountable for requesting, disbursing, and tracking grant funds, making timely payments to project personnel, any project contractual work, and all other costs exclusively associated with project funding. Responsible for pursuing network connections to leverage funding resources solely for this project and identifying opportunities to assist with funding the full land acquisition costs of this project and other infrastructure costs of each farmer-led initiative described in this project, such as renewable energy sources and equipment to ensure the long-term success and sustainability of the Agrarian Commons land-holding entities formed by this project.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $75,000 | Yr 1-2: 75% FTE; Yr 2-5: 50% | 5 years | $237,155.09 |

**TBH, Communications & Education Manager.** Responsible for documenting project learning and successes by attending major meetings, events, and workshops with project beneficiaries and partners and conducting interviews and assessments with project participants. Develop multimedia content for new Agrarian Commons formed by this project to share through communications (online, social media, videos, graphics, press releases, articles, interviews) to enable learning among project beneficiaries in regions across the country. In collaboration with Grant Manager, coordinate project website design and development and all production of project print materials. Assist Commons Alliance Manager with communications. Assist project team with assessing and communicating the socioeconomic impacts of Agrarian Commons entities formed through the project and overall project impact.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $75,000 | Yr 1-2: 75% FTE; Yr 3-5: 50% | 5 years | $237,155.09 |

**TBH, Agrarian Commons Manager.** Responsible for coordinating Agrarian Commons boards formed under this project. Responsibilities will include administration of board documents and recordkeeping, board member management, facilitating communications on behalf of the board, participating in community engagement, serving as a liaison between the Agrarian Commons board and the national Agrarian Trust, consulting with legal advisors, and supporting technical assistance related to Commons development, ownership structures, and tenure agreements.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $75,000 | Yr 1-2: 50% FTE; Yr 3-5: 35% | 5 years | $162,202.32 |

**TBH, Agrarian Commons Alliance Manager.** Assist with building cross-organizational partnerships to ensure project participants exchange best practices throughout the 5-year grant period. Convene monthly and quarterly meetings with project beneficiaries and partners; manage project listserv for sharing best practices and relevant resources. Assist the Agrarian Commons Manager and Land Acquisition Manager with identifying and addressing technical assistance needs of project beneficiaries and Agrarian Commons boards formed by this project. Responsibilities will also include administration of board documents and record-keeping, board member management, facilitating communications on behalf of the board, participating in community engagement, serving as a liaison between the Agrarian Commons boards and the national Agrarian Trust, and supporting technical assistance.

**J.A. 0272**

Attachment 3A

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $65,000 | Yr 1-2: 25% FTE; Yr 3-5: 15% | 5 years | $74,952.78 |

**Salary total: $1,379,598.46**

**Annual Cost of Living Adjustment**
Agrarian Trust's fiscal year runs from January to December. In accordance with our standard budgeting procedure, all annual base salaries for full-time staff have been adjusted at future fiscal years by a rate of a 3% increase to account for our annual cost of living adjustment.

**Fringe Benefits: $400,083.55**
29% of Staff Salaries - All staff of Agrarian Trust receive fringe benefits including but not limited to a health insurance stipend; holiday, vacation, sick, leave, paid time off; internet and phone stipend; workers' compensation, Unemployment Insurance, and Social Security payments.

**Key Personnel Total: $1,779,682.01**

**TRAVEL**

Agrarian Trust Travel for Site Visits, Project Training, and National Conferences to Share Results.

**Site Visits:**
Three Agrarian Trust staff members travel to TX (2 nights and 3 days), NE (2 nights and 3 days), NY (3 nights and 4 days) once a year for 5 years for site visits; the purpose of which is to hold meetings with each group of project beneficiaries to develop, review, finalize, and monitor land stewardship agreements, conduct trainings, hold Agrarian Commons board meetings and provide technical assistance to project beneficiaries.

Flights: $15,795
- Land Acquisition Manager
  - RT flight NC to TX @ $332 x 5 site visits = $1,660
  - RT flight NC to NE @ $335 x 5 site visits = $1,675
  - RT flight NC to NY @ $217 x 5 site visits = $1,085
- Communications Manager
  - RT flight FL to TX @ $381 x 5 site visits = $1,905
  - RT flight FL to NE @ $408 x 5 site visits = $2,040
  - RT flight FL to NY @ $370 x 5 site visits = $1,850
- Grant Manager
  - RT flight FL to TX @ $381 x 5 site visits = $1,905
  - RT flight FL to NE @ $365 x 5 site visits = $1,825
  - RT flight FL to NY @ $370 x 5 site visits = $1,850

Ground Transport & Accommodations: $39,750.00
- Car rental
  - $100/day x 10 days/year x 5 years x 3 staff = $15,000
- Per diem
  - $60 per diem x 10 days/year x 5 years x 3 staff = $9,000
- Accommodations
  - $150/night x 7 nights/year x 5 years x 3 staff = $15,750

Site Visits Total: $55,545.00

**J.A. 0273**

Attachment 3A

**Travel to Project Roadmap & Training Staff: $9,750**

Flights: $4,800
- Grant Manager:
  - RT flight FL to NC: $400
- Communications Manager:
  - RT flight FL to NC: $400
- Operations Manager:
  - RT flight OR to NC: $400
- Finance Manager
  - RT flight OR to NC: $400
- Land Acquisition Manager:
  - RT flight to NC: $350
- Commons Manager
  - RT flight to NC: $350
- Commons Alliance Manager:
  - RT flight to NC: $350
- Facilitator:
  - RT flight NC to NC: $250
- Board member 1
  - RT flight VT to NC: $450
- Board member 2
  - RT flight ME to NC: $450
- Board member 3
  - RT flight CA to NC: $350
- Board member 4
  - RT flight UT to NC: $400
- Board member 5
  - RT flight NYC to NC: $250

Ground Transportation and Accommodations: $4,950
- 1 rental car CLT to event space for 5 days = $300 x 2 = $600
- 1 rental car Hendersonville, NC to event space for 5 days = $450
- Accommodations
  - $300/night x 4 x 13 people = $3,900

**Travel for Project Training with Staff & Project Participants (Virtual) Year 1: $2,362.00**

Flights: $2,600.00
- Grant Manager:
  - RT flight FL to NY: $400
- Communications Manager:
  - RT flight FL to NY: $400
- Operations Manager:
  - RT flight OR to NY: $400
- Finance Manager
  - RT flight OR to NY: $400
- Land Acquisition Manager:
  - RT flight NC to NY: $250
- Commons Manager
  - RT flight NC to NY: $250

**J.A. 0274**

Attachment 3A

- Commons Alliance Manager:
  - RT flight NC to NY: $250
- Facilitator:
  - RT flight NC to NY: $250

Ground Transportation and Accommodations: $1,360.00
- RT train ($50) NYC to Garrison, NY x 8 = $400
- Per diem for travel days = $60 x 2 days x 8 staff = $960

Project Training Total: $3,960

**Travel to National Conferences to Share Results**

Two Agrarian Trust staff members travel each year to a national conference (examples include: Land Rally, Farm Viability Conference, National Risk Management Education conference, Wallace Good Food Conference, Community Food Systems Conference, USDA Small Farms Conference) to share project learnings.

Flights: $4,740
- Staff Member 1
  - $395 flight x 5 years = $1,975
- Staff Member 2
  - $395 flight x 5 years = $1,975
- Agrarian Commons Representative for one year
  - $395
- Agrarian Commons Representative for one year
  - $395

Ground Transportation and Accommodations: $16,550
- Car rental:
  - $100/day x 3 days x 5 years x 2 staff = $3,000
- Per diem
  - $60/day x 3 days x 5 years x 2 staff = $1,800
  - $60/day x 3 days x 1 year x 2 Commons Reps = $360
- Accommodations
  - $500 hotel x 2 nights x 5 years x 2 staff = $10,000
  - $500 hotel x 2 nights x 1 year x 2 Commons Reps = $2,000
- Registration
  - $175 x 2 staff x 5 years= $1,750
  - $175 x 2 Commons reps x 1 year = $350

National Conference Total: $24,000

**Travel Total: $93,255.00**

**MATERIALS AND SUPPLIES**

Includes information technology systems (computing devices, equipment, software, firmware, services) used for the project by staff as well as print materials, translated materials, design, and project website. Training guides are for training for project beneficiaries and Agrarian Commons boards formed by this project to support board governance. 7 copies for the project team and 7 copies per board x 4 boards = 35 copies of each guide.

- Training guides

**J.A. 0275**

Attachment 3A

- ○ Crucial Conversations
  - ■ $20/copy x 35 = $700
- ○ Crucial Accountability
  - ■ $12/copy x 35 = $420
- ○ Printing of Agrarian Trust 35 page color training guide
  - ■ $20/copy x 100 = $2,000
- In Year 1, 7 laptop computers and peripherals will be purchased for use by the project team for project-specific work essential for recording, evaluating, and reporting project results.
  - ○ $1,599 x 7 = $11,193.00

**Materials and Supplies Total: $14,313.00**

**CONTRACTUAL**

**Project Website**

Design and development of a project website to share technical assistance resources, create an online learning hub for project beneficiaries, archive project training for use throughout the 5-year project, and facilitate education and network connections among participants. Agrarian Trust will host the project website and work with our website development firm Digital Mountaineers to build.
- 140 hours x $100/hr = $14,000

**Contractual Total: $14,000**

**Total 5-year Budget for Agrarian Trust: $1,901,250.01**

**OTHER**

**SUBAWARDS (SEE ATTACHED SUBAWARD BUDGET NARRATIVES)**

**Tufts University - $1,623,992**
As a subawardee, Tufts University will fulfill the following two roles:
    1. Serve as the National Network Level Technical Assistance (TA) Provider, coordinating and providing TA to program staff and partners operating incubator/apprenticeship programs, including but not limited to: info sharing, and replication of innovative models to connect underserved producers to innovative models around land, capital, markets, and USDA programs.
    2. Serve as Direct TA to Underserved Producers: TA provided directly to underserved, BIPOC, and New American producers in coordination with existing partner networks in the proposed Agrarian Commons regions. TA will focus on access to USDA programs and resources and increasing capacity to access land, capital, and markets.

**Cornell Cooperative Erie County Extension - $66,667.14**
As a subawardee, CCE will fulfill three roles: 1. Offer a workshop series that helps farmland seekers prepare to apply for financing from the Farm Service Agency (FSA) 2. Assist WNY Agrarian Commons stakeholders with their search for suitable farmland 3. Participate in project activities organized by Tufts University.

**Farm Commons - $108,162**
As a subawardee, Farm Commons will fulfill the following roles: Provide technical assistance and education and support to the underserved farmers who are the beneficiaries of this project to fill the gaps in USDA and FSA programs and opportunities using and empowering local knowledge and innovation.

**American Farmland Trust - $174,225**

**J.A. 0276**

Attachment 3A

As a subawardee, American Farmland Trust will provide Agricultural Land Stewardship education and support to underserved farmers who are the beneficiaries of this project for 3 years of the project.

**The Nature Conservancy - $23,030**
As a subawardee, The Nature Conservancy will provide technical assistance and advisement on soil health and testing, conservation practices, potential funding sources and relevant contacts, data collection and analysis, on-farm technology, and support from agronomists as needed to the stakeholders and beneficiaries of this project.

**New Roots Community Farm - $121,463**
As a subawardee, New Roots Community Farm (NRCF) will work with WVU Center for Resilient Communities in year 1 and 2 to collaborate on a statewide mapping of conserved and eased properties relevant to project participants and farmer-beneficiaries. They will conduct interviews and gather data to compile a report on the state of farmland protection and preservation. NRCF will work with the CRC to develop a road map for land access for project beneficiaries based on mapping and evaluation.

**Maya Economic Development Corporation (MEDC) - $139,600.00**
As a subawardee, MEDC will fulfill the following roles: 1. Coordinate local project farmer-beneficiaries and the project's farm partnerships with Indigenous and other communities in the Omaha, Nebraska region with Agrarian Trust. 2. Build and engage the Indigenous People's Agriculture Council in project educational activities as part of the Indigenous People's Summit conference, where project impacts will be shared by and with farmer-beneficiaries. 3. Co-develop the project's organizational infrastructure and financial sustainability with a focus on coordinating project participants with TA providers promoting use of USDA programs and resources that increase capacity to access land, capital, and markets.

**Ignacio Villa - $85,886**
Responsible for coordinating with all involved partners for the creation and fulfillment of the Buffalo Agrarian Commons. Will assist communications among community stakeholders and project beneficiaries, assist land development and stewardship coordination, and will assist with outreach and development.

**Plant it Forward - $74,880**
Responsible for coordinating with all involved partners for the creation and fulfillment of the Texas Agrarian Commons. She will assist communications among community stakeholders and project beneficiaries, assist land development and stewardship coordination, and will assist with outreach and development.

**EDUCATION & TRAINING**
**Farmer Education & Training: $4,800**
Four farmer beneficiaries from Plant It Forward in Houston, TX to attend Farm Commons 5 week course and the Cornell Cooperative Extension workshops. There are 8 workshops in the courses, each workshop is 1.5 hours long, and each farmer beneficiary will receive a stipend of $25/hr for attendance. = $1,200.

Four farmer beneficiaries from Maya Economic Development Corporation in Lyons, NE to attend Farm Commons 5 week course and the Cornell Cooperative Extension workshops. There are 8 workshops in the courses, each workshop is 1.5 hours long, and each farmer beneficiary will receive a stipend of $25/hr for attendance = $1,200.

Four farmer beneficiaries from Alianza Agrícola in Buffalo, NY to attend Farm Commons 5 week course and the Cornell Cooperative Extension workshops. There are 8 workshops in the courses, each workshop is 1.5 hours long, and each farmer beneficiary will receive a stipend of $25/hr for attendance = $1,200.

**J.A. 0277**

Attachment 3A

Four farmer beneficiaries from the Somali Bantu Community Organization in Buffalo, NY to attend Farm Commons 5 week course and the Cornell Cooperative Extension workshops. There are 8 workshops in the courses, each workshop is 1.5 hours long, and each farmer beneficiary will receive a stipend of $25/hr for attendance = $1,200.

**Project Roadmap and Training Staff: $11,185**
Staff and partners (virtual) gather to roadmap project deliverables.
- Event space rental for 3-day training: $3,885
- AV fee for including virtual participants: $700
- Group facilitation and customized training: $6,000 training team fee

**Agrarian Commons Training Year 1: $20,823**
Agrarian Commons (including farmers and board members) and staff training to gain working knowledge of core commons principles and communication tools necessary to ensure the long-term success of Agrarian Commons entities formed through this project.

Event space rental at Garrison Institute for 3-day training for project participants, including farmers, Agrarian Commons boards, and staff ($700 AV fee for technology costs to include virtual farmer beneficiaries and participants from the Agrarian Commons land-holding entities formed by this project for 3 days at $185 per day for participants):
- Event space rental for 3-day training: $3,885
- AV fee for including virtual participants: $700
- Access to ProSocial online learning platform, resources, support, and networking tools throughout the 5-year project: $2,000
- ProSocial group facilitation and customized training: $6,000 training team fee
- Crucial Conversations facilitation, negotiation, conflict resolution training for project participants and beneficiaries. Full-day Training Workshop, In-Person with Trainer:
- Participant Learner Licenses: In-Person Learner Sets @ Non-Profit Rate of $234 each x 7 staff = $1,638
- Facilitator Fee = $6,600

**Farmer Stewardship Board & Partners Training: $935,450**
Agrarian Commons board training, workshops, collaborative work sessions, and facilitation throughout the 5-year project. This includes partner workshops, online and in-person events, and gatherings throughout each year of the project for its beneficiaries. Support for farmers and board members attending meetings, events, and educational training and workshops organized throughout the 5-year project with a focus on technical assistance for transitioning land ownership for farmers.

● Kristin King-Ries, Agrarian Commons Real Estate Attorney. Legal and transactional support for five land acquisitions funded through this project. Responsible for ensuring laws and regulations are followed. Cost based on past projects that King-Reis has completed for Agrarian Trust. Based on past work, cost is $35,000 per transaction x 5 acquisitions = $175,000.

● Agrarian Commons boards affiliated with Agrarian Trust in 12 locations @ $53,500 per Agrarian Commons board to support organizational development and farm transitions for farmers in their region) = $642,000.

● Commons evaluation process, $500/ person for 7 advisory board members = $3,500.

● Agrarian Commons legal support (for 12 locations @ $5,000 per board for collaboration among boards on developing land-holding and conservation legal agreements: $5,000/each x 12 Agrarian Commons boards = $60,000.

**J.A. 0278**

Attachment 3A

● Partner training with U.S. Food Sovereignty Alliance, educational partner supporting farmers and Agrarian Commons boards with access to resources, events, and network. Event planning, website support, printing, publications, materials and supplies. Total = $51,450.

Total Education & Training: $972,258

**LAND PURCHASES:**
**Lyons, NE -** Land cost: $3,020,219.13 - Approximately 310 acres of farmland (total land cost is an estimate based on average land prices; total cost is estimated at $13,500 per acre = ). The remainder of the land purchase price and project costs will be funded through other avenues which will become available if this project is awarded (other funding that will be leveraged includes philanthropic donors, partner organizations, and other grant opportunities). Additional other costs associated with Lyons, NE land acquisition (all estimates based on previous projects completed by Agrarian Trust):
- Appraisal cost: $7,500
- Title fees: $2,500
- Closing and Recording fees: $15,000
- Reserves: (2 years of property holding cost such as taxes, insurance, etc.): $96,000

**Buffalo, NY, Parcel #1 -** Land cost: $650,000 - Approximately 30 acres of farmland (total land cost is an estimate based on average land prices).The remainder of the land purchase price will be funded through other avenues which will become available if this project is awarded (other funding that will be leveraged includes philanthropic donors, partner organizations, other grant opportunities, etc). Additional other costs associated with Buffalo, NY, piece of land #1 land acquisition (all estimates based on previous projects completed by Agrarian Trust):
- Appraisal cost: $7,500
- Title fees: $2,500
- Closing and Recording fees: $15,000
- Reserves (2 years of property holding cost such as taxes, insurance, etc.): $30,492

**Buffalo, NY, Parcel #2 -** Land cost: $650,000 - Approximately 30 acres of farmland (total land cost is an estimate based on average land prices). The remainder of the land purchase price will be funded through other avenues which will become available if this project is awarded (other funding that will be leveraged includes philanthropic donors, partner organizations, other grant opportunities, etc). Additional other costs associated with Buffalo, NY, piece of land #2 land acquisition (all estimates based on previous projects completed by Agrarian Trust):
- Appraisal cost: $7,500
- Title fees: $2,500
- Closing and Recording fees: $15,000
- Reserves (2 years of property holding cost such as taxes, insurance, etc.): $30,492

**Houston, TX -** Land cost: $2,000,000 - Approximately 40 acres of farmland. (Total land cost is an estimate based on average land prices in the region.) Any remaining costs of the land purchase will be funded through other avenues which will become available if this project is awarded (other funding that will be leveraged includes philanthropic donors, partner organizations, other grant opportunities, etc). Additional other costs associated with Houston, TX land acquisition (all estimates based on previous projects completed by Agrarian Trust):
- Appraisal cost: $7,500
- Title fees: $2,500
- Closing and Recording fees: $15,000
- Reserves (2 years of property holding cost such as taxes, insurance, etc.): $46,000

**Southwest Virginia -** Land cost: $156,619.68 - Request will fund an underserved BIPOC principal

**J.A. 0279**

Attachment 3A

farmer and owner of Garden Variety Harvests. Any remaining costs of the land purchase will be funded through other avenues that will become available if this project is awarded (funding that will be leveraged includes philanthropic donors, partner organizations, fundraisers, other grant opportunities, etc). Additional other costs associated with the land acquisition (all estimates based on previous projects completed by Agrarian Trust):

- Infrastructure (deer fencing, root cellar): $53,302.98
- Endowment and Reserves: $27,909.34

**Agrarian Commons Demonstration Site: $200,000** - Through our Agrarian Commons network, a site will be selected to serve as a demonstration site for farmers and Agrarian Commons board members who are beneficiaries of this project. Funds will cover the purchase of land to establish a new Agrarian Commons land holding entity or expand an existing Agrarian Commons through a partnership with Agrarian Trust. This site will serve to share lessons from this project and educational opportunities to farmers and farm service providers on the Agrarian Commons approach to stewardship.

**Agrarian Commons Land and Market Support: $431,186**. Land costs, infrastructure, and legal entity formation to advance land access and market access for underrepresented farm communities led by underserved BIPOC farmers in the Agrarian Commons network.

- Central Virginia Agrarian Commons - Land cost: $252,639
- Maine (Little Jubba Agrarian Commons) - Land cost: $141,047
- Washington (Puget Sound Agrarian Commons) - Land infrastructure (driveway for farm market access) cost: $30,000
- Filing and incorporation of three Agrarian Commons legal entities at $2,500 each = $7,500

**Total Other Requested: $10,858,164.99**

**Total Direct Costs: $12,864,174.26**

**INDIRECT COSTS**
**10% of Modified Total Direct Cost (MTDC)**

|  | Budget | Indirect Eligible Amount |
|---|---|---|
| Agrarian Trust Salaries | $1,779,682.01 | $1,779,682.01 |
| Agrarian Trust Travel | $93,255.00 | $93,255.00 |
| Agrarian Trust Materials | $18,413.00 | $14,313 |
| Tufts University Subaward | $1,623,993 | $25,000 |
| Cornell Cooperative Erie | $66,667.14 | $25,000 |
| Farm Commons | $108,162 | $25,000 |
| American Farmland Trust | $174,255 | $25,000 |
| The Nature Conservancy | $23,030 | $23,030 |
| New Roots Community Farm | $120,560 | $25,000 |
| Maya Economic Development | $138,000 | $25,000 |
| Alianza Agricola | $85,886 | $25,000 |
| Plant it Forward | $74,880 | $25,000 |
|  |  | **$2,110,280.01** |

**Indirect Costs = MTDC*.1 = $211,028.00**

**TOTAL FEDERAL FUNDS REQUESTED: $12,966,593.00**

**J.A. 0280**

Attachment 3A

## OTHER

### SUBAWARDS

**Tufts University – $1,623,993**
As a subaward, Tufts University will fulfill the following two roles:
1. Serve as the National Network Level Technical Assistance (TA) Provider, coordinating and providing TA to program staff and partners operating incubator/apprenticeship programs, including but not limited to: info sharing, and replication of innovative models to connect underserved producers to innovative models around land, capital, markets, and USDA programs.
2. Serve as Direct TA to Underserved Producers: TA provided directly to underserved, BIPOC, and New American producers in coordination with existing partner networks in the proposed Agrarian Commons regions. TA will focus on access to USDA programs and resources and increasing capacity to access land, capital, and markets.

### PERSONNEL
**Jennifer B. Hashley, New Entry Project Director (15% FTE / 1.8 calendar months per year).**
Ms. Hashley will supervise the New Entry subaward activities in collaboration with the project leadership team, support the program evaluation team, core partners, and other team members to ensure communication, engagement, and fulfillment of project commitments. She will develop project work plan, oversee the project timeline, supervise project staff and work closely with the National Program Manager and National TA Manager to provide overall project management to ensure all project objectives are met, evaluation reports are formatted and published, and project outcomes are reported accurately. Ms. Hashley will be responsible for facilitating outreach and coordination of the National FIELD Schools in collaboration with other New Entry staff and students. Ms. Hashley will attend national conferences to share project results and she will coordinate with project collaborators to track outputs, outcomes, overall project summative evaluation to submit in yearly USDA progress reports.

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $109,731 | 15% | 60 months | $90,934 |

Other Personnel
**TBH, Associate Director (5% FTE / 0.60 calendar months per year)**. This position will provide staff oversight and project management including attracting and supervising student interns, building documentation strategies for project replication, contributing to project tracking and reporting, supporting qualitative evaluation practices, and engaging community partners. This position will have extensive experience in community food systems and community organizing, curriculum development, and organizational management and will support the national program team to develop training modules for underserved producers. He/she/they will provide individual technical assistance to beginning farmer participants, helping connect them to USDA programs and services, to farmland in the region and building relationships with USDA personnel. He/she/they will also participate in webinars and national networking events to share project outcomes.

**J.A. 0281**

Attachment 3A

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $81,600 | 5% | 60 months | $22,541 |

**TBH, National Program Manager (100% / 12 calendar months per year).** This position will be responsible for managing the national planning and program development for this multi-year investing in land, capital, and markets project. The role will coordinate monthly partner calls/meetings and quarterly advisory calls. The role will lead the review of existing technical assistance program materials to identify gaps and oversee development of the educational training, curricula, and professional development resources for this project. The role will have substantial engagement with national collaborators. The role will work closely with the project leadership team to develop a needs assessment among national partners to identify current TA processes, identify gaps, and prioritize and develop the education and training tools and resources. He/she/they will support outreach to identify and categorize/map newly identified organizations, landowners, and consultants to support professional development opportunities and engage new and diverse collaborators to grow the network of service providers piloting innovative land access strategies. He/she/they will be responsible for developing performance measures in collaboration with core partners, coordinating monitoring and evaluation of partner activities and those of New Entry's TA processes, drafting the evaluation reports in collaboration with the project leadership team, and contributing to program reporting and dissemination of outcomes. The role will also supervise graduate student interns, the National TA Coordinator, and will coordinate outreach/dissemination of educational materials, evaluation reports, and share results at the annual FIELD Schools and on webinars and at other national food systems conferences. He/she/they will support the project's tracking of progress to contribute to program reporting and dissemination of outcomes.

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $70,000 | 100% | 60 months | $386,725 |

**TBH, National Technical Assistance Manager (70% / 8.40 calendar months per year)**. This position will be responsible for managing technical assistance and training for producers served by organizations collaborating in this project. The role will coordinate monthly partner calls/meetings and coordinate technical assistance program materials to identify gaps and oversee development of the educational training and curricula for farmers participating in this project. The role will work closely with the project leadership team to develop and administer a needs assessment among national partners to identify current TA processes, identify gaps, and prioritize and develop the education and training tools and resources. He/she/they will support outreach to identify and categorize/map newly identified organizations, landowners, and consultants to engage new and diverse collaborators to grow the network of service providers piloting innovative land access strategies. He/she/they will be responsible for tracking performance measures in collaboration with core partners, coordinating monitoring and evaluation of partner activities and those of New Entry's TA processes, drafting the evaluation reports in collaboration with the project leadership team, and contributing to program reporting and dissemination of outcomes. The role will also plan and organize the annual FIELD Schools and coordinate outreach/dissemination of educational materials, evaluation reports, and share project results on webinars and at other national food systems conferences. He/she/they will support the project's tracking of progress to contribute to program reporting and dissemination of outcomes.

**J.A. 0282**

Attachment 3A

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $65,000 | 70% | 60 months | $251,372 |

**Freddy Soza, Operations Administrator (5% / 0.60 calendar months per year)**
Mr. Soza will be responsible for website updates, newsletter outreach, and support social media outreach related to the outcomes and goals for this project. He will facilitate and support the tracking of New Entry staff input of technical assistance provision and outcomes to our Salesforce CRM database. He will also support outreach, development of marketing and communication tools to promote technical assistance and land access services. He will also support coordination of event planning for farm-based events to bring multiple producers together to promote programs and services for new farmers. He will also support the coordination and planning for the annual FIELD Schools.

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $55,120 | 5% | 60 months | $15,226 |

**TBN, Hourly Graduate Students (approximately 1.7 calendar months per year)**
The graduate students will support organizational data collection, update of national organizational project descriptions and interactive online map listings, coordinate the online resource library materials, provide outreach and share project results through newsletter, listserv and website resource posting, and assist with resource formatting and design, and case study development. Students will also support logistics for the annual National FIELD Schools. Students will work up to 10 hrs/week during the academic year of 36 weeks/year @ $22/hour and may work up to 35 hours/week during the summer session of 12 weeks/year @ $22/hour.

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $22.00/hour | 10 hours/week @ 36 weeks | 60 months | $ 42,897 |
| $22.00/hour | 35 hours/week @ 10 weeks | 60 months | $ 41,706 |

**Annual Salary Escalation**
Tufts University's fiscal year cycles on July 1. In accordance with Friedman School of Nutrition Science & Policy standard budgeting procedure, all annual base salaries have been escalated at future fiscal years by a rate of 4% to account for the Tufts University annual merit review process.

**Fringe Benefits**
The fringe benefit rate of 29.3% is applied to all personnel salaries except postdoctoral fellows, students, and temporary staff. The fringe benefit rate of 29.3% includes group health plans, group life insurance, social security, retirement, workers' compensation, unemployment compensation, and tuition reimbursement. The rate of 8.3% is applied to hourly graduate student salary in the summer. All rates are based on actual costs and assessed in accordance with Tufts University's most recently negotiated rate agreement with the U.S. Department of Health and Human Services, dated through June 30, 2024, see: https://access.tufts.edu/fringe-benefits-rates.

Fringe Benefits | Amount Requested
Total Fringe Benefits: $228,558
**Total Personnel And Fringe Benefits: $1,079,959**

**TRAVEL**

Tufts faculty, staff, and students are periodically required to travel on behalf of the university in furtherance of its educational and research mission. The University has an established travel policy to help facilitate travel and that is designed to be fair and equitable to both the traveler, the University, and external sponsors. The University's travel policy applies to all university travel regardless of the funding source. To be reimbursable, all expenses incurred must be necessary to the business of the university and in compliance with U.S. Internal Revenue Service, state and/or granting agency regulations and represent a reasonable and appropriate use of university funds. In all matters, travelers are representing Tufts and should act in an ethical, practical and fiscally responsible manner. Tufts' travel policy can be reviewed in detail here:
https://access.tufts.edu/sites/default/files/finance/TravelPolicy.pdf

**Travel to National Field Schools, $22,500 per year for 4 years.** Each year (for 4 of the 5 years of the award), the project will host a 3-day National FIELD School which will serve to bring together the Leadership Team, Core Partners, Advisory Team and other land-based farmer training programs to evaluate and update project work plan and timeline and assess project results. The FIELD School will rotate each year to a different location, hosted by a land-based farmer training program and will feature field trips to an incubator/apprenticeship training program, a farmland access or Agrarian Commons site, and feature concurrent workshops, plenary sessions, open space, and provide networking and information sharing for over 100 land-based training programs. Each year funds are requested for travel costs to cover lodging, per diem and meeting space, air fare, ground transport for 10 New Entry staff, partners, beginning farmers, and/or members of the project team @ $2,250 each. This is calculated at $495 flight, $200 registration, $300 hotel (4 nights), $130 ground transport, $75 per diem x 3 days. Travel costs will be cost-reimbursable based on receipts. In year 5, two staff at $2,000 will be covered to attend the FIELD School to share results ($545 flight, $200 registration, $300 hotel (3 nights), $130 ground transport, $75 per diem x 3 days).

**Travel to National Conferences to Share Results.** Other National Conference travel will share project evaluation report and results (examples include: Farm Viability Conference, National Risk Management Education conference, Wallace Good Food Conference, Community Food Systems Conference, USDA Small Farms Conference or other appropriate venue attended by beginning farmer training program staff): 1 staff @ $1,300 ($395 flight, $175 registration, $225 hotel (2 nights), $130 ground transport, $75 per diem x 2 days). An annual 3% escalation is applied each year to account for travel cost increases.

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| FIELD School | $22,500 | $22,500 | $22,500 | $22,500 | $4,000 | $94,000 |
| National Conferences | $1,300 | $1,339 | $1,379 | $1,421 | $1,486 | $6,924 |

**Total Travel: $100,924**

**MATERIALS/SUPPLIES:**

**J.A. 0284**

Attachment 3A

In year 1, two laptop computers and peripherals @ $2,500 each will be purchased for use by the National Program Manager and National Technical Assistance Managers for project-specific work. An annual software license to Salesforce.com, a secure cloud-based platform for tracking program information, survey data, and organizational program metrics is budgeted at $600/year ($60/month @12 months) for the National Program Manager and National Technical Assistance Managers. *Computers and Software = $11,000*

Program supplies are budgeted at $7,500/year for four years and include printing of program booklets for the FIELD Schools ($2,000 – 100 copies @ $20 each for 35 page color program booklet/agenda), name tags/lanyards ($1,000 – 100 name tags at $10 each for lanyard, plastic insert and printed color name tag), conference supplies ($500 – 4 rooms + plenary session of flip chart papers, pens, markers, easels @ $100 each); A/V rental for 5 workshops sessions @ $250 = $1,250; portable microphones for field trip and associated batteries $1,500; PPE for conference participants (COVID tests, masks, sanitizer) $10/person @ 100 people = $1,000; vinyl conference banners to welcome to FIELD School venue and recognize host partners $250. Additional program supplies in Year 5 include printing of program results to share at national conferences 150 copies at $10/copy = $1,500. *FIELD School Supplies = $31,500.*

**Total Materials and Supplies: $42,500**

**CONTRACTUAL**

**Salesforce Consultant, Cheri Lovell of The Strategic Org.** Ms. Lovell will serve as a consultant to support the project's data management, technical assistance tracking, and evaluation processes in New Entry's Salesforce.com platform—a secure, highly customizable, cloud-based data platform — to support data collection, management, analysis, and impact measurement. She will devote 24 hours /year @ $125/hour = $3,000/year or $15,000 total over the project period to customize and support the database to capture survey and organizational contacts.

**Graphic Design.** A graphic designer will be hired to format and create the layout and design of FIELD School program booklet/agenda and any additional resource documents as required for the project training and technical assistance resources created. The FIELD School program booklet is anticipated to be approximately 35 pages with cover, color photos, call out boxes, headings, workshop and field trip descriptions, speaker bios, maps, and other graphic design elements. 50 hours/year x $75/hr = $3,750/year for the 4 years of the FIELD Schools or $15,000 total over the project period.

**Website support services**. New Entry will contract with Tamarack Media to provide technical support, Drupal programming, and other technology upgrades in the process of updating the New Entry website's (www.nesfp.org) online resource library functionality and search terms to upload and share project training tools and resources and other land, capital, and market resources for national programming. 15 hours/year x $100/hr = $1,500/year or $7,500 over the total project period.

**J.A. 0285**

Attachment 3A

**Translation Services.** Funding is requested to support translation or interpretation services needed by core partner organizations conducting interviews on training and technical assistance protocols, evaluations, or case studies with socially disadvantaged, English as a Second Language, immigrant, or refugee farmers. Funding may also be used to translate survey instruments to other languages as specified by core partners. 40 hours x $75/hr = $3,000 per year or $15,000 total over the project period.

**FIELD School Speaker Fees**. Funding is requested to support a keynote/plenary speaker for each of the 4 annual FIELD Schools. It is anticipated that speakers will charge a $3,250 speaker fee to attend and present at the annual FIELD Schools. A total of 4 plenary speakers will be engaged over the project period = $13,000.

**Total Contractual: $65,500.**

**INDIRECT COSTS**: Indirect costs are calculated at 26% of Modified Total Direct Cost (MTDC) per our Off-Campus Other rate and per the RFA and in compliance with the Tufts University DHHS Rate Agreement dated 6/20/2023: https://tufts.app.box.com/s/qlamlkv7ixdzm1kbtfubyoeazqn3iqpk.

**MTDC of $1,288,883 @ 26% Federally Negotiated rate = $335,110**

**Total 5-year Budget for Tufts University: $1,623,992**

---

**Cornell Cooperative Erie County Extension –$66,667.14**

As a subaward, CCE will fulfill three roles:
1. Offer a workshop series that helps farmland seekers prepare to apply for financing from the Farm Service Agency (FSA)
2. Assist WNY Agrarian Commons stakeholders with their search for suitable farmland
3. Participate in project activities organized by Tufts University

**PERSONNEL**

**Kathleen McCormick – Agriculture Educator.** Responsible for developing the workshops and associated training materials. She will also assist the New York Agrarian Commons community groups with their search for suitable farmland.

|        | Salary   | % Effort | Funds Requested |
|--------|----------|----------|-----------------|
| Year 1 | $53,539  | 50%      | $26,769.60      |
| Year 2 | $55,140  | 10%      | $5,514.08       |

**Jolie Hibit – Administrative.** Assist with graphic design of training materials and provide administrative support for workshops (e.g., facility reservations, publicity).

|        | Salary   | Effort   | Funds Requested |
|--------|----------|----------|-----------------|

**J.A. 0286**

Attachment 3A

| | | | |
|---|---|---|---|
| Year 1 | $42,744 | 3% | $1,282.3 |
| Year 2 | $44,033 | 2% | $880.7 |

**Total Personnel Request: $34,446.68**

**Fringe Benefits: $688.9**
2% of salaries and wages for unemployment and workers compensation.

**Total Personnel & Fringe Benefits: $35,135.58**

**TRAVEL**

Mileage for site visits and stakeholder meetings – Local travel to site visits and meetings with the two New York community groups.
- 3000 miles/year for year 1 and year 2 at $0.67/mile: $4,020

**Total Travel Request: $4,020**

**MATERIALS AND SUPPLIES**

Workbooks will be printed for those attending the workshops in-person. Workbooks will be mailed to those participating virtually. We anticipate printing the workbooks in English, Spanish and the Somali Bantu Community Organization's language of choice.
- $15/workbook x 100 = $1,500

**Total Materials and Supplies Request: $1,500**

**CONTRACTUAL**

Translation Services – Translate the workbook into Spanish and the Somali Bantu Community Organization's language of choice: $7,000

Interpretation Services for in-person workshops – 2 workshops, 2 languages for each workshop, 2 interpreters for each workshop at $120/hour: $960

Interpretation Services for in-person site visits and community meetings - 50 hours/year, for year 1 and year 2 at $120/hour: $12,000

**Total Contractual Request: $19,960**

Subtotal: $60,615.56
Indirect Cost: 10% of project costs = $6,061.55

**Total 5-year Budget for Cornell Cooperative Extension: $66,667.14**

J.A. 0287

Attachment 3A

**Farm Commons – $108,162**

As a subaward, Farm Commons will fulfill the following role: Provide technical assistance and education and support to the underserved farmers who are the beneficiaries of this project to fill the gaps in USDA and FSA programs and opportunities using and empowering local knowledge and innovation.

**PERSONNEL**

**Rachel Armstrong - Project Director.** Rachel Armstrong's role as Project Director will coordinate the project overall, ensuring all activities are carried out in a timely, cost-efficient, and responsible manner. Rachel will perform all budget management, invoicing, and financial records management, conduct oversight of daily activities, and direct the project towards the accomplishment of the objectives.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $77,404.05 | 8% | 3 years/36 months | $18,577 |

**Eva Moss - Education Manager.** Eva Moss' role as Education Manager is to adapt the existing curriculum for usage by English as a Second Language (ESL) speakers by modifying activities, text, and script-based resources for optimal utility by specific ESL audiences. Eva will also adapt the form of the curriculum for delivery in online and offline/in-person environments attended by ESL audiences.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $67,053 | 10% | 3 years/36 months | $20,116 |

**Chloe Johnson - Staff Attorney**. Chloe Johnson's role as Staff Attorney is to work with the translation consultants/company to manage the curriculum's legal nuance through the translation process. Chloe will coordinate with the translator and Eva Moss as necessary to ensure consistent and accurate usage of legal terms originating in North American English are maintained in translation to other languages.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $67,053 | 10% | 3 years/36 months | $20,116 |

**Salary Total: $58,809**

**Fringe Benefits: $14,702**

25% of staff salaries- All staff of Farm Commons receive the same fringe benefits including but not limited to health insurance stipend; vacation, sick, holiday and other personal paid time off; an internet stipend; matching SIMPLE IRA contribution, workers' compensation, unemployment insurance and social security payments. The board of directors sets a target fringe benefit rate of 25% and benefits are adjusted as necessary to meet the target annually.

**Total Personnel and Fringe Benefits: $73,511**

Attachment 3A

**EQUIPMENT: None**

**TRAVEL: None**

**CONTRACTUAL**

**CLEAR Global, Inc.** is an organization that partners with nonprofits and NGOs to provide a range of language and communication services, including written translation and audio-visual services. We will contract with CLEAR Global for a 24-month term of service which allows us to submit up to three resources per week for translation into one of about 100 world languages, including the languages targeted in this program. This allows us the flexibility to submit our resources as they are adapted for ESL purposes for translation with a reasonable turnaround time. CLEAR Global charges $14,000 per year for a 12-month term of service, of which we need two. CLEAR Global's term of service business model is more cost effective than a per-word translation service especially for the less common languages considered in this project. CLEAR Global also provides meeting translation services at a separately billed rate. Three 90-minute meetings to conduct question and answer sessions with our ESL audiences will cost $500 each or $1,500 total. It is more efficient to work with the same translation service as will have translated the curricular materials, as the translator will not need extra time to consult the glossary or engage in advanced preparation for the meeting, as the core content is the same.

- $14,000 x 2 years = $28,000
- $1,500

**Contractual Total: $29,500**

**INDIRECT COSTS**
Farm Commons does not have a negotiated indirect cost rate. We use the de minimus cost rate of 10% for all modified direct total costs. For this project, we are voluntarily waiving a portion of our indirect costs and reducing the indirect cost rate to 5% to meet the demands of the budget while achieving objectives. All the costs of this budget are eligible for inclusion, in full, in the modified total direct costs calculation. Therefore, the indirect cost line is as follows: $103,011 x .05 = 5,151
Subtotal: $103,011
**Indirect cost at rate of 5%: $5,151**

**Total 3-year Budget for Farm Commons: $108,162**

---

**American Farmland Trust – $174,225**

As a subaward, American Farmland Trust will provide their Agricultural Land Stewardship education and support to the underserved farmers who are the beneficiaries of this project for three years of the project.

**J.A. 0289**

Attachment 3A

## PERSONNEL

*NOTE: AFT calculation for % effort is 37.5 hours per week, which gives an annual total of 1,950 hours. Salaries are an average over the 2-year project accounting for cost-of-living increases.*

**Aaron Ristow, Agricultural Stewardship Sr. Manager.** Aaron will act as the primary contact for American Farmland Trust under this subaward and will serve as the manager of the AFT portion of this project. He will support supervision of the project and project budget.

| Salary | % effort | | Project Duration | Funds Requested |
|---|---|---|---|---|
| $92,432.03 | 8.5% | | 5 years | $39,373 |

Year 1: $7,070    Year 2: $7,003    Year 3: $7,539    Year 4: $8,143    Year 5: $9,618

**Caitlin Tucker, Agricultural Stewardship Coordinator.** Caitlin will play a primary role in providing practical assistance and guidance for the education and outreach component of the project. Caitlin will assist with coordinating conservation agency's input and provide outreach assistance to strengthen the visibility of the achievements sustained by this project.

| Salary | % effort | | Project Duration | Funds Requested |
|---|---|---|---|---|
| $53,044.40 | 2.1% | | 5 years | $5,563 |

Year 1: $1,050    Year 2: $1,002    Year 3: $1,082    Year 4: $1,168    Year 5: $1,262

**Stephanie Castle, Women for the Land Manager.** Will provide support to the outreach and educational training and will oversee Caitin Tucker's efforts towards this project.

| Salary | % effort | | Project Duration | Funds Requested |
|---|---|---|---|---|
| $67,254.19 | 1.5% | | 5 years | $5,026 |

Year 1: $735    Year 2: $952    Year 3: $1,029    Year 4: $1,111  Year 5: $1,200

**Linda Garrett, New York Regional Director.** will provide overall project guidance, support reporting, and assist with project coordination as needed.

| Salary | % effort | | Project Duration | Funds Requested |
|---|---|---|---|---|
| $135,518.35 | 0.5% | | 5 years | $3,475 |

Year 1: $592    Year 2: $640    Year 3: $691    Year 4: $746    Year 5: $806

**Rachel Seman-Varner, Climate Scientist.** Will assist with developing outreach and educational materials.

| Salary | % effort | | Project Duration | Funds Requested |
|---|---|---|---|---|

**J.A. 0290**

Attachment 3A

| $92,395 | 1.2% | | 5 years | $5,498 |

Year 1: $1,010    Year 2: $960    Year 3: $1,036    Year 4: $1,119 Year 5: $1,374

**Gabrielle Roesch-McNally, Women for the Land National Initiative Director**. Dr. Roesch-McNally will support the development and analysis of pre and post-event surveys that will measure the impact of event education and likelihood of taking action (implementing conservation practices).

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $125,764.23 | >1% | 5 years | $1,876 |

Year 1: $550    Year 2: $178    Year 3: $192    Year 4: $208    Year 5: $748

**Olivia Fuller, New York Regional Communications Manager.** Olivia will support project outreach and communications, working with the National Communications team as appropriate to share relevant updates and project successes.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $69,792.06 | 1.0% | 5 years | $3,579 |

Year 1: $610    Year 2: $659    Year 3: $712    Year 4: $769    Year 5: $830

**Grants Management (1 staff).** staff member will support the project team with all reporting requirements, invoice creation, and submission and additional budgetary needs as they arise.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $102,958.85 | <1% | 5 years | $1,426 |

Year 1: $270    Year 2: $243    Year 3: $262    Year 4: $283    Year 5: $367

**National Communications (1 staff).** staff member will coordinate with regional communications manager on content for social media, newsletters, and blogs as well as assist with outreach and education on a national level.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $102,958.85 | <1% | 5 years | $487 |

Year 1: $0    Year 2: $108    Year 3: $117    Year 4: $126    Year 5: $136

**Fringe Benefits**
AFT's fringe benefit rate is 48.6% of salaries and wages for all staff over the 5-year project term ($66,303 @ 48.6%).
$66,303 in salary x 48.6% = $32,223 in fringe benefits.

**Personnel and Fringe Benefit Total: $98,526**

**J.A. 0291**

Attachment 3A

## TRAVEL

*NOTE: The mileage and per diem rates used below are the standard Internal Revenue Service (IRS) rates for 2023. 20,500

Flights
- Roundtrip flights from Western NY for 1 staff (Aaron Ristow) to run workshops in: Texas @ $500/RT flight x 5 workshops = $2,500
- Nebraska @ $250/RT flight x 5 workshops = $1,250
- Tennessee @ $250/RT flight x 5 workshops = $1,250

Flight subtotal = $5,000

Ground Transportation and Accommodations

- Overnight Stays for 1 staff (Aaron Ristow) for workshops in Texas, Nebraska, and Tennessee @ $200/night x 2 nights/workshop x 4 workshops/year x 5 years = $8,000
- Per diem @ $60/day for 5 days/year x 5 years = $1,500
- Car rental for one staff (Aaron Ristow) for project purposes in Texas, Nebraska, and Tennessee: $150/day x 2 days/workshop x 4 workshops/year x 5 years = $6,000

**Travel Total: $20,500**

## CONTRACTUAL

**Soil Health Experts / workshop speaker fees.** (includes reimbursement for time and travel)
- $180/workshop x 4 workshops/year = $720/year x 5 years = $3,600

**Contractual Total: $3,600**

## MATERIALS & SUPPLIES
- Copies & Printing: $19.50 in printing or copying resources/workshop x 4 workshops/year x 5 years = $390
- *Building Soils for Better Crops* guidebook - 8 per community (workshop region) x 5 communities @ $20 per book x 5 years = $4,000
- Penetrometers in year 5 @ $200/each x 5 = $1,000

**Materials Supplies Total: $5,390.00**

## OTHER
- Participant support costs: $8,000
  - $40 for up to 10 people = $400/workshop x 4 workshops/year = $1600/year * 5 years
- Facility and equipment/AV rental fees: $5,400

**J.A. 0292**

- ○ $250/workshop x 4 workshops/year in Years 1 and 2 (2 years) = $2,000
- ○ $275/workshop x 4 workshops/year in Years 3 and 4 (2 years) = $2,200
- ○ $300/workshop x 4 workshops/year in Year 5 = $1,200

**Other total: $13,400.00**

**INDIRECT**

Indirect cost at federally negotiated rate of 23.2%; 23.2% of direct costs ($141,416) = $32,809.

|  | Budget | Indirect Eligible Amount |  |
|---|---|---|---|
| Personnel (Salaries & wages) | $66,303 | $66,303 |  |
| Fringe Benefits | $32,223 | $32,223 |  |
| Travel | $20,500 | $20,500 |  |
| Contractual | $3,600 | $3,600 |  |
| Materials & Supplies | $5,390 | $5,390 |  |
| Other | $13,400 | $13,400 |  |
| Subtotal (total direct costs) | $141,416 | $141,416 |  |
| Indirect @ 23.2% |  | $32,809 |  |

**Total Other: $32,808.51**

**Total 5-year Budget for American Farmland Trust: $174,225**

---

**The Nature Conservancy – $23,030**

As a subaward, The Nature Conservancy (TNC) will provide technical assistance and advisement on soil health and testing, conservation practices, potential funding sources and relevant contacts, data collection and analysis, on-farm technology, and support from agronomists as needed to the stakeholders and beneficiaries of this project.

**PERSONNEL & FRINGE BENEFITS:**
- ● .02% FTE Nebraska Director of Agriculture support ($1,540/yr x 5 yrs) = $7,700
- ● .02% FTE Nebraska Writer - Communications support ($1,643/yr x 5 yrs) =  $8,215

**Personnel & Fringe Benefit Total: $15,915**

**TRAVEL:**

The Nature Conservancy travel expenses (mileage and lodging) = $2,900
- ● Omaha to Otoe County – 100 miles round trip x .67 per mile = $67 x 30 trips = $2,010

**J.A. 0293**

Attachment 3A

- ○ 10 trips per year for 3 years to farm site to provide TA
- Hotel for conferences $111.25 for four people x 2 nights = $890

**Travel total = $2,900**

**INDIRECT COSTS:**
Indirect cost at the federally negotiated rate of 22.4%: $4,215

**Total 5-year Budget for The Nature Conservancy: $23,030**

---

**New Roots Community Farm – $121,463.00**
As a subaward, New Roots Community Farm (NRCF) will work with WVU Center for Resilient Communities in year 1 and 2 to collaborate on a statewide mapping of conserved and eased properties relevant to project participants and farmer-beneficiaries. They will conduct interviews and gather data to compile a report on the state of farmland protection and preservation. NRCF will work with the CRC to develop a road map for land access for project beneficiaries based on mapping and evaluation.

**PERSONNEL**
**Susanna Wheeler – Director, New Roots Community Farm.** Supervises all Farmer Support Programs. She will provide direct mentorship and TA for landowners and land seekers in the region. She will lead the design and coordination of annual land access workshops in the region and attend county and statewide farmland protection board meetings and conferences. She will be funded each year of the project at 15%. Assessed a salary fringe rate of 30%. Fringe benefits include workers compensation insurance, retirement plan, healthcare stipend, and applicable taxes. Total fringe benefits: $9,570.60

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $52,000 | 15% | 4 years | $31,200 |

Fringe at rate of 30%: $9,360

**Salary & Fringe Benefits: $40,560**

**SUPPLIES:**
Supplies needed to organize, promote, and execute annual workshops on and offsite.
- $1,000 per event (2 events per year for 4 years) = $8,000
  - ○ $200 outreach materials
  - ○ $700 space rental
  - ○ $100 workshop materials and supplies

**Supplies total: $8,000**

**J.A. 0294**

Attachment 3A

**OTHER**
**Subcontractor**

- **West Virginia University Center for Resilient Communities.** NRCF will contract WVU Center for Resilient Communities to work with Susanna Wheeler, to engage in a statewide mapping of conserved and eased properties. They will also conduct interviews and gather data to compile a report on the state of farmland protection and preservation in West Virginia. NRCF will then work with the CRC to develop a road map for land access initiatives based on their mapping and evaluation of current programs.
  - Personnel
    - Research Assistant Professor
      - 10% of $82,667 = $8,267 x 2 years = $16,534
    - Undergrad research assistant
      - $15/hr for 150 hrs = $2,250 x 2 years = $4,500
    - Fringe
      - Research Assistant Professor: rate of 23% = $1,901.41 x 2 = $3,802.82
      - Undergrad research assistant: rate of 2% = $45 x 2 years = $90
    - Personnel total: $24,926.82
  - Indirect
    - Federally negotiated rate of 32% = $7,976.58
  - WVU Total = $32,903
- **TBH. Legal counsel.** New Roots Community Farm will contract legal counsel for the West Virginia Agrarian Commons to develop leases and legal documents and for the land transfer including title fees and transfer costs.
  - $40,000

**Total Other: $72,903**

**Total 5-year Budget for New Roots Community Farm: $121,463**

---

**Maya Economic Development Corporation (MEDC) – $139,600**

As a subaward, MEDC will fulfill the following roles:

1. Coordinate local project farmer-beneficiaries and the project's farm partnerships with Indigenous and other communities in the Omaha, Nebraska region with Agrarian Trust.

2. Build and engage the Indigenous People's Agriculture Council in project educational activities as part of the Indigenous People's Summit conference, where project impacts will be shared by and with farmer-beneficiaries.

3. Co-develop the project's organizational infrastructure and financial sustainability with a focus on coordinating project participants with TA providers promoting use of USDA programs and resources that increase capacity to access land, capital, and markets.

**J.A. 0295**

Attachment 3A

**PERSONNEL**

**Luis Marcos - President and CEO, Project Director.** Luis Marcos's role as Project Director will coordinate MEDC's participation in the project, ensuring all activities are carried out in a timely, cost-efficient, and responsible manner. Luis will perform all budget management, invoicing, and financial records management, conduct oversight of daily activities, and direct the project towards the accomplishment of the objectives.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| Year 1 $120,000 | 35% | 5 years | $42,000 |
| Year 2 $120,000 | 35% | 5 years | $42,000 |
| Year 3 $120,000 | 15% | 5 years | $18,000 |
| Year 4 $120,000 | 15% | 5 years | $18,000 |
| Year 5 $120,000 | 15% | 5 years | $18,000 |
| | | | Total: $138,000 |

Fringe Benefits: Waived

**Personnel and Fringe Total: $138,000**

**MATERIALS AND SUPPLIES**

- In year 1, one desktop computer and peripherals @ $1,600 will be purchased for use by the Project Director for project-specific work. *Desktop Computer* = $1,600

**INDIRECT COSTS**

MEDC does not have a federal negotiated indirect cost rate and will waive indirect costs.

**MEDC Total: $139,600**

---

**Alianza Agricola - $85,886**

**PERSONNEL**

**Ignacio Villa, Commons Community Coordinator for Buffalo, NY.** Responsible for coordinating with all involved partners for the creation and fulfillment of the Buffalo Agrarian Commons. He will assist communications among community stakeholders and project beneficiaries, assist land development and stewardship coordination, and will assist with outreach and development.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $62,400 | 25% | 5 years | $78,000 |

Fringe: Waived

**Personnel and Fringe total: $78,000**

**TRAVEL**

Attachment 3A

- Travel (2,544 miles per year at IRS rate of $0.62/mile): $7,886

**Travel Total: $7,886**

**Alianza Agricola Total: $85,886**

---

**Plant it Forward - $74,880**

**PERSONNEL**
**Rachel Folkerts, Commons Community Coordinator** for Houston, TX. Responsible for coordinating with all involved partners for the creation and fulfillment of the Texas Agrarian Commons. She will assist communications among community stakeholders and project beneficiaries, assist land development and stewardship coordination, and will assist with outreach and development.

- 5 hours per week at $36/hr for 5 years = $46,800

Fringe: Waived

**Personnel and Fringe: $46,800**

---

**SUBAWARD TOTAL: $2,389,836.14**

J.A. 0297

Attachment 4A

**U.S. DEPARTMENT OF AGRICULTURE**
**FARM PRODUCTION AND CONSERVATION**

**GENERAL TERMS AND CONDITIONS FOR**
**GRANTS AND COOPERATIVE AGREEMENTS**

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

**A. APPLICABLE REGULATIONS**

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CFR and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

**J.A. 0298**

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

### B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

**J.A. 0299**

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C.  PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency.  The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov.  All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

**J.A. 0300**

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5. Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6. Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

   a. The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

   b. Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

   c. The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

   d. Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

   e. Additional Federal funds needed to complete the project. This change also requires a formal agreement amendment.

   f. Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs. If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment. If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

   g. If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7. No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

J.A. 0301

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

   a.  Amount of additional time requested

   b.  Explanation for the need for the extension

   c.  A summary of progress to date and revised milestones

### D. PAYMENTS

1. Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to either the ezFedGrants system or to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2. Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3. The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4. Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5. Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E,

**J.A. 0302**

Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

## E. FINANCIAL REPORTING

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

## F. PERFORMANCE MONITORING AND REPORTING

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted. Each report must cover—

   a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   b. The reasons why milestones and deliverables targets were not met, if appropriate.

   c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

3.  The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

4.  The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1.  Reporting of first-tier subawards.

    a.  Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

    b.  Where and when to report.

        i.  You must report each obligating action described in paragraph 1.a. of this award term to http://www.fsrs.gov.

        ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

    c.  What to report. You must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov.

2.  Reporting Total Compensation of Recipient Executives.

    a.  Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

        i.  the total Federal funding authorized to date under this award is $30,000 or more;

        ii. in the preceding fiscal year, you received—

            (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

        iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm

Page 7 of 26

**J.A. 0304**

    b. Where and when to report. You must report executive total compensation described in paragraph 2.a. of this award term:

        i. As part of your registration profile at https://sam.gov

        ii. By the end of the month following the month in which this award is made, and annually thereafter.

3. Reporting of Total Compensation of Subrecipient Executives.

    a. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i. In the subrecipient's preceding fiscal year, the subrecipient received—

            (a) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b. Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i. To the recipient.

        ii. By the end of the month following the month during which you  make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4. Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a. Subawards, and

    b. The total compensation of the five most highly compensated executives of any subrecipient.

5. Definitions. For purposes of this award term:

    a. Entity means all of the following, as defined in 2 CFR part 25:

        i. A Governmental organization, which is a State, local government, or Indian Tribe;

**J.A. 0305**

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

   ii.    A foreign public entity;

   iii.   A domestic or foreign nonprofit organization;

   iv.   A domestic or foreign for-profit organization;

   v.    A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.  Executive means officers, managing partners, or any other employees in management positions.

c.  Subaward:

   i.    This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

   ii.    The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

   iii.   A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.  Subrecipient means an entity that:

   i.    Receives a subaward from you (the recipient) under this award; and

   ii.    Is accountable to you for the use of the Federal funds provided by the subaward.

e.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

   i.    Salary and bonus.

   ii.    Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

   iii.   Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

   iv.   Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

   v.    Above-market earnings on deferred compensation which is not tax-qualified.

   vi.   Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

### H. AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the  audit period, whichever comes first.

### I. AWARDS WITH RESEARCH ACTIVITIES

1. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2. In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication.  Recipients can receive a DOI via NAL.

Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

### J. SPECIAL PROVISIONS

1. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

**J.A. 0307**

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6. The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

   "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

   In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

   "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

   All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

**J.A. 0308**

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L.  COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

   a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

   b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

   Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment.  FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed as  cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

**J.A. 0309**

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

J.A. 0310

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:* When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

J.A. 0312

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1. The listed items are:

   a. Non-ferrous metals;

   b. Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

   c. Glass (including optic glass);

   d. Fiber optic cable (including drop cable);

   e. Optical fiber;

   f. Lumber;

   g. Engineered wood; and

   h. Drywall.

2. Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1. Articles, materials, or supplies that have been:

**J.A. 0313**

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

    a. Processed into a specific form and shape; or

    b. Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2. If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

## P. NONEXPENDABLE EQUIPMENT

1. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3. The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

    a. Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

    b. Activities under Federal awards from other Federal awarding agencies.

4. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6. When equipment is no longer needed for any of the purposes set out in this provision

**J.A. 0314**

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

**Q. LIMIT OF FEDERAL LIABILITY**

1. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

**R. AMENDMENTS**

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

**S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS**

1. Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2. The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3. The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

    a. You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

**J.A. 0315**

    enforcement representative of a Federal department or agency authorized to receive such information.

b. You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c. The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d. If FPAC determines that you are not in compliance with this award provision, FPAC:

    i. Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

    ii. May pursue other remedies available for your material failure to comply with award terms and conditions.

## T.  ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6. The recipient must notify all managers, supervisors, employees, contractors, agents,

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information.  Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a. State identification and county number (where reported and where located).

    b. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c. Farm, tract, field, and contract numbers.

    d. Production shares and share of acres for each Farm Serial Number (FSN) field.

    e. Acreage information, including crop codes.

    f. All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g. Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h. Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law"* (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

**J.A. 0317**

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U.  NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V.  TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

**1.** By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

**2.** By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

**3.** By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

**4.** By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

**5.** If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1.  General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

**J.A. 0318**

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2. Proceedings About Which The Recipient Entity Must Report

Submit the information required about each proceeding that:

a. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

b. Reached its final disposition during the most recent five-year period; and

c. Is one of the following:

   i. A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

   ii. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

   iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

   iv. Any other criminal, civil, or administrative proceeding if:

      a) It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

      b) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

      c) The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4. Reporting Frequency

During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X.  AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

   Recipients must retain all records pertaining to the agreement in accordance with 2

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

**J.A. 0321**

Revised March 2024                                    USDA FPAC General Terms and Conditions
                                                      For Grants and Cooperative Agreements

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer. Documents transmitted via ezFedGrants are digitally authenticated and acceptable.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

   a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

   b. An audit that meets the requirements contained in Subpart F.

J.A. 0322

Revised March 2024                                            USDA FPAC General Terms and Conditions
                                                             For Grants and Cooperative Agreements

**CC. AGREEMENT COUNTERPARTS**

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

**DD. CONTINUING OBLIGATIONS**

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

J.A. 0323

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# ALLIANCE FOR AGRICULTURE
# DECLARATION – EXHIBIT 3

2:25-cv-02152-RMG       Date Filed 03/26/25       Entry Number 24-4       Page 2 of 139

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute, et al., | |
| Plaintiffs, | Civ. No. 2:25-cv-02152-RMG |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**J.A. 0325**

**DECLARATION OF MIGUEL MARXUACH, ALLIANCE FOR AGRICULTURE**

I, Miguel Marxuach, declare as follows:

1.      My name is Miguel Marxuach. I live in Orocovis, Puerto Rico. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration on behalf of Alliance for Agriculture, a nonprofit organization affected by the federal funding pause.

2.      Alliance for Agriculture is a 501(c)(3) nonprofit organization based in Orocovis, Puerto Rico. Alliance for Agriculture's mission is to transform the way agriculture is done in Puerto Rico. The organization achieves this mission by amplifying the local agricultural sector by supporting small farmers and processors, farmers markets and community organizations; working with distribution channels to bring organic products to a wider market; and raising awareness about local food consumption. Alliance for Agriculture has 15 contractors and 5 joining in the next six months.

3.      I am the Executive Director at Alliance for Agriculture. I have served as the Executive Director since Alliance for Agriculture was founded in 2019.

4.      Alliance for Agriculture is the subawardee under a cooperative agreement between Rural Advancement Foundation International – USA ("RAFI-USA") and USDA Natural Resources Conservation Service Outreach and Advocacy Division through the Increasing Land, Capital, and Market Access Program ("Increasing Land Access Grant program"). This subaward agreement obligated $1,538,200 to Alliance for Agriculture. The purpose of this project is for Alliance for

Agriculture to work with RAFI-USA to achieve the goal of improving farmland access and security by addressing core barriers to attaining land while also working to retain farmland by mitigating and preventing land loss.

5.    Alliance for Agriculture is also the subawardee under a separate Conservation Technical Assistance cooperative agreement between RAFI-USA and USDA Natural Resources Conservation Service Outreach and Advocacy Division that has obligated $129,316 to Alliance for Agriculture. The purpose of this project is for the Alliance for Agriculture to provide localized outreach, education, and hands-on technical assistance regarding Natural Resources Conservation Service programs. The primary focus is on assisting small-scale, BIPOC farmers through the Natural Resources Conservation Service application process and conservation action plan preparation.

6.    It took the Alliance for Agriculture at least six months of planning and preparation to apply for the subaward with RAFI-USA through the Increasing Land, Capital, and Market Access Program. A team of at least three contractors worked 60-80 hours per month for those six months, with labor costs averaging $60-$70 per hour. This process included programmatic planning, researching federal compliance issues, financial forecasting, and multi-stakeholder coordination to meet the specific grant application requirements. The administrative and technical workload was significant and required substantial resources to secure and manage federal funding.

7.    Both subawards are reimbursement-only, which means that the Alliance for Agriculture must make expenditures for professional services and then submit reimbursement requests. As a subawardee, Alliance for Agriculture submits reimbursement requests to the main grant recipient, RAFI-USA. As a result of the funding freeze, Alliance for Agriculture has been unable to access its expected federal grant funds since January 28, 2025.

8.      The funding freeze has had a severe impact on farmers and agricultural communities in Puerto Rico. Farmers expect to be able to receive this crucial support, including technical assistance, land access guidance, and financial resources, but are now left in limbo. Training programs, infrastructure investments, and local food system funding have been stalled. Many farmers operate on razor-thin margins already. This disruption could mean the difference between staying in business or shutting down.  This is more than a financial loss—it affects real people, their livelihoods, and the future of local agriculture.

9.      The interruption to funding from these awards and uncertainty about when funding will resume has negatively impacted the organization's ability to operate. Rather than focusing on our core mission of supporting farmworkers and agricultural communities in Puerto Rico, we have been forced to divert attention to navigating the federal funding freeze. We are currently reviewing our programs and services to determine which ones we can afford to continue to provide while funding is paused. The organization is evaluating its budget on a day-to-day basis. This has slowed down our ability to do our programmatic work considerably. Our team is committed, but we are operating under high uncertainty and stress.

10.      If the federal funding freeze continues, the organization will have to lay personnel off. In order to meet the organization's obligations under both USDA subaward agreements, we hired 10 new contractors. Hiring for these positions required significant time and resources. The process included job description development, candidate sourcing from online postings and referrals, screening, multiple interviews, and contract negotiations. Each hire required 40-60 staff hours, including the time of the organization's senior leadership and legal advisors to ensure compliance with federal regulations. At an estimated labor cost of $65-85 per hour, direct hiring costs alone exceeded $25,000-$50,000. The organization also spent additional resources on onboarding and training for the new employees that doubled this total investment.

11.     If the funding freeze continues, it will undoubtedly damage Alliance for Agriculture's reputation in multiple ways. Farmers and partners trust us to deliver, and stalled commitments risk eroding that trust. The funding freeze has caused real, immediate problems for farmers and partners. Farmers who were expecting technical support, grants, or training programs are now in limbo and have been forced to delay investments, postpone projects, or miss planting cycles. Partners who were counting on our collaboration are now uncertain about future projects. Some have put their commitments on hold or redirected resources elsewhere, making it harder to move forward with planned initiatives. For the organization, this disrupts our ability to secure new funding, meet contract obligations, and retain staff. If this continues, it will be harder to get future grants, attract partners, and keep programs running smoothly.

12.     The injury to Alliance for Agriculture and its interests would be redressed by an order from the Court granting the Plaintiffs the relief they have requested.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this __25__ day of __March__ 2025.

_____
Miguel Marxuach

# ALLIANCE FOR AGRICULTURE
# DECLARATION – EXHIBIT 3-A

**PROJECT NARRATIVE:** 2022 Increasing Land, Capital and Market Access Program

| | |
|---|---|
| **Lead Applicant:** | Rural Advancement Foundation International-USA (RAFI-USA) |
| **Project Title:** | *Gaining New Ground for Underserved Farmers in Southeast US & US Caribbean Region* |
| **Project Term:** | April 1, 2023 -March 31, 2028 |
| **Proposed Funding Tier:** | Regional Land Access Tier (NC, FL, USVI & PR) |
| **Total Requested Funds:** | $8,499,695 |

## INTRODUCTION & JUSTIFICATION

### Project Goal & Purpose

The overarching goal of the proposed Gaining New Ground project is to improve land access and land security for underserved farmers of color in four areas: North Carolina (NC), Florida (FL), U.S. Virgin Islands (USVI), and Puerto Rico (PR). This will be accomplished by addressing core barriers to access land, credit, and markets, while also working to retain farmland by mitigating and preventing land loss. The project will work to meet the needs of underserved farmers on the edge of viability by delivering culturally-relevant outreach and education, providing targeted technical and financial assistance and examining and addressing barriers to accessing USDA programs in regions with significant populations of Black, Indigenous, and people of color (BIPOC) farmers, particularly those who are especially vulnerable to climate change impacts. The project will further work to improve land access by exploring the feasibility of establishing an agricultural land trust in Caribbean region and bolstering an existing land trust in Puerto Rico.

### Justification of Need

Since 1990, RAFI-USA has worked with farm families of small and mid-sized farms to help them succeed in the face of financial crises and to reverse the trend of farm loss. Over time, we have recognized that farmers of color face specific difficulties that put their farms and livelihoods in peril. By 2044, the U.S. is projected to have a majority-minority population, yet the U.S. farming community remains dominated by white men. Farmers of color represent less than 4% of all owner-operators.

Thriving regional food systems depend on the land security of farmers, yet finding and securing affordable land is one of the biggest challenges farmers face in starting or maturing a career in agriculture. For BIPOC farmers, this is compounded by the fact that they have historically experienced abusive practices and discrimination in accessing credit, resources, and markets, leading to significant land loss. According to the USDA Tenure, Ownership, and Transition of Agricultural Land (TOTAL) survey in 2014, about 40% of U.S. farmland is rented, and 97% of landlords are white. Nationally, while 14% of tenants are people of color, they operate only 8% of tenant acreage, indicating BIPOC tenants operate smaller farms than white tenants. According to the results of the National Young Farmer Coalition's Survey with over 10,000 responses from farmers under 40 years of age, "Over half of all respondents (54%), and 75% of Black farmers, said that they currently need more access to land, whether to buy or lease."

Accessing affordable land is especially difficult for farmers in Puerto Rico and U.S.Virgin Islands, who must contend not only with expensive farmland and a growing number of outside investors buying up property but also with the realities of climate change, the recurring risk of hurricanes, a lack of local markets for their products, and off-farm wages that are significantly lower than on the mainland.

Farmers in the U.S. Caribbean are *severely* underrepresented and disconnected from available resources and larger networks, yet especially susceptible to climate change impacts. Farmers face challenges unique to their location, geography, and status as a territory. Some of these include difficulty in transportation within and between the various islands that make up the Territories, lack of processing facilities or shared-use certified kitchens, lack of dedicated FSA staff (USVI), and significant distrust of government programs, particularly federal ones.

Small and mid-scale farmers today must rely on off-farm income to cash flow their operations. Unfortunately, this is a challenge for farmers in PR and USVI, where unemployment and poverty rates are high. According to 2021 Census data, the poverty rate in PR at 40.5% was almost double that of Mississippi (MS), the poorest state in the nation, where approximately 19.4% of persons live in poverty. Per capita income in PR was just over $13,000 in 2020 compared to $25,400 in MS. PR and USVI residents are ineligible for the Earned Income Tax Credit and earn less, on average, in Social Security and veterans' benefits. Like PR, poverty in USVI is also high, with more than 20% of the population and a third of children living in poverty. Median household income decreased in 2019 to $40,408.The average annual income for farmers in USVI is approximately $9,500. In 2018, the U.S. Virgin Islands had 565 farms, up 158% from 219 farms in 2007.

**Target Audience**
The Gaining New Ground project will focus efforts in regions where RAFI-USA's Farmers of Color Network (FOCN) program already has a foothold and where our collaborating partners have existing relationships and experience working with local farmers. The primary beneficiaries of this project are historically underserved farmers of color in North Carolina, Florida, the central mountain region of Puerto Rico, and the U.S. Virgin Islands.

**Table 1. Farm Operations, Ownership, Demographics, and Farm Size in Target Region**

|  | NC (2017) | FL (2017) | PR (2018) | USVI (2018) |
|---|---|---|---|---|
| *Number of farms* | 46,418 | 47,590 | 8,230 | 565 |
| *Owned/leased farms* | 43,764 / 15,561 | 45,488 / 8,674 | n/a | 421 / 233 |
| *# BIPOC operated farms* | 3,342 | 9,032 | 744 | n/a |
| *Average farm size (acres)* | 182 | 204 | 58 | 16.5 |

*Data Source: USDA NASS 2017 Census of Agriculture*

Targeted audience includes farmers who have limited resources, are located in high poverty areas, and are susceptible to climate change impacts. Additional details:

- FOCN's membership is 76% Black/African American, 12% Indigenous, 9% Latinx, 3% Asian, and 1% Multiracial. Almost 40% of farmers who have applied for funding from the FOCN grants program include livestock production on their farms.
- In Puerto Rico, most farmers are Hispanic/Latinx. More than half of the farmers in the Alliance for Agriculture's network include livestock production on their farms.
- The majority of farmers in the U.S. Virgin Islands self-identify as Black/Caribbean. Many farmers also include livestock production on their farms.

The project will prioritize farmers previously impacted by disaster(s), those employing agroecological and sustainable production practices, farmers with diversified production systems, small livestock producers, and subsistence farmers in USVI and PR. The following

proposed criteria will help us target and prioritize farmers who can be considered to be on the "edge of viability" for greatest impact:

- Farmers who have been farming more than a year, with priority given to farmers who have been farming for *at least* 3 years
- Farmers who have been unsuccessful in applying for FSA farm ownership loans or other USDA cost-share assistance
- Farmers who are ready to transition from a leased arrangement to land ownership
- Farmers who are close to "business-ready," including farmers who have not filed a Schedule F or registered with FSA
- Farmers who are not a good fit or ready for farm debt

**Programmatic Gaps Addressed By Proposed Project**

**Farmers have lack of awareness of available programs and resources and lack of knowledge of lending requirements:** Farmers of color are often not aware of the various programs and services available to them, as well as the regulations that govern these, and often experience difficulties in accessing USDA programs and services. In 2021, 23% of farmers who applied for RAFI-USA's FOCN grants program reported *not* having a registered FSA number. *The proposed project will fill this gap through strategic outreach to inform underserved farmers about how available resources and services can be used to help strengthen their farm operations and what requirements are necessary to access these.*

**Limited legal, financial, and business assistance for small BIPOC producers, particularly those in USVI and PR**: Farmers of color in the target regions are less likely to have access to technical assistance for their farming operations and are often left on their own when it comes to navigating complex application processes, creating farm business plans, accessing programs, addressing legal and financial challenges, negotiating with lenders, responding to disasters, and preventing land loss. There is a critical need for assistance with accounting, business planning, heir's property issues, etc. In 2021, 28% of farmers who applied for RAFI-USA's FOCN grants program reported not filing a Schedule F with the IRS. *The proposed project will fill gaps in assistance for underserved farmers by providing comprehensive 1-on-1 technical assistance, farm advocacy services, and case management to support the success, resiliency, and viability of their farms.*

**Programs are not designed to meet the needs of small farms, agroecological farmers, or BIPOC farmers**: USDA's decades-long "get big or get out" strategy of pushing farmers into high-volume commodity production has resulted in a long list of farm casualties and land loss. Although federal resources are an important part of the farm safety net, USDA programs are not designed for small-scale, diversified agroecological producers, nor are they designed to equitably meet the needs of BIPOC farmers or farmers in the U.S. Caribbean regions. A sentiment we often hear expressed by farmers: "*It felt like they were looking for reasons to deny my application, not reasons to approve it.*" Small farmers, especially BIPOC farmers, need to work exceptionally hard to justify the feasibility of their applications. On average, farms operated by BIPOC farmers are a quarter of the size of white-owned farms and often adapt by pursuing production practices and markets outside of the commodity system. Further, many USDA staff show little interest or have limited knowledge of adequately supporting smaller, diversified farms. *The proposed project fills this gap by improving agency staff awareness and understanding of the needs of small, agroecological, and BIPOC-underserved farmers while also looking to identify opportunities for service improvement.*

**Low participation by socially disadvantaged farmers in FSA Farm and Loan Programs:** FSA loan origination and servicing are failing BIPOC farmers, especially those in underserved

**Page 3.** *Gaining New Ground Project Narrative;* RAFI-USA

areas such as PR and USVI. Unfortunately, the problem cannot be attributed solely to a lack of farmer awareness about available programs. In our experience working side-by-side with farmers looking to apply for FSA programs, we have seen that often farmers of color are less likely to be treated as serious farmers by FSA staff and receive the bare minimum of information and guidance regarding program eligibility, application processes, and critical considerations for sound decision making. Female farmers also experience difficulty, with many, for example, reporting being asked to use their husbands' names in application documents instead of their own. *The project will fill this gap by seeking to understand <u>why</u> the volume of applications and number of loans approved in FL, PR, and USVI are so low (see table below) and by assisting farmers in overcoming these specific barriers.*

**FSA Direct Farm Ownership Loan Volume & Approvals**

| Region | 2021 | | Jan-Sep 2022 | |
|--------|--------|------------------|--------|------------------|
| | # Apps | Approved % (#) | # Apps | Approved % (#) |
| NC | 102 | 39% (40) | 75 | 45% (34) |
| FL | 100 | 12%  (12) | 71 | 8.5% (6) |
| PR | 37 | 13.5% (5) | 27 | 0% (0) |
| USVI | 0 | 0% (0) | 0 | 0% (0) |

**Small farms, diversified and agroecological farmers, and BIPOC farmers do not have adequate and right-sized market access for farm product distribution in local, regional, and national food systems.** Traditional wholesale buyers and distributors, even those involved in regional food distribution, often prioritize mid-size and large farms over small, diversified producers because of assumptions made regarding the small farmer's ability to deliver products as needed. This, as well as overt racial discrimination against BIPOC producers, has historically resulted in these farmers being excluded from purchase contracts and even local farmer's market organizations while their white counterparts received priority. However, these producers can adequately supply traditional markets if provided specialized technical assistance on topics including wholesale and retail introductions, certifications and/or food safety best practices, market production planning, cooperative producer strategies, and cash flow planning/evaluation. *The project will fill this gap through RAFI-USA's existing strategy and capacity for assisting small BIPOC producers with traditional and alternative market access opportunities and all project partners' existing relationships with wholesale and retail entities in targeted areas.*

**A lack of support and assistance for subsistence farming in the U.S. Caribbean**, particularly in Puerto Rico, where in 2022, the PR Department of Agriculture (ASDA) did not apply for the USDA Micro-Grants for Food Security program. *The project will address this programmatic gap through outreach, education, technical assistance, and financial support for subsistence farmers.*

**Farmers and landowners in PR and USVI have minimal access to land and conservation solutions offered by land trusts.** *The project will fill this gap by providing financial assistance to Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture), the only existing farmland trust in PR, and exploring the feasibility of establishing an additional agricultural land trust for the U.S. Caribbean region.*

<u>Project Concept and Design</u>
RAFI-USA's proposed Gaining New Ground project was designed in close collaboration with the Alliance for Agriculture in PR and the Virgin Islands Good Food Coalition. It will expand the scope and depth of services already provided by these three organizations. The project's primary goal is to increase farm and land ownership opportunities for farmers, particularly historically

**Page 4.** *Gaining New Ground Project Narrative*; RAFI-USA

underserved farmers of color, on small- to mid-sized farms in the regions identified. Designed as a collaborative effort with shared leadership and an Advisory Committee of leaders in the field, the project will build upon a circle of relationships that will strengthen the project's efforts. Gaining New Ground will follow an adaptive, iterative process and project design consisting of five cyclical phases:

1. Discovery: Participatory data gathering process
2. Planning: Develop strategy and activities to fulfill project goals and objectives
3. Implementation: Develop materials and execute activities
4. Tracking Results: Measure the effectiveness and reaction of the target audience
5. Refining: Adjust strategy, plan, and activities accordingly

To ensure the participation and input of diverse regional stakeholders in guiding the direction of the project, an Advisory Committee will be established to provide overall guidance and to make final funding decisions on financial assistance commitments. Members will include staff representatives from RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition, as well as individuals with relevant and varied expertise and perspective. A key early activity will be to help develop the scope and focus of the baseline study.

The initial baseline study will involve conducting regional needs assessments to uncover farmers' primary barriers to land tenure and the regional dynamics that contribute to a lack of ownership and land loss. The baseline study will also identify roadblocks farmers face when attempting to access USDA programs and determine the types of assistance most needed by farmers targeted for this project.

In addition to conducting the baseline study during year one, we will also review USDA outreach materials to assess how understandable, concise, and complete they are. Farmers need centralized, easy-to-find informational materials that summarize programs' purpose, eligibility, and processes. What we learn during this review will be shared with USDA and used to inform the development of our outreach materials. Materials developed for the project will maximize farmers' awareness of resources and include information that could improve farmers' outcomes in accessing services from USDA.

**OBJECTIVES AND OUTCOMES**
<u>**Objective #1**</u>: **Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers. Outputs:**
1.1 Conduct baseline study via existing project partners' data, farmer focus groups, and developed farmer surveys to identify all region and region-specific challenges farmers face in accessing USDA programs, acquiring land, securing credit, and accessing markets.

1.2 Develop recommendations for improving access to land, credit, and markets. Recommendations will be conveyed to USDA via Advisory Committee as described in Goal #2.

1.3 Convene a panel of experts to 1) evaluate current land use and access challenges in USVI and PR and 2) complete a feasibility study on the establishment of a USVI and PR regional land trust to serve as a vehicle to bring forth innovative solutions to underserved farmers that need to secure affordable land via long-term leases, lease-to-own arrangements and/or land acquisition to be dedicated to farming, forestry or to provide ecological service.

**Page 5.** *Gaining New Ground Project Narrative*; RAFI-USA

1.4 Build working relationships with USDA staff to ensure ongoing positive engagement.

**Expected Outcomes:**
1. **Host at least three focus groups** of 8-10 farmers to identify land access challenges and ways USDA programs can better serve farmers in land, capital, and market access.
2. Based on the baseline study, **publish three summary reports.** 2 reports (one all-region, one region-specific) detailing the challenges underserved farmers face in accessing USDA/FSA programs and recommendations to address challenges. And 1 report assessing existing USDA outreach materials and the highest technical assistance needs from farmers.
3. In partnership with USDA staff, project staff will conduct ongoing relationship-building meetings, develop training opportunities, and facilitate farmer-to-USDA staff connections that will improve working relationships with USDA service center field staff and farmers. The Advisory Committee will also **compile and communicate recommendations to USDA** on clarity and ease of use of USDA outreach materials.
4. **Completion of 2 reports**: "Land Use & Land Access in USVI and PR" as well as the USVI and PR land trust feasibility study.

**Objective #2: Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.**
**Outputs:**
2.1 Convene Advisory Committee to provide project input and guidance, identify existing public and private services available in each region to help farmers, and serve as review committee for Gaining New Ground grants and financial incentive award decisions.

2.2 Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements, particularly FSA programs and market opportunities.

2.3 Through outreach activities, identify underserved farmers who meet eligibility criteria and are strong candidates to receive technical assistance related to land, capital, and market access, particularly those previously denied by USDA programs.

**Expected Outcomes:**
1. Conduct outreach activities reaching at least **1,200 farmers** to increase knowledge of and access to available resources or services related to land, credit, or market access, resulting in at least **300 underserved farmers** receiving practical, actionable information through 1-on-1 assistance, online content, webinars, or training.
2. Proactively identify and **recruit 200 underserved farmers** who are eligible and would be strong candidates to receive comprehensive land, capital, or market technical assistance services from project partners.

**Objective #3: Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.**
**Outputs:**
3.1 Build a network of legal, financial, and business technical assistance experts and project case managers that can meet specific needs identified by farmers during a technical assistance intake assessment.

3.2 Develop customized technical assistance plans for each farmer based on their needs and goals, provide farmers with individualized technical assistance, and maintain comprehensive case management to ensure consistent tracking of engagement and progress against goals.

**Page 6.** *Gaining New Ground Project Narrative; RAFI-USA*

3.3 Improve the degree of underserved farmers' participation in USDA programs related to project-developed farm viability benchmark metrics.

3.4 Build relationships with institutional buyers to encourage increased sourcing from local farmers and help connect farmers with opportunities to new and emerging markets.

3.5 Provide farm advocacy services to farmers in crisis, including assisting with creditors, accessing resources and programs to solve immediate and long-term challenges, and assistance in minimizing the impact of disasters on land ownership and farm viability.

**Expected Outcomes:**
1. **200 underserved farmers** receive technical assistance tailored to their individual needs on topics including but not limited to farm business planning, building credit, risk management, identifying suitable farmland, heirs' property/title issues, financial management, accounting, accessing USDA programs, addressing financial challenges, post-disaster farm advocacy and negotiating with creditors.
2. **100 underserved farmers** report having a better understanding of the farmland purchasing process and are better able to make sound decisions regarding credit, land ownership, and retention.
3. **80 underserved farmers** receive assistance identifying land or are connected to landowners.
4. **40 underserved farmers** are connected to market opportunities including but not limited to farmer cooperatives, grocery retail, specialty markets, nutrition programs, and timber sales.
5. **Organize 10 farmer-buyer meetups** that match institutional buyers with farmers who can meet their purchasing needs, serving **80 or more underserved farmers**.

**Objective #4:**
**Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.**
**Outputs:**
4.1 Provide farmers with financial assistance grants to lower the costs of land acquisition by partially or fully covering down payments, brokerage fees, appraisals, or other land acquisition-related costs.

4.2 Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture, a land trust created to ensure perpetual access to arable land as common goods for PR subsistence farmers and improve food security through expansion of sustainable agriculture.

4.3 Incentivize landowners to sell or lease land to targeted farmers or agricultural land trusts.

4.4 Provide farmers with grants to support shared infrastructure, on-farm infrastructure, and equipment that will allow them to more easily and reliably access markets.

**Expected Outcomes:**
1. **45 farmers secure new land** through Gaining New Ground financial assistance grants
2. At least **10 landowners are incentivized** to lease or sell land to a farmer.
3. The Community Land Trust for Sustainable Agriculture acquires at least one land property and leases land via 99-year leases to four farmers in Puerto Rico.
4. At least **30 grants awarded** to farmers or farmer collaboratives to support infrastructure that will improve market access options.

**Page 7.** *Gaining New Ground Project Narrative*; RAFI-USA

**Budget Allocation: Outreach and Technical Assistance**

In total, approximately **66.11%** of the total $8,499,695 grant budget is allocated to *directly* support outreach, technical assistance, and financial support for land acquisition:

- **Outreach: 20.4%** of the budget ($1,736,586) is allocated to outreach and education related activities.
- **Technical Assistance: 20.3%** ($1,724,674) of the budget is allocated to technical assistance
- **Financial Support 25.4%** ($2,158,000) of the budget is allocated to Land and Infrastructure Financial Grants/Incentives.

**APPROACH**

**i. Description of Activities and Approach**

*Note: The proposed project's planned activities will <u>not</u> be duplicative of other activities undertaken with financial support from USDA or other federal sources.*

Project activities will build upon insights from the partners' established programs supporting BIPOC farmers. For example, in NC, we will identify farmers who would be good candidates for the project using data from grant applicants received for the RAFI-USA's FOCN infrastructure grants program. Similarly, PR and USVI partners will rely on their existing knowledge of farmers in their regions.

**ii. Project Timeline**

| Objective & Activity | '23 | | | '24 | | | | '25 | | | | '26 | | | | '27 | | | | '28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 |
| **1 - Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers.** | | | | | | | | | | | | | | | | | | | | |
| 1.1 Conduct baseline study to identify land and market access challenges. | X | X | X | | | | | | | | | | | | | | | | | |
| 1.2 Develop recommendations for improved land and market access. | | X | X | | | | | | | | | | | | | | | | | |
| 1.3 Convene panel to 1) evaluate current land use/ access challenges in USVI and PR and 2) complete feasibility study on creation of regional land trust. | X | X | X | | | | | | | | | | | | | | | | | |
| 1.4 Build working relationships with USDA staff to ensure ongoing positive engagement. | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **2 - Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.** | | | | | | | | | | | | | | | | | | | | |
| 2.1 Convene Advisory Committee to provide project guidance, identify farmer resources, and serve as review committee for farmer grants. | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 2.2 Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements. | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | |
| 2.3 Through outreach activities, identify farmers who are strong candidates to receive technical assistance. | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | |

| | **3 - Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.** |
|---|---|
| 3.1 | Build a network of legal, financial, and business technical assistance experts and case managers that can meet specific farmer needs. |
| 3.2 | Develop customized technical assistance plans for each farmer based on their needs and goals, provide assistance, and maintain case management tracking. |
| 3.3 | Improve the degree of farmers' participation in USDA programs related to farm viability benchmarks |
| 3.4 | Build relationships with institutional buyers to encourage increased sourcing from local farmers and their connection to new markets. |
| 3.5 | Provide farm advocacy services to farmers in crisis; help minimize the impact of disasters on land ownership and farm viability. |
| | **4 - Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.** |
| 4.1 | Provide farmers with financial assistance grants to lower the costs of land acquisition. |
| 4.2 | Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture. |
| 4.3 | Incentivize landowners to sell or lease land to underserved farmers or agricultural land trusts. |
| 4.4 | Provide farmer grants to support farm infrastructure, and equipment that will increase market access. |

### iii. Innovation

***Focus on U.S. Caribbean Territories****.* This project is unique in addressing land tenure challenges in the USVI and PR. Our partners' staff are experienced and trained in specific regional land concerns and will undoubtedly confront more unique situations during the project. Final reports will summarize their findings to enable replicable technical assistance for future engagements. Efforts within the U.S. Caribbean are pilots for the unique situations impacting the agricultural community, land access, capital, and market access in the non-contiguous U.S. and its Territories.

***Regionally-tailored Outreach and Technical Assistance:*** The playing field for farmers and ranchers is ever-changing based on the economy, climate change, supply chain deficiencies, global disruptions, etc. To achieve the best possible outcomes, this project will begin with a baseline study that identifies issues specific to the four focus regions.

***Inclusion of Land Trusts****:* USVI and PR are experiencing an increased purchase of arable land by off-island investors. This project will address the need to ensure that agricultural land remains

available to those who wish to farm by exploring the feasibility of creating a land trust for the region that provides farmers with options to lease, rent-to-own or purchase land trust property.

***Connections to Non-Traditional Lenders***: The project will connect farmers with alternative forms of financing in addition to government resources. Existing loan options include 1) 0% interest farm infrastructure loans for NC Black farmers through Foodshed Capital's Black Farmer Equity Fund, 2) a developing "loan not debt" strategy by Foodshed Capital for no-pay back mortgage loans to farmland buyers, 3) USDA Lenders through Heirs Property Relending Program, including Akiptan, LLC (for nationwide, low-interest heirs property mortgage loans and legal/business technical assistance, priority given to farmers partnering with tribal communities to improve food security and sovereignty) and Shared Capital Cooperative, which has a partnership with Federation of Southern Cooperatives for FL producers.

***Collaborations with Wholesale and Institutional Buyers:*** We will begin market access efforts by collaborating with Freshpoint in exploring possibilities to expand their local produce program in Puerto Rico and the possibility of exporting food produced by Puerto Rican farmers to Florida. RAFI-USA has existing collaborations with several likely buyers, such as NC regional food hubs, including Feast Down East and Weaver Street Market, a local food cooperative seeking new farmers referred by RAFI-USA. We will add additional buyers during year one.

### iv. Outreach Recruitment and Retention
RAFI-USA's outreach efforts will focus on reaching farmers who have engaged with its Farmers of Color Network, followed by outreach to other farmers of color in NC and FL. The FOCN program currently has approximately 300 members, with an additional 1,000 farmers of color who are affiliates of the Network. In Puerto Rico, the Alliance for Agriculture will conduct outreach to farmers using its internal network of more than 250 farmers, farmer's markets, and peer networks. In the U.S. Virgin Islands, we will conduct outreach to VI Good Food Coalition's network of more than 369 farmers, farmer's markets, producers, and affiliates.

Outreach activities will be led by people of color with education and experience with farming, enabling them to connect with farmers with a high level of cultural competency and an understanding of farming. We will target outreach to farmers of color who do not own land or have expressed an interest in acquiring additional land. We will conduct outreach in various formats to ensure that information is accessible to farmers who may not have internet access. Some of the outreach channels include phone banking, texting, cross-platform messaging services, printed materials (including a quarterly Project Bulletin), SMS and chat apps, in-person meetings with individuals or groups of farmers, local advertising, attendance at conferences and events with large populations of farmers of color, and word of mouth. Project partners will adapt the content and outreach methods to best meet their farmer audiences' needs. For example, all Puerto Rico and Florida activities will be delivered in English and Spanish, and materials in U.S. Virgin Islands may be translated into Creole to reach Haitian immigrant populations.

***Amplification of Outreach Efforts:*** We expect our outreach effort to organically extend nationally beyond the project's footprint through digital and social media, media relations, attendance at farm-related events, and outreach activities conducted by project staff, partners, farmers, and collaborators. Outreach will be further amplified through national and regional partnerships. RAFI-USA participates in weekly calls with national farm advocacy partners to develop outreach materials and share feedback on farmers' ability to access federal COVID relief programs. With these external partners, we will share outreach materials and event notifications that may benefit farmer audiences. We are connected with a network of

**Page 10.** *Gaining New Ground Project Narrative*; RAFI-USA

organizations serving farmers of color in their regions and will disseminate information and alert farmers to this project via that network.

***Recruitment of Farmers for Technical Assistance:*** To enroll/participate in technical assistance, farmers will complete an intake and needs assessment. Project staff will use the project's farm viability benchmarking tool to help assess the farmer's situation. As there are many steps between a farmer wanting to acquire land to officially becoming a landowner, the benchmarking tool indicates a five-step progression related to farm viability; crop insurance, farm financial plan, and farm loans. An excerpt of our *draft* benchmarking tool is below, showing a 5-step scale toward land tenure goals.

| Farm Viability Scale | 1-Lacks Access | 2- Aware of opportunities | 3- Takes first actions towards goals | 4-Receives assistance from USDA | 5- Completed goals |
|---|---|---|---|---|---|
| **TOPIC: Land Tenure** | Has no ownership, lease access, or other means of accessing farmland | Aware of range of land tenure options and available programs and resources | Receiving referrals to land access organizations, requesting assistance | Utilizing partnerships and alternative buying markets | Closing contracts offered and signed, land procured |

A case manager will be assigned to each farmer as the primary point of contact. They will work with the farmer to set realistic goals according to the benchmark tool and develop a technical assistance plan to provide a roadmap for the farmer to reach their goals. The case manager would make referrals to other service providers that would benefit the farmers, coordinate and match the farmer with technical assistance providers, and track results. We will provide in-depth 1-on-1 technical assistance unique to the farmer's geography, which may include land tenure strategies, farm loan financing, navigating USDA's FSA/NRCS programs, conservation planning, FSA farm record management, market potential and access, production strategy, risk/disaster management, and evaluation. Farmers deemed ready to purchase or lease land will be offered financial assistance, through a formal application and review committee process, in the form of grants to supplement. This format is comparable to down payment assistance programs for first-time home buyers, which are offered alongside housing counseling services. During periodic check-ins, the case manager will have the opportunity to work with the farmer to refine the technical assistance plan based on results/experiences to date.

In addition to 1-on-1 in-depth assistance, farmers will have the opportunity to participate in peer network calls to provide farmers with a community of peers working towards similar goals. The calls will feature invited speakers to present on topics of relevance. Educational opportunities will be available to help build farm business skills. Topics will be varied and tailored to needs. For livestock producers, for example, we can offer training in collaboration with A Greener World on topics such as best practices for handling and animal welfare in transport and slaughter, livestock health, developing emergency plans, technical support on pasture-based farming systems, and regenerative farm planning. Additional topics to strengthen farm viability may include building and managing credit, financial planning, budgeting, recordkeeping, bookkeeping skills, etc.

***Retention strategy:*** This project intends to maximize retention of farmer relationships developed by tracking progress against goals, as farmers receive case management services throughout their participation in the project. Case management will allow us to track progress on an individual basis as well as project performance.

### v. Sustainability & Scalability

The Gaining New Ground project builds upon existing RAFI-USA programs, namely the Farmers of Color Network and cooperative agreement projects with FSA and NRCS, which deliver targeted outreach and technical assistance to underserved farmers. This existing work shows how project partnerships, outreach, and technical assistance can lead to greater opportunities for underserved farmers, including increased USDA program access and improved farm cash flow for long-term farm viability and land retention. Through the Gaining New Ground project, we expect to see marked progress in regional capacity building, strengthened USDA relationships, and sustained farmer viability. As RAFI-USA is a nonprofit organization reliant upon grants, we cannot be certain that we will be able to give farmers the level of financial incentives beyond the life of this project. However, the infusion of funds that will strengthen and rebuild farmers' land, capital, and market opportunities and the education of farmers to use USDA programs will continue to support regional agricultural viability long after the project ends. The results of the new land trust feasibility study, as supported through this project, also has great potential to lead to long-lasting land access opportunities for farmers.

### vii. Potential Challenges

We anticipate encountering some challenges, including difficulties and delays in hiring and training qualified staff, language access barriers in PR, difficulties identifying affordable land, the possible unwillingness of some FSA staff to collaborate, slow land purchase processes, and more. Below we have identified four potential challenges and our plan to address each.

**Weather-related disruptions to the project timeline:** We know that our work will focus on regions frequently affected by hurricanes and other weather-related events. We further understand that it is not a matter of whether a hurricane will hit but when. The project is designed so that project staff and partners will be prepared to pause activities to shift efforts to disaster preparedness, disaster recovery, and other disaster-related assistance.

**Lack of farmer trust in USDA:** Avoiding engagement with USDA is still a survival strategy for many farmers of color. When we ask these farmers to share their thoughts on how USDA can improve, the most common reaction is skepticism as to whether it is worth their time and what good it will do. The proposed project will fill the trust gaps where USDA has failed to reach farmers by relying on project partners and individuals who already have farmers' trust in their respective regions to lead culturally relevant and place-based outreach and education efforts.

**Lack of access to fast, reliable internet and devices:** From our experience working with farmers of color, particularly those in rural areas, we know that there is a significant lack of access to fast, reliable internet and devices that affect their ability to receive and send important information and documentation; according to the 2017 agricultural census, only 61% of Black farmers have access to the internet. We will ensure outreach efforts and technical assistance services focus on reaching those without reliable internet and devices.

**Potential challenges in overlap and farmer confusion:** We are aware of multiple peer organizations applying to this program, and look forward to collaborating with them. RAFI-USA

J.A. 0342

is also a partner in two applications with minimal geographic scope overlap. If all were to be funded, we have planned the work in such a way as to ensure planned activities will not be duplicative. Because the demand for assistance related to land, credit, and market access is so great, we do not expect significant difficulties in recruiting sufficient participants for the proposed project. However, we anticipate the *possibility* of overlap and farmer confusion if multiple organizations provide similar services within the same regions. To avoid duplication of efforts and maximize impact, we will collaborate and coordinate efforts with other organizations doing similar work. When this is impossible, we will adapt our plan to focus our efforts on areas of greatest need.

**PERSONNEL AND RESOURCES**

RAFI-USA has decades of experience supporting underserved farmers, including providing one-on-one crisis farm advocacy work with farmers in financial distress. This gives us a unique background and informs knowledge of the challenges farmers experience, including those encountered when attempting to access USDA services or negotiate with USDA staff when problems arise. Gaining New Ground project staff will be able to refer farmers to other RAFI-USA staff as well as partners, enabling farmers to benefit from the wide range of other programs and services offered, including opportunities to engage in federal policy work, educational and technical services offered via other USDA-funded projects, farm-to-faith market connections, disaster relief funding, and more.

RAFI-USA's FOCN program is designed to build the strength, prosperity, and economic health of farmers and farming communities of color in the Southeast U.S. and U.S. Caribbean region. FOCN serves farmers of color through outreach, education, and assistance, connecting farmers to opportunities and resources and hosting webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge.

RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition have substantial experience conducting outreach and providing assistance to underserved farmers through our NRCS-funded *Conservation Outreach: Racial Equity and Justice Conservation Cooperative Agreements* program. This existing partnership and the trust built between project staff and farmers make us uniquely poised to continue providing tailored technical assistance and bringing critical, additional support for farm sustainability.

<u>**Project's Leadership Team**</u>

**Edna Rodriguez, Executive Director, RAFI-USA:** Ms. Rodriguez has been with the organization since 2011 and became Executive Director in 2017. In her current role, Ms. Rodriguez has grown the organization's capacity by streamlining financial management, diversifying income, and organizing cross-programmatic staff teams for greater collaboration and impact. Ms. Rodriguez led RAFI-USA through a strategic planning process centered around equity, launching and growing the Farmers of Color Network, and extending programs to the U.S. Caribbean territories. Ms. Rodriguez has significant experience working with communities of color, including managing Latino outreach programs in previous roles, providing oversight for the Farmers of Color Network, and building collaborations to address unmet needs. ***Project Role:*** *Ms. Rodriguez will serve as Project Director and provide oversight for the project, supervise hiring activities, manage partner relationships, assist with capacity-building activities, and support the strategic alignment of the project with other work by RAFI-USA or partners.*

**Page 13.** *Gaining New Ground Project Narrative*; RAFI-USA

**Sommer Sibily Brown, Executive Director and Founder, Virgin Islands Good Food Coalition:** Ms. Sibilly Brown testified at the U.S. Congress to highlight the barriers and challenges of the U.S. Territories in equitably accessing USDA programs; successfully advocated for the inclusion of USVI and Territories for the national farm-to-school network as core partners, resulting in the first farm-to-school program in the USVI. She serves as Chair of the National Farm to School Network's Board of Directors. Ms. Sibilly-Brown is an advisor to the Resilience Playbook local-regional food system USDA AMS project with Colorado State and the University of Kentucky. She co-led FEMA's Food System Assessment with Iowa State, which included a food resilience plan in the USVI's Hurricane Disaster Recovery Plan. ***Project Role:*** *Ms. Sibilly Brown will serve as Project Director in the U.S. Virgin Islands, provide high-level supervision, and be the primary liaison between VIGFC and RAFI-USA. She will also be responsible for managing the subaward budget, ensuring that all deliverables are carried out on time and in compliance with direction from RAFI-USA.*

**Miguel Marxuach, Executive Director and Cofounder, Alliance for Agriculture:** Since 2019, Mr. Marxuach has spearheaded the growth of the Alliance for Agriculture to empower projects and people working on transforming rural communities and farming in Puerto Rico. Mr. Marxuach has worked exclusively with underserved farming people and communities for the past five years. He has developed a profound link with farming entrepreneurs, mostly women of color, supporting their efforts and working with farmer's markets. Before dedicating himself to non-profit work, Mr. Marxuach led a multinational technology information business. Mr. Marxuach holds an MS in Industrial Engineering and an MS in Corporate Social Responsibility, Accounting, and Social Auditing. He has deep knowledge and experience in banking, loans, and financing. ***Project Role:*** *Mr. Marxuach will serve as project lead in Puerto Rico to conceptualize project components, oversee the team, and serve as a principal liaison with RAFI-USA.*

**Key Project Staff**
**Lisa Misch, Director of Farmer Outreach and Technical Assistance, RAFI-USA:** Ms. Misch leads RAFI-USA's Resources for Resilient Farms project and serves as Project Director for multiple USDA-funded projects. Before joining RAFI-USA, she served as the AmeriCorps VISTA Volunteer at the College of Menominee Nation in Keshena, WI, where she managed the Tribe's farmers market. Ms. Misch has previous experience working on small, sustainable farms in the Midwest and internationally. ***Project Role:*** *In addition to ensuring consistency across regions in service delivery and hiring and training project staff, Ms. Misch will lead efforts to manage the project's network of TA providers.*

**Carolina Alzate Gouzy, Ph.D., Farmer Outreach Coordinator, RAFI-USA:** Dr. Alzate Gouzy has worked to support networks of agroecology NGOs. She has degrees in Agribusiness and Sustainable Development from Universidade de Brasília, Brazil. Her extensive experience is based in Latin America, where she worked with small farmers, as well as more recent experience conducting outreach to farmers of color as part of RAFI-USA's NRCS cooperative agreement. ***Project Role:*** *Dr. Alzate Gouzy will provide bilingual coordination between efforts in Puerto Rico and RAFI-USA staff, as well as coordination between NRCS-funded activities and this project.*

**Jaimie McGirt, Agricultural Conservation and Market Access Coordinator, RAFI-USA:** Ms. McGirt has extensive experience providing 1-on-1 technical assistance to historically underserved farmers in the Southeast, including assisting farmers in identifying business and land stewardship priorities, assessing capacity, and identifying capacity-building resources, partnerships, and referrals that help farmers advance their market and farm conservation goals.

**Page 14.** *Gaining New Ground Project Narrative;* RAFI-USA

Ms. McGirt co-leads RAFI-USA's NRCS-specific training for technical assistance providers. ***Project Role:*** *Ms. McGirt will provide 1-on-1 technical assistance related to market access and farmland conservation activities to farmers participating in the project, as well as coordination between current NRCS-funded project activities and the early activities of this project.*

**Benny Bunting**, **Lead Farmer Advocate, RAFI-USA:**  Mr. Bunting is a national leader advocating for farm families and saving farms that would otherwise be lost to foreclosure. He provides farmers various advocacy services through RAFI-USA's Farm Advocacy program, including financial counseling, legal referrals, and TA. He counsels between 75-100 farmers annually and, on average, devotes 60 hours per client. In more than 90% of the cases he works on, Mr. Bunting helps farmers realize their goals and achieve greater stability. ***Project Role:*** *Mr. Bunting will assist with identifying barriers to accessing FSA programs, train staff on FSA regulations, and provide 1-on-1 farm advocacy services to farmers in financial distress.*

**Kristina Torres, Program Manager, VI Good Food Coalition: Ms. Torres** has experience with program design and project management, including working on federal grants. She has over 15 years of experience designing and facilitating systems thinking approaches and fluency in navigating between the U.S. Caribbean and the U.S. mainland. **Project Role:** Ms. Torres will supervise the USVI-specific project objectives, timeline, budget, and ongoing compliance monitoring.

**Mariolga Reyes Cruz, Ph.D., Cofounder and Executive Director in Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible:** Dr. Reyes Cruz is a community psychologist, a documentary filmmaker, and a social and climate justice activist. She is working on producing a feature-length documentary that follows three young Puerto Rican farmers in their efforts to advance sustainable agriculture. Mariolga Reyes lives in Río Piedras and co-manages the family farm in Utuado. ***Project Role:*** *Dr. Reyes Cruz will contribute to the baseline study and oversee the purchase and management of land trust property.*

**Ramón Borges-Méndez, Ph.D., Associate Professor,  Clark University:** Prof. Borges-Méndez teaches graduate courses on food systems, inequality, labor economics, migration, and globalization. Prof. Borges-Méndez is co-founder of Fundación Bucarabón, a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. Prof. Borges-Méndez has extensive consulting experience working with various organizations, including the Ford Foundation, United Nations, and the Brookings Institution. ***Project Role:*** *Prof. Borges-Méndez will serve on the Advisory Committee and lead efforts to conduct the initial baseline study on land access and land use in Puerto Rico.*

### OUTCOME EVALUATION PLAN AND REPORTING

### i. Anticipated Outcomes
Although we will set outcome evaluation and reporting plans for all 15 outcomes listed under the Goals, Objectives, and Outcomes section, here are two anticipated outcomes.

| Anticipated Outcome | Evaluation and Reporting Plan | Significance | Potential Beneficiaries |
|---|---|---|---|
| **200 underserved farmers** receive technical | -Case managers and farmers create technical assistance plan<br>-Case managers track progress | -Farmers are clear on intended goals and plan to reach them | The 200 underserved farmers receiving tech assistance will |

| | | | |
|---|---|---|---|
| assistance tailored to their individual needs | towards goals in Salesforce<br>-Case managers conduct final eval interview with farmer when tech assistance ends | -Project team can quantify how many farmers reached, goals and rating of TA provided | be the primary beneficiaries but will have rippling effects for the surrounding ag economy |
| **45 farmers secure new land** through Gaining New Ground financial assistance grants | -Farmers complete grant application showing eligibility and feasibility for success<br>-Farmers sign grant agreement<br>-Farmers complete final report when land is secured<br>-Project staff do compliance check-in annually for 5 years | -Farmers have clear understanding of their fiscal responsibilities for grant funding<br>-Annual compliance check-in ensures grants used properly | The 45 farmers will be the primary beneficiaries but will have rippling effects for the surrounding ag economy |

The vast majority of farmers reached will be underserved BIPOC producers. We also expect to reach some farmers outside of North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico through virtual training, webinars, or online content. Estimated beneficiaries by region:

- North Carolina - 400
- Florida - 150
- Puerto Rico - 300
- US Virgin Islands - 150
- National - 200
- **TOTAL - 1,200**

## ii. Project Performance Measures & Metrics
The success of the project will be measured using the following metrics:

1. # farmers that report successful engagement with USDA; (Measures: webinar or 1-on-1 technical assistance evaluations)
2. # farmers who complete a needs assessment and technical assistance plan; (Measures: number of completed assessments and plans stored in project drive)
3. # of farm loans or grants secured by project participants for land acquisition or critical infrastructure; (Measures: summation of project land or infrastructure grants awarded as well as USDA or private lending secured through project technical assistance)
4. # farmers who secure long-term land leases or purchase land; (Measures: summation of finalized leases or land purchases as a result of funding and/or technical assistance provided)
5. # landowners incentivized to sell or lease to a farmer; (Measures: number of landowners who receive incentives to sell or lease to an underserved farmer)

## iii. Evaluation: Oversight and Measurement of Project Performance
The Project Director will oversee and measure the project's performance, report on outcomes, and ensure adherence to the project plan and timeline. This work will be done in coordination with the Data Manager and in close partnership with project leadership at RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition. Case managers assigned to follow each farmer throughout their engagement with the project are responsible for evaluating progress against goals for individual technical assistance projects.

## iv. Funding for Monitoring and Performance Measurement
Within the RAFI-USA project team, the Data Manager will be primarily responsible for monitoring and performance measurements. The Data Manager will be a 0.9 full-time equivalent

position with responsibilities including ensuring case managers are collecting required grant evaluation and metrics data, ensuring farmer grantees submit timely reports, assisting with USDA performance reporting and baseline study. Funding set aside for Data Manger is $247,273.

**v. Plans for Reporting and Communicating of Findings and Results**
In addition to required grant reports, we will document, evaluate, report, and share our findings with underserved farmers in the project's geographic region and relevant stakeholders beyond the term and geographic scope of this grant. We will additionally share results with peer organizations, lenders, land trusts, funders, and others who could contribute positively to improving land access for underserved farmers. Plans to share our findings include
- Ongoing meetings with USDA to provide feedback and discuss challenges experienced
- Creation and distribution of a quarterly Project Bulletin
- Hosting "*Gaining New Ground: Farmland Access in USVI and Puerto Rico*" presentations
- Producing reports based on findings from the initial baseline study
- Sharing our recommendations report regarding relevant USDA outreach materials

**vi. Plan for Collaboration and Communication with USDA**
Objective One of this project is to ensure USDA staff, particularly newer staff and staff in offices where participation in programs is low, understand the unique challenges and needs facing farmers in their regions. RAFI-USA looks forward to collaborating with USDA staff, locally, regionally, and nationally, wherever possible to benefit farmers and ranchers. Reports published as part of this project will be widely disseminated and shared with local, regional, and national USDA officials.

**MANAGEMENT AND PARTNERSHIP PLAN**
RAFI-USA will serve as the organizational project lead and, as such, will assume responsibility for the project management, budget management, reporting, and evaluation for this grant. The project will rely on an equitable, shared leadership model with a leadership team consisting of representatives from each core organization, an Advisory Committee, and participatory decision-making processes that are inclusive of all partners and include stakeholder feedback. This approach is consistent with our values and how we approach our work.

**Experience Managing Federal Funds:** RAFI-USA has extensive experience with federal grants management, including 1) USDA FMPP 2020-23 grant #AM200100XXXXG151; 2) FSA Cooperative Agreement 2021-22 #FSA21CPT0011944; 3) Subaward with National Young Farmers Coalition on NIFA Cooperative Agreement # 2022-70416-37195 4) NRCS Cooperative Agreement #NR223A750003C066. In FY2023, we will expand our capacity to manage federal funds by hiring a full-time, dedicated Federal Grants Manager. We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence, which we will use for the proposed project. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. Additionally, we contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop conducts the annual auditing of our financial statements. Beginning in 2023, they will conduct annual yellow book audits to ensure all federal funds are administered per applicable laws and regulations.

**Regranting Experience:** For more than 25 years, RAFI-USA has administered competitive grantmaking programs for farmers. We have in place a process that values equitable access for

all farmers, due diligence for applicant eligibility and feasibility, an external grant review process, and simple yet accountable compliance reporting processes. For this project, RAFI-USA will create grant guidelines and a scoring rubric aligned with project priorities and federal requirements. The review committee will score grant applicants, and applications with the highest scores will be chosen to receive financial assistance per the Advisory Committee's recommendations. Farmer grantees will enter into formal grant agreements with RAFI-USA that clearly outline grant terms and requirements, submit a W-9, signed grant agreement, and complete an orientation to review before payment is issued. RAFI-USA will develop an annual reporting process to ensure farmers comply with the grant agreement for at least five years after initial funding.

**Partnership Plan:** In addition to the partners included in this proposal, we expect to add partners to build an effective and collaborative regional network of partners representing public and private entities. Partner activities will be coordinated and monitored by RAFI-USA staff to ensure cohesiveness and alignment with established work plans and stated goals, objectives, and outcomes. We will host monthly check-ins with partners to receive updates, troubleshoot, discuss new outreach activities or materials, and ensure reporting and evaluation activities are on track.

## Core Project Partners

Alliance for Agriculture *(Subaward)*: Alliance for Agriculture (A4A) is an organization based in Puerto Rico with deep connections to farmers across the island. A4A will lead efforts in Puerto Rico. They will conduct monthly outreach efforts and submit findings to the Project Manager. The Alliance will participate in monthly check-ins, train-the-trainer events and contribute to outreach and supervision of technical assistance activities. The Alliance will establish or strengthen existing working relationships with the existing food/agriculture in Puerto Rico as stated in their Letter of Commitment. The Alliance will also contribute to the initial baseline and land trust feasibility studies.

Virgin Islands Good Food Coalition *(Subaward)*: Virgin Islands Good Food Coalition (VIGFC) is a nonprofit organization that advances food systems transformation in the USVI. VIGFC will lead efforts in the U.S. Virgin Islands and rely on extensive relationships in the territory to accomplish the project's objectives. They will conduct outreach to farmers in St. Croix, St. Thomas, and St. John and four producer-led organizations, organize trainings, supervise technical assistance activities, and contribute to the initial baseline and land trust feasibility studies.

Florida Organic Growers, Inc: *(Subaward)* Florida Certified Organic Growers and Consumers (FOG) is a nonprofit corporation established in 1987. FOG educates producers, consumers, media, institutions, and governments about the benefits of organic and sustainable agriculture, presenting at tours, conferences, workshops, classes, and other educational opportunities.

Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture): *(Subaward)* The Fideicomiso was founded to ensure landless farmers in Puerto Rico can access farmland as a common good and advance the food sovereignty of Puerto Rico. The lands under the custody of the Fideicomiso will be mainly destined to: support small-scale sustainable agriculture aimed at producing food for local consumers and initiatives that promote a good life for underserved farmers and their communities. They will collaborate with the project to identify and secure their first farmland purchase for the land trust.

**Page 18.** *Gaining New Ground Project Narrative*; RAFI-USA

Additionally, Mariolga Reyes Cruz will contribute to the initial baseline study and provide project leadership guidance on land access issues in Puerto Rico.

<u>Fundacion Bucarabon:</u> *(Subaward)* Fundacion Bucarabon is a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. They will support outreach to small and mid-sized farmers in PR and provide logistical support in the region.

## Core Collaborators

<u>Hispanic Federation:</u> *(Collaborator)* Hispanic Federation is an important player in attending to the needs and supporting the Latin community in the U.S. mainland and Puerto Rico. Hispanic Federation's commitment to this project includes: serving on the Advisory Committee for the project and contributing to the initial baseline study of land access, use, and tenure in Puerto Rico. Hispanic Federation will also assist with organizing convening activities in Puerto Rico to support the project.

<u>A Greener World:</u> *(Collaborator)* A Greener World will serve as a technical assistance provider on issues related to small-scale livestock production. In this capacity, they will offer 1-on-1 support to farmers interested in certification on verified farming practices. They will also offer training workshops for livestock farmers on pasture-based farming systems, general or by species, food labeling, best practices for handling and animal welfare in transport and slaughter, and regenerative farm planning. Emily Moose, A Greener World's Executive Director, will also serve as an Advisory Committee member to guide on matters related to livestock production.

<u>Freshpoint:</u> *(Collaborator)* Freshpoint is North America's largest wholly-owned produce distributor. Its client base includes local, regional, and national chains, hotels, resorts, country clubs, restaurants, healthcare, schools, universities, and other institutions. The company will collaborate on matters related to market access, including Freshpoint's planned expansion of its local produce program in Puerto Rico, identifying farmers who may benefit from the project, assisting farmers in becoming wholesale-ready, co-hosting farmer-buyer meetups and events, and exploring the possibility of exporting Puerto Rican produce to Florida.

<u>Triangle Land Conservancy, NC</u> (TLC): *(Collaborator)* TLC recently launched their "Good Ground Initiative," a buy-conserve-sell model of making farmland ownership accessible and affordable to BIPOC farmers. They will collaborate on conservation easement/land trust best practices and lessons learned, assess farmer fitness and land trust feasibility, and provide regional referrals for farmers interested in conservation easements/trusts.  Farmers participating in this project will be made aware of any Good Ground Initiative land sales and receive technical assistance through the buying process should they be selected by the GGI advisory committee.

<u>Foodshed Capital:</u> *(Collaborator)* Foodshed Capital is an experienced lender focused on meeting the needs of underserved producers, particularly BIPOC producers who have faced discrimination and exclusion from traditional lenders and federal programs. They have provided nearly $1.5 million in flexible, affordable capital and will collaborate to provide general support within the context of existing operational lending to Puerto Rican farmers, particularly as it is needed by farmers partnering with Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible.

**J.A. 0349**

<u>Agrarian Trust:</u> *(Collaborator)* Agrarian Trust holds farmland in community-centered commons and provides long-term, equitable land access for next-generation farmers and ranchers by establishing 501(c)(2) and 501(c)(25) landholding entities. Agrarian Trust commits to assisting RAFI-USA and partners in the feasibility study of establishing farmland holding entities where they are not currently working but hope to expand: in NC, FL, US Virgin Islands, and Puerto Rico.  Agrarian Trust will consult on model replication of lessons learned and best practices from the Agrarian Commons initiative.

**<u>Plans for Coordination, Communication, Data Sharing & Reporting</u>**
RAFI-USA has years of experience managing and storing confidential documents shared by farmers we work with via our farm advocacy services. Data protocols will be in place to ensure sensitive data and financial information is protected and stored securely during the life of the grant and after that for five years per RAFI-USA document retention policy, after which documents may be destroyed. To ensure compliance with federal requirements and consistent data tracking of outcomes indicators across the project, RAFI-USA will dedicate staff resources to managing the project's data collection, sharing, and reporting functions and maintaining secure and adequate data systems. Some key systems we will use to store and share information include

***Cloud-Based Document Storage:*** Project partners will have shared access and use of a third-party cloud-based document storage system where partners can store documents to allow for asynchronous collaboration. This system will also allow storing working documents, such as shared project work plans, budgets, project guidelines, outreach materials, and more. The system will also provide a central location to store any financial documents or other farmer data, grant agreements, and other documents. Only authorized RAFI-USA staff and designated partners will be provided access to this cloud storage.

***Use of Third-Party CRM Database:*** RAFI-USA utilizes a third-party CRM database system hosted on the Salesforce.com platform customized to meet organizational and project needs. The customized Salesforce database will be utilized by project staff to record and track participant data and to track and report on outcomes. The database is hosted in a secure server that uses a firewall and other advanced technology to prevent interference or access from outside intruders. Information is protected using server authentication and data encryption to ensure data is safe, secure and available only to authorized users. Only authorized RAFI-USA staff and designated partners are provided access to the database via a unique username and password that must be entered each time a user logs on to the database via industry-standard Secure Socket Layer (SSL) technology. Salesforce user accounts are configured to allow employees and designated partners access only to the information they need while keeping sensitive information about unrelated constituents private. Information stored in our Salesforce database related to farmers includes contact and demographic information, information about their farm, and their history of engagement with our programs, including grants, events, and technical assistance.

# ALLIANCE FOR AGRICULTURE DECLARATION – EXHIBIT 3-B

**Cost Reimbursement Subaward Agreement Between:**

**Rural Advancement Foundation International - USA (RAFI-USA)**

274 Pittsboro Elementary School Road

Pittsboro, NC 27312

DUNS #: 961684198

**And**

**Alliance for Agriculture**

PO Box 2181

Orocovis, PR 00720

DUNS # 117110612

Under Prime Agreement between RAFI-USA and the

USDA, Farm Services Agency ("FSA")

Cooperative Agreement # FSA23CPT0013706

CFDA Number: 10.968 Increasing Land, Capital, and Market Access

Federal Award Date: November 18, 2023

**1. Subaward Period of Performance**

Effective dates 07/01/2024 through 11/30/2028, unless otherwise agreed upon in writing between the parties.

**2. Scope of Work**

This is a Subaward Agreement (the "Agreement" or "Subaward") between **Alliance For Agriculture** ("SUBRECIPIENT") and RAFI-USA. This is not an R&D award. SUBRECIPIENT will use reasonable best efforts to participate in the effort as described in the below Project Description and Attachment 1, the Project Proposal, which is attached hereto and incorporated herein. A copy of the original cooperative agreement FSA23CPT0013706 between RAFI-USA and USDA FSA in Attachment 1, which is attached hereto and incorporated herein. In its performance of work SUBRECIPIENT shall be an independent entity and not an employee or agent of RAFI-USA.

**3. Project Description**

In this partnership, Alliance for Agriculture will work with RAFI-USA to achieve the goal of improving farmland access and security by addressing core barriers to attain land while also working to retain farmland by mitigating and preventing land loss.

Alliance for Agriculture will contribute their depth of experience and knowledge of challenges faced by farmers in Puerto Rico. They will also bring to the table their extensive network of relationships that will provide the necessary ground presence and technical knowledge to deliver an effective tailored

1

**J.A. 0352**

approach to Puerto Rico. Alliance for Agriculture will lead efforts in Puerto Rico to support the success of the program. Alliance for Agriculture commits to the following:

- conduct monthly outreach efforts to farmers in Puerto Rico using its internal network of more than 250 farmers, farmers markets networks, and peer networks; submit findings to the Project Manager;
- establish or strengthen existing working relationships with organizations in Puerto Rico
- participate in monthly check ins, train-the-trainer events, and contribute to outreach and supervision of technical assistance activities;
- contribute to the initial baseline study and the land trust feasibility study.

RAFI-USA retains the right to use (in perpetuity) any of the material RAFI-USA selects from this assignment and any of the work created for all internal purposes. SUBRECIPIENT hereby grants RAFI-USA all right, title and interest in and to any work product provided by SUBRECIPIENT under this Agreement.

● "All internal purposes" means: RAFI-USA print and web publications, web, digital, and broadcast channels, fact sheets, fundraising, philanthropy, display, social media, presentations and membership services, annual report and newsletters.

● RAFI-USA shall retain digital copies of selected images and all work from the assignment that will be archived in RAFI-USA archives and accessible to RAFI-USA staff.

● RAFI-USA will endeavor to credit the SUBRECIPEINT's work in all uses made by RAFI-USA. SUBRECIPIENT will include the following language where appropriate: *This material is based upon work supported by the U.S. Department of Agriculture in partnership with Rural Advancement Foundation International-USA.*

## 4. Invoices and Payments

Total Funds Cumulatively Obligated: **$1,538,200**

In consideration of SUBRECIPIENT's performance hereunder, RAFI-USA agrees to pay the SUBRECIPIENT no more than **$1,538,200** on a cost reimbursable basis. SUBRECIPIENT agrees not to exceed this amount without prior written authorization of RAFI-USA. RAFI-USA shall reimburse SUBRECIPIENT monthly. All invoices shall be submitted using RAFI-USA's template, which will be provided prior to the close of the first reporting period. Invoices are due 30 days after the close of the month. Invoice and questions concerning invoice receipt or payments shall be directed to the Partner and Data Manager, identified in Section 8 below.

The invoice due on December 31, 2028 will serve as the final statement of costs and should be marked "FINAL." Invoices should be paid by RAFI-USA within thirty (30) days of receipt. RAFI-USA reserves the right to reject an invoice in its sole discretion for any reason including, but not limited to, those outlined or referenced in 2 CFR 200.305. Payment may be delayed if a written programmatic report (see Section 5) is overdue.

## 5. Reporting

The SUBRECIPIENT will complete a Performance Progress report that is provided to RAFI-USA in accordance with the schedule outlined below. The Performance Project report template will be provided prior to the close of

2

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 359 of 467  Total Pages:(359 of 467)

Docusign Envelope ID: 65FB31B0-5929-4148-BD49-48EFAB35FB60    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 31 of 139

the first reporting period. In addition to the quarterly reporting, SUBRECIPIENT will participate in a monthly partner meeting, and other program activities and events as required.

Annually:

March 1 - May 31: Report due June 15

June 1- August 31: Report due Sept 15

Sept 1 - Nov 30: report due Dec 15

Dec 1 - Feb 28 (29 for leap years): report due Mar 15

Final:

September 1, 2028-November 30, 2028 - Report due December 15, 2028

There will be a grace period of 7 days for any missed report before follow-up steps are taken. The contract can be terminated at the sole discretion of RAFI-USA for missed reporting deadlines and/or failure to complete the tasks outlined in the project description. If SUBRECIPIENT has concerns about their ability to complete the activities, they should contact the Project Manager as soon as possible.

## 6. Terms of this Subaward

a. SUBRECIPIENT will use either RAFI-USA or project logo on relevant developed materials as laid out under the Scope of Work, in addition to SUBRECIPIENT's own logo. The Project Manager will provide SUBRECIPIENT with appropriate logos for use. Questions and discussion of what appropriate materials may constitute can be directed to the Project Manager.

b. Any changes to this contract must be agreed to in writing by both the SUBRECIPIENT and RAFI-USA.

c. No-cost extensions require the written approval of RAFI-USA. Any requests for a no-cost extension shall be directed to the Project Manager and Partner and Data Manager not less than 30 days prior to the desired effective date of the requested change. In addition, RAFI-USA may issue non substantive changes to the Period of Performance and Budget if agreed to in writing by both the SUBRECIPIENT and RAFI-USA.

d. At any time prior to the termination of the term of this Subaward, either RAFI-USA or SUBRECIPIENT may terminate the Subaward with or without cause by giving thirty (30) days written notice to the other party. RAFI-USA shall pay SUBRECIPIENT for termination costs as allowable under Uniform Guidance, 2 CFR 200, or 45 CFR Part 75 Appendix IX, as applicable. SUBRECIPIENT will be expected to provide a final invoice and programmatic report within 30 days of termination date. In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the termination date.

e. This Subaward assumes the provision and receipt of funds under USDA award #FSA23CPT0013706 necessary for completion of the outlined Scope of Work covered by this Subaward. If the underlying USDA NRCS award is terminated or modified in any manner that affects the funding for the Scope of Work outlined in this Subaward, SUBRECIPIENT will be notified in writing and all work under this Subaward should cease. Any payments for work already completed by SUBRECIPIENT will be paid according to the terms of this Subaward to the extent funding is available through the underlying USDA award. SUBRECIPIENT will be expected to provide a final invoice and programmatic report within 30 days of notice to cease work. In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the date of notification to cease work. If any money already received by SUBRECIPIENT is determined to be unallowable, SUBRECIPIENT will return such money to RAFI-USA within 10 days of written notification by

3

USCA4 Appeal: 25-1575　Doc: 55-1　Filed: 06/23/2025　Pg: 360 of 467　Total Pages:(360 of 467)

Docusign Envelope ID: 6EFB31B0-6929-41A8-BD49-48EFAB35FB60 2:25-cv-02152-RMG　Date Filed 03/26/25　Entry Number 24-4　Page 32 of 139

RAFI-USA.

e. SUBRECIPIENT will comply with the Federal Fair Labor Standards Act.

**Special Conditions in Effect**

LAND ACQUISITION

Any actions related to real property as defined in 2 CFR Part 200.1 such as land purchases, are not authorized, pending agency policy approval. This includes staff time researching costs, working on purchase offers and all other actions associated with the acquisition of real property. Any work in these areas would be considered voluntary and the Federal Government would not be able to reimburse for this work.

More specifically, until further guidance is provided, recipient organization is prohibited from incurring costs for:

- personnel for any activities directly and/or indirectly related to land acquisition.
- fringe benefits for any activities directly and/or indirectly related to land acquisition.
- contractual agreements for any activities directly and/or indirectly related to land acquisition, and specifically:
  - Land Trust Designer, nor
  - any other activities directly and/or indirectly related to land acquisition.
- Recipient organization may not incur indirect costs directly and/or indirectly related to land acquisition.

**7. Certifications and Assurances**

By executing this Agreement, SUBRECIPIENT makes the certification and assurances required by Uniform Guidance: 2 CFR 200, et. seq., including:

**I. Certification Regarding Lobbying (2 CFR 200.450)**

a. No Federal appropriated funds have been paid, by or on behalf of the SUBRECIPIENT, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal Contract, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

b. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or intending to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the SUBRECIPIENT shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," to RAFI-USA.

c. The SUBRECIPIENT shall require that the following language of this certification be included in the award

4

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 361 of 467 Total Pages:(361 of 467)

Docusign Envelope ID: 6EFB31B0-6929-41A8-BD49-4EEAB35FB60I
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 33 of 139

documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all SUBRECIPIENTS shall certify and disclose accordingly.

**This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.**

**II. Debarment, Suspension, and Other Responsibility Matters (2 CFR 200.213 and CFR 180)**

a. SUBRECIPIENT certifies by signing this Agreement that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any federal department or agency.

**III. Audit and Access Records**

A. SUBRECIPIENT certifies by signing this Agreement that it complies with the Uniform Guidance, will provide notice of the completion of required audits and any adverse findings which impact this Subaward as required by 2 CFR parts 200.501 - 200.521, and will provide access to records as required by parts 200.336, 200.337, and 200.201 as applicable.
B. SUBRECIPIENT certifies by signing this Agreement that it will provide RAFI-USA with all required records to support invoices submitted.
C. SUBRECIPIENT will also follow 45 CFR Part 75 where applicable.
D. SUBRECIPIENT understands that, in accordance with federal grant compliance requirements, there exist additional financial reporting requirements as a subcontractor to RAFI based on the level of federal funds usage by SUBRECIPIENT.
   a. SUBRECIPIENT affirms that they receive:

 less than $750,000 annually in federal funds, inclusive of this subawardee agreement

_____ more than $750,000 annually in federal funds, inclusive of this subawardee agreement
   b. If receiving more than $750,000 annually in federal funds, SUBRECIPIENT agrees to provide RAFI with the appropriate tax documentation annually to stay in compliance with federal regulations.

**IV. Prohibition On Certain Telecommunications And Video Surveillance Services Or Equipment**

a. SUBRECIPIENT is responsible for compliance with the prohibition on certain telecommunications and video surveillance services or equipment identified in 2 CFR 200.216. See Public Law 115-232, Section 889 for additional information. In accordance with 2 CFR 200.216, the recipient (including subrecipients) is prohibited from obligating or expending loan or grant funds for covered telecommunications equipment or services to:

1. procure or obtain, extend or renew a contract to procure or obtain;
2. enter into a contract (or extend or renew a contract) to procure; or
3. obtain the equipment, services or systems.

5

J.A. 0356

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 362 of 467  Total Pages:(362 of 467)

Docusign Envelope ID: 6EFB71B0-6929-4148-BD49-48EFAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 34 of 139

**8. RAFI-USA Contacts and Modifications**

• **Project Manager** – Kavita Koppa

919-533-8487, kavita@rafiusa.org

• **Federal Grants Manager** – Kelly Marchand

919-503-2926 kmarchand@rafiusa.org

• **Executive Director–** Edna Rodriguez

919-621-5158, edna@rafiusa.org

Matters concerning the technical performance of this Subaward shall be directed to the Project Manager. Matters concerning the request or negotiation of any changes in the terms, conditions, or amounts cited in this Agreement, and any changes requiring prior approval, shall be directed to the Project Manager.

Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

RAFI-USA roles and personnel are subject to change upon written notification from RAFI-USA to SUBRECIPIENT.

**9. Indemnification**

To the extent permitted by applicable law, SUBRECIPIENT agrees to indemnify, defend, and hold harmless RAFI-USA, and its affiliates, officers, directors, agents, employees, attorneys, insurers, volunteers and permitted successors and assigns against any and all claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of SUBRECIPIENT's negligence or willful acts in performing its duties under this Agreement. This indemnification will survive the termination of this Agreement.

**10. Severability/Interpretation**

In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of the Agreement.

**11. Non-Disparagement**

During the term of this Agreement and at all times thereafter, SUBRECIPIENT hereby promises and agrees not to demean or disparage RAFI-USA or any persons or entities related to RAFI-USA in any manner.

**12. Conflict of Interest**

A potential or actual conflict of interest exists when a Subrecipient's contractual commitments on this project may reasonably appear to be compromised by other financial interests or positions of influence directly related to this project's work. Each Subrecipient/Contractor will disclose any organizational or individual (key personnel only) financial interests or positions of influence that may give rise to a potential or actual conflict of interest. Should any change occur, or any doubt arise, as to whether any proposed financial interest, transaction or position is in contravention of this agreement, the Subrecipient/Contractor must disclose, in writing, the

6

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 363 of 467    Total Pages:(363 of 467)

Docusign Envelope ID: 65FB31B0-5929-A148-BD49-48EEAB25FB60    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 35 of 139

matter to the Project Manager within 30 calendar days.

Please describe any organizational or individual, financial interest or position of influence, the Subrecipient/Contractor (key personnel only) holds, or circumstances that could contribute to a conflict of interest:

_____    No conflict of interest to report.


_____    Subrecipient/Contractor has a conflict of interest (COI) to report. Please specify name, nature of the relationship and the nature of the financial interest or position of influence, e.g. equity (public= include dollar value/private = include % of ownership) or Board membership.

1._____

2._____

3._____


### 12. Confidentiality

RAFI-USA acknowledges that certain documents that SUBRECIPIENT creates and provides to RAFI-USA in the course of the Agreement may contain incomplete or sensitive information that is intended to remain confidential until final approval has been granted by RAFI-USA and the USDA under the terms of the Agreement. Any such documents should be identified with a "CONFIDENTIAL DRAFT" watermark. RAFI-USA will distribute marked documents to internal partners only on a need-to-know basis and include SUBRECIPIENT as a party to any such correspondence. Prior to the distribution of the marked documents RAFI-USA shall inform each recipient of the confidential nature of the information and notify SUBRECIPIENT of RAFI-USA's intent to distribute. SUBRECIPIENT shall use the same degree of care to protect the RAFI-USA and USDA confidential information as it does to protect its own confidential and proprietary information, but in no event shall it use less than reasonable care.


### 13. Warranty

SUBRECIPIENT warrants that all services performed by SUBRECIPIENT under this Agreement will be performed in a competent and workman-like manner in accordance with accepted industry standards for comparable services. SUBRECIPIENT warrants that all services will be completed within the schedule set forth in the Statement of Work or otherwise provided by RAFI-USA.


### 14. Insurance

Throughout the term of this Agreement, SUBRECIPIENT shall maintain general liability insurance coverage underwritten by Best A-rated insurance carrier. Such insurance shall have policy limits of no less than $1,000,000 per occurrence for losses due to errors or omissions, $1,000,000 per occurrence for death or personal injury, $1,000,000 per occurrence for real and personal property damage, and $2,000,000 aggregate liability per year. SUBRECIPIENT shall maintain workers' compensation insurance in amounts required by law. Within ten (10) days following the effective date of this Agreement, on each anniversary of the date of this Agreement and upon any request by RAFI-USA, SUBRECIPIENT will deliver to SUBRECIPIENT a certificate of insurance verifying the foregoing insurance coverage.


### 15. Independent Contractor

a. In making and performing this Agreement, SUBRECIPIENT shall act at all times as an independent contractor. Nothing herein shall be deemed or construed to create a joint venture, partnership, agency or

7

**J.A. 0358**

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 364 of 467  Total Pages:(364 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4148-BD49-48EFAB35FB60    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 36 of 139

employment relationship between the parties for any purpose. Although SUBRECIPIENT will receive generalized instruction from RAFI-USA as to the performance of services hereunder, RAFI-USA will not control or supervise the specific methods to be used or the sequence of tasks to be performed in connection with SUBRECIPIENT's duties hereunder. SUBRECIPIENT shall be responsible for all compensation, fees and taxes (including, without limitation, withholding for income, Social Security and other taxes) applicable to its Representatives. RAFI-USA will not provide insurance, vacation, or other employment benefits of any kind to SUBRECIPIENT or its Representatives.

b. SUBRECIPIENT agrees to indemnify and hold RAFI-USA harmless, and hereby indemnifies and holds RAFI-USA harmless, from and against any damage, claim, assessment, interest charge or penalty incurred by or charged to RAFI-USA as a result of any claim, cause of action or assessment by any Federal or state government or agency for any nonpayment or late payment by SUBRECIPIENT of any tax or for RAFI-USA's failure to withhold any amounts for taxes from compensation paid to SUBRECIPIENT or its Representatives hereunder.

### 16. Notices

All notices shall be in writing and sent by personal delivery; certified or registered mail, return receipt requested; express courier service with next-business-day delivery; or transmittal by facsimile (if confirmed by such mailed) to the addresses indicated above, or to such other address as either party may indicate by at least ten (10) days prior written notice to the other party. Any notice so given shall be deemed to have been received upon receipt by personal delivery or certified or registered mail; the next business day after the dispatch by express courier service; or upon the date transmitted by facsimile (with confirmation of transmittal), as the case may be.

### 17. Applicable Law

This Agreement shall be governed by the laws of the State of North Carolina, without regard to the conflicts-of-law rules of such State. The parties agree that any action proceeding arising out of or related to this Agreement shall be brought only in the Superior Court of Chatham County, North Carolina, or the United States District Court for the Middle District of North Carolina, and the parties hereto consent to such exclusive venue and to the jurisdiction of such courts over the subject matter of such proceeding and themselves.

### 18. Time of the Essence

Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of this provision.

### 19. Assignment

SUBRECIPIENT will not voluntarily, or by operation of law, assign or otherwise transfer its obligations under this Agreement without the prior written consent of RAFI-USA.

### 20. Waiver

The waiver by either party of a breach, default, delay or omission of any of the provisions of this Agreement by the other party will not be construed as a waiver of any subsequent breach of the same or other provisions.

8

**J.A. 0359**

### 21. Award Language

Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

### 22. Cooperation

SUBRECIPIENT agrees to cooperate at any time to the extent and in the manner reasonably requested by RAFI-USA and at SUBRECIPIENT's expense (to the extent allowed by applicable law), in the prosecution or defense of any claims, litigation or other proceeding, including anything related to Confidential Information.

### 23. Legal Expenses

In the event that any legal proceeding is commenced to enforce or interpret any provision of this Agreement, RAFI-USA, if it prevails, shall be entitled to recover from SUBRECIPIENT, in addition to any other damages or award, all reasonable legal costs and fees associated with the action in both the trial and appellate courts.

### 24. Entire Agreement

It is agreed that there is no representation, warranty, collateral agreement or condition affecting this Agreement except as expressly provided in this Agreement and all attachments hereto.

### 25. Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument.

### 26. Signature

By signing this Agreement, SUBRECIPIENT certifies that it will perform the work under this Agreement in accordance with the terms of this Agreement, the applicable terms of the Prime Award, federal, state, and local law, rules and regulations, and the SUBRECIPIENT's policies. Moreover, the persons whose names and signatures appear below, represent and warrant that they have authority to enter into this agreement on behalf of the company, firm or organization they purport to represent and hereby agree to the terms set forth herein.

**Rural Advancement Foundation International – USA**

By: _Edna Rodriguez_

Printed Name: Edna Rodriguez

Title: Executive Director

**Alliance for Agriculture**

By: _Miguel Marxuach_

Printed Name: Miguel Marxuach

Title: Executive Director

9

USCA4 Appeal: 25-1575   Doc: 55-1   Filed: 06/23/2025   Pg: 366 of 467  Total Pages:(366 of 467)

Docusign Envelope ID: 6EFB74B0-6929-A1A8-BD49-48EFAB25FB60
2:25-cv-02152-RMG   Date Filed 03/26/25   Entry Number 24-4   Page 38 of 139

Date:_____        Date:_____

10

**J.A. 0361**

**Attachment 1**

11

**AMENDMENT NO. 1**
**TO AGREEMENT NUMBER FSA24CPT0013706**

**PURPOSE**

The purpose of this amendment is to update the Notice of Award, Statement of Work (Attachment 1A), Project Narrative (Attachment 2A), Budget Narrative (Attachment 3A), and General Terms and Conditions (Attachment 4A).

**In the case of any conflict between language in this amendment and the award General Terms and Conditions, the provisions of this amendment will control.**

**REVISIONS TO THE NOTICE OF AWARD (FORM ADS-093):**

1. The Approved Budget for the agreement is revised as shown in Block 19.
2. The list of Attachments on page 2 of the NOA has been revised to include this amendment narrative and the revised attachments.

**REVISIONS TO AGREEMENT ATTACHMENTS**

1. The Agreement Statement of Work (Attachment 1) is replaced in its entirety with Attachment 1A to this amendment.

2. The Agreement Project Narrative (Attachment 2) is replaced in its entirety with Attachment 2A to this amendment.

3. The Agreement Budget Narrative (Attachment 3) is replaced in its entirety with Attachment 3A to this amendment.

4. The General Terms and Conditions (Attachment 4) is replaced in its entirely with Attachment 4A to this amendment

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 369 of 467  Total Pages:(369 of 467)

## Agreement Number: FSA24CPT0013607
## Statement of Work

### 1. PURPOSE AND OBJECTIVES

The authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169). Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access. Section 1006 also provides resources for grants to improve land access, including providing resources related to heirs' property and other land access issues that affect access to USDA programs.

### 2. SPECIAL CONDITIONS IN EFFECT

This is formal correspondence notifying you that all special conditions included in the original agreement statement of work are rescinded except those included in section 7, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS and those listed below. Other project activities may commence unless they are associated with NEPA or those outlined below.

<u>BENEFICIARY GRANTS</u>

For purposes of this agreement, Beneficiary Grants are small, one-time-only awards given to eligible producers for purposes that support the goals of FSA Increasing Land, Capital, and Market Access Program and where USDA funding isn't already available. Potential uses of funding include but are not necessarily limited to downpayment assistance for land purchase, land lease or rental assistance, implementation of conservation practices, improving soil quality, purchasing or installing on-farm infrastructure, or to cover costs for supplies, equipment, and maintenance if funding isn't currently available through existing USDA programs.

As program beneficiaries rather than subrecipients, producers receiving Beneficiary Grants will not be subject to the property reporting and disposition requirements set out in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards found in 2 CFR Part 200. Funds awarded via Beneficiary Grants must be excluded from the Recipient's indirect cost base when calculating indirect costs.

**PRIOR APPROVAL OF PROJECT PLAN REQUIRED**: Recipient must submit a project plan capturing the details of the Beneficiary Grant component of its project (Project Plan) for FSA review and approval. The execution of any component of a Beneficiary Grants project is not authorized until the recipient has received such written prior approval. The Recipient must also obtain FSA approval for any individual Beneficiary Grant in excess of $100,000 prior to executing the Beneficiary Grant.

Submit prior approval requests for Project Plans and proposed individual Beneficiary Grants exceeding $100,000 via e-mail to FPAC.BC.GAD@usda.gov with a copy to Land.Access@usda.gov.

Recipient's Project Plan must include the following items:

1. Intended beneficiaries for the Beneficiary Grants.
2. Eligibility requirements for beneficiaries.
3. Goals of the Beneficiary Grants project, including proposed allowable uses of Beneficiary Grants funds and allowable costs (see 2 CFR 200 subpart E, Cost Principles).
4. A description of the application process (including a copy of the request for applications), competitive review process, and overall budget associated with the beneficiary-grants.

1

**J.A. 0364**

5.  A plan for verifying that funds are appropriately spent by beneficiaries in accordance with the Beneficiary Grant award.
6.  A plan to assure that improvements or purchases funded with the Beneficiary Grant will continue to meet the objectives of Increasing Land, Capital, and Market Access Program for a specified period of time, as applicable.
7.  Internal controls to ensure program resources are protected from waste, fraud, and mismanagement.

Beneficiary Grant projects that involve land disturbing activity will require individual environmental assessments, in accordance with the National Environmental Policy Act (NEPA), National Historic Preservation Act (NHPA), Endangered Species Act (ESA), and any other relevant environmental compliance laws and executive orders. The Recipient must work with FSA to identify any aspect of its Beneficiary Grants project that involves environmental compliance issues to ensure compliance with the environmental compliance laws and executive orders. See section 7 for further information.

Once the Recipient begins implementation of its Beneficiary Grant project, it must work with producer beneficiaries of the project to provide FSA with at least one success story annually.

<u>LAND ACQUISITION</u>

Any actions related to real property as defined in 2 CFR Part 200.1 such as land purchases, are not authorized, pending agency policy approval.  This includes staff time researching costs, working on purchase offers and all other actions associated with the acquisition of real property.  Any work in these areas would be considered voluntary and the Federal Government would not be able to reimburse for this work.

More specifically, until further guidance is provided, recipient organization is prohibited from incurring costs for:
*   personnel for any activities directly and/or indirectly related to land acquisition.
*   fringe benefits for any activities directly and/or indirectly related to land acquisition.
*   contractual agreements for any activities directly and/or indirectly related to land acquisition, and specifically:
    o  Land Trust Designer, nor
*   any other activities directly and/or indirectly related to land acquisition.
*   Recipient organization may not incur indirect costs directly and/or indirectly related to land acquisition.

**3. PROJECT NARRATIVE**
The recipient will carry out the project described in the Project Proposal; the referenced Project Proposal is incorporated as Attachment 2A.

**4. BUDGET NARRATIVE**
The official budget as noted in the award and described in the attached Budget Narrative (Attachment 3A) will be considered the total budget. Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

2

### 5.  REPORTING  REQUIREMENTS

a.  The recipient must submit performance progress reports to the Results Verification System (RVS) quarterly, according to the following schedule for each year of the agreement. For 2024, the progress report due by March 31 is not required. Thus, the first progress report due in 2024 will be by June 30. Attach only 1 report per email with a copy to FPAC.BC.GAD@usda.gov.

March 31
June 30
September 30
December 31

b.  The recipient must submit financial reports (SF-425) to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov.  If the recipient requests reimbursement payments only, the first financial report is due June 30, 2024, and bi-annually thereafter. Thus, for year 1 of the agreement, the financial report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email.

Financial Report #1: June 30, 2024

Financial Report #2: December 31, 2024

If the recipient requests advance payments, financial reports are due at the same time as performance progress reports, which are as follows:

March 31
June 30
September 30
December 31

### 6. PAYMENT INFORMATION
Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) (see Attachment 4A). Also see https://www.fpacbc.usda.gov/about/grants-and-agreements/awardpayments/index.html for preparation and submission guidance.

### 7. NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS
The National Environmental Policy Act (NEPA) environmental review process must be completed for activities under this agreement, including any NEPA-related activities under Beneficiary Grants, as well as construction activities, with potential impacts to the human environment prior to the recipient drawing down funds or incurring expenses under this Grant Agreement. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 CFR 1506.1. FSA reserves the right to de-obligate funds obligated under this grant agreement (or to require the return of such funds) in the event a recipient breaches or otherwise fails to perform under any of the grant requirements.

### 8. GENERAL TERMS AND CONDITIONS
The General Terms and Conditions applicable to this award (General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) are attached and incorporated as Attachment 4A. They are also available online at the following link:
https://https://www.fpacbc.usda.gov/Assets/fpacbc/files/about/grants-agreements/general_terms_and_conditions_non-ezfed-march_2024-1.pdf

3

**J.A. 0366**

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 372 of 467  Total Pages:(372 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EAB35FB8B0
2:25-cv-02132-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 44 of 139
Agreement #: FSA24CPT0013706                                     Attachment 2A

**PROJECT NARRATIVE:** 2022 Increasing Land, Capital and Market Access Program

| | |
|---|---|
| **Lead Applicant:** | Rural Advancement Foundation International-USA (RAFI-USA) |
| **Project Title:** | *Gaining New Ground for Underserved Farmers in Southeast US & US Caribbean Region* |
| **Project Term:** | **Per award** |
| **Proposed Funding Tier:** | Regional Land Access Tier (NC, FL, USVI & PR) |
| **Total Requested Funds:** | $8,499,695 |

**INTRODUCTION & JUSTIFICATION**

**Project Goal & Purpose**

The overarching goal of the proposed Gaining New Ground project is to improve land access and land security for underserved farmers of color in four areas: North Carolina (NC), Florida (FL), U.S. Virgin Islands (USVI), and Puerto Rico (PR). This will be accomplished by addressing core barriers to access land, credit, and markets, while also working to retain farmland by mitigating and preventing land loss. The project will work to meet the needs of underserved farmers on the edge of viability by delivering culturally-relevant outreach and education, providing targeted technical and financial assistance and examining and addressing barriers to accessing USDA programs in regions with significant populations of Black, Indigenous, and people of color (BIPOC) farmers, particularly those who are especially vulnerable to climate change impacts. The project will further work to improve land access by exploring the feasibility of establishing an agricultural land trust in Caribbean region and bolstering an existing land trust in Puerto Rico.

**Justification of Need**

Since 1990, RAFI-USA has worked with farm families of small and mid-sized farms to help them succeed in the face of financial crises and to reverse the trend of farm loss. Over time, we have recognized that farmers of color face specific difficulties that put their farms and livelihoods in peril. By 2044, the U.S. is projected to have a majority-minority population, yet the U.S. farming community remains dominated by white men. Farmers of color represent less than 4% of all owner-operators.

Thriving regional food systems depend on the land security of farmers, yet finding and securing affordable land is one of the biggest challenges farmers face in starting or maturing a career in agriculture. For BIPOC farmers, this is compounded by the fact that they have historically experienced abusive practices and discrimination in accessing credit, resources, and markets, leading to significant land loss. According to the USDA Tenure, Ownership, and Transition of Agricultural Land (TOTAL) survey in 2014, about 40% of U.S. farmland is rented, and 97% of landlords are white. Nationally, while 14% of tenants are people of color, they operate only 8% of tenant acreage, indicating BIPOC tenants operate smaller farms than white tenants. According to the results of the National Young Farmer Coalition's Survey with over 10,000 responses from farmers under 40 years of age, "Over half of all respondents (54%), and 75% of Black farmers, said that they currently need more access to land, whether to buy or lease."

Accessing affordable land is especially difficult for farmers in Puerto Rico and U.S.Virgin Islands, who must contend not only with expensive farmland and a growing number of outside

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 373 of 467  Total Pages:(373 of 467)

Docusign Envelope ID: 6EFB31B0-5920-4148-BD49-4BEAB35FB6B0
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 45 of 139
Agreement #: FSA24CPT0013706                                    Attachment 2A

investors buying up property but also with the realities of climate change, the recurring risk of hurricanes, a lack of local markets for their products, and off-farm wages that are significantly lower than on the mainland.

Farmers in the U.S. Caribbean are *severely* underrepresented and disconnected from available resources and larger networks, yet especially susceptible to climate change impacts. Farmers face challenges unique to their location, geography, and status as a territory. Some of these include difficulty in transportation within and between the various islands that make up the Territories, lack of processing facilities or shared-use certified kitchens, lack of dedicated FSA staff (USVI), and significant distrust of government programs, particularly federal ones.

Small and mid-scale farmers today must rely on off-farm income to cash flow their operations. Unfortunately, this is a challenge for farmers in PR and USVI, where unemployment and poverty rates are high. According to 2021 Census data, the poverty rate in PR at 40.5% was almost double that of Mississippi (MS), the poorest state in the nation, where approximately 19.4% of persons live in poverty. Per capita income in PR was just over $13,000 in 2020 compared to $25,400 in MS. PR and USVI residents are ineligible for the Earned Income Tax Credit and earn less, on average, in Social Security and veterans' benefits. Like PR, poverty in USVI is also high, with more than 20% of the population and a third of children living in poverty. Median household income decreased in 2019 to $40,408.The average annual income for farmers in USVI is approximately $9,500. In 2018, the U.S. Virgin Islands had 565 farms, up 158% from 219 farms in 2007.

**Target Audience**

The Gaining New Ground project will focus efforts in regions where RAFI-USA's Farmers of Color Network (FOCN) program already has a foothold and where our collaborating partners have existing relationships and experience working with local farmers. The primary beneficiaries of this project are historically underserved farmers of color in North Carolina, Florida, the central mountain region of Puerto Rico, and the U.S. Virgin Islands.

**Table 1. Farm Operations, Ownership, Demographics, and Farm Size in Target Region**

|  | NC (2017) | FL (2017) | PR (2018) | USVI (2018) |
|---|---|---|---|---|
| *Number of farms* | 46,418 | 47,590 | 8,230 | 565 |
| *Owned/leased farms* | 43,764 / 15,561 | 45,488 / 8,674 | n/a | 421 / 233 |
| *# BIPOC operated farms* | 3,342 | 9,032 | 744 | n/a |
| *Average farm size (acres)* | 182 | 204 | 58 | 16.5 |

*Data Source: USDA NASS 2017 Census of Agriculture*

Targeted audience includes farmers who have limited resources, are located in high poverty areas, and are susceptible to climate change impacts. Additional details:

**Page 2.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 374 of 467  Total Pages:(374 of 467)

Docusign Envelope ID: 6EFB31B0-5939-4448-BD49-48EAB35FB6B0
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 46 of 139
Agreement #: FSA24CPT0013706                                                    Attachment 2A

- FOCN's membership is 76% Black/African American, 12% Indigenous, 9% Latinx, 3% Asian, and 1% Multiracial. Almost 40% of farmers who have applied for funding from the FOCN grants program include livestock production on their farms.
- In Puerto Rico, most farmers are Hispanic/Latinx. More than half of the farmers in the Alliance for Agriculture's network include livestock production on their farms.
- The majority of farmers in the U.S. Virgin Islands self-identify as Black/Caribbean. Many farmers also include livestock production on their farms.

The project will prioritize farmers previously impacted by disaster(s), those employing agroecological and sustainable production practices, farmers with diversified production systems, small livestock producers, and subsistence farmers in USVI and PR. The following proposed criteria will help us target and prioritize farmers who can be considered to be on the "edge of viability" for greatest impact:

- Farmers who have been farming more than a year, with priority given to farmers who have been farming for *at least* 3 years
- Farmers who have been unsuccessful in applying for FSA farm ownership loans or other USDA cost-share assistance
- Farmers who are ready to transition from a leased arrangement to land ownership
- Farmers who are close to "business-ready," including farmers who have not filed a Schedule F or registered with FSA
- Farmers who are not a good fit or ready for farm debt

**Programmatic Gaps Addressed By Proposed Project**

**Farmers have lack of awareness of available programs and resources and lack of knowledge of lending requirements:** Farmers of color are often not aware of the various programs and services available to them, as well as the regulations that govern these, and often experience difficulties in accessing USDA programs and services. In 2021, 23% of farmers who applied for RAFI-USA's FOCN grants program reported *not* having a registered FSA number. *The proposed project will fill this gap through strategic outreach to inform underserved farmers about how available resources and services can be used to help strengthen their farm operations and what requirements are necessary to access these.*

**Limited legal, financial, and business technical assistance for small BIPOC producers, particularly those in USVI and PR**: Farmers of color in the target regions are less likely to have access to technical assistance for their farming operations and are often left on their own when it comes to navigating complex application processes, creating farm business plans, accessing programs, addressing legal and financial challenges, negotiating with lenders, responding to disasters, and preventing land loss. There is a critical need for assistance with accounting, business planning, heir's property issues, etc. In 2021, 28% of farmers who applied for RAFI-USA's FOCN grants program reported not filing a Schedule F with the IRS. *The proposed project will fill gaps in assistance for underserved farmers by providing comprehensive 1-on-1 technical assistance, farm advocacy services, and case management to support the success, resiliency, and viability of their farms.*

**Page 3.** *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575   Doc: 55-1   Filed: 06/23/2025   Pg: 375 of 467   Total Pages:(375 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EEAB35FB60
2:25-cv-02152-RMG   Date Filed 03/26/25   Entry Number 24-4   Page 47 of 139
Agreement #: FSA24CPT0013706   Attachment 2A

**Programs are not designed to meet the needs of small farms, agroecological farmers, or BIPOC farmers**: USDA's decades-long "get big or get out" strategy of pushing farmers into high-volume commodity production has resulted in a long list of farm casualties and land loss. Although federal resources are an important part of the farm safety net, USDA programs are not designed for small-scale, diversified agroecological producers, nor are they designed to equitably meet the needs of BIPOC farmers or farmers in the U.S. Caribbean regions. A sentiment we often hear expressed by farmers: "*It felt like they were looking for reasons to deny my application, not reasons to approve it.*" Small farmers, especially BIPOC farmers, need to work exceptionally hard to justify the feasibility of their applications. On average, farms operated by BIPOC farmers are a quarter of the size of white-owned farms and often adapt by pursuing production practices and markets outside of the commodity system. Further, many USDA staff show little interest or have limited knowledge of adequately supporting smaller, diversified farms. *The proposed project fills this gap by improving agency staff awareness and understanding of the needs of small, agroecological, and BIPOC-underserved farmers while also looking to identify opportunities for service improvement.*

**Low participation by socially disadvantaged farmers in FSA Farm and Loan Programs:**
FSA loan origination and servicing are failing BIPOC farmers, especially those in underserved areas such as PR and USVI. Unfortunately, the problem cannot be attributed solely to a lack of farmer awareness about available programs. In our experience working side-by-side with farmers looking to apply for FSA programs, we have seen that often farmers of color are less likely to be treated as serious farmers by FSA staff and receive the bare minimum of information and guidance regarding program eligibility, application processes, and critical considerations for sound decision making. Female farmers also experience difficulty, with many, for example, reporting being asked to use their husbands' names in application documents instead of their own. *The project will fill this gap by seeking to understand why the volume of applications and number of loans approved in FL, PR, and USVI are so low (see table below) and by assisting farmers in overcoming these specific barriers.*

**FSA Direct Farm Ownership Loan Volume & Approvals**

| Region | 2021 | | Jan-Sep 2022 | |
|--------|--------|-----------------|--------|-----------------|
| | # Apps | Approved % (#) | # Apps | Approved % (#) |
| NC | 102 | 39% (40) | 75 | 45% (34) |
| FL | 100 | 12% (12) | 71 | 8.5% (6) |
| PR | 37 | 13.5% (5) | 27 | 0% (0) |
| USVI | 0 | 0% (0) | 0 | 0% (0) |

**Small farms, diversified and agroecological farmers, and BIPOC farmers do not have adequate and right-sized market access for farm product distribution in local, regional, and national food systems.** Traditional wholesale buyers and distributors, even those involved

**Page 4.** *Gaining New Ground Project Narrative; RAFI-USA*

in regional food distribution, often prioritize mid-size and large farms over small, diversified producers because of assumptions made regarding the small farmer's ability to deliver products as needed. This, as well as overt racial discrimination against BIPOC producers, has historically resulted in these farmers being excluded from purchase contracts and even local farmer's market organizations while their white counterparts received priority. However, these producers can adequately supply traditional markets if provided specialized technical assistance on topics including wholesale and retail introductions, certifications and/or food safety best practices, market production planning, cooperative producer strategies, and cash flow planning/evaluation. *The project will fill this gap through RAFI-USA's existing strategy and capacity for assisting small BIPOC producers with traditional and alternative market access opportunities and all project partners' existing relationships with wholesale and retail entities in targeted areas.*

**A lack of support and assistance for subsistence farming in the U.S. Caribbean**, particularly in Puerto Rico, where in 2022, the PR Department of Agriculture (ASDA) did not apply for the USDA Micro-Grants for Food Security program. *The project will address this programmatic gap through outreach, education, technical assistance, and financial support for subsistence farmers.*

**Farmers and landowners in PR and USVI have minimal access to land and conservation solutions offered by land trusts.** *The project will fill this gap by providing financial assistance to Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture), the only existing farmland trust in PR, and exploring the feasibility of establishing an additional agricultural land trust for the U.S. Caribbean region. A regional land trust would provide farmers with access to land in a region that, despite being compromised of two separate territories, face similar challenges regarding development, as well as using the same USDA staff. A unified regional land trust would ease access to USDA resources.*

## Project Concept and Design

RAFI-USA's proposed Gaining New Ground project was designed in close collaboration with the Alliance for Agriculture in PR and the Virgin Islands Good Food Coalition. It will expand the scope and depth of services already provided by these three organizations. The project's primary goal is to increase farm and land ownership opportunities for farmers, particularly historically underserved farmers of color, on small- to mid-sized farms in the regions identified. Designed as a collaborative effort with shared leadership and an Advisory Committee of leaders in the field, the project will build upon a circle of relationships that will strengthen the project's efforts. Gaining New Ground will follow an adaptive, iterative process and project design consisting of five cyclical phases:

1. Discovery: Participatory data gathering process
2. Planning: Develop strategy and activities to fulfill project goals and objectives
3. Implementation: Develop materials and execute activities
4. Tracking Results: Measure the effectiveness and reaction of the target audience
5. Refining: Adjust strategy, plan, and activities accordingly

**Page 5.** *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 377 of 467  Total Pages:(377 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EFAB35FB60    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 49 of 139

Agreement #: FSA24CPT0013706    Attachment 2A

To ensure the participation and input of diverse regional stakeholders in guiding the direction of the project, an Advisory Committee will be established to provide overall guidance and to make final funding decisions on financial assistance commitments. Members will include staff representatives from RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition, as well as individuals with relevant and varied expertise and perspective. A key early activity will be to help develop the scope and focus of the baseline study.

The initial baseline study will involve conducting regional needs assessments to uncover farmers' primary barriers to land tenure and the regional dynamics that contribute to a lack of ownership and land loss. The baseline study will also identify roadblocks farmers face when attempting to access USDA programs and determine the types of assistance most needed by farmers targeted for this project. **The results of the baseline study will directly affect the implementation of the remainder of the project, including but not limited to types of assistance provided, development of relationships with USDA officials, and overcoming barriers uncovered by the study.**

In addition to conducting the baseline study during year one, we will also review USDA outreach materials to assess how understandable, concise, and complete they are. Farmers need centralized, easy-to-find informational materials that summarize programs' purpose, eligibility, and processes. What we learn during this review will be shared with USDA and used to inform the development of our outreach materials. Materials developed for the project will maximize farmers' awareness of resources and include information that could improve farmers' outcomes in accessing services from USDA.

**OBJECTIVES AND OUTCOMES**
**<u>Objective #1</u>: Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers. Outputs:**
1.1 Conduct baseline study via existing project partners' data, farmer focus groups, and developed farmer surveys to identify all region and region-specific challenges farmers face in accessing USDA programs, acquiring land, securing credit, and accessing markets.

1.2 Develop recommendations for improving access to land, credit, and markets. Recommendations will be conveyed to USDA via Advisory Committee as described in Goal #2.

1.3 Convene a panel of experts to 1) evaluate current land use and access challenges in USVI and PR and 2) complete a feasibility study on the establishment of a USVI and PR regional land trust to serve as a vehicle to bring forth innovative solutions to underserved farmers that need to secure affordable land via long-term leases, lease-to-own arrangements and/or land acquisition to be dedicated to farming, forestry or to provide ecological service. RAFI will share the results of the feasibility study with relevant stakeholders in the region and support the placement of farmers onto a new land trust or modification of existing ones based on the study's recommendations.
1.4 Build working relationships with USDA staff to ensure ongoing positive engagement.

USCA4 Appeal: 25-1575    Doc: 55-1      Filed: 06/23/2025    Pg: 378 of 467  Total Pages:(378 of 467)

Docusign Envelope ID: 6FFB31B0-5922-41A8-BD49-4EEAB35FB60D
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 50 of 139

Agreement #: FSA24CPT0013706                                                    Attachment 2A

**Expected Outcomes:**

1. **Host at least three focus groups** of 8-10 farmers to identify land access challenges and ways USDA programs can better serve farmers in land, capital, and market access.

2. Based on the baseline study, **publish three summary reports.** 2 reports (one all-region, one region-specific) detailing the challenges underserved farmers face in accessing USDA/FSA programs and recommendations to address challenges. And 1 report assessing existing USDA outreach materials and the highest technical assistance needs from farmers.

3. In partnership with USDA staff, project staff will conduct ongoing relationship-building meetings, develop training opportunities, and facilitate farmer-to-USDA staff connections that will improve working relationships with USDA service center field staff and farmers. The Advisory Committee will also **compile and communicate recommendations to USDA** on clarity and ease of use of USDA outreach materials.

4. **Completion of 2 reports**: "Land Use & Land Access in USVI and PR" as well as the USVI and PR land trust feasibility study.

**Objective #2: Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.**
**Outputs:**

2.1     Convene Advisory Committee to provide project input and guidance, identify existing public and private services available in each region to help farmers, and serve as review committee for Gaining New Ground grants and financial incentive award decisions.

2.2     Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements, particularly FSA programs and market opportunities.

2.3     Through outreach activities, identify underserved farmers who meet eligibility criteria and are strong candidates to receive technical assistance related to land, capital, and market access, particularly those previously denied by USDA programs.

**Expected Outcomes:**

1. Conduct outreach activities reaching at least **1,200 farmers** to increase knowledge of and access to available resources or services related to land, credit, or market access, resulting in at least **300 underserved farmers** receiving practical, actionable information through 1-on-1 assistance, online content, webinars, or training.

2. Proactively identify and **recruit 200 underserved farmers** who are eligible and would be strong candidates to receive comprehensive land, capital, or market technical assistance services from project partners.

**Objective #3: Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.**
**Outputs:**

3.1     Build a network of legal, financial, and business technical assistance experts and project case managers that can meet specific needs identified by farmers during a technical assistance intake assessment.

*Page 7. Gaining New Ground Project Narrative; RAFI-USA*

**J.A. 0373**

3.2    Develop customized technical assistance plans for each farmer based on their needs and goals, provide farmers with individualized technical assistance, and maintain comprehensive case management to ensure consistent tracking of engagement and progress against goals.

3.3    Improve the degree of underserved farmers' participation in USDA programs related to project-developed farm viability benchmark metrics.

3.4    Build relationships with institutional buyers to encourage increased sourcing from local farmers and help connect farmers with opportunities to new and emerging markets.

3.5    Provide farm advocacy services to farmers in crisis, including assisting with creditors, accessing resources and programs to solve immediate and long-term challenges, and assistance in minimizing the impact of disasters on land ownership and farm viability.

**Expected Outcomes:**

1.    **200 underserved farmers** receive technical assistance tailored to their individual needs on topics including but not limited to farm business planning, building credit, risk management, identifying suitable farmland, heirs' property/title issues, financial management, accounting, accessing USDA programs, addressing financial challenges, post-disaster farm advocacy and negotiating with creditors.

2.    **100 underserved farmers** report having a better understanding of the farmland purchasing process and are better able to make sound decisions regarding credit, land ownership, and retention.

3.    **80 underserved farmers** receive assistance identifying land or are connected to landowners.

4.    **40 underserved farmers** are connected to market opportunities including but not limited to farmer cooperatives, grocery retail, specialty markets, nutrition programs, and timber sales.

5.    **Organize 10 farmer-buyer meetups** that match institutional buyers with farmers who can meet their purchasing needs, serving **80 or more underserved farmers**.

**Objective #4:**
**Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.**
**Outputs:**

4.1    Provide farmers with financial assistance grants to lower the costs of land acquisition by partially or fully covering down payments, brokerage fees, appraisals, or other land acquisition-related costs.

4.2    Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture, a land trust created to ensure perpetual access to arable land as common goods for PR subsistence farmers and improve food security through expansion of sustainable agriculture.

Page 8. *Gaining New Ground Project Narrative*; RAFI-USA

4.3   Incentivize landowners to sell or lease land to targeted farmers or agricultural land trusts.

4.4   Provide farmers with grants to support shared infrastructure, on-farm infrastructure, andequipment that will allow them to more easily and reliably access markets.

**Expected Outcomes:**

1. **45 farmers secure new land** through Gaining New Ground financial assistance grants
2. At least **10 landowners are incentivized** to lease or sell land to a farmer.
3. The Community Land Trust for Sustainable Agriculture acquires at least one land property and leases land via 99-year leases to four farmers in Puerto Rico.
4. At least **30 grants awarded** to farmers or farmer collaboratives to support infrastructure that will improve market access options.

<u>**Budget Allocation: Outreach and Technical Assistance**</u>

In total, approximately **66.11%** of the total $8,499,695 grant budget is allocated to *directly* support outreach, technical assistance, and financial support for land acquisition:

- **Outreach: 20.4%** of the budget ($1,736,586) is allocated to outreach and education related activities.
- **Technical Assistance: 20.3%** ($1,724,674) of the budget is allocated to technical assistance
- **Financial Support 25.4%** ($2,158,000) of the budget is allocated to Land and Infrastructure Financial Grants/Incentives.

**APPROACH**

**i. Description of Activities and Approach**

*Note: The proposed project's planned activities will <u>not</u> be duplicative of other activities undertaken with financial support from USDA or other federal sources.*

Project activities will build upon insights from the partners' established programs supporting BIPOC farmers. For example, in NC, we will identify farmers who would be good candidates for the project using data from grant applicants received for the RAFI-USA's FOCN infrastructure grants program. Similarly, PR and USVI partners will rely on their existing knowledge of farmers in their regions. **ii. Project Timeline**

| Objective & Activity | '23 | | | '24 | | | | '25 | | | | '26 | | | | '27 | | | | '28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 |

USCA4 Appeal: 25-1575     Doc: 55-1     Filed: 06/23/2025     Pg: 381 of 467  Total Pages:(381 of 467)

Docusign Envelope ID: 6EFB74B0-6929-4148-BD49-48EFAB35FB60     2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-4     Page 53 of 139

Agreement #: FSA24CPT0013706     Attachment 2A

| **1 - Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers.** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | Conduct baseline study to identify land and market access challenges. | | | | | | | | | | | | | | | | |
| 1.2 | Develop recommendations for improved land and market access. | | | | | | | | | | | | | | | | |
| 1.3 | Convene panel to 1) evaluate current land use/ access challenges in USVI and PR and 2) complete feasibility study on creation of regional land trust. | | | | | | | | | | | | | | | | |
| 1.4 | Build working relationships with USDA staff to ensure ongoing positive engagement. | | | | | | | | | | | | | | | | |
| **2 - Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.** | | | | | | | | | | | | | | | | | |
| 2.1 | Convene Advisory Committee to provide project guidance, identify farmer resources, and serve as review committee for farmer grants. | | | | | | | | | | | | | | | | |
| 2.2 | Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements. | | | | | | | | | | | | | | | | |
| 2.3 | Through outreach activities, identify farmers who are strong candidates to receive technical assistance. | | | | | | | | | | | | | | | | |

**Page 10.** *Gaining New Ground Project Narrative*; RAFI-USA

| | **3 - Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.** | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Build a network of legal, financial, and business technical assistance experts and case managers that can meet specific farmer needs. | | | ▓ | | | | | | | | | | | | | |
| 3.2 | Develop customized technical assistance plans for each farmer based on their needs and goals, provide assistance, and maintain case management tracking. | | | ▓ | | | | | | | | | | | | ▓ | |
| 3.3 | Improve the degree of farmers' participation in USDA programs related to farm viability benchmarks | | | ▓ | | | | | | | | | | | | ▓ | |
| 3.4 | Build relationships with institutional buyers to encourage increased sourcing from local farmers and their connection to new markets. | | | | | | | | | | | | | | | | |
| 3.5 | Provide farm advocacy services to farmers in crisis; help minimize the impact of disasters on land ownership and farm viability. | ▓ | ▓ | | | | | | | | | | | | | ▓ | |
| | **4 - Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.** | | | | | | | | | | | | | | | | |
| 4.1 | Provide farmers with financial assistance grants to lower the costs of land acquisition. | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | | | |
| 4.2 | Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture. | ▓ | ▓ | | | | | | | | | | | | | | |
| 4.3 | Incentivize landowners to sell or lease land to underserved farmers or agricultural land trusts. | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | | | | | | |
| 4.4 | Provide farmer grants to support farm infrastructure, and equipment that will increase market access. | | | ▓ | ▓ | ▓ | ▓ | ▓ | | | | | | | | | |

### iii. Innovation

*Focus on U.S. Caribbean Territories*. This project is unique in addressing land tenure challenges in the USVI and PR. Our partners' staff are experienced and trained in specific regional land concerns and will undoubtedly confront more unique situations during the project. Final reports will summarize their findings to enable replicable technical assistance for future engagements. Efforts within the U.S. Caribbean are pilots for the unique situations impacting the agricultural community, land access, capital, and market access in the non-contiguous U.S. and its Territories.

*Regionally-tailored Outreach and Technical Assistance:* The playing field for farmers and ranchers is ever-changing based on the economy, climate change, supply chain deficiencies,

global disruptions, etc. To achieve the best possible outcomes, this project will begin with a baseline study that identifies issues specific to the four focus regions.

***Inclusion of Land Trusts***: USVI and PR are experiencing an increased purchase of arable land by off-island investors. This project will address the need to ensure that agricultural land remain

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 384 of 467  Total Pages:(384 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4148-BD49-48EFAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 56 of 139
Agreement #: FSA24CPT0013706                                          Attachment 2A

available to those who wish to farm by exploring the feasibility of creating a land trust for the region that provides farmers with options to lease, rent-to-own or purchase land trust property. *Connections to Non-Traditional Lenders*: The project will connect farmers with alternative forms of financing in addition to government resources. Existing loan options include 1) 0% interest farm infrastructure loans for NC Black farmers through Foodshed Capital's Black Farmer Equity Fund, 2) a developing "loan not debt" strategy by Foodshed Capital for no-pay back mortgage loans to farmland buyers, 3) USDA Lenders through Heirs Property Relending Program, including Akiptan, LLC (for nationwide, low-interest heirs property mortgage loans and legal/business technical assistance, priority given to farmers partnering with tribal communities to improve food security and sovereignty) and Shared Capital Cooperative, which has a partnership with Federation of Southern Cooperatives for FL producers.

*Collaborations with Wholesale and Institutional Buyers:* We will begin market access efforts by collaborating with Freshpoint in exploring possibilities to expand their local produce program in Puerto Rico and the possibility of exporting food produced by Puerto Rican farmers to Florida. RAFI-USA has existing collaborations with several likely buyers, such as NC regional food hubs, including Feast Down East and Weaver Street Market, a local food cooperative seeking new farmers referred by RAFI-USA. We will add additional buyers during year one.

### iv. Outreach Recruitment and Retention

RAFI-USA's outreach efforts will focus on reaching farmers who have engaged with its Farmers of Color Network, followed by outreach to other farmers of color in NC and FL. The FOCN program currently has approximately 300 members, with an additional 1,000 farmers of color who are affiliates of the Network. In Puerto Rico, the Alliance for Agriculture will conduct outreach to farmers using its internal network of more than 250 farmers, farmer's markets, and peer networks. In the U.S. Virgin Islands, we will conduct outreach to VI Good Food Coalition's network of more than 369 farmers, farmer's markets, producers, and affiliates.

Outreach activities will be led by people of color with education and experience with farming, enabling them to connect with farmers with a high level of cultural competency and an understanding of farming. We will target outreach to farmers of color who do not own land or have expressed an interest in acquiring additional land. We will conduct outreach in various formats to ensure that information is accessible to farmers who may not have internet access. Some of the outreach channels include phone banking, texting, cross-platform messaging services, printed materials (including a quarterly Project Bulletin), SMS and chat apps, in-person meetings with individuals or groups of farmers, local advertising, attendance at conferences and events with large populations of farmers of color, and word of mouth. Project partners will adapt the content and outreach methods to best meet their farmer audiences' needs. For example, all Puerto Rico and Florida activities will be delivered in English and Spanish, and materials in U.S. Virgin Islands may be translated into Creole to reach Haitian immigrant populations.

*Amplification of Outreach Efforts:* We expect our outreach effort to organically extend nationally beyond the project's footprint through digital and social media, media relations, attendance at farm-related events, and outreach activities conducted by project staff, partners,

**Page** 13. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1      Filed: 06/23/2025    Pg: 385 of 467  Total Pages:(385 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4A48-BD49-48EFAB35FB60
2:25-cv-02152-RMG      Date Filed 03/26/25    Entry Number 24-4    Page 57 of 139
Agreement #: FSA24CPT0013706                                                    Attachment 2A

farmers, and collaborators. Outreach will be further amplified through national and regional partnerships. RAFI-USA participates in weekly calls with national farm advocacy partners to develop outreach materials and share feedback on farmers' ability to access federal COVID relief programs. With these external partners, we will share outreach materials and event notifications that may benefit farmer audiences. We are connected with a network of organizations serving farmers of color in their regions and will disseminate information and alert farmers to this project via that network.

***Recruitment of Farmers for Technical Assistance:*** To enroll/participate in technical assistance, farmers will complete an intake and needs assessment. Project staff will use the project's farm viability benchmarking tool to help assess the farmer's situation. As there are many steps between a farmer wanting to acquire land to officially becoming a landowner, the benchmarking tool indicates a five-step progression related to farm viability; crop insurance, farm financial plan, and farm loans. An excerpt of our *draft* benchmarking tool is below, showing a 5-step scale toward land tenure goals.

| Farm Viability Scale | 1-Lacks Access | 2- Aware of opportunities | 3- Takes first actions towards goals | 4-Receives assistance from USDA | 5- Completed goals |
|---|---|---|---|---|---|
| TOPIC: Land Tenure | Has no ownership, lease access, or other means of accessing farmland | Aware of range of land tenure options and available programs and resources | Receiving referrals to land access organizations, requesting assistance | Utilizing partnerships and alternative buying markets | Closing contracts offered and signed, land procured |

A case manager will be assigned to each farmer as the primary point of contact. They will work with the farmer to set realistic goals according to the benchmark tool and develop a technical assistance plan to provide a roadmap for the farmer to reach their goals. The case manager would make referrals to other service providers that would benefit the farmers, coordinate and match the farmer with technical assistance providers, and track results. We will provide in-depth 1-on-1 technical assistance unique to the farmer's geography, which may include land tenure strategies, farm loan financing, navigating USDA's FSA/NRCS programs, conservation planning, FSA farm record management, market potential and access, production strategy, risk/disaster management, and evaluation. Farmers deemed ready to purchase or lease land will be offered financial assistance, through a formal application and review committee process, in the form of grants to supplement. This format is comparable to down payment assistance programs for first-time home buyers, which are offered alongside housing counseling services. During periodic check-ins, the case manager will have the opportunity to work with the farmer to refine the technical assistance plan based on results/experiences to date.

In addition to 1-on-1 in-depth assistance, farmers will have the opportunity to participate in peer network calls to provide farmers with a community of peers working towards similar goals. The calls will feature invited speakers to present on topics of relevance. Educational opportunities

**Page 14.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1        Filed: 06/23/2025    Pg: 386 of 467  Total Pages:(386 of 467)

Docusign Envelope ID: 65FB31B0-5929-A148-BD49-48EEAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 58 of 139
Agreement #: FSA24CPT0013706                                              Attachment 2A

will be available to help build farm business skills. Topics will be varied and tailored to needs. For livestock producers, for example, we can offer training in collaboration with A Greener World on topics such as best practices for handling and animal welfare in transport and slaughter, livestock health, developing emergency plans, technical support on pasture-based farming systems, and regenerative farm planning. Additional topics to strengthen farm viability may include building and managing credit, financial planning, budgeting, recordkeeping, bookkeeping skills, etc.

***Retention strategy:*** This project intends to maximize retention of farmer relationships developed by tracking progress against goals, as farmers receive case management services throughout their participation in the project. Case management will allow us to track progress on an individual basis as well as project performance.

### v. Sustainability & Scalability

The Gaining New Ground project builds upon existing RAFI-USA programs, namely the Farmers of Color Network and cooperative agreement projects with FSA and NRCS, which deliver targeted outreach and technical assistance to underserved farmers. **While the Gaining New Ground project is not a cooperative agreement, our past and current cooperative agreements inform the design, implementation, and long-term sustainability of the proposed work in the Gaining New Ground project.** RAFI's cooperative agreements show how project partnerships, outreach, and technical assistance can lead to greater opportunities for underserved farmers, including increased USDA program access and improved farm cash flow for long-term farm viability and land retention. Through the Gaining New Ground project, we expect to see marked progress in regional capacity building, strengthened USDA relationships, and sustained farmer viability. As RAFI-USA is a nonprofit organization reliant upon grants, we cannot be certain that we will be able to give farmers the level of financial incentives beyond the life of this project. However, the infusion of funds that will strengthen and rebuild farmers' land, capital, and market opportunities and the education of farmers to use USDA programs will continue to support regional agricultural viability long after the project ends. The results of the new land trust feasibility study, as supported through this project, also has great potential to lead to long-lasting land access opportunities for farmers. The results will be shared with relevant stakeholders, and RAFI strives to support the placement of farmers onto existing or a new land trust based on the study's recommendations.

### vii. Potential Challenges

We anticipate encountering some challenges, including difficulties and delays in hiring and training qualified staff, language access barriers in PR, difficulties identifying affordable land, the possible unwillingness of some FSA staff to collaborate, slow land purchase processes, and more. Below we have identified four potential challenges and our plan to address each.

**Weather-related disruptions to the project timeline:** We know that our work will focus on regions frequently affected by hurricanes and other weather-related events. We further understand that it is not a matter of whether a hurricane will hit but when. The project is designed so that project staff and partners will be prepared to pause activities to shift efforts to disaster preparedness, disaster recovery, and other disaster-related assistance.

**Page 15.** *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575     Doc: 55-1       Filed: 06/23/2025      Pg: 387 of 467  Total Pages:(387 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EFAB35FB60
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-4     Page 59 of 139
Agreement #: FSA24CPT0013706                                                    Attachment 2A

**Lack of farmer trust in USDA:** Avoiding engagement with USDA is still a survival strategy for many farmers of color. When we ask these farmers to share their thoughts on how USDA can improve, the most common reaction is skepticism as to whether it is worth their time and what good it will do. The proposed project will fill the trust gaps where USDA has failed to reach farmers by relying on project partners and individuals who already have farmers' trust in their respective regions to lead culturally relevant and place-based outreach and education efforts.

**Lack of access to fast, reliable internet and devices:** From our experience working with farmers of color, particularly those in rural areas, we know that there is a significant lack of access to fast, reliable internet and devices that affect their ability to receive and send important information and documentation; according to the 2017 agricultural census, only 61% of Black farmers have access to the internet. We will ensure outreach efforts and technical assistance services focus on reaching those without reliable internet and devices.

**Potential challenges in overlap and farmer confusion:** We are aware of multiple peer organizations applying to this program, and look forward to collaborating with them. RAFI-USA is also a partner in two applications with minimal geographic scope overlap. If all were to be funded, we have planned the work in such a way as to ensure planned activities will not be duplicative. Because the demand for assistance related to land, credit, and market access is so great, we do not expect significant difficulties in recruiting sufficient participants for the proposed project. However, we anticipate the *possibility* of overlap and farmer confusion if multiple organizations provide similar services within the same regions. To avoid duplication of efforts and maximize impact, we will collaborate and coordinate efforts with other organizations doing similar work. When this is impossible, we will adapt our plan to focus our efforts on areas of greatest need.

## PERSONNEL AND RESOURCES

RAFI-USA has decades of experience supporting underserved farmers, including providing one-on-one crisis farm advocacy work with farmers in financial distress. This gives us a unique background and informs knowledge of the challenges farmers experience, including those encountered when attempting to access USDA services or negotiate with USDA staff when problems arise. Gaining New Ground project staff will be able to refer farmers to other RAFI-USA staff as well as partners, enabling farmers to benefit from the wide range of other programs and services offered, including opportunities to engage in federal policy work, educational and technical services offered via other USDA-funded projects, farm-to-faith market connections, disaster relief funding, and more.

RAFI-USA's FOCN program is designed to build the strength, prosperity, and economic health of farmers and farming communities of color in the Southeast U.S. and U.S. Caribbean region. FOCN serves farmers of color through outreach, education, and assistance, connecting farmers to opportunities and resources and hosting webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge.

RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition have substantial experience conducting outreach and providing assistance to underserved farmers through our

**Page 16.** *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 388 of 467  Total Pages:(388 of 467)

Docusign Envelope ID: 65FB31BD-6929-4118-BD49-48EFAB35FB80
2:25-cv-02132-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 60 of 139
Agreement #: FSA24CPT0013706                                              Attachment 2A

NRCS-funded *Conservation Outreach: Racial Equity and Justice Conservation Cooperative Agreements* program. This existing partnership and the trust built between project staff and farmers make us uniquely poised to continue providing tailored technical assistance and bringing critical, additional support for farm sustainability.

### Project's Leadership Team

**Edna Rodriguez, Executive Director, RAFI-USA:** Ms. Rodriguez has been with the organization since 2011 and became Executive Director in 2017. In her current role, Ms. Rodriguez has grown the organization's capacity by streamlining financial management, diversifying income, and organizing cross-programmatic staff teams for greater collaboration and impact. Ms. Rodriguez led RAFI-USA through a strategic planning process centered around equity, launching and growing the Farmers of Color Network, and extending programs to the U.S. Caribbean territories. Ms. Rodriguez has significant experience working with communities of color, including managing Latino outreach programs in previous roles, providing oversight for the Farmers of Color Network, and building collaborations to address unmet needs. ***Project Role:*** *Ms. Rodriguez will serve as Project Director and provide oversight for the project, supervise hiring activities, manage partner relationships, assist with capacity-building activities, and support the strategic alignment of the project with other work by RAFI-USA or partners.*

**Sommer Sibily Brown, Executive Director and Founder, Virgin Islands Good Food Coalition:** Ms. Sibily Brown testified at the U.S. Congress to highlight the barriers and challenges of the U.S. Territories in equitably accessing USDA programs; successfully advocated for the inclusion of USVI and Territories for the national farm-to-school network as core partners, resulting in the first farm-to-school program in the USVI. She serves as Chair of the National Farm to School Network's Board of Directors. Ms. Sibily-Brown is an advisor to the Resilience Playbook local-regional food system USDA AMS project with Colorado State and the University of Kentucky. She co-led FEMA's Food System Assessment with Iowa State, which included a food resilience plan in the USVI's Hurricane Disaster Recovery Plan. ***Project Role:*** *Ms. Sibily Brown will serve as Project Director in the U.S. Virgin Islands, provide high-level supervision, and be the primary liaison between VIGFC and RAFI-USA. She will also be responsible for managing the subaward budget, ensuring that all deliverables are carried out on time and in compliance with direction from RAFI-USA.*

**Miguel Marxuach, Executive Director and Cofounder, Alliance for Agriculture:** Since 2019, Mr. Marxuach has spearheaded the growth of the Alliance for Agriculture to empower projects and people working on transforming rural communities and farming in Puerto Rico. Mr. Marxuach has worked exclusively with underserved farming people and communities for the past five years. He has developed a profound link with farming entrepreneurs, mostly women of color, supporting their efforts and working with farmer's markets. Before dedicating himself to non-profit work, Mr. Marxuach led a multinational technology information business. Mr. Marxuach holds an MS in Industrial Engineering and an MS in Corporate Social Responsibility, Accounting, and Social Auditing. He has deep knowledge and experience in banking, loans, and financing. ***Project Role:*** *Mr. Marxuach will serve as project lead in Puerto Rico to conceptualize project components, oversee the team, and serve as a principal liaison with RAFI-USA.*

Page 17. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 389 of 467  Total Pages:(389 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4148-BD49-48EFAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 61 of 139
Agreement #: FSA24CPT0013706                                              Attachment 2A

**Key Project Staff**

**Lisa Misch, Director of Farmer Outreach and Technical Assistance, RAFI-USA:**
Ms. Misch leads RAFI-USA's Resources for Resilient Farms project and serves as Project Director for multiple USDA-funded projects. Before joining RAFI-USA, she served as the AmeriCorps VISTA Volunteer at the College of Menominee Nation in Keshena, WI, where she managed the Tribe's farmers market. Ms. Misch has previous experience working on small, sustainable farms in the Midwest and internationally. ***Project Role:*** *In addition to ensuring consistency across regions in service delivery and hiring and training project staff, Ms. Misch will lead efforts to manage the project's network of TA providers.*

**Carolina Alzate Gouzy, Ph.D., Farmer Outreach Coordinator, RAFI-USA:** Dr. Alzate Gouzy has worked to support networks of agroecology NGOs. She has degrees in Agribusiness and Sustainable Development from Universidade de Brasília, Brazil. Her extensive experience is based in Latin America, where she worked with small farmers, as well as more recent experience conducting outreach to farmers of color as part of RAFI-USA's NRCS cooperative agreement.
***Project Role:*** *Dr. Alzate Gouzy will provide bilingual coordination between efforts in Puerto Rico and RAFI-USA staff, as well as coordination between NRCS-funded activities and this project.*

**Jaimie McGirt, Agricultural Conservation and Market Access Coordinator, RAFI-USA:**
Ms. McGirt has extensive experience providing 1-on-1 technical assistance to historically underserved farmers in the Southeast, including assisting farmers in identifying business and land stewardship priorities, assessing capacity, and identifying capacity-building resources, partnerships, and referrals that help farmers advance their market and farm conservation goals. Ms. McGirt co-leads RAFI-USA's NRCS-specific training for technical assistance providers.
***Project Role:*** *Ms. McGirt will provide 1-on-1 technical assistance related to market access and farmland conservation activities to farmers participating in the project, as well as coordination between current NRCS-funded project activities and the early activities of this project.*

**Benny Bunting**, **Lead Farmer Advocate, RAFI-USA:** Mr. Bunting is a national leader advocating for farm families and saving farms that would otherwise be lost to foreclosure. He provides farmers various advocacy services through RAFI-USA's Farm Advocacy program, including financial counseling, legal referrals, and TA. He counsels between 75-100 farmers annually and, on average, devotes 60 hours per client. In more than 90% of the cases he works on, Mr. Bunting helps farmers realize their goals and achieve greater stability. ***Project Role:*** *Mr. Bunting will assist with identifying barriers to accessing FSA programs, train staff on FSA regulations, and provide 1-on-1 farm advocacy services to farmers in financial distress.*

**Kristina Torres, Program Manager, VI Good Food Coalition: Ms. Torres** has experience with program design and project management, including working on federal grants. She has over 15 years of experience designing and facilitating systems thinking approaches and fluency in navigating between the U.S. Caribbean and the U.S. mainland. ***Project Role:*** *Ms. Torres will supervise the USVI-specific project objectives, timeline, budget, and ongoing compliance monitoring.*

Page 18. *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 390 of 467  Total Pages:(390 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EEAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 62 of 139
Agreement #: FSA24CPT0013706    Attachment 2A

**Mariolga Reyes Cruz, Ph.D., Cofounder and Executive Director in Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible:** Dr. Reyes Cruz is a community psychologist, a documentary filmmaker, and a social and climate justice activist. She is working on producing a feature-length documentary that follows three young Puerto Rican farmers in their efforts to advance sustainable agriculture. Mariolga Reyes lives in Río Piedras and co-manages the family farm in Utuado. *Project Role: Dr. Reyes Cruz will contribute to the baseline study and oversee the purchase and management of land trust property.*

**Ramón Borges-Méndez, Ph.D., Associate Professor, Clark University:** Prof. Borges-Méndez teaches graduate courses on food systems, inequality, labor economics, migration, and globalization. Prof. Borges-Méndez is co-founder of Fundación Bucarabón, a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. Prof. Borges-Méndez has extensive consulting experience working with various organizations, including the Ford Foundation, United Nations, and the Brookings Institution. *Project Role: Prof. Borges-Méndez will serve on the Advisory Committee and lead efforts to conduct the initial baseline study on land access and land use in Puerto Rico.*

**OUTCOME EVALUATION PLAN AND REPORTING**

**i. Anticipated Outcomes**

Although we will set outcome evaluation and reporting plans for all 15 outcomes listed under the Goals, Objectives, and Outcomes section, here are two anticipated outcomes.

| Anticipated Outcome | Evaluation and Reporting Plan | Significance | Potential Beneficiaries |
|---|---|---|---|
| **200 underserved farmers** receive technical | -Case managers and farmers create technical assistance plan -Case managers track progress | -Farmers are clear on intended goals and plan to reach them | The 200 underserved farmers receiving tech assistance will |
| assistance tailored to their individual needs | towards goals in Salesforce -Case managers conduct final eval interview with farmer when tech assistance ends | -Project team can quantify how many farmers reached, goals and rating of TA provided | be the primary beneficiaries but will have rippling effects for the surrounding ag economy |

**Page 19.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575   Doc: 55-1   Filed: 06/23/2025   Pg: 391 of 467  Total Pages:(391 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EFAB35FB60
2:25-cv-02152-RMG   Date Filed 03/26/25   Entry Number 24-4   Page 63 of 139

Agreement #: FSA24CPT0013706   Attachment 2A

| 45 farmers secure new land through Gaining New Ground financial assistance grants | -Farmers complete grant application showing eligibility and feasibility for success -Farmers sign grant agreement -Farmers complete final report when land is secured -Project staff do compliance check-in annually for 5 years | -Farmers have clear understanding of their fiscal responsibilities for grant funding -Annual compliance check-in ensures grants used properly | The 45 farmers will be the primary beneficiaries but will have rippling effects for the surrounding ag economy |

The vast majority of farmers reached will be underserved BIPOC producers. We also expect to reach some farmers outside of North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico through virtual training, webinars, or online content. Estimated beneficiaries by region:

- North Carolina - 400
- Florida - 150
- Puerto Rico - 300
- US Virgin Islands - 150
- National - 200
- **TOTAL - 1,200**

## ii. Project Performance Measures & Metrics

The success of the project will be measured using the following metrics:

1. # farmers that report successful engagement with USDA; (Measures: webinar or 1-on-1 technical assistance evaluations)
2. # farmers who complete a needs assessment and technical assistance plan; (Measures: number of completed assessments and plans stored in project drive)
3. # of farm loans or grants secured by project participants for land acquisition or critical infrastructure; (Measures: summation of project land or infrastructure grants awarded as well as USDA or private lending secured through project technical assistance)
4. # farmers who secure long-term land leases or purchase land; (Measures: summation of finalized leases or land purchases as a result of funding and/or technical assistance provided)
5. # landowners incentivized to sell or lease to a farmer; (Measures: number of landowners who receive incentives to sell or lease to an underserved farmer) **iii. Evaluation: Oversight and Measurement of Project Performance**

The Project Director will oversee and measure the project's performance, report on outcomes, and ensure adherence to the project plan and timeline. This work will be done in coordination with the Data Manager and in close partnership with project leadership at RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition. Case managers assigned to follow each farmer throughout their engagement with the project are responsible for evaluating progress against goals for individual technical assistance projects.

## iv. Funding for Monitoring and Performance Measurement

**Page 20.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 392 of 467  Total Pages:(392 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EEAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 64 of 139

Agreement #: FSA24CPT0013706                                           Attachment 2A

Within the RAFI-USA project team, the Data Manager will be primarily responsible for monitoring and performance measurements. The Data Manager will be a 0.9 full-time equivalent position with responsibilities including ensuring case managers are collecting required grant evaluation and metrics data, ensuring farmer grantees submit timely reports, assisting with USDA performance reporting and baseline study. Funding set aside for Data Manger is $247,273.

### v.  Plans for Reporting and Communicating of Findings and Results

In addition to required grant reports, we will document, evaluate, report, and share our findings with underserved farmers in the project's geographic region and relevant stakeholders beyond the term and geographic scope of this grant. We will additionally share results with peer organizations, lenders, land trusts, funders, and others who could contribute positively to improving land access for underserved farmers. Plans to share our findings include

- Ongoing meetings with USDA to provide feedback and discuss challenges experienced
- Creation and distribution of a quarterly Project Bulletin
- Hosting "*Gaining New Ground: Farmland Access in USVI and Puerto Rico*" presentations
- Producing reports based on findings from the initial baseline study
- Sharing our recommendations report regarding relevant USDA outreach materials

### vi. Plan for Collaboration and Communication with USDA

Objective One of this project is to ensure USDA staff, particularly newer staff and staff in offices where participation in programs is low, understand the unique challenges and needs facing farmers in their regions. RAFI-USA looks forward to collaborating with USDA staff, locally, regionally, and nationally, wherever possible to benefit farmers and ranchers. Reports published as part of this project will be widely disseminated and shared with local, regional, and national USDA officials.

### MANAGEMENT AND PARTNERSHIP PLAN

RAFI-USA will serve as the organizational project lead and, as such, will assume responsibility for the project management, budget management, reporting, and evaluation for this grant. The project will rely on an equitable, shared leadership model with a leadership team consisting of representatives from each core organization, an Advisory Committee, and participatory decision-making processes that are inclusive of all partners and include stakeholder feedback. This approach is consistent with our values and how we approach our work.

**Experience Managing Federal Funds:** RAFI-USA has extensive experience with federal grants management, including 1) USDA FMPP 2020-23 grant #AM200100XXXXG151; 2) FSA Cooperative Agreement 2021-22 #FSA21CPT0011944; 3) Subaward with National Young Farmers Coalition on NIFA Cooperative Agreement # 2022-70416-37195 4) NRCS Cooperative Agreement #NR223A750003C066. In FY2022, we will expand our capacity to manage federal funds by hiring a full-time, dedicated Federal Grants Manager. We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence, which we will use for the proposed project. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. Additionally,

**Page** 21. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 393 of 467  Total Pages:(393 of 467)

Docusign Envelope ID: 65FB31BD-5929-4148-BD49-48EFAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 65 of 139
Agreement #: FSA24CPT0013706                                    Attachment 2A

we contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop conducts the annual auditing of our financial statements. Beginning in 2023, they will conduct annual yellow book audits to ensure all federal funds are administered per applicable laws and regulations.

**Regranting Experience:** For more than 25 years, RAFI-USA has administered competitive grantmaking programs for farmers. We have in place a process that values equitable access for all farmers, due diligence for applicant eligibility and feasibility, an external grant review process, and simple yet accountable compliance reporting processes. For this project, RAFI-USA will create grant guidelines and a scoring rubric aligned with project priorities and federal requirements. The review committee will score grant applicants, and applications with the highest scores will be chosen to receive financial assistance per the Advisory Committee's recommendations. Farmer grantees will enter into formal grant agreements with RAFI-USA that clearly outline grant terms and requirements, submit a W-9, signed grant agreement, and complete an orientation to review before payment is issued. RAFI-USA will develop an annual reporting process to ensure farmers comply with the grant agreement for at least five years after initial funding.

**Partnership Plan:** In addition to the partners included in this proposal, we expect to add partners to build an effective and collaborative regional network of partners representing public and private entities. Partner activities will be coordinated and monitored by RAFI-USA staff to ensure cohesiveness and alignment with established work plans and stated goals, objectives, and outcomes. We will host monthly check-ins with partners to receive updates, troubleshoot, discuss new outreach activities or materials, and ensure reporting and evaluation activities are on track.

## Core Project Partners

Alliance for Agriculture *(Subaward)*: Alliance for Agriculture (A4A) is an organization based in Puerto Rico with deep connections to farmers across the island. A4A will lead efforts in Puerto Rico. They will conduct monthly outreach efforts and submit findings to the Project Manager. The Alliance will participate in monthly check-ins, train-the-trainer events and contribute to outreach and supervision of technical assistance activities. The Alliance will establish or strengthen existing working relationships with the existing food/agriculture in Puerto Rico as stated in their Letter of Commitment. The Alliance will also contribute to the initial baseline and land trust feasibility studies.

Virgin Islands Good Food Coalition *(Subaward)*: Virgin Islands Good Food Coalition (VIGFC) is a nonprofit organization that advances food systems transformation in the USVI. VIGFC will lead efforts in the U.S. Virgin Islands and rely on extensive relationships in the territory to accomplish the project's objectives. They will conduct outreach to farmers in St. Croix, St. Thomas, and St. John and four producer-led organizations, organize trainings, supervise technical assistance activities, and contribute to the initial baseline and land trust feasibility studies.

**Page 22.** *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 394 of 467  Total Pages:(394 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4148-BD49-48EFAB35FB80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 66 of 139
Agreement #: FSA24CPT0013706                                              Attachment 2A

<u>Florida Organic Growers, Inc</u>: *(Subaward)* Florida Certified Organic Growers and Consumers (FOG) is a nonprofit corporation established in 1987. FOG educates producers, consumers, media, institutions, and governments about the benefits of organic and sustainable agriculture, presenting at tours, conferences, workshops, classes, and other educational opportunities.

<u>Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture)</u>: *(Subaward)* The Fideicomiso was founded to ensure landless farmers in Puerto Rico can access farmland as a common good and advance the food sovereignty of Puerto Rico. The lands under the custody of the Fideicomiso will be mainly destined to: support small-scale sustainable agriculture aimed at producing food for local consumers and initiatives that promote a good life for underserved farmers and their communities. They will collaborate with the project to identify and secure their first farmland purchase for the land trust. Additionally, Mariolga Reyes Cruz will contribute to the initial baseline study and provide project leadership guidance on land access issues in Puerto Rico.

<u>Fundacion Bucarabon</u>: *(Subaward)* Fundacion Bucarabon is a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. They will support outreach to small and mid-sized farmers in PR and provide logistical support in the region.

**Core Collaborators**

<u>Hispanic Federation</u>: *(Collaborator)* Hispanic Federation is an important player in attending to the needs and supporting the Latin community in the U.S. mainland and Puerto Rico. Hispanic Federation's commitment to this project includes: serving on the Advisory Committee for the project and contributing to the initial baseline study of land access, use, and tenure in Puerto Rico. Hispanic Federation will also assist with organizing convening activities in Puerto Rico to support the project.

<u>A Greener World</u>: *(Collaborator)* A Greener World will serve as a technical assistance provider on issues related to small-scale livestock production. In this capacity, they will offer 1-on-1 support to farmers interested in certification on verified farming practices. They will also offer training workshops for livestock farmers on pasture-based farming systems, general or by species, food labeling, best practices for handling and animal welfare in transport and slaughter, and regenerative farm planning. Emily Moose, A Greener World's Executive Director, will also serve as an Advisory Committee member to guide on matters related to livestock production.

<u>Freshpoint</u>: *(Collaborator)* Freshpoint is North America's largest wholly-owned produce distributor. Its client base includes local, regional, and national chains, hotels, resorts, country clubs, restaurants, healthcare, schools, universities, and other institutions. The company will collaborate on matters related to market access, including Freshpoint's planned expansion of its local produce program in Puerto Rico, identifying farmers who may benefit from the project,

**Page 23.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 395 of 467  Total Pages:(395 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EFAB35FB80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 67 of 139
Agreement #: FSA24CPT0013706    Attachment 2A

assisting farmers in becoming wholesale-ready, co-hosting farmer-buyer meetups and events, and exploring the possibility of exporting Puerto Rican produce to Florida.

Triangle Land Conservancy, NC (TLC): *(Collaborator)* TLC recently launched their "Good Ground Initiative," a buy-conserve-sell model of making farmland ownership accessible and affordable to BIPOC farmers. They will collaborate on conservation easement/land trust best practices and lessons learned, assess farmer fitness and land trust feasibility, and provide regional referrals for farmers interested in conservation easements/trusts. Farmers participating in this project will be made aware of any Good Ground Initiative land sales and receive technical assistance through the buying process should they be selected by the GGI advisory committee.

Foodshed Capital: *(Collaborator)* Foodshed Capital is an experienced lender focused on meeting the needs of underserved producers, particularly BIPOC producers who have faced discrimination and exclusion from traditional lenders and federal programs. They have provided nearly $1.5 million in flexible, affordable capital and will collaborate to provide general support within the context of existing operational lending to Puerto Rican farmers, particularly as it is needed by farmers partnering with Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible.

Agrarian Trust: *(Collaborator)* Agrarian Trust holds farmland in community-centered commons and provides long-term, equitable land access for next-generation farmers and ranchers by establishing 501(c)(2) and 501(c)(25) landholding entities. Agrarian Trust commits to assisting RAFI-USA and partners in the feasibility study of establishing farmland holding entities where they are not currently working but hope to expand: in NC, FL, US Virgin Islands, and Puerto Rico. Agrarian Trust will consult on model replication of lessons learned and best practices from the Agrarian Commons initiative.

**Plans for Coordination, Communication, Data Sharing & Reporting**

RAFI-USA has years of experience managing and storing confidential documents shared by farmers we work with via our farm advocacy services. Data protocols will be in place to ensure sensitive data and financial information is protected and stored securely during the life of the grant and after that for five years per RAFI-USA document retention policy, after which documents may be destroyed. To ensure compliance with federal requirements and consistent data tracking of outcomes indicators across the project, RAFI-USA will dedicate staff resources to managing the project's data collection, sharing, and reporting functions and maintaining secure and adequate data systems. Some key systems we will use to store and share information include

***Cloud-Based Document Storage:*** Project partners will have shared access and use of a third-party cloud-based document storage system where partners can store documents to allow for asynchronous collaboration. This system will also allow storing working documents, such as shared project work plans, budgets, project guidelines, outreach materials, and more. The system will also provide a central location to store any financial documents or other farmer data, grant agreements, and other documents. Only authorized RAFI-USA staff and designated partners will be provided access to this cloud storage.

**Page** 24. *Gaining New Ground Project Narrative; RAFI-USA*

Docusign Envelope ID: 6EFB31B0-6929-41A8-BD49-48EFAB35FB60

***Use of Third-Party CRM Database:*** RAFI-USA utilizes a third-party CRM database system hosted on the Salesforce.com platform customized to meet organizational and project needs. The customized Salesforce database will be utilized by project staff to record and track participant data and to track and report on outcomes. The database is hosted in a secure server that uses a firewall and other advanced technology to prevent interference or access from outside intruders. Information is protected using server authentication and data encryption to ensure data is safe, secure and available only to authorized users. Only authorized RAFI-USA staff and designated partners are provided access to the database via a unique username and password that must be entered each time a user logs on to the database via industry-standard Secure Socket Layer (SSL) technology. Salesforce user accounts are configured to allow employees and designated partners access only to the information they need while keeping sensitive information about unrelated constituents private. Information stored in our Salesforce database related to farmers includes contact and demographic information, information about their farm, and their history of engagement with our programs, including grants, events, and technical assistance.

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 397 of 467  Total Pages:(397 of 467)

Docusign Envelope ID: 6FFB31B0-5929-41A8-BD49-48EAB35FB60D
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 69 of 139
Agreement # FSA24CPT0013706                                                    Attachment 4A

Revised March 2024

### U.S. DEPARTMENT OF AGRICULTURE
### FARM PRODUCTION AND CONSERVATION

### GENERAL TERMS AND CONDITIONS FOR
### GRANTS AND COOPERATIVE AGREEMENTS

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

**A. APPLICABLE REGULATIONS**

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CF R and http://www.ecfr.gov/.

    a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

    b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

    c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

    d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

    e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

    f. 2 CFR Part 183 Never Contract with the Enemy

    g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

    h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

    i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

    j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

    k. 2 CFR Part 418, "New Restrictions on Lobbying"

    l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

    m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

**J.A. 0392**

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

Page 2 of 26

J.A. 0393

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C. PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency. The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov. All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

Page 3 of 26

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5.  Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6.  Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

    a.  The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

    b.  Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

    c.  The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

    d.  Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

    e.  Additional Federal funds needed to complete the project.  This change also requires a formal agreement amendment.

    f.  Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs.  If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment.  If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

    g.  If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7.  No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

   a.  Amount of additional time requested

   b.  Explanation for the need for the extension

   c.  A summary of progress to date and revised milestones

## D.  PAYMENTS

1.  Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to either the ezFedGrants system or to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2.  Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3.  The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4.  Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5.  Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E,

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 402 of 467  Total Pages:(402 of 467)

Docusign Envelope ID: 6EFB21B0-5929-411B-BD49-48EAB35FB881
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 74 of 139

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

## E. FINANCIAL REPORTING

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date.  Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

## F. PERFORMANCE MONITORING AND REPORTING

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.  Each report must cover—

   a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   b. The reasons why milestones and deliverables targets were not met, if appropriate.

   c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

3. The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1. Reporting of first-tier subawards.

   a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

   b. Where and when to report.

      i. You must report each obligating action described in paragraph 1.a. of this award term to *http://www.fsrs.gov*.

      ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

   c. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

2. Reporting Total Compensation of Recipient Executives.

   a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

      i. the total Federal funding authorized to date under this award is $30,000 or more;

      ii. in the preceding fiscal year, you received—

         (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

         (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

Page 7 of 26

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 404 of 467  Total Pages:(404 of 467)

Docusign Envelope ID: 6EEB31BD-5929-411B-BD49-4EEAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 76 of 139

    b. Where and when to report. You must report executive total compensation described in paragraph 2.a. of this award term:

        i. As part of your registration profile at https://sam.gov

        ii. By the end of the month following the month in which this award is made, and annually thereafter.

3. Reporting of Total Compensation of Subrecipient Executives.

    a. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i. In the subrecipient's preceding fiscal year, the subrecipient received—

            (a) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b. Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i. To the recipient.

        ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4. Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a. Subawards, and

    b. The total compensation of the five most highly compensated executives of any subrecipient.

5. Definitions. For purposes of this award term:

    a. Entity means all of the following, as defined in 2 CFR part 25:

        i. A Governmental organization, which is a State, local government, or Indian Tribe;

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 77 of 139

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

    ii.   A foreign public entity;

    iii.  A domestic or foreign nonprofit organization;

    iv.  A domestic or foreign for-profit organization;

    v.   A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b. Executive means officers, managing partners, or any other employees in management positions.

c. Subaward:

    i.   This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    ii.   The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

    iii.  A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d. Subrecipient means an entity that:

    i.   Receives a subaward from you (the recipient) under this award; and

    ii.   Is accountable to you for the use of the Federal funds provided by the subaward.

e. Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

    i.   Salary and bonus.

    ii.   Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

    iii.  Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

    iv.  Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

    v.   Above-market earnings on deferred compensation which is not tax-qualified.

    vi.  Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

**H. AUDIT REQUIREMENTS**

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the audit period, whichever comes first.

**I. AWARDS WITH RESEARCH ACTIVITIES**

1. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2. In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication. Recipients can receive a DOI via NAL.

Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

**J. SPECIAL PROVISIONS**

1. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 407 of 467  Total Pages:(407 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EFAB35FB60
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 79 of 139

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3.  Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement.  An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4.  Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5.  The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6.  The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA.  Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1.  The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

    "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

    "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 408 of 467  Total Pages:(408 of 467)

Docusign Envelope ID: 6EFB31B0-5929-41A8-BD49-48EFAB35FB60
2:25-cv-02132-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 80 of 139

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L. COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

    a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

    b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

    Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment. FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed a s cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

Page 13 of 26

**J.A. 0404**

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

Page 14 of 26

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:*  When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements.  The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request.  Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

USCA4 Appeal: 25-1575      Doc: 55-1      Filed: 06/23/2025      Pg: 412 of 467  Total Pages:(412 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4148-BD49-48EFAB25FB80
2:25-cv-02152-RMG      Date Filed 03/26/25      Entry Number 24-4      Page 84 of 139

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1. The listed items are:

    a. Non-ferrous metals;

    b. Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

    c. Glass (including optic glass);

    d. Fiber optic cable (including drop cable);

    e. Optical fiber;

    f. Lumber;

    g. Engineered wood; and

    h. Drywall.

2. Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1. Articles, materials, or supplies that have been:

J.A. 0407

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

    a. Processed into a specific form and shape; or

    b. Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2. If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

## P. NONEXPENDABLE EQUIPMENT

1. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3. The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

    a. Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

    b. Activities under Federal awards from other Federal awarding agencies.

4. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6. When equipment is no longer needed for any of the purposes set out in this provision

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

## Q. LIMIT OF FEDERAL LIABILITY

1. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

## R. AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each.  The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

## S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1. Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2. The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3. The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

    a. You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

Page 18 of 26

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

enforcement representative of a Federal department or agency authorized to receive such information.

b.  You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c.  The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d.  If FPAC determines that you are not in compliance with this award provision, FPAC:

   i.   Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

   ii.  May pursue other remedies available for your material failure to comply with award terms and conditions.

## T.  ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110-246), 7 U.S.C. 8791 as described below.

1.  Acceptance of this award indicates acknowledgement and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2.  Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3.  The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4.  The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5.  The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6.  The recipient must notify all managers, supervisors, employees, contractors, agents,

Page 19 of 26

Agreement # FSA24GRA0013706
Revised March 2024

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information.  Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a. State identification and county number (where reported and where located).

    b. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c. Farm, tract, field, and contract numbers.

    d. Production shares and share of acres for each Farm Serial Number (FSN) field.

    e. Acreage information, including crop codes.

    f. All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g. Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h. Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law*" (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 417 of 467  Total Pages:(417 of 467)

Docusign Envelope ID: 6EFB31B0-5929-4118-BD49-48EEAB35FB60    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 89 of 139

Agreement # FSA24GRA0013706                                                   Attachment 4A
Revised March 2024                                           USDA FPAC General Terms and Conditions
                                                             For Grants and Cooperative Agreements

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U.  NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V.  TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

**1.** By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

**2.** By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

**3.** By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

**4.** By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

**5.** If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1.  General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

Agreement # FSA24GRA0013706
Revised March 2024
Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2.  Proceedings About Which The Recipient Entity Must Report

    Submit the information required about each proceeding that:

    a.  Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

    b.  Reached its final disposition during the most recent five-year period; and

    c.  Is one of the following:

        i.   A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

        ii.  A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

        iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

        iv.  Any other criminal, civil, or administrative proceeding if:

            a)  It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

            b)  It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

            c)  The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3.  Reporting Procedures

    Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4.  Reporting Frequency

    During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

J.A. 0413

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X. AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

Recipients must retain all records pertaining to the agreement in accordance with 2

Page 23 of 26

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

Agreement # FSA24GRA0013706
Revised March 2024

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer. Documents transmitted via ezFedGrants are digitally authenticated and acceptable.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

    a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

    b. An audit that meets the requirements contained in Subpart F.

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

## CC. AGREEMENT COUNTERPARTS

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

## DD. CONTINUING OBLIGATIONS

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

# ALLIANCE FOR AGRICULTURE
# DECLARATION – EXHIBIT 3-C

## EQUITY IN CONSERVATION OUTREACH COOPERATIVE AGREEMENT

### APPLICANT INFORMATION

**Applicant Organization:** Rural Advancement Foundation International-USA
**Phone Number**: 919-542-1396
**Email**: jaimie@rafiusa.org
**Physical Address**: 274 Pittsboro, NC 27312
**Mailing Address**: P.O. Box 640, Pittsboro, NC 27312

### APPLICANT ENTITY TYPE

**X**☐ Nonprofit organization having a 501(c)(3) status with the Internal Revenue Service

### ENTITY OWNERSHIP TYPE

**X**☐ Other

### ORGANIZATION POINT OF CONTACTS (POC)

**Name**: Jaimie McGirt
**Title**: Agricultural Conservation and Market Access Manager
**Phone Number**: 984-282-6047
**Email**: jaimie@rafiusa.org
**Mailing Address**: P.O. Box 640, Pittsboro, NC 27312

**Name 2**: Lisa Misch
**Title 2**: Managing Director of Programs
**Phone Number 2**:919-270-8100
**Email 2**: lisa@rafiusa.org
**Mailing Address 2**: P.O. Box 640, Pittsboro, NC 27312

### AUTHORIZED ORGANIZATION REPRESENTATIVE (AOR)

**Name**:          Edna Rodriguez
**Title**:          Executive Director
**Phone Number**:   919-621-5158
**Email**:          edna@rafiusa.org
**Mailing Address**:  PO Box 640, Pittsboro, NC 27312

### PROJECT TITLE

Expanding RAFI-USA's Conservation Resources for Resilient Farms Project

### FUNDING REQUEST

**Total Funds Requested** : $999,518.07

### DURATION OF PROJECT

**Start Date**:          October 1, 2023          **End Date**:          September 30, 2025

1

**J.A. 0419**

## EXECUTIVE SUMMARY

NRCS programs and services are currently not being accessed equitably by large numbers of historically underserved producers even though the USDA is outreaching to these producers. This project builds upon the goals and activities outlined in Rural Advancement Foundation International-USA's (RAFI-USA) existing NRCS Cooperative Agreement #NR223A750003C066 aimed at expanding delivery of conservation services to underserved, socially disadvantaged farmers and ranchers. Building upon these efforts, the proposed project aims to further increase access to NRCS programs and services for historically underserved producers, adding in Urban or USDA Urban Buffer areas, and continue evaluating barriers producers face. RAFI-USA and partners will continue collaborating to conduct regionally appropriate outreach to introduce approximately 1,000 additional producers to NRCS technical and financial assistance programs in the Southeast U.S., USVI, and Puerto Rico as well as nationally. This outreach plus technical service will result in approximately 500 producers, 350 contacts from our current project and 150 new producers, engaging in regionally relevant conservation planning and requesting NRCS assistance for climate-smart agriculture strategies and natural resource conservation practices.

Our primary intention is to assist producers through the NRCS application process, conservation planning and practice implementation, and long-term contract management. The secondary intention is educating producers on climate-smart and place-based agroecological farming practices.

We will evaluate the experience these producers have when interacting with NRCS staff and the application or contract process and produce a conclusory assessment of barriers farmers identified to inform NRCS's outreach and engagement efforts.

## LOCATION OF WORK TO BE COMPLETED

| | | | |
|---|---|---|---|
| X Alabama | X Louisiana | X South Carolina | X Puerto Rico |
| X Georgia | X NorthCarolina | X Virginia | X Virgin Islands |

Congressional districts where work to be completed: Alabama- All, Georgia- All, Louisiana- All, North Carolina- All, South Carolina- All, Virginia- All, Puerto Rico & U.S. Virgin Islands- All

## PROJECT NARRATIVE

### 1. PROJECT OVERVIEW

**Statement of Need**

Historically underserved farmers in the project region face multiple barriers to accessing NRCS programs and services, including language and cultural barriers, a lack of tailored programs that address their specific needs and challenges, and a lack of trust in government agencies due to a history of discriminatory practices. These barriers highlight the need for targeted outreach and education efforts tailored to small-scale producers that can build trust and understanding among underserved communities. For instance, some programs require out-of-pocket expenses for producers to implement conservation practices on their land, which can be a significant burden for limited-resource producers. Other programs may require larger land areas to achieve the strong environmental outcomes that NRCS seeks, meaning that small-scale producers may

2

**J.A. 0420**

receive lower rankings when competing in the same ranking pools as producers with larger conservation projects. Lastly, some programs do not take into account unique traditional agroecological practices, further limiting access to NRCS programs and services.

The 2022-23 assessment conducted for our current Cooperative Agreement shows that historically underserved producers in the Southeast U.S. and Caribbean territories have a high interest in and demand for NRCS programs and services. However, opportunities and barriers still exist including:

- Because NRCS applications are voluntary and competitive, the majority of producers who apply, through no fault of their own, are not funded in their first year. Only 23% of producers who were provided technical assistance in our current project year 1 were able to apply to NRCS EQIP and/or CSP because the ranking deadlines in all Southeast states came soon after the start of our project, some as early as October 2023. Some of the producers who successfully submitted may receive contracts, some will not due to the competitive nature of NRCS ranking pools. This new project will continue to support both producers awarded and not awarded in USDA FY 23-24, and serve new producer contacts with NRCS application opportunities to the end of 2025 (which includes preparing producers to apply to NRCS for USDA FY 2026 consideration by fall 2025).
- The "Get Started in 5 steps" graphic shared with producers leaves many confused about the overall process and/or how to take early steps to engage with NRCS; further, it does not clearly fit for some, discouraging them from engaging further.
- Some producers do not understand NRSC's term "resource concern" or the purpose of the mitigation program for active producers because NRCS field staff do not always explain this well. Cooperators then need to translate the concept in clear language for the producers. As one Area Conservationist stated, "*There are times when we, NRCS, know what we are saying but have a communication barrier with landowners who do not fully know the same terminology. So, again, thank you for being that go between*."
- Too many NRCS field staff do not themselves understand the Urban Initiative or Climate-Smart Agriculture and Forestry, or do not understand the relevance of these to new/beginning producers with less obvious resource concerns who are proactively conserving resources.This results in producers' missed opportunity with EQIP or CSP.

**Focus Area**

This new NRCS Cooperative Agreement will serve our current focus regions and allow us to expand the service area to all of the Southeast U.S., with an increased presence in VA, GA, FL, and LA. We know that our focus area includes a high number of historically underserved producers who are interested in NRCS services because in just 6 months of our current project, 199 producers in these targeted regions requested assistance, demonstrating a clear need for expanding outreach, education efforts, and technical assistance. The urgency of this project is heightened by the fact that the regions it serves are prone to extreme weather events, which can have devastating impacts on historically underserved producers, especially those in Puerto Rico and USVI, who have been hit hard by recent hurricanes, floods, and other natural disasters. As a result, it is critical that we work to expand access to NRCS programs and services for these populations and help them build resilience to future climate-related challenges.

**Project Community**

3

J.A. 0421

In our current Cooperative Agreement, 86% of service recipients are socially disadvantaged; we expect this trend to continue in the new project. The majority also are small-scale farms. Further, the U.S. Caribbean is *severely* underrepresented and disconnected from available resources and larger networks. These producers face challenges unique to their location, geography, and status as a territory, such as difficulty in transportation within and between the islands, lack of necessary infrastructure, lack of dedicated FSA staff and too few NRCS staff (USVI), and significant distrust of federal programs.

The primary challenges for our project community is that many historically underserved producers in our regions are skeptical of working with government programs; and some, especially in the territories, are suspicious that the government wants to take their property. Further, older or more established farmers are reluctant to adopt new programs and technology like cover crops and no till drilling and they prefer to see these practices in operation on another farm before they attempt to implement them on their farms.

From our current project's intake form and assessment questionnaire:
- 64% of historically underserved producers said they had never heard of NRCS programs.
- 30% of producers requesting our assistance reported a previously bad experience with NRCS, the majority experiencing difficulty understanding their eligibility and not receiving follow-up support from staff.
- 46% of producers reported that they have taken actions on their land to conserve natural resources and do not have apparent resource concerns but may qualify for the Conservation Stewardship Program as an incentive to sustain and enhance their stewardship strategy, but need assistance to follow through.

**Project Alignment**
This Cooperative Agreement project aligns with the Equity in Conservation Outreach Cooperative Agreements program in that our purpose is to expand delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, by providing culturally relevant outreach and technical assistance so these producers can overcome existing barriers. The objectives and activities of this project are designed to produce outcomes which further the program priorities of promoting the adoption of climate-smart conservation, encouraging conservation in small-scale and urban agriculture, and developing conservation leadership skills and opportunities. We are confident that this project will make a difference based on the impacts we are accomplishing in our current NRCS Cooperative Agreement; for instance, 166 historically underserved producers were helped in just six months of year 1 of the project.

**Enhancing Impact: Building on RAFI-USA's Current Efforts**
This project will build upon RAFI-USA's Resources for Resilient Farms program, which is currently carrying out the work of both an NRCS and a FSA Cooperative Agreement. Resources for Resilient Farms provides plain-language information, farmer trainings, and one-on-one assistance for USDA programs that support greater farm resilience for farmers' operations, especially for members of RAFI-USA'S Farmers of Color Network.

J.A. 0422

Through our current NRCS Cooperative Agreement's partnership strategy, we are already meeting NRCS's desired outcome of developing state and community-led conservation leadership for historically underserved producers and underserved communities in our target regions. In this new project, we will expand training of these leaders and equip new ones in LA and NC.

Of the historically underserved producers our current 2 technical assistance contractors have visited, 100% report improved experiences with NRCS staff and have successfully applied for FY 2023 EQIP cost-share assistance. This new project will add and equip 6 new technical assistance providers from 2 new partners as well as current partners. We will also recruit up to 5 stipended "Farmer Allies" to accompany and assist farmers when visiting with NRCS field staff in targeted regions where we have high demand for assistance or no current project team members. We are confident that this strategy will continue to support the 350 contacts served in our current project and serve 150 new contacts with quality assistance that leads to successful engagement with NRCS. This project will also increase the number and geographic range of hands-on training and demonstration days. It will also create on-farm resource hubs or practical learning sites at active farms where new/beginning farmers or conventional farmers will see and get hands-on experience with active natural resource management and NRCS-aligned conservation practice management.

## 2. PROJECT GOALS AND OBJECTIVES

The goal of this two-year project is to build on the successes of our current NRCS Cooperative Agreement to expand delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, in the targeted regions, and continuously evaluate barriers producers face to accessing NRCS programs and services to report to NRCS.

1) Outreach to 1,000 historically underserved producers to increase awareness of NRCS programs/services and recommended resource conservation practices, particularly climate-smart mitigation activities, urban initiative qualifying practices, and local agroecological practices, for small-scale producers

2) Provide technical assistance to 500 historically underserved producers in the Southeast U.S. and Caribbean Area to improve NRCS's outreach efforts and promote conservation practices on historically underserved producers' land. Technical assistance will include assessing producers' eligibility for NRCS programs and aiding them through the NRCS application process and later NRCS processes such as conservation planning, conservation practice implementation, and contract management. 350 of these producers will be returning contacts from our current project and 150 will be new contacts.

3) Equip at least 30 individuals, including farmers and agricultural advocates in the Southeast U.S. and Caribbean territories to serve as conservation leaders within their communities, to advance NRCS's ability to incorporate underserved community priorities into its implementation of NRCS conservation programs.

4) Provide the appropriate support to historically underserved producers in our target areas so that 100 producers in this project institute conservation or climate-smart practices on their land to address local natural resource issues.

5

**J.A. 0423**

### 3.  THE ORGANIZATION AND PARTNERS INVOLVED (WHERE APPLICABLE)

RAFI-USA is expertly positioned to carry out the objectives and activities outlined in this Cooperative Agreement project and meet the stated outcomes because of our 30 plus years of providing outreach and technical service to small- and mid-scale farmers, our specific focus since 2015 on underserved BIPOC farmers, and our successes thus far in carrying out NRCS Cooperative Agreement #NR223A750003C066.

**About RAFI-USA**

RAFI-USA is a 501(c)(3) nonprofit organization based in Pittsboro, NC. We work across agricultural sectors and collaboratively through coalitions, combining on–the-ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farms and families, their communities and the environment. Our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities.

**RAFI-USA's Farmer of Color Network (FOCN) Program**

In 2015, the organization began a project to increase participation of farmers of color on Farm Service Agency or Soil and Water Conservation District committees. We learned that, because of past experiences with being tokenized on such committees, most farmers of color were unwilling to engage further in that direction. Based on this experience, we created the Farmers of Color Network (FOCN) in 2017. FOCN has supported more than 700 BIPOC farmers by providing farmer-led technical assistance, market access opportunities, webinars, farm tours and events. Also, through a cost-share infrastructure grants program, we awarded more than $600,000 to more than 90 socially disadvantaged farmers in the Southeast U.S., USVI and PR.

**RAFI-USA Key Personnel**

Edna Rodriguez, Executive Director, RAFI-USA: Ms. Rodriguez has been with RAFI-USA for 12 years, serving as Executive Director since 2017. She was instrumental in launching the Farmers of Color Network and expanding our efforts to the Caribbean territories. She serves on the National Sustainable Agriculture Coalition Organizational Council and on the National Family Farm Coalition's Executive Committee. She holds a B.A. in Economics with a concentration in Latin American Studies from Haverford College. **Project Role**: *Ms. Rodriguez will conduct high level oversight of the project and continue to liaison with Caribbean partners.*

Lisa Misch, Managing Director of Programs, RAFI-USA: In addition to managing all of RAFI-USA's farmer-facing programming, Ms. Misch chairs our Direct Service team, leads our Resources for Resilient Farms program, and has managed multiple USDA-funded projects. She serves as the Project Director for the current NRCS Cooperative Agreement. She holds a B.A. in Environmental Studies from St. Olaf College. **Project Role:** *Ms. Misch will continue as Project Director and ensure strategic alignment of the project with other RAFI-USA work.*

Jaimie McGirt, Agriculture Conservation Manager, RAFI-USA: Ms. McGirt serves as Project Manager for our current Cooperative Agreement and provides technical assistance to producers. She also performs conservation outreach and training for historically underserved producers across the Southeast region and Caribbean Area. She has attended conferences and trainings on NRCS programs and FSA's Conservation Reserve Program. Ms. McGirt has a B. S. in

6

**J.A. 0424**

Sustainable Development, with coursework and research in agroecology and small-scale sustainable agriculture, owns a beginning farm, and has had personal experience with NRCS. *Project Role: Ms. McGirt will serve as Project Manager, supporting project partners and technical assistance providers, and the development of outreach materials, events and trainings, and will organize and facilitate partner monthly meetings. She will also continue to provide technical assistance to producers.*

Carolina Alzate Gouzy, Ph.D., Farmer Outreach Manager, RAFI-USA: For the current project, Dr. Alzate Gouzy conducts outreach and administrative activities and data collection. She has a Master's in Agribusiness and Ph.D. in Sustainable Development from Universidade de Brasília, Brazil. She was formerly CEO of Low Carbon City, which addresses climate change. She has extensive experience in Latin America working with small farmers. *Project Role: Dr. Alzate Gouzy will be responsible for data management, provide bilingual support and technical assistance to producers.*

Humon Heidarian, Farmers of Color Network Membership Manager, RAFI- USA: Mr. Heidarian is currently training as a new technical assistance provider under the current Cooperative Agreement. He has worked on an urban market farm in all areas of operation and for a value-added company producing and selling products in the metro D.C. area. He has worked in agricultural policy at all levels of government since 2017. He holds a B. S. in Environmental Science and M. S. in Public Administration. *Project Role: Mr. Heidarian will provide technical assistance to producers, with a specific focus on urban/urban buffers in the Southeast U.S., and coordinate with RAFI-USA's Farmers of Color Network membership.*

**Partner Organizations**
*Alliance for Agriculture (Subaward)*
Alliance for Agriculture (A4A) is an organization based in Puerto Rico with deep connections to farmers across the island. A4A is a partner on the current project and through it has supported 66 producers in PR thus far. A4A will host a Farmer-to-Farmer Training Program focused on Climate-Smart and conservation practices and will equip 5 host farmers to serve as primary resources for these trainings. A4A will also continue to provide direct technical assistance with producers and support the producers assisted under the current project. A4A will participate in monthly check-ins, technical assistance training events, and contribute to outreach and technical assistance tracking spreadsheets. Project Lead, Miguel Marxuach [In Kind] - miguelmarxuach@gmail.com

*Fountain Heights Farm (Subaward)*
Fountain Heights Farms (FHF) operates from 4 urban farm sites in the historic Fountain Heights community of Birmingham, AL, and is a partner on the current project. FHF has built a trusted network of BIPOC farmers throughout AL. For the new project, FHF will continue to provide technical assistance and coordinate regional events to increase awareness. Project Lead, Maria Dominique Villanueva - mdv@fountainheightsfarms.com

*Virgin Islands Good Food Coalition (Subaward)*
Good Food Coalition (GFC) is a place-based nonprofit in the U.S. Virgin Islands dedicated to improving food security, food sovereignty, and agro-sustainability for all residents in the territory and is a partner on the current project. GFC will continue its efforts to educate and provide

**J.A. 0425**

technical assistance to USVI producers who want to enhance their farms with conservation practices. With limited NRCS staff capacity in USVI, GFC plays a critical role in helping producers understand NRCS programs, eligibility, and financial benefits and ultimately develop trust between producers and NRCS. Lead, Sommer Sibilly Brown - sommer@goodfoodvi.org

***Faithfull Farms (Subaward)***
Faithfull Farms will be a new project partner. They are a small-scale regenerative farm utilizing conservation practices such as no-till soil management and high tunnel systems, emerging as a leader in the local urban/small farm communities of the Piedmont Region of NC. Howard Allen, founder and manager, currently mentors and provides technical assistance to 13 established and beginning farmers located throughout Central and Eastern NC, from entry level steps to farming, crop production, pest management, high tunnel construction and management, and navigating the NRCS EQIP process. Project Lead, Howard Allen -  hcnella77@gmail.com

***Muse 3 Farm LLC (Subaward)***
Muse 3 Farm LLC will be a new project partner. Muse 3 Farm is located in Greensburg, LA and offers farm fresh produce to their community to help promote healthier eating. They have successfully implemented many NRCS practices on pasture land and timber land. They provide education and guidance on soil health to producers within the Florida Parishes of Louisiana. Farm staff have served as outreach and producer champions for the National Wildlife Federation. For this project, Muse 3 Farm will provide one-on-one producer mentoring and technical assistance, informational meetings/workshops, and field days on conservation practices to increase participation in NRCS programs. Project Lead, Chris Muse - musechris@gmail.com

**Coordinate work with partner organizations and leverage existing resources.**
Partner activities will be coordinated and monitored by RAFI-USA staff to ensure project cohesiveness and alignment with stated objectives and goals. In collaboration with RAFI-USA, partners will carry out proposed activities/objectives, including adapting the content and service methods to best meet the needs of their historically underserved producer audience. RAFI-USA staff will host monthly check-ins with the project partners to receive updates, discuss new outreach or technical assistance materials and on-going assessment activities, and ensure reporting and evaluation activities are on track.

## 4.   PROJECT METHODOLOGY/WORK PLAN ACTIVITIES TO ACHIEVE GOALS

RAFI-USA and partners will continue providing information on NRCS programs and services to historically underserved producers in the targeted regions through culturally appropriate communications such as social media and mailers, presenting at agricultural conferences, educational events including on-farm conservation demonstrations, trainings, and webinars. We will continue and expand our current technical assistance, including small group trainings, to more producers in more regions. By continuing work with existing contractors and partners, adding two new partners, and training "Farmer Allies," RAFI-USA will develop more local conservation leaders adept in place-based conservation practices and NRCS programs/services.

**Why proposed activities were selected**
RAFI-USA and our project partners have selected the proposed activities based on what we have learned thus far in carrying out our current Cooperative Agreement. We prioritize tailored, culturally and regionally appropriate information and services. This is because producers

8

**J.A. 0426**

interested in NRCS practices and programs have expressed different needs in different regions and because NRCS operates and functions somewhat differently in each state and the territories. For instance, priority resource concerns differ, environmental mitigation strategies differ, and ranking pools and available differ from place to place. In all regions, we have found it very effective to provide technical assistance in small group settings as well as on-farm demonstrations of successful conservation practices for producers to see examples working in their locale by farmers they trust.

**Plan to ensure financial accountability**
RAFI-USA has extensive experience with federal grants management, including 1) USDA FMPP 2020-23 grant #AM200100XXXXG151; 2) FSA Cooperative Agreement 2021-22 #FSA21CPT0011944; 3) Subaward with National Young Farmers Coalition on NIFA Cooperative Agreement # 2022-70416-37195 4) NRCS Cooperative Agreement #NR223A750003C066. In FY2023, we will expand our capacity to manage federal funds by hiring a full-time, dedicated Federal Grants Manager. We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence, which we will use for the proposed project. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. Additionally, we contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop will conduct the annual yellow book audits to ensure all federal funds are administered per applicable laws and regulation.

PROJECT BENEFICIARIES

| | |
|---|---|
| Historically Underserved Producer Groups | Numbers Reached/Served, total: 1000 |
| Beginning Farmer and Rancher | Number: 250 |
| Limited Resource Farmer and Rancher | Number: 200 |
| **Socially Disadvantaged Farmer or Rancher:** | |
| American Indian or Alaskan Native | Number: 30 |
| Asian | Number: 30 |
| Black or African American | Number: 540 |
| Native Hawaiian or other Pacific Islander | Number: 0 |
| Hispanic | Number: 230 |
| Veteran Farmer or Rancher | Number: 70 |
| Students/Youth | Number: 0 |

**TECHNICAL MERIT**

| # | Accomplishments/Deliverables | Number of Historically Underserved Producers Reached |
|---|---|---|
| 1 | Producers receive information on NRCS programs and services, recommended resource conservation practices | 1000 |
| 2 | Producers receive technical assistance | 500 |
| 3 | Producers increase knowledge of NRCS programs and understanding of their program eligibility | 425 |

9

**J.A. 0427**

| # | Accomplishments/Deliverables | Number of Historically Underserved Producers Reached |
|---|---|---|
| 4 | Producers apply for NRCS or other financing opportunities for conservation practice implementation | 206 |
| 5 | Local conservation leaders are equipped to advance NRCS outreach and service to target historically underserved producers | 30 |
| 6 | Producers increase implementation of climate-smart agriculture and forestry and conservation practices, with or without NRCS support | 100 |

WORK PLAN

| # | Task Description | Anticipated Start Date | Anticipated Completion Date | Milestone(s) for Assessing Progress and Success |
|---|---|---|---|---|
| 1 | Partner onboarding to reporting/payment | Oct 2023 | Oct 2023 | Approx. 30 project personnel onboarded |
| 2 | Identify and contract with Farmer Allies | Oct 2023 | Dec 2023 | Approximately 6 Allies identified to serve USVI, AL, GA, FL producers |
| 3 | Conference tabling | Oct 2023 | May 2025 | 7 conferences attended, contact with at least 140 producers total |
| 4 | Conference presentations | Oct 2023 | May 2025 | 11 conferences, presentations with 300 total attendees |
| 5 | Training for new partners and technical assistance providers | Nov 2023 | Jan 2024 | 2 new partners and 6 new technical assistance providers trained |
| 6 | Develop and distribute print materials | Nov 2023 | May 2025 | 500 distributed through in-person events and mailers |
| 7 | Host Events and Webinars | Nov 2023 | Aug 2025 | At least 6 virtual/in-person events with 165 total participants |
| 8 | Outreach via mass media promotion | Dec 2023 | Sept 2023 | 20 farmer e-newsletters sent, 50+ social media posts, 25% of print magazine content on NRCS |
| 9 | Farmer Ally assistance provided | Dec 2023 | Sept 2025 | 25 producers served, 13 report positive NRCS customer experience |
| 10 | Technical Assistance by new TA providers | Jan 2024 | Sept 2025 | 150 new contacts receive technical assistance (TA) |
| 11 | On-farm Demo Events | Jan 2024 | Aug 2025 | 21 Demo events, 320 total attend |
| 12 | Farmer-to-Farmer training events | Jan 2024 | Aug 2025 | 27 training events, 365 total participants |
| 13 | Y1 Semiannual Report | April 2024 | April 2024 | 1 report submitted for Oct 2023-Mar 2024 |
| 14 | All Partner Training, planning event | May 2024 | Jan 2023 | Approximately 30 personnel (project managers and TA providers) trained |
| 15 | Technical assistance by 2022-2024 project TA providers begins when | May 2024 | Sept 2025 | 150 new contacts receive technical assistance (TA), 500 total contacts receive TA |
| 16 | Y1 Semiannual Report | Oct 2024 | Oct 2024 | 1 report submitted for Apr 2024-Sept 2024 |
| 17 | Y2 Semiannual Report | April 2025 | April 2025 | 1 report submitted for Oct 2024-Mar 2025 |
| 18 | Create Feedback on Barriers report | July 2025 | Sept 2025 | 1 Feedback on Barriers report to USDA |
| 20 | Feedback on Barriers | Aug 2025 | Sept 2025 | 6 Presentations to NRCS State |

10

**J.A. 0428**

| # | Task Description | Anticipated Start Date | Anticipated Completion Date | Milestone(s) for Assessing Progress and Success |
|---|---|---|---|---|
| | Webinars | | | Technical Advisory Committees |
| 21 | Final Report | Nov 2025 | Nov 2025 | 1 report submitted for Y1-Y2 |

### ACHIEVABILITY

**X☐ Outcome 1: To address local natural resource issues with a focus on working with historically underserved producers and underserved communities.**

| Indicator | Description | Estimated Number |
|---|---|---|
| 1.a. | Outreach and communications to historically underserved producers in target regions on specific conservation opportunities such as the Urban and Climate-Smart Agriculture and Forestry Initiatives, Program information, deadlines, and how to prepare for NRCS assistance. | 1000 |
| 1.b. | RAFI-USA and partners table and present at Historically Black Colleges and Universities' agricultural conferences and statewide/regional conferences designed for small-scale historically underserved producers to share info on conservation strategies and accessing NRCS programs and services, and to connect producers to this project's services. | 11 conf., 440 producers receive information |
| 1.c | RAFI-USA hosts webinars/in-person events to provide introductory information on NRCS programs/services and specific forestland and farm conservation strategies that support producers in target regions, to improve knowledge of the program and financial assistance benefits. | at least 6 events, 165 total attendees |
| 1.d | RAFI-USA, Partners, and Farmer Allies provide plain language one-on-one and small group technical assistance to producers in targeted regions to understand NRCS programs and initiatives that apply to their production/location, interpret their FSA and NRCS eligibility, identify evident resource concerns, educate on potential conservation practices to mitigate concerns, and when requested, accompany producers on NRCS farm or office visits and/or resolve miscommunication and grievances with NRCS staff. | 500 producers assisted, 425 improved understanding, 206 applied to NRCS |

**X☐ Outcome 2: Demonstrating Climate-Smart Conservation Activities that build climate resilience, by mitigating climate change through reducing GHG emissions and/or sequestering carbon, or by adapting agriculture to a world with a changing climate, building a more sustainable future through effective environmental practices on the land.**

| Indicator | Description | Estimated Number |
|---|---|---|
| 2.a. | On-farm demonstration events on climate-smart practices for small and/or urban farms to increase producer knowledge and increase implementation. Includes but not limited to Residue and Tillage management-No-till, Prescribed Grazing, Pollinator Habitat Improvement, Tree and Shrub Establishment, Silvopasture, and conservation practices applied in High Tunnel Systems. | 21 events, 320 attend. 256 increase knowledge, 120 increase implementation |
| 2.b. | Farmer-to-Farmer Trainings for small groups to increase producer knowledge and increase implementation on producers' farms. Trainings focus on 1) implementation and long term management of climate-smart and conservation practices and 2) NRCS application processes to support implementation and management of these practices. | 27 trainings, 365 attend. 292 increase knowledge, 100 increase implementation |

11

**J.A. 0429**

**X☐ Outcome 4: Developing state and community-led conservation leadership for historically underserved producers and underserved communities.**

| Indicator | Description | Estimated Number |
|---|---|---|
| 4.a. | Project and technical assistance training on NRCS programs and services for new technical assistance providers | 6 trained |
| 4.b. | Project planning and technical assistance training for all providers in Urban Initiative and Climate-Smart Agriculture and Forestry | 15 trained |
| 4.c. | Identify and train ad hoc "Farmer Allies" experienced with NRCS programs and conservation practice implementation to provide peer support to producers in their region. Allies will identify the producers' NRCS resource concerns, help producers understand NRCS terminology in plain language, and navigate NRCS visits on-farm or in-office. | 5 Allies trained, 25 producers supported |

| Outcome Indicator # | How did you derive estimated numbers? | How and when do you intend to evaluate? | Anticipated key factors predicted to contribute to and restrict outcome |
|---|---|---|---|
| 1.a. | 24 farmer e-news (2000 BIPOC producers) 50+ social media posts, each reaching up to 20,000 farmers and ag-orgs. Farmer focused magazine mailed 4 times a year to farmers & ag orgs. | A monthly review of metrics informs subsequent messaging and approach. | RAFI-USA sends 4 types of e-news. Of total list of 13,500, 2000 are BIPOC producers. RAFI-USA currently has 18,000 social media followers in addition to partners' channels. Additionally the print magazine currently reaches 3,000 farmers. *Need to create a digital content calendar with all partners responsible for digital media production. Need to request advanced notice of ranking date deadline from NRCS State Technical Advisory Committees for communications purposes.* |
| 1.b. | Tabling, presenting at 11 regional conferences, averaging 26 attendees, totaling 290 producer contacts Muse 3 Farm outreach at 1 rancher meeting, 150 present. | Will provide contact table sign-in sheets and/or presentation participant sign-in sheets for each to count number and follow up | Conferences already identified have a defined audience of historically underserved producers and we historically participate. Muse 3 Farm historically presents to regional Cattleman's Association. *Need to propose strong presentations applicable to a wide variety of attendees and submit presentation proposals well in advance. Partners have incorporated conference fees and travel costs for attending these events.* |
| 1.c. | RAFI-USA will host at least 3 virtual events/90 participants total, 3 in-person events/75 total attendees. Increase of knowledge of 80% participants | Poll participants to evaluate knowledge at the beginning of events, evaluate for change in knowledge at the end of events survey | In addition to Project team's outreach, RAFI-USA's FOCN communicates and engages with more than 700 socially disadvantaged members in the targeted regions at least monthly. We have already identified 2 state level staff experts in soil health and wildlife/forestry to present. *Need to identify more experts to present on conservation topics who have NRCS field experience, can speak to relevance of NRCS across all regions.* . |
| 1.d. | 350 of 500 are returning contacts, 150 are new | All-partner monthly call to assess project | 9 technical assistance providers in current project are already assisting 350 producers, with 166 farmers served in Yr 1. 2 new project |

| Outcome Indicator # | How did you derive estimated numbers? | How and when do you intend to evaluate? | Anticipated key factors predicted to contribute to and restrict outcome |
|---|---|---|---|
| | contacts. 80% of 500 will have improved understanding of eligibility with NRCS, 40% will apply to NCRS or other financial assistance | progress. Partners submit quarterly reports including producer contacts, producers served, and events held. Post project survey of producers served for increased understanding and who applied. | partners will add 4 new providers. *Need: Partners hire 2 additional providers (for 15 providers total) and 6 Farmer Allies identified to serve 150 additional, new producers with technical assistance and outreach to identify new producer contacts requiring technical assistance.* Training for providers will ensure high quality technical assistance that leads to 425 producers reporting an improved understanding of their eligibility with NRCS. Training on application materials and requirements will assist preparing 206 producers to apply to NRCS. |
| 2.a. | 13 Caribbean events with 110 participants, 8 mainland events w/ 210 participants, 80% participants w/ increased knowledge, 20% participants implementing practices | Participant sign-ins, poll to evaluate knowledge at beginning and end of events, post-project survey to measure implementation of practices learned and NRCS program participation | All partners hosting on-farm demonstrations have experience implementing climate smart and other conservation practices through NRCS contracts on their land and have a experience hosting tours and demos on their farms for the target numbers and historically underserved populations. *Need: Back-up shelter due to weather events or public safety considerations such as webinar options. Follow-up assistance with participants will be needed to increase conservation practice implementation rate because demo days often only show one stage of a practice and not longer term management. Need to identify Caribbean on-farm demonstration hosts with historical implementation of EQIP/CSP.* |
| 2.b. | 27 mainland events w/ 365 participants, 80% participants w/ increased knowledge, 20% participants implementing practices | Participant sign-ins, poll to evaluate knowledge at beginning and end of events, post-project survey to measure implementation of practices learned and NRCS program participation | 3 subaward partners have historical local mentorship activities on their farms for new/beginning or conventional farmers in climate-smart and conservation practices. *Need: Unforeseen weather events, pandemic safety concerns warrant back-up shelter or public safety considerations; Webinar alternatives would be less effective target audience may be unable to attend multiple trainings for best outcome so provide these farmers with one-on-one assistance following trainings to assist application of learnings* |
| 4.a. | 6 new technical assistance providers, by region: AL - 1 | Pre and post training evaluation to measure change in knowledge | 9 technical assistance providers in the current project are successfully trained. 4 of the 6 new providers have a history of applying and receiving NRCS assistance to implement practices. 3 of the 6 have a history of NRCS |

J.A. 0431

| Outcome Indicator # | How did you derive estimated numbers? | How and when do you intend to evaluate? | Anticipated key factors predicted to contribute to and restrict outcome |
|---|---|---|---|
| | USVI -1, LA-3, NC-1 | and other future training needs in specific topic areas. | outreach and technical assistance with historically underserved producers. *Need: Partners hire 2 additional providers and train on NRCS programs and conservation planning. Hiring challenges facing the service industry warrants competitive compensation and quality mentorship throughout the project.* |
| 4.b. | 15 providers, by region: USVI-3, PR-1, LA-3 AL-2, VA-1 NC/SC-2, Southeast-3 | Pre and post evaluation to measure change in knowledge of Urban and Climate Smart Ag and Forestry | Identified 1 NRCS Outreach Specialist and 1 NRCS Urban-area Engineering specialist committed to assisting with training. *Challenges/Need: NRCS Urban and CSAF Initiatives are in development and local staff do not yet have operation guidelines to support partners when they seek info for themselves or producers. Identify additional NHQ staff or NRCS Specialists for tailored training.* |
| 4.c. | 5 new Farmer Allies, by region: GA - 1, FL -1, USVI - 1, AL-2; 25 producers supported is 5% of total producers receiving technical assistance, 50% of those (12) will have improved customer experience with NCRS | Pre and post evaluation of Allies to measure readiness for field visits w/producers and project reporting needs. Survey of producers served by Allies to evaluate change | Farmers visited by project personnel in Y1 of current project report improved NRCS customer experience when accompanied by project team member. *Need: Will train Farmer Allies in barriers known to the project team from prior experience with their current Cooperative Agreement. RAFI-USA and partners identify farmers with sufficient time to serve as Allies to support occasional producer visits, a challenge considering farmers' busy schedules in planting and harvest seasons.* |

## EXPERTISE AND PARTNERS

| # | Name and Title of Key Staff & Consultants | RAFI-USA Staff Role | Relevant Experience and Past Successes |
|---|---|---|---|
| 1 | *Edna Rodriguez, Executive Director* RAFI-USA | RAFI-USA and Project high-level oversight, liaison with Caribbean partners [In-kind] | RAFI-USA Executive Director since 2017, developed and responsible for multiple USDA funded projects |
| 2 | *Lisa Misch, Managing Director of Programs* RAFI-USA | Project Director, ensure strategic alignment of project with other work by RAFI-USA | Has been a program manager since 2017, developed and managed multiple USDA funded projects, currently Managing Director of Programs |
| 3 | Jaimie McGirt, Agriculture Conservation Manager, RAFI-USA | Project Manager, support partners and service providers, development of outreach materials and events, organize & facilitate monthly meetings, provide technical assistance | Initially hired as a coordinator on current NRCS project, was promoted in 2022 to Project Manager, has performed conservation outreach and technical assistance across the Southeast region and Caribbean Area |
| 4 | Dr. Carolina Alzate-Gouzy, | Data management, provides bilingual support, and technical assistance to producers | Since 2022 served this role in our current Cooperative Agreement |

14

**J.A. 0432**

| | | | |
|---|---|---|---|
| | Farmer Outreach Manager, RAFI-USA | | |
| 5 | Humon Heidarian, FOCN Membership Manager, RAFIUSA | Provide technical assistance to project beneficiaries, with a focus on urban farmers in the Southeast | Has worked in urban agriculture activities for several years, is training as a technical assistance provider for this project |
| 6 | Jacob Crandle, Consultant RAFI-USA | Provide guidance to technical assistance providers as needed as deliver one-on-one technical assistance | Ag. Program Specialist with NCDA's Small & Minority Farm Program. Retired NRCS employee. Current NRCS project consultant. |
| 7 | Anita Roberson, Consultant RAFI-USA | Provide one-on-one and small group training, technical assistance to producers | Anita started Botanical Bites & Provisions in 2015 and farms in VA. Current NRCS project consultant. |
| # | Name and Title of Key Partners | Partner Role | Relevant Experience and Past Successes |
| 1 | Sommer Sibilly-Brown, ED Good Food Virgin Island Coalition | Project Lead, high level supervision, primary liaison with RAFI-USA, manages budget, ensures deliverables as required | Implemented a farm-to-school program in the VI. Vice Chair of the National Farm to School Network's Board. Current NRCS project partner lead |
| 2 | Miguel Marxuach, ED Alliance for Agriculture | Project Lead, oversee team, primary liaison with RAFI-USA [In Kind] | Co-founder of Alliance for Agriculture. 30 year business experience. Current NRCS project partner lead |
| 4 | Dominique Villanueva, ED Fountain Heights Farms | Project oversight, social media communications, technical assistance, trainings, & events | Co-founded a 467 member BIPOC-centered Food Coop. Current NRCS project partner lead |
| 5 | Howard Allen, Faithfull Farms | Will lead on-farm trainings for a cohort of beginning urban, small scale producers, demo days, one-on-one technical assistance | Beginning farmer specializing in operation and demonstration of profitable no-till market farming, year-round high tunnel production |
| 6 | Chris Muse, Muse 3 Farms LLC | Responsible for project management, scheduling, project financials, event and technical assistance coordination, reporting and training | Over 32 years of project management experience. He and his brothers have successfully implemented conservation practices through NRCS EQIP and CSP programs |

PROJECT MANAGEMENT PLAN

RAFI-USA will serve as the organizational project lead and will be responsible for the budget, reporting, and evaluation requirements. RAFI-USA has extensive previous experience with federal grants management including our current NRCS Cooperative Agreement #NR223A750003C066 and is currently active as a USDA cooperative agreement and grant recipient and subrecipient. We will use similar systems and procedures to ensure overall management of this project as well as financial and regulatory compliance. RAFI-USA staff will host monthly check-ins with project partners to receive updates, discuss new outreach or technical assistance materials, national and state NRCS program announcements and changes, and ensure reporting and evaluation activities are on track.

This project will be housed under the Resources for Resilient Farms project of RAFI-USA's Farmers of Color Network (FOCN), a project already active in outreach and education to farmers of color on FSA and NRCS programs and additional topics that contribute to more resilient farming operations. This project will play an active role in RAFI-USA's cross-programmatic Direct Service Team.

15

J.A. 0433

**FISCAL PLAN AND RESOURCES**

**BUDGET SUMMARY**

| Expense Category | Funds Requested |
|---|---|
| Personnel | $251,464.30 |
| Fringe Benefits | $100,585.74 |
| Travel | $21,711.03 |
| Equipment | $0 |
| Supplies | $9,000 |
| Contractual | $33,300 |
| Other | $527,216 |
| Direct Costs Subtotal | $943,277.07 |
| Indirect Costs @10% rate | $56,241.00 |
| Total Budget *(direct +indirect)* | $999,518.07 |

Will Entity be requesting indirect cost?  **Yes**

If yes, will it be a NICRA or De Minimis? ☐ NICRA        X☐ De Minimis

**PERSONNEL**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PERSONNEL JUSTIFICATION**

**PERSONNEL – Total Cost: $251,464.30**

The personnel expenses include salaries for all project staff members who will be directly involved in the execution of the project. The personnel costs are based on RAFI-USA's salary tiers for the positions required and include an annual 3% cost of living adjustment. Personnel funds requested for each staff member are as follows:

Edna Rodriguez, Executive Director (in-kind) - $0.00
- RAFI-USA and Project high-level oversight, liaison with Caribbean partners

Lisa Misch, Managing Director of Programs - $25,995.20
- Project Director, ensure strategic alignment of the project with other work by RAFI-USA.

16

**J.A. 0434**

Salary: 2023 Salary: $85,051; 2024 salary: $87,762; 2025 salary: $90,569
FTE: Yr 1: 0.20, Yr 2: 0.15 / Totals: Yr 1: $14,602.64; Yr 2: $11,392.57; Total: $25,995.210

Jaimie McGirt, Program Manager - $59,311.52
- Project Manager, support partners and service providers, development of outreach materials and events, organize & facilitate monthly meetings, provide technical assistance.

Salary: 2023 Salary: $66,560; 2024 salary: $68,658; 2025 salary: $70,839
FTE: Yr 1: 0.18, Yr 2: 0.82 / Totals: Yr 1: $10,481.28; Yr 2: $48,830.24; Total: $59,311.52

Carolina Alzate Gouzy, Farmer Outreach Manager - $64,145.30
- Data management provides bilingual support and technical assistance to producers.

Salary: 2023 Salary: $62,858; 2024 salary: $64,855; 2025 salary: $66,938
FTE: Yr 1: 0.35, Yr 2: 0.80 / Totals: Yr 1: $19,129.26; Yr 2: $45,016.04; Total: $64,145.30

Humon Heidarian, TA Provider - $88,741.44
- Provides technical assistance to project beneficiaries, with a focus on urban farmers in the Southeast, and liaisons with the Farmers of Color Network.

Salary: 2023 Salary: $62,858; 2024 salary: $64,855; 2025 salary: $66,938
FTE: Yr 1: 0.80, Yr 2: 0.80 / Totals: Yr 1: $43,749.49; Yr 2: $44,991.94; Total: $88,741.443

Joe Pellegrino, Communication Coordinator - $13,270.89
- Communications support for outreach activities and other project needs.

Salary: 2023 Salary: $51,750; 2024 salary: $53,302; 2025 salary: $54,897
FTE: Yr 1: 0.15, Yr 2: 0.15 / Totals: Yr 1: $6,790.996; Yr 2: $6,479.89; Total: $13,270.89

Total Personnel Funds: Yr 1: $94,753.67 +  Yr 2: $156,710.68  =  $251,464.30
**Total Personnel Funds Requested: $251,464.35**

| Fringe Benefits | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Fringe Benefits Justification

**FRINGE BENEFITS - Total Cost: $100,585.74**

17

**J.A. 0435**

Fringe benefits represent the additional costs related to employee compensation, such as employer taxes, paid time off (sick, holiday, vacation), health and dental plan, health reimbursement arrangement, life insurance, workers comp, 401k, short-term disability insurance, and more. The fringe benefits rate for this project is calculated at 40% of the personnel costs and has been determined using the organization's established policies.

Lisa Misch, Managing Dir. of Programs: Yr 1: $5,841.05, Yr 2: $4,556.03; Total: $10,398.08
Jaimie McGirt, Program Mgr: Yr 1: $4,192.51, Yr 2: $19,532.10; Total: $23,724.61
Carolina Alzate-Gouzy, Outreach Mgr: Yr 1: $7,651.70, Yr 2: $18,006.41; Total  $25,658.12
Humon Heidarian, TA Provider: Yr 1: $17,499.80, Yr 2: $17,996.78; Total: $35,496.58
Joe Pellegrino, Communications Coordinator: Yr 1: $2,716.39, Yr 2: $2,591.96; Total: $5,308.36

### TRAVEL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

#### TRAVEL JUSTIFICATION

**TRAVEL - Total Costs: $21,711.03**
Travel expenses are necessary for project staff to attend meetings, conferences, and other events directly related to the project. This includes costs for transportation, lodging, mileage, and per diem allowances. Travel expenses have been estimated based on the number of trips required, the distance of travel, and the duration of each trip.

**Trip 1 - Puerto Rico**
RT airfare: 4 travelers x $500 = $2,000
Per diem for Utuado: 3 travelers x 3 days x $279 = $2,511
Per diem for San Juan: 3 travelers x 2 days x $282 = $1,692
Car rental: 5 days x $100 = $500
Total for Trip 1: $6,703

**Trip 2 - St. Croix, USVI**
RT airfare: 4 travelers x $600 = $2,400
Per diem for St. Croix: 4 travelers x 4 days x $367 = $5,872
Rental car: 1 traveler x 4 days x $90 = $360
St. Croix to St. Thomas transportation: 4 travelers x $120 = $480

18

**J.A. 0436**

Per diem for St. Thomas: 2 travelers x 2 days x $367 = $1,468
Rental car: 1 traveler x 2 days x $100 = $200
Total for Trip 2: $10,780

**Mileage -** Ongoing travel to mainland farmers for TA and events: 4 travelers x estimated total of 6,455 miles @ $0.655/mi = $4,228

---

CONFORMING WITH YOUR TRAVEL POLICY

X☐ *By checking the box to the right, I confirm that my organization's established travel policies will be adhered to when completing the above-mentioned trips in accordance with* 2 CFR 200.474 *or* 48 CFR subpart 31.2 *as applicable.*

| EQUIPMENT | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | **0** |

EQUIPMENT JUSTIFICATION

**EQUIPMENT - Total Cost: $0**

| SUPPLIES | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SUPPLIES JUSTIFICATION

**SUPPLIES - Total Cost: $9,000**
The supplies budget category includes various items that will support the project's day-to-day operations. The following items are included in this budget category:
1. Laptop replacement: A new laptop is required in July 2024 to replace an old and outdated one. This is a one-time expense with an estimated cost of $800.
2. General Office Supplies: These supplies are needed on an ongoing basis to ensure the smooth running of the project. The cost of these supplies varies and is estimated at $960 for the year.

**J.A. 0437**

3. Cell Phone Service: *(Billed monthly)*
   a. Jaimie McGirt, Program Manager, requires cell phone service for 16 months at a total cost of $832 ($52 x 16)
   b. and Carolina Alzate Gouzy, Farmer Outreach Manager, requires cell phone services for 16 months at the cost of $832. ($52 x 16)
   c. Humon Heidarian, TA Provider, requires cell phone service for 24 months at a cost of $1,248. ($52 x 24)
   d. <u>Total cost of cell phone services for the three staff members is $2,912.</u>
4. Salesforce - 2 licenses: The organization requires two licenses of Salesforce for 24 months at a cost of $432 per license. This is an ongoing expense. Total: $864
5. Expensify (Monthly Subscription): The project requires two subscriptions of Expensify software for 24 months at a cost of $18 per month per user. Total: $864
6. Mailchimp (Annual Subscription): The organization requires a Mailchimp subscription to deliver mass emails to producers and project participants. Pro-rated one-year subscription at a cost of $500 per year. Total: $500.
7. Form Assembly (License): The organization requires one license of Form Assembly at the cost of $2,100 to create intake forms and survey forms to be used in project activities.

**Total Supplies Funds Requested: $9,000.**

CONTRACTUAL/CONSULTANT

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

CONTRACTUAL JUSTIFICATION

**<u>CONTRACTUAL- Total Cost: $33,300</u>**
The following itemized contractors/consultants are necessary to ensure that the project is carried out effectively and efficiently and offer high quality Technical Assistance in the cited states. The funds requested for each contractor/consultant are as follows:
1. Jacob Crandle, Consultant (NC) - Hourly Rate: $40/hr - 5 hrs per week - 60 weeks - Total: $12,000
2. Anita Roberson, Consultant (VA) - Hourly Rate: $40/hr - 8 hrs per week - 60 weeks - Total: $19,200

**J.A. 0438**

3.  TBD, Farmer Ally (GA) - Hourly Rate: $25/hr - 2 hrs per week - 15 weeks - Total: $750
4.  TBD, Farmer Ally (FL) - Hourly Rate: $25/hr - 2 hrs per week - 15 weeks - Total: $750
5.  Speaker Fees - Flat Rate: $200 per speaker for 3 speakers - Total: $600

**Total Contractual Funds Requested:  $33,300**

---

CONFORMING WITH YOUR PROCUREMENT STANDARDS

X☐ *By checking the box to the right, I confirm that my organization followed the same policies and procedures used for procurements from non-federal sources, which reflect applicable State and local laws and regulations and conform to the Federal laws and standards identified in* 2 CFR Part 200.317 through 326, *as applicable. If the contractor(s)/consultant(s) are not already selected, my organization will follow the same requirements.*

OTHER

| Item Description | Per-Unit Cost | Number of Units | Acquire When? | Funds Requested |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| **Other Subtotal** |  |  |  |  |

---

OTHER JUSTIFICATION

**OTHER - Total Cost: $527,216**

This section contains costs that don't fall under other categories, mainly our communication expenses and subawards, as directed in the funding announcement. The announcement stated, "*Include subawards in this category. According to 2 CFR Section 200.92, a subaward is given by a pass-through entity to a subrecipient to help them complete a portion of a federal award that the pass-through entity received.*"

**SUBAWARDS:**

1.    **Alliance for Agriculture (Subaward) - Total Request: $172,464**

| | | | |
|---|---|---|---|
| 1 | Project Coordinator | $37/hr per 28h/week | $76,664 |
| 2 | Administrative Staff | $25/hr per 18h/week | $46,800 |
| 3 | Stipends for Host Farms | $1,250 per event x 14 | $17,500 |
| 4 | Workshop Promotion | $750 per event x 14 | $36,000 |
| 5 | Multimedia Specialists / Workshop Documenter | $1,250 per event x 14 | $17,500 |
| 6 | Supplies | $250 per event x 14 | $3,500 |

21

**J.A. 0439**

| | Total Costs, years 1 & 2 | $172,464 |
|---|---|---|

**2.      Good Food Coalition (Subaward) - Total Request: $$139,190**

| | | | |
|---|---|---|---|
| 1 | Project Director | 102,000 p/yr  x 10% FTE | $14,450 |
| 2 | Project Management | 90,000 p/yr  x 5% FTE | $6,375 |
| 3 | Communications, Marketing, Outreach | 81,600 p/yr  x 5% FTE | $23,120 |
| 4 | TA Case Manager | 500 hrs/year x $22.73/hr | $19,125 |
| 5 | Technical Assistance + Outreach Coordinators | 54,000 p/yr  x 35% FTE | $26,775 |
| 6 | Technical Assistance + Outreach Coordinators | 54,000 p/yr  x 35% FTE | $26,775 |
| 7 | Interisland flight | $250/flight x 2 people x 6 trips TA travel | $3,000 |
| 8 | Lodging | $250/night x 2 people x 2 nights x 4/year | $4,000 |
| 9 | Car Rental | $1000/week x 4 times / year for TA visits | $5,000 |
| 10 | Marketing + Outreach supplies (printing, banners, nametags, folders) | $1.50/unit x 500 | $750 |
| 11 | Event hosting supplies | (e.g. industrial canvas tent, tablecloths, beverage cooler, coolers, rolling supply bin, clipboards) | $1,000 |
| 12 | Farmer Ally, VIGFC | $150 x 12 contacts / year | $3,600 |
| 13 | Stipends/Honorarium for Farmer/Ranchers | $400/farmer x 4 Demo Days farmer-farmer trainings annually | $3,200 |
| 14 | Advertising: local radio and social media | $60/17 months social media + 1,000 local radio | $2,020 |
| | Total Costs, years 1 & 2 | | $139,190 |

**3.      Fountain Heights Farm (Partner & Farmer Collaborator) = $99,093.50**

| | | | |
|---|---|---|---|
| 1 | Project Coordinator | 77,000 p/yr  x 25% FTE - 17 months | $27,270.83 |
| 2 | Outreach Coordinator | 31,053  p/yr  x 100% FTE - 17 months | $43,991.75 |
| 3 | Marisela Williams, Photographer / Videographer | $70/hr x 120 hr | $8,400 |
| 4 | Mileage: Green County, Tuskeegee, Enterprise, Madison (AL) | 2483 miles x $0.625/mile | $1613,75 |
| 5 | Lodging | 18 nights x $138/night | $3,5608 |
| 6 | Farmer listening session and survey participant gift cards | $50 x 30 listening session | $1,500 |
| 7 | On-farm meeting lunch | $12 x 100 farmers | $1,200 |
| 8 | Host Farmer | $350 x 2 | $700 |

22

**J.A. 0440**

| 9 | Tania Roulston, Creative Director/ Designer, Brilliant So Brilliant LLC | 10,850 | | 10,850 |
|---|---|---|---|---|
| | Total Costs, years 1 & 2 | | | 99,093.50 |

**Muse 3 Farms LLC ( Partner & Farmer Collaborator) = $52,246.30**

Located in Greensburg, LA, Muse 3 Farm LLC will be a new project partner and allow us to serve farmers located in Lousiana and Mississippi effectively while building local conservation leadership. Muse 3 Farm will provide one-on-one producer mentoring and technical assistance, scheduling, informational meetings/workshops, and field days on conservation practices to increase participation in NRCS programs. A summary of expenses by category is as follows, followed by a detailed summary by catergory:

Personnel: $44,400.00
Travel: $2,921.30
Supplies: $575
Other: $4,350.00
Total: $52,246.30

Personnel - Total Cost: $44,400
- *Chris Muse - Project Manager;* (Total hours: 528 x $30/hr = $15,840) - Chris has 32 years of project management experience and will oversee project management, scheduling, financials, issue management, meetings, coordination, procurement, reporting, and training.
- *Burnell Muse - Land and Soil Manager;* (Total hours: 352 x $25/hr = $8,800) - Burnell has 37 years of experience as a Soil Scientist and will focus on Soil Health and Cover Crops. He will provide one-on-one consulting and training to minority farmers.
- *Mittie Muse - Forest and Wildlife Manager;* (Total hours: 352 x $25/hr = $8,800) - Mittie has a B.S. in Plant & Soil Science and 30+ years of experience with the TX Railroad Commission. She will focus on forestry and wildlife conservation, providing 1-on-1 assistance to minority farmers.
- *Allen Muse - Lead Farmer;* (Total hours: 192 x $25/hr = $4,800) - Allen is a Marine Corp veteran with 40+ years of supervisory experience. He manages the gardens and animals on Muse 3 Farm and will provide mentorship and guidance to farmers who want hands-on interaction.
- *Michelle Muse - Social Media Manager / Planner;* (Total hours: 176 x $20/hr = $3,520) Michelle has 20+ years of event planning experience and manages the social media platforms for the farm. She will provide social media support and be responsible for posting project-related activities on the company's Instagram and Facebook pages.
- *Juanita Muse - Admin;* (Total hours: 176 x $15/hr = $2,640) - Juanita has worked 30+ years in the banking industry and will provide administrative support, including tour scheduling, conference room scheduling, sign-in sheets, liability management, and timekeeping.

**J.A. 0441**

Travel - Total Cost: $2,921.30

- *NRCS Meetings* (Approximate Date of Travel: 11/2023) - Attend initial meetings with local NRCS personnel covering 7 parishes to review project objectives and gain buy-in for attending meetings with farmers. Travelers: 3 x 60 miles / Cost per Mile: $0.655; Total: $589.50
- *USDA Informational Meetings* (Approximate Date of Travel: 09/2024) - Attend two informational gathering sessions with various USDA organizations to review programs applicable to farmers. Travelers: 4 x 100 miles / Cost per Mile: $0.655; Total: $524.00
- *Farmer One-on-One Sessions* (Approximate Date of Travel: 01/2024) - Visit farms to meet with farmers, with an avg trip distance of 35 miles one way; estimate 14 trips over the project duration. Travelers: 2 x 70 miles /Cost per Mile: $0.655; Total: $1283.80
- *Field Days* (Approximate Date of Travel: 07/2024) - Travel to host farms to demonstrate conservation practices. Travelers: 4 x 100 miles /Cost per Mile: $0.655;  Total: $524.00

Supplies - Total Cost: $575:

- *Cover Crop Seeds* (Acquire: Jan 2024) - To be used for the pasture land conservation practice demonstration, highlighting the importance of cover crops for soil health. The demonstration will be featured during the field day, with some crops being planted using a drill. Per-Unit Cost: $110 x  1 bag (25lbs) = $110
- *No-Till Drill Rental* (Acquire: 7/2024) -To be used for the pasture land conservation practice demonstration, showcasing the benefits of using a no-till drill for planting in order to minimize soil disruption. Per-Unit Cost: $300 x 1 = $300
- *Pens and Notebooks* (Acquire: 1/ 2024) -These pens and notebooks will be distributed to meeting participants for note-taking purposes. Per-Unit Cost: $1.10 x 150 = $165

Other - Total Cost: $4,350:

- *Conference Room Rentals* (Acquire: 3/2024) - Rent conference rooms for the 2 workshops and 2 USDA Informational Sessions. Per-Unit Cost: $300 x  4 = $1,200
- *Printed Flyers* (Acquire: 3/ 2024) - Printed flyers to communicate planned events for the project.Per-Unit Cost: $0.30 x  1,000 = $300
- *Printed Agendas* (Acquire: 3/ 2024) - Provide printed agendas for all events to be distributed to participants. Per-Unit Cost: $0.50 x  500 = $250
- *Signage for Field Day* (Acquire: 6/2024 & 6/2025) - Signs to direct participants to field day locations.Per-Unit Cost: $25 x 8 =  $200
- *Farmer Field Day Host Stipend* (Acquire: 7/ 2024) - Provide host farms with a stipend for the field day.Per-Unit Cost: $600 x  2 =  $1,200
- *Audio/Visual Equipment Rental* (Acquire: 3/ 2024) -Rent projector and sound equipment for workshops and meetings. Per-Unit Cost: $300 x  4 = $1,200

J.A. 0442

**<u>Faithfull Farms (Partner & Farmer Collaborator) = $42,872.00</u>**

*Summary:*
Personnel: $35,000.00
Supplies: $5172.20
Other: 2,700.00

Personnel - Total Cost: $35,000
Howard Allen, Farm Instructor, and Technical Assistance Provider - $35,000
(1,000 hours x $35/hour = $35,000 )

Supplies - Total Cost: $5,172.20
The following supplies are necessary to offer demonstration projects to farmers. These items are part of a caterpillar tunnel kit and complimentary add-on features, and include some construction supplies for demonstrating a low-cost, high-tunnel system that can improve plant health and vigor in a no-till market garden.

- Gothic Caterpillar Tunnel Kit - 16ft x 50ft/5Ft/Pro ($2,580.00) - Used to provide a structure for season extension of crops and production of crops in a controlled environment.
- Gothic Tunnel Cross Bracing - Single piece with hardware ($16.20) - Used to strengthen the gothic caterpillar tunnel and ensure stability in windy conditions.
- DIY End Wall Kit - Woven poorly plastic (2 at $520.00 each) ($1,040.00) - Used to close off the ends of the caterpillar tunnel to protect crops from outside weather and pests.
- Trellising Assembly Kit - 50ft Kit (2 at $162.00 each) ($324.00) - Used to provide support for climbing plants and maximize space utilization.
- Shade Cloth - 20ft x 55ft With Clips / 50 percent ($302.00) - Used to regulate light levels and temperature for better crop growth and management.
- Spring Wire and Channel Kit (93 inch) - 10 Pack ($150.00) - Used to provide a method for attaching shade cloth and trellising to the gothic caterpillar tunnel.
- Ground Cover - 4ft x 300ft ($142.00) - Used to prevent weed growth, reduce soil erosion and retain moisture for improved crop growth.
- Quick Plant Fabric - Pattern #39 / 300ft ($235.00) - Used to suppress weed growth while allowing air, water, and nutrients to pass through to the soil and crops.
- Ground Cover Anchoring Pins - 6 inch 11 gauge (500 per box) ($55.00) - Used to secure ground cover and quick plant fabric to the soil and prevent movement or slippage.
- Caterpillar Tunnel taxes + shipping ($328.00) - Additional cost for taxes and shipping.

---

**<u>RAFI-USACommunications Expenses - Total Cost: $21,350</u>**

25

**J.A. 0443**

- Social media advertising for 6 events at $250 each for a total cost of $1,500: We will allocate $250 per event for social media advertising to increase attendance and engagement. Total = $1,500.
- Advertising in conference programs at 3 conferences at a cost of $500 each for a total cost of $1,500: We will allocate $500 for advertising in conference programs at each of the 3of the conferences we plan to attend. Total = $1,500.
- Video production for various conservation practices at a cost of $2,000 per year: We plan to produce videos on various conservation practices at a cost of $2,000 per year.
- Living Roots Farmer Magazine publication with 25% of the content related to NRCS issues for 5 issues at a total cost of $17,000: We will publish 5 issues of Living Roots Farmer Magazine with 25% of the content related to NRCS issues at a cost of $3,400 per issue for a total cost of $17,000.
- Printing, mailing, and postage for brochures specific to urban and climate smart information for conferences, mailings, and site visits. Estimated total = $1,492.

## INDIRECT COSTS

| Indirect Cost Rate | BASE | Funds Requested |
|---|---|---|
| **Indirect Subtotal** | | |

**INDIRECT COSTS: $56,498**

| | **Budget** | **Indirect Eligible Amounts** |
|---|---|---|
| Personnel | $251,464.3 | $251,464.3 |
| Fringe Benefits | $100,585.74 | $100,585.74 |
| Travel | $21,711.03 | $21,711.03 |
| Equipment | 0 | 0 |
| Supplies | $9,000 | $9,000 |
| Contractual | $33,300.00 | $33,300.00 |
| Other*** | $527,216 | $146,350 |
| Total | $943,277.07 | $562,411.07 |

10% = $56,241.00 Total Indirect Costs

| ***Other Indirect Cost Breakdown | **Budget** | **Indirect Eligible Amounts** |
|---|---|---|
| Subaward, Alliance for Agriculture | $172,464 | $25,000 |
| Subaward, Virgin Islands Good Food Coalition | $139,190 | $25,000 |
| Subaward, Fountain Heights Farm | $99,093.50 | $25,000 |

26

**J.A. 0444**

| | | |
|---|---|---|
| Subaward, Muse Farms LLC | $52,246.30 | $25,000 |
| Subaward, Faithful Farms | $42,872.20 | $25,000 |
| Remaining Other Expenses/Communications: | $21,350 | $21,350 |
| ***Total Other*** | **$527,216** | **$146,350** |

## OTHER

Do you have or have had an Agreement or grant with NRCS?

x☐ Yes          ☐ No

If yes, list the GraNTS or Agreements and provide a brief description Of How This project application is Different.

| # | Grant Program | Description of Difference |
|---|---|---|
| 1 | #NR223A750003C066 | Was outreach and technical assistance only for a smaller number of producers. |
| 2 | | |
| 3 | | |

have you submitted this project proposal to another federal or State Grant Program?

☐ Yes          X☐ No

If yes, list the Federal or State grant progRam and describe how the project is different.

| # | Grant Program | Description of Difference |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

Budget Narrative

27

**J.A. 0445**

# ALLIANCE FOR AGRICULTURE DECLARATION – EXHIBIT 3-D

**Cost Reimbursement Subaward Agreement Between:**

**Rural Advancement Foundation International - USA (RAFI-USA)**
274 Pittsboro Elementary School Road
Pittsboro, NC 27312
DUNS #: 961684198

**And**

**Alliance for Agriculture**
PO Box 2181
Orocovis, PR 00720

DUNS #: 117110612

Under Prime Agreement between RAFI-USA and the
USDA, Outreach and Advocacy Division
Cooperative Agreement # NR223A750003C062
CFDA Number: 10.902 Conservation Technical Assistance
Federal Award Date: March 8, 2024

## 1. Subaward Period of Performance

Effective dates 05/01/2024 through 03/30/2026, unless otherwise agreed upon in writing between the parties.

## 2. Scope of Work

This is a Subaward Agreement (the "Agreement" or "Subaward") between **Alliance for Agriculture**, ("SUBRECIPIENT") and Rural Advancement  Foundation International - USA. This is not an R&D award. SUBRECIPIENT will use reasonable best efforts to participate  in the effort as described in the Project Description.. A  copy of the original cooperative agreement  NR223A750003C062 between RAFI-USA and USDA NRCS, Outreach and Advocacy Division in Attachment 1, which is attached hereto and incorporated herein. In its performance of work SUBRECIPIENT shall be an  independent entity and not an employee or agent of RAFI-USA.

## 3. Project Description

The purpose of this project is to provide localized outreach, education, and hands-on technical assistance regarding NRCS programs. Outreach to farmers will be a combination of trainings, workshops, webinars, written materials, RAFI-USA's Farmers of Color Network events, and online content. The primary focus will be on assisting small-scale, BIPOC farmers through the NRCS application process and conservation action plan preparation. This project builds upon the existing NRCS Cooperative Agreement #NR223A750003C066.

1

**J.A. 0447**

RAFI-USA retains the right to use (in perpetuity) any of the material RAFI-USA selects from this assignment and any of the work created for all internal purposes. SUBRECIPIENT hereby grants RAFI-USA all right, title and interest in and to any work product provided by SUBRECIPIENT under this Agreement.

● "All internal purposes" means: RAFI-USA print and web publications, web, digital, and broadcast channels, fact sheets, fundraising, philanthropy, display, social media, presentations and membership services, annual report and newsletters.

● RAFI-USA shall retain digital copies of selected images and all work from the assignment that will be archived in RAFI-USA archives and accessible to RAFI-USA staff.

● RAFI-USA will endeavor to credit the SUBRECIPEINT's work in all uses made by RAFI-USA. SUBRECIPIENT will include the following language where appropriate: *This material is based upon work supported by the U.S. Department of Agriculture in partnership with Rural Advancement Foundation International-USA.*

**4. Invoices and Payments**

Total Funds Cumulatively Obligated: **$129,316**

In consideration of SUBRECIPIENT's performance hereunder, RAFI-USA agrees to pay the SUBRECIPIENT no more than **$129,316** on a cost reimbursable basis. SUBRECIPIENT agrees not to exceed this amount without prior written authorization of RAFI-USA. RAFI-USA shall reimburse SUBRECIPIENT as frequently as monthly. All invoices shall be submitted using RAFI-USA's template, which will be sent prior to the end of the invoicing period. Invoice and questions concerning invoice receipt or payments shall be directed to the Federal Grants Manager, identified in Section 8 below.

The invoice due on April 15, 2026 will serve as the final statement of costs and should be marked "FINAL." Invoices should be paid by RAFI-USA within thirty (30) days of receipt. RAFI-USA reserves the right to reject an invoice in its sole discretion for any reason including, but not limited to, those outlined or referenced in 2 CFR 200.305. Payment may be delayed if a written programmatic report (see Section 5) is not received with the SUBRECIPIENT invoice.

**5. Reporting**

The SUBRECIPIENT will complete a Performance Progress report that is provided to RAFI-USA in accordance with the schedule outlined below, which is attached hereto and incorporated herein. The template for this programmatic report will be sent prior to the end of the first reporting period. In addition to the quarterly reporting, SUBRECIPIENT will participate in a monthly partner meeting, and other program activities and events (quarterly digital content meeting, educational events, listening sessions) as required.

April 1 - June 30: Report due July 15

July 1 - September 30: Report due October 15

October 1 - December 31: Report due January 15

2

**J.A. 0448**

USCA4 Appeal: 25-1575    Doc: 55-1       Filed: 06/23/2025       Pg: 454 of 467  Total Pages:(454 of 467)

DocuSign Envelope ID: 43D64216-42F5-46F7-8615-F3DB9311F19D
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 126 of 139

January 1 - March 31: Report due April 15

Reports are due within 15 days of the end of the grant quarter, outlined above. There will be a grace period of 15 days for any missed report before follow-up steps are taken. The contract can be terminated at the sole discretion of RAFI-USA for missed reporting deadlines and/or failure to complete the tasks outlined in the project description. If SUBRECIPIENT has concerns about their ability to complete the activities, they should contact the Project Manager as soon as possible.

## 6. Terms of this Subaward

a. SUBRECIPIENT will use either RAFI-USA or project logo on relevant developed materials as laid out under the Scope of Work, in addition to SUBRECIPIENT's own logo. The Project Manager will provide SUBRECIPIENT with appropriate logos for use. Questions and discussion of what appropriate materials may constitute can be directed to the Project Manager.

b. Any changes to this contract must be agreed to in writing by both the SUBRECIPIENT and RAFI-USA.

c. No-cost extensions require the written approval of RAFI-USA. Any requests for a no-cost extension shall be directed to the Project Manager and Federal Grants Manager not less than 30 days prior to the desired effective date of the requested change. In addition, RAFI-USA may issue non substantive changes to the Period of Performance and Budget if agreed to in writing by both the SUBRECIPIENT and RAFI-USA.

d. At any time prior to the termination of the term of this Subaward, either RAFI-USA or SUBRECIPIENT may terminate the Subaward with or without cause by giving thirty (30) days written notice to the other party. RAFI-USA shall pay SUBRECIPIENT for termination costs as allowable under Uniform Guidance, 2 CFR 200, or 45 CFR Part 75 Appendix IX, as applicable. SUBRECIPIENT will be expected to provide a final invoice and programmatic report within 30 days of termination date. In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the termination date.

e. This Subaward assumes the provision and receipt of funds under USDA award # NR223A750003C062 necessary for completion of the outlined Scope of Work covered by this Subaward. If the underlying USDA NRCS award is terminated or modified in any manner that affects the funding for the Scope of Work outlined in this Subaward, SUBRECIPIENT will be notified in writing and all work under this Subaward should cease. Any payments for work already completed by SUBRECIPIENT will be paid according to the terms of this Subaward to the extent funding is available through the underlying USDA award. SUBRECIPIENT will be expected to provide a final invoice and programmatic report within 30 days of notice to cease work. In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the date of notification to cease work. If any money already received by SUBRECIPIENT is determined to be unallowable, SUBRECIPIENT will return such money to RAFI-USA within 10 days of written notification by RAFI-USA.

e. SUBRECIPIENT will comply with the Federal Fair Labor Standards Act.

## 7. Certifications and Assurances

By executing this Agreement, SUBRECIPIENT makes the certification and assurances required by Uniform

Guidance: 2 CFR 200, et. seq., including:

**I. Certification Regarding Lobbying (2 CFR 200.450)**

a. No Federal appropriated funds have been paid, by or on behalf of the SUBRECIPIENT, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal Contract, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

b. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or intending to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the SUBRECIPIENT shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," to RAFI-USA.

c. The SUBRECIPIENT shall require that the following language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all SUBRECIPIENTS shall certify and disclose accordingly.

> **This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.**

**II. Debarment, Suspension, and Other Responsibility Matters (2 CFR 200.213 and CFR 180)**

a. SUBRECIPIENT certifies by signing this Agreement that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any federal department or agency.

**III. Audit and Access Records**

A. SUBRECIPIENT certifies by signing this Agreement that it complies with the Uniform Guidance, will provide notice of the completion of required audits and any adverse findings which impact this Subaward as required by 2 CFR parts 200.501 - 200.521, and will provide access to records as required by parts 200.336, 200.337, and 200.201 as applicable.
B. SUBRECIPIENT certifies by signing this Agreement that it will provide RAFI-USA with all required records to support invoices submitted.
C. SUBRECIPIENT will also follow 45 CFR Part 75 where applicable.
D. SUBRECIPIENT understands that, in accordance with federal grant compliance requirements, there exist additional financial reporting requirements as a subcontractor to RAFI based on the level of federal funds usage by SUBRECIPIENT.

4

**J.A. 0450**

a. SUBRECIPIENT affirms that they receive:

☑ _____ less than $750,000 annually in federal funds, inclusive of this subawardee agreement

_____ more than $750,000 annually in federal funds, inclusive of this subawardee agreement

b. If receiving more than $750,000 annually in federal funds, SUBRECIPIENT agrees to provide RAFI with the appropriate tax documentation annually to stay in compliance with federal regulations.

## IV. Prohibition On Certain Telecommunications And Video Surveillance Services Or Equipment

a. SUBRECEIPIENT is responsible for compliance with the prohibition on certain telecommunications and video surveillance services or equipment identified in 2 CFR 200.216. See Public Law 115-232, Section 889 for additional information. In accordance with 2 CFR 200.216, the recipient (including subrecipients) is prohibited from obligating or expending loan or grant funds for covered telecommunications equipment or services to:

o. procure or obtain, extend or renew a contract to procure or obtain;

p. enter into a contract (or extend or renew a contract) to procure; or

q. obtain the equipment, services or systems.

### 8. RAFI-USA Contacts and Modifications

• **Project Director –** Lisa Misch

919-270-8100, lisa@rafiusa.org

• **Project Manager** – Jaimie McGirt

984-282-6047, jaimie@rafiusa.org

• **Federal Grants Manager - Kelly Marchand**

919-503-2926, kmarchand@rafiusa.org

Matters concerning the technical performance of this Subaward shall be directed to the  Project Manager. Matters concerning the request or negotiation of any  changes in the terms, conditions, or amounts cited in this Agreement, and any changes requiring prior  approval, shall be directed to the Project Manager.

Any amendment or modification of this Agreement or additional obligation assumed by either party  in connection with this Agreement will only be binding if evidenced in writing signed by each party  or an authorized representative of each party.

RAFI-USA roles and personnel are subject to change upon written notification  from RAFI-USA to SUBRECIPIENT.

### 9. Indemnification

To the extent permitted by applicable law, SUBRECEIPIENT agrees to indemnify, defend, and hold  harmless RAFI-USA, and its affiliates, officers, directors, agents, employees, attorneys, insurers, volunteers and

5

**J.A. 0451**

permitted successors and assigns against any and all claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of SUBRECEIPIENT's negligence or willful acts in performing its duties under this Agreement. This indemnification will survive the termination of this Agreement.

**10. Severability/Interpretation**

In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of the Agreement.

**11. Non-Disparagement**

During the term of this Agreement and at all times thereafter, SUBRECEIPIENT hereby promises and agrees not to demean or disparage RAFI-USA or any persons or entities related to RAFI-USA in any manner.

**12. Conflict of Interest**

A potential or actual conflict of interest exists when a Subrecipient's contractual commitments on this project may reasonably appear to be compromised by other financial interests or positions of influence directly related to this project's work. Each Subrecipient/Contractor will disclose any organizational or individual (key personnel only) financial interests or positions of influence that may give rise to a potential or actual conflict of interest. Should any change occur, or any doubt arise, as to whether any proposed financial interest, transaction or position is in contravention of this agreement, the Subrecipient/Contractor must disclose, in writing, the matter to the Project Manager within 30 calendar days.

Please describe any organizational or individual, financial interest or position of influence, the Subrecipient/Contractor (key personnel only) holds, or circumstances that could contribute to a conflict of interest:

_____ _MM_  No conflict of interest to report.


_____ Subrecipient/Contractor has a conflict of interest (COI) to report. Please specify name, nature of the relationship and the nature of the financial interest or position of influence, e.g. equity (public= include dollar value/private = include % of ownership) or Board membership.

1._____

2._____

3._____

**13. Confidentiality**

RAFI-USA acknowledges that certain documents that SUBRECIPIENT creates and provides to RAFI-USA in the course of the Agreement may contain incomplete or sensitive information that is intended to remain confidential until final approval has been granted by RAFI-USA and the USDA under the terms of the Agreement. Any such documents should be identified with a "CONFIDENTIAL DRAFT" watermark.

J.A. 0452

RAFI-USA will distribute marked documents to internal partners only on a need-to-know basis and include SUBRECIPIENT as a party to any such correspondence. Prior to the distribution of the marked documents RAFI-USA shall inform each recipient of the confidential nature of the information and notify SUBRECIPIENT of RAFI-USA's intent to distribute. SUBRECIPIENT shall use the same degree of care to protect the RAFI-USA and USDA confidential information as it does to protect its own confidential and proprietary information, but in no event shall it use less than reasonable care.

## 14. Warranty

SUBRECEIPIENT warrants that all services performed by SUBRECEIPIENT under this Agreement will be performed in a competent and workman-like manner in accordance with accepted industry standards for comparable services. SUBRECEIPIENT warrants that all services will be completed within the schedule set forth in the Statement of Work or otherwise provided by RAFI-USA.

## 15. Insurance

Throughout the term of this Agreement, SUBRECEIPIENT shall maintain general liability insurance coverage underwritten by Best A-rated insurance carrier. Such insurance shall have policy limits of no less than $1,000,000 per occurrence for losses due to errors or omissions, $1,000,000 per occurrence for death or personal injury, $1,000,000 per occurrence for real and personal property damage, and $2,000,000 aggregate liability per year. SUBRECEIPIENT shall maintain workers' compensation insurance in amounts required by law. Within ten (10) days following the effective date of this Agreement, on each anniversary of the date of this Agreement and upon any request by RAFI-USA, SUBRECEIPIENT will deliver to SUBRECEIPIENT a certificate of insurance verifying the foregoing insurance coverage.

## 16. Independent Contractor

a. In making and performing this Agreement, SUBRECEIPIENT shall act at all times as an independent contractor. Nothing herein shall be deemed or construed to create a joint venture, partnership, agency or employment relationship between the parties for any purpose. Although SUBRECEIPIENT will receive generalized instruction from RAFI-USA as to the performance of services hereunder, RAFI-USA will not control or supervise the specific methods to be used or the sequence of tasks to be performed in connection with SUBRECEIPIENT's duties hereunder. SUBRECEIPIENT shall be responsible for all compensation, fees and taxes (including, without limitation, withholding for income, Social Security and other taxes) applicable to its Representatives. RAFI-USA will not provide insurance, vacation, or other employment benefits of any kind to SUBRECIPIENT or its Representatives.

b. SUBRECEIPIENT agrees to indemnify and hold RAFI-USA harmless, and hereby indemnifies and holds RAFI-USA harmless, from and against any damage, claim, assessment, interest charge or penalty incurred by or charged to RAFI-USA as a result of any claim, cause of action or assessment by any Federal or state government or agency for any nonpayment or late payment by SUBRECEIPIENT of any tax or for RAFI-USA's failure to withhold any amounts for taxes from compensation paid to SUBRECEIPIENT or its Representatives hereunder.

## 17. Notices

All notices shall be in writing and sent by personal delivery; certified or registered mail, return receipt requested; express courier service with next-business-day delivery; or transmittal by facsimile (if confirmed by

J.A. 0453

such mailed) to the addresses indicated above, or to such other address as either party may indicate by at least ten (10) days prior written notice to the other party. Any notice so given shall be deemed to have been received upon receipt by personal delivery or certified or registered mail; the next business day after the dispatch by express courier service; or upon the date transmitted by facsimile (with confirmation of transmittal), as the case may be.

**18. Applicable Law**

This Agreement shall be governed by the laws of the State of North Carolina, without regard to the conflicts-of-law rules of such State. The parties agree that any action proceeding arising out of or related to this Agreement shall be brought only in the Superior Court of Chatham County, North Carolina, or the United States District Court for the Middle District of North Carolina, and the parties hereto consent to such exclusive venue and to the jurisdiction of such courts over the subject matter of such proceeding and themselves.

**19. Time of the Essence**

Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of this provision.

**20. Assignment**

SUBRECIPIENT will not voluntarily, or by operation of law, assign or otherwise transfer its obligations under this Agreement without the prior written consent of RAFI-USA.

**21. Waiver**

The waiver by either party of a breach, default, delay or omission of any of the provisions of this Agreement by the other party will not be construed as a waiver of any subsequent breach of the same or other provisions.

**22. Award Language**

Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**23. Cooperation**

SUBRECIPIENT agrees to cooperate at any time to the extent and in the manner reasonably requested by RAFI-USA and at SUBRECIPIENT's expense (to the extent allowed by applicable law), in the prosecution or defense of any claims, litigation or other proceeding, including anything related to Confidential Information.

**24. Legal Expenses**

In the event that any legal proceeding is commenced to enforce or interpret any provision of this Agreement, RAFI-USA, if it prevails, shall be entitled to recover from SUBRECIPIENT, in addition to any other damages or award, all reasonable legal costs and fees associated with the action in both the trial and appellate courts.

8

**J.A. 0454**

**25. Entire Agreement**

It is agreed that there is no representation, warranty, collateral agreement or condition affecting this Agreement except as expressly provided in this Agreement and all attachments hereto.

**26. Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument.

**27. Signature**

By signing this Agreement, SUBRECIPIENT certifies that it will perform the work under this Agreement in accordance with the terms of this Agreement, the applicable terms of the Prime Award, federal, state, and local law, rules and regulations, and the SUBRECIPIENT's policies. Moreover, the persons whose names and signatures appear below, represent and warrant that they have authority to enter into this agreement on behalf of the company, firm or organization they purport to represent and hereby agree to the terms set forth herein.

**Rural Advancement Foundation International – USA**

By: _Edna Rodriguez_
ECB1EB90E0D4490...

Printed Name: Edna Rodriguez

Title: Executive Director

Date: 4/24/2024

**Alliance for Agriculture**

By: _Miguel Marxuach_
6B9731DBD640348E...

Printed Name: Miguel Marxuach

Title: Executive Director

Date: 4/24/2024

9

**J.A. 0455**

Attachment 1

Original Cooperative Agreement  NR223A750003C062 between RAFI-USA and USDA NRCS,
Outreach and Advocacy Division

**J.A. 0456**

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 462 of 467  Total Pages:(462 of 467)

DocuSign Envelope ID: 43D64216-42F5-46F7-8615-F3DB9341F19D
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 134 of 139

DocuSign Envelope ID: F01042C0-D674-4338-8175-AFAF38E8778C

**USDA**

**NRCS-ADS-093**

**U.S. Department of Agriculture**
**Natural Resources Conservation Service**

### NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number | 2. Amendment Number | 3. Award /Project Period | 4. Type of award instrument: |
|---|---|---|---|
| NR243A750003C062 | | Date of Final Signature - 03/30/2026 | Cooperative Agreement |

| 5. Agency (Name and Address) | 6. Recipient Organization (Name and Address) |
|---|---|
| USDA, NRCS Outreach and Advocacy Division c/o FPAC-BC Grants and Agreements Division 1400 Independence Ave SW, Room 3236 Washington, DC 20250 Direct all correspondence to FPAC.BC.GAD@usda.gov | RURAL ADVANCEMENT FOUNDATION INTERN ATIONAL-USA RAFI USA PO BOX 640 PITTSBORO NC 27312-0640 UEI Number: 961684198 / DUNS Number: Z1AXE15PHAL3 EIN: 561704863 |

| 7. NRCS Program Contact | 8. NRCS Administrative Contact | 9. Recipient Program Contact | 10. Recipient Administrative Contact |
|---|---|---|---|
| Name: Erica Westbrook Phone: 479-883-7468 Email: erica.westbrook@usda.gov | Name: LESLIE ROBERTS Phone: (202)690-9021 Email: leslie.roberts@usda.gov | Name: Jaimie McGirt Phone: (984) 282-6047 Email: jaimie@rafiusa.org | Name: Jaimie McGirt Phone: (984) 282-6047 Email: jaimie@rafiusa.org |

| 11. CFDA | 12. Authority | 13. Type of Action | 14. Program Director |
|---|---|---|---|
| 10.902 | 16 U.S.C. 2001-2009 16 U.S.C. 2004 16 U.S.C. 3801 et seq 16 U.S.C. 590a-590f, 590q 7 CFR 12 7 U.S.C. 1010a | New Agreement | Name: Lisa Misch Phone: (919) 270-8100 Email: lisa@rafiusa.org |

15. Project Title/ Description: Expanding RAFI-USA's Conservation Resources for Resilient Farms Project

16. Entity Type: M = Nonprofit with 501C3 IRS Status (Other than Institution of Higher Education)

17. Select Funding Type

| Select funding type: | ☒ Federal | ☐ Non-Federal |
|---|---|---|
| Original funds total | $696,664.00 | $0.00 |
| Additional funds total | $0.00 | $0.00 |
| Grand total | $696,664.00 | $0.00 |

18. Approved Budget

**J.A. 0457**

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 463 of 467  Total Pages:(463 of 467)

DocuSign Envelope ID: 43D64216-42F5-46F7-8615-53DB9341F19D    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 135 of 139

DocuSign Envelope ID: F01042C0-D674-4338-8175-AFAF38E8778C

| Personnel | $0.00 | Fringe Benefits | $0.00 |
|---|---|---|---|
| Travel | $0.00 | Equipment | $0.00 |
| Supplies | $0.00 | Contractual | $0.00 |
| Construction | $0.00 | Other | $696,664.00 |
| Total Direct Cost | $696,664.00 | Total Indirect Cost | $0.00 |
| | | Total Non-Federal Funds | $0.00 |
| | | Total Federal Funds Awarded | $696,664.00 |
| | | Total Approved Budget | $696,664.00 |

This agreement is subject to applicable USDA NRCS statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any, found by NRCS to have been overpaid, will be refunded or credited in full to NRCS.

| Name and Title of Authorized Government Representative LOUIS ASPEY NRCS Associate Chief | Signature | Date |
|---|---|---|
| Name and Title of Authorized Recipient Representative EDNA RODRIGUEZ Executive Director | Signature *Edna Rodriguez* ECB1E890E0D490 | Date 3/8/2024 |

**NONDISCRIMINATION STATEMENT**

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

**PRIVACY ACT STATEMENT**

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

**J.A. 0458**

USCA4 Appeal: 25-1575    Doc: 55-1    Filed: 06/23/2025    Pg: 464 of 467  Total Pages:(464 of 467)

DocuSign Envelope ID: 43D64216-42F5-46F7-8615-F3DB9311F10D
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-4    Page 136 of 139

DocuSign Envelope ID: F01042C0-D674-4338-8175-AFAF38E8778C

## Statement of Work

### Purpose

The Outreach and Partnerships Division (OPD) within the U.S. Department of Agriculture's Natural Resources Conservation Service (USDA NRCS) provides leadership and funding for outreach to ensure that all programs and services are made accessible to all NRCS customers and are treated fairly and equitably with emphasis on reaching the underserved farmers or ranchers and landowners. NRCS is providing funding through "Equity in Conservation Outreach Cooperative Agreements." This award is in the best interest of the Government and necessary to provide outreach and technical assistance to underserved communities.

The purpose of this agreement, between the U.S. Department of Agriculture, Natural Resources Conservation Service (NRCS) and Rural Advancement Foundation International-USA (Recipient), is:
NRCS programs and services are currently not being accessed equitably by large numbers of
historically underserved producers even though the USDA is outreaching to these producers.
This project builds upon the goals and activities outlined in Rural Advancement Foundation
International-USA's (RAFI-USA) existing NRCS Cooperative Agreement
#NR223A750003C066 aimed at expanding delivery of conservation services to underserved,
socially disadvantaged farmers and ranchers. Building upon these efforts, the proposed project
aims to further increase access to NRCS programs and services for historically underserved producers, adding in Urban or USDA Urban Buffer areas, and continue evaluating barriers producers face. RAFI-USA and partners will continue collaborating to conduct regionally appropriate outreach to introduce approximately 1,000 additional producers to NRCS technical and financial assistance programs in the Southeast U.S., USVI, and Puerto Rico as well as nationally. This outreach plus technical service will result in approximately 500 producers, 350 contacts from our current project and 150 new producers, engaging in regionally relevant conservation planning and requesting NRCS assistance for climate-smart agriculture strategies and natural resource conservation practices.

Our primary intention is to assist producers through the NRCS application process, conservation planning and practice implementation, and long-term contract management. The secondary
intention is educating producers on climate-smart and place-based agroecological farming practices.

We will evaluate the experience these producers have when interacting with NRCS staff and the
application or contract process and produce a conclusory assessment of barriers farmers identified to inform NRCS's outreach and engagement efforts.

Locations of work to be completed are in Alabama, Georgia, Louisiana, South Carolina, Puerto Rico, North Carolina, Virginia, Virgin Islands.

Congressional districts where work to be completed:  Alabama -ALL, Georgia- All,
Louisiana- All, North Carolina- All, South Carolina- All, Virginia- All, Puerto Rico &
U.S. Virgin Islands- All

### Objectives

The goal of this two-year project is to build on the successes of our current NRCS Cooperative Agreement to expand delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, in the targeted regions, and continuously evaluate barriers producers face to accessing NRCS programs and services to report to NRCS.

Objective 1. Outreach to    500 historically underserved producers to increase awareness of NRCS programs/services and recommended resource conservation practices, particularly climate-smart mitigation activities, urban initiative qualifying practices, and local agroecological practices, for small-scale producers.

Objective 2. Provide technical assistance to 500 historically underserved producers in the Southeast U.S. and Caribbean Area to improve NRCS's outreach efforts and promote conservation practices on historically underserved producers' land. Technical assistance will include assessing producers' eligibility for NRCS programs and aiding them through the NRCS application process and later NRCS processes such as conservation planning, conservation practice implementation, and contract management. 350 of these producers will be returning contacts from our current project and 150 will be new contacts.

Objective 3. Equip at least 15 individuals, including farmers and agricultural advocates in the Southeast U.S. and

DocuSign Envelope ID: F01042C0-D674-4338-8175-AFAF38E8778C

Caribbean territories to serve as conservation leaders within their communities, to advance NRCS's ability to incorporate underserved community priorities into its implementation of NRCS conservation programs.

Objective 4. Provide the appropriate support to historically underserved producers in our target areas so that 100 producers in this project institute conservation or climate-smart practices on their land to address local natural resource issues.

**Budget Narrative**

The official budget described in this Budget Narrative will be considered the total budget as last approved by the Federal awarding agency for this award.
Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the amount obligated. Advances are authorized for expenditures projected for up to 90 days.

TOTAL BUDGET - FEDERAL FUNDS $696,664.00
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

**Responsibilities of the Parties:**

If inconsistencies arise between the language in this Statement of Work (SOW) and the General Terms and Conditions attached to the agreement, the language in this SOW takes precedence.
NRCS RESPONSIBILITIES
Coordinate with the Program Director to determine the technical assistance necessary to complete deliverables.
Conduct ad-hoc meetings (via electronic, phone or in-person field visit) to discuss the progress of the agreement.
Provide NRCS logo to recipient for usage and review publications as needed.
Provide a program manager who may provide oversight for project activities, as necessary.
RECIPIENT RESPONSIBILITIES
Perform the work, activities and produce the deliverables as outlined in this Statement of Work, maintain communications with the Program Manager and inform of any needed changes.

**J.A. 0460**

DocuSign Envelope ID: F01042C0-D674-4338-8175-AFAF38E8778C

Use the USDA Non-discrimination Statement on all publications, "USDA is an equal opportunity provider, employer and lender" in accordance with USDA Departmental Regulation 4300-3, Equal Opportunity (EO) Public Notification Policy, and Section 7.

Credit NRCS on event materials and or/reports with the usage of the official NRCS logo

Provide schedule of events, workshops, etc. to NRCS at least every six months, prior to events taking place.

Comply with the applicable version of the General Terms and Conditions.

Reports: Submit reports and payment requests to the ezFedGrants system OR the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov as outlined in the applicable version of the General Terms and Conditions. Reporting frequency is:
● Performance reports: Semi-annual with OPD reporting template
● SF-425 Financial Reports: Annual   Quarterly financial reporting is required if advance payments are requested.
● Payment requests: Quarterly (at a minimum) SF-270 with Budget Expense Table

**Expected Accomplishments and Deliverables**

1. Provide outreach and communications to historically underserved producers in target regions on specific conservation opportunities such as the Urban and Climate-Smart Agriculture and Forestry Initiatives, Program information, deadlines, and how to prepare for NRCS assistance.  Will reach 500 Historically Underserved Producers.  March 2024 – December 2025

2. RAFI-USA and subaward partners table and present at Southeast U.S. Historically Black Colleges and Universities' agricultural conferences and statewide/regional conferences designed for small-scale historically underserved producers to share info on conservation strategies and accessing NRCS pro and services, and to connect producers to this project's services.  11 conferences, 300 producers attend presentation sessions/workshops; 140 producers receive information from contact tables.  March 2024-December 2025

3. RAFI-USA hosts webinars to provide introductory information on NRCS programs/services and specific forestland and farm conservation strategies that support producers in target regions, to improve knowledge of the program and financial assistance benefits. At least 3 events, 90 total attendees, 80% reporting a change in knowledge. March 2024-December 2025

4. RAFI-USA, Partners, and Farmer Allies provide plain language one-on-one and small group technical assistance to producers in targeted regions to understand NRCS programs and initiatives that apply to their production/location, interpret their FSA and NRCS eligibility, identify evident resource concerns, educate on potential conservation practices to mitigate concerns, and when requested, accompany producers on NRCS farm or office visits and/or resolve miscommunication and grievances with NRCS staff.  500 producers assisted, 425 increased knowledge, 206 applied to NRCS. March 2024-December 2025

5. On-farm demonstration events on climate-smart practices for small and/or urban farms to increase producer knowledge and increase implementation in target regions.  Includes but not limited to Residue and Tillage management-No-till, Prescribed Grazing, Pollinator Habitat Improvement, Tree and Shrub Establishment, Silvopasture, and conservation practices applied in High Tunnel Systems.  5 events, 125 attend; 100 increase knowledge, 62 increase implementation of conservation practices. March 2024-December 2025.

6. Intensive Trainings on climate-smart practice implementation and NRCS application assistance in target regions. 24 training, 365 producers attending, 292 with increased knowledge, 182 with increased implementation of conservation practices. March 2024 - December 2025.

**Resources Required**

See the Responsibilities of the Parties section for required resources, if applicable.

**J.A. 0461**

DocuSign Envelope ID: 43D64216-42F5-46F7-8615-F3DB9311F10D

DocuSign Envelope ID: F01042C0-D674-4338-8175-AFAF38E8778C

**Milestones**

See the Expected Accomplishments and Deliverables section for milestones.