No. 25-1575

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

The Sustainability Institute, *et al.*,

Plaintiffs-Appellees,

v.

Donald J. Trump, *et al.*,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of South Carolina

---

## JOINT APPENDIX: VOLUME 4

---

KIMBERLEY HUNTER
IRENA COMO
NICHOLAS S. TORREY
CARL T. BRZORAD
SPENCER GALL
*Southern Environ-*
*mental Law Center*
*136 East Rosemary*
*Street, Suite 500*
*Chapel Hill, NC 27514*
*(919) 967-1450*
*kmeyer@selc.org*
*icomo@selc.org*
*ntorrey@selc.org*
*cbrzorad@selc.org*
*sgall@selc.org*

GRAHAM PROVOST
ELAINE POON
JONATHAN MILLER
*Public Rights Project*
*490 43rd Street, Unit #115*
*Oakland, CA 94609*
*(510) 738-6788*
*graham@publicrightsproject.org*
*elaine@publicrightsproject.org*
*jon@publicrightsproject.org*

MARK ANKCORN
*Senior Chief Deputy City*
*Attorney*
*1200 Third Avenue, Suite 1100*
*San Diego, CA 92101-4100*
*(619) 533-5800*
*mankcorn@sandiego.gov*

BRETT A. SHUMATE
*Assistant Attorney*
*General*

BRYAN P. STIRLING
*United States Attorney*

DANIEL TENNY
SEAN R. JANDA
*Attorneys, Appellate*
*Staff*
*Civil Division, Room*
*7260*
*U.S. Department of*
*Justice*
*950 Pennsylvania*
*Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

# TABLE OF CONTENTS

**Page**

## Volume 1

District Court Order with Grant Chart Exhibit (May 20, 2025),
  Order, Dkt. No. 157.................................................................J.A. 1
  Grant Chart Exhibit, Dkt. No. 157-1....................................J.A. 25

District Court Order (April 29, 2025), Dkt. No. 146 ...................J.A. 31

District Court Order (April 9, 2025), Dkt. No. 52 ......................J.A. 48

District Court Order (March 31, 2025), Dkt. No. 32....................J.A. 59

Amended Complaint with Exhibits (March 26, 2025),
  Amended Complaint, Dkt. No. 23.........................................J.A. 61
  Exhibit A: First OMB Memo, Dkt. No. 23-5..................J.A. 155
  Exhibit B: Second OMB Memo, Dkt. No. 23-6 .............J.A. 157
  Exhibit C: USDA Directive, Dkt. No. 23-7 ...................J.A. 160
  Exhibit D: EPA Memo, Dkt. No. 23-8 ...........................J.A. 168
  Exhibit E: EPA Executive Order Compliance Review
  Requirement, Dkt. No. 23-9 ............................................J.A. 171
  Exhibit F: DOT Memo, Dkt. No. 23-10...........................J.A. 174
  Exhibit G: EPA Notice of DOGE Approval
  Requirement, Dkt. No. 23-11 ..........................................J.A. 178
  Exhibit H: DOT Secretary's Directive, Dkt. No. 23-12 ...............J.A. 180
  Exhibit I: DOE Memo, Dkt. No. 23-13 ...........................J.A. 183
  Exhibit J: EPA Flowchart for Equity-Related
  Grants, Dkt. No. 23-14 ...................................................J.A. 187

Exhibits to Plaintiffs' Preliminary Injunction Motion (March 26, 2025),
  Exhibit 1: Sustainability Institute Declaration, Dkt. No. 24-2 ....J.A. 190
  Exhibit 2: Agrarian Trust Declaration, Dkt. No. 24-3 .................J.A. 234
  Exhibit 3: Alliance for Agriculture Declaration, Dkt. No. 24-4 ...J.A. 324

## Volume 2

Exhibits to Plaintiffs' Preliminary Injunction Motion (cont.)
    Exhibit 4: Alliance for the Shenandoah Valley
    Declaration, Dkt. No. 24-5..................................................J.A. 463
    Exhibit 5: Bronx River Alliance Declaration, Dkt. No. 24-6........J.A. 667
    Exhibit 6: CleanAIRE NC Declaration, Dkt. No. 24-7................J.A. 735
    Exhibit 7: Conservation Innovation Fund
    Declaration, Dkt. No. 24-8..................................................J.A. 780
    Exhibit 8: Earth Island Institute
    Declaration, Dkt. No. 24-9..................................................J.A. 852
    Exhibit 9: Leadership Counsel for Justice and Accounability
    Declaration, Dkt. No. 24-10................................................J.A. 920

## Volume 3

Exhibits to Plaintiffs' Preliminary Injunction Motion (cont.)
    Exhibit 10: Marbleseed Declaration, Dkt. No. 24-11 ...................J.A. 942
    Exhibit 11: Organic Association of Kentucky
    Declaration, Dkt. No. 24-12................................................J.A. 1148
    Exhibit 12: Pasa Declaration, Dkt. No. 24-13 .............................J.A. 1368

## Volume 4

Exhibits to Plaintiffs' Preliminary Injunction Motion (cont.)
    Exhibit 13: RAFI-USA Declaration, Dkt. No. 24-14 ..................J.A. 1539
    Exhibit 14: City of Baltimore Declaration, Dkt. No. 24-15 ........J.A. 1917
    Exhibit 15: City of Columbus Declaration, Dkt. No. 24-16 ........J.A. 1988
    Exhibit 16: City of Madison Declaration, Dkt. No. 24-17..........J.A. 2006
    Exhibit 17: City of Nashville Declaration, Dkt. No. 24-18 .........J.A. 2024
    Exhibit 18: City of New Haven Declaration, Dkt. No. 24-19 .....J.A. 2039
    Exhibit 19: City of San Diego (Charvel)
    Declaration, Dkt. No. 24-20................................................J.A. 2091
    Exhibit 20: City of San Diego (Widener)
    Declaration, Dkt. No. 24-21................................................J.A. 2095

Exhibit 21: List of Plaintiffs' Grants and Statutory
Authorities, Dkt. No. 24-22 .........................................................J.A. 2124

## Volume 5

Exhibits to Plaintiffs' Reply in Support of Preliminary Injunction
Motion (April 16, 2025),
Exhibit 1: U.S. Brief in Federal Circuit, Dkt. No. 64-1 .............J.A. 2140
Exhibit 2: Chart Summarizing Plaintiffs'
Injuries, Dkt. No. 64-2 ....................................................J.A. 2242
Exhibit 3: Pasa Supplemental Declaration, Dkt. No. 64-3 .........J.A. 2247

Transcript of April 23 Hearing, Dkt. No. 142 ......................................J.A. 2252

Exhibits to Government's Response to Court Order (May 6, 2025),
Exhibit 1: Declaration of Karen Woodrich, Dkt. No. 147-1........J.A. 2325
Exhibit 2: Declaration of Patricia Kovacs, Dkt. No. 147-2 .........J.A. 2347
Exhibit 3: Declaration of Arlan Finfrock, Dkt. No. 147-3 ..........J.A. 2351
Exhibit 4: Declaration of Travis Voyles, Dkt. No. 147-4.............J.A. 2369
Exhibit 5: Packard Supplemental Search
Declaration, Dkt. Nos. 147-5 through 147-8................................J.A. 2480

## Volume 6

Exhibits to Government's Response to Court Order (cont.)
Exhibit 6: Packard Deliberative Process
Declaration, Dkt. No. 147-9.............................................J.A. 2759
Exhibit 7: Declaration of Kailee Buller, Dkt. No. 147-10 ..........J.A. 2812

Exhibits to Plaintiffs' Response to Court Order (May 12, 2025),
Exhibit 1: Table of Grants and Relief
Requested, Dkt. No. 149-1.............................................J.A. 2826
Exhibit 2: Excerpt of Transcript of Preliminary Injunction
Hearing, Dkt. No. 149-2.............................................J.A. 2832
Exhibit 3: EPA January 21 Email, Dkt. No. 149-3.......................J.A. 2838
Exhibit 4: EPA March 7 Emails, Dkt. No. 149-4.........................J.A. 2839

Exhibit 5: EPA February 22-24 Emails, Dkt. No. 149-5 ............J.A. 2841

Exhibit 6: EPA February 21-24 Emails, Dkt. No. 149-6 ...........J.A. 2843

Exhibit 7: Supplemental Declaration of the Sustainability
Institute, Dkt. No. 149-7 .................................................................J.A. 2844

Exhibit 8: Inside EPA Article, Dkt. No. 149-8............................J.A. 2853

Exhibit 9: EPA Reduction in Force Memo, Dkt. No. 149-9 .......J.A. 2855

Exhibit 10: Supplemental Declaration of
CleanAIRE NC, Dkt. No. 149-10 ..................................................J.A. 2857

Transcript of May 19 Hearing, Dkt. No. 163 .........................J.A. 2881

Notice of Appeal (May 21, 2025), Dkt. No. 159 .....................J.A. 2936

Docket Sheet ...................................................................................J.A. 2937

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# RAFI DECLARATION

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute, et al., | |
| Plaintiffs, | Civ. No. 2:25-cv-02152-RMG |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**J.A. 1540**

## DECLARATION OF KAVITA KOPPA, RAFI-USA

I, Kavita Koppa, declare as follows:

1.      My name is Kavita Koppa. I live in Greensboro, North Carolina. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration on behalf of Rural Advancement Foundation International – USA ("RAFI-USA"), a nonprofit organization affected by the federal funding pause.

2.      RAFI-USA is a 501(c)(3) nonprofit organization dedicated to supporting family farmers, rural communities, and food systems across the country. Based in North Carolina, RAFI-USA works to advance sustainable agriculture and economic justice to promote equity and resilience in rural areas. The organization focuses on key issues such as fair farm policy, disaster relief for farmers, land access and farmer-led food systems. RAFI-USA provides direct support to underserved farmers, particularly those who are Black, Indigenous, and People of Color, small-scale, or facing systemic barriers, through grant programs, technical assistance, and advocacy efforts. RAFI-USA also engages in research and coalition-building to challenge unfair agricultural policies and corporate practices that threaten independent farmers. Our work includes advocating for transparent and just supply chains, preserving seed sovereignty, and ensuring that farmers have a voice in shaping agricultural policies. RAFI-USA has 29 employees.

3.      I am the co-Executive Director at RAFI- USA. I have worked at RAFI-USA for a year and a half but worked here previously for three years.  In this more recent stint, prior to becoming co-Executive Director I was the Land Access Director and Special Projects Manager.

**J.A. 1541**

4.    RAFI-USA is the recipient of seven United States Department of Agriculture ("USDA") grants that have been disrupted by the federal funding freeze. 56% of our budget comes from federal funding.

5.    RAFI-USA was awarded a cooperative agreement with the United States Department of Agriculture (USDA) Outreach Office through the Increasing Land, Capital, and Market Access Program ("Increasing Land Access" Program) for $8,499,695 in May 2024. A team of six staff and several partners spent over 200 hours designing this program and applying for the grant funding. RAFI-USA was awarded this grant to implement the Gaining New Ground project, which improves land access and land security for underserved farmers of color in North Carolina, Florida, U.S. Virgin Islands, and Puerto Rico. The project meets the needs of underserved farmers on the edge of viability by delivering culturally-relevant outreach and education, providing targeted technical and financial assistance and examining and addressing barriers to accessing USDA programs in regions with significant populations of Black, Indigenous, and people of color farmers, particularly those who are especially vulnerable to climate change impacts.

6.    RAFI-USA was awarded a cooperative agreement with the USDA Farm Service Agency through the Distressed Borrower Assistance Network Program for $2,389,182.72 in August 2024. A team of four staff spent at least 80 hours designing this program and applying for the grant funding. RAFI-USA was awarded this grant to address the critical need for farm advocates and technical assistance providers by developing comprehensive training curriculum, piloting the recruitment and training of a new cohort of farm advocates and technical assistance providers, enhancing a peer support program, and establishing a Distressed Borrower Assistance Network. This initiative aims to equip a new generation of farm advocates and technical assistance providers with the necessary skills and support to effectively assist farmers in times of crisis, thereby ensuring the sustainability and resilience of farm communities across the nation.

**J.A. 1542**

7.      RAFI-USA was awarded a cooperative agreement with the USDA Natural Resources Conservation Service through the Climate Smart Commodities Program for $2,073,301. RAFI-USA was awarded this grant in September 2023. A team of four staff spent at least nearly 60 hours designing this program and applying for the grant funding. RAFI-USA was awarded this grant to reduce barriers for small and underserved farmers to implement climate-smart agriculture and forestry practices.

8.      RAFI-USA was awarded a Rural Development Policy Cooperative Agreement with the USDA Farm Service Agency Outreach Office for $1,548,896.68 in September 2023. This cooperative agreement was updated in June 2024 to increase the award amount to $1,707,039.82. A team of four staff spent at least nearly 100 hours designing this program and applying for the grant funding. RAFI-USA was awarded this grant to ensure that all farmers have equitable access to USDA Farm Service Agency programs and services, and to help USDA Farm Service Agency improve its ability to provide high quality customer service to all farmers.

9.      RAFI-USA was awarded a cooperative agreement with the USDA Natural Resources Conservation Service through the Equity in Conservation Outreach Cooperative Agreements program for $696,664 in March 2023. A team of three staff spent at over 90 hours designing this program and applying for the grant funding. RAFI-USA was awarded this grant to build on the successes of RAFI-USA's prior cooperative agreement with USDA Natural Resources Conservation Service by expanding delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, in the targeted regions, and continuously evaluate barriers producers face to accessing USDA Natural Resources Conservation Service programs.

10.     RAFI-USA was awarded American Rescue Plan Technical Assistance Investment Program grant from the USDA National Institute of Food and Agriculture for $425,000. RAFI-

USA was awarded this grant to work to increase familiarity with, and access to, USDA Farm Service Agency loan programs among farmers who are young and Black, Indigenous, and People of Color.

11.     RAFI-USA has not received reimbursement of federal funds for requests submitted since January 20, 2025 aside from a reimbursement through its Equity in Conservation Outreach Cooperative Agreement. RAFI-USA received a reimbursement for the Equity in Conservation Outreach Cooperative Agreement program on March 17, 2025 after waiting on reimbursement requests to be paid out since January.

12.     Farmers and rural communities are being directly harmed by the pause in RAFI-USA's grant funding. Specifically, pauses to our organization's USDA grants prevent us from supporting farmers when they need it most as federal funding they rely on outside of our work is paused and delayed. The pause in funding from the Climate Smart Commodities Program delays the organization's work to support farmers in making a plan and getting financial support to certify their products for new markets.

13.     RAFI-USA puts out a farmer-facing magazine, Living Roots, that provides various resources such as grants, workshops, webinars, and other opportunities, along with feature stories about farmers and noteworthy events. This magazine is distributed to over 1,000 farmers throughout the southeast. Without access to our Increasing Land Access grant funds and other federal funds, the organization will have to publish a scaled-back version of this magazine.

14.     RAFI-USA has invested in tools and systems to implement our federally funded programs and meet agreement requirements. For example, in anticipation of our expanded technical assistance portfolio under the Increasing Land Access Grant and Rural Development Policy Cooperative Agreement, the organization purchased a Salesforce license to build out case management data. RAFI-USA paid an external consultant $83,306.25 to customize the platform for

use with our technical assistance cases, which are almost entirely federally funded. The organization also spent about $10,000 at the end of 2024 to build out partner portals for the same two grants. Additionally, one staff person spent about 30 hours training staff on how to use the platform and about 100 hours maintaining the platform.

15.     The federal funding freeze is disruptive to the organization's operations. RAFI-USA has begun to lay off staff as a result of the freeze. RAFI-USA is risking losing up to nine staff members. Federal funding can typically be used for severance, but because funding is frozen, we do not know if we can even use the funding for the severance, which was caused by the freeze in the first place.  This means the organization has an additional month of expenses to cover without federal funds because our employee handbook dictates we provide 30 days notice to terminated staff. The federal funding freeze is also forcing RAFI-USA to reconsider its organizational structure. The organization is in the middle of a leadership transition. On March 11, 2025, our board of directors voted me to assume the co-Executive Director position. Without money flowing from our federal grants, it is unclear whether the organization can move forward with the next planned steps of the leadership transition. Additionally, staff have been pulled away from their planned work to spend time keeping up to date on the federal funding freeze and the status of our federal grant programs.

16.     RAFI-USA was supposed to hire two full-time staff in January to implement our work under our Land Access Grant. We already prepared and posted the job descriptions for both of these roles and completed the first round of interviews for one of the roles when our funding under this grant was paused. We had also planned to hire a contractor to support this project. We had to rescind an offer made to a contractor a week after the funding freeze went into effect.

17.     The pause has also harmed RAFI-USA financially. Since we have not received reimbursements for expenditures through several of our grant programs, we had to pull from our

general operating budget to continue to keep the organization and its work going. We are at the point of having to assess how deeply to pull from unrestricted or other credit sources. The closing of the organization's fiscal year has been delayed over 45 days because of the funding freeze. The organization had to open a line of credit to ensure it has sufficient cash flow.

18.    RAFI-USA's reputation and relationships have also been harmed. For 35 years, RAFI-USA's specialty has been to assist farmers and agricultural communities in navigating and accessing USDA programs. Now, we cannot provide clear guidance because we do not know what is going on with funding for these programs. Our Increasing Land Access Program was about to launch the week that the funding for this program became frozen. RAFI-USA had built exactment and demand for this program among farmers and is now forced to delay this work. We have seven farmers who are waiting to hear from me about whether RAFI-USA will be able to support them in the land purchase process with either funds or technical assistance. These farmers are on a ticking clock given the state of the farmland market, but RAFI-USA cannot help them until we have clarity on the federal funds.

19.    RAFI-USA staff and board of directors also have concerns about potential retaliation from the Administration for joining this lawsuit. Our primary fear is retaliation against farmers we have worked with. We have some concern about retaliation against the organization, but we are moving forward with this lawsuit nevertheless to make sure our funding is reinstated.

20.    The injury to RAFI-USA and its interests would be redressed by an order from the Court granting the Plaintiffs the relief they have requested.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this 26th day of March 2025.

_Kavita Koppa_
Kavita Koppa

# RAFI DECLARATION

# EXHIBIT 13-A

EQUITY IN CONSERVATION OUTREACH COOPERATIVE AGREEMENT

## APPLICANT INFORMATION

**Applicant Organization:** Rural Advancement Foundation International-USA
**Phone Number**: 919-542-1396
**Email**: jaimie@rafiusa.org
**Physical Address**: 274 Pittsboro, NC 27312
**Mailing Address**: P.O. Box 640, Pittsboro, NC 27312

### APPLICANT ENTITY TYPE

X☐ Nonprofit organization having a 501(c)(3) status with the Internal Revenue Service

### ENTITY OWNERSHIP TYPE

X☐ Other

### ORGANIZATION POINT OF CONTACTS (POC)

**Name**: Jaimie McGirt
**Title**: Agricultural Conservation and Market Access Manager
**Phone Number**: 984-282-6047
**Email**: jaimie@rafiusa.org
**Mailing Address**: P.O. Box 640, Pittsboro, NC 27312

**Name 2**: Lisa Misch
**Title 2**: Managing Director of Programs
**Phone Number 2**:919-270-8100
**Email 2**: lisa@rafiusa.org
**Mailing Address 2**: P.O. Box 640, Pittsboro, NC 27312

### AUTHORIZED ORGANIZATION REPRESENTATIVE (AOR)

**Name**:         Edna Rodriguez
**Title**:         Executive Director
**Phone Number**:   919-621-5158
**Email**:        edna@rafiusa.org
**Mailing Address**:  PO Box 640, Pittsboro, NC 27312

## PROJECT TITLE

Expanding RAFI-USA's Conservation Resources for Resilient Farms Project

## FUNDING REQUEST

**Total Funds Requested** : $999,518.07

## DURATION OF PROJECT

**Start Date**:      October 1, 2023      **End Date**:      September 30, 2025

1

**J.A. 1549**

**EXECUTIVE SUMMARY**

NRCS programs and services are currently not being accessed equitably by large numbers of historically underserved producers even though the USDA is outreaching to these producers. This project builds upon the goals and activities outlined in Rural Advancement Foundation International-USA's (RAFI-USA) existing NRCS Cooperative Agreement #NR223A750003C066 aimed at expanding delivery of conservation services to underserved, socially disadvantaged farmers and ranchers. Building upon these efforts, the proposed project aims to further increase access to NRCS programs and services for historically underserved producers, adding in Urban or USDA Urban Buffer areas, and continue evaluating barriers producers face. RAFI-USA and partners will continue collaborating to conduct regionally appropriate outreach to introduce approximately 1,000 additional producers to NRCS technical and financial assistance programs in the Southeast U.S., USVI, and Puerto Rico as well as nationally. This outreach plus technical service will result in approximately 500 producers, 350 contacts from our current project and 150 new producers, engaging in regionally relevant conservation planning and requesting NRCS assistance for climate-smart agriculture strategies and natural resource conservation practices.

Our primary intention is to assist producers through the NRCS application process, conservation planning and practice implementation, and long-term contract management. The secondary intention is educating producers on climate-smart and place-based agroecological farming practices.

We will evaluate the experience these producers have when interacting with NRCS staff and the application or contract process and produce a conclusory assessment of barriers farmers identified to inform NRCS's outreach and engagement efforts.

**LOCATION OF WORK TO BE COMPLETED**

| | | | |
|---|---|---|---|
| X Alabama | X Louisiana | X South Carolina | X Puerto Rico |
| X Georgia | X NorthCarolina | X Virginia | X Virgin Islands |

Congressional districts where work to be completed: Alabama- All, Georgia- All, Louisiana- All, North Carolina- All, South Carolina- All, Virginia- All, Puerto Rico & U.S. Virgin Islands- All

**PROJECT NARRATIVE**

### 1. PROJECT OVERVIEW

**Statement of Need**

Historically underserved farmers in the project region face multiple barriers to accessing NRCS programs and services, including language and cultural barriers, a lack of tailored programs that address their specific needs and challenges, and a lack of trust in government agencies due to a history of discriminatory practices. These barriers highlight the need for targeted outreach and education efforts tailored to small-scale producers that can build trust and understanding among underserved communities. For instance, some programs require out-of-pocket expenses for producers to implement conservation practices on their land, which can be a significant burden for limited-resource producers. Other programs may require larger land areas to achieve the strong environmental outcomes that NRCS seeks, meaning that small-scale producers may

2

**J.A. 1550**

receive lower rankings when competing in the same ranking pools as producers with larger conservation projects. Lastly, some programs do not take into account unique traditional agroecological practices, further limiting access to NRCS programs and services.

The 2022-23 assessment conducted for our current Cooperative Agreement shows that historically underserved producers in the Southeast U.S. and Caribbean territories have a high interest in and demand for NRCS programs and services. However, opportunities and barriers still exist including:

- Because NRCS applications are voluntary and competitive, the majority of producers who apply, through no fault of their own, are not funded in their first year. Only 23% of producers who were provided technical assistance in our current project year 1 were able to apply to NRCS EQIP and/or CSP because the ranking deadlines in all Southeast states came soon after the start of our project, some as early as October 2023. Some of the producers who successfully submitted may receive contracts, some will not due to the competitive nature of NRCS ranking pools. This new project will continue to support both producers awarded and not awarded in USDA FY 23-24, and serve new producer contacts with NRCS application opportunities to the end of 2025 (which includes preparing producers to apply to NRCS for USDA FY 2026 consideration by fall 2025).
- The "Get Started in 5 steps" graphic shared with producers leaves many confused about the overall process and/or how to take early steps to engage with NRCS; further, it does not clearly fit for some, discouraging them from engaging further.
- Some producers do not understand NRSC's term "resource concern" or the purpose of the mitigation program for active producers because NRCS field staff do not always explain this well. Cooperators then need to translate the concept in clear language for the producers. As one Area Conservationist stated, "*There are times when we, NRCS, know what we are saying but have a communication barrier with landowners who do not fully know the same terminology. So, again, thank you for being that go between*."
- Too many NRCS field staff do not themselves understand the Urban Initiative or Climate-Smart Agriculture and Forestry, or do not understand the relevance of these to new/beginning producers with less obvious resource concerns who are proactively conserving resources.This results in producers' missed opportunity with EQIP or CSP.

**Focus Area**

This new NRCS Cooperative Agreement will serve our current focus regions and allow us to expand the service area to all of the Southeast U.S., with an increased presence in VA, GA, FL, and LA. We know that our focus area includes a high number of historically underserved producers who are interested in NRCS services because in just 6 months of our current project, 199 producers in these targeted regions requested assistance, demonstrating a clear need for expanding outreach, education efforts, and technical assistance. The urgency of this project is heightened by the fact that the regions it serves are prone to extreme weather events, which can have devastating impacts on historically underserved producers, especially those in Puerto Rico and USVI, who have been hit hard by recent hurricanes, floods, and other natural disasters. As a result, it is critical that we work to expand access to NRCS programs and services for these populations and help them build resilience to future climate-related challenges.

**Project Community**

In our current Cooperative Agreement, 86% of service recipients are socially disadvantaged; we expect this trend to continue in the new project. The majority also are small-scale farms. Further, the U.S. Caribbean is *severely* underrepresented and disconnected from available resources and larger networks. These producers face challenges unique to their location, geography, and status as a territory, such as difficulty in transportation within and between the islands, lack of necessary infrastructure, lack of dedicated FSA staff and too few NRCS staff (USVI), and significant distrust of federal programs.

The primary challenges for our project community is that many historically underserved producers in our regions are skeptical of working with government programs; and some, especially in the territories, are suspicious that the government wants to take their property. Further, older or more established farmers are reluctant to adopt new programs and technology like cover crops and no till drilling and they prefer to see these practices in operation on another farm before they attempt to implement them on their farms.

From our current project's intake form and assessment questionnaire:
- 64% of historically underserved producers said they had never heard of NRCS programs.
- 30% of producers requesting our assistance reported a previously bad experience with NRCS, the majority experiencing difficulty understanding their eligibility and not receiving follow-up support from staff.
- 46% of producers reported that they have taken actions on their land to conserve natural resources and do not have apparent resource concerns but may qualify for the Conservation Stewardship Program as an incentive to sustain and enhance their stewardship strategy, but need assistance to follow through.

**Project Alignment**

This Cooperative Agreement project aligns with the Equity in Conservation Outreach Cooperative Agreements program in that our purpose is to expand delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, by providing culturally relevant outreach and technical assistance so these producers can overcome existing barriers. The objectives and activities of this project are designed to produce outcomes which further the program priorities of promoting the adoption of climate-smart conservation, encouraging conservation in small-scale and urban agriculture, and developing conservation leadership skills and opportunities. We are confident that this project will make a difference based on the impacts we are accomplishing in our current NRCS Cooperative Agreement; for instance, 166 historically underserved producers were helped in just six months of year 1 of the project.

**Enhancing Impact: Building on RAFI-USA's Current Efforts**

This project will build upon RAFI-USA's Resources for Resilient Farms program, which is currently carrying out the work of both an NRCS and a FSA Cooperative Agreement. Resources for Resilient Farms provides plain-language information, farmer trainings, and one-on-one assistance for USDA programs that support greater farm resilience for farmers' operations, especially for members of RAFI-USA'S Farmers of Color Network.

**J.A. 1552**

Through our current NRCS Cooperative Agreement's partnership strategy, we are already meeting NRCS's desired outcome of developing state and community-led conservation leadership for historically underserved producers and underserved communities in our target regions. In this new project, we will expand training of these leaders and equip new ones in LA and NC.

Of the historically underserved producers our current 2 technical assistance contractors have visited, 100% report improved experiences with NRCS staff and have successfully applied for FY 2023 EQIP cost-share assistance. This new project will add and equip 6 new technical assistance providers from 2 new partners as well as current partners. We will also recruit up to 5 stipended "Farmer Allies" to accompany and assist farmers when visiting with NRCS field staff in targeted regions where we have high demand for assistance or no current project team members. We are confident that this strategy will continue to support the 350 contacts served in our current project and serve 150 new contacts with quality assistance that leads to successful engagement with NRCS. This project will also increase the number and geographic range of hands-on training and demonstration days. It will also create on-farm resource hubs or practical learning sites at active farms where new/beginning farmers or conventional farmers will see and get hands-on experience with active natural resource management and NRCS-aligned conservation practice management.

## 2. PROJECT GOALS AND OBJECTIVES

The goal of this two-year project is to build on the successes of our current NRCS Cooperative Agreement to expand delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, in the targeted regions, and continuously evaluate barriers producers face to accessing NRCS programs and services to report to NRCS.

1) Outreach to 1,000 historically underserved producers to increase awareness of NRCS programs/services and recommended resource conservation practices, particularly climate-smart mitigation activities, urban initiative qualifying practices, and local agroecological practices, for small-scale producers

2) Provide technical assistance to 500 historically underserved producers in the Southeast U.S. and Caribbean Area to improve NRCS's outreach efforts and promote conservation practices on historically underserved producers' land. Technical assistance will include assessing producers' eligibility for NRCS programs and aiding them through the NRCS application process and later NRCS processes such as conservation planning, conservation practice implementation, and contract management. 350 of these producers will be returning contacts from our current project and 150 will be new contacts.

3) Equip at least 30 individuals, including farmers and agricultural advocates in the Southeast U.S. and Caribbean territories to serve as conservation leaders within their communities, to advance NRCS's ability to incorporate underserved community priorities into its implementation of NRCS conservation programs.

4) Provide the appropriate support to historically underserved producers in our target areas so that 100 producers in this project institute conservation or climate-smart practices on their land to address local natural resource issues.

J.A. 1553

### 3. THE ORGANIZATION AND PARTNERS INVOLVED (WHERE APPLICABLE)

RAFI-USA is expertly positioned to carry out the objectives and activities outlined in this Cooperative Agreement project and meet the stated outcomes because of our 30 plus years of providing outreach and technical service to small- and mid-scale farmers, our specific focus since 2015 on underserved BIPOC farmers, and our successes thus far in carrying out NRCS Cooperative Agreement #NR223A750003C066.

**About RAFI-USA**

RAFI-USA is a 501(c)(3) nonprofit organization based in Pittsboro, NC. We work across agricultural sectors and collaboratively through coalitions, combining on–the-ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farms and families, their communities and the environment. Our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities.

**RAFI-USA's Farmer of Color Network (FOCN) Program**

In 2015, the organization began a project to increase participation of farmers of color on Farm Service Agency or Soil and Water Conservation District committees. We learned that, because of past experiences with being tokenized on such committees, most farmers of color were unwilling to engage further in that direction. Based on this experience, we created the Farmers of Color Network (FOCN) in 2017. FOCN has supported more than 700 BIPOC farmers by providing farmer-led technical assistance, market access opportunities, webinars, farm tours and events. Also, through a cost-share infrastructure grants program, we awarded more than $600,000 to more than 90 socially disadvantaged farmers in the Southeast U.S., USVI and PR.

**RAFI-USA Key Personnel**

Edna Rodriguez, Executive Director, RAFI-USA: Ms. Rodriguez has been with RAFI-USA for 12 years, serving as Executive Director since 2017. She was instrumental in launching the Farmers of Color Network and expanding our efforts to the Caribbean territories. She serves on the National Sustainable Agriculture Coalition Organizational Council and on the National Family Farm Coalition's Executive Committee. She holds a B.A. in Economics with a concentration in Latin American Studies from Haverford College. ***Project Role***: *Ms. Rodriguez will conduct high level oversight of the project and continue to liaison with Caribbean partners.*

Lisa Misch, Managing Director of Programs, RAFI-USA: In addition to managing all of RAFI-USA's farmer-facing programming, Ms. Misch chairs our Direct Service team, leads our Resources for Resilient Farms program, and has managed multiple USDA-funded projects. She serves as the Project Director for the current NRCS Cooperative Agreement. She holds a B.A. in Environmental Studies from St. Olaf College. ***Project Role:*** *Ms. Misch will continue as Project Director and ensure strategic alignment of the project with other RAFI-USA work.*

Jaimie McGirt, Agriculture Conservation Manager, RAFI-USA: Ms. McGirt serves as Project Manager for our current Cooperative Agreement and provides technical assistance to producers. She also performs conservation outreach and training for historically underserved producers across the Southeast region and Caribbean Area. She has attended conferences and trainings on NRCS programs and FSA's Conservation Reserve Program. Ms. McGirt has a B. S. in

6

**J.A. 1554**

Sustainable Development, with coursework and research in agroecology and small-scale sustainable agriculture, owns a beginning farm, and has had personal experience with NRCS. *Project Role: Ms. McGirt will serve as Project Manager, supporting project partners and technical assistance providers, and the development of outreach materials, events and trainings, and will organize and facilitate partner monthly meetings. She will also continue to provide technical assistance to producers.*

Carolina Alzate Gouzy, Ph.D., Farmer Outreach Manager, RAFI-USA: For the current project, Dr. Alzate Gouzy conducts outreach and administrative activities and data collection. She has a Master's in Agribusiness and Ph.D. in Sustainable Development from Universidade de Brasília, Brazil. She was formerly CEO of Low Carbon City, which addresses climate change. She has extensive experience in Latin America working with small farmers. *Project Role: Dr. Alzate Gouzy will be responsible for data management, provide bilingual support and technical assistance to producers.*

Humon Heidarian, Farmers of Color Network Membership Manager, RAFI- USA: Mr. Heidarian is currently training as a new technical assistance provider under the current Cooperative Agreement. He has worked on an urban market farm in all areas of operation and for a value-added company producing and selling products in the metro D.C. area. He has worked in agricultural policy at all levels of government since 2017. He holds a B. S. in Environmental Science and M. S. in Public Administration. *Project Role: Mr. Heidarian will provide technical assistance to producers, with a specific focus on urban/urban buffers in the Southeast U.S., and coordinate with RAFI-USA's Farmers of Color Network membership.*

**Partner Organizations**
*Alliance for Agriculture (Subaward)*
Alliance for Agriculture (A4A) is an organization based in Puerto Rico with deep connections to farmers across the island. A4A is a partner on the current project and through it has supported 66 producers in PR thus far. A4A will host a Farmer-to-Farmer Training Program focused on Climate-Smart and conservation practices and will equip 5 host farmers to serve as primary resources for these trainings. A4A will also continue to provide direct technical assistance with producers and support the producers assisted under the current project. A4A will participate in monthly check-ins, technical assistance training events, and contribute to outreach and technical assistance tracking spreadsheets. Project Lead, Miguel Marxuach [In Kind] - miguelmarxuach@gmail.com

*Fountain Heights Farm (Subaward)*
Fountain Heights Farms (FHF) operates from 4 urban farm sites in the historic Fountain Heights community of Birmingham, AL, and is a partner on the current project. FHF has built a trusted network of BIPOC farmers throughout AL. For the new project, FHF will continue to provide technical assistance and coordinate regional events to increase awareness. Project Lead, Maria Dominique Villanueva - mdv@fountainheightsfarms.com

*Virgin Islands Good Food Coalition (Subaward)*
Good Food Coalition (GFC) is a place-based nonprofit in the U.S. Virgin Islands dedicated to improving food security, food sovereignty, and agro-sustainability for all residents in the territory and is a partner on the current project. GFC will continue its efforts to educate and provide

technical assistance to USVI producers who want to enhance their farms with conservation practices. With limited NRCS staff capacity in USVI, GFC plays a critical role in helping producers understand NRCS programs, eligibility, and financial benefits and ultimately develop trust between producers and NRCS. Lead, Sommer Sibilly Brown - sommer@goodfoodvi.org

***Faithfull Farms (Subaward)***
Faithfull Farms will be a new project partner. They are a small-scale regenerative farm utilizing conservation practices such as no-till soil management and high tunnel systems, emerging as a leader in the local urban/small farm communities of the Piedmont Region of NC. Howard Allen, founder and manager, currently mentors and provides technical assistance to 13 established and beginning farmers located throughout Central and Eastern NC, from entry level steps to farming, crop production, pest management, high tunnel construction and management, and navigating the NRCS EQIP process. Project Lead, Howard Allen - hcnella77@gmail.com

***Muse 3 Farm LLC (Subaward)***
Muse 3 Farm LLC will be a new project partner. Muse 3 Farm is located in Greensburg, LA and offers farm fresh produce to their community to help promote healthier eating. They have successfully implemented many NRCS practices on pasture land and timber land. They provide education and guidance on soil health to producers within the Florida Parishes of Louisiana. Farm staff have served as outreach and producer champions for the National Wildlife Federation. For this project, Muse 3 Farm will provide one-on-one producer mentoring and technical assistance, informational meetings/workshops, and field days on conservation practices to increase participation in NRCS programs. Project Lead, Chris Muse - musechris@gmail.com

**Coordinate work with partner organizations and leverage existing resources.**
Partner activities will be coordinated and monitored by RAFI-USA staff to ensure project cohesiveness and alignment with stated objectives and goals. In collaboration with RAFI-USA, partners will carry out proposed activities/objectives, including adapting the content and service methods to best meet the needs of their historically underserved producer audience. RAFI-USA staff will host monthly check-ins with the project partners to receive updates, discuss new outreach or technical assistance materials and on-going assessment activities, and ensure reporting and evaluation activities are on track.

| 4.  PROJECT METHODOLOGY/WORK PLAN ACTIVITIES TO ACHIEVE GOALS |
| --- |

RAFI-USA and partners will continue providing information on NRCS programs and services to historically underserved producers in the targeted regions through culturally appropriate communications such as social media and mailers, presenting at agricultural conferences, educational events including on-farm conservation demonstrations, trainings, and webinars. We will continue and expand our current technical assistance, including small group trainings, to more producers in more regions. By continuing work with existing contractors and partners, adding two new partners, and training "Farmer Allies," RAFI-USA will develop more local conservation leaders adept in place-based conservation practices and NRCS programs/services.

**Why proposed activities were selected**
RAFI-USA and our project partners have selected the proposed activities based on what we have learned thus far in carrying out our current Cooperative Agreement. We prioritize tailored, culturally and regionally appropriate information and services. This is because producers

8

**J.A. 1556**

interested in NRCS practices and programs have expressed different needs in different regions and because NRCS operates and functions somewhat differently in each state and the territories. For instance, priority resource concerns differ, environmental mitigation strategies differ, and ranking pools and available differ from place to place. In all regions, we have found it very effective to provide technical assistance in small group settings as well as on-farm demonstrations of successful conservation practices for producers to see examples working in their locale by farmers they trust.

**Plan to ensure financial accountability**
RAFI-USA has extensive experience with federal grants management, including 1) USDA FMPP 2020-23 grant #AM200100XXXXG151; 2) FSA Cooperative Agreement 2021-22 #FSA21CPT0011944; 3) Subaward with National Young Farmers Coalition on NIFA Cooperative Agreement # 2022-70416-37195 4) NRCS Cooperative Agreement #NR223A750003C066. In FY2023, we will expand our capacity to manage federal funds by hiring a full-time, dedicated Federal Grants Manager. We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence, which we will use for the proposed project. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. Additionally, we contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop will conduct the annual yellow book audits to ensure all federal funds are administered per applicable laws and regulation.

PROJECT BENEFICIARIES

| | |
|---|---|
| Historically Underserved Producer Groups | Numbers Reached/Served, total: 1000 |
|     Beginning Farmer and Rancher | Number: 250 |
|     Limited Resource Farmer and Rancher | Number: 200 |
|     **Socially Disadvantaged Farmer or Rancher:** | |
|         American Indian or Alaskan Native | Number: 30 |
|         Asian | Number: 30 |
|         Black or African American | Number: 540 |
|         Native Hawaiian or other Pacific Islander | Number: 0 |
|         Hispanic | Number: 230 |
|     Veteran Farmer or Rancher | Number: 70 |
| Students/Youth | Number: 0 |

TECHNICAL MERIT

| # | Accomplishments/Deliverables | Number of Historically Underserved Producers Reached |
|---|---|---|
| 1 | Producers receive information on NRCS programs and services, recommended resource conservation practices | 1000 |
| 2 | Producers receive technical assistance | 500 |
| 3 | Producers increase knowledge of NRCS programs and understanding of their program eligibility | 425 |

9

**J.A. 1557**

| # | Accomplishments/Deliverables | Number of Historically Underserved Producers Reached |
|---|---|---|
| 4 | Producers apply for NRCS or other financing opportunities for conservation practice implementation | 206 |
| 5 | Local conservation leaders are equipped to advance NRCS outreach and service to target historically underserved producers | 30 |
| 6 | Producers increase implementation of climate-smart agriculture and forestry and conservation practices, with or without NRCS support | 100 |

WORK PLAN

| # | Task Description | Anticipated Start Date | Anticipated Completion Date | Milestone(s) for Assessing Progress and Success |
|---|---|---|---|---|
| 1 | Partner onboarding to reporting/payment | Oct 2023 | Oct 2023 | Approx. 30 project personnel onboarded |
| 2 | Identify and contract with Farmer Allies | Oct 2023 | Dec 2023 | Approximately 6 Allies identified to serve USVI, AL, GA, FL producers |
| 3 | Conference tabling | Oct 2023 | May 2025 | 7 conferences attended, contact with at least 140 producers total |
| 4 | Conference presentations | Oct 2023 | May 2025 | 11 conferences, presentations with 300 total attendees |
| 5 | Training for new partners and technical assistance providers | Nov 2023 | Jan 2024 | 2 new partners and 6 new technical assistance providers trained |
| 6 | Develop and distribute print materials | Nov 2023 | May 2025 | 500 distributed through in-person events and mailers |
| 7 | Host Events and Webinars | Nov 2023 | Aug 2025 | At least 6 virtual/in-person events with 165 total participants |
| 8 | Outreach via mass media promotion | Dec 2023 | Sept 2023 | 20 farmer e-newsletters sent, 50+ social media posts, 25% of print magazine content on NRCS |
| 9 | Farmer Ally assistance provided | Dec 2023 | Sept 2025 | 25 producers served, 13 report positive NRCS customer experience |
| 10 | Technical Assistance by new TA providers | Jan 2024 | Sept 2025 | 150 new contacts receive technical assistance (TA) |
| 11 | On-farm Demo Events | Jan 2024 | Aug 2025 | 21 Demo events, 320 total attend |
| 12 | Farmer-to-Farmer training events | Jan 2024 | Aug 2025 | 27 training events, 365 total participants |
| 13 | Y1 Semiannual Report | April 2024 | April 2024 | 1 report submitted for Oct 2023-Mar 2024 |
| 14 | All Partner Training, planning event | May 2024 | Jan 2023 | Approximately 30 personnel (project managers and TA providers) trained |
| 15 | Technical assistance by 2022-2024 project TA providers begins when | May 2024 | Sept 2025 | 150 new contacts receive technical assistance (TA), 500 total contacts receive TA |
| 16 | Y1 Semiannual Report | Oct 2024 | Oct 2024 | 1 report submitted for Apr 2024-Sept 2024 |
| 17 | Y2 Semiannual Report | April 2025 | April 2025 | 1 report submitted for Oct 2024-Mar 2025 |
| 18 | Create Feedback on Barriers report | July 2025 | Sept 2025 | 1 Feedback on Barriers report to USDA |
| 20 | Feedback on Barriers | Aug 2025 | Sept 2025 | 6 Presentations to NRCS State |

| # | Task Description | Anticipated Start Date | Anticipated Completion Date | Milestone(s) for Assessing Progress and Success |
|---|---|---|---|---|
| | Webinars | | | Technical Advisory Committees |
| 21 | Final Report | Nov 2025 | Nov 2025 | 1 report submitted for Y1-Y2 |

**ACHIEVABILITY**

**X☐ Outcome 1: To address local natural resource issues with a focus on working with historically underserved producers and underserved communities.**

| Indicator | Description | Estimated Number |
|---|---|---|
| 1.a. | Outreach and communications to historically underserved producers in target regions on specific conservation opportunities such as the Urban and Climate-Smart Agriculture and Forestry Initiatives, Program information, deadlines, and how to prepare for NRCS assistance. | 1000 |
| 1.b. | RAFI-USA and partners table and present at Historically Black Colleges and Universities' agricultural conferences and statewide/regional conferences designed for small-scale historically underserved producers to share info on conservation strategies and accessing NRCS programs and services, and to connect producers to this project's services. | 11 conf., 440 producers receive information |
| 1.c | RAFI-USA hosts webinars/in-person events to provide introductory information on NRCS programs/services and specific forestland and farm conservation strategies that support producers in target regions, to improve knowledge of the program and financial assistance benefits. | at least 6 events, 165 total attendees |
| 1.d | RAFI-USA, Partners, and Farmer Allies provide plain language one-on-one and small group technical assistance to producers in targeted regions to understand NRCS programs and initiatives that apply to their production/location, interpret their FSA and NRCS eligibility, identify evident resource concerns, educate on potential conservation practices to mitigate concerns, and when requested, accompany producers on NRCS farm or office visits and/or resolve miscommunication and grievances with NRCS staff. | 500 producers assisted, 425 improved understand-ing, 206 applied to NRCS |

**X☐ Outcome 2: Demonstrating Climate-Smart Conservation Activities that build climate resilience, by mitigating climate change through reducing GHG emissions and/or sequestering carbon, or by adapting agriculture to a world with a changing climate, building a more sustainable future through effective environmental practices on the land.**

| Indicator | Description | Estimated Number |
|---|---|---|
| 2.a. | On-farm demonstration events on climate-smart practices for small and/or urban farms to increase producer knowledge and increase implementation. Includes but not limited to Residue and Tillage management-No-till, Prescribed Grazing, Pollinator Habitat Improvement, Tree and Shrub Establishment, Silvopasture, and conservation practices applied in High Tunnel Systems. | 21 events, 320 attend. 256 increase knowledge, 120 increase implementation |
| 2.b. | Farmer-to-Farmer Trainings for small groups to increase producer knowledge and increase implementation on producers' farms. Trainings focus on 1) implementation and long term management of climate-smart and conservation practices and 2) NRCS application processes to support implementation and management of these practices. | 27 trainings, 365 attend. 292 increase knowledge, 100 increase implementation |

11

**J.A. 1559**

**X☐ Outcome 4: Developing state and community-led conservation leadership for historically underserved producers and underserved communities.**

| Indicator | Description | Estimated Number |
|---|---|---|
| 4.a. | Project and technical assistance training on NRCS programs and services for new technical assistance providers | 6 trained |
| 4.b. | Project planning and technical assistance training for all providers in Urban Initiative and Climate-Smart Agriculture and Forestry | 15 trained |
| 4.c. | Identify and train ad hoc "Farmer Allies" experienced with NRCS programs and conservation practice implementation to provide peer support to producers in their region. Allies will identify the producers' NRCS resource concerns, help producers understand NRCS terminology in plain language, and navigate NRCS visits on-farm or in-office. | 5 Allies trained, 25 producers supported |

| Outcome Indicator # | How did you derive estimated numbers? | How and when do you intend to evaluate? | Anticipated key factors predicted to contribute to and restrict outcome |
|---|---|---|---|
| 1.a. | 24 farmer e-news (2000 BIPOC producers) 50+ social media posts, each reaching up to 20,000 farmers and ag-orgs. Farmer focused magazine mailed 4 times a year to farmers & ag orgs. | A monthly review of metrics informs subsequent messaging and approach. | RAFI-USA sends 4 types of e-news. Of total list of 13,500, 2000 are BIPOC producers. RAFI-USA currently has 18,000 social media followers in addition to partners' channels. Additionally the print magazine currently reaches 3,000 farmers. *Need to create a digital content calendar with all partners responsible for digital media production. Need to request advanced notice of ranking date deadline from NRCS State Technical Advisory Committees for communications purposes.* |
| 1.b. | Tabling, presenting at 11 regional conferences, averaging 26 attendees, totaling 290 producer contacts Muse 3 Farm outreach at 1 rancher meeting, 150 present. | Will provide contact table sign-in sheets and/or presentation participant sign-in sheets for each to count number and follow up | Conferences already identified have a defined audience of historically underserved producers and we historically participate. Muse 3 Farm historically presents to regional Cattleman's Association. *Need to propose strong presentations applicable to a wide variety of attendees and submit presentation proposals well in advance. Partners have incorporated conference fees and travel costs for attending these events.* |
| 1.c. | RAFI-USA will host at least 3 virtual events/90 participants total, 3 in-person events/75 total attendees. Increase of knowledge of 80% participants | Poll participants to evaluate knowledge at the beginning of events, evaluate for change in knowledge at the end of events survey | In addition to Project team's outreach, RAFI-USA's FOCN communicates and engages with more than 700 socially disadvantaged members in the targeted regions at least monthly. We have already identified 2 state level staff experts in soil health and wildlife/forestry to present. *Need to identify more experts to present on conservation topics who have NRCS field experience, can speak to relevance of NRCS across all regions.* . |
| 1.d. | 350 of 500 are returning contacts, 150 are new | All-partner monthly call to assess project | 9 technical assistance providers in current project are already assisting 350 producers, with 166 farmers served in Yr 1. 2 new project |

12

**J.A. 1560**

| Outcome Indicator # | How did you derive estimated numbers? | How and when do you intend to evaluate? | Anticipated key factors predicted to contribute to and restrict outcome |
|---|---|---|---|
|  | contacts. 80% of 500 will have improved understanding of eligibility with NRCS, 40% will apply to NCRS or other financial assistance | progress. Partners submit quarterly reports including producer contacts, producers served, and events held. Post project survey of producers served for increased understanding and who applied. | partners will add 4 new providers. *Need: Partners hire 2 additional providers (for 15 providers total) and 6 Farmer Allies identified to serve 150 additional, new producers with technical assistance and outreach to identify new producer contacts requiring technical assistance.* Training for providers will ensure high quality technical assistance that leads to 425 producers reporting an improved understanding of their eligibility with NRCS. Training on application materials and requirements will assist preparing 206 producers to apply to NRCS. |
| 2.a. | 13 Caribbean events with 110 participants, 8 mainland events w/ 210 participants, 80% participants w/ increased knowledge, 20% participants implementing practices | Participant sign-ins, poll to evaluate knowledge at beginning and end of events, post-project survey to measure implementation of practices learned and NRCS program participation | All partners hosting on-farm demonstrations have experience implementing climate smart and other conservation practices through NRCS contracts on their land and have a experience hosting tours and demos on their farms for the target numbers and historically underserved populations. *Need: Back-up shelter due to weather events or public safety considerations such as webinar options. Follow-up assistance with participants will be needed to increase conservation practice implementation rate because demo days often only show one stage of a practice and not longer term management. Need to identify Caribbean on-farm demonstration hosts with historical implementation of EQIP/CSP.* |
| 2.b. | 27 mainland events w/ 365 participants, 80% participants w/ increased knowledge, 20% participants implementing practices | Participant sign-ins, poll to evaluate knowledge at beginning and end of events, post-project survey to measure implementation of practices learned and NRCS program participation | 3 subaward partners have historical local mentorship activities on their farms for new/beginning or conventional farmers in climate-smart and conservation practices. *Need: Unforeseen weather events, pandemic safety concerns warrant back-up shelter or public safety considerations; Webinar alternatives would be less effective target audience may be unable to attend multiple trainings for best outcome so provide these farmers with one-on-one assistance following trainings to assist application of learnings* |
| 4.a. | 6 new technical assistance providers, by region: AL - 1 | Pre and post training evaluation to measure change in knowledge | 9 technical assistance providers in the current project are successfully trained. 4 of the 6 new providers have a history of applying and receiving NRCS assistance to implement practices. 3 of the 6 have a history of NRCS |

| Outcome Indicator # | How did you derive estimated numbers? | How and when do you intend to evaluate? | Anticipated key factors predicted to contribute to and restrict outcome |
|---|---|---|---|
| | USVI -1, LA-3, NC-1 | and other future training needs in specific topic areas. | outreach and technical assistance with historically underserved producers. *Need: Partners hire 2 additional providers and train on NRCS programs and conservation planning. Hiring challenges facing the service industry warrants competitive compensation and quality mentorship throughout the project.* |
| 4.b. | 15 providers, by region: USVI-3, PR-1, LA-3 AL-2, VA-1 NC/SC-2, Southeast-3 | Pre and post evaluation to measure change in knowledge of Urban and Climate Smart Ag and Forestry | Identified 1 NRCS Outreach Specialist and 1 NRCS Urban-area Engineering specialist committed to assisting with training. *Challenges/Need: NRCS Urban and CSAF Initiatives are in development and local staff do not yet have operation guidelines to support partners when they seek info for themselves or producers. Identify additional NHQ staff or NRCS Specialists for tailored training.* |
| 4.c. | 5 new Farmer Allies, by region: GA - 1, FL -1, USVI - 1, AL-2; 25 producers supported is 5% of total producers receiving technical assistance, 50% of those (12) will have improved customer experience with NCRS | Pre and post evaluation of Allies to measure readiness for field visits w/producers and project reporting needs. Survey of producers served by Allies to evaluate change | Farmers visited by project personnel in Y1 of current project report improved NRCS customer experience when accompanied by project team member. *Need: Will train Farmer Allies in barriers known to the project team from prior experience with their current Cooperative Agreement. RAFI-USA and partners identify farmers with sufficient time to serve as Allies to support occasional producer visits, a challenge considering farmers' busy schedules in planting and harvest seasons.* |

### EXPERTISE AND PARTNERS

| # | Name and Title of Key Staff & Consultants | RAFI-USA Staff Role | Relevant Experience and Past Successes |
|---|---|---|---|
| 1 | *Edna Rodriguez, Executive Director* RAFI-USA | RAFI-USA and Project high-level oversight, liaison with Caribbean partners [In-kind] | RAFI-USA Executive Director since 2017, developed and responsible for multiple USDA funded projects |
| 2 | *Lisa Misch, Managing Director of Programs* RAFI-USA | Project Director, ensure strategic alignment of project with other work by RAFI-USA | Has been a program manager since 2017, developed and managed multiple USDA funded projects, currently Managing Director of Programs |
| 3 | Jaimie McGirt, Agriculture Conservation Manager, RAFI-USA | Project Manager, support partners and service providers, development of outreach materials and events, organize & facilitate monthly meetings, provide technical assistance | Initially hired as a coordinator on current NRCS project, was promoted in 2022 to Project Manager, has performed conservation outreach and technical assistance across the Southeast region and Caribbean Area |
| 4 | Dr. Carolina Alzate-Gouzy, | Data management, provides bilingual support, and technical assistance to producers | Since 2022 served this role in our current Cooperative Agreement |

14

| # | Name and Title of Key Partners | Partner Role | Relevant Experience and Past Successes |
|---|---|---|---|
| | Farmer Outreach Manager, RAFI-USA | | |
| 5 | Humon Heidarian, FOCN Membership Manager, RAFIUSA | Provide technical assistance to project beneficiaries, with a focus on urban farmers in the Southeast | Has worked in urban agriculture activities for several years, is training as a technical assistance provider for this project |
| 6 | Jacob Crandle, Consultant RAFI-USA | Provide guidance to technical assistance providers as needed as deliver one-on-one technical assistance | Ag. Program Specialist with NCDA's Small & Minority Farm Program. Retired NRCS employee. Current NRCS project consultant. |
| 7 | Anita Roberson, Consultant RAFI-USA | Provide one-on-one and small group training, technical assistance to producers | Anita started Botanical Bites & Provisions in 2015 and farms in VA. Current NRCS project consultant. |
| # | Name and Title of Key Partners | Partner Role | Relevant Experience and Past Successes |
| 1 | Sommer Sibilly-Brown, ED Good Food Virgin Island Coalition | Project Lead, high level supervision, primary liaison with RAFI-USA, manages budget, ensures deliverables as required | Implemented a farm-to-school program in the VI. Vice Chair of the National Farm to School Network's Board. Current NRCS project partner lead |
| 2 | Miguel Marxuach, ED Alliance for Agriculture | Project Lead, oversee team, primary liaison with RAFI-USA [In Kind] | Co-founder of Alliance for Agriculture. 30 year business experience. Current NRCS project partner lead |
| 4 | Dominique Villanueva, ED Fountain Heights Farms | Project oversight, social media communications, technical assistance, trainings, & events | Co-founded a 467 member BIPOC-centered Food Coop. Current NRCS project partner lead |
| 5 | Howard Allen, Faithfull Farms | Will lead on-farm trainings for a cohort of beginning urban, small scale producers, demo days, one-on-one technical assistance | Beginning farmer specializing in operation and demonstration of profitable no-till market farming, year-round high tunnel production |
| 6 | Chris Muse, Muse 3 Farms LLC | Responsible for project management, scheduling, project financials, event and technical assistance coordination, reporting and training | Over 32 years of project management experience. He and his brothers have successfully implemented conservation practices through NRCS EQIP and CSP programs |

PROJECT MANAGEMENT PLAN

RAFI-USA will serve as the organizational project lead and will be responsible for the budget, reporting, and evaluation requirements. RAFI-USA has extensive previous experience with federal grants management including our current NRCS Cooperative Agreement #NR223A750003C066 and is currently active as a USDA cooperative agreement and grant recipient and subrecipient. We will use similar systems and procedures to ensure overall management of this project as well as financial and regulatory compliance. RAFI-USA staff will host monthly check-ins with project partners to receive updates, discuss new outreach or technical assistance materials, national and state NRCS program announcements and changes, and ensure reporting and evaluation activities are on track.

This project will be housed under the Resources for Resilient Farms project of RAFI-USA's Farmers of Color Network (FOCN), a project already active in outreach and education to farmers of color on FSA and NRCS programs and additional topics that contribute to more resilient farming operations. This project will play an active role in RAFI-USA's cross-programmatic Direct Service Team.

15

J.A. 1563

| FISCAL PLAN AND RESOURCES | |
| --- | --- |

**BUDGET SUMMARY**

| Expense Category | Funds Requested |
| --- | --- |
| Personnel | $251,464.30 |
| Fringe Benefits | $100,585.74 |
| Travel | $21,711.03 |
| Equipment | $0 |
| Supplies | $9,000 |
| Contractual | $33,300 |
| Other | $527,216 |
| Direct Costs Subtotal | $943,277.07 |
| Indirect Costs @10% rate | $56,241.00 |
| Total Budget *(direct +indirect)* | $999,518.07 |

Will Entity be requesting indirect cost?  **Yes**

If yes, will it be a NICRA or De Minimis? ☐  NICRA            X☐  De Minimis

**PERSONNEL**

|  |  |  |  |  |
| --- | --- | --- | --- | --- |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**PERSONNEL JUSTIFICATION**

**<u>PERSONNEL – Total Cost: $251,464.30</u>**

The personnel expenses include salaries for all project staff members who will be directly involved in the execution of the project. The personnel costs are based on RAFI-USA's salary tiers for the positions required and include an annual 3% cost of living adjustment. Personnel funds requested for each staff member are as follows:

Edna Rodriguez, Executive Director (in-kind) - $0.00
- RAFI-USA and Project high-level oversight, liaison with Caribbean partners

Lisa Misch, Managing Director of Programs - $25,995.20
- Project Director, ensure strategic alignment of the project with other work by RAFI-USA.

16

**J.A. 1564**

Salary: 2023 Salary: $85,051; 2024 salary: $87,762; 2025 salary: $90,569
FTE: Yr 1: 0.20, Yr 2: 0.15 / Totals: Yr 1: $14,602.64; Yr 2: $11,392.57; Total: $25,995.210

Jaimie McGirt, Program Manager - $59,311.52
- Project Manager, support partners and service providers, development of outreach materials and events, organize & facilitate monthly meetings, provide technical assistance.

Salary: 2023 Salary: $66,560; 2024 salary: $68,658; 2025 salary: $70,839
FTE: Yr 1: 0.18, Yr 2: 0.82 / Totals: Yr 1: $10,481.28; Yr 2: $48,830.24; Total: $59,311.52

Carolina Alzate Gouzy, Farmer Outreach Manager - $64,145.30
- Data management provides bilingual support and technical assistance to producers.

Salary: 2023 Salary: $62,858; 2024 salary: $64,855; 2025 salary: $66,938
FTE: Yr 1: 0.35, Yr 2: 0.80 / Totals: Yr 1: $19,129.26; Yr 2: $45,016.04; Total: $64,145.30

Humon Heidarian, TA Provider - $88,741.44
- Provides technical assistance to project beneficiaries, with a focus on urban farmers in the Southeast, and liaisons with the Farmers of Color Network.

Salary: 2023 Salary: $62,858; 2024 salary: $64,855; 2025 salary: $66,938
FTE: Yr 1: 0.80, Yr 2: 0.80 / Totals: Yr 1: $43,749.49; Yr 2: $44,991.94; Total: $88,741.443

Joe Pellegrino, Communication Coordinator - $13,270.89
- Communications support for outreach activities and other project needs.

Salary: 2023 Salary: $51,750; 2024 salary: $53,302; 2025 salary: $54,897
FTE: Yr 1: 0.15, Yr 2: 0.15 / Totals: Yr 1: $6,790.996; Yr 2: $6,479.89; Total: $13,270.89

Total Personnel Funds: Yr 1: $94,753.67 +  Yr 2: $156,710.68  =  $251,464.30
**Total Personnel Funds Requested: $251,464.35**

| Fringe Benefits | | |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Fringe Benefits Justification

**FRINGE BENEFITS - Total Cost: $100,585.74**

17

**J.A. 1565**

Fringe benefits represent the additional costs related to employee compensation, such as employer taxes, paid time off (sick, holiday, vacation), health and dental plan, health reimbursement arrangement, life insurance, workers comp, 401k, short-term disability insurance, and more. The fringe benefits rate for this project is calculated at 40% of the personnel costs and has been determined using the organization's established policies.

Lisa Misch, Managing Dir. of Programs: Yr 1: $5,841.05, Yr 2: $4,556.03; Total: $10,398.08
Jaimie McGirt, Program Mgr: Yr 1: $4,192.51, Yr 2: $19,532.10; Total: $23,724.61
Carolina Alzate-Gouzy, Outreach Mgr: Yr 1: $7,651.70, Yr 2: $18,006.41; Total  $25,658.12
Humon Heidarian, TA Provider: Yr 1: $17,499.80, Yr 2: $17,996.78; Total: $35,496.58
Joe Pellegrino, Communications Coordinator: Yr 1: $2,716.39, Yr 2: $2,591.96; Total: $5,308.36

TRAVEL

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

TRAVEL JUSTIFICATION

**TRAVEL - Total Costs: $21,711.03**
Travel expenses are necessary for project staff to attend meetings, conferences, and other events directly related to the project. This includes costs for transportation, lodging, mileage, and per diem allowances. Travel expenses have been estimated based on the number of trips required, the distance of travel, and the duration of each trip.

**Trip 1 - Puerto Rico**
RT airfare: 4 travelers x $500 = $2,000
Per diem for Utuado: 3 travelers x 3 days x $279 = $2,511
Per diem for San Juan: 3 travelers x 2 days x $282 = $1,692
Car rental: 5 days x $100 = $500
Total for Trip 1: $6,703

**Trip 2 - St. Croix, USVI**
RT airfare: 4 travelers x $600 = $2,400
Per diem for St. Croix: 4 travelers x 4 days x $367 = $5,872
Rental car: 1 traveler x 4 days x $90 = $360
St. Croix to St. Thomas transportation: 4 travelers x $120 = $480

18

**J.A. 1566**

Per diem for St. Thomas: 2 travelers x 2 days x $367 = $1,468
Rental car: 1 traveler x 2 days x $100 = $200
Total for Trip 2: $10,780

**Mileage -** Ongoing travel to mainland farmers for TA and events: 4 travelers x estimated total of 6,455 miles @ $0.655/mi = $4,228

---

CONFORMING WITH YOUR TRAVEL POLICY

X☐ *By checking the box to the right, I confirm that my organization's established travel policies will be adhered to when completing the above-mentioned trips in accordance with* 2 CFR 200.474 *or* 48 CFR subpart 31.2 *as applicable.*

EQUIPMENT

| | | | | |
|---|---|---|---|---|
| | | | | **0** |

EQUIPMENT JUSTIFICATION

**EQUIPMENT - Total Cost: $0**

SUPPLIES

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

SUPPLIES JUSTIFICATION

**SUPPLIES - Total Cost: $9,000**
The supplies budget category includes various items that will support the project's day-to-day operations. The following items are included in this budget category:
1. Laptop replacement: A new laptop is required in July 2024 to replace an old and outdated one. This is a one-time expense with an estimated cost of $800.
2. General Office Supplies: These supplies are needed on an ongoing basis to ensure the smooth running of the project. The cost of these supplies varies and is estimated at $960 for the year.

19

**J.A. 1567**

3. Cell Phone Service: *(Billed monthly)*
   a. Jaimie McGirt, Program Manager, requires cell phone service for 16 months at a total cost of $832 ($52 x 16)
   b. and Carolina Alzate Gouzy, Farmer Outreach Manager, requires cell phone services for 16 months at the cost of $832. ($52 x 16)
   c. Humon Heidarian, TA Provider, requires cell phone service for 24 months at a cost of $1,248. ($52 x 24)
   d. Total cost of cell phone services for the three staff members is $2,912.
4. Salesforce - 2 licenses: The organization requires two licenses of Salesforce for 24 months at a cost of $432 per license. This is an ongoing expense. Total: $864
5. Expensify (Monthly Subscription): The project requires two subscriptions of Expensify software for 24 months at a cost of $18 per month per user. Total: $864
6. Mailchimp (Annual Subscription): The organization requires a Mailchimp subscription to deliver mass emails to producers and project participants. Pro-rated one-year subscription at a cost of $500 per year. Total: $500.
7. Form Assembly (License): The organization requires one license of Form Assembly at the cost of $2,100 to create intake forms and survey forms to be used in project activities.

**Total Supplies Funds Requested: $9,000.**

Contractual/Consultant

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Contractual Justification

**CONTRACTUAL- Total Cost: $33,300**

The following itemized contractors/consultants are necessary to ensure that the project is carried out effectively and efficiently and offer high quality Technical Assistance in the cited states. The funds requested for each contractor/consultant are as follows:

1. Jacob Crandle, Consultant (NC) - Hourly Rate: $40/hr - 5 hrs per week - 60 weeks - Total: $12,000
2. Anita Roberson, Consultant (VA) - Hourly Rate: $40/hr - 8 hrs per week - 60 weeks - Total: $19,200

20

**J.A. 1568**

3.  TBD, Farmer Ally (GA) - Hourly Rate: $25/hr - 2 hrs per week - 15 weeks - Total: $750
4.  TBD, Farmer Ally (FL) - Hourly Rate: $25/hr - 2 hrs per week - 15 weeks - Total: $750
5.  Speaker Fees - Flat Rate: $200 per speaker for 3 speakers - Total: $600

**Total Contractual Funds Requested:  $33,300**

---

CONFORMING WITH YOUR PROCUREMENT STANDARDS

X☐ *By checking the box to the right, I confirm that my organization followed the same policies and procedures used for procurements from non-federal sources, which reflect applicable State and local laws and regulations and conform to the Federal laws and standards identified in 2 CFR Part 200.317 through 326, as applicable. If the contractor(s)/consultant(s) are not already selected, my organization will follow the same requirements.*

OTHER

| Item Description | Per-Unit Cost | Number of Units | Acquire When? | Funds Requested |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| **Other Subtotal** |  |  |  |  |

---

OTHER JUSTIFICATION

**OTHER - Total Cost: $527,216**

This section contains costs that don't fall under other categories, mainly our communication expenses and subawards, as directed in the funding announcement. The announcement stated, "*Include subawards in this category. According to 2 CFR Section 200.92, a subaward is given by a pass-through entity to a subrecipient to help them complete a portion of a federal award that the pass-through entity received.*"

**SUBAWARDS:**

1.     **Alliance for Agriculture (Subaward) - Total Request: $172,464**

| 1 | Project Coordinator | $37/hr per 28h/week | $76,664 |
|---|---|---|---|
| 2 | Administrative Staff | $25/hr per 18h/week | $46,800 |
| 3 | Stipends for Host Farms | $1,250 per event x 14 | $17,500 |
| 4 | Workshop Promotion | $750 per event x 14 | $36,000 |
| 5 | Multimedia Specialists / Workshop Documenter | $1,250 per event x 14 | $17,500 |
| 6 | Supplies | $250 per event x 14 | $3,500 |

21

**J.A. 1569**

|  | Total Costs, years 1 & 2 |  | $172,464 |
|---|---|---|---|

**2.    Good Food Coalition (Subaward) - Total Request: $$139,190**

| | | | |
|---|---|---|---|
| 1 | Project Director | 102,000 p/yr x 10% FTE | $14,450 |
| 2 | Project Management | 90,000 p/yr x 5% FTE | $6,375 |
| 3 | Communications, Marketing, Outreach | 81,600 p/yr x 5% FTE | $23,120 |
| 4 | TA Case Manager | 500 hrs/year x $22.73/hr | $19,125 |
| 5 | Technical Assistance + Outreach Coordinators | 54,000 p/yr x 35% FTE | $26,775 |
| 6 | Technical Assistance + Outreach Coordinators | 54,000 p/yr x 35% FTE | $26,775 |
| 7 | Interisland flight | $250/flight x 2 people x 6 trips TA travel | $3,000 |
| 8 | Lodging | $250/night x 2 people x 2 nights x 4/year | $4,000 |
| 9 | Car Rental | $1000/week x 4 times / year for TA visits | $5,000 |
| 10 | Marketing + Outreach supplies (printing, banners, nametags, folders) | $1.50/unit x 500 | $750 |
| 11 | Event hosting supplies | (e.g. industrial canvas tent, tablecloths, beverage cooler, coolers, rolling supply bin, clipboards) | $1,000 |
| 12 | Farmer Ally, VIGFC | $150 x 12 contacts / year | $3,600 |
| 13 | Stipends/Honorarium for Farmer/Ranchers | $400/farmer x 4 Demo Days farmer-farmer trainings annually | $3,200 |
| 14 | Advertising: local radio and social media | $60/17 months social media + 1,000 local radio | $2,020 |
| | Total Costs, years 1 & 2 | | $139,190 |

**3.    Fountain Heights Farm (Partner & Farmer Collaborator) = $99,093.50**

| | | | |
|---|---|---|---|
| 1 | Project Coordinator | 77,000 p/yr x 25% FTE - 17 months | $27,270.83 |
| 2 | Outreach Coordinator | 31,053 p/yr x 100% FTE - 17 months | $43,991.75 |
| 3 | Marisela Williams, Photographer / Videographer | $70/hr x 120 hr | $8,400 |
| 4 | Mileage: Green County, Tuskeegee, Enterprise, Madison (AL) | 2483 miles x $0.625/mile | $1613,75 |
| 5 | Lodging | 18 nights x $138/night | $3,5608 |
| 6 | Farmer listening session and survey participant gift cards | $50 x 30 listening session | $1,500 |
| 7 | On-farm meeting lunch | $12 x 100 farmers | $1,200 |
| 8 | Host Farmer | $350 x 2 | $700 |

22

| 9 | Tania Roulston, Creative Director/ Designer, Brilliant So Brilliant LLC | 10,850 | | 10,850 |
|---|---|---|---|---|
| | Total Costs, years 1 & 2 | | | 99,093.50 |

## **Muse 3 Farms LLC ( Partner & Farmer Collaborator) = $52,246.30**

Located in Greensburg, LA, Muse 3 Farm LLC will be a new project partner and allow us to serve farmers located in Lousiana and Mississippi effectively while building local conservation leadership. Muse 3 Farm will provide one-on-one producer mentoring and technical assistance, scheduling, informational meetings/workshops, and field days on conservation practices to increase participation in NRCS programs. A summary of expenses by category is as follows, followed by a detailed summary by catergory:

Personnel: $44,400.00
Travel: $2,921.30
Supplies: $575
Other: $4,350.00
Total: $52,246.30

Personnel - Total Cost: $44,400
- *Chris Muse - Project Manager;* (Total hours: 528 x $30/hr = $15,840) - Chris has 32 years of project management experience and will oversee project management, scheduling, financials, issue management, meetings, coordination, procurement, reporting, and training.
- *Burnell Muse - Land and Soil Manager;* (Total hours: 352 x $25/hr = $8,800) - Burnell has 37 years of experience as a Soil Scientist and will focus on Soil Health and Cover Crops. He will provide one-on-one consulting and training to minority farmers.
- *Mittie Muse - Forest and Wildlife Manager;* (Total hours: 352 x $25/hr = $8,800) - Mittie has a B.S. in Plant & Soil Science and 30+ years of experience with the TX Railroad Commission. She will focus on forestry and wildlife conservation, providing 1-on-1 assistance to minority farmers.
- *Allen Muse - Lead Farmer;* (Total hours: 192 x $25/hr = $4,800) - Allen is a Marine Corp veteran with 40+ years of supervisory experience. He manages the gardens and animals on Muse 3 Farm and will provide mentorship and guidance to farmers who want hands-on interaction.
- *Michelle Muse - Social Media Manager / Planner;* (Total hours: 176 x $20/hr = $3,520) Michelle has 20+ years of event planning experience and manages the social media platforms for the farm. She will provide social media support and be responsible for posting project-related activities on the company's Instagram and Facebook pages.
- *Juanita Muse - Admin;* (Total hours: 176 x $15/hr = $2,640) - Juanita has worked 30+ years in the banking industry and will provide administrative support, including tour scheduling, conference room scheduling, sign-in sheets, liability management, and timekeeping.

**J.A. 1571**

Travel - Total Cost: $2,921.30
- *NRCS Meetings* (Approximate Date of Travel: 11/2023) - Attend initial meetings with local NRCS personnel covering 7 parishes to review project objectives and gain buy-in for attending meetings with farmers. Travelers: 3 x 60 miles / Cost per Mile: $0.655; Total: $589.50
- *USDA Informational Meetings* (Approximate Date of Travel: 09/2024) - Attend two informational gathering sessions with various USDA organizations to review programs applicable to farmers. Travelers: 4 x 100 miles / Cost per Mile: $0.655; Total: $524.00
- *Farmer One-on-One Sessions* (Approximate Date of Travel: 01/2024) - Visit farms to meet with farmers, with an avg trip distance of 35 miles one way; estimate 14 trips over the project duration. Travelers: 2 x 70 miles /Cost per Mile: $0.655; Total: $1283.80
- *Field Days* (Approximate Date of Travel: 07/2024) - Travel to host farms to demonstrate conservation practices. Travelers: 4 x 100 miles /Cost per Mile: $0.655;  Total: $524.00

Supplies - Total Cost: $575:
- *Cover Crop Seeds* (Acquire: Jan 2024) - To be used for the pasture land conservation practice demonstration, highlighting the importance of cover crops for soil health. The demonstration will be featured during the field day, with some crops being planted using a drill. Per-Unit Cost: $110 x  1 bag (25lbs) = $110
- *No-Till Drill Rental* (Acquire: 7/2024) -To be used for the pasture land conservation practice demonstration, showcasing the benefits of using a no-till drill for planting in order to minimize soil disruption. Per-Unit Cost: $300 x 1 = $300
- *Pens and Notebooks* (Acquire: 1/ 2024) -These pens and notebooks will be distributed to meeting participants for note-taking purposes. Per-Unit Cost: $1.10 x 150 = $165

Other - Total Cost: $4,350:
- *Conference Room Rentals* (Acquire: 3/2024) - Rent conference rooms for the 2 workshops and 2 USDA Informational Sessions. Per-Unit Cost: $300 x  4 = $1,200
- *Printed Flyers* (Acquire: 3/ 2024) - Printed flyers to communicate planned events for the project.Per-Unit Cost: $0.30 x  1,000 = $300
- *Printed Agendas* (Acquire: 3/ 2024) - Provide printed agendas for all events to be distributed to participants. Per-Unit Cost: $0.50 x  500 = $250
- *Signage for Field Day* (Acquire: 6/2024 & 6/2025) - Signs to direct participants to field day locations.Per-Unit Cost: $25 x 8 =  $200
- *Farmer Field Day Host Stipend* (Acquire: 7/ 2024) - Provide host farms with a stipend for the field day.Per-Unit Cost: $600 x  2 =  $1,200
- *Audio/Visual Equipment Rental* (Acquire: 3/ 2024) -Rent projector and sound equipment for workshops and meetings. Per-Unit Cost: $300 x  4 = $1,200

**Faithfull Farms (Partner & Farmer Collaborator) = $42,872.00**

*Summary:*
Personnel: $35,000.00
Supplies: $5172.20
Other: 2,700.00

Personnel - Total Cost: $35,000
Howard Allen, Farm Instructor, and Technical Assistance Provider - $35,000
(1,000 hours x $35/hour = $35,000 )

Supplies - Total Cost: $5,172.20
The following supplies are necessary to offer demonstration projects to farmers. These items are part of a caterpillar tunnel kit and complimentary add-on features, and include some construction supplies for demonstrating a low-cost, high-tunnel system that can improve plant health and vigor in a no-till market garden.

- Gothic Caterpillar Tunnel Kit - 16ft x 50ft/5Ft/Pro ($2,580.00) - Used to provide a structure for season extension of crops and production of crops in a controlled environment.
- Gothic Tunnel Cross Bracing - Single piece with hardware ($16.20) - Used to strengthen the gothic caterpillar tunnel and ensure stability in windy conditions.
- DIY End Wall Kit - Woven poorly plastic (2 at $520.00 each) ($1,040.00) - Used to close off the ends of the caterpillar tunnel to protect crops from outside weather and pests.
- Trellising Assembly Kit - 50ft Kit (2 at $162.00 each) ($324.00) - Used to provide support for climbing plants and maximize space utilization.
- Shade Cloth - 20ft x 55ft With Clips / 50 percent ($302.00) - Used to regulate light levels and temperature for better crop growth and management.
- Spring Wire and Channel Kit (93 inch) - 10 Pack ($150.00) - Used to provide a method for attaching shade cloth and trellising to the gothic caterpillar tunnel.
- Ground Cover - 4ft x 300ft ($142.00) - Used to prevent weed growth, reduce soil erosion and retain moisture for improved crop growth.
- Quick Plant Fabric - Pattern #39 / 300ft ($235.00) - Used to suppress weed growth while allowing air, water, and nutrients to pass through to the soil and crops.
- Ground Cover Anchoring Pins - 6 inch 11 gauge (500 per box) ($55.00) - Used to secure ground cover and quick plant fabric to the soil and prevent movement or slippage.
- Caterpillar Tunnel taxes + shipping ($328.00) - Additional cost for taxes and shipping.

---

**RAFI-USACommunications Expenses - Total Cost: $21,350**

25

**J.A. 1573**

- Social media advertising for 6 events at $250 each for a total cost of $1,500: We will allocate $250 per event for social media advertising to increase attendance and engagement. Total = $1,500.
- Advertising in conference programs at 3 conferences at a cost of $500 each for a total cost of $1,500: We will allocate $500 for advertising in conference programs at each of the 3of the conferences we plan to attend. Total = $1,500.
- Video production for various conservation practices at a cost of $2,000 per year: We plan to produce videos on various conservation practices at a cost of $2,000 per year.
- Living Roots Farmer Magazine publication with 25% of the content related to NRCS issues for 5 issues at a total cost of $17,000: We will publish 5 issues of Living Roots Farmer Magazine with 25% of the content related to NRCS issues at a cost of $3,400 per issue for a total cost of $17,000.
- Printing, mailing, and postage for brochures specific to urban and climate smart information for conferences, mailings, and site visits. Estimated total = $1,492.

### INDIRECT COSTS

| Indirect Cost Rate | BASE | Funds Requested |
|---|---|---|
| | | |
| **Indirect Subtotal** | | |

**INDIRECT COSTS: $56,498**

| | **Budget** | **Indirect Eligible Amounts** |
|---|---|---|
| Personnel | $251,464.3 | $251,464.3 |
| Fringe Benefits | $100,585.74 | $100,585.74 |
| Travel | $21,711.03 | $21,711.03 |
| Equipment | 0 | 0 |
| Supplies | $9,000 | $9,000 |
| Contractual | $33,300.00 | $33,300.00 |
| Other*** | $527,216 | $146,350 |
| Total | $943,277.07 | $562,411.07 |

10% = $56,241.00 Total Indirect Costs

| ***Other Indirect Cost Breakdown* | **Budget** | **Indirect Eligible Amounts** |
|---|---|---|
| Subaward, Alliance for Agriculture | $172,464 | $25,000 |
| Subaward, Virgin Islands Good Food Coalition | $139,190 | $25,000 |
| Subaward, Fountain Heights Farm | $99,093.50 | $25,000 |

26

**J.A. 1574**

| | | |
|---|---|---|
| Subaward, Muse Farms LLC | $52,246.30 | $25,000 |
| Subaward, Faithful Farms | $42,872.20 | $25,000 |
| Remaining Other Expenses/Communications: | $21,350 | $21,350 |
| ***Total Other*** | **$527,216** | **$146,350** |

## OTHER

DO YOU HAVE OR HAVE HAD AN AGREEMENT OR GRANT WITH NRCS?

x☐ Yes          ☐ No

IF YES, LIST THE GRANTS OR AGREEMENTS AND PROVIDE A BRIEF DESCRIPTION OF HOW THIS PROJECT APPLICATION IS DIFFERENT.

| # | Grant Program | Description of Difference |
|---|---|---|
| 1 | #NR223A750003C066 | Was outreach and technical assistance only for a smaller number of producers. |
| 2 | | |
| 3 | | |

HAVE YOU SUBMITTED THIS PROJECT PROPOSAL TO ANOTHER FEDERAL OR STATE GRANT PROGRAM?

☐ Yes          X☐ No

IF YES, LIST THE FEDERAL OR STATE GRANT PROGRAM AND DESCRIBE HOW THE PROJECT IS DIFFERENT.

| # | Grant Program | Description of Difference |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

Budget Narrative

27

**J.A. 1575**

# RAFI DECLARATION

# EXHIBIT 13-B



**U.S. Department of Agriculture**
**Natural Resources Conservation Service**

NRCS-ADS-093

### NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number<br><br>NR243A750003C062 | 2. Amendment Number | 3. Award /Project Period<br><br>Date of Final Signature<br>- 03/30/2026 | 4. Type of award instrument:<br><br>Cooperative Agreement |
|---|---|---|---|

| 5. Agency (Name and Address)<br><br>USDA, NRCS Outreach and Advocacy Division<br>c/o FPAC-BC Grants and Agreements Division<br>1400 Independence Ave SW, Room 3236<br>Washington, DC 20250<br>Direct all correspondence to FPAC.BC.GAD@usda.gov | 6. Recipient Organization (Name and Address)<br><br>RURAL ADVANCEMENT FOUNDATION INTERN ATIONAL-USA RAFI USA<br>PO BOX 640<br>PITTSBORO NC 27312-0640<br><br>UEI Number: 961684198 / DUNS Number: Z1AXE15PHAL3<br>EIN: 561704863 |
|---|---|

| 7. NRCS Program Contact<br><br>Name: Erica Westbrook<br>Phone: 479-883-7468<br>Email: erica.westbrook@usda.gov | 8. NRCS Administrative Contact<br><br>Name: LESLIE ROBERTS<br>Phone: (202)690-9021<br>Email: leslie.roberts@usda.gov | 9. Recipient Program Contact<br><br>Name: Jaimie McGirt<br>Phone: (984) 282-6047<br>Email: jaimie@rafiusa.org | 10. Recipient Administrative Contact<br><br>Name: Jaimie McGirt<br>Phone: (984) 282-6047<br>Email: jaimie@rafiusa.org |
|---|---|---|---|

| 11. CFDA<br><br>10.902 | 12. Authority<br><br>16 U.S.C. 2001-2009<br>16 U.S.C. 2004<br>16 U.S.C. 3801 et seq<br>16 U.S.C. 590a-590f, 590q<br>7 CFR 12<br>7 U.S.C. 1010a | 13. Type of Action<br><br>New Agreement | 14. Program Director<br><br>Name: Lisa Misch<br>Phone: (919) 270-8100<br>Email: lisa@rafiusa.org |
|---|---|---|---|

15. Project Title/ Description:  Expanding RAFI-USA's Conservation Resources for Resilient Farms Project

16. Entity Type:  M = Nonprofit with 501C3 IRS Status (Other than Institution of Higher Education)

17. Select Funding Type

| Select funding type: | ☒ Federal | ☐ Non-Federal |
|---|---|---|
| Original funds total | $696,664.00 | $0.00 |
| Additional funds total | $0.00 | $0.00 |
| Grand total | $696,664.00 | $0.00 |

18.  Approved Budget

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 45 of 606

DocuSign Envelope ID: 5018A2C9-B67A-4008-8175-AEAF38E9778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 40 of 378

| Personnel | $0.00 | Fringe Benefits | $0.00 |
|---|---|---|---|
| Travel | $0.00 | Equipment | $0.00 |
| Supplies | $0.00 | Contractual | $0.00 |
| Construction | $0.00 | Other | $696,664.00 |
| Total Direct Cost | $696,664.00 | Total Indirect Cost | $0.00 |
| | | Total Non-Federal Funds | $0.00 |
| | | Total Federal Funds Awarded | $696,664.00 |
| | | Total Approved Budget | $696,664.00 |

This agreement is subject to applicable USDA NRCS statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any, found by NRCS to have been overpaid, will be refunded or credited in full to NRCS.

| Name and Title of Authorized Government Representative LOUIS ASPEY NRCS Associate Chief | Signature | Date |
|---|---|---|
| Name and Title of Authorized Recipient Representative EDNA RODRIGUEZ Executive Director | Signature *Edna Rodriguez* DocuSigned by: ECB1EB90E0D4490... | Date 3/8/2024 |

**NONDISCRIMINATION STATEMENT**

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

**PRIVACY ACT STATEMENT**

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 46 of 606

DocuSign Envelope ID: E01842CB-B674-4828-8175-AEAF39E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 41 of 378

### Statement of Work

**Purpose**

The Outreach and Partnerships Division (OPD) within the U.S. Department of Agriculture's Natural Resources Conservation Service (USDA NRCS) provides leadership and funding for outreach to ensure that all programs and services are made accessible to all NRCS customers and are treated fairly and equitably with emphasis on reaching the underserved farmers or ranchers and landowners. NRCS is providing funding through "Equity in Conservation Outreach Cooperative Agreements." This award is in the best interest of the Government and necessary to provide outreach and technical assistance to underserved communities.

The purpose of this agreement, between the U.S. Department of Agriculture, Natural Resources Conservation Service (NRCS) and Rural Advancement Foundation International-USA (Recipient), is:

NRCS programs and services are currently not being accessed equitably by large numbers of historically underserved producers even though the USDA is outreaching to these producers. This project builds upon the goals and activities outlined in Rural Advancement Foundation International-USA's (RAFI-USA) existing NRCS Cooperative Agreement #NR223A750003C066 aimed at expanding delivery of conservation services to underserved, socially disadvantaged farmers and ranchers. Building upon these efforts, the proposed project aims to further increase access to NRCS programs and services for historically underserved producers, adding in Urban or USDA Urban Buffer areas, and continue evaluating barriers producers face. RAFI-USA and partners will continue collaborating to conduct regionally appropriate outreach to introduce approximately 1,000 additional producers to NRCS technical and financial assistance programs in the Southeast U.S., USVI, and Puerto Rico as well as nationally. This outreach plus technical service will result in approximately 500 producers, 350 contacts from our current project and 150 new producers, engaging in regionally relevant conservation planning and requesting NRCS assistance for climate-smart agriculture strategies and natural resource conservation practices.

Our primary intention is to assist producers through the NRCS application process, conservation planning and practice implementation, and long-term contract management. The secondary intention is educating producers on climate-smart and place-based agroecological farming practices.

We will evaluate the experience these producers have when interacting with NRCS staff and the application or contract process and produce a conclusory assessment of barriers farmers identified to inform NRCS's outreach and engagement efforts.

Locations of work to be completed are in Alabama, Georgia, Louisiana, South Carolina, Puerto Rico, North Carolina, Virginia, Virgin Islands.

Congressional districts where work to be completed:  Alabama -ALL, Georgia- All, Louisiana- All, North Carolina- All, South Carolina- All, Virginia- All, Puerto Rico & U.S. Virgin Islands- All

**Objectives**

The goal of this two-year project is to build on the successes of our current NRCS Cooperative Agreement to expand delivery of conservation services to historically underserved producers, including producers in Urban or USDA Urban Buffer areas, in the targeted regions, and continuously evaluate barriers producers face to accessing NRCS programs and services to report to NRCS.

Objective 1. Outreach to    500 historically underserved producers to increase awareness of NRCS programs/services and recommended resource conservation practices, particularly climate-smart mitigation activities, urban initiative qualifying practices, and local agroecological practices, for small-scale producers.

Objective 2. Provide technical assistance to 500 historically underserved producers in the Southeast U.S. and Caribbean Area to improve NRCS's outreach efforts and promote conservation practices on historically underserved producers' land. Technical assistance will include assessing producers' eligibility for NRCS programs and aiding them through the NRCS application process and later NRCS processes such as conservation planning, conservation practice implementation, and contract management. 350 of these producers will be returning contacts from our current project and 150 will be new contacts.

Objective 3. Equip at least 15 individuals, including farmers and agricultural advocates in the Southeast U.S. and

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 47 of 606

DocuSign Envelope ID: F01842CB-B674-4828-8175-AEAF39E8778C
2:25-cv-02152-RMC    Date Filed 03/26/25    Entry Number 24-14    Page 42 of 378

Caribbean territories to serve as conservation leaders within their communities, to advance NRCS's ability to incorporate underserved community priorities into its implementation of NRCS conservation programs.

Objective 4. Provide the appropriate support to historically underserved producers in our target areas so that 100 producers in this project institute conservation or climate-smart practices on their land to address local natural resource issues.

**Budget Narrative**

The official budget described in this Budget Narrative will be considered the total budget as last approved by the Federal awarding agency for this award.
Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the amount obligated. Advances are authorized for expenditures projected for up to 90 days.

TOTAL BUDGET - FEDERAL FUNDS $696,664.00
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
Personnel = $208,556.47
Fringe Benefits = $79,042.90
Travel = $8,174.49
Equipment = $0.00
Supplies = $4,681.00
Contractual = $31,200.00
Other = $318,645.25
Direct Costs Subtotal = $650,300.11
MTDC = $463,638.86
Indirect Costs @10% rate = $46,363.89

Total Budget (Direct + Indirect) = $696,664

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

TOTAL PERSONNEL COSTS: $208,556.47

PERSONNEL:
Program Director: Lisa Misch =$35,739
Program Manager: Jaimie McGirt = $98,138
Farm Outreach Manager: Carolina Alzate Gouzy = $71,091
Communications Coordinator:  Joe Pellegrino = $3,588

Personnel Justification
The personnel expenses include salaries for all project staff members who will be directly involved in the execution of the project. The personnel costs are based on RAFI-USA's salary tiers for the positions required and include an annual 3% cost of living adjustment.
    Lisa Misch, Program Director, ensures strategic alignment of the project with other work by RAFI-USA.    Annual Salary Yr. 1 $88,027, Annual Salary Yr. 2 $90,668; 0.2% FTE, 24 months, Total funding = $35,739
Jaimie McGirt, Program Manager, responsible for supporting partners and service providers, development of outreach materials and events, organizing and facilitating monthly meetings, and providing technical assistance to producers. Annual Salary Yr. 1 $65,057, Annual Salary Yr. 2 $67,009; 0.53% FTE Yr. 1, 12 months; 0.95% FTE Yr. 2, 12 months. Total funding = $98,138
Carolina Alzate Gouzy, Farmer Outreach Manager, responsible for data management, providing bilingual support and technical assistance to producers.  Annual Salary Yr 1 $48,793, Annual Salary Yr 2 $50,257; 0.53% FTE Yr 1, 12 months; 0.9% FTE Yr. 2, 12 months. Total funding = $71,091.

Joe Pellegrino, Communication Coordinator, provides communications support for outreach activities and other project needs.   Annual Salary Yr. 1 $53,560, Annual Salary Yr. 2 $55,167; 0.033% FTE, 24 months, Total funding = $3,588

TOTAL FRINGE COSTS: $79,042.90

FRINGE BENEFITS:
Fringe benefits include, but are not limited to, the costs of leave (e.g., vacation, family related, sick or military), employee insurance, and unemployment benefit plans. Fringe benefits are calculated at 37.9% for full-time, salaried employees.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 48 of 606

DocuSign Envelope ID: F018426B-D674-4828-8175-AEAF39E9778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 43 of 378

Lisa Misch, Program Director: (total funds requested) $35,739 X 37.9% = $13,545
Jaimie McGirt, Program Manager: (total funds requested) $98,138 X 37.9% = $37,194
Carolina Alzate-Gouzy, Farm Outreach Manager: (total funds requested) $71,091 X 37.9% = $26,944
Joe Pellegrino, Communications Coordinator:(total funds requested) $3,588 X 37.9% = $1,360

++++++++++++++++++++++++++++++++++++++++++++++++
TOTAL TRAVEL COSTS: $8,174.49

Trip 1 - Puerto Rico, site visit, year 2
Project staff site visit in Puerto Rico to meet with Alliance for Agriculture staff. One project representative travel round trip from RDU to airport to San Juan, PR for a total of 4 nights: 3 days in Utuado and 2 days in San Juan. RAFI staff representative will join Alliance for Agriculture staff for farm site visits, including TA delivery, meetings with local NRCS staff, and project-specific meetings.
RT airfare: 1 traveler x $500 = $500
Per diem for Utuado: 1 traveler x 3 days x $279 = $837
Per diem for San Juan: 1 traveler x 2 days x $282 = $564
Car rental: 5 days x $100 = $500
Total for Trip 1: $2,401

Approximate Date of Travel: March-July 2024. The one traveler mentioned above will be Jaimie McGirt. The rates that are being used are within the government per diem rates.

Trip 2 - St. Thomas, USVI, site visit, year 2
Project staff site visit in US Virgin Islands to meet with Good Food Virgin Island Coalition staff. One project representative travel round trip from RDU airport to St. Thomas, USVI, for a total of 2 nights. RAFI staff representative will join Virgin Islands Good Food Coalition staff for farm site visits, including TA delivery, meetings with local NRCS staff, and project-specific meetings.

RT airfare: 1 traveler x $600 = $600
Per diem for St. Thomas: 1 traveler x 2 days x $367 = $734
Rental car: 1 traveler x 2 days x $100 = $200
Total for Trip 2: $1,534

Approximate Date of Travel: March-July 2024. The traveler mentioned above will be Jaimie McGirt. The rates that are being used are within the government per diem rates.

Mileage - Ongoing travel to mainland farmers for TA and events: 1 traveler x estimated total of 6472.5 miles @ $0.655/mi = $4,239.49
Mileage is necessary for project staff to attend farm visits, meetings, conferences, and other events to connect with NRCS staff and to provide technical assistance to producers. Approximately 36 - 40 trips during the project period.
EQUIPMENT- Total Federal Share: $0

TOTAL SUPPLIES COSTS: $4,681
The supplies budget category includes various items that will support the project's day-to-day operations. The following items are included in this budget category:

1. General Office Supplies: These supplies are needed on an ongoing basis to ensure the smooth running of the project. The cost of these supplies varies and is estimated at $960 for the project.
a. General office supplies $11/month x 20 months = $220
b. Pocket folders 250 X $0.90 = $225
c. Copies 1000 copies x.10/copy = $100
d. Flip Charts for partner outreach events and conference presentations = 5 x $55/2-pack= $275
e. Computer monitor = $140
2. Cell Phone Service: (Billed monthly)
   a. Jaimie McGirt, Program Manager, requires cell phone service for 16 months at a total cost of $832 ($52 x 16)
   b. Carolina Alzate Gouzy, Farmer Outreach Manager, requires cell phone services for 16 months at the total cost of $832. ($52 x 16)
   Total cost of cell phone services for the two staff members = $1,664
3. Expensify is the expense management system the organization uses and is necessary to ensure financial accounting and reporting for the project. (Monthly Subscription): The project requires two subscriptions of Expensify software for 24 months at a cost of $18 per month per user. This is an ongoing expense. 2 X $18 X 24, Total: $864
4. Mailchimp is the platform the organization uses to deliver mass emails to producers and project participants and supports Objectives 1, 3, and 4; pro-rated at 10% of total annual subscription for organization, $250/year for 2 years. Total: $500.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 49 of 606

DocuSign Envelope ID: F019429CB D674 4828-8175-AEAF39E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 44 of 378

5. Form Assembly - 1 license - is the platform the organization uses to create intake forms to receive technical assistance inquiries and survey forms, so this data is integrated into Salesforce and supports Objectives 2 and 4. One license at $2,100; this project requires 33% of the usage = $693.

TOTAL CONTRACTUAL COSTS: $31,200
The following itemized contractors/consultants are necessary to ensure that the project is carried out effectively and efficiently and offer high quality Technical Assistance in the cited states. The funds requested for each contractor/consultant are as follows:

1. Jacob Crandle, Consultant (NC) - Hourly Rate: $40/hr - 5 hrs per week - 60 weeks - Total: $12,000
NC Agricultural Program Specialist (Retired NRCS employee); Current NRCS project consultant. Provide guidance to technical assistance providers as needed and deliver one-on-one technical assistance in North and South Carolina and other states as assigned by the RAFI-USA Program Manager.

2. Anita Roberson, Consultant (VA) - Hourly Rate: $40/hr - 8 hrs per week - 60 weeks - Total: $19,200
Farmer with NRCS expertise; Current NRCS project consultant. Provide one-on-one and small group training, technical assistance to producers in Virginia, Maryland, and other states as assigned by the RAFI Program Manager.

CONSTRUCTION: Total Federal Share: $0

++++++++++++++++++++++++++++++++++++++++++++++
TOTAL COST OTHER:  $318,645.25

Alliance for Agriculture (Subaward) - Total Request: $129,316
Alliance for Agriculture, a current NRCS subaward, will organize and run a Farmer-to-Farmer Training Program focusing on Climate Smart and NRCS funded practices with educational materials and will provide producers with direct TA assistance. Furthermore, the Alliance for Agriculture will continue to support producers who received TA assistance under the current cooperative agreement.

Project Coordinator $45 / hr for 20 hrs/week for 87 weeks, total $78,300
Coordinator is the lead person overseeing the Alliance's project and is direct liaison with host farms and local NRCS offices.  The program Coordinator provides direct TA assistance and field support.
Administrative Staff $25 / hr for 12 hrs/week for approximately 104 weeks, total $31,200
Administrative Staff provide back-office support to field operations and to the coordinator. Includes aggregation of data, communications, reporting and compliance.
Stipends for Host Farms $45 / hr for 24 hours of event prep x 8 training events, total $8,640.
Training will be held on farms where climate smart practices are being successfully implemented. The Farm Host will serve as the primary resource for the training.
Training Promotion $25 / hr rate for 15 hours per event for 8 events, total $3,000. This person will oversee social networks, email marketing, graphic art and copy to effectively promote each event.
Multimedia Specialists / Workshop Documenter $35 / hr rate for 15 hours per event, including documentation and editing x 8 events, total $4,200. This person will oversee documenting the training with video and photos and deliver curated material for sharing openly with the broader farming community in Puerto Rico.
Resource Expert $100 /hour for 5 hours of event prep and event instruction x 4 events, total $2,000.  Resource experts will join 4 of the on-farm training events as an expert in particular conservation practices.
Lodging $200/night for 4 events for 2 project personnel, total $1,600
Car Rental $94     /per event for 4 events, total $376

Good Food Coalition (Subaward) - Total Request: $62,525.00
Good Food Coalition (GFC) is a partner on the current NRCS project. GFC will continue its efforts to educate and provide technical assistance to USVI producers who want to enhance their farms with conservation practices, as well as play a critical role in helping producers understand NRCS programs, eligibility, and financial benefits and ultimately develop trust between producers and NRCS.
Project Manager Annual Salary $52,000, 15% FTE, 18 months = $11,700.00
   Project Manager ensures overall compliance of Good Food Coalition Subaward, including oversight of contracts and payment, budget management and invoicing RAFI-USA for reimbursement. Will support TA/Case Manager in tracking outcomes and ensure they are collecting required grant evaluation data and ensure GFC submits timely reports to RAFI-USA for complaint USDA reporting.
TA Case Manager Annual Salary $52,000, 25% FTE, 18 months = $19,500
TA Case Manager completes farmer intake forms and assigns TA cases to Technical Assistance and Outreach Coordinators for site visits and other technical assistance delivery. Works with NRCS/FSA form management for eligibility and application for services. Works with RAFI-USA TA Team to develop technical assistance plans and collect farmer feedback.
Technical Assistance + Outreach Coordinators (2 positions) Annual Salary $40,560, 25% FTE X 18 months x 2 (TA & Outreach Coordinators) = $30,420

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 50 of 606

DocuSign Envelope ID: F01842CB-B674-4928-8175-AEAF39E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 45 of 378

Assigned Farmer TA Cases, provide technical assistance to St. Croix, St. John, St. Thomas producers, identification of resource needs on the farm and how they may pair with NRCS eligible programs. Conduct field visits with NRCS as requested by the producer or field office.

Marketing + Outreach supplies = $905

Printing business / project appointment cards for team members to distribute during networking and outreach events; $1.50/unit x 500 = $750. 18X24 poster = $14.50/each X 6 = $87, 18X48 banner = $34 each X 2 = $68. Total Printing = $905 .

All printed materials will include NRCS logo.

Fountain Heights Farm (Subaward) - Total Request: $48,701.75

Fountain Heights Farms (FHF) operates from 4 urban farm sites in the historic Fountain Heights community of Birmingham, AL, and is a partner on the current NRCS project. FHF will continue to provide technical assistance and coordinate regional trainings to increase awareness.

Project Director, Annual Salary $77,000, 25% FTE, 17 months = $27,270.83

Project Director provides overall project oversight, serves as primary RAFI-USA contact, leads Alabama team with identifying BIPOC farmers, conducts outreach and provides technical assistance, social media content creator and management, curriculum for training the trainer for Farmer Allies, attending and presenting at conferences.

Photographer / Videographer $70/hr x 60 hrs (5 hrs/month X 12 months) = $4,200.00

Photographer and Videographer Marisela Williams is responsible for visual documentation of all events and for capturing visual content to be used on all social media channels, in print, and for presentations.

Mileage: For 6 trips with Alabama, approx. 2575.45 total miles X $0.655/mile =    $1,686.92

Fountain Heights Farm will conduct 4 train the trainer workshops for farmers in AL, as well as present at 3 Farmer Conferences. Farmer conferences and train the trainer workshops with identified farmer leaders will increase the dissemination of accurate information to smaller urban and rural BIPOC farmers and farm communities and raise awareness about NRCS.

Trip 1: Train the trainer workshop for farmers in Greene County, AL. Completed in Q4, 2025
Trip 2: Train the trainer workshop for farmers in Tuskegee, AL. Completed in Q4, 2025
Trip 3: Train the trainer workshop for farmers in Enterprise, AL. Completed in Q4, 2025
Trip 4: Train the trainer workshop for farmers in Madison, AL. Completed in Q4,2025
Trip 5: AAMU Small Farm Community Outreach Conference, Presenting in AL. March 2025
Trip 6: Tuskegee University Annual Farmers Conference, Presenting in AL. February 2025
  Trip 7: Black Urban Gardeners Conference, Presenting in Texas. October 2024 = in-kind

Lodging & Per Diem = $3,494
Trip 3: Enterprise, AL, 3 days, 2 nights, 1 Traveler, Lodging and per diem = $746.00
Trip 5: AAMU Conf, 5 days, 4 nights, 2 Travelers, Lodging and per diem = $1,374.00
Trip    6: Tuskegee Univ.  Conf, 5 days, 4 nights, 2 Travelers, Lodging and per diem = $1,374.00

On-farm meeting light refreshments $12/per person x 25 participants/per workshop X 4 workshops = $1,200
Light refreshments for 100 farmers in training to maintain continuity of training experience, especially in rural communities of Green County, AL, Tuskegee, AL, Enterprise, AL and Madison, AL where farmer training is to take place.

Creative Director/ Designer, $70/hr. x 155 hrs. = $10,850
Tania Roulston of Brilliant So Brilliant, designs all virtual and in-print materials/ collateral for training events and conference workshops; creates and maintains a cohesive representation on all social media platforms (Facebook, Twitter, Instagram, TikTok) for the project, schedule posts and manage comments on all platforms.

Muse 3 Farms (Subaward) - Total Request: $39,006.30

Muse 3 Farm, Greensboro, LA has successfully implemented many NRCS practices on pastureland and timber land and provides education and guidance on soil health to producers in LA. They will provide one-on-one producer mentoring and technical assistance, informational meetings/workshops, and field days on conservation practices to increase participation in NRCS programs.

Personnel - Total Cost: $32,960.00

Chris Muse - Project Manager; (Total hours: 528 x $30/hr = $15,840) - Chris has 32 years of project management experience and will oversee project management, scheduling, financials, issue management, meetings, coordination, procurement, reporting, and training.

Burnell Muse - Land and Soil Manager; (Total hours: 352 x $25/hr = $8,800) - Burnell has 37 years of experience as a Soil Scientist and will focus on Soil Health and Cover Crops. He will provide one-on-one consulting and training to minority farmers.

Allen Muse - Lead Farmer; (Total hours: 192 x $25/hr = $4,800) - Allen is a Marine Corp veteran with 40+ years of supervisory experience. He manages the gardens and animals on Muse 3 Farm and will provide mentorship and guidance to farmers who want hands-on interaction.

Michelle Muse - Social Media Manager / Planner; (Total hours: 176 x $20/hr = $3,520) Michelle has 20+ years of event planning experience and manages the social media platforms for the farm. She will provide social media support and be

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 51 of 606

DocuSign Envelope ID: E018A9CB-B674-4828-8175-AEAF39E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 46 of 378

responsible for posting project-related activities on the company's Instagram and Facebook pages.

Travel - Total Cost: $2,921.30
NRCS Meetings (Approximate Date of Travel: January & February 2024 - Attend 5 initial meetings with local NRCS personnel covering 7 parishes to review project objectives and gain buy-in for attending meetings with farmers. 5 trips X 3 travelers    x 60 miles / Cost per Mile: $0.655; Total: $589.50
USDA Informational Meetings (Approximate Date of Travel: 09/2024) - Attend two informational gathering sessions with various USDA organizations to review programs applicable to farmers. 2 trips X 4    travelers    x 100 miles / Cost per Mile: $0.655; Total: $524.00
Farmer One-on-One Sessions (Approximate Date of Travel: February 2024-November 2025 - Visit farms to meet with farmers, with an avg. trip distance of 35 miles one way; estimate 14 trips over the project duration. Travelers: 2 x 70 miles /Cost per Mile: $0.655; Total: $1283.80
Field Days (Approximate Date of Travel: July 2024) - Travel to 2 host farms to demonstrate conservation practices. 2 field days X 4    travelers    x 100 miles /Cost per Mile: $0.655; Total: $524.00

Supplies - Total Cost: $575:
Cover Crop Seeds (Acquire: 1/2024) - To be used for the pastureland conservation practice demonstration, highlighting the importance of cover crops for soil health. The demonstration will be featured during the field day, with some crops being planted using a drill. Per-Unit Cost: $110 x 1 bag (25lbs) = $110

No-Till Drill Rental (Acquire: 7/2024) -To be used for the pastureland conservation practice demonstration, showcasing the benefits of using a no-till drill for planting in order to minimize soil disruption. Per-Unit Cost: $300 x 1 = $300

Pens and Notebooks (Acquire: 1/ 2024) -These pens and notebooks will be distributed to meeting participants for note-taking purposes. Per-Unit Cost: $1.10 x 150 = $165

Other - Total Cost: $2,550
Conference Room Rentals (Acquire: 3/2024) - Rent conference rooms for the 2 indoor workshops.  Per-Unit Cost: $300 x 2 = $600
Printed Flyers (Acquire: 3/ 2024) - Printed flyers to communicate planned events for the project. Per-Unit Cost: $0.30 x 1,000 = $300
Printed Agendas (Acquire: 3/ 2024) - Provide printed agendas for all events to be distributed to participants. Per-Unit Cost: $0.50 x 500 = $250
Signage for Field Day (Acquire: 6/2024 & 6/2025) - Signs to direct participants to field day locations. Per-Unit Cost: $25 x 8 = $200
All printed materials will include NRCS logo.
Farmer Field Day Host Stipend (Acquire: 7/ 2024) - Provide host farms with a stipend for hosting a field day and presenting how the farm has worked with NRCS to implement conservation practices.  Per-Unit Cost: $300 x 2 = $600
Audio/Visual Equipment Rental (Acquire: 3/ 2024) -Rent projector and sound equipment for workshops and meetings. Per-Unit Cost: $300 x 2 = $600

Faithfull Farms (Subaward) - Total Request: $32,112.20
Faithfull Farms will provide one-on-one farmer technical assistance to 20 farmers and provide group education and training on conservation practices within high tunnels and small-scale farm operations.  Group education and trainings will include a 10-person cohort with 8 training days, 3 on-farm demonstration days with approximately 75 total participants, and 1 conference presentation on applying to NRCS for High Tunnel Systems.

Personnel: Howard Allen, Farm Instructor, and Technical Assistance Provider 714 hrs x $35/hour =$24,990)
Howard Allen will be the Farm Instructor and Technical Assistance provider.  Farm Instruction includes small group mentorship at 8 cohort meetings, leading 3 demonstration days, and presenting at 1 conference on applying to NRCS for High Tunnel Systems, crop production, and conservation practices within high tunnels on small scale farm operations
Supplies - Total Cost: $5,172.20
The following supplies are necessary to offer demonstration projects to farmers. These items are part of a caterpillar tunnel kit and complimentary add-on features, and include some construction supplies for demonstrating a low-cost, high-tunnel system that can improve plant health and vigor in a no-till market garden.
Gothic Caterpillar Tunnel Kit - 16ft x 50ft/5Ft/Pro ($2,580.00) - Used to provide a structure for season extension of crops and production of crops in a controlled environment.
Gothic Tunnel Cross Bracing - Single piece with hardware ($16.20) - Used to strengthen the gothic caterpillar tunnel and ensure stability in windy conditions.
DIY End Wall Kit - Woven poorly plastic (2 at $520.00 each) ($1,040.00) - Used to close off the ends of the caterpillar tunnel to protect crops from outside weather and pests.
Trellising Assembly Kit - 50ft Kit (2 at $162.00 each) ($324.00) - Used to provide support for climbing plants and maximize space utilization.
Shade Cloth - 20ft x 55ft With Clips / 50 percent ($302.00) - Used to regulate light levels and temperature for better crop growth and management.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 52 of 606

DocuSign Envelope ID: F01842CB-B674-4828-8175-AEAF39E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 47 of 378

Spring Wire and Channel Kit (93 inch) - 10 Pack ($150.00) - Used to provide a method for attaching shade cloth and trellising to the gothic caterpillar tunnel.

Ground Cover - 4ft x 300ft ($142.00) - Used to prevent weed growth, reduce soil erosion and retain moisture for improved crop growth.

Quick Plant Fabric - Pattern #39 / 300ft ($235.00) - Used to suppress weed growth while allowing air, water, and nutrients to pass through to the soil and crops.

Ground Cover Anchoring Pins - 6-inch 11 gauge (500 per box) ($55.00) - Used to secure ground cover and quick plant fabric to the soil and prevent movement or slippage.

Caterpillar Tunnel taxes + shipping ($328.00) - Additional cost for taxes and shipping.

Meeting Expenses - Total Cost: $1,950

Cohort Trainings - Light Refreshments @ $15/cohort member x 10 cohort members x 8 Cohort meetings (1 every two months), $1,200 - Small group training events in high tunnel construction/operation and applying conservation practices on small scale, no-till farm operation.

Demonstration Days - Light Refreshments @ $15/event participant x 25 participants x 2 demo days, (1 every three months) $750 - Large group events for hands on demonstration of high tunnel construction/operation and individual conservation practices on small scale, no-till farm operation; 1 additional demo day will have meals provided from in-kind source.


RAFI-USA Communications Expenses – Total Cost: $6,984.00

1. Social media advertising for 6 events at $250 each for a total cost of $1,500.

2. Living Roots Farmer Magazine publication; printing/mailing at $5/each magazine; with 25% of the content each issue related to NRCS, prorated $1.25/magazine X 4 issues X 800 printed/mailed per issue = $4,000

3. Total Printing/Mailing = $1,484

a. Current NRCS Brochure Reprinting/Mailing at $1.26/each X 150 = $189

b. New NRCS program guidebook from TA provider perspective, Printed/Mailed at $1.57/each X 500 = $785

c. New Urban & Climate Smart Brochure printed/mailed at $1.02/each X 500 = $510

All printed material will include NRCS logo.


INDIRECT COSTS: Total Federal Share: $46,363.89


Recipient has elected to use the de minimis indirect cost rate.


|  | Total Direct Cost | Modified Total Direct Cost (MTDC) |
|---|---|---|
| Personnel | $208,556.47 | $208,556.47 |
| Fringe | $79,042.90 | $79,042.90 |
| Travel | $8,174.49 | $8,174.49 |
| Equipment | $0.00 | $0.00 |
| Supplies | $4,681.00 | $4,681.00 |
| Contractual | $31,200.00 | $31,200.00 |
| Other | $318,645.25 | $131,984.00 |
| Total Direct Cost | $650,300.11 | $463,638.86 |

10 % (DeMinimis Rate for IDC)
Total Indirect Cost      $46,363.89

 TOTAL PROJECT COST: $696,664.00


**Responsibilities of the Parties:**

If inconsistencies arise between the language in this Statement of Work (SOW) and the General Terms and Conditions attached to the agreement, the language in this SOW takes precedence.

NRCS RESPONSIBILITIES

Coordinate with the Program Director to determine the technical assistance necessary to complete deliverables.

Conduct ad-hoc meetings (via electronic, phone or in-person field visit) to discuss the progress of the agreement.

Provide NRCS logo to recipient for usage and review publications as needed.

Provide a program manager who may provide oversight for project activities, as necessary.

RECIPIENT RESPONSIBILITIES

Perform the work, activities and produce the deliverables as outlined in this Statement of Work, maintain communications with the Program Manager and inform of any needed changes.

Use the USDA Non-discrimination Statement on all publications, "USDA is an equal opportunity provider, employer and lender" in accordance with USDA Departmental Regulation 4300-3, Equal Opportunity (EO) Public Notification Policy, and Section 7.
Credit NRCS on event materials and or/reports with the usage of the official NRCS logo
Provide schedule of events, workshops, etc. to NRCS at least every six months, prior to events taking place.
Comply with the applicable version of the General Terms and Conditions.

Reports: Submit reports and payment requests to the ezFedGrants system OR the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov as outlined in the applicable version of the General Terms and Conditions. Reporting frequency is as follows:
● Performance reports: Semi-annual with OPD reporting template
● SF-425 Financial Reports: Annual   Quarterly financial reporting is required if advance payments are requested.
● Payment requests:  Quarterly (at a minimum) SF-270 with Budget Expense Table

**Expected Accomplishments and Deliverables**

1. Provide outreach and communications to historically underserved producers in target regions on specific conservation opportunities such as the Urban and Climate-Smart Agriculture and Forestry Initiatives, Program information, deadlines, and how to prepare for NRCS assistance.  Will reach 500 Historically Underserved Producers. March 2024 – December 2025

2. RAFI-USA and subaward partners table and present at Southeast U.S. Historically Black Colleges and Universities' agricultural conferences and statewide/regional conferences designed for small-scale historically underserved producers to share info on conservation strategies and accessing NRCS pro and services, and to connect producers to this project's services.  11 conferences, 300 producers attend presentation sessions/workshops; 140 producers receive information from contact tables.  March 2024-December 2025

3. RAFI-USA hosts webinars to provide introductory information on NRCS programs/services and specific forestland and farm conservation strategies that support producers in target regions, to improve knowledge of the program and financial assistance benefits. At least 3 events, 90 total attendees, 80% reporting a change in knowledge. March 2024-December 2025

4. RAFI-USA, Partners, and Farmer Allies provide plain language one-on-one and small group technical assistance to producers in targeted regions to understand NRCS programs and initiatives that apply to their production/location, interpret their FSA and NRCS eligibility, identify evident resource concerns, educate on potential conservation practices to mitigate concerns, and when requested, accompany producers on NRCS farm or office visits and/or resolve miscommunication and grievances with NRCS staff.  500 producers assisted, 425 increased knowledge, 206 applied to NRCS. March 2024-December 2025

5. On-farm demonstration events on climate-smart practices for small and/or urban farms to increase producer knowledge and increase implementation in target regions.  Includes but not limited to Residue and Tillage management- No-till, Prescribed Grazing, Pollinator Habitat Improvement, Tree and Shrub Establishment, Silvopasture, and conservation practices applied in High Tunnel Systems.  5 events, 125 attend; 100 increase knowledge, 62 increase implementation of conservation practices. March 2024-December 2025.

6. Intensive Trainings on climate-smart practice implementation and NRCS application assistance in target regions. 24 training, 365 producers attending, 292 with increased knowledge, 182 with increased implementation of conservation practices. March 2024 - December 2025.

**Resources Required**

See the Responsibilities of the Parties section for required resources, if applicable.

**Milestones**

See the Expected Accomplishments and Deliverables section for milestones.

Revised March 2024

## U.S. DEPARTMENT OF AGRICULTURE
## FARM PRODUCTION AND CONSERVATION

## GENERAL TERMS AND CONDITIONS FOR
## GRANTS AND COOPERATIVE AGREEMENTS

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

### A. APPLICABLE REGULATIONS

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CFR and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

**J.A. 1588**

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

**J.A. 1589**

Revised February 2024                              USDA FPAC General Terms and Conditions
                                                   For Grants and Cooperative Agreements

        level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C. PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency.  The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov.  All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

**J.A. 1590**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 58 of 606

DocuSign Envelope ID: F01842C8-9671-4888-8175-AEAF38E9778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 53 of 378

Revised February 2024                        USDA FPAC General Terms and Conditions
                                             For Grants and Cooperative Agreements

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5. Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6. Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

   a. The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

   b. Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

   c. The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

   d. Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

   e. Additional Federal funds needed to complete the project.  This change also requires a formal agreement amendment.

   f. Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs.  If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment.  If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

   g. If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7. No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

J.A. 1591

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

a.  Amount of additional time requested

b.  Explanation for the need for the extension

c.  A summary of progress to date and revised milestones

### D.  PAYMENTS

1.  Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to either the ezFedGrants system or to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2.  Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3.  The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4.  Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5.  Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E,

**J.A. 1592**

DocuSign Envelope ID: E01842C8-8674-4338-8175-AEAF38E978C

Revised February 2024                          USDA FPAC General Terms and Conditions
                                               For Grants and Cooperative Agreements

Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

### E. FINANCIAL REPORTING

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

### F. PERFORMANCE MONITORING AND REPORTING

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted. Each report must cover—

   a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   b. The reasons why milestones and deliverables targets were not met, if appropriate.

   c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 61 of 606

DocuSign Envelope ID: F01842C8-B674-4228-8175-AEAF38E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 56 of 378

3. The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

**G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION**

1. Reporting of first-tier subawards.

    a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

    b. Where and when to report.

        i. You must report each obligating action described in paragraph 1.a. of this award term to *http://www.fsrs.gov*.

        ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

    c. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

2. Reporting Total Compensation of Recipient Executives.

    a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

        i. the total Federal funding authorized to date under this award is $30,000 or more;

        ii. in the preceding fiscal year, you received—

            (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

        iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

**J.A. 1594**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 62 of 606

DocuSign Envelope ID: F01942C8-9674-4338-8175-AEAF38E9778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 57 of 378

Revised February 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

    b.  Where and when to report. You must report executive total compensation described in paragraph 2.a. of this award term:

        i.  As part of your registration profile at https://sam.gov

        ii.  By the end of the month following the month in which this award is made, and annually thereafter.

3.  Reporting of Total Compensation of Subrecipient Executives.

    a.  Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i.  In the subrecipient's preceding fiscal year, the subrecipient received—

           (a)  80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

           (b)  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b.  Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i.  To the recipient.

        ii.  By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4.  Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a.  Subawards, and

    b.  The total compensation of the five most highly compensated executives of any subrecipient.

5.  Definitions. For purposes of this award term:

    a.  Entity means all of the following, as defined in 2 CFR part 25:

        i.  A Governmental organization, which is a State, local government, or Indian Tribe;

J.A. 1595

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 63 of 606

DocuSign Envelope ID: F01B42C8-B671-4338-8175-AEAF38E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 58 of 378

        ii.   A foreign public entity;

        iii.  A domestic or foreign nonprofit organization;

        iv.  A domestic or foreign for-profit organization;

        v.   A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.  Executive means officers, managing partners, or any other employees in management positions.

c.  Subaward:

        i.   This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

        ii.   The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

        iii.  A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.  Subrecipient means an entity that:

        i.   Receives a subaward from you (the recipient) under this award; and

        ii.   Is accountable to you for the use of the Federal funds provided by the subaward.

e.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

        i.   Salary and bonus.

        ii.   Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

        iii.  Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

        iv.  Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

        v.   Above-market earnings on deferred compensation which is not tax-qualified.

        vi.  Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

Revised February 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

### H.  AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the  audit period, whichever comes first.

### I.  AWARDS WITH RESEARCH ACTIVITIES

1. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2. In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

   Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication.  Recipients can receive a DOI via NAL.

   Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

### J.  SPECIAL PROVISIONS

1. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

**J.A. 1597**

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6. The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

   "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

   In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

   "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

   All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

**J.A. 1598**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 66 of 606

DocuSign Envelope ID: 501842C9-B671-4338-8175-AEAF38E977AC
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 61 of 378

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L. COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

   a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

   b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

   Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment.  FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed a s cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

**J.A. 1599**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 67 of 606

DocuSign Envelope ID: E01842C8-9674-4388-8175-AFAF38E977AC
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 62 of 378

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

**J.A. 1600**

USCA4 Appeal: 25-1575     Doc: 55-4        Filed: 06/23/2025      Pg: 68 of 606

DocuSign Envelope ID: F01842C8-B671-4338-8175-AEAF38E9778C
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14      Page 63 of 378

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

Revised February 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:* When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

J.A. 1602

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 70 of 606

DocuSign Envelope ID: E018420B-8674-4338-8175-AEAF38E8778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 65 of 378

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1.  The listed items are:

    a.  Non-ferrous metals;

    b.  Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

    c.  Glass (including optic glass);

    d.  Fiber optic cable (including drop cable);

    e.  Optical fiber;

    f.  Lumber;

    g.  Engineered wood; and

    h.  Drywall.

2.  Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1.  Articles, materials, or supplies that have been:

a. Processed into a specific form and shape; or

b. Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2. If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

P. **NONEXPENDABLE EQUIPMENT**

1. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3. The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

a. Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

b. Activities under Federal awards from other Federal awarding agencies.

4. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6. When equipment is no longer needed for any of the purposes set out in this provision

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 72 of 606

DocuSign Envelope ID: F01842C8-B671-4338-8175-AEAF38E9778C
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 67 of 378

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

### Q. LIMIT OF FEDERAL LIABILITY

1. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

### R. AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

### S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1. Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2. The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3. The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

   a. You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

enforcement representative of a Federal department or agency authorized to receive such information.

b. You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c. The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d. If FPAC determines that you are not in compliance with this award provision, FPAC:

   i. Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

   ii. May pursue other remedies available for your material failure to comply with award terms and conditions.

## T. ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6. The recipient must notify all managers, supervisors, employees, contractors, agents,

Revised February 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information. Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a. State identification and county number (where reported and where located).

    b. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c. Farm, tract, field, and contract numbers.

    d. Production shares and share of acres for each Farm Serial Number (FSN) field.

    e. Acreage information, including crop codes.

    f. All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g. Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h. Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law"* (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

**J.A. 1607**

DocuSign Envelope ID: F01842C8-B671-4338-8175-AEAF38E8778C

Revised February 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

**U.  NATIONAL POLICY REQUIREMENTS**

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Polic y_Requirements_Overlay.pdf

**V.  TERMINATION**

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

**1.**  By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

**2.**  By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

**3.**  By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

**4.**  By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

**5.**  If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

**W.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE**

1.  General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 76 of 606

DocuSign Envelope ID: F01842C8-B671-4338-8175-AEAF38E978C0
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 71 of 378

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2. Proceedings About Which The Recipient Entity Must Report

   Submit the information required about each proceeding that:

   a. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

   b. Reached its final disposition during the most recent five-year period; and

   c. Is one of the following:

      i. A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

      ii. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

      iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

      iv. Any other criminal, civil, or administrative proceeding if:

         a) It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

         b) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

         c) The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. Reporting Procedures

   Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4. Reporting Frequency

   During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X. AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

   Recipients must retain all records pertaining to the agreement in accordance with 2

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 78 of 606

DocuSign Envelope ID: F01842C8-B674-4338-8175-AEAF38E877AC
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 73 of 378

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

**J.A. 1611**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 79 of 606

DocuSign Envelope ID: E018420B-D674-4838-8175-AFAF38E878AC
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 74 of 378

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer. Documents transmitted via ezFedGrants are digitally authenticated and acceptable.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

    a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

    b. An audit that meets the requirements contained in Subpart F.

DocuSign Envelope ID: F01842C8-B674-4338-8175-AFAF38E9778C

Revised February 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

### CC. AGREEMENT COUNTERPARTS

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

### DD. CONTINUING OBLIGATIONS

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

**GENERAL TERMS AND CONDITIONS**

Please reference the below link(s) for the General Terms and Conditions pertaining to this award:
https://www.fpacbc.usda.gov/about/grants-and-agreements/award-terms-and-conditions/index.html

RAFI DECLARATION

EXHIBIT 13-C

May 24, 2024

## RAFI Statement of Work - Farm Advocacy Network

### Background & Need

Rural Advancement Foundation International-USA (RAFI) is a 501(c)(3) nonprofit organization headquartered in Pittsboro, NC. We work across agricultural sectors and collaboratively through coalitions, combining on–the–ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farms and families, their communities, and the environment. Our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities.

Since 1990, RAFI has worked with small and mid-sized farmers to help them succeed in the face of financial crises and reverse the trend of farm loss.

Our lead farm advocate, Benny Bunting, has been saving farms since the early eighties. For over 30 years, Benny has been sitting down at farmers' kitchen tables, listening to their stories, and helping them understand their options and name their goals in times of financial and personal crisis. While our caseload varies with the vicissitudes of the farm economy, in a typical year, we work 35-40 intensive cases with farmers, with $7 million to $11 million of farmers' farm, home, and land assets at stake. We are not able to save every farm, but working together with farmers and their families, we have saved many and have helped other families find the best solution possible for their situation, preserving assets whenever possible. While we receive both internal referrals (from our hotline and other program staff) and external referrals (from partners like Farm Aid), we also get calls directly from farmers who know Benny's reputation in the community by word of mouth as someone you can trust to call when things are looking hopeless.

"Farm advocate" is a rare, high-stakes, and highly skilled profession that must combine a broad array of competencies.  Commonalities of the most effective Farm Advocates from across the country include: 1) a thorough understanding of farm finances and business planning 2) an encyclopedic knowledge of FSA and NAD handbook regulations, rules, and statutes 3) comprehensive familiarity with the many steps in the proceedings of loan-making, loan servicing, loan foreclosures, and bankruptcy 4) a relentless eye for detail and 5) deep compassion for the farmers and families in crisis. These are the qualities RAFI's Farm Advocacy program embodies.

Decades of experience have shown us the crucial difference a farm advocate can make for a farmer.  However, farm advocate is a profession that requires a wide and deep skill set. Because the stakes are so high (whether a family loses their farm and home, for example), asking an

J.A. 1616

May 24, 2024

under-trained employee to serve as a farm advocate would be irresponsible and unfair to all parties involved. It is also a profession with significant emotional highs and lows. For all these reasons, recruiting and training new farm advocates who decide to make it their long-term career is extremely challenging. We currently do not widely advertise our farm advocacy services because we do not have the capacity to serve a much larger number of farmers than we do now. Training a new generation of farm advocates to answer today's unmet demand and continue this critical profession into the future is an urgent need, not only for RAFI but also for the national farming community.

## Purpose

The purpose of this project is to address the critical need for trained farm advocates by developing a comprehensive training curriculum, piloting the recruitment and training of a new cohort of farm advocates, enhancing the Farm Advocacy Witness program, and establishing a National Farm Advocate Network. This initiative aims to equip a new generation of farm advocates with the necessary skills and support to effectively assist farmers in times of crisis, thereby ensuring the sustainability and resilience of farm communities across the nation.

## Objectives

### Objective 1

Develop a comprehensive living curriculum of farmer advocacy training materials to be used by the Southeast cohort and in network-wide training events to prepare advocates for casework. Topics may include but are not limited to: standard FSA forms, loan eligibility and feasibility, FSA farm programs, and the FSA loan process.

> ▶ Spend Year 1 developing a full curriculum based on existing resources and then developing new pieces (guides, videos, case strategy deep dives, etc) based on Y1 farm advocacy casework. Training curriculum will be designed in relation to Farm Advocacy Tiers/depth of expertise (e.g. witness, outreach, financial analysis, financial scenarios, basic advocacy). This would involve reviewing existing resources across organizations to identify gaps or areas for further development. RAFI will present at least one training workshop in collaboration with project partners at each network gathering. RAFI will collaborate with Farm Aid and other partner organizations to compile training resources onto a national database.

### Objective 2

J.A. 1617

May 24, 2024

Conduct a pilot farmer advocate training project, Years 2-3, by recruiting 7 advocates across the Southeast who will receive farm advocacy training, mentorship, and case shadowing opportunities.

> ▶ RAFI will hold 4 in-person cohort gatherings over the two-year pilot project. Advocates are 0.5 FTE structured as a 'fellowship stipend' that could be awarded to an organization or could be given to an individual. Each cohort member will have a host organization in the Southeast. Potential hosting organizations include, but are not limited to, Kentucky Black Farmers Association, Southwest Georgia project, Organic Growers School, Farmer Veteran Coalition, etc. The Cohort Manager and Lead Farmer Advocate will host a weekly meeting reviewing case work, discussing strategy and training topics.

### Objective 3
Contribute to Farm Advocacy Witness program in collaboration with Guidance Team members by recruiting, training, and coordinating 15 witnesses across Southeast who will support 50 farmers over the course of the project, with an emphasis on veteran recruitment.

> ▶ In addition to coordinating the 15 witnesses, RAFI will support the Guidance Team in the development of a national structure in which Southeast witnesses will participate, including the referral, tracking, and follow-up process for farmers assisted by witnesses.

### Objective 4
Collaborate with Farm Aid to develop a national network of experienced farm advocates who are available for mentorship and intergenerational knowledge sharing with the National Farm Advocate Network.

> ▶ RAFI will recruit at least 5 advocate mentors starting in Year 2. These mentors will be activated to host trainings, consult on advocacy cases, and provide peer support to the Southeast Cohort and wider National Farm Advocate Network.

### Objective 5
Contribute to the Leadership/Guidance Team and Evaluation Process.

> ▶ RAFI will support the development of governance protocols for Guidance Team, case management tracking processes across the project, and advocacy standards of practice. We will support the subgranting process by participating on the advisory team. We are bringing our expertise of providing in depth farm advocacy to project development.

**J.A. 1618**

May 24, 2024

**Deliverables/Milestones**

*\*\*Quarterly projections relate to an anticipated start date of July 1. Therefore Q1 represents work completed in July-September, Q2 October-December, and so on.*

| Related Objective | Project Activity | Timeline** | Who is involved |
|---|---|---|---|
| Objective 1 | Hire Curriculum Developer | Q1/2 Year 1 | Project Manager, Executive Director, Lead Farmer Advocate |
| Objective 1 | Develop "living curriculum" and trainings that correspond to advocacy tier levels, fill gaps in existing training resources, and respond to casework needs | Begin work in Q2 Y1, develop by Q4 Y1 with ongoing additions in Y2 and Y3 in response to casework<br><br>Implement curriculum in Y2 and Y3 | Curriculum Developer, Project Manager, Lead Farmer Advocate, contractual positions |
| Objective 1 | Collaborate with Farm Aid and other Project Partners to compile training resources onto national database | Ongoing | Curriculum Developer, Project Manager |
| Objective 1 | Facilitate trainings at each Farm Advocacy Network gathering in collaboration with other partners, i.e. FLAG (at least one per gathering) | Ongoing- at least one per year | Project Manager, Lead Farm Advocate, Curriculum Developer |
| Objective 2 | Hire a SE Pilot Cohort Manager and Project Coordinator | Q 1/2 Year 1 | Project Manager, HR staff, Lead Farmer Advocate |
| Objective 2 | Identify, Recruit, and onboard cohort members | Recruit Q1 Y2 Onboard Q2 Y2 | Cohort Manager, Project Manager, Project Coordinator |
| Objective 2 | Facilitate cohort trainings during pilot program (trainings, convenings, case work meetings) | Starting in Q2 Y2, Ongoing Year 2 and 3 | Lead Farmer Advocate, Cohort Manager, Project Manager, Farm Advocate |
| Objective 2 | Evaluation of Cohort Pilot Program | Q4 Y3 with additional responsive feedback during trainings | Cohort Manager |
| Objective 3 | Recruit 15 witnesses across the Southeast who will | Q2 Y1 | Project Manager, Lead Farm Advocate, |

**J.A. 1619**

May 24, 2024

| | | | |
|---|---|---|---|
| | participate in training, emphasis on veterans | | |
| Objective 3 | Collaborate with Project Partners on Witness training and recruitment | Starting in Q1 Y1 and ongoing in Y2 | Project Manager, Lead Farm Advocate, Farm Advocate |
| Objective 3 | Develop referral, tracking, and follow up process for farmers assisted by witnesses | Q3 Year 1 and 2 | Cohort Manager, Project Manager, Salesforce Manager |
| Objective 4 | Develop community of practice and facilitate peer support circles for farmer advocates | Q2 Year 2 and ongoing | Project Manager and Farm Advocate in collaboration with Farm Aid as Network Summit Convener |
| Objective 4 | Recruit experienced farmer advocates and develop process for intergenerational knowledge transfer (recruit 5 mentors) | Q1 Year 2 and ongoing | Project Manager, Lead Farmer Advocate, Project Coordinator |
| Objective 5 | Collaborate with Project Partners on case management best practices | Ongoing | Project Manager, Salesforce Manager, Farm Advocates |
| Objective 5 | Supporting re-granting process: collaborating on RFP and selection process | Design support, Q1 and Q2 in Y1 Ongoing support | Executive Director, Managing Director of Programs, Project Manager |
| Objective 5 | Complete required performance and financial reports according to FSA and University of Arkansas reporting requirements | According to established FSA timeline | Federal Grants Manager, Project Manager |
| Objective 5 | Conduct final evaluation surveys or data analysis to assess project impact according to FSA and University of Arkansas reporting requirements | Q 4 Y3 | Federal Grants Manager, Project Manager, Salesforce Manager, and Program Managers |

**Roles and Responsibilities**

**J.A. 1620**

May 24, 2024

Project Management

The work outlined will be carried out under the direction of Executive Director Edna Rodriguez by RAFI's Farm Advocacy Team. The project will be led by the Project Manager, Liz Richardson under the supervision of Policy Co-Director, Margaret Krome-Lukens. The majority of project activities will be completed by the Project Manager, Lead Farm Advocate, Curriculum Developer, and Cohort Manager. Lisa Misch (RAFI-'s Managing Director of Programs) will help ensure internal coordination across projects and teams to maximize communication and effectiveness.

Our team of Farm Advocates will grow gradually over the course of the project as we hire a new Farm Advocate, contract with a Southeast Cohort, and train Witnesses.

Data Collection & Project Reporting

The Project Manager, Federal Grants Manager, Salesforce Manager, and other project team members will meet regularly to ensure the project is progressing and to ensure that we are accurately tracking, recording, and reporting outreach and technical assistance impact numbers.

Collaboration with the Guidance Team and Potential Partners

Collaboration with other Project Partners will be essential to the success of this project. The Executive Director, Managing Director of Programs, and Project Manager will engage in the Guidance Team to provide feedback and expert insight on the development of governance structures, project design, and evaluation. Project staff will participate in other steering committee groups as relevant to their roles. This may include but is not limited to: Regranting and Subawards, Curriculum Development, Network Gatherings, etc.

In addition to the Guidance Team, RAFI will also collaborate with other farmer-serving organizations across the Southeast for recruitment of pilot cohort members and Farm Advocacy Witnesses. Collaborating groups expected to be, but not limited to, Kentucky Black Farmers Association, Southwest Georgia Project, Organic Growers School, Farmer Veteran Coalition, etc.

RAFI Staff Roles

**Executive Director**, Edna Rodriguez: Accountable for ensuring project objectives and activities align with organizational goals and strategy. Participate in the Guidance Team. Time spent on the project will be prioritized in Year 1. Engage philanthropy to identify additional funds to support the project's purpose.

**Managing Director of Programs**, Lisa Misch: Ensure internal coordination across projects and team to maximize communication and effectiveness. Ensure data collection infrastructure aligns with overall organizational data infrastructure; assist with evaluation. Participate in the Guidance Team. Oversee hiring.

**Project Manager,** Liz Richardson: Accountable for ensuring that all project activities are carried out in a timely, cost efficient and responsible manner. Supervise SE Cohort Manager, Curriculum Developer, and Project Coordinator. Be the point of contact with other Guidance Team members.

May 24, 2024

**Farm Advocacy Director**, Margaret Krome-Lukens: Provide director level oversight of project activities. Supervise Project Manager. Responsible for ensuring submission of the required reports.

**Lead Farm Advocate**, Benny Bunting: Contribute to development of farm advocacy training curriculum, train SE cohort of advocates, conduct one-on-one farm advocacy casework to provide case shadowing opportunities.

**Farm Advocate**, to be hired: Train with SE Cohort of advocates to eventually take on responsibility for one-on-one farm advocacy casework.

**Federal Grants Manager**, Kelly Marchand: Ensure project staff are properly collecting impact data and are aware of reporting requirements and deadlines. Ensure compliance with federal budget requirements and assess progress towards cooperative agreement deliverables.

**Salesforce Manager**, Mo Murrie: Ensure the case management systems in Salesforce are properly constructed and functioning. Ensure timely input of all casework data, coordinating across staff and program areas; contribute to required reports.

**Curriculum Developer**, to be hired: Develop curriculum for SE Cohort as well as broad use training materials for those training to be farm advocates. Work with project partners to develop comprehensive training materials.

**Southeast (SE) Cohort Manager**, to be hired: Lead recruitment, onboarding, and ongoing management of cohort members training to be farm advocates. Contribute to the development of a nationwide Farm Advocate Network.

**Project Coordinator**, to be hired: Provide support for project activities; event planning, scheduling, coordination with project partners, travel arrangements, etc.

## Evaluation

The University of Arkansas will manage the evaluation of this project. We will follow their evaluation reporting requirements and formatting. In addition to the University of Arkansas reporting, we will conduct our own internal evaluation of the Farmer Advocate Cohort Pilot Project and the Witness Program to adjust our training and curriculum responsively to the needs of program participants and farmers.

**J.A. 1622**

RAFI DECLARATION

EXHIBIT 13-D

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. **Award Identifying Number** FSA24CPT0014403 | 2. **Amendment No.** | 3. **Award/Project Period** Date of Final signature - 12/31/2027 | 4. **Type of Award Instrument** Cooperative |
|---|---|---|---|

| 5. **Agency:** (Name and Address) USDA, FSA Outreach Office 1400 Independence Ave SW Stop 0511 Rm 3086 Washington DC 20250-0511 | 6. **Recipient Organization:** (Name and Address) Rural Advancement Foundation International-USA PO Box 640 Pittsboro, NC 27312-0640 |
|---|---|

|  | **DUNS/UEI:** Z1AXE15PHAL3 | **EIN:** N/A |
|---|---|---|

| 7. **Agency Program Contact:** Sarah Campbell srah.campbell@usda.gov | 8. **Agency Administrative Contact:** Dennisse Bedard Dennisse.Bedard@usda.gov (605)692-2344 extension 131 | 9. **Recipient Program Contact:** Margaret Krome-Lukens margaret@rafiusa.org (919)621-3593 | 10. **Recipient Administrative Contact:** Edna Rodriguez edna@rafiusa.org (916)621-5158 |
|---|---|---|---|

| 11. **CFDA Number** 10.147 | 12. **Authority** H.R. 5376 Inflation Reduction Act of 2022 | 13. **Type of Action** i. New Agreement | 14. **Project Director** Margaret Krome-Lukens margaret@rafiusa.org (919)621-3593 |
|---|---|---|---|

15. **Project Title/Description:**
Distressed Borrower Technical Assistance
Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

16. **Entity Type:** _____ Profit    _X_ Nonprofit    _____ Higher Education    _____ Federal    _____ State/Local    _____ Indian/Native American    _____ Other

| 17. **Select Funding Type:** | ✔ **Federal** | ☐ **Non-Federal** | 18. **Accounting and Appropriation Data** |
|---|---|---|---|

| | Federal | Non-Federal | Financial Code | Amount | Fiscal Year | Treasury Symbol |
|---|---|---|---|---|---|---|
| Original Funds Total: | $ 2,389,182.72 | | FPDefault | $ 2,389,182.72 | 2231 | 1222/310115 |
| Additional Funds Total: | | | Cost Center: FA10000000 | | BOC:2559 | Functional Area: FA6011RATOE |
| Grand Total: | $ 2,389,182.72 | $ 0.00 | | | | |

19. **APPROVED BUDGET**

| Personnel | $ 1,011,734.16 | Fringe Benefits | $ 354,106.96 |
|---|---|---|---|
| Travel | $ 79,063.95 | Equipment | $ |
| Supplies | $ 10,320.00 | Contractual | $ 585,110.50 |
| Construction | $ | Other | $ 144,817.50 |
| Total Direct Cost\ | $ 2,185,153.07 | Total Indirect Cost | $ 204,029.65 |
| | | Total Non-Federal Funds | $ 0.00 |
| | | Total Federal Funds Awarded | $ 2,389,182.72 |
| | | Total Approved Budget | $ 2,389,182.72 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

## J.A. 1624

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

## NOTICE OF GRANT AND AGREEMENT AWARD

| Award Identifying Number | Amendment No. | Award/Project Period | Type of Award Instrument |
|---|---|---|---|
| FSA24CPT0014403 | | Date of Final signature - 12/31/2027 | Cooperative |

List of Attachments:

Attachment 1 - Statement of Work; Attachment 2 - Project Narrative; Attachment 3 - Budget Narrative; Attachment 4 - General Terms and Conditions

| Name and Title of Authorized Government Representative | Signature | Date |
|---|---|---|
| Steven Peterson, Associate Administrator | | |
| **Name and Title of Authorized Recipient Representative** | **Signature** | **Date** |
| Edna Rodriguez, Executive Director | DocuSigned by: *Edna Rodriguez* ECB1EB90E0D4490... | 8/26/2024 |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).  To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD).  USDA is an equal opportunity provider and employer.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

**J.A. 1625**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 93 of 606

Docusign Envelope ID: E43512D3-C878-4A27-969E-03FB2DE406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 88 of 378

Attachment 1

**Agreement Number: FSA24CPT0014403**
**Statement of Work**

1. **PURPOSE AND OBJECTIVES**

   The authorizing statutes and regulations for this agreement is 7 U.S.C. 2204b(b)(4).

   The mission of the Farm Service Agency (FSA) is equitably serving all farmers, ranchers, and agricultural partners through the delivery of effective, efficient agricultural programs for all Americans. FSA supports the delivery of farm credit, and administers disaster assistance, livestock, specialty crop, commodity, and some USDA conservation programs. FSA delivers its programs through a network of 2,124 county-based Service Centers, 50 State Offices, and an area office in Puerto Rico.

   FSA county and state offices provide outreach and education for producers which typically involves public meetings and workshops with individual producers seeking additional information or to enroll in a program. However, additional targeted outreach efforts are needed for educating socially disadvantaged farmers and ranchers on FSA programs and services.  Socially disadvantaged groups are defined as a group whose members have been subject to racial, ethnic, or gender prejudice groups consist of American Indians or Alaskan Natives, Asians, Blacks or African Americans, Native Hawaiians or Pacific Islanders, Hispanics, and women. This agreement provides FSA funding for the creation of Taxpayer Education and Asset Protection effort to support the creation of educational materials and the establishment of a network to deliver education on ag taxes.

2. **PROJECT NARRATIVE**

   The recipient will carry out the project described in the Project; the referenced Project Narrative is incorporated as Attachment 2.  Pre-award costs are approved beginning **02/01/2024** as long as the costs are part of the approved budget as identified in the award and are necessary for efficient and timely performance of the award's Statement of Work. In accordance with 2 CFR 200.458, these costs must be charged to the initial budget period of the award."

3. **BUDGET NARRATIVE**

   The official budget as noted in the award and described in the attached Budget Narrative, (attachment 3), will be considered the total budget as last approved by the Federal awarding agency for this award. Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

4. **REPORTING REQUIREMENTS**

   a. The recipient must submit an SF-425 Financial Report on an annual basis to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov, provided that the recipient requests reimbursement payments only. If the recipient requests advance payments, it must submit financial reports quarterly. Reports are due 30 calendar days after the reporting period on January 31, April 30, July 31, October 31. (Please note that financial reporting is based on the calendar year.)

   b. The recipient must submit performance progress reports semi-annually via e-mail to FPAC.BC.GAD@usda.gov.  Reports are due 30 calendar days after the reporting period and are based on the agreement period of performance start date.

**5. PAYMENT INFORMATION**

Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions, attached and incorporated as Attachment 4.

**6. GENERAL TERMS AND CONDITIONS**

The General Terms and Conditions applicable to this award are attached and incorporated as Attachment 4. They are also available online at the following link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-terms-and-conditions/index.html

2

**J.A. 1627**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 95 of 606

Docusign Envelope ID: E435A2D1-C819-4AA7-969E-03EB2DE405EB
2:23-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 90 of 378
Agreement # FSA24CPT0014403                                          Attachment 2

## RAFI Project Narrative - Distressed Borrower Assistance Network

### Background & Need

Rural Advancement Foundation International-USA (RAFI) is a 501(c)(3) nonprofit organization headquartered in Pittsboro, NC. We work across agricultural sectors and collaboratively through coalitions, combining on–the–ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farms and families, their communities, and the environment. Our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities.

Since 1990, RAFI has worked with small and mid-sized farmers to help them succeed in the face of financial crises and reverse the trend of farm loss.

Our lead farm advocate, Benny Bunting, has been saving farms since the early eighties. For over 30 years, Benny has been sitting down at farmers' kitchen tables, listening to their stories, and helping them understand their options and name their goals in times of financial and personal crisis. While our caseload varies with the vicissitudes of the farm economy, in a typical year, we work 35-40 intensive cases with farmers, with $7 million to $11 million of farmers' farm, home, and land assets at stake. We are not able to save every farm, but working together with farmers and their families, we have saved many and have helped other families find the best solution possible for their situation, preserving assets whenever possible. While we receive both internal referrals (from our hotline and other program staff) and external referrals (from partners like Farm Aid), we also get calls directly from farmers who know Benny's reputation in the community by word of mouth as someone you can trust to call when things are looking hopeless.

"Farm advocate" is a rare, high-stakes, and highly skilled profession that must combine a broad array of competencies.  Commonalities of the most effective Farm Advocates from across the country include: 1) a thorough understanding of farm finances and business planning 2) an encyclopedic knowledge of FSA and NAD handbook regulations, rules, and statutes 3) comprehensive familiarity with the many steps in the proceedings of loan-making, loan servicing, loan foreclosures, and bankruptcy 4) a relentless eye for detail and 5) deep compassion for the farmers and families in crisis. These are the qualities RAFI's Farm Advocacy program embodies.

Decades of experience have shown us the crucial difference a farm advocate can make for a farmer.  However, farm advocate is a profession that requires a wide and deep skill set. Because the stakes are so high (whether a family loses their farm and home, for example), asking an under-trained employee to serve as a farm advocate would be irresponsible and unfair to all parties involved.  It is also a profession with significant emotional highs and lows.  For all these

1

reasons, recruiting and training new farm advocates who decide to make it their long-term career is extremely challenging. We currently do not widely advertise our farm advocacy services because we do not have the capacity to serve a much larger number of farmers than we do now. Training a new generation of farm advocates to answer today's unmet demand and continue this critical profession into the future is an urgent need, not only for RAFI but also for the national farming community.

**Purpose**

The purpose of this project is to address the critical need for trained farm advocates/TA providers by developing a comprehensive training curriculum, piloting the recruitment and training of a new cohort of farm advocates/TA providers, enhancing the Peer Support program, and establishing a Distressed Borrower Assistance Network. This initiative aims to equip a new generation of farm advocates/TA providers with the necessary skills and support to effectively assist farmers in times of crisis, thereby ensuring the sustainability and resilience of farm communities across the nation.

## Objectives

### *Objective 1*

Develop a comprehensive living curriculum of farmer advocacy/TA provider training materials to be used by the Southeast cohort and in network-wide training events to prepare advocates for casework. Topics may include but are not limited to: standard FSA forms, loan eligibility and feasibility, FSA farm programs, and the FSA loan process.

> ▶ Spend Year 1 developing a full curriculum based on existing resources and then developing new pieces (guides, videos, case strategy deep dives, etc) based on Y1 farm advocacy casework. Training curriculum will be designed in relation to Farm Advocacy/TA Tiers/depth of expertise (e.g. witness, outreach, financial analysis, financial scenarios, basic advocacy). This would involve reviewing existing resources across organizations to identify gaps or areas for further development. RAFI will present at least one training workshop in collaboration with project partners at each network gathering. RAFI will collaborate with Farm Aid and other partner organizations to compile training resources onto a national database.

### *Objective 2*

Conduct a pilot farmer advocate/TA provider training project, Years 2-3, by recruiting 7 advocates/TA providers across the Southeast who will receive farm advocacy/TA training, mentorship, and case shadowing opportunities.

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 97 of 606

Docusign Envelope ID: F43513D1-C879-4A27-969E-83EB2DE4055B
2:23-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 92 of 378

Agreement # FSA24CPT0014403                                    Attachment 2

▶ RAFI will hold 4 in-person cohort gatherings over the two-year pilot project. Advocates/TA providers are 0.5 FTE structured as a 'fellowship stipend' that could be awarded to an organization or could be given to an individual. Each cohort member will have a host organization in the Southeast. Potential hosting organizations include, but are not limited to, Kentucky Black Farmers Association, Southwest Georgia project, Organic Growers School, Farmer Veteran Coalition, etc. The Cohort Manager and Lead Farmer Advocate will host a weekly meeting reviewing case work, discussing strategy and training topics.

*Objective 3*

Contribute to Peer Support program in collaboration with Guidance Team members by recruiting, training, and coordinating 15 peer supporters who will support 50 farmers over the course of the project.

▶ In addition to coordinating the 15 peer supporters, RAFI will support the Guidance Team in the development of a national structure including the referral, tracking, and follow-up process for farmers assisted by peer supporters.

*Objective 4*

Collaborate with Farm Aid to develop a national network of experienced farm advocates/TA providers who are available for mentorship and intergenerational knowledge sharing with the Distressed Borrower Assistance Network.

▶ RAFI will recruit at least 5 advocate/TA mentors starting in Year 2. These mentors will be activated to host trainings, consult on advocacy/TA cases, and provide peer support to the Southeast Cohort and wider Distressed Borrower Assistance Network.

*Objective 5*

Contribute to the Leadership/Guidance Team and Evaluation Process.

▶ RAFI will support the development of governance protocols for Guidance Team, case management tracking processes across the project, and advocacy/TA standards of practice. We will support the subgranting process by participating on the advisory team. We are bringing our expertise of providing in depth farm advocacy/TA to project development.

**Deliverables/Milestones**

3

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 98 of 606

Docusign Envelope ID: F43543D1-C849-4A27-969E-83EB2DE405EB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 93 of 378
Agreement # FSA24CPT0014403                                                    Attachment 2

*__**Quarterly projections relate to an anticipated start date of July 1. Therefore Q1 represents work completed in July-September, Q2 October-December, and so on.__*

| Related Objective | Project Activity | Timeline** | Who is involved |
|---|---|---|---|
| Objective 1 | Hire Curriculum Developer | Q1/2  Year 1 | Project Manager, Executive Director, Lead Farmer Advocate |
| Objective 1 | Develop "living curriculum" and trainings that correspond to advocacy/TA tier levels, fill gaps in existing training resources, and respond to casework needs | Begin work in Q2 Y1, develop by Q4 Y1 with ongoing additions in Y2 and Y3 in response to casework

Implement curriculum in Y2 and Y3 | Curriculum Developer, Project Manager, Lead Farmer Advocate, contractual positions |
| Objective 1 | Collaborate with Farm Aid and other Project Partners to compile training resources onto national database | Ongoing | Curriculum Developer, Project Manager |
| Objective 1 | Facilitate trainings at each Distressed Borrower Assistance Network gathering in collaboration with other partners, i.e. FLAG (at least one per gathering) | Ongoing- at least one per year | Project Manager, Lead Farm Advocate, Curriculum Developer |
| Objective 2 | Hire a SE Pilot Cohort Manager and Project Coordinator | Q 1/2 Year 1 | Project Manager, HR staff, Lead Farmer Advocate |
| Objective 2 | Identify, Recruit, and onboard cohort members | Recruit Q1 Y2 Onboard Q2 Y2 | Cohort Manager, Project Manager, Project Coordinator |
| Objective 2 | Facilitate cohort trainings during pilot program (trainings, convenings, case work meetings) | Starting in Q2 Y2, Ongoing Year 2 and 3 | Lead Farmer Advocate, Cohort Manager, Project Manager, Farm Advocate |
| Objective 2 | Evaluation of Cohort Pilot Program | Q4 Y3 with additional responsive feedback during trainings | Cohort Manager |
| Objective 3 | Recruit 15 peer supporters who will participate in | Q2 Y1 | Project Manager, Lead Farm Advocate, |

4

**J.A. 1631**

|  |  | training, |  |  |
| --- | --- | --- | --- | --- |
| Objective 3 | Collaborate with Project Partners on peer support training and recruitment | Starting in Q1 Y1 and ongoing in Y2 | Project Manager, Lead Farm Advocate, Farm Advocate |
| Objective 3 | Develop referral, tracking, and follow up process for farmers assisted by peer supporters | Q3 Year 1 and 2 | Cohort Manager, Project Manager, Salesforce Manager |
| Objective 4 | Develop community of practice and facilitate peer support circles for farmer advocates/TA providers | Q2 Year 2 and ongoing | Project Manager and Farm Advocate in collaboration with Farm Aid as Network Summit Convener |
| Objective 4 | Recruit experienced farmer advocates/TA providers and develop process for intergenerational knowledge transfer (recruit 5 mentors) | Q1 Year 2 and ongoing | Project Manager, Lead Farmer Advocate, Project Coordinator |
| Objective 5 | Collaborate with Project Partners on case management best practices | Ongoing | Project Manager, Salesforce Manager, Farm Advocates |
| Objective 5 | Supporting re-granting process: collaborating on RFP and selection process | Design support, Q1 and Q2 in Y1 Ongoing support | Executive Director, Managing Director of Programs, Project Manager |
| Objective 5 | Complete required performance and financial reports according to FSA and University of Arkansas reporting requirements | According to established FSA timeline | Federal Grants Manager, Project Manager |
| Objective 5 | Conduct final evaluation surveys or data analysis to assess project impact according to FSA and University of Arkansas reporting requirements | Q 4 Y3 | Federal Grants Manager, Project Manager, Salesforce Manager, and Program Managers |

**Roles and Responsibilities**

5

**J.A. 1632**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 100 of 606

Docusign Envelope ID: F43513D1-C819-4A27-969E-03EB2DF405FB
2:23-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 95 of 378
Agreement # FSA24CPT0014403    Attachment 2

<u>Project Management</u>
The work outlined will be carried out under the direction of Executive Director Edna Rodriguez by RAFI's Farm Advocacy Team. The project will be led by the Project Manager, Liz Richardson under the supervision of Policy Co-Director, Margaret Krome-Lukens. The majority of project activities will be completed by the Project Manager, Lead Farm Advocate, Curriculum Developer, and Cohort Manager. Lisa Misch (RAFI-'s Managing Director of Programs) will help ensure internal coordination across projects and teams to maximize communication and effectiveness.

Our team of Farm Advocates/TA providers will grow gradually over the course of the project as we hire a new Farm Advocate/TA provider, contract with a Southeast Cohort, and train peer supporters.

<u>Data Collection & Project Reporting</u>
The Project Manager, Federal Grants Manager, Salesforce Manager, and other project team members will meet regularly to ensure the project is progressing and to ensure that we are accurately tracking, recording, and reporting outreach and technical assistance impact numbers.

<u>Collaboration with the Guidance Team and Potential Partners</u>
Collaboration with other Project Partners will be essential to the success of this project. The Executive Director, Managing Director of Programs, and Project Manager will engage in the Guidance Team to provide feedback and expert insight on the development of governance structures, project design, and evaluation. Project staff will participate in other steering committee groups as relevant to their roles. This may include but is not limited to: Regranting and Subawards, Curriculum Development, Network Gatherings, etc.

In addition to the Guidance Team, RAFI will also collaborate with other farmer-serving organizations across the Southeast for recruitment of pilot cohort members and peer supporters. Collaborating groups expected to be, but not limited to, Kentucky Black Farmers Association, Southwest Georgia Project, Organic Growers School, Farmer Veteran Coalition, etc.

<u>RAFI Staff Roles</u>
**Executive Director**, Edna Rodriguez: Accountable for ensuring project objectives and activities align with organizational goals and strategy.  Participate in the Guidance Team. Time spent on the project will be prioritized in Year 1. Engage philanthropy to identify additional funds to support the project's purpose.

**Managing Director of Programs**, Lisa Misch: Ensure internal coordination across projects and team to maximize communication and effectiveness. Ensure data collection infrastructure aligns with overall organizational data infrastructure; assist with evaluation.  Participate in the Guidance Team. Oversee hiring.

**Project Manager,** Liz Richardson: Accountable for ensuring that all project activities are carried out in a timely, cost efficient and responsible manner. Supervise SE Cohort Manager, Curriculum Developer, and Project Coordinator. Be the point of contact with other Guidance Team members.

6

**J.A. 1633**

**Farm Advocacy Director**, Margaret Krome-Lukens: Provide director level oversight of project activities. Supervise Project Manager. Responsible for ensuring submission of the required reports.

**Lead Farm Advocate**, Benny Bunting: Contribute to development of farm advocacy training curriculum, train SE cohort of advocates, conduct one-on-one farm advocacy casework to provide case shadowing opportunities.

**Farm Advocate/TA provider**, to be hired: Train with SE Cohort of advocates to eventually take on responsibility for one-on-one farm advocacy casework.

**Federal Grants Manager**, Kelly Marchand: Ensure project staff are properly collecting impact data and are aware of reporting requirements and deadlines. Ensure compliance with federal budget requirements and assess progress towards cooperative agreement deliverables.

**Salesforce Manager**, Mo Murrie: Ensure the case management systems in Salesforce are properly constructed and functioning. Ensure timely input of all casework data, coordinating across staff and program areas; contribute to required reports.

**Curriculum Developer**, to be hired: Develop curriculum for SE Cohort as well as broad use training materials for those training to be farm advocates. Work with project partners to develop comprehensive training materials.

**Southeast (SE) Cohort Manager**, to be hired: Lead recruitment, onboarding, and ongoing management of cohort members training to be farm advocates/TA providers. Contribute to the development of a nationwide Distressed Borrower Assistance Network.

**Project Coordinator**, to be hired: Provide support for project activities; event planning, scheduling, coordination with project partners, travel arrangements, etc.

## Evaluation

The University of Arkansas will manage the evaluation of this project. We will follow their evaluation reporting requirements and formatting. In addition to the University of Arkansas reporting, we will conduct our own internal evaluation of the Farmer Advocate/TA provider Cohort Pilot Project and the Peer Support Program to adjust our training and curriculum responsively to the needs of program participants and farmers.

J.A. 1634

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 102 of 606

Docusign Envelope ID: E43512D1-C878-4A27-969E-83EB2DF405FB
2:23-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 97 of 378

Agreement # FSA24CPT0014403                                                    Attachment 3

**Rural Advancement Foundation International - USA (RAFI)**
**Distressed Borrower Assistance Network Award - Budget Narrative**

### PERSONNEL - $1,011,734.16

- Hourly salary rates are adjusted by a 5% increase yearly, including COLA. The rates listed below reflect the **average** hourly rate over the 3-year period.
- The FTE listed below is the average for the entire 3-year period.
- "Funds requested" totals below are total wages before fringe is applied.

**Executive Director,** *Edna Rodriguez*: Accountable for ensuring project objectives and activities align with organizational goals and strategy. Participate in the Guidance Team. Time spent on project will be prioritized in Year 1.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $148,280.60 | 0.12 | $53,381.02 |

**Managing Director of Programs,** *Lisa Misch*: Ensure internal coordination across projects and team to maximize communication and effectiveness. Ensure data collection infrastructure aligns with overall organizational data infrastructure; assist with evaluation. Participate in the Guidance Team.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $94,427.75 | 0.11 | $31,161.16 |

**Project Manager,** *Liz Richardson*: Accountable for ensuring that all project activities are carried out promptly, cost-efficient, and responsibly. Supervise SE Cohort Manager, Curriculum Developer, and Project Coordinator. Be the point of contact with other Guidance Team members.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $73,900.07 | 0.45 | $99,765.09 |

**Farm Advocacy Director,** *Margaret Krome-Lukens:* Provide director-level oversight of project activities. Supervise the Project Manager. Ensure the submission of the required reports.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $86,193.51 | 0.07 | $18,100.64 |

**Lead Farm Advocate and Content Advisor***, Benny Bunting:* Contribute to development of farm advocacy training curriculum, train SE cohort of advocates, conduct one-on-one farm advocacy casework to provide case shadowing opportunities..

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|

1

**J.A. 1635**

USCA4 Appeal: 25-1575    Doc: 55-4       Filed: 06/23/2025    Pg: 103 of 606

Docusign Envelope ID: F43513D1-C919-4A37-969E-83EB2DE4055B
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 98 of 378

Agreement # FSA24CPT0014403                                          Attachment 3

|  | $62,168.74 | 0.14 | $26,110.87 |

**Farm Advocate/TA Provider,** *to be hired:* Train with SE Cohort of advocates to eventually take on responsibility for one-on-one farm advocacy casework.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $57,455.19 | 0.83 | $143,063.42 |

**Federal Grants Manager,** *Kelly Marchand*: Ensure project staff are properly collecting impact data and are aware of reporting requirements and deadlines. Ensure compliance with federal budget requirements and assess progress towards cooperative agreement deliverables.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $69,793.68 | 0.16 | $33,500.97 |

**Salesforce Manager,** *Mo Murrie:* Ensure the case management systems in Salesforce are properly constructed and functioning. Ensure timely input of all casework data, coordinating across staff and program areas; contribute to required reports.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $94,427.75 | 0.18 | $50,990.99 |

**Curriculum Developer,** *to be hired:* Develop the curriculum for the SE Cohort and broad-use training materials for farm advocates/TA providers. Work with project partners to develop comprehensive training materials.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $69,793.68 | 0.94 | $196,818.18 |

**Southeast (SE) Cohort Manager,** *to be hired:* Lead recruitment, onboarding, and ongoing management of cohort members training to be farm advocates/TA providers. Contribute to development of nationwide Distressed Borrower Assistance Network.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $69,793.68 | 0.94 | $196,818.18 |

**Project Coordinator,** *to be hired:* Provides support for project activities; event planning, scheduling, coordination with project partners, travel arrangements, etc.

| Avg. Annual Salary | FTE | Funds Requested |
|---|---|---|
| $57,455.19 | 0.94 | $162,023.64 |

**Total personnel requested: $1,011,734.16**

J.A. 1636

USCA4 Appeal: 25-1575     Doc: 55-4       Filed: 06/23/2025      Pg: 104 of 606

Docusign Envelope ID: E43512D1-C879-4A37-969E-83EB2DF405FB
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 99 of 378

Agreement # FSA24CPT0014403                                                    Attachment 3

### FRINGE BENEFITS  - $354,106.96
Fringe benefits include, but are not limited to, employment taxes, employee insurance, and unemployment benefit plans. Fringe benefits are calculated at 35% for full-time, salaried employees.

**Total fringe benefits requested: $354,106.96**


### TRAVEL - $79,063.95

**Casework Travel:** mileage for RAFI staff to meet with farmers and/or FSA offices regarding casework. Rental cars will be used for longer trips.

$0.67 per mile x avg 250 miles round trip x 50 trips per year x 3 years = $25,125
$100/day car rental x 10 trips over 3 years = $1,000

**Amount Requested: $26,125**


**Trips to Attend Annual Farm Aid Festivals**: One trip per year to the annual Farm Aid festival to participate in training and networking opportunities as well meet with Guidance Team members. Travel will include at least 6 project staff members each of 3 years.

*RAFI Staff*
Flight: $400/flight x 6 travelers x 1 trip/yr x 3 years = $7,200
Lodging: $107/night (base GSA rate) x 3 nights x 1 trip/yr  x 3 years x 6 staff = $5,778
Meals: $57/day x 3 full travel days x 6 staff x 1 trip/yr x 3 years = $3,078
Rental Car: $100/day x 2 cars x 3 days x 1 trip/yr x 3 years = $1,800
Transport to/from Home Airport: avg mileage or taxi $20/trip x 2 trips x 6 staff x 3 yr = $720

**Amount Requested = $18,576**


**Annual Summit Network Gathering**: Travel support to attend project wide summit network gathering events held annually in Year Two and Year Three. Six RAFI staff members will attend each year.

Flight: $400/flight x 6 travelers x 1 trip/yr x 2 years = $4,800
Lodging: $107/night (base GSA rate) x 2 nights x 1 trip/yr  x 2 years x 6 staff = $2,568
Meals: $57/day x 2 full travel days x 6 staff x 1 trip/yr x 2 years = $1,368
Rental Car: $100/day x 2 cars x 2 days x 1 trip/yr x 2 years = $800
Transport to/from Home Airport: avg mileage or taxi $20/trip x 2 trips x 6 staff x 2 yr = $480

**Amount Requested = $10,016**

**Trips to FSA National Office**: One trip to Washington, DC per year to meet with FSA staff

3

**J.A. 1637**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 105 of 606

Docusign Envelope ID: F43512D3-C828-4A37-9695-93FB2F5406FD
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 100 of 378
Agreement # FSA24CPT0014403                                              Attachment 3

and/or Project Partners to discuss project progress and upcoming work. At least 5 RAFI staff will attend each year.

Mileage: $0.67/mile x 460 miles roundtrip x 2 cars x 1 trip/year x 3 years = $1,849.20
Lodging: $220/night (avg DC GSA rate) x 2 nights x 1 trip/yr x 3 years x 5 staff = $6,600
Meals: ($79/day x 1 days x 5 staff x 1 trip/yr x 3 years) + ($59.25/day for first/last day travel x 1 days x 5 staff x 1 trip/yr x 3 years) = $2,073.75

**Amount Requested = $10,522.95**

**Professional Development Travel:** Travel support for RAFI staff to attend conferences, trainings, or workshops that will increase the knowledge, skills, or networks to aid in completion of project deliverables. Events may include but are not limited to; biannual Farm Viability Conference, training on trauma informed casework, training on farm financials. Travel expenses exclude conference registration fees.

Flight: $400/flight x 6 travelers x 1 trip/yr x 3 years = $7,200
Lodging: $107/night (base GSA rate) x 2 nights x 1 trip/yr x 3 years x 6 staff = $3,852
Meals: $57/day x 2 full travel days x 6 staff x 1 trip/yr x 3 years = $2,052
Transport to/from Home Airport: avg mileage or taxi $20/trip x 2 trips x 6 staff x 3 yr = $720

**Amount Requested = $13,824**

**Total travel funds requested = $79,063.95**

<u>**SUPPLIES**</u> **- $10,320**
- Printing & ink (for cohort members to print casework materials, handbooks, etc) $100 annually x 7 cohort members x 2 years = **$1,400**
- Postage: $40 annually for 3 years = **$120**
- Office supplies (for 4 new RAFI staff members: notebooks, pens, binders, cards, etc) $150/yr x 4 new staff members x 3 years = **$1,800**
- Cohort office supplies (7 cohort members: notebooks, pens, binders, cards, etc) $150/yr x 7 cohort members x 2 years = **$2,100**
- Southeast Cohort Gathering Meal (one box lunch provided during day long gathering in order to allow for continuance of meeting) $15/person x 15 people x 2 gatherings/yr x 2 years = **$900**
- Laptops for four new staff (Farm Advocate/TA Provider, Curriculum Developer, SE Cohort Manager, Project Coordinator): $1,000 computer x 4 staff in year 1 = **$4,000**

**Total supplies funds requested: $10,320**

4

**J.A. 1638**

**CONTRACTUAL** - **$585,110.50**

**Southeast Cohort Members**
Payment for participation in farm advocate/TA provider project events, and for providing ongoing farm advocacy/TA case work. Contract payment based on an estimated average 100 hours of work per month at $30/hr.
    $3,000/mo x 18 months x 7 cohort members = $378,000

SE Cohort Member Trips to Attend Annual Farm Aid Festivals
One trip per year to the annual Farm Aid festival to participate in networking opportunities as well as meet with Guidance Team members. Travel will include 7 Cohort members Year 2 (after their training period) and Year 3.
    *SE Cohort Member Travel Support*
    Flight: $400/flight x 7 travelers x 1 trip/yr x 2 years = $5,600
    Lodging: $107/night (GSA rate) x 3 nights x 1 trip/yr  x 2 years x 7 travelers = $4,494
    Meals: $57/day x 3 full travel days x 7 travelers x 1 trip/yr x 2 years = $2,394
    Rental Car: $100/day x 2 cars x 3 days x 1 trip/yr x 2 years = $1,200
    Transport to/from Home Airport: avg mi/taxi $20/trip x 2 trips x 7 travelers x 2 yr = $560
    Amount Requested = $14,248.00

Southeast Cohort Gatherings
One meeting in Year Two and two meetings in Year Three for 7 cohort members to travel to the NC office to meet with advocate staff for casework and networking opportunities.

    Flight: $350/flight x 7 travelers x 3 trips = $7,350
    Lodging: $107/night (base GSA rate) x 1 night x 3 trips x 7 travelers = $2,247
    Meals: $42.75 (75% for partial travel day) x 2 days x 7 travelers x 3 trips = $1,795.50
    Transport to/from Home Airport: avg mileage or taxi $20/trip x 3 trips x 7 travelers  = $420
    Amount Requested = $11,812.50

**Total Southeast Cohort = $404,060.50**

Farm Advocate/TA Provider Mentor Stipends
To cover experienced farm advocates'/TA providers' time spent mentoring advocates/TA providers in the SE Cohort. Stipend based on an estimated average of 6.25 hours of work per month at $80/hr.

5 advocates x $500/mo x 12 mo/yr x 2 years = **$60,000**

Videographer - in support of curriculum development, for the design, recording, and editing of video educational content
$75/hr x 275 hrs = $20,625

Graphic Design - in support of curriculum development, for the adaptation of existing and design

of new training materials
$75/hr x 200 hr = $15,000

Writer/Editor - in support of curriculum development, provide writing and editing support with adapting existing or creating new training content that is accessible for adult learners. Also writers to contribute to Living Roots magazine content.
$55/hr x 180 hr = $9,900

Expert Advocates/TA providers and Caseworkers for Trainings - contract those who have expertise in casework and/or farm advocacy/TA topics for additional SE Cohort and other project trainings
$75/hr x 6 training sessions x avg 55 hr work/training = $24,750

Translation & Interpretation - 40 hours of Spanish translation annually x 3 years x $72/hour estimated cost = $8,640

Salesforce Annual License Fees
$446/person x 5 staff** x 3 years = $6,690

Monthly phone service
$55/mo x 5 staff** x 12 months x 3 years = $9,900

> **Staff include Project Manager, SE Cohort Manager, Curriculum Developer, Project Coordinator, Farm Advocate*

Living Roots Magazine outreach
Funds to cover at least 3 pages of content in each Living Roots magazine issue (3 per year) and to increase mailing list from 3,400 to 5,000 contacts. Content will include farmer-facing information about project, such as overview of the peer support program, the Southeast Cohort, or advocacy/TA services.  $2,000/issue (editing, printing, postage expenses) x 3 issues/yr x 3 yrs = $18,000

Printing
Funds to cover printing of developed curriculum materials for cohort members or for training presentations at project-sponsored events. $0.50/pg color x avg 10 page/publication x 1,113 copies = $5,565

Expense Tracking
Funds to cover the cost of RAFI's expense tracking software, Expensify - represents project proportional expense of total cost. $39/mo x 12 mo/yr x 3 yr = $1,404

Mailchimp
Funds to cover the cost of RAFI's e-newsletter software, Mailchimp, allowing us to connect with over 14,000 contacts - represents project proportional expense of total cost. $16/mo x 12 mo/yr x 3 yr = $576

**J.A. 1640**

**Total contractual funds requested = $585,110.50**

**OTHER - $144,817.50**

*Other - Participant Travel*

**Peer Supporter Travel Support**
Trip to the annual Farm Aid festival to participate in training and networking opportunities as well meet with Guidance Team members. Travel will include 15 peer supporters in Year 1.

Flight: $400/flight x 15 travelers x 1 trip/yr x 1 year = $6,000
Lodging: $107/night (GSA rate) x 3 nights x 1 trip/yr x 1 years x 15 travelers = $4,815
Meals: $57/day x 3 full travel days x 15 travelers x 1 trip/yr x 1 years = $2,565
Rental Car: $100/day x 3 cars x 3 days x 1 trip/yr x 1 year = $900
Transport to/from Home Airport: avg mi. or taxi $20/trip x 2 trips x 15 staff x 1 yr = $600
Amount Requested = $14,880.00

**Southeast Cohort Gatherings**
One meeting in Year Two for 7 cohort members to travel to the NC office with advocate training staff to gather for training

Flight: $350/flight x 7 travelers x 1 trip = $2,450
Lodging: $107/night (base GSA rate) x 1 night x 1 trip x 7 travelers = $749
Meals: $42.75 (75% for partial travel day) x 2 days x 7 travelers x 1 trip  = $598.50
Transport to/from Home Airport: avg mileage or taxi $20/trip x 1 trip x 7 travelers = $140
Amount Requested = $3,937.50

**Total Other - Participant Travel = $18,817.50**

*Southeast Cohort Members*
Payment for participation in farm advocate/TA training. Contract payment based on an estimated average 100 hours of work per month at $30/hr.

$3,000/mo x 6 months x 7 cohort members = $126,000

**Total Other Requested: $144,817.50**

**INDIRECT - $204,029.65**
Indirect costs were calculated using the 10% de minimis rate based on **modified total direct costs** (federal): salary and wages, fringe benefit, travel, supplies, contractual, and other = $2,040,335.57 x 10% = $204,033.56 - $3.91 (foregone indirect funds to maintain same total federal funds requested as budget submitted on June 5, 2024) = $204,029.65

7

Agreement # FSA24CPT0014403

Attachment 3

| Budget Categories | Budgeted Amount | MTDC Amount |
|---|---|---|
| Personnel | $1,011,734.16 | $1,011,734.16 |
| Fringe | $354,106.96 | $354,106.96 |
| Travel | $79,063.95 | $79,063.95 |
| Supplies | $10,320.00 | $10,320.00 |
| Equipment | 0 | $0.00 |
| Contractual | $585,110.50 | $585,110.50 |
| Other | $144,817.50 | $0 |
| Total Direct Cost | $2,185,153.07 | $2,040,335.57 |
| Indirect @ 10% | $204,033.56 | |
| Requested Indirect (minus $3.91) | $204,029.65 | |

**Total Indirect costs requested = $204,029.65**

**Total Federal Funds Requested = $2,389,182.72**

8

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 110 of 606

Docusign Envelope ID: E43512D3-C878-4A37-969E-93FB2DE406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 105 of 378

Agreement # FSA24GRA0014403
<div align="right">Attachment 4</div>

# U.S. DEPARTMENT OF AGRICULTURE
# FARM PRODUCTION AND CONSERVATION

## GENERAL TERMS AND CONDITIONS FOR
## GRANTS AND COOPERATIVE AGREEMENTS

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

### A. APPLICABLE REGULATIONS

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CFR and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

<div align="right">1</div>

<div align="center">**J.A. 1643**</div>

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

**J.A. 1644**

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C.  PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency.  The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov.  All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

**J.A. 1645**

Docusign Envelope ID: F43512D3-C878-4A37-969F-93FB2BF406FB

Agreement # FSA24GRA0014403                                                    Attachment 4

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5. Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6. Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

   a. The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

   b. Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

   c. The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

   d. Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

   e. Additional Federal funds needed to complete the project. This change also requires a formal agreement amendment.

   f. Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs. If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment. If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

   g. If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7. No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

4

**J.A. 1646**

Docusign Envelope ID: E43512D3-C878-4A37-969E-93EB2BF496FB
Agreement # FSA24GRA0014403

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

   a.  Amount of additional time requested

   b.  Explanation for the need for the extension

   c.  A summary of progress to date and revised milestones

### D.  PAYMENTS

1.  Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to either the ezFedGrants system or to FPAC.BC.GAD@usda.gov.  Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html.  Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2.  Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205.  Requests must be submitted no less than 15 days prior to the start of the requested advance period.  The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3.  The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs.  The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government.  Do not provide supporting documentation unless it is specifically requested.

4.  Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date.  The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5.  Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred.  The Government and recipient must utilize 2 CFR 200, Subpart E,

**J.A. 1647**

Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

### E. FINANCIAL REPORTING

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

### F. PERFORMANCE MONITORING AND REPORTING

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted. Each report must cover—

   a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   b. The reasons why milestones and deliverables targets were not met, if appropriate.

   c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

3. The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1. Reporting of first-tier subawards.

    a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

    b. Where and when to report.

        i. You must report each obligating action described in paragraph 1.a. of this award term to *http://www.fsrs.gov*.

        ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

    c. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

2. Reporting Total Compensation of Recipient Executives.

    a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

        i. the total Federal funding authorized to date under this award is $30,000 or more;

        ii. in the preceding fiscal year, you received—

            (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

        iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

**J.A. 1649**

7

USCA4 Appeal: 25-1575    Doc: 55-4      Filed: 06/23/2025    Pg: 117 of 606

Docusign Envelope ID: F43512D3-C878-4A37-969E-93FB2BF406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 112 of 378
Agreement # FSA24GRA0014403                                              Attachment 4

    b.  Where and when to report. You must report executive total compensation described in paragraph 2.a. of this award term:

       i.  As part of your registration profile at https://sam.gov

      ii.  By the end of the month following the month in which this award is made, and annually thereafter.

3.  Reporting of Total Compensation of Subrecipient Executives.

    a.  Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

       i.  In the subrecipient's preceding fiscal year, the subrecipient received—

          (a)  80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

          (b)  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

      ii.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b.  Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

       i.  To the recipient.

      ii.  By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4.  Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a.  Subawards, and

    b.  The total compensation of the five most highly compensated executives of any subrecipient.

5.  Definitions. For purposes of this award term:

    a.  Entity means all of the following, as defined in 2 CFR part 25:

       i.  A Governmental organization, which is a State, local government, or Indian Tribe;

**J.A. 1650**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 118 of 606

Docusign Envelope ID: E43542D8-C878-4A37-969E-03FB2DF406FB    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 113 of 378
Agreement # FSA24GRA0014403    Attachment 4

    ii.    A foreign public entity;

    iii.    A domestic or foreign nonprofit organization;

    iv.    A domestic or foreign for-profit organization;

    v.    A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.  Executive means officers, managing partners, or any other employees in management positions.

c.  Subaward:

    i.    This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    ii.    The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

    iii.    A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.  Subrecipient means an entity that:

    i.    Receives a subaward from you (the recipient) under this award; and

    ii.    Is accountable to you for the use of the Federal funds provided by the subaward.

e.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

    i.    Salary and bonus.

    ii.    Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

    iii.    Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

    iv.    Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

    v.    Above-market earnings on deferred compensation which is not tax-qualified.

    vi.    Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

**J.A. 1651**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 119 of 606

Docusign Envelope ID: E43512D3-C878-4A37-969E-93FB2DF406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 114 of 378
Agreement # FSA24GRA0014403                                          Attachment 4

## H.  AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the  audit period, whichever comes first.

## I.  AWARDS WITH RESEARCH ACTIVITIES

1.  Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2.  In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication.  Recipients can receive a DOI via NAL.

Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

## J.  SPECIAL PROVISIONS

1.  The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2.  Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

10

**J.A. 1652**

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6. The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

   "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

   In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

   "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

   All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

11

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L.  COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

   a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

   b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

   Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment. FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed as cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

**J.A. 1654**

Agreement # FSA24GRA0014403                                                          Attachment 4

      services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

**J.A. 1655**

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

14

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 124 of 606

Docusign Envelope ID: F43512D3-C878-4A37-969E-93EB2BF406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 119 of 378
Agreement # FSA24GRA0014403                                    Attachment 4

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:* When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

**J.A. 1657**

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1. The listed items are:

    a. Non-ferrous metals;

    b. Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

    c. Glass (including optic glass);

    d. Fiber optic cable (including drop cable);

    e. Optical fiber;

    f. Lumber;

    g. Engineered wood; and

    h. Drywall.

2. Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1. Articles, materials, or supplies that have been:

    a.  Processed into a specific form and shape; or

    b.  Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2. If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

## P. NONEXPENDABLE EQUIPMENT

1. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3. The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

    a.  Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

    b.  Activities under Federal awards from other Federal awarding agencies.

4. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6. When equipment is no longer needed for any of the purposes set out in this provision

17

**J.A. 1659**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 127 of 606

Docusign Envelope ID: F43512D3-C878-4A37-969E-93EB2DF406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 122 of 378
Agreement # FSA24GRA0014403                                                        Attachment 4

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

### Q. LIMIT OF FEDERAL LIABILITY

1. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

### R. AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

### S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1. Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2. The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3. The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

   a. You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

**J.A. 1660**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 128 of 606

Docusign Envelope ID: F43512D3-C878-4A37-969E-93FB2F5406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 123 of 378
Agreement # FSA24GRA0014403                                                    Attachment 4

enforcement representative of a Federal department or agency authorized to receive such information.

b. You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c. The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d. If FPAC determines that you are not in compliance with this award provision, FPAC:

   i. Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

   ii. May pursue other remedies available for your material failure to comply with award terms and conditions.

## T. ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6. The recipient must notify all managers, supervisors, employees, contractors, agents,

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 129 of 606

Docusign Envelope ID: F43512D3-C878-4A37-969F-93FB2BF406FB
2:25-cv-02132-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 124 of 378
Agreement # FSA24GRA0014403                                    Attachment 4

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information.  Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

   a.  State identification and county number (where reported and where located).

   b.  Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

   c.  Farm, tract, field, and contract numbers.

   d.  Production shares and share of acres for each Farm Serial Number (FSN) field.

   e.  Acreage information, including crop codes.

   f.  All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

   g.  Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

   h.  Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law*" (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

J.A. 1662

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U.  NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V.  TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

1. By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

2. By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

3. By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

4. By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

5. If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1. General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

**J.A. 1663**

Docusign Envelope ID: E43512D8-C878-4A37-969E-93FB2BF406FB

Agreement # FSA24GRA0014403                                                        Attachment 4

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2.  Proceedings About Which The Recipient Entity Must Report

Submit the information required about each proceeding that:

a.  Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

b.  Reached its final disposition during the most recent five-year period; and

c.  Is one of the following:

   i.  A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

   ii.  A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

   iii.  An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

   iv.  Any other criminal, civil, or administrative proceeding if:

      a)  It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

      b)  It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

      c)  The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3.  Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4.  Reporting Frequency

During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

22

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 132 of 606

Docusign Envelope ID: E43542D3-C9B9-4A37-969E-93EB2DF406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 127 of 378
Agreement # FSA24GRA0014403                                          Attachment 4

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X. AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

Recipients must retain all records pertaining to the agreement in accordance with 2

23

**J.A. 1665**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 133 of 606

Docusign Envelope ID: E43512D3-C878-4A37-969F-93EB2BE496FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 128 of 378
Agreement # FSA24GRA0014403    Attachment 4

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y.   NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z.   CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

24

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer. Documents transmitted via ezFedGrants are digitally authenticated and acceptable.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

   a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

   b. An audit that meets the requirements contained in Subpart F.

J.A. 1667

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 135 of 606

Docusign Envelope ID: F43512D3-C878-4A37-969E-93EB2DE406FB
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 130 of 378
Agreement # FSA24GRA0014403                                    Attachment 4

**CC. AGREEMENT COUNTERPARTS**

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

**DD. CONTINUING OBLIGATIONS**

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

26

# RAFI DECLARATION

# EXHIBIT 13-E

**PROJECT NARRATIVE:** 2022 Increasing Land, Capital and Market Access Program

**Lead Applicant:**          Rural Advancement Foundation International-USA (RAFI-USA)
**Project Title:**           *Gaining New Ground for Underserved Farmers in Southeast US &*
                             *US Caribbean Region*
**Project Term:**            April 1, 2023 -March 31, 2028
**Proposed Funding Tier:**   Regional Land Access Tier (NC, FL, USVI & PR)
**Total Requested Funds:**   $8,499,695

## INTRODUCTION & JUSTIFICATION

### Project Goal & Purpose

The overarching goal of the proposed Gaining New Ground project is to improve land access and land security for underserved farmers of color in four areas: North Carolina (NC), Florida (FL), U.S. Virgin Islands (USVI), and Puerto Rico (PR). This will be accomplished by addressing core barriers to access land, credit, and markets, while also working to retain farmland by mitigating and preventing land loss. The project will work to meet the needs of underserved farmers on the edge of viability by delivering culturally-relevant outreach and education, providing targeted technical and financial assistance and examining and addressing barriers to accessing USDA programs in regions with significant populations of Black, Indigenous, and people of color (BIPOC) farmers, particularly those who are especially vulnerable to climate change impacts. The project will further work to improve land access by exploring the feasibility of establishing an agricultural land trust in Caribbean region and bolstering an existing land trust in Puerto Rico.

### Justification of Need

Since 1990, RAFI-USA has worked with farm families of small and mid-sized farms to help them succeed in the face of financial crises and to reverse the trend of farm loss. Over time, we have recognized that farmers of color face specific difficulties that put their farms and livelihoods in peril. By 2044, the U.S. is projected to have a majority-minority population, yet the U.S. farming community remains dominated by white men. Farmers of color represent less than 4% of all owner-operators.

Thriving regional food systems depend on the land security of farmers, yet finding and securing affordable land is one of the biggest challenges farmers face in starting or maturing a career in agriculture. For BIPOC farmers, this is compounded by the fact that they have historically experienced abusive practices and discrimination in accessing credit, resources, and markets, leading to significant land loss. According to the USDA Tenure, Ownership, and Transition of Agricultural Land (TOTAL) survey in 2014, about 40% of U.S. farmland is rented, and 97% of landlords are white. Nationally, while 14% of tenants are people of color, they operate only 8% of tenant acreage, indicating BIPOC tenants operate smaller farms than white tenants. According to the results of the National Young Farmer Coalition's Survey with over 10,000 responses from farmers under 40 years of age, "Over half of all respondents (54%), and 75% of Black farmers, said that they currently need more access to land, whether to buy or lease."

Accessing affordable land is especially difficult for farmers in Puerto Rico and U.S.Virgin Islands, who must contend not only with expensive farmland and a growing number of outside investors buying up property but also with the realities of climate change, the recurring risk of hurricanes, a lack of local markets for their products, and off-farm wages that are significantly lower than on the mainland.

**J.A. 1670**

Farmers in the U.S. Caribbean are *severely* underrepresented and disconnected from available resources and larger networks, yet especially susceptible to climate change impacts. Farmers face challenges unique to their location, geography, and status as a territory. Some of these include difficulty in transportation within and between the various islands that make up the Territories, lack of processing facilities or shared-use certified kitchens, lack of dedicated FSA staff (USVI), and significant distrust of government programs, particularly federal ones.

Small and mid-scale farmers today must rely on off-farm income to cash flow their operations. Unfortunately, this is a challenge for farmers in PR and USVI, where unemployment and poverty rates are high. According to 2021 Census data, the poverty rate in PR at 40.5% was almost double that of Mississippi (MS), the poorest state in the nation, where approximately 19.4% of persons live in poverty. Per capita income in PR was just over $13,000 in 2020 compared to $25,400 in MS. PR and USVI residents are ineligible for the Earned Income Tax Credit and earn less, on average, in Social Security and veterans' benefits. Like PR, poverty in USVI is also high, with more than 20% of the population and a third of children living in poverty. Median household income decreased in 2019 to $40,408.The average annual income for farmers in USVI is approximately $9,500. In 2018, the U.S. Virgin Islands had 565 farms, up 158% from 219 farms in 2007.

**Target Audience**
The Gaining New Ground project will focus efforts in regions where RAFI-USA's Farmers of Color Network (FOCN) program already has a foothold and where our collaborating partners have existing relationships and experience working with local farmers. The primary beneficiaries of this project are historically underserved farmers of color in North Carolina, Florida, the central mountain region of Puerto Rico, and the U.S. Virgin Islands.

**Table 1. Farm Operations, Ownership, Demographics, and Farm Size in Target Region**

|  | NC  (2017) | FL (2017) | PR (2018) | USVI (2018) |
|---|---|---|---|---|
| *Number of farms* | 46,418 | 47,590 | 8,230 | 565 |
| *Owned/leased farms* | 43,764 / 15,561 | 45,488 / 8,674 | n/a | 421 / 233 |
| *# BIPOC operated farms* | 3,342 | 9,032 | 744 | n/a |
| *Average farm size (acres)* | 182 | 204 | 58 | 16.5 |

*Data Source: USDA NASS 2017 Census of Agriculture*

Targeted audience includes farmers who have limited resources, are located in high poverty areas, and are susceptible to climate change impacts. Additional details:

● FOCN's membership is 76% Black/African American, 12% Indigenous, 9% Latinx, 3% Asian, and 1% Multiracial. Almost 40% of farmers who have applied for funding from the FOCN grants program include livestock production on their farms.
● In Puerto Rico, most farmers are Hispanic/Latinx. More than half of the farmers in the Alliance for Agriculture's network include livestock production on their farms.
● The majority of farmers in the U.S. Virgin Islands self-identify as Black/Caribbean. Many farmers also include livestock production on their farms.

The project will prioritize farmers previously impacted by disaster(s), those employing agroecological and sustainable production practices, farmers with diversified production systems, small livestock producers, and subsistence farmers in USVI and PR. The following

**J.A. 1671**

proposed criteria will help us target and prioritize farmers who can be considered to be on the "edge of viability" for greatest impact:

- Farmers who have been farming more than a year, with priority given to farmers who have been farming for *at least* 3 years
- Farmers who have been unsuccessful in applying for FSA farm ownership loans or other USDA cost-share assistance
- Farmers who are ready to transition from a leased arrangement to land ownership
- Farmers who are close to "business-ready," including farmers who have not filed a Schedule F or registered with FSA
- Farmers who are not a good fit or ready for farm debt

**Programmatic Gaps Addressed By Proposed Project**

**Farmers have lack of awareness of available programs and resources and lack of knowledge of lending requirements:** Farmers of color are often not aware of the various programs and services available to them, as well as the regulations that govern these, and often experience difficulties in accessing USDA programs and services. In 2021, 23% of farmers who applied for RAFI-USA's FOCN grants program reported *not* having a registered FSA number. *The proposed project will fill this gap through strategic outreach to inform underserved farmers about how available resources and services can be used to help strengthen their farm operations and what requirements are necessary to access these.*

**Limited legal, financial, and business technical assistance for small BIPOC producers, particularly those in USVI and PR**: Farmers of color in the target regions are less likely to have access to technical assistance for their farming operations and are often left on their own when it comes to navigating complex application processes, creating farm business plans, accessing programs, addressing legal and financial challenges, negotiating with lenders, responding to disasters, and preventing land loss. There is a critical need for assistance with accounting, business planning, heir's property issues, etc. In 2021, 28% of farmers who applied for RAFI-USA's FOCN grants program reported not filing a Schedule F with the IRS. *The proposed project will fill gaps in assistance for underserved farmers by providing comprehensive 1-on-1 technical assistance, farm advocacy services, and case management to support the success, resiliency, and viability of their farms.*

**Programs are not designed to meet the needs of small farms, agroecological farmers, or BIPOC farmers**: USDA's decades-long "get big or get out" strategy of pushing farmers into high-volume commodity production has resulted in a long list of farm casualties and land loss. Although federal resources are an important part of the farm safety net, USDA programs are not designed for small-scale, diversified agroecological producers, nor are they designed to equitably meet the needs of BIPOC farmers or farmers in the U.S. Caribbean regions. A sentiment we often hear expressed by farmers: "*It felt like they were looking for reasons to deny my application, not reasons to approve it.*" Small farmers, especially BIPOC farmers, need to work exceptionally hard to justify the feasibility of their applications. On average, farms operated by BIPOC farmers are a quarter of the size of white-owned farms and often adapt by pursuing production practices and markets outside of the commodity system. Further, many USDA staff show little interest or have limited knowledge of adequately supporting smaller, diversified farms. *The proposed project fills this gap by improving agency staff awareness and understanding of the needs of small, agroecological, and BIPOC-underserved farmers while also looking to identify opportunities for service improvement.*

**Low participation by socially disadvantaged farmers in FSA Farm and Loan Programs:** FSA loan origination and servicing are failing BIPOC farmers, especially those in underserved

**Page 3.** *Gaining New Ground Project Narrative*; RAFI-USA

areas such as PR and USVI. Unfortunately, the problem cannot be attributed solely to a lack of farmer awareness about available programs. In our experience working side-by-side with farmers looking to apply for FSA programs, we have seen that often farmers of color are less likely to be treated as serious farmers by FSA staff and receive the bare minimum of information and guidance regarding program eligibility, application processes, and critical considerations for sound decision making. Female farmers also experience difficulty, with many, for example, reporting being asked to use their husbands' names in application documents instead of their own. *The project will fill this gap by seeking to understand <u>why</u> the volume of applications and number of loans approved in FL, PR, and USVI are so low (see table below) and by assisting farmers in overcoming these specific barriers.*

**FSA Direct Farm Ownership Loan Volume & Approvals**

| Region | 2021 | | Jan-Sep 2022 | |
|---|---|---|---|---|
| | # Apps | Approved % (#) | # Apps | Approved % (#) |
| NC | 102 | 39% (40) | 75 | 45% (34) |
| FL | 100 | 12% (12) | 71 | 8.5% (6) |
| PR | 37 | 13.5% (5) | 27 | 0% (0) |
| USVI | 0 | 0% (0) | 0 | 0% (0) |

**Small farms, diversified and agroecological farmers, and BIPOC farmers do not have adequate and right-sized market access for farm product distribution in local, regional, and national food systems.** Traditional wholesale buyers and distributors, even those involved in regional food distribution, often prioritize mid-size and large farms over small, diversified producers because of assumptions made regarding the small farmer's ability to deliver products as needed. This, as well as overt racial discrimination against BIPOC producers, has historically resulted in these farmers being excluded from purchase contracts and even local farmer's market organizations while their white counterparts received priority. However, these producers can adequately supply traditional markets if provided specialized technical assistance on topics including wholesale and retail introductions, certifications and/or food safety best practices, market production planning, cooperative producer strategies, and cash flow planning/evaluation. *The project will fill this gap through RAFI-USA's existing strategy and capacity for assisting small BIPOC producers with traditional and alternative market access opportunities and all project partners' existing relationships with wholesale and retail entities in targeted areas.*

**A lack of support and assistance for subsistence farming in the U.S. Caribbean**, particularly in Puerto Rico, where in 2022, the PR Department of Agriculture (ASDA) did not apply for the USDA Micro-Grants for Food Security program. *The project will address this programmatic gap through outreach, education, technical assistance, and financial support for subsistence farmers.*

**Farmers and landowners in PR and USVI have minimal access to land and conservation solutions offered by land trusts.** *The project will fill this gap by providing financial assistance to Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture), the only existing farmland trust in PR, and exploring the feasibility of establishing an additional agricultural land trust for the U.S. Caribbean region.*

<u>Project Concept and Design</u>

RAFI-USA's proposed Gaining New Ground project was designed in close collaboration with the Alliance for Agriculture in PR and the Virgin Islands Good Food Coalition. It will expand the scope and depth of services already provided by these three organizations. The project's primary goal is to increase farm and land ownership opportunities for farmers, particularly historically

**Page 4.** *Gaining New Ground Project Narrative*; RAFI-USA

underserved farmers of color, on small- to mid-sized farms in the regions identified. Designed as a collaborative effort with shared leadership and an Advisory Committee of leaders in the field, the project will build upon a circle of relationships that will strengthen the project's efforts. Gaining New Ground will follow an adaptive, iterative process and project design consisting of five cyclical phases:

1. Discovery: Participatory data gathering process
2. Planning: Develop strategy and activities to fulfill project goals and objectives
3. Implementation: Develop materials and execute activities
4. Tracking Results: Measure the effectiveness and reaction of the target audience
5. Refining: Adjust strategy, plan, and activities accordingly

To ensure the participation and input of diverse regional stakeholders in guiding the direction of the project, an Advisory Committee will be established to provide overall guidance and to make final funding decisions on financial assistance commitments. Members will include staff representatives from RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition, as well as individuals with relevant and varied expertise and perspective. A key early activity will be to help develop the scope and focus of the baseline study.

The initial baseline study will involve conducting regional needs assessments to uncover farmers' primary barriers to land tenure and the regional dynamics that contribute to a lack of ownership and land loss. The baseline study will also identify roadblocks farmers face when attempting to access USDA programs and determine the types of assistance most needed by farmers targeted for this project.

In addition to conducting the baseline study during year one, we will also review USDA outreach materials to assess how understandable, concise, and complete they are. Farmers need centralized, easy-to-find informational materials that summarize programs' purpose, eligibility, and processes. What we learn during this review will be shared with USDA and used to inform the development of our outreach materials. Materials developed for the project will maximize farmers' awareness of resources and include information that could improve farmers' outcomes in accessing services from USDA.

**OBJECTIVES AND OUTCOMES**
**Objective #1: Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers. Outputs:**
1.1 Conduct baseline study via existing project partners' data, farmer focus groups, and developed farmer surveys to identify all region and region-specific challenges farmers face in accessing USDA programs, acquiring land, securing credit, and accessing markets.

1.2 Develop recommendations for improving access to land, credit, and markets. Recommendations will be conveyed to USDA via Advisory Committee as described in Goal #2.

1.3 Convene a panel of experts to 1) evaluate current land use and access challenges in USVI and PR and 2) complete a feasibility study on the establishment of a USVI and PR regional land trust to serve as a vehicle to bring forth innovative solutions to underserved farmers that need to secure affordable land via long-term leases, lease-to-own arrangements and/or land acquisition to be dedicated to farming, forestry or to provide ecological service.

**Page 5.** *Gaining New Ground Project Narrative*; RAFI-USA

J.A. 1674

1.4 Build working relationships with USDA staff to ensure ongoing positive engagement.

**Expected Outcomes:**
1. **Host at least three focus groups** of 8-10 farmers to identify land access challenges and ways USDA programs can better serve farmers in land, capital, and market access.
2. Based on the baseline study, **publish three summary reports.** 2 reports (one all-region, one region-specific) detailing the challenges underserved farmers face in accessing USDA/FSA programs and recommendations to address challenges. And 1 report assessing existing USDA outreach materials and the highest technical assistance needs from farmers.
3. In partnership with USDA staff, project staff will conduct ongoing relationship-building meetings, develop training opportunities, and facilitate farmer-to-USDA staff connections that will improve working relationships with USDA service center field staff and farmers. The Advisory Committee will also **compile and communicate recommendations to USDA** on clarity and ease of use of USDA outreach materials.
4. **Completion of 2 reports**: "Land Use & Land Access in USVI and PR" as well as the USVI and PR land trust feasibility study.

**Objective #2: Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.**
**Outputs:**
2.1 Convene Advisory Committee to provide project input and guidance, identify existing public and private services available in each region to help farmers, and serve as review committee for Gaining New Ground grants and financial incentive award decisions.

2.2 Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements, particularly FSA programs and market opportunities.

2.3 Through outreach activities, identify underserved farmers who meet eligibility criteria and are strong candidates to receive technical assistance related to land, capital, and market access, particularly those previously denied by USDA programs.

**Expected Outcomes:**
1. Conduct outreach activities reaching at least **1,200 farmers** to increase knowledge of and access to available resources or services related to land, credit, or market access, resulting in at least **300 underserved farmers** receiving practical, actionable information through 1-on-1 assistance, online content, webinars, or training.
2. Proactively identify and **recruit 200 underserved farmers** who are eligible and would be strong candidates to receive comprehensive land, capital, or market technical assistance services from project partners.

**Objective #3: Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.**
**Outputs:**
3.1 Build a network of legal, financial, and business technical assistance experts and project case managers that can meet specific needs identified by farmers during a technical assistance intake assessment.

3.2 Develop customized technical assistance plans for each farmer based on their needs and goals, provide farmers with individualized technical assistance, and maintain comprehensive case management to ensure consistent tracking of engagement and progress against goals.

**Page 6.** *Gaining New Ground Project Narrative*; RAFI-USA

3.3 Improve the degree of underserved farmers' participation in USDA programs related to project-developed farm viability benchmark metrics.

3.4 Build relationships with institutional buyers to encourage increased sourcing from local farmers and help connect farmers with opportunities to new and emerging markets.

3.5 Provide farm advocacy services to farmers in crisis, including assisting with creditors, accessing resources and programs to solve immediate and long-term challenges, and assistance in minimizing the impact of disasters on land ownership and farm viability.

**Expected Outcomes:**
1. **200 underserved farmers** receive technical assistance tailored to their individual needs on topics including but not limited to farm business planning, building credit, risk management, identifying suitable farmland, heirs' property/title issues, financial management, accounting, accessing USDA programs, addressing financial challenges, post-disaster farm advocacy and negotiating with creditors.
2. **100 underserved farmers** report having a better understanding of the farmland purchasing process and are better able to make sound decisions regarding credit, land ownership, and retention.
3. **80 underserved farmers** receive assistance identifying land or are connected to landowners.
4. **40 underserved farmers** are connected to market opportunities including but not limited to farmer cooperatives, grocery retail, specialty markets, nutrition programs, and timber sales.
5. **Organize 10 farmer-buyer meetups** that match institutional buyers with farmers who can meet their purchasing needs, serving **80 or more underserved farmers**.

**Objective #4:**
**Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.**
**Outputs:**
4.1 Provide farmers with financial assistance grants to lower the costs of land acquisition by partially or fully covering down payments, brokerage fees, appraisals, or other land acquisition-related costs.

4.2 Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture, a land trust created to ensure perpetual access to arable land as common goods for PR subsistence farmers and improve food security through expansion of sustainable agriculture.

4.3  Incentivize landowners to sell or lease land to targeted farmers or agricultural land trusts.

4.4 Provide farmers with grants to support shared infrastructure, on-farm infrastructure, and equipment that will allow them to more easily and reliably access markets.

**Expected Outcomes:**
1. **45 farmers secure new land** through Gaining New Ground financial assistance grants
2. At least **10 landowners are incentivized** to lease or sell land to a farmer.
3. The Community Land Trust for Sustainable Agriculture acquires at least one land property and leases land via 99-year leases to four farmers in Puerto Rico.
4. At least **30 grants awarded** to farmers or farmer collaboratives to support infrastructure that will improve market access options.

**Page 7.** *Gaining New Ground Project Narrative*; RAFI-USA

### Budget Allocation: Outreach and Technical Assistance

In total, approximately **66.11%** of the total $8,499,695 grant budget is allocated to *directly* support outreach, technical assistance, and financial support for land acquisition:

- **Outreach: 20.4%** of the budget ($1,736,586) is allocated to outreach and education related activities.
- **Technical Assistance: 20.3%** ($1,724,674) of the budget is allocated to technical assistance
- **Financial Support 25.4%** ($2,158,000) of the budget is allocated to Land and Infrastructure Financial Grants/Incentives.

### APPROACH

#### i. Description of Activities and Approach

*Note: The proposed project's planned activities will <u>not</u> be duplicative of other activities undertaken with financial support from USDA or other federal sources.*

Project activities will build upon insights from the partners' established programs supporting BIPOC farmers. For example, in NC, we will identify farmers who would be good candidates for the project using data from grant applicants received for the RAFI-USA's FOCN infrastructure grants program. Similarly, PR and USVI partners will rely on their existing knowledge of farmers in their regions.

#### ii. Project Timeline

| Objective & Activity | '23 | | | '24 | | | | '25 | | | | '26 | | | | '27 | | | | '28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 |
| **1 - Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers.** | | | | | | | | | | | | | | | | | | | | |
| 1.1 Conduct baseline study to identify land and market access challenges. | ▓ | ▓ | ▓ | | | | | | | | | | | | | | | | | |
| 1.2 Develop recommendations for improved land and market access. | ▓ | ▓ | ▓ | | | | | | | | | | | | | | | | | |
| 1.3 Convene panel to 1) evaluate current land use/ access challenges in USVI and PR and 2) complete feasibility study on creation of regional land trust. | ▓ | ▓ | ▓ | | | | | | | | | | | | | | | | | |
| 1.4 Build working relationships with USDA staff to ensure ongoing positive engagement. | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ |
| **2 - Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.** | | | | | | | | | | | | | | | | | | | | |
| 2.1 Convene Advisory Committee to provide project guidance, identify farmer resources, and serve as review committee for farmer grants. | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | | | | | |
| 2.2 Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements. | | | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | | |
| 2.3 Through outreach activities, identify farmers who are strong candidates to receive technical assistance. | | | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | | |

**Page 8.** *Gaining New Ground Project Narrative*; RAFI-USA

**3 - Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.**

| # | Task |
|---|------|
| 3.1 | Build a network of legal, financial, and business technical assistance experts and case managers that can meet specific farmer needs. |
| 3.2 | Develop customized technical assistance plans for each farmer based on their needs and goals, provide assistance, and maintain case management tracking. |
| 3.3 | Improve the degree of farmers' participation in USDA programs related to farm viability benchmarks |
| 3.4 | Build relationships with institutional buyers to encourage increased sourcing from local farmers and their connection to new markets. |
| 3.5 | Provide farm advocacy services to farmers in crisis; help minimize the impact of disasters on land ownership and farm viability. |

**4 - Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.**

| # | Task |
|---|------|
| 4.1 | Provide farmers with financial assistance grants to lower the costs of land acquisition. |
| 4.2 | Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture. |
| 4.3 | Incentivize landowners to sell or lease land to underserved farmers or agricultural land trusts. |
| 4.4 | Provide farmer grants to support farm infrastructure, and equipment that will increase market access. |

### iii. Innovation

*Focus on U.S. Caribbean Territories*. This project is unique in addressing land tenure challenges in the USVI and PR. Our partners' staff are experienced and trained in specific regional land concerns and will undoubtedly confront more unique situations during the project. Final reports will summarize their findings to enable replicable technical assistance for future engagements. Efforts within the U.S. Caribbean are pilots for the unique situations impacting the agricultural community, land access, capital, and market access in the non-contiguous U.S. and its Territories.

*Regionally-tailored Outreach and Technical Assistance:* The playing field for farmers and ranchers is ever-changing based on the economy, climate change, supply chain deficiencies, global disruptions, etc. To achieve the best possible outcomes, this project will begin with a baseline study that identifies issues specific to the four focus regions.

*Inclusion of Land Trusts*: USVI and PR are experiencing an increased purchase of arable land by off-island investors. This project will address the need to ensure that agricultural land remains

**Page 9.** *Gaining New Ground Project Narrative*; RAFI-USA

available to those who wish to farm by exploring the feasibility of creating a land trust for the region that provides farmers with options to lease, rent-to-own or purchase land trust property.

***Connections to Non-Traditional Lenders***: The project will connect farmers with alternative forms of financing in addition to government resources. Existing loan options include 1) 0% interest farm infrastructure loans for NC Black farmers through Foodshed Capital's Black Farmer Equity Fund, 2) a developing "loan not debt" strategy by Foodshed Capital for no-pay back mortgage loans to farmland buyers, 3) USDA Lenders through Heirs Property Relending Program, including Akiptan, LLC (for nationwide, low-interest heirs property mortgage loans and legal/business technical assistance, priority given to farmers partnering with tribal communities to improve food security and sovereignty) and Shared Capital Cooperative, which has a partnership with Federation of Southern Cooperatives for FL producers.

***Collaborations with Wholesale and Institutional Buyers:*** We will begin market access efforts by collaborating with Freshpoint in exploring possibilities to expand their local produce program in Puerto Rico and the possibility of exporting food produced by Puerto Rican farmers to Florida. RAFI-USA has existing collaborations with several likely buyers, such as NC regional food hubs, including Feast Down East and Weaver Street Market, a local food cooperative seeking new farmers referred by RAFI-USA. We will add additional buyers during year one.

### iv. Outreach Recruitment and Retention

RAFI-USA's outreach efforts will focus on reaching farmers who have engaged with its Farmers of Color Network, followed by outreach to other farmers of color in NC and FL. The FOCN program currently has approximately 300 members, with an additional 1,000 farmers of color who are affiliates of the Network. In Puerto Rico, the Alliance for Agriculture will conduct outreach to farmers using its internal network of more than 250 farmers, farmer's markets, and peer networks. In the U.S. Virgin Islands, we will conduct outreach to VI Good Food Coalition's network of more than 369 farmers, farmer's markets, producers, and affiliates.

Outreach activities will be led by people of color with education and experience with farming, enabling them to connect with farmers with a high level of cultural competency and an understanding of farming. We will target outreach to farmers of color who do not own land or have expressed an interest in acquiring additional land. We will conduct outreach in various formats to ensure that information is accessible to farmers who may not have internet access. Some of the outreach channels include phone banking, texting, cross-platform messaging services, printed materials (including a quarterly Project Bulletin), SMS and chat apps, in-person meetings with individuals or groups of farmers, local advertising, attendance at conferences and events with large populations of farmers of color, and word of mouth. Project partners will adapt the content and outreach methods to best meet their farmer audiences' needs. For example, all Puerto Rico and Florida activities will be delivered in English and Spanish, and materials in U.S. Virgin Islands may be translated into Creole to reach Haitian immigrant populations.

***Amplification of Outreach Efforts:*** We expect our outreach effort to organically extend nationally beyond the project's footprint through digital and social media, media relations, attendance at farm-related events, and outreach activities conducted by project staff, partners, farmers, and collaborators. Outreach will be further amplified through national and regional partnerships. RAFI-USA participates in weekly calls with national farm advocacy partners to develop outreach materials and share feedback on farmers' ability to access federal COVID relief programs. With these external partners, we will share outreach materials and event notifications that may benefit farmer audiences. We are connected with a network of

**Page 10.** *Gaining New Ground Project Narrative*; RAFI-USA

organizations serving farmers of color in their regions and will disseminate information and alert farmers to this project via that network.

***Recruitment of Farmers for Technical Assistance:*** To enroll/participate in technical assistance, farmers will complete an intake and needs assessment. Project staff will use the project's farm viability benchmarking tool to help assess the farmer's situation. As there are many steps between a farmer wanting to acquire land to officially becoming a landowner, the benchmarking tool indicates a five-step progression related to farm viability; crop insurance, farm financial plan, and farm loans. An excerpt of our *draft* benchmarking tool is below, showing a 5-step scale toward land tenure goals.

| Farm Viability Scale | 1-Lacks Access | 2- Aware of opportunities | 3- Takes first actions towards goals | 4-Receives assistance from USDA | 5- Completed goals |
|---|---|---|---|---|---|
| **TOPIC: Land Tenure** | Has no ownership, lease access, or other means of accessing farmland | Aware of range of land tenure options and available programs and resources | Receiving referrals to land access organizations, requesting assistance | Utilizing partnerships and alternative buying markets | Closing contracts offered and signed, land procured |

A case manager will be assigned to each farmer as the primary point of contact. They will work with the farmer to set realistic goals according to the benchmark tool and develop a technical assistance plan to provide a roadmap for the farmer to reach their goals. The case manager would make referrals to other service providers that would benefit the farmers, coordinate and match the farmer with technical assistance providers, and track results. We will provide in-depth 1-on-1 technical assistance unique to the farmer's geography, which may include land tenure strategies, farm loan financing, navigating USDA's FSA/NRCS programs, conservation planning, FSA farm record management, market potential and access, production strategy, risk/disaster management, and evaluation. Farmers deemed ready to purchase or lease land will be offered financial assistance, through a formal application and review committee process, in the form of grants to supplement. This format is comparable to down payment assistance programs for first-time home buyers, which are offered alongside housing counseling services. During periodic check-ins, the case manager will have the opportunity to work with the farmer to refine the technical assistance plan based on results/experiences to date.

In addition to 1-on-1 in-depth assistance, farmers will have the opportunity to participate in peer network calls to provide farmers with a community of peers working towards similar goals. The calls will feature invited speakers to present on topics of relevance. Educational opportunities will be available to help build farm business skills. Topics will be varied and tailored to needs. For livestock producers, for example, we can offer training in collaboration with A Greener World on topics such as best practices for handling and animal welfare in transport and slaughter, livestock health, developing emergency plans, technical support on pasture-based farming systems, and regenerative farm planning. Additional topics to strengthen farm viability may include building and managing credit, financial planning, budgeting, recordkeeping, bookkeeping skills, etc.

**Page 11.** *Gaining New Ground Project Narrative*; RAFI-USA

***Retention strategy:*** This project intends to maximize retention of farmer relationships developed by tracking progress against goals, as farmers receive case management services throughout their participation in the project. Case management will allow us to track progress on an individual basis as well as project performance.

### v. Sustainability & Scalability

The Gaining New Ground project builds upon existing RAFI-USA programs, namely the Farmers of Color Network and cooperative agreement projects with FSA and NRCS, which deliver targeted outreach and technical assistance to underserved farmers. This existing work shows how project partnerships, outreach, and technical assistance can lead to greater opportunities for underserved farmers, including increased USDA program access and improved farm cash flow for long-term farm viability and land retention. Through the Gaining New Ground project, we expect to see marked progress in regional capacity building, strengthened USDA relationships, and sustained farmer viability. As RAFI-USA is a nonprofit organization reliant upon grants, we cannot be certain that we will be able to give farmers the level of financial incentives beyond the life of this project. However, the infusion of funds that will strengthen and rebuild farmers' land, capital, and market opportunities and the education of farmers to use USDA programs will continue to support regional agricultural viability long after the project ends. The results of the new land trust feasibility study, as supported through this project, also has great potential to lead to long-lasting land access opportunities for farmers.

### vii. Potential Challenges

We anticipate encountering some challenges, including difficulties and delays in hiring and training qualified staff, language access barriers in PR, difficulties identifying affordable land, the possible unwillingness of some FSA staff to collaborate, slow land purchase processes, and more. Below we have identified four potential challenges and our plan to address each.

**Weather-related disruptions to the project timeline:** We know that our work will focus on regions frequently affected by hurricanes and other weather-related events. We further understand that it is not a matter of whether a hurricane will hit but when. The project is designed so that project staff and partners will be prepared to pause activities to shift efforts to disaster preparedness, disaster recovery, and other disaster-related assistance.

**Lack of farmer trust in USDA:** Avoiding engagement with USDA is still a survival strategy for many farmers of color. When we ask these farmers to share their thoughts on how USDA can improve, the most common reaction is skepticism as to whether it is worth their time and what good it will do. The proposed project will fill the trust gaps where USDA has failed to reach farmers by relying on project partners and individuals who already have farmers' trust in their respective regions to lead culturally relevant and place-based outreach and education efforts.

**Lack of access to fast, reliable internet and devices:** From our experience working with farmers of color, particularly those in rural areas, we know that there is a significant lack of access to fast, reliable internet and devices that affect their ability to receive and send important information and documentation; according to the 2017 agricultural census, only 61% of Black farmers have access to the internet. We will ensure outreach efforts and technical assistance services focus on reaching those without reliable internet and devices.

**Potential challenges in overlap and farmer confusion:** We are aware of multiple peer organizations applying to this program, and look forward to collaborating with them. RAFI-USA

**J.A. 1681**

is also a partner in two applications with minimal geographic scope overlap. If all were to be funded, we have planned the work in such a way as to ensure planned activities will not be duplicative. Because the demand for assistance related to land, credit, and market access is so great, we do not expect significant difficulties in recruiting sufficient participants for the proposed project. However, we anticipate the *possibility* of overlap and farmer confusion if multiple organizations provide similar services within the same regions. To avoid duplication of efforts and maximize impact, we will collaborate and coordinate efforts with other organizations doing similar work. When this is impossible, we will adapt our plan to focus our efforts on areas of greatest need.

## PERSONNEL AND RESOURCES

RAFI-USA has decades of experience supporting underserved farmers, including providing one-on-one crisis farm advocacy work with farmers in financial distress. This gives us a unique background and informs knowledge of the challenges farmers experience, including those encountered when attempting to access USDA services or negotiate with USDA staff when problems arise. Gaining New Ground project staff will be able to refer farmers to other RAFI-USA staff as well as partners, enabling farmers to benefit from the wide range of other programs and services offered, including opportunities to engage in federal policy work, educational and technical services offered via other USDA-funded projects, farm-to-faith market connections, disaster relief funding, and more.

RAFI-USA's FOCN program is designed to build the strength, prosperity, and economic health of farmers and farming communities of color in the Southeast U.S. and U.S. Caribbean region. FOCN serves farmers of color through outreach, education, and assistance, connecting farmers to opportunities and resources and hosting webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge.

RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition have substantial experience conducting outreach and providing assistance to underserved farmers through our NRCS-funded *Conservation Outreach: Racial Equity and Justice Conservation Cooperative Agreements* program. This existing partnership and the trust built between project staff and farmers make us uniquely poised to continue providing tailored technical assistance and bringing critical, additional support for farm sustainability.

### Project's Leadership Team

**Edna Rodriguez, Executive Director, RAFI-USA:** Ms. Rodriguez has been with the organization since 2011 and became Executive Director in 2017. In her current role, Ms. Rodriguez has grown the organization's capacity by streamlining financial management, diversifying income, and organizing cross-programmatic staff teams for greater collaboration and impact. Ms. Rodriguez led RAFI-USA through a strategic planning process centered around equity, launching and growing the Farmers of Color Network, and extending programs to the U.S. Caribbean territories. Ms. Rodriguez has significant experience working with communities of color, including managing Latino outreach programs in previous roles, providing oversight for the Farmers of Color Network, and building collaborations to address unmet needs. ***Project Role:*** *Ms. Rodriguez will serve as Project Director and provide oversight for the project, supervise hiring activities, manage partner relationships, assist with capacity-building activities, and support the strategic alignment of the project with other work by RAFI-USA or partners.*

**Page 13.** *Gaining New Ground Project Narrative*; RAFI-USA

J.A. 1682

**Sommer Sibily Brown, Executive Director and Founder, Virgin Islands Good Food Coalition:** Ms. Sibilly Brown testified at the U.S. Congress to highlight the barriers and challenges of the U.S. Territories in equitably accessing USDA programs; successfully advocated for the inclusion of USVI and Territories for the national farm-to-school network as core partners, resulting in the first farm-to-school program in the USVI. She serves as Chair of the National Farm to School Network's Board of Directors. Ms. Sibilly-Brown is an advisor to the Resilience Playbook local-regional food system USDA AMS project with Colorado State and the University of Kentucky. She co-led FEMA's Food System Assessment with Iowa State, which included a food resilience plan in the USVI's Hurricane Disaster Recovery Plan. *Project Role: Ms. Sibilly Brown will serve as Project Director in the U.S. Virgin Islands, provide high-level supervision, and be the primary liaison between VIGFC and RAFI-USA. She will also be responsible for managing the subaward budget, ensuring that all deliverables are carried out on time and in compliance with direction from RAFI-USA.*

**Miguel Marxuach, Executive Director and Cofounder, Alliance for Agriculture:** Since 2019, Mr. Marxuach has spearheaded the growth of the Alliance for Agriculture to empower projects and people working on transforming rural communities and farming in Puerto Rico. Mr. Marxuach has worked exclusively with underserved farming people and communities for the past five years. He has developed a profound link with farming entrepreneurs, mostly women of color, supporting their efforts and working with farmer's markets. Before dedicating himself to non-profit work, Mr. Marxuach led a multinational technology information business. Mr. Marxuach holds an MS in Industrial Engineering and an MS in Corporate Social Responsibility, Accounting, and Social Auditing. He has deep knowledge and experience in banking, loans, and financing. *Project Role: Mr. Marxuach will serve as project lead in Puerto Rico to conceptualize project components, oversee the team, and serve as a principal liaison with RAFI-USA.*

**Key Project Staff**
**Lisa Misch, Director of Farmer Outreach and Technical Assistance, RAFI-USA:**
Ms. Misch leads RAFI-USA's Resources for Resilient Farms project and serves as Project Director for multiple USDA-funded projects. Before joining RAFI-USA, she served as the AmeriCorps VISTA Volunteer at the College of Menominee Nation in Keshena, WI, where she managed the Tribe's farmers market. Ms. Misch has previous experience working on small, sustainable farms in the Midwest and internationally. *Project Role: In addition to ensuring consistency across regions in service delivery and hiring and training project staff, Ms. Misch will lead efforts to manage the project's network of TA providers.*

**Carolina Alzate Gouzy, Ph.D., Farmer Outreach Coordinator, RAFI-USA:** Dr. Alzate Gouzy has worked to support networks of agroecology NGOs. She has degrees in Agribusiness and Sustainable Development from Universidade de Brasília, Brazil. Her extensive experience is based in Latin America, where she worked with small farmers, as well as more recent experience conducting outreach to farmers of color as part of RAFI-USA's NRCS cooperative agreement. *Project Role: Dr. Alzate Gouzy will provide bilingual coordination between efforts in Puerto Rico and RAFI-USA staff, as well as coordination between NRCS-funded activities and this project.*

**Jaimie McGirt, Agricultural Conservation and Market Access Coordinator, RAFI-USA:**
Ms. McGirt has extensive experience providing 1-on-1 technical assistance to historically underserved farmers in the Southeast, including assisting farmers in identifying business and land stewardship priorities, assessing capacity, and identifying capacity-building resources, partnerships, and referrals that help farmers advance their market and farm conservation goals.

Page 14. *Gaining New Ground Project Narrative; RAFI-USA*

**J.A. 1683**

Ms. McGirt co-leads RAFI-USA's NRCS-specific training for technical assistance providers. *Project Role: Ms. McGirt will provide 1-on-1 technical assistance related to market access and farmland conservation activities to farmers participating in the project, as well as coordination between current NRCS-funded project activities and the early activities of this project.*

**Benny Bunting**, **Lead Farmer Advocate, RAFI-USA:**  Mr. Bunting is a national leader advocating for farm families and saving farms that would otherwise be lost to foreclosure. He provides farmers various advocacy services through RAFI-USA's Farm Advocacy program, including financial counseling, legal referrals, and TA. He counsels between 75-100 farmers annually and, on average, devotes 60 hours per client. In more than 90% of the cases he works on, Mr. Bunting helps farmers realize their goals and achieve greater stability. *Project Role: Mr. Bunting will assist with identifying barriers to accessing FSA programs, train staff on FSA regulations, and provide 1-on-1 farm advocacy services to farmers in financial distress.*

**Kristina Torres, Program Manager, VI Good Food Coalition: Ms. Torres** has experience with program design and project management, including working on federal grants. She has over 15 years of experience designing and facilitating systems thinking approaches and fluency in navigating between the U.S. Caribbean and the U.S. mainland.  *Project Role:* Ms. Torres will supervise the USVI-specific project objectives, timeline, budget, and ongoing compliance monitoring.

**Mariolga Reyes Cruz, Ph.D., Cofounder and Executive Director in Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible:** Dr. Reyes Cruz is a community psychologist, a documentary filmmaker, and a social and climate justice activist. She is working on producing a feature-length documentary that follows three young Puerto Rican farmers in their efforts to advance sustainable agriculture. Mariolga Reyes lives in Río Piedras and co-manages the family farm in Utuado. *Project Role: Dr. Reyes Cruz will contribute to the baseline study and oversee the purchase and management of land trust property.*

**Ramón Borges-Méndez, Ph.D., Associate Professor,  Clark University:** Prof. Borges-Méndez teaches graduate courses on food systems, inequality, labor economics, migration, and globalization. Prof. Borges-Méndez is co-founder of Fundación Bucarabón, a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. Prof. Borges-Méndez has extensive consulting experience working with various organizations, including the Ford Foundation, United Nations, and the Brookings Institution. *Project Role: Prof. Borges-Méndez will serve on the Advisory Committee and lead efforts to conduct the initial baseline study on land access and land use in Puerto Rico.*

### OUTCOME EVALUATION PLAN AND REPORTING

### i. Anticipated Outcomes
Although we will set outcome evaluation and reporting plans for all 15 outcomes listed under the Goals, Objectives, and Outcomes section, here are two anticipated outcomes.

| Anticipated Outcome | Evaluation and Reporting Plan | Significance | Potential Beneficiaries |
|---|---|---|---|
| **200 underserved farmers** receive technical | -Case managers and farmers create technical assistance plan<br>-Case managers track progress | -Farmers are clear on intended goals and plan to reach them | The 200 underserved farmers receiving tech assistance will |

Page 15. *Gaining New Ground Project Narrative*; RAFI-USA

**J.A. 1684**

| assistance tailored to their individual needs | towards goals in Salesforce -Case managers conduct final eval interview with farmer when tech assistance ends | -Project team can quantify how many farmers reached, goals and rating of TA provided | be the primary beneficiaries but will have rippling effects for the surrounding ag economy |
|---|---|---|---|
| **45 farmers secure new land** through Gaining New Ground financial assistance grants | -Farmers complete grant application showing eligibility and feasibility for success -Farmers sign grant agreement -Farmers complete final report when land is secured -Project staff do compliance check-in annually for 5 years | -Farmers have clear understanding of their fiscal responsibilities for grant funding -Annual compliance check-in ensures grants used properly | The 45 farmers will be the primary beneficiaries but will have rippling effects for the surrounding ag economy |

The vast majority of farmers reached will be underserved BIPOC producers. We also expect to reach some farmers outside of North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico through virtual training, webinars, or online content. Estimated beneficiaries by region:

- North Carolina - 400
- Florida - 150
- Puerto Rico - 300
- US Virgin Islands - 150
- National - 200
- **TOTAL - 1,200**

## ii. Project Performance Measures & Metrics
The success of the project will be measured using the following metrics:
1. # farmers that report successful engagement with USDA; (Measures: webinar or 1-on-1 technical assistance evaluations)
2. # farmers who complete a needs assessment and technical assistance plan; (Measures: number of completed assessments and plans stored in project drive)
3. # of farm loans or grants secured by project participants for land acquisition or critical infrastructure; (Measures: summation of project land or infrastructure grants awarded as well as USDA or private lending secured through project technical assistance)
4. # farmers who secure long-term land leases or purchase land; (Measures: summation of finalized leases or land purchases as a result of funding and/or technical assistance provided)
5. # landowners incentivized to sell or lease to a farmer; (Measures: number of landowners who receive incentives to sell or lease to an underserved farmer)

## iii. Evaluation: Oversight and Measurement of Project Performance
The Project Director will oversee and measure the project's performance, report on outcomes, and ensure adherence to the project plan and timeline. This work will be done in coordination with the Data Manager and in close partnership with project leadership at RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition. Case managers assigned to follow each farmer throughout their engagement with the project are responsible for evaluating progress against goals for individual technical assistance projects.

## iv. Funding for Monitoring and Performance Measurement
Within the RAFI-USA project team, the Data Manager will be primarily responsible for monitoring and performance measurements. The Data Manager will be a 0.9 full-time equivalent

position with responsibilities including ensuring case managers are collecting required grant evaluation and metrics data, ensuring farmer grantees submit timely reports, assisting with USDA performance reporting and baseline study. Funding set aside for Data Manger is $247,273.

### v. Plans for Reporting and Communicating of Findings and Results
In addition to required grant reports, we will document, evaluate, report, and share our findings with underserved farmers in the project's geographic region and relevant stakeholders beyond the term and geographic scope of this grant. We will additionally share results with peer organizations, lenders, land trusts, funders, and others who could contribute positively to improving land access for underserved farmers. Plans to share our findings include
- Ongoing meetings with USDA to provide feedback and discuss challenges experienced
- Creation and distribution of a quarterly Project Bulletin
- Hosting "*Gaining New Ground: Farmland Access in USVI and Puerto Rico*" presentations
- Producing reports based on findings from the initial baseline study
- Sharing our recommendations report regarding relevant USDA outreach materials

### vi. Plan for Collaboration and Communication with USDA
Objective One of this project is to ensure USDA staff, particularly newer staff and staff in offices where participation in programs is low, understand the unique challenges and needs facing farmers in their regions. RAFI-USA looks forward to collaborating with USDA staff, locally, regionally, and nationally, wherever possible to benefit farmers and ranchers. Reports published as part of this project will be widely disseminated and shared with local, regional, and national USDA officials.

### MANAGEMENT AND PARTNERSHIP PLAN
RAFI-USA will serve as the organizational project lead and, as such, will assume responsibility for the project management, budget management, reporting, and evaluation for this grant. The project will rely on an equitable, shared leadership model with a leadership team consisting of representatives from each core organization, an Advisory Committee, and participatory decision-making processes that are inclusive of all partners and include stakeholder feedback. This approach is consistent with our values and how we approach our work.

**Experience Managing Federal Funds:** RAFI-USA has extensive experience with federal grants management, including 1) USDA FMPP 2020-23 grant #AM200100XXXXG151; 2) FSA Cooperative Agreement 2021-22 #FSA21CPT0011944; 3) Subaward with National Young Farmers Coalition on NIFA Cooperative Agreement # 2022-70416-37195 4) NRCS Cooperative Agreement #NR223A750003C066. In FY2023, we will expand our capacity to manage federal funds by hiring a full-time, dedicated Federal Grants Manager. We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence, which we will use for the proposed project. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. Additionally, we contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop conducts the annual auditing of our financial statements. Beginning in 2023, they will conduct annual yellow book audits to ensure all federal funds are administered per applicable laws and regulations.

**Regranting Experience:** For more than 25 years, RAFI-USA has administered competitive grantmaking programs for farmers. We have in place a process that values equitable access for

Page 17. *Gaining New Ground Project Narrative*; RAFI-USA

all farmers, due diligence for applicant eligibility and feasibility, an external grant review process, and simple yet accountable compliance reporting processes. For this project, RAFI-USA will create grant guidelines and a scoring rubric aligned with project priorities and federal requirements. The review committee will score grant applicants, and applications with the highest scores will be chosen to receive financial assistance per the Advisory Committee's recommendations. Farmer grantees will enter into formal grant agreements with RAFI-USA that clearly outline grant terms and requirements, submit a W-9, signed grant agreement, and complete an orientation to review before payment is issued. RAFI-USA will develop an annual reporting process to ensure farmers comply with the grant agreement for at least five years after initial funding.

**Partnership Plan:** In addition to the partners included in this proposal, we expect to add partners to build an effective and collaborative regional network of partners representing public and private entities. Partner activities will be coordinated and monitored by RAFI-USA staff to ensure cohesiveness and alignment with established work plans and stated goals, objectives, and outcomes. We will host monthly check-ins with partners to receive updates, troubleshoot, discuss new outreach activities or materials, and ensure reporting and evaluation activities are on track.

### Core Project Partners

Alliance for Agriculture *(Subaward)*: Alliance for Agriculture (A4A) is an organization based in Puerto Rico with deep connections to farmers across the island. A4A will lead efforts in Puerto Rico. They will conduct monthly outreach efforts and submit findings to the Project Manager. The Alliance will participate in monthly check-ins, train-the-trainer events and contribute to outreach and supervision of technical assistance activities. The Alliance will establish or strengthen existing working relationships with the existing food/agriculture in Puerto Rico as stated in their Letter of Commitment. The Alliance will also contribute to the initial baseline and land trust feasibility studies.

Virgin Islands Good Food Coalition *(Subaward)*: Virgin Islands Good Food Coalition (VIGFC) is a nonprofit organization that advances food systems transformation in the USVI. VIGFC will lead efforts in the U.S. Virgin Islands and rely on extensive relationships in the territory to accomplish the project's objectives. They will conduct outreach to farmers in St. Croix, St. Thomas, and St. John and four producer-led organizations, organize trainings, supervise technical assistance activities, and contribute to the initial baseline and land trust feasibility studies.

Florida Organic Growers, Inc: *(Subaward)* Florida Certified Organic Growers and Consumers (FOG) is a nonprofit corporation established in 1987. FOG educates producers, consumers, media, institutions, and governments about the benefits of organic and sustainable agriculture, presenting at tours, conferences, workshops, classes, and other educational opportunities.

Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture): *(Subaward)* The Fideicomiso was founded to ensure landless farmers in Puerto Rico can access farmland as a common good and advance the food sovereignty of Puerto Rico. The lands under the custody of the Fideicomiso will be mainly destined to: support small-scale sustainable agriculture aimed at producing food for local consumers and initiatives that promote a good life for underserved farmers and their communities. They will collaborate with the project to identify and secure their first farmland purchase for the land trust.

**Page 18.** *Gaining New Ground Project Narrative*; RAFI-USA

Additionally, Mariolga Reyes Cruz will contribute to the initial baseline study and provide project leadership guidance on land access issues in Puerto Rico.

Fundacion Bucarabon: *(Subaward)* Fundacion Bucarabon is a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. They will support outreach to small and mid-sized farmers in PR and provide logistical support in the region.

## Core Collaborators

Hispanic Federation: *(Collaborator)* Hispanic Federation is an important player in attending to the needs and supporting the Latin community in the U.S. mainland and Puerto Rico. Hispanic Federation's commitment to this project includes: serving on the Advisory Committee for the project and contributing to the initial baseline study of land access, use, and tenure in Puerto Rico. Hispanic Federation will also assist with organizing convening activities in Puerto Rico to support the project.

A Greener World: *(Collaborator)* A Greener World will serve as a technical assistance provider on issues related to small-scale livestock production. In this capacity, they will offer 1-on-1 support to farmers interested in certification on verified farming practices. They will also offer training workshops for livestock farmers on pasture-based farming systems, general or by species, food labeling, best practices for handling and animal welfare in transport and slaughter, and regenerative farm planning. Emily Moose, A Greener World's Executive Director, will also serve as an Advisory Committee member to guide on matters related to livestock production.

Freshpoint: *(Collaborator)* Freshpoint is North America's largest wholly-owned produce distributor. Its client base includes local, regional, and national chains, hotels, resorts, country clubs, restaurants, healthcare, schools, universities, and other institutions. The company will collaborate on matters related to market access, including Freshpoint's planned expansion of its local produce program in Puerto Rico, identifying farmers who may benefit from the project, assisting farmers in becoming wholesale-ready, co-hosting farmer-buyer meetups and events, and exploring the possibility of exporting Puerto Rican produce to Florida.

Triangle Land Conservancy, NC (TLC): *(Collaborator)* TLC recently launched their "Good Ground Initiative," a buy-conserve-sell model of making farmland ownership accessible and affordable to BIPOC farmers. They will collaborate on conservation easement/land trust best practices and lessons learned, assess farmer fitness and land trust feasibility, and provide regional referrals for farmers interested in conservation easements/trusts.  Farmers participating in this project will be made aware of any Good Ground Initiative land sales and receive technical assistance through the buying process should they be selected by the GGI advisory committee.

Foodshed Capital: *(Collaborator)* Foodshed Capital is an experienced lender focused on meeting the needs of underserved producers, particularly BIPOC producers who have faced discrimination and exclusion from traditional lenders and federal programs. They have provided nearly $1.5 million in flexible, affordable capital and will collaborate to provide general support within the context of existing operational lending to Puerto Rican farmers, particularly as it is needed by farmers partnering with Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible.

**Page 19.** *Gaining New Ground Project Narrative*; RAFI-USA

<div align="center">

**J.A. 1688**

</div>

<u>Agrarian Trust:</u> *(Collaborator)* Agrarian Trust holds farmland in community-centered commons and provides long-term, equitable land access for next-generation farmers and ranchers by establishing 501(c)(2) and 501(c)(25) landholding entities. Agrarian Trust commits to assisting RAFI-USA and partners in the feasibility study of establishing farmland holding entities where they are not currently working but hope to expand: in NC, FL, US Virgin Islands, and Puerto Rico.  Agrarian Trust will consult on model replication of lessons learned and best practices from the Agrarian Commons initiative.

**<u>Plans for Coordination, Communication, Data Sharing & Reporting</u>**
RAFI-USA has years of experience managing and storing confidential documents shared by farmers we work with via our farm advocacy services. Data protocols will be in place to ensure sensitive data and financial information is protected and stored securely during the life of the grant and after that for five years per RAFI-USA document retention policy, after which documents may be destroyed. To ensure compliance with federal requirements and consistent data tracking of outcomes indicators across the project, RAFI-USA will dedicate staff resources to managing the project's data collection, sharing, and reporting functions and maintaining secure and adequate data systems. Some key systems we will use to store and share information include

***Cloud-Based Document Storage:*** Project partners will have shared access and use of a third-party cloud-based document storage system where partners can store documents to allow for asynchronous collaboration. This system will also allow storing working documents, such as shared project work plans, budgets, project guidelines, outreach materials, and more. The system will also provide a central location to store any financial documents or other farmer data, grant agreements, and other documents. Only authorized RAFI-USA staff and designated partners will be provided access to this cloud storage.

***Use of Third-Party CRM Database:*** RAFI-USA utilizes a third-party CRM database system hosted on the Salesforce.com platform customized to meet organizational and project needs. The customized Salesforce database will be utilized by project staff to record and track participant data and to track and report on outcomes. The database is hosted in a secure server that uses a firewall and other advanced technology to prevent interference or access from outside intruders. Information is protected using server authentication and data encryption to ensure data is safe, secure and available only to authorized users. Only authorized RAFI-USA staff and designated partners are provided access to the database via a unique username and password that must be entered each time a user logs on to the database via industry-standard Secure Socket Layer (SSL) technology. Salesforce user accounts are configured to allow employees and designated partners access only to the information they need while keeping sensitive information about unrelated constituents private. Information stored in our Salesforce database related to farmers includes contact and demographic information, information about their farm, and their history of engagement with our programs, including grants, events, and technical assistance.

**J.A. 1689**

RAFI DECLARATION

EXHIBIT 13-F

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 158 of 606

DocuSign Envelope ID: 4EF49755-83BF-4726-A3B2-6B2E5CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 153 of 378

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number<br>FSA24CPT0013706 | 2. Amendment No.<br>01 | 3. Award/Project Period<br>11/18/2023 - 11/30/2028 | 4. Type of Award Instrument<br>Cooperative |
|---|---|---|---|

| 5. Agency:<br>   (Name and Address)<br><br>USDA, FSA Outreach Office<br>1400 Independence Ave SW<br>Stop 0511 Rm 3086<br>Washington DC 20250-0511 | 6. Recipient Organization:  (Name and Address)<br>Rural Advancement Foundation International - USA<br>PO Box 640<br>Pittsboro, NC 27312-0640 |
|---|---|

| DUNS/UEI:<br>Z1AXE15PHAL3 | EIN: |
|---|---|

| 7. Agency Program Contact:<br>Sonja Baisden Shell<br>Sonja. Baisden Shell@usda.gov | 8. Agency Administrative Contact:<br>Dennisse Bedard<br>Dennisse.Bedard@usda.gov<br>(605)692-2344 extension 131 | 9. Recipient Program Contact:<br>Lisa Misch<br>lisa@rafiusa.org<br>(919)270-8100 | 10. Recipient Administrative Contact:<br>Lisa Misch<br>lisa@rafiusa.org<br>(919)270-8100 |
|---|---|---|---|

| 11. CFDA Number<br>10.968 | 12. Authority<br>Increasing Land, Capital, and Market Access<br>Program ARPA Section 1006 | 13. Type of Action<br>ii. Amendment/Revision | 14. Project Director<br>Edna Rodriguez<br>edna@rafiusa.org<br>(919)621-5158 |
|---|---|---|---|

**15. Project Title/Description:**
Title: Gaining New Ground
Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16. Entity Type:** _____Profit   _X_ Nonprofit   _____Higher Education   _____Federal   _____State/Local   _____Indian/Native American
Other

| 17.  Select Funding<br>Type: | ✔ Federal | ☐ Non-Federal | 18. Accounting and Appropriation Data |
|---|---|---|---|

| | Federal | Non-Federal | Financial Code | Amount | Fiscal Year | Treasury Symbol |
|---|---|---|---|---|---|---|
| Original Funds Total: | $ 8,499,695.00 | | FA.AD.ORCH.CA | $ 8,499,695.00 | 2231 | 12-1124 2022/2031 |
| Additional Funds Total: | | | Cost Center: FA10402000 | Fund: FAPMB1124D | BOC:2559 | Functional Area: FA6011IRALLA |
| Grand Total: | $ 8,499,695.00 | $ 0.00 | | | | |

**19. APPROVED BUDGET**

| Personnel | $ | 1,351,319.72 | Fringe Benefits | $ | 367,018.44 |
|---|---|---|---|---|---|
| Travel | $ | 117,392.50 | Equipment | $ | |
| Supplies | $ | 32,912.00 | Contractual | $ | 392,990.77 |
| Construction | $ | | Other | $ | 6,001,699.12 |
| Total Direct Cost\ | $ | 8,263,332.55 | Total Indirect Cost | $ | 236,362.45 |
| | | | Total Non-Federal Funds | $ | 0.00 |
| | | | Total Federal Funds Awarded | $ | 8,499,695.00 |
| | | | Total Approved Budget | $ | 8,499,695.00 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations.  In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

**J.A. 1691**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 159 of 606

DocuSign Envelope ID: 4EE49155-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 154 of 378

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

| NOTICE OF GRANT AND AGREEMENT AWARD | | | |
|---|---|---|---|
| **Award Identifying Number** | **Amendment No.** | **Award/Project Period** | **Type of Award Instrument** |
| FSA24CPT0013706 | 01 | 11/18/2023 - 11/30/2028 | Cooperative |

List of Attachments:

Amendment Narrative; Attachment 1A - Revised Statement of Work; Attachment 2A - Revised Project Narrative; Attachment 3A - Revised Budget Narrative; Attachment 4A - General Terms and Conditions

| **Name and Title of Authorized Government Representative** | **Signature** | **Date** |
|---|---|---|
| Steven Peterson, Associate Administrator | | |
| **Name and Title of Authorized Recipient Representative** | **Signature** | **Date** |
| Edna Rodriguez, Executive Director | DocuSigned by: *Edna Rodriguez* ECB1EB90E0D4490... | 5/3/2024 |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD).  USDA is an equal opportunity provider and employer.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Page 2

**J.A. 1692**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 160 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E56D10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 155 of 378

Amendment Narrative

**AMENDMENT NO. 1**
**TO AGREEMENT NUMBER FSA24CPT0013706**

**PURPOSE**

The purpose of this amendment is to update the Notice of Award, Statement of Work (Attachment 1A), Project Narrative (Attachment 2A), Budget Narrative (Attachment 3A), and General Terms and Conditions (Attachment 4A).

**In the case of any conflict between language in this amendment and the award General Terms and Conditions, the provisions of this amendment will control.**

**REVISIONS TO THE NOTICE OF AWARD (FORM ADS-093):**

1. The Approved Budget for the agreement is revised as shown in Block 19.
2. The list of Attachments on page 2 of the NOA has been revised to include this amendment narrative and the revised attachments.

**REVISIONS TO AGREEMENT ATTACHMENTS**

1. The Agreement Statement of Work (Attachment 1) is replaced in its entirety with Attachment 1A to this amendment.

2. The Agreement Project Narrative (Attachment 2) is replaced in its entirety with Attachment 2A to this amendment.

3. The Agreement Budget Narrative (Attachment 3) is replaced in its entirety with Attachment 3A to this amendment.

4. The General Terms and Conditions (Attachment 4) is replaced in its entirely with Attachment 4A to this amendment

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 161 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 156 of 378
Agreement # FSA24CPT0013607                                        Attachment 1A

## Agreement Number: FSA24CPT0013607

## Statement of Work

### 1. PURPOSE AND OBJECTIVES

The authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169). Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access. Section 1006 also provides resources for grants to improve land access, including providing resources related to heirs' property and other land access issues that affect access to USDA programs.

### 2. SPECIAL CONDITIONS IN EFFECT

This is formal correspondence notifying you that all special conditions included in the original agreement statement of work are rescinded except those included in section 7, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS and those listed below. Other project activities may commence unless they are associated with NEPA or those outlined below.

<u>BENEFICIARY GRANTS</u>

For purposes of this agreement, Beneficiary Grants are small, one-time-only awards given to eligible producers for purposes that support the goals of FSA Increasing Land, Capital, and Market Access Program and where USDA funding isn't already available. Potential uses of funding include but are not necessarily limited to downpayment assistance for land purchase, land lease or rental assistance, implementation of conservation practices, improving soil quality, purchasing or installing on-farm infrastructure, or to cover costs for supplies, equipment, and maintenance if funding isn't currently available through existing USDA programs.

As program beneficiaries rather than subrecipients, producers receiving Beneficiary Grants will not be subject to the property reporting and disposition requirements set out in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards found in 2 CFR Part 200. Funds awarded via Beneficiary Grants must be excluded from the Recipient's indirect cost base when calculating indirect costs.

**PRIOR APPROVAL OF PROJECT PLAN REQUIRED**: Recipient must submit a project plan capturing the details of the Beneficiary Grant component of its project (Project Plan) for FSA review and approval. The execution of any component of a Beneficiary Grants project is not authorized until the recipient has received such written prior approval. The Recipient must also obtain FSA approval for any individual Beneficiary Grant in excess of $100,000 prior to executing the Beneficiary Grant.

Submit prior approval requests for Project Plans and proposed individual Beneficiary Grants exceeding $100,000 via e-mail to FPAC.BC.GAD@usda.gov with a copy to Land.Access@usda.gov.

Recipient's Project Plan must include the following items:

1. Intended beneficiaries for the Beneficiary Grants.
2. Eligibility requirements for beneficiaries.
3. Goals of the Beneficiary Grants project, including proposed allowable uses of Beneficiary Grants funds and allowable costs (see 2 CFR 200 subpart E, Cost Principles).
4. A description of the application process (including a copy of the request for applications), competitive review process, and overall budget associated with the beneficiary-grants.

1

**J.A. 1694**

5.  A plan for verifying that funds are appropriately spent by beneficiaries in accordance with the Beneficiary Grant award.
6.  A plan to assure that improvements or purchases funded with the Beneficiary Grant will continue to meet the objectives of Increasing Land, Capital, and Market Access Program for a specified period of time, as applicable.
7.  Internal controls to ensure program resources are protected from waste, fraud, and mismanagement.

Beneficiary Grant projects that involve land disturbing activity will require individual environmental assessments, in accordance with the National Environmental Policy Act (NEPA), National Historic Preservation Act (NHPA), Endangered Species Act (ESA), and any other relevant environmental compliance laws and executive orders. The Recipient must work with FSA to identify any aspect of its Beneficiary Grants project that involves environmental compliance issues to ensure compliance with the environmental compliance laws and executive orders. See section 7 for further information.

Once the Recipient begins implementation of its Beneficiary Grant project, it must work with producer beneficiaries of the project to provide FSA with at least one success story annually.

LAND ACQUISITION

Any actions related to real property as defined in 2 CFR Part 200.1 such as land purchases, are not authorized, pending agency policy approval.  This includes staff time researching costs, working on purchase offers and all other actions associated with the acquisition of real property.  Any work in these areas would be considered voluntary and the Federal Government would not be able to reimburse for this work.

More specifically, until further guidance is provided, recipient organization is prohibited from incurring costs for:

•  personnel for any activities directly and/or indirectly related to land acquisition.
•  fringe benefits for any activities directly and/or indirectly related to land acquisition.
•  contractual agreements for any activities directly and/or indirectly related to land acquisition, and specifically:
    o  Land Trust Designer, nor
•  any other activities directly and/or indirectly related to land acquisition.
•  Recipient organization may not incur indirect costs directly and/or indirectly related to land acquisition.

**3. PROJECT NARRATIVE**
The recipient will carry out the project described in the Project Proposal; the referenced Project Proposal is incorporated as Attachment 2A.

**4. BUDGET NARRATIVE**
The official budget as noted in the award and described in the attached Budget Narrative (Attachment 3A) will be considered the total budget. Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

2

**J.A. 1695**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 163 of 606

DocuSign Envelope ID: 4EF49TE5-83BE-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 158 of 378
Agreement # FSA24CPT0013607    Attachment 1A

5.  **REPORTING  REQUIREMENTS**

   a.   The recipient must submit performance progress reports to the Results Verification System (RVS) quarterly, according to the following schedule for each year of the agreement. For 2024, the progress report due by March 31 is not required. Thus, the first progress report due in 2024 will be by June 30. Attach only 1 report per email with a copy to FPAC.BC.GAD@usda.gov.
   March 31
   June 30
   September 30
   December 31

   b.   The recipient must submit financial reports (SF-425) to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov.  If the recipient requests reimbursement payments only, the first financial report is due June 30, 2024, and bi-annually thereafter. Thus, for year 1 of the agreement, the financial report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email.
   Financial Report #1: June 30, 2024
   Financial Report #2: December 31, 2024
   If the recipient requests advance payments, financial reports are due at the same time as performance progress reports, which are as follows:
   March 31
   June 30
   September 30
   December 31

**6. PAYMENT INFORMATION**
Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) (see Attachment 4A). Also see https://www.fpacbc.usda.gov/about/grants-and-agreements/awardpayments/index.html for preparation and submission guidance.

**7. NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS**
The National Environmental Policy Act (NEPA) environmental review process must be completed for activities under this agreement, including any NEPA-related activities under Beneficiary Grants, as well as construction activities, with potential impacts to the human environment prior to the recipient drawing down funds or incurring expenses under this Grant Agreement. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 CFR 1506.1. FSA reserves the right to de-obligate funds obligated under this grant agreement (or to require the return of such funds) in the event a recipient breaches or otherwise fails to perform under any of the grant requirements.

**8. GENERAL TERMS AND CONDITIONS**
The General Terms and Conditions applicable to this award (General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) are attached and incorporated as Attachment 4A. They are also available online at the following link:
https://https://www.fpacbc.usda.gov/Assets/fpacbc/files/about/grants-agreements/general_terms_and_conditions_non-ezfed-march_2024-1.pdf

**J.A. 1696**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 164 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 159 of 378
Agreement #: FSA24CPT0013706                                    Attachment 2A

**PROJECT NARRATIVE:** 2022 Increasing Land, Capital and Market Access Program

| | |
|---|---|
| **Lead Applicant:** | Rural Advancement Foundation International-USA (RAFI-USA) |
| **Project Title:** | *Gaining New Ground for Underserved Farmers in Southeast US & US Caribbean Region* |
| **Project Term:** | **Per award** |
| **Proposed Funding Tier:** | Regional Land Access Tier (NC, FL, USVI & PR) |
| **Total Requested Funds:** | $8,499,695 |

**INTRODUCTION & JUSTIFICATION**

**Project Goal & Purpose**

The overarching goal of the proposed Gaining New Ground project is to improve land access and land security for underserved farmers of color in four areas: North Carolina (NC), Florida (FL), U.S. Virgin Islands (USVI), and Puerto Rico (PR). This will be accomplished by addressing core barriers to access land, credit, and markets, while also working to retain farmland by mitigating and preventing land loss. The project will work to meet the needs of underserved farmers on the edge of viability by delivering culturally-relevant outreach and education, providing targeted technical and financial assistance and examining and addressing barriers to accessing USDA programs in regions with significant populations of Black, Indigenous, and people of color (BIPOC) farmers, particularly those who are especially vulnerable to climate change impacts. The project will further work to improve land access by exploring the feasibility of establishing an agricultural land trust in Caribbean region and bolstering an existing land trust in Puerto Rico.

**Justification of Need**

Since 1990, RAFI-USA has worked with farm families of small and mid-sized farms to help them succeed in the face of financial crises and to reverse the trend of farm loss. Over time, we have recognized that farmers of color face specific difficulties that put their farms and livelihoods in peril. By 2044, the U.S. is projected to have a majority-minority population, yet the U.S. farming community remains dominated by white men. Farmers of color represent less than 4% of all owner-operators.

Thriving regional food systems depend on the land security of farmers, yet finding and securing affordable land is one of the biggest challenges farmers face in starting or maturing a career in agriculture. For BIPOC farmers, this is compounded by the fact that they have historically experienced abusive practices and discrimination in accessing credit, resources, and markets, leading to significant land loss. According to the USDA Tenure, Ownership, and Transition of Agricultural Land (TOTAL) survey in 2014, about 40% of U.S. farmland is rented, and 97% of landlords are white. Nationally, while 14% of tenants are people of color, they operate only 8% of tenant acreage, indicating BIPOC tenants operate smaller farms than white tenants. According to the results of the National Young Farmer Coalition's Survey with over 10,000 responses from farmers under 40 years of age, "Over half of all respondents (54%), and 75% of Black farmers, said that they currently need more access to land, whether to buy or lease."

Accessing affordable land is especially difficult for farmers in Puerto Rico and U.S.Virgin Islands, who must contend not only with expensive farmland and a growing number of outside

**J.A. 1697**

investors buying up property but also with the realities of climate change, the recurring risk of hurricanes, a lack of local markets for their products, and off-farm wages that are significantly lower than on the mainland.

Farmers in the U.S. Caribbean are *severely* underrepresented and disconnected from available resources and larger networks, yet especially susceptible to climate change impacts. Farmers face challenges unique to their location, geography, and status as a territory. Some of these include difficulty in transportation within and between the various islands that make up the Territories, lack of processing facilities or shared-use certified kitchens, lack of dedicated FSA staff (USVI), and significant distrust of government programs, particularly federal ones.

Small and mid-scale farmers today must rely on off-farm income to cash flow their operations. Unfortunately, this is a challenge for farmers in PR and USVI, where unemployment and poverty rates are high. According to 2021 Census data, the poverty rate in PR at 40.5% was almost double that of Mississippi (MS), the poorest state in the nation, where approximately 19.4% of persons live in poverty. Per capita income in PR was just over $13,000 in 2020 compared to $25,400 in MS. PR and USVI residents are ineligible for the Earned Income Tax Credit and earn less, on average, in Social Security and veterans' benefits. Like PR, poverty in USVI is also high, with more than 20% of the population and a third of children living in poverty. Median household income decreased in 2019 to $40,408.The average annual income for farmers in USVI is approximately $9,500. In 2018, the U.S. Virgin Islands had 565 farms, up 158% from 219 farms in 2007.

**Target Audience**

The Gaining New Ground project will focus efforts in regions where RAFI-USA's Farmers of Color Network (FOCN) program already has a foothold and where our collaborating partners have existing relationships and experience working with local farmers. The primary beneficiaries of this project are historically underserved farmers of color in North Carolina, Florida, the central mountain region of Puerto Rico, and the U.S. Virgin Islands.

**Table 1. Farm Operations, Ownership, Demographics, and Farm Size in Target Region**

|  | NC (2017) | FL (2017) | PR (2018) | USVI (2018) |
|---|---|---|---|---|
| *Number of farms* | 46,418 | 47,590 | 8,230 | 565 |
| *Owned/leased farms* | 43,764 / 15,561 | 45,488 / 8,674 | n/a | 421 / 233 |
| *# BIPOC operated farms* | 3,342 | 9,032 | 744 | n/a |
| *Average farm size (acres)* | 182 | 204 | 58 | 16.5 |

*Data Source: USDA NASS 2017 Census of Agriculture*

Targeted audience includes farmers who have limited resources, are located in high poverty areas, and are susceptible to climate change impacts. Additional details:

**Page 2.** *Gaining New Ground Project Narrative*; RAFI-USA

**J.A. 1698**

USCA4 Appeal: 25-1575    Doc: 55-4       Filed: 06/23/2025      Pg: 166 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B255CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 161 of 378
Agreement #: FSA24CPT0013706                                           Attachment 2A

- FOCN's membership is 76% Black/African American, 12% Indigenous, 9% Latinx, 3% Asian, and 1% Multiracial. Almost 40% of farmers who have applied for funding from the FOCN grants program include livestock production on their farms.
- In Puerto Rico, most farmers are Hispanic/Latinx. More than half of the farmers in the Alliance for Agriculture's network include livestock production on their farms.
- The majority of farmers in the U.S. Virgin Islands self-identify as Black/Caribbean. Many farmers also include livestock production on their farms.

The project will prioritize farmers previously impacted by disaster(s), those employing agroecological and sustainable production practices, farmers with diversified production systems, small livestock producers, and subsistence farmers in USVI and PR. The following proposed criteria will help us target and prioritize farmers who can be considered to be on the "edge of viability" for greatest impact:

- Farmers who have been farming more than a year, with priority given to farmers who have been farming for *at least* 3 years
- Farmers who have been unsuccessful in applying for FSA farm ownership loans or other USDA cost-share assistance
- Farmers who are ready to transition from a leased arrangement to land ownership
- Farmers who are close to "business-ready," including farmers who have not filed a Schedule F or registered with FSA
- Farmers who are not a good fit or ready for farm debt

**Programmatic Gaps Addressed By Proposed Project**

**Farmers have lack of awareness of available programs and resources and lack of knowledge of lending requirements:** Farmers of color are often not aware of the various programs and services available to them, as well as the regulations that govern these, and often experience difficulties in accessing USDA programs and services. In 2021, 23% of farmers who applied for RAFI-USA's FOCN grants program reported *not* having a registered FSA number. *The proposed project will fill this gap through strategic outreach to inform underserved farmers about how available resources and services can be used to help strengthen their farm operations and what requirements are necessary to access these.*

**Limited legal, financial, and business technical assistance for small BIPOC producers, particularly those in USVI and PR**: Farmers of color in the target regions are less likely to have access to technical assistance for their farming operations and are often left on their own when it comes to navigating complex application processes, creating farm business plans, accessing programs, addressing legal and financial challenges, negotiating with lenders, responding to disasters, and preventing land loss. There is a critical need for assistance with accounting, business planning, heir's property issues, etc. In 2021, 28% of farmers who applied for RAFI-USA's FOCN grants program reported not filing a Schedule F with the IRS. *The proposed project will fill gaps in assistance for underserved farmers by providing comprehensive 1-on-1 technical assistance, farm advocacy services, and case management to support the success, resiliency, and viability of their farms.*

**Page** 3. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 167 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B255CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 162 of 378
Agreement #: FSA24CPT0013706    Attachment 2A

**Programs are not designed to meet the needs of small farms, agroecological farmers, or BIPOC farmers**: USDA's decades-long "get big or get out" strategy of pushing farmers into high-volume commodity production has resulted in a long list of farm casualties and land loss. Although federal resources are an important part of the farm safety net, USDA programs are not designed for small-scale, diversified agroecological producers, nor are they designed to equitably meet the needs of BIPOC farmers or farmers in the U.S. Caribbean regions. A sentiment we often hear expressed by farmers: "*It felt like they were looking for reasons to deny my application, not reasons to approve it.*" Small farmers, especially BIPOC farmers, need to work exceptionally hard to justify the feasibility of their applications. On average, farms operated by BIPOC farmers are a quarter of the size of white-owned farms and often adapt by pursuing production practices and markets outside of the commodity system. Further, many USDA staff show little interest or have limited knowledge of adequately supporting smaller, diversified farms. *The proposed project fills this gap by improving agency staff awareness and understanding of the needs of small, agroecological, and BIPOC-underserved farmers while also looking to identify opportunities for service improvement.*

**Low participation by socially disadvantaged farmers in FSA Farm and Loan Programs:** FSA loan origination and servicing are failing BIPOC farmers, especially those in underserved areas such as PR and USVI. Unfortunately, the problem cannot be attributed solely to a lack of farmer awareness about available programs. In our experience working side-by-side with farmers looking to apply for FSA programs, we have seen that often farmers of color are less likely to be treated as serious farmers by FSA staff and receive the bare minimum of information and guidance regarding program eligibility, application processes, and critical considerations for sound decision making. Female farmers also experience difficulty, with many, for example, reporting being asked to use their husbands' names in application documents instead of their own. *The project will fill this gap by seeking to understand __why__ the volume of applications and number of loans approved in FL, PR, and USVI are so low (see table below) and by assisting farmers in overcoming these specific barriers.*

**FSA Direct Farm Ownership Loan Volume & Approvals**

| Region | 2021 | | Jan-Sep 2022 | |
|--------|--------|-----------------|--------|-----------------|
| | # Apps | Approved % (#) | # Apps | Approved % (#) |
| NC | 102 | 39% (40) | 75 | 45% (34) |
| FL | 100 | 12% (12) | 71 | 8.5% (6) |
| PR | 37 | 13.5% (5) | 27 | 0% (0) |
| USVI | 0 | 0% (0) | 0 | 0% (0) |

**Small farms, diversified and agroecological farmers, and BIPOC farmers do not have adequate and right-sized market access for farm product distribution in local, regional, and national food systems.** Traditional wholesale buyers and distributors, even those involved

Page 4. *Gaining New Ground Project Narrative; RAFI-USA*

USCA4 Appeal: 25-1575    Doc: 55-4        Filed: 06/23/2025      Pg: 168 of 606

DocuSign Envelope ID: 4EF49TE5-83BF-4726-A3B2-6B2E5CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 163 of 378
Agreement #: FSA24CPT0013706                                          Attachment 2A

in regional food distribution, often prioritize mid-size and large farms over small, diversified producers because of assumptions made regarding the small farmer's ability to deliver products as needed. This, as well as overt racial discrimination against BIPOC producers, has historically resulted in these farmers being excluded from purchase contracts and even local farmer's market organizations while their white counterparts received priority. However, these producers can adequately supply traditional markets if provided specialized technical assistance on topics including wholesale and retail introductions, certifications and/or food safety best practices, market production planning, cooperative producer strategies, and cash flow planning/evaluation. *The project will fill this gap through RAFI-USA's existing strategy and capacity for assisting small BIPOC producers with traditional and alternative market access opportunities and all project partners' existing relationships with wholesale and retail entities in targeted areas.*

**A lack of support and assistance for subsistence farming in the U.S. Caribbean**, particularly in Puerto Rico, where in 2022, the PR Department of Agriculture (ASDA) did not apply for the USDA Micro-Grants for Food Security program. *The project will address this programmatic gap through outreach, education, technical assistance, and financial support for subsistence farmers.*

**Farmers and landowners in PR and USVI have minimal access to land and conservation solutions offered by land trusts.** *The project will fill this gap by providing financial assistance to Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture), the only existing farmland trust in PR, and exploring the feasibility of establishing an additional agricultural land trust for the U.S. Caribbean region. A regional land trust would provide farmers with access to land in a region that, despite being compromised of two separate territories, face similar challenges regarding development, as well as using the same USDA staff. A unified regional land trust would ease access to USDA resources.*

<u>**Project Concept and Design**</u>

RAFI-USA's proposed Gaining New Ground project was designed in close collaboration with the Alliance for Agriculture in PR and the Virgin Islands Good Food Coalition. It will expand the scope and depth of services already provided by these three organizations. The project's primary goal is to increase farm and land ownership opportunities for farmers, particularly historically underserved farmers of color, on small- to mid-sized farms in the regions identified. Designed as a collaborative effort with shared leadership and an Advisory Committee of leaders in the field, the project will build upon a circle of relationships that will strengthen the project's efforts. Gaining New Ground will follow an adaptive, iterative process and project design consisting of five cyclical phases:

1. Discovery: Participatory data gathering process
2. Planning: Develop strategy and activities to fulfill project goals and objectives
3. Implementation: Develop materials and execute activities
4. Tracking Results: Measure the effectiveness and reaction of the target audience
5. Refining: Adjust strategy, plan, and activities accordingly

**Page 5.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4      Filed: 06/23/2025    Pg: 169 of 606

DocuSign Envelope ID: 4EF49TE5-83BF-4726-A3B2-6B2F5CD10D80
2:25-cv-02152-RMG      Date Filed 03/26/25      Entry Number 24-14      Page 164 of 378
Agreement #: FSA24CPT0013706                                                    Attachment 2A

To ensure the participation and input of diverse regional stakeholders in guiding the direction of the project, an Advisory Committee will be established to provide overall guidance and to make final funding decisions on financial assistance commitments. Members will include staff representatives from RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition, as well as individuals with relevant and varied expertise and perspective. A key early activity will be to help develop the scope and focus of the baseline study.

The initial baseline study will involve conducting regional needs assessments to uncover farmers' primary barriers to land tenure and the regional dynamics that contribute to a lack of ownership and land loss. The baseline study will also identify roadblocks farmers face when attempting to access USDA programs and determine the types of assistance most needed by farmers targeted for this project. **The results of the baseline study will directly affect the implementation of the remainder of the project, including but not limited to types of assistance provided, development of relationships with USDA officials, and overcoming barriers uncovered by the study.**

In addition to conducting the baseline study during year one, we will also review USDA outreach materials to assess how understandable, concise, and complete they are. Farmers need centralized, easy-to-find informational materials that summarize programs' purpose, eligibility, and processes. What we learn during this review will be shared with USDA and used to inform the development of our outreach materials. Materials developed for the project will maximize farmers' awareness of resources and include information that could improve farmers' outcomes in accessing services from USDA.

**OBJECTIVES AND OUTCOMES**
**Objective #1: Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers. Outputs:**
1.1 Conduct baseline study via existing project partners' data, farmer focus groups, and developed farmer surveys to identify all region and region-specific challenges farmers face in accessing USDA programs, acquiring land, securing credit, and accessing markets.

1.2 Develop recommendations for improving access to land, credit, and markets. Recommendations will be conveyed to USDA via Advisory Committee as described in Goal #2.

1.3 Convene a panel of experts to 1) evaluate current land use and access challenges in USVI and PR and 2) complete a feasibility study on the establishment of a USVI and PR regional land trust to serve as a vehicle to bring forth innovative solutions to underserved farmers that need to secure affordable land via long-term leases, lease-to-own arrangements and/or land acquisition to be dedicated to farming, forestry or to provide ecological service. RAFI will share the results of the feasibility study with relevant stakeholders in the region and support the placement of farmers onto a new land trust or modification of existing ones based on the study's recommendations.
1.4 Build working relationships with USDA staff to ensure ongoing positive engagement.

Page 6. *Gaining New Ground Project Narrative*; RAFI-USA

**Expected Outcomes:**

1. **Host at least three focus groups** of 8-10 farmers to identify land access challenges and ways USDA programs can better serve farmers in land, capital, and market access.
2. Based on the baseline study, **publish three summary reports.** 2 reports (one all-region, one region-specific) detailing the challenges underserved farmers face in accessing USDA/FSA programs and recommendations to address challenges. And 1 report assessing existing USDA outreach materials and the highest technical assistance needs from farmers.
3. In partnership with USDA staff, project staff will conduct ongoing relationship-building meetings, develop training opportunities, and facilitate farmer-to-USDA staff connections that will improve working relationships with USDA service center field staff and farmers. The Advisory Committee will also **compile and communicate recommendations to USDA** on clarity and ease of use of USDA outreach materials.
4. **Completion of 2 reports**: "Land Use & Land Access in USVI and PR" as well as the USVI and PR land trust feasibility study.

**Objective #2: Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.**
**Outputs:**

2.1    Convene Advisory Committee to provide project input and guidance, identify existing public and private services available in each region to help farmers, and serve as review committee for Gaining New Ground grants and financial incentive award decisions.

2.2    Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements, particularly FSA programs and market opportunities.

2.3    Through outreach activities, identify underserved farmers who meet eligibility criteria and are strong candidates to receive technical assistance related to land, capital, and market access, particularly those previously denied by USDA programs.

**Expected Outcomes:**

1. Conduct outreach activities reaching at least **1,200 farmers** to increase knowledge of and access to available resources or services related to land, credit, or market access, resulting in at least **300 underserved farmers** receiving practical, actionable information through 1-on-1 assistance, online content, webinars, or training.
2. Proactively identify and **recruit 200 underserved farmers** who are eligible and would be strong candidates to receive comprehensive land, capital, or market technical assistance services from project partners.

**Objective #3: Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.**
**Outputs:**

3.1    Build a network of legal, financial, and business technical assistance experts and project case managers that can meet specific needs identified by farmers during a technical assistance intake assessment.

*Page 7. Gaining New Ground Project Narrative; RAFI-USA*

3.2  Develop customized technical assistance plans for each farmer based on their needs and goals, provide farmers with individualized technical assistance, and maintain comprehensive case management to ensure consistent tracking of engagement and progress against goals.

3.3  Improve the degree of underserved farmers' participation in USDA programs related to project-developed farm viability benchmark metrics.

3.4  Build relationships with institutional buyers to encourage increased sourcing from local farmers and help connect farmers with opportunities to new and emerging markets.

3.5  Provide farm advocacy services to farmers in crisis, including assisting with creditors, accessing resources and programs to solve immediate and long-term challenges, and assistance in minimizing the impact of disasters on land ownership and farm viability.

**Expected Outcomes:**

1.  **200 underserved farmers** receive technical assistance tailored to their individual needs on topics including but not limited to farm business planning, building credit, risk management, identifying suitable farmland, heirs' property/title issues, financial management, accounting, accessing USDA programs, addressing financial challenges, post-disaster farm advocacy and negotiating with creditors.

2.  **100 underserved farmers** report having a better understanding of the farmland purchasing process and are better able to make sound decisions regarding credit, land ownership, and retention.

3.  **80 underserved farmers** receive assistance identifying land or are connected to landowners.

4.  **40 underserved farmers** are connected to market opportunities including but not limited to farmer cooperatives, grocery retail, specialty markets, nutrition programs, and timber sales.

5.  **Organize 10 farmer-buyer meetups** that match institutional buyers with farmers who can meet their purchasing needs, serving **80 or more underserved farmers**.

<u>**Objective #4:**</u>
**Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.**
**Outputs:**

4.1  Provide farmers with financial assistance grants to lower the costs of land acquisition bypartially or fully covering down payments, brokerage fees, appraisals, or other land acquisition-related costs.

4.2  Provide funding for land acquisition for The Community Land Trust for SustainableAgriculture, a land trust created to ensure perpetual access to arable land as common goods for PR subsistence farmers and improve food security through expansion of sustainable agriculture.

**Page 8.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4       Filed: 06/23/2025    Pg: 172 of 606

DocuSign Envelope ID: 4EE49155-83BF-4726-A3B2-6B2E55CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 167 of 378
Agreement #: FSA24CPT0013706                                                    Attachment 2A

    4.3  Incentivize landowners to sell or lease land to targeted farmers or agricultural land trusts.

    4.4  Provide farmers with grants to support shared infrastructure, on-farm infrastructure, andequipment that will allow them to more easily and reliably access markets.

**Expected Outcomes:**

1. **45 farmers secure new land** through Gaining New Ground financial assistance grants
2. At least **10 landowners are incentivized** to lease or sell land to a farmer.
3. The Community Land Trust for Sustainable Agriculture acquires at least one land property and leases land via 99-year leases to four farmers in Puerto Rico.
4. At least **30 grants awarded** to farmers or farmer collaboratives to support infrastructure that will improve market access options.

**Budget Allocation: Outreach and Technical Assistance**

In total, approximately **66.11%** of the total $8,499,695 grant budget is allocated to *directly* support outreach, technical assistance, and financial support for land acquisition.

- **Outreach: 20.4%** of the budget ($1,736,586) is allocated to outreach and education related activities.
- **Technical Assistance: 20.3%** ($1,724,674) of the budget is allocated to technical assistance
- **Financial Support 25.4%** ($2,158,000) of the budget is allocated to Land and Infrastructure Financial Grants/Incentives.

**APPROACH**

**i. Description of Activities and Approach**

*Note: The proposed project's planned activities will <u>not</u> be duplicative of other activities undertaken with financial support from USDA or other federal sources.*

Project activities will build upon insights from the partners' established programs supporting BIPOC farmers. For example, in NC, we will identify farmers who would be good candidates for the project using data from grant applicants received for the RAFI-USA's FOCN infrastructure grants program. Similarly, PR and USVI partners will rely on their existing knowledge of farmers in their regions. **ii. Project Timeline**

| Objective & Activity | '23 | | | '24 | | | | '25 | | | | '26 | | | | '27 | | | | '28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 |

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 173 of 606

DocuSign Envelope ID: 4EF49755-83BF-4726-A3B2-6B2F5CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 168 of 378

Agreement #: FSA24CPT0013706    Attachment 2A

| **1 - Stakeholders, service providers, and government agencies improve their understanding and knowledge of unique barriers to land access for underserved farmers.** | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | Conduct baseline study to identify land and market access challenges. | | | | | | | | | | | | | | | |
| 1.2 | Develop recommendations for improved land and market access. | | | | | | | | | | | | | | | |
| 1.3 | Convene panel to 1) evaluate current land use/ access challenges in USVI and PR and 2) complete feasibility study on creation of regional land trust. | | | | | | | | | | | | | | | |
| 1.4 | Build working relationships with USDA staff to ensure ongoing positive engagement. | | | | | | | | | | | | | | | |
| **2 - Improve farmer awareness and knowledge of available private and public programs that benefit the resiliency and viability of their farms.** | | | | | | | | | | | | | | | | |
| 2.1 | Convene Advisory Committee to provide project guidance, identify farmer resources, and serve as review committee for farmer grants. | | | | | | | | | | | | | | | |
| 2.2 | Increase farmers' awareness and knowledge of available USDA programs, capital access options, and lending requirements. | | | | | | | | | | | | | | | |
| 2.3 | Through outreach activities, identify farmers who are strong candidates to receive technical assistance. | | | | | | | | | | | | | | | |

**Page 10.** *Gaining New Ground Project Narrative*; RAFI-USA

**J.A. 1706**

| | **3 - Provide targeted farmers with technical assistance, training, and referrals related to accessing land, credit, and markets and addressing financial challenges.** |
|---|---|
| 3.1 | Build a network of legal, financial, and business technical assistance experts and case managers that can meet specific farmer needs. |
| 3.2 | Develop customized technical assistance plans for each farmer based on their needs and goals, provide assistance, and maintain case management tracking. |
| 3.3 | Improve the degree of farmers' participation in USDA programs related to farm viability benchmarks |
| 3.4 | Build relationships with institutional buyers to encourage increased sourcing from local farmers and their connection to new markets. |
| 3.5 | Provide farm advocacy services to farmers in crisis; help minimize the impact of disasters on land ownership and farm viability. |
| | **4 - Increase land and farm ownership opportunities among underserved producers and explore the feasibility of a land trust in the U.S. Caribbean.** |
| 4.1 | Provide farmers with financial assistance grants to lower the costs of land acquisition. |
| 4.2 | Provide funding for land acquisition for The Community Land Trust for Sustainable Agriculture. |
| 4.3 | Incentivize landowners to sell or lease land to underserved farmers or agricultural land trusts. |
| 4.4 | Provide farmer grants to support farm infrastructure, and equipment that will increase market access. |

### iii. Innovation

***Focus on U.S. Caribbean Territories***. This project is unique in addressing land tenure challenges in the USVI and PR. Our partners' staff are experienced and trained in specific regional land concerns and will undoubtedly confront more unique situations during the project. Final reports will summarize their findings to enable replicable technical assistance for future engagements. Efforts within the U.S. Caribbean are pilots for the unique situations impacting the agricultural community, land access, capital, and market access in the non-contiguous U.S. and its Territories.

***Regionally-tailored Outreach and Technical Assistance:*** The playing field for farmers and ranchers is ever-changing based on the economy, climate change, supply chain deficiencies,

**J.A. 1707**

DocuSign Envelope ID: 4EF49755-83BF-4726-A3B2-652E55CD10D80

Agreement #: FSA24CPT0013706

global disruptions, etc. To achieve the best possible outcomes, this project will begin with a baseline study that identifies issues specific to the four focus regions.

***Inclusion of Land Trusts:*** USVI and PR are experiencing an increased purchase of arable land by off-island investors. This project will address the need to ensure that agricultural land remain

J.A. 1708

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 176 of 606

DocuSign Envelope ID: 4EF49TF5-83BE-4726-A3B2-6B2E5SCD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 171 of 378
Agreement #: FSA24CPT0013706                                    Attachment 2A

available to those who wish to farm by exploring the feasibility of creating a land trust for the region that provides farmers with options to lease, rent-to-own or purchase land trust property.

***Connections to Non-Traditional Lenders***: The project will connect farmers with alternative forms of financing in addition to government resources. Existing loan options include 1) 0% interest farm infrastructure loans for NC Black farmers through Foodshed Capital's Black Farmer Equity Fund, 2) a developing "loan not debt" strategy by Foodshed Capital for no-pay back mortgage loans to farmland buyers, 3) USDA Lenders through Heirs Property Relending Program, including Akiptan, LLC (for nationwide, low-interest heirs property mortgage loans and legal/business technical assistance, priority given to farmers partnering with tribal communities to improve food security and sovereignty) and Shared Capital Cooperative, which has a partnership with Federation of Southern Cooperatives for FL producers.

***Collaborations with Wholesale and Institutional Buyers:*** We will begin market access efforts by collaborating with Freshpoint in exploring possibilities to expand their local produce program in Puerto Rico and the possibility of exporting food produced by Puerto Rican farmers to Florida. RAFI-USA has existing collaborations with several likely buyers, such as NC regional food hubs, including Feast Down East and Weaver Street Market, a local food cooperative seeking new farmers referred by RAFI-USA. We will add additional buyers during year one.

### iv. Outreach Recruitment and Retention

RAFI-USA's outreach efforts will focus on reaching farmers who have engaged with its Farmers of Color Network, followed by outreach to other farmers of color in NC and FL. The FOCN program currently has approximately 300 members, with an additional 1,000 farmers of color who are affiliates of the Network. In Puerto Rico, the Alliance for Agriculture will conduct outreach to farmers using its internal network of more than 250 farmers, farmer's markets, and peer networks. In the U.S. Virgin Islands, we will conduct outreach to VI Good Food Coalition's network of more than 369 farmers, farmer's markets, producers, and affiliates.

Outreach activities will be led by people of color with education and experience with farming, enabling them to connect with farmers with a high level of cultural competency and an understanding of farming. We will target outreach to farmers of color who do not own land or have expressed an interest in acquiring additional land. We will conduct outreach in various formats to ensure that information is accessible to farmers who may not have internet access. Some of the outreach channels include phone banking, texting, cross-platform messaging services, printed materials (including a quarterly Project Bulletin), SMS and chat apps, in-person meetings with individuals or groups of farmers, local advertising, attendance at conferences and events with large populations of farmers of color, and word of mouth. Project partners will adapt the content and outreach methods to best meet their farmer audiences' needs. For example, all Puerto Rico and Florida activities will be delivered in English and Spanish, and materials in U.S. Virgin Islands may be translated into Creole to reach Haitian immigrant populations.

***Amplification of Outreach Efforts:*** We expect our outreach effort to organically extend nationally beyond the project's footprint through digital and social media, media relations, attendance at farm-related events, and outreach activities conducted by project staff, partners,

**Page 13.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 177 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 172 of 378
Agreement #: FSA24CPT0013706    Attachment 2A

farmers, and collaborators. Outreach will be further amplified through national and regional partnerships. RAFI-USA participates in weekly calls with national farm advocacy partners to develop outreach materials and share feedback on farmers' ability to access federal COVID relief programs. With these external partners, we will share outreach materials and event notifications that may benefit farmer audiences. We are connected with a network of organizations serving farmers of color in their regions and will disseminate information and alert farmers to this project via that network.

***Recruitment of Farmers for Technical Assistance:*** To enroll/participate in technical assistance, farmers will complete an intake and needs assessment. Project staff will use the project's farm viability benchmarking tool to help assess the farmer's situation. As there are many steps between a farmer wanting to acquire land to officially becoming a landowner, the benchmarking tool indicates a five-step progression related to farm viability; crop insurance, farm financial plan, and farm loans. An excerpt of our *draft* benchmarking tool is below, showing a 5-step scale toward land tenure goals.

| Farm Viability Scale | 1-Lacks Access | 2- Aware of opportunities | 3- Takes first actions towards goals | 4-Receives assistance from USDA | 5-Completed goals |
|---|---|---|---|---|---|
| **TOPIC: Land Tenure** | Has no ownership, lease access, or other means of accessing farmland | Aware of range of land tenure options and available programs and resources | Receiving referrals to land access organizations, requesting assistance | Utilizing partnerships and alternative buying markets | Closing contracts offered and signed, land procured |

A case manager will be assigned to each farmer as the primary point of contact. They will work with the farmer to set realistic goals according to the benchmark tool and develop a technical assistance plan to provide a roadmap for the farmer to reach their goals. The case manager would make referrals to other service providers that would benefit the farmers, coordinate and match the farmer with technical assistance providers, and track results. We will provide in-depth 1-on-1 technical assistance unique to the farmer's geography, which may include land tenure strategies, farm loan financing, navigating USDA's FSA/NRCS programs, conservation planning, FSA farm record management, market potential and access, production strategy, risk/disaster management, and evaluation. Farmers deemed ready to purchase or lease land will be offered financial assistance, through a formal application and review committee process, in the form of grants to supplement. This format is comparable to down payment assistance programs for first-time home buyers, which are offered alongside housing counseling services. During periodic check-ins, the case manager will have the opportunity to work with the farmer to refine the technical assistance plan based on results/experiences to date.

In addition to 1-on-1 in-depth assistance, farmers will have the opportunity to participate in peer network calls to provide farmers with a community of peers working towards similar goals. The calls will feature invited speakers to present on topics of relevance. Educational opportunities

**Page** 14. *Gaining New Ground Project Narrative*; RAFI-USA

will be available to help build farm business skills. Topics will be varied and tailored to needs. For livestock producers, for example, we can offer training in collaboration with A Greener World on topics such as best practices for handling and animal welfare in transport and slaughter, livestock health, developing emergency plans, technical support on pasture-based farming systems, and regenerative farm planning. Additional topics to strengthen farm viability may include building and managing credit, financial planning, budgeting, recordkeeping, bookkeeping skills, etc.

***Retention strategy:*** This project intends to maximize retention of farmer relationships developed by tracking progress against goals, as farmers receive case management services throughout their participation in the project. Case management will allow us to track progress on an individual basis as well as project performance.

### v. Sustainability & Scalability

The Gaining New Ground project builds upon existing RAFI-USA programs, namely the Farmers of Color Network and cooperative agreement projects with FSA and NRCS, which deliver targeted outreach and technical assistance to underserved farmers. **While the Gaining New Ground project is not a cooperative agreement, our past and current cooperative agreements inform the design, implementation, and long-term sustainability of the proposed work in the Gaining New Ground project.** RAFI's cooperative agreements show how project partnerships, outreach, and technical assistance can lead to greater opportunities for underserved farmers, including increased USDA program access and improved farm cash flow for long-term farm viability and land retention. Through the Gaining New Ground project, we expect to see marked progress in regional capacity building, strengthened USDA relationships, and sustained farmer viability. As RAFI-USA is a nonprofit organization reliant upon grants, we cannot be certain that we will be able to give farmers the level of financial incentives beyond the life of this project. However, the infusion of funds that will strengthen and rebuild farmers' land, capital, and market opportunities and the education of farmers to use USDA programs will continue to support regional agricultural viability long after the project ends. The results of the new land trust feasibility study, as supported through this project, also has great potential to lead to long-lasting land access opportunities for farmers. The results will be shared with relevant stakeholders, and RAFI strives to support the placement of farmers onto existing or a new land trust based on the study's recommendations.

### vii. Potential Challenges

We anticipate encountering some challenges, including difficulties and delays in hiring and training qualified staff, language access barriers in PR, difficulties identifying affordable land, the possible unwillingness of some FSA staff to collaborate, slow land purchase processes, and more. Below we have identified four potential challenges and our plan to address each.

**Weather-related disruptions to the project timeline:** We know that our work will focus on regions frequently affected by hurricanes and other weather-related events. We further understand that it is not a matter of whether a hurricane will hit but when. The project is designed so that project staff and partners will be prepared to pause activities to shift efforts to disaster preparedness, disaster recovery, and other disaster-related assistance.

Page 15. *Gaining New Ground Project Narrative*; RAFI-USA

**Lack of farmer trust in USDA:** Avoiding engagement with USDA is still a survival strategy for many farmers of color. When we ask these farmers to share their thoughts on how USDA can improve, the most common reaction is skepticism as to whether it is worth their time and what good it will do. The proposed project will fill the trust gaps where USDA has failed to reach farmers by relying on project partners and individuals who already have farmers' trust in their respective regions to lead culturally relevant and place-based outreach and education efforts.

**Lack of access to fast, reliable internet and devices:** From our experience working with farmers of color, particularly those in rural areas, we know that there is a significant lack of access to fast, reliable internet and devices that affect their ability to receive and send important information and documentation; according to the 2017 agricultural census, only 61% of Black farmers have access to the internet. We will ensure outreach efforts and technical assistance services focus on reaching those without reliable internet and devices.

**Potential challenges in overlap and farmer confusion:** We are aware of multiple peer organizations applying to this program, and look forward to collaborating with them. RAFI-USA is also a partner in two applications with minimal geographic scope overlap. If all were to be funded, we have planned the work in such a way as to ensure planned activities will not be duplicative. Because the demand for assistance related to land, credit, and market access is so great, we do not expect significant difficulties in recruiting sufficient participants for the proposed project. However, we anticipate the *possibility* of overlap and farmer confusion if multiple organizations provide similar services within the same regions. To avoid duplication of efforts and maximize impact, we will collaborate and coordinate efforts with other organizations doing similar work. When this is impossible, we will adapt our plan to focus our efforts on areas of greatest need.

## PERSONNEL AND RESOURCES

RAFI-USA has decades of experience supporting underserved farmers, including providing one-on-one crisis farm advocacy work with farmers in financial distress. This gives us a unique background and informs knowledge of the challenges farmers experience, including those encountered when attempting to access USDA services or negotiate with USDA staff when problems arise. Gaining New Ground project staff will be able to refer farmers to other RAFI-USA staff as well as partners, enabling farmers to benefit from the wide range of other programs and services offered, including opportunities to engage in federal policy work, educational and technical services offered via other USDA-funded projects, farm-to-faith market connections, disaster relief funding, and more.

RAFI-USA's FOCN program is designed to build the strength, prosperity, and economic health of farmers and farming communities of color in the Southeast U.S. and U.S. Caribbean region. FOCN serves farmers of color through outreach, education, and assistance, connecting farmers to opportunities and resources and hosting webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge.

RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition have substantial experience conducting outreach and providing assistance to underserved farmers through our

Page 16. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 180 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 175 of 378
Agreement File: FSA24CPT0013706    Attachment 2A

NRCS-funded *Conservation Outreach: Racial Equity and Justice Conservation Cooperative Agreements* program. This existing partnership and the trust built between project staff and farmers make us uniquely poised to continue providing tailored technical assistance and bringing critical, additional support for farm sustainability.

**Project's Leadership Team**

**Edna Rodriguez, Executive Director, RAFI-USA:** Ms. Rodriguez has been with the organization since 2011 and became Executive Director in 2017. In her current role, Ms. Rodriguez has grown the organization's capacity by streamlining financial management, diversifying income, and organizing cross-programmatic staff teams for greater collaboration and impact. Ms. Rodriguez led RAFI-USA through a strategic planning process centered around equity, launching and growing the Farmers of Color Network, and extending programs to the U.S. Caribbean territories. Ms. Rodriguez has significant experience working with communities of color, including managing Latino outreach programs in previous roles, providing oversight for the Farmers of Color Network, and building collaborations to address unmet needs. *Project Role: Ms. Rodriguez will serve as Project Director and provide oversight for the project, supervise hiring activities, manage partner relationships, assist with capacity-building activities, and support the strategic alignment of the project with other work by RAFI-USA or partners.*

**Sommer Sibily Brown, Executive Director and Founder, Virgin Islands Good Food Coalition:** Ms. Sibilly Brown testified at the U.S. Congress to highlight the barriers and challenges of the U.S. Territories in equitably accessing USDA programs; successfully advocated for the inclusion of USVI and Territories for the national farm-to-school network as core partners, resulting in the first farm-to-school program in the USVI. She serves as Chair of the National Farm to School Network's Board of Directors. Ms. Sibilly-Brown is an advisor to the Resilience Playbook local-regional food system USDA AMS project with Colorado State and the University of Kentucky. She co-led FEMA's Food System Assessment with Iowa State, which included a food resilience plan in the USVI's Hurricane Disaster Recovery Plan. *Project Role: Ms. Sibilly Brown will serve as Project Director in the U.S. Virgin Islands, provide high-level supervision, and be the primary liaison between VIGFC and RAFI-USA. She will also be responsible for managing the subaward budget, ensuring that all deliverables are carried out on time and in compliance with direction from RAFI-USA.*

**Miguel Marxuach, Executive Director and Cofounder, Alliance for Agriculture:** Since 2019, Mr. Marxuach has spearheaded the growth of the Alliance for Agriculture to empower projects and people working on transforming rural communities and farming in Puerto Rico. Mr. Marxuach has worked exclusively with underserved farming people and communities for the past five years. He has developed a profound link with farming entrepreneurs, mostly women of color, supporting their efforts and working with farmer's markets. Before dedicating himself to non-profit work, Mr. Marxuach led a multinational technology information business. Mr. Marxuach holds an MS in Industrial Engineering and an MS in Corporate Social Responsibility, Accounting, and Social Auditing. He has deep knowledge and experience in banking, loans, and financing. *Project Role: Mr. Marxuach will serve as project lead in Puerto Rico to conceptualize project components, oversee the team, and serve as a principal liaison with RAFI-USA.*

Page 17. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575     Doc: 55-4      Filed: 06/23/2025     Pg: 181 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 176 of 378
Agreement #: FSA24CPT0013706                                        Attachment 2A

### Key Project Staff

**Lisa Misch, Director of Farmer Outreach and Technical Assistance, RAFI-USA:**
Ms. Misch leads RAFI-USA's Resources for Resilient Farms project and serves as Project Director for multiple USDA-funded projects. Before joining RAFI-USA, she served as the AmeriCorps VISTA Volunteer at the College of Menominee Nation in Keshena, WI, where she managed the Tribe's farmers market. Ms. Misch has previous experience working on small, sustainable farms in the Midwest and internationally. ***Project Role:*** *In addition to ensuring consistency across regions in service delivery and hiring and training project staff, Ms. Misch will lead efforts to manage the project's network of TA providers.*

**Carolina Alzate Gouzy, Ph.D., Farmer Outreach Coordinator, RAFI-USA:** Dr. Alzate Gouzy has worked to support networks of agroecology NGOs. She has degrees in Agribusiness and Sustainable Development from Universidade de Brasília, Brazil. Her extensive experience is based in Latin America, where she worked with small farmers, as well as more recent experience conducting outreach to farmers of color as part of RAFI-USA's NRCS cooperative agreement.
***Project Role:*** *Dr. Alzate Gouzy will provide bilingual coordination between efforts in Puerto Rico and RAFI-USA staff, as well as coordination between NRCS-funded activities and this project.*

**Jaimie McGirt, Agricultural Conservation and Market Access Coordinator, RAFI-USA:**
Ms. McGirt has extensive experience providing 1-on-1 technical assistance to historically underserved farmers in the Southeast, including assisting farmers in identifying business and land stewardship priorities, assessing capacity, and identifying capacity-building resources, partnerships, and referrals that help farmers advance their market and farm conservation goals. Ms. McGirt co-leads RAFI-USA's NRCS-specific training for technical assistance providers.
***Project Role:*** *Ms. McGirt will provide 1-on-1 technical assistance related to market access and farmland conservation activities to farmers participating in the project, as well as coordination between current NRCS-funded project activities and the early activities of this project.*

**Benny Bunting**, **Lead Farmer Advocate, RAFI-USA:** Mr. Bunting is a national leader advocating for farm families and saving farms that would otherwise be lost to foreclosure. He provides farmers various advocacy services through RAFI-USA's Farm Advocacy program, including financial counseling, legal referrals, and TA. He counsels between 75-100 farmers annually and, on average, devotes 60 hours per client. In more than 90% of the cases he works on, Mr. Bunting helps farmers realize their goals and achieve greater stability. ***Project Role:*** *Mr. Bunting will assist with identifying barriers to accessing FSA programs, train staff on FSA regulations, and provide 1-on-1 farm advocacy services to farmers in financial distress.*

**Kristina Torres, Program Manager, VI Good Food Coalition: Ms. Torres** has experience with program design and project management, including working on federal grants. She has over 15 years of experience designing and facilitating systems thinking approaches and fluency in navigating between the U.S. Caribbean and the U.S. mainland. ***Project Role:*** *Ms. Torres will supervise the USVI-specific project objectives, timeline, budget, and ongoing compliance monitoring.*

**Page 18.** *Gaining New Ground Project Narrative*; RAFI-USA

**Mariolga Reyes Cruz, Ph.D., Cofounder and Executive Director in Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible:** Dr. Reyes Cruz is a community psychologist, a documentary filmmaker, and a social and climate justice activist. She is working on producing a feature-length documentary that follows three young Puerto Rican farmers in their efforts to advance sustainable agriculture. Mariolga Reyes lives in Río Piedras and co-manages the family farm in Utuado. ***Project Role:*** *Dr. Reyes Cruz will contribute to the baseline study and oversee the purchase and management of land trust property.*

**Ramón Borges-Méndez, Ph.D., Associate Professor, Clark University:** Prof. Borges-Méndez teaches graduate courses on food systems, inequality, labor economics, migration, and globalization. Prof. Borges-Méndez is co-founder of Fundación Bucarabón, a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. Prof. Borges-Méndez has extensive consulting experience working with various organizations, including the Ford Foundation, United Nations, and the Brookings Institution. ***Project Role:*** *Prof. Borges-Méndez will serve on the Advisory Committee and lead efforts to conduct the initial baseline study on land access and land use in Puerto Rico.*

## OUTCOME EVALUATION PLAN AND REPORTING

### i. Anticipated Outcomes

Although we will set outcome evaluation and reporting plans for all 15 outcomes listed under the Goals, Objectives, and Outcomes section, here are two anticipated outcomes.

| Anticipated Outcome | Evaluation and Reporting Plan | Significance | Potential Beneficiaries |
|---|---|---|---|
| **200 underserved farmers** receive technical | -Case managers and farmers create technical assistance plan -Case managers track progress | -Farmers are clear on intended goals and plan to reach them | The 200 underserved farmers receiving tech assistance will |
| assistance tailored to their individual needs | towards goals in Salesforce -Case managers conduct final eval interview with farmer when tech assistance ends | -Project team can quantify how many farmers reached, goals and rating of TA provided | be the primary beneficiaries but will have rippling effects for the surrounding ag economy |

**Page 19.** *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 183 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 178 of 378
Agreement #: FSA24CPT0013706    Attachment 2A

| 45 farmers secure new land through Gaining New Ground financial assistance grants | -Farmers complete grant application showing eligibility and feasibility for success -Farmers sign grant agreement -Farmers complete final report when land is secured -Project staff do compliance check-in annually for 5 years | -Farmers have clear understanding of their fiscal responsibilities for grant funding -Annual compliance check-in ensures grants used properly | The 45 farmers will be the primary beneficiaries but will have rippling effects for the surrounding ag economy |

The vast majority of farmers reached will be underserved BIPOC producers. We also expect to reach some farmers outside of North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico through virtual training, webinars, or online content. Estimated beneficiaries by region:

- North Carolina - 400
- Florida - 150
- Puerto Rico - 300
- US Virgin Islands - 150
- National - 200
- **TOTAL - 1,200**

## ii. Project Performance Measures & Metrics

The success of the project will be measured using the following metrics:

1. # farmers that report successful engagement with USDA; (Measures: webinar or 1-on-1 technical assistance evaluations)
2. # farmers who complete a needs assessment and technical assistance plan; (Measures: number of completed assessments and plans stored in project drive)
3. # of farm loans or grants secured by project participants for land acquisition or critical infrastructure; (Measures: summation of project land or infrastructure grants awarded as well as USDA or private lending secured through project technical assistance)
4. # farmers who secure long-term land leases or purchase land; (Measures: summation of finalized leases or land purchases as a result of funding and/or technical assistance provided)
5. # landowners incentivized to sell or lease to a farmer; (Measures: number of landowners who receive incentives to sell or lease to an underserved farmer) **iii. Evaluation: Oversight and Measurement of Project Performance**

The Project Director will oversee and measure the project's performance, report on outcomes, and ensure adherence to the project plan and timeline. This work will be done in coordination with the Data Manager and in close partnership with project leadership at RAFI-USA, Alliance for Agriculture, and Virgin Islands Good Food Coalition. Case managers assigned to follow each farmer throughout their engagement with the project are responsible for evaluating progress against goals for individual technical assistance projects.

## iv. Funding for Monitoring and Performance Measurement

**Page 20.** *Gaining New Ground Project Narrative*; RAFI-USA

J.A. 1716

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 184 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 179 of 378
Agreement #: FSA24CPT0013706                                                          Attachment 2A

Within the RAFI-USA project team, the Data Manager will be primarily responsible for monitoring and performance measurements. The Data Manager will be a 0.9 full-time equivalent position with responsibilities including ensuring case managers are collecting required grant evaluation and metrics data, ensuring farmer grantees submit timely reports, assisting with USDA performance reporting and baseline study. Funding set aside for Data Manger is $247,273.

### v.  Plans for Reporting and Communicating of Findings and Results

In addition to required grant reports, we will document, evaluate, report, and share our findings with underserved farmers in the project's geographic region and relevant stakeholders beyond the term and geographic scope of this grant. We will additionally share results with peer organizations, lenders, land trusts, funders, and others who could contribute positively to improving land access for underserved farmers. Plans to share our findings include

- Ongoing meetings with USDA to provide feedback and discuss challenges experienced
- Creation and distribution of a quarterly Project Bulletin
- Hosting "*Gaining New Ground: Farmland Access in USVI and Puerto Rico*" presentations
- Producing reports based on findings from the initial baseline study
- Sharing our recommendations report regarding relevant USDA outreach materials

### vi. Plan for Collaboration and Communication with USDA

Objective One of this project is to ensure USDA staff, particularly newer staff and staff in offices where participation in programs is low, understand the unique challenges and needs facing farmers in their regions. RAFI-USA looks forward to collaborating with USDA staff, locally, regionally, and nationally, wherever possible to benefit farmers and ranchers. Reports published as part of this project will be widely disseminated and shared with local, regional, and national USDA officials.

### MANAGEMENT AND PARTNERSHIP PLAN

RAFI-USA will serve as the organizational project lead and, as such, will assume responsibility for the project management, budget management, reporting, and evaluation for this grant. The project will rely on an equitable, shared leadership model with a leadership team consisting of representatives from each core organization, an Advisory Committee, and participatory decision-making processes that are inclusive of all partners and include stakeholder feedback. This approach is consistent with our values and how we approach our work.

**Experience Managing Federal Funds:** RAFI-USA has extensive experience with federal grants management, including 1) USDA FMPP 2020-23 grant #AM200100XXXXG151; 2) FSA Cooperative Agreement 2021-22 #FSA21CPT0011944; 3) Subaward with National Young Farmers Coalition on NIFA Cooperative Agreement # 2022-70416-37195 4) NRCS Cooperative Agreement #NR223A750003C066. In FY2023, we will expand our capacity to manage federal funds by hiring a full-time, dedicated Federal Grants Manager. We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence, which we will use for the proposed project. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. Additionally,

**Page** 21. *Gaining New Ground Project Narrative*; RAFI-USA

we contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop conducts the annual auditing of our financial statements. Beginning in 2023, they will conduct annual yellow book audits to ensure all federal funds are administered per applicable laws and regulations.

**Regranting Experience:** For more than 25 years, RAFI-USA has administered competitive grantmaking programs for farmers. We have in place a process that values equitable access for all farmers, due diligence for applicant eligibility and feasibility, an external grant review process, and simple yet accountable compliance reporting processes. For this project, RAFI-USA will create grant guidelines and a scoring rubric aligned with project priorities and federal requirements. The review committee will score grant applicants, and applications with the highest scores will be chosen to receive financial assistance per the Advisory Committee's recommendations. Farmer grantees will enter into formal grant agreements with RAFI-USA that clearly outline grant terms and requirements, submit a W-9, signed grant agreement, and complete an orientation to review before payment is issued. RAFI-USA will develop an annual reporting process to ensure farmers comply with the grant agreement for at least five years after initial funding.

**Partnership Plan:** In addition to the partners included in this proposal, we expect to add partners to build an effective and collaborative regional network of partners representing public and private entities. Partner activities will be coordinated and monitored by RAFI-USA staff to ensure cohesiveness and alignment with established work plans and stated goals, objectives, and outcomes. We will host monthly check-ins with partners to receive updates, troubleshoot, discuss new outreach activities or materials, and ensure reporting and evaluation activities are on track.

**<u>Core Project Partners</u>**

<u>Alliance for Agriculture</u> *(Subaward)*: Alliance for Agriculture (A4A) is an organization based in Puerto Rico with deep connections to farmers across the island. A4A will lead efforts in Puerto Rico. They will conduct monthly outreach efforts and submit findings to the Project Manager. The Alliance will participate in monthly check-ins, train-the-trainer events and contribute to outreach and supervision of technical assistance activities. The Alliance will establish or strengthen existing working relationships with the existing food/agriculture in Puerto Rico as stated in their Letter of Commitment. The Alliance will also contribute to the initial baseline and land trust feasibility studies.

<u>Virgin Islands Good Food Coalition</u> *(Subaward)*: Virgin Islands Good Food Coalition (VIGFC) is a nonprofit organization that advances food systems transformation in the USVI. VIGFC will lead efforts in the U.S. Virgin Islands and rely on extensive relationships in the territory to accomplish the project's objectives. They will conduct outreach to farmers in St. Croix, St. Thomas, and St. John and four producer-led organizations, organize trainings, supervise technical assistance activities, and contribute to the initial baseline and land trust feasibility studies.

**Page** 22. *Gaining New Ground Project Narrative*; RAFI-USA

USCA4 Appeal: 25-1575     Doc: 55-4          Filed: 06/23/2025     Pg: 186 of 606

DocuSign Envelope ID: 4EF49TE5-83BE-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 181 of 378
Agreement #: FSA24CPT0013706                                        Attachment 2A

<u>Florida Organic Growers, Inc</u>: *(Subaward)* Florida Certified Organic Growers and Consumers (FOG) is a nonprofit corporation established in 1987. FOG educates producers, consumers, media, institutions, and governments about the benefits of organic and sustainable agriculture, presenting at tours, conferences, workshops, classes, and other educational opportunities.

<u>Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible (The Community Land Trust for Sustainable Agriculture)</u>: *(Subaward)* The Fideicomiso was founded to ensure landless farmers in Puerto Rico can access farmland as a common good and advance the food sovereignty of Puerto Rico. The lands under the custody of the Fideicomiso will be mainly destined to: support small-scale sustainable agriculture aimed at producing food for local consumers and initiatives that promote a good life for underserved farmers and their communities. They will collaborate with the project to identify and secure their first farmland purchase for the land trust. Additionally, Mariolga Reyes Cruz will contribute to the initial baseline study and provide project leadership guidance on land access issues in Puerto Rico.

<u>Fundacion Bucarabon</u>: *(Subaward)* Fundacion Bucarabon is a rural community development organization based in Maricao, PR, focused on empowering women, providing education and training services, workforce development, and strengthening local supply chains for farmers. They will support outreach to small and mid-sized farmers in PR and provide logistical support in the region.

## **Core Collaborators**

<u>Hispanic Federation</u>: *(Collaborator)* Hispanic Federation is an important player in attending to the needs and supporting the Latin community in the U.S. mainland and Puerto Rico. Hispanic Federation's commitment to this project includes: serving on the Advisory Committee for the project and contributing to the initial baseline study of land access, use, and tenure in Puerto Rico. Hispanic Federation will also assist with organizing convening activities in Puerto Rico to support the project.

<u>A Greener World</u>: *(Collaborator)* A Greener World will serve as a technical assistance provider on issues related to small-scale livestock production. In this capacity, they will offer 1-on-1 support to farmers interested in certification on verified farming practices. They will also offer training workshops for livestock farmers on pasture-based farming systems, general or by species, food labeling, best practices for handling and animal welfare in transport and slaughter, and regenerative farm planning. Emily Moose, A Greener World's Executive Director, will also serve as an Advisory Committee member to guide on matters related to livestock production.

<u>Freshpoint</u>: *(Collaborator)* Freshpoint is North America's largest wholly-owned produce distributor. Its client base includes local, regional, and national chains, hotels, resorts, country clubs, restaurants, healthcare, schools, universities, and other institutions. The company will collaborate on matters related to market access, including Freshpoint's planned expansion of its local produce program in Puerto Rico, identifying farmers who may benefit from the project,

**J.A. 1719**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 187 of 606

DocuSign Envelope ID: 4EF491F5-83BF-4726-A3B2-6B2E55CD10D90
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 182 of 378
Agreement #: FSA24CPT0013706                                        Attachment 2A

assisting farmers in becoming wholesale-ready, co-hosting farmer-buyer meetups and events, and exploring the possibility of exporting Puerto Rican produce to Florida.

<u>Triangle Land Conservancy, NC</u> (TLC): *(Collaborator)* TLC recently launched their "Good Ground Initiative," a buy-conserve-sell model of making farmland ownership accessible and affordable to BIPOC farmers. They will collaborate on conservation easement/land trust best practices and lessons learned, assess farmer fitness and land trust feasibility, and provide regional referrals for farmers interested in conservation easements/trusts. Farmers participating in this project will be made aware of any Good Ground Initiative land sales and receive technical assistance through the buying process should they be selected by the GGI advisory committee.

<u>Foodshed Capital:</u> *(Collaborator)* Foodshed Capital is an experienced lender focused on meeting the needs of underserved producers, particularly BIPOC producers who have faced discrimination and exclusion from traditional lenders and federal programs. They have provided nearly $1.5 million in flexible, affordable capital and will collaborate to provide general support within the context of existing operational lending to Puerto Rican farmers, particularly as it is needed by farmers partnering with Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible.

<u>Agrarian Trust:</u> *(Collaborator)* Agrarian Trust holds farmland in community-centered commons and provides long-term, equitable land access for next-generation farmers and ranchers by establishing 501(c)(2) and 501(c)(25) landholding entities. Agrarian Trust commits to assisting RAFI-USA and partners in the feasibility study of establishing farmland holding entities where they are not currently working but hope to expand: in NC, FL, US Virgin Islands, and Puerto Rico. Agrarian Trust will consult on model replication of lessons learned and best practices from the Agrarian Commons initiative.

### **Plans for Coordination, Communication, Data Sharing & Reporting**

RAFI-USA has years of experience managing and storing confidential documents shared by farmers we work with via our farm advocacy services. Data protocols will be in place to ensure sensitive data and financial information is protected and stored securely during the life of the grant and after that for five years per RAFI-USA document retention policy, after which documents may be destroyed. To ensure compliance with federal requirements and consistent data tracking of outcomes indicators across the project, RAFI-USA will dedicate staff resources to managing the project's data collection, sharing, and reporting functions and maintaining secure and adequate data systems. Some key systems we will use to store and share information include

***Cloud-Based Document Storage:*** Project partners will have shared access and use of a third-party cloud-based document storage system where partners can store documents to allow for asynchronous collaboration. This system will also allow storing working documents, such as shared project work plans, budgets, project guidelines, outreach materials, and more. The system will also provide a central location to store any financial documents or other farmer data, grant agreements, and other documents. Only authorized RAFI-USA staff and designated partners will be provided access to this cloud storage.

**Page** 24. *Gaining New Ground Project Narrative*; RAFI-USA

***Use of Third-Party CRM Database:*** RAFI-USA utilizes a third-party CRM database system hosted on the Salesforce.com platform customized to meet organizational and project needs. The customized Salesforce database will be utilized by project staff to record and track participant data and to track and report on outcomes. The database is hosted in a secure server that uses a firewall and other advanced technology to prevent interference or access from outside intruders. Information is protected using server authentication and data encryption to ensure data is safe, secure and available only to authorized users. Only authorized RAFI-USA staff and designated partners are provided access to the database via a unique username and password that must be entered each time a user logs on to the database via industry-standard Secure Socket Layer (SSL) technology. Salesforce user accounts are configured to allow employees and designated partners access only to the information they need while keeping sensitive information about unrelated constituents private. Information stored in our Salesforce database related to farmers includes contact and demographic information, information about their farm, and their history of engagement with our programs, including grants, events, and technical assistance.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 189 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2F5CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 184 of 378
Agreement #: FSA24CPT0013706                                          Attachment: 3A

# BUDGET NARRATIVE

## <u>Personnel</u>

RAFI-USA personnel estimates include 4% annual cost of living adjustment.

1. **Principal Investigator** - Provide oversight for the project, supervise hiring activities, manage partner relationships, assist with capacity-building activities, and support the strategic alignment of the project with other work by RAFI-USA or partners. RAFI-USA will contribute the majority of the PI's time on the project in kind, with the expectation of 13% of her time in year 1 and 5% in year 2-5.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $153,789 | 13% | 1 yrs | $19,992.57 for efforts in year 1. |
| $153,789 | 5% | 4 yrs | $30,757.80 for efforts in year 2-5 |

2. **Project Director** - Ensure project work follows timeline, supervise RAFI-USA project staff, direct farmer regranting, overall coordination of partners, collaborators, and technical assistance providers.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $78,772 | 100% | 5 yrs | $393,860.00 |

3. **Federal Grants Manager** - Ensuring overall compliance of RAFI, partners, and collaborators with USDA grant and budget requirements. Oversight of partner contracts and subaward payments. Responsible for budget management and invoicing USDA for reimbursement.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $70,475 | 25% | 5 yrs | $88,093.75 |

4. **Data Manager** - Will manage outcomes tracking and ensure case managers are collecting required grant evaluation data, ensure grantees submit timely reports, assist with USDA reporting and baseline study. 55% effort in Year 1-4 and 90% in Year 5 to support final evaluation and reporting efforts.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $71,111.08 | 55% | 4 yrs | $156,444.38 |
| $71,111.08 | 90% | 1 yr | $63,999.97 |

5. **Puerto Rico Farmer Advocate** - Assist with identifying barriers to accessing FSA programs, train staff on FSA regulations, and provide 1-on-1 farm advocacy services to farmers in financial distress.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $58,020 | 50% | 5 yrs | $145,050 |

6. **Senior Case Manager 1** - Assigned to participating farmers completing intake forms, develop technical assistance plans, connect with or provide technical assistance to farmers, properly track evaluation metrics and data.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|

*1 Gaining New Ground Budget Narrative; RAFI-USA*

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 190 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 185 of 378
Agreement #: FSA24CPT0013706                                              Attachment: 3A

| $76,060 | 75% | 4 yrs | $228,180 |
|---------|-----|-------|----------|

7. **Senior Case Manager 2** - Assigned to participating farmers completing intake forms, develop technical assistance plans, connect with or provide technical assistance to farmers, properly track evaluation metrics and data.

| Salary | % Effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $74,626 | 25% | 5 yrs | $93,282.50 |

8. **Communications Coordinator** - Will coordinate project based communications activities within RAFI and subaward partners, and assist with events planning.

| Salary | % effort | Project Duration | Funds Requested |
|--------|----------|------------------|-----------------|
| $58,515 | 25% | 1 yrs | $14628.75 |
| $58,515 | 50% | 4 yrs | $117,030 |

**Total RAFI-USA Personnel Request: $1,351,319.72**


# Fringe

Fringe benefits are calculated at 27.16% for full-time employees (30+ hours).
Calculation: We used a fringe benefit rate of 27.16% and applied to the total salary and wages ( $**1,351,319.72** x 27.16% )

**Total Fringe Request: $367,018.44**

# Travel

**Mileage**: will include in person meetings with USDA staff, technical assistance site visits, travel to focus group events, and farm visits to grantees. Mileage expenses will be used for trips under 150 miles round trip.
    Amt. Requested = 150 miles x $0.67/mile (GSA) x 150 trips over 5 years
    Mileage Total = **$15,075**
**Car Rental**: will include in person meetings with USDA staff, technical assistance site visits, travel to focus group events, and farm visits to grantees. Car rental will be used for trips over 150 miles round trip.
    Amt. Requested = $80/day x 150 days over 5 years
    Car Rental Total = **$12,400**
**Per Diem**: we expect case managers to combine some longer-distance farmer technical assistance or grantee site visits into multi-day trips for more cost-effective travel funds use. We will also require lodging for annual trips to PR and USVI.
    Mainland = (1 night @ $96 GSA NC lodging rate + 2 days @ $59 GSA per diem rate) x 10 trips/year x 5 years = $10,700
    PR = $282 (Dept of Defense per diem rate) x 3 days/trip x 1 trip/yr x 3 travelers x 5 years = $12,690
    USVI = $367 (Dept of Defense per diem rate) x 3 days/trip x 1 trip/yr x 3 travelers x 5 years = $16,515
Per Diem Total = **$39,905**
**Airfare**: 1 flight per year to USVI and 1 flight per year to PR for 3 staff at $600 each for 5 years = **$18,000**
**Conference Registration**: Attend 4 conferences per year to share information about the project, such as the Black Urban Growers Conference (BUGS). $150 per conference x 20 conferences = **$3,000**
**Partner Trainings in NC:** Host staff from select subrecipient organizations for annual project training at RAFI office in NC. We anticipate hosting 11 subrecipient staff - 5 from Alliance for Agriculture, 3 from Virgin Island Good Food, 1 from Fundacion Bucarabon, 1 from Florida Organic Growers, and 1 from Fideicomiso de Tierras

J.A. 1723

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 191 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B255CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 186 of 378

Agreement #: FSA24CPT0013706    Attachment: 3A

Comunitarias para la Agricultura Sostenible (5+3+1+1+1=11). Please note: lodging and per diem for these trainings are in the RAFI portion of this budget. The airfares related to these partner trainings are in each partner's subaward budget to allow them logistical control over transportation details.

Lodging = 3 nights * 11 people * $107/night * 1 trip/yr * 5 years = **$17,655**
Per Diem = [$59 (GSA NC per diem rate) *2 days + $44.25 (GSA NC travel day per diem rate)* 2 days]* 11 people * 1 trip/yr * 5 years = **$11,357.50**

**Total Travel Request: <u>$117,392.50</u>**

## Supplies
- Laptops for new staff - $800 for 3 laptops = $2,400
- Summary Reports Printing - reports generated from this project will be shared with food system stakeholders, including USDA; 100 reports x $100/report = $10,000
- "Living Roots" Farmer Newsletter Printing (current distribution list reaches ~3000 farmers; cost per newsletter based on historical cost) - $0.42733/newsletter * 3,000 newsletters x 16 issues over 5 years = $20,512

**Total Supplies Request: <u>$32,912.00</u>**

## Contractual:
- Newsletter Translation into Spanish and Creole - $0.07/word * 34,655 words (estimate) = **$12,129.25**
- Monthly Phone Costs for RAFI-USA staff:- $624/yr for 1 phone plan, proportional to effort for 5 yrs = **$9,503.52**
- Expensify Licenses (for expense tracking and reimbursement) - $120/yr for 4 users for 5 years = **$2,400**
- FormAssembly Account (for regranting applications and data collection) - $2,092 for 30% use of the account over 5 years, based on anticipated proportion of RAFI's entire FormAssembly usage = **$3,138**
- Docusign Account (for secure remote signature collection) - $120/yr for 1 plan for 5 years = **$600**
- Zoom Account (for project and partner coordination) - $300/year for 1 account for 5 years = **$1,500**
- Salesforce Licenses (for regranting and project data management) - $423 per license per year. 8 licenses over 5 years = **$16,920**
- Exponent Partners consultants (to customize Salesforce for partner project data management since Salesforce does not provide this service) - $10,000 per year * 5 years = **$50,000**
- Baseline Study Experts for mainland and USVI (to be identified) - 2 people * 12 hrs/wk * 52 wk/year * $75/hr * 2 years = **$187,200. Note: RAFI will be managing these two regional experts for the baseline study, while subawardee Alliance for Agriculture will be managing the Puerto Rico expert for the study. This division of labor is the result of Alliance for Agriculture's specific request to manage the Puerto Rico expert (see their subaward section of the budget narrative for more detail) as well as RAFI's ability/capacity to manage the mainland and USVI experts. Hourly rates for USVI and mainland experts was set to match hourly rate for PR expert.**
- Freelance Writer (to create farmer storybank) - $25/hr * 128 hr/yr  * 5 years = **$16,000**
- **Land Trust Designer (to design culturally appropriate lease/ownership models for PR/USVI land trusts, based on results of feasibility study) - $75/hr * 12 hrs/wk * 52 wks/yr * 2 yrs = $93,600**

**Total Contractual request: <u>$392,990.77</u>**

## Other:

### Advisory Committee
Responsibilities: provide overall project input/guidance, identify existing land access resources in each region, compile and convey recommendations to USDA, and make funding decisions on financial assistance commitments. Estimated 8 one-hour meetings per year including 32 hours of meeting preparation, committee work, or email communication outside of meetings.
Calculation: 5 advisory committee members x 40 hrs/yr x $125/hr x 5 years = $125,000
Total Advisory Committee request: **<u>$125,000.00</u>**

3 *Gaining New Ground Budget Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 192 of 606

DocuSign Envelope ID: 4EE49715-83BF-4726-A3B2-6B255CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 187 of 378
Agreement #: FSA24CPT0013706    Attachment: 3A

**Technical Assistance and External Expertise Fund**
Expert Technical Assistance Providers - funding for compensation to secure assistance from a diverse network of technical assistance providers who will be assigned to assist farmers in meeting individual goals and objectives in in expert topics outside of case managers' knowledge area (e.g. legal, accounting)
Calculation: 5 experts/year * $50/hr x 150 hr x 4 years = $150,000
Total request: **$150,000.00**

**Outreach & Education Expenses**
- Training/Workshop Stipend - stipends for project collaborators to conduct essential trainings, workshops, or education material development based on farmer need
  - $400 speaker stipend + $100 supplies **(e.g. easels, sticky pads)** + $50 printing + $150 venue rental + $50 supplies for facility (e.g. paper towels) = $750 / training
  - 8 training events x $750/event = $6,000
  - Note: $150 venue rental not included in indirect cost calculation
- Advertising- $4,350 (spread through project) - digital, regional publications, farm conference programs
- "Living Roots" Farmer Newsletter Mailing and Postage - $1240 per mailing x 16 mailings to farmers = $19,840
Total Request: **$30,190.00**

**Project Management & Compliance Support**
- Attorney Fees- legal review of grant agreements and project documents - $2,600/yr for 5 years = $13,000
- Nonprofit financial compliance and accounting - $5,600 /yr for 5 years = $28,000
- Yellow Book federal organizational audit - $5,000/yr for 5 years = $25,000
Total Request: **$66,000.00**

**Land and Infrastructure Financial Grants/Incentives ($2,158,000.00)**
For all the following incentive categories RAFI project leadership will develop eligibility criteria, an application and review process, and required reporting/evaluation needs for each grant. The advisory committee will be responsible for reviewing and approving the processes for each incentive category. Land Access Grants and Landowner-Seller Incentives will be made available on an invite-only basis to farmers who have been identified as 'land access ready'. Readiness will be gauged via farmers' engagement in, first, RAFI or partner outreach educational events and second, 1-on-1 technical assistance, as well as their progress along RAFI's farm viability benchmarking tool. One of the incentive options may be more greatly emphasized in a region vs another based on land access conditions. For instance, land ownership in USVI is very uncommon. So the landowner incentives may be more emphasized to encourage land leasing. The Market Access Infrastructure Grants will be distributed using the same process and timeline as RAFI's annual Farmers of Color Network Infrastructure grant - supporting high ranking applications that are located in one of the 4 project states/territories and with a market access focus. Our subaward, Fideicomiso, will lead the process for purchasing real estate for a PR land trust. The Advisory Committee will do a final review of the purchase to ensure it aligns with the Project objectives and purpose.

- Land Access Grants *(e.g. downpayment assistance, appraisal costs, brokerage fees)* - An estimated 45 grants of approximately $30,000 each = $1,350,000
- Landowner-Seller Incentives - An estimated 10 incentives x average $25,800 incentive to landowner = $258,000
- Market Access Infrastructure Grants - 30 grants x $10,000 = $300,000
- Fideicomiso Land Trust Purchase - To make real estate purchase of land for farm operations - $250,000

Total Request: **$2,158,000.00**

**Subawards (partners & collaborators):**

**Alliance for Agriculture** - **(Subaward) ($1,538,200)**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 193 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 188 of 378
Agreement #: FSA24CPT0013706    Attachment: 3A

| Personnel | FTE | Annual Compensation (2023) | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 | Total |
|---|---|---|---|---|---|---|---|---|
| Project Lead & Program Director- overall project oversight, coordinate with A4A staff, ensure project progress | 0.33te | $180,000 | 630,000 | $60,000 | $60,000 | $60,000 | $60,000 | $300,000 |
| Project Manager - support data collection, coordinate with project partners, clients, and external TA providers | 0.5fte | $80,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $200,000 |
| Operations Manager - oversee compliance of project and grants management | 0.5fte | $60,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $150,000 |
| Outreach & Communications - support outreach and local comms to PR farmers | 0.5fte | $60,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $150,000 |
| Total Personnel: | | | $160,000 | $160,000 | $160,000 | $160,000 | $160,000 | $800,000 |

- **Total Personnel**: $800,000

Contractors
- **Legal Services:** Funding allocated for securing legal services in Puerto Rico to assist farmers and the project with complex legal challenges and situations related to land acquisition, as well as A4A organizational needs. Calculation: 240 hrs per year x $125/hr x  5 yrs = $150,000. Total Legal Services: $150,000
- **Technical Assistance and External Expertise Fund:** funding for compensation to secure assistance from a diverse network of technical assistance providers who will be assigned to assist farmers in meeting individual goals and objectives in expert topics outside of the organization's knowledge area (e.g. surveyors, farm design). This need is great in Puerto Rico due to a unique land and regulatory landscape. Calculation: 5700 hrs (over all 5 years) * $75/hr = $427,500. Total Technical Assistance and External Expertise Fund: $427,500
- **Puerto Rico Portion of Baseline Study:** Funding allocated for Dr. Ramón Borges-Méndez to conduct the baseline study on land access and land use in Puerto Rico, develop capacity building proposals, create recommendations for increased land access, and conduct a feasibility study regarding the establishment of a Regional Land Trust. Calculation: 10 hr/wk x 52 wk/yr x $75/hr x 3 yrs = $117,000 ($39,000/yr). Total PR Baseline Study: $117,000. **Note: Alliance for Agriculture is managing the PR portion of the baseline study in order to keep the various PR-specific experts in the grant on the same page throughout the project. This was an active request made by Alliance for Agriculture. RAFI will remain involved and informed throughout, but we see the value and advantage of this effort being in-region led by a trusted, capable partner.**
- **Travel:** funding allocated for one flight annually for 5 staff to NC for annual partner training. Calculation: $500/flight * 5 people * 1 trip/yr * 5 yrs = $12,500. Total Travel: $12,500

**Total Alliance for Agriculture Subaward Request: $1,538,200**

**Virgin Islands Good Food** - Subaward ($814,059.12)

| Personnel | FTE | Annual Compensation | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 | Total |
|---|---|---|---|---|---|---|---|---|
| Project Director - overall project oversight, | 0.25FTE (yr 1-2), 0.10FTE | $104,000 | $26,000 | $26,000 | $10,400 | 0 | 0 | $62,400 |

**5** *Gaining New Ground Budget Narrative*; RAFI-USA

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 194 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B255CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 189 of 378
Agreement #: FSA24CPT0013706    Attachment: 3A

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| coordinate with A4A staff, ensure project progress | (yr 3), 0FTE (yr4-5) | | | | | | | |
| Project Manager - support data collection, coordinate with project partners, clients, and external contractors | 0.6FTE (yr1-2), 0.75FTE (yr3-5) | $62,400 | $37,440 | $37,440 | $46,800 | $46,800 | $46,800 | $215,280 |
| Navigator 1 - provide technical assistance and conduct outreach | 1.0FTE | $50,440 | $50,440 | $50,440 | $50,440 | $50,440 | $50,440 | $252,200 |
| Navigator 2 - provide technical assistance and conduct outreach | 0.5FTE (yrs 4-5) | $50,440 | 0 | 0 | 0 | $25,220 | $25,220 | $50,440 |
| Total Personnel | | | $87,880 | $87,880 | $97,240 | $122,460 | $122,460 | $517,920 |

Contractors
- USVI Legal Expertise - funding to assist farmers with legal needs and contribute to VI portion of feasibility study. Calculation: 25 hours * $250/hr = $6,250. Total Legal Expertise: $6,250.
- USVI Real Estate Expertise - funding to contribute to VI portion of feasibility study. Calculation: 15 hrs/yr * $250/hr = $3,750. **Note: VIGF is charged with managing the USVI legal and real estate experts due to their on-the-ground knowledge of potential candidates in the territory, as well as territory-specific laws and regulations. Their management of these contractors will ensure the contractors' work is of the highest possible quality and relevance. RAFI will remain involved and informed throughout the project.**
- Website Developer - funding to develop an online clearinghouse of technical assistance services for farmers. Calculation: 50 hrs @ $200/hr (development phase) +  40 hrs @ $100/hr (maintenance phase) =$14,000.
- Cloud Space - funding to store online clearinghouse. Calculation: 12 mo * $150/mo * 4 = $7,200.

Total Contractors: **$31,200**

| **Supplies** | **Per-Unit Cost** | **# of Units** | **yr1** | **yr2** | **yr 3** | **yr 4** | **yr 5** | **Total** |
|---|---|---|---|---|---|---|---|---|
| Laptops | 900 | 3 | $2,700 | $0 | $0 | $0 | $0 | **$2,700** |
| Lockable File Cabinets | $689 | 1 | $0 | $689 | $0 | $0 | $0 | **$689** |
| High-capacity printer and scanner | $650 | 1 | $650 | $0 | $0 | $0 | $0 | **$650** |
| Printer and Copier Paper (case) | $46.99 | 12 | $93.98 | $93.98 | $140.97 | $140.97 | $93.98 | **$563.88** |
| Folders (case) | $30.00 | 9 | $0.00 | $60.00 | $90.00 | $90.00 | $30.00 | **$270.00** |
| Printer Toner | $100.00 | 12 | $0 | $300 | $300 | $300 | $300 | **$1,200** |
| **Total Supplies** | | | **$3,443.98** | **$1,142.98** | **$530.97** | **$530.97** | **$423.98** | **$6,072.88** |

Total Supplies: **$6,072.88**

| **Travel:** | **Per-Unit Cost** | **# units** | **yr1** | **yr2** | **yr 3** | **yr 4** | **yr 5** | **total** |
|---|---|---|---|---|---|---|---|---|
| Airfare - Interisland | $258/flight | 3 | $1,548 | $2,322 | $4,644 | $4,644 | $3,096 | **$16,254** |

**J.A. 1727**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 195 of 606

DocuSign Envelope ID: 4EE49TF5-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 190 of 378
Agreement #: FSA24CPT0013706    Attachment: 3A

| Airfare - Continental | $850/flight | 3 | $850 | $850 | $850 | $850 | $850 | **$4,250** |
| Car Rental | $183/day | 105 days | $1,830 | $2,745 | $5,490 | $5,490 | $3,660 | **$19,215** |
| Mileage | $0.67/mi | 1372 mi | $53.60 | $107.20 | $107.20 | $325.62 | $325.62 | **$919.24** |
| Per Diem (Dept of Defense) | $150/day | 105 days * 3 people | $4,500 | $6,750 | $13,500 | $13,500 | $9,000 | **$47,250** |
| Lodging (in-season) | $364/night | 44 nights * 3 people | $4,368 | $8,736 | $13,104 | $13,104 | $8,736 | **$48,048** |
| Lodging (off-season) | $274/night | 40 nights * 3 people | $3,288 | $3,288 | $9,864 | $9,864 | $6,576 | **$32,880** |
| **Total Travel** | | | $18,137.60 | $26,498.20 | $49,259.20 | $49,477.62 | $33,943.62 | **$177,316.24** |

Total Travel: **$177,316.24**

**Other:**

| Outreach and Communications Expenses | Per-Unit Cost | # of Units | yr1 | yr2 | yr 3 | yr 4 | yr 5 | total |
|---|---|---|---|---|---|---|---|---|
| Quarterly 2-hour Convening w Farmers (space and associated fees) | $2,750 | 4 | $5,500 | $11,000 | $11,000 | $11,000 | $11,000 | $49,500 |
| Specialized Printing (e.g. banners) | $50/print job (average) | 57 | $0 | $1,550 | $800 | $250 | $250 | $2,850 |
| Advertisement (newspaper, radio) | $400/mo * 3 stations | 3mo | $3,600 | $5,000 | $5,000 | $5,000 | $3,600 | $22,200 |
| Training Stipend for professional development | $350/hr | 4 hrs/yr | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $7,000 |
| **Total:** | | | $10,500 | $18,950 | $18,200 | $17,650 | $16,250 | **$81,550** |

Total Other: **$81,550**

**Total VIGF Subaward Request: $814,059.12**

**Florida Organic Growers - Subaward ($351,750)**

As Florida Organic Growers (FOG) specializes in resources and support to farmers with organic certification or pursuing certification, FOG will hire one Project Coordinator to conduct educational outreach to 800-2000 farmers in NC, FL, PR, and USVI regarding organic certification and provide technical assistance regarding certification and/or marketing support. They will also serve as an in-state contact for FL farmers served by the project, connecting them with information about project events, resources, and TA offerings.

| Annual Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $70,000 | 100% for 1.0 FTE | 5 yrs | $350,000 |

| Travel | Per Unit Cost | Project Duration | Funds Requested |
|---|---|---|---|
| Airfare - for annual NC partner training | $350.00 | 5 years | $1,750.00 |

**7** *Gaining New Ground Budget Narrative*; RAFI-USA

USCA4 Appeal: 25-1575     Doc: 55-4        Filed: 06/23/2025     Pg: 196 of 606

DocuSign Envelope ID: 4EE49155-83BE-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG      Date Filed 03/26/25     Entry Number 24-14     Page 191 of 378
Agreement #: FSA24CPT0013706                                        Attachment: 3A

**Total FOG Subaward Request: $351,750**

**Fundacion Bucarabon - Subaward ($517,250)**

| Personnel | Compensation | % effort/Hrs | Project Duration | Funds Requested |
|---|---|---|---|---|
| Farmland Access and Production Specialist (provide technical assistance to farmers around land access in Puerto Rican highlands) | $60,000/yr | 83% | 5 years | $250,000 |
| Outreach Coordinator (conduct outreach to area farmers and organizations) | $35,000/yr | 100% | 5 years | $175,000 |
| Administrative Support (overall project management) | $35/hr | 10 hrs/week | 5 years | $91,000 |

| Travel | Per Unit Cost | Project Duration | Funds Requested |
|---|---|---|---|
| Airfare - for annual NC partner training | $250.00 | 5 years | $1,250.00 |

**Total Fundacion Bucabaron Subaward Request: $517,250**

**Fideicomiso de Tierras Comunitarias para la Agricultura Sostenible - Subaward ($251,250)**
Project and Land Management Coordinator (Mariolga Reyes Cruz) - Responsibilities: oversee the land purchase by the land trust, coordinate with RAFI-USA project team, coordinate with PR farmers on the leasing and annual management of the property.

| Annual Coordinator Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $50,000 | 100% | 5 yrs | $250,000 |

| Travel | Per Unit Cost | Project Duration | Funds Requested |
|---|---|---|---|
| Airfare - for annual NC partner training | $250.00 | 5 years | $1,250.00 |

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 197 of 606

DocuSign Envelope ID: 4ED49TE5-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 192 of 378
Agreement #: FSA24CPT0013706                                                Attachment: 3A

**Total Fideicomiso Subaward Request: $251,250**

## Total Other Requested: $6,001,699.12

## Total Direct Costs Requested: $8,263,332.55

## Indirect

Calculated at 10% of Modified Total Direct Costs

**Modified Total Direct Costs Calculation**

| Budget Category | Total Direct Costs | Modified Total Direct Cost | Indirect Calculation (10% MTDC) |
|---|---|---|---|
| Personnel | $1,351.319.72 | $1,351,319.72 | $135,131.97 |
| Fringe | $367,018.44 | $367,018.44 | $36,701.84 |
| Travel | $117,392.50 | $117,392.50 | $11,739.25 |
| Supplies | $32,912.00 | $32,912.00 | $3,291.20 |
| Other | $6,001,699.12* | $494,990.00 | $49,499.00 |
| Total | $7,870,341.77 | $2,363,632.65 | **$236,363.27** |

**Total Indirect Requested: $236,362.45****

*Other Costs include the following categories. The subawards were capped at $25,000 for indirect calculations.
- Advisory Committee
  - $125,000
- Technical Assistance and External Expertise Fund
  - $150,000
- Outreach and Education
  - $28,990.00 (venue rental and participant costs not included in indirect calculation)
- Project Management and Compliance
  - $66,000
- Land and Infrastructure Grants/Incentives (no indirect taken)
  - $2,158,000
- Subawards (5 subawards x $25,000 = $125,000)
  - Alliance for Agriculture: $1,538,200
  - Virgin Islands Good Food: $814,059
  - Florida Organic Growers: $351,750
  - Fundación Bucabaron: $517,250
  - Fideicomiso: $251,250

**Total Indirect request has been reduced by $0.82 to match the signed agreement total budget amount of $8,499,695.00.

## TOTAL BUDGET = $8,499,695.00

**J.A. 1730**

Agreement # FSA24CPT0013706

Attachment 4A

Revised March 2024

### U.S. DEPARTMENT OF AGRICULTURE
### FARM PRODUCTION AND CONSERVATION

### GENERAL TERMS AND CONDITIONS FOR
### GRANTS AND COOPERATIVE AGREEMENTS

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

## A. APPLICABLE REGULATIONS

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CF R and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D80

Agreement # FSA24GRA0013706                                                    Attachment 4A
Revised March 2024                                          USDA FPAC General Terms and Conditions
                                                             For Grants and Cooperative Agreements

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C.  PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency.  The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov.  All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

Page 3 of 26

Agreement # FSA24GRA0013706                                Attachment 4A
Revised March 2024                          USDA FPAC General Terms and Conditions
                                   For Grants and Cooperative Agreements

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5. Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6. Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

   a. The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

   b. Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

   c. The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

   d. Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

   e. Additional Federal funds needed to complete the project. This change also requires a formal agreement amendment.

   f. Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs. If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment. If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

   g. If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7. No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

USCA4 Appeal: 25-1575     Doc: 55-4          Filed: 06/23/2025     Pg: 202 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E5C6D10D80
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 197 of 378

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

   a. Amount of additional time requested

   b. Explanation for the need for the extension

   c. A summary of progress to date and revised milestones

**D. PAYMENTS**

1. Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to either the ezFedGrants system or to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2. Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3. The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of the award. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4. Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5. Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E,

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 203 of 606

DocuSign Envelope ID: 4EE49TE5-83BF-4726-A3B2-6B2E5CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 198 of 378

Agreement # FSA24GRA0013706                                         Attachment 4A
Revised March 2024                          USDA FPAC General Terms and Conditions
                                              For Grants and Cooperative Agreements

Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

**E. FINANCIAL REPORTING**

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date.  Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

**F. PERFORMANCE MONITORING AND REPORTING**

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.  Each report must cover—

    a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

    b. The reasons why milestones and deliverables targets were not met, if appropriate.

    c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

3. The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1. Reporting of first-tier subawards.

   a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

   b. Where and when to report.

      i. You must report each obligating action described in paragraph 1.a. of this award term to http://www.fsrs.gov.

      ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

   c. What to report. You must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov.

2. Reporting Total Compensation of Recipient Executives.

   a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

      i. the total Federal funding authorized to date under this award is $30,000 or more;

      ii. in the preceding fiscal year, you received—

         (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

         (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm

    b. Where and when to report. You must report executive total compensation described in paragraph 2.a. of this award term:

        i. As part of your registration profile at https://sam.gov

        ii. By the end of the month following the month in which this award is made, and annually thereafter.

3. Reporting of Total Compensation of Subrecipient Executives.

    a. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i. In the subrecipient's preceding fiscal year, the subrecipient received—

            (a) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm

    b. Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i. To the recipient.

        ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (i.e., between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4. Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a. Subawards, and

    b. The total compensation of the five most highly compensated executives of any subrecipient.

5. Definitions. For purposes of this award term:

    a. Entity means all of the following, as defined in 2 CFR part 25:

        i. A Governmental organization, which is a State, local government, or Indian Tribe;

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 206 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E55CD10D90
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 201 of 378

    ii.   A foreign public entity;

    iii.   A domestic or foreign nonprofit organization;

    iv.   A domestic or foreign for-profit organization;

    v.   A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.  Executive means officers, managing partners, or any other employees in management positions.

c.  Subaward:

    i.   This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    ii.   The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

    iii.   A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.  Subrecipient means an entity that:

    i.   Receives a subaward from you (the recipient) under this award; and

    ii.   Is accountable to you for the use of the Federal funds provided by the subaward.

e.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

    i.   Salary and bonus.

    ii.   Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

    iii.   Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

    iv.   Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

    v.   Above-market earnings on deferred compensation which is not tax-qualified.

    vi.   Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

## H. AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the audit period, whichever comes first.

## I. AWARDS WITH RESEARCH ACTIVITIES

1. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2. In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

   Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication. Recipients can receive a DOI via NAL.

   Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

## J. SPECIAL PROVISIONS

1. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6. The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

   "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

   "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L. COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

    a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

    b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

    Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment. FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed as cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

Page 12 of 26

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

Page 13 of 26

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 212 of 606

DocuSign Envelope ID: 4EF49155-83BF-4726-A3B2-6B2E5CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 207 of 378

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:* When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 213 of 606

DocuSign Envelope ID: 4EF49**5-83BF-4726-A3B2-6B2E5CD10D90
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 208 of 378

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1.  The listed items are:

    a.  Non-ferrous metals;

    b.  Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

    c.  Glass (including optic glass);

    d.  Fiber optic cable (including drop cable);

    e.  Optical fiber;

    f.  Lumber;

    g.  Engineered wood; and

    h.  Drywall.

2.  Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1.  Articles, materials, or supplies that have been:

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 214 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B2E55CD10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 209 of 378

    a.  Processed into a specific form and shape; or

    b.  Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2. If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

## P. NONEXPENDABLE EQUIPMENT

1. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3. The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

    a.  Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

    b.  Activities under Federal awards from other Federal awarding agencies.

4. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6. When equipment is no longer needed for any of the purposes set out in this provision

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

## Q. LIMIT OF FEDERAL LIABILITY

1. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

## R. AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

## S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1. Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2. The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3. The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

   a. You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 216 of 606

DocuSign Envelope ID: 4EE49155-83BF-4726-A3B2-6B2E55CD10D90

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 211 of 378

Agreement # FSA24GRA0013706                                        Attachment 4A
Revised March 2024                              USDA FPAC General Terms and Conditions
                                               For Grants and Cooperative Agreements

enforcement representative of a Federal department or agency authorized to receive such information.

b. You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c. The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d. If FPAC determines that you are not in compliance with this award provision, FPAC:

    i. Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

    ii. May pursue other remedies available for your material failure to comply with award terms and conditions.

## T. ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6. The recipient must notify all managers, supervisors, employees, contractors, agents,

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 217 of 606

DocuSign Envelope ID: 4EF49TF5-83BF-4726-A3B2-6B2F5C6D10D80
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 212 of 378

Agreement # FSA24GRA0013706                                    Attachment 4A
Revised March 2024                              USDA FPAC General Terms and Conditions
                                                 For Grants and Cooperative Agreements

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7.  When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8.  Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9.  Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information.  Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a.  State identification and county number (where reported and where located).

    b.  Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c.  Farm, tract, field, and contract numbers.

    d.  Production shares and share of acres for each Farm Serial Number (FSN) field.

    e.  Acreage information, including crop codes.

    f.  All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g.  Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h.  Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law*" (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U.  NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V.  TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

**1.** By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

**2.** By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

**3.** By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

**4.** By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

**5.** If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1. General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

J.A. 1751

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 219 of 606

DocuSign Envelope ID: 4EE49155-83BF-4726-A3B2-6B2E55CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 214 of 378

Agreement # FSA24GRA0013706                                    Attachment 4A
Revised March 2024                            USDA FPAC General Terms and Conditions
                                              For Grants and Cooperative Agreements

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2. Proceedings About Which The Recipient Entity Must Report

   Submit the information required about each proceeding that:

   a. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

   b. Reached its final disposition during the most recent five-year period; and

   c. Is one of the following:

      i. A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

      ii. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

      iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

      iv. Any other criminal, civil, or administrative proceeding if:

         a) It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

         b) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

         c) The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. Reporting Procedures

   Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4. Reporting Frequency

   During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X. AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

   Recipients must retain all records pertaining to the agreement in accordance with 2

Page 23 of 26

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 221 of 606

DocuSign Envelope ID: 4EF49AF5-83BF-4726-A3B2-6B255CD10D90
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 216 of 378

Agreement # FSA24GRA0013706
Revised March 2024
Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y.  NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z.  CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

J.A. 1754

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer. Documents transmitted via ezFedGrants are digitally authenticated and acceptable.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

    a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

    b. An audit that meets the requirements contained in Subpart F.

Agreement # FSA24GRA0013706
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

**CC. AGREEMENT COUNTERPARTS**

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

**DD. CONTINUING OBLIGATIONS**

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

# RAFI DECLARATION

# EXHIBIT 13-G

Cooperative Agreement
*Increasing young, BIPOC farmer success in the Southeast through outreach and technical assistance on USDA FSA loans*

About us:
The National Young Farmers Coalition (Young Farmers) shifts power and changes policy to equitably resource a new generation of working farmers. Since 2010, Young Farmers has launched 50 farmer-led chapters in 32 states across the United States, and has built a grassroots base of almost 3,000 members and more than 200,000 supporters. In 2019 we made an organizational commitment to center the needs of young Black, Indigenous, and People of Color (BIPOC) farmers and now all of our outreach and programming work prioritizes BIPOC farmers. One of the five pillars of our Federal Policy Platform is USDA Access & Accountability - ensuring that young and particularly BIPOC farmers have access to the federal programs that can help them to launch and grow their farm businesses.

Partners:
RAFI-USA - RAFI-USA challenges the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities. RAFI-USA founded the Farmers of Color Network in 2017 to support BIPOC farmers and grow their numbers. The Network provides farmer-led technical assistance and funding opportunities, and hosts farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge, as well as explore market solutions. Currently, the program serves farmers of color in the Southeast with plans to expand in the future.

Project need:
Young BIPOC farmers are largely not engaged with USDA programs which may help them. Due to decades of documented discrimination at USDA, many do not trust that the agency has their best interests at heart. And for young farmers, many of whom are first-generation farmers, they do not have a family history of working with the agency. In our 2017 National Young Farmer Survey, we found that 30% of farm owner respondents were unfamiliar with USDA programs. Forty percent thought the applications and paperwork were too burdensome. And 28% said their local USDA has been difficult to work with.

But access to credit is a large challenge for young farmers and USDA FSA programs can help them to invest in important inputs and equipment, purchase farmland, build infrastructure on their farms, and more. Young BIPOC farmers need additional outreach and information to decide to apply to FSA programs, connect with their FSA office, and support filling out the necessary paperwork for the program. Young BIPOC farmers need to hear from an organization they trust and receive one-on-one support from a peer BIPOC farmer to fully benefit from FSA programs available to them.

<div align="center">**J.A. 1758**</div>

Young BIPOC farmers are busy as owner/operators and are often not available to attend workshops and webinars. Direct phone calls and outreach through trusted partner organizations are our best strategies to reach farmers and educate them about FSA programs, providing one-on-one technical assistance to ensure they have what they need to successfully apply. Once these farmers have a positive experience and are in the system, they'll be able to work with FSA for decades to come.

Scope of Work:

The geographic reach for this project will focus on the Southeast region, with specific focus on Virginia, North Carolina, South Carolina, Georgia, Mississippi, Arkansas, Texas and Oklahoma. As a multiracial coalition of farmers, we recognize the existence of racial disparities in access to federal programs. This cooperative agreement will focus on assisting Black, Indigenous, and People of Color (BIPOC) farmers and supporting the growth of their businesses through accessing USDA FSA loans such as the Microloan, Operating Loans, Farm Ownership Loans, and Farm Enrollment. Our outreach and technical assistance to young BIPOC farmers will benefit American Indians, Asians, Blacks or African Americans, and Hispanics. The long-term goal of this project is to increase access by young BIPOC farmers to FSA loan programs to support their farm businesses.

**Objective 1: Young farmers staff and partners provide outreach to 3,000 young BIPOC farmers each year, informing them about FSA loan programs.**

Activity 1.1 Phone bankers will call BIPOC farmers in the Young Farmer network and partners' networks to provide outreach of FSA programs available to help.

Outcome 1.1a 3,000 BIPOC farmers called each year, and 600 conversations logged each year (3,000 total conversations over 5 years) about FSA programs, including information on how to apply.

Outcome 1.1b At least 65% of farmers reached through phone banking report that our outreach helped them learn more about FSA programs and affected their decision to apply.

**Objective 2: Key partner RAFI-USA and additional partners provide one-on-one technical assistance to BIPOC farmers in their networks.**

Young BIPOC farmers have reported a lack of trust of their local FSA offices and the need for help with completing necessary paperwork. RAFI-USA has developed deep relationships with BIPOC farmers in their regional networks. Our partners' technical assistants will provide one-on-one appointments with BIPOC farmers to build trust and to provide additional support to them in the application process.

Activity 2.1 Engage partners such as RAFI-USA, supporting them to provide technical assistance. Technical assistants at partner organizations will host 100 one-on-one appointments per year, 500 total one-on-one conversations with BIPOC farmers.

Outcome 2.1 375 farmers established a new or strengthened partnership with FSA due to technical assistance through actions including but not limited to: acquiring a Farm Number, submitting a FSA loan application, restructuring an existing loan, learning more about their fiscal and borrower responsibilities, etc.

**J.A. 1759**

**Objective 3: Young Farmers' organizers communicate about FSA loan programs to our network during one-on-one conversations, listening sessions, and events.**

Activity 3.1 Our Southeast Organizer and USDA Access & Accountability Organizer will provide information on FSA loan programs to 500 farmers and at 3-5 events per year.

Outcome 3.1 500 farmers in the Southeast and across the country hear about FSA programs from a trusted organization and learn about opportunities for direct technical assistance with our partners.

**Objective 4: Young Farmers communicates about FSA programs via our social media platforms to our network of young BIPOC farmers and creatively provide technical assistance through Q&As, Instagram Live sessions, etc.**

Activity 4.1 Post informative material about FSA programs to Young Farmers Facebook and Instagram at least once per month during the application period and answer questions posted on social media.

Outcome 4.1 60 informational posts shared on Young Farmers' social media channels (Facebook, Instagram, Twitter) over five years, resulting in at least 40,000 impressions by users in our network across all platforms.

Activity 4.2 Host Facebook Live and Instagram Live sessions about CFAP2 and other FSA programs 10 times during the application period.

Outcome 4.2 Facebook Live and Instagram Live sessions receive 2,500 impressions by our network.

Activity 4.3 Post informative material about FSA programs in the Young Farmers monthly newsletter.

Outcome 4.3 FSA program information shared with 25,000 users on our email list 15 times during the application period.

Budget Narrative:

| Category | Details | Per Year | 5 Year Expense |
|---|---|---|---|
| Personnel: Co-Executive Director | 10% | 11000 | 55,000 |
| Personnel: USDA access & accountability organizer | 60.00% | 30000 | 150000 |
| Personnel: Southeast Organizer | 15% | 7,500 | 37,500 |
| Personnel: Comms Director | 7.50% | 6,000 | 30,000 |

**J.A. 1760**

| | | | |
|---|---|---|---|
| Personnel: Finance Director | 3% | 2,550 | 12750 |
| Fringe | 24% | 13,692 | 68460 |
| Contract: RAFI | | 85,000 | 425,000 |
| Contract: Translation | | 2,000 | 10,000 |
| Contract: Design | | 3,000 | 15,000 |
| Contract: Phonebankers | | 10,000 | 50,000 |
| Contract: Additional partners | | 10,000 | 50,000 |
| Technology & Platforms | | 1,000 | 5,000 |
| Admin | 10% | 18174.2 | 90871 |
| **Total** | | | **999,581** |

**Personnel**
**The total personnel cost is $57,050 per year, or $285,250 total over five years. The following National Young Farmers Coalition staff will participate in this project.**

Sophie Ackoff (10% FTE) will serve as Project Director. Ackoff will contribute to the overall administration and management of the project, including fiscal management and reporting, and outcomes-based reporting. The personnel cost for Ackoff is $11,000 per year and $55,000 over five years.

Jessica Manly (7.5% FTE) will support in the development of resource and outreach materials for social media engagement and partner engagement. The personnel cost for Manly is $6,000 per year and $30,000 over five years.

Luis Media (3% FTE) will oversee all finances and budgeting on this grant and assist with grant management. The personnel cost for Media is $2,550 per year and $12,750 over five years.

USDA Access & Accountability Organizer (75% FTE) will conduct outreach and phonebanking to young BIPOC farmers. The personnel cost for the USDA organizer is $30,000 per year and $150,000 over five years.

**J.A. 1761**

Olivia Cleveland, Southeast Organizer (15% FTE) will conduct outreach to young BIPOC farmers in the Southeast region about USDA FSA loan programs. The personnel cost for Cleveland is $7,500 per year and $37,500 over five years.

**Fringe**

The National Young Farmers Coalition uses a 24% rate for fringe benefits. The total fringe cost for staff is $68,460 for five years.

**Technology & Equipment**

The cost for technology & equipment is $5,000 over five years and includes a computer for the USDA Access & Accountability Organizer as well as annual Salesforce licenses for our phonebankers.

**Contractual Costs**

The total contract costs is 555,000 over five years. This includes five contracts, including the following partner organizations and other contractors.

*Partner - RAFI USA*: RAFI will receive $425,000 ($85,000/yr) to participate in this project. They will hire one 1.0 FTE technical assistant to provide one-on-one technical assistance to young BIPOC farmers in the Southeast on business planning including using FSA loans as a part of their business growth and development.

| | |
|---|---|
| 1 FTE Technical Assistant - Salary | $254,190 |
| 1 FTE Technical Assistant - Fringe | $99,134 |
| Phone for Technical Assistant | $4,922 |
| Computer for Technical Assistant | $1,000 |
| Professional Development - FSA and farm business planning | $900 |
| Travel - occasional in-person visits, 1,340 mi @ $0.56/mi | $750 |
| RAFI-USA Supervisor to Technical Assistant | $11,911 |
| Indirect @ 14% | $52,193 |
| TOTAL | $425,000 |

*Additional partners - to be determined.* We've allocated funds $50,000 over five years to other partners in the Southeast to assist in technical support and outreach for young BIPOC producers.

*Translation contractor* - We will translate our materials to Spanish, making them more accessible to our audience. We estimate this cost to be $15,000 for five years.

**J.A. 1762**

Phone Bank Contractors: We will hire a team of phone bankers, compensating them for their outreach to BIPOC farmers in our network. 2-4 phone bankers will be hired, paid at $33.3/hour for a total of approximately 300 hours per year. We estimate a total of $50,000 for the phone banking team over five years.

Design Contractor: We will utilize our graphic designer on retainer, SJ Brekosky, to design outreach materials advertising the CFAP2 and FSA programs and our technical assistance support to share with our network and partners. We estimate $3,000 for this design contractor per year or $15,000 over five years.

Indirect Costs
We use a 10% De Minimis indirect cost rate for a total of $85,871.

# RAFI DECLARATION

# EXHIBIT 13-H

**Cost Reimbursement Subaward Agreement Between:**

**National Young Farmers Coalition (The Coalition)**
PO Box 1074
Hudson, NY 12534

**And**

**Rural Advancement Foundation International - USA**
274 Pittsboro Elementary School Road
Pittsboro, NC 27312
DUNS #: 961684198

Under Prime Agreement between The Coalition and the
United States Department of Agriculture (USDA)
National Institute of Food and Agriculture (NIFA)
Cooperative Agreement # 2022-70416-37195
CFDA Number: 10.234 American Rescue Plan Technical Assistance Investment Program
Federal Award Date: April 18, 2022

## 1.  Subaward Period of Performance

Effective dates April 1, 2022 through March 31, 2027, unless otherwise agreed upon in writing between the parties.

## 2.  Scope of Work

This is a Subaward Agreement (the "Agreement" or "Subaward") between Rural Advancement Foundation International - USA, (SUBRECIPIENT) and National Young Farmers Coalition (The Coalition). This is not an R&D award. SUBRECIPIENT will use reasonable best efforts to participate in the effort as described in the below Project Description and Attachment 1, the Project Proposal. A copy of the original cooperative agreement #2022-70416-37195 between The Coalition and USDA NIFA is available in Attachment 2. In its performance of work SUBRECIPIENT shall be an independent entity and not an employee or agent of The Coalition.

## 3. Project Description

The purpose of this project is to increase young and Black, Indigenous, and people of color (BIPOC) farmer familiarity with and access to USDA Farm Service Agency (FSA) loan programs. The ultimate goal is to move federal dollars into the hands of young and BIPOC farmers in the form of FSA loans to support the launch and growth of their farm businesses. For a detailed description of work to be performed see the proposal in Attachment 1.

SUBRECIPIENT shall grant to The Coalition an irrevocable, royalty-free, non-transferable, non-exclusive right and license to use, reproduce, make derivative works, display, and perform publicly any copyrights or copyrighted material (including any computer software and its documentation and/or databases) first developed and delivered under this Agreement for any purpose including, but not limited to, the purpose of meeting The Coalition's obligations to the Federal Government under its Prime Award.

## 4. Invoices and Payments
Total Funds Cumulatively Obligated: $425,000

In consideration of SUBRECIPIENT's performance hereunder, The Coalition agrees to pay the SUBRECIPIENT no more than $425,000 on a cost reimbursable basis (Attachment 5). SUBRECIPIENT agrees not to exceed this amount without prior written authorization of The Coalition. The Coalition shall reimburse SUBRECIPIENT in accordance with the below schedule of invoices and programmatic reporting. All invoices shall be submitted using SUBRECIPIENT's standard invoice, but at a minimum shall include current and cumulative costs for the reporting period in accordance with the below budget categories and certification as required in 2 CFR 200.45(a). Invoices and questions concerning invoice receipt or payments shall be directed to the Finance Director. A template invoice is provided in Attachment 3 should the SUBRECIPIENT want to use it.

Budget Categories to be included in invoices are:
- Personnel Costs,
- Consultant Services,
- Equipment Costs,
- Materials/Supplies,
- Travel Costs, and
- Other Costs.

Schedule of expected receipt of invoices and programmatic reporting for each reporting year (see section 5 below):
- July 15 covering activities and costs April 1 through June 30.
- October 15, covering activities and costs July 1 through September 30.
- January 15, covering activities and costs October 1 through December 31.
- April 15, covering activities and costs January 1 through March 31.

The invoice due on April 15, 2027 will serve as the final statement of costs and should be marked "FINAL." Invoices should be paid by The Coalition within thirty (30) days of receipt. The Coalition reserves the right to reject an invoice in its sole discretion for any reason including, but not limited to, those outlined or referenced in 2 CFR 200.305. Payment may be delayed if a written programmatic report (see Section 5) is not received with the SUBRECIPIENT invoice.

J.A. 1766

## 5. Reporting

The SUBRECIPIENT will complete a programmatic report that is provided to The Coalition in accordance with the schedule outlined in Section 4. The template for this programmatic report can be found in Attachment 4. SUBRECIPIENT is also expected to participate in regular calls with the Project Coordinator. The Project Coordinator will provide call details after award. SUBRECIPIENT will participate in a minimum of one call every quarter.

Failure to submit detailed written programmatic reports in accordance with the schedule in Section 4 will result in termination of this contract. Failure to participate in required minimum frequency of calls per quarter will result in termination of this contract. There will be a grace period of 5 days for any missed deadline or call participation before termination of contract is pursued.

## 6.  Terms of this Subaward

SUBRECIPIENT will use either the Coalition or project logo on relevant developed materials as laid out under the Scope of Work in addition to SUBRECIPIENT's own logo. The Project Coordinator will provide SUBRECIPIENT with appropriate logos for use. Questions and discussion of what appropriate materials may constitute can be directed to the Project Coordinator.

Any changes to this contract must be agreed to in writing by both the SUBRECIPIENT and The Coalition.

No-cost extensions require the written approval of The Coalition. Any requests for a no-cost extension shall be directed to the Principal Investigator and Project Coordinator not less than 30 days prior to the desired effective date of the requested change. In addition, The Coalition may issue non-substantive changes to the Period of Performance and Budget if agreed to in writing by both the SUBRECIPIENT and The Coalition.

At any time prior to the termination of the term of this Subaward, either The Coalition or SUBRECIPIENT may terminate the Subaward with or without cause by giving thirty (30) days written notice to the other party. The Coalition shall pay SUBRECIPIENT for termination costs as allowable under Uniform Guidance, 2 CFR 200, or 45 CFR Part 75 Appendix IX, as applicable. SUBRECIPIENT will be expected to provide a final invoice and programmatic report within 30 days of termination date. In this case, final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the termination date.

This Subaward assumes the provision and receipt of funds under USDA NIFA award #2022-70416-37195, necessary for completion of the outlined Scope of Work covered by this Subaward.  If the underlying USDA NIFA award is terminated or modified in any manner that affects the funding for the Scope of Work outlined in this Subaward, SUBRECIPIENT will be notified in writing and all work under this Subaward should cease.   Any payments for work already completed by SUBRECIPIENT will be paid according to the terms of this Subaward to the extent funding is

available through the underlying USDA NIFA award. SUBRECIPIENT will be expected to provide a final invoice and programmatic report within 30 days of notice to cease work. In this case, final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the date of notification to cease work.  If any money already received by SUBRECIPIENT is determined to be unallowable, SUBRECIPIENT will return such money to The Coalition within 10 days of written notification by The Coalition.

**7. Certifications and Assurances**

By executing this Agreement, SUBRECIPIENT makes the certification and assurances required by Uniform Guidance: 2 CFR 200, et. seq. Including:

I. **Certification Regarding Lobbying (2 CFR 200.450)**
   a. No Federal appropriated funds have been paid, by or on behalf of the SUBRECIPIENT, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal Contract, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.
   b. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or intending to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the SUBRECIPIENT shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," to The Coalition.
   c. The SUBRECIPIENT shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all SUBRECIPIENTS shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

II. **Debarment, Suspension, and Other Responsibility Matters (2 CFR 200.213 and CFR 180)**
   a. SUBRECIPIENT certifies by signing this Agreement that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any federal department or agency.

**J.A. 1768**

III.   **Audit and Access Records**
   a. SUBRECIPIENT certifies by signing this Agreement that it complies with the Uniform Guidance, will provide notice of the completion of required audits and any adverse findings which impact this Subaward as required by parts 200.501 - 200.521, and will provide access to records as required by parts 200.336, 200.337, and 200.201 as applicable.
   b. SUBRECIPIENT certifies by signing this Agreement that it will provide The Coalition with all required records to support invoices submitted.

SUBRECIPIENT will also follow 45 CFR Part 75 where applicable.

**8.  The Coalition Contacts and Modifications**
   - **Principal Investigator** – Sophie Ackoff
     (518) 643-3564 ext. 703, sophie@youngfarmers.org

   - **Finance Director –** Luis Medina
     (518) 643-3564 ext. 713, luis@youngfarmers.org

   - **Project Coordinator –** Ebonee Stevenson
     (518) 643-3564 ext. 744, ebonee@youngfarmers.org

Matters concerning the technical performance of this Subaward shall be directed to either the Principal Investigator or Project Coordinator. Matters concerning the request or negotiation of any changes in the terms, conditions, or amounts cited in this Agreement, and any changes requiring prior approval, shall be directed to either the Principal Investigator or Project Coordinator.

Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

The Principal Investigator and Project Coordinator are subject to change upon written notification from The Coalition to SUBRECIPIENT.

**9. Indemnification**

To the extent permitted by applicable law, SUBRECEIPIENT agrees to indemnify, defend, and hold harmless The Coalition, and its affiliates, officers, directors, agents, employees, attorneys, insurers, volunteers and permitted successors and assigns against any and all claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of this Agreement.  This indemnification will survive the termination of this Agreement.

Page 5 of 8

**J.A. 1769**

## 10. Severability/Interpretation

In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of the Agreement.

## 11.  Non-Disparagement

During the term of this Agreement and at all times thereafter, SUBRECEIPIENT hereby promises and agrees not to demean or disparage The Coalition or any persons or entities related to The Coalition in any manner.

## 12.  Confidentiality

The Coalition acknowledges that certain documents that SUBRECIPIENT creates and provides to The Coalition in the course of the Agreement may contain incomplete or sensitive information that is intended to remain confidential until final approval has been granted by The Coalition and the USDA under the terms of the Agreement. Any such documents should be identified with a "CONFIDENTIAL DRAFT" watermark. The Coalition will distribute marked documents to internal partners only on a need-to-know basis and include SUBRECIPIENT as a party to any such correspondence. Prior to the distribution of the marked documents The Coalition shall inform each recipient of the confidential nature of the information and notify SUBRECIPIENT of The Coalition's intent to distribute.

## 15.  Time of the Essence

Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of this provision.

## 16.  Assignment

SUBRECIPIENT will not voluntarily, or by operation of law, assign or otherwise transfer its obligations under this Agreement without the prior written consent of The Coalition.

## 17.  Waiver

The waiver by either party of a breach, default, delay or omission of any of the provisions of this Agreement by the other party will not be construed as a waiver of any subsequent breach of the same or other provisions.

**J.A. 1770**

**18.  Award Language**

Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**20. Cooperation**

SUBRECIPIENT agrees to cooperate at any time to the extent and in the manner reasonably requested by The Coalition and at SUBRECIPIENT's expense (to the extent allowed by applicable law), in the prosecution or defense of any claims, litigation or other proceeding, including anything related to Confidential Information.

**21.  Legal Expenses**

In the event that any legal proceeding is commenced to enforce or interpret any provision of this Agreement, The Coalition, if it prevails, shall be entitled to recover from SUBRECIPIENT, in addition to any other damages or award, all reasonable legal costs and fees associated with the action in both the trial and appellate courts.

**22.  Entire Agreement**

It is agreed that there is no representation, warranty, collateral agreement or condition affecting this Agreement except as expressly provided in this Agreement.

**23.  Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument.

**J.A. 1771**

**24. Signature**

By signing this Agreement, SUBRECIPIENT certifies that it will perform the work under this Agreement in accordance with the terms of this Agreement, the applicable terms of the Prime Award, federal, state, and local law, rules and regulations, and the SUBRECIPIENT's policies.  Moreover, the persons whose names and signatures appear below, represent and warrant that they have authority to enter into this agreement on behalf of the company, firm or organization they purport to represent and hereby agree to the terms set forth herein.


_____          5/11/22
Sophie Ackoff, Co-Executive Director              _____
National Young Farmers Coalition                  Date


_____          5/12/2022
Edna Rodriguez, Executive Director                _____
Rural Advancement Foundation International - USA   Date

ATTACHMENT 1:
United States Department of Agriculture
**Project Initiation**

| | | | |
|---|---|---|---|
| **Title:** | **American Rescue Plan Technical Assistance Investment Program - National Young Farmers Coalition** | | |

| | | | |
|---|---|---|---|
| **Accession No.** | 1028530 | **Sponsoring Institution** | National Institute of Food and Agriculture |
| **Project No.** | | **Project Status** | ACTIVE |
| **Funding Source** | Non Formula | | |
| **Grants.gov No.** | | **Proposal No.** | 2022-03129 |
| | | **DUNS Number** | 962111873 |
| **Start Date** | 04/01/2022 | **End Date** | 03/31/2027 |
| **Award Number** | | **Award Amount** | |
| **Award Date** | | **Award Fiscal Year** | |
| **Submitted By** | Sophie Ackoff | **Date Submitted to NIFA** | 03/23/2022 |

**Program Code** ARP                    **Program Name**    ARP Technical Assistance Investment Program

**Project Director**
Sophie Ackoff
518-643-3564
sophie@youngfarmers.org

**Performing Organization/Institution**                    **Performing Department**

NATIONAL YOUNG FARMERS COALITION, INC.                    {NO DATA ENTERED}
418 BROADWAY
ALBANY, NY 122072922

**Co-Project Directors**                    **Departments**
{NO DATA ENTERED}                    {NO DATA ENTERED}

**Collaborating/Partnering States**                    **Collaborating/Partnering Countries**
{NO DATA ENTERED}                    {NO DATA ENTERED}

**Collaborating/Partnering Organizations**
{NO DATA ENTERED}

**Non-Technical Summary**
The next generation of farmers and ranchers need credit to launch and grow their farm businesses. USDA FSA loans can help farmers invest in important inputs and equipment, purchase farmland, build infrastructure on their farms, and more. Unfortunately, they are largely not engaged with USDA Farm Service Agency loan programs that can help. And due to to decades of documented discrimination at USDA, many do not trust that the agency has their best interests at heart. And for young farmers, many of whom are first-generation farmers, they do not have a family history of working with the agency. In our 2017 National Young Farmer Survey, we found that 30% of farm owner respondents were unfamiliar with USDA programs. Forty percent thought the applications and paperwork were too burdensome. And 28% said their local USDA has been difficult to work with. To ensure our communities have access to fresh, local food we must ensure these farmers have access to the federal programs designed to help.

Young BIPOC farmers need additional outreach and information to decide to apply to FSA programs, connect with their FSA office, and support filling out the necessary paperwork for the program. As an organization with a lot of trust with young, BIPOC farmers, we are in the best position to introduce these farmers to USDA FSA programs. Through phone calls, events, and social media, farmers will learn about USDA FSA, what loan programs best serve young farmer needs, and how to apply. Our partner in the Southeast, RAFI, will provide one-on-one technical assistance to help answer questions and support farmers in filling out the applications.

The ultimate goal of our project is to increase the number of young, BIPOC farmers successfully utilizing FSA loan programs.

---

**J.A. 1773**

United States Department of Agriculture
**Project Initiation**

| Accession No. 1028530 | Project No. |
|---|---|

Once these farmers have a positive experience and are in the system, they'll be able to work with FSA for years to come and eventually graduate to commercial credit. With the capital they need to launch and grow their farm businesses, we'll all benefit from the quality food they are able to grow.

**Goals / Objectives**

The primary goal of this project is to increase young, BIPOC farmer familiarity with and access to USDA Farm Service Agency loan programs. Our ultimate goal is to move federal dollars into the hands of young, BIPOC farmers in the form of FSA loans to support the launch and growth of their farm businesses.

1.    Young farmers, particularly young BIPOC farmers, learn about USDA Farm Service Agency loans and how to access them to launch or grow their farm businesses.
Objective 1: Young Farmers staff and partners provide outreach to 3,000 young BIPOC farmers each year, informing them about FSA loan programs.
Objective 2: Young Farmers staff and RAFI's technical assistant communicate about FSA loan programs to our networks during one-on-one conversations, listening sessions, and events, reaching 500 additional farmers per year.
Objective 3: Young Farmers communicates about FSA programs via our social media platforms to our network of young BIPOC farmers using creative ways to educate our farmers: Q&As, Instagram Live sessions, etc, resulting in 60 posts and 40,000 impressions over the course of the grant. Facebook Live and Instagram Live sessions receive 2,500 impressions by our network.
Objective 4: Young Farmers communicates about FSA programs via our network newsletter. FSA program information is shared with 25,000 users on our email list 15 times during the application period.

2.    Young, BIPOC farmers in the Southeast have one-on-one support to apply for USDA programs, including support in crafting their business plans and other necessary documents.
Objective 1: Key partner RAFI-USA provides one-on-one technical assistance to 500 BIPOC farmers in our combined networks over the course of the grant period.
Objective 2: 3-5 BIPOC-led partner organizations are resourced to provide technical assistance to farmers in their networks applying for USDA FSA loans.

**Methods**

Goal 1:
We will conduct the following efforts to meet our outreach goal:

• Hire Young Farmers USDA organizer and 2-4 phone bankers
• Develop outreach materials in English and Spanish
• Refine current script for phone banking
• Phonebank 3,000 farmers per year
• Distribute survey to farmers we phonebank (250 farmers participate per year)
• Work with our Southeast Organizer to identify 3-5 events happening either virtually or on-line where young BIPOC farmers will be gathering. Work with event organizers to add space to share information about FSA loans.
• Write informative copy for social media posts, send to our designer to make them visually appealing and accessible, and post on our Instagram, Facebook and Twitter platforms.
Goal 2: Technical Assistance
We will conduct the following efforts to meet our technical assistance goal:

• Partner RAFI will hire a full-time FSA Technical assistant to be based in the Southeast
• Train the FSA technical assistant with the help of Young Farmers, RAFI, and USDA FSA
• Young Farmers, RAFI, and 3-5 partner organizations refer farmers to technical assistant through phonebanking, social media, events, and newsletters.
• Technical assistant conducts 60-minute consultations online and in-person with 100 farmers per year.
• Distribute survey to farmers who receive technical assistance. (50 farmers take the survey per year)
Evaluation:
We will evaluate our efforts by tracking the number of farmers we reach and who receive our content:

**J.A. 1774**

United States Department of Agriculture
**Project Initiation**

| Accession No. 1028530        Project No. |
|---|

- How many farmers we have outreach conversations with (via phone and text)
- How many farmers attend events that we are speaking at about FSA loan programs, and
- How many farmers participate in a one-on-one technical assistance appointment (in person and online)
- How many farmers view our informative social media posts (impressions)

We will also evaluate impact through surveying farmers that we reach. The survey will be sent to all farmers who we call or who attend an event or have a one-on-one appointment with our technical assistant. Surveys will be succinct two to three questions to increase participation by busy farmers. We will ask the following questions to participating farmers:

To farmers who were called or attended an event:

1. Did outreach from the National Young Farmers Coalition help you learn something about USDA FSA programs?
2. Will you consider applying for FSA programs based on what you learned?
3. Have you applied for FSA programs since receiving outreach from Young Farmers?

To farmers who received technical assistance:

1. Did one-on-one technical assistance help you apply to FSA programs?
2. Have you applied for FSA programs as a result of receiving technical assistance?
3. How much credit did you receive from FSA?

From this surveying effort, we will learn not only about the quality of our outreach and technical assistance (did farmers learn something) but also what impact it had on our farmers - did they turn this knowledge and support into action (i.e. applying and receiving funding from USDA.) By asking how much credit our farmers received from FSA, we will be able to make a statement about how many dollars of impact we have unlocked for young, BIPOC farmers.


**Target Audience**
The target audience for this project are young and beginning Black, Indigenous, and People of Color (BIPOC) farmers in the Southeast region. As a multiracial coalition of farmers, we recognize the existence of racial disparities in access to federal programs. Our outreach and technical assistance to young BIPOC farmers will benefit American Indians, Asians, Blacks or African Americans, and Hispanics. We do not have an age cut off for providing outreach and technical assistance, but the majority of the farmers who we serve will be under 45 years old and in their first 10 years of farming. The majority of farmers receiving technical assistance will live and farm in the Southeast region, with specific focus on Virginia, North Carolina, South Carolina, Georgia, Mississippi, Arkansas, Texas and Oklahoma. The individuals served will include aspiring and current farmers and ranchers in rural and urban areas. We expect the majority will be engaged in diversified farm production and sell direct-to-consumer since these farmers need the most support in utilizing FSA loan programs often designed for commodity operations. Because we are focusing on young and beginning BIPOC farmers, this project is designed to serve socially disadvantaged farmers.

**Products**
Activities

1. Phone bankers will make 3,000 calls to BIPOC farmers in the Young Farmer network to provide information about FSA programs available to help.
2. Share outreach materials in English and Spanish to 3-5 BIPOC-led or BIPOC-serving partner organizations to share with their farmer networks, referring them to RAFI's technical assistant.
3. Engage RAFI-USA as a key partner, providing a sub-award to provide direct technical assistance to young, BIPOC farmers in the Southeast in applying for FSA loans. RAFI's technical assistant will host 100 one-on-one appointments per year, totalling 500 one-on-one appointments with BIPOC farmers over the course of the grant period.
4. Post informative material about FSA loan programs to Young Farmers social media at least once per month during the application period and answer questions posted on social media.
5. Host Facebook Live and Instagram Live sessions about FSA programs at least twice a year (10 times during the grant period).
6. Facebook Live and Instagram Live sessions receive 2,500 impressions by our network.

**J.A. 1775**

United States Department of Agriculture
**Project Initiation**

| Accession No. 1028530    Project No. |
| --- |

7.  Post informative material about FSA loan programs in the Young Farmers newsletter three times per year.

Events

1.  Our Southeast Organizer, USDA Access & Accountability Organizer, and/or RAFI's technical assistant will provide information on FSA loan programs to 500 farmers at 3-5 virtual or in-person events per year. Events may be a conference session, information booth at a farmer event, or workshop specifically on accessing FSA loans.

Services

1.  RAFI's FSA technical assistant will provide one-on-one appointments to provide technical assistance on applying for USDA FSA loans - 500 over the course of the grant period. The technical assistant will provide TA on FSA loans specifically and the financial literacy required to successfully apply, supporting farmers to prepare their loan applications and any necessary paperwork and documentation.

Products (all translated in Spanish/English)

1.  Young Farmers will create a 8.5x11 flier in English and Spanish introducing USDA FSA loan programs to farmers with contact information for RAFI's technical assistant.
2.  Young Farmers will create a 3x5 postcard in English and Spanish introducing USDA FSA loan programs to farmers with contact information for RAFI's technical assistant.
3.  Young Farmers will create at least 12 informative social media graphics for Instagram and Facebook to educate our network on USDA FSA loan opportunities and with contact information for RAFI's technical assistant. ?

**Expected Outcomes**

Outcomes

1.  600 farmers each year (3,000 total) increase their knowledge of FSA loans from our phone bankers: what USDA FSA loan programs are, how they can be helpful, and how to apply.
2.  At least 65% of farmers reached through phone banking and who complete our follow up survey report that our outreach helped them learn more about FSA programs and affected their decision to apply.
3.  Information about FSA loans is presented where farmers are already at and in accessible ways: from peer BIPOC farmers who give them a phone call, at events they are already planning to attend, and through social media where they are already spending their time.
4.  375 farmers report establishing a new or strengthened partnership with FSA due to technical assistance through actions including but not limited to: acquiring a Farm Number, submitting a FSA loan application, restructuring an existing loan, learning more about their fiscal and borrower responsibilities, etc.
5.  100 young BIPOC farmers report receiving a USDA FSA loan for the first time and have the credit they need to farm or ranch.

**Keywords**

technical assistance ~outreach ~financial literacy ~financial sustainability ~rural development ~agricultural producer ~agricultural extension ~farmer ~rancher ~forest land owner ~equitable access ~farm production

**J.A. 1776**

United States Department of Agriculture

**Project Initiation**

| Accession No. 1028530     Project No. |
|---|

**Estimated Project FTEs For The Project Duration**

| Role | Non-Students or Faculty | Students with Staffing Roles | | | Computed Total by Role |
|---|---|---|---|---|---|
| | | Undergraduate | Graduate | Post-Doctorate | |
| Scientist | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Professional | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 |
| Technical | 1.6 | 0.0 | 0.0 | 0.0 | 1.6 |
| Administrative | 0.3 | 0.0 | 0.0 | 0.0 | 0.3 |
| Other | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Computed Total | 2.1 | 0.0 | 0.0 | 0.0 | 2.1 |

**Animal Health Component**  0 %

**Activities**

    **Research**        0 %

    **Extension**      0 %

    **Education**      100 %

**Classification**

| Knowledge Area (KA) | Subject of Investigation (SOI) | Field of Science (FOS) | Percent |
|---|---|---|---|
| 602 | 6030 | 3100 | 100 |

**Knowledge Area**

602 - Business Management, Finance, and Taxation

**Subject Of Investigation**

6030 - The farm as an enterprise

**Field Of Science**

3100 - Management

**J.A. 1777**

ATTACHMENT 2:

**United States Department of Agriculture**
**National Institute of Food and Agriculture**
**AWARD FACE SHEET**

| 1. Award No.<br>2022-70416-37195 | 2.Amendment No. | 3. Proposal Number<br>2022-03129 | 4. Period of Performance<br>04/01/2022  through 03/31/2027 | 5. Type of Instrument<br>Cooperative Agreement |
|---|---|---|---|---|

| 6. Type of Action<br>New | 7. CFDA Number<br>10.234 | 8.FAIN<br>20227041637195 | 9. Method of Payment<br>ASAP 70416371957041622000 | 10. CRIS Number<br>1028530 |
|---|---|---|---|---|

**11.Authority.**  7 USC 3318, Section 1006; American Recovery Act of 2021 P.L. 117-2
, American Rescue Plan Technical Assistance Investment Program

| 12. Agency (Name and Address)<br><br>Awards Management Division<br>National Institute of Food and Agriculture/USDA<br>805 Pennsylvania Ave Kansas City, MO 64105 | 13. Awardee Organization<br>NATIONAL YOUNG FARMERS COALITION, INC.<br>DBA: NATIONAL YOUNG FARMERS COALITION<br>ALBANY, NY 12207-2922 |
|---|---|

| 14. Program Point of Contact:<br>Ahlishia Shipley<br><br>Telephone: 000-000-0000<br><br>ahlishia.shipley@usda.gov | Administrative Point of Contact:<br>Hollie Boyd<br><br>Telephone: 816-591-7743<br><br>hollie.boyd@usda.gov | 15. Project Director/Performing Organization<br>Sophie  Ackoff<br>National Young Farmers Coalition<br>Albany, NY 12207-2922 |
|---|---|---|

| 16. Funding: | **Federal** | **Non-Federal** | 17. Funds Chargeable | | | |
|---|---|---|---|---|---|---|
| | | | **FY - FDC** | **Amount** | **FY - FDC** | **Amount** |
| **Previous Total** | $0.00 | $0.00 | 21- 133-70416 | $999,951.00 | | |
| **+ or -** | $999,951.00 | $0.00 | | | | |
| **Total** | $999,951.00 | $0.00 | | | | |
| **Grand Total** | | $999,951.00 | | | | |

**18. Title of Proposal**
American Rescue Plan Technical Assistance Investment Program - National Young Farmers Coalition

**PROVISIONS**

**This Award incorporates the following:**

1.  Funds in the amount of $999,951 are withheld pending receipt of the signed cooperative agreement document, final statement of work, effort statement and final budget. To activate this award, please sign, date this form and return this agreement to the USDA/NIFA, Awards Management Division, via PDF to awards@usda.gov. These funds will not be fully released until all required documents are received by NIFA.

2.  The Conditionally Approved Award Budget.

3.  Research Terms and Conditions and NIFA Agency Specific Terms and Conditions (11/12/2020) at http://nifa.usda.gov/terms-and-conditions excluding the following sections; Under Article 2 - No Cost Time Extension; Under Article 3 Section Indirect Costs and Tuition Remission and Under Article 7 Sections; Life Sciences Dual Use Research of Concern (DURC); Genetic Resources from Outside of U.S., Responsible and Ethical Conduct of Research.

4.  Failure to submit complete, accurate, and timely reports may result in possible award delays or enforcement actions. Federal Financial SF-425 forms are to be sent to awards@usda.gov. Project progress reports are to be completed in the REEport portal at https://portal.nifa.usda.gov. Questions regarding access to REEport should be directed to electronic@usda.gov. Additional information regarding grant management and closeout can be found at: https://nifa.usda.gov/manage-grant and https://nifa.usda.gov/close-grant.

5.  The obligation of funds may be terminated without further cause unless the recipient commences the timely drawdown of funds; initial drawdown signifies acceptance of award terms and conditions and should commence in a timely manner within the award period of performance.   Inquiries regarding ASAP Payment Accounts should be directed to the Financial Management Division at asapcustomerservice@nifa.usda.gov.

6.  The referenced proposal, and any revisions thereof, incorporated by reference

7.  NIFA Project Initiation Documents, incorporated by reference.

FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE

This award, subject to the provisions above, shall constitute an obligation of funds on behalf of the Government. Such obligation may be terminated without further cause unless the recipient commences the timely drawdown of funds; such drawdowns may not exceed one year from issuance date of the award.

| Typed Name<br>Mark Heap<br>Authorized Departmental Officer | Signature<br>MARK.HEAP | Date<br>03/24/2022 |
|---|---|---|

| FOR THE PERFORMING ORGANIZATION | | |
|---|---|---|
| Signature of person authorized by the governing body of the performing organization to incur contractual obligations.<br>Signature indicates acceptance when a cooperative agreement is cited in Type of Instrument (block 5) above. | | |

| Typed Name and Title<br>Sophie Ackoff, Co-Executive Director | Signature<br>*Sophie Ackoff* | Date<br>4/18/22 |
|---|---|---|

NIFA-2009

**J.A. 1778**

**United States Department of Agriculture**
**National Institute of Food and Agriculture**
**AWARD FACE SHEET**

| 1. Award No.<br>2022-70416-37195 | 2.Amendment No. | 3. Proposal Number<br>2022-03129 | 4. Period of Performance<br>04/01/2022  through 03/31/2027 | 5. Type of Instrument<br>Cooperative Agreement |
|---|---|---|---|---|
| 6. Type of Action<br>New | 7. CFDA Number<br>10.234 | 8.FAIN<br>20227041637195 | 9. Method of Payment<br>ASAP 70416371957041622000 | 10. CRIS Number<br>1028530 |

| 11.Authority. | 7 USC 3318, Section 1006; American Recovery Act of 2021 P.L. 117-2<br>, American Rescue Plan Technical Assistance Investment Program |
|---|---|

| 12. Agency (Name and Address)<br><br>Awards Management Division<br>National Institute of Food and Agriculture/USDA<br>805 Pennsylvania Ave Kansas City, MO 64105 | 13. Awardee Organization<br>NATIONAL YOUNG FARMERS COALITION, INC.<br>DBA: NATIONAL YOUNG FARMERS COALITION<br>ALBANY, NY 12207-2922 |
|---|---|

| 14. Program Point of Contact:<br>Ahlishia Shipley<br>Telephone: 000-000-0000<br>ahlishia.shipley@usda.gov | Administrative Point of Contact:<br>Hollie Boyd<br>Telephone: 816-591-7743<br>hollie.boyd@usda.gov | 15. Project Director/Performing Organization<br>Sophie Ackoff<br>National Young Farmers Coalition<br>Albany, NY 12207-2922 |
|---|---|---|

| 16. Funding: | **Federal** | **Non-Federal** | 17. Funds Chargeable | | | |
|---|---|---|---|---|---|---|
| | | | **FY - FDC** | **Amount** | **FY - FDC** | **Amount** |
| **Previous Total** | $0.00 | $0.00 | 21- 133-70416 | $999,951.00 | | |
| **+ or -** | $999,951.00 | $0.00 | | | | |
| **Total** | $999,951.00 | $0.00 | | | | |
| **Grand Total** | $999,951.00 | | | | | |

| 18. Title of Proposal |
|---|
| American Rescue Plan Technical Assistance Investment Program - National Young Farmers Coalition |

**PROVISIONS**

8.  In addition to required annual technical and financial reporting required by NIFA's Research and Related Terms and Conditions, the cooperators must submit to Ahlishia.shipley@usda.gov interim comprehensive five-year plan developed by the cooperator and USDA at the 90-day (1st quarter) period, a semi-annual (2nd quarter) progress report, and a 270-day (3rd quarter) progress report to NIFA program leader or designee on their performance to show achievement of goals and objectives, share lessons learned, improve program outcomes, and foster adoption of promising practices, including metrics reflecting the cooperator's impact toward overall program goals.
9.  First-time cooperators must attend an orientation covering NIFA's background and effective award management within the 1st 90 days of award.
10.  When this award expires on 3/31/2027, it will have run for the full five year period, the maximum length of time currently permitted under Federal statute.  The recipient must complete the project as proposed and obligate all funds awarded by this date.  No cost time extensions under Article 2 of the Terms and Conditions of time cannot be permitted, all funds must be drawn down within 90 days after the end date of the period of performance.
11.  The 10% de minimis rate for Facilities and Administrative costs (F&A)/Indirect costs (IDC) have been elected at the time this award was approved and is the F&A/IDC rate that must be used for the life of this award.
12.  Form AD-1048 or other NIFA approved format must be completed by the approved consultant(s) and returned to the recipient for retention in the official award file. It is not necessary to send a copy to NIFA. (https://www.ocio.usda.gov/document/ad-1048)
13.  Pursuant to 2 CFR 200.331, pass-through entities must appropriately monitor subrecipient activities and must convey the requirements of the Federal grant as well as any additional requirements imposed by the pass-through entity. NIFA reserves the right to request and review subaward budget information during or after the Period of Performance of this award. Form AD-1048 or other NIFA

FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE

This award, subject to the provisions above, shall constitute an obligation of funds on behalf of the Government. Such obligation may be terminated without further cause unless the recipient commences the timely drawdown of funds; such drawdowns may not exceed one year from issuance date of the award.

## United States Department of Agriculture
## National Institute of Food and Agriculture
## AWARD FACE SHEET

| 1. Award No. 2022-70416-37195 | 2.Amendment No. | 3. Proposal Number 2022-03129 | 4. Period of Performance 04/01/2022 through 03/31/2027 | 5. Type of Instrument Cooperative Agreement |
|---|---|---|---|---|

| 6. Type of Action New | 7. CFDA Number 10.234 | 8.FAIN 20227041637195 | 9. Method of Payment ASAP 70416371957041622000 | 10. CRIS Number 1028530 |
|---|---|---|---|---|

**11.Authority.** 7 USC 3318, Section 1006; American Recovery Act of 2021 P.L. 117-2
, American Rescue Plan Technical Assistance Investment Program

| 12. Agency (Name and Address)<br><br>Awards Management Division<br>National Institute of Food and Agriculture/USDA<br>805 Pennsylvania Ave Kansas City, MO 64105 | 13. Awardee Organization<br>NATIONAL YOUNG FARMERS COALITION, INC.<br>DBA: NATIONAL YOUNG FARMERS COALITION<br>ALBANY, NY 12207-2922 |
|---|---|

| 14. Program Point of Contact:<br>Ahlishia Shipley<br>Telephone: 000-000-0000<br>ahlishia.shipley@usda.gov | Administrative Point of Contact:<br>Hollie Boyd<br>Telephone: 816-591-7743<br>hollie.boyd@usda.gov | 15. Project Director/Performing Organization<br>Sophie Ackoff<br>National Young Farmers Coalition<br>Albany, NY 12207-2922 |
|---|---|---|

| 16. Funding: | **Federal** | **Non-Federal** | 17. Funds Chargeable | | | |
|---|---|---|---|---|---|---|
| | | | **FY - FDC** | **Amount** | **FY - FDC** | **Amount** |
| **Previous Total** | $0.00 | $0.00 | 21- 133-70416 | $999,951.00 | | |
| **+ or -** | $999,951.00 | $0.00 | | | | |
| **Total** | $999,951.00 | $0.00 | | | | |
| **Grand Total** | $999,951.00 | | | | | |

**18. Title of Proposal**
American Rescue Plan Technical Assistance Investment Program - National Young Farmers Coalition

### PROVISIONS

approved format must be completed by the approved subawardee(s) and returned to the recipient for retention in the official award file.
It is not necessary to send a copy to NIFA. (https://www.ocio.usda.gov/document/ad-1048)

#### FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE

This award, subject to the provisions above, shall constitute an obligation of funds on behalf of the Government. Such obligation may be terminated without further cause unless the recipient commences the timely drawdown of funds; such drawdowns may not exceed one year from issuance date of the award.

NIFA-2009

**Subrecipient Name**

Subrecipient Address line 1
Subrecipient Address line 2

# INVOICE

| INVOICE # | DATE |
|---|---|
|  |  |
| Billing Period Included in Invoice: | |
|  | |

**BILL TO**

National Young Farmers Coaltion
PO BOX 1074
Hudson, NY 12534
luis@youngfarmers.org
(518) 643-3564

**Project/Award Title**

**Subrecipient Financial Report**

| Budget Category | Funds Awarded | Expenses for Current Billing Period | Cumulative Prior Expenses Submitted | Total Cumulative Expenses |
|---|---|---|---|---|
| Senior/Key Personnel Costs (Fringe and Salary) | $          - |  |  | $0.00 |
| Other Personnel Costs (Fringe and Salary) | $          - |  |  | $0.00 |
| Consultant Services | $          - |  |  | $0.00 |
| Indirect Costs | $          - |  |  | $0.00 |
| Total | $          - | $0.00 | $0.00 | $0.00 |

By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729–3730 and 3801–3812).

_____          _____
Name                                              Signature

**J.A. 1781**

## PROJECT TITLE
Performance Progress Report

| 1. Recipient Name: | | 3. Report Date: | |
|---|---|---|---|
| 2. Address: | | 4. Reporting Period End Date: | |

**Report Frequency - Quarterly**

### Project Quantitative Report

| | Activity Type | Deliverable Quantity | Description of Activity Type and Deliverable Quantity |
|---|---|---|---|
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |

**13. Locations of Any Trainings Hosted this Quarter (City, State *or* Zip Code).**

**14. List of Any Conferences Attended this Quarter (include: Conference *or* Organization Title; Purpose of Conference; Audience Type; and City, State *or* Zip Code).**

### Project Qualitative Report

**15. Describe your progress meeting each major deliverable under the project.**

**J.A. 1782**

**DELIVERABLE 1 – DELIVERABLE 1 TITLE - (brief description ex. collaborative building/reporting/meetings and calls)**

**DELIVERABLE 2 - DELIVERABLE 2 TITLE – (brief description)**

**DELIVERABLE 3 - DELIVERABLE 3 TITLE (brief description ex. Perform outreach at 20 conferences/present 5 shorter workshops/NYFC website)**

**DELIVERABLE 4 - DELIVERABLE 4**

**16. Describe any challenges or obstacles encountered and mitigation strategies you have employed.**

**17. Describe planned major activities for the next quarter.**

**18. Provide any other information that would be useful to Young Farmers as it assesses this project's progress.**

**19. Describe any success stories or best practices you have identified. Please be as specific as possible.**

## Attachment 5: Subaward Budget

| Salary | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|---|
| Farmer Resource Coordinator, 1 FTE | | $47,050 | $48,932 | $50,889 | $52,925 | $54,394 | $254,190 |
| Lisa Misch, Supervisor, ~2hr/wk | | $3,361 | $3,462 | $3,566 | $3,673 | $3,783 | $17,845 |
| | Total Salary | $50,411 | $52,394 | $54,455 | $56,598 | $58,177 | $272,036 |
| **Fringe** | | | | | | | |
| Farmer Resource Coordinator | | $18,350 | $19,083 | $19,847 | $20,641 | $21,214 | $99,134 |
| Supervisor to Coordinator | | $1,311 | $1,350 | $1,391 | $1,432 | $1,475 | $6,960 |
| | Total Fringe | $19,660 | $20,434 | $21,238 | $22,073 | $22,689 | $106,094 |
| | Total Personnel | $70,072 | $72,828 | $75,693 | $78,671 | $80,866 | $378,130 |
| | | | | | | | |
| **Travel** | | | | | | | |
| Mileage, $0.585/mi | | $280 | $280 | $280 | $280 | $280 | $1,400.00 |
| **Supplies** | | | | | | | |
| Computer for Coordinator | | $1,000 | $0 | $0 | $0 | $0 | $1,000.00 |
| Phone for Coordinator | | $984 | $984 | $984 | $984 | $984 | $4,922.00 |
| **Other** | | | | | | | |
| Professional Development for coordinator | | $212 | $200 | $200 | $200 | $100 | $900.00 |
| | | | | | | | |
| **Total Direct Costs** | | $72,548 | $74,292 | $77,157 | $80,135 | $82,231 | $386,364 |
| | | | | | | | |
| **Indirect** | | | | | | | |
| 10% direct costs | | $7,255 | $7,429 | $7,716 | $8,014 | $8,223 | $38,636 |
| | | | | | | | |
| **Total Project Costs** | | $79,803 | $81,721 | $84,873 | $88,149 | $90,454 | $425,000 |

# RAFI DECLARATION

# EXHIBIT 13-I

## EXECUTIVE SUMMARY

### A. Contact Information
Project Director Emily Moose, Executive Director, A Greener World
emily@agreenerworld.org; 202-618-4497

### B. Project Partners
- *Lead applicant, A Greener World (AGW)* – Will oversee the project and manage partnerships; administer regenerative certification program including practice monitoring and verification; provide marketing support to participating producers; and complete evaluation and reporting on grant outcomes.
- *Sub-award/Key Collaborator, Rural Advancement Foundation International-USA (RAFI-USA)* – Will conduct outreach and recruitment of producers for participation in the pilot, including underserved producers through their Farmers of Color Network (FOCN); manage distribution of financial incentives; and providing technical assistance providers on Climate-Smart Agriculture and Forestry (CSAF) practices.
- *Sub-contractor/Evaluation Partner, Soil Health Institute (SHI)* – Will conduct soil testing on a sample sub-set of participating pilot farms to establish baselines, determine potential for soil improvements and monitor impact of practices used; and will assist AGW and RAFI-USA in interpreting overall findings from soil health sampling including how results can calibrate predictions from COMET-Farm and what inferences can be drawn from all participating farms.
- *National Young Farmers Coalition (NYFC)* – Will assist with outreach and recruitment of beginning, small, and underserved farmers using their national membership network.
- *National Co-op Grocers (NCG)* – Will assist with marketing of climate-smart commodities by sharing information about Certified Regenerative products with their national network of cooperative grocery stores.

### C. Underserved/Minority-Focused Project Partners
*Rural Advancement Foundation International-USA (RAFI-USA)* – RAFI-USA will promote this opportunity to the producers in its Farmers of Color Network (FOCN), which was created in 2017 to more intentionally support Black, Indigenous, and People of Color (BIPOC) farmers in the Southeast with the goals of improving their economic viability, keeping their land, and gaining generational investment. FOCN has more than 300 BIPOC farmer-members and services have included farmer-led technical assistance, market access opportunities, webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge. Demographically, the FOCN membership is 82% Black/African American, 6% Indigenous, 6% Latinx, 1% Asian, and 5% Multiracial. FOCN has also, through a cost-share infrastructure grants program, awarded $603,300 to 90 grantees in nine states and the U.S. Virgin Islands between 2020 and 2022. RAFI-USA is a current subcontractor with NRCS under the *Conservation Outreach: Racial Equity and Justice Conservation Cooperative Agreements* program, and has experience conducting outreach and technical assistance to underserved farmers on similar topics to this project.

### D. Compelling Need for the Project
There is rapidly growing interest amongst small and underserved producers to implement Climate-Smart agricultural practices on their farms, as the evidence for the environmental benefits of these practices continues to grow, and the demand from consumers for products using

verifiable CSAF practices also increases. Many small and underserved producers are limited in their access to financial resources to invest in the needed infrastructure for these practices; time to invest in creating plans for their usage; knowledge of how to implement the practices specifically on their farm and how to access appropriate markets; and/or understanding of the benefits of CSAF practices for the long-term health of their farm. With many different programs now available and a wealth of terms used to describe agricultural practices that may fall under the CSAF definition, it is also a confusing landscape for many of these farmers to enter.

Given these common barriers, in order for small and underserved farmers to be able to benefit from the Partnerships for Climate-Smart Commodities program, specific resources and approaches are needed to bridge the gap to this exciting new program. The proposed project brings together the expertise of three established nonprofit organizations to create a program that offers a uniquely-designed set of services to meet these specific needs.

A Greener World (AGW) has extensive experience with creating and managing certification programs for farmers that emphasize CSAF practices, and recently developed a new certification specifically intended to increase accessibility for farmers to this type of certification. This new program, Certified Regenerative by AGW, was developed over three years in response to farmer, consumer, and market demand for a meaningful, verified regenerative claim that worked collaboratively with the farmer to create a farm-specific plan for improvement, and allowed the consumer to find products that used the type of climate-smart practices they were seeking. A pilot test of this new certification was recently completed with 50 farms, and the certification opens to the public in June 2022, and has an existing waiting list of participants.

The regenerative practices included in this program are all climate-smart practices, and the certification has a large umbrella, allowing all types of farms to participate (not product-specific) and not requiring any other certifications. The Certified Regenerative program will be the basis for this project with all enrolled farms following the established process and protocols for certification. Certification fees will be subsidized as part of the incentive package offered to participating producers, and each farm will also receive marketing assistance by the AGW team, which has experience with labeling products to convey the use of specific practices to consumers, as well as connecting producers with different types of markets.

Rural Advancement Foundation International-USA (RAFI-USA) has expertise in building farmer-led networks and offering financial and technical assistance to small and underserved farms. Their Farmers of Color Network (FOCN) has more than 300 members, many of whom have expressed interest in implementing more CSAF practices on their farms. RAFI-USA will serve as the key outreach partner on this project, promoting the opportunity through the FOCN as well as their larger network of farmers. They will also administer direct financial incentive payments to participating farms, provide technical assistance to producers, and match producers with early adopters (Farm Ambassadors) who can provide additional training and support for the regenerative planning process.

Soil Health Institute (SHI) will support the project with technical expertise in measuring soil carbon and creating baseline and goal measurements for improving soil health. This scientific expertise will allow AGW to verify the projections made by COMET-Farm for participating farms, as well as to verify the impact of regenerative practices on carbon sequestration.

**E. Approach to Minimize Transaction Costs**

Transaction costs will be minimized by creating templates and systems that can be standardized for use by the partners in implementing the project. For instance, a custom Regenerative Plan template will be created that works well with COMET and reduces duplication in measurement. As AGW is already an established certifier, many of the processes and systems needed to do annual in-person monitoring with audits are already established in the organization. RAFI-USA also has prior experience administering financial incentive payments to underserved farmers and will be able to streamline the process, minimizing the number of payments and paperwork required.

**F. Approach to Reduce Producer Barriers to Implementing CSAF Practices**

The primary purpose of this project is to reduce barriers for small and underserved farmers to implementing CSAF practices, so the entire project is designed with this outcome in mind. RAFI-USA will ensure all outreach and technical assistance efforts are culturally-relevant based on their prior experience working with underserved farmers. Some specific barriers RAFI-USA has observed include: overwhelm in dealing with paperwork required by conservation and certification programs; lack of adequate record-keeping practices; lack of access to capital needed to invest in new practices and necessary infrastructure; and the need for more culturally-relevant and individualized technical assistance with implementing climate-smart production practices.

In order to address these barriers, each farm enrolled in this program will receive extensive individual support throughout the entire process, from the creation of their own Regenerative Plan, to connection with markets to sell their products. Support will be provided by both AGW and RAFI-USA staff, as well as Farmer Ambassadors who are early adopters that can provide farmer-to-farmer guidance.

AGW's Certified Regenerative is the only regenerative agriculture certification program that also functions as a management tool, helping producers meet their own regenerative goals through an audited, regenerative plan. The core feature of Certified Regenerative by AGW is a farmer-led Regenerative Plan whereby farms assess risk, set goals and track progress toward their own meaningful milestones. Plans are written in partnership with farmers by experts in the field and independently evaluated by experts in regenerative agriculture. Due to the collaborative nature of this process and additional technical assistance provided through this project, the paperwork and record-keeping required will be clearly explained to each farmer, with support available at any time throughout the project. Certified Regenerative by AGW is open to all types of operations which further increases accessibility for producers.

Many of the barriers to implementing CSAF practices are also financial, so the financial incentives in this project design will also significantly increase access. All certification fees will be subsidized for the three years of this pilot project, allowing producers to benefit from the certification in their marketing without an outlay of initial expense. There is also no transition period required, as the Regenerative Plan starts where the producer is, validating existing conservation practices as well as improvements with CSAF practices over time. This also increases the producer's ability to benefit right away from higher prices in the marketplace, reducing the risk of market entry. Financial incentive payments will also be provided to farmers

to cover not only infrastructure needs and expenses, but also to reimburse them for time spent on creating the Regenerative Plan.

## G. Geographic Focus

This project will focus on the Southeast Region of the United States but will also be open to interested producers in other areas, depending on the level of interest and the availability of technical assistance providers in that area. Producers will be recruited from the states of North Carolina, Arkansas, Georgia, Missouri, Mississippi, South Carolina, Texas and Virginia.

## H. Project Management Capacity of Partners

*AGW* – Established in 2014 as a 501(c)(3) organization, AGW's mission has four key components: 1)To identify and promote agricultural systems that have a positive impact on the environment, society and animals (wild and farmed); 2)To educate consumers about the environmental, social and animal outcomes of their food purchasing decisions; 3)To establish and promote trusted farm certification programs that help reconnect the consumer and food producer by encouraging—and rewarding—positive farm management changes; and 4)To support independent farmers who are committed to sustainable livestock production. AGW's portfolio of leading farm certifications includes Certified Animal Welfare Approved by AGW, Certified Grassfed by AGW, Certified Non-GMO by AGW, Certified Regenerative by AGW and Certified Organic by AGW. Each program is specifically designed to have positive and measurable impacts on the environment, society and animals, and to encourage truly sustainable farming practices. Developed with scientists, veterinarians, experts and farmers from across the globe, our farm standards and certification procedures are reassuringly robust and totally transparent, while remaining realistic and achievable for the farmer. AGW has worked with more than 6,000 farmers managing more than 3 million acres to date. AGW is also backed by the globally-recognized accreditation for certifiers, ISO/IEC 17065 International Accreditation, demonstrating excellence in auditing and certifying.

*RAFI-USA* – RAFI-USA is a 501c3 nonprofit organization based in Pittsboro, North Carolina. They work across agricultural sectors and collaboratively through coalitions, combining on–the-ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farm and families, their communities and the environment. Their mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities. Since their founding in 1990, they have worked with small and mid-sized farmers to help them succeed in the face of financial crises and reverse the trend of farm loss. RAFI-USA has extensive previous experience with federal grants management (i.e. FMPP, RCDG, FINI) and is currently active as a USDA grant recipient, subrecipient, and FSA cooperative agreement recipient. They will use similar systems and procedures to ensure financial and regulatory compliance on their subaward.

*SHI* – SHI is a global non-profit with a mission of safeguarding and enhancing the vitality and productivity of soils through scientific research and advancement. The Institute brings together leaders in soil health science and the industry to conduct research and empower farmers and other landowners with the knowledge to successfully adopt regenerative soil health systems that contribute economic and environmental benefits to agriculture and society. SHI's scientific team holds doctorates in various soil science and related disciplines, with specialties in carbon cycling, nutrient cycling, water cycling, nutrient management, farmer training, education, GIS, ecosystem service modeling, soil-plant relationships, on-farm economics, and others. Together, the team follows a comprehensive strategy for advancing adoption of regenerative soil health systems.

## PLAN TO PILOT CLIMATE-SMART AGRICULTURE

### A. Practices to be Deployed

The set of Climate-Smart practices to be deployed in this project will be dictated by the existing standards set by the Certified Regenerative by AGW program. This allows for a clear definition of what will qualify as a CSAF for the sake of this project (within the parameters set by the USDA), a standardized process for creating farm-specific plans for management and measurement of impact, and the use of in-person on-farm verification of practices in annual audits. The standards for Certified Regenerative by AGW have been carefully researched, developed, and reviewed with the advice of experts from an extensive network of leading veterinarians, scientists and farmers committed to regenerative systems. The standards are evaluated annually to incorporate the latest research and best practices in regenerative agriculture. The full standards for Certified Regenerative by AGW are publicly available and can be provided upon request.

Climate-Smart practices, as defined by USDA, are hardwired into AGW's Certified Regenerative standards, as AGW defines "regenerative" as agricultural practices that leave the agricultural system in a better state than when they started, or in a state of ecological equilibrium if the maximum living soil health has already been achieved. In addition to a core focus on soil health, regenerative agriculture incorporates environmentally-beneficial practices throughout the ecosystem, including water, air, cropping systems, livestock management, biodiversity, wild harvest, and human/societal factors. Becoming Certified Regenerative requires each producer to create a customized Regenerative Plan for their farm which specifies the practices they will use and how they will measure them. The plan is subsequently reviewed by the AGW Review Panel and used by in-person auditors to evaluate progress and monitor practices.

*Climate-Smart Practices encouraged or required by Certified Regenerative by AGW:*
- Cover cropping
- Minimum till to no-till
- Climate-smart pasture practices, including a requirement for a grazing management plan which includes rest and recovery time for pastures (prescribed and rotational grazing), and prohibits grazing in riparian zones
- Manure and fertilizer management: manure holding can't pose a risk to waterways, or the producers have to mitigate that risk and prove it to the auditor with water testing to confirm it is not damaging.
- Required planting of buffer zones
- Strategies to reduce irrigation needs over time
- Fertility must be generated through activities on the farm: green manure, composting, cover-cropping. Limit offsets and reduce inputs from off-farm businesses over time to become a self-sustaining entity. Encourage a transition to renewable energy over time.
- Maintaining living roots: prohibitions on bare ground, requirements to maintain or increase permanent pasture, and a focus on deep-rooted plants such as perennials, native grasses, and legumes for improvement of carbon sequestration, fertility and soil structure, water cycling and biodiversity.

## B. Plan to Recruit Producers

A total of 100 farms will be enrolled to participate in this project over the course of the 3-year grant period, with a goal of having as many farms as possible sign up in the earlier part of the project to allow for the most time to measure the impact of the practices used. AGW recruitment will center on 50 farms that completed the initial pilot test of the Certified Regenerative program, as well as a waiting list of other farms interested in the program, with a goal of enrolling 25 farms as participants in this project. Those farms which have already received Certified Regenerative status will be considered "early adopters" and will be given the opportunity to use incentives to expand or improve upon existing practices, and to act as Farmer Ambassadors to help provide technical assistance to new farms.

RAFI-USA will conduct outreach to its Farmers of Color Network (FOCN) and external partners to identify and recruit 75 small or historically underserved producers (35 in year 1, 25 in year 2, 15 in year 3) in this pilot project to enroll their farm operations in AGW's Regenerative Certification process and to adopt climate-smart production practices that reduce greenhouse gas emissions or sequester carbon. Of the total 100 producers participating in this project (75 producers from RAFI-USA, 25 from AGW), RAFI-USA will identify at least 10 producers as Farmer Ambassadors, who are early adopters, who can serve as farmer-to-farmer regenerative planning mentors, assist with recruitment of other producers, and review farmer incentive payments projects for increased amounts over the minimum $5,000.

The increased capacity brought in with the additional AGW Farmer and Market Outreach Coordinator will be able to assist with reaching out to producers that express interest in the program, establishing contact with them and getting them started with the certification process if they are a good fit for the program. The Farmer and Market Outreach Coordinator is the primary point of contact to producers initially to answer questions about the regenerative program and the certification process. Additionally, the National Young Farmers Coalition will also promote this opportunity with its national network of more than 3,000 members and 51 state chapters.

## C. Plan for Technical Assistance, Outreach & Training

Technical assistance will be focused on the process of creating a regenerative plan for each farm, completing the certification process, and utilizing the certification to increase marketing outlets for each farm's products. A Regenerative Plan must be designed by the producer in conjunction with a qualified expert familiar with regenerative farming systems in the region, with technical support from RAFI-USA as needed. Regenerative plans will be reviewed by AGW's Review Panel prior to the plan being approved. Incremental and measurable improvement is expected and if equilibrium is reached within the soil or system, the producer is expected to maintain it over time.

The Regenerative Plan analyzes risks and opportunities from farming activities and operations, historical, current, and future and outlines methods, timelines and measurable results of the practices used to address the identified risks. Plans are farm-specific and highly adapted to each individual farm, facilitating a meaningful, place-based, accountable journey toward more regenerative, increasingly climate-smart practices. AGW's expert team is available to respond to any questions producers have about the process, and RAFI-USA will provide technical assistance to producers with Regenerative Plan writing and CSAF production practices during

the grant period. Technical assistance and training provided will be to help producers overcome barriers to adopting CSAF practices and focused on whole-farm planning leading to AGW regenerative certification as well as uptake of applicable federal programs through NRCS, Rural Development, or FSA. "Early adopter" farmers will be utilized as trainers and technical assistance providers whenever possible through the Farm Ambassadors program.

In addition to 1:1 technical assistance, producers will also receive a newsletter from RAFI-USA twice a year, with at least 35% of the content related to climate-smart agriculture. The main purpose of this newsletter will be to promote climate-smart agriculture practices to small and historically underserved producers and conduct outreach for this project. Content will include articles on specific climate-smart production practices, stories highlighting successful farmers and on-farm projects, promotion of the added value to the producer and the environment, promotion of USDA programs and resources, announcements of events, and assistance and resources provided to small and historically underserved producers by RAFI-USA. This newsletter will reach 1,000 producers.

AGW will also provide significant marketing support and technical assistance to all producers in the program, including help with labeling their products to promote their use of CSAF/regenerative practices to the consumer; assistance with locating new markets; connections to buyers and processors seeking Certified Regenerative ingredients; and listing in the AGW online directory. More detail on marketing assistance is outlined below.

**D. Plan for Financial Assistance to Producers**
Financial assistance in this project will be provided through two different vehicles: subsidized fees by AGW to provide free certification for the entire grant period, and direct financial incentive payments administered by RAFI-USA.

*Subsidized Fees*
One of the incentives offered to reduce barriers to participation in this program will be subsidization of certification fees for the length of the program, to ease the initial costs to obtaining Certified Regenerative status. Fees covered by this program include:

**First Year the Producer Enrolls**: $450 application and Regenerative Plan review fee at the time of application + $800 audit fee billed separately prior to audit ($1,250 initially)

**After certification, every 15 months:** $950 audit fee according to AGW's 15-month audit cycle. Any additional plan review needed (for example, due to major changes on-farm), would require an additional review fee.

*Direct Financial Payments*
As a sub-awardee and key partner with prior experience administering financial assistance to underserved and small producers, RAFI-USA will manage the process of providing direct financial incentive payments to producers enrolled in this pilot project. To offset the time required to develop a regenerative farm plan, all pilot participants will be paid a stipend of $1,250, covering up to 50 hours of time spent on regenerative farm planning and emissions reduction plan design at an hourly rate of $25.

Each farm will also have access to $5,000-$25,000 in incentive payments, dependent on their emissions reductions and specific implementation of CSAF practices. All participants will conduct a farm emissions audit utilizing USDA's COMET-Farm tool, and will create a farm

emissions reduction plan, which will be submitted to a competitive financial incentives payment cycle (coordinated by RAFI-USA) within the pilot. All enrolled producers who submit a complete/feasible emission reduction plan will be eligible for $5,000 - $25,000 in incentive payments based on their ability to maximize their emissions reductions and the costs of proposed projects. Emission reductions may be achieved through any of the following means, but preference will be given to direct emission reductions over GHG sequestration, and to reduction estimates that are assessed to have a higher degree of reliability.

Acceptable emission reduction methods:
- Scope 1 reductions achieved through on-farm projects, infrastructure, or equipment changes that reduce actual on-farm GHG emissions (e.g. a new, low emission tractor)
- Scope 2 emissions reductions through new usage of renewable electricity in replacement of more emissions intensive energy sources (e.g. on farm solar)
- Scope 3 reduction or elimination of the usage of farm inputs that cause emissions in the farm's value chain (e.g. elimination of high emissions fertilizer)
- Estimated GHG sequestration that is a result of project activities.

Applications should include:
- An estimate of their farm's baseline annual emissions in MTCO2e
- An estimate of the annual reduction in MTCO2e emissions that their project activities will achieve
- A plan for how they will maximize their utilization of RD, NRCS or FSA resources and programs to accomplish aspects of the project

Applications will be competitively evaluated based on:
- Their ability to proportionally maximize their emissions reductions in relation to their estimated baseline
- Their ability to approach estimated net zero or absolute zero on farm emissions

Incentive payments can be used for expenses such as: equipment for implementing no-till practices, mobile fencing for prescribed grazing, feeding and watering equipment, seeds for cover cropping, renewable energy infrastructure such as solar panels, trees/shrubs for planting borders and buffers, costs for running water out to new areas to expand range for pasture-based livestock, and lower-emissions tractors. Specific needs for each farm will be determined as part of the Regenerative Plan.

**E. Plan to Enroll Underserved and Small Producers**
The majority of producers participating in this project will either be considered small farms by the USDA definition, and/or will also meet one of the other criteria for underserved status, including: beginning and limited-resource producers, as well as producers from socially-disadvantaged populations. RAFI's Farmers of Color Network (FOCN) currently has more than 300 BIPOC farmers and ranchers in their network, and will recruit 75 producers to participate in this project (35 in year 1, 25 in year 2, 15 in year 3).

**MEASUREMENT/QUANTIFICATION, MONITORING, REPORTING & VERIFICATION PLAN**

**A. Greenhouse Gas Benefit Quantification**
*Use of COMET Tools*

A comprehensive GHG assessment and forecast utilizing COMET-Farm will be integrated into the whole-farm Regenerative Plan that is core to the Certified Regenerative label. The standardized use of COMET-Farm across the pilot will enable a common baseline of evaluation of emissions impact estimation tied to practice changes and form the basis for assigning incentive payments.

***Innovative and Alternative Quantification Methodologies***
As a key partner on this project, subcontractor SHI will assist with establishing soil health baselines and targets, and measurement of soil results of climate-smart practices implemented by participating farms including measuring soil carbon stock on select farms. SHI has recently developed a unique approach, called Soil Health Targets, that provides farmers with place-based, measurable goals for improving the health of their soils. This approach has been made possible by SHI's 3-year, $6.5M project (https://soilhealthinstitute.org/north-american-project-to-evaluate-soil-health-measurements/) to identify the most effective measures of soil health by evaluating 31 soil health measurements at 124 long-term agricultural research sites across the U.S., Canada, and Mexico.

Based on this knowledge of how to measure and monitor soil health, SHI can establish Soil Health Targets for practically any soil. These Targets allow SHI to assist farmers with assessing the current status of their soils (i.e., establish their baseline) and measure progress towards improving the health of their soils using a realistic, locally relevant, science-based Soil Health Target. These same soil health goals and targets can be used to document progress toward climate smart agriculture. This approach was designed to be locally relevant, scalable to a continental scale, and affordable to farmers and stakeholders.

Soil Health Targets are demonstrated in Figure 2 (below). In this example, the same soil was sampled on the same day from two adjacent agricultural fields under different management practices. Management-induced differences in the health of that soil are evident in pictures of the soil when managed as "Business as Usual" (i.e., conventional) compared to when managed for optimal soil health ("Target"). Notice how the soil is soupy and has no strength against the weight of a foot in the "Business as Usual" image on the left, and how the soil is aggregated and held together in the "Target" soil on the right. These images of soil health can be quantified by measurements such as Total Organic Carbon so that a numerical Soil Health Target can be established and the current progress achieved by adopting a "Soil Health Management System" (SHMS) can also be assessed (Fig. 2).



*Figure 2. Quantified impacts of management on health of the same soil in two fields separated by a fence in the Palouse Region of Washington State. The "Business As Usual" (BAU) soil is on the left, "SHMS" = Soil Health Management System, and the Soil Health Target is on the right.*

Most farmers do not know how healthy their soil can become, because until now, soil health assessment based on measurements has been obtuse. If a farmer is receiving a respectable yield and making a profit, they may not realize how degraded their soil is and how healthy it can become. From a farmer empowerment perspective, providing farmers with measurable and obtainable soil health goals, using the Soil Health Targets concept, can be more motivational toward adopting regenerative practices to achieve that target. Additionally, using Soil Health Targets to quantitatively monitor and verify improvement in soil functioning is useful for developing a climate smart agriculture market. As farmers make measurable progress toward achieving their Target, they will attain numerous on-farm benefits such as resilience to drought and heavy rainfall, nutrient-use efficiency, natural pest suppression, field trafficability, and yield stability.

Developing a unique Soil Health Target for each of thousands of soil series would be a daunting task. To address this issue SHI has developed an algorithm to group similar soils into strata based on soil properties that affect how a soil responds to management. These strata represent soils with similar soil health potential. Specific properties used to group similar soils include such factors as mineralogy, base saturation, organic matter, cation exchange capacity, texture, drainage, thickness, and landscape position.

**B. Monitoring Practice Implementation**

This project anticipates reaching 100 farms, and an estimated 26,396 acres, over the course of the 3-year grant period. Farm sizes can range significantly depending on the type of operation, with livestock ranches covering more acreage than specialty crop production, for instance.

The first step in monitoring CSAF practice implementation on these farms is the creation and approval of the Regenerative Plan by each participating farm, which must cover a minimum of 5 years, and is specific to each farm. Testing methods are to be identified, depending on the risk assessment detailed in the Regenerative Plan and detailed to reflect the specific holding's areas of needed improvement. The appropriate testing method to be used, if required, will be discussed, and detailed within the Regenerative Plan by the holding's Qualified Expert. Each farm is required to select two metrics/indicators for soil health (soil health will also be measured by SHI for 16 farms selected for sampling - these farms will not be required to do additional

testing of their soil during the project period); 2 metrics/indicators of biodiversity; and one metric for air quality. There are a range of tests that can be incorporated, dependent on the specific risks, targets and outcomes, as long as the same method is used on an ongoing basis to be able to monitor changes as a result of the CSAF practices used. A list of possible tests and resources are provided to all farms as part of the regenerative planning process.

Progress towards milestones will be assessed at each annual audit. As an example, the plan might identify the lack of organic matter in the soil, and a potential target level of organic matter (per targets set by SHI). The proposed method of increasing the organic matter and the methods of validating the milestones of achieving this goal shall be detailed in the Regenerative Plan. Audits are impartial and based on the published standards. Though an audit is a snapshot of a farm, auditors are able to get an accurate picture of year-round practices by evaluating farm records, environmental quality, and animal conditions. Applicable testing of soil and high-risk factors from the Regenerative Plan will also be required. Auditors will issue non-compliances if their monitoring shows that any indicators have worsened, or that there is a risk that is not being properly mitigated, to help the producer stay on track with their plan. Auditors can also do random spot-checks if necessary.

AGW auditors attend an annual in-person training which consists of an on-farm and classroom component, and monthly training calls where they discuss standards changes, best practices for scoring standards, common questions, and professional development in areas of relevant technical knowledge. A specific regenerative plan template will be created for this project that has all of the required metrics in it so the auditors know specifically what they are checking, and which is calibrated with projections from COMET Farms.

### C. Reporting & Tracking Greenhouse Gas Benefits
***Estimates for Anticipated GHG benefits:***
**Per farm**
There is a very large range of possible farm sizes and types of operations that can potentially participate in this project, while still being considered small and/or underserved. The numbers below are based on COMET-Planner estimates using an average farm size of 264 acres.
-264 acres in "Cropland Management" using two CSAFractices (Conservation Practice Standards as designated in COMET-Planner) = 162 tonnes $CO_2$-equivalent/year
-264 acres in "Grazing Management" using one CSAF practice (Conservation Practice Standards as designated in COMET-Planner) = 34 tonnes $CO_2$-equivalent/year

**Per project**
Extrapolated using the averaged figures above for 100 farms over the course of the project, estimating 50% grazing and 50% cropland management:
**Year 1**: (30 grazing farms * 34 tonnes $CO_2$e/year = 1,020)  + (30 cropland farms * 162 tonnes $CO_2$e/year = 4,860) = 5,880 tonnes $CO_2$e
**Year 2**: Year 1 total <u>plus</u> (15 grazing farms * 34 tonnes $CO_2$e/year = 510)  + (10 cropland farms * 162 tonnes $CO_2$e/year = 1,620) = 2,130 tonnes $CO_2$e
**Year 3**: Year 2 total <u>plus</u> (5 grazing farms * 34 tonnes $CO_2$e/year = 170)  + (10 cropland farms * 162 tonnes $CO_2$e/year = 1,620) = 1,790 tonnes $CO_2$e
**Total emissions reductions estimate for project: 9,800 tonnes $CO_2$e**

**Per commodity produced**

This will depend on the final selection of farms participating and associated acreage, so it cannot be forecasted until producers are enrolled in the project. Participating farms managing grazing lands produce beef, lamb, goat and dairy products. Participating farms managing croplands produce a range of commodities including corn, peas, alfalfa, soybeans, barley, clover, hay, oats, rye, sorghum sudan grass, triticale, wheat, pumpkins, squash, kale, sunflowers, green beans, edamame, kidney beans, beets, carrots, potatoes, and a range of fruits.

**Per dollar expended** – 413 tonnes CO2 (total project cost $4,044,389)

### D. Verification of Greenhouse Gas Benefits

Verification of carbon stock will occur through soil testing conducted by SHI on the 16 farms showing increased carbon stock that results from regenerative practices. This will inform on the uncertainty of COMET-Farm predictions and allow the team to make inferences about the accuracy of COMET-Farm carbon stock predictions for other participating farms. All certified farms are required to track fossil fuel usage, machinery hours and/or fuel consumption, and fossil fuels burned for heating or as an energy source, and must have a goal of reducing consumption over time which can be verified in each annual audit. Comparing farmer-reported reductions in fuel usage validate COMET-Farm predictions of reduced GHG emissions.

Soil Carbon and Health Targets are a novel form of verification of soil carbon accumulation on farms as well as quantifying improvements in water-related ecosystems service benefits. What Soil Carbon and Health Targets provide is a way to scale soil carbon and health measurement to millions of acres. Grouping soil with similar soil carbon and health potential, and then measuring them at different states allows for measurement-based goal setting (how much carbon can a soil hold); bracketing the likely range (knowing soil carbon for predominant management practices) and understanding how healthy a soil can be. Once a soil's performance under different climate-smart management practices is quantified, reasonable assumptions can be made on quantity and rate of soil improvement with adoption of practices.

***SHI Scientist Duties:***
-   Develop Soil Health Grouping stratification for the project area. **(Yr. 1)**
-   Select a subset of 16 farmers (in consultation with AGW) that are enrolled in the pilot for on-farm soil health measurements within soil health groups. Factors in selection include soil type (soil texture, drainage, etc.), major land resource area, production practices, and distance to other suitable field locations. **(Yr. 1)**
-   In consultation with AGW and RAFI, define what "business-as-usual" and ideal soil health practices are for the selected soil health groups. **(Yr. 1)**
-   Identify fields that are appropriate for measuring Soil Health and Carbon Targets (ideal management) and business as usual. **(Yr. 1)**
-   Travel to selected farms and verify that AGW fields, business as usual fields, and target fields are within the intended Soil Health Groups.
-   Travel to the pilot locations to sample soils using SHI standard operating procedures for Soil Organic Carbon stock (Carbon concentration and bulk density), aggregate stability, and potentially mineralizable C. **(Yr. 1, 2,3)**
-   Supervise shipment of soil samples to the laboratory for analysis. **(Yr. 1, 2,3)**

*AGW Project Narrative – Partnerships for Climate-Smart Commodities*    12

**J.A. 1797**

- Conduct quality control on data from labs. **(Yr. 1, 2,3)**
- Verify post hoc which targets and business as usual fields are appropriate comparisons for pilot farms (i.e., that each field is in the correct Soil Health Group). **(Yr. 1)**
- Develop reports for each pilot farm that includes what measurements mean, how healthy that farm is, and how healthy it can become (example report attached). **(Yr. 2,3)**
- Assist AGW and RAFI in interpreting overall findings from soil health sampling including how results can calibrate predictions from COMET-Farm and what inferences can be drawn all AGW enrolled farmers, not just the subset on whose farm soil health was measured, about the effects of AGW methodology **(Yr. 3)**

## E. Agreement to Participate in Partnerships Network

Emily Moose, Project Director and Executive Director of A Greener World, will be the designated representative from this project to participate in the USDA Partnerships for Climate-Smart Commodities Learning Network.

## DEVELOPING & EXPANDING MARKETS

### A. Partnerships for Marketing Climate-Smart Commodities

AGW's staff will be the primary source of market expansion and development efforts for this project, with two full-time staff positions added which will contribute to the tasks listed below: an additional Farmer and Market Outreach Coordinator, and a new position, Supply Chain Development Specialist (whose role is detailed further in section B below). AGW will provide extensive support and technical assistance with marketing for all producers enrolled in this project, including:

- Listing all Certified Regenerative farms in the AGW online directory, frequented by thousands of consumers seeking sustainable, high-welfare meat, dairy, eggs, grains and produce
- Providing individual farms with press and media assistance, including a press release written by the AGW team announcing their certification which is distributed to AGW's media contacts. PR assistance from the AGW team is available to farms throughout their certification, to support raising market awareness about new products, new relationships with retailers, or any other relevant news. The marketing team is experienced with publicity efforts and has a history of significant success in earned media.
- Profiling each farm on the AGW website with photos and details about their story and why they have chosen regenerative practices, as well as what products they have available and where to purchase them. These are written by the AGW staff. Additionally, as part of this project, 9 new videos will also be created to profile participating farms, which can be shared extensively by the farms themselves and through AGW's outlets. Each video will profile multiple farms and clips can also be used.
- Sharing news about participating farms and their products through AGW e-newsletters shared with 12,000 subscribers bi-weekly, which will highlight special offerings and inform consumers about participating producers; on AGW social media accounts; and through a quarterly publication, _Sustainable Farming_ Magazine, with over 5,000 print readers and an additional digital reach of well over 30,000 individuals.

- Assisting producers in designing new product labels incorporating the Certified Regenerative logo into their packaging, and providing technical assistance to get USDA approval for the on-product packaging.
- Assisting with organizing promotional events and attending events and farm tours with participating producers to help share information about the practices used and the regenerative certification program.

AGW has existing relationships with retailers and wholesalers and will also offer assistance to these markets with locating and sourcing Certified Regenerative products; designing marketing materials to promote Certified Regenerative products; providing in-person training to retailers about the climate-smart practices signified by regenerative certification so retailers can educate their consumers; attending point-of-sale events at retail outlets to promote Certified Regenerative and answer questions; and drafting content that highlights specific retailers the producers are working with when there is a strong partnership. Retailers and processors who have already expressed interest in sourcing products from producers in this project include Whole foods Market (Rocky Mountain Region), Weaver Street Market, and Zack's Mighty Organic Tortilla Chips. National Co-op Grocers association, which works with 200 stores in 38 states, has also agreed to assist with promotion of products generated through this project to their members.

**B. Tracking Climate-Smart Commodities Through the Supply Chain**
The creation of a new position with this grant, a full-time Supply Chain Development Specialist, will provide additional capacity to AGW to further develop and expand relationships with potential markets for products produced in this program. This new role will serve as a liaison between producers and retailers/wholesalers, and will be able to make connections for small and underserved producers with purchasers who are seeking Certified Regenerative products. The AGW name is recognized and trusted by consumers, retailers, wholesalers and processors, which allows small and underserved farms to access markets they otherwise would not be able to.

The supply chain is often fairly short for the farmers involved in this program, with many producers selling direct to the consumer with their farm identity intact, or through a small or mid-sized local supply chain which also maintains the farm's identity. Under AGW's standards, when agricultural products such as milk or eggs are pooled, they may only be represented for sale as Certified Regenerative if all producers are certified as such. Similarly, if agricultural products from several producers are sold under a single brand, the brand may only represent the products as Certified Regenerative if all producers are certified. We also anticipate that some producers in this project will be producing larger commodities, such as corn, which can be sold to processors for inclusion in a value-added product. If there are multiple steps in the supply chain, AGW has existing processes in place to track the regeneratively-grown ingredients in a final product to ensure the label is applied properly. In some cases, UPC codes can be utilized to see how products are moving through the supply chain.

**C. Estimated Economic Benefits for Producers**
AGW's international recognition and high consumer trust level creates new opportunities for small-scale producers that aren't well known on their own brand, and also adds value to established brands. Additionally, farmers can access regenerative markets early without being certified Organic. In practice the Certified Regenerative program has important benefits for farmers in that it facilitates access to the growing regenerative market without relying

*AGW Project Narrative – Partnerships for Climate-Smart Commodities*   14

**J.A. 1799**

exclusively on Organic certification, which can be complementary to regenerative certification but has a longer transition time, can be more costly, and is not a perfect fit for all farm operations. Certified Regenerative also has the benefit of validating increased adoption of multiple climate-smart agriculture practices. Regenerative farming can also help increase profitability and make farms easier to manage through the use of efficient practices that reduce the need for outside inputs over time.

AGW certification is a selling point for restaurants, retailers, and other market-savvy buyers, allowing producers to access a higher price point for their products while gaining recognition for their verified use of climate-smart practices. Certified Regenerative by AGW farms that are raising animals will also have the benefit of being Certified Animal Welfare Approved (AWA) by AGW, which was recognized by Consumer Reports as the only welfare label in which they have confidence, and the label with the highest impact on consumer purchasing of any food label (per The Hartman Group). The Hartman Group also conducted consumer research demonstrating that 72% of consumers are willing to pay more to support companies that share their values; 57% of consumers are aware of regenerative agriculture (up 10 percentage points from 2019-2021); and 75% of consumers are aware of soil health as an environmental concern (up 13 percentage points from 2019-2021). (*https://www.hartman-group.com/reports/1877811174/sustainability-2021-environment-and-society-in-focus*) AGW's regenerative certification of climate-smart practices ensures producers are well-positioned to benefit from this increased awareness and demand.

Additionally, AGW and RAFI-USA have secured letters of support from two carbon offsetting organizations, Carbon Harvest, and Nori. The former, Carbon Harvest, is a regional voluntary carbon offsetting platform that supports regional agroforestry through design and technical assistance for farmers and through facilitated business investment in climate-smart farming. Their services will be available to add value to our pilot participants' whole-farm regenerative plans, should they choose to implement agroforestry systems. The latter, Nori, is a carbon removal marketplace that issues carbon removal credits to farmers. Since COMET-Farm's methodology undergirds Nori's own carbon accounting model, farmers who engage in this pilot will be well-positioned to take advantage of current and future Nori carbon credit offerings as an additional revenue stream after completing their participation in this pilot program. This project will clearly communicate to participants the importance of ensuring any emissions are not double-counted, and will screen all producers to prevent duplication of payment for any farmer already receiving EQIP funds for a CSAF practice.

### D. Post-Project Potential, Scalability, & Long-Term Viability

In order for a farm to be regenerative, it must be economically sustainable. Certified Regenerative holdings must have a financial plan that considers the long-term financial stability and viability of the holding and its operation. This is a required component of the Regenerative Plan. With access to new markets and price premiums from using the Certified Regenerative by AGW label, the individual farms involved in this pilot will be able to maintain their use of CSAF practices over the long term.

AGW is a nonprofit organization and receives funding from a diverse group of donors, including individuals and foundation grants. This support will allow for the continued provision of extensive support and technical assistance to both producers and consumers beyond the grant period. Certification fees cover the costs of audits and other processes required to maintain the

labels, which will increase with time as the Certified Regenerative label gains in popularity. AGW has already seen a very high interest in this program, and is already a national organization with the necessary infrastructure to scale up the program over time.

RAFI-USA is also a nonprofit organization with a diversified funding base which covers the costs of maintaining the FOCN and offering some technical assistance services.

While crucial to facilitate initial adoption, financial incentives to producers are not as likely to be sustainable over time without federal funding.

**J.A. 1801**

# RAFI DECLARATION

# EXHIBIT 13-J

**Cost Reimbursement Subaward Agreement Between:**

**A Greener World AGW**
PO Box 115
Terrebonne, OR 97760
UEI Number QD8LCE33NMN3 / DUNS Number: 080519174

**And**

**RAFI-USA**
274 Pittsboro Elem School Road
Pittsboro, NC 27312
UEI Number / DUNS Number: _____961684198_____

Under Prime Agreement between AGW and the
USDA, NRCS, Partnerships for Climate Smart Commodities
Award # NR233A750004G080
CDFA: 10.937
Federal Award Date: August 28, 2023

## 1. Subaward Period of Performance

This Cost Reimbursement Subaward Agreement (the "**Agreement**") is effective 8/28/23. SUBRECIPIENT (defined below) shall commence performance of the Work (defined below) no later than 8/28/23.

## 2. Scope of Work

This Agreement is between RAFI-USA, ("**SUBRECIPIENT**") and A Greener World (AGW). This is not an R&D award. SUBRECIPIENT will participate by providing the work described in Attachment 1 (the "**Work**") in the AGW effort described in the Project Description and Attachment 1, the Notice of Grant and Agreement Award, Award Identifying Number NR233A750004G080 between AGW and USDA NRCS, Partnerships for Climate-Smart Commodities (the "**Grant**"), which is attached hereto and incorporated herein for all purposes.

## 3. Project Description and Purposes

The purpose of the Grant is to provide outreach, education, technical assistance, measurement, monitoring, reporting and verification (MMRV), financial incentives and marketing support in implementing and marketing climate-smart and regenerative agricultural practices, with a specific focus on serving underserved producers.

## 4. Invoices and Payments

Total Maximum Funds to be Paid for the Work: **$2,073,301**

1

**J.A. 1803**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 271 of 606

DocuSign Envelope ID: 06F29B55-A55B-409A-A07A-231A6B803945
2:25-CV-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 266 of 378

a.  In consideration of SUBRECIPIENT's performance of the Work, AGW will pay the SUBRECIPIENT no more than **$2,073,301** for all of the Work, on a Cost Reimbursable basis. SUBRECIPIENT agrees not to exceed this amount without the prior written authorization of AGW. AGW shall pay SUBRECIPIENT in accordance with the below schedule of invoices and programmatic reporting. All invoices shall be submitted using the description of Cost Reimbursable Work and costs and AGW's template (Attachment 2), which is attached hereto and incorporated herein for all purposes. This template may be updated from time to time, with the latest version effective once circulated by AGW. Invoice and questions concerning invoice receipt or payments shall be directed to the Finance and Administrative Manager, identified in Section 8 below.

b.  Schedule of expected  reporting are as follows:

SUBRECIPIENT Reporting Schedule

January 1 – March 31: SUBRECIPIENT Report due to AGW April 15
April 1 – June 30: SUBRECIPIENT Report due to AGW Report due July 15
July 1 – September 30: SUBRECIPIENT Report due to AGW Report due October 15
October 1 – December 31: SUBRECIPIENT Report due to AGW Report due January 15

AGW – USDA Reporting Schedule

January 1 – March 31: AGW Report due to USDA April 30
April 1 – June 30: AGW Report due to USDA July 30
July 1 – September 30: AGW Report due to USDA October 30
October 1 – December 31: AGW Report due to USDA January 30

The invoice due on July 15, 2026 will serve as the final statement of costs and should be marked "FINAL."

c.   Invoices may be submitted as frequently as monthly or as infrequently as quarterly. Invoices must be submitted within 90 days of incurring an expense to be reimbursable.

d. Each invoice will be paid by AGW within thirty (30) days of AGW's receipt and approval of such invoice and associated required material.  AGW reserves the right to reject an invoice in its sole discretion for any reason including, but not limited to, those outlined or referenced in 2 CFR 200.305. SUBRECIPIENT acknowledges that payments may be delayed if a written programmatic report (see Section 5) or other required information is not received with a SUBRECIPIENT invoice.

e.  AGW shall be entitled to withhold from payment to SUBRECIPIENT the reasonable value of any amount due to AGW under Sections 9 and 15 of this Agreement.


**5. Reporting**

a. The SUBRECIPIENT shall complete quarterly reporting consistent with the requirements of the Grant in accordance with the schedule outlined in Section 4. AGW will provide a template for reporting which SUBRECIPIENT must use. In addition to the quarterly reporting, SUBRECIPIENT shall participate in a monthly

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 272 of 606

DocuSign Envelope ID: 08F29B55-A55B-409A-A07A-231A6B803945    2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 267 of 378

virtual partner meeting, an annual in-person partner meeting, and other program activities and events (e.g., webinars, educational events, trainings, etc.) as requested by AGW.

b. SUBRECIPIENT reports are due within 30 days of the end of the grant quarter, outlined above. There will be a grace period of 5 days for any missed report before Performance Improvement Plan steps are taken.

c. Timely SUBRECIPIENT reports are a material component of this Agreement and non- or sub-performance of this aspect of the Agreement can be grounds for termination of the Agreement.


## 6. Other Terms

a. AGW grants to SUBRECIPIENT a limited license to use the AGW logos described on Attachment 4 on written and electronic materials that constitute a component of the Work. SUBRECIPIENT must obtain prior approval from AGW for each instance of AGW or project logo use prior to publication. The AGW Partner Liaison will provide SUBRECIPIENT with appropriate logos for use and is SUBRECIPIENT's contact for questions and discussion of logo-related matters. This license terminates upon termination of this Agreement, except with respect to previously published materials. neither party shall acquire any property interest in the other's property as a result of this Agreement.

d. SUBRECIPIENT acknowledges that the USDA may have rights to the information developed in conjunction with the Work and shall respect those rights. SUBRECIPIENT shall include the following language on written or electronic material: "*This material is based upon work supported by the U.S. Department of Agriculture in partnership with A Greener World.*"

e. Any changes to this contract must be agreed to in writing by both the SUBRECIPIENT and AGW. No-Cost Extensions require the prior written approval of AGW. Any requests for a No-Cost Extension shall be directed to the Project Manager and Finance and Administrative Manager not less than 30 days prior to the desired effective date of the requested change. In addition, AGW may issue non-substantive changes to the Period of Performance and Budget, which shall take effect no later than 30 days from notice of the change is given to SUBRECIPIENT.

g. The initial Term of this Agreement commences on the Effective Date and ends on **8/15/2026.**

(1) At any time prior to the termination of the term of this Agreement, either AGW or SUBRECIPIENT may terminate this Agreement with or without cause by giving thirty (30) days written Notice of Termination to the other party. AGW shall pay SUBRECIPIENT for termination costs as allowable under Uniform Guidance, 2 CFR 200, or 45 CFR Part 75 Appendix IX, as applicable. SUBRECIPIENT must provide a final invoice and programmatic report within 30 days of the date of termination. In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the termination date.

(2) AGW may terminate this Agreement if the Grant is terminated or the amounts due AGW under the Grant are not paid due to Sequestration or any other event. The effective date of termination shall be the date that AGW specifies that the Grant is terminated or the date of USDA nonpayment in a Notice of Termination given to SUBRECIPIENT  Any payments for Work already completed by SUBRECIPIENT will be paid according to the terms of this Agreement to the extent funding is available through the Grant SUBRECIPIENT must provide a final invoice and programmatic report within 30 days of Notice of

3

**J.A. 1805**

USCA4 Appeal: 25-1575    Doc: 55-4      Filed: 06/23/2025    Pg: 273 of 606

DocuSign Envelope ID: 06F29B55-A55R-490A-A07A-231A6B803945
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 268 of 378

Termination. . In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the date of the Notice of Termination.

(3) At any time, AGW may deliver a Notice of Non-Compliance to SUBRECIPIENT, which shall specify in reasonable detail how SUBRECIPIENT's performance under this Agreement is non-compliant. Within 10 Business Days of receipt of such Notice of Non-Compliance, the parties shall meet to confer and develop a Work Improvement Plan, any costs of which shall be borne by SUBRECIPIENT. The Work Improvement Plan shall specify in reasonable detail the steps for improvement, the timeline for such steps and the consequences of failure to improve. If, at the end of the timeline, AGW is not, in its sole discretion, satisfied with SUBRECIPIENT's compliance with the Work Improvement Plan, AGW may terminate this Agreement by providing a Notice of Termination to SUBRECIPIENT with an effective date specified in the Notice. Any payments for Work already completed by SUBRECIPIENT will be paid according to the terms of this Agreement to the extent funding is available through the Grant. SUBRECIPIENT must provide a final invoice and programmatic report within 30 days of notice to cease work. In this case, the final invoice and programmatic report would cover activities and costs from the first day of the current quarter up to the date of the Notice of Termination.

(4) SUBRECIPIENT may terminate this Agreement upon AGW's failure to pay SUBRECIPIENT for a period of 90 days after payment is due.

(5) If AGW reasonably determines that any money already received by SUBRECIPIENT is unallowable, SUBRECIPIENT will return such money to AGW within 10 days of written notification by AGW.


**7. Certifications and Assurances**

a. SUBRECIPIENT shall perform the Work in accordance with Applicable Law.

b. By executing this Agreement, SUBRECIPIENT makes the certifications and assurances required by the Uniform Guidance: 2 CFR 200, et. seq., including:

**(1) . Certification Regarding Lobbying (2 CFR 200.450)**

(i) No Federal appropriated funds have been paid, by or on behalf of the SUBRECIPIENT, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal Contract, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(ii) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or intending to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the SUBRECIPIENT shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," to AGW.

(iii) SUBRECIPIENT shall require that the following language of this certification be included in

4

**J.A. 1806**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 274 of 606

DocuSign Envelope ID: 06F29B55-A55B-489A-A07A-231A6B80394F
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 269 of 378

the award documents for all Subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all such persons shall certify and disclose accordingly.

**This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.**

**(2) Debarment, Suspension, and Other Responsibility Matters (2 CFR 200.213 and CFR 180)**

SUBRECIPIENT certifies by signing this Agreement that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in any program by any federal or State department or agency.

**(3) Audit and Access Records**

(i) SUBRECIPIENT certifies by signing this Agreement that it complies with the Uniform Guidance, will provide notice of the completion of required audits and any adverse findings which impact this Agreement as required by 2 CFR parts 200.501 - 200.521, and will provide access to records as required by parts 200.336, 200.337, and 200.201 as applicable.

(ii) SUBRECIPIENT certifies by signing this Agreement that it will provide AGW with all required records to support invoices submitted.

(iii) SUBRECIPIENT will follow 45 CFR Part 75, where applicable.

**(4) Prohibition On Certain Telecommunications And Video Surveillance Services Or Equipment**

SUBRECEIPIENT is responsible for compliance with the prohibition on certain telecommunications and video surveillance services or equipment identified in 2 CFR 200.216. See Public Law 115-232, Section 889 for additional information. In accordance with 2 CFR 200.216, SUBRECIPIENT is prohibited from obligating or expending loan or grant funds for covered telecommunications equipment or services to:

    (i)  procure or obtain, extend or renew a contract to procure or obtain;

    (ii)  enter into a contract (or extend or renew a contract) to procure; or

    (iii) obtain the equipment, services or systems.

**(5) Buy America Requirements.**

As appropriate, and to the greatest extent practicable consistent with Applicable Law, SUBRECIPIENT will provide a preference for the purchase, acquisition, or use of goods, products or materials produced in the United States.

**(6) Equal Employment Opportunity and Notice of Labor Rights.**

SUBRECIPIENT shall, to the extent they apply, abide by (1) the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a), which prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin and require affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status, or disability; (2) 29 CFR Part 471, Appendix A to Subpart A; and (3) E-Verify. If SUBRECIPIENT is required by federal regulations to file Employer Information Report EEO-1 (standard form 100) or Federal SUBRECIPIENT Veterans' Employment Report VETS-4212, SUBRECIPIENT certifies that it has done so or will file such reports in accordance with applicable instructions and will continue to file such reports unless or until no longer required by law or regulation.

**(7) Clean Air Act (42 U.S.C. 7401 et seq.) and the Federal Water Pollution Contract Act (33 U.S.C . 1251 et seq.), as amended.**

If this Contract is in excess of $100,000 SUBRECIPIENT shall comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.) and the Federal Water Pollution Control Act as amended (33 U.S.C 1251 et seq.). Violations shall be reported to the USDA and the Regional Office of the Environmental Protection Agency (EPA).

### 8. AGW Contacts and Modifications

• **Project Manager** – Emily Moose

202-618-4497, emily@agreenerworld.org

• **Finance and Administrative Manager** – Julie Walker

202-545-5292, julie@agreenerworld.org

• **Partner Liaison** – Callie Casteel
931-548-0664, callie@agreenerworld.org
• **Implementation and Incentives Manager** – Teiara Turner
336-979-3391, teiara@rafiusa.org

a.  Matters concerning the technical performance of this Agreement shall be directed to the Project Manager, AGW Project Liaison and the Implementation and Incentives Manager. Matters concerning the request or negotiation of any changes in the terms, conditions, or amounts cited in this Agreement, and any changes requiring prior approval, shall be directed to the Project Manager.

b.  Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

c.  AGW roles and personnel are subject to change upon written notification from AGW to SUBRECIPIENT.

### 9. Indemnification

6

**J.A. 1808**

USCA4 Appeal: 25-1575   Doc: 55-4   Filed: 06/23/2025   Pg: 276 of 606

DocuSign Envelope ID: 06F29B55-A55B-489A-A07A-231A6B803945
2:25-cv-02152-RMG   Date Filed 03/26/25   Entry Number 24-14   Page 271 of 378

a. To the fullest extent permitted by Applicable Law, SUBRECIPIENT agrees to indemnify, defend, and hold harmless the USDA, AGW, and any of their affiliates, officers, directors, agents, employees, attorneys, insurers, volunteers and permitted successors and assigns against any and all third party claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of SUBRECEIPIENT's performance under this Agreement. .

b. If any component of the Work Product constitutes an infringement of any third party's intellectual property, SUBRECIPIENT shall, at its expense, either (1) procure for AGW and, as applicable, the USDA the right to use the infringing item; or (2) replace the infringing item with a substantially equal but non-infringing item. If either party determines that these remedies are not reasonably practicable under the circumstances that exist at the time the infringement is discovered, that party may give a Notice to the other proposing an alternative remedy. The party receiving the Notice shall have 60 days to accept such proposed alternative remedy or submit the matter to arbitration as described in this Agreement. If that party does not accept or submit to arbitration within the 60-day period, it shall be deemed to have accepted the proposed alternative remedy.

### 10. Severability/Interpretation

In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of the Agreement.

### 11. Non-Disparagement

During the term of this Agreement and at all times thereafter, SUBRECEIPIENT shall not demean or disparage AGW or any persons or entities related to AGW in any manner.

### 12. Confidentiality and Data Security.

a. "Confidential Information" means (1) strategic business documents relating to either party's operations; (2) proprietary information; (3) personal or proprietary information relating to customers, vendors, clients or project participants; (4) information marked as "confidential"; (5) information reasonably known by a party as treated by the other party as confidential, in each case for information that is not generally available to the public.

b. Each party will use any Confidential Information of the other party obtained in the course of this Agreement only for the purposes of this Agreement, and will destroy or return Confidential Information obtained that is not related to the purposes of the Agreement. Each party will take all reasonable steps to protect from disclosure the other party's Confidential Information.

c. Each party will promptly inform the other party in writing of (1) any unauthorized disclosure of the latter's Confidential Information, and (2) any request or demand by a third party to obtain the latter's Confidential Information.

d. AGW acknowledges that certain documents that SUBRECIPIENT creates and provides to AGW in the course

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 277 of 606

DocuSign Envelope ID: 06F29B55-A55R-409A-A07A-231A6B80394B
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 272 of 378

of the Agreement may contain incomplete or sensitive information that is intended to remain confidential until final approval for public dissemination has been granted by AGW and the USDA under the terms of this Agreement and the Grant. Any such documents should be identified with a "CONFIDENTIAL DRAFT" watermark and transmitted electronically with encryption AGW will take reasonable steps to ensure that recipients of such marked documents are informed of the confidential nature of the documents.

e. SUBRECIPIENT shall maintain during the Term of this Agreement (and thereafter for as long as SUBRECIPIENT is in possession of AGW Confidential Information obtained under this Agreement) administrative, technical, and physical safeguards and controls sufficient to: (i) ensure the security and confidentiality of AGW Confidential Information; (ii) protect against anticipated threats or hazards to the security or integrity of such information; and (iii) protect against unauthorized access to, or disclosure or use of, all AGW Confidential Information that SUBRECIPIENT accesses, receives, stores, processes, transmits, maintains, or possesses (the "**Security Measures**"). SUBRECIPIENT shall ensure Security Measures comply with applicable industry standards, techniques, and data protection and privacy laws. Security Measures shall include, but not be limited to, all the following:

(1)    Written information security and disaster recovery policies that are continuously updated in light of changes in relevant technology, including documentation of all safeguards, procedures, and controls taken by SUBRECIPIENT, to be provided to AGW upon request.

(2)    Password-protected workstations at SUBRECIPIENT's premises and at the premises of any person who has access to Confidential Information.

(3)    Encryption of all Confidential Information and any portable laptop computing device or portable storage medium that contains or processes Confidential Information. Confidential Information must be stored, processed, maintained, and/or transmitted (i) on designated target servers residing physically within the boundaries of the United States, and (ii) at physically secure premises.

(4)    Maintaining network and electronic security perimeter controls, applying security patches in a timely manner, equipping all systems with anti-virus/anti-malware software, testing security of systems, and monitoring relevant key and critical systems for unauthorized use of or access to Confidential Information.

(5)    Taking reasonable precautions with respect to the employment of, and whether access is given to, employees and persons who access to Confidential Information, including background checks and security clearances that assign specific access privileges to personnel, and training of personnel on proper data use, computer systems, and the importance of information security.

**13.  Performance by SUBRECIPIENT**

a. SUBRECEIPIENT warrants that it will perform the Work  in a competent and workman-like manner in accordance with accepted industry standards for comparable services. SUBRECEIPIENT warrants that all services will be completed within the schedule set forth in the Statement of Work or otherwise provided by AGW.

b. SUBRECIPIENT acknowledges receipt of  A Greener World Contractor Policy (the "**Standards**") and shall perform the Work consistently with the Standards. SUBRECIPIENT shall immediately inform AGW in writing of any deviance from the Standards.

c. SUBRECIPIENT represents and warrants that it is, and shall throughout the term of this Agreement continue to be, properly licensed, equipped, organized and financed to perform the Work and shall engage for the performance of the Work employees, agents and other representatives who are reasonably experienced and qualified to perform the Work.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 278 of 606

DocuSign Envelope ID: 06F29B55-A55B-499A-A07A-231A6B80394-5
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 273 of 378

d.  SUBRECIPIENT shall cooperate fully with AGW and its designees to coordinate performance of the Work and shall immediately inform AGW of any events or situations related to this Agreement that will or may reasonably be expected to have a negative impact on the Work, its performance in accordance with the required schedule, or its cost.

e.  SUBRECIPIENT represents and warrants that it has no Conflict of Interest that could interfere with its performance of the Work or any of its other obligations under this Agreement.  SUBRECIPIENT shall immediately inform AGW in writing of any actual or potential Conflict of Interest that arises during the term of this Agreement.

f. SUBRECIPIENT shall immediately inform AGW of the imposition of any fines, penalties, liens, claims (or the reasonable potential for any of these) related to or arising from the Work and imposed upon (or threatened to be imposed upon) SUBRECIPIENT.  SUBRECIPIENT shall keep AGW reasonably informed of developments and provide AGW with evidence of release or satisfaction of each lien, claim, fine or penalty.

g.  SUBRECIPIENT and each of its employees, agents or other representatives shall sign, upon the request of AGW, a Systems Use Agreement prior to accessing AGW's non-public electronic or other databases, documents, or equipment.

h.  SUBRECIPIENT shall use Subawards to carry out the Work only with the prior written approval of AGW, which approval may be withheld for any or no reason. SUBRECIPIENT shall ensure that each Subaward meets all requirements of Applicable Law and is consistent with this Agreement and the Grant.

i. SUBRECIPIENT shall abide by and fulfill the responsibilities described in the Award Terms and Conditions referenced within Attachment 1, including the U.S. Department of Agriculture Farm Production and Conservation General Terms and Conditions for Grants and Cooperative Agreements (Rev. November 2022), and the Program-Specific Award Terms for the Partnerships for Climate-Smart Commodities (February 2023). SUBRECIPIENT shall cooperative with and support AGW in fulfilling its responsibilities under the aforementioned terms.

j.  SUBRECIPIENT shall inform AGW in writing of any use of AI in completing any component of the Work. SUBRECIPIENT is responsible for any inaccuracy or infringement in materials generated through AI.

k.  SUBRECIPIENT shall, at its expense, promptly and satisfactorily correct any Work that AGW finds defective or not in compliance with SUBRECIPIENT's requirements under this Agreement. If SUBRECIPIENT fails to satisfactorily correct the defective or non-complying Work, AGW may correct such Work by the most commercially reasonable means available to it, at SUBRECIPIENT's expense.


## 14. Insurance

Throughout the term of this Agreement, SUBRECEIPIENT shall maintain general liability insurance coverage underwritten by Best A-rated insurance carrier.  Such insurance shall have policy limits of no less than $1,000,000 per occurrence for losses due to errors or omissions, $1,000,000 per occurrence for death or personal injury, $1,000,000 per occurrence for real and personal property damage, and $2,000,000 aggregate liability per year.  SUBRECEIPIENT shall maintain workers' compensation insurance in amounts required by Applicable Law.  Each policy shall name AGW as an additional insured and shall provide written notice to AGW of actual or proposed cancellation of such insurance. Within ten (10) days following the Effective Date of this Agreement, on each anniversary thereafter during the term of this Agreement and upon any request by AGW, SUBRECEIPIENT will deliver to SUBRECEIPIENT a certificate of insurance verifying the foregoing insurance

**J.A. 1811**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 279 of 606

DocuSign Envelope ID: 06F29B55-A55B-489A-A07A-231A6B803945
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 274 of 378

coverage. Upon AGW's request, SUBRECIPIENT shall provide the actual policies of insurance.

**15. Independent Contractor**

a. SUBRECIPIENT represents and warrants that as of the Effective Date of this Agreement it qualifies, and will continue to qualify for the duration of this Agreement, as an independent contractor under federal law and under the any other Applicable Law with respect to any of the Work to be performed under this Agreement.

b. In making and performing this Agreement, SUBRECEIPIENT shall act at all times as an independent contractor. Nothing herein shall be deemed or construed to create a joint venture, partnership, agency or employment relationship between the parties for any purpose. Although SUBRECEIPIENT will receive generalized instruction from AGW as to the performance of services hereunder, AGW will not control or supervise the specific methods to be used or the sequence of tasks to be performed in connection with SUBRECEIPIENT's duties hereunder. SUBRECEIPIENT shall be responsible for all compensation, fees and taxes (including, without limitation, withholding for income, Social Security and other taxes) applicable to its employees, agents and other representatives. AGW will not provide insurance, vacation, or other employment benefits of any kind to SUBRECEIPIENT or its Representatives. SUBRECIPIENT will not hold itself, or its employees, agents or other representatives, out as authorized to act for or bind AGW in any manner and will not take any action to bind, or seek to bind, AGW in any manner.

c. AGW will not withhold any taxes from any payment to SUBRECIPIENT other than taxes required to be withheld to independent contractors. SUBRECEIPIENT shall indemnify and hold AGW harmless from and against any damage, claim, assessment, interest charge or penalty incurred by or charged to AGW as a result of any claim, cause of action or assessment by any Federal or State government or agency for any nonpayment or late payment by SUBRECEIPIENT of any tax or for AGW's failure to withhold any amounts for taxes from compensation paid to SUBRECEIPIENT or its employees, agents and other representatives hereunder.

**16. Notices**

All notices shall be in writing and sent by personal delivery; email; certified or registered mail, return receipt requested; or express courier service with next-business-day delivery;  to the addresses indicated  in Section 8 or to such other address as either party may indicate by at least ten (10) days prior written notice to the other party.  Any notice so given shall be deemed to have been received upon receipt by personal delivery, certified or registered mail; 24 hours  after the dispatch by express courier service; or upon the date transmitted by email (with no receipt of an "undeliverable" message), as the case may be.

**17. Applicable Law/ Dispute Resolution**

a. This Agreement shall be governed by the laws of the State of Oregon, without regard to the conflicts-of-law rules of such State. The parties have chosen arbitration as their dispute resolution procedure. If for any provisional remedy or other matter in which court action is required, exclusive venue shall be in the state or federal courts of Oregon.

b. The parties shall seek to resolve any dispute arising out of or relating to this Agreement promptly by discussion among those individuals most closely involved in the implementation of this Agreement.  Any dispute that cannot be resolved among such individuals shall be referred to subcommittees of the respective governing boards of the parties for resolution. By agreement, such governing boards may refer the matter to a confidential

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 280 of 606

DocuSign Envelope ID: 06F2BB55-A55B-489A-A07A-231A6B803945
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 275 of 378

mediation under the rules of JAMS.

c.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Portland, Oregon before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in accordance with the Expedited Procedures in those Rules. Judgment on the award may be entered in any court having jurisdiction.

d. With respect to any arbitration, regardless of the rules of the dispute resolution services provider, the arbitrator must have expertise in the subject matter of this Agreement and arbitration shall be conducted through Zoom or similar teleconference service in order to reduce travel costs of the parties.

## 18. Time of the Essence

Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of this provision.

## 19. Assignment and Third Party Beneficiaries

SUBRECIPIENT may  not voluntarily or by operation of law assign or otherwise transfer its obligations under this Agreement without the prior written consent of AGW. Any such transfer will be void ab initio.  Except with respect to performance inuring to the benefit of the USDA, there are no intended third-party beneficiaries of this Agreement.

## 20. Waiver

The waiver by either party of a breach, default, delay or omission of any of the provisions of this Agreement by the other party will not be construed as a waiver of any subsequent breach of the same or other provisions.

## 21. Headings and Language

Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

## 22. Cooperation

SUBRECIPIENT agrees to cooperate at any time to the extent and in the manner reasonably requested by AGW and at SUBRECIPIENT's expense (to the extent allowed by Applicable Law), in the prosecution or defense of any claims, litigation or other proceeding, including any matter related to Confidential Information.

## 23. Legal Expenses

In the event that any legal proceeding is commenced to enforce or interpret any provision of this Agreement,

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 281 of 606

DocuSign Envelope ID: 06F29B55-A55B-499A-A07A-231A6B803945
2:23-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 276 of 378

AGW, if it prevails, shall be entitled to recover from SUBRECIPIENT, in addition to any other damages or award, all reasonable legal costs and fees associated with the action in arbitration or otherwise.

**24. Entire Agreement**

This Agreement is the entire agreement of the parties with respect to its subject matter. All prior agreements, communications, and similar expressions are superseded and replaced by this Agreement.

**25. Counterparts and Execution**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument. The Agreement may be executed by any generally accepted means of electronic signature, which shall be treated as an original signature.

**26. Survival.**

The provisions of Sections 6,7(b)(1), 7(b)(3), 9, 11, 12,15, 16, 17, 22 23, and 27 and any other provision necessary for interpretation and enforcement of the parties' respective obligations, shall survive termination of this Agreement.

**27. Definitions.**

Capitalized terms in this Agreement have the meanings assigned to them in Attachment 3.

**27. Signature**

The persons whose names and signatures appear below, represent and warrant that they have authority to enter into this agreement on behalf of the company, firm or organization they purport to represent and hereby agree to the terms set forth herein.

**A Greener World**

By: _Emily Moose_
DocuSigned by:
77DC0C44308F464...

Printed Name: Emily Moose

Title: Executive Director

Date: 11/29/2023

**RAFI-USA**

By: _Edna Rodriguez_
DocuSigned by:
ECB1EB90E0D4490...

Printed Name: Edna Rodriguez

Title: Executive Director

Date: 11/29/2023

12

**J.A. 1814**

Attachment 1

Notice of Grant and Agreement Award, Award Identifying Number NR233A750004G080 between
AGW and USDA NRCS, Partnerships for Climate-Smart Commodities

**Description of the Work**

**The Work is described in the Grant award document, attached hereto and incorporated for all
purposes.**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 283 of 606

DocuSign Envelope ID: 06F29B55-A5FB-489A-A07A-231A6B80394F
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 278 of 378

Attachment 2

**Amounts to be Paid to SUBRECIPIENT**

The budget and milestones are described in the Grant award agreement, attached hereto and incorporated herein for all purposes.

SUBRECIPIENT shall use the form of invoice provided by AGW.

DocuSign Envelope ID: 06F25B55-A55R-409A-A07A-231A6B803945

Attachment 3

**Definitions**

| **Each of the following terms:** | **Has the following meaning or the meaning assigned in the Section indicated:** |
|---|---|
| | |
| AI | Artificial Intelligence applications |
| AGW | 1 |
| AGW's Standards of Conduct | 13(b) |
| Applicable Law | The law of the United States, or any State, local or foreign government applicable to the obligations of the parties under this Agreement |
| Agreement | 1 |
| Conflict of Interest | Any situation in which SUBRECIPIENT or any of its employees, Subawardees, agents or other representatives has a financial or other pecuniary interest of any kind, direct or indirect, in any USDA or AGW activity. |
| Cost Reimbursable Basis | Attachment 2 |
| Grant | 2 |
| No-Cost Extension | An extension of the grant period without an increase to the budget, as described in the Award Terms and Conditions |
| Notice of Non-Compliance | 6(g)(3) |
| Notice of Termination | 6(g)(1) |
| Project | The activities of SUBRECIPIENT and AGW pursuant to the Grant |
| Security Measures | 12[e] |
| Sequestration | Any event that temporarily eliminates or reduces the ability of USDA to pay monies to AGW pursuant to the Grant, including but not limited to government shutdown or budget alterations |
| Standards | 13(b) |
| State | Any state of the United States of America |
| Subawardee | A person who has received a Subaward from SUBRECIPIENT |
| Subawards | Any person engaged by SUBRECIPIENT to perform all of part of the Work that is not an employee of SUBRECIPIENT |
| SUBRECIPIENT | 2 |
| Systems Use Agreement | The AGW contract applicable to external users of AGW information systems |
| Uniform Guidance | 2 CFR Part 200 |
| USDA | United States Department of Agriculture |
| Work | 2, Attachment 1 |
| Work Improvement Plan | 6(g)(3) |
| Work Product | 6(b) |

15

**J.A. 1817**

DocuSign Envelope ID: 06F29B55-A55B-499A-A07A-231A6B80394F

**Attachment 4**
**Logos Licensed to SUBRECIPIENT**







**J.A. 1818**

RAFI DECLARATION

EXHIBIT 13-K

## FSA Cooperative Agreement Scope of Work - RAFI-USA
### *FSA Farm Advocacy Technical Assistance Cooperative Agreement*

## Project Team and Institutional Background

Rural Advancement Foundation International-USA (RAFI-USA) is a 501c3 nonprofit organization based in Pittsboro, NC. We work across agricultural sectors and collaboratively through coalitions, combining on–the-ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farm and families as well as for their communities and the environment. Our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities.

Since 1990, RAFI-USA has worked with small and mid-sized farmers to help them succeed in the face of financial crises and reverse the trend of farm loss.

**Farm Advocacy Program**

Our lead farm advocate, Benny Bunting, has been saving farms since the early eighties. For over 30 years, Benny has been sitting down at farmers' kitchen tables, listening to their stories, and helping them understand their options and name their goals, in times of financial and personal crisis. While our caseload varies with the vicissitudes of the farm economy, in a typical year, we work 35-40 intensive cases with farmers, with $7 million to $11 million of farmers' farm, home, and land assets at stake. We are not able to save every farm; but working together with farmers and their families, we have saved many, and have helped other families find the best solution possible for their situation, preserving assets whenever possible. While we receive get both internal referrals (from our hotline and other program staff) and external referrals (from partners like Farm Aid), we also get calls directly from farmers, who know Benny's reputation in the community by word of mouth as someone you can trust to call when things are looking hopeless.

"Farm advocate" is a rare, high stakes, and highly skilled profession that must combine a broad array of competencies.  Commonalities of the most effective Farm Advocates from across the country include: 1) a thorough understanding of farm finances and business planning 2) an encyclopedic knowledge of FSA and NAD handbook regulations, rules, and statute 3) comprehensive familiarity with the many steps in the proceedings of loan-making, loan servicing, loan foreclosures, and bankruptcy 4) a relentless eye for detail and 5) deep compassion for the farmers and families in crisis. These are the qualities RAFI-USA's Farm Advocacy program embodies.

**Related RAFI-USA Programming and USDA Collaboration**

RAFI-USA created the Farmers of Color Network (FOCN) program in 2017 to more intentionally serve farmers who had been historically underserved. FOCN supports farmers of color by providing farmer-led technical assistance and market access opportunities, hosting webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge. FOCN prioritizes resourcing the most underserved and underrepresented BIPOC farmers. The network currently includes 784 members representing 12 Southeast states, US Virgin Islands, and Puerto Rico.

**J.A. 1820**

In addition to reaching farmers of color through the network, RAFI-USA has connections with many other underserved farmer populations across the Southeast, in both rural and urban communities, through our direct service programs. This includes beginning farmers, women farmers, veterans, and limited resource farmers. Many of the farmers we serve produce on a small or mid-scale. Currently, we reach 4500 farmers through our email newsletters, and 3000 through our print magazine, *Living Roots*. We have a social media reach of 17,500 and roughly 7,000 unique visitors per month to our website.

RAFI-USA began a new initiative in 2021 called **Resources for Resilient Farms** that focuses on providing plain-language information, farmer trainings, and one-on-one assistance for USDA programs that would support greater farm resilience for farmers' operations, especially within RAFI-USA'S Farmers of Color Network. Through this project and various USDA funding sources, we have been able to increase farmers' familiarity with FSA and NRCS offices, educate farmers about available programs, and improve farmers' participation rates. For instance, RAFI-USA facilitated a webinar in 2022 called "How to Work with FSA" which educated farmers who were unfamiliar with FSA on process and best practices for building productive working relationships with their local USDA Service Center. The webinar was well attended and has since received over 2,100 views on YouTube.

RAFI-USA recently completed the USDA/FSA Cooperative Agreement project, "CFAP 2 for Farmers of Color Initiative," FSA # 21CPT0011944. This project provided targeted education outreach and assistance on FSA disaster assistance programs and COVID Relief program, as well as other FSA programs, to 9,324 socially disadvantaged farmers and ranchers.

We are also beginning Year 2 of a 5-year subaward with the National Young Farmers Coalition's USDA/NIFA Cooperative Agreement # 2022-70416-37195, the purpose of which is to increase young and Black, Indigenous, and people of color (BIPOC) farmer familiarity with and access to USDA Farm Service Agency (FSA) loan programs. RAFI-USA is conducting outreach to underserved farmers with the objective of providing one-on-one technical assistance to 500 BIPOC farmers in our combined networks over the course of the grant period.

Through a NRCS Cooperative Agreement starting in 2022, we were able to expand our Southeast mainland outreach and technical assistance efforts to Puerto Rico and the U.S. Virgin Islands by partnering with trusted farmer-serving organizations located in the territories. Since beginning that project, we have seen that there is a significant need for additional outreach and assistance for farmers in these territories, especially to get them connected to USDA programs. We have also seen that adapting materials and technical assistance to certain regions and cultures can positively impact farmers' access to USDA programs.

RAFI-USA has connections with many FSA state and county employees across the Southeast, and particularly in North Carolina. We have coordinated with state contacts in past projects to clarify program questions, participate in training events, or troubleshoot farmer case concerns. As part of the *FSA Farm Advocacy Technical Assistance Cooperative Agreement* we would similarly coordinate with county and state offices to amplify project success. Beyond RAFI-USA staff coordinating with FSA staff, it would also be our goal for all farmers involved to build their relationships with local FSA employees so they can continue to see their USDA Service Center as a valuable resource in their farming operation.

**J.A. 1821**

The Project will include existing and new RAFI-USA staff members in the Farm Advocacy Program, as well as staff who work in the Resources for Resilient Farms program, who are familiar with interacting with underserved farmers, and who have the ability to provide clear education and assistance to farmers navigating federal programs. Further project support will be provided by a communications assistant who has experience tailoring social media and written articles for a farmer audience, and a data manager and a federal grants manager who will ensure data is properly collected and reported.

## Problem Statement/Needs Assessment

USDA, and FSA, NRCS and RMA in particular, offer a wide range of resources that can be crucial for farmers who are seeking annual operating funds, risk management, support for conservation practices, or ways to expand their business.  However, the information and expertise needed to access all of these resources, and to navigate agency processes when one's luck runs out, is harder to come by, in particular for historically underserved farmers.

In RAFI-USA's work with small scale farmers, beginning farmers, farmers of color, farmers in US Caribbean territories, and other historically underserved farmers, we frequently encounter **farmers who have no relationship with FSA at all**. Sometimes these farmers are acting on the advice of their parents and grandparents, who avoided USDA based on personal experience or based on its reputation. Sometimes they believe that FSA won't have anything to offer a "farmer like them."  They may also not know the full breadth of what is available through FSA or NRCS, whether or not they have visited their county office.

In other cases, farmers are struggling with their relationship with FSA - for example, they may be **applying for an operating or ownership loan at FSA and running into challenges**.  Sometimes those challenges can be resolved with adjustments to their farm business plan that make their plan cash flow or by helping a farmer understand eligibility requirements or loan limits better. In other cases, a greater knowledge of the process or handbook guidance can help a farmer better communicate their plan to the agency. For example, an agent may disagree with a farmers' estimate (or documentation of) the price they believe they will get for their product; they may contend that the farmer does not have sufficient experience to demonstrate managerial ability; or may simply not share fully ahead of time all the kinds of documentation required in the process.  There are many possible reasons for the challenges and delays farmers face. It can be due to understaffing and too many applications for a loan officer to effectively deal with, or it may be a kind of agricultural production and marketing with which the loan officer is less familiar.

In situations when **a farmer already has a loan with FSA**, and they get a year or two of bad weather, bad prices, or bad luck, they can find themselves either in **financial distress, or delinquent on their loan payments,** either to FSA or to their other creditors.  Understanding the loan servicing process and their rights within it can be the difference between keeping and losing the farm. While in recent years (between the moratorium on adverse actions, and the implementation of funding from Section 22006 of the Inflation Reduction Act), FSA has been very focused on working with farmers to resolve their challenges, much of that agency orientation is discretionary according to the orientation and priorities of the administration.

All of the circumstances above are ones in which a farmer can greatly benefit from the services of a farm advocate as offered in our Farm Advocacy program.

**J.A. 1822**

Without reading the particulars of every loan application process across the country, it can be hard for the FSA Administrator's office to know which state or county offices could benefit from additional training, oversight, or clarification on how to implement handbook guidance. RAFI-USA can help the agency achieve its mission by **providing this "outsider" perspective of the process**: a perspective that combines priority for the welfare of the farmer, with expert knowledge on how the process *should* work.

Similarly, through this granular and in-depth familiarity with the host of regulations and handbook provisions that describe and dictate FSA processes, we are able to identify those **provisions that most frequently function as barriers to farmers, or make it harder for them to navigate out of financial crisis.** We can also be thought partners about alternative wording, using our experience to try to ensure the policies are well-written and do not have unintended negative consequences.

Decades of experience have shown us the crucial difference a farm advocate can make for a farmer. However, as stated in the "Project Team and Institutional Background" section above, farm advocate is a profession that requires a wide and deep skill set. Because the stakes are so high (whether a family loses their farm and home, for example), asking an under-trained employee to serve as a farm advocate would be irresponsible and unfair to all parties involved. It is also a profession with significant emotional highs and lows. For all these reasons, recruiting and training new farm advocates, who wind up deciding to make it their long-term career, is extremely challenging. We currently do not advertise our farm advocacy services because we do not have the capacity to serve a much larger number of farmers than we do now. Training a new generation of farm advocates to both answer today's unmet demand, and to continue this critical profession into the future is an urgent need, not only for RAFI-USA, but for the national farming community at large.

## Purpose

The purpose of this cooperative agreement is to ensure that all farmers have equitable access to FSA programs and services, and to help FSA improve its ability to provide high quality customer service to all farmers.

**Goal 1** - Ensure farmers have full access to the information and support they need to effectively access agency resources, both to prevent financial crisis and to mitigate imminent financial failure if necessary. Provide in-depth technical assistance to farmers on program and loan applications and debt servicing or restructuring.

**Goal 2** - Provide recommendations to the agency regarding a) regulatory or handbook language that may be functioning as a barrier to better service or greater farmer success and b) training topic areas which could improve service, or where agency staff may be unaware of, or not following, existing regulations and/or handbook guidance.

**Goal 3** - Invest in the future of farm advocacy by creating farm advocate training materials available to a wider audience (including partner organizations, FSA cooperators, and FSA staff) as well as training at least two farm advocates over the next five years.

**J.A. 1823**

## Objectives

1. Provide outreach and education to farmers in our networks to ensure they stay updated about current and new initiatives which USDA and FSA are implementing according to Congressional authorization (such as Inflation Reduction Act Section 22006 debt payments, for example, and others): inform farmers on developments, recommend actions they should take such as completing important forms with FSA. Publish and share information via social media, web content, newsletters, webinars, and targeted phone calls when appropriate to approximately 5,000 farmers by the end of Year 5.

2. Monitor and respond to approximately 225 hotline calls and email inquiries, assessing what resources could be helpful to farmer callers and whether they are in immediate financial crisis and need to be referred to our farm advocate.

3. Help at least 300 farmers initiate or update their FSA record, and assist with FSA loan applications.

4. Provide one-on-one in-depth farm advocacy assistance by assessing farmers' overall financial situation, helping the farmer understand various processes and procedures related to loan and program applications, debt servicing, or bankruptcies, and work with them to identify realistic goals and priorities in their situation. Provide in depth support to help them achieve those goals. Provide this in-depth casework support to 30 farmers annually per fully trained farm advocate.

   a. *Note: while our farm advocates do, and will, serve as a farmer's authorized representative during National Appeal Division hearings, that work does not fall within the scope of this agreement and will not be paid for with federal funds. We will closely track our farm advocate's time on casework to ensure that all time spent as a farmer's authorized representative for a NAD appeal is accurately recorded, and charged to other, non-federal funders - see Appendix A for more details.*

5. Refer farmers to others for services we cannot provide, for example: to attorneys for bankruptcy filings, estate planning, or heirs property issues; to tax professionals for detailed assistance in tax preparation; to partner organizations for certifications such as GAP or organic; or to Farm Aid for household grants for emergency assistance. Referrals are dependent on need but we estimate approximately 20 annually.

6. Provide Spanish-language technical assistance for the services listed in Objectives 1, 2, 3, and 5.

7. Share recommendations/information with FSA on where additional staff training is needed, ongoingly throughout the project as needs are identified.

8. Share recommendations on where handbook and regulatory language could be improved, ongoingly throughout the project as needs are identified.

9. Train two new farmer advocates.

**J.A. 1824**

10. Develop a farm advocacy training curriculum and training materials. Convene partner farm advocacy practitioner groups and FSA cooperators to share, test, and improve training curriculum and materials.

11. Fulfill the FSA reporting requirements of the cooperative agreement.

## Resources Required

In addition to the funds that would come through the cooperative agreement, RAFI-USA would need the following to complete a successful project:

From FSA:
- Regular communication with FSA national, state, and county offices regarding details and timelines of how USDA is implementing Congressional initiatives and intent
- Reasonable responsiveness of county and state FSA office staff to RAFI inquiries and requests for assistance when working with a farmer, as FSA staff would for any farmer.

RAFI Resources:
- Use of RAFI-USA's farmer-specific outreach channels (email, print magazine, social media) for sharing information about FSA program implementation
- Engaging the services of a professional translator or interpreter when our Spanish-speaking staff are not available to provide assistance (these translation/interpretation costs are reflected in the budget narrative)
- Continued strong relationships with service providers to whom we refer when farmer needs fall outside the scope of the services we provide.

We also acknowledge the potential for a conflict of interest or perceived conflict of interest inherent in being funded by FSA to help farmers access FSA programs, where that work may involve advocating with agency staff. To ensure transparency with the farmers we work with in this program, as we enter into a client/casework relationship with those farmers, we will ask them to sign a service agreement acknowledging that they understand that:
- While FSA funds RAFI to provide casework service, the advice we provide in our service is NOT the same as advice from FSA staff, though we are funded as an FSA technical assistance provider; and
- Should their casework transition into RAFI support for a NAD appeal, RAFI time and expenses would not be funded by FSA.

RAFI carries general liability insurance for $2 million per incident or $4 million per year. RAFI would indemnify FSA in the case of a lawsuit against RAFI based on advice we provided as a part of this casework.

## Responsibilities of Parties

Project Management

The work outlined will be carried out under the direction of Executive Director Edna Rodriguez by RAFI-USA's Farm Advocacy Team. The project will be overseen by the Project Manager, Margaret Krome-

**J.A. 1825**

Lukens, with the majority of the project activities being completed by Farm Advocates and the Data Manager. RAFI-USA's hotline team and the communications manager will also provide assistance. Lisa Misch (RAFI-USA's Managing Director of Programs) will help ensure internal coordination across projects and teams to maximize communication and effectiveness.

Our team of Farm Advocates will grow gradually over the course of the project as we hire and train additional advocates. It will include a part-time Advocate based in Puerto Rico who will concentrate on providing locally and culturally relevant technical assistance in Spanish.

<u>Data Collection & Project Reporting</u>
The Project Manager, the Farm Advocates, and the Data Manager will meet regularly to ensure the project is progressing and to ensure that we are accurately tracking, recording, and reporting outreach and technical assistance impact numbers. We will also be hiring additional federal grants management staff to provide support for project reporting.

<u>Collaboration with Farm Service Agency</u>
We highly value the partnership of Farm Service Agency staff, from county offices to DC, and that collaboration will be essential to the success of this project. We depend on FSA for updates about program implementation and for consultation on specific farmer cases. We believe that combining our knowledge about farmer needs and local service with the agency's inside perspective, will yield solutions that improve service while taking into account the practical realities faced by loan officers and FSA overall. We hope that FSA will share ideas, and potentially existing agency content, related to farm advocacy trainings to help us build a complete, accurate, and well-rounded curriculum. We hope that FSA will put us into contact with other FSA cooperators who are doing related work, so that we can share training materials as well as build a broader community of practice.

<u>Potential Partners & Collaborators</u>
Current strategic partners in this work include staff and leadership at FSA and partner organizations who are also practitioners in farm financial crisis work (such as Farm Aid, Farmers Legal Action Group, the Federation of Southern Cooperatives / Land Assistance Fund, California FarmLink, and the Intertribal Agriculture Council). We work with those partners to share information, to stay current on USDA implementation of initiatives authorized by Congress, to understand the detailed implications of that implementation for the farmers we work with, and to explore and discuss how existing regulations and FSA handbook guidelines are impacting farmers.

In this project, we will also invite those partners and more to share feedback, additions, and recommendations for the training curriculum and materials we develop, and share those materials with them in both initial and amended forms for their use. We will also invite additional partners including other FSA cooperators, and institutions of higher learning with agricultural law centers, to both participate in this feedback process and to use the training materials. We have included funding in our budget for stipends for partner organizations' staff time, where partners do not have existing funding for that kind of work.

Another of our current partners is the Alliance for Agriculture in Puerto Rico. Much of our existing outreach work with farmers in Puerto Rico happens in collaboration with them. With .5 FTE funded via this

**J.A. 1826**

agreement for a Spanish-speaking advocate in Puerto Rico to help farmers access FSA programs, Alliance for Agriculture would intend to fund .5 FTE for that same person for similar work from their existing funding, in order to provide full time employment for that person.

## Expected Accomplishments & Deliverables

| Project Activity | Related Deliverable | Who Involved | Time |
|---|---|---|---|
| Communicate with FSA to ensure accuracy of information to share | Objective 1 | Farm Advocates, Project Manager | ongoingly as needed depending on program timelines |
| Publish/share information on FSA programs and initiatives via social media, web content, newsletters, webinars<br><br>*Reach approximately 5,000 farmers by Year 5* | Objective 1 | Farm Advocates, Communications Manager | ongoingly as needed depending on program timelines |
| Conduct individual outreach to farmers in our network who could be eligible for the benefit or program<br><br>*Number of farmers will depend on program eligibility requirements* | Objective 1 | Farm Advocates, Project Manager | ongoingly as needed depending on program timelines |
| Maintain farmer hotline 5 days/week, conduct initial intakes, make referrals to staff within the organization or outside of it as needed.<br><br>*Approx. 45 calls annually, approx. 225 in total.* | Objective 2 | Hotline Team, Farm Advocates | ongoing |
| Refer farmers from other programs in RAFI (NRCS, FOCN) when they tell us they do not have an FSA number; provide assistance for them to complete the process of getting a farm number<br><br>*Approximately 190 farmers in total* | Objective 3 | Farm Advocates | ongoing |
| Assist with FSA loan applications: help them understand FSA loan parameters and | Objective 3 | Farm Advocates | ongoing |

| | | | |
|---|---|---|---|
| requirements; ensure farmers' loan applications are eligible and have strong farm business plans<br><br>*Approximately 110 farmers in total* | | | |
| Conduct in-depth farm advocacy casework: meet with farmers, go over their financial situation and documents, meet with relevant stakeholders & decision-makers (loan officers, FSA staff, etc), make a plan with the farmer and take steps to pursue that plan.<br><br>*30 farmers supported annually per fully trained advocate* | Objective 4 | Farm Advocates | ongoing |
| Identify when farmers have needs we cannot meet with technical assistance in-house; refer to other organizations and partner service providers as needed.<br><br>*Approximately 20 farmers annually* | Objective 5 | Farm Advocates, Hotline Team | ongoing |
| Hire a part-time advocate in Puerto Rico to provide the services listed in Objectives 1, 2, 3, and 5 in Spanish | Objective 6 | Project Manager, Part-time Puerto-Rico based Advocate | Year 1 |
| Identify both broad patterns we experience across different county offices, where we believe that the handbook could be implemented more completely or correctly; and specific offices which may benefit from additional training. Communicate with the Administrator's office and State offices to share this information. | Objective 7 | Farm Advocates, Program Manager | Ongoing; findings shared at least quarterly |
| Identify handbook and regulatory provisions that most frequently function as barriers to farmers, make it more difficult for farmers to achieve short- and long-term financial success, or make it harder for them to navigate out of financial crisis. Share findings and recommendations for improvements and solutions with the Administrator's office. | Objective 8 | Farm Advocates, Program Manager | Ongoing; findings shared at least twice a year |
| Identify & select strong candidates for training as | Objective 9 | Farm Advocates, | Year 1 and Year 3 |

| | | Program Manager | |
|---|---|---|---|
| farm advocates; share existing training materials with them; conduct casework-based training with our Lead Farm Advocate. | | Program Manager | |
| Identify topic areas for Farm Advocacy training; produce both video and written materials to educate and train new advocates.c | Objective 10 | Farm Advocates, Program Manager, contractors as needed (in-kind) | Year 1 |
| Recruit participation from partner organizations for providing feedback on training curriculum and materials as developed; offer stipends for time. Modify, adapt and improve training materials according to feedback shared. | Objective 10 | Program Manager, partner organizations | Year 1 |
| Share training materials with FSA cooperators, universities with agricultural law programs, partner organizations, and more | Objective 10 | Program Manager, partner organizations | Year 2 and 3 |
| Meet weekly to ensure that outreach and technical assistance impact numbers are collected and updated | Objective 11 | Data Manager, Farm Advocates Program Manager | ongoing |
| Complete required performance and financial reports according to FSA reporting requirements | Objective 11 | Data Manager, Program Manager, Federal Grants Manager (in-kind) | semi-annually |
| Conduct final evaluation surveys or data analysis to assess project impact according to FSA reporting requirements | Objective 11 | Data Manager, Program Manager, Federal Grants Manager | Year 5 |

## Evaluation Plan

Through regular project work meetings between the Managing Director of Programs, the Federal Grants Manager, the Data Manager, the Project Manager, and Farm Advocates, we will ensure that we are properly collecting and tracking farmer case information while providing technical assistance as well as outreach impact data through communications efforts. This will include the evaluation metrics listed in the table below.

| Desired Outcomes | Data Source or | Data Collection | Evaluation Activity, |
|---|---|---|---|

|  | Indicator | Method | Timeline, Responsible Party |
|---|---|---|---|
| Outcome: No farmer who desires to continue farming and who receives RAFI farm advocacy assistance loses their farmland or home. | -Farmer retains land deed or lease<br>-Farmer retains home ownership or lease | Salesforce farm advocacy case management profiles, Case Closeout questions:<br>-Does the farmer still hold a land deed or active lease?<br>-Has the farmer remained in their home, owned or leased? | Assigned Farmer Advocate completes the Case Closeout questions in Salesforce whenever a case is concluded; ongoing. |
| Outcome: Farmers assisted by RAFI preserve their assets or grow their businesses | Dollar value of economic impact (for example: $350,000 FSA direct loan approved; property valued at $1.2 million preserved through prevented foreclosure) | Salesforce farm advocacy case management profiles, case closeout questions:<br>- "Value of assets preserved" | Assigned Farmer Advocate completes the Case Closeout questions in Salesforce whenever a case is concluded; ongoing. |
| Outcome: Farmers assisted by RAFI meet their goals for their situation | Farmer goals are identified and recorded at the beginning of a case. | Salesforce farm advocacy case management profiles, case closeout questions:<br>- "Case goal met?"<br>- "Farmer still farming?" | Assigned Farmer Advocate completes the Case Closeout questions in Salesforce whenever a case is concluded; ongoing. |
| Outcome: Farmers feel they have received helpful, supportive, and high quality technical assistance from RAFI-USA | Qualitative survey responses | Surveys conducted annually with a randomized sample of farm advocacy clients | Data manager conducts surveys including clients for each farm advocate to gather feedback and seek ways to improve our service; annual. |
| Outcome: RAFI-USA serves farmers equitably across racial/ethnic, gender, and language demographics | Demographics recorded for farm advocacy client race/ethnicity, gender, and primary language | Salesforce farm advocacy case management profiles | Assigned Farmer Advocate records data when cases are initiated in Salesforce; ongoing |
| Outcome: More farmers receive timely and accurate information from RAFI about FSA Program updates and implementation | Number of farmers receiving updates via social media, web content, newsletters, webinars<br><br>Open/engagement statistics for those channels | Communications channel analytics | Communications Manager, Data Manager, and Federal Grants Manager collaborate to ensure recording of data |

## Sustainability

The most urgent need in terms of the sustainability of the Farm Advocacy profession is to train new advocates.  This project will both train new advocates at RAFI-USA, and produce materials which can be

used broadly by other organizations.  Additionally, we believe that improvements to FSA handbooks and to regulations are another important way to have long-term impact.

In terms of funding, for years RAFI-USA has scraped together small, limited-term grants—and sometimes needed to use unrestricted funding—to ensure that the work of the farm advocacy program continues.  This cooperative agreement will give us the support and the staff both to allow the work to grow, and to collect more data and stories about that work - essential ingredients for development efforts to find long-term funding.

## Appendix A: Fiscal Management and Tracking Allowable/Unallowable Activities

We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. We contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop conducted our annual yellow book audit in 2023 to ensure all federal funds are administered per applicable laws and regulation. Additionally, we are increasing our capacity to manage federal funds with new hiring to 1) provide oversight for RAFI's federal grants and cooperative agreements; 2) ensure compliance with OMB Uniform Guidance and specific grant program or agency requirements; 3) provide clarification to program staff regarding allowable expenses; and 4) maintain accurate budget tracking and invoicing logs of federal reimbursement payments.

**Tracking Staff Time Across Allowable and Unallowable Activities:**
As outlined in the proposed scope of work, Farm Advocacy services provided by RAFI may alternate between activities that are allowable and unallowable for Farm Service Agency funding support. Unallowable activities include:

1. Advising an organization or non-RAFI farm advocate regarding a National Appeals Division (NAD) case against FSA
2. RAFI representing a farmer in a NAD case against FSA

Although RAFI is still able to engage in these activities, we would properly track time and resources devoted to them and charge to a separate, non-federal funding source.

In situation #1, RAFI would be able to track the time required to respond to a phone call, email, or in-person conversation through our time sheet system which allows staff to indicate precise time allocations by funding source. RAFI staff would consider any time from the beginning to the end of the call, conversation, or email response as unallowable under this proposed budget. Timesheets are reviewed and approved by staff's direct supervisor and final approval by the executive director. This will provide an extra level of oversight to ensure timesheets are allocated accurately.

In situation #2, RAFI would begin to allocate staff time to non-federal funding sources **as soon as a farmer confirms verbally or in writing that they would like to proceed with filing a NAD case.** This decision would further be logged in to our Salesforce case management system to ensure we have a record of when the NAP appeal casework begins. Any activities prior to this decision - which may include FSA mediation or educating a farmer about the NAD appeals process - would still be considered allowable. As with #1, RAFI would begin allocating personnel time to non-federal funding sources through our Quickbooks timesheet software.

We will also exercise vigilance concerning the topic of **trainings** to ensure that all time and training-related expenses charged are allowable. For example, we would consider providing a farmer or farm advocate trainees with details about what the NAD process entails, to be an allowable expense; however, communicating on strategy or specifics of an individual's NAD case, would be a non-allowable expense which we would charge to a non-federal funding source.

**J.A. 1832**

# RAFI DECLARATION

# EXHIBIT 13-L

Pg: 301 of 606    Filed: 06/23/2025    Doc: 55-4    USCA4 Appeal: 25-1575

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number | 2. Amendment No. | 3. Award/Project Period | 4. Type of Award Instrument |
|---|---|---|---|
| FSA23CPT0013667 | | Date of Final signature - 9/30/2028 | Cooperative |

| 5. Agency: (Name and Address) | 6. Recipient Organization: (Name and Address) |
|---|---|
| USDA, FSA Office of Outreach<br>1400 INDEPENDENCE AVENUE, SW<br>Stop 0511, Room 3086-S<br>WASHINGTON, DC 20250 | Rural Advancement Foundation International-USA<br>PO Box 640<br>Pittsboro, North Carolina 27312-0640 |

| | UEI: Z1AXE15PHAL3 | EIN: 56-1704863 |
|---|---|---|

| 7. Agency Program Contact:<br>Cara McNab<br>cara.mcnab@usda.gov<br>509-202-0639 | 8. Agency Administrative Contact:<br>Kenneth James<br>kenneth.james@usda.gov<br>301-395-2816 | 9. Recipient Program Contact:<br>Margaret Krome-Lukens<br>margaret@rafiusa.org<br>919-621-3593 | 10. Recipient Administrative Contact:<br>Edna Rodriguez<br>edna@rafiusa.org<br>919-621-5158 |
|---|---|---|---|

| 11. CFDA Number | 12. Authority | 13. Type of Action | 14. Project Director |
|---|---|---|---|
| 10.147 | 7 U.S.C. 2204b(b)(4) | i. New Agreement | Margaret Krome-Lukens<br>margaret@rafiusa.org<br>919-621-3593 |

**15. Project Title/Description:**

Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16. Entity Type:** ___ Profit  **X** Nonprofit  ___ Higher Education  ___ Federal  ___ State/Local  ___ Indian/Native American

___ Other

| 17. Select Funding Type: | ☑ Federal | ☐ Non-Federal |
|---|---|---|
| Original Funds Total: | $ 1,548,896.68 | |
| Additional Funds Total: | | |
| Grand Total: | $ 1,548,896.68 | $ 0.00 |

**18. Accounting and Appropriation Data**

| Financial Code | Amount | Budget Period | Treasury Symbol |
|---|---|---|---|
| WBS Code: FPDEFAULT | $ 1,548,896.68 | 2323 | 1230600 |
| BOC: 2540 | | | Fund: FA84B0600M |
| Fund Center: FA10402000 | | | Functional Area:<br>FA01ADFEDSALARY0 |

**19. APPROVED BUDGET**

| Personnel | $ 997,164.37 | Fringe Benefits | $ 365,463.48 |
|---|---|---|---|
| Travel | $ 20,000.04 | Equipment | $ 0.00 |
| Supplies | $ 6,400.00 | Contractual | $ 0.00 |
| Construction | $ 0.00 | Other | $ 19,060.00 |
| Total Direct Cost\ | $ 1,408,087.89 | Total Indirect Cost | $ 140,808.79 |
| | | Total Non-Federal Funds | $ 0.00 |
| | | Total Federal Funds Awarded | $ 1,548,896.68 |
| | | Total Approved Budget | $ 1,548,896.68 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

**J.A. 1834**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 302 of 606

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

| NOTICE OF GRANT AND AGREEMENT AWARD | | | |
|---|---|---|---|
| **Award Identifying Number**<br>FSA23CPT0013667 | Amendment No. | **Award/Project Period**<br>Date of Final signature - 9/30/2028 | **Type of Award Instrument**<br>Cooperative |

List of Attachments:

Attachment 1 - Statement of Work; Attachment 2 - Project Proposal; Attachment 3 - Budget Narrative; Attachment 4 - General Terms and Conditions

| Name and Title of Authorized Government Representative<br>Steven Peterson, Associate Administrator | Signature | Date |
|---|---|---|
| Name and Title of Authorized Recipient Representative<br>Edna Rodriguez, Executive Director | Signature<br>**Edna Rodriguez**   Digitally signed by Edna Rodriguez<br>Date: 2023.09.25 09:34:48 -04'00' | Date |

## NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider, employer, and lender.

## PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Page 2

**Attachment 1**

### Agreement Number: FSA23CPT0013667
### Statement of Work

#### 1. PURPOSE AND OBJECTIVES

The authorizing statute for this agreement is 7 U.S.C. 2204b(b)(4).

The purpose of this agreement is to provide outreach, education, and technical assistance to farmers, to help ensure they have equitable access to FSA programs and services, and to help FSA improve its ability to provide high quality customer service.

#### 2. PROJECT NARRATIVE

The recipient will carry out the project described in the Project Proposal; the referenced Project Proposal is incorporated as Attachment 2.

#### 3. BUDGET NARRATIVE

The official budget as noted in the award and described in the attached Budget Narrative, as revised (Attachment 3), will be considered the total budget as last approved by the Federal awarding agency for this award. Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the obligated amount. Negotiated changes to the budget narrative are captured in Attachment 3.

#### 4. REPORTING REQUIREMENTS

    a. The recipient must submit an SF-425 Financial Report on a semi-annual basis to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov, provided that the recipient requests reimbursement payments only. Semi-annual financial reports are due January 30 and July 30 of each calendar year. If the recipient requests advance payments, financial reports are due 30 days after each quarter of the calendar year, with due dates of January 30, April 30, July 30, and October 30.

    b. The recipient must submit performance progress reports semi-annually to the Farm Production and Conservation (FPAC) Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov. Performance progress reports are due 30 days after each 6-month

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 303 of 606

**J.A. 1836**

reporting period. Performance progress report due dates are based on the agreement start date, not the calendar year.

### 5.  PAYMENT INFORMATION

Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions, attached and incorporated as Attachment 4.

### 6.  DATA COLLECTION

If your proposal will include information collection from non-Federal sources, ensure the collection meets the requirements of the Paperwork Reduction Act. Surveys of individuals or entities are generally prohibited without prior approval from the Office of Management and Budget. For additional guidance about allowable and unallowable activities, please visit the following website https://pra.digital.gov/.

### 7.  GENERAL TERMS AND CONDITIONS

The General Terms and Conditions applicable to this award are attached and incorporated as Attachment 4. They are also available online at the following link:
https://www.fpacbc.usda.gov/about/grants-and-agreements/award-terms-and-conditions/index.html

2

**J.A. 1837**

# Project Narrative

## Project Team and Institutional Background

Rural Advancement Foundation International-USA (RAFI-USA) is a 501c3 nonprofit organization based in Pittsboro, NC. We work across agricultural sectors and collaboratively through coalitions, combining on–the-ground practical services and policy advocacy to ensure farmers have access to the tools they need to make the right choices for their farm and families as well as for their communities and the environment. Our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities.

Since 1990, RAFI-USA has worked with small and mid-sized farmers to help them succeed in the face of financial crises and reverse the trend of farm loss.

### Farm Advocacy Program

Our lead farm advocate, Benny Bunting, has been saving farms since the early eighties. For over 30 years, Benny has been sitting down at farmers' kitchen tables, listening to their stories, and helping them understand their options and name their goals, in times of financial and personal crisis. While our caseload varies with the vicissitudes of the farm economy, in a typical year, we work 35-40 intensive cases with farmers, with $7 million to $11 million of farmers' farm, home, and land assets at stake. We are not able to save every farm; but working together with farmers and their families, we have saved many, and have helped other families find the best solution possible for their situation, preserving assets whenever possible. While we receive get both internal referrals (from our hotline and other program staff) and external referrals (from partners like Farm Aid), we also get calls directly from farmers, who know Benny's reputation in the community by word of mouth as someone you can trust to call when things are looking hopeless.

"Farm advocate" is a rare, high stakes, and highly skilled profession that must combine a broad array of competencies. Commonalities of the most effective Farm Advocates from across the country include: 1) a thorough understanding of farm finances and business planning 2) an encyclopedic knowledge of FSA and NAD handbook regulations, rules, and statute 3) comprehensive familiarity with the many steps in the proceedings of loan-making, loan servicing, loan foreclosures, and bankruptcy 4) a relentless eye for detail and 5) deep compassion for the farmers and families in crisis. These are the qualities RAFI-USA's Farm Advocacy program embodies.

### Related RAFI-USA Programming and USDA Collaboration

RAFI-USA created the Farmers of Color Network (FOCN) program in 2017 to more intentionally serve farmers who had been historically underserved. FOCN supports farmers of color by providing farmer-led technical assistance and market access opportunities, hosting webinars, farm tours, networking events, and gatherings to highlight ancestral traditions and knowledge. FOCN prioritizes resourcing the most underserved and underrepresented BIPOC farmers. The network currently includes 784 members representing 12 Southeast states, US Virgin Islands, and Puerto Rico.

In addition to reaching farmers of color through the network, RAFI-USA has connections with many other underserved farmer populations across the Southeast, in both rural and urban communities, through our direct service programs. This includes beginning farmers, women farmers, veterans, and limited resource farmers. Many of the farmers we serve produce on a small or mid-scale. Currently, we reach 4500 farmers through our email newsletters, and 3000 through our print magazine, *Living Roots*. We have a social media reach of 17,500 and roughly 7,000 unique visitors per month to our website.

RAFI-USA began a new initiative in 2021 called **Resources for Resilient Farms** that focuses on providing plain-language information, farmer trainings, and one-on-one assistance for USDA programs that would support greater farm resilience for farmers' operations, especially within RAFI-USA'S Farmers of Color Network. Through this project and various USDA funding sources, we have been able to increase farmers' familiarity with FSA and NRCS offices, educate farmers about available programs, and improve farmers' participation rates. For instance, RAFI-USA facilitated a webinar in 2022 called "How to Work with FSA" which educated farmers who were unfamiliar with FSA on process and best practices for building productive working relationships with their local USDA Service Center. The webinar was well attended and has since received over 2,100 views on YouTube.

RAFI-USA recently completed the USDA/FSA Cooperative Agreement project, "CFAP 2 for Farmers of Color Initiative," FSA # 21CPT0011944. This project provided targeted education outreach and assistance on FSA disaster assistance programs and COVID Relief program, as well as other FSA programs, to 9,324 socially disadvantaged farmers and ranchers.

We are also beginning Year 2 of a 5-year subaward with the National Young Farmers Coalition's USDA/NIFA Cooperative Agreement # 2022-70416-37195, the purpose of which is to increase young and Black, Indigenous, and people of color (BIPOC) farmer familiarity with and access to USDA Farm Service Agency (FSA) loan programs. RAFI-USA is conducting outreach to underserved farmers with the objective of providing one-on-one technical assistance to 500 BIPOC farmers in our combined networks over the course of the grant period.

Through a NRCS Cooperative Agreement starting in 2022, we were able to expand our Southeast mainland outreach and technical assistance efforts to Puerto Rico and the U.S. Virgin Islands by partnering with trusted farmer-serving organizations located in the territories. Since beginning that project, we have seen that there is a significant need for additional outreach and assistance for farmers in these territories, especially to get them connected to USDA programs. We have also seen that adapting materials and technical assistance to certain regions and cultures can positively impact farmers' access to USDA programs.

RAFI-USA has connections with many FSA state and county employees across the Southeast, and particularly in North Carolina. We have coordinated with state contacts in past projects to clarify program questions, participate in training events, or troubleshoot farmer case concerns. As part of the *FSA Farm Advocacy Technical Assistance Cooperative Agreement* we would similarly coordinate with county and state offices to amplify project success. Beyond RAFI-USA staff coordinating with FSA staff, it would also be our goal for all farmers involved to build their relationships with local FSA employees so they can continue to see their USDA Service Center as a valuable resource in their farming operation.

The Project will include existing and new RAFI-USA staff members in the Farm Advocacy Program, as well as staff who work in the Resources for Resilient Farms program, who are familiar with interacting with underserved farmers, and who have the ability to provide clear education and assistance to farmers navigating federal programs. Further project support will be provided by a communications assistant who has experience tailoring social media and written articles for a farmer audience, and a data manager and a federal grants manager who will ensure data is properly collected and reported.

## Problem Statement/Needs Assessment

USDA, and FSA, NRCS and RMA in particular, offer a wide range of resources that can be crucial for farmers who are seeking annual operating funds, risk management, support for conservation practices, or ways to expand their business. However, the information and expertise needed to access all of these resources, and to navigate agency processes when one's luck runs out, is harder to come by, in particular for historically underserved farmers.

In RAFI-USA's work with small scale farmers, beginning farmers, farmers of color, farmers in US Caribbean territories, and other historically underserved farmers, we frequently encounter **farmers who have no relationship with FSA at all**. Sometimes these farmers are acting on the advice of their parents and grandparents, who avoided USDA based on personal experience or based on its reputation. Sometimes they believe that FSA won't have anything to offer a "farmer like them." They may also not know the full breadth of what is available through FSA or NRCS, whether or not they have visited their county office.

In other cases, farmers are struggling with their relationship with FSA - for example, they may be **applying for an operating or ownership loan at FSA and running into challenges**. Sometimes those challenges can be resolved with adjustments to their farm business plan that make their plan cash flow or by helping a farmer understand eligibility requirements or loan limits better. In other cases, a greater knowledge of the process or handbook guidance can help a farmer better communicate their plan to the agency. For example, an agent may disagree with a farmers' estimate (or documentation of) the price they believe they will get for their product; they may contend that the farmer does not have sufficient experience to demonstrate managerial ability; or may simply not share fully ahead of time all the kinds of documentation required in the process. There are many possible reasons for the challenges and delays farmers face. It can be due to understaffing and too many applications for a loan officer to effectively deal with, or it may be a kind of agricultural production and marketing with which the loan officer is less familiar.

In situations when **a farmer already has a loan with FSA**, and they get a year or two of bad weather, bad prices, or bad luck, they can find themselves either in **financial distress, or delinquent on their loan payments,** either to FSA or to their other creditors. Understanding the loan servicing process and their rights within it can be the difference between keeping and losing the farm. While in recent years (between the moratorium on adverse actions, and the implementation of funding from Section 22006 of the Inflation Reduction Act), FSA has been very focused on working with farmers to resolve their challenges, much of that agency orientation is discretionary according to the orientation and priorities of the administration.

All of the circumstances above are ones in which a farmer can greatly benefit from the services of a farm advocate as offered in our Farm Advocacy program.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 307 of 606

Without reading the particulars of every loan application process across the country, it can be hard for the FSA Administrator's office to know which state or county offices could benefit from additional training, oversight, or clarification on how to implement handbook guidance. RAFI-USA can help the agency achieve its mission by **providing this "outsider" perspective of the process**: a perspective that combines priority for the welfare of the farmer, with expert knowledge on how the process *should* work.

Similarly, through this granular and in-depth familiarity with the host of regulations and handbook provisions that describe and dictate FSA processes, we are able to identify those **provisions that most frequently function as barriers to farmers, or make it harder for them to navigate out of financial crisis.** We can also be thought partners about alternative wording, using our experience to try to ensure the policies are well-written and do not have unintended negative consequences.

Decades of experience have shown us the crucial difference a farm advocate can make for a farmer. However, as stated in the "Project Team and Institutional Background" section above, farm advocate is a profession that requires a wide and deep skill set. Because the stakes are so high (whether a family loses their farm and home, for example), asking an under-trained employee to serve as a farm advocate would be irresponsible and unfair to all parties involved. It is also a profession with significant emotional highs and lows. For all these reasons, recruiting and training new farm advocates, who wind up deciding to make it their long-term career, is extremely challenging. We currently do not advertise our farm advocacy services because we do not have the capacity to serve a much larger number of farmers than we do now. Training a new generation of farm advocates to both answer today's unmet demand, and to continue this critical profession into the future is an urgent need, not only for RAFI-USA, but for the national farming community at large.

## Purpose

The purpose of this cooperative agreement is to ensure that all farmers have equitable access to FSA programs and services, and to help FSA improve its ability to provide high quality customer service to all farmers.

**Goal 1** - Ensure farmers have full access to the information and support they need to effectively access agency resources, both to prevent financial crisis and to mitigate imminent financial failure if necessary. Provide in-depth technical assistance to farmers on program and loan applications and debt servicing or restructuring.

**Goal 2** - Provide recommendations to the agency regarding a) regulatory or handbook language that may be functioning as a barrier to better service or greater farmer success and b) training topic areas which could improve service, or where agency staff may be unaware of, or not following, existing regulations and/or handbook guidance.

**Goal 3** - Invest in the future of farm advocacy by creating farm advocate training materials available to a wider audience (including partner organizations, FSA cooperators, and FSA staff) as well as training at least two farm advocates over the next five years.

## Objectives

1. Provide outreach and education to farmers in our networks to ensure they stay updated about current and new initiatives which USDA and FSA are implementing according to Congressional authorization (such as Inflation Reduction Act Section 22006 debt payments, for example, and others): inform farmers on developments, recommend actions they should take such as completing important forms with FSA. Publish and share information via social media, web content, newsletters, webinars, and targeted phone calls when appropriate to approximately 5,000 farmers by the end of Year 5.

2. Monitor and respond to approximately 225 hotline calls and email inquiries, assessing what resources could be helpful to farmer callers and whether they are in immediate financial crisis and need to be referred to our farm advocate.

3. Help at least 300 farmers initiate or update their FSA record, and assist with FSA loan applications.

4. Provide one-on-one in-depth farm advocacy assistance by assessing farmers' overall financial situation, helping the farmer understand various processes and procedures related to loan and program applications, debt servicing, or bankruptcies, and work with them to identify realistic goals and priorities in their situation. Provide in depth support to help them achieve those goals. Provide this in-depth casework support to 30 farmers annually per fully trained farm advocate.

   a. *Note: while our farm advocates do, and will, serve as a farmer's authorized representative during National Appeal Division hearings, that work does not fall within the scope of this agreement and will not be paid for with federal funds. We will closely track our farm advocate's time on casework to ensure that all time spent as a farmer's authorized representative for a NAD appeal is accurately recorded, and charged to other, non-federal funders - see Appendix A for more details.*

5. Refer farmers to others for services we cannot provide, for example: to attorneys for bankruptcy filings, estate planning, or heirs property issues; to tax professionals for detailed assistance in tax preparation; to partner organizations for certifications such as GAP or organic; or to Farm Aid for household grants for emergency assistance.  Referrals are dependent on need but we estimate approximately 20 annually.

6. Provide Spanish-language technical assistance for the services listed in Objectives 1, 2, 3, and 5.

7. Share recommendations/information with FSA on where additional staff training is needed, ongoingly throughout the project as needs are identified.

8. Share recommendations on where handbook and regulatory language could be improved, ongoingly throughout the project as needs are identified.

9. Train two new farmer advocates.

10. Develop a farm advocacy training curriculum and training materials. Convene partner farm advocacy practitioner groups and FSA cooperators to share, test, and improve training curriculum and materials.

11. Fulfill the FSA reporting requirements of the cooperative agreement.

## Resources Required

In addition to the funds that would come through the cooperative agreement, RAFI-USA would need the following to complete a successful project:

From FSA:
- Regular communication with FSA national, state, and county offices regarding details and timelines of how USDA is implementing Congressional initiatives and intent
- Reasonable responsiveness of county and state FSA office staff to RAFI inquiries and requests for assistance when working with a farmer, as FSA staff would for any farmer.

RAFI Resources:
- Use of RAFI-USA's farmer-specific outreach channels (email, print magazine, social media) for sharing information about FSA program implementation
- Engaging the services of a professional translator or interpreter when our Spanish-speaking staff are not available to provide assistance (these translation/interpretation costs are reflected in the budget narrative)
- Continued strong relationships with service providers to whom we refer when farmer needs fall outside the scope of the services we provide.

We also acknowledge the potential for a conflict of interest or perceived conflict of interest inherent in being funded by FSA to help farmers access FSA programs, where that work may involve advocating with agency staff. To ensure transparency with the farmers we work with in this program, as we enter into a client/casework relationship with those farmers, we will ask them to sign a service agreement acknowledging that they understand that:
- While FSA funds RAFI to provide casework service, the advice we provide in our service is NOT the same as advice from FSA staff, though we are funded as an FSA technical assistance provider; and
- Should their casework transition into RAFI support for a NAD appeal, RAFI time and expenses would not be funded by FSA.

RAFI carries general liability insurance for $2 million per incident or $4 million per year. RAFI would indemnify FSA in the case of a lawsuit against RAFI based on advice we provided as a part of this casework.

## Responsibilities of Parties

### Project Management
The work outlined will be carried out under the direction of Executive Director Edna Rodriguez by RAFI-USA's Farm Advocacy Team. The project will be overseen by the Project Manager, Margaret Krome-

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 310 of 606

Lukens, with the majority of the project activities being completed by Farm Advocates and the Data Manager. RAFI-USA's hotline team and the communications manager will also provide assistance. Lisa Misch (RAFI-USA's Managing Director of Programs) will help ensure internal coordination across projects and teams to maximize communication and effectiveness.

Our team of Farm Advocates will grow gradually over the course of the project as we hire and train additional advocates. It will include a part-time Advocate based in Puerto Rico who will concentrate on providing locally and culturally relevant technical assistance in Spanish.

Data Collection & Project Reporting
The Project Manager, the Farm Advocates, and the Data Manager will meet regularly to ensure the project is progressing and to ensure that we are accurately tracking, recording, and reporting outreach and technical assistance impact numbers. We will also be hiring additional federal grants management staff to provide support for project reporting.

Collaboration with Farm Service Agency
We highly value the partnership of Farm Service Agency staff, from county offices to DC, and that collaboration will be essential to the success of this project. We depend on FSA for updates about program implementation and for consultation on specific farmer cases. We believe that combining our knowledge about farmer needs and local service with the agency's inside perspective, will yield solutions that improve service while taking into account the practical realities faced by loan officers and FSA overall. We hope that FSA will share ideas, and potentially existing agency content, related to farm advocacy trainings to help us build a complete, accurate, and well-rounded curriculum. We hope that FSA will put us into contact with other FSA cooperators who are doing related work, so that we can share training materials as well as build a broader community of practice.

Potential Partners & Collaborators
Current strategic partners in this work include staff and leadership at FSA and partner organizations who are also practitioners in farm financial crisis work (such as Farm Aid, Farmers Legal Action Group, the Federation of Southern Cooperatives / Land Assistance Fund, California FarmLink, and the Intertribal Agriculture Council). We work with those partners to share information, to stay current on USDA implementation of initiatives authorized by Congress, to understand the detailed implications of that implementation for the farmers we work with, and to explore and discuss how existing regulations and FSA handbook guidelines are impacting farmers.

In this project, we will also invite those partners and more to share feedback, additions, and recommendations for the training curriculum and materials we develop, and share those materials with them in both initial and amended forms for their use. We will also invite additional partners including other FSA cooperators, and institutions of higher learning with agricultural law centers, to both participate in this feedback process and to use the training materials. We have included funding in our budget for stipends for partner organizations' staff time, where partners do not have existing funding for that kind of work.

Another of our current partners is the Alliance for Agriculture in Puerto Rico. Much of our existing outreach work with farmers in Puerto Rico happens in collaboration with them. With .5 FTE funded via this

**J.A. 1844**

agreement for a Spanish-speaking advocate in Puerto Rico to help farmers access FSA programs, Alliance for Agriculture would intend to fund .5 FTE for that same person for similar work from their existing funding, in order to provide full time employment for that person.

## Expected Accomplishments & Deliverables

| Project Activity | Related Deliverable | Who Involved | Time |
|---|---|---|---|
| Communicate with FSA to ensure accuracy of information to share | Objective 1 | Farm Advocates, Project Manager | ongoingly as needed depending on program timelines |
| Publish/share information on FSA programs and initiatives via social media, web content, newsletters, webinars<br><br>*Reach approximately 5,000 farmers by Year 5* | Objective 1 | Farm Advocates, Communications Manager | ongoingly as needed depending on program timelines |
| Conduct individual outreach to farmers in our network who could be eligible for the benefit or program<br><br>*Number of farmers will depend on program eligibility requirements* | Objective 1 | Farm Advocates, Project Manager | ongoingly as needed depending on program timelines |
| Maintain farmer hotline 5 days/week, conduct initial intakes, make referrals to staff within the organization or outside of it as needed.<br><br>*Approx. 45 calls annually, approx. 225 in total.* | Objective 2 | Hotline Team, Farm Advocates | ongoing |
| Refer farmers from other programs in RAFI (NRCS, FOCN) when they tell us they do not have an FSA number; provide assistance for them to complete the process of getting a farm number<br><br>*Approximately 190 farmers in total* | Objective 3 | Farm Advocates | ongoing |
| Assist with FSA loan applications: help them understand FSA loan parameters and | Objective 3 | Farm Advocates | ongoing |

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 313 of 606

| | | | |
|---|---|---|---|
| requirements; ensure farmers' loan applications are eligible and have strong farm business plans<br><br>*Approximately 110 farmers in total* | | | |
| Conduct in-depth farm advocacy casework: meet with farmers, go over their financial situation and documents, meet with relevant stakeholders & decision-makers (loan officers, FSA staff, etc), make a plan with the farmer and take steps to pursue that plan.<br><br>*30 farmers supported annually per fully trained advocate* | Objective 4 | Farm Advocates | ongoing |
| Identify when farmers have needs we cannot meet with technical assistance in-house; refer to other organizations and partner service providers as needed.<br><br>*Approximately 20 farmers annually* | Objective 5 | Farm Advocates, Hotline Team | ongoing |
| Hire a part-time advocate in Puerto Rico to provide the services listed in Objectives 1, 2, 3, and 5 in Spanish | Objective 6 | Project Manager, Part-time Puerto-Rico based Advocate | Year 1 |
| Identify both broad patterns we experience across different county offices, where we believe that the handbook could be implemented more completely or correctly; and specific offices which may benefit from additional training. Communicate with the Administrator's office and State offices to share this information. | Objective 7 | Farm Advocates, Program Manager | Ongoing; findings shared at least quarterly |
| Identify handbook and regulatory provisions that most frequently function as barriers to farmers, make it more difficult for farmers to achieve short- and long-term financial success, or make it harder for them to navigate out of financial crisis. Share findings and recommendations for improvements and solutions with the Administrator's office. | Objective 8 | Farm Advocates, Program Manager | Ongoing; findings shared at least twice a year |
| Identify & select strong candidates for training as | Objective 9 | Farm Advocates, | Year 1 and Year 3 |

**J.A. 1846**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 314 of 606

| farm advocates; share existing training materials with them; conduct casework-based training with our Lead Farm Advocate. | | Program Manager | |
| Identify topic areas for Farm Advocacy training; produce both video and written materials to educate and train new advocates.c | Objective 10 | Farm Advocates, Program Manager, contractors as needed (in-kind) | Year 1 |
| Recruit participation from partner organizations for providing feedback on training curriculum and materials as developed; offer stipends for time. Modify, adapt and improve training materials according to feedback shared. | Objective 10 | Program Manager, partner organizations | Year 1 |
| Share training materials with FSA cooperators, universities with agricultural law programs, partner organizations, and more | Objective 10 | Program Manager, partner organizations | Year 2 and 3 |
| Meet weekly to ensure that outreach and technical assistance impact numbers are collected and updated | Objective 11 | Data Manager, Farm Advocates Program Manager | ongoing |
| Complete required performance and financial reports according to FSA reporting requirements | Objective 11 | Data Manager, Program Manager, Federal Grants Manager (in-kind) | semi-annually |
| Conduct final evaluation surveys or data analysis to assess project impact according to FSA reporting requirements | Objective 11 | Data Manager, Program Manager, Federal Grants Manager | Year 5 |

## Evaluation Plan

Through regular project work meetings between the Managing Director of Programs, the Federal Grants Manager, the Data Manager, the Project Manager, and Farm Advocates, we will ensure that we are properly collecting and tracking farmer case information while providing technical assistance as well as outreach impact data through communications efforts. This will include the evaluation metrics listed in the table below.

| Desired Outcomes | Data Source or | Data Collection | Evaluation Activity, |
|---|---|---|---|

**J.A. 1847**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 315 of 606

|  | Indicator | Method | Timeline, Responsible Party |
|---|---|---|---|
| Outcome: No farmer who desires to continue farming and who receives RAFI farm advocacy assistance loses their farmland or home. | -Farmer retains land deed or lease<br>-Farmer retains home ownership or lease | Salesforce farm advocacy case management profiles, Case Closeout questions:<br>-Does the farmer still hold a land deed or active lease?<br>-Has the farmer remained in their home, owned or leased? | Assigned Farmer Advocate completes the Case Closeout questions in Salesforce whenever a case is concluded; ongoing. |
| Outcome: Farmers assisted by RAFI preserve their assets or grow their businesses | Dollar value of economic impact (for example: $350,000 FSA direct loan approved; property valued at $1.2 million preserved through prevented foreclosure) | Salesforce farm advocacy case management profiles, case closeout questions:<br>- "Value of assets preserved" | Assigned Farmer Advocate completes the Case Closeout questions in Salesforce whenever a case is concluded; ongoing. |
| Outcome: Farmers assisted by RAFI meet their goals for their situation | Farmer goals are identified and recorded at the beginning of a case. | Salesforce farm advocacy case management profiles, case closeout questions:<br>- "Case goal met?"<br>- "Farmer still farming?" | Assigned Farmer Advocate completes the Case Closeout questions in Salesforce whenever a case is concluded; ongoing. |
| Outcome: Farmers feel they have received helpful, supportive, and high quality technical assistance from RAFI-USA | Qualitative survey responses | Surveys conducted annually with a randomized sample of farm advocacy clients | Data manager conducts surveys including clients for each farm advocate to gather feedback and seek ways to improve our service; annual. |
| Outcome: RAFI-USA serves farmers equitably across racial/ethnic, gender, and language demographics | Demographics recorded for farm advocacy client race/ethnicity, gender, and primary language | Salesforce farm advocacy case management profiles | Assigned Farmer Advocate records data when cases are initiated in Salesforce; ongoing |
| Outcome: More farmers receive timely and accurate information from RAFI about FSA Program updates and implementation | Number of farmers receiving updates via social media, web content, newsletters, webinars<br><br>Open/engagement statistics for those channels | Communications channel analytics | Communications Manager, Data Manager, and Federal Grants Manager collaborate to ensure recording of data |

## Sustainability

The most urgent need in terms of the sustainability of the Farm Advocacy profession is to train new advocates. This project will both train new advocates at RAFI-USA, and produce materials which can be

used broadly by other organizations. Additionally, we believe that improvements to FSA handbooks and to regulations are another important way to have long-term impact.

In terms of funding, for years RAFI-USA has scraped together small, limited-term grants—and sometimes needed to use unrestricted funding—to ensure that the work of the farm advocacy program continues. This cooperative agreement will give us the support and the staff both to allow the work to grow, and to collect more data and stories about that work - essential ingredients for development efforts to find long-term funding.

## Appendix A: Fiscal Management and Tracking Allowable/Unallowable Activities

We use systems and procedures to manage federal funds to ensure financial and regulatory compliance and budget adherence. Systems include Quickbooks Timesheets for time allocation, Expensify for expense tracking, and Bill.com for processing payments. We contract with an accountant (CPA) for help with financial reporting and compliance with grant agreements. Blackman & Sloop conducted our annual yellow book audit in 2023 to ensure all federal funds are administered per applicable laws and regulation. Additionally, we are increasing our capacity to manage federal funds with new hiring to 1) provide oversight for RAFI's federal grants and cooperative agreements; 2) ensure compliance with OMB Uniform Guidance and specific grant program or agency requirements; 3) provide clarification to program staff regarding allowable expenses; and 4) maintain accurate budget tracking and invoicing logs of federal reimbursement payments.

**Tracking Staff Time Across Allowable and Unallowable Activities:**
As outlined in the proposed scope of work, Farm Advocacy services provided by RAFI may alternate between activities that are allowable and unallowable for Farm Service Agency funding support. Unallowable activities include:

1. Advising an organization or non-RAFI farm advocate regarding a National Appeals Division (NAD) case against FSA
2. RAFI representing a farmer in a NAD case against FSA

Although RAFI is still able to engage in these activities, we would properly track time and resources devoted to them and charge to a separate, non-federal funding source.

In situation #1, RAFI would be able to track the time required to respond to a phone call, email, or in-person conversation through our time sheet system which allows staff to indicate precise time allocations by funding source. RAFI staff would consider any time from the beginning to the end of the call, conversation, or email response as unallowable under this proposed budget. Timesheets are reviewed and approved by staff's direct supervisor and final approval by the executive director. This will provide an extra level of oversight to ensure timesheets are allocated accurately.

In situation #2, RAFI would begin to allocate staff time to non-federal funding sources **as soon as a farmer confirms verbally or in writing that they would like to proceed with filing a NAD case.** This decision would further be logged in to our Salesforce case management system to ensure we have a record of when the NAP appeal casework begins. Any activities prior to this decision - which may include FSA mediation or educating a farmer about the NAD appeals process - would still be considered allowable. As with #1, RAFI would begin allocating personnel time to non-federal funding sources through our Quickbooks timesheet software.

We will also exercise vigilance concerning the topic of **trainings** to ensure that all time and training-related expenses charged are allowable. For example, we would consider providing a farmer or farm advocate trainees with details about what the NAD process entails, to be an allowable expense; however, communicating on strategy or specifics of an individual's NAD case, would be a non-allowable expense which we would charge to a non-federal funding source.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 317 of 606

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 318 of 606

Attachment 3
Agreement Number: FSA23CPT0013667

## Budget Narrative

### PERSONNEL

- Hourly salary rates are adjusted by a 6% COLA increase every year. The rates listed below reflect the **average** hourly rate over the 5 year period.
- The total hours listed below are for the entire 5 year period.
- "Funds requested" totals below are the salary totals before fringe is applied.

**Executive Director,** *Edna Rodriguez*: Accountable for ensuring that project objectives and activities align with organizational goals and strategy. We anticipate that Edna will spend approximately 88 hours annually on this project, but she will not be charging her time to this budget.

**Managing Director of Programs,** *Lisa Misch*: Ensure internal coordination across projects and team to maximize communication and effectiveness. Ensure data collection infrastructure aligns with overall organizational data infrastructure; assist with evaluation. Supervise data manager, federal grants manager, and hotline team.

| Avg. Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $42.77 | 353.6 | $15,123.47 |

**Project Manager,** *Margaret Krome-Lukens*: Accountable for ensuring that all project activities are carried out in a timely, cost efficient and responsible manner. Supervise Farm Advocates and be the point of contact with other farm organization partners. Responsible for ensuring submission of the required reports.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $39.32 | 530.4 | $20,855.33 |

**Lead Farm Advocate**, *Benny Bunting:* Conduct one-on-one farm advocacy casework; identify trends in program implementation or farmer experience to communicate to FSA via recommendations for improvements or adjustments.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $40.30 | 5127.2 | $206,626.16 |

**Farm Advocate #1,** *to be hired:* Train with lead farm advocate to eventually take on responsibility for one-on-one farm advocacy casework.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $35.03 | 6364.8 | $222,958.94 |

**Farm Advocate #2,** *Otis Wright:* In years 1 and 2 Otis will continue to work on our cooperative agreement subaward through National Young Farmers' Coalition, spending a small amount of time (approx. 10%) on the Farm Advocacy project. In year 3 he will begin to train more intensively as a farm advocate and be fully onboarded onto the project in years 4 and 5.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $29.62 | 4420 | $130,920.40 |

**Hotline Team,** *multiple direct service team staff:* Monitor and respond to hotline calls and email inquiries, assess what resources could be helpful to farmer callers and whether they are in immediate financial crisis and need to be referred to our farm advocate.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $34.07 | 884 | $30,117.88 |

**Federal Grants Manager,** *hiring in process:* Ensure project staff are properly collecting impact data and are aware of reporting requirements and deadlines. Ensure compliance with federal budget requirements and assess progress towards cooperative agreement deliverables.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $33.81 | 2652 | $89,664.12 |

**Data Manager,** *to be hired:* Ensure the timely input of all casework data, ensuring coordination across staff and program areas; contribute to required reports.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $34.24 | 3978 | $136,206.72 |

**Communications Manager,** *Beth Hauptle***:** Support the development and dissemination of outreach materials, including adapting materials for our various media channels.

| Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $36.93 | 530.4 | $19,587.67 |

**Part Time Puerto Rico-based Farm Advocate**, *to be hired:* Provide support for Spanish-speaking farmers to get FSA numbers; help with FSA loan and program applications, with a focus on Puerto Rico. The other half of this position be funded by the Alliance for Agriculture in Puerto Rico, making it 1 FTE in total and enabling the person hired to be able to work full time.

**J.A. 1852**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 320 of 606

| Hourly Rate | Total Hours | Funds Requested |
|-------------|-------------|-----------------|
| $35.38 | 3536 | $125,103.68 |

Total personnel requested for full-time staff: $872,060.69
Total personnel requested for part-time staff: $125,103.68

**Total personnel requested: $997,164.37**

## FRINGE BENEFITS

Fringe benefits include, but are not limited to, the costs of leave (e.g., vacation, family related, sick or military), employee insurance, and unemployment benefit plans.

Fringe benefits are calculated at 40.33% for full-time, salaried employees.
Fringe benefits are calculated at 11% for part-time employees.

- Full-Time Staff: 40.33% of salaries and wages: 872,060.69 x .4033% = $351,702.08
- Part-Time Staff: 11% of salaries and wages: $125,103.68 x .11 = $13,761.40

**Total fringe benefits requested: $365,463.48**

## TRAVEL

In our experience, in-person visits with farmers are essential during the course of our casework to get the best sense of the farmers' financial situations, as well as to build relationships and trust. It is also important to be able to visit FSA offices with farmers to speak with FSA staff and the farmers directly and at the same time.

We expect our annual travel expenses to be significantly over $4,000 annually, and we will cover the difference with other sources of funding.

**Casework Travel:** local mileage to meet with farmers and/or FSA offices regarding casework for Lead Farmer Advocate and Advocate hires.

$0.655 per mile x 250 miles round trip** x 18 trips per year x 5 years = $14,737.50

**Amount Requested: $14,737.50**

*\*\*Calculating average miles per trip is difficult without knowing where farmer cases will be located and where new advocate hires will live. The average here is based on typical mileage for the Lead Farm Advocate in recent years. If expenses exceed the budgeted amount, RAFI will cover travel with other sources of funding.*

**Trips to FSA National Office**: One trip to Washington, DC per year to meet with FSA staff to go over casework and recommendations for handbook / regulatory changes for Lead Farm Advocate.

Mileage: $0.655/mile x 460 miles roundtrip x 1 RAFI staff x 1 trip/year x 5 years = $1,506.50
Lodging: $220/night (avg monthly DC GSA rate) x 2 nights x 1 trip/yr x 5 years x 1 staff = $2,200
Meals: ($79/day x 1 days x 1 staff x 1 trip/yr x 5 years) + ($59.25/day for first/last day travel x 2 days x 1 staff x 1 trip/yr x 5 years) = $987.50

**Amount Requested = $4,694**


**Farm Aid Concert Mileage**: Partial travel expense support for Lead Farm Advocate and/or other hired Advocates to attend annual Farm Aid festival and pre-concert events - an invaluable opportunity to connect with other farm advocates and farmers seeking assistance.
> ***Note: one of our goals in this agreement is to invest in the future of farm advocacy - both by creating advocate training materials, with feedback from other farm advocacy practitioner groups and FSA cooperators, and by training additional farm advocates. While much of this work can happen online, the Farm Aid festival is both the historic home, and the single best event for meeting with this community of practice in person. Specifically, the networking spaces that Farm Aid creates for partners to meet with each other in the two days before the festival itself, are unique opportunities to meet with both seasoned and new practitioners, and organizations working to build a professional pipeline to train farm advocates for the future. We have Farm Aid travel expenses in our budget to support staff to attend those pre-concert events.

Mileage: 868 miles x $0.655/mile = $568.54

**Amount Requested = $568.54**


**TOTAL TRAVEL REQUESTED = $20,000.04**

**SUPPLIES**
- Laptops for new staff: $2,000 in year 1 = **$2,000**
- Social media advertising boosts: $600 boosts annually for 5 years = **$3,000**
  - ***Note: Advertisements are an additional outreach strategy to let farmers know about our financial crisis casework. We have historically had a full caseload without any advertising; however, as we train additional farm advocates and have an expanded casework capacity, we will be able to let more farmers know about this (free) service, who may be in crisis but hesitate to seek help. Additionally, depending on how FSA implements various programs, we may want to reach farmers with information on deadlines or eligibility criteria for program applications, etc. Social media advertising is especially helpful when we are trying to reach farmers with urgency regarding time sensitive opportunities, etc.
- Printing & ink (casework materials, handbooks, etc) $240 annually for 5 years = **$1,200**
- Postage: $40 annually for 5 years = **$200**

**J.A. 1854**

**Total Supplies Requested: $6,400**

**OTHER**

*Training Feedback Stipends*
Funds to cover the time of partners who look at first-draft farm advocacy training materials and provide feedback for improvements. $300 x 5 partners x 2 rounds = **$3,000**

*Translation & Interpretation*
20 hours of interpretation annually x 5 years x $55/hour estimated cost = $5,500

Spanish translation of RAFI-USA developed materials. Estimated 20,000 word total translated x $0.12/word = $2,400.

Total for translation & interpretation = **$7,900**

*Salesforce Annual License Fees*
$432/person x 3 staff x 5 years = **$6,480**

*Phone forwarding service for hotline*
$336 annually x 5 years = **$1,680**

**Total Other Requested: $19,060**

**INDIRECT**
Indirect costs were calculated using the 10% de minimis rate based on total direct costs (federal): salary and wages, fringe benefit, travel, supplies, other = $1,408,087.89 x 10% = $140,808.79

**Total Indirect costs requested=$140,808.79**

**Total Federal Request = $1,548,896.68**

J.A. 1855

Attachment 4
**Agreement Number: FSA23CPT0013667**

Rev. November 2022

## U.S. DEPARTMENT OF AGRICULTURE
### FARM PRODUCTION AND
### CONSERVATION

### GENERAL TERMS AND CONDITIONS FOR
### NON-ezFEDGRANTS GRANTS AND
### COOPERATIVE AGREEMENTS

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

## I.    APPLICABLE REGULATIONS

a.  As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations references may be found at
https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CFR and http://www.ecfr.gov/.

1.  2 CFR Part 25, "Universal Identifier and System of Award Management"
2.  2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"
3.  2 CFR Part 175, "Award Term for Trafficking in Persons"
4.  2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"
5.  2 CFR Part 182, "Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)"
6.  2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"
7.  2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"
8.  2 CFR Part 417, "Nonprocurement Debarment and Suspension"
9.  2 CFR Part 418, "New Restrictions on Lobbying"
10. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"
11. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

b.  Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at

Page 1 of 23

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 323 of 606

**J.A. 1856**

https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CFR
and http://www.ecfr.gov/.

> 2 CFR Part 200, "Uniform Administrative Requirements, Cost
> Principles and Audit Requirements for Federal Awards".

c. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## II.  UNALLOWABLE COSTS

The following costs are not allowed:

a. Profit and management fees. Recipients may not earn and keep income resulting from an award
b. Costs above the amount authorized for the project.
c. Costs incurred after the award period of performance end date.
d. Costs not identified in the approved budget or approved budget revisions.
e. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.
f. Compensation for injuries to persons or damage to property arising from project activities.
g. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting, the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.
h. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.
i. Salaries that are not commensurate with level of work: All costs must be reasonable

Pg: 325 of 606    Filed: 06/23/2025    Doc: 55-4    USCA4 Appeal: 25-1575

to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the level of work will be unallowable.

j.   Honoraria. Speaker fees are allowable.
k.   Costs which lie outside the scope of the approved project and amendments thereto.
l.   Entertainment costs, regardless of their apparent relationship to project objectives.
m.   Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and
n.   Renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## III.    PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency. The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail FPAC.BC.GAD@usda.gov. All requests for prior approval must reference the applicable agreement number.

a.   Pre-award costs.—To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost-share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

b.   Revisions to scope, objective, or deliverables.—When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

c.   Additions or changes to subawards and contracts.—The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed

subaward/contract, a statement of work to be performed, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

d.  Change in a key person specified in the application or award.—When there is a permanent change in key personnel, such as a project director or principal investigator, the recipient must request prior written approval for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

e.  Absence or temporary change in project leadership.—If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

f.  Budget revisions.—Recipients must request prior written approval for deviations from the approved budget in the instances described below. For all budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

   1.  The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

   2.  Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

   3.  The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

   4.  Changes in the approved cost-sharing or matching provided by the recipient, including to amount, source, or type.

   5.  Additional Federal funds needed to complete the project.  This change also requires a formal agreement amendment.

   6.  Changes to negotiated indirect cost rates during the award period of performance.  If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

g.  No-Cost Extensions of Time.—When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost

extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

1. Amount of additional time requested
2. Explanation for the need for the extension
3. A summary of progress to date and revised milestones

## IV.    PAYMENTS

a. Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable, via e-mail to FPAC.BC.GAD@usda.gov. Templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/doing-business/index.html.

b. Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost-share provided.

c. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

d. The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 328 of 606

documentation unless it is specifically requested.

e. Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment not later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date, and the Government is not obligated to make such payments.

f. Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E, Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

## V.     FINANCIAL REPORTING

a. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports via e-mail to FPAC.BC.GAD@usda.gov. Failure to submit reports as required may result in suspension or termination of award.

  b. The recipient must submit a final financial report no later than 120 days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

  c. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## VI.     PERFORMANCE MONITORING AND REPORTING

  a. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

  b. The recipient must submit a written progress report at the frequency specified in the statement of work via e-mail to FPAC.BC.GAD.usda.gov. Each report must cover—

   1. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   2. The reasons why milestones and deliverables targets were not met, if appropriate.

   3. Additional pertinent information including, where appropriate, analysis

and explanation of cost overruns or high unit costs.

c. The recipient must submit a final performance report within 120 calendar days of the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

d. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## VII. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

a. Reporting of first-tier subawards.

1. Applicability. Unless you are exempt as provided in paragraph d. of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

2. Where and when to report.
   i. You must report each obligating action described in paragraph a.1. of this award term to *http://www.fsrs.gov*.

   ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

1. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

b. Reporting Total Compensation of Recipient Executives.

1. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

   i. the total Federal funding authorized to date under this award is $30,000 or more;

   ii. in the preceding fiscal year, you received—

      A. 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      B. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

   iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15

U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*.)

2. Where and when to report. You must report executive total compensation described in paragraph b.1. of this award term:

   *i.* As part of your registration profile at *https://www.sam.gov*.

   ii. By the end of the month following the month in which this award is made, and annually thereafter.

c. Reporting of Total Compensation of Subrecipient Executives.

   1. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

      i. in the subrecipient's preceding fiscal year, the subrecipient received—

         A. 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

         B. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

      ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*.)

   2. Where and when to report. You must report subrecipient executive total compensation described in paragraph c.1. of this award term:

      i. To the recipient.

      ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

d. Exemptions

   If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

      1. Subawards, and

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 331 of 606

2. The total compensation of the five most highly compensated executives of any subrecipient.

e. Definitions. For purposes of this award term:

1. Entity means all of the following, as defined in 2 CFR part 25:

   i. A Governmental organization, which is a State, local government, or Indian tribe;

   ii. A foreign public entity;

   iii. A domestic or foreign nonprofit organization;

   iv. A domestic or foreign for-profit organization;

   v. A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

2. Executive means officers, managing partners, or any other employees in management positions.

3. Subaward:

   i. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

   ii. The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

   iii. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

4. Subrecipient means an entity that:

   i. Receives a subaward from you (the recipient) under this award; and

   ii. Is accountable to you for the use of the Federal funds provided by the subaward.

5. Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

   i. Salary and bonus.

   ii. Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

   iii. Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical

J.A. 1864

reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

iv. Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

v. Above-market earnings on deferred compensation which is not tax-qualified.

vi. Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

## VIII.    AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the audit period, whichever comes first.

## IX.    SPECIAL PROVISIONS

a. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

b. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

c. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

d. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

e. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities

include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

f. Recipients of awards under covered programs (as defined in Executive Order 13858, January 31, 2019) are encouraged to use, to the greatest extent practicable, iron and aluminum as well as steel, cement, and other manufactured products produced in the United States in every contract, subcontract, purchase order, or subaward that is chargeable under the award. "Covered program" means a program that provides financial assistance for the alteration, construction, conversion, demolition, extension, improvement, maintenance, construction, rehabilitation, or repair of an infrastructure project in the United States. However, it does not include programs for which a domestic preference is inconsistent with law or programs providing financial assistance that are subject to comparable domestic preferences.

g. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

## X.     PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

a. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

"This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

"Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

b. All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a

Pg: 333 of 606     Filed: 06/23/2025     Doc: 55-4     USCA4 Appeal: 25-1575

J.A. 1866

minimum, include the following statement:

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

c.  Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

d.  In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

e.  USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## XI.    COST SHARING REQUIREMENTS

a.  If the award has specific cost-sharing requirements, cost-sharing participation in other projects must not be counted toward meeting the specific cost-share requirement of this award. Cost sharing must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

b.  Cost sharing costs must be necessary and reasonable for accomplishment of project or program objectives.

c.  Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost-share or matching ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

d.  Should the recipient become aware that it may be unable to provide the cost-sharing amount identified in this award, it must—

1.  Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and
2.  Either specify the steps it plans to take to secure replacement cost sharing or specify the plans to phase out the project in the absence of cost sharing.

Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or

debarment. FPAC reviews and approves or disapproves cost-sharing remediation plans on a case-by-case basis.

  e.  The recipient must maintain records of all project costs that are claimed as cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer services and donated property must be documented.

  f.  Recipients must also request prior approval before changing the source or type of cost sharing. See Section III(e)(4).

## XII.    PROGRAM INCOME

  a.  Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

  b.  FPAC recommends treating program income with the additive method, however recipients may request to use the deductive method.

  c.  If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method (additive or deductive).

  d.  Program income may be used to meet recipient cost-sharing requirements with the approval of the Government.

  e.  Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## XIII.    PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Particularly, take note that sole-source contracting is unallowable in almost all instances. Procurements must be well-documented, and those records are subject to inspection and audit.

Page 13 of 23

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 336 of 606

## XIV.   BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

"Buy America" preference applies to Federal financial assistance awards that include construction components, even if it is funded by both Federal and non-Federal funds under the award. Subawards should conform to the terms and conditions of the Federal award from which they flow. A Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to a construction project.

In accordance with 2 CFR § 200.327, contracts must contain the applicable provisions described in Appendix II to Part 200. Solicitations for Bid and Pre-bid Conference must point out the requirement for the Buy America terms in the awarded contracts. Responsive bids must include any requests for waivers to the Buy America requirements.

Recipients must ensure that none of the funds provided under this award are used for project construction unless: (1) all iron and steel used in the project are produced in the United States-- this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States; (2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and (3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. (Excludes cement and cementitious materials, aggregates such as stone, sand, or gravel, or aggregate binding agents or additives.) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to a construction project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished project but are not an integral part of the structure or permanently affixed to it.

## XV.   NONEXPENDABLE EQUIPMENT

a. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

b. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without approval of the Government.

c. The recipient must use equipment for the authorized purposes of the project as long as needed whether or not the project or program continues to be supported by the federal award. When no longer needed for the original program or project, the equipment may be used for other activities supported by the Federal awarding agency, in the following order of priority:

Pg: 337 of 606     Filed: 06/23/2025     Doc: 55-4     USCA4 Appeal: 25-1575

1. Activities under a Federal award from the Federal awarding agency which funded the original program or project, then

2. Activities under Federal awards from other Federal awarding agencies.

d. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

e. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

f. When equipment is no longer needed for any of the purposes set out in this provision and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

## XVI.    LIMIT OF FEDERAL LIABILITY

a. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

b. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

## XVII.   AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

J.A. 1870

XVIII.  **PRIVACY ACT AND PROHIBITION AGAINST CERTAININTERNAL CONFIDENTIALITY AGREEMENTS**

a.  Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

b.  The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

c.  The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

1.  You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

2.  You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph (1) of this award provision are no longer in effect.

3.  The prohibition in paragraph (1) of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

4.  If FPAC determines that you are not in compliance with this award provision, FPAC:

    i.   Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

    ii.  May pursue other remedies available for your material failure to comply with award terms and conditions.

XIX.  **ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE**

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and

Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below. Responsibilities.

a. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

b. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

c. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

d. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

e. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

f. The recipient must notify all managers, supervisors, employees, contractors, agents, and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

g. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

h. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

i. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the

Pg: 339 of 606        Filed: 06/23/2025        Doc: 55-4        USCA4 Appeal: 25-1575

Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

j.   Protected Information.

Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

   i.   State identification and county number (where reported and where located).
   ii.  Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.
   iii. Farm, tract, field, and contract numbers.
   iv.  Production shares and share of acres for each Farm Serial Number (FSN) field.
   v.   Acreage information, including crop codes.
   vi.  All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System
   vii. Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.
   viii. Location of conservation practices.

k.   Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law*" (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

l.   Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any—(i) individual owner, operator, or producer; or (ii) specific data gathering cite." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

m.   Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by FPAC, including termination of the underlying Federal award.

n.   Effective Period. The requirements of this provision is effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## XX.    PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT

The recipient (including subrecipients) is responsible for compliance with the prohibition on certain telecommunications and video surveillance services or equipment identified in 2 CFR 200.216. See Public Law 115-232, Section 889 for additional information. In accordance with 2 CFR 200.216, the recipient (including subrecipients) is prohibited from obligating or expending loan or grant funds for covered telecommunications equipment or services to:

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 341 of 606

o.  procure or obtain, extend or renew a contract to procure or obtain;

p.  enter into a contract (or extend or renew a contract) to procure; or

q.  obtain the equipment, services or systems.

## XXI.    NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.ocfo.usda.gov/docs/Regulatory_Statutory_and_National_Policy_Requirements_v 2_2018_04_17.pdf

## XXII.    TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

a.  By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

b.  By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

c.  By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

d.  By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

e.  If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR200.341.

## XXIII.    REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

If the total value of the recipient's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any

J.A. 1874

period of time during the period of performance of this Federal award, then the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

a.  Proceedings About Which You Must Report

Submit the information required about each proceeding that:

1.  Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

2.  Reached its final disposition during the most recent five-year period; and

3.  Is one of the following:

    i.   A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

    ii.  A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

    iii. An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

    iv.  Any other criminal, civil, or administrative proceeding if:

        A.  It could have led to an outcome described in paragraph 2.c.(1), (2), or (3) of this award term and condition;

        B.  It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

        C.  The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

b.  Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

c.  Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report.

Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

d.  Definitions

For purposes of this award term and condition:

1.  Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (*e.g.,* Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

2.  Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3.  Total value of currently active grants, cooperative agreements, and procurement contracts includes—

    i.   Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

    ii.  The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## XXIV.   AWARD CLOSEOUT

a.  Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

b.  The recipient must submit, no later than 120 calendar days after the end date of the period of performance, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that match or cost-share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

c.  Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement not later than 120 calendar days after the end date of the period of performance.

d.  Recipients must submit all requests for reimbursements no later than 120 calendar days after the end date of the period of performance.

e.  The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 344 of 606

f. Recipients must retain all records pertaining to the agreement in accordance with 2 CFR 200.333-337 and any additional requirements included in the agreement statement of work.

g. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

h. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB-designated integrity and performance system (currently FAPIIS).

### XXV. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

### XXVI. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89-544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact NRCS to discuss alternatives.

### XXVII. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval

of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification.  Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer.

# RAFI DECLARATION

# EXHIBIT 13-M

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. **Award Identifying Number** FSA23CPT0013667 | 2. **Amendment No.** 1 | 3. **Award/Project Period** Date of Final signature - 9/30/2028 | 4. **Type of Award Instrument** Cooperative |
|---|---|---|---|

| 5. **Agency:** (Name and Address) USDA, FSA Office of Outreach 1400 INDEPENDENCE AVENUE, SW Stop 0511, Room 3086-S WASHINGTON, DC 20250 | 6. **Recipient Organization:** (Name and Address) Rural Advancement Foundation International-USA PO Box 640 Pittsboro, North Carolina 27312-0640 |
|---|---|

| **DUNS:** Z1AXE15PHAL3 | **EIN:** |
|---|---|

| 7. **Agency Program Contact:** Cara McNab cara.mcnab@usda.gov 509-202-0639 | 8. **Agency Administrative Contact:** Kenneth James kenneth.james@usda.gov 301-395-2816 | 9. **Recipient Program Contact:** Margaret Krome-Lukens margaret@rafiusa.org 919-621-3593 | 10. **Recipient Administrative Contact:** Edna Rodriguez edna@rafiusa.org 919-621-5158 |
|---|---|---|---|

| 11. **CFDA Number** 10.147 | 12. **Authority** 7 U.S.C. 2204b(b)(4) | 13. **Type of Action** ii. Amendment/Revision | 14. **Project Director** Margaret Krome-Lukens margaret@rafiusa.org 919-621-3593 |
|---|---|---|---|

| 15. **Project Title/Description:** Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2. |
|---|

16. **Entity Type:** _____Profit   _X_ Nonprofit   ____Higher Education   ____Federal   ____State/Local   ____Indian/Native American   ____Other

| 17. **Select Funding Type:** | ✔ **Federal** | ☐ **Non-Federal** | 18. **Accounting and Appropriation Data** |
|---|---|---|---|

| | | | Financial Code | Amount | Budget Period | Treasury Symbol |
|---|---|---|---|---|---|---|
| Original Funds Total: | $ 1,548,896.68 | | WBS Code: FPDEFAULT | $ 158,143.14 | 2424 | 1230600 |
| Additional Funds Total: | $ 158,143.14 | | BOC: 2510 | | | Fund: FA84B0600M |
| Grand Total: | $ 1,707,039.82 | $ 0.00 | Fund Center: FA10402000 | DEFC Code: Q | | Functional Area: FA01ADFEDSALARY0 |

19. **APPROVED BUDGET**

| Personnel | $ | 1,031,822.46 | Fringe Benefits | $ | 379,441.09 |
|---|---|---|---|---|---|
| Travel | $ | 49,213.84 | Equipment | $ | 0.00 |
| Supplies | $ | 9,150.00 | Contractual | $ | 48,745.00 |
| Construction | $ | 0.00 | Other | $ | 33,482.00 |
| Total Direct Cost\ | $ | 1,551,854.39 | Total Indirect Cost | $ | 155,185.43 |
| | | | Total Non-Federal Funds | $ | 0.00 |
| | | | Total Federal Funds Awarded | $ | 1,707,039.82 |
| | | | Total Approved Budget | $ | 1,707,039.82 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

**J.A. 1881**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 349 of 606

DocuSign Envelope ID: C9F792E1-D786-486D-BE7E-28A5E957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 344 of 378

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

### NOTICE OF GRANT AND AGREEMENT AWARD

| Award Identifying Number | Amendment No. | Award/Project Period | Type of Award Instrument |
|---|---|---|---|
| FSA23CPT0013667 | 1 | Date of Final signature - 9/30/2028 | Cooperative |

List of Attachments:

Attachment 1 - Amendment Narrative; Attachment 2A - Revised Project Narrative: Attachment 3A - Revised Budget Narrative; Attachment 4A - General Terms and Conditions

| Name and Title of Authorized Government Representative | Signature | Date |
|---|---|---|
| Steven Peterson, Associate Administrator | | |
| **Name and Title of Authorized Recipient Representative** | **Signature** | **Date** |
| Edna Rodriguez, Executive Director | DocuSigned by:<br>*Edna Rodriguez*<br>EC81EB90E0D4490... | 6/11/2024 |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD).  USDA is an equal opportunity provider, employer, and lender.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Page 2

Attachment 1

# AMENDMENT NO. 1
# TO AGREEMENT NUMBER FSA23CPT0013667
# WITH
# (RURAL ADVANCEMENT FOUNDATION INTERNATONAL-USA)

**PURPOSE**

The purpose of this amendment is to add more tasks and funds to the agreement to better accomplish the goals and objectives of the project. The net result is a budget increase of $158,143.14 in federal funding.

**Except as provided herein, all other terms and conditions of the original agreement and any previous amendments remain unchanged and in full force and effect.**

**REVISIONS TO THE NOTICE OF AWARD (FORM NRCS-ADS-093):**

Federal funds were added as shown in Blocks 17 and 18.

The approved budget was revised in Block 19.

The List of Attachments on page 2 was updated to include this attachment, a revised project narrative, a revised budget narrative, and updated general terms and conditions.

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 351 of 606

DocuSign Envelope ID: C957A2E1-D796-486D-BE76-29A5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 346 of 378
Attachment 2A

**Revised Project Narrative**
Amended to Existing Award FSA23CPT0013667

**Purpose:**

This amendment details additional activities completed by RAFI as a part of their existing cooperative agreement, FSA23CPT0013667. In light of the sudden and severe impacts experienced by contracted poultry producers with the closure of Cooks Venture, and knowing that similar unexpected economic, market-driven closures or weather-related disasters may impact other farmers across the country over the next few years, this amended statement of work is intended to increase RAFI's capacity to provide time-sensitive, crisis response farm advocacy services. With increased crisis response capabilities, we hope to provide immediate support to severe farmer crisis cases as well as convey critical on-the-ground information to the national FSA office.

**Activities:**

Relevant activities for this amendment can be found in the "Expected Accomplishments and Deliverables," table of our original Scope of Work, specifically:

- Communicate with FSA to ensure accuracy of information to share (Objective 1)

- Assist with FSA loan applications: help them understand FSA loan parameters and requirements; ensure farmers' loan applications are eligible and have strong farm business plans (Objective 3)

- Conduct in-depth farm advocacy casework: meet with farmers, go over their financial situation and documents, meet with relevant stakeholders & decision-makers (loan officers, FSA staff, etc), make a plan with the farmer and take steps to pursue that plan. (Objective 4)

- Identify when farmers have needs we cannot meet with technical assistance in-house; refer to other organizations and partner service providers as needed. (Objective 5)

- Identify both broad patterns we experience across different county offices, where we believe that the handbook could be implemented more completely or correctly; and specific offices which may benefit from additional training. Communicate with the Administrator's office and State offices to share this information. (Objective 7)

- Identify handbook and regulatory provisions that most frequently function as barriers to farmers, make it more difficult for farmers to achieve short- and long-term financial success, or make it harder for them to navigate out of financial crisis. Share findings and recommendations for improvements and solutions with the Administrator's office. (Objective 8)

The 2023 closure of Cooks Venture has demonstrated the increased need for RAFI's crisis intervention support to farmers beyond the initial scope and capacity of the cooperative agreement. A situation requires crisis intervention when an economic, market-driven, or disaster-related event results in a group of farmers in a similar geographic region experiencing a severe financial crisis. The activities and related funding in this amendment are designed to allow RAFI's Farm Advocacy program to respond to 3-5 crisis intervention events, Cooks Venture included, until the end of the existing cooperative agreement (September 30th, 2028).

**J.A. 1884**

The largest areas of increased funding are within 1) travel and 2) contractual. We are requesting additional travel funds because the ability to visit farmers quickly and in person is crucial to building necessary connections and trust with impacted farmers, which helps us gain a detailed understanding of a crisis situation. We also know that such comprehensive crises and the services they warrant may require several trips over time to address immediate and long-term needs.

The second area of requested funding is Contractual. Crisis response situations like Cooks Venture result in a sudden spike in farm advocacy cases that can overwhelm RAFI advocates and outstrip their capacity. Due to the specialized nature of advocacy work, simply hiring an additional advocate is not a viable option to expand capacity. To address this, RAFI will likely contract with an individual - ideally a former or retired FSA employee - who would have relevant agricultural lending experience and be available to travel with RAFI staff on crisis intervention trips and provide farm advocacy services as needed. Based on our experience with the Cooks Venture case, we also recognize the need for legal counsel in circumstances where state-specific laws and regulations could impact farm advocacy work. This legal counsel would be restricted solely to general education on relevant state-specific issues and would not be used as legal advice on any individual farmer case.

The following process will be used to provide crisis intervention to farmers:

**Crisis Intervention Process**
1. **Identify crisis situation**: RAFI learns of potential crisis intervention events either directly from impacted farmers or via the national FSA office. RAFI communicates with the national FSA office to discuss initiating a crisis intervention response.
2. **Assess crisis situation:** RAFI travels to meet with farmers and other stakeholders to gain greater understanding of farmers' financial situations.
3. **Strategize on solutions:** During and post-trip, RAFI continues to gather more information or data from farmers, lenders, FSA, or other involved parties to determine viable strategies to improve farmers' financial situations. This may require additional trips to the impacted area.
4. **Provide farm advocacy services:** RAFI provides farmers with technical assistance to address financial crises and reach desired outcomes. This may require additional trips to the impacted area.
5. **Information Feedback Loop with FSA:** RAFI will communicate with the national FSA office on key learning, potential intervention opportunities, or recommended agency changes based on crisis intervention work. FSA will also support RAFI by helping establish contact with state or local FSA staff or providing case related information, if appropriate.

**Revised Budget Narrative**

**Travel**

Trips to Arkansas - *for the purpose of visiting farmers impacted by Cooks Venture closure to assess the situation and provide farm advocacy services. The first of the two trips listed here occurred February*

*7-10, 2024. These trips account for two RAFI travelers. Lodging and meals rates reflect the AR GSA rates.*

Flights: $450 ticket x 2 travelers x 2 trips = $1,800 (roundtrip from RDU to SGF)
Rental Car: $100/day x 3 days x 2 trips = $600
Lodging: $107/night x 2 travelers x 2 nights x 2 trips = $856
Meals (Travel Day): $59 (travel day) x 1 day x 2 travelers x 2 trips = $236
Meals (First/Last Day): $44.25 (first/last travel day) x 2 days x 2 travelers x 2 trips = $354
**Total: $3,846**

Trips to Crisis Intervention Areas - *for the purpose of visiting farmers in a crisis intervention situation. We anticipate 8 trips based on an estimate of 4 additional crisis interventions, and they are divided below into 2-person trips, and 3-person trips (which would include our Puerto-Rico-based farm advocate for training and for crises involving Spanish-speaking farmers). As we cannot determine what areas we would need to travel to, flight expenses were estimated at $600/flight and the national GSA rate was used for lodging and meals.*

*Two Travelers (five trips)*
Flights: $600 ticket x 2 travelers x 5 trips = $6,000 (roundtrip from RDU to unknown airport)
Rental Car: $100/day x 3 days x 5 trips = $1,500
Lodging: $107/night x 2 travelers x 2 nights x 5 trips = $2,140
Meals (Travel Day): $59 (travel day) x 1 day x 2 travelers x 5 trips = $590
Meals (First/Last Day): $44.25 (first/last travel day) x 2 days x 2 travelers x 5 trips = $885
**Total: $11,115**

*Three Travelers (three trips)*
Flights: $600 ticket x 3 travelers x 3 trips = $5,400 (roundtrip from RDU to unknown airport)
Rental Car: $100/day x 3 days x 3 trips = $900
Lodging: $107/night x 3 travelers x 2 nights x 3 trips = $1,926
Meals (Travel Day): $59 (travel day) x 1 day x 3 travelers x 3 trips = $531
Meals (First/Last Day): $44.25 (first/last travel day) x 2 days x 3 travelers x 3 trips = $796.50
**Total: $9,553.50**

Trips to Washington DC - *for the purpose of meeting with FSA national staff to discuss issues related to crisis intervention cases. These three trips account for three RAFI travelers and DC area GSA rates.*

**Mileage: (2 cars x 150 miles x $.67/mi) + (2 cars x 310 miles x $.33/mi) x 3 trips = $1,216.80 (calculated at 460 mi RT Oak City, NC to USDA office, DC)
Parking (DC): $40/day x 2 cars x 3 trips = $240
Flight: $200 x 1 traveler x 2 trips = $400 (RT from RDU to DCA)
Parking (RDU airport): $12/day x 2 days x 2 trips = $48
Local transportation / rideshare = $20 x 9 rides = $180
Lodging: $258/night x 3 travelers x 2 trips (assuming 1 trip will not require overnight stay in DC) = $1,548

USCA4 Appeal: 25-1575     Doc: 55-4          Filed: 06/23/2025     Pg: 354 of 606

DocuSign Envelope ID: C957925E-D796-486D-BE75-28A5F957CDB3
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 349 of 378

Meals: $59.25/day for first/last day of travel x 3 travelers x 2 days x 3 trips = $1,066.50
**Total: $4,699.30**

***RAFI travel policy, federal mileage rate up to 150 mi and then $0.33/mi for any miles above**

<u>**Total Travel Requested: $29,213.80**</u>

## Personnel
- Hourly salary rates are adjusted by a 6% COLA increase every year. The rates listed below reflect the average hourly rate over the 5 year period.
- The total hours listed below are for the entire 5 year period.
- "Funds requested" totals below are the salary totals before fringe is applied.

**Executive Director**, *Edna Rodriguez:* provides RAFI and project oversight, whole organization strategy and direction.

| Avg. Hourly Rate | Total Hours | Funds Requested |
|---|---|---|
| $78.41 | 442 | $34,658.09 |

<u>**Total Personnel Requested: $34,658.09**</u>

## Fringe Benefits
- Fringe benefits include, but are not limited to, the costs of leave (e.g., vacation, family related, sick or military), employee insurance, and unemployment benefit plans.
- Fringe benefits are calculated at 40.33% for full-time, salaried employees.

$34,658.09 full-time personnel costs x 40.33% = $13,977.61

<u>**Total Fringe Benefits Requested: $13,977.61**</u>

## Supplies

On-site printing (educational materials etc) for farmer group meetings: 7,500 pages x .20/page = $1,500
Additional paper & ink supplies for added casework: $200 annually x 5 years = $1,000
General office supplies: $50 annually x 5 years = $250

<u>**Total Supplies Requested: $2,750**</u>

**J.A. 1887**

**Contractual**

<u>Farm Advocate</u> - *individual who will provide farm advocacy service support to RAFI on crisis intervention cases on an as needed basis*

$$\$50/hr \times 600 \text{ hr} = \$30,000$$

<u>Legal Counsel</u> - *used to educate RAFI advocates and contractor on state-based legal issues that may be relevant to providing farm advocacy services to a group of farmers. Not to be used for legal advice on individual farmer cases.*

$$\$250/hr \times 50 \text{ hr} = \$12,500$$

<u>Travel for Farm Advocate</u> - *To cover expenses of traveling with RAFI staff to crisis intervention locations to provide immediate or long-term advocacy services.*

Trip to Arkansas - *same purpose as listed under the Travel section. This trip accounts for 1 traveler and reflects AR GSA rates.*

Flights: $450 ticket x 1 traveler x 1 trip = $450 (roundtrip from unknown airport to SGF)
Lodging: $107/night x 1 traveler x 2 nights x 1 trip = $214
Meals (Travel Day): $59 (travel day) x 1 day x 1 traveler x 1 trip = $59
Meals (First/Last Day): $44.25 (first/last travel day) x 2 days x 1 traveler x 1 trip = $88.50
Total: $811.50

Trips to Crisis Intervention Areas - *same purpose as listed under the Travel section. These trips account for 1 traveler, and reflect national GSA rates.*

Flights: $600 ticket x 1 travelers x 5 trips = $3,000 (roundtrip from RDU to unknown airport)
Lodging: $107/night x 1 travelers x 2 nights x 5 trips = $1,070
Meals (Travel Day): $59 (travel day) x 1 day x 1 travelers x 5 trips = $295
Meals (First/Last Day): $44.25 (first/last travel day) x 2 days x 1 travelers x 5 trips = $442.50
Total: $4,807.50

Trip to Washington DC - *same purpose as listed under the Travel section. This trip accounts for 1 traveler and reflects AR GSA rates.*

**Mileage: (1 car x 150 miles x .67/mi) + (1 car x 300 miles x .33/mi) x 1 trip = $199.50
Lodging: $258/night x 1 traveler x 1 trip = $258
Parking: $25/day x 1 traveler x 2 days x 1 trip = $50
Meals: $59.25/day for first/last day of travel x 1 traveler x 2 days x 1 trips = $118.50
Total: $626

*\*\*RAFI travel policy, federal mileage rate up to 150 mi and then $0.33/mi for any miles above*

<u>**Total Contractual requested: $48,745**</u>

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 356 of 606

DocuSign Envelope ID: C957925E-D786-486D-BE76-29A5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 351 of 378

## Other

<u>In-region farmer coordinator stipends</u> - *used to compensate farmers or stakeholders located in a crisis intervention location who are providing support to RAFI (e.g. locating venue for farmer meeting, contacting impacted farmers, making in-region connections). Stipends would be provided per trip although not every trip may require a farmer coordinator.*

$500/stipend x 8 stipends = $4,000

Total stipends requested: $4,000

### **Monthly staff costs:**
*Note: costs are prorated to reflect that the staff listed do not spend 100% of their time on activities related to this cooperative agreement.*

<u>Telephone:</u>

Lead Farm Advocate Benny Bunting: annual cost $618 x 75% prorated x 5 years = $2,317.50

Farm Advocate # 1 (new hire) Liz Richardson: annual cost $618 x 75% prorated x 4 years (already funded for Year 1) = $1,854

Puerto Rico Farm Advocate (to be hired): annual cost of $618 x 50% prorated x 4.5 years = $1,390.50

Total Telephone requested = $5,562

<u>Computer/Tech Subscriptions (Expensify, Bill.com, Mailchimp)</u>

Lead Farm Advocate Benny Bunting: annual cost $540 x 75% prorated x 5 years = $2,025

Farm Advocate # 1 (new hire) Liz Richardson: annual cost $540 x 75% prorated x 4 years (already funded for Year 1) = $1,620

Puerto Rico Farm Advocate (to be hired): annual cost of $540 x 50% prorated x 4.5 years = $1,215

Total Computer/Tech Subscriptions requested = $4,860

**Total Other Requested = $14,422**

**TOTAL DIRECT EXPENSES = $143,766.50**

**Indirect**

$143,766.49 x 10% de minimis rate = $14,376.64

*Note: We are budgeting this amount to match what the agency is allowing for the amendment*

**TOTAL REQUESTED FUNDS = $158,143.14**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 358 of 606

DocuSign Envelope ID: C957022E1-D786-406D-BE75-28A5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 353 of 378

Attachment 4A
FSA23CPT0013667

**U.S. DEPARTMENT OF AGRICULTURE**
**FARM PRODUCTION AND CONSERVATION**

Revised March 2024

**GENERAL TERMS AND CONDITIONS FOR NON-ezFEDGRANTS**
**GRANTS AND COOPERATIVE AGREEMENTS**

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

### A. APPLICABLE REGULATIONS

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CFR and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

**J.A. 1891**

Revised March 2024                                      USDA FPAC General Terms and Conditions
                                                        For Grants and Cooperative Agreements

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

J.A. 1892

DocuSign Envelope ID: C9F792E1-D786-486D-BE7B-28A5F957CDB3

Revised March 2024                                   USDA FPAC General Terms and Conditions
                                                     For Grants and Cooperative Agreements

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C.  PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency.  The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov. All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5. Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6. Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

   a. The inclusion of costs that require prior approval in accordance with Subpart E—Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

   b. Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

   c. The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

   d. Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

   e. Additional Federal funds needed to complete the project. This change also requires a formal agreement amendment.

   f. Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs. If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment. If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

   g. If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7. No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

J.A. 1894

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

  a.  Amount of additional time requested

  b.  Explanation for the need for the extension

  c.  A summary of progress to date and revised milestones

### D.  PAYMENTS

1.  Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2.  Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3.  The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4.  Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5.  Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E, Cost principles to support unit prices included in fixed amount awards prior to

**J.A. 1895**

agreement execution.

6.  The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

## E.  FINANCIAL REPORTING

1.  Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2.  The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date.  Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3.  The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4.  Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

## F.  PERFORMANCE MONITORING AND REPORTING

1.  The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2.  The recipient must submit a written progress report at the frequency specified in the statement of work via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.  Each report must cover—

    a.  A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

    b.  The reasons why milestones and deliverables targets were not met, if appropriate.

    c.  Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

3.  The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to

**J.A. 1896**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 364 of 606

DocuSign Envelope ID: C9F792E1-D786-426D-BE75-2BA5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 359 of 378

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1. Reporting of first-tier subawards.

   a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

   b. Where and when to report.

      i. You must report each obligating action described in paragraph 1.a. of this award term to *http://www.fsrs.gov*.

      ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

   c. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

2. Reporting Total Compensation of Recipient Executives.

   a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

      i. the total Federal funding authorized to date under this award is $30,000 or more;

      ii. in the preceding fiscal year, you received—

         (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

         (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

   b. Where and when to report. You must report executive total compensation

**J.A. 1897**

described in paragraph 2.a. of this award term:

    i.  As part of your registration profile at https://sam.gov

    ii.  By the end of the month following the month in which this award is made, and annually thereafter.

3. Reporting of Total Compensation of Subrecipient Executives.

    a.  Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i.  In the subrecipient's preceding fiscal year, the subrecipient received—

            (a)  80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b)  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b.  Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i.  To the recipient.

        ii.  By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4. Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a.  Subawards, and

    b.  The total compensation of the five most highly compensated executives of any subrecipient.

5. Definitions. For purposes of this award term:

    a.  Entity means all of the following, as defined in 2 CFR part 25:

        i.  A Governmental organization, which is a State, local government, or Indian Tribe;

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

    ii.    A foreign public entity;

    iii.    A domestic or foreign nonprofit organization;

    iv.    A domestic or foreign for-profit organization;

    v.    A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.    Executive means officers, managing partners, or any other employees in management positions.

c.    Subaward:

    i.    This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    ii.    The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

    iii.    A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.    Subrecipient means an entity that:

    i.    Receives a subaward from you (the recipient) under this award; and

    ii.    Is accountable to you for the use of the Federal funds provided by the subaward.

e.    Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

    i.    Salary and bonus.

    ii.    Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

    iii.    Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

    iv.    Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

    v.    Above-market earnings on deferred compensation which is not tax-qualified.

    vi.    Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

J.A. 1899

## H. AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the audit period, whichever comes first.

## I. AWARDS WITH RESEARCH ACTIVITIES

1.  Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2.  In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

    Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication. Recipients can receive a DOI via NAL.

    Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

## J. SPECIAL PROVISIONS

1.  The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2.  Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

**J.A. 1900**

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6. The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

### K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

   "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

   In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

   "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

   All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

J.A. 1901

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L. COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

   a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

   b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

   Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment. FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed as cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

J.A. 1902

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 370 of 606

DocuSign Envelope ID: C9F792E1-D796-496D-BE7F-28A5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 365 of 378

Revised March 2024                                    USDA FPAC General Terms and Conditions
                                                      For Grants and Cooperative Agreements

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

J.A. 1903

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 371 of 606

DocuSign Envelope ID: C9F792E1-D786-426D-BE7F-28A5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 366 of 378

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:*  When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements.  The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request.  Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

J.A. 1905

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1. The listed items are:

    a. Non-ferrous metals;

    b. Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

    c. Glass (including optic glass);

    d. Fiber optic cable (including drop cable);

    e. Optical fiber;

    f. Lumber;

    g. Engineered wood; and

    h. Drywall.

2. Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1. Articles, materials, or supplies that have been:

**J.A. 1906**

  a.  Processed into a specific form and shape; or

  b.  Combined with other articles, materials, or supplies to create a product with
      different properties than the individual articles, materials, or supplies.

2.  If an item is classified as an iron or steel product, a construction material, or a
    Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2
    CFR 184.3, then it is not a manufactured product. However, an article, material, or
    supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1
    of this definition may include components that are construction materials, iron or
    steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the
iron and steel content exceeds 50 percent of the total cost of all its components. The
cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab,
wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and
a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates
such as stone, sand, or gravel; or aggregate binding agents or additives. See Section
70917(c) of the Build America, Buy America Act.

## P. NONEXPENDABLE EQUIPMENT

1.  Recipients purchasing equipment or products with funds provided under this award
    are encouraged to purchase only American-made equipment and products. A state
    must use, manage and dispose of equipment acquired under a Federal award by the
    state in accordance with state laws and procedures. All other recipients must follow
    these procedures.

2.  Title to equipment acquired under a Federal award will vest conditionally in the
    recipient upon acquisition. The recipient must not encumber the property without prior
    approval of the Government.

3.  The recipient must use the equipment for the authorized purposes of the project for
    as long as needed whether or not the project or program continues to be supported
    by the Federal award. When no longer needed for the original program or project, the
    equipment may be used in other activities supported by the Federal awarding
    agency, in the following order of priority:

    a.  Activities under a Federal award from the Federal awarding agency which
        funded the original program or project, then.

    b.  Activities under Federal awards from other Federal awarding agencies.

4.  The recipient must maintain property records that include a description of the
    property, a serial number or other identification number, the source of funding for the
    property (including the FAIN), who holds title, the acquisition date, and cost of the
    property, percentage of Federal participation in the project costs for the Federal
    award under which the property was acquired, the location, use and condition of the
    property, and any ultimate disposition data including the date of disposal and sale
    price of the property.

5.  The recipient must take a physical inventory of the property and reconcile the results
    with the property records at least once every two years until final disposition.

6.  When equipment is no longer needed for any of the purposes set out in this provision

**J.A. 1907**

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

## Q. LIMIT OF FEDERAL LIABILITY

1.  The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2.  For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

## R. AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

## S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1.  Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2.  The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3.  The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

    a.  You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

> enforcement representative of a Federal department or agency authorized to receive such information.

b. You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c. The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d. If FPAC determines that you are not in compliance with this award provision, FPAC:

    i. Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

    ii. May pursue other remedies available for your material failure to comply with award terms and conditions.

## T. ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6. The recipient must notify all managers, supervisors, employees, contractors, agents,

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 377 of 606

DocuSign Envelope ID: C9F792F1-D796-496D-BE7F-2BA5F957CDB3
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-14    Page 372 of 378

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information.  Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a. State identification and county number (where reported and where located).

    b. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c. Farm, tract, field, and contract numbers.

    d. Production shares and share of acres for each Farm Serial Number (FSN) field.

    e. Acreage information, including crop codes.

    f. All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g. Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h. Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law"* (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U. NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V. TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

1. By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

2. By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

3. By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

4. By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

5. If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W. REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1. General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

**J.A. 1911**

DocuSign Envelope ID: C9F792E1-D786-426D-BE7F-28A5F957CDB3

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2.  Proceedings About Which The Recipient Entity Must Report

    Submit the information required about each proceeding that:

    a.  Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

    b.  Reached its final disposition during the most recent five-year period; and

    c.  Is one of the following:

        i.   A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

        ii.  A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

        iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

        iv.  Any other criminal, civil, or administrative proceeding if:

             a)  It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

             b)  It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

             c)  The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3.  Reporting Procedures

    Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4.  Reporting Frequency

    During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X. AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

   Recipients must retain all records pertaining to the agreement in accordance with 2

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

**J.A. 1914**

USCA4 Appeal: 25-1575     Doc: 55-4     Filed: 06/23/2025     Pg: 382 of 606

DocuSign Envelope ID: C9F792E1-D786-426D-BE7B-28A5F957CDB3
2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-14     Page 377 of 378

Revised March 2024

USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

### AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer.

### BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

   a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

   b. An audit that meets the requirements contained in Subpart F.

**J.A. 1915**

DocuSign Envelope ID: C9F792E1-D796-4B6D-BE7F-28A5F957CDB3

Revised March 2024                                    USDA FPAC General Terms and Conditions
                                                      For Grants and Cooperative Agreements

### CC. AGREEMENT COUNTERPARTS

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

### DD. CONTINUING OBLIGATIONS

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

**J.A. 1916**

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# BALTIMORE DECLARATION
# EXHIBIT 14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE,   )
  et al.,   )
   )
         Plaintiffs,   )       Case No. 2:25-cv-02152-RMG
   )
v.   )
   )
DONALD J. TRUMP, in his official   )
capacity as President of the United States;   )
et al.,   )
   )
         Defendants.   )

## DECLARATION OF FAITH P. LEACH
## (BALTIMORE, MARYLAND)

I, Faith P. Leach, hereby declare as follows:

1.     I submit this declaration on behalf of the Mayor and City Council of Baltimore, Maryland ("Baltimore" or "the City").

2.     I am the Chief Administrative Officer of the City of Baltimore. I was appointed by Mayor Brandon Scott to serve as Baltimore's first woman Chief Administrative Officer. On March 13, 2023, the Baltimore City Council unanimously confirmed my appointment. In my role, I manage the day-to-day governmental operations across the entire City enterprise, ensuring the effective, efficient, and equitable delivery of City services.

3.     In my role, I oversee and supervise all staff who administer grants from the federal government. This includes the staff who oversee Baltimore's federal grants described in this declaration. I am personally familiar with these grants and the City programs the grants are meant to fund.

**J.A. 1918**

4. Baltimore is a municipal corporation organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles.

5. Baltimore is a city of nearly 600,000 people. It is the largest city in Maryland and the 30th-largest city in the United States.

***Baltimore's Federal Funding Related to Clean Energy***

6. Over the past few years, Baltimore has been awarded more than 20 federal grants through grant programs funded by the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA"). As relevant here, these grants include the following: (1) a $4 million grant under the Solid Waste Infrastructure for Recycling ("SWIFR") program from the Environmental Protection Agency ("EPA"), to develop a solar-powered composting facility; (2) two grants totaling $524,000 through the EPA's Environmental Justice Government-to-Government ("EJG2G") Program to fund Baltimore's YH2O+ Career Training Program ("YH2O+"), which prepares young adults for jobs in the water and solid waste industries; and (3) a $10 million grant from the U.S. Department of Energy ("DOE") to fund a grant under the IRA's Assistance for the Adoption of the Latest and Zero Building Energy Codes program (the "Energy Codes grant").

7. The Trump administration's freezes on IRA and IIJA funds have affected the SWIFR, YH2O+, and Energy Codes grants, harming Baltimore, as described below.

***Harms of Funding Freeze to Baltimore's Composting Facility***

8. In 2023, the EPA awarded Baltimore a $4.0 million SWIFR grant to fund the Bowley's Lane Composting Facility.

2

**J.A. 1919**

9.      Baltimore entered into a Cooperative Agreement with the EPA, with an award date of August 2, 2024, for the composting facility funding (Exhibit A to this Declaration). The total approved assistance amount is $4 million, and the total amount awarded to date is $3,031,840, as stated on page 3 of the Cooperative Agreement. The approximately $3.0 million amount is intended to fund equipment purchases for the composting facility, and the remaining $1 million will pay for construction costs. The project period is August 15, 2024 through August 15, 2027.

10.      The composting facility, which will be solar-powered and scalable, is a four-acre property co-located with Baltimore's new East Side Transfer Station. The transfer station is a waste-processing facility and includes administration and maintenance buildings. The $4 million EPA funding will allow the City's Department of Public Works ("DPW") to develop the composting facility, which had been identified as a future component of the East Side Campus. No funding had been allocated for the composting facility prior to the EPA grant.

11.      In reliance on the grant funding, the transfer station project has been designed so that its design and construction timeline runs concurrent to the three-year grant period. The City has reached the 30% design milestone for project development of the transfer station, including for the composting facility.

12.      The City's composting facility is expected to benefit the City in several ways.

13.      First, the facility will reduce emissions of greenhouse gases. The facility will have the capacity to compost approximately 12,000 tons of organic materials per year, diverting the materials from landfills and incinerators, and it will reduce greenhouse gas emissions by 6,000 tons. The facility will move the City one step closer to reaching goals it has established to reduce greenhouse gases 60% by 2030 and reach full carbon neutrality by 2045, as set out in Baltimore's Climate Action Plan.

**J.A. 1920**

14.     Second, because the composting facility will be solar-powered, it will reduce long-term energy costs and encourage renewable energy.

15.     Third, the composting facility will reduce the City's dependence on combustion-based power and improve air quality and public health in Baltimore. Currently, thirty-six percent of all industrial air pollution in Baltimore comes from the Baltimore Refuse Energy Systems Co. ("BRESCO") waste incinerator. BRESCO has been the focus on several lawsuits, and Baltimore is under pressure to rely less on the incinerator for the City's waste management. The compositing facility will allow the City to transition away from waste incineration, creating positive environmental and health benefits.

16.     Fourth, the facility will create four or five permanent full-time green energy jobs for local residents in low-income, high-unemployment areas of the City which are currently facing environmental pollution. Hiring will occur once the facility is constructed.

17.     Fifth, the facility will provide communities in Baltimore with access to organics recycling infrastructure. Compostable materials constitute nearly 40% of the City's residential solid waste stream, but only a portion of the City's organic waste is being diverted.

18.     Sixth, the facility will benefit local food production. Compost improves the soil's water retention capacity, which reduces run-off, protects the local watershed, prevents flooding, and improves soil health. Compost also regenerates local soil by increasing its capacity to sequester carbon.

19.     Seventh, the facility will further Baltimore's goal to prioritize composting as part of the City's solid waste management plan. The composting goal is set out in the Building a Better Baltimore action plan, which states a goal to "Move the City and Baltimore residents towards a more sustainable future and zero waste, through improved recycling, composting, waste

management, and improved energy practices." Baltimore's Comprehensive Plan similarly lists a "desire to move toward a circular economy" and "prioritize reduction, reuse, recycling, and composting options wherever possible." And Baltimore's Food Waste and Recovery Strategy discusses the importance of composting at length.

20.      However, on January 31, 2025, Baltimore received an email from an EPA official stating that "Funding has been paused for grants under the Infrastructure Investment and Jobs Act at this time. This pause pertains to <u>all external activities and all funding on existing grants for the Solid Waste Infrastructure for Recycling (SWIFR) grant program</u>" (emphasis in original). The January 31, 2025 email also forwarded a January 28, 2025 email to grant recipients which stated that "EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time." A true and correct, redacted copy of these EPA emails is attached as Exhibit B.

21.      Then, two weeks later, on February 12, 2025, Baltimore received an email from the same EPA employee stating that Baltimore could resume work on the SWIFR grant. However, no guarantee was given that Baltimore's SWIFR funding would remain unfrozen, nor that Baltimore's grant funding is exempt from the directions in the Energy EO requiring a freeze of IRA and IIJA funding.

22.      The two-week funding freeze and uncertainty about future funding have harmed Baltimore in several ways. Although the SWIFR grant is currently unfrozen, the grant is reimbursement-based, so Baltimore must front any money for the compositing facility and then seek reimbursement from the EPA. The City expected to draw down the funds gradually over the

5

**J.A. 1922**

three-year grant period. Because Baltimore cannot predict if the SWIFR grant will be frozen again, when, and for how long, the City is hesitant to expend resources on the project given the risk that the funding will be suspended and expenses will not be reimbursed. Then Baltimore would have to pay such expenses from its general account, which would affect other City needs.

23.     The uncertainty over whether EPA will continue to honor the grant funding is impacting the equipment procurement process for the composting facility and thus the overall project timeline. Baltimore has not drawn down any of the $4 million grant funding yet. The City would like to purchase certain equipment to use at the compositing facility—a front-end loader, an excavator, and a grinder—but does not want to make these expensive purchases until it is sure it will be reimbursed by EPA. Baltimore planned to cost-share on purchasing equipment with the Department of Recreation and Parks, but conversations about that coordination have been paused due to the current uncertainty. This has delayed the timeline for purchasing equipment and thus has delayed the overall project timeline.

24.     Broadly speaking, the uncertainty of EPA funding is detrimental to the many expected benefits of the composing facility to Baltimore, as described above.

### *Harms of Funding Freeze to Baltimore's Career Training Program*

25.     Baltimore was also awarded $524,000 through two different EPA awards, a $200,000 grant for fiscal years 2021 through 2024 and a $324,000 grant for fiscal year 2025, to fund the City's innovative, award-winning YH2O+ Career Training Program.

26.     The YH2O+ program prepares young adults to be employed in full-time paying jobs in the water and solid waste industries, with the opportunity for career growth and advancement. It is open to individuals, ages 18 to 24 years old, who have a high school diploma or GED, are unemployed or underemployed, and are not currently enrolled in a job training

program or post-secondary education. The Baltimore City Mayor's Office of Employment Development ("MOED") and DPW have partnered with the Chesapeake Water Environment Association ("CWEA") to design and operate the program.

27.     The YH2O+ program consists of three phases. In Phase I, participants complete skill and interest assessments, take part in basic job readiness and training, and are introduced to water and solid waste industries. In Phase II, participants explore a variety of career options available within the water and solid waste industries, take part in job shadowing experiences and worksite tours, and are paired with career coaches. In Phase III, participants are placed in paid summer jobs through YouthWorks and begin interviewing for full-time positions.

28.     The YH2O+ program reached its ten-year anniversary in December 2024. Roughly 200 young men and women have successfully completed the training since its inception in 2015, including 22 participants in fall 2024, the most recent class. Graduates have taken jobs with employers including the Public Works Departments of the City, Baltimore County, and Howard County; Baltimore's Department of Recreation and Parks; the Baltimore City Fire Department; and private industry.

29.     The YH2O+ program benefits the City by providing a better-educated and better-trained workforce for City departments. Baltimore relies on this program as a pipeline for new workers in the water and solid waste industries, with the right skills to fill entry-level positions in multiple City departments. Indeed, Baltimore departments support the YH2O+ program because it helps them recruit. The City has high unemployment and this program trains youth for gainful employment.

30.     Moreover, the City is subject to a consent decree with the State of Maryland Department of the Environment regarding the discharge of pollutants from the City's wastewater

treatment plants. Among other conditions, the consent decree requires Baltimore to implement a Staffing Plan, requiring sufficient staffing levels of qualified operators for its water-treatment facilities. In the consent decree, the City notes that there is a shortage of wastewater treatment plant operators, exacerbated by turnover and retirements during COVID. The YH2O+ program is valuable to the City by training young workers for its water treatment facilities, educating them in the latest industry standards for water treatment, thus helping the City to satisfy the conditions of the consent decree.

31.    The YH2O+ program has become a national model for other cities and public and private utilities. Representatives from many cities have visited Baltimore to observe the program directly and have since adopted it in their cities. The program also received the Water Environment Foundation's Public Communication and Outreach Program award.

32.    Baltimore entered into a Cooperative Agreement with the EPA, with an award date of September 30, 2021, for the first YH2O+ grant of $200,000 (Exhibit C). The project period was October 1, 2021 through September 30, 2023. Baltimore requested an extension of this grant through May 31, 2024. Baltimore entered into a second Cooperative Agreement with the EPA, with an award date of September 5, 2024, for the YH2O+ grant of $324,000 for fiscal year 2025 (Exhibit D). The project period for the second grant is October 1, 2023 through September 30, 2025.

33.    Baltimore relies on the EPA grant to fund the YH2O+ program. This spring, the City was planning to use the fiscal year 2025 funding for the following program needs, at a minimum: (1) to purchase steel-toed boots and hardhats for the students, since those are required for tours at wastewater plants and other worksites; (2) to purchase business attire for program participants, to be used for interviews with a panel of industry professionals during the program;

and (3) for $500 stipends paid to participants upon completion as an incentive and to help defray transportation costs. The City also competes with similar regional programs for participants, and it needs the funding to stay competitive with those programs.

34.    The YH2O+ grants were present in Baltimore's federal payment portal as of November 1, 2024, and were available consistently prior to January 2025. On February 13, 2025, the City received a message in the portal stating that "federal agency has made changes to an account," and the accounts were unavailable on that date. The funds were unavailable to be drawn down from the portal on other dates in February, as well.

35.    The two YH2O+ awards subsequently reappeared in the portal and were available on March 5 and 6, 2025. The City was able to confirm the draw-down of the remaining $100,579.85 for the first YH2O+ grant on March 6, 2025. Baltimore received a receipt for the draw-down but has not received the funds yet.

36.    As of March 11, 2025, the $324,000 YH2O+ award for fiscal year 2025 was missing again from Baltimore's funding portal. None of the funds have been drawn down. A Baltimore employee recently attempted to draw down an initial $3,000 corresponding to funds that Baltimore has recently spent on the program (for program t-shirts), but the grant funds were missing in the payment portal, so Baltimore will have to cover the $3,000 cost from its general account. Baltimore also had to cover the $22,000 cost of stipends for the fall 2024 program participants, and a $932 payment to a seamstress to tailor participants' business attire, both of which the City was expecting to pay from the $324,000 grant. Without the YH2O+ grant funds, Baltimore has had to pay these costs itself from its general account, which affects other City funding needs, with no promise of future payment.

37.    Without the $324,000 in 2025 funds, the YH2O+ program was put on hold in January 2025 for this year's spring and fall sessions. The City is not taking applications for participants for spring 2025. Baltimore is very unlikely to run the program without the EPA funding because the City has budget limitations. If Baltimore is unable to put on its spring and/or fall programs, it will lose the opportunity to train future employees of City departments, depriving Baltimore of the trained 2025 program participants, who were expected to join the ranks of City departments.

### *Harms of Federal Funding Freeze to Baltimore's Building Codes Program*

38.    In addition to the SWIFR and YH2O+ grants described above, Baltimore was also awarded $10 million through the IRA's Assistance for the Adoption of the Latest and Zero Building Energy Codes grant program (the "Energy Codes grant"). An energy code is one of several types of building codes that help contribute to the overall health, safety, efficiency, and long-term resilience of buildings. The IRA program is meant to provide funds for states and local governments to adopt and implement the latest building energy codes. These codes support the decarbonization of new and existing residential and commercial buildings.

39.    Baltimore's Department of Housing and Community Development, Department of Planning Office of Sustainability, and Department of General Services sought funding under the Energy Codes grant program, and the City received a $10 million award. The signed grant agreement with the U.S. Department of Energy, State and Community Energy Programs is attached as Exhibit E. The signature date is December 18, 2024, the effective date is January 1, 2025, and the performance period is January 1, 2025 through December 31, 2025. The federal government's share of the grant is $10 million, with a cost share of $0. The grant program is intended to run for nine years, with the $10 million allocated across that time period.

40. The money is meant to pay for staff workforce training related to building inspections in the City, to fund evaluation of energy code compliance and enforcement in new and existing buildings in Baltimore, and to develop and adopt a Building Performance Standard for the City to complement the State of Maryland's stricter standard. The funds would help Baltimore adopt International Code Council ("ICC") and International Energy Conservation Code ("IECC") construction standards, now required by the State of Maryland.

41. This initiative is intended to contribute to the City's greenhouse gas emissions reduction goals and provide an opportunity for workforce training. The project includes benchmarking and stepwise actions towards the City's goal of carbon neutrality by 2045.

42. The City's objectives for Baltimore's Energy Codes project are to evaluate and audit current code adoption, knowledge, and enforcement efforts; design, develop, and adopt a local building performance standard; educate building owners on building performance and state and local requirements; provide workforce training through contract support and to build up compliance enforcement capability; support local workforce development; and provide increased support to property owners to understand and comply with the building performance standard code.

43. Although Baltimore has the signed $10 million grant agreement, the City is awaiting DOE's review and approval of the Statement of Project Objectives ("SOPO") for the City's project. The SOPO will specify what the funding will be spent on. When the SOPO is approved, Baltimore will be able to begin drawing down funds.

44. The City has drafted the SOPO with DOE's input. The City asked DOE on March 13, 2025 for a call to discuss the SOPO, seeking to finalize it, but the DOE gave a non-committal response on March 14, 2025 and has not responded further. As of today, it appears that the $10

11

J.A. 1928

million in funding is on hold, and any further progress and work on the grant is on hold. The project was meant to begin on January 1, 2025, but Baltimore is uncertain if the $10 million grant will be funded at all.

45. For 2025, Baltimore planned to use the federal funding to hire new staff—including educators, project managers, and consultants—and to audit buildings' compliance with ICC and IECC standards. Without the funds, the City is not able to hire those employees and cannot begin its work of training staff, education, and outreach to building owners and local organizations and non-profits. The funding loss affects Baltimore's ability to educate the community and enforce new stricter building codes in the City.

46. The City owns many buildings in Baltimore, so losing the Building Codes grant funding also negatively affects the City's own real estate. Without the training and education which this Building Codes grant would provide, the City's buildings will lose out on the benefits of additional attention paid to building code compliance for its buildings. The grant funding would help Baltimore comply with new stricter building code regulations from the State of Maryland, and without compliance Baltimore could be fined by the State. For new City-owned buildings, the grant funding would help ensure compliance during construction to avoid building code violations and fines. Also, losing this funding will affect Baltimore's ability to meet its goals and requirements for compliance with green energy standards and addressing the harms of climate change.

*(signature on following page)*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in Baltimore, Maryland, on this 25th day of March, 2025.

_____
Faith P. Leach
Chief Administrative Officer
City of Baltimore

# BALTIMORE DECLARATION

# EXHIBIT 14-A

4Z - 95335901 - 0      Page 1

| | |
|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Cooperative Agreement | GRANT NUMBER (FAIN): 95335901     MODIFICATION NUMBER: 0     PROGRAM CODE: 4Z     DATE OF AWARD 08/02/2024 |

| GRANT NUMBER (FAIN): | 95335901 | DATE OF AWARD |
|---|---|---|
| MODIFICATION NUMBER: | 0 | 08/02/2024 |
| PROGRAM CODE: | 4Z | |
| TYPE OF ACTION New | | MAILING DATE 08/07/2024 |
| PAYMENT METHOD: ASAP | | ACH# 9997 |

| RECIPIENT TYPE: Municipal | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| CITY OF BALTIMORE 200 Holliday Street, Floor 6 Baltimore, MD 21202-3618 EIN: 52-6000769 | City of Baltimore 200 Holliday Street, Floor 6 Baltimore, MD 21202-3618 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Sophia Hosain 200 Holliday Street, Floor 6 Baltimore, MD 21202-3618 **Email:** sophia.hosain@baltimorecity.gov **Phone:** 410-396-1185 | Evelyn Velazquez Four Penn Center, 1600 John F. Kennedy Boulevard, 3LD00 Philadelphia, PA 19103-2852 **Email:** Velazquez.Evelyn@epa.gov **Phone:** 215-814-5412 | Haley McAlpine Grants Management Section, 3MD22 Four Penn Center, 1600 John F. Kennedy Boulevard Philadelphia, PA 19103-2852 **Email:** McAlpine.Haley@epa.gov **Phone:** 215-814-5281 |

**PROJECT TITLE AND DESCRIPTION**

Baltimore City Department of Public Works' Bowley's Lane Composting Facility

See Attachment 1 for project description.

| BUDGET PERIOD 08/15/2024 - 08/15/2027 | PROJECT PERIOD 08/15/2024 - 08/15/2027 | TOTAL BUDGET PERIOD COST $ 4,259,362.00 | TOTAL PROJECT PERIOD COST $ 4,259,362.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 01/22/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 3,031,840.00. EPA agrees to cost-share 93.91% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 3,031,840.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 3, US EPA Region 3, 3MD22 Four Penn Center, 1600 John F. Kennedy Boulevard Philadelphia, PA 19103-2852 | U.S. EPA, Region 3, Land, Chemicals and Redev Div (3LD00) R3 - Region 3 Four Penn Center, 1600 John F. Kennedy Boulevard Philadelphia, PA 19103-2852 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Lisa White - Mission Support Division, Deputy Director | DATE 08/02/2024 |

Mayor and City Council of Baltimore     Approved for form and legal sufficiency     Approved by the Board of Estimates

*Khalil Zaied*      08/12/2024          *[signature]*      8/12/2024

Khalil Zaied, Director          Date     Chief Solicitor          Date     Clerk          Date
Department of Public Works

4Z - 95335901 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 3,031,840 | $ 3,031,840 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 259,362 | $ 259,362 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 3,291,202 | $ 3,291,202 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.920 - Solid Waste Infrastructure Financing - Save Our Seas Act Grants | 33 USC 4282 & Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2403PA0053 | 22 | E1SD | 03P | 000D11X81 | 4183 | - | - | $ 3,031,840 |
| | | | | | | | | | $ 3,031,840 |

J.A. 1933

2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-15     Page 18 of 71

4Z - 95335901 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 225,532 |
| 2. Fringe Benefits | $ 33,830 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 3,031,840 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 968,160 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 4,259,362 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___6.09 % Federal ___93.91 %) | $ 4,259,362 |
| 12. Total Approved Assistance Amount | $ 4,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 3,031,840 |
| 15. Total EPA Amount Awarded To Date | $ 3,031,840 |

4Z - 95335901 - 0    Page 4

## Attachment 1 - Project Description

This cooperative agreement provides funding from the Infrastructure Investment and Jobs Act (IIJA). EPA's Solid Waste Infrastructure for Recycling (SWIFR) grants for political subdivisions of states and territories will fund activities that will result in a significant decrease in the generation of Municipal Solid Waste (MSW) and/or an increase in the diversion of MSW from landfills and incineration, as well as fund innovative solutions and programs that provide or increase access to prevention, reuse, mechanical recycling, anaerobic digestion, and composting.

The purpose of this award is to enhance the City of Baltimore's efforts to meet the SWIFR grants elements. Specifically, the City of Baltimore will develop a solar-powered, scalable composting facility for local organics diversion that will be co-located with the new East Side Transfer Station at Bowley's Lane. The new composting facility will allow for increased collection of organic materials and access to improved materials management infrastructure for communities in Baltimore. This project will move the City of Baltimore closer to reaching its Food Waste and Recovery Strategy goal. This action partially funds the grant in the amount of $3,031,840. Federal funds in the amount of $968,160 remain contingent upon approval of NEPA (National Environmental Policy Act) review. The activities to be performed are to purchase equipment for the operation of the composting facility and to lay an asphalt foundation pad for the facility, ensuring it is in compliance with Maryland Compost Facility regulations on a 4-acre parcel of land. The equipment will be used to manage the composting process at the facility. The anticipated deliverables include the production of compost from approximately 12,000 tons of collected organic materials per year that will be diverted from the landfill and incineration streams, as well as the creation of 4-5 full-time green industry jobs. The expected outcomes from the development of this composting facility in the City of Baltimore are improved environmental conditions for Baltimore communities and its residents. These conditions include improved air quality, reduced greenhouse gas (GHG) emissions and other pollutants, and the diversion of organic materials from the landfill and incineration streams to composting. The intended beneficiaries include the communities in the City of Baltimore. No subawards are included in this assistance agreement.

4Z - 95335901 - 0    Page 5

## Administrative Conditions

### General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425):  RTPFC-Grants@epa.gov with copy to grant specialist of record.
- MBE/WBE reports (EPA Form 5700-52A):R3_MBE-WBE_Reports@epa.gov.
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, requests for extensions of the budget and project period, amendment requests, requests for other prior approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications:  Grant specialist and project officer of record.
- Payment requests (if applicable):  RTPFC-Grants@epa.gov.
- Quality Assurance documents, work plan revisions, equipment lists, programmatic reports and deliverables: project officer of record.

### B. Contingent Funding

EPA is funding this agreement incrementally. There is no guarantee of funding beyond the first year. The **Total Approved Assistance Amount** identified on Line 12 of the budget table of this award is contingent upon the availability of appropriated funds, EPA funding priorities, and satisfactory progress in carrying out the activities described in the scope of work. If EPA informs the recipient that the amount on Line 12 will be reduced, the recipient agrees to provide an updated workplan and budget information, as needed, to amend the agreement.

**J.A. 1936**

## Programmatic Conditions

<u>Grant-Specific Programmatic Terms and Conditions</u>

## A.  PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

<u>Performance Reports – Content</u>

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas:  1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) Additional pertinent information, including, when appropriate, analysis and explanation of cost overruns or high-unit costs.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

<u>Performance Reports - Frequency</u>

Quarterly progress reports and a detailed final report will be required. The quarterly progress reports will be submitted to the EPA Project Officer within thirty days after each reporting period. These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies shall be included in the report. The report shall also include any changes of key personnel concerned with the project.

Applicants should describe how they plan to meet the requirement to provide as part of its quarterly performance report, a description of how program income is being used.

Applicants should also indicate how they plan to meet the requirement to submit a report on the amount of program income earned during the award period must be submitted with the quarterly Federal Financial Report, Standard Form 425.

At the close of the grant, the successful applicant will submit a final technical report to the EPA Project Officer within 90 calendar days of completion of the period of performance. The final technical report shall include a summary of the project or activity, advances or goals achieved, and costs of the project or activity. In addition, the final technical report should discuss the problems, successes, and lessons learned during the project period.

## B.  Cybersecurity Condition

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of

**J.A. 1937**

4Z - 95335901 - 0    Page 7

this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements.

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D.  Leveraging

**Leveraging:** The recipient agrees to provide the proposed leveraged funding, including any voluntary cost-share contribution or overmatch, that is described in its proposal dated 1/22/2024.  If the proposed leveraging does not materialize during the period of award performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient.  In addition, if the proposed leveraging does not materialize during the period of award performance then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding the recipient described in its proposal dated 1/22/2024.   EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

**J.A. 1938**

4Z - 95335901 - 0    Page 8

## Voluntary Cost-Share or Overmatch

This award and the resulting federal funding of **$4,000,000** is based on estimated costs requested in the recipient's application dated 1/22/2024.  Included in these costs is a voluntary cost-share contribution of **$259,362** by the recipient in the form of a voluntary cost-share or overmatch (providing more than any minimum required cost-share) that the recipient included in its proposal dated 1/22/2024.  The recipient must provide this voluntary cost-share contribution during performance of this award unless the EPA agrees otherwise in a modification to this agreement. While actual total costs may differ from the estimates in the recipient's application, EPA's participation shall not exceed the total amount of federal funds awarded.

If the recipient fails to provide the voluntary cost-share contribution during the period of award performance, and EPA does not agree to modify the agreement to reduce the cost share, the recipient is in violation of the terms of the agreement.  In addition to other remedies available under 2 CFR Part 200, the Agency may consider this factor in evaluating future proposals from the recipient.  In addition, if the voluntary cost-share contribution does not materialize during the period of award performance then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the voluntary cost-share or overmatch the recipient described in its proposal dated 1/22/2024.  EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## E.  EQUIPMENT DISPOSITION

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient must request disposition instructions from the EPA Project Officer Disposition instructions will be one of the following:

(1) Items of equipment with a current per unit fair market value of $5,000 or less may be retained, sold or otherwise disposed of with no further obligation to the EPA.

(2) Except as provided in 2 CFR 200.312 Federally-owned and exempt property, paragraph (b), or if EPA fails to provide requested disposition instructions within 120 days, items of equipment with a current per-unit fair-market value in excess of $5,000 may be retained by the recipient or sold. EPA is entitled to an amount calculated by multiplying the current market value or proceeds from sale by EPA's percentage of participation in the cost of the original purchase. If the equipment is sold, EPA may permit the recipient to deduct and retain from the Federal share $500 or ten percent of the proceeds, whichever is less, for its selling and handling expenses.

(3) The recipient may transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the recipient must be entitled to compensation for its attributable percentage of the current fair market value of the property.

(4) In cases where a recipient fails to take appropriate disposition actions, EPA may direct the recipient to take disposition actions.

## F.  Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach

**J.A. 1939**

4Z - 95335901 - 0     Page 9

materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the City of Baltimore received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

## G. Substantial Involvement

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) monthly telephone calls and other monitoring (or meeting on an alternate schedule suggested by EPA's Project Officer),

2.) reviewing project phases and providing approval to continue to the next phase,

3.) reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5.) reviewing and commenting on the programmatic progress reports

6) consultation with EPA regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) joint operational involvement, participation, and/or collaboration between EPA and the recipient. EPA's Project Officer or designee may provide data, advice, and information that will help the grantee carry out the agreement effectively.

## H. National Environmental Policy Act (NEPA)

EPA is initially awarding $3,031,840 funds for preconstruction activities (e.g. planning and pre-design work). No environmental documentation is required; however, Recipient may only drawdown funds for preconstruction activities. Recipient shall not drawdown EPA funds, or make any expenditures to meet a cost share obligation, for Construction as defined in 40 CFR 33.103 in relevant part as (" . . . erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property . . . ")

EPA will not award additional funds for construction activities until EPA has complied with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and implementing EPA regulations at 40 CFR Part 6 and Council for Environmental Quality regulations at 40 CFR §§ 1500-1508. In order for EPA to carry out its environmental review obligations under NEPA, recipient must provide EPA with information on all impacts the construction activities may have on the quality of the human environment. This may include, at the direction of the EPA Project Officer, providing an Environmental Information

**J.A. 1940**

4Z - 95335901 - 0    Page 10

Document to EPA to assist EPA in preparing the required NEPA review document. The recipient may charge costs for providing this information to the initial award. Once EPA completes its NEPA review, the EPA Project Officer will notify the recipient that the assistance agreement is being amended to add remaining funds to the award to cover the costs of construction. After the amendment is processed, recipient may drawdown funds for construction activities.

## I. Davis-Bacon Act

DAVIS BACON PREVAILING WAGE TERM AND CONDITION

The following terms and conditions specify how grantees will assist EPA in meeting its Davis Bacon Related Acts (DB) responsibilities under 33 U.S.C. 4282(e)(1) when EPA funding will be used for a construction project. Act If the grantee has questions regarding when DB applies, obtaining the correct DB wage determinations, DB contract provisions, or DB compliance monitoring, they should contact their EPA Project Officer.

1. Applicability of the Davis Bacon Prevailing Wage Requirements

For the purposes of this term and condition, EPA has determined that "construction" as defined in 40 CFR 33.103means, "erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property, and activities in response to a release or a threat of a release of a hazardous substance into the environment, or activities to prevent the introduction of a hazardous substance into a water supply." In pertinent part construction If the grantee encounters a unique situation at a site that presents uncertainties regarding DB applicability, the grantee must discuss the situation with EPA before authorizing work on that site.

2. Obtaining Wage Determinations

(a) Unless otherwise instructed by EPA on a project specific basis, the grantee shall use the following DOL General Wage Classifications for the locality in which the construction activity subject to DB will take place. Grantees must obtain wage determinations for specific localities at https://sam.gov/content/wage-determinations. Grantees shall use the "Building Construction" classification.

Note: Grantees must discuss unique situations that may not be covered by the General Wage Classifications described above with EPA's Project Officer. If, based on discussions with a grantee, EPA determines that DB applies to a unique situation the Agency will advise the grantee which General Wage Classification to use based on the nature of the construction activity at the site.

(b)  Grantee shall obtain the wage determination for the locality in which a project subject to DB will take place *prior* to issuing requests for bids, proposals, quotes or other methods for soliciting contracts (solicitation) for activities subject to DB. These wage determinations shall be incorporated into solicitations and any subsequent contracts. Prime contracts must contain a provision requiring that subcontractors follow the wage determination incorporated into the prime contract.

(i) While the solicitation remains open, the grantee shall monitor https://sam.gov/content/wage-determinations on a weekly basis to ensure that the wage determination contained in the solicitation remains current. The grantee shall amend the solicitation if DOL issues a modification more than 10 days prior to the closing date (i.e., bid opening) for the solicitation. If DOL modifies or supersedes the applicable wage determination less than 10 days prior to the closing date, the grantee may request a

finding from EPA that there is not a reasonable time to notify interested contractors of the modification of the wage determination. EPA will provide a report of the Agency's finding to the grantee.

(ii) If the grantee does not award the contract within 90 days of the closure of the solicitation, any modifications or determination contained in the solicitation shall be effective unless EPA, at the request of the grantee, obtains an extension of the 90 day period from DOL pursuant to 29 CFR 1.6(c)(3)(iv). The grantee shall monitor https://sam.gov/content/wage-determinations on a weekly basis if it does not award the contract within 90 days of closure of the solicitation to ensure that wage determinations contained in the solicitation remain current.

(iii) If the grantee carries out an activity subject to DB by issuing a task order, work assignment or similar instrument to an existing contractor (ordering instrument) rather than by publishing a solicitation, the grantee shall insert the appropriate DOL wage determination from https://sam.gov/content/wage-determinations into the ordering instrument.

(c) Grantee shall review all subcontracts subject to DB entered into by prime contractors to verify that the prime contractor has required its subcontractors to include the applicable wage determinations.

(d) As provided in 29 CFR 1.6(f), DOL may issue a revised wage determination applicable to a grantee's contract after the award of a contract or the issuance of an ordering instrument if DOL determines that the grantee has failed to incorporate a wage determination or has used a wage determination that clearly does not apply to the contract or ordering instrument.  If this occurs, the grantee shall either terminate the contract or ordering instrument and issue a revised solicitation or ordering instrument or incorporate DOL's wage determination retroactive to the beginning of the contract or ordering instrument by change order. The grantee's contractor must be compensated for any increases in wages resulting from the use of DOL's revised wage determination.

3. Contract and Subcontract Provisions

(a) The grantee shall insert in full in any contract in excess of $2,000 which is entered into for the actual construction, alteration and/or repair, including painting and decorating, of a public building or public work, or building or work financed in whole or in part from Federal funds or in accordance with guarantees of a Federal agency or financed from funds obtained by pledge of any contract of a Federal agency to make a loan, grant or annual contribution (except where a different meaning is expressly indicated), and which is subject to DB, the following labor standards provisions.

(1) Minimum wages.

(i) All laborers and mechanics employed or working upon the site of the work will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by regulations issued by the Secretary of Labor under the Copeland Act (29 CFR Part 3)), the full amount of wages and bona fide fringe benefits (or cash equivalents thereof) due at time of payment computed at rates not less than those contained in the applicable wage determination of the Secretary of Labor which the grantee obtained under the procedures specified in Item 2, above, and made a part hereof, regardless of any contractual relationship which may be alleged to exist between the contractor and such laborers and mechanics.

Contributions made or costs reasonably anticipated for bona fide fringe benefits under section 1(b)(2) of the Davis-Bacon Act on behalf of laborers or mechanics are considered wages paid to such laborers or

4Z - 95335901 - 0    Page 12

mechanics, subject to the provisions of paragraph (a)(1)(iv) of this section; also, regular contributions made or costs incurred for more than a weekly period (but not less often than quarterly) under plans, funds, or programs which cover the particular weekly period, are deemed to be constructively made or incurred during such weekly period. Such laborers and mechanics shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill, except as provided in § 5.5(a)(4). Laborers or mechanics performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein: Provided that the employer's payroll records accurately set forth the time spent in each classification in which work is performed. The wage determination (including any additional classification and wage rates conformed under paragraph (a)(1)(ii) of this section) and the Davis-Bacon poster (WH-1321) shall be posted at all times by the contractor and its subcontractors at the site of the work in a prominent and accessible place where it can be easily seen by the workers. Grantees shall require that the contractor and subcontractors include the name of the grantee employee or official responsible for monitoring compliance with DB on the poster.

(ii)(A) The grantee, on behalf of EPA, shall require that contracts and subcontracts entered into under this agreement provide that any class of laborers or mechanics, including helpers, which is not listed in the wage determination and which is to be employed under the contract shall be classified in conformance with the wage determination. The EPA Award Official shall approve an additional classification and wage rate and fringe benefits therefore only when the following criteria have been met:

(1) The work to be performed by the classification requested is not performed by a classification in the wage determination; and

(2) The classification is utilized in the area by the construction industry; and

(3) The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination.

(B) If the contractor and the laborers and mechanics to be employed in the classification (if known), or their representatives, and the grantee agree on the classification and wage rate (including the amount designated for fringe benefits where appropriate), a report of the action taken shall be sent by the grantee to the EPA Award Official. The Award Official will transmit the report, to the Administrator of the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Washington, DC 20210. The Administrator, or an authorized representative, will approve, modify, or disapprove every additional classification action within 30 days of receipt and so advise the award official or will notify the award official within the 30-day period that additional time is necessary.

(C) In the event the contractor, the laborers or mechanics to be employed in the classification or their representatives, and the grantee do not agree on the proposed classification and wage rate (including the amount designated for fringe benefits, where appropriate), the award official shall refer the questions, including the views of all interested parties and the recommendation of the award official, to the Administrator for determination. The Administrator, or an authorized representative, will issue a determination within 30 days of receipt and so advise the contracting officer or will notify the Award Official within the 30-day period that additional time is necessary.

(D) The wage rate (including fringe benefits where appropriate) determined pursuant to paragraphs (a)(1) (ii)(B) or (C) of this section, shall be paid to all workers performing work in the classification under this contract from the first day on which work is performed in the classification.

**J.A. 1943**

4Z - 95335901 - 0　　Page 13

(iii) Whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly rate, the contractor shall either pay the benefit as stated in the wage determination or shall pay another bona fide fringe benefit or an hourly cash equivalent thereof.

(iv) If the contractor does not make payments to a trustee or other third person, the contractor may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing bona fide fringe benefits under a plan or program, Provided, that the Secretary of Labor has found, upon the written request of the contractor, that the applicable standards of the Davis-Bacon Act have been met. The Secretary of Labor may require the contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

(1) Withholding. The grantee, upon written request of the Award Official or an authorized representative of the Department of Labor, shall withhold or cause to withhold from the contractor under this contract or any other Federal contract with the same prime contractor, or any other federally-assisted contract subject to Davis-Bacon prevailing wage requirements, which is held by the same prime contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the contractor or any subcontractor the full amount of wages required by the contract. In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work, all or part of the wages required by the contract, EPA may, after written notice to the contractor, or grantee take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

(2) Payrolls and basic records.

(i) Payrolls and basic records relating thereto shall be maintained by the contractor during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work. Such records shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalents thereof of the types described in section 1(b)(2)(B) of the Davis-Bacon Act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of Labor has found under 29 CFR 5.5(a)(1)(iv) that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in section 1(b)(2)(B) of the Davis-Bacon Act, the contractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual cost incurred in providing such benefits. Contractors employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs.

(ii)(A) The contractor shall submit weekly for each week in which any contract work is performed a copy of all payrolls to the grantee who will maintain the records on behalf of EPA. The payrolls submitted shall set out accurately and completely all of the information required to be maintained under 29 CFR 5.5(a)(3) (i), except that full social security numbers and home addresses shall not be included on weekly transmittals. Instead the payrolls shall only need to include an individually identifying number for each employee (e.g., the last four digits of the employee's social security number). The required weekly payroll

**J.A. 1944**

4Z - 95335901 - 0     Page 14

information may be submitted in any form desired. Optional Form WH-347 is available for this purpose from the Wage and Hour Division Web site at https://www.dol.gov/whd/programs/dbra/wh347.htm or its successor site. The prime contractor is responsible for the submission of copies of payrolls by all subcontractors. Contractors and subcontractors shall maintain the full social security number and current address of each covered worker, and shall provide them upon request to the grantee for transmission to the EPA, if requested by EPA, the contractor, or the Wage and Hour Division of the Department of Labor for purposes of an investigation or audit of compliance with prevailing wage requirements. It is not a violation of this section for a prime contractor to require a subcontractor to provide addresses and social security numbers to the prime contractor for its own records, without weekly submission to the grantee.

(B) Each payroll submitted to the grantee shall be accompanied by a "Statement of Compliance," signed by the contractor or subcontractor or his or her agent who pays or supervises the payment of the persons employed under the contract and shall certify the following:

(1) That the payroll for the payroll period contains the information required to be provided under § 5.5 (a) (3)(ii) of Regulations, 29 CFR Part 5, the appropriate information is being maintained under § 5.5 (a)(3)(i) of Regulations, 29 CFR Part 5, and that such information is correct and complete;

(2) That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth in Regulations, 29 CFR Part 3;

(3) That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract.

(C) The weekly submission of a properly executed certification set forth on the reverse side of Optional Form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by paragraph (a)(3)(ii)(B) of this section.

(D) The falsification of any of the above certifications may subject the contractor or subcontractor to civil or criminal prosecution under section 1001 of title 18 and section 231 of title 31 of the United States Code.

(iii) The contractor or subcontractor shall make the records required under paragraph (a)(3)(i) of this section available for inspection, copying, or transcription by authorized representatives of the EPA or the Department of Labor, and shall permit such representatives to interview employees during working hours on the job. If the contractor or subcontractor fails to submit the required records or to make them available, EPA may, after written notice to the contractor, grantee, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 CFR 5.12.

(4) Apprentices and Trainees

(i) Apprentices. Apprentices will be permitted to work at less than the predetermined rate for the work they performed when they are employed pursuant to and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor, Employment and Training

**J.A. 1945**

4Z - 95335901 - 0    Page 15

Administration, Office of Apprenticeship Training, Employer and Labor Services, or with a State Apprenticeship Agency recognized by the Office, or if a person is employed in his or her first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Office of Apprenticeship Training, Employer and Labor Services or a State Apprenticeship Agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeymen on the job site in any craft classification shall not be greater than the ratio permitted to the contractor as to the entire work force under the registered program. Any worker listed on a payroll at an apprentice wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any apprentice performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. Where a contractor is performing construction on a project in a locality other than that in which its program is registered, the ratios and wage rates (expressed in percentages of the journeyman's hourly rate) specified in the contractor's or subcontractor's registered program shall be observed. Every apprentice must be paid at not less than the rate specified in the registered program for the apprentice's level of progress, expressed as a percentage of the journeymen hourly rate specified in the applicable wage determination. Apprentices shall be paid fringe benefits in accordance with the provisions of the apprenticeship program. If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification. If the Administrator determines that a different practice prevails for the applicable apprentice classification, fringes shall be paid in accordance with that determination. In the event the Office of Apprenticeship Training, Employer and Labor Services, or a State Apprenticeship Agency recognized by the Office, withdraws approval of an apprenticeship program, the contractor will no longer be permitted to utilize apprentices at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(ii) Trainees. Except as provided in 29 CFR 5.16, trainees will not be permitted to work at less than the predetermined rate for the work performed unless they are employed pursuant to and individually registered in a program which has received prior approval, evidenced by formal certification by the U.S. Department of Labor, Employment and Training Administration. The ratio of trainees to journeymen on the job site shall not be greater than permitted under the plan approved by the Employment and Training Administration. Every trainee must be paid at not less than the rate specified in the approved program for the trainee's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Trainees shall be paid fringe benefits in accordance with the provisions of the trainee program. If the trainee program does not mention fringe benefits, trainees shall be paid the full amount of fringe benefits listed on the wage determination unless the Administrator of the Wage and Hour Division determines that there is an apprenticeship program associated with the corresponding journeyman wage rate on the wage determination which provides for less than full fringe benefits for apprentices. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the Employment and Training Administration shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any trainee performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. In the event the Employment and Training Administration withdraws approval of a training program, the contractor will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(iii) Equal employment opportunity. The utilization of apprentices, trainees and journeymen under this

J.A. 1946

4Z - 95335901 - 0   Page 16

part shall be in conformity with the equal employment opportunity requirements of Executive Order 11246, as amended, and 29 CFR Part 30.

(5) Compliance with Copeland Act requirements. The contractor shall comply with the requirements of 29 CFR Part 3, which are incorporated by reference in this contract.

(6) Subcontracts. The contractor or subcontractor shall insert in any subcontracts the clauses contained in 29 CFR 5.5(a)(1) through (10) and such other clauses as the EPA may by appropriate instructions require, and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor with all the contract clauses in this term and condition.

(7) Contract termination: debarment. A breach of the contract clauses in 29 CFR 5.5 may be grounds for termination of the contract, and for debarment as a contractor and a subcontractor as provided in 29 CFR 5.12.

(8) Compliance with Davis-Bacon and Related Act requirements. All rulings and interpretations of the Davis-Bacon and Related Acts contained in 29 CFR Parts 1, 3, and 5 are herein incorporated by reference in this contract.

(9) Disputes concerning labor standards. Disputes arising out of the labor standards provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR Parts 5, 6, and 7. Disputes within the meaning of this clause include disputes between the contractor (or any of its subcontractors), the grantee, borrower or subrecipent and EPA, the U.S. Department of Labor, or the employees or their representatives.

(10) Certification of eligibility.

(i) By entering into this contract, the contractor certifies that neither it (nor he or she) nor any person or firm who has an interest in the contractor's firm is a person or firm ineligible to be awarded Government contracts by virtue of section 3(a) of the Davis-Bacon Act or 29 CFR 5.12(a)(1).

(ii) No part of this contract shall be subcontracted to any person or firm ineligible for award of a Government contract by virtue of section 3(a) of the Davis-Bacon Act or 29 CFR 5.12(a)(1).

(iii) The penalty for making false statements is prescribed in the U.S. Criminal Code, 18 U.S.C. 1001.

 4. Contract Provisions for Contracts in Excess of $100,000

(a) Contract Work Hours and Safety Standards Act. The grantee shall insert the following clauses set forth in paragraphs (a)(1), (2), (3), and (4) of this section in full in any contract in an amount in excess of $100,000 and subject to the overtime provisions of the Contract Work Hours and Safety Standards Act. These clauses shall be inserted in addition to the clauses required by Item 3, above or 29 CFR 4.6. As used in this paragraph, the terms laborers and mechanics include watchmen and guards.

(1) Overtime requirements. No contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any such laborer or mechanic in any workweek in which he or she is employed on such work to work in excess of

**J.A. 1947**

4Z - 95335901 - 0    Page 17

forty hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times the basic rate of pay for all hours worked in excess of forty hours in such workweek.

(2) Violation; liability for unpaid wages; liquidated damages. In the event of any violation of the clause set forth in paragraph (a)(1) of this section the contractor and any subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of the clause set forth in paragraph (a)(1) of this section, in the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of the standard workweek of forty hours without payment of the overtime wages required by the clause set forth in paragraph (a)(1) of this section.

(3) Withholding for unpaid wages and liquidated damages. The grantee, upon written request of the Award Official or an authorized representative of the Department of Labor, shall withhold or cause to withhold from any moneys payable on account of work performed by the contractor or subcontractor under any such contract or any other Federal contract with the same prime contractor, or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime contractor, such sums as may be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in paragraph (a)(2) of this section.

(4) Subcontracts. The contractor or subcontractor shall insert in any subcontracts the clauses set forth in paragraph (a)(1) through (4) of this section and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the clauses set forth in paragraphs (a)(1) through (4) of this section.

(b) In addition to the clauses contained in Item 3, above, in any contract subject only to the Contract Work Hours and Safety Standards Act and not to any of the other statutes cited in 29 CFR 5.1, the grantee shall insert a clause requiring that the contractor or subcontractor shall maintain payrolls and basic payroll records during the course of the work and shall preserve them for a period of three years from the completion of the contract for all laborers and mechanics, including guards and watchmen, working on the contract. Such records shall contain the name and address of each such employee, social security number, correct classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. Further, the grantee shall insert in any such contract a clause providing that the records to be maintained under this paragraph shall be made available by the contractor or subcontractor for inspection, copying, or transcription by authorized representatives of the Environmental Protection Agency and the Department of Labor, and the contractor or subcontractor will permit such representatives to interview employees during working hours on the job.

5. Compliance Verification

(a) The grantee shall periodically interview a sufficient number of employees entitled to DB prevailing wages (covered employees) to verify that contractors or subcontractors are paying the appropriate wage rates. As provided in 29 CFR 5.6(a)(6), all interviews must be conducted in confidence. The grantee must use Standard Form 1445 or equivalent documentation to memorialize the interviews. Copies of the SF 1445 are available from EPA on request.

**J.A. 1948**

4Z - 95335901 - 0    Page 18

(b) The grantee shall establish and follow an interview schedule based on its assessment of the risks of noncompliance with DB posed by contractors or subcontractors and the duration of the contract or subcontract. At a minimum, the grantee must conduct interviews with a representative group of covered employees within two weeks of each contractor or subcontractor's submission of its initial weekly payroll data and two weeks prior to the estimated completion date for the contract or subcontract. Grantees must conduct more frequent interviews if the initial interviews or other information indicates that there is a risk that the contractor or subcontractor is not complying with DB. Grantees shall immediately conduct necessary interviews in response to an alleged violation of the prevailing wage requirements. All interviews shall be conducted in confidence.

(c) The grantee shall periodically conduct spot checks of a representative sample of weekly payroll data to verify that contractors or subcontractors are paying the appropriate wage rates. The grantee shall establish and follow a spot check schedule based on its assessment of the risks of noncompliance with DB posed by contractors or subcontractors and the duration of the contract or subcontract. At a minimum, the grantee must spot check payroll data within two weeks of each contractor or subcontractor's submission of its initial payroll data and two weeks prior to the completion date the contract or subcontract. Grantee must conduct more frequent spot checks if the initial spot check or other information indicates that there is a risk that the contractor or subcontractor is not complying with DB. In addition, during the examinations the grantee shall verify evidence of fringe benefit plans and payments thereunder by contractors and subcontractors who claim credit for fringe benefit contributions.

(d)  The grantee shall periodically review contractors and subcontractors use of apprentices and trainees to verify registration and certification with respect to apprenticeship and training programs approved by either the U.S Department of Labor or a state, as appropriate, and that contractors and subcontractors are not using disproportionate numbers of, laborers, trainees and apprentices. These reviews shall be conducted in accordance with the schedules for spot checks and interviews described in Item 5(b) and (c) above.

(e)  Grantees must immediately report potential violations of the DB prevailing wage requirements to the EPA DB contact listed above and to the appropriate DOL Wage and Hour District Office listed at https://www.dol.gov/whd/america2.htm.

### J.  Build America, Buy America – Required Use of American Iron, Steel, Manufactured Products, and Construction Materials

*Buy America Preference*. Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

(1) All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) All manufactured products used in the project are produced in the United States— this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

**J.A. 1949**

4Z - 95335901 - 0    Page 19

(3) All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

Incorporation into an infrastructure project. The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

Categorization of articles, materials, and supplies. An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

Application of the Buy America Preference by category. An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

Determining the cost of components for manufactured products. In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

(a) For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

(b) For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

Construction material standards. The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied to a single construction material.

(1) Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

(2) Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until

**J.A. 1950**

the item is in its final form, occurred in the United States.

(3) Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

&lt;style fontName=&quot;Arial&quot; size=&quot;12&quot;&gt;(4) Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for nonferrous metals, plastic and polymer-based products, or any others.&lt;/style&gt;

(5) Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

(6) Lumber. All manufacturing processes, from initial debarking through treatment and planingoccurred in the United States.

(7) Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

(8) Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

Waivers. When supported by rationale provided in IIJA §70914, the recipient may submit a waiver request in writing to EPA. Recipients should request guidance on the submission instructions of an EPA waiver request from the EPA Project Officer for this agreement. A list of approved EPA waivers (general applicability and project specific) is available on the EPA Build America, Buy America website.

EPA may waive the application of the Buy America Preference when it has determined that one of the following exceptions applies:

(1) applying the Buy America Preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

For questions regarding the Build America, Buy America Act requirements for this assistance agreement or to determine if there is an approved waiver in place, please contact the EPA Project Officer for this agreement.

Definitions. For legal definitions and sourcing requirements, the recipient must consult the EPA Build America, Buy America website, 2 CFR Part 184, and the Office of Management and Budget's (OMB) Memorandum M-24-02 Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure.

## K. Federal Cross-cutting Authorities, Policy, and Guidance

Recipients must comply with Federal cross-cutting requirements as well as other applicable Federal

4Z - 95335901 - 0    Page 21

laws. These requirements may include but are not limited to –

- **Environmental Authorities:** Archeological and Historic Preservation Act, Pub. L. 93- 291, as amended; Clean Air Act, Pub. L. 95-95, as amended; Clean Water Act, Titles III, IV and V, Pub. L. 92-500, as amended (including permits required by Section 404); Coastal Barrier Resources Act, Pub. L. 97-348; Coastal Zone Management Act, Pub. L. 92-583, as amended; Endangered Species Act, Pub. L. 93-205, as amended; Environmental Justice, Executive Order 12898; Flood Plain Management, Executive Order 11988, as amended by Executive Order 12148; Protection of Wetlands, Executive Order 11990, as amended by Executive Order 12608; Farmland Protection Policy Act, Pub. L. 97-98; Fish and Wildlife Coordination Act, Pub. L. 85- 624, as amended; Magnuson-Stevens Fishery Conservation and Management Act, Pub. L. 94-265; National Environmental Policy Act, Pub. L. 91-190; National Historic Preservation Act, Pub. L. 89-655, as amended; Safe Drinking Water Act, Pub L. 93-523, as amended; Wild and Scenic Rivers Act, Pub. L. 90-54, as amended; Marine Mammal Protection Act (16 U.S.C. §§ 1361-1384); Migratory Bird Treaty Act (16 U.S.C. § 703 *et seq.*); Native American Graves Protection and Repatriation Act (25 U.S.C. §§ 3001-3013);

- **Economic and Miscellaneous Authorities:** OSHA Worker Health and Safety Standards; Contract Work Hours and Safety Standards Act, Pub. L. 91-54; Debarment and Suspension, Executive Order 12549; Demonstration Cities and Metropolitan Development Act, Pub. L. 89 -754, as amended, and Executive Order 12372; DrugFree Workplace Act, Pub. L. 100-690; Copeland "Anti-kickback" Act, Pub. L. 73-324; Government Neutrality Toward Contractor's Labor Relations, Executive Order 13202, as amended by Executive Order 13208; New Restrictions on Lobbying, Section 319 of Pub. L. 101-121; Prohibitions relating to violations of the Clean Water Act or Clean Air Act with respect to Federal contracts, grants, or loans under Section 306 of the Clean Air Act and Section 508 of the Clean Water Act, and Executive Order 11738; Uniform Relocation and Real Property Acquisition Policies Act, Pub. L. 91-646, as amended;

- **Civil Rights, Nondiscrimination, Equal Employment Opportunity Authorities:** Age Discrimination Act, Pub. L. 94-135; Equal Employment Opportunity, Executive Order 11246; Section 13 of the Clean Water Act, Pub. L. 92-500; Section 504 of the Rehabilitation Act, Pub. L 93-112, supplemented by Executive Orders 11914 and 11250; Title VI of the Civil Rights Act, Pub. L 88-352;
    - Under Title VI of the Civil Rights Act, EPA has a responsibility to ensure that federal funds are not being used to subsidize discrimination based on race, color, or national origin. This prohibition against discrimination under Title VI has been a statutory mandate since 1964, and EPA has had Title VI regulations since 1973. EPA's nondiscrimination regulations prohibit recipients of EPA financial assistance from taking actions in their programs or activities that are intentionally discriminatory and/or have a discriminatory effect based on race, color, national origin (including limited English proficiency), age, disability, or sex.

- **Disadvantaged Business Enterprise Authorities:** EPA's FY 1993 Appropriations Act, Pub. L. 102-389; Section 129 of the Small Business Administration Reauthorization and Amendment Act, Pub. L. 100-590; Small, Minority and Women Owned Business Enterprises, Executive Orders 11625, 12138 and 12432.

For additional information on cross-cutting requirements, as well as applicability for recipients and subrecipients, visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

# BALTIMORE DECLARATION
# EXHIBIT 14-B

 Outlook

---

**FW: Pause EPA Grants**

| From | ███████████ @epa.gov> |
| Date | Fri 1/31/2025 2:21 PM |
| To | ███████████ @baltimorecity.gov> |

**CAUTION:** This email originated from outside of Baltimore City IT Network Systems.
**Reminder:** DO NOT click links or open attachments unless you recognize the sender and know that the content is safe. Report any suspicious activities using the Report Phishing Email Button, or by emailing to Phishing@baltimorecity.gov

Hi ████,
I wanted to make sure that you were aware of the below message from EPA's Office of Grants and Debarment. Funding has been paused for grants under the Infrastructure Investment and Jobs Act at this time. This pause pertains to all external activities and all funding on existing grants for the Solid Waste Infrastructure for Recycling (SWIFR) grant program. The pause on these grants remains in place even though it has been lifted for other federal grant programs. We will provide more guidance as EPA's Office of Grants and Debarment makes it available to our program.

Thank you,
████



---

**From:** EPA_Grants_Info <EPA_Grants_Info@epa.gov>
**Sent:** Tuesday, January 28, 2025 4:41 PM
**Subject:** Pause EPA Grants

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

**J.A. 1954**

# BALTIMORE DECLARATION

# EXHIBIT 14-C

AJ - 84032401 - 0    Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY
## Cooperative Agreement

| | |
|---|---|
| GRANT NUMBER (FAIN): 84032401 | DATE OF AWARD |
| MODIFICATION NUMBER: 0 | 09/30/2021 |
| PROGRAM CODE: AJ | MAILING DATE |
| TYPE OF ACTION | 10/07/2021 |
| New | PAYMENT METHOD: ASAP |

**RECIPIENT TYPE:** Township

**RECIPIENT:**
Baltimore City Department of Public Works
200 Holiday Street Suite 600
Baltimore, MD 21202-3618
EIN: 52-6000769

Send Payment Request to:
Contact EPA RTPFC at: rtpfc-grants@epa.gov

ACH#
PEND

**PAYEE:**
Chief Financial Officer
Baltimore City Dept of Public Works
200 Holliday Street, Suite 600
Baltimore, MD 21202-3618

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Anthony Greene | Jacob Burney | Robin Holder |
| 101 W. 24th. Street | 1200 Pennsylvania Ave NW, 2202A | 1200 Pennsylvania Ave NW  3903R |
| Baltimore, MD 21218 | Washington, DC 20460 | Washington, DC 20460 |
| E-Mail: agreene@oedworks.com | E-Mail: Burney.Jacob@epa.gov | E-Mail: Holder.Robin@epa.gov |
| Phone: 410-396-6722 | Phone: 202-564-2907 | Phone: 202-564-1532 |

**PROJECT TITLE AND DESCRIPTION**

ARP / SEJCA - YH2O+ Expansion Project

The purpose of this American Rescue Plan funded cooperative agreement is to provide funding to the Baltimore City Department of Public Works (DPW) for the YH2O+ program designed to provide green jobs training to the city's youth related primarily to the provision of safe drinking water.  The program will be expanded to address and reduce other common environmental issues seen throughout Baltimore's vulnerable communities by strengthening the city's youth workforce through on-the-job training.  There will be two sources of funds for this award - $100,000 from the American Rescue Plan to fund activities specifically related to the Safe Drinking Water Act, Section 1442(c)(3) and $100,000 from the annual appropriation for environmental justice (EJ) to fund activities related to the: 1) Solid Waste Disposal Act, Section 8001(a); 2) Clean Water Act, Section 104(b)(3); and 3) Federal Insecticide, Fungicide, and Rodenticide Act, Section 20(a).  Project activities include training of YH2O+ program participants to lead educational workshops in vulnerable communities for local environmental issues and actions to reduce the severity of those issues.  These activities will build on citywide efforts to promote recycling, proper waste disposal, and neighborhood cleanliness.  Outcomes will include enrollment and training of approximately 30 youth, advancement of city environmental monitoring systems, and improved resident practices likely to lead to less waste and cleaner water.  Intended beneficiaries include the city's unemployed/underemployed youth population from low income and minority communities, as well as all underserved communities of Baltimore.  The recipient does not intend to issue any subawards.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 10/01/2021 - 09/30/2023 | 10/01/2021 - 09/30/2023 | $200,000.00 | $200,000.00 |

## NOTICE OF AWARD

Based on your Application dated 06/30/2020 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $200,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $200,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Grants and Interagency Agreement Management Division | Environmental Protection Agency |
| 1200 Pennsylvania Ave, NW Mail code 3903R | OA - Office of the Administrator |
| Washington, DC 20460 | 1200 Pennsylvania Ave, NW |
|  | Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official for Jill Young - Chief - Grants Management Branch
LaShaun Phillips - Associate Award Official | DATE 09/30/2021 |

AJ - 84032401 - 0    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $0 | $200,000 | $200,000 |
| EPA In-Kind Amount | $0 | $0 | $0 |
| Unexpended Prior Year Balance | $0 | $0 | $0 |
| Other Federal Funds | $0 | $0 | $0 |
| Recipient Contribution | $0 | $0 | $0 |
| State Contribution | $0 | $0 | $0 |
| Local Contribution | $0 | $0 | $0 |
| Other Contribution | $0 | $0 | $0 |
| Allowable Project Cost | $0 | $0 | $0 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.312 - State Environmental Justice Cooperative Agreement Program | FIFRA: Sec. 20(a) & PL 106-74<br><br>Clean Water Act  Sec. 104(b)(3)<br><br>Solid Waste Disposal Act: Sec. 8001(a)<br><br>Safe Drinking Water Act: Sec. 1442(c)(3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| | | | | | Fiscal | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2111Y11011 | 2122 | B | QY | 000M57 | 4183 | - | - | $100,000 |
| - | 2111B11017 | 21 | BS7 | QB | 000M57 | 4183 | - | - | $100,000 |
| | | | | | | | | | $200,000 |

Mayor and City Council of Baltimore

Jason W. Mitchell, Director
Department of Public Works

Approved for form and legal sufficiency

Chief Solicitor

Approved by the Board of Estimates

Clerk  By Celeste.Amato at 1:59:27 PM, 5/4/2022  Date

**J.A. 1957**

Budget Summary Page                                      AJ - 84032401 - 0     Page 3

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | |
| 2. Fringe Benefits | $0 |
| 3. Travel | $0 |
| 4. Equipment | $0 |
| 5. Supplies | $0 |
| 6. Contractual | $29,440 |
| 7. Construction | $50,000 |
| 8. Other | $0 |
| 9. Total Direct Charges | $120,560 |
| 10. Indirect Costs: 0.00 % Base | $200,000 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $0 |
| 12. Total Approved Assistance Amount | $200,000 |
| 13. Program Income | $200,000 |
| 14. Total EPA Amount Awarded This Action | $0 |
| 15. Total EPA Amount Awarded To Date | $200,000 |
| | $200,000 |

J.A. 1958

# YH₂O+ Budget Template

|  | Description | Total |
|---|---|---|
| **Supplies** | Educational Resources including outreach materials, Career fair materials, postage and signage, online ads (**$20,440**). Water Sampling Equipment; Equipment and supports to gather environmental data $1000/year for 2 years (**$2,000**). (Needed for QAPP); Dell Laptop Computers to be used to conduct mapping (including EJSCREEN) and data analysis in addition to virtual training sessions and material development (10@$700 each=**$7,000**) | $29,440 |
| **Contractual** | Contracts with various environmental justice entities/universities to secure appropriate training courses and certifications such as EPA, NIH, etc. $25,000/year for 2 years | $50,000 |
| **Other** | Stipends ($1,200/applicant x 30 applicants annually= $36,000/year for 2 years = **$72,000**); Estimated cost for 10 Field Trips ($2,500 x 2 years for a total of **$5,000**); Transportation allowance ($121 per applicant for 6 months =$726 x 30 applicants = $21,780 x 2 years for a total of **$48,560**) | $120,560 |
|  |  | $200,000 |

AJ - 84032401 - 0    Page 4

## *Administrative Conditions*

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-november-12-2020-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

· Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and holder.robin@epa.gov

· MBE/WBE reports (EPA Form 5700-52A): **Suzanne Hersh, DBE Coordinator: mbe.wbe@epa.gov**

· All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Project Officer, Jacob Burney, burney.jacob@epa.gov**

· Payment requests (if applicable): Project Officer, Jacob Burney, burney.jacob@epa.gov

· Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Project Officer, **burney.jacob@epa.gov.**


### C. Prompt Payment Act
In accordance with Section 2(d) of the Prompt Payment Act (P.L. 97-177), Federal funds may not be used by the recipient for the payment of interest penalties to contractors when bills are paid late nor may interest penalties be used to satisfy cost sharing requirements. Obligations to pay such interest penalties will not be obligations of the United States.

### D. Payment to Consultants

EPA participation in the salary rate (excluding overhead) paid to individual consultants retained by recipients or by a recipient's contractors or subcontractors shall be limited to the maximum daily rate for a Level IV of the Executive Schedule (formerly GS-18), to be adjusted annually. This limit applies to consultation services of designated individuals with

AJ - 84032401 - 0    Page 5

specialized skills who are paid at a daily or hourly rate. As of January 1, 2021, the limit is $661.23 per day and $82.65 per hour. This rate does not include transportation and subsistence costs for travel performed (the recipient will pay these in accordance with their normal travel reimbursement practices). Subagreements with firms for services which are awarded using the procurement requirements in Subpart D of 2 CFR 200, are not affected by this limitation unless the terms of the contract provide the recipient with responsibility for the selection, direction and control of the individuals who will be providing services under the contract at an hourly or daily rate of compensation. See 2 CFR 1500.9.

AJ - 84032401 - 0    Page 6

## *Programmatic Conditions*

### A. Reporting Terms and Conditions

**1. Semi-Annual Reports** – In accordance with federal regulations (Title 2 CFR, Part 200.329), the recipient agrees to submit semi-annual progress reports (i.e. every six (6) months) to the EPA Project Officer within thirty (30) days after each six-month reporting period. Specifically, reports are due each April 30 and October 31 for the duration of the agreement These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies shall be included in the report. The report shall also include any changes of key personnel concerned with the project.

In addition, the report shall include brief information on each of the following areas: 1) a comparison of actual accomplishments with the anticipated outputs/outcomes specified in the assistance agreement work plan; 2) reasons why anticipated outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. It may be helpful to include best practices and/or lessons learned (e.g., tip sheets, "how-to" sheets) to date, and attachments and links for materials that may be helpful to other Environmental Justice Grants recipients or similar organizations (e.g., communication materials, outreach materials, web tools, etc). The recipient agrees that it will notify EPA of problems, delays, or adverse conditions which materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

**2. Final Reports** – In accordance with federal regulations (Title 2 CFR, Part 200.329), the recipient agrees to submit to the EPA Project Officer within one hundred twenty (120) days after the expiration or termination of the approved project period, a final report and at least one reproducible copy suitable for printing. The final report shall document project activities over the entire project period and shall include brief information on each of the following areas: 1) a comparison of actual accomplishments with the anticipated outputs/outcomes specified in the assistance agreement work plan; 2) reasons why anticipated outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc). The recipient agrees that it will notify EPA of problems, delays, or adverse conditions which materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

### B. EJ Grantee Workshops (Virtual and/or In-Person)

All SEJCA recipients will be required to attend at least one EJ Grantee virtual training

J.A. 1962

AJ - 84032401 - 0    Page 7

workshop hosted by your EPA Region. These trainings will assist all current EPA EJ grant recipients with strategic planning and project management of their grants and/or cooperative agreements, as well as afford recipients opportunities to learn from their peers and other experts. Recipients will need to identify at least one authorized official to participate. The virtual workshops will utilize webinar technology that can be accessed via personal computer. A conference call line will be available for any recipient who doesn't have the technical capability (i.e. slow internet connection) to access the webinar. Your EPA Project Officer will keep you informed of the dates of the workshops. Each EPA Regional Office will tailor their workshop agenda to the environmental needs and priorities of workshop participants and local communities in the region. Workshops may include a mix of current and former EJ grant recipients, local community stakeholders, other EPA and federal program personnel, and other attendees. Workshop attendees will come together to provide perspective, insight, and lessons learned regarding environmental justice issues plaguing their communities and ways to address them. If COVID-19 related travel and gathering concerns are sufficiently mitigated during the project period, your EPA Regional Office may work to coordinate an in-person workshop where active EJ grant recipients may travel to the EPA Regional office, if they choose to, for a workshop. Recipients would need to identify at least one authorized official to participate. Recipients are permitted to use awarded funds to pay for travel to the workshops. Conference lines and virtual call-in options will be made available for all recipients who cannot or choose not to physically attend any potential in-person workshops. Your EPA Project Officer will keep you informed of any and all developments.

### C. Review and Oversight

**1. Products -** The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

**2. Monthly Calls -** The recipient shall consult with the EPA Project Officer on a monthly basis in order to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. Conference call minutes/notes will be prepared after each call. It is at the EPA Project Officer's discretion to determine any change to the frequency with which calls are held.

**3. Prior Approval -** Any proposed changes to the project must be submitted in writing to EPA Region 9 for approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

### D. Post-Project Period Follow-up and Engagement

For no less than one year after completion of the project, recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed SEJCA project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing

J.A. 1963

AJ - 84032401 - 0    Page 8

partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work*. The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be at the discretion of the designated EPA Project Officer and will be discussed with the recipient before the end of the project period. **Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.**

*NOTE – Compliance with this term & condition will **not** give the recipient priority during future EPA EJ grant competitions and is **not** a guarantee for future EPA grant funding.*

### E. Cybersecurity Condition

**Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.331(d), by inquiring whether the subrecipient

AJ - 84032401 - 0    Page 9

has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## F. Procurement Terms and Conditions

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.326. No assistance agreement funds shall be used to reimburse the Federal share of any procurement action found to be in noncompliance with the procurement standards. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

## G. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the City of San Pablo received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

## H. Paperwork Reduction Act

Notwithstanding any references to collection of information in the recipient's application or proposal for EPA funding, the scope of work for this cooperative agreement does not include a survey or other information collection of identical information from 10 or more parties. No EPA funds (directly paid by EPA or from the recipient's cost share) may be used for the design or administration of such an information collection, and EPA personnel may not participate in such activities. Reasonable costs for analyzing independently collected information and publishing the results of such information collections are allowable to the extent authorized in the EPA approved budget for this agreement.

## I. Substantial Involvement

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) monthly telephone calls and other monitoring,

2.) reviewing project phases and providing approval to continue to the next phase,

3.) reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

AJ - 84032401 - 0    Page 10

5.) reviewing and commenting on the programmatic progress reports

6) Consultation with EPA regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

**J.** Acceptable Quality Assurance Documentation must be submitted to the EPA Project Officer within 60 days of the acceptance of this agreement. No work involving direct measurements or data generation, environmental modeling, compilation of data from literature or electronic media, and data supporting the design, construction, and operation of environmental technology shall be initiated under this project until the EPA Project Officer, in concert with the EPA Quality Assurance Manager, has approved the quality assurance documentation (see 2 CFR 1500.11). Additional information on these requirements can be found at the EPA Office of Grants and Debarment Web Site: https://www.epa.gov/grants/implementation-quality-assurance-requirements-organizations-receiving-epa-financial

J.A. 1966



**CITY OF BALTIMORE**
BRANDON M. SCOTT, Mayor

**DEPARTMENT OF PUBLIC WORKS**
Richard J. Luna, Interim Director
Abel Wolman Municipal Building, 6th Floor
200 N. Holliday Street
Baltimore, Maryland 21202

September 7, 2023

Kathleen Kirkland
Office of Communities, Tribes and Environment Assessment
Region 3 (Mid-Atlantic: WV, VA, PA, MD, DE, DC
and 7 federally recognized tribes)
1600 John F Kennedy Ave.
Philadelphia, PA 19103
U.S. Environmental Protection Agency

Dear Ms. Kirkland,

I want to thank you on behalf of the Department of Public Works' (DPW) leadership for EPA's invaluable partnership and your support of the YH$_2$O Career Mentoring Program. This letter serves as DPW's request for an extension through May 31, 2024. DPW has an opportunity to extend additional career development and training to our surrounding communities as well as programming for the Fall 2023 mini-session that will take place. We specifically anticipate using the funds for:

✓ Fall 2023 Recruitment of Participants for the YH$_2$O Career Mentoring Program
✓ Stipends for the Fall 2023 Participants
✓ Job Readiness Professional Attire
✓ Transportation and Programming Cost Associated with Guest speakers, industry worksite tours, job shadows and vendors for various events

Thank you again for your assistance and support.  Please feel free to contact me regarding any questions and/or concerns.

In Partnership,

Yolanda Winkler, B.S., M.B.A.
Chief - Office of Strategic Alliances and Youth

cc: Anthony Greene
Files

**J.A. 1967**

AJ - 84032401 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY  Assistance Amendment | GRANT NUMBER (FAIN): 84032401 | DATE OF AWARD |
|---|---|---|
| | MODIFICATION NUMBER: 1 | 09/14/2023 |
| | PROGRAM CODE: AJ | |
| | TYPE OF ACTION  No Cost Amendment | MAILING DATE  09/14/2023 |
| | PAYMENT METHOD:  ASAP | ACH#  PEND |

| RECIPIENT TYPE:  Township | Send Payment Request to:  Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|

| RECIPIENT: | PAYEE: |
|---|---|
| Baltimore City Department of Public Works  200 Holiday Street Suite 600  Baltimore, MD 21202-3618  EIN:  52-6000769 | Chief Financial Officer  Baltimore City Dept of Public Works  200 Holliday Street, Suite 600  Baltimore, MD 21202-3618 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Anthony Greene  101 W. 24th. Street  Baltimore, MD 21218  Email: anthonyl.green@baltimorecity.gov  Phone: 410-396-6722 | Kathleen Kirkland  Four Penn Center, 1600 John F. Kennedy  Boulevard, 3RA10  Philadelphia, PA 19103-2852  Email: Kirkland.Kathleen@epa.gov  Phone: 215-814-5176 | Robin Holder  1200 Pennsylvania Ave NW  3903R  Washington, DC 20460  Email: Holder.Robin@epa.gov  Phone: 202-564-1532 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

ARP / SEJCA - YH2O+ Expansion Project

Amendment; Time Extension

Your organizations written request for a no cost extension has been approved.

| BUDGET PERIOD  10/01/2021 - 05/31/2024 | PROJECT PERIOD  10/01/2021 - 05/31/2024 | TOTAL BUDGET PERIOD COST  $200,000.00 | TOTAL PROJECT PERIOD COST  $200,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 06/30/2020 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $200,000.00 in this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency , Grants and Interagency Agreement  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 | U.S. EPA, Region 3, US EPA Region 3, 3MD22  OEJECR - Office of Environmental Justice and External Civil Rights  1650 Arch Street  Philadelphia, PA 19103-2029 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | | |
|---|---|---|
| Digital signature applied by EPA Award Official for | Jill Young - Chief - Grants Management Branch  Robin Holder - Award Official Delegate | DATE  09/14/2023 |

Mayor and City Council  of Baltimore        Approved by the Board of Estimates

_____

Richard Luna, Interim Director              Clerk                    Date
Department of Public Works        Approved for form and legal sufficiency

                                      _U. Michael Ruck_  3-12-202_
                                      Chief Solicitor            Date

**J.A. 1968**

AJ - 84032401 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $200,000 | $0 | $200,000 |
| EPA In-Kind Amount | $0 | $0 | $0 |
| Unexpended Prior Year Balance | $0 | $0 | $0 |
| Other Federal Funds | $0 | $0 | $0 |
| Recipient Contribution | $0 | $0 | $0 |
| State Contribution | $0 | $0 | $0 |
| Local Contribution | $0 | $0 | $0 |
| Other Contribution | $0 | $0 | $0 |
| Allowable Project Cost | $0 | $0 | $0 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.312 - State Environmental Justice Cooperative Agreement Program | FIFRA: Sec. 20(a) & PL 106-74<br><br>Clean Water Act: Sec. 104(b)(3)<br><br>Solid Waste Disposal Act: Sec. 8001(a)<br><br>Safe Drinking Water Act: Sec. 1442(c)(3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

**J.A. 1969**

AJ - 84032401 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $0 |
| 2. Fringe Benefits | $0 |
| 3. Travel | $0 |
| 4. Equipment | $0 |
| 5. Supplies | $29,440 |
| 6. Contractual | $50,000 |
| 7. Construction | $0 |
| 8. Other | $120,560 |
| 9. Total Direct Charges | $200,000 |
| 10. Indirect Costs: 0.00 % Base | $0 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $200,000 |
| 12. Total Approved Assistance Amount | $200,000 |
| 13. Program Income | $0 |
| 14. Total EPA Amount Awarded This Action | $0 |
| 15. Total EPA Amount Awarded To Date | $200,000 |

J.A. 1970

# BALTIMORE DECLARATION

# EXHIBIT 14-D

5C - 95336801 - 0    Page 1

| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Cooperative Agreement | GRANT NUMBER (FAIN): 95336801 MODIFICATION NUMBER: 0 PROGRAM CODE: 5C | | |
|---|---|---|---|
| | | | DATE OF AWARD 09/05/2024 |
| | TYPE OF ACTION New | | MAILING DATE 09/10/2024 |
| | PAYMENT METHOD: ASAP | | ACH# 9997 |

| RECIPIENT TYPE: Municipal | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT: CITY OF BALTIMORE 200 Holliday St Fl 6 Baltimore, MD 21202-3618 EIN: 52-6000769 | PAYEE: City of Baltimore 200 Holliday St Fl 6 Baltimore, MD 21202-3618 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Anthony Greene 200 Holliday St Fl 6 Baltimore, MD 21202-3618 **Email:** anthonyl.greene@baltimorecity.gov **Phone:** 410-545-6541 | Lily Middleton Four Penn Center, 1600 John F. Kennedy Boulevard, 3EJ20 Philadelphia, PA 19103-2852 **Email:** Middleton.Lily@epa.gov **Phone:** 202-566-0497 | Donna Armstrong Grants Management Section, 3MD22 Four Penn Center, 1600 John F. Kennedy Boulevard Philadelphia, PA 19103-2852 **Email:** Armstrong.Donna@epa.gov **Phone:** 215-814-5393 |

**PROJECT TITLE AND DESCRIPTION**

DPW YH2O+ Expansion II

See Attachment 1 for project description.

| BUDGET PERIOD 10/01/2023 - 09/30/2025 | PROJECT PERIOD 10/01/2023 - 09/30/2025 | TOTAL BUDGET PERIOD COST $ 324,000.00 | TOTAL PROJECT PERIOD COST $ 324,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/13/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 324,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 324,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 3, US EPA Region 3, 3MD22 Four Penn Center, 1600 John F. Kennedy Boulevard Philadelphia, PA 19103-2852 | U.S. EPA, Region 3, Environmental Justice, Community Health, & Environmental Review 3EJ00 R3 - Region 3 Four Penn Center, 1600 John F. Kennedy Boulevard Philadelphia, PA 19103-2852 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Lisa White - Mission Support Division, Deputy Director | DATE 09/05/2024 |

Mayor and City Council of Baltimore        Approved for form and legal sufficiency        Approved by the Board of Estimates

*Khalil Zaied*        09/17/2024        *a. Richardson*        9-16-2024        _____

Khalil Zaied, Director        Date        Chief Solicitor        Date        Clerk        Date
Department of Public Works

**J.A. 1972**

5C - 95336801 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 324,000 | $ 324,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 324,000 | $ 324,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.312 - Environmental Justice Government-to-Government (EJG2G) Program | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 24124WB244 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 324,000 |
| | | | | | | | | | $ 324,000 |

2:25-cv-02152-RMG      Date Filed 03/26/25      Entry Number 24-15      Page 58 of 71

5C - 95336801 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 100,000 |
| 5. Supplies | $ 33,000 |
| 6. Contractual | $ 50,750 |
| 7. Construction | $ 0 |
| 8. Other | $ 140,250 |
| 9. Total Direct Charges | $ 324,000 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 324,000 |
| 12. Total Approved Assistance Amount | $ 324,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 324,000 |
| 15. Total EPA Amount Awarded To Date | $ 324,000 |

**J.A. 1974**

5C - 95336801 - 0    Page 4

## Attachment 1 - Project Description

This cooperative agreement provides funding under the Inflation Reduction Act (IRA) for the operation and execution of activities conducted through the City of Baltimore to support the Department of Public Works YH20 Expansion II Program. This agreement funds administrative requirements, trainings, workshops, outreach, and events, in support of decisive action to advance environmental justice and civil rights and embed environmental justice and civil rights into the City of Baltimore and its programs, policies, and activities.

These objectives will be met by carrying out the activities defined in the approved grant workplan, budget, and statutory requirements identified under the Clean Air Act: Section 138. The citizens of Baltimore are direct beneficiaries of this agreement.

This action provides a total of $324,000.00 in federal funds for the budget and project period of 10/01/2023-09/30/2025.

The activities to be performed by the City of Baltimore include educating the public about the YH20 Expansion II youth internship and career mentoring program; recruitment of two 30 person cohorts; marketing the YH20 program by creating flyers, posters, and motivational materials with community partners including the Mayor's Office of Employment and Development of Baltimore, Howard County, and Baltimore County. Program participants will engage in various hands-on activities including worksite tours, workshops, and trainings to discuss and learn the skills needed to be successful in the water, wastewater, and solid waste industries and develop transferable life skills like emotional regulation and conflict resolution. Participants will also obtain drivers education training, transportation passes, field related attire, office supplies, tablets, and stipends to ensure successful completion throughout each phase of the program. The City of Baltimore will also purchase two fifteen passenger vans to ensure safe, consistent, and reliable transportation for all participants. Water sampling kits will be purchased to demonstrate how water quality testing is used to educate the community on acceptable and extreme impacts on aquatic ecosystems. Each cohort will closeout by celebrating the participants' success with a commencement ceremony, honoring current participants, alumni, and supporters with certificates and certifications in coordination with the Department of Public Works leadership, family, friends, elected officials, and industry leaders. The anticipated deliverables and expected outcomes of this agreement with the City of Baltimore include engagement of the City's youth and participating cohorts; access to field related software and technology to develop computer literacy skills; introducing and educating participants on the water, wastewater, and solid waste industry and importance of keeping the environment clean and healthy; increasing the chances for participants to obtain a job or raising their salary post internship; gaining experience working in large and small group settings to support development of transferable life skills such as emotional regulation, conflict mediation, social-emotional skills, and attachment styles.

The citizens of Baltimore are direct beneficiaries of this agreement.

No subawards are included in this assistance agreement.

**J.A. 1975**

5C - 95336801 - 0    Page 5

## Administrative Conditions

### General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A.  Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425):  RTPFC-Grants@epa.gov  with a copy to grant specialist of record.

MBE/WBE reports (EPA Form 5700-52A):  R3_MBE-WBE_Reports@epa.gov.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications:  Grant specialist and project officer of record.

Payment requests (if applicable):  RTPFC-Grants@epa.gov

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables:  project officer of record.

### B.  Pre-Award Costs

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from 10/1/2023 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

### C. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

**J.A. 1976**

5C - 95336801 - 0    Page 6

## Programmatic Conditions

### A. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) Additional pertinent information, including, when appropriate, analysis and explanation of cost overruns or high-unit costs.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

Interim performance and final progress reports must prominently display the three Essential Elements for state work plans: 1) Strategic Plan Goal; (2) Strategic Plan Objective; and (3) Workplan Commitments plus time frame.

(See Grants Policy Issuance 11-03 State Grant Workplans and Progress Reports for more information)

**Performance Reports - Frequency**

The recipient agrees to submit semi-annul performance reports electronically to the EPA Project Officer within 30 days after the semi-annual reporting period ends on six months on 4/30 and 10/30. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance of 09/30/2025.

### B. Cybersecurity Condition

**Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the

**J.A. 1977**

recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, <u>Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,</u>

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/measurements-modeling/documents-about-measurement-competency-under-assistance-agreements or a copy may also be requested by contacting the EPA Project Officer for this award.

## D.  Signage Required

**Signage Required Term and Condition (Non-BIL)**

### 1.  Signage Requirements

The recipient is required to place a sign at construction sites supported under this award displaying the EPA logo in a manner that informs the public that the project is funded in part or wholly by the EPA. The sign must be placed in a visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period.

Recipients are required to comply with the sign specifications provided by the EPA Office of Public Affairs (OPA) available at: https://www.epa.gov/grants/epa-logo-seal-specifications-signage-produced-epa-assistance-agreement-recipients. If the EPA logo is displayed along with the logos of other participating entities, the EPA logo must not be displayed in a manner that implies that EPA itself is conducting the project. Instead, the EPA logo must be accompanied with a statement indicating that the recipient received financial assistance from EPA for the project. As provided in the sign specifications from OPA, the EPA logo is the preferred identifier for assistance agreement projects and use of the EPA seal requires prior approval from the EPA. To obtain the appropriate EPA logo or seal graphic file, the recipient should send a request directly to OPA and include the EPA Project Officer in the communication. Instructions for contacting OPA is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo.

State agencies and agencies of political subdivisions of states must comply with 2 CFR 200.323, Procurement of recovered materials when procuring signage for projects funded by EPA assistance agreement.  EPA encourages other recipients to use recycled or recovered materials when procuring signs.

Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

### 2.  Public or Media Events

The Recipient agrees to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this

5C - 95336801 - 0    Page 8

agreement, and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

**E. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**F. Quality Assurance (Updated 6/13/2024)**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement a Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

**1. Quality Management Plan (QMP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QMP within 120 days after grant award, and/or no more than 120 days after grant award.

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QAPP,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

**J.A. 1979**

b. The recipient must submit the QAPP 120 days after grant award, and/or no more than 120 days after grant award.

c. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## G. EQUIPMENT DISPOSITION

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient must request disposition instructions from the EPA Project Officer Disposition instructions will be one of the following:

(1) Items of equipment with a current per unit fair market value of $5,000 or less may be retained, sold or otherwise disposed of with no further obligation to the EPA.

(2) Except as provided in 2 CFR 200.312 Federally-owned and exempt property, paragraph (b), or if EPA fails to provide requested disposition instructions within 120 days, items of equipment with a current per-unit fair-market value in excess of $5,000 may be retained by the recipient or sold. EPA is entitled to an amount calculated by multiplying the current market value or proceeds from sale by EPA's percentage of participation in the cost of the original purchase. If the equipment is sold, EPA may permit the recipient to deduct and retain from the Federal share $500 or ten percent of the proceeds, whichever is less, for its selling and handling expenses.

(3) The recipient may transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the recipient must be entitled to compensation for its attributable percentage of the current fair market value of the property.

(4) In cases where a recipient fails to take appropriate disposition actions, EPA may direct the recipient to take disposition actions.

## H. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities

**J.A. 1980**

are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the City of Baltimore received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

## I. Paperwork Reduction Act

Notwithstanding any references to collection of information in the recipient's application or proposal for EPA funding, the scope of work for this cooperative agreement does not include a survey or other information collection of identical information from 10 or more parties. No EPA funds (directly paid by EPA or from the recipient's cost share) may b used for the design or administration of such an information collection, and EPA personnel may not participate in such activities. Reasonable costs for analyzing independently collected information and publishing the results of such information collections are allowable to the extent authorized in the EPA approved budget for this agreement.

## J. DURC/iDURC

The recipient agrees to not initiate any life sciences research involving agents and toxins identified in Section 6.2.1 of the *United States Government Policy for Institutional Oversight of Life Sciences Dual Use Research of Concern (iDURC Policy)* until appropriate review and clearance by the recipient institution's Institutional Review Entity (IRE). The recipient also agrees to temporarily suspend life sciences research in the event that, during the course of the research project, the IRE determines that the life sciences research meets the definition of DURC in the iDURC Policy, and the recipient agrees to notify the EPA Institutional Contact for Dual Use Research (ICDUR) (DURC@epa.gov) of the institution's determination.

## K. Substantial Involvement

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) monthly telephone calls and other monitoring,

2.) reviewing project phases and providing approval to continue to the next phase,

3.) reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5.) reviewing and commenting on the programmatic progress reports

6.) Consultation with EPA regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

## L. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

5C - 95336801 - 0    Page 11

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Non-procurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Non-procurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

BALTIMORE DECLARATION

EXHIBIT 14-E

**ASSISTANCE AGREEMENT**

| | | | |
|---|---|---|---|
| 1. Award No.<br>DE-SE0001546 | 2. Modification No. | 3. Effective Date<br>01/01/2025 | 4. CFDA No.<br>81.117 |

| | | |
|---|---|---|
| 5. Awarded To<br>Baltimore, City of<br>Attn: Michael Moiseyev<br>100 N HOLLIDAY ST<br>CITY HALL<br>BALTIMORE MD 212023427 | 6. Sponsoring Office<br>State and Community Energy Programs<br>U.S. Department of Energy<br>1000 Independence Ave, SW<br>washington DC 20585 | 7. Period of Performance<br>01/01/2025<br>through<br>12/31/2025 |

| | | |
|---|---|---|
| 8. Type of Agreement<br>[X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | 9. Authority<br>IRA PL 117-169, 2022<br>PL 109-58 EPACT, 2005 | 10. Purchase Request or Funding Document No.<br>25SE000219 |

| | | |
|---|---|---|
| 11. Remittance Address<br>Baltimore, City of<br>Attn: Michael Moiseyev<br>BUREAU OF TREASURY MGMT<br>200 HOLLIDAY STREET RM 7<br>BALTIMORE MD 212023427 | 12. Total Amount<br>Govt. Share: $10,000,000.00<br><br>Cost Share : $0.00<br><br>Total    : $10,000,000.00 | 13. Funds Obligated<br>This action:<br>$10,000,000.00<br><br>Total    :<br>$10,000,000.00 |

| | | |
|---|---|---|
| 14. Principal Investigator | 15. Program Manager<br>Christian F. Philipsen<br>Phone: 240-474-8562 | 16. Administrator<br>Golden Field Office<br>U.S. Department of Energy<br>Golden Field Office<br>15013 Denver West Parkway<br>Golden CO 80401 |

| | | |
|---|---|---|
| 17. Submit Payment Requests To<br>Payment - Direct Payment<br>from U.S. Dept of Treasury | 18. Paying Office<br>Payment - Direct Payment<br>from U.S. Dept of Treasury | 19. Submit Reports To |

| |
|---|
| 20. Accounting and Appropriation Data<br>05477-2022-31-200835-41999-1800011-0000000-0000000-0000000 |

| |
|---|
| 21. Research Title and/or Description of Project<br>IRA Building a Better Baltimore |

| | |
|---|---|
| For the Recipient | For the United States of America |
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br>*Elizabeth Parrish* |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer<br>Elizabeth A. Parrish | 27. Date Signed<br>12/18/2024 |

NSO

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-SE0001546 | PAGE 2 | OF 3 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
Baltimore, City of

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | UEI: CN6MMSGHNJ39 | | | | |

UEI:  CN6MMSGHNJ39
This is a conditional award, comprised of this
Assistance Agreement and the Special Terms and
Conditions. Upon successful completion of
negotiations, this award will be modified to lift
its conditional status, to revise the Special
Terms and Conditions, and to add additional
attachments, such as Attachment 1, Statement of
Project Objectives and Milestone Summary Table;
Attachment 2, Federal Assistance Reporting
Checklist and Instructions; Attachment 3, Budget
Information SF-424A; and Attachment 4,
Intellectual Property Provisions; Attachment 5,
Community Benefits Objectives and Outcomes; and
Attachment 6, NEPA Determination.

1. The award was prepared using the proposed
budget information in the Recipient's
application. Term 1 of the Special Terms and
Conditions states that the Recipient is
prohibited from spending Federal funds at this
time. DOE will not release the funding obligated
by this award until successful completion of
negotiations are reached to the satisfaction of
the Contracting Officer.
2. Performance against this award is, therefore,
at the Recipient's own risk, and payments for
costs incurred for Recipient's project will not
be made until the parties complete negotiations
and the Contracting Officer issues a modification
to this award.
3. A representative of the DOE office will
contact the Recipient to request additional
and/or revised information needed to supplement
and clarify the Recipient's application, to
complete the negotiations of an amended award.

In Block 7 of the Assistance Agreement, the
Period of Performance reflects the beginning of
the Project Period through the end of the current
Budget Period.

Additional future DOE funding and additional
budget periods are not contemplated under this
award.  Funding for all awards and future budget
periods is contingent upon the availability of
funds appropriated by Congress for the purpose of
this program and the availability of future-year
budget authority.

DOE Award Administrator:  Mandy Aden
Continued ...

**J.A. 1985**

NSO

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-SE0001546 | | | PAGE 3 | OF 3 |

NAME OF OFFEROR OR CONTRACTOR
Baltimore, City of

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | E-mail:  mandy.aden@ee.doe.gov Phone:   240-562-1280 | | | | |
| | DOE Project Officer:  Christian Philipsen E-mail:  christian.philipsen@hq.doe.gov Phone:   240-474-8562 | | | | |
| | Recipient Business Officer:   Julia Kalloz E-mail:  Julia.Kalloz@baltimorecity.gov Phone:   410-925-6130 | | | | |
| | Recipient Principal Investigator:   Jason Mathias E-mail:  Jason.Mathias@baltimorecity.gov Phone:   667-209-6929 | | | | |
| | "Electronic signature or signatures as used in this document means a method of signing an electronic message that-- (A) Identifies and authenticates a particular person as the source of the electronic message; (B) Indicates such person's approval of the information contained in the electronic message; and, (C) Submission via FedConnect constitutes electronically signed documents." ASAP: YES Extent Competed: COMPETED Davis-Bacon Act: YES PI: MARTHIAS, JASON Fund: 05477 Appr Year: 2022 Allottee: 31 Report Entity: 200835 Object Class: 41999 Program: 1800011 Project: 0000000 WFO: 0000000 Local Use: 0000000 | | | | |

NSO

JULY 2004

NSO

**J.A. 1987**

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# COLUMBUS DECLARATION

# EXHIBIT 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE, et al.,
        Plaintiff,

v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES, et al.,

        Defendants.

## DECLARATION OF TROY EUTON
### (City of Columbus, Ohio)

I, Troy Euton, declare as follows:

1.      My name is Troy Euton. This declaration is based on my knowledge, professional education, and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of Columbus ("Columbus"), which is one of many grant recipients that has been affected by freezes on federal grant funding.

2.      I am an Assistant Director at the Columbus Recreation and Parks Department. I have held this position since November 2016. I have worked in parks departments in Ohio for 32 years. In my current role, I oversee the parks, facilities, forestry, and golf divisions. I also oversee the finances for the Recreation and Parks Department. The City Forester, Rosalie Hendon, reports directly to me.

3.      Columbus is a municipal corporation organized under Ohio law. It is the capital and largest city in the State of Ohio, and is predominantly located within Franklin County, Ohio.

1

**J.A. 1989**

It is the 14th-largest city in the United States, with a population of 913,175, according to the 2023 Census estimates. More than 2.1 million people live in the Columbus metropolitan area.

4.      From about 2019 to 2022, I oversaw the development of Columbus's Urban Forestry Master Plan ("UFMP"). We initiated the UFMP because Columbus has less tree cover than other major cities, and the lack of tree cover contributes to an urban heat island effect. A heat island is a phenomenon where urban areas experience higher temperatures than surrounding areas due to the absorption and retention of heat by built environments like buildings and pavement. A 2014 study found that Columbus had the fastest-growing and eighth-most intense heat island of the 60 major cities studied.[1] Heat island effects can mean that our residents experience higher utility bills and can mean that vulnerable residents such as the elderly are subject to more heat-related illnesses, especially during the summer time.

5.      To develop the UFMP, I met weekly with a small team, including the City Forester, and we all met several times a year to engage members of the community. Our goal was to get community input about the impact across Columbus of lack of tree cover.

6.      We completed the UFMP in 2022. It has won several awards, including the 2021 Best Practice Award from the American Planning Association and a 2021 award for Planning and Analysis from the American Society of Landscape Architects. Our implementation of the UFMP won additional awards in 2022 and 2023.

7.      The UFMP confirmed that Columbus needed more trees. It offered a closer analysis of which neighborhoods needed more tree cover.

8.      In Columbus, lower-income neighborhoods are more likely to have few trees and a strong urban heat island effect. In 2022, a summer heat mapping effort found a 13.2-degree

---

[1] Climate Central, "Hot and Getting Hotter: Heat Islands Cooking U.S. Cities," Aug. 20, 2014.

difference in evening temperatures between different parts of Columbus, confirming that some residents inequitably experience more heat stress. Increased tree cover improves health outcomes, quality of life, and property values, while also lowering utility bills. More trees also help offset the impacts of climate change.

9.    Columbus Recreation and Parks Department Forestry staff plant an average of 3,000 trees each year, which are paid for through both Columbus's capital budget and operating budget. Trees are planted both by contracts with outside vendors and by in-house staff. Tree planting varies year-to-year based on the weather and duration of the planting season. Columbus's long-term goal is to plant enough trees to reach 40% canopy coverage by 2050.

10.    As a part of its plan to improve Columbus's tree canopy following the UFMP, the Recreation and Parks Department applied for an Urban and Community Forestry Grant with the U.S. Forest Service, an agency of the U.S. Department of Agriculture ("USDA"), as a subgrantee of the Ohio Department of Natural Resources. Columbus applied for $500,000 in order to purchase and plant approximately 1,250 diverse, large-class trees in disadvantaged areas in need of increased tree cover. I authorized the City Forester to apply for the grant.

11.    On February 28, 2024, the Ohio Department of Natural Resources sent a letter to Columbus confirming that the city had been chosen as a recipient of the US Forest Service's Inflation Reduction Act funding. A true and accurate copy of the Notice of Award is attached as Exhibit A. On July 10, 2024, Columbus signed a USDA certification related to the grant.

12.    Columbus' grant application specified that the additional $500,000 grant would allow Columbus to plant, on a one-time basis, an additional 1,250 street trees, beyond the typical 3,000 annual average.

3

**J.A. 1991**

13.     During the 2024 planting season, Columbus expended $393,930 of the awarded $500,000 to outside vendors, as detailed in the grant application. Through these vendors, Columbus has already planted about 1,100 of the promised trees. It plans to plant about 1,200 trees, then use the remaining grant funds to increase pruning services on mature trees in the neighborhoods identified in the grant application.

14.     Ordinarily, Columbus would have waited until 1,200 trees were planted to request reimbursement. On February 18, 2025, the Ohio Department of Natural Resources sent a letter to the Columbus Recreation and Parks Department. The letter indicated that ODNR was unsure which grants would be impacted but advised that grant recipients temporarily suspend expenditures of grant money, in light of the possibility that expenditures would not be reimbursed. ODNR also asked us to submit any outstanding reimbursements.

15.     On February 27, 2025, Columbus submitted a "Sub Awardee Request for Reimbursement(s)" to the Ohio Department of Natural Resources requesting reimbursement in the amount of $393,930 for expenses. As of the date of this declaration, Columbus has not been reimbursed for these expenses.

16.     Following the ODNR guidance, Columbus avoided making additional expenditures. Columbus had spent the outstanding $393,930 over the entire prior year since the grant was awarded.

17.     On March 13, 2025, the Ohio Department of Natural Resources sent an email to various grant recipients informing them that their previously-approved award was "approved for implementation:"

> If you have paused grant activities, please make plans to resume
> your project. I know many of you are concerned that this delay
> impacted your ability to complete the grant within the planned

project period. We understand your concern and will work with
you on the necessary amendments.

18.    Given these events, Columbus is concerned that the federal government will

continue to turn this grant on and off and may either fail to reimburse the city for the full amount

of eligible expenses already incurred through this grant, or may not reimburse the city for the full

amount of the grant after the city completes all of its required work.

19.    If Columbus does not receive the reimbursement it is owed under this grant, it

will be forced to cover the $393,930 it has already spent through money from its capital budget.

This would mean those funds would be unavailable for other important projects. This might

include future planting or new special projects across the rest of the Recreation and Parks

department. It would also cause staff in my department to have to spend resources and time to

rewrite and seek amendment of the budget, and attempt to identify and seek funds to fill the new

budget shortfall.

20.    Columbus intends to use the remaining $106,070 to prune mature trees in the

neighborhoods covered by the grant. If Columbus does not receive the remaining funds, or if it is

unclear whether that money will be available, then Columbus will not be able to perform this

important upkeep.

21.    Already, because of the funding freeze, we have delayed engaging a request for

proposals for tree pruning. Oak trees must be pruned during the winter, and while we prune other

tree variants year-round, it is generally easier and more efficient to prune trees during the winter.

22.    These trees and their maintenance improve quality of life and health for low-

income, disadvantaged communities, as the UFMP explains. Delaying tree maintenance impacts

the communities in Columbus that already suffer harm from unequal access to a healthy tree

canopy that could improve their health, their utility bills, and their well-being. These harms have

a ripple effect. When communities suffer greater health concerns, our health systems may be affected, and other public services may be strained. If the funding is not released, the delays also impact the many residents who contributed to the UFMP, who will not see their input and engagement honored.

*(signature on following page)*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in Columbus, Ohio, on this 25th day of March, 2025.

Troy Euton
Assistant Director
Columbus Recreation and Parks Department

7

**J.A. 1995**

# COLUMBUS DECLARATION

# EXHIBIT 15-A

## SUBRECIPIENT GRANT AGREEMENT

This Agreement is between the **OHIO DEPARTMENT OF NATURAL RESOURCES** ("ODNR")**,** acting through its **DIVISION OF FORESTRY**, with offices located at 2045 Morse Rd., Columbus, OH, 43229, and **City of Columbus dba Columbus Recreation and Parks Department** (UEI # E212WH2HVV55), which is located at 1533 Alum Industrial Drive West, Columbus, Ohio 43209 **("Subrecipient")**.

Expenditures for this Agreement are partially or fully funded by federal funds. ODNR received a federal grant under the terms and conditions of an Ohio's Urban & Community Forestry Grant Program, awarded through USDA Forest Service, Eastern Region State, Private, and Tribal Forestry. This grant is identified by Federal Award Identification Number (FAIN) 23-DG-11094200-363, which became effective on September 5, 2023, with a total award amount of $9,000,000.00, and an approved indirect rate of 19.09%. This grant is made under Assistance Listing Number 10.727 Inflation Reduction Act Urban & Community Forestry Program. This Agreement is a subaward of that grant.

**Total Award Committed to Subrecipient:**      **$500,000.00**

**Total Award Obligated for this Action:**      **$500,000.00**

**Cumulative Award Total Obligated (including this action and all prior actions):**      **$500,000.00**

Subrecipient is an applicant who submitted a grant application to ODNR for this grant program. Under R.C. § 1501.0, ODNR may provide federal pass-through grants to eligible applicants for purpose or goal of federal program. Subrecipient has met the application requirements and has been approved by ODNR as eligible to receive this federal pass-through grant. Subrecipient will undertake the following with funding from this grant: tree plantings and public outreach that will conform to the approved timelines and project milestones as approved by the Division of Forestry.

The parties therefore agree as follows:

1. **Award.** ODNR hereby awards to the Subrecipient an Ohio's Urban & Community Forestry grant subaward not to exceed **$500,000.00** for the purpose of reimbursing the Subrecipient for performance and completion of the deliverables detailed in the attached Exhibits A-Scope of Work and Budget ("Exhibits") (the "Project").

2. **Performance of Project.** Subrecipient shall perform its duties and responsibilities under this Agreement in compliance with the terms, promises, conditions, plans, specifications, estimates, procedures, maps, and assurances set forth in the Exhibits, program guidelines, and the project application/proposal, incorporated herein by reference as though fully set forth herein, as well as the terms set forth in this Agreement. Subrecipient shall: (1) perform and complete the Project as set forth herein; (2) promptly submit to ODNR such reports and documents as required by ODNR and 2 CFR §200.330; (3) establish a separate special account for the funds for the acquisition and/or development of the Project; and (4) not change any of the terms, promises, conditions, plans, specifications, estimates, procedures, maps, or assurances set forth in the Exhibits, unless the proposed change is approved by ODNR. ODNR reserves the right to audit the special account created by Subrecipient, pursuant to this paragraph, either during or after the completion of the Project.

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 1997**

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

3.  **Notice.** All notices, consents, and communications required hereunder (each, a "Notice") shall be in writing and shall be deemed to have been properly given when: 1) hand delivered with delivery acknowledged in writing; 2) sent by U.S. Certified mail, return receipt requested, postage prepaid; 3) sent by overnight delivery service (FedEx, UPS, etc.) with receipt; or 4) sent by fax or email. Notices shall be deemed given upon receipt thereof and shall be sent to the addresses below. Notices sent by fax or email shall be effectively given only upon acknowledgement of receipt by the receiving party. Any party may change its address for receipt of Notices upon notice to the other party. If delivery cannot be made at any address designated for Notices, a Notice shall be deemed given on the date on which delivery at such address is attempted.

| Subrecipient Contact: | ODNR Program Contact: | ODNR Federal Contact: |
|---|---|---|
| Rosalie Hendon<br>City Forester<br>Columbus Recreation and Parks Department<br>1533 Alum Industrial Dr. West<br>Columbus, Ohio 43209<br>614-724-3003<br>rfhendon@columbus.gov | Carrie Morrow<br>Urban Forestry Coordinator<br>ODNR Division of Forestry<br>2045 Morse Rd. Bldg. H-1<br>Columbus, Ohio  43229<br>614-265-6509<br>Carrie.morrow@dnr.ohio.gov | Kelsey Bradley<br>Program Administrator<br>ODNR Division of Forestry<br>2045 Morse Rd. Bldg. H-1<br>Columbus, Ohio  43229<br>614-265-6689<br>Kelsey.bradley@dnr.ohio.gov |

4.  **Research and Development.** Grant funds shall not be used for research and development.

5.  **Indirect Costs.** Grant funds are not authorized for indirect costs.

6.  **Period of Performance.** Implementation of the Project shall not commence until this Agreement is effective. This Agreement shall be effective as of March 12, 2024.  ODNR shall not be responsible for any costs incurred by the Subrecipient prior to the date this Agreement becomes effective.  The Project shall be completed by April 1, 2028 unless modified by the mutual, written consent of both parties before that date or otherwise terminated as provided herein.  This Agreement shall terminate on April 1, 2028, unless modified by the mutual, written consent of both parties before that date or otherwise terminated as provided herein.

7.  **Budget Period.** The budget period for this Agreement is March 12, 2024 through April 1, 2028.

8.  **Non-Appropriation.** Performance by ODNR under this Agreement may be dependent upon the appropriation of funds by the Ohio General Assembly. Therefore, in accordance with R.C. § 126.07, it is agreed that ODNR's payments are contingent on the availability of such lawful appropriations by the Ohio General Assembly. If the Ohio General Assembly fails at any time to continue funding for the payments due hereunder, this Agreement is hereby terminated as of the date that the funding expires without further obligation of ODNR.  If appropriations are approved, ODNR may continue this Agreement past the current biennium by mutual written agreement between the parties.

9.  **Permissible Costs.** Subrecipient shall comply with 2 CFR Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards) to determine the permissibility of all expenditures under this Agreement.

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 1998**

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

10. **Termination by ODNR.** Any time after signing this Agreement, ODNR may terminate the Agreement, in whole or in part, for any reason whatsoever, upon written notification to the Subrecipient. If ODNR terminates this Agreement, the Subrecipient will be paid for any non-cancelable obligation properly incurred by the Subrecipient prior to termination. Subrecipient shall return any unused grant funds to ODNR within thirty (30) days of termination.

11. **Termination by Subrecipient.** Any time after signing this Agreement, Subrecipient may terminate this Agreement for any reason whatsoever upon written notification to ODNR. If Subrecipient terminates this Agreement, Subrecipient shall not incur any new obligations using grant funds and shall use its reasonable best efforts to cancel as many outstanding obligations of grant funds as possible. Subrecipient shall return all unused grant funds to ODNR within thirty (30) days of termination.

12. **Nondiscrimination in Employment.** Subrecipient, Subrecipient's contractors, and any person acting on behalf of Subrecipient, shall comply with all federal and Ohio statutes, executive orders, and regulations implementing 42 U.S.C. Part 2000(d), Title IV of the Civil Rights Act of 1964 and R.C. Chapter 4112, prohibiting discrimination on the grounds of race, color, religion, sex, sexual orientation, age, disability, military status (as defined in R.C. § 4112.01), national origin, or ancestry against any citizen of this state in the employment of any person qualified and available for work related to the Project. Subrecipient further agrees that Subrecipient, Subrecipient's contractors, and any person acting on behalf of Subrecipient shall not, in any manner, discriminate against, intimidate, or retaliate against any employee hired for the performance of work related to the Project on the grounds of race, color, religion, sex, sexual orientation, age, disability, military status, national origin, or ancestry.

Subrecipient shall, in all solicitations or advertisements for employees placed by or on behalf of the Subrecipient, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, national origin, ancestry, age, sex, sexual orientation, handicap, or any disability. Subrecipient shall comply with Ohio and federal statutes, executive orders, and regulations to assure equal employment practices under the Agreement, and Subrecipient shall comply promptly with all orders, requests, and directions from the State of Ohio and federal agencies pertaining to the enforcement of the aforementioned nondiscrimination laws.

13. **Workers' Compensation.** Subrecipient shall provide its own workers' compensation coverage throughout the duration of this Agreement and any extensions thereof. ODNR is hereby released from any and all liability for injury received by the Subrecipient, its employees, agents, or subcontractors, while performing tasks, duties, work, or responsibilities as set forth in this Agreement.

14. **Compliance with Laws.** Subrecipient, in the execution of its duties and obligations under this Agreement, agrees to comply with all applicable federal, state, and local laws, rules, regulations, and ordinances.

15. **Prevailing Wage.** Pursuant to Chapter 4115 of the Ohio Revised Code, the Davis-Bacon Act (40 U.S.C. §§ 3141-3148) and 2 CFR 200 Appendix II(D), if applicable, Subrecipient shall require that all contractors pay the prevailing wage rate of the locality on all work performed on the Project. Subrecipient and any of its contractors shall comply with all other applicable provisions of Chapter 4115 of the Ohio Revised Code, the Davis-Bacon Act (40 U.S.C. §§ 3141-3148) and 2 CFR 200 Appendix II(D), including making the required reports to the prevailing wage coordinator.

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 1999**

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

16. **Liability; Indemnification.** Subrecipient shall be solely responsible for any and all claims, demands, or causes of action arising from Subrecipient's obligations under this Agreement. Each party to this Agreement must seek its own legal representative and bear its own costs, attorney fees, and expenses, in any litigation that may arise from the performance of this Agreement. It is specifically understood and agreed that ODNR does not indemnify Subrecipient. Nothing in this Agreement shall be construed to be a waiver of the sovereign immunity of the State of Ohio or the immunity of any of its employees or agents for any purpose. In no event shall ODNR be liable for indirect, consequential, incidental, special, liquidated, or punitive damages, or lost profits.

17. **Drug-Free Workplace.** Subrecipient agrees to comply with all applicable state and federal laws regarding drug-free workplace.

18. **Inspection.** The federal awarding agency, inspectors general, the Comptroller General of the United States, and ODNR, or any of their authorized representatives, have the right of access to any documents, papers, or other records of the Subrecipient which are pertinent to the federal award, to make audits, examinations, excerpts, and transcripts. This right also includes timely and reasonable access to the Subrecipient's personnel for the purpose of interview and discussion related to such documents. The rights of access in this section are not limited to the required retention period but last as long as the records are retained.

19. **OMB Guidance.** Subrecipient shall comply with OMB guidance in subparts A through F of 2 CFR Part 200. Subrecipient must also follow the regulations found in 2 CFR 200.330 through 2 CFR 200.332. Electronic copies of the CFR can be obtained at the following internet site: www.ecfr.gov.

20. **Use of MBE and EDGE Vendors.** Revised Code § 125.081 requires state agencies to set aside purchases for Minority Business Enterprises ("MBE") and Executive Order 2008-13S encourages use of Encouraging Diversity, Growth and Equity ("EDGE") businesses. ODNR encourages Subrecipient to purchase goods and services from Ohio-certified MBE and EDGE vendors.

21. **Events of Significant Impact.** Subrecipient shall immediately notify ODNR of developments that have a significant impact on the activities supported under this award. Also, notification must be given in case of problems, delays, or adverse conditions that materially impair the ability to meet the objectives of the award. This notification must include a statement of the action taken or contemplated, and any assistance needed to resolve the situation.

22. **Public Records.** Public access to award or agreement records must not be limited, except when such records must be kept confidential and would have been exempted from disclosure pursuant to Freedom of Information regulations (5 U.S.C. 552) or Ohio public records laws. Requests for research data are subject to 2 CFR 315(e).

23. **Records Retention**. Financial records, supporting documents, statistical records, and all other non-federal entity records pertinent to a federal award must be retained for a period of three years from the date of submission of the final expenditure report or, for federal awards that are renewed quarterly or annually, from the date of the submission of the quarterly or annual financial report, respectively, as reported to the federal awarding agency or pass-through entity in the case of a subrecipient. Records for real property and equipment acquired with federal funds must be retained for three (3) years after final disposition in accordance with 2 CFR 200.333.

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 2000**

USCA4 Appeal: 25-1575    Doc: 55-4    Filed: 06/23/2025    Pg: 468 of 606

DocuSign Envelope ID: A2C6DB48-FD41-43BC-9584-5C215A84CDF8
2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-16    Page 14 of 18

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

24. **Debarment and Suspension.** Subrecipient shall immediately inform ODNR if it or any of its principals is presently excluded, debarred, or suspended from entering into covered transactions with the federal government or entities according to the terms of 2 CFR Part 180. If Subrecipient or any of its principals receive a transmittal letter or other official federal notice of debarment or suspension, it shall promptly notify ODNR. This applies whether the exclusion, debarment, or suspension is voluntary or involuntary. Subrecipient certifies that it is not debarred from consideration for contract awards by the State of Ohio under R.C. §§ 153.02, 125.25, or 5513.06. If this certification is false, this Agreement is void *ab initio* and Subrecipient shall immediately repay ODNR all funds transferred by this Agreement.

25. **Findings for Recovery.** Subrecipient represents and warrants that it is not subject to a finding for recovery under R.C. § 9.24, or that it has taken appropriate remedial steps required under R.C. § 9.24 or otherwise qualifies under that section. Subrecipient agrees that if this representation or warranty is deemed to be false, the agreement shall be void *ab initio* as between the parties to this agreement, and any funds paid by ODNR hereunder immediately shall be repaid to ODNR, or an action for recovery immediately may be commenced by ODNR for recovery.

26. **Ohio Ethics Law.** The Subrecipient certifies that it: (i) has reviewed and understands the Ohio ethics and conflict of interest laws as found in Ohio Revised Code Chapter 102 and in Ohio Revised Code Sections 2921.42 and 2921.43, and (ii) will take no action inconsistent with those laws. The Subrecipient understands that failure to comply with Ohio's ethics and conflict of interest laws is grounds for termination of this Agreement and may result in the loss of other contacts or grants with the State of Ohio.

27. **Campaign Contributions.** The Subrecipient affirms that, as applicable to it, no party listed in R.C. § 3517.13(I) or R.C. § 3517.13(J) or spouse of such party has made, as an individual, within the two previous calendar years, one or more contributions totaling in excess of $1,000.00 to the Governor or the Governor's campaign committees.

28. **Governing Law.** This Agreement and the rights of the parties hereunder shall be governed, construed, and interpreted in accordance with the laws of the State of Ohio and with the laws of the U.S. federal funding source. Subrecipient consents to jurisdiction in a court of proper jurisdiction in Franklin County, Ohio.

29. **Waiver.** A waiver by any party of any breach or default by the other party under this Agreement shall not constitute a continuing waiver by such party of any subsequent act in breach of or in default hereunder.

30. **Assignment.** Neither this Agreement nor any rights, duties, or obligations hereunder may be assigned or transferred in whole or in part by Subrecipient.

31. **Confidentiality Agreements.** Subrecipient shall not require its employees or subcontractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law-enforcement representative. Any prohibitions or restrictions of any internal confidentiality agreements inconsistent with the previous sentence are no longer in effect.

32. **Eligible Workers.** Subrecipient shall ensure all employees complete the I-9 form to certify they are eligible for lawful employment under the Immigration and Nationality Act (8 USC 1324a). Subrecipient shall

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 2001**

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

comply with regulations regarding certification and retention of the complete forms. These requirements also apply to any contract or supplement instruments awarded under this Agreement.

33. **Lobbying.** Subrecipient certifies that no federal appropriated funds have been paid by or on behalf of Subrecipient to any person for influencing or attempting to influence an officer or employee of any agency, member of Congress, or officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement. If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this federal contract, grant, loan, or cooperative agreement, Subrecipient shall request, complete, and submit Standard Form-111, "Disclosure Form to Report Lobbying," in accordance with its instructions.

34. **Federal Clean Air Act and Water Pollution Control Act.** Subrecipient agrees to comply with all applicable standards, orders, or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401-7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. 1251-1387). Violations must be reported to the federal awarding agency and the Regional Office of the Environmental Protection Agency (EPA).

35. **Trafficking In Persons.** Subrecipient shall not: (i) engage in severe forms of trafficking in persons during the period of time that the subaward is in effect; (ii) procure a commercial sex act during the period of time that the subaward is in effect; or (iii) use forced labor in the performance of the subaward, pursuant to section 106(g) of the federal Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)).

36. **Federal Single Audit Requirement.** Subrecipient shall comply with the federal single audit requirements in 2 CFR 200.501.

37. **In-Kind Match.** If applicable, Subrecipient shall comply with 2 CFR 200.306 when using in-kind contributions as matching funds for this Project.

38. **Independent Capacity of Subrecipient.** The parties agree that the Subrecipient, and any agents or employees of the Subrecipient, in the performance of this Agreement, shall act in an independent capacity and not as officers, employees, or agents of the State of Ohio for any purpose. Nothing in this Agreement shall be construed to create a partnership, joint venture, or other relationship between the parties.

39. **Use of ODNR and USDA Forest Service Logos.** For OH DNR to use the Forest Service insignia on any published media, such as a Web page, printed publication, or audiovisual production, permission must be granted by the Forest Service's Office of Communications (Washington Office). A written request will be submitted by Forest Service, Program Manager, to the Office of Communications Assistant Director, Visual information and Publishing Services prior to use of the insignia. The Forest Service Program Manager will notify OH DNR when permission is granted.

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 2002**

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

40. **Nondiscrimination Statement – Printed, Electronic, or Audiovisual Material.** OH DNR shall include the following statement, in full, in any printed, audiovisual material, or electronic media for public distribution developed or printed with any Federal funding.

> In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, this institution is prohibited from discriminating on the basis of race, color, national origin, sex, age, disability, and reprisal or Award Number: 23-DG-11094200-363 Page 8 of 19 retaliation for prior civil rights activity. (Not all prohibited bases apply to all programs.)

> Program information may be made available in languages other than English. Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, and American Sign Language) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339.

> To file a program discrimination complaint, a complainant should complete a Form AD-3027, USDA Program Discrimination Complaint Form, which can be obtained online at https://www.ocio.usda.gov/document/ad-3027, from any USDA office, by calling (866) 632-9992, or by writing a letter addressed to USDA. The letter must contain the complainant's name, address, telephone number, and a written description of the alleged discriminatory action in sufficient detail to inform the Assistant Secretary for Civil Rights (ASCR) about the nature and date of an alleged civil rights violation. The completed AD-3027 form or letter must be submitted to USDA by:
> (1) Mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, D.C. 20250-9410; or
> (2) Fax: (833) 256-1665 or (202) 690-7442; or
> (3) Email: program.intake@usda.gov.

> If the material is too small to permit the full Non-Discrimination Statement to be included, the material will, at a minimum, include the alternative statement: "This institution is an equal opportunity provider."

41. **Copyrighting.** OH DNR is/are granted sole and exclusive right to copyright any publications developed as a result of this award. This includes the right to publish and vend throughout the world in any language and in all media and forms, in whole or in part, for the full term of copyright and all renewals thereof in accordance with this award.
No original text or graphics produced and submitted by the Forest Service shall be copyrighted. The Forest Service reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use the work for federal government purposes.
This right shall be transferred to any sub-awards or subcontracts.
This provision includes:
- The copyright in any work developed by OH DNR under this award.
- Any right of copyright to which OH DNR purchase(s) ownership with any federal contributions.

42. **Qualifications.** Subrecipient represents that it has all approvals, licenses, or other qualifications needed to conduct its business in Ohio and that all are current.

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 2003**

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

43. **Conflicts.** In the event of any conflict between the terms and provisions of the body of this Agreement and any attachments hereto, the terms of this Agreement shall control.

44. **Severability**. The provisions of this Agreement are severable and independent, and if any such provision shall be determined to be unenforceable in whole or in part, the remaining provisions and any partially enforceable provisions shall, to the extent enforceable in any jurisdiction, nevertheless be binding and enforceable.

45. **Headings.** The headings in this Agreement have been inserted for convenient reference only and shall not be considered in any questions of interpretation or construction of this Agreement.

46. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Either party hereto may deliver a copy of its counterparty's signature page to this Agreement electronically pursuant to R.C. § 1306. Each party hereto shall be entitled to rely upon an electronic signature of any other party delivered in such a manner as if such signature were an original.

47. **Entire Agreement.** This Agreement, including any attachments, contains the entire agreement between the parties hereto with respect to the subject matter hereof, and shall not be modified, amended, or supplemented, or any rights herein waived, unless specifically agreed upon in writing by the parties hereto. This Agreement supersedes any and all previous agreements, whether written or oral, between the parties.

*[SIGNATURE PAGE FOLLOWS]*

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 2004**

DocuSign Envelope ID: A2C6DB48-FD41-43BC-9584-FC215AD4CDF8

Subrecipient Grant Agreement between ODNR
and Columbus Recreation and Parks Department
Legal Contract ID # 2024-0799

Each party is signing this Agreement on the date stated below that party's signature.

SUBRECIPIENT                                OHIO DEPARTMENT OF NATURAL RESOURCES

Columbus Recreation and Parks Department    DIVISION OF FORESTRY

By: _____        By: _____

Printed Name: Bernita A. Reese              Printed Name: Mary Mertz

Title: Director                             Title: Director, ODNR

Date: May 31, 2024                          Date: June 4, 2024

ODNR Legal Form
Rev. Mar. 16, 2022

**J.A. 2005**

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# MADISON DECLARATION

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE, et al.,
            Plaintiffs,

v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES, et
al.,

            Defendants.

## DECLARATION OF JESSICA PRICE
(City of Madison, Wisconsin)

I, Jessica Price, declare as follows:

1.      My name is Jessica Price. This declaration is based on my knowledge,

professional education, and experience. I am over the age of eighteen and suffer from no legal

incapacity. I submit this declaration in support of the City of Madison ("Madison"), which is one

of many grant recipients that has been affected by freezes on federal grant funding.

2.      Madison is a municipal corporation existing by virtue of the laws of the State of

Wisconsin.

3.      I am the Sustainability and Resilience Manager for Madison, a role I have held

since 2021. I oversee a team of four, and I report to Mayor Satya Rhodes-Conway. My team

works across city agencies to develop policies and strategies that advance climate resilience,

sustainability, and environmental justice. I have a doctorate in Environment and Resources and a

Master of Science in Conservation Biology and Sustainable Development. Before joining

1

**J.A. 2007**

Madison's government, I was a Program Director for The Nature Conservancy, leading projects to advance renewable energy, climate mitigation, and climate adaptation strategies.

4.      In May 2024, Madison applied for a grant through the U.S. Environmental Protection Agency's ("EPA") Community Change Grants Program to lead a collaborative project to improve housing affordability through whole home energy upgrades. I oversaw the application process, and I submitted the application. On December 5, 2024, Madison was awarded a grant of $20,232,335. A true and accurate copy of the Grant Agreement, which also served as the notice of award, is attached as Exhibit A.

5.      The project outlined in the grant application is designed to be a collaboration between Madison and four community-based organizations: Urban Triage, Project Home, Sustain Dane, and Operation Fresh Start.

6.      I oversee the leadership team for the project, which has representatives from each of the five partner organizations (including Madison). We meet at least monthly. In my role overseeing the project, I manage Madison's existing contracts with each of these organizations and federal grant drawdowns with assistance from Madison's finance department.  I either led or participated in this grant process from application to grant agreement to management of the grant.

7.      The project aims to improve access to affordable, healthy, and energy-efficient homes while also providing green workforce training and jobs that provide good wages.

8.      The project will provide whole-home upgrades to 825 units of housing in low-income census tracts, thereby saving residents money on energy bills, improving indoor air quality, and cutting climate pollution. Whole-home upgrades include efficient lighting; improved HVAC systems; better insulation and air sealing; low-carbon technologies like air source heat

pumps, electric water heaters, and electric stoves; and remediation of indoor air pollution including radon and mold.

9.    The project will provide energy-saving devices to lower electricity usage to 1,050 additional homes. The project will also provide workforce training to 60 early career workers to grow the local construction workforce.

10.    Homes in the targeted low-income areas tend to be among the least energy efficient in Madison. Residents of these areas are statistically more likely to pay a large portion of their monthly income on utility bills, and inefficient and aging construction makes their energy bills even more expensive.

11.    To meet the project's goals, each of the four participating organizations will contribute its unique expertise. Project Home provides weatherization and home upgrades for single-family homes. Sustain Dane leads on upgrades for multifamily buildings. Urban Triage will lead community engagement and education to bring in participants. Operation Fresh Start will provide green workforce training and job readiness.

12.    Project Home and Sustain Dane both already run effective programs to provide energy efficiency upgrades in housing, and the grant allows them to scale up these programs.

13.    Urban Triage will lead the community outreach and engagement component of the grant. This role leverages Urban Triage's deep community connections and expertise to drive the project's success in improving energy efficiency, indoor air quality, and job opportunities for local residents.

14.    Operation Fresh Start will train 60 early career workers (20 per year) in weatherization, HVAC, and general carpentry, preparing them for career placement with construction contractors. The program is designed so that trainees work alongside experienced

industry professionals while being guided through real-world building energy efficiency projects led by Project Home and Sustain Dane.

15.    After receiving notice in December 2024 that the grant was awarded, Madison entered into subcontracts with Project Home and Sustain Dane to initiate home upgrade work for the project. Project Home and Sustain Dane invoiced Madison for the cost of home upgrade work for the first quarter of 2025. Madison intended to enter into similar subcontracts with Urban Triage and Operation Fresh Start in or around February 2025.

16.    On January 22, 2025, Madison requested to draw down $549.67 for reimbursement.  On January 29, 2025, Madison again requested to draw down funds from the EPA Community Change Grant, in amounts of $880,411 and $324,103, to pay the Sustain Dane and Project Home invoices, respectively. On January 30, 2025, we received the payments for the requested funds.

17.    On or around January 31, 2025, Madison's grant disappeared from the Automated Standard Application for Payments (ASAP) transaction page, making it impossible to draw down funds.

18.    At or around the same time, Madison received a communication from the EPA notifying us that all funding had been paused. On February 3, the EPA sent another email sharing the temporary restraining order issued in *New York et al. v. Trump*. The email did not explain how the ruling would impact our grant access.

19.    The grant's status in ASAP was then labeled as "Suspended" until around February 19, 2025, when that status changed to "Open." On February 19, Madison requested a reimbursement from the Community Change Grant in the amount of $5,642.34.

20.     On or around March 10, 2025, Madison's EPA Community Change grant status changed back to "Suspended."

21.     Madison has now been reimbursed with grant funding for the requests it was able to submit, but the city remains unable to draw down new funds.

22.     The funds that have been reimbursed only covered contract payments for Project Home and Sustain Dane. The funds already paid cover home upgrades only through the first quarter of 2025.

23.     Madison has delayed entering into contracts with the other two organizations, Urban Triage and Operation Fresh Start, until it knows it will be able to draw down on the promised funds.

24.     Freezing this grant creates several contractual problems for Madison: Madison cannot continue to honor its agreements with Sustain Dane and Project Home, and it cannot execute expected agreements with Operation Fresh Start and Urban Triage.

25.     Additionally, the EPA required Madison to identify a "statutory partner" in the grant application. Madison indicated in the grant application that it would award $1,163,842 to its statutory partner, Urban Triage. Madison will not be able to honor its "Statutory Partnership Agreement" with Urban Triage if the grant remains frozen.

26.     Without funding, Operation Fresh Start has not been able to start its workforce training program for this project. This delay impacts the overall success of the comprehensive program, because the project plan intended for training to start in tandem with the home upgrades. Homes are now being upgraded without trainees there to learn. These are missed opportunities that will result in fewer trained workers at the end of the program. Among other harms, this will impact the home construction market, which needs more trained workers.

27.    Operation Fresh Start's workforce training program is intended to run ten weeks for some participants, and six months for other participants. The project team is hesitant to initiate training if the funding is uncertain, because it could mean cancelling a training program midway through.

28.    Urban Triage has not been able to start its community outreach and education efforts on this project. Sustain Dane and Project Home have been able to start home upgrade work for this project based on pre-existing community interest, but the project's ultimate success depends on Urban Triage bringing in through its outreach additional community members who would benefit from the program.

29.    Urban Triage's outreach for this project is also intended to also provide additional support helping community members learn about and enroll in any other local, state, or federal home efficiency programs for which they may be eligible. Because Urban Triage has not begun its work on this project, community members are missing opportunities to get this additional assistance.

30.    Madison has only been able to provide enough funds for Project Home and Sustain Dane to work on the project during the first quarter of 2025. If the funds remain frozen, the organizations will soon need to pause home upgrade work on this project until more funds come in.

31.    I meet with representatives from all five organizations, including Madison, at least monthly to discuss the project. Despite receiving no funds thus far, Urban Triage and Operation Fresh Start have continued to attend these meetings. The success of this interconnected project depends on the contributions of all five groups, so Urban Triage and

Operation Fresh Start are caught in limbo, continuing to be involved even when it is unclear if or when they will receive funding.

32.     Madison had intended to bring three to five additional organizations into the project as trusted partners to broaden community and contractor engagement as part of a planned ambassador network for the project. Madison has drafted a request for proposals to send to prospective partner organizations, but I have not distributed it because of the uncertainty of future funds.

33.     The EPA requires that Community Change Grants be completed within three years. The Grant Agreement specifies that the project and budget period extend only until November 30, 2027. The funding freeze has already made it more challenging for Madison to meet its project goals during the three-year window, and continued freezing of funds will only make it more difficult.

34.     If Madison is not able to meet its project goals, it will mean more homes in Madison will remain energy inefficient. Residents of these homes will continue paying unnecessarily high utility bills every month, wasting money that they could be saving or spending in Madison. They will continue to suffer from higher indoor air pollution caused by radon, mold, and fossil fuel combustion. Inefficient homes also contribute to climate change.

35.     Delays will also have direct and indirect impacts on the economy. Through the high-quality workforce training and contractor outreach that the project would provide, residents of disadvantaged neighborhoods would have greater access to jobs and stronger connections to employers and programs in sectors that deliver building energy retrofits. The project would pay nearly $14 million to local contractors including Minority Business Enterprises and

Disadvantaged Business Enterprises, create local green jobs, and support wage growth in the local economy. Delays in funding prevent these economic benefits.

*(signature on following page)*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct. Executed this 25 th day of March, 2025 in Madison, Wisconsin.

JESSICA PRICE
Sustainability and Resilience Manager
City of Madison, Wisconsin

9

**J.A. 2015**

MADISON DECLARATION

EXHIBIT 16-A

5F - 00E05005 - 0    Page 1

## U.S. ENVIRONMENTAL PROTECTION AGENCY

### Grant Agreement

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 00E05005 | **DATE OF AWARD** 12/05/2024 |
| **MODIFICATION NUMBER:** 0 | |
| **PROGRAM CODE:** 5F | |
| **TYPE OF ACTION** New | **MAILING DATE** 12/10/2024 |
| **PAYMENT METHOD:** ASAP | **ACH#** 50926 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| Municipal | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| CITY OF MADISON<br>210 MARTIN LUTHER KING JR BLVD<br>ROOM 406<br>MADISON, WI 53703-3340<br>**EIN:** 39-6005507 | CITY OF MADISON<br>210 MARTIN LUTHER KING JR BLVD<br>ROOM 406<br>MADISON, WI 53703-3340 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Jessica Price<br>210 Martin Luther King Jr. Blvd<br>Room 406<br>MADISON, WI 53703-3340<br>**Email:** jprice2@cityofmadison.com<br>**Phone:** 608-266-4611 | Ravishankar Rao<br>77 W Jackson Blvd., EC-19J<br>Chicago, IL 60604-3507<br>**Email:** Rao.Ravi@epa.gov<br>**Phone:** 312-353-4365 | Gulfishan Ali Hamid<br>Assistance Section, MA-10J<br>77 W Jackson Blvd.<br>Chicago, IL 60604-3507<br>**Email:** Hamid.GulfishanAli@epa.gov<br>**Phone:** 312-886-4238 |

**PROJECT TITLE AND DESCRIPTION**

Climate Resilience Starts at Home: Growing Energy Efficiency, Indoor Air Quality, and Green Jobs in Madison and Fitchburg, Wisconsin

See Attachment 1 for project description.

| **BUDGET PERIOD** 12/01/2024 - 11/30/2027 | **PROJECT PERIOD** 12/01/2024 - 11/30/2027 | **TOTAL BUDGET PERIOD COST** $ 20,232,335.00 | **TOTAL PROJECT PERIOD COST** $ 20,232,335.00 |
|---|---|---|---|

### NOTICE OF AWARD

Based on your Application dated 11/23/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 20,232,335.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 20,232,335.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 5, U.S. EPA Region 5<br>Mail Code MCG10J 77 West Jackson Blvd.<br>Chicago, IL 60604-3507 | U.S. EPA, Region 5, Environmental Justice, Community Health, and Environmental Review Division<br>R5 - Region 5<br>77 W Jackson Blvd.,  EC-19J<br>Chicago, IL 60604-3507 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official for Sheila Dolan - Manager, Acquisition & Assistance Branch<br>by Robert Fields - Award Official Delegate | **DATE**<br>12/05/2024 |

2:25-cv-02152-RMG    Date Filed 03/26/25    Entry Number 24-17    Page 13 of 18

5F - 00E05005 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 20,232,335 | $ 20,232,335 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 20,232,335 | $ 20,232,335 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.616 - Environmental and Climate Justice Block Grant Program | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 25125WB047 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 20,232,335 |
| | | | | | | | | | $ 20,232,335 |

**J.A. 2018**

2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-17     Page 14 of 18

5F - 00E05005 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 196,828 |
| 2. Fringe Benefits | $ 41,572 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 19,993,935 |
| 9. Total Direct Charges | $ 20,232,335 |
| 10. Indirect Costs: 0.00 % Base N/A | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 20,232,335 |
| 12. Total Approved Assistance Amount | $ 20,232,335 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 20,232,335 |
| 15. Total EPA Amount Awarded To Date | $ 20,232,335 |

J.A. 2019

5F - 00E05005 - 0    Page 4

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to City of Madison. Specifically, the project will address energy justice head on and implementing equitable

residential energy efficiency and workforce training programs tailored to and delivering meaningful benefits for disadvantaged communities in Madison. The Project will serve 61 Census block groups designated as disadvantaged on the EPA IRA Disadvantaged Communities Map. These disadvantaged block groups correspond to 10 City of Madison neighborhoods – Wexford Ridge, Park Edge-Park Ridge, Hammersley Theresa, Balsam Russet Road, Meadowood, University Avenue Student Housing, Tenney Lapham, Marquette, Sherman, Sheridan Triangle, Brentwood Northport Corridor, Carpenter Ridgeway, Darbo-Worthington, East Town-Burke Heights – and 3 neighborhoods shared by the City of Madison and City of Fitchburg, including Allied-Dunn's Marsh, Arbor Hills-Leopold, and Park Street-Fish Hatchery.

- the project will train and lead a CBO Ambassador Network to collaboratively provide outreach and education to residents and housing owners in the disadvantaged communities served by this project.

= This project will provide free energy-efficiency and healthy home upgrades to both single- and multi-family housing serving low-income residents in Madison's disadvantaged neighborhoods.

- This project will provide workforce training through Operation Fresh Start's Build Academy and Climate Corps programs.

Lower energy usage by 20% or more in 285 residential buildings (825 units); Complete 295 or more energy audits and home health assessments;

Weatherization (air sealing and insulation) completed on 150 single family homes and 675 multifamily units; Electrification and HVAC upgrades completed on 75 single family homes and 50 or more multifamily units (10 buildings); The intended beneficiaries are disadvantaged communities.60 trainees complete Build Academy training;36 trainees complete Climate Corps training; Weatherization (air sealing and insulation) completed on 150 single family homes and 675 multifamily units. Electrification and HVAC upgrades completed on 75 single family homes and 50 or more multifamily units (10 buildings);

Outcomes: Reduced energy burden for residents of upgraded homes (calculated from energy bills); Reduction in greenhouse gas emissions from reduction in fossil fuel use (calculated using EPA GHG Equivalencies Calculator); Reduced combustion of fossil fuels resulting in improved indoor air quality due to reduction in $CO_2$, Volatile Organic Compounds, and Particulate Matter (Calculated from indoor air quality testing in a sample of units); Increased business opportunities for disadvantaged contractors and other local contractors (measured by number of minority/women/Veteran owned business engaged through the program); Improved job opportunities for trainees including opportunities to work with participating contractors and/or enter apprenticeship programs (measured by number of trainees that obtain jobs or enter apprenticeship programs); Reduced combustion of fossil fuels resulting in improved indoor air quality due to reduction in $CO_2$, Volatile Organic Compounds, and Particulate Matter (Calculated from indoor air quality sampling on sample number of units); Improved comfort from weatherization activities and HVAC upgrades (assessed via resident surveys)

Project home will serve on the Leadership Team (Task 1) and lead implementation of weatherization and healthy home upgrades to 50 single-family homes per year.

**J.A. 2020**

5F - 00E05005 - 0     Page 5

Sustain Dane will serve on the Leadership Team (Task 2) and lead implementation of energy efficiency and healthy home upgrades to 135 multi-family buildings (675 units) through their Efficiency Navigator Program.

Operation Fresh Start will serve on the Leadership Team (Task 1) and lead implementation of Green Workforce Training.

Urban Triage will serve on the projects Leadership Team (Task 1) and implement community engagement.

5F - 00E05005 - 0    Page 6

# Administrative Conditions

**General Terms and Conditions**

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and **hamid. gulfishanali@epa.gov**
- MBE/WBE reports (EPA Form 5700-52A): **Gulfishan Hamid** at **Hamid. Gulfishanali@epa.gov** and region5closeouts@epa.gov.
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Ravishankar Rao** at Rao.Ravi@epa.gov and **Gulfishan Hamid** at Hamid.Gulfishanali@epa.gov.
- Payment requests (if applicable): Rao.Ravi@epa.gov.
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Rao.Ravi@epa.gov.

## B. Pre-award Costs

In accordance with 2 CFR 1500.9, the grantee may charge pre-award costs (both Federal and non-Federal matching shares) incurred from **12/1/24** to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

5F - 00E05005 - 0     Page 7

## Programmatic Conditions

The recipient agrees to comply with the current EPA Community Change Grants Programmatic Terms and Conditions, available at: https://www.epa.gov/inflation-reduction-act/epa-community-change-grants-program-terms-and-conditions.

These terms and conditions are in addition to the General Terms and Conditions, additional programmatic terms and conditions, and the administrative terms and conditions included in the EPA award document.

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# NASHVILLE AND DAVIDSON DECLARATION

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| THE SUSTAINABILITY INSTITUTE, et al.,<br>                    Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as<br>President of the United States, et al.,<br><br>                    Defendants. | 2:25-cv-02152-RMG |

**DECLARATION OF CASEY HOPKINS
(Metropolitan Government of Nashville & Davidson County)**

I, CASEY HOPKINS, declare as follows:

1.      This declaration is based on my knowledge, professional education and experience. I am over the age of eighteen and suffer from no legal incapacity.  I submit this declaration in support of the Metropolitan Government of Nashville & Davidson County ("Nashville"), which is one of many grant recipients that has been affected by freezes on federal grant funding.

2.      I am the Policy Manager in the Nashville Department of Transportation & Multimodal Infrastructure of Nashville ("NDOT"). I have served in this position since April 2024. My position is a part of the division of Communications and Policy. Before that, I began with Nashville in September of 2020, and served as the Grants Administrator in the Finance Division within NDOT. Subsequently, I was promoted to become the Grants Coordinator. Until December 2024, when the Finance Division backfilled my position, I continued to hold many of my prior responsibilities and am still available for help for the new staff.

1

**J.A. 2025**

3.      In these positions, I coordinated or oversaw a wide range of federal and state grant activities, including identifying new funding opportunities; assembling and supporting the project team to create and submit grant applications; seeking vendors externally to assist on grant applications or collaborating with coworkers internally to implement grants; and managing the application process. Once the grants were awarded, I worked with project managers to ensure that the grant agreement is in place. I managed the grant schedules and the reporting goals promised in the grants.  On occasion, I prepared the grant reports for the team. I worked with teams to submit federal or state reimbursements, or did so on their behalf.

4.      I was involved in both of the grants at issue in this lawsuit from the grant application phase until the present.  In fact, I submitted both of these grants on behalf of Nashville.

*Electrify Music City: the Charging and Infrastructure Grant Program*

5.      Nashville has operated free or affordable electric vehicle charging stations since 2017.  Many of the existing charging stations were not operating to the highest standard. For example, the U.S. Department of Energy National Electrical Vehicle Infrastructure standards state that charging infrastructures should have an annual network "uptime" (meaning they are operational and available for use) of 97%. Between April 2018 and April 2023, the average uptime for the existing infrastructure was approximately 85%.

6.      In order to replace damaged charging stations and expand the number of charging stations available for Nashville residents, Nashville created its project: "Electrify Music City." This project is intended to provide increased access to electrical vehicle charging stations and increase jobs for residents in Nashville and the surrounding region through installation and maintenance of the EV charging stations.

2

**J.A. 2026**

7.     Nashville applied for a grant with the U.S. Department of Transportation ("DOT"), and Nashville matched the potential federal grant with a promise of approximately $1.1 million. In August 2024, DOT awarded Nashville approximately $4.7 million for our project in order to upgrade, improve, and expand our public electric vehicle charging infrastructure under the Charging and Fueling Infrastructure Grant program. A true and accurate copy of the Notice of Award is attached as Exhibit A.

8.     Upon receiving notice of the Charging and Fueling Infrastructure award, Nashville immediately began the process to complete a grant agreement with the Federal Highway Administration ("FHWA") so that it could get started on the work for the EV charging stations.

9.     In September 2024, FHWA provided Nashville with draft agreements to begin filling out. We held a kickoff meeting with the FHWA in November.  Nashville and FHWA exchanged drafts until late December, when the FHWA field office approved the final draft. I believe the final draft was sent to headquarters by early January.  We heard nothing from FHWA or DOT about the grant except for an email in late February with a new point of contact.  We have received no updates on the grant agreement at all since early January.

10.      Nashville has committed to expanding and improving its electric charging infrastructure and hopes to move forward to the extent that it can with or without federal funds. However, the uncertainty and threat of losing federal funds has thrown planning and implementation of the Electrify Music City project into disarray and uncertainty.  It is likely that if this uncertainty continues, the project will need to be re-evaluated and may not go forward.

11.     Nashville started its procurement process with several vendors to install, repair, and improve its electric vehicle charging stations in accordance with federal procurement

3

**J.A. 2027**

requirements to accommodate the potential federal funds award. Nashville selected a vendor to purchase charging stations from and entered into a contract with this vendor, Blink Charging. Nashville now cannot guarantee that it has the federal funds to complete this project. With the uncertainty caused by the funding freezes, we have not been able to even plan with our new vendors to start this project.

12. Many of the potential vendors for electrical services, such as Stansell Electric, are local or regional businesses, who would likely hire local residents to work on these EV Charging projects. Now that the funds are frozen, residents are deprived (even if temporarily) from these projects moving forward and the related employment opportunities.

13. Nashville also incorporated the awarded funds in its Transportation Improvement Program (TIP) for the Nashville metropolitan planning area. The TIP shows that there is a need for federal funding. Uncertainty around these funds means that Nashville staff may need to take extra time and expend resources to re-evaluate the project and additional time trying to fill this budget gap. With the funds frozen, Nashville cannot properly plan or fully implement all the projects as planned.

14. Long term, if these promised funds are rescinded or eliminated, Nashville residents will be deprived of the opportunity for improved access to electric vehicle charging. Without fully implementing this program, residents will not have access to the new amenities or the benefits the project proposed. The accessibility of electric vehicle charging infrastructure not only improves the quality of life for residents who use electric vehicles but also incentivizes others to purchase electric vehicles. More electrical vehicle chargers also reduce pollution in the city that can cause medical issues for residents and that contributes to climate change and other environmental harms.

4

15.    Metro Nashville adopted a resolution for a community-wide target of an 80% reduction for annual greenhouse gas emissions by 2050. RS2022-1358.  Every action, such as encouraging electric vehicles in the community, can contribute to this goal.  Defendants' freeze of Nashville's promised funds puts this goal - voted on by the Metropolitan Council – in jeopardy.

*East Nashville Spokes: the Active Transportation Infrastructure Investment Program*

16.    Currently, the Cumberland River creates a natural barrier between East Nashville and the downtown economic hub of the city. Transit connections between these neighborhoods need improvement, particularly for residents who may not own a car. Thus, in addition to posing safety concerns, the decreased connectivity between neighborhoods has meant that some residents in Nashville struggle with access to employment opportunities just based on where they live.

17.    Nashville applied for in July of 2024 and won a highly competitive approximately $9.3 million grant for their "East Nashville Spokes" project under the Active Transportation Infrastructure Investment Program with the Department of Transportation ("USDOT") in January 2025 to help fund a multi-modal, safe transit connection project to connect neighborhoods in the city so residents can have safer, better transit access to their jobs. The project includes protected bike lanes as well as Americans with Disabilities Act and pedestrian improvements.  A true and accurate copy of the Notice of Award is attached as Exhibit B.

18.    Nashville residents expect and are excited about the East Nashville Spokes project. East Nashville Spokes is a multi-year project that could transform Nashville into a more walkable, bikeable, and accessible city, and work on this project had already started when the city applied.

5

**J.A. 2029**

19.     This project was so important to Nashville that it committed approximately $7.6 million of its own funds to the project.  For the past several years, Nashville conducted community engagement, planning, and designing to create a project plan to connect several neighborhoods in the city. Nashville residents even supported the project and its funding with its votes. To help fund the next several phases of the project, Nashville incorporated this project into a city-wide Transit Referendum that anticipates leveraging federal funds to bring the project to completion. The Transit Referendum passed overwhelmingly in November 2024.

20.     The project includes a transit connection between a Metropolitan Development and Housing Agency ("MDHA") community, Cayce Homes, to historic Edgefield and downtown.  Downtown is not the only employment hub that would be connected to East Nashville — it will also connect neighborhoods to the East Bank, where the Tennessee Titans (Nashville's National Football League team) stadium is being rebuilt with surrounding mixed-use development that will include residential, retail, and entertainment venues.  These many connections will also bring more consumers to downtown and East Bank businesses as more residents will have easier access to storefronts.  This project would provide safe, walkable or bikeable connections to these amenities.

21.     After both a public press release and written notification by USDOT that Nashville won its award of approximately $9.4 million, FHWA reached out to introduce their point of contact to execute the grant agreement process in January 2025.  This was the last communication that Nashville received from USDOT nor FHWA about this project.

22.     With the funds frozen, this project has languished in uncertainty.  The project team is ready to move to the next phase of the project, but if funds continue to be frozen, they cannot plan, implement, or execute the project. The next steps for East Nashville Spokes would

6

**J.A. 2030**

be to receive National Environmental Policy Act final approval, finalize the design, and move towards construction by 2027.[1]  Because these steps take a great deal of resources and time, the delay caused by the federal freezes has a cascading effect on future steps.  For example, until the final designs are made, Nashville cannot begin its process for securing easements for the project. Nor can it begin procurement for the project, which can take many months.

23.     If this uncertainty continues, Nashville staff will have to re-evaluate this project in light of the massive budget gap.  At a minimum, it will delay progress and completion on the project.  These delays could compound, as delayed projects often require amendment and changes to schedules.

24.      This project will create jobs in the construction phase, and the federal funding freeze means that residents are deprived access to these jobs. The funding freeze means that local businesses, such as engineering firms will be deprived of work on this important project.

25.     The federal government refusing to release funds on its award means that better connections across the city and safer streets, including for connections between downtown and quickly developing areas in Nashville, are not fully funded. As residents wait on this project, the transit connections that do exist are not as safe as they could be. It means residents will continue to have less access to jobs, amenities such as stores, hotels and other businesses, and connections to one another.

*(signature on following page)*

---

[1]NEPA requires that certain proposed projects which implicate federal funds must undergo a review of environmental impacts created by the project and methods for mitigating such impacts, which must be approved by the relevant agency.  *See* Environmental Protection Agency, *National Environmental Policy Act Review Process* (March 24, 2025), https://www.epa.gov/nepa/national-environmental-policy-act-review-process

7

**J.A. 2031**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in Nashville, Tennessee, on this 25th day of March, 2025.

CASEY HOPKINS
Policy Manager
Nashville Department of Transportation &
Multimodal Infrastructure of Nashville

8

**J.A. 2032**

# NASHVILLE AND DAVIDSON DECLARATION

# EXHIBIT 17-A

| | |
|---|---|
| **From:** | CFIAwardees |
| **To:** | Patel, Neelam (FHWA); Tarpgaard, Sarah (FHWA) |
| **Cc:** | Hopkins, Casey (NDOT); Pulley, Amos (FHWA) |
| **Subject:** | CFI: Notice of Selection for CFI Grant Award |
| **Date:** | Thursday, August 29, 2024 2:28:02 PM |

You don't often get email from cfiawardees@dot.gov. Learn why this is important

**Attention**: This email originated from a source external to Metro Government. Please exercise caution when opening any attachments or links from external sources.

Applicant Name: Metropolitan Government of Nashville-Davidson County
Application Title: Electrify MUSIC City: Municipality Upgrades for Stations and Integrated Charging
Federal Funding: $4,694,080

Dear Selected CFI Applicant,

**Congratulations!** The U.S. Department of Transportation (USDOT) selected your application to receive a grant award under the Charging and Fueling Infrastructure (CFI) Discretionary Grant Program.

Your selected application was originally submitted in response to the FY 2022/2023 CFI Round 1 NOFO (693JJ323NF00004) issued March 14, 2023, and has been selected under the reserved funding made available for additional awards under the CFI Round 2 NOFO. By email to USDOT, you indicated your request to be reconsidered for award under the reserved funding. Your project has been selected for award under the reserved funding and you are considered a "Round 1B" CFI awardee.

The list of 51 selected Round 1B applications is available online at: https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1b/. Please check the list of selected applications to ensure your application information is displayed correctly. Some projects have been selected by USDOT to receive a reduced funding amount that is less than the requested Federal share. In such cases, the project scope will be scaled accordingly in the respective grant awards.

This email is not authorization to begin work, and it does not guarantee Federal funding. For each selected project, USDOT and the selected applicant organization must establish and execute a signed, mutually agreed upon grant agreement prior to the disbursement of award funds. No costs incurred before USDOT signs and executes the grant agreement will be reimbursed.

**J.A. 2034**

**Next Steps**: The Federal Highway Administration (FHWA) is responsible for establishing and executing the CFI grant agreements with the selected applicants. You can expect to hear from your designated FHWA Point of Contact (POC) in the near future. Your designated FHWA POC will be an employee of the FHWA Division Office based in your State or the FHWA Office of Tribal Transportation. In the meantime, if you have questions about next steps, please direct them to FHWA using the email CFIAwardees@dot.gov.

**Request for Applicant Points of Contact:** Please reply to this email to confirm receipt and provide your organization's point(s) of contact for FHWA's use in the CFI grant award process.

**Welcome Webinars:** You are invited to attend the following Zoom webinars. The webinars will cover the process for executing grant agreements. The webinars will be recorded for those unable to attend.  The intended audience includes the CFI selected recipients' primary POCs and the FHWA POCs.  If additional people from your office should be included, please share with the appropriate people.
- CFI Round 1B Welcome Webinar One
- Wednesday, September 11, 2024, 2:00 – 3:00pm Eastern
- https://usdot.zoomgov.com/j/1604060503?pwd=dSkWbG5IyjUVFB4zTm5vFkLJBDqroP.1&from=addon; Meeting ID: 160 406 0503; Passcode: 910522
- CFI Round 1B Welcome Webinar Two
- Thursday, September 19, 2024, 1:00-2:30pm Eastern
- https://usdot.zoomgov.com/j/1607563076?pwd=ZXJoECPZK7JNkTJiytnSNOxVfBI2sQ.1&from=addon; Meeting ID: 160 756 3076; Passcode: 594740

**CFI Grant Administration Documents:** In the near future, FHWA will provide a CFI Grant Agreement Template for the recipient to complete in preparation for the award. The template will be discussed at the webinars listed above, and FHWAs POC will coordinate with recipients to complete their agreement template. Recipients are encouraged to review the grant terms and conditions, and grant exhibits, which are incorporated into all CFI grants by reference. The CFI General Terms and Conditions and the CFI Exhibits can be accessed on the CFI website at the bottom of the Grant Resources page.  You are also encouraged to review the CFI FY 2022 and 2023 Round 1 NOFO and Round 1 Question and Answer document.  These documents and other resources can be found using the links on the CFI Round 1 FY 2022 and 2023 Resources page.

**J.A. 2035**

**Statewide Transportation Improvement Program (STIP):** All CFI projects are considered to be construction projects under Title 23 United States Code (U.S.C.). Accordingly, all CFI projects are subject to the requirement to be included in an approved STIP applicable to the project. CFI recipients are strongly encouraged to work with their FHWA Division Office and State DOT to ensure the CFI project is consistent with the existing STIP or begin the STIP submittal process as soon as possible. FHWA is unable to execute a CFI grant until the project is included in an approved STIP.  For more information on STIP requirements in your State, please contact your local FHWA Division Office and/or State DOT.

**In Closing:** We ask for your patience as we work diligently toward executing grant agreements so your important work may begin. The timeline for awarding new grants vary from project to project, and may take months to process and complete.

It's exciting to see so many communities on the path to accelerating an electrified and alternative fuel transportation system that is convenient, affordable, reliable, equitable, accessible, and safe. The whole CFI Grants Program team is passionate about helping you succeed. Thank you for your commitment to electric vehicle charging and alternative fueling infrastructure. If you have questions, please direct them to FHWA using the email CFIAwardees@dot.gov.

Once again, congratulations!

| | |
|---|---|
| ? | **Neelam R. Patel**<br>(she/her)<br>U.S. DOT \| FHWA<br>Office of Natural Environment<br>Sustainable Transportation and Resilience Team<br>Neelam.Patel@dot.gov<br>https://www.fhwa.dot.gov/environment/sustainability/ |

# NASHVILLE AND DAVIDSON DECLARATION

# EXHIBIT 17-B

| | |
|---|---|
| **From:** | Jackson, Jeremy (FHWA) |
| **To:** | Hopkins, Casey (NDOT) |
| **Cc:** | Oldham, Jason (FHWA); Weems, Dysha (FHWA) |
| **Subject:** | Your ATIIP Discretionary Program Grant - Metropolitan Government of Nashville-Davidson County - Jan. 15, 2025 |
| **Date:** | Wednesday, January 15, 2025 9:01:47 AM |

You don't often get email from jeremy.jackson1@dot.gov. Learn why this is important

**Attention**: This email originated from a source external to Metro Government. Please exercise caution when opening any attachments or links from external sources.

Hello Casey,

I am Jeremy, Grants and Local Public Agency Program Coordinator for the Tennessee Division of the Federal Highway Administration (FHWA). Our division administers the Active Transportation Infrastructure Investment Program (ATIIP) Grant.

Congratulations on being selected as a grant recipient for a Construction Grant for your project, East Nashville Spokes. I will be your primary point of contact at FHWA.

Prior to commencing work on your grant, FHWA must execute a formal Grant Agreement with Metropolitan Government of Nashville-Davidson County outlining the terms and conditions of your ATIIP grant. It is crucial to understand that any expenditures incurred before the formal execution of this agreement by both parties will not be eligible for reimbursement.

In the weeks ahead, FHWA will share information with you about the process we will follow for development and approval of the Grant Agreement. Following an initial information exchange, I will contact you to schedule a kick-off meeting. In the meantime, if you have any questions, please feel free to contact me.

Thank you for your commitment to improving active transportation and transportation choices for all. I look forward to working with you.

Best,

**Jeremy T. Jackson, PMP**
Grants & Local Public Agency Program Coordinator
Cell: 629.203.0072 | Office: 615.781.5762
jeremy.jackson1@dot.gov

Federal Highway Administration | Tennessee Division
highways.dot.gov

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# NEW HAVEN DECLARATION

# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

---

THE SUSTAINABILITY INSTITUTE, et al.,
         Plaintiffs,

v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES, et al.,

         Defendants.

---

**DECLARATION OF JUSTIN ELICKER (CITY OF NEW HAVEN)**

I, Justin Elicker, declare as follows:

1.      My name is Justin Elicker. This declaration is based on my personal knowledge, professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of New Haven, which is one of many grant recipients that has been affected by freezes on federal grant funding.

2.      The City of New Haven is a municipal corporation existing by virtue of the laws of the State of Connecticut.

3.      I am the Mayor of the City of New Haven, Connecticut (hereinafter "New Haven" or the "City"). I have served in this position since January 1, 2020, and I supervise the City's Budget Director in developing the City's annual budget. I also supervise the City's Executive Director of Climate and Sustainability.

4.      I have long been committed to sustainability and environmental justice. Prior to becoming mayor, I earned a master's degree in Environmental Management and served as

1

**J.A. 2040**

Executive Director of the New Haven Land Trust. As mayor, I created New Haven's office of Climate and Sustainability to prioritize these issues in our community.

5.     In my tenure as Mayor, I have worked on the financial planning process for five budget cycles and the City has applied for and received numerous federal awards including the Environmental Justice Government-to-Government award, the Climate Pollution Reduction Grant, and the Community Change Grant at issue in this litigation.

6.     In July 2024, New Haven was awarded a $1 million Government-to-Government award to help city residents transition from burning heating oil to heating their homes with efficient heat pumps in order to reduce heating costs and air pollution. The award also helps residents to switch from gas stoves to induction stoves. A true and correct copy of the Cooperative Agreement is attached as Exhibit A.

7.     The project has already begun in partnership with several partner organizations including the Community Action Agency of New Haven (CAANH). CAANH has already hired one full-time staff person to implement the project and other partner organizations have invoiced the City for staff time spent working on the project.

8.     The funding under this award became unavailable on or before Monday, February 3, 2025. The City's Executive Director of Climate and Sustainability sent me a screenshot showing our lack of access to this and other grant accounts in the Automated Standard Application for Payments (ASAP). Since that time, he has periodically run Account Profile Inquiry reports on ASAP to check the status of the funding. When the funding has been frozen, its status has been labeled as "Suspended." When the funding has been unfrozen, its status has been labeled as "Open."

9.      On Friday, February 7, 2025, the award's status was changed to "Open" and the City attempted to draw down funds to reimburse a partner for ongoing work. However, the EPA failed to process the drawdown request at that time.

10.     An Account Profile Status report on Monday, February 10, 2025, showed that the funding was again labeled with a status of "Suspended." On February 11, 2025, our Executive Director of Climate and Sustainability sent me a screenshot showing the suspended status.

11.     On February 20, 2025, the funding again became available and EPA subsequently processed the February 7 drawdown request.

12.     On March 6, New Haven submitted two more drawdown requests, but neither was processed.

13.     On March 10, 2025, in an Account Profile Status report, the account status indicator was again labeled as "Suspended." Since that time, the status has remained "Suspended."

14.     New Haven urgently needs to tell its partner organizations whether to continue work funded by the Government-to-Government award. CAANH has already hired a dedicated staff member to implement the project and may need to eliminate the position if the funding remains suspended much longer. Because this program did not require the City to allocate matching funding, the project budget was structured to rely entirely on federal funds. As such, the City is limited in its ability to continue to pay CAANH's and other partner organizations' invoices for work related to this project as long as the funding is frozen.

15.     Without this federal funding, New Haven will be unable to move forward with this program and New Haven residents will be deprived of the opportunity to reduce their energy costs. This includes households who have already been informed that they are eligible for the

program and have already been enrolled. Residents may also expect the program to continue based on information presented to the Board of Alders and reported on by the local media.

16.      In July 2024, New Haven was also awarded a $9.5 million grant under the EPA's Climate Pollution Reduction Grant Program. A true and correct copy of the Grant Agreement is attached as Exhibit B. The grant provides approximately 60% of the funding required for an advanced geothermal heat pump system that will heat and cool the City's main train station, Union Station, and also provide heating and cooling for 1000 units of mixed-income apartments the New Haven Housing Authority plans to build on adjacent property.

17.      This grant became unavailable on or before Monday, February 3, 2025. It was briefly made available on Friday, February 7, 2025, before its account status indicator was labeled "Suspended" in an Account Profile Inquiry report on Monday, February 10, 2025. Our Executive Director of Climate and Sustainability sent me screenshots taken from ASAP showing the lack of access to the grant account on February 3, 2025, and the grant's suspended status on February 11, 2025.

18.      On February 20, 2025, an Account Profile Inquiry report showed the account status indicator had again switched to "Open." At present, the status remains "Open," but I am concerned given the fluctuating status of this and other EPA grants, that it may again switch to "Suspended" at any moment.

19.      New Haven plans to release a Request for Proposals ("RFP") this week, the week of March 24, 2025, for the design of its geothermal heating and cooling system. After 30 days, the City will review the submitted proposals and select a firm to design the system. The design for this complex system is likely to cost over $1 million. As such, New Haven will not be able to enter into a design contract unless we are confident the grant funding will remain unfrozen.

20.     Without the Climate Pollution Reduction Grant, New Haven will not be able to construct the planned geothermal system. As such, New Haven is hesitant to move forward with the project unless we are confident the funding will remain unfrozen.

21.     Complete rescission of the grant or an extended delay will likely prevent the project from ever getting started. This would deprive New Haven of an innovative geothermal system that would both reduce city residents' energy expenses and help the city to achieve its goal of completely electrifying city operated buildings by 2030.

22.     In January 2025, New Haven was awarded a $20 million grant under the EPA's Community Change Grant program to fund a project known as the Elm City Climate Collaborative. A true and correct copy of the Grant Agreement is attached as Exhibit C. With this funding, New Haven plans to lead a coalition of 20 partner organizations to make energy efficiency improvements to new affordable housing, upgrade existing homes with energy efficiency measures, and improve bike infrastructure and green spaces. The project will also include improved food rescue (matching unused food from food businesses with people who need it), composting in schools, green job development programs, and a ramped-up effort to meet the need for bicycles among residents who lack other transportation options.

23.     On January 21, 2025, the City received a notification through the ASAP system that funding for the Elm City Climate Collaborative had been authorized at an amount of $20 million. However, after receiving the formal notice of award on February 3, 2025, the City's Executive Director of Climate and Sustainability was unable to access the account on ASAP. He sent me a screenshot showing the lack of access.

24.     On February 10, 2025, the Executive Director of Climate and Sustainability ran an Account Profile Inquiry report on ASAP which showed that the grant had an account status

indicator of "Suspended." On February 11, 2025, he sent me a screenshot showing the "Suspended" status of the grant.

25.      On February 18, 2025, he ran another Account Profile Inquiry report on ASAP which showed the status indicator had changed "Open." On March 10, 2025, the grant's account status indicator was again changed to "Suspended." As of the date of this declaration, the status remains "Suspended."

26.      The period of performance for the Community Change Grant begins April 1, 2025. No funds have yet been disbursed. The grant has a three-year term with no possibility of extension, meaning that all project activities must be completed during that time, and any delays may hinder the city's ability to achieve the project goals.

27.      New Haven is currently finalizing job descriptions for new hires to launch and manage this project, as is the City's Statutory Partner, Greater Dwight Development Corporation. New Haven and its partners will not be able to move forward with hiring for the positions if the grant funding remains frozen.

28.      The City and Greater Dwight are finalizing the language of subaward agreements for project partners but the partners will be unable to begin work to carry out the project activities without clear understanding that funding will be available to reimburse them for cost they incur.

29.      Without the Community Change Grant funds promised by the EPA, the City of New Haven and Elm City Climate Collaborative will be unable to move forward with their projects. The City and its residents will be deprived of improved infrastructure and more energy efficient housing that decreases energy bills. More food will go to waste and more residents will

likely go hungry. Fewer residents will have access to green spaces and new transportation options.

30.    In addition to the direct benefits that our Environmental Justice Government-to-Government award, Climate Pollution Reduction Grant, and Community Change Grant deliver to New Haven and our residents, they also promise to create numerous good-paying jobs through the construction of our advanced geothermal system and implementation of our other programs and will otherwise boost our local economy. The Community Change grant alone is estimated to create 79 jobs (22 full time and 57 part time) directly funded across project activities.

31.    Given the nature of these projects and the fact that we must spend money before submitting a reimbursement request, the funding freezes, even where intermittent, are grinding the programs to a halt, creating a risk that they will never be completed, and jeopardizing all the associated benefits to our community.

*(signature on following page)*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this 25th day of March 2025.

Justin Elicker
Mayor of New Haven, Connecticut

8

J.A. 2047

# NEW HAVEN DECLARATION

# EXHIBIT 18-A

52 - 00A01441 - 0    Page 1

| | **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br>Cooperative Agreement | GRANT NUMBER (FAIN): 00A01441<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 52 | DATE OF AWARD<br>07/01/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/05/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>10058 |

| RECIPIENT TYPE:<br>Municipal | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>City of New Haven<br>165 Church St<br>New Haven, CT 06510-2010<br>EIN:  06-6001876 | PAYEE:<br>City of New Haven<br>165 Church St<br>New Haven, CT 06510-2010 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Steven Winter<br>165 Church St<br>New Haven, CT 06510-2010<br>**Email:**  SWinter@newhavenct.gov<br>**Phone:** 475-331-3769 | Keyana White<br>5 Post Office Square, Ste 100<br>Boston, MA 02109-3946<br>**Email:**  White.Keyana@epa.gov<br>**Phone:** 617-918-1436 | Robert Smith<br>Grants Management Branch<br>5 Post Office Square, Ste 100<br>Boston, MA 02109-3946<br>**Email:**  Smith.Robert.F@epa.gov<br>**Phone:** 617-918-1960 |

**PROJECT TITLE AND DESCRIPTION**

Electrify New Haven

See Attachment 1 for project description.

| BUDGET PERIOD<br>07/01/2024 - 06/30/2027 | PROJECT PERIOD<br>07/01/2024 - 06/30/2027 | TOTAL BUDGET PERIOD COST<br>$ 1,000,000.00 | TOTAL PROJECT PERIOD COST<br>$ 1,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/14/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 1,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 1,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 1, EPA New England<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 | U.S. EPA, Region 1, Environmental Justice, Community Health and Environmental Review Division<br>R1 - Region 1<br>5 Post Office Square, Ste 100<br>Boston, MA 02109-3946 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| *Digital signature applied by EPA Award Official* Arthur Johnson - Director, Mission Support Division | DATE<br>07/01/2024 |

52 - 00A01441 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 1,000,000 | $ 1,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 1,000,000 | $ 1,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.312 - Environmental Justice Government-to-Government (EJG2G) Program | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 24124WB046 | 2226 | BSF5 | WF | 000W57XK1 | 4183 | - | - | $ 1,000,000 |
| | | | | | | | | | $ 1,000,000 |

2:25-cv-02152-RMG     Date Filed 03/26/25     Entry Number 24-19     Page 13 of 52

52 - 00A01441 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 4,500 |
| 6. Contractual | $ 542,381 |
| 7. Construction | $ 0 |
| 8. Other | $ 434,751 |
| 9. Total Direct Charges | $ 981,632 |
| 10. Indirect Costs: 0.00 % Base - | $ 18,368 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 1,000,000 |
| 12. Total Approved Assistance Amount | $ 1,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 1,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 1,000,000 |

J.A. 2051

52 - 00A01441 - 0    Page 4

## Attachment 1 - Project Description

The cooperative agreement provides funding to the City of New Haven. The recipient will partner with local community-based organizations and engage communities with a focus on six neighborhoods: West Rock/West Hills, Newhallville, Dixwell, the Hill, Fair Haven, and Annex. The recipient will develop a program to reduce energy burden and provide energy efficiency alternatives to 50-100 households and enroll up to 400 households in energy counseling programs. Through this project, the City of New Haven will seek to distribute the benefits of energy efficiency conversions to historically underserved communities, lower greenhouse gas emissions and indoor air pollution, and increase resilience to climate change impacts. The recipient will evaluate the effectiveness of the proposed project with Yale University including qualitative interviews and monitoring indoor air quality before and after the electrification interventions.This project will develop a new program focused on providing electrification improvements to energy-burdened residents and equitably distributing the benefits of energy efficiency upgrades and counseling to historically disadvantaged communities in New Haven, Connecticut. Through partnership with local community-based organizations (CBOs), the New Haven Office of Climate and Sustainability (OCS) will identify and engage eligible households in the project, design and complete electrification and deep energy efficiency improvements, and qualify resident participation, participants' perceived benefits of improvements, and public perception of electrification. In addition, through partnership with Yale University, OCS will assess the participant benefits of improvements, quantify indoor air quality improvements and collect data to improve awareness of the potential impacts of residential exposure to indoor air pollutants. It is anticipated that this project will result in the following deliverables: enrollment of up to 400 energy-burdened households in energy efficiency counseling programs; conversion of 50-100 oil heating systems to air source heat pumps (ASHPs); conversion of 20-50 gas stoves to induction ranges; enrollment of 350-750 participants in energy efficiency programs; completion of indoor air quality monitoring in up to 50 eligible households; completion of 2 focus groups to evaluate awareness of energy efficiency programs and benefits of energy conversions; and survey of over 250 eligible New Haven residents pre- and post-electrification interventions. The expected outcomes of the project include: increased education about the potential benefits of energy efficiency conversions; increased education about energy improvements and energy efficiency rebate and incentive programs; increased community engagement in historically disadvantaged communities in New Haven; increased resiliency to climate change impacts in historically disadvantaged communities in New Haven; and strengthened partnerships between local government, community-based organizations (CBOs), community residents, and academic partners. Intended beneficiaries include New Haven residents, with a special emphasis on the historically disadvantaged neighborhoods of Wets Rock/West Hills, Newhallville, Dixwell, the Hill, Fair Haven, and the Annex.The Community Action Agency of New Haven (CAANH) will support one outreach worker over two years to assist with enrolling households into energy efficiency programs and act as an initial point of contact for residents. The primary role of CAANH in the project is to identify households who are eligible and interested in participating in the project. CAANH will also participate in up to 150 community events in collaboration with the City of New Haven and Junta for Progressive Action (Junta) to carry out public outreach and assist Yale University in connecting with 250 community members at the beginning and end of the 3-year project.

Junta will work to connect Latine households eligible for and interested in participating in the project. Junta will work in collaboration with CAANH to contact households and participate in up to 150 community engagement events with the goal of recruiting participants interested in enrolling in the Neighborhood Housing Services' energy counseling program and Connecticut's Home Energy Solutions – Income Eligible (HES-IE) energy efficiency program. Together, Junta and CAANH will aim to enroll 350-750 participants.

**J.A. 2052**

52 - 00A01441 - 0    Page 5

Neighborhood Housing Services of New Haven (NHS) will work to connect participants with energy efficiency programs and rebates, support participants through the application process, design of energy efficiency plans, and engaging reliable contractors to install the electrification upgrades. NHS will provide counselling services to up to 400 households.

Yale University will conduct 30 interviews before and after electrification intervention. Yale University will also conduct focus groups to assess whether the project had a demonstrable effect. Yale University will conduct additional evaluation at the beginning and end of the project period to assess general change of public awareness regarding air quality concerns, energy efficiency, and electrification.

52 - 00A01441 - 0     Page 6

# Administrative Conditions

## National Administrative Terms and Conditions

### General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov
- MBE/WBE reports (EPA Form 5700-52A): **Grants Specialist on Page 1 of Award Document AND Larry Wells, Disadvantaged Business Utilization Program Manager:** r1_mbewbereport@epa.gov
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Grants Specialist and Project Officer on Page 1 of Award Document**
- Workplan revisions, equipment lists, programmatic reports and deliverables: **Project Officer on Page 1 of Award Document**
- Quality Assurance documents, **Project Officer on Page 1 of Award Document AND** R1QAPPs@epa.gov

### B. Pre-Award Costs

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from 07/01/2024 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

# Programmatic Conditions

Environmental Justice Government to Government (EJG2G) Cooperative Agreement Terms and Conditions (Updated 01/17/2024)

## A. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

### Performance Reports – Content

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas:  1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies shall be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

### Performance Reports - Frequency

The recipient agrees to submit semi-**annual** performance reports electronically to the EPA Project Officer within 30 days after the reporting period (every three- or six-month period). The reporting periods are January 1, 2025, July 1, 2025, January 1, 2026, July 1, 2026, January 1, 2027, June 30, 2027.

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance. The final report shall document project activities over the entire project period.

### Subaward Performance Reporting

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

1. Summaries of results of reviews of financial and programmatic reports.

2. Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Environmental results the subrecipient achieved.

4. Summaries of audit findings and related pass-through entity management decisions.

**J.A. 2055**

5. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

## B. EJ Grantee Workshops (Virtual and/or In-Person)

All EJCPS recipients will be required to attend at least one EJ Grantee training workshop hosted by your EPA Region. These trainings will assist all current EPA EJ grant recipients with strategic planning and project management of their grants and/or cooperative agreements, as well as afford recipients opportunities to learn from their peers and other experts. Recipients will need to identify at least one authorized official to participate. Virtual workshops will utilize webinar technology that can be accessed via personal computer. A conference call line will be available for any recipient who doesn't have the technical capability (i.e. slow internet connection) to access the webinar. Your EPA Project Officer will keep you informed of the dates of the workshops. Each EPA Regional Office will tailor their workshop agenda to the environmental needs and priorities of workshop participants and local communities in the region. Workshops may include a mix of current and former EJ grant recipients, local community stakeholders, other EPA and federal program personnel, and other attendees. Workshop attendees will come together to provide perspective, insight, and lessons learned regarding environmental justice issues plaguing their communities and ways to address them. Recipients will need to identify at least one authorized official to participate. Recipients are permitted to use awarded funds to pay for travel to the workshops.

## C. Review and Oversight

1. Products - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis in order to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. It is at the EPA Project Officer's discretion to determine any change to the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer for approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

## D. Post-Project Period Follow-up and Engagement

For no less than one year after completion of the project, recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJCPS project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work*. The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be at the discretion of the designated EPA Project Officer and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding.

## E.   Cybersecurity Condition

### State Grant Cybersecurity

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332 (d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## F.   Competency Policy

### Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, <u>Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,</u>

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## G. Procurement Terms and Conditions

**J.A. 2057**

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

## L.  Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement [a/the] Quality Assurance (QA) planning document[s] in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QAPP,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## O.  Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being

conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the [Insert Recipient or subrecipient NAME] received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**P.  Paperwork Reduction Act**

The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties.  As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information.  The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization.  The recipient may not collect information until EPA obtains OMB approval.

**R.  Substantial Involvement**

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) monthly telephone calls and other monitoring,

2.) reviewing project phases and providing approval to continue to the next phase,

3.) reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5.) reviewing and commenting on the programmatic progress reports

6) Consultation with EPA regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection.  EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

**T. Conditional Award - Execution of Subaward to Implement Qualifying Community-Based Nonprofit Organization (CBO) Partnership Agreeement**

In order to demonstrate eligibility for EPA's **Environmental Justice Government-to-Government (EJG2G) Program,** the City of New Haven submitted a Partnership Agreement to EPA that did not include a binding subaward agreement between the recipient and the Community Action Agency of New Haven (CAANH), Neighborhood Housing Services (NHS), and Junta for Progressive Action (Junta) due to the recipient's local policies and laws that restrict the recipient from entering into subaward agreements prior to receipt of a Notice of Award. The recipient may not draw down funds for this award until the subaward with the subrecipient is executed through a written subaward agreement that is consistent with the requirements in 2 CFR 200.332(a). The recipient may refer to Appendix D of the EPA Subaward Policy for additional guidance. Once the subaward agreement with the subrecipients is executed and submitted to EPA's Project Officer, the EPA Grants Management Officer or the

**J.A. 2059**

52 - 00A01441 - 0    Page 12

EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down EJG2G funds in accordance with the standards described in the EPA General Term and Condition *Automated Standard Application Payments (ASAP) and Proper Payment Draw Down.*

NEW HAVEN DECLARATION

EXHIBIT 18-B

5E - 00A01475 - 0    Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Grant Agreement

| | |
|---|---|
| GRANT NUMBER (FAIN): 00A01475 | |
| MODIFICATION NUMBER: 0 | DATE OF AWARD |
| PROGRAM CODE: 5E | 10/02/2024 |
| TYPE OF ACTION<br>New | MAILING DATE<br>10/16/2024 |
| PAYMENT METHOD:<br>ASAP | ACH#<br>10058 |

| RECIPIENT TYPE:<br>Municipal | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| City of New Haven<br>165 Church Street<br>New Haven, CT 06510-2080<br>EIN: 06-6001876 | City of New Haven<br>165 Church Street<br>New Haven, CT 06510-2080 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Giovanni Zinn<br>200 Orange Street 5th Floor<br>New Haven, CT 06510-2080<br>**Email:** GZinn@newhavenct.gov<br>**Phone:** 203-410-0238 | Joshua Dow<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br>**Email:** Dow.Joshua@epa.gov<br>**Phone:** 617-918-1079 | Robert Smith<br>Grants Management Branch<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br>**Email:** Smith.Robert.F@epa.gov<br>**Phone:** 617-918-1960 |

**PROJECT TITLE AND DESCRIPTION**

Union Station Area Thermal Energy Network

See Attachment 1 for project description.

| BUDGET PERIOD<br>10/01/2024 - 09/30/2029 | PROJECT PERIOD<br>10/01/2024 - 09/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 16,586,025.00 | TOTAL PROJECT PERIOD COST<br>$ 16,586,025.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/01/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 9,471,615.00. EPA agrees to cost-share 57.11% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 9,471,615.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 1, EPA New England<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 | U.S. EPA, Region 1, EPA New England<br>R1 - Region 1<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Arthur Johnson - Director, Mission Support Division | DATE<br>10/02/2024 |

5E - 00A01475 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 9,471,615 | $ 9,471,615 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 7,114,410 | $ 7,114,410 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 16,586,025 | $ 16,586,025 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| IRA-CPRG | 24010CG084 | 2226 | E4SF5 | 01V1 | 000ACGXJ2 | 4132 | - | - | $ 9,471,615 |
| | | | | | | | | | $ 9,471,615 |

J.A. 2063

2:25-cv-02152-RMG      Date Filed 03/26/25     Entry Number 24-19     Page 26 of 52

5E - 00A01475 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 16,586,025 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 16,586,025 |
| 10. Indirect Costs: 0.00 % Base - | $ 0 |
| 11. Total (Share: Recipient 42.89 % Federal 57.11 %) | $ 16,586,025 |
| 12. Total Approved Assistance Amount | $ 9,471,615 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 9,471,615 |
| 15. Total EPA Amount Awarded To Date | $ 9,471,615 |

J.A. 2064

5E - 00A01475 - 0    Page 4

## Attachment 1 - Project Description

The purpose of this award is to provide funding under the Inflation Reduction Act (IRA) to the City of New Haven Office of Climate & Sustainability. The recipient will implement greenhouse gas (GHG) reduction programs, policies, projects, and measures identified in a Priority Climate Action Plan (PCAP) developed under a Climate Pollution Reduction Grants (CPRG) planning grant. Activities conducted through this grant will benefit all residents and visitors to New Haven Union Station Thermal Energy Network: tenants, employees, and visitors to Union Station as well as residents of and visitors to the Union Station area through four main objectives: implementation of ambitious measures that will achieve significant cumulative GHG reductions by 2030 and beyond; pursuit of measures that will achieve substantial community benefits, particularly in low-income and disadvantaged communities; complementing other funding sources to maximize these GHG reductions and community benefits; and, pursuit of innovative policies and programs that are replicable and can be "scaled up" across multiple jurisdictions. The activities include the designing and building a geothermal energy network with 285 boreholes, 850 feet deep to service Union Station and nearby Union Square development with the capacity to supply heating and cooling for 1000 units of housing; construction of the housing is not included within the scope of this project. The approved activities include all components of the completed geothermal network including piping and laterals as well as required pumping and other support equipment. The second activity includes the design and installation of a geothermal heat pump retrofit of Union Station with a 200-ton heat pump to accommodate 64,240 square feet of livable area in the building.The anticipated deliverables include a completed Union Station Area Thermal Energy Network connected to and being utilized by Union Station and the adjacent Union Square Development. As well as a retrofitted Union Station, utilizing a 200-ton heat pump as its primary heating system. The expected outcomes include 6,363 metric ton (MT) carbon dioxide equivalent (CO2e) reductions by 2030 and 63,272 MT CO2e reductions by 2050 as well a thermal energy network that could be scaled in the future for other developments. The intended beneficiaries include residents and visitors to the Union Square Development as well as tenants, employees, and visitors to Union Station. The development is slated for mixed income housing and is located in a disadvantaged community.No subawards are included in this assistance agreement.

5E - 00A01475 - 0    Page 5

## Administrative Conditions

### National Administrative Terms and Conditions

### General Terms and Conditions

The recipient agrees to comply with the current Environmental Protection Agency (EPA) general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A.  Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

•Federal Financial Reports (SF-425):  rtpfc-grants@epa.gov and Project Officer on Page 1 of Award Document

•MBE/WBE reports (EPA Form 5700-52A): Grants Specialist on Page 1 of Award Document AND Larry Wells, Disadvantaged Business Utilization Program Manager: r1_mbewbereport@epa.gov

•All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: Grants Specialist and Project Officer on Page 1 of Award Document

•Payment requests (if applicable): Grants Specialist and Project Officer on Page 1 of Award Document

•Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Project Officer on Page 1 of Award Document AND R1QAPPs@epa.gov

### B.  Pre-Award Costs

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal cost sharing) incurred from *10/01/2024* to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

**J.A. 2066**

5E - 00A01475 - 0    Page 6

## Programmatic Conditions

Climate Pollution Reduction Implementation Grants Programmatic Terms and Conditions

### A. Deliverables

The first phase of the Climate Pollution Reduction Grants (CPRG) program provided funding for designing Priority Climate Action Plans (PCAPs) that incorporate a variety of measures (i.e., programs, policies, measures, and projects) that reduce greenhouse gas (GHG) emissions. The purpose of this CPRG Implementation assistance agreement is to implement proposed measures within a specified PCAP identified in the CPRG Implementation Grant General Competition application. All programs, policies, measures, and projects contained in the final, approved CPRG implementation assistance agreement workplan are required deliverables.

The recipient agrees to implement GHG reduction programs, policies, projects, and measures (collectively referred to as "GHG reduction measures," or "measures") identified in a PCAP developed under a CPRG planning grant and included in the CPRG implementation grant workplan. The recipient agrees to ensure that each is successfully implemented before the end of the grant project period. The recipient agrees to successful project implementation, which includes the process of putting a decision or plan into effect; executing the program, policies, projects and/or measures, not just planning or designing the programs, policies, projects and/or measures. The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, including actual GHG emissions reduced, not just the expected outputs and outcomes of the proposed measures. Clean Air Act (CAA) section 137 also requires that CPRG Implementation grant recipients address the degree to which a grant reduces GHG emissions in total and with respect to low-income and disadvantaged communities, where "greenhouse gas" refers to the air pollutants carbon dioxide ($CO_2$), hydrofluorocarbons (HFCs), methane ($CH_4$), nitrous oxide ($N_2O$), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$).

To the best of their ability, the recipient agrees to:

- implement GHG emission reduction programs, policies, measures, and projects that are expected to reduce GHG emissions (or enhance GHG removals) by the estimated cumulative total GHG emission reductions from the final approved workplan;
- only report emission reductions occurring as a result of CPRG funding; and
- only report emission reduction data in units of million metric tons of carbon dioxide equivalent ($MMTCO_2e$) where appropriate, calculated using the global warming potentials (GWP) in the International Panel on Climate Change's (IPCC) Fifth Assessment Report.

Refer to the Notice of Funding Opportunity, EPA-R-OAR-CPRGI-23-07 (https:

//www.epa.gov/system/files/documents/2023-09/CPRG General Competition NOFO.pdf), Appendix B, Global Warming Potentials for GHGs, for details about how to apply GWP values for different gases.

For the measures included in the final, approved assistance agreement work plan, the recipient agrees to provide transparent GHG emission reduction estimates based on high-quality, thorough, reasonable, and comprehensive methodologies, assumptions, and calculations. Examples of tools that could be used to assist in these GHG quantifications can be found at: https://www. epa.gov/inflation-reduction-act/climate-pollution-reduction-grants.

**J.A. 2067**

5E - 00A01475 - 0    Page 7

## B. Final Approved Work Plan and Modifications

The recipient agrees to implement the measures in the EPA-approved work plan that will achieve significant cumulative GHG reductions by 2030 and beyond.

Recipient agrees to carry out the project in accordance with the final approved workplan. Recipients are required to report deviations from budget or project scope or objective, and must request prior written approval from the EPA:

- For any change in the scope or objective of the project or program (even if there is no associated budget revision requiring prior written approval);
- For change in key personnel (including employees and contractors) that are identified by name or position in the Federal award;
- For the disengagement from a project for more than three months, or a 25% reduction in time and effort devoted to the Federal award over the course of the period of performance, by the approved project director or principal investigator;
- For the inclusion of costs that require prior approval in accordance with 2 CFR Part 200 Subpart E—Cost Principles or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable;
- For the transfer of funds budgeted for participant support costs as defined in 2 CFR Section 200.1 Definitions to other budget categories;
- For the subawarding, transferring or contracting out of any work under the award;
  - Changes in the total approved cost-sharing amount;
  - When the need arises for additional Federal funds to complete the project.

Proposed modifications to the approved work plan or budget, including additions, deletions, or changes in the schedule, shall be submitted in a timely manner to the EPA Project Officer for approval. Depending on the type or scope of changes, a formal amendment to the award may be necessary.

Major project modifications may include but are not limited to: changes to the approved environmental results, outputs or outcomes, types and number of affected devices or equipment, the approved types of emission reduction technologies to be implemented, specific programs or policies to be adopted, or changes to the approved project location(s). Any change that would significantly alter the cumulative GHG reductions achieved by 2030 and beyond and affect the achievement of community benefits, especially in low- income and disadvantaged communities, may not be allowed. The recipient shall not make changes to the proposed activities in the EPA-approved work plan without prior written approval from the EPA. The recipient shall contact the EPA Project Officer with the proposed changes; however, depending on the type of change, the Agency Award Official or Grant Management Officer may need to make the final determination. If issues regarding proposed measures arise that cannot be resolved, the EPA may elect to terminate the assistance agreement, and/or if applicable, recover ineligible expenditures from the recipient. Any significant changes to the approved work plan that would result in undermining the integrity of the award competition will not be approved.

For grants that are awarded to a recipient that is serving as the lead for a coalition under the CPRG program, the recipient agrees to abide by the terms set out in the Memorandum of Agreement (MOA), including the roles, responsibilities, and commitments that each partner will provide to ensure project success, the operating model for the coalition, and the resources that each partner will contribute to the project. As established in the CPRG coalition's MOA, the lead applicant is accountable to the EPA and

accepts full responsibility for effectively carrying out the full scope of work and proper financial management of the grant. Coalition members who are grant subrecipients are accountable to the lead applicant for proposed use of EPA funding and successful project implementation. The recipient shall not make changes to the signed MOA without prior written approval from the EPA.

## C. Performance Reporting and Final Performance Report -

### 1. Performance Reports - Content

The recipient agrees to inform the EPA as soon as it is aware of problems, delays, or adverse conditions that will materially impair the recipient's ability to meet the outputs/outcomes specified in the final, approved assistance agreement work plan. The recipient agrees to inform the EPA immediately rather than waiting until the next performance report is due.

The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, not just the expected outputs and outcomes of the proposed measures. The recipient agrees to report out on each performance measures that will be the mechanism to track, measure, and report progress toward achieving the expected outputs and outcomes for each GHG reduction measure. The recipient agrees to track and report separately on the work conducted and GHG emissions reductions for each measure (program, policy, measure, or project) specified in the final, approved assistance agreement work plan. Recipients also agree to track and report separately on the budgets for each measure.

In accordance with 2 CFR 200.329, the recipient agrees to submit semi- annual, one-year, and final performance progress reports that include brief information on each of the areas specified below. To ensure the EPA can effectively monitor progress towards the achievement of measures, the recipient also agrees to report progress for each measure identified in the final, approved assistance agreement work plan as soon as work is completed and information is available.

a. Semi-Annual: The recipient agrees to submit semi-annual performance reports that include brief information on each of the following areas:

1. a comparison of actual technical progress and milestones achieved during the reporting period to the outputs/outcomes and performance measures established in the final, approved assistance agreement work plan, which may include technical changes made to the project, public events conducted, websites published, release of public-facing documents or tools, or other reportable activities described in the work plan;

2. a consolidated budget update with separate tracking for each measure (that is, how much was spent on equipment, supplies, contractors, subgrants, etc., during the reporting period and cumulatively) and, when appropriate, additional pertinent information such as analysis and explanation of cost overruns, high-unit costs, cost-share expenditures, program income, infrastructure costs subject to Buy America, Build America (BABA) compliance, or requested budget modifications (for example, when the recipient is requesting to move funding from one budget category to another);

3. if necessary, a description of the reasons why any implementation timeline milestones or outputs/outcomes were missed for each measure established in the final, approved assistance agreement work plan, including the recipient's strategy to address challenges faced and/or the recipient's approach to ensure that the approved outputs/outcomes for each measure will be achieved within the period of performance;

5E - 00A01475 - 0    Page 9

4. documentation of community engagement activities conducted in low- income and disadvantaged communities for each measure, which describes how the activities were publicized, categorizes respondents/attendees (e.g., the number of people from Tribal governments, federal government, state government, local government, nonprofits, for profits, universities, and the public), explains how input from participants was considered in decisions for implementing the measure, and details how meaningful engagement with low- income and disadvantaged communities will be continuously included in the development and implementation of the measure;

5. as applicable, strategies for mitigating environmental risks;

6. a description of any climate resiliency planning, siting, design, and operation of the project.

7. as applicable, updates to individuals, including those from coalition members, who serve as key contacts and/or any changes to the roles and responsibilities of key contacts involved in each measure and the reason(s) for the change(s).

8. as applicable, updates regarding which organizations have the authority to implement each measure and the reason(s) for the change(s);

9. as applicable, updates regarding changes to contracts, subgrants, and participant support costs;

10. as applicable, progress on generating high-quality jobs with a diverse, highly skilled workforce and support of strong labor standards; and

11. summary of anticipated activities for the next 6-month reporting period.


b. One-year report: As part of the second semi-annual progress report (i.e. the more detailed one-year report), the recipient agrees to report the additional data to the EPA using the reporting template from the EPA's Information Collection Request 2806.01, Office of Management and Budget (OMB) Control Number 2060-0763. The reporting template will be made available to grant recipients through an electronic data interface to be specified by EPA upon approval of the Information Collection Request. This includes co-pollutant emissions reductions of each pollutant impacted by each measure, the sector impacted, and the county in which the emissions change. In addition, the recipient agrees to report theClimate and Economic Justice Screening Tool (CEJST) Census tract IDs or the EPA's EJScreen Censusblock group IDs for areas affected by GHG reduction measures, consistent with the EPA's definition oflow-income and disadvantaged communities for the CPRG program.


c. Final Report: The recipient also agrees to submit a detailed final report and to report certain data associated with the final report to the EPA using the reporting template from the EPA's Information Collection Request 2806.01, OMB Control Number 2060-0763.


d. Coalition Performance: As with any EPA grant with a grant recipient subawarding to subrecipients, the grant recipient is accountable to the EPA and accepts responsibility for carrying out the full scope of work and proper financial management of the grant. In the event that a coalition member withdraws, the grant recipient continues to be subject to the EPA's terms and conditions for the grant, the subaward policy, and EPA grants policy. In circumstances where the EPA deems that the withdrawal of a coalition member fundamentally alters the project or jeopardizes the project's success, the EPA will consider appropriate remedies and reserves the right to terminate an awarded grant (see 2 CFR 200.339 through 343)


2. Performance Reports – Frequency


The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

**J.A. 2070**

5E - 00A01475 - 0    Page 10

within 30 days after the six-month reporting period ends. Semi-annual reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This semi-annual reporting schedule shall be repeated for the duration of the award agreement.

October 1 – March 31 Reporting Period: report due April 30

April 1 – September 30 Reporting Period: report due October 30

As part of the second semi-annual performance report that is submitted one year after the grant award, the recipient agrees to submit the one-year performance report that includes the additional details specified above in section C.1.b.

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.

## D. Allowable and Unallowable Activities

The recipient agrees to only use this CPRG Implementation grant award funding to implement measures in the EPA approved workplan for this CPRG Implementation grant and follow the grant Terms and Conditions.

All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for financial assistance as well as other activities that involve acquiring real property, including related equipment purchases, if not already in the EPA approved work plan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that are not in the EPA approved work plan; (b) activities that support measures, activities or projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use this CPRG award to replace existing program federal funding, but the recipient may use CPRG funds to supplement or expand existing programs. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

The recipient agrees to not use the award to aid regulated entities to comply with EPA regulatory requirements.

## E. Davis-Bacon Related Act Term and Condition –

1.    Program Applicability

   a.   Climate Pollution Reduction Implementation Grants.
   b.   Section 314 of the Clean Air Act.
   c.   Construction activities conducted under a Climate Pollution Reduction Implementation Grant.

**J.A. 2071**

5E - 00A01475 - 0     Page 11

   d.   The recipient must work with the appropriate authorities to determine wage classifications for the specific project(s) or activities subject to Davis Bacon under this grant.

2.      Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) (https://www.dol. gov/agencies/whd/government-contracts/construction) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

   a.   Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

   b.   Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

   c.   Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

3.      Recipient Responsibilities When Entering Into and Managing Contracts

   a.   Solicitation and Contract Requirements:

   1.   Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

   2.   Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

      "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants (https://www.epa. gov/grants/contract- provisions-davis-bacon-and-related-acts)."

   b.   After Award of Contract:

   1.   Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

   2.   Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

4.      Recipient Responsibilities When Establishing and Managing Additional Subawards

   a.   Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant:

**J.A. 2072**

5E - 00A01475 - 0     Page 12

"By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients (https://www.epa. gov/grants/contract-provisions-davis-bacon- and-related-acts)."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. Consideration as Part of Every Prime Contract Covered by DBRA

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. Cybersecurity Condition

1. <u>Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia</u>

a.     The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

b.     (1) The EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or the EPA's Central Data Exchange, the recipient agrees to contact the EPA PO no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by the EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or the EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and the EPA.

5E - 00A01475 - 0    Page 13

## G. Climate Resilience:

To the extent practicable, the recipient agrees to incorporate current and future climate change risk in planning, siting, design, and operation of the project. Approaches for incorporating climate change risk may make use of climate change data and information (e.g., projections and emission scenarios) that are reflective of the project's anticipated lifespan. This includes consideration of the climate change risks posed to the individuals, communities, local governments, organizations, or other entities served by the project over its anticipated lifespan.

## H. Equipment and Devices

1.    Procurement of Systems, Equipment and Devices

When purchasing replacement systems, equipment and/or devices, the recipient agrees the replacement systems, equipment or device:

1.

    a.  will continue to perform a similar function and operation as the system, equipment or device that is being permanently rendered inoperable;

    b.  will achieve the estimated emission reductions included in the EPA-approved work plan; and

    c.  is consistent in its intended use, operation and location as described in the EPA-approved work plan.

The procurement of systems, equipment or devices should follow the EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements (https://www.epa.gov/grants/best-practice- guide-procuring-services-supplies-and-equipment-under-epa-assistance).

2.    Operation and Maintenance

The recipient will assure the continued proper operation and maintenance of systems, equipment and devices funded under this agreement. Such practices shall be operated and maintained for the expected lifespan of the specific measure and in accordance with commonly accepted design standards and specifications. The recipient shall include a provision in every applicable sub-agreement (subaward or contract) awarded under this grant requiring that the management practices for the project be properly operated and maintained. Likewise, the sub-agreement will assure that similar provisions are included in any sub-agreements that are awarded by the sub- recipient.

3.    Equipment Use and Management

Equipment is defined as tangible personal property having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes (see Capital assets at 2 CFR 200.1 Definitions), or the amount specified in Equipment at 2 CFR 200.1. Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally- awarded funds, title to the equipment vests in the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

**J.A. 2074**

5E - 00A01475 - 0     Page 14

These conditions must be met by the grant recipient for equipment use and management during the grant period:

    a. Use the equipment for the authorized purposes of the project during the period of performance or until the property is no longer needed for the purposes of the project.

    b. Not encumber the property without approval of the Federal awarding agency or pass-through entity.

    c. Use and dispose of the property as described below. Equipment use and management instructions are applicable to assistance agreement recipients and subrecipients acquiring equipment under this award. Per 2 CFR 200.313 (b), state agencies may use and manage equipment acquired through a Federal award by the state in accordance with state laws and procedures. Per 2 CFR 200.313(b), Indian Tribes must use, manage, and dispose of equipment acquired under a Federal award in accordance with tribal laws and procedures.

Recipient agrees that at the end of the project period the recipient will continue to use the equipment purchased under this assistance agreement in the project or program for which it was acquired as long as needed, whether or not the project or program continues to be supported by the Federal award. After the end of the grant period, equipment purchased under this award that is no longer needed, may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency.

Consistent with 2 CFR 200.313, unless instructed otherwise, a grant recipient may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds. When acquiring replacement equipment, the non-Federal entity may use the equipment to be replaced as a trade-in or sell the property and use the proceeds to offset the cost of the replacement property.

Subrecipients are subject to the same federal requirements as the grant recipient (also known as the "pass-through entity") and they must comply with applicable subaward provisions of 2 CFR Part 200, the EPA Subaward Policy, and the EPA's General Term and Condition for Subawards.

Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally-awarded funds, title to the equipment vests with the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

In this case, equipment includes systems, equipment and devices.

## I. QUALITY ASSURANCE

    I.   *Quality Assurance Project Plan(s) (QAPP)*

Prior to beginning environmental information operations, the recipient must:

    1. Prepare a QAPP(s) for all applicable projects and tasks involving environmental information operations in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard;

    2. Submit the document for EPA review and approval at least sixty (60) days before environmental

5E - 00A01475 - 0    Page 15

information operations begin. QAPPs are submitted by e-mail to both the EPA Project Officer (PO) (see page 1 of the assistance agreement for contact information) and the Region 1 Quality Assurance Branch (QAB) at R1QAPPS@epa.gov;

3.  Obtain EPA approval from both the EPA PO and Regional Quality Assurance Manager (RQAM) (or delegated QA Reviewer) prior to the start of environmental information operations.

4.  The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the RQAM at least annually and may also be submitted when changes occur.

The recipient should discuss any potential new environmental information operations with the EPA PO prior to starting those operations. The EPA PO and the RQAM can assist in determining if a QAPP is required.

1.  The recipient shall notify the PO and RQAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval. In consultation with the PO and the RQAM, if it is determined that no QAPP is required at the time of award, the recipient must review project activities at least annually and discuss any revisions to determine whether a QAPP is appropriate.

## J. Retention / Required Documentation

In accordance with 2 CFR 200.334, the recipient must retain all Federal award records, including but not limited to, financial records, supporting documents, and statistical records for at least three years from the date of submission of the final financial report. The records must be retained until all litigation, claims, or audit findings have been resolved and final action has been taken if any litigation, claim, or audit is started before the expiration of the three-year period. Examples of the required records include: (1) time and attendance records and supporting documentation; and (2) documentation of compliance with statutes and regulations that apply to the project.

In accordance with 2 CFR 200.337, the EPA, the Inspector General, the Comptroller General, and the pass-through entity, or any of their authorized representatives, have the right of access to any documents, papers or records of the recipient which are pertinent to the grant award. The rights of access are not limited to the required retention period, but last as long as the records are retained.

If the demonstration projects or activities, device and/or the device components are to be sold, the recipient must comply with the program income requirements (see the Program Income section below).

## K. Program Audit

The EPA will conduct random reviews of recipients to protect against waste, fraud, and abuse. As part of this process, the EPA, or its authorized representatives may request documentation from current recipients to verify statements made on the application and reporting documents. Recipients may be selected for advanced monitoring, including a potential site visit to confirm project details. The EPA, or its authorized representatives, may also conduct site visits to confirm documentation is on hand and that the project is completed as agreed upon, as well as confirm applicable infrastructure adheres to Build America, Buy America (BABA) requirements. Recipients are expected to comply with site visit requests and recordkeeping requirements and must supply the EPA with any requested documents for three years from the date of submission of the final expenditure report, or risk cancellation of an active grant

**J.A. 2076**

application or other enforcement action.

## L. Use of Submitted Information

Applications and reporting materials submitted under this competition may be released in part or in whole in response to a Freedom of Information Act (FOIA) request. The EPA recommends that applications and reporting materials not include trade secrets or commercial or financial information that is confidential or privileged, or sensitive information that, if disclosed, would invade another individual's personal privacy (e.g., an individual's salary, personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR 2.203. (Review EPA clause IV.a, Confidential Business Information, under EPA Solicitation Clauses (https://www.epa.gov/grants/epa-solicitation-clauses)).

The EPA may make publicly available on the EPA's website or another public website copies or portions of CPRG grant project information.

The EPA reserves a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use, for federal purposes, submitted project photos, including use in program materials.

## M. Program Income

In accordance with 2 CFR Part 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period.

The program income shall be used in one of the following ways:

1.

   1.

      1. Added to funds committed to the project by the EPA and used for the purposes and under the conditions of the assistance agreement.

The recipient must provide a description of how program income is being used in each of its performance reports. Further, a report on the amount of program income earned during the award period must be submitted with the Federal Financial Report, Standard Form 425.

## N. SIGNAGE REQUIREMENTS

1. Investing in America Emblem

The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act" as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period.

The recipient will ensure compliance with the guidelines and design specifications provided by the EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage

**J.A. 2077**

2.    Procuring Signs

Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or the EPA logo or seal) into the appropriate non-English language (s). The costs of such translation are allowable, provided the costs are reasonable.

## O. USE OF LOGOS

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the City of New Haven Office of Climate and Sustainability received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa. gov/stylebook/using-epa-seal-and-logo#policy

## P. Public or Media Events

The EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

## Q. Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## R. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## S. Health and Safety Plan

Before beginning field work, the recipient must have a health and safety plan in place providing for the protection of on-site personnel and area residents, unless specifically waived by the award official. This plan need not be submitted to the EPA but must be made available to the EPA upon request. The

recipient's health and safety plan must comply with Occupational Safety and Health Administration (OSHA) 29 CFR 1910.120, entitled "Hazardous Waste Operations and Emergency Response."

## T. Foreign Entity of Concern

The recipient agrees to not directly transfer EPA funds through a subaward, contract, or participant support costs to a foreign entity of concern (FEOC). The EPA considers FEOCs to include foreign entities that are owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation as defined by Congress in Section 40207 of the Infrastructure Investment and Jobs Act. The EPA uses the proposed interpretive rule from the U.S. Department of Energy (DOE) to provide additional guidance in determining FEOCs. See 88 Fed. Reg. 84,082 (Dec. 4, 2023). If DOE finalizes an interpretive rule that differs in material respects from the proposal, the EPA may amend the award agreement accordingly.

Additionally, the recipient agrees to develop and implement internal controls that ensure EPA funds are not directly transferred to FEOCs, including through subawards, contractors, and participant support costs.

## U. Voluntary Cost Share or Overmatch

This award and the resulting federal funding of $16,586,025 is based on estimated costs requested in the recipient's application dated April 01, 2024.  Included in these costs is a voluntary cost-share contribution of $7,114,410 by the recipient in the form of a voluntary cost-share or overmatch (providing more than any minimum required cost-share) that the recipient included in its proposal dated April 01, 2024  The recipient must provide this voluntary cost-share contribution during performance of this award unless the EPA agrees otherwise in a modification to this agreement. While actual total costs may differ from the estimates in the recipient's application, EPA's participation shall not exceed the total amount of federal funds awarded.

If the recipient fails to provide the voluntary cost-share contribution during the period of award performance, and EPA does not agree to modify the agreement to reduce the cost share, the recipient is in violation of the terms of the agreement.  In addition to other remedies available under 2 CFR Part 200, the Agency may consider this factor in evaluating future proposals from the recipient.  In addition, if the voluntary cost-share contribution does not materialize during the period of award performance then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the voluntary cost-share or overmatch the recipient described in its proposal dated April 01, 2024. EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## V. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities

funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### W. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation* and in the General Term and Condition "Reporting Subawards and Executive Compensation."

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

5E - 00A01475 - 0     Page 20

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

# NEW HAVEN DECLARATION

# EXHIBIT 18-C

5F - 00A01479 - 0　　Page 1

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>Grant Agreement | **GRANT NUMBER (FAIN):** 00A01479<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5F | | **DATE OF AWARD**<br>01/17/2025 |
| | **TYPE OF ACTION**<br>New | | **MAILING DATE**<br>02/03/2025 |
| | **PAYMENT METHOD:**<br>ASAP | | **ACH#**<br>10058 |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Municipal | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| City of New Haven<br>200 Orange Street Room 404<br>New Haven, CT 06510-2080<br>**EIN:** 06-6001876 | City of New Haven<br>200 Orange Street Room 404<br>New Haven, CT 06510-2080 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Steven Winter<br>165 Church St 2nd Floor Annex<br>New Haven, CT 06510-2080<br>**Email:** SWinter@newhavenct.gov<br>**Phone:** 475-331-3769 | Keyana White<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br>**Email:** White.Keyana@epa.gov<br>**Phone:** 617-918-1436 | Robert Smith<br>Grants Management Branch<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br>**Email:** Smith.Robert.F@epa.gov<br>**Phone:** 617-918-1960 |

**PROJECT TITLE AND DESCRIPTION**

Elm City Climate Collaborative

See Attachment 1 for project description.

| BUDGET PERIOD<br>04/01/2025 - 03/31/2028 | PROJECT PERIOD<br>04/01/2025 - 03/31/2028 | TOTAL BUDGET PERIOD COST<br>$ 20,000,000.00 | TOTAL PROJECT PERIOD COST<br>$ 20,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 08/11/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 20,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 20,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 1, EPA New England<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 | U.S. EPA, Region 1, EPA New England<br>R1 - Region 1<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Arthur Johnson - Director, Mission Support Division | **DATE**<br>01/17/2025 |

5F - 00A01479 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 20,000,000 | $ 20,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 20,000,000 | $ 20,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.616 - Environmental and Climate Justice Block Grant Program | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 25125WB118 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 20,000,000 |
| | | | | | | | | | $ 20,000,000 |

**J.A. 2084**

5F - 00A01479 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 828,484 |
| 2. Fringe Benefits | $ 449,774 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 48,410 |
| 6. Contractual | $ 130,000 |
| 7. Construction | $ 3,700,000 |
| 8. Other | $ 14,627,665 |
| 9. Total Direct Charges | $ 19,784,333 |
| 10. Indirect Costs: 0.00 % Base - | $ 215,667 |
| 11. Total (Share: Recipient ____0.00 % Federal __100.00 %) | $ 20,000,000 |
| 12. Total Approved Assistance Amount | $ 20,000,000 |
| 13. Program Income | $ 345,000 |
| 14. Total EPA Amount Awarded This Action | $ 20,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 20,000,000 |

5F - 00A01479 - 0    Page 4

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA), to the City of New Haven Office of Climate and Sustainability and their Statutory Partner, the Greater Dwight Development Corporation (GDDC) the "project team." Together, the project team will implement their project, the Elm City Collaborative (EC3), to support 14 neighborhoods in New Haven, defined as disadvantaged communities by the EPA IRA Disadvantaged Communities Map, the "project area" (West River, Dwight, Edgewood, Beaver Hills, the Hill, Amity, West Rock, Newhallville, Dixwell, Long Wharf, Fair Haven, Quinnipiac Meadows, Fair Haven Heights, and the Annex). Specifically, EC3 will deploy 4 connected strategies encompassing 12 projects that address 9 EPA climate and pollution reduction strategies. EC3's 4 strategies will address: 1) Community Infrastructure and Land Use, 2) Housing, 3) Materials Management, and 4) Transportation. These strategies will support community action across the project area by managing stormwater and mitigating urban heat, expanding access to zero-emission transportation, significantly reducing greenhouse gas emissions, and reducing local food waste. EC3's outputs will stimulate the local economy by training a green workforce and creating green jobs; provide funding for ongoing environmental initiatives facilitated by local businesses; reduce financial, public, and environmental impacts in communities; and reduce utility rates for energy burdened households. The activities include: 4 strategies to address environmental and climate justice in the 14 neighborhoods through integrated outreach with community-based organizations (CBOs) and resident engagement in the project area. The project team will promote improved community infrastructure and land use by establishing climate resilience corridors, creating over 5,000 feet of new greenway, and enhance soil and grow vegetation in over 90 community gardens and green spaces. The project team will revise current site requirements in the City's Zoning Ordinance related to heat generation to better address heat islands. The project team will address housing and energy efficiency by enrolling residents in the project area who live in 1–4-unit buildings in energy efficiency counseling programs and facilitating energy upgrades for affordable housing projects through small grants. The project team will promote materials management by enhancing access to healthy food and addressing food insecurity through increased food recovery efforts, increasing community-based composting capacity by enhancing facilities, and supporting 20 schools and a network of CBOs to implement food recovery, composting, anti-litter, recycling, and local produce programs. Finally, to address transportation, the project team will conduct repair clinics and workshops to help residents maintain household appliances and consumer goods. In addition, they will increase bike infrastructure, access, and safety education. EC3 will also connect residents to green job opportunities through construction and student internships, including mini grants to stimulate grassroots community action on climate and pollution reduction actions, creating full-time green jobs, and monitoring local air quality.The anticipated deliverables include: 400 trees planted; installation of 100 stormwater diversion structures; 10,545 acres of community gardens reinvigorated and revitalized greenspaces 120 cubic yards of compost distributed; passing of a heat related zoning ordinance amendment; energy upgrades for up to 53 buildings; 1,260 affordable housing projects supported with energy upgrades; 20 schools engaged on food recovery education; 6.4 million pounds and 5.4 million pounds of edible food recovered and distributed; 300 residents reached by home device repair workshops; creation of 2,000 feet of new bike lanes; creation of 2.6 miles of bike lane protection; adding 100 electric and pedal bikes to New Haven's bikeshare program; 150 bikes provided to residents in the project area; 3,000 students and 2,000 residents reached by bicycling safety education trainings and workshops; workforce skills training provided to 115 project area residents and 112 youth; and creation of one new community composting facility – diverting 848 tons of organic waste from landfills and creating 722 tons of compost.

The expected outcomes include reduction in annual stormwater discharges and combined sewer overflows; reduction in CO2 and pollutant emissions; reduction in ambient and indoor hazardous air

**J.A. 2086**

pollutants; decreased food insecurity and increased community resilience; increased carbon sequestration; increased knowledge of, and participation in, waste diversion; increased bicycle use; and increased employment in climate related jobs. The intended beneficiaries are communities within the service area in New Haven, Connecticut.Greater Dwight Development Corporation (GDDC)- Run the small building energy upgrades program, which will recruit 350 buildings to receive comprehensive energy assessments. GDDC will also offer up to four grants of up to $100,000 each for energy upgrades at community development corporation sponsored new or substantially rehabilitated affordable housing projects. GDDC will also offer an estimated 4-10 mini grants each year (up to 30 across the grant period) to grassroots groups communities stimulating community action on climate and pollution reduction. GDDC will lead environmental monitoring on air quality and urban heat in various locations throughout the project area selected by partner organizations. GDDC will hire 1 full time engagement specialist over the grant period to lead community engagement.

CitySeed- Host a composting hub that will have the capacity to handle 889 tons of organic material per year. They will purchase equipment necessary to establish and operate the composting hub. CitySeed will deploy a full-time Food System Educator to raise awareness about healthy food options and nutrition, climate and economic benefits of buying and eating locally grown and prepared food, pathways to equitable access such as doubled SNAP and FMNP, and composting.

Haven's Harvest- Lead project efforts to rescuing food from the waste stream to address food insecurity in local neighborhoods. They will expand their food storage warehouse and update supplies to increase capacity to preserve food longer, repackage food for distribution, and hire more staff in order to increase food recovery and distribution efforts. Haven's Harvest will also collaborate with public schools to expand the number of sites and help schools donate surplus food.

Urban Resources Initiative (URI)- Collaborate to help establish green and stormwater resilience corridors throughout the project area. They will plant at least 1,900 trees and establish 100 stormwater management devices along these corridors and in adjacent streets to address stormwater management, flooding and urban head. They will also support increased plantings throughout 50 greenspaces in the project area. URI will also offer internships for 27 students per year to work on community infrastructure projects.

Park New Haven- Expand its bike share system throughout the project area by doubling the fleet of e-bikes and retrofit existing bicycles to deploy in the bike share program. Park New Haven will conduct outreach and provide bicycle education to residents in the project area.

Bradley Street Bicycle Cooperative- Restore 150 donated bicycles for Partner CBOs to distribute to low-income residents without access to safe, reliable transportation. Organize and deliver at least 17 free repair clinics per year, reaching 750 riders.

Gather New Haven- Invest in upgrades to improve soil and amenities at 45 existing community gardens. They will also increase their network of volunteers to expand capacity to make physical improvements to community gardens including new raised beds, and crop plantings.

Common Ground/NHEP- Collaborate with composting and food recovery efforts. They will expand staffing to aid in production of compost, community education, and workforce development for youth and adults. They will also establish community-based food scrap drop off locations.

DataHaven- Conduct three phase program evaluation activities for the project. Specifically, they will

**J.A. 2087**

5F - 00A01479 - 0    Page 6

include a baseline assessment of the project area, create hands on training for staff on the collection, cleaning, and utilization of data. They will also monitor data and outputs to ensure that projects are functioning as intended (i.e. reaching the intended audience of the program and conducting work equitably). Finally, DataHaven will conduct an impact assessment to estimate the net effects of the project outputs for local residents.

New Haven Coalition for Active Transportation- Expand physical and social bike infrastructure throughout the project area. They will perform equity focused outreach and provide bicycle education to 1,224 residents.

Center for Environmental Technology - Will provide technical assistance to assist the New Haven's Magnet school system in resolving logistical and organizational issues in order to implement durable food scrap diversion programs. A Student Recycling Team will support the initiative and participate in field trips to regional materials management sites. Two students from each of the four high schools projected to be part of the grant activities will form the Recycling Team and up to 10 students from each school will join field trips organized by the Recycling Educator.

MakeHaven- Conduct quarterly hands-on repair clinics and a workshop series wherein residents work alongside knowledgeable volunteers to learn how to repair and maintain consumer goods including countertop appliances, electronics, textiles, furniture, and plastic products.

New Haven Public Schools - Will assist with the transportation of students in the recycling team, supporting their participation in traveling to materials management sites to facilitate recycling education for participating students. In addition, New Haven Public Schools will assist with bicycle education and instruction.

Connecticut Department of Energy and Environmental Protection - Will assist with the distribution of 50 bike vouchers for electric bicycles to Project Area residents. This will increase access to the electric bicycles for project area residents and access to alternative transportation methods.

## Administrative Conditions

### National Administrative Terms and Conditions

### General Terms and Conditions

The recipient agrees to comply with the current Environmental Protection Agency (EPA) general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

•Federal Financial Reports (SF-425):  rtpfc-grants@epa.gov and Project Officer on Page 1 of Award Document

•MBE/WBE reports (EPA Form 5700-52A): Grants Specialist on Page 1 of Award Document AND Larry Wells, Disadvantaged Business Utilization Program Manager: r1_mbewbereport@epa.gov

•All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: Grants Specialist and Project Officer on Page 1 of Award Document

•Payment requests (if applicable): Grants Specialist and Project Officer on Page 1 of Award Document

•Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Project Officer on Page 1 of Award Document AND R1QAPPs@epa.gov

5F - 00A01479 - 0    Page 8

## Programmatic Conditions

The recipient agrees to comply with the current EPA Community Change Grants Programmatic Terms and Conditions, available at: https://www.epa.gov/inflation-reduction-act/epa-community-change-grants-program-terms-and-conditions

These terms and conditions are in addition to the General Terms and Conditions, additional programmatic terms and conditions, and the administrative terms and conditions included in the EPA award document.

Please also add the following programmatic conditions to this award:

### EQUIPMENT DISPOSITION

Notwithstanding EPA General Term and Condition "Tangible Personal Property", in accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient must request disposition instructions from EPA or the pass-through entity. If the equipment is sold during the period of performance, proceeds of sales of equipment purchased with EPA funds during the period of performance are program income.

### PROGRAM INCOME

In accordance with 2 CFR Part 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period. The recipient agrees to use the following method for applying income:

Program income is added to the total allowable costs, increasing the overall total amount of the award. Program income must be used for the original purpose of the award and under the conditions of the assistance agreement.

The recipient must provide as part of its required progress performance reports, a description of how program income is being used.  Further, a report on the amount of program income earned during the award period must be submitted with all Federal Financial Report, Standard Form 425 submissions.

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# SAN DIEGO DECLARATION

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

|  |  |
|---|---|
| THE SUSTAINABILITY INSTITUTE, et al., <br>      Plaintiff, <br><br> v. <br><br> DONALD TRUMP, IN HIS OFFICIAL CAPACITY <br> AS PRESIDENT OF THE UNITED STATES, et al., <br><br>      Defendants. | **Case No. 2:25-cv-02152-RMG** |

**DECLARATION OF CITY OF SAN DIEGO**

I, Rolando Charvel, declare as follows:

1.    I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set out below.

2.    I am the Director of Finance and Comptroller for the City of San Diego ("San Diego or "City"). Among many financial responsibilities, I develop and submit the City's proposed and balanced budget each fiscal year. My role entails serving as an internal fiscal consultant to the City, which requires close oversight of accounting, debt management, financial compliance and reporting, and all grants, including federal grants.

3.    Over the course of nearly 26 years in various finance roles for San Diego, including as its former Chief Financial Officer, I have overseen all aspects of the City's financial operations and have worked on dozens of financial reports

**J.A. 2092**

including the annual adopted budgets and many long-term financial planning, monitoring and accounting documents, such as the City's Five-Year Financial Outlook and Annual Comprehensive Financial Reports.

4.      The City's Transportation Department was verbally notified of a sudden pause of a $10 million grant for the City's climate initiative, "Ready, Set, Grow San Diego," from U.S. Forest Service, a federal agency under the U.S. Department of Agriculture. This funding was awarded to plant and preserve more than 8,400 trees in San Diego's historically disadvantaged communities to improve our urban forest. Funding for this grant is now uncertain for an indefinite duration.

5.      The loss of $10 million in funds would impact the City's budget, and drive consequences to the Ready, Set, Grow San Diego program accordingly. The City is facing a substantial budget deficit projected to be approximately $1 billion over the next five years, so it will already be required to make budget reductions that will have a significant impact on service levels provided to residents.

6.      The City already started its lengthy year-long process of preparing the annual budget for the coming fiscal year, which begins on July 1, 2025. On December 4, 2024, the Mayor announced the City was facing a $258.2 million deficit for Fiscal Year 2026 and directed a series of actions to mitigate this deficit. These actions include freezing all but the most essential hiring, suspending all non-essential overtime, pausing non-essential spending, reviewing the City's Capital Improvement Program to ensure projects under construction are prioritized and construction of new facilities is limited, evaluating City leases, and exploring opportunities for revenue-generating measures.

7.      On February 18, 2025, the Mayor also announced a series of budget-driven operational efficiencies, reductions and consolidations intended to help align the City's budget with its resources and streamline operations. These include the Mayor assuming the responsibilities of City Manager, consolidation of the

J.A. 2093

Mayor's Office with several other City departments, including the Office of the Chief Operating Officer (COO), and reductions of City management positions.

8.      The City is considering how to develop a budget that considers the possible and very likely loss of federal funds in the coming fiscal year. If the City loses its $10 million in grant funding, the Ready, Set, Grow San Diego program could be cancelled or modified, and the City may have to lay off employees funded by the grant. The City would also have to absorb funds already expended by using its General Fund and consider whether to continue using General Fund monies to fund Ready, Set, Grow San Diego. Using the City's General Fund diverts money as well as resources from essential services that the City and its residents depend upon, such as police, fire, lifeguards, libraries, and road repair.

9.      Harm to the City of San Diego and its interests would be redressed by an order from this Court to preliminarily and permanently enjoin the Defendants from implementing, applying, or enforcing any freeze or rescission of funding to our Urban and Community Forestry grant. Without such an order, the City of San Diego will continue to be unable to reliably access our awarded USDA grant funds and be harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this <u>24</u>th day of March 2025.

Rolando Charvel

SUSTAINABILITY INSTITUTE, ET AL v. TRUMP

2:25-CV-02152-RMG

# SAN DIEGO DECLARATION
# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| THE SUSTAINABILITY INSTITUTE, et al.,<br>Plaintiff,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY<br>AS PRESIDENT OF THE UNITED STATES, et al.,<br><br>Defendants. | Case No. 2:25-cv-02152-RMG |

**DECLARATION OF CITY OF SAN DIEGO**

I, Brian Widener, declare as follows:

1.  This declaration is based on my knowledge, professional education and experience, and belief. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of San Diego ("San Diego") -- a United States Department of Agriculture ("USDA"), Urban and Community Forestry grant recipient affected by a freeze in grant funding.

2.  The City of San Diego is a municipal corporation and California charter city, duly organized and existing by virtue of the laws of the State of California. San Diego is the second largest city in California and the eighth largest city in the United States.

3.  I am the City Forester for the City of San Diego's Department of Transportation. I have been employed in this capacity since September 2017. If called upon as a witness, I could and would competently testify as to the matters set forth in this declaration and these matters are within my personal knowledge.

4.  I received a Bachelor of Science in Forestry from Northern Arizona University, Flagstaff, Arizona in May 2005.

1

**J.A. 2096**

5.     Prior to my employment with the City, I was an Assistant Regional Forester with the State of New Jersey Department of Environmental Protection for five years, from June 2005 to March 2010. I was a Senior Forester with City of New York Parks & Recreation for seven years, from May 2010 to September 2017.

6.     As City Forester, I manage all forestry staff and City tree trimming crews. My duties also include, but are not limited to, tree management of trees within the City's right of way, tree planting, tree protection, tree maintenance, tree risk assessment, mapping of trees, verification of City trees, and public outreach.

7.     On May 1, 2024, the City of San Diego was awarded a $10 million grant under the USDA's Urban and Community Forestry grant program for a project entitled "Ready, Set, Grow San Diego." A grant agreement was executed on May 1, 2024. A true and accurate copy of the grant agreement is attached to this Declaration as Exhibit A.

8.     The grant funds a five-year program to plant trees and fix sidewalks around existing trees in local communities as part of an ongoing effort to grow and improve San Diego's urban forest. This grant is intended to increase equitable access to trees and nature, aid in combating extreme heat and climate change, and provide much-needed shade to San Diego residents. Under the program four (4) new jobs were created and all of them recently staffed. These positions are reimbursable under the grant.

9.     The grant requires the City of San Diego to first expend its own funds and then submit for reimbursement for eligible costs later. Under the grant agreement, there are no mandatory due dates for reimbursement requests imposed on San Diego. San Diego submits reimbursement requests in accordance with project activities once it has exact amounts to request.

10.     Planting and maintaining trees is important to the City of San Diego because trees play a critical role in improving San Diego's air quality. Without them, air pollution levels rise, worsening respiratory conditions, particularly among vulnerable populations such as children,

2

**J.A. 2097**

the elderly, and individuals with preexisting health conditions. Expanded tree coverage also increases stormwater absorption, leading to less runoff, decreased erosion, and a lower risk of flooding in certain areas. Well-canopied urban landscapes have also been shown to encourage commercial activity.

11.    On February 13, 2025, USDA program manager Alicia Sanchez-Scott verbally notified me by phone that USDA's Budget and Finance Incident Finance Branch, Albuquerque Service Center (ASC) had paused all payments for grant reimbursement requests, noting however that the City could continue to submit invoices to USDA for reimbursement. Ms. Sanchez-Scott would not provide written confirmation. Since then, I have reached out to Ms. Sanchez-Scott multiple times requesting confirmation of whether the pause is in full effect. On March 20, 2025, Ms. Sanchez-Scott informed me all payments were being processed for the grant and that our next invoice "should" be paid within approximately one (1) week. On March 19, 2025, the Transportation Department submitted for its 2nd payment for this grant to the USDA.

12.    A lack of funding for tree planting could worsen air pollution, increase stormwater runoff, erosion, and flood risk, and raise the City's already high temperatures, increasing energy costs for San Diego residents, and placing increased strain on the power grid.

13.    Harm to the City of San Diego and its interests would be redressed by an order from this Court to preliminarily, and permanently, enjoin the Defendants from implementing, applying, or enforcing any freeze or rescission of funding to our Urban and Community Forestry grant.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this 25 th day of March 2025.

_____
Brian Widener

3

**J.A. 2098**

# SAN DIEGO DECLARATION

# EXHIBIT 20-A

**FEDERAL FINANCIAL ASSISTANCE**
**AWARD OF DOMESTIC GRANT 24-DG-11052021-228**
**Between**
**CITY SAN DIEGO TRANS-STREET**
**And The**
**USDA, FOREST SERVICE**
**REGION 5**
**STATE & PRIVATE FORESTRY**

Project Title: Ready, Set, Grow San Diego

Upon execution of this document, an award to City San Diego Trans-Street, hereinafter referred to as "City of San Diego," in the amount of **10,000,000**, is made under the authority of Cooperative Forestry Assistance Act, P.L. 95-313 as amended,16 USC 2105 and Public Law 117-169, Subtitle D, Section 23003(a).  The Federal Assistance Listing (formerly Catalog of Federal Domestic Assistance - CFDA) number and name are 10.727 IRA Urban & Community Forestry.  City San Diego Trans-Street accepts this award for the purpose described in the application narrative.  Your application for Federal financial assistance, dated 02/28/2024, and the attached Forest Service provisions, 'Forest Service Award Provisions,' are incorporated into this letter and made a part of this award.

This authority requires a match of 1:1, however match has been waived under the provision of Public Law 117-169 (Inflation Reduction Act) and based on assurance from the Cooperator that 100% of the work and funding will benefit disadvantaged communities, which your organization has agreed to provide as shown in the attached application, financial plan and narrative.

As addressed in Provision E and F, the financial status and performance reports are due on a semi-annual basis for the periods ending June 30 and December 31.  The final performance report is to be submitted no later than 120 days from the expiration date of the grant.  The first reports will be due July 30, 2024, for the period ending June 30, 2024.

Send the financial status reports to Kathryn Williams at the address on page 2, and the performance reports to Alicia Sanchez-Scott at the address on page 2 of this award and as shown in the narrative.

This is an award of Federal financial assistance.   Prime and sub-recipients to this award are subject to the OMB guidance in subparts A through F of 2 CFR Part 200 as adopted and supplemented by the USDA in 2 CFR Part 400.  Adoption by USDA of the OMB guidance in 2 CFR 400 gives regulatory effect to the OMB guidance in 2 CFR 200 where full text may be found.

Electronic copies of the CFRs can be obtained at the following internet site: www.ecfr.gov.  If you are unable to retrieve these regulations electronically, please contact your Grants and Agreements Office at (707) 980-3927.



**Caring for the Land and Serving People**
Printed on Recycled Paper

**J.A. 2100**

OMB 0596-0217
Expiration Date: 11/30/2017
Rev. (12-13)

The following administrative provisions apply to this award:

A. <u>LEGAL AUTHORITY</u>. City of San Diego shall have the legal authority to enter into this award, and the institutional, managerial, and financial capability to ensure proper planning, management, and completion of the project, which includes funds sufficient to pay the non-Federal share of project costs, when applicable.

B. <u>PRINCIPAL CONTACTS</u>. Individuals listed below are authorized to act in their respective areas for matters related to this award.

**Principal Cooperator Contacts:**

| Cooperator Program Contact | Cooperator Administrative Contact |
|---|---|
| Brian Widener<br>City Forester<br>2781 Caminito Chollas<br>San Diego, CA 92105<br>Telephone: 619-527-8050<br>Email: BWidener@sandiego.gov | Nancy Alvarez<br>Senior Management Analyst<br>8575 Gibbs Dr<br>San Diego, CA 92123<br>Telephone: 619-533-3752<br>Email: NAlvarez@sandiego.gov |

**Principal Forest Service Contacts:**

| Forest Service Program Manager Contact | Forest Service Administrative Contact |
|---|---|
| Alicia Sanchez-Scott<br>Urban & Community Forestry Assistant Program Manager<br>State & Private Forestry<br>1323 Club Drive<br>Vallejo, CA 94592<br>Cell: 805-450-8369<br>Email: alicia.sanchezscott@usda.gov | Kathryn Williams<br>Program Specialist<br>USDA Forest Service<br>State & Private Forestry<br>1323 Club Drive<br>Vallejo, CA 94592<br>Telephone: (707) 980-3927<br>Email: kathryn.williams2@usda.gov |

C. <u>SYSTEM FOR AWARD MANAGEMENT REGISTRATION REQUIREMENT (SAM)</u>. City of San Diego shall maintain current organizational information and the original Unique Entity Identifier (UEI) provided for this agreement in the System for Award Management (SAM) until receipt of final payment. This requires annual review and updates, when needed, of organizational information after the initial registration. More frequent review and updates may be required for changes in organizational information or agreement term(s). Any change to the original UEI provided in this agreement will result in termination of this agreement and de-obligation of any remaining funds. For purposes of this agreement, System for Award Management (SAM) means the Federal repository into which an entity must provide information required for the conduct of business as a Cooperative. Additional information about registration procedures may be found at the SAM Internet site at <u>www.sam.gov</u>.

Award Number: 21-DG-11052021-228

D.    ADVANCES AND REIMBURSABLE PAYMENTS – FINANCIAL ASSISTANCE.
Advances and reimbursable payments are approved under this award.  Only costs for
those project activities approved in (1) the initial award, or (2) modifications thereto,
are allowable.  Requests for payment must be submitted on Standard Form 270 (SF-
270), Request for Advance or Reimbursement, and must be submitted no more than
monthly.  In order to approve a Request for Advance Payment or Reimbursement, the
Forest Service shall review such requests to ensure advances or payments for
reimbursement are in compliance and otherwise consistent with OMB, USDA, and
Forest Service regulations.

Advance payments must not exceed the minimum amount needed or no more than is
needed for a 30-day period, whichever is less.  If the Recipient receives an advance
payment and subsequently requests an advance or reimbursement payment, then the
request must clearly demonstrate that the previously advanced funds have been fully
expended before the Forest Service can approve the request for payment. Any funds
advanced, but not spent, upon expiration of this award must be returned to the Forest
Service.

The Program Manager reserves the right to request additional information prior to
approving a payment.

| The invoice must be sent by one of three methods: | Send a copy to: |
|---|---|
| EMAIL (preferred): SM.FS.asc_ga@usda.gov | |
| FAX:  877-687-4894 | |
| POSTAL:  USDA Forester Service <br> Budget & Finance - Grants and Agreements <br> 4000 Masthead St, NE <br> Albuquerque, NM  87109 | |

E.    ELECTION OF DE MINIMIS INDIRECT RATE. City of San Diego has elected to use
the *de minimis* indirect cost rate of 10% of modified total direct costs (MTDC) as
allowed under 2 CFR 200.414 (f).  This rate must be used consistently for all Federal
awards until such time as  City of San Diego chooses to negotiate for a rate, which they
may apply to do at any time.  If a new rate is negotiated and utilized the *de minimis* rate
can no longer be utilized.

F.    PRIOR WRITTEN APPROVAL.  City of San Diego shall obtain prior written approval
pursuant to conditions set forth in 2 CFR 200.407.

G.    MODIFICATIONS.  Modifications within the scope of this award must be made by
mutual consent of the parties, by the issuance of a written modification signed and
dated by all properly authorized signatory officials, prior to any changes being



**Caring for the Land and Serving People**

Printed on Recycled Paper



**J.A. 2102**

performed.  Requests for modification should be made, in writing, at least 45 days prior to implementation of the requested change.  The Forest Service is not obligated to fund any changes not properly approved in advance.

H.  <u>PERIOD OF PERFORMANCE</u>.  This agreement is executed as of the date of the Forest Service signatory official signature.

The end date, or expiration date is **03/14/2029.** This instrument may be extended by a properly executed modification.  *See Modification Provision above.*

I.  <u>AUTHORIZED REPRESENTATIVES</u>.  By signature below, each party certifies that the individuals listed in this document as representatives of the individual parties are authorized to act in their respective areas for matters related to this award. In witness whereof the parties hereto have executed this award.

_Kris McFadden_                                          05/01/2024        _Dominic Guglielmo_
KRIS McFADDEN, Deputy Chief Operating Officer            Date             _Deputy City Attorney_
City San Diego Trans-Street                                               _5/1/24_

SHERRY HAZELHURST    Digitally signed by SHERRY HAZELHURST
                     Date: 2024.05.09 13:50:04 -07'00'

SHERRY HAZELHURST, Director                              Date
USDA Forest Service, State & Private Forestry,
Region 5

The authority and the format of this award have been reviewed and approved for signature.

JASON BUCKNER        Digitally signed by JASON BUCKNER
                     Date: 2024.03.25 14:31:33 -05'00'

JASON BUCKNER                                            Date
Forest Service Acting Supervisory Grants
Management Specialist

**J.A. 2103**

# ATTACHMENT A:  FOREST SERVICE AWARD PROVISIONS

A.   <u>COLLABORATIVE ARRANGEMENTS</u>.  Where permitted by terms of the award and Federal law, City of San Diego a may enter into collaborative arrangements with other organizations to jointly carry out activities with Forest Service funds available under this award.

B.   <u>FOREST SERVICE LIABILITY TO THE RECIPIENT</u>.  The United States shall not be liable to City of San Diego for any costs, damages, claims, liabilities, and judgments that arise in connection with the performance of work under this award, including damage to any property owned by City of San Diego or any third party.

C.   <u>NOTICES</u>.  Any notice given by the Forest Service or City of San Diego will be sufficient only if in writing and delivered in person, mailed, or transmitted electronically by e-mail or fax, as follows:

> To the Forest Service Program Manager, at the address specified in the award.

> To City of San Diego, at the address shown in the award or such other address designated within the award.

Notices will be effective when delivered in accordance with this provision, or on the effective date of the notice, whichever is later.

D.   <u>SUBAWARDS</u>. Prior approval is required to issue subawards under this grant.  The intent to subaward must be identified in the approved budget and scope of work and approved in the initial award or through subsequent modifications.  Approval of each individual subaward is not required, however the cooperator must document that each sub-recipient does NOT have active exclusions in the System for Award Management (sam.gov).

The Cooperator must also ensure that they have evaluated each subrecipient's risk in accordance with 2 CFR 200.332 (b).

Any subrecipient under this award must be notified that they are subject to the OMB guidance in subparts A through F of 2 CFR Part 200, as adopted and supplemented by the USDA in 2 CFR Part 400.  Any sub-award must follow the regulations found in 2 CFR 200.331 through .333.

All subawards $30,000 or more must be reported at <u>fsrs.gov</u> in compliance with 2 CFR 170.  *See Attachment B for full text.*

E.   <u>FINANCIAL STATUS REPORTING</u>.  A Federal Financial Report, Standard Form SF-425 (and Federal Financial Report Attachment, SF-425A, if required for reporting multiple awards), must be submitted  semi-annually. These reports are due 30 days after the reporting period ending June 30 and December 31.  The final SF-425 (and SF-425A,

if applicable) must be submitted either with the final payment request or no later than 120 days from the expiration date of the award. These forms may be found at https://www.grants.gov/web/grants/forms.html.

F.  <u>PROGRAM PERFORMANCE REPORTS</u>.  The recipient shall perform all actions identified and funded in application/modification narratives within the performance period identified in award.

In accordance with 2 CFR 200.301, reports must relate financial data to performance accomplishments of the federal award.

City of San Diego shall submit semi-annual performance reports.  These reports are due 30 days after the reporting period ending June 30 and December 31.  The final performance report shall be submitted either with City of San Diego's final payment request, or separately, but not later than 120 days from the expiration date of the award.

-  Additional pertinent information: To support consistent and transparent public access to project outcomes funded through the Inflation Reduction Act, grantees are required to report quantitative and qualitative project accomplishments for reporting periods ending June 30 and December 31 to a public-facing Impact Reporting Platform. Grantees will be provided instructions for project impact reporting.

G.  <u>NOTIFICATION</u>.  City of San Diego shall immediately notify the Forest Service of developments that have a significant impact on the activities supported under this award.  Also, notification must be given in case of problems, delays or adverse conditions that materially impair the ability to meet the objectives of the award.  This notification must include a statement of the action taken or contemplated, and any assistance needed to resolve the situation.

H.  <u>CHANGES IN KEY PERSONNEL</u>.  Any revision to key personnel identified in this award requires notification of the Forest Service Program Manager by email or letter.

I.  <u>USE OF FOREST SERVICE INSIGNIA</u>.  In order for City of San Diego to use the Forest Service insignia on any published media, such as a Web page, printed publication, or audiovisual production, permission must be granted by the Forest Service's Office of Communications (Washington Office).  A written request will be submitted by Forest Service, Program Manager, to the Office of Communications Assistant Director, Visual Information and Publishing Services prior to use of the insignia.  The Forest Service Program Manager will notify City of San Diego when permission is granted.

J.  <u>FUNDING EQUIPMENT</u>.  Federal funding under this award is not available for reimbursement of City of San Diego's purchase of equipment.  Equipment is defined as having a fair market value of $5,000 or more per unit and a useful life of over one year. Supplies are those items that are not equipment.

**J.A. 2105**

Award Number: 24-DG-11052021-228

K.  <u>PUBLIC NOTICES</u>.  It is Forest Service's policy to inform the public as fully as possible of its programs and activities.  City of San Diego is encouraged to give public notice of the receipt of this award and, from time to time, to announce progress and accomplishments.

City of San Diego may call on Forest Service's Office of Communication for advice regarding public notices.  City of San Diego is requested to provide copies of notices or announcements to the Forest Service Program Manager and to Forest Service's Office Communications as far in advance of release as possible.

L.  <u>FOREST SERVICE ACKNOWLEDGED IN PUBLICATIONS, AUDIOVISUALS, AND ELECTRONIC MEDIA</u>.  City of San Diego shall acknowledge Forest Service support in any publications, audiovisuals, and electronic media developed as a result of this award.  Follow direction in USDA Supplemental 2 CFR 415.2.

M.  <u>COPYRIGHTING.</u>  City of San Diego is/are granted sole and exclusive right to copyright any publications developed as a result of this award.  This includes the right to publish and vend throughout the world in any language and in all media and forms, in whole or in part, for the full term of copyright and all renewals thereof in accordance with this award.

No original text or graphics produced and submitted by the Forest Service shall be copyrighted.  The Forest Service reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use the work for federal government purposes.

This right shall be transferred to any sub-awards or subcontracts.

This provision includes:
- The copyright in any work developed by City of San Diego under this award.
- Any right of copyright to which City of San Diego purchase(s) ownership with any federal contributions.

N.  <u>NONDISCRIMINATION STATEMENT – PRINTED, ELECTRONIC, OR AUDIOVISUAL MATERIAL</u>.  City of San Diego shall include the following statement, in full, in any printed, audiovisual material, or electronic media for public distribution developed or printed with any Federal funding.

*In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, this institution is prohibited from discriminating on the basis of race, color, national origin, sex, age, disability, and reprisal or retaliation for prior civil rights activity. (Not all prohibited bases apply to all programs.)*

*Program information may be made available in languages other than English. Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, and American Sign*

**J.A. 2106**

*Language) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339.*

*To file a program discrimination complaint, a complainant should complete a Form AD-3027, USDA Program Discrimination Complaint Form, which can be obtained online at https://www.ocio.usda.gov/document/ad-3027, from any USDA office, by calling (866) 632-9992, or by writing a letter addressed to USDA. The letter must contain the complainant's name, address, telephone number, and a written description of the alleged discriminatory action in sufficient detail to inform the Assistant Secretary for Civil Rights (ASCR) about the nature and date of an alleged civil rights violation. The completed AD-3027 form or letter must be submitted to USDA by:*
*(1) Mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, D.C. 20250-9410; o*
*(2) Fax: (833) 256-1665 or (202) 690-7442; or*
*(3) Email: program.intake@usda.gov.*

If the material is too small to permit the full Non-Discrimination Statement to be included, the material will, at a minimum, include the alternative statement:
***"This institution is an equal opportunity provider."***

O.  <u>DISPUTES</u>.  In the event of any issue of controversy under this agreement, the parties may pursue Alternate Dispute Resolution (ADR) procedures to voluntarily resolve those issues. These procedures may include, but are not limited to conciliation, facilitation, mediation, and fact finding.

Should the parties be unable to resolve the issue of controversy through ADR, then the Signatory Official will make the decision.  A written copy of the decision will be provided to the Cooperator.

Decisions of the Signatory Official shall be final unless, within 30 days of receipt of the decision of the Signatory Official, the Cooperator appeals the decision to the Forest Service's Deputy Chief, State, Private, and Tribal Forestry (SPTF). Any appeal made under this provision shall be in writing and addressed to the Deputy Chief, SPTF, USDA, Forest Service, Washington, DC 20024. A copy of the appeal shall be concurrently furnished to the Signatory Official.

A decision under this provision by the Deputy Chief, SPTF, is final. The final decision by the Deputy Chief, SPTF, does not preclude the Cooperator from pursuing remedies available under the law.

P.  <u>AWARD CLOSEOUT</u>.  City of San Diego must submit, no later than 120 calendar days after the end date of the period of performance, all financial, performance, and other reports as required by the terms and conditions of the Federal award.

Any unobligated balance of cash advanced to City of San Diego must be immediately refunded to the Forest Service, including any interest earned in accordance with 2 CFR 200.344(d).

If this award is closed without audit, the Forest Service reserves the right to disallow and recover an appropriate amount after fully considering any recommended disallowances resulting from an audit which may be conducted later.

Q.   <u>TERMINATION</u>.  This award may be terminated, in whole or part pursuant to 2 CFR 200.340.

R.   <u>DEBARMENT AND SUSPENSION</u>.  City of San Diego shall immediately inform the Forest Service if they or any of their principals are presently excluded, debarred, or suspended from entering into covered transactions with the federal government according to the terms of 2 CFR Part 180.  Additionally, should City of San Diego or any of their principals receive a transmittal letter or other official federal notice of debarment or suspension, then they shall notify the Forest Service without undue delay.  This applies whether the exclusion, debarment, or suspension is voluntary or involuntary.  The Recipient shall adhere to 2 CFR Part 180 Subpart C in regards to review of sub-recipients or contracts for debarment and suspension.

All subrecipients and contractors must complete the form AD-1048, Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion, Lower Tier Covered Transactions.  Blank forms are available electronically.  Completed forms must be kept on file with the primary recipient.

S.   <u>MEMBERS OF CONGRESS</u>.  Pursuant to 41 U.S.C. 22, no member of, or delegate to, Congress shall be admitted to any share or part of this award, or benefits that may arise therefrom, either directly or indirectly.

T.   <u>SCIENTIFIC INTEGRITY</u>: USDA is committed to the highest levels of integrity in all of our scientific activities and decision making. This includes to performing, recording and reporting the results of scientific activities with honesty, objectivity, and transparency. All persons performing under this agreement shall adhere to the principles of scientific integrity described in <u>Departmental Regulation (DR) 1074-001</u>.

U.   <u>GEOSPATIAL DATA</u>.  All data collected will meet the requirements of the Geospatial Data Act of 2018 where applicable. This will always include the documentation of all relevant metadata standards, use of standard data formats; description of quantitative measures of uncertainty and source of uncertainty and sources of uncertainty associated with the data. Additionally, the data must meet specific standards specified elsewhere to ensure the data is useful to support the USDA's mission. The recipient/cooperator agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in <u>Departmental Regulation 3465-001</u> which establishes the USDA policy

for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA.

V. <u>PUBLIC ACCESS TO SCHOLARLY PUBLICATIONS AND DIGITAL SCIENTIFIC RESEARCH DATA.</u> The recipient agrees to comply with USDA's Department-wide <u>public access policy</u> implemented in <u>Departmental Regulation 1020-006</u> which establishes the USDA policy for public access to scholarly publications and digital scientific research data assets. The USDA will make all peer-reviewed, scholarly publications and digital scientific research data assets arising from unclassified scientific research supported wholly or in part by the USDA accessible to the public, to the extent practicable.

W. <u>BUY AMERICA BUILD AMERICA.</u> Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

(1) All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) All manufactured products used in the project are produced in the United States— this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

(3) All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an

integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

   (a) For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

   (b) For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied to a single construction material.

   (1) Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

   (2) Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable,

constituent composite materials, until the item is in its final form, occurred in the United States.

(3) Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

(4) Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

(5) Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

(6) Lumber. All manufacturing processes, from initial debarking through treatment and planning, occurred in the United States.

(7) Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

(8) Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers.* When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

(1) applying the Buy America Preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at USDA Buy America Waivers for Federal Financial Assistance | USDA.

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material.

(1) The listed items are:

(i) Non-ferrous metals;

(ii) Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

(iii) Glass (including optic glass);

(iv) Fiber optic cable (including drop cable);

(v) Optical fiber;

(vi) Lumber;

(vii) Engineered wood; and

(viii) Drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

X.    <u>TRAFFICKING IN PERSONS</u>.

1. Provisions applicable to a Recipient that is a private entity.

    a. You as the Recipient, your employees, Subrecipients under this award, and Subrecipients' employees may not:
       (1) Engage in severe forms of trafficking in persons during the period of time that the award is in effect;
       (2) Procure a commercial sex act during the period of time that the award is in effect; or
       (3) Use forced labor in the performance of the award or subawards under the award.

    b. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a Subrecipient that is a private entity:
       (1) Is determined to have violated a prohibition in paragraph a.1 of this award term; or
       (2) Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a.1 of this award term through conduct that is either:
          i.  Associated with performance under this award; or
          ii. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement),".

2. Provision applicable to a Recipient other than a private entity. We as the Federal

awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity:

a. Is determined to have violated an applicable prohibition in paragraph a.1 of this award term; or

b. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a.1 of this award term through conduct that is either—

    (1) Associated with performance under this award; or

    (2) Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, ''OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement),''

3. Provisions applicable to any recipient.

    a. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a.1 of this award term.

    b. Our right to terminate unilaterally that is described in paragraph a.2 or b of this section:

        (1) Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

        (2) Is in addition to all other remedies for noncompliance that are available to us under this award.

    c. You must include the requirements of paragraph a.1 of this award term in any subaward you make to a private entity.

4. Definitions. For purposes of this award term:

    a. ''Employee'' means either:

        (1) An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

        (2) Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

    b. ''Forced labor'' means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

    c. ''Private entity'':

        (1) Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

        (2) Includes:

            i. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).

            ii. A for-profit organization.

    d. ''Severe forms of trafficking in persons,'' ''commercial sex act,'' and

''coercion'' have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

Y.   DRUG-FREE WORKPLACE.

1. City of San Diego agree(s) that it will publish a drug-free workplace statement and provide a copy to each employee who will be engaged in the performance of any project/program that receives federal funding.  The statement must
   a. Tell the employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in its workplace;
   b. Specify the actions City of San Diego will take against employees for violating that prohibition; and
   c. Let each employee know that, as a condition of employment under any award, the employee:

      (1) Shall abide by the terms of the statement, and
      (2) Shall notify City of San Diego in writing if they are convicted for a violation of a criminal drug statute occurring in the workplace, and shall do so no more than 5 calendar days after the conviction.

2. City of San Diego agree(s) that it will establish an ongoing drug-free awareness program to inform employees about
   a. The dangers of drug abuse in the workplace;
   b. The established policy of maintaining a drug-free workplace;
   c. Any available drug counseling, rehabilitation and employee assistance programs; and
   d. The penalties that you may impose upon them for drug abuse violations occurring in the workplace.

3. Without the Program Manager's expressed written approval, the policy statement and program must be in place as soon as possible, no later than the 30 days after the effective date of this instrument, or the completion date of this award, whichever occurs first.

4. City of San Diego agrees to immediately notify the Program Manager if an employee is convicted of a drug violation in the workplace.  The notification must be in writing, identify the employee's position title, the award number of each award on which the employee worked.  The notification must be sent to the Program Manager within 10 calendar days after City of San Diego learns of the conviction.

5. Within 30 calendar days of learning about an employee's conviction, City of San Diego must either
   a. Take appropriate personnel action against the employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973 (29 USC 794), as amended, or

**J.A. 2115**

  b. Require the employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for these purposes by a Federal, State or local health, law enforcement, or other appropriate agency.

Z.   <u>PROHIBITION AGAINST USING FUNDS WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS</u>.

  1. The recipient may not require its employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

  2. The recipient must notify its employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph (1) of this award provision are no longer in effect.

  3. The prohibition in paragraph (1) of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

  4. If the Government determines that the recipient is not in compliance with this award provision, it;

   a. Will prohibit the recipient's use of funds under this award in accordance with sections 743, 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law; and

   b. May pursue other remedies available for the recipient's material failure to comply with award terms and conditions.

AA.   <u>ELIGIBLE WORKERS</u>.  City of San Diego shall ensure that all employees complete the I-9 form to certify that they are eligible for lawful employment under the Immigration and Nationality Act (8 U.S.C. 1324(a)).  City of San Diego shall comply with regulations regarding certification and retention of the completed forms.  These requirements also apply to any contract or supplemental instruments awarded under this award.

BB.   <u>FREEDOM OF INFORMATION ACT (FOIA)</u>.  Public access to award or agreement records must not be limited, except when such records must be kept confidential and would have been exempted from disclosure pursuant to Freedom of Information regulations (5 U.S.C. 552).  Requests for research data are subject to 2 CFR 315(e).

  Public access to culturally sensitive data and information of Federally-recognized Tribes may also be explicitly limited by P.L. 110-234, Title VIII Subtitle B §8106 (2009 Farm Bill).

CC.   <u>TEXT MESSAGING WHILE DRIVING</u>.  In accordance with Executive Order (EO) 13513, "Federal Leadership on Reducing Text Messaging While Driving," any and all text messaging by Federal employees is banned: a) while driving a Government owned vehicle (GOV) or driving a privately owned vehicle (POV) while on official Government

business; or b) using any electronic equipment supplied by the Government when driving any vehicle at any time. All Cooperators, their Employees, Volunteers, and Contractors are encouraged to adopt and enforce policies that ban text messaging when driving company owned, leased or rented vehicles, POVs or GOVs when driving while on official Government business or when performing any work for or on behalf of the Government.

DD. <u>PROMOTING FREE SPEECH AND RELIGIOUS FREEDOM</u>. As a recipient of USDA financial assistance, you will comply with the following:
   1. Do not discriminate against applicants for sub-grants on the basis of their religious character.
   2. 7 Code of Federal Regulations (CFR) part 16.3(a), Rights of Religious Organizations.
   3. Statutory and National policy requirements, including those prohibiting discrimination and those described in Executive Order 13798 promoting free speech and religious freedom, 2 CFR 200.300.

EE. <u>PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT</u>. The cooperator (including subrecipients) is responsible for compliance with the prohibition on certain telecommunications and video surveillance services or equipment identified in 2 CFR 200.216. See Public Law 115-232, Section 889 for additional information.

In accordance with 2 CFR 200.216, the grantee (including subrecipients) is prohibited from obligating or expending loan or grant funds for covered telecommunications equipment or services to:
   (1) procure or obtain, extend or renew a contract to procure or obtain;
   (2) enter into a contract (or extend or renew a contract) to procure; or
   (3) obtain the equipment, services or systems.

FF. <u>DAVIS BACON WAGES FOR CONSTRUCTION</u>. Following the requirement in Section 41101 of the Bipartisan Infrastructure Law, P.L. 117-58, Davis-Bacon wage rates must be applied for all laborers and mechanics employed by contractors or subcontractors in the performance of construction, alteration, or repair work on a project assisted in whole or in part by funding made available under this Act. Laborers and mechanics shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code (commonly referred to as the ''Davis-Bacon Act'').

# ATTACHMENT B:  2 CFR PART 170

**Appendix A to Part 170—Award Term**

I. Reporting Subawards and Executive Compensation

a.  *Reporting of first-tier subawards.*

    1.  *Applicability.* Unless you are exempt as provided in paragraph d. of this award term, you must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph e. of this award term).

    2.  *Where and when to report.*

        i.  The non-Federal entity or Federal agency must report each obligating action described in paragraph a.1. of this award term to *http://www.fsrs.gov.*

        ii.   For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

    3.  *What to report.* You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov specify.*

b.  *Reporting total compensation of recipient executives for non-Federal entities.*

    1.  *Applicability and what to report.* You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

        i.  The total Federal funding authorized to date under this Federal award equals or exceeds $30,000 as defined in 2 CFR 170.320;

        ii.  in the preceding fiscal year, you received—

            (A) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), and

            (B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and,

        iii.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm.*)

    2.  *Where and when to report.* You must report executive total compensation described in paragraph b.1. of this award term:

        i.  As part of your registration profile at *https://www.sam.gov.*

        ii.  By the end of the month following the month in which this award is made, and annually thereafter.

c.  *Reporting of Total Compensation of Subrecipient Executives.*

    1.  *Applicability and what to report.* Unless you are exempt as provided in paragraph d. of this award term, for each first-tier non-Federal entity subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most

**J.A. 2118**

Award Number: 24-DG-11052021-228

highly compensated executives for the subrecipient's preceding completed fiscal year, if—

    i. in the subrecipient's preceding fiscal year, the subrecipient received—

       (A) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards) and,

       (B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

    ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm.*)

2. *Where and when to report.* You must report subrecipient executive total compensation described in paragraph c.1. of this award term:

    i. To the recipient.

    ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

d. *Exemptions.*

If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    i. Subawards, and

    ii. The total compensation of the five most highly compensated executives of any subrecipient.

e. *Definitions.* For purposes of this award term:

1. Federal Agency means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

2. Non-Federal *entity* means all of the following, as defined in 2 CFR part 25:

    i. A Governmental organization, which is a State, local government, or Indian tribe;

    ii. A foreign public entity;

    iii. A domestic or foreign nonprofit organization; and,

    iv. A domestic or foreign for-profit organization

3. *Executive* means officers, managing partners, or any other employees in management positions.

4. *Subaward:*

    i. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    ii. The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).

    iii. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

Award Number: 24-DG-11052021-228

5. *Subrecipient* means a non-Federal entity or Federal agency that:
   i.   Receives a subaward from you (the recipient) under this award; and
   ii.  Is accountable to you for the use of the Federal funds provided by the subaward.
6. *Total compensation* means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)).

<center>END OF ATTACHMENT B:  2 CFR PART 170</center>

## ATTACHMENT C:  WHISTLEBLOWER NOTICE

Whistleblowers perform an important service to USDA and the public when they come forward with what they reasonably believe to be evidence of wrongdoing.  They should never be subject to reprisal for doing so. Federal law protects federal employees as well as personal services contractors and employees of Federal contractors, subcontractors, grantees, and subgrantees against reprisal for whistleblowing.  USDA bears the responsibility to ensure that nothing in a non-disclosure agreement which a contractor, subcontractor, grantee, or subgrantee requires their employees to sign should be interpreted as limiting their ability to provide information to the Office of Inspector General (OIG).

41 U.S.C. § 4712 requires the head of each executive agency to ensure that its contractors inform their workers in writing of the rights and remedies under the statute. Accordingly, it is illegal for a personal services contractor or an employee of a Federal contractor, subcontractor, grantee, or subgrantee to be discharged, demoted, or otherwise discriminated against for making a protected whistleblower disclosure.  In this context, these categories of individuals are whistleblowers who disclose information that the individual reasonably believes is evidence of one of the following:

- Gross mismanagement of a Federal contract or grant;
- A gross waste of Federal funds;
- An abuse of authority relating to a Federal contract or grant;
- A substantial and specific danger to public health or safety; or
- A violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

To be protected under 41 U.S.C. § 4712, the disclosure must be made to one of the following:

- A Member of Congress, or a representative of a committee of Congress;
- The OIG;
- The Government Accountability Office (GAO);
- A Federal employee responsible for contract or grant oversight or management at USDA;
- An otherwise authorized official at USDA or other law enforcement agency;
- A court or grand jury; or
- A management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct.

Under 41 U.S.C. § 4712, personal services contractors as well as employees of contractors, subcontractors, grantees, or subgrantees may file a complaint with OIG, who will investigate the matter unless they determine that the complaint is frivolous, fails to allege a violation of the prohibition against whistleblower reprisal, or has been addressed in another proceeding. OIG's investigation is then presented to the head of the executive agency who evaluates the facts of the investigation and can order the contractor, subcontractor, grantee, or subgrantee

to take remedial action, such as reinstatement or back pay.

Federal Acquisition Regulation (FAR) Subpart 3.903, *Whistleblower Protections for Contractor Employees, Policy*, prohibits government contractors from retaliating against a contract worker for making a protected disclosure related to the contract.  FAR Subpart 3.909-1 prohibits the Government from using funds for a contract with an entity that requires its employees or subcontractors to sign internal confidentiality statements prohibiting or restricting disclosures of fraud, waste, or abuse to designated persons. This prohibition does not contravene agreements pertaining to classified information. The regulation also requires contracting officers to insert FAR clause 52.203-17, *Contractor Employee Whistleblower Rights and Requirement to Inform Employees of Whistleblower Rights,* in all solicitations and contracts that exceed the Simplified Acquisition Threshold as defined in FAR Subpart 3.908. This clause requires notification to contractor employees that they are subject to the whistleblower rights and remedies referenced in 41 U.S.C. § 4712.

In order to make a complaint alleging any of the violations mentioned above, one should complete the OIG Hotline form located at: https://www.usda.gov/oig/hotline.  For additional information, they may also visit the WPC's webpage at: https://www.usda.gov/oig/wpc or they may directly contact the WPC at OIGWPC@oig.usda.gov.

Award Number: 24-DG-11052021-228

## ATTACHMENT D: SUPPLEMENTAL PROVISIONS

**JUSTICE 40 INITIATIVE.** Executive Order (EO) 14008, Tackling the Climate Crisis at Home and Abroad, was signed on January 27, 2021. This EO commits federal agencies to providing 40% of federal benefits to disadvantaged communities. When the cooperator is considering a sub-award or contract to be executed under this agreement, the cooperator shall consider the requirements of EO 14008, section 223, OMB M-21-28 and OMB-23-09.

**Investing in America Signage.** For any Bipartisan Infrastructure Law or Inflation Reduction Act funded public construction projects over $250,000, the Cooperator shall visibly post clear and prominent signs acknowledging the source of funding. See Office of Management and Budget Memorandum CA-23-6.

For any construction project less than $250,000 or a non-construction project, the Cooperator is encouraged to display a poster or utilize other appropriate Investing in America media. Specific sign and poster design criteria may be found in the USDA Style Guide. Production costs of Investing in America signs shall be reasonable. To maintain reasonable costs, the Cooperator is encouraged to use recycled or recovered materials when producing signs. In the event production of such signs and/or posters will result in unreasonable costs, expenses or burden to the Cooperator, production will not be required and the Forest Service should be notified.

# LIST OF PLAINTIFFS' GRANTS AND STATUTORY AUTHORITIES

# EXHIBIT 21

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| Granting Agency | Grant Number | Project Name/Notes | Grant Program | Grant Recipient | Relevant Cites | Statutory Authority and Funding Source(s) for Grant Program |
|---|---|---|---|---|---|---|
| DOE | DE-SE0001546 | Assistance for Latest and Zero Building Energy Code Adoption | Assistance for Adoption of the Latest and Zero Building Energy Codes | City of Baltimore | Baltimore Decl., Ex. 14-C [1]<br><br>Amended Compl. ¶¶ 55–61, 150–52 | "Assistance for Latest and Zero Building Energy Code Adoption." DOE "shall use" appropriated funds for this program for "grants to assist" State and local governments to "adopt . . . building energy code[s]" for residential and commercial buildings that meet certain "energy savings" standards. Inflation Reduction Act ("IRA"), Pub. L. No. 117–169 § 50131, 136 Stat. 1818, 2041–42 (Aug. 16, 2022).<br><br>"Energy Policy and Conservation Act." Granting DOE certain authority "to promote the conservation of energy and reduce the rate of growth of energy demand," including through "the development and implementation of specific State energy conservation programs" and "Federal financial and technical assistance to States in support of such programs." 42 U.S.C. § 6321(b). |
| EPA | 5F-03D33625-0 | Youth Empowerment Strategies 4 Environmental Justice | Environmental and Climate Justice Block Grant – | Earth Island Institute | Earth Island Decl., Ex. 8-D<br><br>Amended Compl. ¶¶ 37–38, 114–122 | "Environmental and Climate Justice Block Grants." EPA "shall" use IRA funds appropriated for this program to award grants for certain environmental projects "that benefit disadvantaged |

---

[1] Exhibit cites in this column reference exhibits to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction.

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Community Change Grant | | | communities." IRA § 60201, 136 Stat. at 2078–79 (codified at 42 U.S.C. § 7438). |
| EPA | 3D30824 | Community Change Grant | Environmental and Climate Justice Block Grant - Community Change Grant | Sustainability Institute | Sustainability Inst. Decl., Ex. 1-B Amended Compl. ¶¶ 18–21, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 97T28301 | Inflation Reduction Act – Environmental and Climate Justice | Environmental and Climate Justice Block Grant - Community Change Grant | Leadership Counsel for Justice and Accountability | Leadership Counsel Decl., Ex. 9-A Amended Compl. ¶¶ 39–40, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 96272300 | Uplifting Bronx Voices for Climate Change Resilience | Environmental and Climate Justice Block Grant – Community Change Grant | Bronx River Alliance | Bronx River Decl., Ex. 5-B Amended Compl. ¶¶ 30–31, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 97T28901 | Huliau o Wai'anae: Turning Points for a Sustainable Future. | Environmental and Climate Justice Block Grant – Community Change Grant | Earth Island Institute | Earth Island Decl., Ex. 8-B Amended Compl. ¶¶ 37–38, 114–122 | *See* IRA "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 00A01479 | Elm City Climate Collaborative | Environmental and Climate Justice Block Grant – Community Change Grant | City of New Haven | New Haven Decl., Ex. 18-C Amended Compl. ¶¶ 70–73, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | |
|---|---|---|---|---|---|
| EPA | 00E05005 | Climate Resilience Starts at Home: Growing Energy Efficiency, Indoor Air Quality, and Green Jobs in Madison and Fitchburg, Wisconsin | Environmental and Climate Justice Block Grant - Community Change Grant | City of Madison | Madison Decl., Ex. 16-A  Amended Compl. ¶¶ 64–65, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 00A01441 | Electrify New Haven | Environmental and Climate Justice Block Grant – Government to Government Grant | City of New Haven | New Haven Decl., Ex. 18-A  Amended Compl. ¶¶ 70–73, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 95336801 | DPW YH20+ Expansion II | Environmental and Climate Justice Block Grant - Government to Government Grant | City of Baltimore | Baltimore Decl., Exs. 14-C, 14-D  Amended Compl. ¶¶ 55–61, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 03D03424 | North Mecklenburg Air Monitoring Network | Environmental Justice Collaborative Problem-Solving | CleanAIRE NC | CleanAIRE NC Decl., Ex. 6-B  Amended Compl. ¶¶ 32–33, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |
| EPA | 96229424 | Partnership for Urban Waterways in Bronx and Lower Westchester Counties, New York | Environmental Justice Collaborative | Bronx River Alliance | Bronx River Decl., Ex. 5-D Amended Compl. ¶¶ 30–31, 114–122 | *See* IRA, "Environmental and Climate Justice Block Grants" program, *supra*. |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | Problem-Solving | | | |
|---|---|---|---|---|---|---|
| EPA | 00A01475 | Union Station Area Thermal Energy Network | Climate Pollution Reduction Grant Program | City of New Haven | New Haven Decl., Ex. 18-B<br><br>Amended Compl. ¶¶ 70–73, 138–141 | "Greenhouse Gas Air Pollution Plans and Implementation Grants." EPA "shall" use IRA funds appropriated to this program to award grants for plans and projects "for the reduction of greenhouse gas air pollution." IRA § 60114, 136 Stat. at 2076–77 (codified at 42 U.S.C. § 7437). |
| EPA | 95335901 | Bowley's Lane Composing Facility | Solid Waste Infrastructure for Recycling Grant Program | City of Baltimore | Baltimore Decl., Ex. 14-A<br><br>Amended Compl. ¶¶ 55–61, 155–58 | "State and Tribal Assistance Grants." Under this program, the Infrastructure Investment and Jobs Act ("IIJA") appropriated funds to EPA which "shall be made available" until 2026 for grants under Section 302(a) of the Save Our Seas 2.0 Act. IIJA, Pub. L. No. 117–58 § 601, 135 Stat. 429, 1404 (Nov. 15, 2021).<br><br>"Post-Consumer Materials Infrastructure Grant Program." Section 302(a) of the Save Our Seas 2.0 Act creates a grant program to "support . . . municipal recycling programs" and "improvements to local waste management systems," among other purposes. Pub. L. 116-224 § 302(a), 134 Stat. 1072, 1092 (2020). |
| EPA / NFWF | 0602.24.082555 | Accelerating Clean Water and Conservation Outcomes in | Innovative Nutrient and Sediment Reduction | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Ex. 4-E | "Environmental Programs and Management." The IIJA appropriated funds which "shall be for" EPA's Chesapeake Bay Program, IIJA § 601, |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Shenandoah Valley (VA) | Grants Program | | Amended Compl. ¶¶ 27–29, 159–62 | 135 Stat. at 1396, the "goal" of which is "restoring and protecting the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem," including through "assistance grants [] to nonprofit organizations." 33 U.S.C. § 1267(a)(2), (a)(4), (d)(2) |
| USDA | AM22FFWPA0013 | Collaborative Farm Worker and Meatpacking Worker 14-State COVID Relief Fund Project | Agricultural Marketing Service Farm and Food Worker Relief | Pasa | Pasa Decl., Ex. 12-B<br><br>Amended Compl. ¶¶ 47–50, 171–72 | "Agricultural Programs." The Consolidated Appropriations Act of 2021 appropriated funds that USDA "shall use" for "grants and loans" to farmers and other food workers on the frontlines of the COVID-19 pandemic. Pub. L. 116-260 § 751, 134 Stat. 1182, 2107.<br><br>"Specialty Crop Block Grants." The Consolidated Appropriations Act of 2021 appropriated funds to USDA for "Specialty Crop Block Grants" "to remain available until expended." Pub. L. 116-260 § 752, 134 Stat. 1182, 2108.<br><br>Under the Specialty Crops Competitiveness Act of 2004, Specialty Crop Block Grants are made by USDA "to enhance the competitiveness of specialty crops," Pub. L. 108-465 § 101, 118 Stat. 3882, 3882, and include "multistate programs." Agriculture Improvement Act of 2018, Pub. L. 115-334 § 10107, 132 Stat. 4490, 4905–06 |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| USDA | 2022-70416-37195 | Subaward with National Young Farmers Coalition | American Rescue Plan Technical Assistance Investment Program | RAFI-USA | Amended Compl. ¶¶ 51–54, 132–37 | "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups." The American Rescue Plan Act of 2021 appropriated funds to this program that USDA "shall" use to provide "technical assistance" and other support to "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2 § 1006, 135 Stat. 4, 13 (Mar. 11, 2021).<br><br>"USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters." The IRA amended Section 1006 of the American Rescue Plan Act and appropriated funds to, among other things, "provide . . . technical assistance" on agriculture issues "to underserved farmers, ranchers, or forest landowners." IRA § 22007(a), 136 Stat. at 2022–23. |
| USDA | NR225F48XXXXC002 | Organic Technical Staffing Assistance | Conservation Stewardship Program: Organic Technical Assistance Grant | Marbleseed | Marbleseed Decl., Ex. 10-C<br><br>Amended Compl. ¶¶ 41–43, 123–131 | "Additional Agricultural Conservation Investments." The IRA appropriated funds to USDA's "conservation stewardship program" and other programs—funds that "shall" be available for agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–2016.<br><br>"Conservation Stewardship Program." USDA "shall carry out [the] conservation stewardship program to encourage producers to address priority resource concerns and improve and conserve the quality and condition of natural resources in a comprehensive manner." 16 U.S.C. § 3839aa-22. |
| USDA | NR223A75000 3C062 | Subaward with RAFI-USA | Conservation Technical Assistance Cooperative Agreement | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3-D<br><br>Amended Compl. ¶¶ 24–26, 123–131 | "Conservation Technical Assistance." IRA appropriates funds to USDA "to provide conservation technical assistance through the Natural Resources Conservation Service." IRA § 21002(a), 136 Stat. at 2018.<br><br>"Conservation Technical Assistance Fund." The Soil Conservation and Domestic Allotment Act of 1935 appropriates funds to USDA "to provide permanently for the control and prevention of soil erosion to preserve soil, water, and related resources, promote soil and water quality, control floods, [and] . . . protect public health, public lands and relieve unemployment," among other purposes. 16 U.S.C.A. §§ 590a, 590f(b). |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| USDA | FSA24CPT0014403 | Distressed Borrower Technical Assistance | Distressed Borrower Assistance Network Program | RAFI-USA | RAFI Decl., Ex. 13-D<br><br>Amended Compl. ¶¶ 51–54, 146–49 | "Farm Loan Immediate Relief for Borrowers with at-Risk Agricultural Operations." USDA "shall" use IRA funds for this program to "provide relief" to "distressed borrowers . . . whose agricultural operations are at financial risk as expeditiously as possible." IRA § 22006, 136 Stat. at 2021.<br><br>The Consolidated Farm and Rural Development Act further empowers USDA to "compromise, adjust, reduce, or charge-off debts or claims," among other authorities. 7 U.S.C. 1981(b)(4). |
| USDA | NR242D37XXXXG002 | In Pennsylvania to help improve grazing success and associated economic, environmental, and social co-benefits, including animal health, soil health, carbon sequestration, cost savings, water quality | Environmental Quality Incentives Program – Conservation Innovation Grants | Pasa | Pasa Decl., Ex. 12-D<br><br>Amended Compl. ¶¶ 47–50, 123–131 | "Additional Agricultural Conservation Investments." The IRA appropriates funds to USDA's "environmental quality incentives program,"—funds that "shall" be available for agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–2016.<br><br>Under the "Environmental Quality Incentives Program," USDA "shall provide payments to [certain] producers," 16 U.S.C. § 3839aa-2(a), to "promote agricultural production, |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | forest management, and environmental quality as compatible goals, and to optimize environmental benefits." *Id.* § 3839aa. |
| USDA | NR243A750003C062 | Expanding RAFI-USA's Conservation Resources for Resilient Farms Project | Equity in Conservation Outreach Cooperative Agreement | RAFI-USA | RAFI Decl., Ex. 13-B<br><br>Amended Compl. ¶¶ 51–54, 123–131 | *See* "Additional Agricultural Conservation Investments" program, "Environmental Quality Incentives Program," the "Conservation Stewardship Program," and the "Conservation Technical Assistance Fund," *supra*.<br><br>*See also* "Agricultural Conservation Easement Program," which USDA "shall establish for the conservation of eligible land and natural resources through easements or other interests in land." 16 U.S.C.A. § 3865(a). |
| USDA | NR243A750003C045 | Deliver outreach and education programming to increase awareness of and participation in NRCS programs, services and leadership opportunities in agriculture and natural resource conservation in Kentucky. | Equity in Conservation Outreach Cooperative Agreement | Organic Association of Kentucky (OAK) | OAK Decl., Ex. 11-B<br><br>Amended Compl. ¶¶ 44–46, 123–131 | *See* "Additional Agricultural Conservation Investments" program "Environmental Quality Incentives Program," the "Conservation Stewardship Program," the "Conservation Technical Assistance Fund," and the "Agricultural Conservation Easement Program," *supra*. |
| USDA | FSA24GRA0011586 | Increase Land, Capital, and Market Access for Underserved Farmers on a Mid-size National Landscape using New | Increasing Land, Capital, and Market Access Program | Agrarian Trust | Agrarian Trust Decl., Ex. 2-A | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups." The American Rescue Plan Act of 2021 appropriated |

**J.A. 2133**

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Model, Agrarian Commons | | | Amended Compl. ¶¶ 22–23, 132–37 | funds that USDA "shall" use to provide "technical assistance," "grants and loans" to "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2 § 1006, 135 Stat. 4, 13 (Mar. 11, 2021).<br><br>"USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters." The IRA amended Section 1006 of the American Rescue Plan Act and appropriated additional funds to benefit "underserved farmers, ranchers, or forest landowners" and those who "experienced discrimination . . . in Department of Agriculture farm lending programs," and to "address racial equity issues" within USDA. IRA § 22007, 136 Stat. at 2022–23. |
| USDA | FSA24CPT0013706 | Gaining New Ground | Increasing Land, Capital, and Market Access Program | RAFI-USA | RAFI Decl., Ex. 13-F<br><br>Amended Compl. ¶¶ 51–54, 123–131 | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups" program, and "USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters" program, *supra*. |
| USDA | FSA23CPT0013706 | Gaining New Ground - Subaward with RAFI-USA | Increasing Land, Capital, and Market Access Program | Alliance for Agriculture | Alliance for Agriculture Decl., Ex. 3-B. | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups" program, and "USDA Assistance and Support for |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | Amended Compl. ¶¶ 24–26, 123–131 | Underserved Farmers, Ranchers, Foresters" program, *supra*. |
| USDA | NR233A750004G045 | Expands markets for climate-smart dairy, beef and poultry industry in DE, NC, NJ, NY, MD, OH, PA, SC, TN, VA and WV and supports the implementation and monitoring of climate-smart practices. | Partnerships for Climate-Smart Commodities Program | Conservation Innovation Fund | Cons. Innovation Fund Decl., Ex. 7-A<br><br>Amended Compl. ¶¶ 34–36, 169–170 | The "Commodity Credit Corporation Charter Act" created the Commodity Credit Corporation as an arm of USDA for the purpose of "stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds, and fibers . . . and of facilitating the orderly distribution of agricultural commodities." 15 U.S.C. § 714.<br><br>"Additional Agricultural Conservation Investments." The IRA appropriated funds to USDA's Commodity Credit Corporation that "shall" be available for agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–2016. |
| USDA | NR233A750004G045 | Subaward with Conservation Innovation Fund | Partnerships for Climate-Smart Commodities Program | Alliance for the Shenandoah Valley | Alliance for the Shenandoah Decl., Exs. 4-A, 4-B<br><br>Amended Compl. ¶¶ 27–29, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra*. |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | |
|---|---|---|---|---|---|
| USDA | NR243A75000 4G010 | Expands climate-smart wheat, grain, specialty and organic crop markets in IA, IL, IN, KS, KY, MI, MN, MO, ND, NE, OH, SD, TN, WI and supports farmer CS practice implementation and monitoring. | Partnerships for Climate-Smart Commodities Program | Marbleseed | Marbleseed Decl., Ex. 10-B<br><br>Amended Compl. ¶¶ 41–43, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra*. |
| USDA | NR233A75000 4G025 | Expands markets in the Eastern US for climate-smart dairy, grain, livestock, organic and specialty crops; supports farmer and rancher climate-smart practice implementation and monitoring | Partnerships for Climate-Smart Commodities Program | Pasa | Pasa Decl., Ex. 12-A<br><br>Amended Compl. ¶¶ 47–50, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra*. |
| USDA | NR233A75000 4G092 | Expand markets for climate-Smart grass-fed lamb, grass fed beef, corn, soybeans, small grains, produce, dairy, agroforestry and hemp in Kentucky; supports socially disadvantaged farmers | Partnerships for Climate-Smart Commodities Program | Organic Association of Kentucky (OAK) | OAK Decl., Ex.11-D<br><br>Amended Compl. ¶¶ 44–46, 169–170 | *See* "Commodity Credit Corporation Charter Act" and "Additional Agricultural Conservation Investments," *supra*. |
| USDA | NR233A75000 4G080 | Subaward with A Greener World (AGW) | Partnerships for Climate-Smart | RAFI-USA | RAFI Decl., Ex. 13-J | *See* "Commodity Credit Corporation Charter Act" and "Additional |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | Commodities Program | | Amended Compl. ¶¶ 51–54, 169–170 | Agricultural Conservation Investments," *supra*. |
|---|---|---|---|---|---|---|
| USDA | FSA23CPT0013667 | Resources for Resilient Farms | Rural Development Policy Cooperative Agreement | RAFI-USA | RAFI Decl., Ex. 13-L<br><br>Amended Compl. ¶¶ 41–43, 132–137 | *See* "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups" program, and "USDA Assistance and Support for Underserved Farmers, Ranchers, Foresters" program, *supra*.<br><br>*See also* "Rural development policy cooperative agreements." The Rural Development Act of 1972 authorizes USDA to enter into cooperative agreements "to improve the coordination and effectiveness of Federal programs, services, and actions affecting rural areas," and that "serve the mutual interest of the parties in rural development activities." 7 U.S.C. § 2204b(b)(4)(A). |
| USDA | FSA23CPT0012856 | Collaborative Approaches for Impact for Philadelphia Urban and Innovative Agriculture | Urban Agriculture and Innovative Production Grant | Pasa | Pasa Decl., Ex. 12-C<br><br>Amended Compl. ¶¶ 47–50, 173 | "Food Supply Chain and Agriculture Pandemic Response." The American Rescue Plan Act of 2021 appropriated funds that USDA "shall use" to "make loans and grants" to "maintain and improve food and agricultural supply chain resiliency," among other things. American Rescue Plan Act § 1001, 135 Stat. at 11. |
| USDA | 24-DG-11052021-228 | Ready, Set, Grow San Diego | | City of San Diego | San Diego Decl., Ex. 20-A | "State and Private Forestry Conservation Programs." The IRA appropriated funds to USDA "to |

**J.A. 2137**

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Urban and Community Forestry Grant | | Amended Compl. ¶¶ 74–75, 142–145 | provide multiyear, programmatic, competitive grants" to states and local governments through the Urban and Community Forestry Assistance Program. IRA § 23003(a)(2), 136 Stat. at 2026.<br><br>"Urban and Community Forestry Assistance Program." This program is intended to "implement a tree planting program to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits." 16 U.S.C. § 2105(b)(5). |
| USDA | 23-DG-11094200-363 | Subaward of Ohio Department of Natural Resources | Urban and Community Forestry Grant | City of Columbus | Columbus Decl., Ex. 15-A<br><br>Amended Compl. ¶¶ 62–63, 142–45 | " *See* "State and Private Forestry Conservation Programs" and the "Urban and Community Forestry Assistance Program," *supra*. |
| USDOT | N/A | East Nashville Spokes | Active Transportation Infrastructure Investment Program | City of Nashville | Nashville Decl., Ex. 17<br><br>Amended Compl. ¶¶ 66–69, 166–168 | "Active Transportation Infrastructure Investment Program." The IIJA appropriated funds through 2026 that USDOT "shall" use to "carry out an active transportation infrastructure investment program to make grants, on a competitive basis, to eligible organizations to construct eligible projects to provide safe and connected active transportation facilities in an active transportation network or active |

**EXHIBIT 21 – List of Plaintiffs' Grants and Statutory Authorities**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | transportation spine." IIJA § 11529(a), (j), 135 Stat. at 612, 615. |
| USDOT | N/A | Electrify Music City | Charging and Fueling Infrastructure Grant Program | City of Nashville | Nashville Decl., Ex. 17<br><br>Amended Compl. ¶¶ 66–69, 163–165 | "Grants for Charging and Fueling Infrastructure." The IIJA appropriated funds to USDA "to establish a grant program to strategically deploy publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure along designated alternative fuel corridors or in certain other locations that will be accessible to all drivers of electric vehicles, hydrogen vehicles, propane vehicles, and natural gas vehicles." IIJA § 11401(a), 135 Stat. at 546; *id.* § 11101(b)(1)(C)(i)–(v), 135 Stat. at 445 |