No. 25-1575

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE SUSTAINABILITY INSTITUTE, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
*et al.*,
*Defendants-Appellants.*

———————————————————————

### PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' OPENING BRIEF

———————————————————————

Kimberley Hunter
Irena Como
Nicholas S. Torrey
Carl T. Brzorad
Spencer Gall
SOUTHERN ENVIRONMENTAL LAW CENTER
*136 East Rosemary Street, Suite 500*
*Chapel Hill, NC 27514*
(919) 967-1450
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
cbrzorad@selc.org
sgall@selc.org

Graham Provost
Elaine Poon
Jonathan Miller
PUBLIC RIGHTS PROJECT
*490 43rd Street, Unit #115*
*Oakland, CA 94609*
(510) 738-6788
graham@publicrightsproject.org
elaine@publicrightsproject.org
jon@publicrightsproject.org

Mark Ankcorn, Senior Chief Deputy
City Attorney
*1200 Third Avenue, Suite 1100*
*San Diego, California 92101-4100*
(619) 533-5800
mankcorn@sandiego.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................iii

INTRODUCTION ...........................................................................1

STATEMENT OF THE ISSUES ........................................................3

STATEMENT OF THE CASE............................................................4

I.   The Infrastructure Investment and Jobs Act and the Inflation Reduction Act...4

II.  Plaintiffs' Grant Awards ........................................................6

III. Executive Actions to Terminate Grants.......................................8

IV.  This Lawsuit ......................................................................10

V.   The Tucker Act and the Court of Federal Claims ...........................12

SUMMARY OF ARGUMENT.........................................................13

ARGUMENT ................................................................................18

I.   The Record Belies Defendants' Telling and Confirms Why the District Court
     Had Jurisdiction................................................................19

II.  The District Court Had Jurisdiction Over Plaintiffs' Freestanding
     Constitutional Claim ..........................................................21

     A.   The District Court's Jurisdiction Over Plaintiffs' Freestanding Separation
          of Powers Claim is Clearly Established and the Claim Is Meritorious....22

     B.   The Tucker Act and *California* are Irrelevant to the District Court's
          Jurisdiction over Plaintiffs' Freestanding Separation of Powers Claim...26

     C.   Plaintiffs' Separation of Powers Claim Is a Constitutional Claim..........28

     D.   Defendants' Remaining Arguments Apply Solely to Claims for Statutory
          Violations that Belong in an Alternative Forum—Not Constitutional
          Claims that Lack an Alternative Forum ....................................32

III. The District Court Had Jurisdiction Over Plaintiffs' Administrative Procedure
     Act Claims.......................................................................34

     A.   Unlike *California,* the Developed Record Here Demonstrates That
          Defendants Acted Against Entire Grant Programs..................................35

     B.   Plaintiffs May Enforce the Constitution and Federal Law......................38

     C.   Plaintiffs Seek Forward-Looking Injunctive and Declaratory Relief. .....41

i

D.    Plaintiffs' APA Claims Challenge Actions Not Committed to Agency Discretion ........................................................................................ 45

IV.   The Equities Favor Plaintiffs ............................................................ 49

A.    Absent Relief, Plaintiffs' Non-Monetary Harms Are Serious and Irreparable ................................................................................... 50

B.    Enjoining Defendants' Unlawful Actions Causes No Meaningful Harm to Defendants. ............................................................................... 52

C.    Injunctive Relief Is Needed to Protect the Public Interest. .............. 55

CONCLUSION ........................................................................................ 56

# TABLE OF AUTHORITIES

## Cases

*Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112
(4th Cir. Apr. 17, 2025)............................................................ 55

*AIDS Vaccine Advocacy Coalition v. United States Department of State*,
770 F. Supp. 3d 121 (D.D.C. 2025).........................................31

*American Federation of Government Employees v. Trump*, No. 25-cv-03698,
2025 WL 1482511 (N.D. Cal. May 22, 2025)...........................31

*American Forest Research Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ..................................................30

*Armstrong v. Exceptional Child Center, Inc.*, 474 U.S. 320 (2015) .......................33

*Bell v. Hood*, 327 U.S. 678 (1946)...........................................................26

*Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985) ....................41

*Board of Governors of Federal Reserve System v. MCorp Financial, Inc.*,
502 U.S. 32 (1991) ................................................................ 33, 34

*Boaz Housing Authority v. United States*,
994 F.3d 1359 (Fed. Cir. 2021)............................................ 39, 44

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)................................................. *passim*

*California v. U.S. Department of Education*, 132 F.4th 92 (1st Cir. 2025) .............36

*California v. U.S. Department of Education*,
769 F. Supp. 3d 72 (D. Mass. 2025)........................................46

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ............................30

*Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ..........................................25

*Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998)........................39

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).......24, 32

*Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC,
2025 WL 1131412 (D.D.C. Apr. 16, 2025).............................. 36, 49

*Collins v. Yellen*, 594 U.S. 220 (2021) .....................................................25

*Common Cause Rhode Island v. Gorbea*, 970 F.3d 11 (1st Cir. 2020)....................53

*Community Legal Services in East Palo Alto v. U.S. Department of Health and Human Services*, No. 25-cv-02847, 2025 WL 1393876 (N.D. Cal. April 29, 2025) ................................................................................................37

*Community Legal Services in East Palo Alto v. U.S. Department of Health and Human Services*, 137 F.4th 932 (9th Cir. 2025) ............................................ 49, 53

*Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001)......................29

*Dalton v. Specter*, 511 U.S. 462 (1994) .......................................... *passim*

*Demore v. Kim*, 538 U.S. 510 (2003)....................................................27

*Department of Education v. California*, 145 S. Ct. 966 (2025)...................... *passim*

*Does 1-26 v. Musk*, 771 F. Supp. 3d 637 (D. Md. 2025) ........................................31

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) .................................................................25

*Great-West Life & Annuity Insurance Company v. Knudson*, 534 U.S. 204 (2002)..........................................................13, 44

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................47

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ...................................51

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ............................ 25, 32

*Ingersoll–Rand Company v. United States,* 780 F.2d 74 (D.C. Cir. 1985).............40

*Johnson v. Robison*, 415 U.S. 361 (1974)................................................27

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994). ...............................43

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) .........56

*Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) ............................................... 52, 56

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995).......................... 12, 27, 34

*Lincoln v. Vigil,* 508 U.S. 182 (1993)............................................ *passim*

*Maine Community Health Options v. United States*, 590 U.S. 296 (2020) .............44

*Maryland v. King*, 567 U.S. 1301 (2012)................................................53

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)......................................38

*Meridian Investments v. Federal Home Loan Mortgage Corporation*, 855 F.3d 573 (4th Cir. 2017) .....................................................12

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2022) ........................... 46, 47

*N.C. Growers' Association, Inc. v. United Farm Workers*,
   702 F.3d 755 (4th Cir. 2012) ..................................................................1

*National Council of Nonprofits v. Office of Management & Budget*,
   736 F. Supp. 3d (D.D.C. 2025) .............................................................54

*National Treasury Employees Union v. Vought*, No. 25-cv-0381,
   2025 WL 942772 (D.D.C. Mar. 28, 2025) ............................................31

*National Center for Manufacturing Sciences v. United States*,
   114 F.3d 196 (Fed. Cir. 1997) ...............................................................44

*New Motor Vehicle Board of California v. Orrin W. Fox Co.*,
   434 U.S. 1345 (1977) ..................................................................... 53, 54

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................... 52, 53

*Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762 (2025) ......................33

*Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990) ....................22

*Quinteros-Mendoza v. Holder*, 556 F.3d 159 (4th Cir. 2009) .................................46

*Richardson v. Morris,* 409 U.S. 464 (1973) ...................................................... 13, 43

*Rochester Pure Waters District v. Environmental Protection Agency*,
   960 F.2d 180 (D.C. Cir. 1992) ...............................................................22

*Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020)................................ 50

*School Committee of Burlington v. Department of Education
   of Massachusetts*, 471 U.S. 359 (1985)..................................................42

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) ........................................47

*South Dakota v. Dole*, 483 U.S. 203 (1987)........................................................22

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985) ..............40

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022)..................................... 26, 28

*Tootle v. Secretary of Navy*, 446 F.3d 167 (D.C. Cir. 2006) .................................27

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)..............................................21

*United States v. J&E Salvage Company*, 55 F.3d 985 (4th Cir. 1995) ............ 39, 40

*United States v. King*, 395 U.S. 1 (1969)...........................................................13

*United States v. Testan,* 424 U.S. 392 (1976) .......................................................12

*Webster v. Doe*, 486 U.S. 592 (1988)................................................................27

*Weinberger v. Salfi*, 422 U.S. 749 (1975) ...............................................................27

*Widakuswara v. Lake*,
No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ........................... 27, 28

*Widakuswara v. Lake*, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc)......28

*Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 597 (1952) ....................32

**Statutes**

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4.................... 5, 6

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818
(2022)........................................................................................................ 4, 5, 24

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58,
135 Stat. 429 (2021)...........................................................................................4, 5

5 U.S.C. § 706 ..............................................................................................................10

28 U.S.C. § 1491 ...........................................................................................................12

42 U.S.C. § 7438 .................................................................................................... 23, 46

**Constitutional Provisions**

U.S. Const., Art. I, § 8, cl. 1.................................................................................. 22, 29

U.S. Const., Art. I, § 9, cl. 7.................................................................................. 22, 29

**Other Authorities**

Brief of Appellants, *112 Genesee Street, LLC v. United States*, No. 25-1373
(Fed. Cir. Mar. 14, 2025)............................................................................... 37, 38

Memorandum from William H. Rehnquist, Assistant Attorney General, Off. Of
Legal Couns., to Edward L. Morgan, Deputy Couns. to the President (Dec. 1,
1969)........................................................................................................................25

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025)........................ 8, 22, 24

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025)...............................8, 22

**Regulations**

2 C.F.R. § 200.205 (2025).............................................................................................6

2 C.F.R. § 200.328 (2025).............................................................................................7

2 C.F.R. § 200.329 (2025).............................................................................................7

2 C.F.R. § 200.330 (2025).............................................................................................7

2 C.F.R. §§ 200.500–521 (2025)..................................................................................7

# INTRODUCTION

This case arises from Defendants' illegal campaign to dismantle federal grant programs mandated and funded by Congress for reasons that stand in exact opposition to what Congress commanded. In this case, discovery confirmed that Defendants did not review individual grant agreements or grant-funded projects out of a desire to reprioritize funding or ensure the programs are well run. Instead, they eliminated entire grant programs in bulk. And consistent with nullifying these programs, Defendants have taken no steps to reallocate appropriated funding to other qualified grantees. Simply put, Defendants are defying the express will of Congress.

Defendants are openly violating the Constitution, which gives the power of the purse to Congress and requires the Executive to faithfully execute the laws Congress has passed. And they are flouting the Administrative Procedure Act ("APA"), which ensures that federal agencies do not act on "political winds and currents" without adherence to "law and legal process." *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring).

In this case, as in others across the country, Defendants barely attempt to defend their actions as lawful. Indeed, here they have actually consented to judgment on Plaintiffs' APA claims, which include substantive violations of the

1

Constitution and federal statutes. But just as they disregard Congress, Defendants also object to any check from the federal courts. Throughout this case, Defendants have engaged in a series of shifting arguments all with one common aim: manufacturing facts and skewing jurisprudence to ensure no court can hear Plaintiffs' claims or provide the relief they seek.

First, Defendants seek to miscast the facts of this case. Defendants insist they were owed deference to engage in an individualized review of grants and determine which ones were consistent with agency priorities. But after discovery made matters clear, the District Court concluded that Defendants illegally canceled entire grant programs without any review of individual grants for the sole reason that the programs themselves were inconsistent with the President's priorities.

Next, Defendants have advanced a series of shifting legal theories to avoid the claim at the core of this case—Defendants' violation of the constitution's separation of powers. Defendants' latest approach is to argue that this well-plead and thoroughly supported constitutional claim is not constitutional at all. And Defendants hope to evade Plaintiffs' APA claims by convincing the Court that Plaintiffs' request for forward-looking equitable relief against Defendants' broad and unlawful policies should be limited to an action for backward-looking "money damages" in the Court of Federal Claims. But in briefing before the Court of

Federal Claims, the government has asserted that court lacks jurisdiction over similar claims.

So, Defendants' positions net out to this: The Executive can flout Article I of the Constitution and the APA by abruptly terminating congressionally mandated grant programs, and refuse to spend congressionally appropriated funding for the purposes Congress specified with no reasoned decisionmaking and *no* court can check these abuses.

This Court should reject Defendants' latest attempt to evade judicial review. The District Court had jurisdiction over Plaintiffs' claims and correctly ruled in Plaintiffs' favor and granted them the equitable relief they requested—the ability to continue working to deliver promised projects to the communities they serve. This court should uphold the District Court's orders.

## STATEMENT OF THE ISSUES

1) Whether Plaintiffs' claim that Defendants violated the separation of powers when they refused to carry out congressional grant programs which were duly appropriated and directed to specific purposes are "constitutional" claims.

2) Whether Plaintiffs have a forum to seek equitable and declaratory relief for their freestanding constitutional claim.

3

3) Whether Plaintiffs have a forum to bring substantive and procedural Administrative Procedure Act claims that seek to vacate Defendant's actions terminating statutory grant programs.

4) Whether the District Court abused its discretion when it concluded the equities favor Plaintiffs.

## STATEMENT OF THE CASE

For decades, Congress has used federal grant programs to efficiently improve communities throughout the United States. By enlisting nonprofit organizations and local governments, Congress directs federal money where it is most needed without having to create new federal infrastructure. Congress designs these programs with specific parameters and appropriates money to fund them. Grantees, including Plaintiffs, work hard to turn Congress's objectives into reality on the ground.

## I.     The Infrastructure Investment and Jobs Act and the Inflation Reduction Act.

In 2021, Congress passed and the President signed into law the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021) ("IIJA"), which directed investments in transportation, broadband, water systems, and energy infrastructure via federal grant programs for nonprofits and cities. In 2022, Congress passed and the President signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA"),

which created programs to fight greenhouse gas pollution, promote environmental justice, and more. Like with the IIJA, Congress structured the IRA to achieve a significant portion of its objectives through grants to nonprofits and cities.

In the IRA and IIJA, Congress established and funded a host of bespoke grant programs and gave detailed commands for how they must be administered. For an example from the IRA, Congress created the "Environmental and Climate Justice Block Grants" program, instructing that EPA "shall" use $2.8 billion in appropriated funds "to award grants for periods of up to three years to eligible entities to carry out" certain kinds of environmental projects "that benefit disadvantaged communities." IRA § 60201, 136 Stat. at 2078. For an example from the IIJA, Congress appropriated $1.96 billion to EPA for "Environmental Programs and Management" and directed that $238 million of which "shall be for" EPA's Chesapeake Bay Program, IIJA § 601, 135 Stat. at 1396. The purpose of this program is "to achieve the goal of restoring and protecting the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem," including through "assistance grants[] to nonprofit organizations." 33 U.S.C. § 1267(a)(2), (a)(4), (d)(1).

The IRA and IIJA also built on programs Congress established previously. For example, in the American Rescue Plan Act of 2021, Congress appropriated over $1 billion to the Secretary of Agriculture, directing that the Secretary "shall"

5

use those funds on various agricultural projects that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2, 135 Stat. 4, 13–14. Then in the IRA, Congress appropriated an additional $2.9 billion to the Department of Agriculture to fund grants through this program for various agricultural projects, including the American Rescue Plan Technical Assistance Investment Program and Increasing Land Access grants to benefit "underserved farmers, ranchers, or forest landowners," and those who "experienced discrimination . . . in Department of Agriculture farm lending programs." IRA § 22007, 136 Stat. at 2021–23.

## II.    Plaintiffs' Grant Awards.

Plaintiffs are nonprofits and local governments that answered the call to participate in the programs that Congress established and funded. Some Plaintiffs were awarded grants directly, while others are sub-recipients of grant programs led by other groups. Plaintiffs that received awards directly qualified for these grants through a competitive application process, in which they demonstrated that they were the recipients "most likely to be successful in delivering results based on the program objectives," 2 C.F.R. § 200.205 (2025).

After the awards were made, most Plaintiffs entered into formal grant agreements, although for some Plaintiffs, these are not yet final. These agreements commit Plaintiffs to comprehensive reporting and auditing requirements to ensure

6

that the taxpayer money entrusted to them is well spent. *See, e.g.*, *id*. §§ 200.328–200.330; 200.500–200.521; Pasa Decl., J.A. 1368–1538; Sustainability Institute Decl., J.A. 190–233. Plaintiff subgrantees do not have formal agreements with the government, but agreements with direct grantees where they likewise commit to engage in work and comply with reporting requirements. *See, e.g.*, Bronx River Alliance Decl., J.A. 671; Earth Island Decl, J.A. 885; Columbus Decl., J.A. 1991.

For many of Plaintiffs' grants, the relevant agencies agreed to provide funding up to a specified dollar amount, over a specified time, for specified work to advance Congress's objectives. In exchange, Plaintiffs committed to use the grant funds to complete their agency-approved projects on an agency-approved timeline. *See, e.g.*, Leadership Counsel Decl., J.A. 922–923 (EPA awarded a three-year grant to achieve congressional goals like reducing pollution, increasing community climate resilience, and building community capacity in disadvantaged communities).

These multi-year grant projects require long term partnership between agencies and the grantees. Grantees like Plaintiffs do not hold the funding in their own bank accounts. Instead, they withdraw money from government-controlled accounts incrementally, as-needed to reimburse themselves for work and expenses. *See, e.g.*, Sustainability Institute Decl., J.A. 196–197.

III.    **Executive Actions to Terminate Grants.**

The day he took office, President Trump issued two executive orders that, among other things, targeted the programs Congress established and funded in the IRA and IIJA. In *Unleashing American Energy*, the President purported to "[t]erminat[e] the Green New Deal" by instructing that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act . . . or the Infrastructure Investment and Jobs Act." Exec. Order No. 14,154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025) ("Energy EO"). The Energy EO also dictated that "no Federal funding be employed in a manner contrary to the principles outlined in" a list of presidential policies and specifically prohibited agencies from disbursing any funds under the IRA and IIJA without direct approval from the President's political appointees. *Id.* §§ 2, 7. In *Ending Radical and Wasteful Government DEI Programs and Preferencing*, the President directed each agency to "terminate" within sixty days all "'environmental justice' offices and positions" and all "'equity-related' grants or contracts." Exec. Order No. 14,151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) ("Equity EO").

These orders prompted federal officials to begin abolishing entire grant programs *en masse*, with no individualized consideration of specific grant agreements. Discovery below revealed that Defendants eliminated entire grant programs based on their disagreement with Congress's decisions to create them.

8

For example, Environmental Protection Agency Assistant Deputy Administrator

Travis Voyles averred in a sworn declaration that, in a single day, he "decided that

certain grant *programs* . . . should be terminated for policy reasons." J.A. 2370-

2371 (emphasis added). Defendant EPA purported to terminate these programs

shortly thereafter, and grant managers were instructed to provide only boilerplate

"Copy/paste email language from Grant Termination [memo]," and send a form

termination letter by email to each grantee. D.Ct. Dkt. 132-1 at 57–59 (M. Wise

email re termination procedure – Feb. 21, 2025); *see also* D.Ct. Dkt. 118-1 at 1–7

(EPA Grant Termination Standard Operating Procedure); D.Ct. Dkt. 128-8 at 1–2

(Boilerplate Termination Letter). In fact, for every grant program involved in this

case, "[n]ot one document" produced in discovery "showed any individualized

review of the grant of any Plaintiff in this action before the grant was terminated or

designated for termination." J.A. 6.

The appropriations for many of Plaintiffs' grants expire in 2026, *see* 42

U.S.C. § 7438(a), and reallocating the funding would entail complex processes that

could take months or even years. But the record shows that Defendants have not

taken any action to reallocate the money appropriated and directed by Congress to

an alternative set of grantees. Rather, Defendants have consistently referred to the

cancellation of grants and grant programs as "taxpayer savings." *See, e.g.*, D.Ct.

Dkt. 64 at 8 & n.7. In fact, the President himself noted in a joint address to

9

Congress that he had "terminated" "the Green New Scam" —his pejorative term for the IRA and IIJA.[1]

## IV.    This Lawsuit

As their grants were placed in limbo and began to be terminated, Plaintiffs filed this suit in the U.S. District Court for the District of South Carolina, to address the ongoing injuries from Defendants' violations of the Constitution and the APA.

While Plaintiffs' standing is tied to their individual grants, their legal claims and requested relief are broader. Specifically, Plaintiffs challenged Executive Orders, agency memoranda, and other agency actions that led to the freezing and termination of their grants, J.A. 149-152. For relief, they requested: declaratory judgments that the Executive Orders directing the termination of congressionally mandated grant programs were unconstitutional; declaratory judgments that agency actions to freeze and terminate federal grant programs was unconstitutional; an order from the Court to hold unlawful and set aside agency actions to terminate federal grants and grant programs pursuant to 5 U.S.C. § 706; and preliminary and permanent relief to enjoin Defendants from continuing to freeze or terminate grants going forward. J.A. 149-152.

---

[1] Congressional Record Online, *Address by the President Delivered to a Joint Session of Congress on March 4, 2025--PM 12* (Mar. 4, 2025), https://perma.cc/5H47-88B8.

Because in other litigation Defendants have engaged in shifting justifications for their freezing and termination of federal grants and grant programs, Plaintiffs requested discovery to ascertain the precise basis for which Defendants froze and terminated their grants. D.Ct. Dkt. 25. Once this discovery was produced, it became clear that Defendants had terminated Plaintiffs grants as part of a wholesale attack on the grant programs themselves, without any steps to review individual grants, what they were for, and how they were working to accomplish the goals Congress had directed. J.A. 6.

When these facts came to light, Defendants largely ceased defending their conduct on the merits. Subject to jurisdictional objections, Defendants informed the district court that they "[did] not contest judgment on the merits of [the] APA claims"—which include allegations that Defendants violated the separation of powers—and made scant attempt to defend their unconstitutional behavior more generally. D.Ct. Dkt. 153 at 1.[2] Defendants did not consent to judgment on Plaintiffs' freestanding constitutional claims, but neither did they offer a substantial defense that their actions did not violate separation of powers. D.Ct. Dkt. 153 at 1.

After two hearings and two rounds of discovery to elucidate Defendants' actions, the District Court issued an order entering partial judgment and a permanent injunction on the uncontested APA claims, and a preliminary injunction

---

[2] Their concession excluded six grants that are not part of this appeal.

on Plaintiff's freestanding constitutional claim. J.A. 24. Although the District Court ruled that Defendants' unlawful behavior took place at a broad programmatic level with far-reaching effect across four federal agencies, the injunctions were narrowly tailored to provide relief to Plaintiffs only. J.A. 8, J.A. 20. Defendants appealed and sought a stay of the District Court's orders, which a divided panel granted. Dkt. 38.

## V.    The Tucker Act and the Court of Federal Claims.

Because Defendants rely heavily on the Tucker Act and the jurisdiction of the Court of Federal Claims, a brief overview of both is warranted. Enacted in 1887, the Tucker Act represents the culmination of efforts to enable private parties to sue the United States for money damages. *See Meridian Inv., v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578 & n.2 (4th Cir. 2017) (describing history of Tucker Act). Congress passed the Tucker Act "to allow private claims against the government, including contract claims," and vested exclusive jurisdiction in the Court of Federal Claims when the damages claimed exceed $10,000. *Id.* at 578; *see also* 28 U.S.C. § 1491.

The Court of Federal Claims does not have jurisdiction simply because money is involved. Rather, it is authorized to hear claims involving "a substantive right enforceable against the federal government *for money damages*." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (emphasis added) (citing *United States v. Testan,* 424 U.S. 392, 398 (1976)). Thus, while the Court of Federal

12

Claims can hear disputes involving constitutional provisions deemed money-mandating, such as takings claims under the Fifth Amendment, the court undisputedly lacks jurisdiction over separation of powers claims. *Id.*

The Court of Federal Claims also cannot provide equitable remedies. It "does not have the general equitable powers of a district court to grant prospective relief," and the Supreme Court has "stated categorically that 'the Court of Claims has no power to grant equitable relief.'" *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (quoting *Richardson v. Morris,* 409 U.S. 464, 465 (1973)); *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (distinguishing *Bowen*'s "going forward" relief from an injunction solely to enforce a contractual obligation to pay money past due). Likewise, the Court of Federal Claims lacks authority to issue declaratory judgments. *United States v. King*, 395 U.S. 1, 5 (1969).

## SUMMARY OF ARGUMENT

The District Court correctly enjoined Defendants' unlawful conduct and should be affirmed.

***First***, Defendants spend most of their brief defending a counterfactual, but the record speaks for itself: Defendants dismantled entire programs because they disagree with the decisions of Congress to create them. This is not a case in which Defendants exercised permissible discretion to reallocate funding for specific

13

grant-based projects. Instead, as the District Court recognized, the record does not "show[] any individualized review of the grant of any Plaintiff in this action before the grant was terminated or designated for termination." J.A. 6. Debunking this misconception refutes the premise for many of Defendants' arguments.

***Second***, the District Court has jurisdiction over Plaintiffs' freestanding constitutional claim. Defendants' contrary arguments—which have shifted through every stage of this case—continue to be wrong. After their earlier contentions based on overreading of the Tucker Act and *Department of Education v. California*, 145 S. Ct. 966 (2025), fell apart, Defendants stopped disputing that federal district courts have jurisdiction to hear "bona fide" separation of powers claims. Instead, Defendants now try the novel argument that Plaintiffs' constitutional claims are not constitutional at all. With this latest attempt to evade review, Defendants would simply write the Spending and Appropriations clauses—which grant Congress exclusive power over the Nation's purse—out of the Constitution. And Defendants ignore the long line of cases holding that Executive agencies violate the *Constitution* when they withhold funding appropriated by Congress because they disagree with Congress's policy aims.

To mount this newest argument, Defendants rely almost entirely on a misreading of *Dalton v. Specter*, 511 U.S. 462 (1994). That case stands for the unremarkable proposition that not "every" statutory violation by the Executive is

"*ipso facto*" a constitutional violation. *Id.* at 472–73. Specifically, *Dalton* held that when Congress has left a decision to the President's limitless discretion, that discretionary decision is not subject to judicial review. But *Dalton* did not hold that the Executive's infringement on specific constitutional powers of Congress ceases to be a constitutional violation simply because a statutory violation is also involved.

Here, where Plaintiffs' separation of powers claim stems from decisions outside the bounds of lawful discretion, *Dalton* is inapplicable. Defendants' remaining arguments rely on inapposite cases about *statutory* violations, which have no bearing on *constitutional* claims for which there is no other judicial review available. Defendants would deprive Plaintiffs of *any* forum for the violation of their constitutional rights—something the Supreme Court has never upheld.

**Third**, Defendants' attempts to evade Plaintiffs' APA claims fare no better. These arguments primarily center on *California* order, but this case is factually and legally different from *California* in key ways that demand a different outcome. Unlike the APA claim on appeal in *California*, the APA claims in this case assert— and discovery has confirmed—that Defendants took unreasoned and unconstitutional actions to cancel entire grant programs with no consideration of Plaintiffs' individual grants or their terms and conditions. Indeed, the fact that Defendants have consented to judgment on Plaintiffs' claims about those unlawful,

15

high-level agency decisions belies their attempt to argue that this case involves only the individual terms and conditions of Plaintiffs' grant awards.

The longstanding legal precedent undisturbed by *California* likewise confirms the District Court had jurisdiction to enter judgement on Plaintiffs' APA claims. The source of the rights Plaintiffs seek to enforce are the Constitution and the APA, not their individual awards' terms and conditions. And, perhaps most importantly, the relief Plaintiffs seek—which is equitable and forward-looking—is relief that can only be granted by a district court. The Court of Federal Claims could provide Plaintiffs with no more than backward-looking money damages. This is wholly insufficient for Plaintiffs who do not seek compensation, but rather the ability to continue to deliver the projects they have promised their communities over the long term.

Defendants' remaining APA argument—that they enjoy unreviewable discretion—can be quickly discarded. Defendants rely heavily on *Lincoln v. Vigil,* 508 U.S. 182 (1993), but that case that could not be more different from this one. *Lincoln* involved a "lump-sum" payment with no specific directives or limitations from Congress. Here, Congress directed funding in specific ways, and the Executive is refusing to fund programs precisely because it disagrees with those directions. And unlike *Lincoln*, where the agency planned to spend the money

16

differently, Defendants are refusing a congressional command to implement the grant programs at all.

*Finally*, in addition to their jurisdictional arguments, Defendants object to the District Court's balancing of the equities. Defendants do not even address the deference owed to the District Court under the abuse-of-discretion standard and their equitable arguments should be rejected on that basis alone. In any event, Defendants are wrong: the equities overwhelmingly favor Plaintiffs. Since President Trump took office and Defendants started to freeze and then terminate grant programs, Plaintiffs have and continue to suffer significant irreparable harm. Much of this harm is non-monetary, including reputational injury, a loss of goodwill, and an inability to fulfill their organizational missions.

By contrast, Defendants have not established that they will be harmed and have filed no declaration or affidavit documenting harm. Defendants' argument boils down to a dislike of any judicial oversight on their unlawful behavior. Defendants overstate the breadth of the District Court's orders while ignoring the legal reasoning behind them. Defendants' insistence on continuing to flout the law unchecked should be rejected.

For similar reasons, the injunctions here are fully within the public interest. There is nothing more essential to the public interest than preserving our system of

government and the rule of law. Moreover, Congress designed and funded the grant programs at issue to improve lives and enhance the public good.

## ARGUMENT

The facts in this case are straightforward and confirmed by discovery. Congress created a set of federal grant programs, legislated with great specificity how money should be allocated, and appropriated funding to achieve outcomes on the ground. The executive branch followed this congressional direction and selected grantees, including Plaintiffs, to receive grant awards and achieve Congress's objectives. President Trump took over the Executive branch in January, 2025 and disagreed with Congress's priorities. He directed his administration to terminate grant programs inconsistent with his own priorities. His administration followed these orders and terminated grant programs *en masse*, without any consideration of individual grants or the impact to grantees.

Faced with this clear record, and a decision by Defendants to consent to judgment on Plaintiff's APA claims, the District Court correctly concluded that Plaintiffs prevailed on two sets of claims and issued two orders. The District Court concluded Plaintiffs were likely to succeed on their freestanding constitutional claim that Defendants' actions violated separation of powers and granted preliminary relief on that basis. In addition, the District Court ordered permanent

injunctive relief on Plaintiffs' substantive and procedural APA claims. The District Court had jurisdiction to issue both orders.

## I.     The Record Belies Defendants' Telling and Confirms Why the District Court Had Jurisdiction.

Underlying each of Defendants' attempts to evade judicial review is a straw man Defendants have clumsily built up and torn down. In Defendants' telling, they used their discretion to determine on an individual basis that "plaintiffs' projects do not comport with Administration priorities." Dkt. 52 at 35–36. Defendants' theory continues with the fiction that Plaintiffs subsequently moved to challenge these discretionary terminations of their own individual grants to obtain money damages.

This recital contradicts the facts of this case.

The District Court recognized that a full factual accounting of Defendants' actions would be necessary to determine its own jurisdiction. J.A. 44–47. As such, the Court made sure that it got complete information before ruling on Plaintiffs' claims. After reviewing Defendants' discovery and asking Defendants to identify with specificity all documentation related to the freezing and termination of Plaintiffs individual grants, the District Court found Defendants had not engaged in *any* review of the individual grants. J.A. 6. Rather, the District Court found Defendants had terminated the grants *en masse* because they did not like the entire grant programs. This finding is not surprising given the Presidents' Executive Order to "terminate" the "Green New Deal."

19

This factual reality makes clear that Defendants' actions could not have been based on reasoned conclusions that the specific grants at issue were inconsistent with Administration priorities. Without reviewing the specific grants in question Defendants had no way to know what those grants were intended to accomplish, or how well they were being administered. Their defenses, which in one way or another all stem from a theory that they have discretion to make choices about individual grants, are unavailing. Whether or not Defendants theoretically have such discretion, the record establishes that they did not employ it.

Plaintiffs' Complaint makes clear that their claims center on these high-level agency actions to terminate entire grant programs, not the individualized termination of their specific grant agreements. Plaintiffs' prayer for relief unambiguously does not include a request for money damages. Rather, Plaintiffs seek equitable relief to ensure the continuation of the grant programs and the ability to deliver promised work to their communities. Indeed, past due "damages" would not get Plaintiffs very far. The vast majority of Plaintiffs' grant projects had just begun when this litigation was filed and any such payments would be insignificant compared to the future years of work they have committed to.

It is true that some Plaintiffs are harmed by these high-level agency actions by virtue of their direct agreements with Defendants, but others are harmed because they are subgrantees and others do not yet have signed, finalized grant

20

agreements. And Defendants cannot use the fact that Plaintiffs have standing—i.e., have been concretely injured on an individualized basis—to recast Plaintiffs' claims as a dispute over their individual grant agreements. As the Supreme Court has emphasized, "an important difference exists" between a cause of action and a concrete injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). The two cannot be conflated.

In sum, Defendants' jurisdictional arguments all stem from a counterfactual version of events. A review of the full record and Plaintiffs' pleadings makes clear the District Court had jurisdiction and correctly ruled in Plaintiffs' favor.

## II. The District Court Had Jurisdiction Over Plaintiffs' Freestanding Constitutional Claim.

The heart of this case has always been the Constitution's separation of powers, which bars Defendants' efforts to seize Congress's power of the purse. This freestanding constitutional claim is the leading claim in Plaintiffs' Complaint and is central to every substantive brief Plaintiffs have filed.

Defendants have mounted various attempts to evade review of this claim, including a late-breaking effort to recast their unlawful behavior as purely statutory. But Defendants cannot escape that their actions significantly intrude on Congress's Article I power over the purse—a textbook separation of powers claim that is enhanced, not undermined, by the fact that it involves a wholesale assault on statutory grant programs.

**A.    The District Court's Jurisdiction Over Plaintiffs' Freestanding Separation of Powers Claim Is Clearly Established and the Claim Is Meritorious.**

The District Court properly ruled that Plaintiffs were likely to succeed on the merits of their freestanding constitutional claim that Defendants' actions violated separation of powers. The Spending and Appropriations Clauses of the Constitution. art. I, § 8, cl. 1; art. I, § 9, cl. 7, grant Congress—not the President—"exclusive" power over the Nation's purse, *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992), including the power to "attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Constitution assigned Congress power over the purse "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents . . . ." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

In briefing below, Plaintiffs highlighted several examples of Defendants' unconstitutional conduct: In the Energy EO, President Trump ordered agencies to "Terminat[e]" the IRA and IIJA, which he termed "the Green New Deal," by freezing all IRA and IIJA funds and prohibiting the disbursement of *any* such funds not deemed "consisten[t]" with a long list of Executive policies. Energy EO §§ 7, 2. In the Equity EO, the President ordered agencies to "terminate . . . all . . . 'equity-related' grants or contracts." Equity EO § 2(b)(i).

22

These directives stand in direct opposition to what Congress mandated. For example, as noted above, Congress created "Environmental and climate justice block grants" and directed that EPA "shall" use appropriated funds to award grants for certain projects "that benefit disadvantaged communities." 42 U.S.C. § 7438(b)(1). After the Executive Orders, EPA terminated the entire "Environmental and Climate Justice Block Grant *Program*," J.A. 2478 (emphasis added), for "policy reasons," J.A. 2370—specifically, because it funds "Environmental justice work" that implicates "DEI EO issues." *See* D.Ct. Dkt. 95-1 at 99; D.Ct. Dkt. 95-2 at 7; *see also* J.A. 181 (memorandum stating that Executive Orders require the termination of all grants "which reference or relate in any way to . . . environmental justice").

These and other examples demonstrate Defendants simply refuse to fund the exact work Congress mandated. Contrary to Defendants' assertions, these decisions were not centered on the consideration that individual "projects do not comport with Administration priorities" Dkt. 52 at 36. Defendants did not conduct any individualized review of the grants in question, nor have they taken steps to spend the money differently. Rather, Defendants have repeatedly referred to terminated grants as "taxpayer savings," J.A. 2841–2843; D.Ct. Dkt. 64 at 8 & n.7 (collecting citations), confirming that they will not spend the money Congress appropriated at all. And indeed, for many of the grant programs at issue here, it would not be

possible for Defendants to spend the appropriated funding as required by Congress while complying with the President's Orders. For instance, Defendants could not award grants "that benefit disadvantaged communities," IRA § 60201(b)(1), or that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups," 135 Stat. at 13–14, while also complying with the Equity EO's prohibition on "equity-related grants," Equity EO § 2(b)(i); *see also* J.A. 181 (memorandum stating that Executive Orders require the termination of all grants "which reference or relate in any way to climate change, 'greenhouse gas' emissions, . . . 'diversity, equity, and inclusion goals, [or] environmental justice'").

The suggestion in Defendants' brief that they are simply reallocating funds to "best achieve" Congress's goal to "benefit disadvantaged communities," Dkt. 52 at 35–36 (citation and quotations omitted), is unsupported by the record and not credible.

Withholding funding appropriated by Congress, as Defendants have done here, simply because they disagree with Congress's policy aims is a textbook violation of the separation of powers. *E.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018) ("Because the Executive Order directs Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with [the President's policy], there is no reasonable argument that the

24

President has not . . . . violate[d] the constitutional principle of the Separation of Powers."); *Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) ("[T]he power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any [of the President's] conditions on the receipt of such funds.") *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (majority opinion) ("'[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.'") (quoting Memorandum from William H. Rehnquist, Assistant Attorney General, Off. of Legal Couns., to Edward L. Morgan, Deputy Couns. to the President (Dec. 1, 1969)).

Plaintiffs' claim seeking equitable relief for constitutional violations based on executive officers violating their constitutional obligations is a well-established cause of action that is nearly as old as the federal judiciary itself. Separation of powers claims, like "every other constitutional claim," fall within this longstanding cause of action at equity. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *accord Free Enter. Fund*, 561 U.S. at 491 n.2.

25

As this Court recently reaffirmed, "a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his . . . constitutional authority because such actions 'are considered individual and not sovereign actions.'" *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022) (citation and quotations omitted). "[I]njunctive relief has long been recognized as the proper means for preventing [government] entities from acting unconstitutionally." *Corr'l. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). "[I]t is the established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 & n.4 (1946) (collecting cases). Under this black letter law, the District Court had jurisdiction over Plaintiffs' separation of powers claim and correctly ruled Plaintiffs were likely to succeed on the merits.

**B.    The Tucker Act and *California* are Irrelevant to the District Court's Jurisdiction over Plaintiffs' Freestanding Separation of Powers Claim.**

Defendants appear to have abandoned their previous argument that the Tucker Act strips federal courts of jurisdiction to hear constitutional separation of powers claims. *See* Dkt. 52 at 43 (changing their position to argue Plaintiffs' constitutional claims are not "bona fide"). Defendants are right to drop this argument. The Supreme Court has repeatedly held that "where Congress intends to

26

preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (collecting cases); *Demore v. Kim*, 538 U.S. 510, 517 (2003) (same). The Court "require[s] this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster*, 486 U.S. at 603 (citation omitted). Courts thus require "'clear and convincing' evidence" that Congress intended to preclude review of constitutional claims. *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (quoting *Johnson v. Robison*, 415 U.S. 361, 373 (1974)).

It is undisputed that the Court of Federal Claims lacks jurisdiction over separation of powers claims. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). So, if the Tucker Act was able to strip the District Court of jurisdiction over such claims, Plaintiffs would have no forum to assert this constitutional claim, thus triggering *Webster*'s clear statement rule. 486 U.S. at 603.

The Tucker Act does not explicitly preclude review of such claims, and if it did, the Act itself would likely be unconstitutional. Courts "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *see also Widakuswara v. Lake*, No. 25-

5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) (affirming district court's jurisdiction where "the Court of Claims could not adjudicate plaintiffs' constitutional claims"), *rev'd by*, 2025 WL 1521355 at 1 (D.C. Cir. May 28, 2025) (en banc) (adopting J. Pillard's dissent).

Defendants also seem to have largely abandoned their argument that *California* speaks to Plaintiffs' separation of powers claim. Rightly so. *California*, which focused only on an APA arbitrary and capricious claim, has no relevance to freestanding constitutional claims. The Supreme Court's order was based on the interplay between the Tucker Act and "the APA's limited waiver of [sovereign] immunity." *California*, 145 S. Ct. at 968. "Unlike the [Plaintiffs] here, the [*California*] plaintiffs raised no constitutional claim." *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J., dissenting). This constitutional claim is wholly separate from the APA, *see* J.A. 137–140 (Count I), and does not implicate sovereign immunity at all "because such actions are considered individual and not sovereign actions." *Strickland*, 32 F.4th at 363 (citation and quotations omitted).

### C.     Plaintiffs' Separation of Powers Claim Is a Constitutional Claim.

Defendants' newest contention is that Plaintiffs' freestanding constitutional claim is not constitutional at all. Dkt. 52 at 38-39. Defendants attempt to reframe their violation of the Appropriations and Spending Clauses of the Constitution as pure violations of the grant statutes. As such, Defendants insist Plaintiffs' claim is

transformed into a mere "statutory" challenge rather than the separation of powers constitutional claim Plaintiffs have plead, argued, and established. Dkt. 52 at 39–40.

Defendants' argument fails because it would write the Spending and Appropriations Clauses of the Constitution out of existence. U.S. Const. art. I, § 8, cl. 1; art. I, § 9, cl. 7. Under Defendants' theory, these core constitutional pillars could be freely violated if Congress has expressed its authority via statutory text, as is virtually always the case. This absurd proposition would render the Spending and Appropriations clauses meaningless.

This new theory is based entirely on a mistaken reading of *Dalton*, 511 U.S. 462, a case that has no bearing on the jurisdictional issues at play here.[3] In *Dalton*, the President was alleged to have "violated the procedural requirements of [a statute] in formulating [] recommendations" for the closure of a Naval base. *Id.* at

---

[3] Not only is *Dalton* inapposite, but Defendants waived any argument based on it. This Court could reject their *Dalton* argument on that basis alone. In the District Court, Defendants never cited *Dalton* or took the position they take now that Plaintiff's separation-of-powers claims is purely statutory. To the contrary, Defendants failed to develop any jurisdictional argument about Plaintiffs' freestanding constitutional claims through several rounds of briefing below. *See* J.A. 2914 ("I did not assert in our brief that the Court lacks jurisdiction over those claims."). Defendants' argument is too little too late. *See Wilkins v. United States*, 598 U.S. 152, 157-58 (2023) (parties should not be permitted to side-step waiver rules by "resurrect[ing]" merits arguments as "eleventh-hour jurisdictional objections . . . on appeal" after "things go poorly for them on the merits.").

29

471–72. The Supreme Court stated that not "all executive actions in excess of statutory authority" are "necessarily," "*ipso facto*" constitutional violations. *Id.* at 472–73. The Court reasoned that violations of the statute at issue, which did "not at all limit the President's discretion in approving or disapproving . . . recommendations" for the closure of Naval bases, *id*. At 476, did not give rise to a constitutional claim because "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President," *id.* at 474. Thus, "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Am. Forest Rsch. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (emphasis in original, citation and quotations omitted). *Dalton*'s "limited holding" did not "repudiate *Marbury v. Madison*"—the foundational precedent that federal courts can review and enjoin unconstitutional executive action. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 & n.5 (D.C. Cir. 1996).

This case is nothing like *Dalton*. Congress did not confer limitless discretion to the Executive when it created the grant programs at issue here. To the contrary, the relevant grant statutes direct in specific detail to whom funding should be allocated and how grantees should use it. *See supra* pp. 4–6. And, as discussed

above, Defendants are not employing their discretion; they are refusing to advance

funding because they disagree with Congress's clearly stated objectives. *See supra*

pp. 8–11, 19–21, 23. For these reasons, courts across the country have roundly

rejected Defendants' *Dalton* arguments in analogous cases.[4]

By contrast, this case raises the type of constitutional claim specifically

sanctioned by *Dalton*, i.e., where the Executive acts in the "absence of any

statutory authority" whatsoever. 511 U.S. at 473 (emphasis removed). There is a

manifest difference between cases alleging "a mere excess or abuse of discretion"

and those concerning "a want of [Presidential] power." *Id.* at 474 (alteration in

original). *Dalton* was the former and this case is the latter. As Plaintiffs alleged and

showed below, "[n]one of the Executive Orders nor the Program Freezing Actions

point to any statutory . . . authority to indefinitely freeze congressionally

---

[4] *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 148 n.17 (D.D.C. 2025) (distinguishing *Dalton* because "Plaintiffs assert that the Executive has attempted to usurp Congress's power over the purse"); *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-cv-03698, 2025 WL 1482511, at *19 (N.D. Cal. May 22, 2025) ("Plaintiffs' [*ultra vires*] claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed. Instead, [it] is about the President acting without *any* authority, constitutional or statutory."); *Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-0381, 2025 WL 942772, at * 8–9 (D.D.C. Mar. 28, 2025) ("Since there is no act of Congress that empowers the President to [take the challenged action] in his discretion, *Dalton* does not apply,."); *Does 1-26 v. Musk*, 771 F. Supp. 3d 637, 678 (D. Md. 2025) (unlike in *Dalton*, "Plaintiffs' Separation of Powers claim is not based only on alleged statutory violations but instead further asserts that the [challenged action] exceeds the President's Article II powers.").

appropriated funds based on the President's policy preferences." J.A. 139.
"[B]ecause Congress has the exclusive power to spend and has not delegated
authority to the Executive to condition . . . grants on compliance with [his
policies,] the President's 'power is at its lowest ebb,'" and he "has none of 'his
own constitutional powers' to 'rely' upon." *City & County. of S.F.*, 897 F.3d at
1233–34 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38
(1952) (Jackson, J., concurring)).

For these reasons, far more than statutory violations hang in the balance
here. "This case has serious implications for our constitutional structure. It is no
overstatement to say that our constitutional system of separation of powers would
be significantly altered if we were to allow executive and independent agencies to
disregard federal law" by "declin[ing] to spend appropriated funds" on programs
mandated by Congress. *In re Aiken County*, 725 F.3d at 393–94 & n.1 (Kavanaugh,
J.) (citation and quotations omitted).

### D.    Defendants' Remaining Arguments Apply Solely to Claims for Statutory Violations that Belong in an Alternative Forum—Not Constitutional Claims that Lack an Alternative Forum.

Defendants' remaining arguments are without merit. Defendants cite and
apply cases articulating a heightened standard of review for ultra vires claims
based on *statutory* violations, where Congress has provided an alternative forum to

assert those claims. These cases do not apply to *constitutional* claims lacking any alternative forum like Plaintiffs' claim here.

For example, *Nuclear Regulatory Commission v. Texas* involved a "typical statutory authority argument" "dress[ed] up . . . as an ultra vires claim" alleging that the Commission exceeded its authority under the Hobbs Act, which contains a specific "path to judicial review" that the plaintiffs had neglected. 145 S. Ct. 1762, 1776 (2025). This, the Court reasoned, precluded an "end-run" ultra vires claim alleging defendants had violated that very statute. *Id*. at 1775. By contrast, here Plaintiffs' constitutional claim is not an end run around any statutory claim— Congress's power over the purse is a constitutional check on Executive action separate and aside from the contours of the appropriating statutes.[5]

Similarly, *Armstrong v. Exceptional Child Center, Inc.*, involved ultra vires claims alleging that state officials violated the Medicaid Act, which expressly provided a different "method of enforcing [the] substantive rule" that "implicitly preclude[d] private enforcement." 575 U.S. 320, 327–29 (2015). And in *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, the Supreme

---

[5] Defendants cannot claim the APA provides an adequate vehicle for this constitutional claim while simultaneously insisting APA claims must go to the Court of Federal Claims, which has no jurisdiction over separation of powers claims and cannot provide the prospective relief Plaintiffs' seek. On Defendants' view, there is no alternative "path to judicial review" for this constitutional claim. *Nuclear Regul. Comm'n,* 145 S. Ct at 1776. One cannot make an "end run" around nothing. *See id* at 1775.

33

Court again considered an ultra vires claim for a statutory violation, where

Congress had provided an alternative forum for the statutory claim *and* "clearly

and directly" stripped district courts of jurisdiction to hear it. 502 U.S. 32, 43–44

(1991).

Unlike these cases, Defendants' actions amount to an attempt to repeal entire

congressional enactments—not just to violate a term in a statute. This is not a case

where, for example, Plaintiffs are quibbling over meaning of a singular team in the

grant statute—rather, Plaintiffs claim and the record confirms that Defendants are

refusing to fund the grant programs at all. Plaintiffs' claims are thus constitutional.

And unlike these cases, here Congress has provided no alternative avenue

for review. The Court of Federal Claims undisputedly lacks jurisdiction over

separation of powers claims, *LeBlanc*, 50 F.3d at 1028, and, as discussed below,

has no power to grant prospective equitable relief that is critical to redress

Plaintiffs' injuries, *Bowen*, 487 U.S. at 905–07; *see also infra* pp. 42–46.

## III.    The District Court Had Jurisdiction Over Plaintiffs' Administrative Procedure Act Claims.

In the proceedings below, the District Court gave Defendants several

opportunities to demonstrate the steps they had taken to engage in reasoned

decision-making, consider reliance interests, and center their termination of

Plaintiffs' grants on something other than high-level policy disagreements—in

34

violation of separation of powers. Instead, Defendants filed a notice that they would consent to judgment on Plaintiffs' APA claims. D.Ct. Dkt. 153 at 1.

Having consented to judgment, Defendants now seek to eliminate judicial review of their APA violations. Defendants argue their unlawful behavior is nothing more than a contract dispute that belongs in the Court of Federal Claims. But Plaintiffs' claims arise from the Constitution and federal statute, not from contracts, and could not be brought in the Court of Federal Claims. Furthermore, the Court of Federal Claims only provides money damages for past due relief and cannot provide Plaintiffs the forward-looking equitable remedy they seek. Indeed, in other cases—even those with a much stronger basis for jurisdiction in the Court of Federal Claims—the United States has attempted to block such claims from being heard there. *See supra* at 37–38. The APA acts as an important check to ensure agency action is reasoned and is particularly important when there is a change in administration. Defendants cannot be allowed to evade its strictures.

### A. Unlike *California*, the Developed Record Here Demonstrates That Defendants Acted Against Entire Grant Programs.

Defendants overread the Supreme Court's short emergency order in *Department of Education v. California* to argue that they are not subject to the APA's waiver of sovereign immunity because the Tucker Act provides an alternative venue for Plaintiffs' claims. Dkt. 52 at 25-44. But this case is very different from *California*, which was decided at a preliminary stage without a

35

developed record about the grants at issue or how they were terminated. On that bare record, the Supreme Court centered its conclusion that the APA claim on appeal was essentially a contract dispute subject to the Tucker Act on the fact that, as the First Circuit found, "the terms and conditions of each individual grant award [we]re at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025); *accord California*, 145 S.Ct. at 968 (noting that the district court had issued an "order[] to enforce a contractual obligation to pay money") (citation and quotations omitted). Indeed, *California* was an appeal from an order that expressly did *not* reach claims that agency-level policy decisions to terminate entire grant programs were substantively unlawful. *See California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 78 n.3 (D. Mass. 2025) (declining to rule on "substantive violation[s] of the APA"); *see also* J.A. 41.

By contrast, this case, which is much more factually advanced, presents significantly different factual and legal circumstances.[6] First, the developed record

---

[6] Numerous courts have rejected Defendants' expansive reading of *California*. *See Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, 2025 WL 1131412, at *11 (D.D.C. Apr. 16, 2025) (noting *California* does not foreclose equitable relief including reinstatement of grants nor declaratory relief regarding "thinly veiled attempts to dismantle the entirety of a congressionally created program"); *see also Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *5-6 (D.R.I. May 6, 2025); *Woonasquatucket River Watershed Council v. USDA*, No. 25-cv-97, 2025 WL 1116157, at *12-15 (D.R.I. Apr. 15, 2025); *Maryland v. Corp. for Nat'l and Cmty. Serv.*, No. 25-cv-1363, 2025 WL 1585051, at *27 (D. Md. June 5, 2025); *Southern Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079, 2025 WL 1453047,

demonstrates Defendants froze and terminated entire grant programs, "because they were funded by now disfavored legislation." J.A. 14; *see also supra* pp. 8–11, 19–21, 23. The termination of grants at the program level underscored that the illegal action challenged here has nothing to do with the terms and conditions of any individual grants and is unlike a contract dispute.

Likewise, the legal posture of this case also differs from *California*. Here, Defendants no longer contest the substantive APA violations set out in Plaintiff's Complaint including that Defendants violated the separation of powers by blocking policies Congress chose to fund. J.A. 143–144. Defendants cannot convincingly argue this is merely a contract dispute over terms and conditions when they have essentially admitted to high-level unlawful behavior.

In fact, Defendants' expansive reading of *California,* when read alongside other recent government action, appears designed to eliminate judicial review entirely. In a recent brief—filed in a case brought by plaintiff business owners in the Court of Federal Claims arguing they were entitled to receive grants, the United States argued the exact opposite to what Defendants argue here. There, despite facts that provided a much stronger basis for Court of Federal Claims jurisdiction, the United States argued that the Court of Federal Claims lacked jurisdiction and

at *8-9 (D.D.C. May 21, 2025); *Cmty Legal Servs in East Palo Alto v. U.S. Dept' of Health and Hum. Servs.*, No. 25-cv-02847, 2025 WL 1233674, at *7 (N.D. Cal. April 29, 2025).

that plaintiffs really made "a disguised APA claim," that "seek[s] to obtain money by having a court enforce [a] statutory mandate . . . to award grants." Opening Br. of Appellant at 34–35, 43, *112 Genesee Street, LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025), *reproduced at* J.A. 2183–2184, 2192.

The "heads I win, tails you lose" approach to these arguments underscores the Executive's efforts to evade judicial review. But here, Plaintiffs' claims, the nature of the agency actions they challenge, and the relief they seek confirm this case belongs in federal district court.

### B.    Plaintiffs May Enforce the Constitution and Federal Law.

While Defendants take the short ruling in *California* and attempt to stretch it to shield them from all their wrongdoing, the seminal case on the interplay between the Tucker Act and the APA is not *California*, but *Bowen v. Massachusetts*, 487 U.S. 879, 893–94 (1988)*,* which the Supreme Court has confirmed is undisturbed. *California*, 145 S. Ct. at 968. A crucial issue under *Bowen*—and one that *California* did not address—is the source of rights being enforced. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, Plaintiffs are enforcing the Constitution and federal law, and the Complaint makes clear that the source of rights is not contractual.

Thus, Defendants' broad proclamation that "asserted violations of . . . grant agreements" belong in the Court of Federal Claims can be easily dispensed with.

Dkt. 52 at 26-27. Plaintiffs do not allege any violation or breach of their grant agreements. As the District Court held, "[n]one of Plaintiffs' claims are based on Defendants' failure to perform obligations in the grant awards." J.A. 35. Indeed, even if Defendants fully complied with the terms of their grant agreements with Plaintiffs, it would not undermine or even affect Plaintiffs' claims for violations of federal law, confirming that these are not contract claims. And, as noted above, several Plaintiffs do not even have direct grant agreements with the government *See, e.g.*, Bronx River Alliance Decl., J.A. 671, Earth Island Decl, J.A. 885, City of Columbus Decl, J.A. 1991; *see also Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (To "maintain a cause of action pursuant to the Tucker Act [in the Court of Federal Claims] that is based on a contract, the contract must be between the plaintiff and the government."). Indeed, one of Defendants' own authorities, *Boaz Housing Authority v. United States*, 994 F.3d 1359, 1364 (Fed. Cir. 2021), recognized the key distinction "between claims based on the Constitution, a statute, or a regulation and claims based on a contract." The claims here are not for breach of contract—instead, they challenge Defendants' violations of the Constitution and federal law in their high-level freezing and termination of the grant programs at issue.

By the same token, this case does not resemble *United States v. J&E Salvage Co.*, 55 F.3d 985 (4th Cir. 1995), which involved a contract claim as well as several

tort claims related to the ownership of helicopter parts hidden in storage containers purchased at a government auction. In that case, this Court held all the claims were in essence contract claims because "[t]he meaning of these [contract] provisions controls the outcome of this case. Hence, 'it is possible to conceive of this dispute as entirely contained within the terms of the contract.'" *Id.* at 988 (quoting *Ingersoll–Rand Co. v. United States,* 780 F.2d 74, 78 (D.C. Cir. 1985)). Here, Plaintiffs' claims—as well as Defendants' own arguments that their challenged actions are committed to agency discretion by the grant statutes, Dkt. 52 at 33–38—make clear that the outcome of this case turns not on individual grant agreements but on the outcome of Plaintiffs' constitutional and APA claims, i.e., the meaning of federal law.

Defendants likewise fail in their effort to liken this case to *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985). In *Spectrum*, the government collected contractual liquidated damages from a firm by stopping lease payments for other products it had provided; the company claimed this violated procedures in the Debt Collection Act and sought "an order compelling the government to pay money owed in exchange for goods procured under an executory contract." *Id.* at 894. The suit fundamentally sought to enforce the contract, as confirmed by the backward-looking, past-due payment sought.

The instant case presents an entirely different circumstance. "Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). The Executive branch has ignored Congress and violated separation of powers, and it has cancelled entire federal grant programs without reasoned decisionmaking or a consideration of reliance interests. Plaintiffs seek to enforce their rights under the Constitution and the APA, not the contract terms of their grants.

### C.    Plaintiffs Seek Forward-Looking Injunctive and Declaratory Relief.

The relief sought also makes clear this is not a contract case. In *Bowen*, the Supreme Court evaluated whether a claim against United States involving payment of money may be brought in federal district court under the APA or in the Court of Federal Claims pursuant to the Tucker Act. As that Court explained, "insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages." *Bowen*, 487 U.S. at 893. It held such claims belonged in district court and went on to explain "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" commenting "we have recognized that relief that orders a town to reimburse parents for educational costs that Congress intended the

41

town to pay is not 'damages.'" *Id.* at 893–94 (citing *Sch. Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 370–71 (1985)).

The Supreme Court also explained Section 704's exception to the APA's waiver of sovereign immunity was "intended to avoid . . . duplication [of statutory procedures relating to specific agencies, and] should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Id.* at 903. Here, *Bowen* makes clear Plaintiffs' claims for declaratory and injunctive relief going forward, which do not seek money damages to compensate for past harm, belong in federal district court.

Here, Plaintiffs seek to resume work so they can deliver the grant projects they have promised their communities via forward-looking equitable relief that removes Defendants' unlawful interference with the congressionally mandated grant programs. They also seek declaratory relief that will help redress their reputational injuries, as well as other forward-looking relief such as making grant officers available to assist, answer questions, and provide status updates in order to address the harm from Defendants' chaotic and unexplained actions. J.A. 149-152.

Defendants are plain wrong when they attempt to distinguish *Bowen's* analysis of relief sought from that in this case, Dkt. 52 at 32. Indeed, Plaintiffs seek precisely the type of "specific relief" the Supreme Court has confirmed is well within a district court's jurisdiction under the APA. *Bowen*, 487 U.S. at 910

42

(upholding injunction to correct the method of calculating statutorily obligated payments going forward).

Thus, Defendants' attempt to distinguish *Bowen* fails: the "aim of plaintiffs' endeavor" is being allowed to pursue the projects they have committed to, not "specific monetary payments." A retrospective award of damages would be wholly insufficient because it would not enable Plaintiffs to move forward and complete these projects. Grants are not funded as a lump sum, but rather awards are held in government bank accounts and Plaintiffs only incur the right to withdraw funds as they complete specific agency-approved work.[7] Damages could not compensate for future work; prospective relief is needed. Instead, damages "are intended to provide a [plaintiff] with monetary compensation for an injury to his person, property, or reputation," *Bowen*, 487 U.S. at 893, and "are quintessentially backward looking." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 282 (1994).

Importantly, the Court of Federal Claims cannot provide the forward-looking relief Plaintiffs seek. "The Claims Court does not have the general equitable powers of a district court to grant prospective relief. Indeed, we have stated categorically that 'the Court of Claims has no power to grant equitable relief.'" *Bowen*, 487 U.S. at 905 (citing *Richardson v. Morris,* 409 U.S. at 465); *see also*

---

[7] *See, e.g.*, Alliance for Agriculture Decl., J.A. 327, Marbleseed Decl., J.A. 947, Pasa Sustainable Agriculture Decl., J.A. 1372–73.

*Nat'l Ctr. for Mfg. Sciences. v. United States*, 114 F.3d 196, 201–02 (Fed. Cir. 1997) (explaining grant restrictions governing future disbursal of funds made money judgment inappropriate, and reversing district court's transfer order); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (distinguishing *Bowen*'s "going forward" relief from an injunction solely to enforce a contractual obligation to pay money past due).

Defendants' citations to *Boaz* regarding relief, Dkt. 52 at 26-27, are equally inapt: there, the plaintiffs sought compensatory damages for past-due, unpaid subsidies from the Court of Federal Claims. *Boaz*, 994 F.3d at 1362. The Federal Circuit—following *Bowen*—carefully distinguished between compensatory damages "to *substitute* for a suffered loss," which belong in the Court of Federal Claims, and specific remedies, "which are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled," over which federal district courts have jurisdiction. *Id.* at 1367–68 (quoting *Bowen*) (emphasis in original). Plaintiffs here seek the latter: the continuation of their grants, with the attendant obligations on Plaintiffs to perform the approved project work going forward. In *Maine Community Health Options*, meanwhile, the statute at issue "attempt[ed] to compensate a particular class of persons for past injuries or labors," unlike here. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 325 (2020) (quoting *Bowen*, 487 U.S. at 906, n. 42).

While true that relief from Defendants' broad illegal actions would encompass Plaintiffs' specific grants being unfrozen, enabling them to perform approved project work and allowing them to be reimbursed, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. To the contrary, the APA permits "judicial review of the administration of Federal grant-in-aid programs," because Plaintiffs "seek[] funds to which a statute allegedly entitles [them], rather than money in compensation for the losses, whatever they may be, that [Plaintiffs] will suffer . . . by virtue of the withholding of these funds." *Id.* at 895, 898, 901 (citations and quotations omitted).

### D. Plaintiffs' APA Claims Challenge Actions not Committed to Agency Discretion.

Defendants' final pitch to evade judicial review of Plaintiffs' APA claims is the remarkable contention that their wholesale freezing and termination of specific, mandatory grant programs for "policy reasons" is "committed to agency discretion by law." *See* Dkt. 52 at 33–38. This argument does not extend to Plaintiffs' freestanding constitutional claim, and in any event the Court should summarily reject it as without any merit.

Defendants rely heavily on *Lincoln v. Vigil*, which held an agency's reallocation of funds within a "lump-sum appropriation" to meet other "permissible statutory objectives" was committed to agency discretion by law

45

because the statute did not "restrict[] what can be done with those funds." 508 U.S.

182, 192–94 (1993). Congress had appropriated funds to an agency to expend "for

the benefit, care, and assistance of the Indians, for the relief of distress and

conservation of health." *Id.* at 185. The Supreme Court held that the agency's

decision to "reallocate" these funds from a regional program for "handicapped

Indian children" to a "nationwide effort to assist such children" was committed to

agency discretion. *Id.* at 184. The Court defined the "'committed to agency

discretion' exception extremely narrowly, applying it only 'in those rare

circumstances where the relevant statute is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion.'"

*Quinteros-Mendoza v. Holder*, 556 F.3d 159, 162 (4th Cir. 2009) (quoting *Lincoln*,

508 U.S. at 191).

The facts here and those in *Lincoln* bear no resemblance.  For Plaintiffs' EPA

grants, for example, as explained above, Congress mandated funds "shall" be spent

for specific purposes including "[e]nvironmental and climate justice," 42 U.S.C.

§ 7438, and "the reduction of greenhouse gas air pollution," *id.* § 7437; *see also*

*supra* pp. 4–6.  These appropriations were not part of an undifferentiated "lump

sum" lacking any statutory restrictions; the statutes list specific types of projects

that "shall" be funded to advance statutory purposes. *Id.* § 7438(b); *id.* § 7437 (b)–

(c).  For the same reasons this case is nothing like *Milk Train, Inc. v. Veneman*,

where the statute at issue contained no "reference point for the court other than the decisionmaker's own views of what is an 'appropriate' manner" to distribute funds "consistent with the [statute's] general policy"—and the agency was actually striving to advance Congress's policy by "balancing a number of factors which [were] peculiarly with the [agency's] expertise." 310 F.3d 747, 751–52 (D.C. Cir. 2002) (citations and quotations omitted).

As discussed above, Defendants terminated grants wholesale precisely *because* they serve Congress's purposes for the grant programs. *See supra* pp. 8–11, 19–21, 23. *Lincoln* would have been a very different case if the agency there had cancelled the program precisely *because* it serves Indians—Congress's stated objective for the funding. But that is what happened here. "Of course, an agency is not free simply to disregard statutory responsibilities" and must respect "restrictions in the operative statutes" that define "permissible statutory objectives." *Lincoln*, 508 U.S. at 193. Accordingly, this case is far from "those rare circumstances" where the statute is drawn so broadly that the Court lacks any "meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 190–91. Defendants have flouted Congress's objectives or pursued wholly extraneous non-statutory policies. *See Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) ("Congress can limit an agency's discretion . . . 'by setting substantive priorities.'") (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)).

Even further afield from *Lincoln*, Defendants here are manifestly *not* reallocating funds from cancelled grants to fund different projects that also serve Congress's objectives. To the contrary, as explained above, the record here shows that Defendants will not use funds from cancelled grants to fund other projects that advance Congress's goals.

Defendants attempt a wholly fictitious narrative, without citing any record evidence, where they are hard at work figuring out how to use cancelled grant funds to advance "Environmental and climate justice" and "disadvantaged communities" in a different way than the previous administration. Dkt. 52 at 35–36. But Defendants cannot escape the extensive discovery in this case showing exactly what they did—cancel entire grant programs wholesale, with no process whatsoever, because they disagree with Congress's objectives and refuse to disburse funds for those mandatory purposes. *E.g.*, J.A. 2370–2371, J.A. 2478; D.Ct. Dkt. 95-1 at 99–D.Ct. Dkt. 95-2 at 7; *see also* J.A. 2841–2843; D.Ct. Dkt. 64 at 8 & n.7.

Lastly, Defendants claim nothing in the relevant appropriating statutes limits their discretion to terminate Plaintiffs' "specific grants." Dkt. 52 at 36-37. But the actions challenged in this case targeted entire grant *programs* because Defendants disagree with Congress's objectives. J.A. 120–126, J.A. 137–148 (alleging the "Executive Orders and *Program* Freezing Actions" are unlawful (emphasis

added)). As the District Court correctly found, "[n]ot one document" of the "thousands" produced in this case "show[s] any individualized review of the grant of any Plaintiff in this action before the grant was terminated or designated for termination." J.A. 5–6.

In sum, this Court should reject Defendants' efforts to conjure unlimited discretion for their conduct and join the chorus of other courts that have rejected Defendants' *Lincoln* arguments in analogous cases.[8]

## IV.    The Equities Favor Plaintiffs.

Beyond their jurisdictional objections, Defendants protest how the District Court weighed the equities. Their arguments should be rejected at the outset. This Court reviews the decision to enter a preliminary injunction for abuse of discretion

---

[8] *E.g.*, *Green & Healthy Home Initiatives, Inc. v. Env't Prot. Agency.*, No. 25-cv-1096, 2025 WL 1697463, at *15–16 (D. Md. June 17, 2025) (finding the termination of Environmental and Climate Justice Block Grants—one of the same statutes at issue here—were not committed to agency discretion by law because "EPA terminated grants that were awarded using statutorily-appropriated funds" and "Congress has circumscribed agency discretion to allocate resources by putting restrictions in the operative statute."); *Cmty Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 137 F.4th 932, 940 (9th Cir. 2025) ("*Lincoln* has no application where, as here, the agency fails to carry out a program that is *required* by statute."); *Martin Luther King, Jr. Cty. v. Turner*, No. 2:25-cv-814, 2025 WL 1582368, at *13 (W.D. Wash. June 3, 2025) (distinguishing *Lincoln* in another grant case where "the moneys at issue . . . were not appropriated in an undifferentiated 'lump sum.'"); *Climate United Fund*, No. 25-cv-698, 2025 WL 1131412, at *13 (distinguishing *Lincoln* where relevant grant statute, 42 U.S.C. § 7434, "appropriated money for specific grant programs by a specific deadline and set specific, substantive priorities, thereby limiting how the appropriated funds could be allocated.").

and "may not reverse so long as the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Roe v. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020). Defendants do not even attempt to overcome this deferential standard and ask this Court to reweigh the equities *de novo*. The Court should decline the invitation.

In any event, Defendants are wrong. The relief entered below was solidly within the District Court's discretion because the equities overwhelmingly favor Plaintiffs: (A) they face serious and irreparable harm absent relief, (B) Defendants conversely face none, and (C) the public interest demands the faithful implementation of the grant programs Congress mandated and adherence to the separation of powers.

### A. Absent Relief, Plaintiffs' Non-Monetary Harms Are Serious and Irreparable.

Plaintiffs face serious, non-monetary harm if Defendants' actions to block these grant programs continue unchecked. Defendants claim "the gravamen of plaintiffs' injury is monetary" and therefore reparable with damages, Dkt, No. 52 at 47, but make no attempt to address the "dozens of examples" of irreparable harm the district court found, J.A. 16, based on a robust factual record. *See* J.A. 2242-2246 (summarizing irreparable injuries). Perhaps Defendants misunderstand how their own grant programs work, but their argument does not match the facts.

*First,* without injunctive relief, Plaintiffs will be unable to perform the essential work to serve their communities: projects central to Plaintiffs' missions will stall or simply disappear, such as the Sustainability Institute's project to weatherize and upgrade low-income homes in Charleston, J.A. 199–200, and Agrarian Trust's project to help underserved farmers secure land and farm sustainably, J.A. 237–239. Monetary damages for the harm Plaintiffs have suffered to date will do nothing to ensure their projects can move forward in the future.

Unlike in *California,* Plaintiffs here do not "have the financial wherewithal to keep their programs running" absent grant funding. 145 S. Ct. at 969. *See, e.g.*, J.A. 1545–1546, J.A. 739. Without this funding, Plaintiffs will be unable to accomplish their multi-year workplans, *e.g.*, J.A. 200, and face more lay-offs. *E.g.*, J.A.1545, J.A. 239–40. These myriad harms are not monetary and cannot be remedied by damages.

*Second*, without injunctive relief, Plaintiffs will continue to suffer damage to their reputations, goodwill, and "community connections," which are "significant and irreparable injuries." *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021). Plaintiffs had earned the trust of their communities as reliable partners. Plaintiffs promised to complete critical projects on defined timelines. Without injunctive relief, Plaintiffs will continue to see their hard-earned trust and reputations in their communities erode. J.A. 2242-2246.

***Third,*** without an injunction, City Plaintiffs will continue to be harmed by Defendants' actions, which are hampering local job and business growth, Madison Decl., J.A. 2013-2014, undermining democratic referenda, Nashville Decl., J.A. 2029, J.A. 2030-2031, jeopardizing City Plaintiffs' ability to plan for the future, New Haven Decl., J.A. 2043, J.A. 2045, and depriving City Plaintiffs' residents of access to important public programs. Madison Decl., J.A. 2012-2013, New Haven Decl., J.A. 2042, J.A. 2044, J.A. 2045-2046. These harms cannot be reduced to money damages and are thus irreparable.

### B.    Enjoining Defendants' Unlawful Actions Causes No Meaningful Harm to Defendants.

Defendants argue they are harmed by having to fund grants pursuant to the Order when they might ultimately prevail, Dkt. 52 at 44–47, yet they did not contest judgment on Plaintiffs' APA claims that their actions violate the Constitution, the grant statutes, and the Impoundment Control Act. D.Ct. Dkt. 153 at 1. Defendants are in no way harmed by issuance of an injunction that prevents activity that they have conceded is unconstitutional and otherwise unlawful. *E.g.*, *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

Moreover, Defendants' vague assertions of irreparable harm are supported by absolutely no evidence, whether in sworn affidavits or otherwise. *See Nken v. Holder*, 556 U.S. 418, 434-35 (2009) ("[S]imply showing some possibility of

52

irreparable injury fails to satisfy the second factor."); *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020) (per curiam) (rejecting a claim of irreparable harm that was "correct as a matter of theory" but was "dubious as a matter of fact and reality"). The Ninth Circuit recently critiqued a similar failure to provide any evidence of harm and distinguished the case from *California* on that basis. *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 943.

Defendants also claim "the government" is harmed by having to fund these grants, Dkt. 52 at 38, but there is no dispute Congress lawfully directed and appropriated this grant funding, even directing that the funds be spent promptly—in some cases by as soon as next year. J.A. 98-114. And the Defendant agencies themselves previously awarded the grants that are subject to the injunctions. What Defendants mean is that they would now prefer not to fund the grants. They have not demonstrated that being required to do so is a cognizable harm.

Defendants rely on *Maryland v. King*, Dkt. 52 at 39-40, a case they did not raise below, and an argument they have therefore waived. Regardless, that decision involved a state being enjoined from implementing its own state legislation. *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Here, by contrast, it is the Executive Branch that is unlawfully preventing federal legislation from being implemented. The district court's injunction was crafted not to block, but to "effectuat[e] statutes enacted by representatives of [the] people." *Id.* (quoting *New*

53

*Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977)

(Rehnquist, J., in chambers)). There is no injury to the Executive Branch from

being required to cease its interference with Congress's spending decisions and

stay in its constitutional lane.

Defendants express outrage at the District Court's "extreme intrusions into

the workings of the Executive Branch," Dkt. 52 at 46, but these complaints are

unfounded and would apply to virtually any injunction against agency actions.

First, they point to a "preclearance regime," but the District Court simply ensured

its injunction would be given effect by requiring that Defendants only freeze or

terminate Plaintiffs' grants lawfully; Defendants conspicuously leave out the

court's statement that it would "promptly" allow "legitimate and lawful"

terminations, J.A. 8. As the Order pointed out, requiring court approval was

particularly appropriate here because Defendants have proffered "shifting post hoc

justifications" to "evade court orders" that enjoined specific agency actions in

other cases. J.A. 8; *accord Nat'l Council of Nonprofits v. Office of Mgmt. &*

*Budget,* 763 F. Supp. 3d 36, 51 (D.D.C. 2025) (criticizing the government's

shifting justifications "without actually ceasing the challenged conduct" for the

purpose of "evading judicial review" in another grant freeze case).

Ultimately, Defendants make clear they resent *any* court intrusion on

executive power, complaining that the court "seized a portion of that power for

itself" even though that could describe any injunction that blocks executive branch actions to provide relief to plaintiffs. Beyond their litigation position here, the White House insists that "[c]ourts do not have jurisdiction to require the Administration to issue unnecessary funds,"[9] that is, Defendants believe they can refuse to spend any appropriations they do not like regardless of the legal requirements to do so, without check from the courts. Defendants seem to ignore that "the rule of law [i]s vital to the American ethos." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *3 (4th Cir. Apr. 17, 2025).

Lastly, Defendants fault the District Court for extending the injunction to awarded grants that lack "final grant agreements," Dkt. 52 at 40, despite their own concession to judgment "that would require Defendants to . . . negotiate" those agreements. D.Ct. Dkt. 153 at 1. But as explained above, the actions challenged and enjoined here are not tied to individual grant agreements but rather flow from high-level agency actions. Thus, Defendants' refusal to finalize plaintiffs' grants are properly within the scope of the injunction.

### C.    Injunctive Relief Is Needed to Protect the Public Interest.

The public interest strongly favors the faithful execution of grant programs Congress created to help communities across the country. Defendants have been

---

[9] Taylor Mills, *Trump Administration Ordered to Restore Cities' Green Grants*, Bloomberg Law (May 19, 2025), https://perma.cc/7H3X-TC3X. (Dkt. 43 at 17 ).

clear about their refusal to spend appropriated funds on these congressional priorities. *E.g.*, J.A. 2370; J.A. 2478-2479. Without injunctive relief, Defendants will continue harming the communities Congress sought to assist.

The public interest strongly disfavors that result, particularly as Defendants no longer defend the legality of their actions. As this Court has observed, "the system is improved by … an injunction" that "prevents the state from enforcing [policies] likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F. 4th at 346 (citation and quotations omitted); *accord League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (citation and quotations omitted).

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Respectfully submitted,

Kimberley Hunter
Irena Como
Nicholas S. Torrey
Carl T. Brzorad
Spencer Gall
SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
cbrzorad@selc.org
sgall@selc.org

*Counsel for Plaintiff-Appellees The Sustainability Institute, Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance,*
*CleanAIRE NC, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association of Sustainable Agriculture, and Rural Advancement Foundation International - USA*

Graham Provost
Elaine Poon
Jonathan Miller
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org
elaine@publicrightsproject.org
jon@publicrightsproject.org

*Counsel for Plaintiff-Appelleess Baltimore, Maryland; Columbus, Ohio; Madison, Wisconsin; Nashville, Tennessee; and New Haven, Connecticut*

Mark Ankcorn, Senior Chief Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Plaintiff-Appellee City of San Diego*

57

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing petition complies with the word limit of Federal Rule of Appellate Procedure 40(d)(3)(A) because the petition contains 12,999 words. The petition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 4(d)(2) and 32(a)(5) and (6) because it has been prepared using Microsoft Word for Microsoft 365 in proportionally spaced 14-pt Times New Roman typeface.

*/s/ Kimberley Hunter*
Kimberley Hunter

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Kimberley Hunter*
Kimberley Hunter