No. 25-1575

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE SUSTAINABILITY INSTITUTE, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants*.

*On Appeal from the United States District Court
for the District of South Carolina*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICUS CURIAE* ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ...................................................................................... 7

I.   The Constitution's Separation of Powers Prohibits Presidential Impoundment of Appropriated Funds Based on Disagreement with Congressional Policy ...................................................................... 7

    A. The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate that Congress Has Exclusive Power over Funding Decisions ............................... 7

    B. All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Refusing to Spend Appropriated Funds .......................... 12

II.  Plaintiffs Bring a Bona Fide Separation-of-Powers Claim Premised on the Executive Branch's Usurpation of Congressional Spending Authority .................................................................................... 16

    A. Defendants Overread *Dalton v. Specter* ................................... 16

    B. Defendants Contort Plaintiffs' Separation-of-Powers Claim ... 23

III. Defendants' Position Raises Serious Constitutional Problems, While Plaintiffs' Position Does Not Have the Broad Implications that Defendants Claim ..................................................................... 26

CONCLUSION ................................................................................ 30

CERTIFICATE OF COMPLIANCE ...................................................... 1A

CERTIFICATE OF SERVICE .............................................................. 2A

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Am. Forest Res. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023) ............................................................... 23, 27

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ............................................................................ 27

*Biden v. Sierra Club*,
    142 S. Ct. 46 (2021) ........................................................................... 25

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ............................................................................ 18

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ............................................................................ 26

*Campaign Clean Water, Inc. v. Ruckelshaus*,
    361 F. Supp. 689 (E.D. Va. 1973) ..................................................... 14

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) ............................................................................ 2, 7, 8

*Chamber of Com. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................... 23

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ........................................................... 11

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ........................................................... 12

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................ 3, 14

## TABLE OF AUTHORITIES – cont'd

Page(s)

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
   365 F. Supp. 1355 (D.N.J. 1973) ........................................................ 14

*Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*,
   250 U.S. 163 (1919)............................................................................. 18

*Dalton v. Specter*,
   511 U.S. 462 (1994).............................................. 1, 4-6, 17-19, 27

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981)........................................................................ 21, 22

*Eagle County v. Surface Trans. Bd.*,
   82 F.4th 1152 (D.C. Cir. 2023)............................................................ 28

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)............................................................................. 22

*Freytag v. Comm'r*,
   501 U.S. 868 (1991)............................................................................. 29

*Guadamuz v. Ash*,
   368 F. Supp. 1233 (D.D.C. 1973) ....................................................... 14

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ....................................................... 11, 16

*Johnson v. Robison*,
   415 U.S. 361 (1974)............................................................................. 26

*Kendall v. United States ex rel. Stokes*,
   37 U.S. 524 (1838).......................................................................... 3, 13

*LeBlanc v. United States*,
   50 F.3d 1025 (Fed. Cir. 1995) ............................................................ 26

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975) ....................................................... 14

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................................ 6

*Motions Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ..................................................... 27, 28

*Pennsylvania v. Weinberger*,
    367 F. Supp. 1378 (D.D.C. 1973) ...................................................... 14

*Rochester Pure Waters Dist. v. EPA*,
    960 F.2d 180 (D.C. Cir. 1992) ............................................................ 7

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
    145 S. Ct. 1497 (2025) ...................................................................... 28

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ...................................................... 5, 18, 25

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ............................................................. 25

*Train v. City of New York*,
    420 U.S. 35 (1975) ............................................................................ 14

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) ...................................................... 10, 25

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) .......................................................... 7

*U.S. House of Representatives v. Mnuchin*,
    976 F.3d 1 (D.C. Cir. 2020) .............................................................. 10

iv

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Webster v. Doe*,
  486 U.S. 592 (1988)............................................................. 2, 6, 26

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ............... 11

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ............. 11

*Wilkins v. Gaddy*,
  734 F.3d 344 (4th Cir. 2013)............................................... 3

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952).............................................................. 5, 18-20


CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6............................... 9

Del. Const. of 1776, art. VII ................................................... 8

Mass. Const. of 1780, ch. 2, § 1, art. XI ...................................... 8

U.S. Const. art. I, § 8, cl.1................................................... 2, 9

U.S. Const. art. I, § 9, cl. 7.................................................. 2, 3, 9, 25

U.S. Const. art. II, § 3 ...................................................... 11


STATUTES AND LEGISLATIVE MATERIALS

120 Cong. Rec. (1974)......................................................... 13

Impoundment Control Act, Pub. L. No. 93-344, tit. X,
  88 Stat. 297 (1974)........................................................... 12

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

S. Rep. No. 93-688 (1974) ........................................................ 12

2 U.S.C. § 683 ........................................................................ 12

2 U.S.C. § 684 ........................................................................ 12

BOOKS, ARTICLES, AND OTHER AUTHORITIES

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017) ............................................... 10

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) .............................. 10

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025).................. 24

*The Federalist No. 30* (Alexander Hamilton) (Clinton Rossiter ed., 1961)........................................................................................ 2, 9

*The Federalist No. 78* (Alexander Hamilton) (Clinton Rossiter ed., 1961)........................................................................................ 9

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207 (2009) ...................... 8

Alexander Hamilton, *Report on the Subject of Manufactures* (1791).... 9

F.W. Maitland, *The Constitutional History of England* (1908).............. 8

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303 (1969)............ 4, 1

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*The President's Veto Power*, 12 Op. O.L.C. 128 (1988)........................ 16

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)................................................................ 8

John G. Roberts, Jr., Memorandum for Fred F. Fielding Re: Impoundment Authority (Aug. 15, 1985).......................................... 15

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................................................................ 11

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

This case at its core is about whether our Constitution, which indisputably commits the power of the purse to the people's representatives in Congress, allows a President to order the unilateral suspension or termination of grant agreements based on his disagreement with the congressional policies those grants further.  The answer is no, and there must be a forum in which Plaintiffs can bring this critically important separation-of-powers claim.

Rather than defend their actions on the merits, Defendants seek to deprive Plaintiffs of any such forum based on a misreading of *Dalton v. Specter*, 511 U.S. 462 (1994).  According to Defendants, Plaintiffs' constitutional claims are just dressed-up statutory claims that should be channeled to the Court of Federal

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission.  All parties consent to its filing.

Claims pursuant to the Tucker Act, which Defendants say "impliedly preclude[s] review" of those claims in federal district court, Appellants Br. 15.

The district court saw through this subterfuge, and this Court should too. Plaintiffs assert freestanding constitutional claims, premised on the executive branch's usurpation of Congress's authority over appropriations and spending. *See* U.S. Const. art. I, § 8, cl. 1; *id.* art. I, § 9, cl. 7. If those claims must be channeled to the Court of Federal Claims under the Tucker Act—a court that, as all parties agree, does not have jurisdiction to adjudicate them—Plaintiffs are left without "any judicial forum for [their] colorable constitutional claim[s]," raising a "serious constitutional question." *Webster v. Doe*, 486 U.S. 592, 603 (1988).

**I.** The choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), a consensus reflecting centuries of struggle in England for legislative supremacy over fiscal matters. Thus, when the Framers gathered to draft the new Constitution, there was no question that the authority to spend and appropriate funds would be given to Congress. Indeed, Congress's "Power . . . to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, at 188 (Alexander Hamilton) (Clinton Rossiter ed., 1961). At the same

2

time, the Appropriations Clause evinced a clear limitation on executive authority: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

These provisions, coupled with structural separation-of-powers principles, mean that the executive has no power to unilaterally withhold funding appropriated by Congress.  As this Court has put it, "[p]rotection of the public fisc is a core responsibility of the legislative branch"—not of the executive.  *Wilkins v. Gaddy*, 734 F.3d 344, 351 (4th Cir. 2013).

The Supreme Court first made this clear in 1838, unanimously rejecting the authority of the Postmaster General to withhold appropriated funding for a contract he claimed was tainted by political favoritism.  *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838).  The issue came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted . . . that his constitutional right to impound appropriated funds was absolutely clear."  *Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).  A slew of decisions "proved him wrong." *Id.*

Before long, both Congress and the executive branch joined the chorus— Congress through passage of the Impoundment Control Act of 1974, and the executive branch through a series of memoranda, including ones authored by

future Chief Justices Rehnquist and Roberts.  As Rehnquist put it while leading the Justice Department's Office of Legal Counsel (OLC), it is "*extremely difficult to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend.*"  *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310 (1969) ["Rehnquist Memo"] (emphasis added).

**II.**  Rather than face up to these principles, Defendants seek to avoid them, claiming that under *Dalton v. Specter* Plaintiffs' constitutional claims are just dressed-up statutory claims that should be channeled to the Court of Federal Claims.  However, Defendants overread *Dalton* and misunderstand Plaintiffs' separation-of-powers claim.

In *Dalton*, the Supreme Court grappled with a claim that the President had exceeded his statutorily delegated discretion in closing a naval shipyard.  In concluding that the statute granted *unbridled* discretion to the President and accordingly rejecting the plaintiffs' separation-of-powers claim, the Court clarified that "*all* executive actions in excess of statutory authority" are not "*ipso facto* unconstitutional."  *Dalton*, 511 U.S. at 472 (emphasis added).

Defendants would read that language to mean that *no* executive action in excess of statutory authority is *ever* unconstitutional.  But that is not what *Dalton* says.  Indeed, *Dalton* strongly suggests that a plaintiff may bring a constitutional

claim against the executive branch whenever a federal official violates a
constitutional prohibition, even if there is a separate question whether the
defendant also acted in excess of statutory authority. *Id.* At the same time, *Dalton*
also makes clear that a separation-of-powers claim is "fundamentally a
constitutional one," *Sierra Club v. Trump*, 929 F.3d 670, 697-98 (9th Cir. 2019),
when a plaintiff alleges that executive branch officials took an action for which
they possessed *neither* statutory nor constitutional authority, even if there is no
express constitutional prohibition on the action. *See Dalton*, 511 U.S. at 473.

Plaintiffs' separation-of-power claim fits both of these categories. Plaintiffs
assert that Defendants violated the constitutional prohibition on presidential
impoundments. In making that claim, they also allege that the executive branch
suspended or terminated their grants without *any* valid statutory or constitutional
authority. That makes this case like *Youngstown Sheet & Tube Co. v. Sawyer*, 343
U.S. 579 (1952)—the archetypal separation-of-powers case—and Defendants'
contentions that certain statutes authorized their actions do not change that.

Defendants' reading of *Dalton* would have staggering implications. It would
allow the executive branch to evade constitutional review simply by asserting that
a statute authorizes its conduct—no matter how baseless that assertion, and even
where the plaintiffs' claim squarely raises the "concern[s] of encroachment and
aggrandizement" that have consistently "animated [the Supreme Court's]

5

separation-of-powers jurisprudence and aroused [its] vigilance." *Mistretta v. United States*, 488 U.S. 361, 382 (1989). By Defendants' reckoning, the President could have avoided constitutional review in *Youngstown* simply by making a dubious claim of statutory authority for his seizure of the steel mills.

That scenario is what should give this Court pause—not Defendants' allegation that Plaintiffs' position would open the floodgates to a slew of constitutional claims. *Dalton* ensures that a claim that the President merely acted "in excess" of statutorily delegated discretion, 511 U.S. at 473—as opposed to violating a constitutional prohibition or acting without *any* statutory or constitutional authority—may not be recast as a constitutional claim. That restriction applies to a vast array of challenges to agency actions, from arbitrary-and-capricious review under the Administrative Procedure Act (APA) to petitions for review of agency decisions under the National Environmental Policy Act (NEPA). But it does not allow the executive branch to avoid separation-of-powers claims merely by claiming statutory authority for its actions.

**III.** Finally, this Court should also be wary of the implications of channeling Plaintiffs' bona fide constitutional claims into a court without jurisdiction over them. The Supreme Court has repeatedly emphasized the grave constitutional concerns that "would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster*, 486 U.S. at 603. It is thus no

surprise that rather than grapple with those concerns, Defendants seek to brush off Plaintiffs' constitutional claims altogether. This Court should not do so.

## ARGUMENT

I.    **The Constitution's Separation of Powers Prohibits Presidential Impoundment of Appropriated Funds Based on Disagreement with Congressional Policy.**

Under the Constitution, the power of the purse is "exclusive" to Congress, *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.), which "has absolute control of the moneys of the United States." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992). Plaintiffs' separation-of-powers claim seeks to enforce that principle. It challenges the executive branch's unilateral impoundment of duly appropriated funds, in contravention of constitutional text, structure, and history, as well as longstanding interpretations of that text, structure, and history by all three branches of government.

A.    **The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate that Congress Has Exclusive Power over Funding Decisions.**

"By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement," as the Founders were intimately familiar with the struggles in England over the purse strings and sought to avoid a repeat of that saga. *CFPB*,

601 U.S. at 427-31.  In the seventeenth century, British kings used their royal

prerogatives to tax and spend without the approval of Parliament, *see id.*,

antagonizing the legislature and blurring the distinction between the monarch's

pocket money and the national treasury, F.W. Maitland, *The Constitutional History*

*of England* 431-33 (1908).  After the Glorious Revolution, royal attempts to seize

the purse were finally squelched.  *See, e.g.*, *id.* at 433 ("Since the Revolution the

practice has [been,] . . . in granting money to the crown, parliament has

appropriated the supply to particular purposes more or less narrowly defined.");

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign*

*Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009) (describing Parliament's

elimination of the King's prerogative to determine how the "civil list"—the

domestic budget—would be spent).

　　In "defining the Executive powers" of the new federal government, the

American Founders firmly rejected the historic "Prerogatives of the British

Monarch."  1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand

ed., 1911) (James Wilson).  Indeed, almost every post-Independence state

constitution vested spending and appropriations authority in a legislative body.

*See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI.

Even the Articles of Confederation, despite leaving the federal government without

the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.  Articles of Confederation of 1781, art. IX, para. 6.

Against that backdrop, when the Framers drafted the new Constitution, there was no question that Congress would be granted the exclusive powers to raise, spend, and appropriate funds.  Congress's authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, *supra*, at 188 (Alexander Hamilton).  The language of this clause was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791), and the Founders were resolute in their conviction that such sweeping power should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

At the same time that they empowered Congress, the Framers limited executive authority over finances: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  Because the Appropriations Clause "is phrased as a limitation, it means that 'the expenditure of public funds is proper only when authorized by Congress, not that

9

public funds may be expended unless prohibited by Congress.'" *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quotation marks omitted).  In this manner, "[t]he Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them."  *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

Indeed, the Clause's simple and uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president."  Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 57 (2017).  As Charles Pinckney put it, "[w]ith this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments."  4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 330 (Jonathan Elliot ed., 1836).  Or in Edmund Randolph's words, the President "can handle no part of the public money except what is given him by law."  3 *id.* at 201; *see also, e.g.*, 2 *id.* at 349 (Alexander Hamilton); 3 *id.* at 17 (George Nicholas); 3 *id.* at 201 (James Madison).  These statements reflect the fundamental rule embodied in the Appropriations Clause: the President has no power over federal funds except that which is explicitly delegated by statute.

A critical corollary to this rule is that the President has no constitutional authority to, for "policy reasons, . . . spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Such authority would give the President, not Congress, the ultimate "power to decide[] how and when any money should be applied for these purposes." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213 (1833). And the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, further prohibits the executive branch from "redistribut[ing] or withhold[ing] properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Failure to execute appropriations laws in accordance with their terms thus amounts to the "effective[] repeal[]" of those laws in violation of "the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard J., dissenting); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (vacating panel decision "substantially for the reasons explained by Judge Pillard").

**B.     All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Refusing to Spend Appropriated Funds.**

**1.**  Congress manifested its understanding of the constitutional prohibition on impoundments through the passage of the Impoundment Control Act (ICA) in 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332.  Passed in the wake of Nixon's attempt to unilaterally cut billions of dollars from federal programs he disfavored, the Act prohibited the President from deferring or rescinding appropriated funds without sending a "special message" to Congress justifying the decision.  2 U.S.C. §§ 683-84.  Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions must be approved by Congress, *id.* § 683.

Notably, although the Act's procedures facilitating communication between the executive branch and Congress were new, its basic principles were merely a "reassert[ion]" of Congress's "control over the budgetary process" under the Appropriations Clause, the Spending Clause, and longstanding separation-of-powers principles.  *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).  The ICA codified the constitutional rule that the President may not impound funds without congressional approval.  *See, e.g.*, S. Rep. No. 93-688, at 73-74 (1974) (cataloging pre-ICA cases rejecting impoundments as unconstitutional, and explaining that the ICA is "consistent" with them in its rejection of the idea that federal funds can be withheld "for fiscal policy

12

purposes"). As one Representative put it, the ICA would "return to the Congress the basic powers of budgeting that were originally intended by the Founding Fathers in the Constitution." 120 Cong. Rec. 19668 (1974) (Rep. Albert Ullman); *see also, e.g.*, *id.* at 20464 (Sen. Samuel Ervin, Jr.) (The bill "is based on the assumption that the President has no power under the Constitution to impound lawfully appropriated funds in the absence of a delegation of such authority by the Congress.").

**2.**  Federal courts have also consistently construed the Constitution's separation of powers to bar executive impoundment of appropriated funds. In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Supreme Court unanimously rejected Postmaster General Amos Kendall's claim that he could withhold money that Congress had required him to spend. The Justices balked at the Attorney General's defense that the President possessed some inherent constitutional authority to rescind statutorily mandated funds, which he had in turn delegated to Kendall, remarking that "[t]o contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 525. Sanctioning such a theory would be, according to the Court, "asserting a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress." *Id.*

13

During the Nixon years and prior to the passage of the ICA, many of Nixon's impoundments were also tested in district courts across the country, where the administration argued it had "'inherent power' to impound congressionally appropriated funds," premised on Article II's Vesting and Take Care Clauses. *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243 (D.D.C. 1973). This claim was soundly rejected. Court after court held that the Appropriations Clause, Spending Clause, and broader separation-of-powers principles bar the executive from "refus[ing] to spend . . . appropriations." *Id.* at 1244; *see, e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975); *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381 (D.D.C. 1973); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973).

By the time one of these cases made it to the Supreme Court, the Nixon administration had abandoned its constitutional argument. *See Train v. City of New York*, 420 U.S. 35, 42-49 (1975). As Justice Scalia later succinctly summarized it, "our decision . . . in *Train* . . . proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

**3.**  Even the executive branch has conceded that the Constitution prohibits executive impoundment of appropriated funds based on policy disagreement with Congress.  Future Chief Justice William Rehnquist, writing in 1969 as the head of the OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."  Rehnquist Memo 309.  Rehnquist wrote that although "[i]t may be argued that the spending of money is inherently an executive function, . . . the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them."  *Id.* at 310.

Fifteen years later, future Chief Justice John Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel.  He wrote a memo seeking to "dampen any hopes that inherent constitutional impoundment authority may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse."  John G. Roberts, Jr., Memorandum for Fred F. Fielding Re: Impoundment Authority 1 (Aug. 15, 1985).  The Reagan administration OLC later

adopted Roberts's position in a formal advisory opinion, declaring that "[t]here is no textual source in the Constitution for any inherent authority to impound." *The President's Veto Power*, 12 Op. O.L.C. 128, 167 (1988).

## II. Plaintiffs Bring a Bona Fide Separation-of-Powers Claim Premised on the Executive Branch's Usurpation of Congressional Spending Authority.

As the above discussion makes clear, the Constitution's text, structure, and history prohibit the executive branch from impounding federal funds—including through the unilateral suspension or termination of grants funded by congressional appropriations based on disagreement with the congressional policies those grants further. These are "settled, bedrock principles of constitutional law." *In re Aiken County*, 725 F.3d at 259 (Kavanaugh, J.). And they are the core of Plaintiffs' separation-of-powers claim. Defendants' assertion that "plaintiffs advance no bona fide, freestanding constitutional claims," Appellants Br. 37, misconstrues both the language from *Dalton v. Specter* upon which they rely and the nature of Plaintiffs' constitutional allegations.

### A. Defendants Overread *Dalton v. Specter*.

In *Dalton v. Specter*, a group of plaintiffs challenged the President's decision to close the Philadelphia Naval Shipyard pursuant to a 1990 statute governing base closures, asserting that the President "violated the terms of the [governing statute] by accepting procedurally flawed recommendations" from other executive branch

16

officials regarding the closure of the shipyard.  511 U.S. at 474.  The Court rejected the plaintiffs' effort to convert this alleged statutory violation into a constitutional violation.  It reasoned that the plaintiffs' constitutional claim was really a claim challenging the President's "exercise [of] discretion Congress ha[d] granted him" through the governing law.  *Id.* at 476.  And critically, that law did "not *at all* limit the President's discretion."  *Id.* (emphasis added).

In rejecting the plaintiffs' constitutional claim, the Supreme Court corrected a misperception by the court below: "[o]ur cases do not support the proposition that *every* action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."  *Id.* at 472 (emphasis added).  The Court noted that its prior decisions would not have distinguished between statutory and constitutional claims "[i]f *all* executive actions in excess of statutory authority were *ipso facto* unconstitutional."  *Id*. (emphasis added).  But the Court never suggested that *no* action by the President in excess of his statutory authority may *ever* violate the Constitution.  And the Court's repeated inclusion of "*ipso facto*" and "necessarily" in its formulations demonstrate that this was intentional.

Indeed, *Dalton* makes clear that some executive actions in excess of statutory authority *do* give rise to freestanding constitutional claims.  For instance, the Court strongly suggested that a plaintiff may bring a constitutional claim

whenever an executive official violates a constitutional prohibition, even if there remains a separate question whether the defendant also acted in excess of statutory authority. *See id.* (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396-97 (1971), for the distinction between "actions contrary to [a] constitutional prohibition," and those "merely said to be in excess of the authority delegated . . . by the Congress").

*Dalton* also makes clear that plaintiffs may bring a constitutional challenge where there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given." 511 U.S. at 474 (alteration in original) (quoting *Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). A claim that the President acted in "*absence* of *any* statutory authority," in other words, is not the same as "a claim that the President acted in *excess* of such authority," *id.* at 473 (third emphasis added), particularly where that authority is completely unrestricted by statute, *id.* at 476.

Of course, a "want of [Presidential] power," *id.*, may exist even when the President defends his action on the basis that it is authorized by statute. After all, the President's authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585, so it is hardly surprising that in the face of a separation-of-powers challenge, the executive branch will often point to a statute purportedly authorizing its conduct. *See, e.g.*, *Sierra Club*, 929

18

F.3d at 696-97 (holding that although the defendants claimed "statutory authority to reprogram the [relevant] funds," the plaintiffs disputed that contention and alleged the defendants "acted in violation of constitutional separation of powers principles because [they] lack[ed] any background constitutional authority to appropriate funds—making Plaintiffs' claim fundamentally a constitutional one"). If *Dalton* means that any time an executive official invokes a statute purportedly authorizing his action, no "bona fide, freestanding constitutional claim" may lie, Appellants Br. 37, it is difficult to see how a plaintiff could *ever* articulate a colorable separation-of-powers claim.

To be sure, *Youngstown* was the rare case in which "no statutory authority was claimed" by the executive, as the Court noted in *Dalton*.  511 U.S. at 473. Rather, the President claimed only constitutional authority to seize the country's steel mills in the face of a nationwide strike.  *Youngstown*, 343 U.S. at 585-86. Given the conceded absence of any statutory authority in *Youngstown*, that decision—as the Court explained in *Dalton*—could not stand for the proposition "that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution."  *Dalton*, 511 U.S. at 473 (emphasis added).

At the same time, *Youngstown* explicitly contemplated the adjudication of some separation-of-powers claims against the backdrop of asserted statutory authority by the President.  Perhaps most notably, Justice Jackson's concurring

19

opinion elaborated on three "practical situations" in which plaintiffs "may challenge [the President's] powers" and courts must assess the scope of executive authority under the Constitution: (1) "[w]hen the President acts pursuant to an express or implied authorization of Congress," (2) "[w]hen the President acts in the absence of either a congressional grant or denial of authority," or (3) "[w]hen the President takes measures incompatible with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring).

By Defendants' account, only the second category—where Congress has not passed any pertinent statute at all—would allow for the assertion of freestanding separation-of-powers claims. That cannot be. Indeed, *Youngstown* itself did not even fall into that category. Rather, Justice Jackson analyzed the text of the relevant federal condemnation statutes and concluded that their policies were "inconsistent" with the President's seizure of the steel mills, putting President Truman's authority in the third category and his power at its lowest ebb. *Id.* at 639-40.

Even worse, Defendants' position would allow executive branch lawyers to dictate whether or not a plaintiff's constitutional claim falls into *Youngstown*'s second category—and thus, according to Defendants, whether or not courts may review that claim. To illustrate, imagine that President Truman, instead of disclaiming statutory authority for his seizure of the steel mills, had invoked some

20

law that he dubiously claimed authorized his conduct.  Or, more analogous to the present case, imagine if Truman himself did not point to that law, but his attorneys did in the course of litigation.  Under Defendants' reading of *Dalton*, that defense, even if it were ultimately rejected by the courts as a matter of statutory interpretation, would insulate from constitutional review the *exact same executive action* challenged in *Youngstown*.  Again, that cannot be.

Since *Youngstown*, the Supreme Court has confirmed that an executive branch assertion of statutory authority—requiring courts to parse the legislation and evaluate the assertion—does not negate the existence of a separation-of-powers claim.  For instance, in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), the Court resolved the merits of a claim that the President and the Treasury Secretary went "beyond their statutory and constitutional powers."  *Id.* at 667.  Unlike in *Youngstown*, in *Dames & Moore* the President "purported to act under authority of" two federal statutes, *id.* at 675, which the Court had to interpret to resolve the separation-of-powers claim, *id.* at 670-74.  The presence of the statutory dispute did not, however, nullify the plaintiffs' freestanding constitutional claim.  Although the Court ultimately resolved the statutory dispute in favor of the President and concluded that the plaintiffs did not overcome the presumption of validity conferred by *Youngstown* Category One, there was no question that the plaintiffs'

separation-of-powers claim was judicially reviewable—the plaintiffs just lost on the merits. *Id.* at 674.

Likewise, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the plaintiffs challenged the executive branch's method of counting overseas federal employees for the census, bringing claims "under both the APA and the Constitution." *Id.* at 796. The Court held that the APA claims were not viable, *id.* at 796-801, but also made explicit that this "d[id] not dispose of [the plaintiffs'] constitutional claims," *id.* at 801. Although the executive branch relied entirely on statutory authority, *id.* at 791-94, the Court resolved "[o]n the merits" the plaintiffs' claim "that the Secretary [of Commerce]'s allocation of overseas federal employees . . . violated the command of Article I, § 2, cl. 3." *Id.* at 803. Concluding that the Secretary's action was "consonant with . . . the text and history of the Constitution," the Court held that the "constitutional challenge fails on the merits." *Id.* at 806. Once again, reliance on statutory authority did not foreclose judicial review of a claim that the executive violated a constitutional prohibition.

Defendants' reading of *Dalton* boils down to an assertion that whenever there is debate about whether executive action falls into the first or third *Youngstown* category, the challenged action necessarily can only be reviewed as a statutory matter. If Defendants' argument were accepted, it would allow the executive to evade constitutional review simply by pointing to a statute—even one

that is plainly inapplicable or being misconstrued.  That is contrary to precedent

like *Franklin* and *Dames & Moore*, and it would raise serious constitutional

concerns.

It would also be perverse to read *Dalton* as demanding that troubling result

when *Dalton* itself involved no statutory or constitutional violations at all.  Other

courts have therefore recognized that *Dalton*'s scope is much narrower than

Defendants suggest.  *See, e.g.*, *Am. Forest Res. Council v. United States*, 77 F.4th

787, 797 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024) ("*Dalton*'s holding

merely stands for the proposition that when a statute entrusts a discrete specific

decision to the President and contains *no limitations* on the President's exercise of

that authority, judicial review of an abuse of discretion claim is not available."

(citation omitted)); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)

(same).

**B.    Defendants Contort Plaintiffs' Separation-of-Powers Claim.**

Not only do Defendants misconstrue *Dalton*, but they also misunderstand the

nature of Plaintiffs' separation-of-powers claim.  Unlike in *Dalton*, the claim here

is not premised on the President exceeding some delegated discretionary authority.

Rather, Count I of Plaintiffs' amended complaint alleges that the President acted

without any authority—constitutional or statutory—*and* violated the constitutional

prohibition on impoundments.  J.A. 139.

23

Specifically, Plaintiffs assert that through a series of executive orders and actions implementing those orders, the executive branch has unilaterally frozen or terminated congressionally appropriated funds based on its judgment that the grants supported by those funds do not "compl[y] with the President's policies and preferences—as distinct from Congress's." J.A. 63. The record bears out that characterization. For instance, in the Executive Order titled "Unleashing American Energy," President Trump ordered the "[t]erminat[ion]" of grants created pursuant to the Inflation Reduction Act and Infrastructure Investment and Jobs Act, requiring all agencies to "immediately pause the disbursement of funds appropriated through" those statutes pending agency review "for consistency with . . . the [President's] policy." Exec. Order No. 14,154, § 7, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Notably, none of the challenged executive orders or program-freezing actions "point[ed] to any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds based on the President's policy preferences." J.A. 139.

That is because there is no such authority. As described above, the Constitution prohibits the President from impounding appropriated funds unilaterally, and *Dalton*, *Franklin*, and *Dames & Moore* all make clear that a constitutional claim may lie when an officer violates a constitutional prohibition while acting under purported statutory authority. Moreover, as courts have

recognized, a claim may be "fundamentally a constitutional one" under *Dalton*,
*Sierra Club*, 929 F.3d at 697-98, where executive officials possess neither statutory
nor constitutional authority for their challenged actions.

That is precisely what is alleged here. Plaintiffs assert that Defendants
violated the constitutional prohibition on impoundments. They also claim these
impoundments were undertaken without *any* valid statutory or constitutional
authority, usurping Congress's power of the purse in derogation of the separation
of powers.

To be sure, because the Appropriations Clause requires that appropriations
be "made by Law," U.S. Const. art. I, § 9, cl. 7, constitutional claims challenging
impoundments of appropriated funds will often depend on whether or not the
executive branch is acting in accordance with appropriations statutes. But courts
have recognized freestanding separation-of-powers claims premised on the
Appropriations Clause even when the parties dispute whether the challenged
executive action complies with an appropriations statute. *See, e.g.*, *McIntosh*, 833
F.3d at 1175 (holding that an alleged violation of an appropriations statute would
also violate the Appropriations Clause and its "separation-of-powers limitation,"
which plaintiffs "can invoke to challenge [executive action]"); *Sierra Club v.
Trump*, 963 F.3d 874, 890 (9th Cir. 2020) (recognizing that "[u]nder *Dalton*, . . .
violations of the Appropriations Clause may give rise to viable causes of action"

25

directly under the Constitution), *vacated and remanded sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021).  In other words, the existence of a statutory dispute about an appropriations law does not foreclose a separation-of-powers claim, as Defendants would have it.

### III.    Defendants' Position Raises Serious Constitutional Problems, While Plaintiffs' Position Does Not Have the Broad Implications that Defendants Claim.

Because Defendants fixate on recasting Plaintiffs' separation-of-powers claim as a statutory claim under *Dalton*, they do not seriously contend with the implications of reading the Tucker Act to cut off all judicial review of this claim by channeling it to the Court of Federal Claims, which could not adjudicate it either, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no jurisdiction for separation-of-powers claims).  And for good reason: the Supreme Court has emphasized that a "'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."  *Webster*, 486 U.S. at 603 (citation omitted).

In case after case, the Court has refused to read statutes in the manner urged by Defendants—*i.e.*, as stripping *all* courts of jurisdiction to review constitutional claims.  *See, e.g.*, *id.* (interpreting legislation to bar adjudication of statutory challenges but not constitutional challenges); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986) (concluding that statutory bar of judicial

26

review of certain Medicare awards did not bar constitutional challenges); *Johnson v. Robison*, 415 U.S. 361, 366-67 (1974) (holding that statute making veteran benefits decisions unreviewable did not apply to certain constitutional challenges to those decisions); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (holding that a law foreclosed review of statutory violations but still considering whether litigants could bring a viable constitutional claim).

Meanwhile, Plaintiffs' understanding of *Dalton* does not invite the "recharacteriz[ation]" of any number of statutory violations as violations of the "separation of powers," as Defendants would have it.  Appellants Br. 38.  *Dalton* itself is the prototypical example.  There, the Court held that regardless of whether executive officials "compli[ed] with statutory procedures," the statute at issue "d[id] not *at all* limit the President's discretion in approving or disapproving [their] recommendations."  *Dalton*, 511 U.S. at 476 (emphasis added).  There was no allegation in *Dalton* that the President had usurped a core congressional power— just that he exceeded his delegated discretionary authority under the statute.  Indeed, there was no dispute that the statute granted some degree of discretionary authority to the President—the only question was how expansively to read that grant of discretion.  *Id.* at 475-77; *see Am. Forest Res. Council*, 77 F.4th at 797.

As another example, take *Motions Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) (per curiam).  There, the plaintiff challenged the President's

27

determination not to grant import relief to a company under a trade statute.  As in *Dalton*, the court held that the statute committed the determination to the President's discretion, and thus no separation-of-powers claim could be brought against him.  *Id.* at 1360-61.  The essence of the plaintiff's claim was, according to the court, that the President had exceeded his statutorily delegated authority, not that he had violated the Constitution or usurped a core congressional power.  *Id.*

Or imagine a statute that granted discretion to an agency to consider certain environmental effects before greenlighting infrastructure projects—not unlike NEPA.  *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1513 (2025) (under NEPA, "agencies possess discretion and must have broad latitude" to make decisions about where to draw the line when considering environmental effects).  A claim brought against the agency for failure to consider certain environmental factors would not amount to a constitutional violation—just an abuse of statutory discretion.  *See Eagle County v. Surface Trans. Bd.*, 82 F.4th 1152, 1168-69 (D.C. Cir. 2023) (describing the petitioners' purely statutory and procedural claims).  Indeed, the same could be said about the vast majority of challenges to agency actions alleged to be arbitrary and capricious under the APA.

Critically, Plaintiffs are not alleging that the executive's cancellation of grants is an act in excess of discretionary authority conferred by statutes.  They are alleging that the President acted with *no authority*, statutory or constitutional, and

28

in the process violated a specific constitutional proscription. *See, e.g.*, J.A. 139. This makes Plaintiffs' claim akin to the one in *Youngstown*.

* * *

Put simply, Plaintiffs claim that by seizing the authority to make spending decisions for himself, President Trump has encroached on Congress's exclusive power of the purse, in violation of the constitutional prohibition on impoundments. Such encroachment is precisely what the separation of powers guards against, for the Supreme Court's "separation-of-powers jurisprudence" is uniquely "focuse[d] on the danger of one branch's aggrandizing its power at the expense of another branch." *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991).

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: July 11, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the attached *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 14-point Times New Roman font.

Executed this 11th day of July, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

1A

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on July 11, 2025.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 11th day of July, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

2A