No. 25-1575

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

The Sustainability Institute, *et al.*,

Plaintiffs-Appellees,

v.

Donald J. Trump, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of South Carolina

**REPLY BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
  *Assistant Attorney General*

BRYAN P. STIRLING
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY .................................................................. 1

ARGUMENT ............................................................................................... 2

I.   The District Court Lacked Jurisdiction over Plaintiffs' Claims ............. 2

    A.   Plaintiffs Assert Essentially Contractual Claims That May
         Not Be Brought in District Court ....................................................... 2

    B.   The Challenged Actions Are Committed to Agency
         Discretion by Law .......................................................................... 13

    C.   Plaintiffs Cannot Circumvent These Limitations on Review
         by Labeling Their Claims as "Constitutional" ............................... 16

II.  The Relevant Equitable Considerations Preclude Injunctive
     Relief ................................................................................................... 24

CONCLUSION ........................................................................................... 28

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
   770 F. Supp. 3d 121 (D.D.C. 2025) ........................................... 7, 8

*Aiken County, In re,*
   725 F.3d 255 (D.C. Cir. 2013) ..................................................... 21

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) .................................................................. 8, 9

*California v. U.S. Dep't of Educ.,*
   769 F. Supp. 3d 72 (D. Mass. 2025) ............................................ 4

*City & County of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ..................................................... 21

*City of Chicago v. Sessions,*
   888 F.3d 272 (7th Cir. 2018), *vacated in part on other grounds,*
   2018 WL 4268817 (7th Cir. June 4, 2018) .................................. 21

*Collins v. Yellen,*
   594 U.S. 220 (2021) ..................................................................... 21

*Constantine v. Rectors & Visitors of George Mason Univ.,*
   411 F.3d 474 (4th Cir. 2005) ...................................................... 23

*Dalton v. Specter,*
   511 U.S. 462 (1994) ......................................................... 17, 18, 19

*Department of Educ. v. California,*
   145 S. Ct. 966 (2025) ............................................... 3, 4, 5, 8

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ..................................................................... 20

*HIAS, Inc. v. Trump,*
   985 F.3d 309 (4th Cir. 2021) ...................................................... 26

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985) ......................................................10

ii

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................14

*Maryland v. King*,
    567 U.S. 1301 (2012) ........................................................... 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................. 13

*Presidential Gardens Assocs. v. United States ex rel. Secretary*
    *of Hous. & Urb. Dev.*,
    175 F.3d 132 (2d Cir. 1999) ................................................. 12

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ........................................ 6, 7, 10, 12

*Trump v. CASA, Inc.*,
    Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (U.S. June 27, 2025) ..... 25

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
    770 F. Supp. 3d 155 (D.D.C. 2025) ....................................... 10

**U.S. Constitution:**

U.S. Const. art. I, § 8, cl. 1 ................................................ 22

U.S. Const. art. I, § 9, cl. 7 ................................................ 22

**Statutes:**

Administrative Procedure Act (APA),
    5 U.S.C. § 702 ................................................................ 9

25 U.S.C. § 13 ...................................................................14

**Legislative Material:**

An Act to Provide for Reconciliation,
    H.R. 1, 119th Cong. tit. VI (2025) ....................................... 25

## INTRODUCTION AND SUMMARY

Plaintiffs do not dispute that no statute mandates that the government fund plaintiffs' specific grants. Nor do plaintiffs identify any limitations in the relevant statutes that would constrain the agencies' discretion to reallocate funds from plaintiffs to other potential grant recipients. Rather, the only plausible basis for requiring the government to provide money to plaintiffs is the relevant grant agreements. But plaintiffs do not dispute that Congress has precluded any attempt to bring essentially contractual claims against the United States through the Administrative Procedure Act (APA). That should be enough to end this case.

There is no merit to plaintiffs' view that they can obtain an order requiring the government to comply with the terms of a grant agreement under the guise of a statutory or constitutional claim. Plaintiffs' so-called statutory claims ignore the fact that—as the stay panel recognized—only their contractual grant agreements, not any statute, could serve as a basis for their asserted right to receive funds. Similarly, although plaintiffs contend that the relevant statutes limit the agencies' discretion in some ways, they nowhere identify any limitation on the agencies' ability to pause or terminate their grants.

When plaintiffs turn to their asserted "constitutional" claim, they fare no better. The only "constitutional" claim they advance is a so-called "separation-of-powers" claim that is entirely premised on an argument that the Executive Branch has failed to comply with various statutes. Not only have plaintiffs failed to identify any statutory violation but also the Supreme Court has expressly rejected the proposition that run-of-the-mill statutory claims can be constitutionalized by invoking separation of powers. The district court's injunctions should be vacated.

## ARGUMENT

### I. The District Court Lacked Jurisdiction over Plaintiffs' Claims

#### A. Plaintiffs Assert Essentially Contractual Claims That May Not Be Brought in District Court

Plaintiffs do not dispute that the Tucker Act precludes any attempt to use the APA to bring an essentially contractual claim against the United States in district court. Nor do plaintiffs dispute that the grant agreements at issue in this case are contracts, such that any claim to enforce those agreements is a contractual claim subject to the Tucker Act's preclusive effect.

Nonetheless, after the agencies paused or terminated plaintiffs' grant funding, plaintiffs sought—and obtained—injunctions in district court

2

requiring the agency defendants to resume making grant funds available to plaintiffs. As the government explained (Gov't Br. 19-26), as the stay panel correctly held, *see* Stay Op. 3-4, and as the Supreme Court recently held in similar circumstances, *see Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam), plaintiffs' claims seeking access to their grant funds are essentially contractual claims that may not proceed in district court.

1. As explained, *see* Gov't Br. 21-22, the Supreme Court recently stayed a district-court order to make payments based on grant agreements, concluding that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted). Plaintiffs contend that the Court's decision is inapposite here, but they advance no persuasive way to distinguish the Supreme Court's reasoning.

At the outset, plaintiffs—quoting the First Circuit's, not the Supreme Court's, reasoning—contend that in *California*, "the terms and conditions of each individual grant award" were at issue, whereas this case "has nothing to do with the terms and conditions of any individual grants." Pls. Br. 36-37 (quotation omitted). But plaintiffs are wrong to perceive any difference

3

between this case and *California* in this respect. The district-court order at issue in *California* did not analyze the terms and conditions of any grant award and did not conclude that the grant awards themselves prohibited the agencies' terminations. Instead, the district court there—like the district court here—held that the agencies' actions violated the APA's requirements. *See California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 76-78 (D. Mass. 2025). And indeed, although plaintiffs state that the district court there "did *not* reach claims that agency-level policy decisions to terminate entire grant programs were substantively unlawful," Pls. Br. 36, that district court expressly emphasized its understanding that "*all*" of the relevant "grants were simply terminated" without any "individualized analysis," *California*, 769 F. Supp. 3d at 77.

Thus, the problem with the district court's order in *California* was not that it rested on any analysis of the individual grant conditions. Instead, the problem with that order was that it was an attempt to "enforce a contractual obligation," which the APA does not permit. *California*, 145 S. Ct. at 968 (quotation omitted). The same is true here.

Nor do plaintiffs make any headway when they contend that this case is different from *California* because the government here does not "contest

4

the substantive APA violations" and has thus "essentially admitted to high-level unlawful behavior." Pls. Br. 37. The problem in this case is that the district court lacked jurisdiction to consider plaintiffs' claims, and plaintiffs' insistence that their claims are meritorious is beside the point. In addition, the fact that the government was sufficiently sure of its jurisdictional objection that it elected to prompt an appealable order rather than engaging in costly litigation before a court without jurisdiction hardly constitutes a concession that plaintiffs' claims would be held to have merit if they were properly litigated. And in this respect, too, this case is no different from *California*: there, the government rested its application for emergency relief entirely on the same threshold jurisdictional arguments it advances here— and did not contest in that application the lower courts' conclusions on the merits. *See California*, 145 S. Ct. at 969 (Kagan, J., dissenting) ("Nowhere in its papers does the Government defend the legality of canceling the education grants at issue here.").

2. Plaintiffs' arguments from first principles are no more persuasive. Initially, plaintiffs insist (at 39-40) that their claims are founded on the Constitution and federal statutes, not on their grant agreements. That insistence is seemingly based on plaintiffs' view, repeated throughout their

5

brief, that the relevant statutes—and the "separation of powers"—require the agency defendants to fund grants that fall within the various statutory parameters. *See* Pls. Br. 20-22. But as plaintiffs themselves appear to concede, nothing in the relevant statutes requires the agencies to fund plaintiffs' grants specifically, rather than the myriad other potential grant projects that fit within the broad statutory parameters. *Cf.* Pls. Br. 48 (suggesting that the agencies could comply with the relevant statutes by reallocating funds from cancelled grants to fund other projects that also fit the statutory criteria).

Thus, regardless whether plaintiffs' construction of the statutes is correct, their claims necessarily go far beyond any attempt to enforce the asserted statutory requirements. Rather than seeking to require the agencies to fund grants generally, plaintiffs sought and received injunctions requiring the agencies to fund plaintiffs' grants specifically. Nothing in the relevant statutes can support that relief.

Plaintiffs' claims are thus relevantly similar to the claims at issue in *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894-95 (D.C. Cir. 1985), where the D.C. Circuit rejected a plaintiff's attempt to seek an injunction in district court enforcing an asserted contractual right to

payment. Plaintiffs attempt to distinguish that case as involving a request for "past-due payment[s]," Br. 40, but that attempted distinction does not track the D.C. Circuit's reasoning. That court did not locate the problem with the plaintiff's claim in the fact that it sought to compel the government to make past-due, rather than future required, payments. Instead, the problem with the plaintiff's claim was that the right to the "payments [wa]s created in the first instance by the contract," rather than by any statute. *See Spectrum*, 764 F.2d at 894. So too here.

An effort to force the government to comply with a statute that ostensibly requires expenditure of certain funds would look very different. Although the government disagrees with the district court's reasoning in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, 770 F. Supp. 3d 121 (D.D.C. 2025), and has appealed its decision, that court was correct to recognize that the proper remedy in a case in which the plaintiffs asserted that the relevant statutes required the government to expend the funds Congress has appropriated for grant programs was not an injunction requiring the agencies "to continue to contract with" the plaintiffs specifically. *Id.* at 154. Rather, the plaintiffs' legal theory "dictate[d] only that the Executive follow Congress's decision to spend funds" but not that

the Executive fund the plaintiffs' grants specifically. *Id.* Thus, the district court entered an injunction requiring the defendants to "make available for obligation" the appropriated funds—but not requiring the defendants to reinstate or continue to fund the plaintiffs' contracts. *Id.* at 155.

3. Plaintiffs fare no better when they contend, in reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), that their suit is properly brought in district court because the relief they seek is not "money damages" but is instead "declaratory and injunctive relief." Pls. Br. 41 (quotation omitted). The Supreme Court specifically considered and rejected that argument in *California*, noting that while "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," the "APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910) (quotation omitted). Thus, the Supreme Court did not merely "confir[m]" that *Bowen* is "undisturbed," Pls. Br. 38, but explained why it has no application in cases like this one.

The Supreme Court's reasoning flows from the fact that the APA contains two different limitations on review. First, the APA does not permit

8

the maintenance of a suit seeking "money damages." 5 U.S.C. § 702. Second, and separately, the APA does not permit the maintenance of a suit "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* Plaintiffs' arguments regarding the proper characterization of the relief they seek focus on the first of those limitations but ignore that the fundamental problem with their suit is the second.

As previously explained (Gov't Br. 26), *Bowen* did not involve contracts with the government at all. Thus, the Court in that case had no occasion to address whether the plaintiff's claim constituted an essentially contractual claim that must be brought pursuant to the Tucker Act rather than the APA. Instead, the Court's analysis focused on the distinct question whether the relief that the district court had provided constituted improper "money damages" or instead was permissible "specific relief." *Bowen*, 487 U.S. at 910 (quotation omitted).[1]

---

[1] For similar reasons, plaintiffs are wrong to invoke a recent government brief contending that certain grant-related claims brought in the Court of Federal Claims should have been brought in district court. *See* Pls. Br. 37-38. In that case, the plaintiffs had not been awarded grants, but they contended that the correct application of the relevant statute would have required the government to award them grants. *See* J.A. 2159. Thus, in that case, the plaintiffs' claims could not have been essentially contractual, because there was no contract to speak of. Instead, the arguments in the case

*Continued on next page.*

Even accepting plaintiffs' characterization of the relief they sought as "specific relief" rather than "monetary damages," it is clear that the relief is contractual. As plaintiffs themselves describe the relief, they wanted their grants to be "unfrozen," "allowing them to be reimbursed" for work performed pursuant to those grants. Pls. Br. 45. In other words, "[s]tripped of its equitable flair," plaintiffs sought one thing: they wanted "the Government to keep paying up." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025). But that is "the classic contractual remedy of specific performance." *Id.* (quoting *Spectrum Leasing Corp.*, 764 F.2d at 894). And any such "request for an order that the government 'must perform' on its contract is one that 'must be resolved by the Claims Court.'" *Id.* (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985)).

Perhaps implicitly recognizing the impropriety of the relief that they actually sought and received, plaintiffs repeatedly and incorrectly describe their requested relief as simply "enabling them to perform approved project

---

centered on the distinct question whether the relevant statute was money-mandating and thus capable of giving rise to a damages claim. *See* J.A. 2160-2161. Those arguments have no relevance here, where plaintiffs seek to enforce grant agreements.

work" or "allow[ing]" them "to pursue the projects they have committed to." Pls. Br. 43, 45. Although those descriptions may be intended to divorce the relief from plaintiffs' grant agreements, they elide the fact that the challenged agency actions in no way prohibit plaintiffs from pursuing whatever projects they wish. Instead, the government simply declined to continue paying plaintiffs for that work. And what plaintiffs actually want (and got from the district court) is relief requiring the government to continue to pay plaintiffs under their grant agreements, not merely relief forbidding the government from interfering in plaintiffs' pursuit of their chosen projects.

4. Plaintiffs further highlight the incompatibility of this suit with Congress's statutory choices when they emphasize the various ways that their suit would be unsuccessful in Congress's chosen forum. Thus, plaintiffs concede that they have not alleged "any violation or breach of their grant agreements." Pls. Br. 39. And they complain that the Court of Federal Claims could not "provide the forward-looking relief" that they seek. Pls. Br. 43-44.

But the fact that plaintiffs would be limited to bringing claims for a breach of contract and would be generally limited to receiving monetary

11

(rather than equitable) relief in the Court of Federal Claims reflects deliberate congressional choices, not a ground for evading the carefully crafted remedial scheme. Congress has determined that claims against the United States that are "founded upon a contract" should be brought pursuant to the Tucker Act, not pursuant to the APA. *Spectrum Leasing Corp.*, 764 F.2d at 893 (quotation omitted). Those suits thus cannot advance APA claims and must instead conform to the limitations that Congress has embedded in the Tucker Act.

In other words, by "creat[ing] a damage remedy for contract claims with jurisdiction limited to the Court of Claims," Congress "intended to foreclose specific performance of government contracts" and preclude APA review of such claims. *Spectrum Leasing Corp.*, 764 F.2d at 893 n.2 (quotation omitted); *see also Presidential Gardens Assocs. v. United States ex rel. Secretary of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States."). And conversely, the APA's carveout where another statute "impliedly forbids the relief which is sought" is designed to "preven[t] plaintiffs from exploiting the APA's waiver to evade

12

limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). Plaintiffs' attempt to use the APA to advance arguments and obtain relief that would be foreign to the Court of Federal Claims runs headlong into these limitations. And plaintiffs' suggestion that they should be permitted to bring this suit because they find the restricted cause of action Congress has provided for contractual claims insufficient only highlights the fundamental problems with this suit.

### B.    The Challenged Actions Are Committed to Agency Discretion by Law

Even if plaintiffs could get around the Tucker Act's preclusion of review, the district court still lacked jurisdiction over their claims because the challenged decisions to pause or terminate grants were committed to agency discretion by law. As the government explained—and as plaintiffs do not contest—the APA does not generally permit review of an agency's decisions regarding how best to allocate funds for a grant program among different potential recipients unless the relevant statute constrains the agency's discretion. *See* Gov't Br. 27-29; *see also* Pls. Br. 46-47 (agreeing that there is no APA review available if the statute provides no limitation other than "the decisionmaker's own views of what is an appropriate manner to

13

distribute funds" (quotation omitted)). Nor do plaintiffs identify any statutory provision—in any of the programs at issue in this case—that would prohibit the agencies from pausing or terminating the funding of plaintiffs' specific grants if the agencies believe that the broad statutory goals of each program could best be achieved by reallocating the funding to other grants. That failure dooms plaintiffs' claims. Without such a statutory constraint, there is no standard against which the district court could reasonably judge the agencies' decisions.

Nonetheless, plaintiffs contend that these established principles do not apply to this case, because the relevant statutes generally mandate that the funds in question must be spent for specific purposes, such as "environmental and climate justice" or "the reduction of greenhouse gas air pollution." Pls. Br. 46 (alteration and quotation omitted). But that is no different from *Lincoln v. Vigil* itself, where the funds had to be expended "'for the benefit, care, and assistance of the Indians,'" for the 'relief of distress and conservation of health.'" 508 U.S. 182, 185 (1993) (quoting 25 U.S.C. § 13). The relevant point is the one the government already made (Gov't Br. 31-32): even under plaintiffs' understanding of the statute, nothing about those mandates requires the agencies to fund plaintiffs' specific grants

14

or constrains the agencies' decisions to pause or terminate those grants. Thus, nothing about those mandates can support review of plaintiffs' challenges to such decisions. Instead, at most, those mandates might support review of claims contending that the agencies had allocated money to recipients or programs that were statutorily ineligible for funds. Plaintiffs have no response.

Plaintiffs fare no better in complaining (at 48-49) that the agencies have not reallocated funds to other projects or have terminated "entire grant programs." For one, Congress has now rescinded the unobligated funding for some of the statutory programs at issue in this case, *see infra* pp. 25-26, undermining plaintiffs' assertions that the agencies' failure to expend more funds flouted Congress's will. And regardless, plaintiffs' complaints on this score could have supported—at most—a claim that the agencies were violating a statutory mandate to expend the funds generally. But that claim could not have supported the relief that plaintiffs sought and received requiring the agencies to fund plaintiffs' grants specifically, *see supra* pp. 5-8, and plaintiffs' argument that such a claim would be reviewable does nothing to support the district court's assertion of jurisdiction over the claim that plaintiffs actually brought.

### C.    Plaintiffs Cannot Circumvent These Limitations on Review by Labeling Their Claims as "Constitutional"

1. Notwithstanding these limitations on review of essentially contractual claims, plaintiffs have contended that the district court may exercise jurisdiction over "nonstatutory review" claims asserting that the agencies' decisions to pause or terminate their grants violate various statutes or the Constitution. That is incorrect.

As explained, the Supreme Court has strictly limited the ability of plaintiffs to evade limitations on review by recasting their claims as "nonstatutory review" or "ultra vires" claims. To succeed on such a claim, a plaintiff must show that no other adequate opportunity for judicial review exists, that Congress has not foreclosed judicial review, and that the government has plainly acted in violation of a specific statutory prohibition. Plaintiffs' claims here fail at each step. *See* Gov't Br. 32-37.

In response, plaintiffs have developed no argument that their asserted ultra vires claims can meet these demanding standards. Instead, plaintiffs contend that those standards apply only to ultra vires claims alleging a statutory violation—and thus do not apply to their purportedly freestanding "constitutional claims." Pls. Br. 32-34 (emphasis omitted). In this way, plaintiffs have effectively abandoned the ultra vires claims that they

16

previously—and successfully—advanced based on purported statutory violations. *Cf.* J.A. 147-148 (advancing an "ultra vires" claim for violation of "the [Inflation Reduction Act] and the [Infrastructure Investment and Jobs Act] and other relevant statutes" (formatting altered)); J.A. 14 (concluding that plaintiffs were likely to succeed on their ultra vires claims because the agencies had failed to faithfully execute "the laws of the United States"). And plaintiffs' ability to assert their ultra vires claims now hinges on the proposition that they constitute bona fide, freestanding constitutional claims.

Plaintiffs assert that those claims are based on the "separation of powers" because, in plaintiffs' view, the agencies' actions "stand in direct opposition to what Congress mandated" in the relevant statutes. Pls. Br. 22-23. But as Supreme Court precedent makes clear, such claims that an official has acted in opposition to a statute are statutory claims—not "'constitutional claims' that can be asserted through a direct cause of action." Gov't Br. 37-38 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)) (quotation omitted).

2. In response, plaintiffs contend that *Dalton* does not apply to their claims because—in plaintiffs' view—*Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that

17

authority, judicial review of an abuse of discretion claim is not available." Pls. Br. 30 (quotation omitted).

*Dalton* does stand for that proposition, but it also held, as plaintiffs acknowledge, "that not 'all executive actions in excess of statutory authority' are 'necessarily,' '*ipso facto*' constitutional violations." Pls. Br. 30 (quoting *Dalton*, 511 U.S. at 472-73). That holding was entirely distinct from the holding about judicial review for abuse of discretion; the Court's analysis about actions in excess of statutory authority would have no relevance in a circumstance where there was no statutory limitation on the President's authority.

Rather, the two holdings came in two separate portions of the Court's decision. The first holding, relevant here, responded to the plaintiffs' effort to avoid Supreme Court precedent holding that APA claims may not be asserted against the President by asserting that their claims had "a constitutional aspect" that was "grounded in the separation of powers." *Dalton*, 511 U.S. at 471 (quotation omitted). The Supreme Court emphatically rejected that argument—the argument that plaintiffs repeat here—holding that "claims simply alleging that" an official "has exceeded his statutory authority are not 'constitutional' claims" that may be brought in a

freestanding manner. *Id.* at 473-74. Studiously policing the line between statutory and constitutional claims is important, the Court explained, to ensure that the exception permitting judicial review of constitutional claims in equity is not "broadened beyond recognition." *Id.* at 474.

The passage on which plaintiffs rely to describe what the Supreme Court "merely" held came in the Court's response to the plaintiffs' back-up statutory claim. In addressing that claim, the Supreme Court "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." *Dalton*, 511 U.S. at 474. But, the Court continued, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* Thus, because the statute at issue in *Dalton* did not "limit the President's discretion," the Court held that no equitable statutory claim could be advanced. *Id.* at 476.

Nor are plaintiffs correct when they briefly contend that their claim is similar to the "constitutional claim specifically sanctioned by *Dalton*"— where "the Executive acts in the absence of any statutory authority whatsoever," Pls. Br. 31-32 (quotation omitted). Plaintiffs nowhere contest that the relevant statutes provide the agencies with discretion to pause or

19

terminate funding—indeed, to the contrary, plaintiffs seem to concede (as

explained, *see supra* pp. 5-6) that the statutes would leave the agencies free

to terminate plaintiffs' specific grants in order to reallocate funding to other

recipients whose projects fit the statutory criteria. Instead, plaintiffs'

fundamental claim is that the agencies exercised that statutory authority

here for the wrong reasons. And that is, again, a statutory—not a

constitutional—claim.

3. The cases on which plaintiffs rely for the proposition that they may

advance freestanding separation-of-powers claims further illustrate the point

by highlighting the distinction between a true separation-of-powers claim

and a statutory claim dressed up as one. Pls. Br. 25. For example, in *Free

Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477,

487 (2010), the plaintiffs contended that provisions of the Sarbanes-Oxley Act

violated the Constitution by "conferring wide-ranging executive power on"

members of the Public Company Accounting Oversight Board "without

subjecting them to Presidential control." That claim turned not on whether

the Board was violating any statute, but on whether the statutory basis for

the Board's independence violated Article II of the Constitution.

20

The same was true in *Collins v. Yellen*, 594 U.S. 220, 235 (2021), where the plaintiffs claimed that the statute providing the Director of the Federal Housing Finance Agency for-cause removal protection violated Article II of the Constitution. Again, the plaintiffs' claim in that case did not rest on whether the defendant officials had violated a statute but instead on whether the statutory framework violated the Constitution.

And although plaintiffs cite (at 24-25) other cases where courts described claims that agencies acted in excess of statutory authority as implicating the separation of powers, nothing in those cases turned on—and the courts thus had no occasion to address the question—whether the claims were properly understood as statutory or as freestanding constitutional claims. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018); *City of Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018). And although plaintiffs cite *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), the claim in that case was a simple statutory claim that the agency had failed "to perform a statutorily mandated activity"; nothing about the petitioners' claim there was constitutional. *See id.* at 259-61.

4. Finally, plaintiffs' last-ditch efforts to avoid the import of *Dalton*—which, again, establishes that plaintiffs' purported ultra vires claims are statutory, not constitutional, claims of the kind that plaintiffs effectively concede they may not bring—are unpersuasive.

Plaintiffs briefly contend that the government's position would "write the Spending and Appropriations Clauses of the Constitution out of existence," by allowing those "core constitutional pillars" to "be freely violated if Congress has expressed its authority via statutory text." Pls. Br. 29. That argument is difficult to understand. The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. If the Executive Branch attempted to expend funds from the Treasury that had not been appropriated, it would violate the Appropriations Clause. But that has nothing to do with this case. The Spending Clause is a grant of authority to Congress to spend money to promote the general welfare, and it is difficult to fathom how the Executive Branch could violate it. *See id.* art. I, § 8, cl. 1.

And of course nothing in the government's position here suggests that the Executive Branch is free to disregard duly enacted statutes. If the Executive Branch is violating a statute, plaintiffs may well have a successful

statutory claim for relief—as, for example, in *Aiken County*. The import of *Dalton* is simply that plaintiffs may not constitutionalize that statutory claim to evade whatever restrictions Congress has placed on judicial review.

Nor are plaintiffs correct to argue (at 29 n.3) that the government has forfeited its argument based on *Dalton* by failing to raise it in district court. For one, as plaintiffs seem to recognize, the question whether plaintiffs' claim is properly characterized as constitutional goes to the courts' jurisdiction. *See* Pls. Br. 29 (describing the relevant questions as "jurisdictional issues"). If plaintiffs' claim is merely statutory, then the Tucker Act's and APA's jurisdictional limitations preclude review, as explained. *See* Gov't Br. 35-36; *see also supra* pp. 16-17. Therefore, the government's arguments on this score cannot be waived. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005).

Regardless, in district court, plaintiffs did not contend until their reply brief—at the earliest—that the purportedly constitutional nature of their claims exempted those claims from the ordinary limitations on judicial review. *Cf.* Dkt. No. 24-1, at 14-19 (advancing "separation of powers" claims without any discussion of the implications for the standard of review or the Court's jurisdiction). And even then, plaintiffs did not draw a sharp

distinction between their statutory and constitutional ultra vires claims. *See* Dkt. No. 64, at 2-4 (contending on reply that their ultra vires claims are not subject to the Tucker Act's preclusion of review). The government can hardly be faulted for failing to anticipate plaintiffs' late-breaking attempt to evade restrictions on review by emphasizing the purportedly freestanding constitutional aspect of their claims.

## II.    The Relevant Equitable Considerations Preclude Injunctive Relief

As explained, the district court's injunctions inflict severe harm on the government and the public, both by requiring the government to expend substantial funds that it may never recover and by undermining the elected Executive's ability to implement core policy objectives. *See* Gov't Br. 38-40. Plaintiffs have no persuasive response.

At the outset, plaintiffs contend (at 52-53) that the government fails to substantiate its claimed monetary harm. But plaintiffs do not dispute that the entire point of the injunctions they sought is to allow them to access grant funds from the government. And plaintiffs do not represent that they would repay any funds disbursed if the government ultimately prevails on appeal. To the contrary, plaintiffs' own assertions of harm rest on the premise that plaintiffs are sufficiently insolvent that they require immediate access to

the funds to continue running their projects. *See* Pls. Br. 50-52. Against that backdrop, the government's financial injuries are clear and wholly supported by the record.

Next, plaintiffs attempt to brush aside the severe harm that the district court's injunction inflicts on the Executive Branch's ability to implement core policies by contending that *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), only recognizes such harm in the context of injunctions against legislative action. But the Supreme Court has recently made clear that those same principles apply in the context of injunctions against the Executive Branch. *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631, at *15, (U.S. June 27, 2025).

And indeed, Congress has recently rescinded all unobligated funds previously made available for two of the grant programs at issue in this case, Environmental and Climate Justice Grants and Greenhouse Gas Air Pollution Plans and Implementation Grants. *See* An Act to Provide for Reconciliation, H.R. 1, 119th Cong. tit. VI (2025) (enacted); *cf.* J.A. 2125-2128. Thus, to the extent that the injunctions require the government to continue funding plaintiffs' grants even though Congress has now expressed a desire

to curtail those programs, the injunctions also undermine Congress's policy choices in addition to the Executive Branch's.

Nor, contrary to plaintiffs' contention (at 53), did the government forfeit these arguments in district court. In opposing plaintiffs' motion for a preliminary injunction, the government explained that such relief would "negatively impac[t] the public interest" by undermining the Executive's ability to exercise the "control of these grant programs" that Congress has "vested by statute" in the agencies. Dkt. No. 56, at 35.

Against those severe harms to the public and the government, plaintiffs cannot demonstrate any substantial countervailing irreparable harm, because plaintiffs may seek any funds to which they are entitled in an appropriate forum. Plaintiffs contend that they will experience various non-monetary harms without injunctive relief, such as the inability "to perform the essential work to serve their communities" and the need to lay off employees. Pls. Br. 51-52. But all of those asserted harms are simply downstream consequences of plaintiffs' inability to access funds, and those harms are properly remediable through monetary damages in the appropriate forum. For that reason, plaintiffs' citation (at 51) to *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021), is inapposite. In *HIAS*, there was

26

no suggestion that the plaintiffs could bring contractual claims seeking damages. Without that option, their intangible harms may have been irreparable, but nothing about that conclusion supports' plaintiffs suggestion that damages are an inadequate remedy here.

Finally, and in any event, the district courts' injunctions are particularly unsupported insofar as they require the Executive Branch to seek preapproval from the district court before terminating or pausing plaintiffs' grants in the future. *See* Gov't Br. 40-41. Plaintiffs have no reasonable defense of this provision; instead, they primarily contend that the preclearance regime is reasonable because the district court stated that it would "promptly allow legitimate and lawful terminations." Pls. Br. 54 (quotation omitted). But the fact that district court may, in its grace, permit the Executive Branch to exercise its Article II authorities in the future cannot ameliorate the severe harm occasioned by the district court's attempt to superintend the exercise of those authorities on an ongoing basis. And although plaintiffs claim that the preclearance regime is appropriate in this case because the government has assertedly violated court orders "in other cases," *id.*, plaintiffs make no attempt to explain how those purported

27

violations in other district courts in unrelated cases—even if they could be substantiated—could justify the extreme relief entered here.

## CONCLUSION

For the foregoing reasons and those in the government's opening brief, the judgment and injunctions of the district court should be vacated, and the case should be remanded with instructions to dismiss for lack of jurisdiction.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRYAN P. STIRLING
  *United States Attorney*

DANIEL TENNY

 *s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

July 2025

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of
Appellate Procedure 32(a)(7)(B) because it contains 5645 words. This brief
also complies with the typeface and type-style requirements of Federal Rule
of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for
Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced
typeface.

*s/ Sean R. Janda*
Sean R. Janda